# 24-961

*To Be Argued By:*
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖❖

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ZIXIAO GARY WANG, CAROLINE ELLISON, NISHAD SINGH, RYAN SALAME,

*Defendants,*

FTX TRADING LTD., WEST REALM SHIRES INC,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors,*

SAMUEL BANKMAN-FRIED, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

ALEXANDRA A.E. SHAPIRO
THEODORE SAMPSELL-JONES
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... v

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 4

ISSUES PRESENTED ........................................................................... 4

STATEMENT OF THE CASE ............................................................... 5

      A.    Background ...................................................................... 5

            1.  FTX ....................................................................... 5

            2.  Alameda ............................................................... 9

            3.  2022 Collapse .................................................... 11

      B.    Government Case ........................................................ 13

      C.    Defense Case .............................................................. 16

      D.    Summations ................................................................. 19

      E.    Sentencing .................................................................. 20

SUMMARY OF ARGUMENT ............................................................. 20

STANDARDS OF REVIEW ................................................................ 22

ARGUMENT ....................................................................................... 22

    I.    THE DISTRICT COURT ERRONEOUSLY ALLOWED THE
        PROSECUTION TO PRESENT EVIDENCE OF LOSS WHILE
        EXCLUDING CONTRARY DEFENSE EVIDENCE ......................... 22

      A.    Background .................................................................. 23

          1.   Motion to Dismiss ........................................................23

          2.   Evidentiary Rulings .....................................................24

          3.   Trial Evidence .............................................................26

    B.   The Exclusion Of Defense Evidence On Loss Was Legally Erroneous And Violated Due Process ...............................28

          1.   The Excluded Evidence Was Relevant ......................28

          2.   The Defense Had A Right To Respond To Prosecution Evidence On Loss...................................................31

          3.   The Error Requires Retrial .........................................33

II.   THE DISTRICT COURT ILLEGALLY BARRED EVIDENCE THAT BANKMAN-FRIED RELIED ON COUNSEL ..........................36

    A.   Background ....................................................................37

          1.   Advice-Of-Counsel ....................................................37

          2.   Government's Discovery Demands ............................38

          3.   The Government's Motion In Limine ........................39

          4.   Defense Proffer And Preview Deposition .................39

          5.   The Exclusion Of Bankman-Fried's Testimony .......41

    B.   The District Court Lacked Authority To Require Disclosure Or The Preview Hearing ..................................................43

    C.   There Was No Legal Basis To Exclude The Evidence ...................47

    D.   Excluding The Evidence Unfairly Prevented Bankman-Fried From Rebutting The Prosecution's Lawyer-Witness .......................50

    E.   The Jury Instructions On Advice-Of-Counsel Misstated The Law...............................................................................51

ii

F.    The Errors Require A New Trial ...................................................52

III.  THE SCIENTER INSTRUCTIONS ERRONEOUSLY LOWERED
THE GOVERNMENT'S BURDEN .........................................................55

    A.    The Jury Instructions Omitted The Requirement Of Intent To
Cause Loss .........................................................................................55

        1.   Background ...............................................................................55

        2.   The Instructions Misstated The Law .........................................56

    B.    Additional Errors In The Good Faith And Willfulness
Instructions Further Gutted The Scienter Requirements.................59

        1.   Background ...............................................................................59

        2.   The Willfulness Instructions Were Erroneous .........................60

    C.    The Errors Require Retrial ...............................................................61

IV.  THE DISTRICT COURT ERRONEOUSLY REFUSED TO
ORDER DISCOVERY FROM THE FTX DEBTORS AND THEIR
COUNSEL, WHO WERE AN ARM OF THE PROSECUTION...........65

    A.    Background .......................................................................................67

        1.   Appointment of Ray And S&C ................................................67

        2.   The Government Deputizes The Debtors..................................68

        3.   Defense Motion ........................................................................71

    B.    The Debtors And Their Counsel Functioned As Members Of
The Prosecution Team.......................................................................73

    C.    The Court Should Reverse And Remand .........................................75

V.   THE FORFEITURE MONEY JUDGMENT WAS UNLAWFUL .........78

    A.    Background .......................................................................................78

B.   The Statutes Do Not Authorize Money Judgments.........................79

C.   Section 981(a)(1)(C) Does Not Authorize Forfeiting Investor
     And Lender Money ..............................................................80

D.   The Forfeiture Was Unconstitutional...............................................82

VI.  ON REMAND, THE CASE SHOULD BE REASSIGNED TO A
     DIFFERENT JUDGE ...............................................................83

CONCLUSION ........................................................................87

# TABLE OF AUTHORITIES

**Cases**                                         **Page(s)**

*Brady v. Maryland*,
373 U.S. 83 (1963)................................................................78

*Brooks v. Tennessee*,
406 U.S. 605 (1972)..............................................................45

*Bryan v. United States*,
524 U.S. 184 (1998)..............................................................60

*Chapman v. California*,
368 U.S. 18 (1967)................................................................33

*Ciminelli v. United States*,
598 U.S. 306 (2023)........................................................22, 57

*Crane v. Kentucky*,
476 U.S. 683 (1986)..............................................................52

*Dubin v. United States*,
599 U.S. 110 (2023)..............................................................79

*Hammerschmidt v. United States*,
265 U.S. 182 (1924)..............................................................28

*Howard v. S.E.C.*,
376 F.3d 1136 (D.C. Cir. 2004) ..............................38, 48, 51

*In re: FTX Trading Ltd.*,
91 F.4th 148 (3d Cir. 2024) ..................................................68

*Kelly v. United States*,
590 U.S. 391 (2020)..................................................28, 30, 57

*Koon v. United States*,
518 U.S. 81 (1996)................................................................22

*Kyles v. Whitley*,
    514 U.S. 419 (1995)..................................................................73

*Martin v. Ohio*,
    480 U.S. 228 (1987)..................................................................37

*Neder v. United States*,
    527 U.S. 1 (1999)...............................................................53, 62

*Old Chief v. United States*,
    519 U.S. 172 (1997)..................................................................49

*Pasquantino v. United States*,
    544 U.S. 349 (2005)..................................................................28

*Pfizer, Inc. v. H.H.S.*,
    42 F.4th 67 (2d Cir. 2022) ......................................................61

*Ratzlaf v. United States*,
    510 U.S. 135 (1994)..................................................................60

*Taylor v. Illinois*,
    484 U.S. 400 (1988)..................................................................32

*United States ex rel. Hart v. McKesson Corp.*,
    96 F.4th 145 (2d Cir. 2024) ....................................................61

*United States v. Abu-Jihaad*,
    630 F.3d 102 (2d Cir. 2010)....................................................29

*United States v. Afremov*,
    2007 WL 2475972 (D. Minn. Aug. 27, 2007) ........................44

*United States v. Bajakajian*,
    524 U.S. 321 (1998)..................................................................82

*United States v. Barcelo*,
    628 F. App'x 36 (2d Cir. 2015) ..............................................74

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990)....................................................32

*United States v. Blum*,
   62 F.3d 63 (2d Cir. 1995) ..................................................................33

*United States v. Blumberg*,
   2:14-cr-00458-JLL, ECF 113 (D.N.J. June 7, 2019) ........................76

*United States v. Bradley*,
   105 F.4th 26 (2d Cir. 2024) ........................................................22, 73

*United States v. Brandt*,
   196 F.2d 653 (2d Cir. 1952) ..............................................................32

*United States v. Brutus*,
   505 F.3d 80 (2d Cir. 2007) ................................................................64

*United States v. Bryan*,
   393 F.2d 90 (2d Cir. 1968) ................................................................87

*United States v. Connolly*,
   2019 WL 2120523 (S.D.N.Y. May 2, 2019) ......................................75

*United States v. Contorinis*,
   692 F.3d 136 (2d Cir. 2012) ........................................................22, 81

*United States v. Dinome*,
   86 F.3d 277 (2d Cir. 1996) ................................................................57

*United States v. Dove*,
   916 F.2d 41 (2d Cir. 1990) ................................................................64

*United States v. Espy*,
   1996 WL 560354 (E.D. La. Oct. 2, 1996) ........................................44

*United States v. Fortunato*,
   402 F.2d 79 (2d Cir. 1968) ................................................................30

*United States v. Gabriel*,
   125 F.3d 89 (2d Cir. 1997) ................................................................57

*United States v. Gluk*,
   831 F.3d 608 (5th Cir. 2016) ............................................................81

vii

*United States v. Gramins*,
    939 F.3d 429 (2d Cir. 2019).................................................29, 31, 32

*United States v. Guadagna*,
    183 F.3d 122 (2d Cir. 1999)................................................................29

*United States v. Hartsock*,
    347 F.3d 1 (1st Cir. 2003)...................................................................37

*United States v. Hatfield*,
    2010 WL 1685826 (E.D.N.Y. Apr.21, 2010) ...................................81

*United States v. Hunter*,
    32 F.4th 22 (2d Cir. 2022) ....................................................73, 74, 77

*United States v. Kaiser*,
    609 F.3d 556 (2d Cir. 2010)................................................................61

*United States v. Kilroy*,
    523 F. Supp. 206 (E.D. Wis. 1981)....................................................76

*United States v. Kopstein*,
    759 F.3d 168 (2d Cir. 2014)................................................................22

*United States v. Kosinski*,
    976 F.3d 135 (2d Cir. 2020).........................................................60, 61

*United States v. Kukushkin*,
    61 F.4th 327 (2d Cir. 2023) .........................................................60, 61

*United States v. Lacour*,
    2008 WL 5191596 (M.D. Fla. Dec. 10, 2008)...................................44

*United States v. Lange*,
    834 F.3d 58 (2d Cir. 2016)..................................................................58

*United States v. Levesque*,
    546 F.3d 78 (1st Cir. 2008).................................................................82

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015).........................................................22, 29, 33

*United States v. Meredith*,
2014 WL 897373 (W.D. Ky. Mar. 5, 2014) ........................................43

*United States v. Mittelstaedt*,
31 F.3d 1208 (2d Cir. 1994).............................................................31

*United States v. Nejad*,
933 F.3d 1162 (9th Cir. 2019) ..........................................................80

*United States v. Ortiz-Rengifo*,
832 F.2d 722 (2d Cir. 1987).............................................................31

*United States v. Padilla*,
186 F.3d 136 (2d Cir. 1999).............................................................83

*United States v. Parks*,
2022 WL 2916080 (N.D. Okla. July 25, 2022) ..................................43

*United States v. Quattrone*,
441 F.3d 153 (2d Cir. 2006).................................................29, 62, 83

*United States v. Ray*,
2021 WL 5493839 (S.D.N.Y. Nov. 22, 2021) .....................................44

*United States v. Regent Office Supply Co.*,
421 F.2d 1174 (2d Cir. 1970)...........................................................28

*United States v. Rhodes*,
229 F.3d 659 (7th Cir. 2000) ...........................................................31

*United States v. Risha*,
445 F.3d 298 (3d Cir. 2006).............................................................76

*United States v. Robin*,
553 F.2d 8 (2d Cir. 1977).................................................................87

*United States v. Rossomando*,
144 F.3d 197 (2d Cir. 1998).............................................................58

*United States v. Santos*,
553 U.S. 507 (2008).........................................................................81

ix

*United States v. Scully,*
    877 F.3d 464 (2d Cir. 2017)................................................................passim

*United States v. Sindona,*
    636 F.2d 792 (2d Cir. 1980)...................................................................30

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020)................................................................................85

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987).....................................................................28

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006)...................................................................74

*United States v. Stewart,*
    907 F.3d 677 (2d Cir. 2018)............................................................33, 34

*United States v. Surgent,*
    2009 WL 2525137 (E.D.N.Y. Aug. 17, 2009)........................................80

*United States v. Torres,*
    604 F.3d 58 (2d Cir. 2010).....................................................................60

*United States v. Viloski,*
    814 F.3d 104 (2d Cir. 2016)...................................................................82

*United States v. White,*
    692 F.3d 235 (2d Cir. 2012)...................................................................29

*United States v. Wilkerson,*
    388 F. Supp. 3d 969 (E.D. Tenn. 2019).............................................43, 44

*Wardius v. Oregon,*
    412 U.S. 470 (1973)................................................................................45

## Rules

Fed. R. Crim. P. 12.1 ..................................................................................43

Fed. R. Crim. P. 12.2 ..................................................................................43

x

Fed. R. Crim. P. 12.3 ................................................43

Fed. R. Crim. P. 15 ..................................................45

Fed. R. Crim. P. 16 .............................................71, 73

Fed. R. Crim. P. 17 ..................................................73

Fed. R. Evid. 401 ..............................................passim

Fed. R. Evid. 402 ....................................................48

Fed. R. Evid. 403 .........................................36, 48, 49

**Statutes**

7 U.S.C. §13 ..........................................................60

15 U.S.C. §78ff ......................................................60

18 U.S.C. §656 .......................................................30

18 U.S.C. §981 ..............................................79, 80, 81

18 U.S.C. §982 ..............................................79, 80, 81

18 U.S.C. §1343 ......................................................30

18 U.S.C. §3231 ........................................................4

18 U.S.C. §3500 ......................................................71

28 U.S.C. §1291 ........................................................4

28 U.S.C. §2461 ......................................................79

**Other Authorities**

3 Mueller & Kirkpatrick,
   *Federal Evidence* §6:89 (4th ed. & 2023 update) ................31

Jonathan Lipson & David Skeel,
  *FTX'd: Conflicting Public and Private Interests in Chapter 11*,
  Stan. L. Rev. (forthcoming 2024), *available at*
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4760736 ..........................68

Sarah Patterson,
  *Co-Opted Cooperators: Corporate Internal Investigations and* Brady v.
  Maryland, 2021 Colum. Bus. L. Rev. 417 (2021) ...............................................77

## INTRODUCTION

In the United States, people accused of crimes are presumed innocent unless and until proven guilty beyond a reasonable doubt. They are entitled to a fair trial by a jury. When the government introduces evidence, defendants have the right to rebut that evidence and present their side of the story.

That, at least, is how it's supposed to work. But none of that happened here. Fair trial principles were swept away in a "Sentence first-verdict afterwards" tsunami, as everyone rushed to judgment following FTX's collapse. Sam Bankman-Fried was never presumed innocent. He was presumed *guilty*—before he was even charged. He was presumed guilty by the media. He was presumed guilty by the FTX debtor estate and its lawyers. He was presumed guilty by federal prosecutors eager for quick headlines. And he was presumed guilty by the judge who presided over his trial.

From day one, the prevailing narrative—initially spun by the lawyers who took over FTX, quickly adopted by their contacts at the U.S. Attorney's Office— was that Bankman-Fried had stolen billions of dollars of customer funds, driven FTX to insolvency, and caused billions in losses. Now, nearly two years later, a very different picture is emerging—one confirming FTX was never insolvent, and in fact had assets worth billions to repay its customers. But the jury at Bankman-Fried's trial never got to see that picture.

The trial errors start with loss.  Although actual loss is not required to prove fraud, intent to cause loss *is* required.  Yet the district court ruled that whether Bankman-Fried intended to steal his customers' money was "immaterial as a matter of law."  It then prohibited him from introducing evidence that FTX and Alameda (his hedge fund) were solvent and that he believed there were sufficient assets to cover customer withdrawals.  But whether evidence was "material" apparently depended on who was offering it, because the district court simultaneously allowed the government to offer evidence of loss.  The government thus presented a false narrative that FTX's customers, lenders, and investors had permanently lost their money.  The jury was only allowed to see half the picture.

The picture was further distorted by rulings gutting another critical defense. Bankman-Fried would have testified that he relied in good faith on lawyers' participation in certain business practices the government criticized—had he been allowed to do so.  But he was not.  In an unprecedented proceeding, the district court compelled him to sit for a pre-testimony deposition about the involvement of lawyers.  It then permitted a prosecutor to conduct cross-examination going way beyond the supposed purpose of this preview hearing.  And it ultimately refused to allow Bankman-Fried to testify about most of the proffered topics during trial, ostensibly because of "the potential harm to the public interest in creating a misleading impression."  In other words, the judge didn't credit the testimony, so

he didn't allow the jury to hear it.  But defendants have a right to tell the jury their side of the story without having to first persuade the judge to believe them.  If their testimony is *admissible*, it's up to the jury to decide whether it's *true*.

The proceedings were tainted by other errors too.  The FTX Debtors and their counsel worked hand-in-glove with the prosecutors to charge and imprison Bankman-Fried, in ways that far exceeded normal "cooperation."  This enabled the government to claim it didn't possess potentially exculpatory information and thereby evade its *Brady* and other discovery obligations.  Yet the district court summarily refused to order discovery, or even a hearing to determine whether the Debtors and their counsel were an "arm of the prosecution."  And its crippling forfeiture order—imposed on top of a draconian 25-year sentence—was unauthorized by statute and unconstitutional.

Throughout the proceedings the district court made little pretense of objectivity or even-handedness.  In addition to eviscerating Bankman-Fried's defenses, the judge repeatedly made biting comments undermining the defense and defense counsel, even deriding the defendant's own testimony during the preview hearing and in front of the jury.

The judgment should be reversed, and the case remanded for a new trial before a different judge.

3

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. Judgment was entered on March 29, 2024. SPA-96. Bankman-Fried filed a notice of appeal on April 11, 2024. A-1311. This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1.     Whether rulings permitting the government to introduce evidence misleadingly suggesting alleged victims had permanently lost their money, while excluding contrary defense evidence, deprived Bankman-Fried of a fair trial.

2.     Whether compelling Bankman-Fried to preview his testimony and submit to a deposition by the prosecutor and then precluding defense evidence that he relied on counsel, together with erroneous jury instructions on advice of counsel, deprived Bankman-Fried of a fair trial.

3.     Whether erroneous jury instructions on scienter deprived Bankman-Fried of a fair trial.

4.     Whether Bankman-Fried was erroneously deprived of *Brady* material and Rule 16 and other discovery controlled by the FTX Debtors and their counsel.

5.     Whether the forfeiture money judgment was unlawful.

6.     Whether the case should be remanded to a new judge.

4

## STATEMENT OF THE CASE

### A.     Background

Sam Bankman-Fried was indicted on charges arising from FTX's collapse. The indictment alleged that, while leading FTX and Alameda, he deceived customers, lenders, and investors and stole their money.  He was tried in the Southern District of New York before the Honorable Lewis A. Kaplan.  On November 2, 2023, a jury convicted Bankman-Fried of two wire fraud conspiracy counts, two wire fraud counts, one count each of securities fraud conspiracy and commodities fraud conspiracy, and one money laundering conspiracy count.  A-1218-19.

#### 1.     FTX

The alleged scheme involved FTX Trading, Ltd. and its exchange, FTX.com ("FTX").  Unlike its domestic counterpart—FTX.us—FTX.com was based outside the United States and had no U.S. customers.  A-699-701, A-1018.

Bankman-Fried and Gary Wang founded FTX in 2019.  A-990, A-716.  FTX was designed to be a cryptocurrency futures exchange combining the best elements of "traditional financial products" with the best and most innovative elements of the "crypto ecosystem."  A-990.

FTX adopted two features that were standard on traditional exchanges for non-crypto assets, but not available on U.S.-based crypto exchanges like Coinbase.

5

First, it allowed customers to trade crypto derivatives such as futures. A-705-06. In a spot trade a customer purchases or sells an asset like bitcoin. A-703-04. By contrast, futures trading involves purchasing or shorting a futures contract—a derivative financial instrument in which parties agree to buy or sell an asset at a specific price in the future. A-1002-03, A-827-28, A-689-90, A-714-716. The investment's value is contingent on whether the future price of the underlying asset ends up higher or lower than the price when the future was purchased. A-689-90, A-715-16. The ability to trade derivatives was a key feature on FTX, and derivatives became its most popular financial product. A-689-91, A-714-15.

Second, like other non-U.S.-based crypto exchanges, FTX allowed customers to trade on margin, i.e., by borrowing funds from the exchange. Whereas U.S.-based competitors allowed customers to purchase and sell assets dollar-for-dollar, A-703-704, FTX's margin feature allowed customers to increase and leverage their positions through spot margin borrowing and lending.

One innovative feature of FTX was "cross-margining," which allowed customers to rely on their overall assets and liabilities on the exchange—in whatever currencies—to margin trade other assets on the exchange. A-1004-05, A-999-1001. For example, a customer could deposit $100 of bitcoin to immediately trade $1,000 of bitcoin, or to trade other assets on the exchange, such as $1,000 of ether. A-704. These margin features meant FTX was not merely a

6

trading platform; it was a finance platform as well, offering lending services and operating as a "prime broker."  A-993-94, A-1222.

FTX's innovations gave retail customers access to a variety of sophisticated trading strategies that were previously available only to hedge funds and institutional investors.  These innovations were incredibly popular.  FTX became "predominantly a margin exchange," and the "vast majority of [trading] activity happened on margin on FTX."  A-991.  About 80% of assets had the margin feature enabled, by customers' election.  A-881, A-1298-99.

That popularity led to explosive and unprecedented growth.  FTX grew from an average daily trading volume of a few million in 2019, to hundreds of millions in 2020, to $10-$15 billion in 2022 across six million different user accounts.  A-1011, A-770-71.  In that time, the company grew from just two employees to about 350.  A-702-03, A-756-57.

\* \* \* \*

FTX's trading features also posed increased risks.  On any exchange that allows both margin and derivatives trading, the notional value of positions could significantly exceed the value of underlying collateral, for individual customer accounts and across the exchange as a whole.  FTX disclosed these risks to customers in its terms of service and elsewhere.  A-1232-34, A-1246-47.

7

FTX also developed a risk engine to mitigate risks. FTX's risk engine monitored customer accounts against the market 24/7 and could automatically liquidate customer positions when necessary if an account fell below specified margin requirements. A-1004-05, A-1012, A-705, A-718-20, A-728, A-835-36, A-858, A-871-73. This process, called auto-deleveraging, was disclosed to customers. A-1014-15, A-1246 §16.2, A-870-72.

But liquidation of individual customer accounts could not always proceed quickly enough to stem losses, especially in volatile and illiquid markets. Thus, as a further protection against loss, FTX also engaged backstop liquidity providers—usually hedge funds serving as market makers on the exchange. A-1004-05, A-1008-10, A-728-30, A-836-39, A-858. When a customer account had fallen below margin requirements and needed to be liquidated but the account was "too big to close" efficiently, FTX would transfer the account's assets to a backstop liquidity provider that could more efficiently liquidate the customer's positions. A-1008-10, A-837-39. These market makers served as purchasers of last resort when a customer's position collapsed.

FTX also created a backstop insurance fund to further mitigate risk. A-729-730, A-858-60. And in extreme circumstances, large losses could even be socialized in a "clawback" process—whereby FTX would claw back other customers' assets to cover losses from a large client. A-1247 §16.4, A-907, A-

8

870-72. Thus, in extreme market conditions, losses could be spread across all customers on the exchange. Largely because of the features mitigating risk, however, FTX was one of the only crypto exchanges that never had to socialize losses before November 2022. A-768-69, A-859-60, A-1013.

### 2. Alameda

Before creating FTX, Bankman-Fried and Wang founded a trading firm called Alameda Research in 2017. A-995, A-712. It was a cryptocurrency hedge fund specializing in arbitrage trading. A-996-97.

From FTX's beginning and for much of its existence, Alameda was FTX's largest customer and primary market maker. A-1006-07, A-738-40. This meant Alameda was often forced to act as a counterparty to other customers' trades and provide liquidity for the exchange. A-750. It also meant, as described above, that Alameda was required to assume customers' assets and liabilities in the event of a forced liquidation. Alameda was thus the initial "backstop liquidity provider" for the FTX exchange. A-1010, A-741-42, A-836. Its role was critical to FTX, because it gave new customers confidence that the exchange was solvent and there would always be a counterparty for their trades. Alameda received benefits in return for providing these critical functions and special permissions on the exchange "[b]ecause [it] was one of the main market makers." A-724, A-833-34. FTX provided Alameda a large line of credit—which it also did for other market

9

makers.  A-1008.  FTX allowed Alameda to draw on a larger line of credit and permitted it to maintain a negative balance on FTX without posting additional collateral.  A-723-25, A-708-11, A-742-52.  The line of credit also functioned as collateral for Alameda on the exchange.  A-750.  Prior to getting its own bank accounts in 2021-22, FTX used Alameda's North Dimension accounts to process customer deposits and withdrawals, which it tracked through a ledger called fiat@ftx.com.  A-763, A-692-95.  Alameda was also a customer of FTX—initially its largest customer—and traded and borrowed on margin from the exchange like any other customer.  A-1010, A-829, A-754-55, A-776.

Alameda also made substantial investments that were not held on FTX. While some of the funding for these investments came from its FTX line of credit, most came from third-party lenders unaffiliated with FTX.  A-1024-25, A-713, A-777, A-998.

A significant amount of evidence (and confusion) at trial revolved around Alameda's net asset value, or NAV.  Multiple witnesses testified regarding Alameda's NAV—and thus its solvency or lack thereof.  Alameda's "overall NAV" included all of Alameda's assets no matter where they were held.  A-759. In contrast, Alameda's primary trading account on FTX, called info@alamedaresearch.com, provided a more limited snapshot of Alameda's

10

trading activity on the FTX exchange itself, which did not include most of Alameda's assets.  A-734-35, A-753-54, A-762-767.

The government repeatedly conflated Alameda's *overall* NAV with the more specific account balances Alameda maintained on the FTX exchange—or other arbitrary subsets of Alameda assets.

### 3.    *2022 Collapse*

FTX and Alameda experienced a crisis in the summer to fall of 2022, when markets tumbled.  The Federal Reserve rapidly raised interest rates, which drained liquidity from world financial markets.  The stock market declined and crypto markets crashed.  The price of bitcoin dropped over 50% and other crypto assets fell even further, causing tens of billions in losses and the collapse of Luna, its affiliated stablecoin, and Three Arrows Capital.  A-781-82, A-818-19, A-826, A-1022, A-843-44.  Crypto lending platforms began "experiencing the highest level of withdrawals…that [they] had ever experienced…in [their] history," and many ended in bankruptcy.  A-819-20.

Alameda's assets were largely correlated with the cryptocurrency market's health.  A-1024-26.  Although Alameda's day-to-day trading remained profitable, the 2022 collapse caused the value of its assets to fall precipitously—from about $50 billion in late 2021 to around $20 billion in June 2022; its *net* asset value fell to roughly $10 billion.  A-1026, A-782.  The crypto collapse spurred some of

11

Alameda's lenders to recall some open-term loans, meaning Alameda was forced to pay back loans immediately. A-782-83, A-733, A-820-21.

Given these challenging conditions, Alameda's leadership became concerned about its ability to cover short-term liabilities. Bankman-Fried, Wang, and colleagues Caroline Ellison and Nishad Singh met in mid-June 2022 to discuss Alameda's financial position. A-809-10. After Wang corrected an accounting "bug" in Alameda's fiat liability balance that overstated Alameda's liabilities, Alameda's NAV remained "significantly positive"—around $10 billion. A-810-13, A-759-60. This revelation left Ellison and Wang "quite relieved" and the fund's accounting "in a better situation." A-812-13, A-759-760.

In October, Alameda still had a NAV of around $10 billion, and Bankman-Fried was actively working to raise additional capital and bolster FTX's liquidity position. A-1032-34, A-1041-45. However, on November 2, CoinDesk published a leaked version of Alameda's balance sheet, igniting public concern and spurring customer withdrawals. A-798-99, A-1046. On November 6, Changpeng Zhao— the CEO of FTX competitor Binance—began publicly questioning FTX's viability. A-1047-49, A-772-74.

Customer withdrawals at FTX "increased massively," from about $50-$100 million per day to about $1 billion per day—a "run on the bank." A-1049-50, A-773-75. On November 7, FTX experienced about $4 billion of net withdrawals,

leaving it days away from a liquidity crisis, although both FTX and Alameda still had far more assets than liabilities. A-1051. Alameda's NAV remained positive. A-1052, A-760-61. But customer withdrawals continued, and the value of Alameda's holdings in certain FTX-affiliated cryptocurrencies were cut in half, such that Alameda's NAV approached barely positive territory, forcing Bankman-Fried to liquidate the fund. A-1053-56.

On November 11, John Ray took over from Bankman-Fried as FTX's CEO and filed for bankruptcy. A-801, A-1046; Dkt.143 at 1.

### B.    Government Case

The government contended FTX was a scam from inception. It claimed Bankman-Fried "set up…FTX…to lie to customers," A-672, and devised "a scheme to take money from FTX and give it to Alameda," A-673. "Once Alameda had the money," the government argued, Bankman-Fried "walked out the door with it and spent it as he pleased." A-674. It argued Bankman-Fried had stolen all the money customers, lenders, and investors had put into FTX and Alameda and that the money had disappeared.

The government alleged Bankman-Fried instructed his engineers to introduce Alameda's special market-making privileges into FTX's computer code to facilitate the scheme. A-675-76. It suggested Bankman-Fried used customer money "for his own investments," which were "risky" and "losing money," as well

13

as for real estate and political donations, and that he lied to investors and lenders when Alameda became increasingly leveraged in 2022.  A-677-78.

The government alleged that in various public statements, Bankman-Fried fraudulently misrepresented how customer funds were used.  These included tweets on November 7, 2022, stating "FTX is fine. Assets are fine," and that "FTX has enough to cover all client holdings."  A-1293.  The government also cited a passage in FTX's Terms of Service stating customers maintained title to any "digital assets" deposited on the exchange.  A-855-57, A-869, A-1240 §8.2.6, A-1241-42 §8.3.

The government called several former FTX and Alameda employees.  Adam Yedidia, an FTX software developer, testified about FTX's document retention policy and automatic deletion of communication over Signal, which the government suggested was designed to destroy evidence.  A-696-97.  Former General Counsel Can Sun testified he was instructed to create a legal justification for why customer deposits were missing from FTX.  A-864.  He described a purported conversation with Bankman-Fried in which he claimed there were some theoretical arguments, but none supported by the facts or FTX's terms of service.  A-865-68.  He testified he never approved lending FTX customer assets to Alameda and that he, various regulators, and the public were always told customer funds were segregated.  A-845-52.  Sun testified pursuant to a non-prosecution

14

agreement, A-862-63, A-875-77, and Yedidia testified pursuant to an immunity order, A-687-88, A-707.

Three co-defendants testified pursuant to cooperation agreements. Wang testified that many of Bankman-Fried's public statements about FTX—including about its use of assets, Alameda's privileges, and its risk exposure—were false. A-726-27, A-731-32, A-737. He described various loans the government alleged were fraudulent. Singh, head of engineering, described various loans and venture investments by FTX and Alameda. He claimed that after he told Bankman-Fried about a large deficit in assets, Bankman-Fried continued to direct large investments. A-832. Ellison, Alameda's CEO, testified that Alameda drew approximately $8 billion more from its FTX line of credit starting in June 2022 to repay the lenders, taking funds from FTX customers, and that Bankman-Fried authorized this. A-784-86, A-788. She claimed Bankman-Fried instructed her to obscure the nature of liabilities in an Alameda balance sheet sent to lenders. A-789-96.

The government also called an expert, Peter Easton, who opined on the movement of funds between FTX and Alameda. And it elicited testimony from FTX customers, lenders, and investors who claimed to have lost all their money, with no hope of return. A-685-86, A-822-24, A-878.

15

## C.     Defense Case

There was another way to view FTX's demise.  FTX quickly grew to $1 billion of revenue, and in November 2022, was still solvent and profitable—but shaken by the market conditions and resulting bank run.  Its legal advisors took control, pushed it into bankruptcy proceedings and lost billions mismanaging the estate—while blaming Bankman-Fried for FTX's collapse.

At trial, the defense argued Bankman-Fried created FTX and Alameda in good faith and never intended to defraud anyone.  Bankman-Fried reasonably believed that loans made by FTX to Alameda were permitted and backed by legitimate collateral, that both FTX and Alameda were always solvent, and that the late 2022 collapse was a liquidity—not a solvency—crisis spurred by rapid customer withdrawals.  A-679-84.

In support of its case, the defense sought to introduce evidence that there were always sufficient assets to make customers whole, although it would have taken a few days to a few weeks to sell enough of them to cover *all* remaining customer deposits, should the run on the bank continue.  The defense also sought to introduce evidence that Alameda's investments outside of FTX were legitimate and valuable.  But the court, having permitted the government to present its side of the case on both points, precluded the defense from rebutting it.  *See infra*, Point I.

16

Similarly, when the defense sought to demonstrate that numerous aspects of FTX's and Alameda's business that the government had characterized as fraudulent were normal in the industry and approved by counsel, the court precluded the evidence. *See infra*, Point II. The court also excluded six of seven expert witnesses the defense disclosed and limited the testimony of the seventh. A-572-76. Finally, the defense was denied access to key evidence needed to present its case, which was held by the FTX Debtor estate and withheld during discovery. *See infra*, Point IV.

Thus, Bankman-Fried was forced to present his defense largely through his own testimony. But the court gutted this effort as well. Before Bankman-Fried testified, and without prior warning, the court ordered a hearing—in essence, a pre-testimony deposition—to preview aspects of his good-faith defense. During that deposition, the court permitted the government to conduct a dry run of its cross-examination and ridiculed Bankman-Fried's demeanor, making comments like "the witness has what I'll simply call an interesting way of responding to questions." A-969.

When Bankman-Fried later testified in front of the jury, the court continued this inappropriate criticism, A-1019, A-1022, A-1024, A-1029-30, A-1036-40, A-1062-70, and repeatedly derided defense evidence as irrelevant, A-1020-21, A-1027-28. It also repeatedly prevented Bankman-Fried from testifying about his

17

state of mind during relevant events and from telling his side of the story.  A-1016-17, A-1020-21, A-1023-24, A-1057-61, A-1071.

Bankman-Fried's testimony refuted key aspects of the cooperators' accounts.  Contrary to prosecution witnesses' claims that Alameda used $8 billion of FTX funds in June 2022 to repay lenders, Bankman-Fried testified it was "about two billion dollars" from the "highly liquid assets off of FTX in [Alameda's] wallets, bank accounts, and other exchange accounts."  A-1035, A-1295-97.  He testified that FTX publicly disclosed the risk of clawbacks to customers and that Alameda was permitted to borrow funds from FTX through the margin lending and collateral program, as disclosed in the terms of service.  A-1010-11, A-1014-15, A-1246-47 §§16.2-16.4.  And when he became aware of Alameda's liability to FTX, he believed it could be paid back because Alameda's net asset value was still $10 billion.  A-1029-1033.  But as described in Point I of the Argument, the defense was prevented from presenting evidence corroborating his testimony.

He admitted FTX and Alameda made many mistakes, including not having a risk management team or anyone dedicated to managing risk.  A-992.  Instead, FTX relied on its risk engine technology, which was insufficient to manage the run on FTX in November 2022.

The court at various points made clear it did not credit the defense's narrative.  For instance, one disputed issue was the extent to which Bankman-Fried

18

controlled Alameda de facto after mid-2021, even though Ellison was the CEO. Before hearing evidence on the matter during the government's case, the court called the question "a joke" because Bankman-Fried was "obviously the boss," "no matter what" testimony Alameda employees would offer about day-to-day operations.  A-814-15.

### D.    Summations

In summation, the prosecution suggested FTX and Alameda were insolvent—that even if they sold all their assets, they still "couldn't" repay their debts.  A-1111.  It told the jury "there is no serious dispute that around $10 billion went missing."  A-1077-78.  It told the jury billions of dollars were "gone" for good, stolen by Bankman-Fried.  A-1078-79.  It claimed he "knew" Alameda was insolvent and "did not have the assets to cover this giant debt to FTX customers." A-1110.  In making these arguments, the government parroted statements by the FTX Debtors, who had an interest in suggesting any harm suffered by customers was somehow Bankman-Fried's fault, rather than the result of their mismanagement of estate assets.

Those claims were demonstrably false, as the FTX Debtors later admitted when announcing that FTX customers would be repaid with interest.  In fact, Alameda had made many sound investments and had valuable assets, which were eventually liquidated to pay back both Alameda lenders and FTX customers.  But,

because of various district court rulings detailed below in the Argument, the defense was not allowed to demonstrate that the government's claims were false, or why Bankman-Fried's beliefs about Alameda's overall NAV in November 2022—and his resulting actions and statements—were not unreasonable.

### E.    Sentencing

The district court sentenced Bankman-Fried to 25 years' imprisonment and ordered him to forfeit $11,020,000,000.  SPA-96-102.

Bankman-Fried is incarcerated.

## SUMMARY OF ARGUMENT

*First*, the district court issued profoundly one-sided evidentiary rulings on the issue of loss.  The court excluded all defense evidence of actual or intended loss as "immaterial," but simultaneously allowed prosecution evidence and argument that FTX customers and investors had lost all their money—and that Bankman-Fried knew they would.  The asymmetrical rulings were premised upon a misinterpretation of the law of fraud and the Rules of Evidence.  The resulting one-sided presentation deprived Bankman-Fried of his right to present his defense to the jury.

*Second*, the district court illegally required Bankman-Fried to sit for a deposition to preview his testimony about how FTX lawyers had been involved in key decisions.  It then violated *United States v. Scully*, 877 F.3d 464 (2d Cir. 2017),

by excluding most of Bankman-Fried's testimony based on its supposed "harm to the public interest"—a rationale with no basis in law—that gutted what little was left of the defense.

*Third*, the jury instructions on intent misstated the law. The instructions falsely stated that a defendant's belief that putative victims would suffer no harm is irrelevant and falsely stated that "willfulness" means simply knowledge of wrongdoing rather than knowledge of illegality.

*Fourth*, the government violated its *Brady*, Rule 16, and other discovery obligations by refusing to turn over exculpatory evidence possessed by the FTX Debtors, who coordinated with the government to an extraordinary extent and were thus acting as an arm of the prosecution.

*Fifth*, the $11 billion forfeiture award was illegal and unconstitutional. The relevant statutes authorize forfeiture of traceable assets, but do not authorize general money judgments, especially ones that permanently destroy a defendant's ability to earn a livelihood.

Finally, based on these errors and numerous other rulings and statements evincing partiality, the case should be remanded to a different district judge for retrial.

## STANDARDS OF REVIEW

*De novo* review applies to statutory interpretation, *Ciminelli v. United States*, 598 U.S. 306, 312-16 (2023), jury instructions, *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014), as well as legal conclusions regarding discovery, *United States v. Bradley*, 105 F.4th 26, 33 (2d Cir. 2024), and forfeiture, *United States v. Contorinis*, 692 F.3d 136, 145 (2d Cir. 2012). Evidentiary rulings are reviewed for abuse of discretion. *United States v. Litvak*, 808 F.3d 160, 179-80 (2d Cir. 2015). An "error of law" is "by definition" an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996).

## ARGUMENT

## I. THE DISTRICT COURT ERRONEOUSLY ALLOWED THE PROSECUTION TO PRESENT EVIDENCE OF LOSS WHILE EXCLUDING CONTRARY DEFENSE EVIDENCE

The government told the jury Bankman-Fried had lost billions of dollars of other people's money by frittering it away on luxury condos, political donations, and outlandishly risky investments. It told the jury the money was missing, gone forever.

That narrative was false. As everyone now knows, FTX customers and Alameda creditors will be repaid by the bankruptcy estate. The estate now has billions more in assets than liabilities and expects to distribute net proceeds of

22

$14.7 to $16.5 billion.  Bankr.Dkt.19143 at 29.[1]  Bankman-Fried had not lost or stolen all the money, and the investments he made were not risky or stupid.  Many of them, like his $500 million investment in Anthropic and his investment in Solana, were prescient.  Those investments, however, were illiquid, meaning they could not be immediately converted to cash to satisfy the November 2022 bank-run of customer withdrawals.  FTX faced a liquidity crisis, not a solvency crisis.

That is what Bankman-Fried has been saying all along, and that is what he tried to present as his core defense.  But the district court prevented him from presenting his side of that story.  The court permitted the government to introduce evidence of loss but precluded the defense from presenting contrary evidence, on the erroneous premise that the defense's evidence was "immaterial as a matter of law."  That grossly one-sided ruling denied Bankman-Fried his right to present a defense.

A.    **Background**

1.    *Motion to Dismiss*

The defense moved pre-trial to dismiss several counts for failure to allege "that Mr. Bankman-Fried engaged in a scheme to cause economic loss to FTX customers because [the indictment did] not allege that he never intended to pay

---

[1] "Bankr.Dkt." refers to entries in *In re: FTX Trading Ltd.*, 22-11068-JTD (Bankr. D. Del.).

back the loans to Alameda." Dkt.140 at 16. The government argued it was irrelevant whether Bankman-Fried believed customers and lenders would suffer no loss. Dkt.149 at 11-12.

The district court denied Bankman-Fried's motion, holding it "immaterial as a matter of law" whether he believed customers and lenders would suffer no ultimate loss. SPA-28.

### 2. Evidentiary Rulings

The government sought to turn that victory into a broad limitation on Bankman-Fried's ability to present evidence. It moved *in limine* for an order preventing Bankman-Fried from arguing "that he intended to repay his customers, intended to return their funds, or believed that even though he had misappropriated their funds he could ultimately repay them." Dkt.204 at 42. It claimed such a limitation was required by the court's prior ruling, because "whether customers could be made whole 'is immaterial as a matter of law.'" *Id*. at 51 (quoting SPA-28).

The defense also moved *in limine* to preclude the government "from arguing or presenting evidence suggesting that FTX and Alameda are insolvent and that their customers will not be made whole." Dkt.207 at 8. It argued it would be unfair to allow prosecution evidence regarding bankruptcy without allowing the defense to respond. *Id*. at 11-14.

24

Although the government previously argued that events after FTX's collapse were irrelevant, it changed tack, claiming the bankruptcy was "inextricably intertwined" with the charged offenses, and that it should be allowed to prove FTX was ultimately unable "to honor customer withdrawals." Dkt.245 at 1.

The defense responded that the government was seeking "to exclude evidence of Mr. Bankman-Fried's 'intent to repay' customers" while simultaneously seeking to present "evidence that Mr. Bankman-Fried did *not* have that intent." Dkt.246 at 28. The defense suggested either *both* sides should be permitted to present evidence of solvency, or *neither* should. *Id*. at 28-29 n.7.

The district court misinterpreted this as agreeing with the government. It thus precluded defense evidence of Bankman-Fried's intent to repay customers or evidence of FTX's solvency, SPA-57—while simultaneously permitting *the government* to "explain to the jury its views of what allegedly happened" as to loss and bankruptcy, SPA-59-60.

Justifiably puzzled, the defense sought clarification, arguing that if the government presented evidence of actual loss suffered through FTX's bankruptcy, the defense must "be permitted to present its view of the same facts, and to rebut any evidence introduced by the Government relevant to these issues." A-579-80. The court refused to clarify or modify its prior order, reiterating that it is "immaterial as a matter of law whether the defendant intended to repay" customer

25

funds. SPA-73. The court ignored its contradictory ruling allowing government evidence on the identical question.

The government next moved to exclude any "evidence or argument about the current value of certain investments made by the defendant," including Anthropic, again arguing it was irrelevant. A-582, A-778-80. The defense countered that the evidence was necessary to rebut prosecution arguments that Bankman-Fried had made "risky" and "losing" investments. A-588.

The court granted the government's motion. SPA-74, A-802-08. It ruled that the charged offense was misappropriation, which was "finished, the minute the misappropriation happened," so whatever happened later was irrelevant. A-806. But it nonetheless let the government introduce evidence that $10 billion was lost.

### 3. Trial Evidence

The government exploited the one-sided rulings throughout trial. It opened by telling the jury "the customers' money[] was gone. The defendant had taken it. FTX collapsed and its customers were left with billions of dollars in losses. That's why we are here today." A-671. At every stage, the government presented testimony implying that FTX customers, lenders, and investors had lost all their money, with no hope of return.

Its first witness was Marc-Antoine Julliard, an FTX customer. He testified that in November 2022 he had $100,000 in his FTX account but was unable to

26

make any withdrawals. A-685-86. The government then asked: "And as we sit here today, have you ever been able to withdraw your FTX customer deposits that we see?" Julliard answered: "Never." A-686. One of the government's last witnesses was another customer, Tareq Morad. He said he had deposited several hundred thousand dollars but was unable to withdraw the funds in November 2022. A-823-24. Asked if he had *ever* been able to withdraw his funds, he responded: "No, I haven't." A-825.

The government presented similar evidence regarding Alameda's lenders and investors. For example, there was testimony that BlockFi lent Alameda $650 million, which had not been repaid. A-816. (Shortly *after* trial, the FTX Debtors agreed to repay BlockFi in full.) The government also elicited cooperator testimony that Alameda and FTX were insolvent. *E.g.*, A-1292, A-800, A-830-31.

The government hammered these points in closing, arguing Bankman-Fried had caused billions in losses—money that was "missing." A-1078. It repeatedly argued FTX and Alameda were "deeply in the red," "$10 billion plus in the hole," and "totally under water." A-1087, A-1091. And it contended the insolvency was "very clear to the defendant." A-1091. The defense was prevented from presenting evidence rebutting these arguments.

27

**B.    The Exclusion Of Defense Evidence On Loss Was Legally Erroneous And Violated Due Process**

*1.    The Excluded Evidence Was Relevant*

The ruling excluding evidence that Bankman-Fried believed he could repay customers and lenders gutted his core defense—that FTX and Alameda faced a liquidity crisis, not a solvency crisis, and he reasonably believed that with enough time, their assets could easily satisfy their liabilities.  The court's holding that such evidence was "immaterial as a matter of law" contradicts well-settled precedent and conflicts with its own rulings permitting the government to argue there was a loss.

Fraud requires the "wrongful purpose of injuring one in his property rights." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  A completed offense must "inflict[] an economic injury."  *Pasquantino v. United States*, 544 U.S. 349, 356 (2005).  A scheme need not be successful, but a violation does require proof the defendant intended harm and injury.  "[L]oss to the victim" must be "an 'object of the fraud.'"  *Kelly v. United States*, 590 U.S. 391, 402 (2020).

These principles are firmly established in this Court's case law as well.  To prove fraud, the government must "prove that defendants *contemplated* some actual harm or injury to their victims."  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).  "[T]he purpose of the scheme 'must be to injure.'"  *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970).  Put differently, "the

28

proof must demonstrate that the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (cleaned up).

If fraud requires proof the defendant intended economic harm, then evidence that he believed putative victims would not lose money is obviously *relevant*. Relevance, as defined by Rule 401, "is a low threshold, easily satisfied." *United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019); *accord United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). And "so long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." *United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006). A defendant who believes putative victims will retain their money is less likely to possess fraudulent intent than one who knows his victims will lose their money (and intends to take it). Such evidence easily meets the relevance standard—indeed, it was "highly probative" of the "central issue in the case." *Litvak*, 808 F.3d at 182.

The district court's categorical exclusion of all defense evidence on the topic clearly violated Rule 401.

* * * *

Nor can the categorical exclusion be justified by this Court's decades-old opinion in *United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980), on which the district court relied, SPA-28. *Sindona* purported to follow *United States v. Fortunato*, 402 F.2d 79 (2d Cir. 1968), which, according to *Sindona*, "held that under 18 U.S.C. §1343, loss to the victim need not be shown in order to prove a violation." *Id*. at 800. But *Fortunato* interpreted 18 U.S.C. §656, the bank embezzlement statute—which criminalizes "willfully misappl[ying]" bank funds—not §1343. *See* 402 F.2d at 79-80. *Sindona*'s logic is also spurious, akin to arguing that because motive is not an element of murder, evidence of motive is irrelevant. Indeed, this Court hasn't cited *Sindona* on this point for decades, and never outside the bank fraud context.

Regardless, a broad reading of *Sindona* would conflict with intervening Supreme Court decisions holding that defendants must intend to cause "loss to the victim"—such loss *must* be "an 'object of the fraud.'" *Kelly*, 590 U.S. at 402. And long before *Kelly*, this Court had rejected the government's argument that "it does not matter whether" the alleged victims in a fraud scheme "would have suffered some economic loss if the scheme had been successful." *United States v.*

30

*Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994). *Of course* it matters, because it sheds light on whether the defendant intended to inflict loss.

        2.      *The Defense Had A Right To Respond To Prosecution Evidence On Loss*

Even if evidence that no loss resulted could be excluded in some cases, that would not be true here, because the government introduced evidence and argued that the alleged victims had lost money. The defense had a right to respond with counterproof.

Relevance depends on what facts are "of consequence in determining the action." Fed. R. Evid. 401(b). That depends on what charges or defenses are raised in the particular case, and on evidence submitted by the other party. When one party offers proof of a point, otherwise irrelevant evidence becomes relevant and admissible for the opposing party. *See United States v. Ortiz-Rengifo*, 832 F.2d 722, 725 (2d Cir. 1987). When one party introduces evidence to prove a point that matters to the case, "[c]ounterproof is admissible if it contradicts" that point. 3 Mueller & Kirkpatrick, *Federal Evidence* §6:89 (4th ed. & 2023 update).

"Evidence relevant to undercut a charge is no less relevant to bolster it; the standard under Rule 401 is symmetric." *United States v. Rhodes*, 229 F.3d 659, 661 (7th Cir. 2000). This is because the "relative significance of…facts…[is] for the jury to decide," *Gramins*, 939 F.3d at 453, "in light of the opposing theories advanced by the two sides and the evidence that each side marshal[s] to support

31

them," *id.* at 446. This Court has long recognized this principle, noting, for example, that defense evidence showing consciousness of innocence must be admitted if the prosecution introduces evidence showing consciousness of guilt. *United States v. Biaggi*, 909 F.2d 662, 691-92 (2d Cir. 1990). The same is true of evidence proving *or disproving* fraudulent intent. *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952). If one party's evidence is relevant, the opposing party's contrary evidence is relevant too.

This principle is also one of constitutional law. "[C]riminal defendants have ... the right to put before a jury evidence that might influence the determination of guilt…. Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). Neither this Court nor the Supreme Court has ever suggested the Constitution permits the prosecution to present evidence on a point while precluding all defense evidence on the same point. Yet that is what the district court did.

The court's responses to this asymmetry were specious. On Anthropic, for example, the court refused to allow evidence of Bankman-Fried's profitable investment because it would be "kind of like trying to prove that you're a good guy by looking around the room, picking your three best friends, and asking them what kind of a guy you are, and ignoring everybody else." A-806. But it is no better to allow the other side to prove you're a bad guy by picking your three worst enemies

32

and ignoring everyone else.  In the adversary system, the jury is supposed to hear *both sides*.  In Bankman-Fried's trial, it only got to hear one.

Since the prosecution claimed victims lost all their money—and that Bankman-Fried knew they would—the defense had a right to respond.  The asymmetrical rulings violated fundamental principles of relevance and fairness.

### 3.    *The Error Requires Retrial*

Exclusion of defense evidence is harmless only if it "did not substantially influence the jury."  *Litvak*, 808 F.3d at 184.  And where the error violates the constitutional right to present a defense, the government must prove beyond a reasonable doubt that it would not have affected the result.  *Chapman v. California*, 368 U.S. 18, 23-24 (1967).  An error going "to the heart" of the defense and its ability to respond "to the core of the prosecution's case" is not harmless.  *United States v. Blum*, 62 F.3d 63, 68-69 (2d Cir. 1995).

The excluded evidence here was not "cumulative," nor was Bankman-Fried "otherwise permitted to advance the defense."  *United States v. Stewart*, 907 F.3d 677, 688 (2d Cir. 2018).  The ruling was categorical, barring an entire defense. The court prohibited *all evidence and argument* "that he intended to repay his customers, intended to return their funds, or believed … he could ultimately repay them."  Dkt.204 at 42.  It precluded *all evidence and argument* "about the current

value of certain investments made by the defendant," including Anthropic. Dkt.315. Bankman-Fried was thus not permitted to advance this defense at all.

These rulings allowed the government to make "unrebutted assertions" and denied the defense any ability to "contradict[] the government's case on the factual questions at issue." *Stewart*, 907 F.3d at 688. That asymmetry profoundly distorted what was presented to the jury.

The government's closings make this plain. The prosecution repeatedly and falsely argued that FTX and Alameda were insolvent—that even if they sold all their assets, they still "couldn't" repay their debts. A-1088. It argued the money was gone because Bankman-Fried "stole that money." A-1094, A-1097 ("the defendant stole money"). It argued Bankman-Fried "lied and he stole from his customers; he lied and he stole from his lenders; he lied and he stole from his investors." A-1105. It claimed Bankman-Fried "knew" Alameda was insolvent and "did not have the assets to cover this giant debt to FTX customers." A-1110.

The government claimed $10 billion was "missing" and gone for good. A-1077-78. It said customers, creditors, and investors "lost all their money." A-1096. "Thousands of people lost billions of dollars. Everyday people lost savings, companies went bankrupt, all because of this defendant's fraud." A-1105. It argued Bankman-Fried had "raid[ed] … billions and billions of dollars" of

customer money and spent it or lost it.  A-1115.  It stated FTX was "10 billion plus

in the hole… deeply in the red, totally underwater."  A-1091.

   None of that was true.  The alleged victims didn't "lose all their money."  As

everyone now knows, customers and creditors "are expected to get back all of their

money."[2]  Dkt.407 at 17.  FTX was solvent when the bankruptcy petition was filed.

*Id.* at 19.  Billions of dollars weren't "missing."  They were tied up in sound but

illiquid investments, such as the investment in Anthropic, which was eventually

sold for a substantial gain.  *Id.* at 21 ($500 million investment was worth between

$1-$1.4 billion).  Bankman-Fried didn't "know" Alameda was irredeemably

insolvent.  He *believed* that with more time, Alameda could sell its assets to cover

its liabilities—and he was proven correct in the end.

   All this could have been proven at trial if the judge had allowed the defense

evidence.  The prejudice arising from the error can be summed up simply:  The

prosecution was allowed to present a case that was objectively false, and the

defense was not permitted to rebut it.

---

[2] If both sides had been allowed to present evidence, there might still have been a
dispute about whether alleged victims were "made whole," since they had to wait
to get repaid, and repayment will be in dollars rather than in-kind.  Much of the
blame lies with the FTX Debtors—who, for example, shut down the profitable
exchange, ignored liquidity offers, and dissipated estate assets, cutting into the
recovery.  But the larger point is the jury heard a false narrative—that everyone
lost all their money—which the defense was prohibited from rebutting.

## II. THE DISTRICT COURT ILLEGALLY BARRED EVIDENCE THAT BANKMAN-FRIED RELIED ON COUNSEL

To prove intent to defraud, the government contended that certain FTX policies and business practices were deceptive. Bankman-Fried sought to show that the policies and practices were appropriate and had been adopted with counsel's advice.

In *United States v. Scully*, 877 F.3d 464 (2d Cir. 2017), this Court held that a fraud defendant is entitled to testify that he relied on counsel's advice. Such evidence "can raise a reasonable doubt in the minds of the jurors about whether … the defendant had an 'unlawful intent.'" *Id*. at 476. This Court held that district courts cannot exclude such testimony on Rule 403 grounds, even if they find a defendant's story potentially "false or misleading"—the solution for such potentially false testimony is cross-examination and contrary evidence, not exclusion. *Id*. at 474-75. Yet the court below ignored *Scully*'s holding and made an egregious error, bizarrely reasoning that Bankman-Fried's testimony on advice-of-counsel had to be excluded as contrary to "the public interest."

The procedures that led to that ruling were even more bizarre. Before trial, the district court ruled that all defense evidence on advice-of-counsel was inadmissible absent explicit advance approval by the court. It then rejected the defense's detailed written proffer. Bankman-Fried was thus forced to sit for a

36

deposition, allowing the government to cross-examine him before he took the stand—something that apparently has never happened before in federal court.

The grossly unfair proceeding and the lawless exclusionary ruling that followed deprived Bankman-Fried of a fair trial.

## A. Background

### 1. Advice-Of-Counsel

Before trial, the government repeatedly sought to block Bankman-Fried from presenting an advice-of-counsel defense. The government's arguments were premised on the notion that advice-of-counsel is a "formal defense," apparently meaning affirmative defense. That reflects a fundamental misconception.

There are two kinds of defenses: those that negate an element of the offense, and those that establish an affirmative defense, such as insanity or self-defense. *See Martin v. Ohio*, 480 U.S. 228, 230 (1987). The fundamental difference is that, for affirmative defenses, the defendant bears the initial burden of production (and sometimes the ultimate burden of persuasion). *United States v. Hartsock*, 347 F.3d 1, 7-8 (1st Cir. 2003).

This Court has held that that "the advice-of-counsel defense is not an affirmative defense." *Scully*, 877 F.3d at 476. Rather, it is an element-negation defense, because it "can raise a reasonable doubt in the minds of the jurors about whether … the defendant had an 'unlawful intent.'" *Id*. Put differently, "reliance

on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter." *Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004).

There are thus no special rules of evidence or procedure that apply to advice-of-counsel arguments. When a defendant claims he relied on advice of counsel or that attorneys were involved in creating corporate policies, the evidence is admissible if relevant under Rule 401 and there is no other basis for exclusion.

### 2.    *Government's Discovery Demands*

The government nonetheless sought pretrial disclosure of any advice-of-counsel defense, A-374, which the district court required, SPA-44. The defense responded it would present an advice-of-counsel defense. A-401. The government complained the disclosure was insufficient. It asked the court to order a "detailed" disclosure, including the "nature and specifics" of the defense and a detailed "proffer of facts." *Id.*

The defense responded that the Rules of Criminal Procedure required no further detail. A-554. But to avoid further discovery disputes, the defense outlined the topics on which it planned to introduce evidence of counsel's involvement. *Id*. The government again objected and sought more extensive disclosure. A-557-64. The defense again argued no further disclosure was legally required, A-569-70, but the court disagreed, stating it would "order some disclosure," A-400.

3.      *The Government's Motion In Limine*

The government also moved *in limine* to exclude any evidence that Bankman-Fried relied on advice of counsel unless the defense provided detailed notice "*and* establish[ed] the required elements of such a defense."  Dkt.204 at 44-45.  The defense objected that such evidence was relevant and admissible to prove good faith.  Dkt.246 at 29-31.

The district court initially deferred ruling, but ultimately prohibited the defense from presenting any of this evidence "absent prior notice to the Court and the government outside the presence of the jury."  SPA-71.  It thus held defense advice-of-counsel evidence inadmissible absent prior vetting and explicit approval from the district court.

4.      *Defense Proffer And Preview Deposition*

The defense thus proceeded to trial constrained by an extraordinary order that, before presenting any evidence mentioning FTX lawyers, it was required to get advance permission.  The defense sought to comply with that order throughout trial.  It sought advance permission, for example, to cross-examine Wang and Ellison regarding their interactions with counsel.  A-585-87, A-590-91.  The court sustained government objections to much of this cross-examination.  A-874.

Most importantly, the defense complied with the court's prior order in a six-page, single-spaced letter stating Bankman-Fried planned to testify regarding the

involvement of counsel on several relevant matters. A-664-67. The letter detailed what Bankman-Fried would say and why it was relevant.

Compelling such a detailed preview of important aspects of a criminal defendant's testimony was itself unprecedented. What happened next was even worse. Without warning, the district court announced it could not rule without first hearing Bankman-Fried's testimony, saying: "the amount of information that I have to date is, in my judgment, inadequate to resolve the admissibility of this testimony … because it's not sufficiently detailed or specific." A-882. It said it had "authority under the rules of evidence" to require this preview hearing. *Id*.

Pursuant to and immediately after that ruling, Bankman-Fried testified outside the presence of the jury. He was, in other words, deposed. At this deposition, he testified about matters where he had relied on counsel. A-882-919.

The government's cross-examination strayed far beyond the deposition's stated purpose. It was twice as long as the direct. A-919-84. Fairly quickly, the defense objected that the government was going far beyond the scope. A-928. The government repeatedly asked questions unrelated to the defense proffer. A-953. It asked questions that had nothing to do with lawyers, such as whether Bankman-Fried believed Alameda was authorized to spend FTX customer funds. A-957. The government asked about liquidation of accounts, A-963, and whether account

liquidations were typical, A-965. The government asked whether Bankman-Fried knew Alameda's trading account was allowed to go negative. A-967-68.

The defense repeatedly objected that the government was going beyond the scope, but the court overruled the objections. *E.g.*, A-928, A-953, A-963, A-968, A-974, A-979-84. The defense complained that the "issue for this hearing is the scope of counsel relationship," and that the government had turned it into a general deposition. A-968. The district court allowed the questioning because "all things are relative." *Id*.

The government's questioning grew increasingly argumentative and badgering, but the district court still refused to rein it in. A-980-81. By the end, the government had obtained a free preview of Bankman-Fried's testimony, and a free practice session to better cross him when he testified before the jury.

## 5.    *The Exclusion Of Bankman-Fried's Testimony*

The next morning, the district court stated that an advice-of-counsel defense can be "very misleading" and that a court considering such evidence must "assess the balance between the potential harm to the public interest in creating a misleading impression and the defendant's right to present a defense." A-987.

It ruled that Bankman-Fried could offer limited testimony on the involvement of lawyers in creating FTX's corporate document retention policy, including its policy of automatically deleting certain communications between its

41

executives. On that topic, it ruled there was not "sufficient harm to the public interest in allowing the defendant" to testify. A-988-89. And that minor victory was hollow due to prior rulings denying Bankman-Fried's efforts to obtain the document retention policy in discovery, as detailed *infra* at 71-73, and its refusal to allow cross-examination of the cooperating witnesses on the same topic, A-874.

The court excluded all the other proffered testimony. The court thus excluded evidence that (a) lawyers approved the North Dimension entities and bank accounts; (b) lawyers drafted the Payment Agent Agreement between FTX and Alameda; (c) lawyers approved loans from FTX to Bankman-Fried and others; and (d) lawyers drafted and approved FTX's terms of service. *See* A-665.

The rationale was somewhat inscrutable: "The other four items all involve circumstances in which lawyers drafted plain vanilla legal documents and in which the alleged problem was not the transaction in the document per se, it was what was done and with what intent collateral to the document." A-989. Such concerns, whatever they meant, went to weight not admissibility. Regardless, the court ruled that the evidence would "be confusing and highly prejudicial by falsely implying, given the testimony yesterday, that the lawyers, with full knowledge of the facts, all of the facts, blessed what the defendant is alleged to have done." *Id*.

The district court apparently recognized the issue was likely to be raised on appeal, so after trial, it filed a lengthy written order attempting to justify its

42

handling of the issue.  SPA-75-87.  It opined about the "risks" associated with

testimony that "lawyers were involved to some degree with one aspect of events"

and that "a lawyer is present at a meeting."  SPA-82.

> **B.** **The District Court Lacked Authority To Require Disclosure Or The Preview Hearing**

a.     Nothing in the Rules or this Court's case law requires advanced

disclosure of an advice-of-counsel defense.  The Federal Rules of Criminal

Procedure contain particular provisions requiring extra disclosures for certain

defenses:  alibi (Rule 12.1), insanity (Rule 12.2), and public-authority (Rule 12.3).

The Rules thus require disclosure for "certain, carefully enumerated defences."

*United States v. Wilkerson*, 388 F. Supp. 3d 969, 974 (E.D. Tenn. 2019).  District

courts do not have free-ranging "ad hoc" authority to "invent" additional disclosure

requirements.  *Id*.

Nor has this Court ever suggested that such discovery is allowed, much less

required.  Numerous courts have correctly held that defendants cannot be required

to disclose defenses unless explicitly required by the Rules.  *E.g.*, *United States v.*

*Parks*, 2022 WL 2916080, at *2 (N.D. Okla. July 25, 2022) ("There is no statute,

rule, or Tenth Circuit authority requiring that a defendant provide any written

notice of an advice of counsel defense or description of consultations with

counsel."); *accord United States v. Meredith*, 2014 WL 897373, at *1 (W.D. Ky.

Mar. 5, 2014); *United States v. Espy*, 1996 WL 560354, at *1 (E.D. La. Oct. 2,

43

1996); *United States v. Afremov*, 2007 WL 2475972, at \*4-5 (D. Minn. Aug. 27, 2007); *United States v. Lacour*, 2008 WL 5191596, at \*1 n.1 (M.D. Fla. Dec. 10, 2008).

Several district judges in this Circuit, however, have asserted "inherent authority" to require additional disclosure for policy reasons. *See, e.g.*, *United States v. Ray*, 2021 WL 5493839, at \*5 (S.D.N.Y. Nov. 22, 2021). But these policy reasons mostly reduce to the claim that requiring disclosure "would be more convenient for the Government and the Court." *Wilkerson*, 388 F. Supp. 3d at 975. That is not sufficient. And whatever their merits, policy arguments should be addressed to the Rules Committee. Lower courts should not be permitted to create their own discovery rules.

b.    Even if lower courts have inherent authority to require some additional disclosure—which is dubious—they don't have inherent authority to require criminal defendants to testify at a preview hearing like this one. A trial judge is not permitted to say: "You are allowed to present your defense, but only if you tell it to me and the government first, so we can decide whether it's in the

44

public interest." Yet that is what the judge did. Neither this Court nor any other

circuit has ever approved such a practice.[3]

Once again, nothing in the Rules of Criminal Procedure authorizes such a

proceeding. Rule 15 allows depositions only in "exceptional circumstances"—and

not of defendants themselves. Fed. R. Crim. P. 15(a)(1). Under the Fifth

Amendment, a defendant cannot be deposed—nor even required to disclose his

decision to testify, because he has a constitutional right to hear the government's

case before making his decision. *Brooks v. Tennessee*, 406 U.S. 605, 610-12

(1972). Moreover, it is unconstitutional "to require a defendant to divulge the

details of his own case" unless, at a minimum, the government has equivalent and

reciprocal obligations. *Wardius v. Oregon*, 412 U.S. 470, 476 (1973). The district

court did not require any government witnesses—including the former general

_____

[3] The day after the preview hearing, the district court appeared to recognize the proceeding had gone off the rails, but blamed defense counsel for failing to object. A-985-86. That is absurd. The defense had objected to advance disclosure, but the district court ordered it anyway. The defense thus made a detailed written proffer—but the district court ruled it inadequate. Given those rulings, the defense had no choice but to acquiesce to the hearing. The court's post-hoc suggestion that Bankman-Fried invited the hearing, SPA-79-80, was belied by its own words insisting on the hearing. *See* A-880 ("I have concluded that …I am going to take the testimony initially out of the presence of the jury because the letter provides insufficient detail for me to rule on it."); A-969 ("[I]f you want to push ahead with the evidence you're seeking to introduce, it's through this hearing, if at all."). Moreover, the defense objected a dozen times to the unbounded cross-examination.

counsel, who covered many of the subjects Bankman-Fried wanted to testify about—to testify in preview hearings.

The court's requirement of preview testimony was also utterly unnecessary because other disclosure methods would have sufficed. The extensive written proffer was more than sufficient to assess admissibility. After all, the court's ultimate ruling was based on general concerns about how advice-of-counsel defenses can be "confusing" and cause "harm to the public interest." The district court didn't need a deposition to reach that (apparently foregone) conclusion.

The district court could have just ruled on specific topics as they arose during the testimony. That is, after all, the ordinary course of business in federal criminal trials. The desire to make an advance ruling cannot justify compelling the defendant to be deposed by the government prior to testifying. If such a pre-testimony deposition is acceptable when a defendant raises an advice-of-counsel defense, why wouldn't it be acceptable for any other kind of defense, from self-defense to alibi to lack of knowledge?

The preview hearing had no justification. It violated the Rules of Criminal Procedure and the Constitution.

### C.    There Was No Legal Basis To Exclude The Evidence

The ruling excluding the evidence was equally unfounded.  The district court determined that since *it* didn't believe the defense's case, the jury had no need to hear it.

a.    The government's argument that advice-of-counsel evidence was irrelevant was based on a patent misreading of *Scully*.  In *Scully*, this Court held that a defendant's testimony about his reliance on counsel is *relevant and admissible* in fraud cases because the testimony, "if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.'"  *Id*. at 476.  It held that "the district court abused its discretion when it excluded testimony and evidence relating to the legal advice" and reversed the conviction.  *Id.* at 473.

*Scully* went on to state (in dicta) that, even though the defendant was entitled to present *evidence*, he was not entitled to a theory-of-defense *instruction* on advice-of-counsel.  *Id*. at 476.  Citing only that portion of *Scully*, the government argued that if Bankman-Fried could not meet the higher standard for an instruction, his evidence was also not "relevant."  Dkt.204 at 44-45.  That argument fundamentally misreads *Scully*—which held that defendants are allowed to testify about their reliance on counsel *even if* they cannot meet the requisites for a jury

47

instruction. Yet the district court adopted the government's misreading—leading to the farcical proceedings discussed above. It is as if the government and district court only read half the opinion.

      b.   The court's novel rationale—excluding Bankman-Fried's testimony based on its "harm to the public interest in creating a misleading impression," A-987—also has no basis in the Rules of Evidence.

      A defendant has a constitutional right to testify and present admissible evidence. Under Rule 402, relevant evidence is admissible unless explicitly excluded by another rule. This Court has already held that a defendant's testimony on his discussions with counsel are relevant to good faith. *Scully*, 877 F.3d at 473. Other courts of appeals have as well, because discussions with counsel are a "relevant consideration in evaluating a defendant's scienter." *Howard*, 376 F.3d at 1147.

      Nothing in Rule 403 or elsewhere suggests trial judges may exclude evidence based on their view that it has "potential harm to the public interest." Federal district judges do not have free-ranging authority to create new rules of evidence.

      The government will undoubtedly ask this Court to ignore the district court's stated rationale, and instead treat this as an ordinary exercise of Rule 403 discretion. Indeed, after trial, the district court tried to put lipstick on its own prior

ruling with something that sounded more like actual Rule 403 reasoning. SPA-80-83. But appellate courts "evaluate the trial court's decision from its perspective when it had to rule." *Old Chief v. United States*, 519 U.S. 172, 182 n.6 (1997).[4]

Regardless, *Scully* itself rejected the very same Rule 403 arguments—that such testimony could be excluded as potentially "false" and "misleading." Just like the district court in *Scully*, the court below reasoned that Bankman-Fried's proposed defense would be "misleading" because it might "falsely imply[]" that lawyers had "full knowledge of the facts" and had "blessed" what Bankman-Fried did. A-987-989. But as *Scully* held, "[o]ne party to a trial will frequently believe that testimony offered by the other side is false or misleading," but that is "not a factor to be weighed against" admissibility. 877 F.3d at 475. Even if there are "reasons to doubt the credibility and reliability" of a defendant's testimony on advice of counsel, *id*. at 474, the solution is simple: It's called the adversary system.

If Bankman-Fried's testimony had been admitted, "the government could have cross-examined him about that testimony, [and] noted in summation the self-serving nature of the testimony due to [Bankman-Fried's] interest in the outcome and the conspicuous lack of corroboration from" the attorneys themselves. *Id*. at

---

[4] At the time, no motion or objection was pending. It was essentially an amicus brief by the court defending its prior ruling.

475.  It could have "challenged the likelihood that a reputable attorney" would give such bad advice, or it could have called the attorneys as rebuttal witnesses.  *Id.*  If the government believed Bankman-Fried's lawyers did not have full knowledge of the facts when they blessed his actions, then the government could have sought to prove that.  That is what trials are for.

This case is on all fours with *Scully*.  The evidentiary ruling was a flagrant abuse of discretion.

### D.  Excluding The Evidence Unfairly Prevented Bankman-Fried From Rebutting The Prosecution's Lawyer-Witness

The exclusion of defense evidence about involvement of attorneys also violated the basic principle, discussed above, that where one side presents evidence on a point, the other side is entitled to present counter-evidence.  Despite its professed concerns about the "harm to the public interest" from "any evidence relating to the involvement of attorneys," the court allowed the government to present testimony by Can Sun—FTX's former General Counsel—that raised the same supposed concerns.  For instance, the court permitted the government to ask whether Sun was "involved in any way in monitoring FTX's bank accounts"; about his "aware[ness] of any entity called North Dimension"; and about his "work[] on terms of service."  A-850, A-853-54.

Yet it precluded Bankman-Fried from discussing the "involvement of counsel"—including Sun—in "North Dimension," "its bank account," and "the

50

FTX terms of service." SPA-79. And the court allowed Sun to speculate about his and Bankman-Fried's knowledge and beliefs about the terms of service, A-861—while preventing Bankman-Fried from discussing the exact same subject. SPA-86. The asymmetry further violated due process. *See supra* Point I.B.2.

### E.    The Jury Instructions On Advice-Of-Counsel Misstated The Law

The district court compounded the errors with an erroneous jury instruction. Although the court permitted Bankman-Fried to testify about the auto-deletion policy, it told the jury to ignore that testimony and all other evidence regarding counsel's involvement.

It started off by stating: "A lawyer's involvement with an individual, entity—an individual or entity or transaction doesn't itself constitute a defense to any charge in this case." A-1134. That is false. Although reliance on counsel is not an *affirmative defense*, it is *a defense* if it negates the element of fraudulent intent. An advice-of-counsel defense "can raise a reasonable doubt in the minds of the jurors" on intent, *Scully*, 877 F.3d at 476, and thus "negate an element," *Howard*, 376 F.3d at 1147 n.2. Once again, the court erred because it misunderstood the difference between an affirmative defense and an element-negation defense.

The instructions further stated: "The defense has not claimed, and it cannot claim, that the defendant's allegedly unlawful conduct, assuming he committed any

unlawful conduct, was lawful because he engaged in such conduct in good-faith reliance on the advice of a lawyer." A-1134. That is both legally and factually wrong. A defendant *can* legally claim he is not guilty because he relied on a lawyer and therefore acted in good faith. And here, that is what Bankman-Fried was trying to do—and would have done had the court not unlawfully barred his defense.

*Scully* explained what a fair and balanced instruction on advice of counsel should say. 877 F.3d at 477-78. But the district court ignored that guidance, instead giving a one-sided and erroneous instruction.

## F.    The Errors Require A New Trial

The errors were not harmless. First, the district court required Bankman-Fried to preview his defense and allowed the prosecution a trial run at its cross. That unprecedented proceeding gave the prosecution a major tactical advantage, an advantage so significant it can hardly be measured on ordinary scales of prejudice. The district court compelled Bankman-Fried to testify as a precondition to exercising his constitutional right "to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). It did so based on its erroneous view of the law and its inherent authority. This was "a defect affecting the framework within which the trial proceeds," which "infect[ed] the entire trial process" and "necessarily render[ed] [the] trial fundamentally unfair"—and thus a structural

52

error not subject to harmless error review. *Neder v. United States*, 527 U.S. 1, 8 (1999). Such a proceeding apparently has never happened before, and this Court should ensure that it never happens again.

Prohibiting Bankman-Fried from testifying about critical parts of his defense was also reversible under *Scully*. A large part of Bankman-Fried's defense was that "he relied on the advice of counsel in operating his business and therefore lacked the requisite fraudulent intent that the government had to prove at trial." *Scully*, 877 F.3d at 475. The government claimed numerous FTX business practices were unusual and inherently deceptive. Bankman-Fried sought to testify that the practices were adopted on advice of counsel, and in many cases drafted by counsel. Evidence of counsel's advice and involvement "was necessary to rebut the government's claim." *Id.*

And the government fully exploited the defense's inability to respond. It argued that related-party loans were part of the theft, designed to "funnel[] money" to Bankman-Fried and other executives in a dishonest way. A-1092. The defense was prevented from proving or arguing that the loans were approved by counsel. The government repeatedly argued that the terms of service were inherently deceptive. A-1077, A-1089-90, A-1100-03. The defense was prevented from proving or arguing that the terms of service were drafted and approved by counsel. The government argued Bankman-Fried had personally set up the North

53

Dimension bank accounts to steal customer funds. A-1082, A-1095. The defense
was prevented from proving or arguing that the accounts were proposed and
approved by counsel. And, as discussed, the government elicited lengthy
testimony from FTX's former General Counsel that Bankman-Fried was not
allowed to rebut, which it cited repeatedly in summation. *E.g.*, A-1100-01.

Bankman-Fried should have been allowed to testify that counsel was
involved in all these policies and practices. To be sure, the government should also
have been allowed to cross-examine and otherwise rebut Bankman-Fried's
testimony. But "[i]t was for the jury to determine whether that testimony was
credible and raised a reasonable doubt about [his] guilt." *Scully*, 877 F.3d at 476.
Such significant limitations on a defendant's testimony are reversible error. *Id*.

The prejudice was further aggravated by the advice-of-counsel instruction—
which falsely instructed that a defendant "cannot argue" he had good faith because
he relied on counsel's advice, and falsely stated that reliance on advice of counsel
is no defense. The instruction told the jury to ignore the limited defense evidence
that was allowed. The faulty jury instruction enabled the government to argue
repeatedly in closing that FTX's auto-delete policies were obvious evidence of
fraud, rather than a standard (lawyered) corporate policy. The government thus
told the jury that, based on the instructions and how they applied to the deletion

54

policy, "you can infer that he believed he was guilty, that he didn't have good faith." A-1098-99; *see also* A-1093, A-1113-14.

The government engineered an unfair proceeding, prevented Bankman-Fried from presenting his planned defense, and then ruthlessly exploited that advantage in its arguments to the jury. The court's rulings facilitated these tactics and thereby deprived Bankman-Fried of his constitutional right to have the jury hear both sides' evidence before deciding his fate. A new trial is required.

## III. THE SCIENTER INSTRUCTIONS ERRONEOUSLY LOWERED THE GOVERNMENT'S BURDEN

All charges required criminal intent. But the jury instructions either watered down or eliminated these elements. These errors, especially when considered together with the errors discussed above, require reversal.

### A. The Jury Instructions Omitted The Requirement Of Intent To Cause Loss

#### 1. Background

As discussed, fraud requires intended loss. Bankman-Fried sought jury instructions on that principle but the district court refused. Instead, the court erroneously instructed the jury that in effect, no intended loss is required.

For the fraud counts, the government requested instructions inviting conviction regardless of whether "any victim actually suffered damages" and regardless of whether Bankman-Friend "believed that the victims would … ultimately lose money." A-416, A-419. The defense, by contrast, requested

55

instructions requiring proof that Bankman-Fried engaged in fraud "for the purpose of causing financial loss," and that if he believed FTX could cover all obligations, he lacked intent to defraud. A-515. The government objected to the defense proposal, citing the prior rulings that loss is "immaterial as a matter of law." A-592.

The court sided with the government. A-1073. Its instructions barely mentioned loss and said mere "use" of another's money or property sufficed. A-1125-26. To make matters worse, overruling defense objections, A-658-60, A-1073, the court gave a no-ultimate-harm instruction requested by the government, A-593. That instruction said even an honest belief "that ultimately everything would work out to the benefit of the alleged victims" was not good faith. A-1133. The instruction further stated that intent to deprive victims of their ability to use their money, "even if only for a period of time," satisfied the requisite criminal intent. *Id*.

The definitions of "intent to defraud" and "good faith" applied to Counts One through Six. A-1155, A-1163. And since Count One was the predicate for Count Seven (money laundering), A-1167, the instructions applied to all counts.

### 2. *The Instructions Misstated The Law*

a. Taken together, the jury instructions eliminated an element of the offense—namely, intent to cause loss. The government must prove "loss to the

56

victim" was "an 'object of the fraud.'" *Kelly*, 590 U.S. at 402; *see supra* at 28. In other words, the alleged fraudster must contemplate a loss to the victim—and *contemplate* in this context means *intend*. *United States v. Gabriel*, 125 F.3d 89, 97 (2d Cir. 1997). A defendant must have the conscious object of bringing about that forbidden result. The instructions never set forth that element. Indeed, the no-ultimate-harm instruction states the contrary—that even if the defendant does *not* intend loss, he can be guilty based on a temporary deprivation.

The no-ultimate-harm instruction is an incorrect statement of the law and should be repudiated. It has no basis in Supreme Court precedent, much less the text of the fraud statutes. This Court originally endorsed it in right-to-control cases because a temporary deprivation of money constituted a sufficient "loss of control" of the funds. *See United States v. Dinome*, 86 F.3d 277, 281 (2d Cir. 1996). But the Supreme Court has since invalidated the right-to-control doctrine on which the no-ultimate-harm concept was based. *See Ciminelli*, 598 U.S. at 309.

Additionally, the Supreme Court recently granted certiorari to clarify whether deception can constitute fraud "even if inflicting economic harm on the victim was not an object of the scheme." Petition for Writ of Certiorari at i, *Kousisis v. United States*, No. 23-909, *cert. granted*, 144 S. Ct. 2655 (2024). Given its holdings in *Kelly* and *Ciminelli*, the Court's likely answer will be no. That is because fraud requires an intent to cause *loss*—period. Temporarily

57

depriving someone of his ability to *use* or *control* his property is not the same, and it is not sufficient.

b.    Even if the no-ultimate-harm doctrine retains some vitality after *Kelly*, *Ciminelli*, and *Kousisis*—which is doubtful—the instruction was impermissible here. This Court has long warned that the no-ultimate-harm instruction has a grave potential to confuse jurors. *See United States v. Rossomando*, 144 F.3d 197, 202-03 (2d Cir. 1998). It has held the instruction should only be given where the evidence "necessitate[s]" it, and where the instruction will not cause confusion. *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016).

Neither requirement was satisfied. The district court excluded all defense evidence and argument that Bankman-Fried "intended to repay his customers, intended to return their funds, or believed that … he could ultimately repay them." Dkt.204 at 42; SPA-57. Given that (erroneous) ruling, there was no need for any instruction. This Court has never endorsed a no-ultimate-harm instruction in a case where the defense was prevented from arguing the very point the instruction is supposed to address.

The facts here also make the instruction wrong and deeply confusing. Alameda was a hedge fund, and FTX was a margin futures trading platform—a leveraged lending platform. Lenders like BlockFi deployed complicated cryptocurrency lending structures where they would rehypothecate crypto assets.

58

A-817. BlockFi placed no restrictions on what Alameda could do with the funds. The very nature of the lending agreement meant BlockFi would be "deprived" of its funds for a period, and if Bankman-Fried believed the loans could be covered, he could not have intended a "loss" in any meaningful sense. The same is true of FTX customers, who engaged in margin trading with 80% of assets on the platform.

In short, the leveraged nature of the Alameda fund and the FTX platform itself rendered the no-ultimate-harm instruction deeply confusing—because it implied that investors and customers suffered a loss when funds were invested elsewhere or lent out to others. It implied, in other words, that the (publicly and repeatedly disclosed) structure of the businesses—and indeed the entire futures industry—was inherently illegal. That is wrong as a matter of law.

### B. Additional Errors In The Good Faith And Willfulness Instructions Further Gutted The Scienter Requirements

#### 1. Background

Bankman-Fried requested instructions that the "willfully" element in securities and commodities fraud requires proof the defendant knew his conduct was unlawful. A-611, A-625, A-629. He also requested language, applicable to all counts, stating "Good faith is an honest belief by the defendant that his conduct was not unlawful." A-1072; *see also* A-1073, A-611. However, when the government objected, the district court sided with the government. A-1074.

Thus, for Counts Five and Six, the court instructed the jury to apply the definition that "willfully" "means to act voluntarily and with wrongful purpose." A-1131; *see* A-1155, A-1163.  Likewise, the good faith instructions as to all counts omitted that a defendant's good faith belief that he was not violating the law negates scienter.  A-1133, A-1155.

After the jury charge, the defense renewed its objections.  A-1212-13.

<em>2.    The Willfulness Instructions Were Erroneous</em>

a.    Criminal violations of the Securities Exchange Act and Commodities Exchange Act require proof the defendant acted "willfully."  15 U.S.C. §78ff(a); 7 U.S.C. §13(a)(5).  Thus, to conspire to violate either statute, proof of willfulness is required.  *See United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).

The Supreme Court has repeatedly held that "to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'"  *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).  *Bryan*'s "definition of willfulness is generally applicable" and requires, for securities fraud, proof of the defendant's "knowledge that the conduct is unlawful."  *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020).  This Court has held the "generally applicable" rule is that "willful" means "with knowledge that [the] conduct was *unlawful*."  *United States v. Kukushkin*, 61 F.4th 327, 332 (2d Cir. 2023); *accord*

60

*United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 154 (2d Cir. 2024). By refusing to instruct the jury that willfulness requires "knowledge that the conduct is unlawful," *Kosinski*, 976 F.3d at 154, the district court erroneously lowered the government's burden.

  b. The court watered down the "willfulness" instruction based on the erroneous premise that under *United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010), knowledge of unlawfulness is only required in insider trading cases. But *Kaiser* merely held willfulness does not "require a securities defendant's awareness of more than the general unlawfulness of his conduct." *Kosinski*, 976 F.3d at 154. That is, defendants need not know what *specific* law they are violating but must know they were violating the law. *McKesson Corp.*, 96 F.4th at 159 (discussing the distinction). Since *Kaiser*, this Court has reaffirmed "willfulness" requires a "bad purpose to disobey or disregard the law," describing that formulation as "the standard jury instruction on willfulness." *Kukushkin*, 61 F.4th at 329; *accord Pfizer, Inc. v. H.H.S.*, 42 F.4th 67, 77 (2d Cir. 2022).

  **C.** **The Errors Require Retrial**

  The instructional errors deprived Bankman-Fried of his right to have a jury find each element beyond a reasonable doubt. In *Neder*, the Supreme Court held that such a fundamental constitutional error is only harmless in the rarest circumstances: "[W]here the defendant contested the omitted element and raised

evidence sufficient to support a contrary finding—it should not find the error harmless." 527 U.S. at 19.

*Neder* requires reversal where the defendant offers "innocent explanations" or "disputed evidence" as to the element in question. *Quattrone*, 441 F.3d at 179, 181. That standard is easily met here. The question of loss and ultimate harm was contested, and Bankman-Fried certainly would have presented much more evidence on solvency and intent to cause loss had he been allowed to do so.

Moreover, the prosecution repeatedly urged the jury to convict based on the faulty no-ultimate-harm instruction in summation. It told the jury it was *irrelevant* whether Bankman-Fried believed that "with just a little more time, everything could have worked out, and they could have processed some more withdrawals." A-1104. It said that under the law, which would be reflected in the instructions, "even an honest belief, that ultimately everything would work out fine or that victims wouldn't ultimately lose money, does not mean the defendant acted in good faith." *Id*. And it hammered this point home on rebuttal:

> Whether Alameda was liquid, solvent, had $40 billion of coins or gold bars, or just a worthless pile of junk, it doesn't matter. It's a distraction. Because even if the defendant thought that Alameda could sell all its assets and investments that were not on the FTX exchange to repay a $14 billion debt—which it couldn't and it didn't—that wouldn't be good faith.

A-1110-11.

The faulty willfulness and good faith instructions similarly require reversal. The government told the jury "[t]he core dispute in this case is whether the defendant knew taking the money was *wrong*. That's the core question." A-1079 (emphasis added). It then equated "the path of doing the wrong thing" with "the criminal path," A-1086, repeatedly relying on that watered-down standard, *e.g.*, A-1079-81, A-1083-85, A-1098-99, A-1112. When arguing lack of good faith, the government doubled down, noting it had "spent th[e] morning talking about all the reasons you know the defendant knew what he was doing was wrong, and those are all reasons the defendant wasn't acting in good faith." A-1098. During testimony, the government asked former FTX employees whether they believed the alleged conduct was "wrong," A-698, A-736, A-787, A-796, then highlighted that testimony in closing, A-1077, A-1108-09.

The remaining instructions did nothing to lessen the harm from these errors. To the contrary, the instructions read like a statement of the government's theory, in which the court marshaled the evidence in favor of the prosecution.

For example, it gave a lengthy and erroneous instruction implying that when considering FTX's terms of service, the jury should focus only on the government's exhibit and ignore Bankman-Fried's testimony. A-1126-27. And because certain terms disclaimed a fiduciary relationship, and thus favored the defense, the district court warned the jury to discount those terms. A-1128.

63

Likewise, the advice-of-counsel instruction effectively advocated the government's theory. A-1134. The court also gave an entirely unnecessary willful blindness instruction. A-1179. And it instructed the jury that it could infer lack of good faith based on deleted communications, A-1200—even though it had prevented Bankman-Fried from obtaining the relevant version of FTX's data deletion policy, which had been endorsed by outside counsel, as discussed *infra*.

Jury instructions must be balanced. *United States v. Brutus*, 505 F.3d 80, 86-87 (2d Cir. 2007). If instructions tell the jury it may consider circumstantial evidence of guilt on a point, they must likewise tell the jury it may consider circumstantial evidence of innocence on that point. *See United States v. Dove*, 916 F.2d 41, 45-47 (2d Cir. 1990). And while a defendant is entitled to an instruction on his defense theory, *see id*. at 47, there is no similar principle entitling the government to specific instructions on its prosecution theory. Yet here, time and time again, the district court gave instructions endorsing and highlighting specific prosecution arguments about Bankman-Fried's intent and lack of good faith.

The erroneous instructions were reversible error.

64

## IV. THE DISTRICT COURT ERRONEOUSLY REFUSED TO ORDER DISCOVERY FROM THE FTX DEBTORS AND THEIR COUNSEL, WHO WERE AN ARM OF THE PROSECUTION

The last few decades of American white-collar practice have produced a disturbing trend of collaboration between large law firms and federal prosecutors. Attorneys for white-shoe law firms—many themselves former AUSAs—feed cases to prosecutors. Prosecutors benefit from outsourcing their work. One of the most important benefits is that it allows the government to avoid its *Brady* obligations. Cooperating law firms (billing many hours) do investigative work for the prosecution. They then hand *inculpatory* evidence they find to prosecutors on a silver platter but systematically withhold *exculpatory* evidence. It's a win-win, at least for AUSAs and big firm lawyers. But it comes at the expense of defendants' constitutional rights and fair trials.

This case presents an extreme example of that dynamic. The FTX debtor estate had sole possession of much of the evidence necessary to determine Bankman-Fried's guilt or innocence. John Ray and Sullivan & Cromwell, who took control of the company three days into the liquidity crisis, provided extraordinary assistance to the government. S&C—which billed *hundreds of millions of dollars* in this case—performed prosecutorial tasks that had nothing to do with bankruptcy. Moreover, the Debtors and S&C were motivated to place all blame squarely on Bankman-Fried—to avoid scrutiny of their *own* business

65

decisions, their *own* conflicts of interest, their *own* exorbitant billing, and their *own* misconduct.

The Debtors were not mere spectators. They took control of FTX—a solvent company—from Bankman-Fried and forced it into a bankruptcy filing, before spending the next year loudly and repeatedly claiming FTX was completely worthless because Bankman-Fried, a "villain," had stolen all the money because of "hubris, incompetence, and greed." Dkt.143 at 13-14. This infected the public sentiment, charging decisions, witness testimony, judicial rulings, and sentencing—and they waited until *after* Bankman-Fried was convicted to admit that customers and creditors would get back their money.

The result of this extraordinary dynamic was to deprive Bankman-Fried of important information he could have used to defend himself. When he sought to obtain evidence necessary for his defense, he was stonewalled at every turn. The government claimed *it* had no obligation to turn anything over, since the evidence was not in its possession. Meanwhile the government declined to ask the Debtors for exculpatory material, despite the Debtors' assurance that they would immediately provide the government with anything it wanted. And the government and the Debtors successfully fought every defense subpoena. The district court, for its part, refused to investigate the matter, much less order discovery. Once again demonstrating a troubling degree of bias, the court simply

accepted the government's demonstrably false representation that the estate and S&C had "no involvement" in the prosecution.

Bankman-Fried was entitled to exculpatory information possessed by the debtor estate. The failure to disclose that information undermined the fairness and integrity of the trial.

### A. Background

#### 1. Appointment of Ray And S&C

When FTX experienced the November 2022 bank run, S&C still represented FTX. It pressured Bankman-Fried to give it control of FTX. On November 9— without notifying Bankman-Fried, who it had also represented personally—S&C contacted federal prosecutors and commenced an investigation. That same evening, prosecutors sent S&C a "Voluntary Document Request" asking for "all of FTX's and Alameda's balance sheets, profit and loss statements, general ledgers, and bank account statements." A-1305-07. S&C again did not notify Bankman-Fried, who was still CEO.

Two days later, S&C arranged for Ray's appointment to replace Bankman-Fried as CEO of FTX. Ray filed for bankruptcy, and appointed S&C as counsel to the estate.

The U.S. Trustee moved to appoint an independent examiner and remove S&C as counsel to the Debtors, citing multiple conflicts of interest. *See, e.g.*,

Bankr.Dkts.176, 496. S&C's conflicts at the time—which the government

certainly knew about—were substantial.[5] But no independent examiner was

appointed until the Third Circuit so ordered, well *after* Bankman-Fried's trial. *See*

*In re: FTX Trading Ltd.*, 91 F.4th 148 (3d Cir. 2024).

### 2. *The Government Deputizes The Debtors*

a. Having taken control of FTX, Ray and S&C immediately became

agents of the government's investigative team. Ray "made it very, very clear from

the beginning…that [the FTX Debtors] would do whatever the [g]overnment

request[ed] relative to cooperation," and that he would allow the government "to

get full access to the information on a real time basis." A-189-90. The FTX

Debtors, via S&C, fielded "over 150 requests from the Southern District"—

"produc[ing] substantial amounts of information." A-191-92. Thus, prosecutors

contacted S&C "on a daily basis," asking it to "look at these transactions, these

individuals, and get us this information in 24 hours." A-201-02. Ray

characterized this as a "circular effort" to gather and analyze information for the

government—the FTX Debtors would "get questions, [and] provide information,

that information gets synthesized, that turns into new inquiries [and] new

---

[5] *See* Jonathan Lipson & David Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11*, Stan. L. Rev. (forthcoming 2024), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4760736.

questions" from the prosecutors.  A-197.  Throughout, the government never subpoenaed the Debtors, relying instead on voluntary requests.

   b.   S&C did an enormous amount of investigative work for the prosecution.  By February 2023, it "collected…over twenty-seven million documents" and "provided an analysis of several hundred thousand documents" to the government.  A-191.  It "interviewed and received [pr]offers of 24 current and former employees" and read its notes of these interviews to the prosecutors.  *Id.*; Dkt.143 at 6.  It conducted interviews in which it posed the SDNY's "questions for former FTX personnel."  Bankr.Dkt.818-2 at 521.  It "also provided an analysis [of] transactions inside the companies['] databases."  A-191; *see also* Dkt.143 at 5-6.

   S&C proactively recommended new areas of inquiry and helped guide prosecutorial strategy.  For example, in an unprompted December 16, 2022 email, S&C drew prosecutors' "attention to" certain data "that resembles a transfer discussed by Sam Bankman-Fried in Signal chats to address the $45 million 'hole' in the FTX.us balance sheet."  A-212.  The government adopted S&C's summary in the Third Superseding Indictment, which parroted S&C's email.  A-106.

   S&C vetted prosecution theories.  On January 6, 2023, AUSA Roos sent S&C multiple priority government requests about various topics of investigation.  A-209-10.  The recipients included four former SDNY AUSAs.  One "top priority"

69

request was "[a] presentation on anything [S&C] can determine with respect to whether FTX.com, Alameda Research, and/or North Dimension were acting as an unlicensed money transmission business."  A-210.  S&C responded that it would review approximately "6000 documents…to make a presentation on this topic," *id.*, and that the Debtor would selectively waive privilege on this topic "to assist [the government's] investigation," A-207.  One week later, the government superseded to add an unlicensed money transmitting count.  A-134-35.

Remarkably, S&C also dictated government strategy regarding bail conditions.  S&C had numerous internal discussions and conversations with prosecutors about a "strategy" to impose more restrictive conditions, Bankr.Dkt.721-2 at 510, and "revocation," *id.* at 521.  These discussions initially led to motions for further restrictions, *e.g.*, A-87, and eventually a successful motion to remand Bankman-Fried—after S&C "review[ed] and analyze[d]" a July 2023 SDNY motion for additional conditions and participated in a "[c]all with SDNY re [the] motion," Bankr.Dkt.2271-2 at 244, 246, which then became a detention request, A-378.

c.      The FTX Debtors' and S&C's involvement in the investigation was instrumental to the government's case.  According to Ray, "provid[ing] the information that the Government ha[d] requested…yielded substantial results in record time," A-192, and "the role of [FTX's counsel]…in contacting federal

prosecutors…[was] of critical importance to the speed with which federal prosecutors [were] able to charge and arrest Mr. Bankman-Fried and charge (and obtain guilty pleas from) Ms. Ellison and Mr. Wang," Dkt.143 at 7 (quoting Bankr.Dkt.509 ¶2). S&C touted its work billing "tens of millions of dollars" for "reporting to the [government]," which "led to the indictment of three individuals…in record time," as well as "lawsuits…filed by the SEC and the CFTC." A-201.

### 3. Defense Motion

Months before trial, based on this evidence, the defense moved to compel additional discovery, arguing that the Debtors and S&C were members of the "prosecution team" for purposes of Rule 16, *Brady* and *Giglio,* and 18 U.S.C. §3500. *See* Dkts.143, 158.

The motion sought all documents held by the Debtors that were material to the defense under Rule 16 and all exculpatory and impeachment evidence and witness interview notes compiled by the Debtors. In the alternative, the defense requested an evidentiary hearing on whether the Debtors and S&C were effectively members of the prosecution team. Dkts.143, 158.

The motion identified documents possessed by the Debtors that likely contained exculpatory evidence. The first was the FTX codebase editing history, which was central to assessing the allegation that Bankman-Fried "caused the

creation of secret loopholes in the computer code that powered FTX." A-144. The codebase history would have revealed any relevant codebase edits—or lack thereof. The second concerned documents reflecting outside counsel's advice about FTX's document retention policy and use of ephemeral messaging applications (which the government claimed was designed to destroy evidence), as well as the document retention policy itself. Dkts.143 at 12, 158 at 55-56.

The defense separately moved to compel production of documents responsive to eleven different subpoena requests addressed to Fenwick & West, FTX's outside counsel. Dkt.151. The motion sought documents reflecting counsel's legal advice on various topics material to the defense, including the document retention policies and use of Signal. A-225.

In opposing the motions—and despite the extensive collaboration detailed above—the government remarkably claimed FTX and S&C had "no involvement in any significant aspect of the Government's investigation and prosecution." Dkt.149 at 59. The government asserted the Debtors and S&C were merely acting voluntarily as cooperating third parties. Dkts.149 at 56-67, 156 at 3-8.

The court denied the defense motions "substantially for the reasons that the government ha[d] advanced." A-373; *see also* SPA-1-2.

The defense later moved for disclosure of any *Brady* material disclosed to the government orally, Dkt.207 at 17-18—noting that billing records demonstrated

72

frequent calls and presentations between S&C and the prosecutors—and in the alternative requested Rule 17 subpoenas. The court denied that motion too. SPA-60-61.

## B. The Debtors And Their Counsel Functioned As Members Of The Prosecution Team

The government's argument was belied by substantial evidence that it worked hand-in-glove with the Debtors and S&C to prosecute Bankman-Fried. The district court erred by summarily adopting the government's position, thereby preventing Bankman-Fried from obtaining critical exculpatory evidence.

The government's discovery obligations extend to all third parties who can be considered members of the prosecution team. *See United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022). Rule 16 likewise requires the government to "turn over evidence if the piece of evidence 'is within the government's possession, custody, or control' or *that of its agent*." *Bradley*, 105 F.4th at 35 (emphasis added). The government "has a duty to learn of any favorable evidence known to" any third party acting as its agent. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

The "prosecution team" includes not only prosecutors and case agents, but any other entity or individual "'acting on the government's behalf' in a case." *Hunter*, 32 F.4th at 35. The rule resists a "broad, categorical approach," and instead requires courts to "examin[e] the specific circumstances of the person alleged to be an 'arm of the prosecutor.'" *United States v. Stewart*, 433 F.3d 273,

73

298 (2d Cir. 2006). "[T]he relevant inquiry is what the person *did*, not who the person *is*." *Id.* "Individuals who perform investigative duties…are considered members of the prosecution team." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015).

This was not an ordinary instance of corporate cooperation. The Debtors and S&C helped initiate the prosecution by identifying allegedly culpable individuals and potential witnesses. They collected and "review[ed] documents," "interview[ed] witnesses," "gather[ed] facts" at the government's request, and posed questions on topics the government told them to inquire about, all to distill the evidence for the government and help "develop prosecutorial strategy." *Stewart*, 433 F.3d at 299. They did not merely "provide information to the government;" they carried out "investigative duties" and "played [a critical] role in the investigation [and] in determining investigation [and] trial strategy," pointing the government to new allegations and avenues of inquiry. *Barcelo*, 628 F. App'x at 38.

This all occurred over multiple months in response to hundreds of government requests, with daily correspondence and collaboration between the parties, ultimately leading to indictments, multiple superseders, and guilty pleas. If this conduct does not amount to "'acting on the government's behalf' in a case," *Hunter*, 32 F.4th at 35, it is hard to imagine what would. And the extensive

74

coordination between the government and the Debtors manifest from the record is likely just the tip of the iceberg.

The sheer magnitude of the Debtors' participation in the prosecution and the government's outsourcing of key inquiries showed they were an arm of the prosecution. The Debtors and their counsel likely conducted a more voluminous investigation than the government itself. The facts here are analogous to *United States v. Connolly*, 2019 WL 2120523 (S.D.N.Y. May 2, 2019), where a corporate cooperator's and its counsel's actions were "fairly attributable" to the prosecution team. There, as here, "rather than simply producing documents and providing interview summaries," the company's counsel "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect" after completing a $10 million investigation. *Id*. at *10, *12. In effect, there, as here, "the Government outsourced the important developmental stage of its investigation…and then built its own 'investigation' into specific employees…on a very firm foundation constructed for it" by the cooperating third party. *Id.* at *12. Such conduct warrants imputation.

## C. The Court Should Reverse And Remand

The defense identified documents that were likely exculpatory and requested their disclosure. It was an entirely reasonable request, yet the government, Debtors, and court stonewalled the defense. On the one hand, Ray and S&C told

75

the bankruptcy court they would "mak[e] available … any records…the Government want[ed]." *United States v. Kilroy*, 523 F. Supp. 206, 215 (E.D. Wis. 1981). The government thus had "'ready access' to th[is] evidence," *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006). Yet, knowing of its existence and likely exculpatory nature, the government refused to obtain it. This hamstrung Bankman-Fried's defense and denied him a fair trial.

At an absolute minimum, a hearing is required. *See*, *e.g.*, *United States v. Blumberg*, 2:14-cr-00458-JLL, ECF 113 (D.N.J. June 7, 2019) (ordering evidentiary hearing to determine if corporate cooperator was member of "prosecution team"). The district court dismissed the defense arguments, which were backed up by strong evidence, in conclusory fashion and without a basis to make any "factual and credibility determinations." *Risha*, 445 F.3d at 299 (remanding for further factfinding). Worse, it adopted the government's view even though the government failed to contest most of the problematic facts demonstrating that the Debtors, S&C, and the government were working in concert to destroy Bankman-Fried.

And the government's denials of coordination were patently unbelievable. When Ray trumpeted his work for the prosecution, the government dismissed his statements as "puffery." Dkt.149 at 67. It also asserted, for example, that it had not "directed the FTX Debtors to take any affirmative steps" and had not "entered

76

any formal collaboration agreement." Dkt.149 at 66. Only a lawyer could make such claims with a straight face. In other instances, the government responded with half-truths and misleading omissions. When the defense moved for disclosure of oral *Brady* information, the government responded with a non-sequitur: It identified materials it had turned over but failed to explain why it was not disclosing all information the Debtors and their counsel had orally communicated to the government. It strains credulity to think that in thousands of conversations with prosecutors, S&C never communicated any exculpatory information.

* * * *

This Court has already expressed serious concern about whether its "jurisprudence circumscribing the 'prosecution team'…[is] adequate to protect [d]efendants' rights." *Hunter*, 32 F.4th at 38 & n.70 (collecting cases). This case proves the danger. "If prosecutors can categorically ignore the contents of a cooperating company's file, regardless of its exculpatory value or their own role in driving the information-gathering effort, the wholesale delegation of the investigative process to entities unconstrained by the Constitution becomes more and more likely." Sarah Patterson, *Co-Opted Cooperators: Corporate Internal Investigations and* Brady v. Maryland, 2021 Colum. Bus. L. Rev. 417, 471 (2021). Indeed, the government now routinely deploys this approach in large white-collar

77

investigations, and its corporate cooperation framework explicitly encourages such outsourcing of investigations.[6]

Without sufficiently robust protections for criminal defendants, the government will continue outsourcing its investigative duties to third parties—often former colleagues—avoiding discovery obligations designed to ensure "criminal trials are fair." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Court should end this subversion of *Brady*, and reverse and remand.

## V. THE FORFEITURE MONEY JUDGMENT WAS UNLAWFUL

### A. Background

The government sought an $11,020,000,000 money judgment *and* forfeiture of specified property. Dkt.410 at 101-09. Bankman-Fried did not object to forfeiture of any specified property. He did, however, challenge the lawfulness of the money judgment, which was duplicative because he had already delivered all assets of FTX and Alameda to the Debtors so that customers could be made whole. Dkt.407 at 85-88; Dkt.414 at 6-9.

The court nonetheless entered the $11 billion money judgment and the duplicative forfeiture of specified property. A-1310, SPA-102, SPA-88-95. And it did so in lieu of restitution, at the government's request, because calculating

---

[6] *E.g.*, United States Attorneys' Offices Voluntary Self-Disclosure Policy (Feb. 22, 2023), https://www.justice.gov/usao-sdny/press-release/file/1569411/dl.

accurate victim compensation estimates would be too "complex" and "impractical." Dkt.410 at 109-12; A-1310. The court thus sidestepped the need to accurately estimate victim loss and ensured Bankman-Fried would be personally indebted to the government for the rest of his life.

### B. The Statutes Do Not Authorize Money Judgments

The court ordered forfeiture under 18 U.S.C. §§981(a)(1)(c) and 982(a)(1) and 28 U.S.C. §2461(c). *See* Dkt.410 at 103-04. But those statutes do not authorize money judgments, as opposed to the forfeiture of specific assets derived from the crime.

The court must "begin[] with th[e] [statutory] terms themselves" and "avoid[] reading incongruous breadth into… criminal statutes." *Dubin v. United States*, 599 U.S. 110, 118, 130 (2023). Section 981(a)(1)(c) authorizes forfeiture of "any property…which constitutes or is derived from proceeds traceable to" the crime. Section 982(a)(1) similarly authorizes forfeiture of "any property … involved in such offense, or any property traceable to such property." But the money judgment here is in no way "traceable to" or "involved in" the offenses of conviction.

The money judgment does not satisfy the statutory requirements, because the court also ordered the duplicative forfeiture of specific property allegedly traceable to the crimes. For example, the forfeiture order identified 55 million shares of

Robinhood stock "seized by the Government" prior to sentencing and worth about $1.1 billion at the time.  SPA-88.  It also identified over $1 billion of U.S. currency in already seized deposit accounts.  SPA-89.  The government argued at trial that these Robinhood shares were purchased using FTX customer deposits.  A-840-42.  But the $11 billion money judgment failed to account for this.  Instead, it blindly equated "property" and "proceeds" with the "sum of money" the government alleged represented victims' losses.  SPA-88.  That is not how the statutes operate.

Where—as here—the statutory text does not expressly authorize a forfeiture money judgment, courts lack power to impose one.  "The criminal forfeiture statutes at issue…lack any textual basis for imposing a personal money judgment." *United States v. Nejad*, 933 F.3d 1162, 1164-65 (9th Cir. 2019); *accord United States v. Surgent*, 2009 WL 2525137, at *5-16 (E.D.N.Y. Aug. 17, 2009).

### C.  Section 981(a)(1)(C) Does Not Authorize Forfeiting Investor And Lender Money

And §981(a)(1)(C) does not authorize the forfeiture of money received from investors and lenders in connection with the wire fraud counts.  Section 981(a)(2) defines forfeitable "proceeds" as used in §981(a)(1)(C) and distinguishes between cases involving inherently illegal goods and services, §981(a)(2)(A), and "lawful goods or lawful services that are sold or provided in an illegal manner," §981(a)(2)(B).  As to the latter, §981(a)(2)(B) defines forfeitable "proceeds" as "the amount of money acquired through the illegal transactions resulting in the

forfeiture, less the direct costs incurred in providing the goods or services." This means "profits" not "receipts." *United States v. Santos*, 553 U.S. 507, 511-12 (2008).

There is nothing "inherently unlawful" about exchanging equity for investments or taking loans pursuant to legitimate contracts. *See Contorinis*, 692 F.3d at 145 n.3. For example, in interpreting §981(a)(1)(C) in a securities fraud case, only the "difference between the stock's inflated value, and what it would have sold for absent the fraud" is subject to forfeiture. *United States v. Hatfield*, 2010 WL 1685826, at *3 (E.D.N.Y. Apr.21, 2010). This is because "[r]equiring forfeiture of the entire value of stock sold would require forfeiting compensation, even when that compensation is not traceable to fraud." *United States v. Gluk*, 831 F.3d 608, 618 n.11 (5th Cir. 2016). The district court made no attempt to determine what the value of FTX stock would have been absent the alleged fraud. Because investors received legitimate FTX equity, their entire investment plainly did not constitute criminal "proceeds."

The district court did not make any attempt to calculate actual proceeds under §981(a)(2)(B), so its forfeiture order was grossly inflated.

81

### D.    The Forfeiture Was Unconstitutional

If forfeiture is punitive, a court must consider "whether the forfeiture is unconstitutionally excessive." *United States v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016).  In *United States v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court "emphasize[d] that the Excessive Fines Clause grew out of the English constitutional tradition, including Magna Carta, which required that a fine 'should not deprive a wrongdoer of his livelihood.'" *Viloski*, 814 F.3d at 111.  Thus, courts must consider "whether the forfeiture would destroy a defendant's livelihood" in addition to the non-exhaustive *Bajakajian* factors, because "hostility to livelihood-destroying fines is deeply rooted in our constitutional tradition." *Viloski*, 814 F.3d at 111-12.

The forfeiture will destroy Bankman-Fried's future livelihood.  The $11 billion amount is astronomical, and Bankman-Fried has no assets.  *See* PSR31. Even if he survives his 25-year-sentence and is eventually released, it will be impossible for him to earn substantial wages because of his conviction.  He would never be able to come close to satisfying the $11 billion judgment.  Thus, independent of other relevant considerations, the court should have rejected the requested forfeiture, or at minimum conducted a more probing inquiry into whether forfeiture would be "ruinous" here.  *See United States v. Levesque*, 546 F.3d 78, 83-85 (1st Cir. 2008).

82

## VI.    ON REMAND, THE CASE SHOULD BE REASSIGNED TO A DIFFERENT JUDGE

In high-profile cases the press and public clamor for punishment.  The glare of publicity can make it difficult for actors in the legal system to maintain their impartiality.  Unfortunately, the trial judge's one-sided handling of this case illustrates the problem.  The case should be reassigned on remand.

Reassignment is appropriate where (1) an objective observer might reasonably "question the judge's impartiality" or (2) "reassignment is advisable to preserve the appearance of justice."  *Quattrone*, 441 F.3d at 192 (cleaned up); *accord*, *e.g.*, *United States v. Padilla*, 186 F.3d 136, 143 (2d Cir. 1999).

Here, many "objective observers" have already questioned the judge's impartiality.  They reported, for instance, "the judge appears to have a dim view of Bankman-Fried," "couldn't or didn't hide his disdain" from the jury,[7] he made "skeptical facial expressions [and] muted gesticulations…aimed at [the defense],"[8]

_____

[7] Nikhilesh De, Coindesk, *Is the Sam Bankman-Fried Story Over?* (Apr. 9, 2024), https://www.coindesk.com/policy/2024/04/10/is-the-sam-bankman-fried-story-over/.

[8] Nitish Pahwa, Slate, *The Judge Is So Fed Up With Sam Bankman-Fried's Lawyers* (Oct. 5, 2023), https://slate.com/technology/2023/10/sam-bankman-fried-trial-lewis-kaplan-mark-cohen-gary-wang.html.

"it was pretty clear…the judge did not like [Bankman-Fried]…didn't like his demeanor,"[9] and "he's coaching the prosecution on an argument to make."[10]

These observations are borne out by the record. As explained in this brief, many of the judge's rulings were not just erroneous but unbalanced—repeatedly putting a thumb on the scale to help the government and thwart the defense. But that is not all. The judge continually ridiculed Bankman-Fried during trial, repeatedly criticized his demeanor, and signaled his disbelief of Bankman-Fried's testimony. *See supra* at 17-18.

Equally troubling, he repeatedly mocked defense counsel and discredited their cross-examinations in front of the jury. *E.g.*, A-756 ("let's stop that, please"; "What part of 'let's stop that' was obscure?"); A-745 ("Could we get to the point."); A-879 ("This is not an exam for new eyeglasses. I assume he can read it just as well as everybody in the jury box can read it…You can ask him who Johnny Podres was. Let's move along. He pitched for the Brooklyn Dodgers."). On multiple occasions, the judge even sustained frivolous objections to defense

───────────────

[9] The Rest Is Politics, *From Peerages To Putin: The Fight Against Corruption In Politics* (Apr. 2, 2024), https://podcasts.apple.com/podcast/from-peerages-to-putin-the-fight-against-corruption/id1611374685?i=1000651214797.

[10] Matthew Goldstein, David Yaffe-Bellany, N.Y. Times, *'Don't Do That Again': Sam Bankman-Fried's Lawyers Under Fire From Judge* (Oct. 10, 2023), https://www.nytimes.com/2023/10/10/technology/sam-bankman-fried-trial-lawyers-judge.html.

cross questions on the absurd basis that the questions were "cumulative of the direct"—even though a time-honored technique of exposing a lie is to show that a witness changes details when retelling a fabricated story. *E.g.*, A-756-57.

The judge went out of his way to help the government in other ways. At one point he encouraged prosecutors to research whether an obscure legal doctrine applied. A-758. Another time, he intervened during the government's direct to elicit testimony that clued the prosecutor into a follow-up strategy to clarify a government argument. A-721-22. That was out-of-bounds in our adversary system. *See United States v. Sineneng-Smith*, 590 U.S. 371 (2020) (rebuking court for raising issues sua sponte).

The judge also improperly prodded the jury to reach its verdict in just a single evening following the complex four-week trial. Telegraphing his impatience, he three times invited jurors to stay until 8:15pm the first day of deliberations to reach a verdict, offering them free dinner and car service. A-1106-07, A-1216-17. The jury apparently got the message and convicted after just four hours of deliberations.

Other statements before the trial confirm bias. Before Bankman-Fried was detained, he was permitted to live at the home of his parents (both Stanford Law professors) on restrictive conditions. During bail proceedings, the judge imposed additional, more onerous conditions sua sponte or encouraged the government to

85

press for them.  At one such hearing, after prosecutors requested only limited

restrictions on Bankman-Fried's use of electronic devices, the judge inquired:

"You are putting an awful lot of trust in him, aren't you?"  A-97; A-98 ("Why am I

being asked to turn him loose in this garden of electronic devices, when he is in

home detention.").

The judge also repeatedly imputed the worst possible motives to Bankman-

Fried.  Upon learning he had used a VPN to watch NFL games using a subscription

streaming service (there was no TV in the home), the judge initially suggested this

violated bail conditions.  A-99-100, A-95.  But the bail conditions only prevented

the use of encrypted or ephemeral "call or messaging application[s]."  A-94.  After

being corrected, the judge switched to criticizing Bankman-Fried for violating the

provider's terms of service (requiring viewers to access it from the Bahamas).  A-

101-02.  He then cited this in his subsequent remand order, conceding the conduct

"didn't violate any of his bail conditions" but finding it "says something about the

mindset."  A-380.

These are just a few examples.  Over and over, Judge Kaplan expressed a

firm belief in Bankman-Fried's guilt.  *E.g.*, A-814-15 (deriding defense argument

that Bankman-Fried did not run Alameda after stepping down as CEO as "a joke");

A-814 (after prosecutor stated tweet was a "misrep," stating "Of course it is.  It's a

misrep, no matter what this [witness] says.").  When discussing jury instructions,

86

the judge quipped that the wire fraud standards "ought not to be much of a problem for the government because god knows there's more than sufficient evidence." A-1075.

Given his previously expressed views, it was no surprise when the judge imposed a draconian quarter-century sentence on this first time, non-violent offender. The judge imposed this sentence "for the purposes of disabling him…for a significant period of time"—supposedly because he thought Bankman-Fried would "do something very bad in the future." A-1309.

In short, the trial judge "would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977). After such lengthy and difficult proceedings, reassignment "is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *United States v. Bryan*, 393 F.2d 90, 91 (2d Cir. 1968).

## CONCLUSION

For the foregoing reasons, the judgment should be vacated and the case remanded to another judge for a new trial, or at minimum, an evidentiary hearing on whether the Debtors and S&C were an arm of the prosecution team.

87

Dated:    New York, New York        /s/Alexandra A.E. Shapiro
              September 13, 2024           Alexandra A.E. Shapiro

Theodore Sampsell-Jones

Jason A. Driscoll

SHAPIRO ARATO BACH LLP

1140 Ave of the Americas, 17th Floor

New York, New York 10036

(212) 257-4880

*Attorneys for Defendant-Appellant*
*Samuel Bankman-Fried*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.  The undersigned counsel of record for Defendant-Appellant Samuel Bankman-Fried certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 18,811 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word 2024, and is therefore in compliance with this Court's Order dated September 4, 2024, permitting Bankman-Fried to file a principal brief of up to 19,000 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2023 in 14-point font of Times New Roman.

Dated:    September 13, 2024

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro