# 24-961

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆❖◆

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ZIXIAO GARY WANG, CAROLINE ELLISON, NISHAD SINGH, RYAN SALAME,

*Defendants,*

FTX TRADING LTD., WEST REALM SHIRES INC,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors,*

SAMUEL BANKMAN-FRIED, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## APPENDIX FOR DEFENDANT-APPELLANT
## VOLUME II OF V
## (Pages A-213 to A-503)

---

ALEXANDRA A.E. SHAPIRO
THEODORE SAMPSELL-JONES
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS

PAGE

District Court Docket Entries in *United States v. Bankman-Fried*,
No. 22-cr-673 (LAK) (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Excerpts of Arraignment Transcript, dated January 3, 2023 . . . . . . . . . . . . . A-86

Memorandum and Order Modifying Release Conditions,
dated February 1, 2023 (Dkt. 58) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-88

Order Modifying Release Conditions, dated February 14, 2023
(Dkt. 68) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-95

Excerpts of Transcript of February 16, 2023 Pre-Trial Conference . . . . . . . A-96

Third Superseding Indictment, dated February 23, 2023 (Dkt. 80) . . . . . A-103

Fifth Superseding Indictment, dated March 28, 2023 (Dkt. 115) . . . . . . . A-142

Exhibits to Declaration of Christian R. Everdell in Support of Motion
for Additional Discovery

    Exhibit 9 – Excerpts of Bankruptcy Hearing Transcript,
    dated February 6, 2023 (Dkt. 137-9) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-185

    Exhibit 10 – Emails dated February 16, 2023,
    and January 13, 2023 (Dkt. 137-10). . . . . . . . . . . . . . . . . . . . . . . . . . . . A-205

    Exhibit 11 – Email dated December 16, 2022 (Dkt. 137-11) . . . . . . . A-211

Exhibit To Bankman-Fried's Motion to Compel Discovery

    Exhibit 1 – Subpoena to Fenwick & West LLP (Dkt. 151-1) . . . . . . . A-213

Excerpts of Transcript of June 15, 2023 Pre-Trial Conference . . . . . . . . . A-361

ii

PAGE

Letter from Government to Hon. Lewis A. Kaplan Re Pretrial Filings,
dated June 29, 2023 (Dkt. 171) .................................... A-374

Excerpts of Transcript of July 26, 2023 Pre-Trial Conference.......... A-377

Excerpts of Transcript of August 11, 2023 Pre-Trial Conference....... A-379

Sixth Superseding (Operative) Indictment, dated August 14, 2023
(Dkt. 202) ...................................................... A-381

Excerpts of Transcript of August 30, 2023 Pre-Trial Conference....... A-399

Letter from Government to Hon. Lewis A. Kaplan Re Advice-Of-
Counsel Defense Notice, dated August 18, 2023 (Dkt. 211) ....... A-401

Government's Requests to Charge, dated August 21, 2023 (Dkt. 214) .. A-404

Bankman-Fried's Requests to Charge, dated August 21, 2023
(Dkt. 215) ...................................................... A-504

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Re Advice-Of-
Counsel Defense Notice, dated August 23, 2023 (Dkt. 222) ....... A-554

Letter from Government to Hon. Lewis A. Kaplan Re Advice-Of-
Counsel Defense Notice, dated August 29, 2023 (Dkt. 239) ....... A-557

Letter from Bankman-Fried to Hon. Lewis A. Kaplan In Response To
Dkt. 239, dated August 30, 2023 (Dkt. 240) ..................... A-565

Order On Motions To Exclude Proposed Expert Testimony,
dated September 21, 2023 (Dkt. 287) ........................... A-572

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
Clarification And Reconsideration Of Rulings,
dated October 2, 2023 (Dkt. 306) ............................... A-577

iii

PAGE

Letter from Government to Hon. Lewis A. Kaplan Moving to
    Preclude Evidence Of Current Value Of Investments,
    dated October 8, 2023 (Dkt. 315) ................................. A-582

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
    Permission To Cross Examine Gary Wang On Involvement of
    Counsel In Loan Structuring, dated October 9, 2023 (Dkt. 316) ... A-585

Letter from Bankman-Fried to Hon. Lewis A. Kaplan In Response To
    Dkt. 315, dated October 10, 2023 (Dkt. 317) ..................... A-588

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
    Permission To Cross Examine Caroline Ellison On Involvement
    of Counsel In Creating Auto-Deletion Policies,
    dated October 10, 2023 (Dkt. 318) ............................... A-590

Letter from Government to Hon. Lewis A. Kaplan Re Additional
    Requests To Charge, dated October 19, 2023 (Dkt. 326) .......... A-592

Bankman-Fried's Amended Requests to Charge,
    dated October 19, 2023 (Dkt. 327) ............................... A-598

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Re Objections
    to Government's Proposed Jury Instructions,
    dated October 24, 2023 (Dkt. 329) ............................... A-658

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Providing
    Notice of Certain Direct Examination Testimony Regarding
    Involvement of Counsel, dated October 25, 2023 (Dkt. 338)....... A-664

Excerpts of Trial Transcript ......................................... A-670

**Government's Exhibits**

    GX-532 FTX Investor Deck, dated March 2021 .................. A-1220

    GX-558 FTX Terms Of Service, dated May 13, 2022 ............ A-1231

    GX-866 @SBF_FTX Twitter Post, dated November 7, 2022...... A-1293

iv

PAGE

GX-1005 Alameda Balance on FTX in 2022 Chart . . . . . . . . . . . . . . A-1295

GX-1014 Alameda Borrowing From Third Party Lenders Chart . . A-1296

**Defense Exhibits**

DX-1617 Alameda LOC Principal Chart . . . . . . . . . . . . . . . . . . . . . . . . A-1297

DX-1618 FTX User Accounts Balance Chart . . . . . . . . . . . . . . . . . . . A-1298

DX-1619 FTX User Accounts All Coins Balance Chart . . . . . . . . . . A-1299

DX-964 (excluded) FTX Blogpost, dated October 28, 2020 . . . . . . A-1300

Exhibit to Bankman-Fried's Sentencing Submission

Excerpts of Exhibit E – November 15, 2022 Letter From James
M. McDonald To Prosecutors (Dkt. 407-34) . . . . . . . . . . . . . . . . . . A-1304

Excerpts of Sentencing Transcript, dated March 28, 2024 . . . . . . . . . . . A-1308

Notice of Appeal, filed April 11, 2024 (Dkt. 428) . . . . . . . . . . . . . . . . . . A-1311

A-213

# Exhibit 1

**A-214**

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Samuel Bankman-Fried | ) Case No. S5 22-CR-673 (LAK) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS IN A CRIMINAL CASE

To:  Fenwick & West LLP c/o Nancy Hart, Esq., Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166

*(Name of person to whom this subpoena is directed)*

    **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following books, papers, documents, data, or other objects:

Please see attached Exhibit A.

| Place: Cohen & Gresser LLP 800 Third Ave., 19th Fl. New York, New York 10022 | Date and Time: 06/20/2023 5:00 pm |
|---|---|

    Certain provisions of Fed. R. Crim. P. 17 are attached, including Rule 17(c)(2), relating to your ability to file a motion to quash or modify the subpoena; Rule 17(d) and (e), which govern service of subpoenas; and Rule 17(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

        *(SEAL)*

Date:  _____

                    *CLERK OF COURT*

                    _____
                    *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
Samuel Bankman-Fried                                         , who requests this subpoena, are:

 Christian R. Everdell, Cohen & Gresser LLP,
 800 Third Avenue, 21st Fl. New York, NY 10022, ceverdell@cohengresser.com; +1 212 707 7268

### Notice to those who use this form to request a subpoena

Before requesting and serving a subpoena pursuant to Fed. R. Crim. P. 17(c), the party seeking the subpoena is advised to consult the rules of practice of the court in which the criminal proceeding is pending to determine whether any local rules or orders establish requirements in connection with the issuance of such a subpoena. If no local rules or orders govern practice under Rule 17(c), counsel should ask the assigned judge whether the court regulates practice under Rule 17(c) to 1) require prior judicial approval for the issuance of the subpoena, either on notice or ex parte; 2) specify where the documents must be returned (e.g., to the court clerk, the chambers of the assigned judge, or counsel's office); and 3) require that counsel who receives produced documents provide them to opposing counsel absent a disclosure obligation under Fed. R. Crim. P. 16.

Please note that Rule 17(c) (attached) provides that a subpoena for the production of certain information about a victim may not be issued unless first approved by separate court order.

**A-215**

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case  (Page 2)

Case No.   S5 22-CR-673 (LAK)

**PROOF OF SERVICE**

This subpoena for *(name of individual and title, if any)*   Fenwick & West LLP

was received by me on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case (Page 3)

## Federal Rule of Criminal Procedure 17 (c), (d), (e), and (g) (Effective 12/1/08)

**(c) Producing Documents and Objects.**

**(1)  In General.** A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

**(2)  Quashing or Modifying the Subpoena.** On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

**(3)  Subpoena for Personal or Confidential Information About a Victim.** After a complaint, indictment, or information is filed, a subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order. Before entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object.

**(d) Service.** A marshal, a deputy marshal, or any nonparty who is at least 18 years old may serve a subpoena. The server must deliver a copy of the subpoena to the witness and must tender to the witness one day's witness-attendance fee and the legal mileage allowance. The server need not tender the attendance fee or mileage allowance when the United States, a federal officer, or a federal agency has requested the subpoena.

**(e)  Place of Service.**

**(1)  In the United States.** A subpoena requiring a witness to attend a hearing or trial may be served at any place within the United States.

**(2)  In a Foreign Country.** If the witness is in a foreign country, 28 U.S.C. § 1783 governs the subpoena's service.

**(g)  Contempt.** The court (other than a magistrate judge) may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by a federal court in that district. A magistrate judge may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by that magistrate judge as provided in 28 U.S.C. § 636(e).

**A-217**

# Exhibit A

**A-218**

## Exhibit A

### <u>DEFINITIONS</u>

1.      "Alameda" shall mean Alameda Research LLC, Alameda Research LTD, and their subsidiaries and affiliates.

2.      "Communication" or "Communications" shall mean voice messages, letters, emails, presentations, drafts, memoranda, notes, text messages, or instant messages sent via Slack, Signal, or other similar applications.

3.      "Document" or "Documents" shall mean books, papers, documents, data or other objects, including Communications.  A draft or non-identical copy is a separate document within the meaning of this term.

4.      "Fenwick" shall mean Fenwick & West LLP.

5.      "FTX" shall mean FTX Trading Ltd. d/b/a FTX.com and its subsidiaries.

6.      "FTX Group" shall mean FTX and FTX US, collectively.

7.      "FTX US" shall mean West Realm Shires Inc. d/b/a FTX US and its subsidiaries.

8.      "Local Rules" shall mean the Local Criminal Rules of the United States District Courts for the Southern and Eastern Districts of New York.

9.      "North Dimension" shall mean North Dimension Inc., North Wireless Dimension Inc., and North Dimension Ltd.

10.      "Requests" shall mean the requests to produce Documents pursuant to this subpoena.

11.      "You" or "Your" shall mean Fenwick and all representatives, agents, advisors, and all other Persons or entities acting or purporting to act on Your behalf.

## INSTRUCTIONS

1.      Any and all provisions contained in the Federal Rules of Criminal Procedure and the Local Rules are incorporated by reference as if set forth fully herein.

2.      For the convenience of the Court and counsel, You are requested to restate each Request immediately before Your response thereto.

3.      In responding to the Requests, You shall produce all responsive Documents that are in Your possession, custody, or control, or in the possession, custody, or control of Your agents, employees, or other representatives.  A Document shall be deemed to be within Your control if You have the right to obtain the Document or a copy of the Document from another person having possession or custody of the Document.

4.      If You believe that any person or entity might have custody or control of any Document that is not within Your custody or control but is otherwise responsive to any part of these Requests, You shall state so and shall identify the person or entity that You believe might have custody or control of that Document.

5.      These Requests cover the time period of January 1, 2019 to the present unless otherwise specified or inherent in a particular Request.

6.      Although some of the Requests may overlap, each Request shall be construed independently and no Request should be read as limiting any other Request, but You are required to produce a Document only once, even if it is responsive to multiple Requests.

7.      The terms "concerning," "reflecting," "related to," and "relating to" mean relating to, referring to, concerning, mentioning, reflecting, pertaining to, evidencing, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, or constituting (in whole or in part), as the context makes appropriate.

A-220

8.      Each requested Document shall be produced in its entirety, without abbreviation or redaction, and shall include all attachments, appendices, exhibits, lists, schedules, or other documents at any time affixed thereto.  If a Document responsive to any Request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

9.      You must produce responsive Documents as they have been kept in the usual course of business or organize and label them to correspond to the enumerated Requests.  If there are no Documents responsive to any particular Request, You must so state in writing.

10.     Any Document that contains any notation, addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document without such marks shall be produced as a separate Document.

11.     If You contend that part of a Request is objectionable, You are requested to respond to that portion of the Request that You do not contend is objectionable and specifically identify the respect in which You consider the Request to be objectionable.  If Your objection relates only to part of the Request, You are to produce all Documents or other information that do not fall within the scope of Your objection.

12.     If You claim any ambiguity in interpreting a Request or a definition or instruction applicable thereto, You should not rely on such claim as a basis for refusing to respond, but You shall set forth as part of Your response to such Request the language deemed to be ambiguous and the interpretation chosen to be used in responding to the Request.

13.     If any responsive Documents contain electronically-stored information, such Documents should be produced in a form that contains all electronically-stored information for those Documents, including but not limited to the metadata for those Documents.  Electronic

3

Documents and data that are electronically searchable should be produced in a form that does not remove or downgrade this feature.

14.      Documents in electronic form, including but not limited to e-mail, shall be produced in single-page, group IV tagged image file format ("TIFF") for black and white images, and single-page, Joint Photographic Experts Group ("JPEG") format for color images, in a separate folder labeled "Images."  Each image shall have a unique production number. Metadata associated with electronically-stored information shall be produced in delimited text format in a separate folder labeled "Data."  Full extracted text files, if any, should be delivered as document-level text files named for the first Bates number in a separate folder labeled "Text." Spreadsheets and database files shall be provided in native format, with an accompanying placeholder production-numbered TIFF file.  Each responsive spreadsheet filename shall be clearly labeled to indicate the placeholder production number that corresponds to each spreadsheet.

15.      If You believe that any Document covered by these Requests is or may be subject to a claim of privilege, including the attorney-client privilege or work product doctrine, prior to responding to these Requests, You should confirm with the holder of the privilege that any applicable attorney-client privilege or work product protection has not been waived, either in whole or in part.

16.      If any Document covered by these Requests is withheld by reason of a claim of privilege, including the attorney-client privilege or work product doctrine, You must provide a log identifying the categories of Documents for which the privilege is claimed specifically identifying the following:  (i) the type of Document, (ii) any addressor and addressee; (iii) any indicated or blind copies, (iv) the Document's date, (v) the general subject matter of the

A-222

Document, and a description of any attachments or appendices, (vi) all persons to whom the Document was distributed, shown, or explained, (vii) the nature and basis of the privilege or grounds for withholding being asserted, and (viii) whether the asserted privilege arises from a corporate representation only, a joint representation of a corporation and an individual, or an individual representation only.

17.    If information protected from disclosure by the attorney-client privilege is redacted from a Document produced in response to a Request, identify the redaction by stamping the text "Redacted – Privileged" on the Document at each place where information has been redacted and separately log each redaction on the privilege log.

18.    This request for production of documents is without prejudice to any later subpoenas in this action.

A-223

## REQUESTS FOR PRODUCTION

### Request No. 1

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to, the FTX Group or Alameda, dated November 2017 through November 2022, concerning the formation and incorporation of FTX, FTX US, or Alameda, including jurisdictional and regulatory considerations and determinations of applicable law, such as reflected in the following invoices:

- Attachment 1:  SBF_GOOGLE_SW_00192150 ("draft futures exchange documents; emails regarding Antigua entity . . . jurisdictional futures trading regulation survey . . . Review options to launch futures exchange . . . Call with Alameda and Fenwick team; A&O on proposed approach to establishing new foreign exchange . . . emails with A&O regarding multi-jurisdictional futures trading regulation survey; confer with D. Friedberg regarding same")

- Attachment 2:  SBF_GOOGLE_SW_00177562 ("read through relevant no action letters and policy statements regarding foreign exchange registration . . . research and analyze effect of CFTC's rules regarding exchanges not located in the United States . . . legal research on subsidiaries of U.S. companies trading on foreign futures exchanges . . . Review news articles regarding CFTC enforcement actions against foreign exchanges . . . Research and analyze [CFTC] regulations for foreign board of trade as applied to foreign crypto futures exchange")

- Attachment 3:  SDNY_03_00054152 ("regulatory advice on foreign jurisdictions")

### Request No. 2

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to, the FTX Group or Alameda in connection with the formation and incorporation of North Dimension Inc. and North Wireless Dimension Inc. in Delaware and North Dimension Ltd. in the British Virgin Islands, such as reflected in the following invoices:

- Attachment 4:  SDNY_03_00208210 ("Attention to incorporation of North Dimension Inc[.] and North Wireless Dimension Inc. . . Draft certificate of incorporation for subsidiary . . . North Dimension Inc. formation and North Wireless Dimension Inc. formation")

- Attachment 3:  SDNY_03_00054152 ("Confer with Silvergate; prepare material; regulatory advice on foreign jurisdictions")

**Request No. 3**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to, the FTX Group or Alameda concerning whether FTX, Alameda or North Dimension were required to register as a Money Services Business as defined in 31 C.F.R. 1010.100(ff), such as reflected in the following invoices and memoranda:[1]

- <u>Attachment 4</u>:  SDNY_03_00208253 ("MTL project . . . orientation meeting with I. Voloshin and team members regarding money transmitter licensing project . . . MTL Project:  Daily check-in with FTX team")

- <u>Attachment 5</u>:  SDNY_02_00416556 (Memorandum from Fenwick to Dan Friedberg re: "West Realm Shires Services, Inc. dba FTX.US ("FTX.US") Exemption under Federal and State Money Transmission Rules re FTX US")

- <u>Attachment 6</u>:  SDNY_03_00056209 ("Compliance training for MSB matters . . . Money transmission related support")

- <u>Attachment 7</u>:  SDNY_03_00567632 (email from Igor Voloshin to Dan Friedberg re "Tether Gold Analysis")

**Request No. 4**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to, the FTX Group or Alameda, dated May 2019 through November 2022, concerning a banking relationship between the FTX Group, Alameda or North Dimension and Silvergate Bank, specifically in connection with (i) opening bank accounts at Silvergate Bank, (ii) using such accounts to process deposits and withdrawals on behalf of FTX customers, (iii) using such accounts to conduct OTC trading and processing on behalf of FTX customers, and (iv) responding to compliance inquiries from Silvergate Bank, such as is reflected in the following invoices:

- <u>Attachment 8</u>:  SBF_GOOGLE_SW_00137561 ("Draft Silvergate letter")

- <u>Attachment 9</u>:  SDNY_03_00208162 ("Call with Silvergate; draft follow up email")

- <u>Attachment 10</u>:  SDNY_03_00208309 ("Draft response to Silvergate . . . Draft Silvergate EDD responses")

- <u>Attachment 3</u>:  SDNY_03_00054152 ("Prepare material for Silvergate submission . . . Confer with Silvergate; prepare material . . . update Silvergate material")

---

[1] We note that the U.S. Attorney's Office for the Southern District of New York has indicated to counsel for Mr. Bankman-Fried that FTX and Alameda have waived privilege regarding this topic.

**A-225**

**Request No. 5**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to the FTX Group or Alameda, concerning data retention policies at FTX, including the use of auto-delete policies and ephemeral messaging applications, such as reflected in the following invoices:

- Attachment 11:  SDNY_03_00208353 ("research retention issues for ephemeral messaging and confer internally re same . . . draft retention policy and schedule")

- Attachment 12:  SDNY_03_00697055 ("Prepare for D. Friedberg call through review of prior draft retention policy")

**Request No. 6**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to the FTX Group or Alameda concerning FTX's or FTX US's margin lending program and liquidity requirements, such as reflected in the following invoices:

- Attachment 13:  SDNY_03_00208054 ("Advice to C. Richman on margin lending program … Draft ECP only US margin agreement")

- Attachment 14:  SDNY_03_00208087 ("Review new CFTC guidance on actual delivery for FTX margin program")

**Request No. 7**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to, the FTX Group concerning (i) FTX Terms of Service, (ii) FTX customer agreements, (iii) FTX user agreements, and (iv) FTX master agreement, such as reflected in the following invoices:

- Attachment 15:  SDNY_03_00694422 ("Draft terms of use for FTX Exchange . . . drafting terms of use/service")

- Attachment 9:  SDNY_03_00208162 ("pull and evaluate FTX terms of service per D. Friedberg request . . . consider revisions to same")

- Attachment 16:  SBF_GOOGLE_SW_00199432 ("Draft cryptocurrency exchange master agreement")

- Attachment 17:  SDNY_03_00694438 ("Draft user agreements")

**A-226**

- <u>Attachment 18</u>:  SBF_GOOGLE_SW_00180328 ("Draft FTX customer agreement")

**Request No. 8**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to, the FTX Group or Alameda concerning certain intercompany agreements between FTX and Alameda Research Ltd., specifically:

    i.    The Payment Agent Agreement, dated June 1, 2019

    ii.    The Intercompany Treasury Management Agreement, dated June 1, 2019

    iii.    The fiat integration agreement, dated sometime in or around November 2020

    iv.    The intercompany services agreement, pursuant to which Alameda provided certain services to FTX

    v.    The cost allocation agreement

    vi.    Token exchange agreements

    vii.    The Cash Management Agreement

such as reflected in the following invoices:

- <u>Attachment 19</u>:  SDNY_03_00056230 ("Draft intercompany services agreement")

- <u>Attachment 15</u>:  SDNY_03_00694422 ("confer with C. Richman on user agreement/liquidity provider agreement")

- <u>Attachment 20</u>:  SDNY_03_00208024 ("Review exchange agreement . . . Attend to intercompany agreements")

- <u>Attachment 3</u>:  SDNY_03_00054152 ("revise intercompany cash management agreement; research in connection with the same")

**Request No. 9**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to, the FTX Group concerning planned or actual statements or representations made on the FTX.com or FTX.us websites, such as reflected in the following invoices:

- <u>Attachment 21</u>:  SDNY_03_00208123 ("review FTX website for terms of service")

9

**A-227**

- <u>Attachment 13</u>:  SDNY_03_00208054 ("Review online disclosures regarding equity financing")

- <u>Attachment 9</u>:  SDNY_03_00208162 ("confer regarding FTT and FTX disclosures")

## **Request No. 10**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to the FTX Group or Alameda, in connection with any documents, materials, statements or representations made or contemplated to be made to actual or prospective investors in FTX, FTX US, or lenders to Alameda, including loans, pitch decks, prospectuses, offering documents and disclosure schedules thereto, such as reflected in the following invoices:

- <u>Attachment 15</u>:  SDNY_03_00694422 ("Revise FTX deck . . . review FTX deck, plan structuring for exchange and leveraged tokens)

- <u>Attachment 22</u>:  SDNY_03_00056076 ("Edit Series B-1 financing documents, address due diligence questions, and related correspondence")

- <u>Attachment 17</u>:  SDNY_03_00694438 ("Draft prospectus")

- <u>Attachment 23</u>:  SDNY_03_00208108 ("Research seed round docs")

- <u>Attachment 13</u>:  SDNY_03_00208054 ("comments to FTX offering documents; confer regarding same; prepare comments to same . . . Confer regarding global offering and current Reg D and Reg S compliance")

## **Request No. 11**

We request Documents reflecting Fenwick's research, assessment, analysis, guidance, or legal advice conducted or prepared on behalf of, or provided to, the FTX Group or Alameda concerning intercompany loans or lines of credit, loans or lines of credit to individuals including but not limited to the founders and other executives, such as reflected in the following invoices:

- <u>Attachment 4</u>:  SDNY_03_00208210 ("attention to employee loan documents . . . attention to manager loans")

- <u>Attachment 23</u>:  SDNY_03_00208108 ("draft loan agreement")

**A-228**

## INDEX TO ATTACHMENTS

| | Beginning Bates Number | Description |
|---|---|---|
| 1. | SBF_GOOGLE_SW_00192150 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated April 30, 2019 |
| 2. | SBF_GOOGLE_SW_00177562 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated September 26, 2019 |
| 3. | SDNY_03_00054152 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated February 11, 2021 |
| 4. | SDNY_03_00208210 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated September 11, 2020 |
| 5. | SDNY_02_00416556 | Memorandum from Igor Voloshin to Daniel Friedberg, dated January 10, 2022, regarding West Realm Shires, Inc. dba FTX.US ("FTX.US") Exemption under Federal and State Money Transmission Rules |
| 6. | SDNY_03_00056209 | Excerpts from Invoice from Fenwick & West LLP to West Realm Shires Services Inc., dated August 24, 2021 |
| 7. | SDNY_03_00567632 | Email from Daniel Friedberg to Igor Voloshin, dated February 28, 2020, regarding Tether Gold Analysis |
| 8. | SBF_GOOGLE_SW_00137561 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated December 11, 2020 |
| 9. | SDNY_03_00208162 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated August 21, 2020 |
| 10. | SDNY_03_00208309 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated November 18, 2020 |
| 11. | SDNY_03_00208353 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated January 26, 2021 |
| 12. | SDNY_03_00697055 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated March 31, 2021 |
| 13. | SDNY_03_00208054 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated March 31, 2020 |

| 14. | SDNY_03_00208087 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated April 15, 2020 |
| --- | --- | --- |
| 15. | SDNY_03_00694422 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated May 31, 2019 |
| 16. | SBF_GOOGLE_SW_00199432 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated January 22, 2019 |
| 17. | SDNY_03_00694438 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated June 30, 2019 |
| 18. | SBF_GOOGLE_SW_00180328 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated August 28, 2019 |
| 19. | SDNY_03_00056230 | Excerpts from Invoice from Fenwick & West LLP to West Realm Shires Services Inc., dated January 27, 2022 |
| 20. | SDNY_03_00208024 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated January 28, 2020 |
| 21. | SDNY_03_00208123 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated July 13, 2020 |
| 22. | SDNY_03_00056076 | Excerpts from Invoice from Fenwick & West LLP to West Realm Shires Services Inc., dated October 19, 2021 |
| 23. | SDNY_03_00208108 | Excerpts from Invoice from Fenwick & West LLP to Alameda Research LLC, dated May 12, 2020 |

**A-230**

# Attachment 1

**A-231**

| | |
|---|---|
| **FENWICK & WEST LLP** | Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041<br>Tel  650.988.8500<br>Fax  650.938.5200 |

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley,  CA  94704

| | |
|---|---|
| Invoice Date: | April 30, 2019 |
| Client Number: | 34394 |
| Matter Number: | 00600 |
| Invoice Number: | 750861 |

Attn:    Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through March 31, 2019.

| | |
|---|---|
| Fees: | $ 44,050.00 |
| Disbursements: | 5,123.50 |
| | ———————— |
| CURRENT AMOUNT DUE | $ 49,173.50 |

SBF_GOOGLE_SW_00192150

**A-232**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | April 30, 2019 |
| Client Number: 34394 | Invoice Number: | 750861 |
| | Billing Attorney: | Daniel  Friedberg |

Page 2

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 03/01/19 | Daniel  Friedberg | Analyze regulatory issues. | 0.8 | 572.00 |
| 03/01/19 | Chad  Richman | Emails with accountants regarding tax reorganization. | 0.3 | 148.50 |
| 03/04/19 | David L. Forst | Conference call regarding trading activities. | 1.2 | 1,590.00 |
| 03/04/19 | Daniel  Friedberg | Conference with client; draft futures exchange documents; emails regarding Antigua entity. | 2.3 | 1,644.50 |
| 03/04/19 | Chad  Richman | Develop plan to address Jurisdictional considerations for futures exchange; emails with D.Forst regarding tax restructuring and ; emails with A&O regarding futures regulation; Call with Alameda to discuss futures exchange; emails to S.Bankman-Fried, A.Croghan regarding futures exchange; staff term sheet project. | 5.3 | 2,623.50 |
| 03/04/19 | Igor  Voloshin | Discuss entity structure with C. Richman. | 0.6 | 297.00 |
| 03/04/19 | Igor  Voloshin | Call with Andy and Sam on forming foreign entity; issuing security token; tax consequence of different business models. | 1.5 | 742.50 |
| 03/05/19 | Andrew  Albertson | Confer regarding security token design. | 0.4 | 310.00 |
| 03/05/19 | Daniel  Friedberg | Attention to formation and regulatory issues. | 1.4 | 1,001.00 |

**A-233**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | April 30, 2019 |
| Client Number: 34394 | Invoice Number: | 750861 |
| | Billing Attorney: | Daniel  Friedberg |

Page 5

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 03/13/19 | Melanie  McLain | Forward Delaware tax notification for Hilltop Technology Services, LLC; update corporate records. | 0.2 | 62.00 |
| 03/13/19 | Chad  Richman | Review HK law analysis from Dentons; emails with Alameda and A&O; review Singapore-CFTC reciprocity agreement; emails regarding ETF token. | 1.6 | 792.00 |
| 03/13/19 | Igor  Voloshin | Assist forming Antigua entity; discuss potential suite of products that can be offered by Alameda out of Antigua entity with C. Richman with minimal foreign regulatory scrutiny. | 1.2 | 594.00 |
| 03/14/19 | Chad  Richman | Emails with A.Croghan regarding ECP status. | 0.3 | 148.50 |
| 03/15/19 | Chad  Richman | Emails with A. Croghan regarding ECP status and FTX exchange; emails with A&O regarding FTX exchange; develop strategy for responding to HK law analysis; discuss FTX strategy with I.Voloshin, D.Friedberg; emails regarding same. | 2.2 | 1,089.00 |
| 03/17/19 | Daniel  Friedberg | Review options to launch futures exchange. | 1.2 | 858.00 |
| 03/18/19 | Daniel  Friedberg | Calls with Alameda and A&O; regulatory issues. | 2.8 | 2,002.00 |
| 03/18/19 | Chad  Richman | Preparation for and call with Alameda/A&O regarding FTX exchange. | 1.3 | 643.50 |
| 03/18/19 | Igor  Voloshin | Call with Alameda and Fenwick team; A&O on proposed approach to establishing new foreign exchange. | 0.9 | 445.50 |
| 03/19/19 | Mona  Clee | Emails to, from Delaney Ornelas re review of 401(k) documents. | 0.2 | 143.00 |

**A-234**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | April 30, 2019 |
| Client Number: 34394 | Invoice Number: | 750861 |
| | Billing Attorney: | Daniel  Friedberg |

Page 6

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 03/19/19 | Chad  Richman | Discuss interactive brokers issues with I.Voloshin; examine IB account types; emails with A.Croghan regarding IB account. | 0.7 | 346.50 |
| 03/20/19 | Mona  Clee | Review 401(k) documents; send email to Delaney Ornelas raising questions for future revision of charter re exclusion of leased employees, misclassified employees; answer follow-up question from Delaney Ornelas regarding leased employees hired as permanent. | 1.5 | 1,072.50 |
| 03/20/19 | Chad  Richman | Emails with A&O regarding multi-jurisdictional futures trading regulation survey. | 0.4 | 198.00 |
| 03/21/19 | Daniel  Friedberg | Conference call with Deacons; analyze issues regarding futures. | 2.3 | 1,644.50 |
| 03/21/19 | Chad  Richman | Call with Deacons regarding HK regulation of futures exchanges; emails with A&O regarding multi-jurisdictional futures trading regulation survey; confer with D.Friedberg regarding same. | 2.1 | 1,039.50 |
| 03/22/19 | Daniel  Friedberg | Further analysis regarding futures exchange; draft documents. | 1.2 | 858.00 |
| 03/25/19 | Chad  Richman | Emails with A&O regarding multi-jurisdictional futures trading regulation survey; confer with D.Friedberg regarding FTX exchange strategy and next steps. | 0.7 | 346.50 |
| 03/26/19 | Daniel  Friedberg | Attention to issues with futures exchange. | 1.0 | 715.00 |
| 03/27/19 | Chad  Richman | Discuss Alameda fund raising with D.Friedberg. | 0.2 | 99.00 |

SBF_GOOGLE_SW_00192155

Alameda Research LLC
Client Number: 34394

| | | |
|---|---|---|
| Invoice Date: | | April 30, 2019 |
| Invoice Number: | | 750861 |
| Billing Attorney: | | Daniel Friedberg |

Page 7

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 03/28/19 | Igor Voloshin | Analyze Singapore futures exchange operations presence with visiting Singaporean attorney. | 0.5 | 247.50 |
| 03/29/19 | Daniel Friedberg | Attention to formation matters; draft documents. | 2.0 | 1,430.00 |
| 03/29/19 | Chad Richman | Review FTX deck, discuss FTX process with D.Friedberg. | 0.8 | 396.00 |
| | | Total Hours and Fees | 73.4 | $ 44,050.00 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Andrew Albertson | Partner | 3.8 | 775.00 | 2,945.00 |
| David L. Forst | Partner | 1.7 | 1325.00 | 2,252.50 |
| Mona Clee | Of Counsel | 1.7 | 715.00 | 1,215.50 |
| Daniel Friedberg | Of Counsel | 24.5 | 715.00 | 17,517.50 |
| Chad Richman | Associate | 30.7 | 495.00 | 15,196.50 |
| Vincent Sheu | Associate | 4.0 | 400.00 | 1,600.00 |
| Igor Voloshin | Associate | 6.5 | 495.00 | 3,217.50 |
| Melanie McLain | Paralegal | 0.2 | 310.00 | 62.00 |
| Kathleen Murray | Paralegal | 0.3 | 145.00 | 43.50 |
| Total | | 73.4 | | $ 44,050.00 |

Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 03/07/19 | Incorporation of International Business Corporation. - VENDOR: Corporate & Trust Services (Caribbean) | 3,802.00 |
| 03/31/19 | Voice & Data Communications | 1,321.50 |
| | Total Disbursements | $ 5,123.50 |

SBF_GOOGLE_SW_00192156

A-236

# Attachment 2

**A-237**

| | |
|---|---|
| **FENWICK & WEST LLP** | Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041<br>Tel  650.988.8500<br>Fax  650.938.5200 |

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley,  CA  94704

Invoice Date:          September 26, 2019

Client Number:                      34394

Invoice Number:                    770539

Attn:    Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through August 31, 2019.

| | |
|---|---|
| Fees: | $ 59,785.50 |
| No Charge for 32.50 Hours: | (17,578.00) |
| Adjusted Fees: | $ 42,207.50 |
| Disbursements: | 1,766.23 |
| | _____ |
| CURRENT AMOUNT DUE | $ 43,973.73 |

SBF_GOOGLE_SW_00177562

**A-238**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | September 26, 2019 |
| Client Number: 34394 | Invoice Number: | 770539 |
| | Billing Attorney: | Daniel  Friedberg |

Page 5

---

Compliance and Risk Mitigation
Matter number 34394-00402

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 08/08/19 | Michael  Dicke | Analyze new Ninth Circuit CFTC enforcement case and consider application to Alameda's business, and follow-up with D. Friedberg re same; confer with D. Friedberg re FTX exchange, business strategy update, compliance issues, and follow-up. | 1.1 | 1,017.50 |
| 08/09/19 | Michael  Dicke | Review compliance issues. | 1.9 | 1,757.50 |
| 08/14/19 | Michael  Dicke | Analysis of CFTC guidance on non-U.S. swap participants. | 1.1 | 1,017.50 |
| 08/14/19 | Daniel  Friedberg | Research regarding compliance issues. | 2.0 | 1,430.00 |
| 08/15/19 | Chad  Richman | Research related to risk mitigation project. | 0.4 | 220.00 |
| 08/16/19 | Vincent  Barredo | Analyze CFTC rules research for FTX. | 0.5 | 345.00 |
| 08/16/19 | Michael  Dicke | Legal issue for FTX exchange; legal research re  affiliates of U.S. entities trading on futures exchange. | 1.0 | 925.00 |
| 08/19/19 | Michael  Dicke | Research for client inquiries on prediction markets, futures contracts. | 0.8 | 740.00 |
| 08/20/19 | Vincent  Barredo | Research and review FTX website and materials (0.5); research and analyze effect of CFTC's rules regarding exchanges not located in the United States (2.0). | 2.5 | 1,725.00 |

SBF_GOOGLE_SW_00177567

# A-239

| | |
|---|---|
| Alameda Research LLC | Invoice Date:            September 26, 2019 |
| Client Number: 34394 | Invoice Number:                      770539 |
| | Billing Attorney:        Daniel  Friedberg |

Page 6

---

Compliance and Risk Mitigation
Matter number 34394-00402

| <u>Date</u> | <u>Timekeeper</u> | <u>Description</u> | <u>Hours</u> | <u>Amount</u> |
|---|---|---|---|---|
| 08/21/19 | Vincent  Barredo | Strategize approach to CFTC analysis with M. Dicke (0.6); read through relevant no action letters and policy statements regarding foreign exchange registration (1.4). | 2.0 | 1,380.00 |
| 08/21/19 | Michael  Dicke | Review legal research on subsidiaries of U.S. companies trading on foreign futures exchanges. | 0.3 | 277.50 |
| 08/22/19 | Vincent  Barredo | Review news articles regarding CFTC enforcement actions against foreign exchanges. | 0.2 | 138.00 |
| 08/23/19 | Vincent  Barredo | Research and analyze CFCT regulations for foreign board of trade as applied to foreign crypto futures exchange (1.8); review no-action and policy letters (0.7); prepare analysis (1.6). | 4.1 | 2,829.00 |
| | | Total Hours and Fees | 17.9 | $ 13,802.00 |

Timekeeper Summary

| <u>**Name**</u> | <u>**Title**</u> | <u>**Hours**</u> | <u>**Rate**</u> | <u>**Amount**</u> |
|---|---|---|---|---|
| Michael  Dicke | Partner | 6.2 | 925.00 | 5,735.00 |
| Daniel  Friedberg | Of Counsel | 2.0 | 715.00 | 1,430.00 |
| Vincent  Barredo | Associate | 9.3 | 690.00 | 6,417.00 |
| Chad  Richman | Associate | 0.4 | 550.00 | 220.00 |
| Total | | 17.9 | | $ 13,802.00 |

SBF_GOOGLE_SW_00177568

A-240

# Attachment 3

**A-241**



**Fenwick & West LLP**
**801 California Street**
**Mountain View, CA 94041**
**Tel  650.988.8500**
**www.fenwick.com**

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley, CA 94704

| | |
|---|---|
| Invoice Date: | February 11, 2021 |
| Client Number: | 34394 |
| Invoice Number: | 841932 |

Attn:   Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through January 31, 2021.

| | |
|---|---|
| Fees: | $ 371,624.00 |
| Disbursements: | 34,052.38 |
| | ——————— |
| CURRENT AMOUNT DUE | $ 405,676.38 |

Confidential Treatment Requested by Armanino LLP

Armanino-FTX-001842
SDNY_03_00054152

**A-242**

Alameda Research LLC
Client Number: 34394

Invoice Date:        February 11, 2021
Invoice Number:              841932
Billing Attorney:     Andrew Albertson

Page 29

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 01/12/21 | Kent Sucgang | Continue to collect and coordinate docusign distribution of purchase agreements; respond to client questions. | 0.7 | 129.50 |
| 01/12/21 | Can Sun | Weekly call; review SPAC precedents. | 1.2 | 1,074.00 |
| 01/12/21 | Jacob Wittman | Attend internal call; attend to emails. | 0.5 | 375.00 |
| 01/12/21 | Jacob Wittman | Attend to bittrex matters; internal call; review Binance restrictions on transaction. | 2.0 | 1,500.00 |
| 01/13/21 | David L. Forst | Review emails regarding Ashlan; review regulations regarding acquisition structuring; brief review of Westrealm agreements. | 2.7 | 4,117.50 |
| 01/13/21 | Sean McElroy | Research on exit tax issues; research Project Alshain tax planning issues. | 3.3 | 2,689.50 |
| 01/13/21 | Chad Richman | Call with D. Friedberg regarding FTX US futures business. | 0.3 | 225.00 |
| 01/13/21 | Ryan J. Straus | Attention to multijurisdictional issue; correspondence regarding same. | 0.8 | 728.00 |
| 01/13/21 | Can Sun | Coordinate token sales matters. | 0.2 | 179.00 |
| 01/13/21 | Igor Voloshin | Prepare material for Silvergate submission. | 2.1 | 1,575.00 |
| 01/14/21 | Andrew Albertson | Confer regarding open items, including options, transactions and form of forward contract. | 1.3 | 1,319.50 |

Confidential Treatment Requested by Armanino LLP

**A-243**

| | |
|---|---|
| Alameda Research LLC | Invoice Date:      February 11, 2021 |
| Client Number: 34394 | Invoice Number:      841932 |
| | Billing Attorney:    Andrew  Albertson |
| Page 30 | |

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 01/14/21 | David L. Forst | Review Westrealm contribution documents; discussions with S. McElroy regarding same; brief legal research regarding tax treatment; review and discuss proposed structuring for Ashlan. | 2.9 | 4,422.50 |
| 01/14/21 | Sean  McElroy | Research on Project Alshain tax issues; research on West Realm IP contribution issue; confer with D. Forst regarding West Realm IP contribution issue. | 4.1 | 3,341.50 |
| 01/14/21 | Katherine  Schuler | Prepare annual reports for NV and CA; emails re DBA filings; upload DBAs to NMLS. | 1.9 | 446.50 |
| 01/14/21 | Can Sun | Draft token evaluation memo; coordinate token sale matters; discuss SPAC with C. Richman. | 1.0 | 895.00 |
| 01/14/21 | Igor  Voloshin | Confer with Silvergate; prepare material; regulatory advice on foreign jurisdictions. | 2.3 | 1,725.00 |
| 01/15/21 | David L. Forst | Discussion with S. McElroy regarding reorganization rules regarding Ashlan; review structuring alternatives; conference call regarding FTX and related issues. | 2.4 | 3,660.00 |
| 01/15/21 | Andrea King-Lock Louie | Attend meeting with I. Voloshin and K. Schuler to discuss MTL strategy; consider issues, review and analyze organizational chart. | 0.8 | 548.00 |

Confidential Treatment Requested by Armanino LLP

# A-244

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | February 11, 2021 |
| Client Number: 34394 | Invoice Number: | 841932 |
| | Billing Attorney: | Andrew Albertson |

Page 31

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 01/15/21 | Sean McElroy | Research Project Alshain tax issues; confer with D. Forst regarding same; research exit tax issues; research IP contribution issues; confer with D. Freidberg & D. Forst regarding IP planning issues. | 4.2 | 3,423.00 |
| 01/15/21 | Katherine Schuler | FTX-MTL team catch-up phone call. | 0.3 | 70.50 |
| 01/15/21 | Ryan J. Straus | Attention to jurisdictional matters; conference regarding same. | 3.2 | 2,912.00 |
| 01/15/21 | Kent Sucgang | Prepare purchase agreements and coordinate execution. | 0.5 | 92.50 |
| 01/15/21 | Igor Voloshin | Miscellaneous corporate items; MTL process update; update Silvergate material. | 2.4 | 1,800.00 |
| 01/15/21 | Jacob Wittman | Draft form of share transfer agreement; call with client. | 1.3 | 975.00 |
| 01/16/21 | Sean McElroy | Review emails; review notes on Project Alshain. | 0.3 | 244.50 |
| 01/16/21 | Kent Sucgang | Continue to put together additional token purchase agreements; coordinate execution of agreements. | 0.7 | 129.50 |
| 01/17/21 | Ryan J. Straus | Attention to audit policy; review jurisdictional matters. | 2.5 | 2,275.00 |
| 01/17/21 | Igor Voloshin | Regulatory advice to operations team on compliance recordkeeping. | 2.0 | 1,500.00 |
| 01/18/21 | David L. Forst | Review and comment on analysis regarding purchase structure for Ashlan. | 2.8 | 4,270.00 |
| 01/18/21 | Ryan J. Straus | Attention to jurisdictional matters; conference regarding same. | 2.5 | 2,275.00 |

Armanino-FTX-001873
SDNY_03_00054183

## A-245

Alameda Research LLC
Client Number: 34394

Invoice Date:     February 11, 2021
Invoice Number:     841932
Billing Attorney:     Andrew Albertson

Page 35

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 01/21/21 | Chad Richman | FTX US token listing analysis. | 0.3 | 225.00 |
| 01/21/21 | Kent Sucgang | Continue to collect and coordinate token purchase agreement distribution via Docusign. | 1.7 | 314.50 |
| 01/21/21 | Igor Voloshin | Confer with HK counsel on Cottonwood Spinoff. | 1.7 | 1,275.00 |
| 01/22/21 | Whitney Anne Bishop | Coordinate signatures on option grants. | 2.7 | 1,093.50 |
| 01/22/21 | David L. Forst | Emails to and from Mr. Friedberg regarding Solana; discussion with Mr. McElroy regarding same. | 0.3 | 457.50 |
| 01/22/21 | Sean McElroy | Review emails; coordinate meetings. | 0.2 | 163.00 |
| 01/22/21 | Kent Sucgang | Continue to collect, track, and send out additional docusigns for token purchase agreements; confer with client team regarding same. | 0.6 | 111.00 |
| 01/23/21 | Sean McElroy | Research crypto tax issues. | 0.6 | 489.00 |
| 01/23/21 | Ryan J. Straus | Ancillary review of intercompany and related agreements. | 1.0 | 910.00 |
| 01/24/21 | David L. Forst | Conference call regarding charitable donations and other issues; brief follow-up with Mr. McElroy and email to Ms. Fritz. | 0.8 | 1,220.00 |
| 01/24/21 | Sean McElroy | Research crypto tax issues; attend phone conference with S. Bankman-Fried et al. | 0.7 | 570.50 |
| 01/24/21 | Ryan J. Straus | Revise and revise intercompany cash management agreement; research in connection with the same. | 1.4 | 1,274.00 |

Confidential Treatment Requested by Armanino LLP

# A-246

| | | | |
|---|---|---|---|
| Alameda Research LLC | | Invoice Date: | February 11, 2021 |
| Client Number: 34394 | | Invoice Number: | 841932 |
| | | Billing Attorney: | Andrew Albertson |
| Page 40 | | | |

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 01/31/21 | Jacob Wittman | Prepare board consent for option grants, attend to emails, review FTX, FTT agreement. | 1.0 | 750.00 |
| | | Total Hours and Fees | 288.8 | $ 239,810.00 |

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Andrew Albertson | Partner | 9.1 | 1015.00 | 9,236.50 |
| David L. Forst | Partner | 29.0 | 1525.00 | 44,225.00 |
| Bomi Lee | Partner | 1.5 | 1050.00 | 1,575.00 |
| Felix Lee | Partner | 0.3 | 1095.00 | 328.50 |
| Eric Shedlosky | Partner | 0.3 | 995.00 | 298.50 |
| Mark Porter | Of Counsel | 2.6 | 880.00 | 2,288.00 |
| Ryan J. Straus | Of Counsel | 55.7 | 910.00 | 50,687.00 |
| Vincent Barredo | Associate | 7.9 | 880.00 | 6,952.00 |
| Andrea King-Lock Louie | Associate | 12.3 | 685.00 | 8,425.50 |
| Sean McElroy | Associate | 46.9 | 815.00 | 38,223.50 |
| Chad Richman | Associate | 7.8 | 750.00 | 5,850.00 |
| Leeza Soulina | Associate | 0.2 | 505.00 | 101.00 |
| Can Sun | Associate | 34.1 | 895.00 | 30,519.50 |
| Igor Voloshin | Associate | 20.2 | 750.00 | 15,150.00 |
| Jacob Wittman | Associate | 17.9 | 750.00 | 13,425.00 |
| Whitney Anne Bishop | Paralegal | 18.5 | 405.00 | 7,492.50 |
| Catherine Howell | Paralegal | 1.8 | 343.33 | 618.00 |
| Katherine Schuler | Paralegal | 4.3 | 235.00 | 1,010.50 |
| Jacob E. Simmons | Case Assistant | 0.5 | 185.00 | 92.50 |
| Kent Sucgang | Case Assistant | 17.9 | 185.00 | 3,311.50 |
| Total | | 288.8 | | $ 239,810.00 |

Confidential Treatment Requested by Armanino LLP

A-247

# Attachment 4

| | Silicon Valley Center |
|---|---|
| **Fenwick** FENWICK & WEST LLP | 801 California Street |
| | Mountain View, CA 94041 |
| | Tel  650.988.8500 |
| | Fax  650.938.5200 |

Alameda Research LLC                     Invoice Date:        September 11, 2020
2000 Center Street, Suite 400
Berkeley,  CA  94704                     Client Number:                  34394

                                         Invoice Number:                 819810


Attn:    Sam Bankman-Fried


**(Invoice Emailed)**

---

For professional services rendered through August 31, 2020.


Fees:                          $ 498,484.50

Disbursements:                    16,860.95
                              _____

CURRENT AMOUNT DUE             $ 515,345.45

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-249**

Alameda Research LLC                     Invoice Date:      September 11, 2020
Client Number: 34394                     Invoice Number:            819810
                                         Billing Attorney:   Andrew  Albertson

Page 19

---

Project B
Matter number 34394-00201

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 08/13/20 | Victoria  Lupu | Review and update the signing and closing checklist; email correspondence with the GP, FTX and Fenwick teams regarding signing timeline, deal status and next steps; review and provide comments on the Company disclosure letter. | 1.0 | 860.00 |
| 08/13/20 | Jason  Malashevich | Perform trademark due diligence. | 0.5 | 295.00 |
| 08/13/20 | Jacob  Wittman | Attend to Board Consent draft; attend to diligence matters. | 1.7 | 1,113.50 |
| 08/14/20 | David L. Forst | Review Benchmark documents; emails regarding same. | 0.6 | 870.00 |
| 08/14/20 | Ammanuel Gebeyehu | Revise disclosure schedule; attend to pre-signing workstreams. | 1.6 | 1,160.00 |
| 08/14/20 | Carson A. Jackson | Confer with A. Gebeyehu regarding disclosure schedule. | 0.1 | 59.00 |
| 08/14/20 | Bomi  Lee | Attention to employee loan documents. | 0.4 | 394.00 |
| 08/14/20 | Sean  McElroy | Research on crypto tax issues; draft memo to file on Subpart F issues; tax diligence; review ancillary documents for Project Benchmark and confer regarding same. | 2.0 | 1,480.00 |
| 08/14/20 | Marshall  Mort | Attention to structuring transaction exercises and promissory note review. | 0.5 | 460.00 |
| 08/14/20 | Corinne  Nhaissi | Markup disclosure schedules; confer with A. Gebeyehu regarding same; review SPA; email correspondence with M. Mort regarding disclosure schedules. | 2.4 | 1,896.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-250**

| | |
|---|---|
| Alameda Research LLC | Invoice Date:        September 11, 2020 |
| Client Number: 34394 | Invoice Number:                    819810 |
| | Billing Attorney:        Andrew Albertson |

Page 24

---

Project B
Matter number 34394-00201

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 08/18/20 | Jacob Wittman | Attend to due diligence request list matters; review financials; attend to information statement. | 3.2 | 2,096.00 |
| 08/19/20 | Andrew Albertson | Attention to open points, ancillaries and information statement. | 1.3 | 1,248.00 |
| 08/19/20 | Julia Arruda | Update outstanding diligence requests. | 0.4 | 334.00 |
| 08/19/20 | Eric D. Bobila | Review and analyze material agreements; prepare diligence summary. | 0.3 | 112.50 |
| 08/19/20 | David L. Forst | Review documents and emails regarding Benchmark; discussion with S. McElroy. | 2.4 | 3,480.00 |
| 08/19/20 | Ammanuel Gebeyehu | Revise information statement descriptions; attend to pre-signing workstreams. | 5.0 | 3,625.00 |
| 08/19/20 | Carson A. Jackson | Prepare for and attend internal sync regarding deal status and timing; review and revise ancillary documents. | 0.5 | 295.00 |
| 08/19/20 | Bomi Lee | Participate on M&A team sync call; review pledge agreement; attention to manager loans. | 1.4 | 1,379.00 |
| 08/19/20 | Sean McElroy | Tax diligence for Project Benchmark; review ancillary documents for Project Benchmark; research on crypto tax issues; confer with D. Forst regarding Project Benchmark. | 2.9 | 2,146.00 |
| 08/19/20 | Marshall Mort | Attention to ancillary employment documents (e.g., loan and pledge). | 0.8 | 736.00 |

FTX_000314148
SDNY_03_00208234

**A-251**

| | |
|---|---|
| Alameda Research LLC | Invoice Date: September 11, 2020 |
| Client Number: 34394 | Invoice Number: 819810 |
| | Billing Attorney: Andrew Albertson |

Page 40

Project B
Matter number 34394-00201

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|------:|-----:|-------:|
| Andrew Albertson | Partner | 17.8 | 960.00 | 17,088.00 |
| Connie L. Ellerbach | Partner | 0.2 | 1045.00 | 209.00 |
| David L. Forst | Partner | 62.8 | 1450.00 | 91,060.00 |
| Bomi Lee | Partner | 35.5 | 985.00 | 34,967.50 |
| Jonathan Millard | Partner | 4.6 | 1045.00 | 4,807.00 |
| Marshall Mort | Partner | 15.3 | 920.00 | 14,076.00 |
| Tyler G. Newby | Partner | 0.7 | 1015.00 | 710.50 |
| Christopher Joslyn | Of Counsel | 0.4 | 835.00 | 334.00 |
| Julia Arruda | Associate | 10.9 | 835.00 | 9,101.50 |
| Ammanuel Gebeyehu | Associate | 44.8 | 725.00 | 32,480.00 |
| Carson A. Jackson | Associate | 39.0 | 590.00 | 23,010.00 |
| Mark A. Jansen | Associate | 0.3 | 860.00 | 258.00 |
| Victoria Lupu | Associate | 48.5 | 860.00 | 41,710.00 |
| Jason Malashevich | Associate | 4.0 | 590.00 | 2,360.00 |
| Sean McElroy | Associate | 53.0 | 740.00 | 39,220.00 |
| Corinne Nhaissi | Associate | 19.4 | 790.00 | 15,326.00 |
| Shajee T. Rizvi | Associate | 24.4 | 590.00 | 14,396.00 |
| Jonathan Stephenson | Associate | 15.5 | 485.00 | 7,517.50 |
| Can Sun | Associate | 11.2 | 860.00 | 9,632.00 |
| Igor Voloshin | Associate | 1.7 | 655.00 | 1,113.50 |
| Jacob Wittman | Associate | 63.5 | 655.00 | 41,592.50 |
| Eric D. Bobila | Staff Attorney | 38.4 | 375.00 | 14,400.00 |
| Van Ly | Paralegal | 3.8 | 215.00 | 817.00 |
| Total | | 515.7 | | $ 416,186.00 |

### Disbursement Summary

| Date | Description | Total |
|------|-------------|------:|
| 08/31/20 | Voice & Data Communications | 12,485.58 |
| | Total Disbursements | $ 12,485.58 |

**A-252**

Alameda Research LLC
Client Number: 34394

Invoice Date:          September 11, 2020
Invoice Number:                    819810
Billing Attorney:      Andrew Albertson

Page 43

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 08/15/20 | Igor Voloshin | MTL Project; draft roadmap for MTL project; review outstanding items in application logs; review AML Policy audit. | 3.6 | 2,358.00 |
| 08/17/20 | Andrew Albertson | Attention to MTL and financial regulatory compliance. | 0.5 | 480.00 |
| 08/17/20 | Sean McElroy | Confer with D. Forst regarding generic crypto loan agreements and intercompany crypto loan agreements; mark up and edit loan agreement documents; circulate documents. | 1.5 | 1,110.00 |
| 08/17/20 | Igor Voloshin | MTL Project: Miscellaneous project management arrangements. | 1.2 | 786.00 |
| 08/18/20 | Andrew Albertson | Review intercompany note and prepare comments to same; confer regarding approval/ratification. | 0.7 | 672.00 |
| 08/19/20 | Andrew Albertson | Attention to MTL project and related issues. | 0.5 | 480.00 |
| 08/19/20 | Igor Voloshin | Comfort letter; miscellaneous international corporate formation matters. | 0.4 | 262.00 |
| 08/19/20 | Igor Voloshin | MTL Project: surety bonds; confer internally on project management. | 2.1 | 1,375.50 |
| 08/20/20 | Kathrine McEnroe | Orientation meeting with I. Voloshin and team regarding money transmitter licensing project. | 1.0 | 440.00 |
| 08/20/20 | Liliya McKenzie | Orientation meeting with I. Voloshin and team members regarding money transmitter licensing project. | 1.0 | 400.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-253**

Alameda Research LLC
Client Number: 34394

Invoice Date:           September 11, 2020
Invoice Number:                     819810
Billing Attorney:      Andrew  Albertson

Page 44

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 08/20/20 | Meera  Park | Orientation meeting with I. Voloshin and team members regarding money transmitter licensing project. | 1.0 | 360.00 |
| 08/20/20 | Mark  Porter | Meeting with I. Voloshin and others regarding licensing project. | 1.0 | 850.00 |
| 08/20/20 | Katherine  Schuler | Orientation meeting with I. Voloshin and team members regarding money transmitter licensing project. | 1.1 | 236.50 |
| 08/20/20 | Igor  Voloshin | MTL Project: presentation to MTL Team; client call on roadmap. | 3.5 | 2,292.50 |
| 08/21/20 | Liliya  McKenzie | Prepare list of bonding requirements nationwide. | 1.7 | 680.00 |
| 08/21/20 | Igor  Voloshin | MTL Project: Update AML policy. | 1.5 | 982.50 |
| 08/22/20 | Sean  McElroy | Review loan documents; research tax issues regarding crypto loans; send emails regarding same. | 1.0 | 740.00 |
| 08/22/20 | Can  Sun | Prepare EIACA for WRSS. | 0.2 | 172.00 |
| 08/23/20 | Sean  McElroy | Research crypto tax loan issues; confer with D. Forst regarding same; mark up  and review loan documents; organize call with D. Friedberg and D. Forst. | 2.5 | 1,850.00 |
| 08/23/20 | Igor  Voloshin | MTL Project: Update AML Policy; review Washington licensing items; state assignment to Fenwick MTL Team. | 2.9 | 1,899.50 |
| 08/24/20 | Sean  McElroy | Research tax reporting issue; confer with D. Forst regarding same; review loan document; draft internal emails on crypto tax issues. | 3.4 | 2,516.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-254**

Alameda Research LLC
Client Number: 34394

Invoice Date:     September 11, 2020
Invoice Number:     819810
Billing Attorney:     Andrew Albertson

Page 45

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 08/24/20 | Ryan J. Straus | Review communication regarding network operation; correspondence regarding same. | 2.7 | 2,376.00 |
| 08/24/20 | Igor Voloshin | MTL Project: Update AML Policy; review bond summary. | 1.7 | 1,113.50 |
| 08/25/20 | Sean McElroy | Research on tax reporting issues; confer with D. Forst regarding same and other tax issues; review ancillary documents for Project Benchmark; confer regarding intercompany agreements. | 2.8 | 2,072.00 |
| 08/25/20 | Kathleen Murray | Attention to incorporation of North Dimension Inc and North Wireless Dimension Inc. | 0.7 | 150.50 |
| 08/25/20 | Jacob E. Simmons | Draft certificate of incorporation for subsidiary; file EIN application; confer with K. Murray regarding same. | 1.2 | 204.00 |
| 08/25/20 | Ryan J. Straus | Review Fiat Integration and Revolving Loan Agreement; revisions to the same; review ancillary documents. | 2.3 | 2,024.00 |
| 08/25/20 | Igor Voloshin | MTL Project: Surety bond call with Nano; miscellaneous project management. | 2.2 | 1,441.00 |
| 08/26/20 | Kathrine McEnroe | Telephone calls to NMLS requesting unlocking of the FTX NMLS account; confer with I. Voloshin regarding steps to give Fenwick permission to access the account. | 0.3 | 132.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-255**

Alameda Research LLC
Client Number: 34394

Invoice Date:  September 11, 2020
Invoice Number:  819810
Billing Attorney:  Andrew Albertson

Page 46

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 08/26/20 | Kathrine McEnroe | Review State Assignments, checklists, current state requirements and current state of material in state folder. | 1.3 | 572.00 |
| 08/26/20 | Kathleen Murray | Attention to EIN for Alameda Research Ventures LLC. | 0.1 | 21.50 |
| 08/26/20 | Ryan J. Straus | Review and revise Fiat Integration and Loan Agreement; ancillary review in connection with same. | 1.6 | 1,408.00 |
| 08/26/20 | Igor Voloshin | MTL Project: Daily check-in with FTX team. | 1.0 | 655.00 |
| 08/27/20 | Kathrine McEnroe | WebEx meeting with I. Voloshin and money transmitter licensing team to answer question regarding NMLS DATABASE, MMLA application, status of Washington application; paralegal assignments and next steps. | 0.6 | 264.00 |
| 08/27/20 | Kathrine McEnroe | Contact IT Department regarding creating internal Fenwick email to be used for individual state applications and registering users on West Realm NMLS data base; register as a user on NMLS database; forward email to team members providing West Realm details, such as account number, user login, password, etc. for accessing database and instructions for setting up user account; download MU1 form and MU2 Associates and distribute to team. | 1.0 | 440.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

# A-256

Alameda Research LLC
Client Number: 34394

Invoice Date:          September 11, 2020
Invoice Number:                 819810
Billing Attorney:      Andrew  Albertson

Page 52

General Corporate
Matter number 34394-00600

## Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|------:|-----:|-------:|
| Andrew  Albertson | Partner | 2.5 | 960.00 | 2,400.00 |
| David L. Forst | Partner | 2.7 | 1450.00 | 3,915.00 |
| Stephen  Gillespie | Partner | 1.0 | 1175.00 | 1,175.00 |
| Mark  Porter | Of Counsel | 2.6 | 850.00 | 2,210.00 |
| Ryan J. Straus | Of Counsel | 7.9 | 880.00 | 6,952.00 |
| Sean  McElroy | Associate | 12.1 | 740.00 | 8,954.00 |
| Can  Sun | Associate | 2.2 | 860.00 | 1,892.00 |
| Igor  Voloshin | Associate | 26.5 | 655.00 | 17,357.50 |
| Jacob  Wittman | Associate | 2.7 | 655.00 | 1,768.50 |
| Kathrine  McEnroe | Paralegal | 12.9 | 440.00 | 5,676.00 |
| Liliya  McKenzie | Paralegal | 4.1 | 400.00 | 1,640.00 |
| Kathleen  Murray | Paralegal | 1.2 | 215.00 | 258.00 |
| Meera  Park | Paralegal | 1.0 | 360.00 | 360.00 |
| Katherine  Schuler | Paralegal | 4.3 | 215.00 | 924.50 |
| Jacob E. Simmons | Case Assistant | 1.6 | 170.00 | 272.00 |
| Total | | 85.3 | | $ 55,754.50 |

## Disbursement Summary

| Date | Description | Total |
|------|-------------|------:|
| 08/26/20 | North Dimension Inc. formation and North Wireless Dimension Inc. formation. - VENDOR: GKL Register Agents Inc./TIN 81-2236321 | 1,828.00 |
| 08/31/20 | Voice & Data Communications | 1,672.64 |
| | Total Disbursements | $ 3,500.64 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

A-257

# Attachment 5

A-258

# FENWICK

1191 Second Avenue
10th Floor
Seattle, WA 98101

206.389.4510
Fenwick.com

Igor Voloshin
Associate
ivoloshin@fenwick.com | +1 206-389-4546

January 10, 2022

Via Email [Daniel@FTX.US]

Daniel S. Friedberg
Chief Compliance Officer
West Realm Shires Services, Inc.

Re:     West Realm Shires Services, Inc. dba FTX.US (“**FTX.US**”) Exemption under Federal and State
        Money Transmission Rules

Dear Daniel:

## I.     EXECUTIVE SUMMARY

We are counsel for FTX.US. We have prepared this memorandum that addresses the permissibility of FTX.US operating its cryptocurrency exchange. We have represented FTX.US since its inception in or around January 2019 and the information and analysis provided herein reflects the legal assessment of FTX.US products since this engagement.

FTX.US is registered with the U.S. Department of the Treasury Financial Crimes Enforcement Network (“**FinCEN**”) as a money services business (“MSB”) under the U.S. Federal Bank Secrecy Act and its regulations (collectively, the “**BSA**”) and has money transmitter licenses (“**MTLs**”) in good standing in twenty-three (23) states along with pending applications in twenty-three (23) others. FTX.US products are not available to New York based residents.  FTX.US has established a BSA compliant compliance program, which is subject to independent audits and assessment by reputable compliance firms as well as state regulators as part of FTX.US’ MTL application process.

FTX.US operates a cryptocurrency exchange which enables Users (as defined below) to purchase cryptocurrency via the FTX.US orderbook that links Users (e.g., purchasers and sellers of cryptocurrency) using a standard bid and quote system. Users login to their FTX.US account (“**Account**”) using this Platform (as defined below) to generate payment instructions to participating financial institutions (the “**Partner Financial Institutions**”) to fund their FTX.US balances (collectively, “**Services**”). Its key Partner Financial Institution, Silvergate Bank, has reviewed and passed upon FTX.US’s compliance systems including its regulatory posture related to money transmission for the Services rendered to Users and continues to oversee activity processed through the Services.

FTX_000291858
SDNY_02_00416556

**A-259**

Daniel S. Friedberg
January 10, 2022
Page 2

Under Federal law, FTX.US is operating within the scope of its MSB registration.

Under state law, FTX.US has received MTLs and is applying for others. With respect to the states that FTX.US has not yet received an MTL, the applicable state exemptions are discussed below. It is very common for cryptocurrency exchanges to operate in such states while their MTL application is pending.

## II.    FENWICK & WEST BACKGROUND

The undersigned is a former enforcement attorney with a state non-depository regulatory agency with jurisdiction over, among other industries, money transmitters , and is intimately familiar with the KYC/AML requirements imposed in the United States under the framework of the Bank Secrecy Act of 1970. Several years ago, the undersigned shifted his emphasis to representing technology companies with respect to compliance with financial laws.

At Fenwick & West LLP, we represent the entire spectrum of clients in the cryptocurrency ecosystem including cryptocurrency exchanges, emerging payments, and financial institutions with respect to financial compliance. We have a deep understanding and knowledge of the space from both a technological and financial perspective.

## III.    SUMMARY OF FTX.US OPERATIONS

Presently, FTX.US' core product is a cryptocurrency exchange ("**Exchange**") where Users can purchase and sell eligible cryptocurrency on the platform ("**Platform**"). Users utilize FTX.US to operate in part its exchange activities, which primarily include cryptocurrency to cryptocurrency transactions. Several states have expressly either carved out crypto-to-crypto trading or otherwise limit their regulatory oversight functions to cash-to-crypto transactions.

### A.    Funding an Account and Maintaining an Account (Account Based Activity)

Users can fund their FTX.US account with U.S. Dollars ("**USD**") or cryptocurrency to begin trading. As further detailed in Appendix A,[1] where a User is only exposed to cryptocurrency transactions (e.g., crypto-to-crypto), the identified states where licenses are pending or not being sought do not presently require MTLs.

However, we also note that Users who fund their Account with USD are in effect receiving an advance from FTX.US where FTX.US where the Account is prefunded by FTX.US. This flow can best be characterized as an advance where FTX.US assumes the credit risk between the point of prefunding the Account balance and receiving the settlement amount advanced by FTX.US.[2] Account balances

---

[1] We have compiled a survey of state laws in those states where FTX.US has licenses pending, has not submitted license but intends to, or will not submit licenses due to the regulatory treatment of its operations in such jurisdictions (collectively discussed in "Appendix A").

[2] Our review has not uncovered a circumstance where applicable regulators have opined on a similar funds flow in the context of money transmission/cryptocurrency operations. California Department of Financial Protection and Innovation, however, recently issued an administrative opinion that stated, ". . . . transactions do not

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000291859
SDNY_02_00416557

**A-260**

Daniel S. Friedberg
January 10, 2022
Page 3

denominated in USD also presently likely fall outside the scope of applicable money transmitter regulations as those balances are only maintained as necessary and incidental to the Exchange.

B.    <u>Blind Order Matching</u>

FTX.US exchange operates an orderbook that on the backend, fulfills orders through a combination of institutional and retail liquidity pools into a single orderbook for Users. As a result, for each Exchange transaction on the Platform, Users are transacting opposite other Users and the subject consideration is immediately delivered. Applicable states have either explicitly or tacitly acknowledged that such transactions fall outside the scope of money transmitter regulations absent explicit guidance to the contrary.

C.    <u>Future Products and Regulatory Roadmap</u>

FTX.US continues to operate its core product while pursuing MTLs without negative regulatory treatment. This approach is consistent with industry practice given the fractured nature of state regulations applicable to cryptocurrency operators, and FTX.US' stated desire to both exemplify best practices and release products that may require MTLs. As a result, FTX.US has received twenty-three (23) licenses in many states where it has a prior operational history. Further, FTX.US has applications pending in an additional twenty-three (23), with an additional eight (8) states and US territories that are pending submission or exempt from requiring licensure based on the current and future FTX.US product roadmap. As noted, FTX.US does not operate in New York, and Montana does not have a money transmission licensing law.

**IV.    FTX.US IS EXEMPT FROM STATE MONEY TRANSMISSION LICENSING**

State rules on money transmission in the context of cryptocurrency operators vary, are ever evolving and disparate. Some states have instituted legislative changes to their money transmission rules that specify such rules apply to cryptocurrency (often referring to "virtual currencies"). For instance, in 2017, Washington State amended its money transmission act to incorporate virtual currency transmission:

> *"Money transmission" means receiving money or its equivalent value (equivalent value includes virtual currency) to transmit, deliver, or instruct to be delivered to another location,*

---

constitute money transmission because [Company's] first action after receiving instructions from its customers is to instruct [Company's] bank to immediately disburse the requested amount to the recipient. [Company] places a hold on sender's debit card; however, this hold does not initiate the transfer of funds to [Company]. Only *after* [Company] has paid the beneficiary is the hold status converted to a payment/post status, and the reimbursement to [Company] finalized. Under this payment reimbursement model, [Company] never 'receives money for transmission.' [Company] does not actually or constructively receive, take possession of, or hold money or monetary value for transmission. Since funds are not transferred to reimburse [Company] until after the designated beneficiary has been paid, [Company] incurs no transmission liability and consumer funds are not at risk." *Transactions in which recipients are paid before company is reimbursed are not subject to licensing under MTA*, Feb. 11, 2021. As noted in Appendix A, states uniformly require an acceptance of USD as a definitional element of money transmission (i.e., transfer of USD to another place or person). Therefore, FTX.US' model for USD funding transactions is distinct from the statutory treatment of money transmission activity where FTX.US does not accept funds for the purpose of transfer but prefunds the account from its own capital.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-261**

Daniel S. Friedberg
January 10, 2022
Page 4

> inside or outside the United States, by any means including but not limited to by wire, facsimile, or electronic transfer. "Money transmission" includes selling, issuing, or acting as an intermediary for open loop prepaid access and payment instruments, but not closed loop prepaid access. 'Money transmission' does not include: The provision solely of connection services to the internet, telecommunications services, or network access; units of value that are issued in affinity or rewards programs that cannot be redeemed for either money or virtual currencies; and units of value that are used solely within online gaming platforms that have no market or application outside of the gaming platforms." RCW 19.230.010(18).

Other states promulgate guidance notices, regulatory bulletins, enforcement actions, or take some other affirmative step to broadcast their intent to regulate cryptocurrency operators. Each state interprets like business activity in distinct ways. As a result, the industry trend is to seek licensure as quickly as possible to avoid changes in regulatory treatment.  Nonetheless, while states are grappling on how to adopt their rules to cryptocurrency, they are creating a fractured body of law that can be difficult to navigate.

For instance, in April 2019, Texas issued a memorandum that crypto-to-crypto trades within Texas are permissible without a money transmitter license. *See* Texas Memorandum 1037. Other states have sought to welcome cryptocurrency activity by intentionally limiting the scope of regulation or through determinations that existing legislation does not authorize them to treat cryptocurrency as analogous to statutorily defined "money." Wyoming and New Hampshire have also exempted the sale or third-party transmission of cryptocurrency from money transmitter licensing requirements.

As you know, we have continued to monitor regulatory developments in this space and reviewed relevant state money transmission rules and any available guidance on the treatment of cryptocurrency activity.  In each of the states, as well as in the remaining jurisdictions where FTX.US operates, money transmission requires receiving money or monetary instruments as defined by such states. FTX.US would therefore not be subject to MTL obligations in such jurisdictions.

Prior to FTX.US commencing business, as a precautionary measure, we contacted those states that were deemed the most restrictive in this regard, as follows:

- California
- Colorado
- Indiana
- Kentucky
- Maryland
- Michigan
- Missouri
- Utah
- Wisconsin
- Wyoming

FTX.US has since received MTLs in Maryland, Michigan, and Missouri without those states objecting to any prior operational history in those jurisdictions. We have also assessed state money transmission laws in the states where FTX.US operates. *See* Appendix A.  In each of those states,

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-262**

Daniel S. Friedberg
January 10, 2022
Page 5

money transmission includes either businesses that: (1) receive money for the purposes of transmission; or (2) sell payment instruments or stored value.[3] Further, where states have issued regulatory guidance on cryptocurrency, FTX.US has historically established commercial partnerships with Financial Partner Institutions prior to submitting an MTL application to buttress its regulatory model. For various reasons, these relationships shift during the FTX.US product lifecycle.  Based on this information, we have a reasonable belief that FTX.US is excluded from money transmission for the following reasons:

- States have expressed explicit regulatory interpretations that exempt the Platform from MTLs

- FTX.US does not presently offer services that may require licensure (e.g., peer to peer transfers within the Platform[4])

- FTX.US has submitted MTL license applications in all but nine (8) states or US territories and we understand that it has not to date received regulatory push-back on the above stated Platform's historic operations in such jurisdictions

We have kept in close contact with state regulators during the application process and have not received any negative feedback regarding the above information. FTX.US is also working with reputable compliance consultants as part of the application process who are well known to regulators and are providing ongoing application, license maintenance, and other support as part of FTX licensing strategy.

**V.      COMPLIANCE**

Pursuant to 31 CFR § 1022.210, financial institutions must maintain a BSA/AML compliance program that incorporates five elements (commonly referred to the five pillars of BSA compliance). Further, FTX.US must maintain a registration in good standing as required under 31 CFR § 1022.380. FTX.US has developed and maintains AML policies and procedures ("AML Program") that meets or exceeds industry practices and regulatory standards. The AML Program must also include relevant procedures on reporting suspicious activity to appropriate governmental agencies in accordance with 31 CFR § 1022.320.

The Program incorporates the five pillars of institutional AML compliance that highlights FTX.US' regulatory obligations and demonstrates FTX.US' intent to ensure that an adequate AML program is implemented. It includes relevant sections that are generally found within an AML policy along with relevant AML regulatory references.

---

[3] Payment instruments include common negotiable instruments such as cashier's checks or similar bank notes, and stored value are open-loop prepaid cards.  FTX.US is not engaged in either business model.

[4] We note that states do typically regulate peer-to-peer USD and cryptocurrency transfers. *See e.g.,* Interim Regulatory Guidance Cryptocurrency and the Colorado Money Transmitters Act." ("If a person is engaged in the business of transmitting *money from one consumer to another within an exchange through the medium of cryptocurrency, that act would constitute money transmission and would be subject to licensure under the Colorado law.*"). FTX.US does not offer a peer-to-peer product in the fashion of Venmo or other like products.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-263**

Daniel S. Friedberg
January 10, 2022
Page 6

FTX.US has developed procedures that implement the AML program that are reasonably designed to deter and detect suspicious or other illicit activity consistent with regulatory guidance and industry practice. The procedures are effectuated through a team of specifically designated compliance representatives within FTX.US who report to the Chief Compliance Officer. The procedures include relevant customer identification procedures ("CIP") and transaction monitoring systems that combine automated and manual systems and leverage third party compliance vendors.

The procedures also discuss red flags applicable to FTX.US's business. The procedures discuss the record keeping obligations associated with AML requirements and include a requirement that the AML Policy be approved and signed off by the AML Compliance Officer.

As part of FTX.US's employee training requirement, FTX.US holds compliance meetings and employees are also required to complete an on-line AML training course. In reviewing the training material, FTX.US has developed sufficient material to cover the key components of the BSA. The Company's operationalization of the above is consistent with applicable AML Rules. We have also reviewed FTX.US's regulatory registrations and FTX.US is actively registered as an MSB and licensed as a money transmitter.

We note that FTX.US' procedures address applicable rules and BSA requirements including: designating an AML Compliance Officer and requiring that all employees sign an AML attestation form and provides procedures and supervisory controls for employees, supervisors. The Company's operationalization of the above is consistent with applicable AML Rules.

As a baseline all Users need to provide identifying information at onboarding, which is risk screened based on the information provided. These measures taken together form a reasonable belief of the User identity and their apparent use of FTX.US, which is consistent with AML Rules.

FTX.US regularly (and no less frequently than annually) reviews its CIP to determine if it needs to be recalibrated. The review is conducted on multiple levels including by third party BSA auditors (as described below). FTX.US has conducted third party assessments of its AML Program in September 2020 and September 2021. The scope of the audits include all elements of the AML Program including each of the five pillars of BSA compliance. Both found that FTX.US' BSA compliance policies are in line with BSA obligations related to an MSB and did not identify any material deficiencies. FTX.US also continues to advance and improve its compliance controls consistent with industry practices and regulatory obligations based on working with third party auditors and advisors.

**VI.     CONCLUSION**

We trust that the foregoing is sufficient to satisfy your inquiry.

We are happy to provide additional information at your request relating the information noted above.

The scope of this memorandum is limited to the rules identified above and does not address any other laws or regulations. The analysis herein is limited to and based on statutes, regulations, historical precedents, relevant federal and state enforcement actions and other communications that we deemed relevant as of the date of this memorandum. We do not undertake to update this

A-264

Daniel S. Friedberg
January 10, 2022
Page 7

memorandum after the date hereof as a result of any future developments. Regulators have broad
discretion to interpret the rules identified herein and may take a contrary position.

Sincerely,

Fᴇɴᴡɪᴄᴋ & Wᴇsᴛ LLP

Igor Voloshin

IV:sdj

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000291864
SDNY_02_00416562

**A-265**

Daniel S. Friedberg
January 10, 2022
Page 8

### APPENDIX A: REVIEW OF STATE MONEY TRANSMITTER LAWS

(a)     California

California defines "'Money transmission' means any of the following: (1) Selling or issuing payment instruments. (2) Selling or issuing stored value. (3) Receiving money for transmission." Cal. Fin. Code § 2003(q) (emphasis added). California's Money Transmitter Act does not address cryptocurrency and officially the State has "not determined whether a business that purchases and sells decentralized cryptocurrencies, or issuance of stored value that can be redeemed for cryptocurrency, triggers the application of California's money transmission law."[5]

Accordingly, guidance from California suggests that, in perhaps a faint-hearted way, the absence of any affirmative guidance requiring MTLs for cryptocurrency indicates that an MTL is not necessary. We further note that we have had opportunity to have informal conversations

In addition to our informal inquiry regarding FTX.US noted above, we also note that California has on nearly a dozen occasions identified that cryptocurrency transactions are not subject to the MTA.[6] Where a state has not taken an affirmative position on the application of its money transmission laws to cryptocurrency activity, such states have uniformly not required MTLs for cryptocurrency activity. FTX.US therefore does not presently require licensure. Based on informal conversations with state regulators, California does not presently accept MTL applications from cryptocurrency operators.

(b)     Colorado

Outside counsel for FTX.US contacted the Colorado Division of Banking prior to beginning operations in the state and informed the agency about FTX.US' planned operations. The agency did not oppose FTX.US opening its business to residents.

Under Colorado law, "money transmission" means "the sale or issuance of exchange or engaging in the business of receiving money for transmission or transmitting money within the United States or to locations abroad by any and all means including but not limited to payment instrument, wire, facsimile, or electronic transfer."[7] Colorado has issued an advisory explaining that cryptocurrency is not covered within the definition of "exchange" and concluding that buying, selling, or facilitating the

---

[5] *See* 10/01/2019 Letter From The Department of Financial Protection and Innovation Letter (https://dfpi.ca.gov/2019/10/10/cryptocurrency-exchange-platform-10-1-19/).

[6] *See e.g.*, Cal. Department of Financial Protection and Innovation, *Request for Interpretive Opinion re Bitcoin ATM Kiosks*, May 25, 2021 ("Under the MTA, a person may not engage in the business of money transmission in California unless the person is licensed, exempt from licensure, or an agent of a person licensed or exempt from licensure. Financial Code section 2003, subdivision (q), defines 'money transmission' as: (1) selling or issuing payment instruments, (2) selling or issuing stored value, or (3) receiving money for transmission. The sale and purchase of bitcoin from [Company] through a bitcoin ATM kiosk does not meet the definition of 'money transmission.' Therefore, [Company]'s activities through its bitcoin ATM kiosks are not subject to licensing under the MTA.").

[7] C.R.S. 11-110-103(11).

A-266

Daniel S. Friedberg
January 10, 2022
Page 9

transfer of cryptocurrencies is not an activity requiring a Colorado money transmission license.[8] We therefore believe that FTX.US current operations do not require licensure within the meaning of Colorado law. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

    **(c)**    Connecticut

Under Connecticut law, "money transmission" means "engaging in the business of issuing or selling payment instruments or stored value, receiving money or monetary value for current or future transmission or the business of transmitting money or monetary value within the United States or to locations outside the United States by any and all means including, but not limited to, payment instrument, wire, facsimile or electronic transfer."[9] "Monetary value" means a medium of exchange, whether or not redeemable in money.[10]

The Connecticut Department of Banking has published an FAQ guidance document that notes, "Connecticut General Statutes treats virtual currency similarly to fiat currency (a.k.a. cash) under Connecticut's money transmission scheme."[11] The Department has entered two consent orders against cryptocurrency companies in the past year. In both instances, the companies were in the business of storing their customers' cryptocurrencies. On the other hand, the Department has issued two unpublished opinions holding that companies offering the purchase and sale of virtual currencies through Bitcoin ATMs or virtual currency kiosks were not required to obtain licensure under the Money Transmission Act.[12]

FTX.US's historic operations leveraged Partner Financial Institutions that assumed the regulated conduct while concurrently expeditiously compiling a license application for Connecticut. FTX.US has since submitted its MTL application to ensure compliance with applicable regulatory requirements.

    **(d)**    Delaware

Delaware law prohibits any person from engaging in the business of selling checks or issuing checks or engaging in the business of receiving money for transmission or transmitting the same without having first obtained a money transmission license.[13] The state code does not define "money," and the Office of the State Bank Commissioner has not published any enforcement actions or issued any

---

[8] Colorado Division of Banking, "Interim Regulatory Guidance Cryptocurrency and the Colorado Money Transmitters Act" (Sep. 20, 2018), available at https://www.csbs.org/system/files/2019-05/CO-%20Interim%20Guidance%20Cryptocurrency%20and%20the%20Money%20Transmitters%20Act.pdf.

[9] Conn. Gen. Stat. § 36a-596(9).

[10] Conn. Gen. Stat. § 36a-596(8).

[11] Connecticut Department of Banking, Virtual Currency Money Transmission FAQs, https://portal.ct.gov/DOB/Consumer-Credit-Licensing-Info/Consumer-Credit-Licensing-Information/Virtual-Currency-MTRA-FAQs.

[12] *Id.*

[13] 5 Del. C. § 2303.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

A-267

Daniel S. Friedberg
January 10, 2022
Page 10

guidance relating to the treatment of virtual currency under the state's Sale of Checks Act. Given this, consistent with fundamental canons of statutory interpretation, we believe that Delaware does not presently treat Exchange activity as requiring licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

    **(e)**    Hawaii

The Hawaii legislature has tried to pass legislation that both includes (SB 949) and excludes (SB 2853 and 3082) virtual currencies from its Money Transmitter Act. While these proposed regulations have not been enacted, the State's Division of Financial Institutions has issued public guidance on the applicability of State MTL to cryptocurrency transactions, stating generally that "cryptocurrency transactions" require a money transmission license.

The States' Money Transmitter Act is uniquely burdensome in that it requires licensees to hold "in trust permissible investments having an aggregate market value of not less than the aggregate amount of its outstanding transmission obligations." In other words, if a virtual currency business were to hold a cryptocurrency on behalf of a Hawaiian customer they would be required by the State to maintain an equivalent cash value in trust. This requirement has proven financially untenable for virtual currency operators, including Coinbase, who have suspended service to Hawaii.

As a response to criticism regarding the burden Hawaii places on virtual currency businesses, Hawaii's legislature adopted HR 94 which requests the department of commerce and consumer affairs to reconsider the burdensome assert reserve requirements. Additionally, and in response to the State's burdensome virtual currency regulations, in August 2020 Hawaii created a no-license digital currency sandbox through its Digital Currency Innovation Lab (DCIL). See http://www.htdc.org/programs/#dcil-section. Sandbox participants are exempt from the requirement to maintain a cash equivalent, and from acquiring the usual money transmitter license, through June 2022.

With respect to money transmission laws, in January 2019, the Hawaii Senate introduced a bill to extend "the money transmitters act to expressly apply to persons engaged in the transmission of virtual currency" and require "licensees dealing with virtual currency to provide a warning to customers prior to entering into an agreement with the customers."

To account for this regulatory interpretation, FTX.US's historic operations leveraged Partner Financial Institutions that assumed the regulated conduct while concurrently expeditiously compiling a license application for Hawaii. Due to legislative pronouncements that indicated a shift in the treatment of exchanges referenced above, FTX.US awaited further clarity from local regulators. However, we understand that it is presently anticipating submitting an MTL as quickly as possible.

    **(f)**    Idaho

Under Idaho law, "money transmission" means "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or the business of transmitting money

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-268**

Daniel S. Friedberg
January 10, 2022
Page 11

within the United States or to locations outside the United States by any and all means including, but not limited to, payment instrument, wire, facsimile or electronic transfer."[14]

The Idaho Department of Finance has issued guidance stating, "If you act as a virtual/digital currency exchanger and accept legal tender (e.g., government backed/issued "fiat" currencies) for later delivery to a third party in association with the purchase of a virtual currency, then you must be licensed as a money transmitter with the Department of Finance."[15] As noted above, where FTX.US holds a USD balance, it does so primarily as an advance to Users.

FTX.US's historic operations leveraged Partner Financial Institutions that assumed the regulated conduct while concurrently expeditiously compiling a license application for Idaho. FTX.US has since submitted its MTL application to ensure compliance with applicable regulatory requirements.

    **(g)**   Indiana

Outside counsel for FTX.US contacted the Indiana Department of Financial Institutions prior to beginning operations in the state and informed the agency about FTX.US' planned operations. The agency did not oppose FTX.US opening its business to residents.

Per Indian's money transmission statute, "any entity that engages in the business of selling or issuing payment instruments primarily for personal, family, or household purposes. Money transmissions performed by an entity from an office or place of business, or internet, wherever located (inside or outside the United States) by any means, including but not limited to a payment instrument, wire, facsimile, or electronic transfer would be considered money transmission activity."[16] Indian's Money Transmitter Act does not expressly include the concepts of "virtual currencies" or "monetary value" and no guidance on the matter has been provided by the State. Where a state has not taken an affirmative position on the application of its money transmission laws to cryptocurrency activity, such states have uniformly not required MTLs for cryptocurrency activity. FTX.US therefore does not presently require licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

    **(h)**   Kansas

Under the Kansas Money Transmitter Act, "money transmission" means "to engage in the business of the sale or issuance of payment instruments or of receiving money or monetary value for transmission to a location within or outside the United States by wire, facsimile, electronic means or any other means, except that money transmission does not include currency exchange where no transmission of money occurs."[17]

---

[14] Idaho Code § 26-2902(11).

[15] Idaho Money Transmitters Section, "Who is required to have an Idaho Money Transmitter License," https://www.finance.idaho.gov/who-we-regulate/money-transmitters/.

[16] Indiana Code 28-8-4-13.

[17] K.S.A. § 9-508(h).

CONFIDENTIAL TREATMENT REQUESTED BY FTX

A-269

Daniel S. Friedberg
January 10, 2022
Page 12

The state's Office of the State Bank Commissioner issued 2014 guidance stating:

> Exchange of cryptocurrency for sovereign currency between two parties is not
> money transmission under the KMTA. This is essentially a sale of goods between
> two parties. The seller gives units of cryptocurrency to the buyer, who pays the
> seller directly with sovereign currency. The seller does not receive the sovereign
> currency with the intent to transmit to another entity[.][18]

FTX.US's historic operations have leveraged Partner Financial Institutions that assumed the regulated
conduct while concurrently expeditiously compiling a license application for Kansas. We understand
that FTX.US is presently anticipating submitting an MTL as quickly as possible. .

   **(i)**     Kentucky

Outside counsel for FTX.US contacted the Kentucky Department of Financial Institutions prior to
beginning operations in the state and informed the agency about FTX.US' planned operations. The
agency did not oppose FTX.US opening its business to residents.

Under Kentucky law, "money transmission" means "engaging in the business of receiving money or
monetary value to transmit, deliver, or instruct to be transmitted or delivered, money or monetary
value to another location inside or outside the United States by any and all means, including but not
limited to wire, facsimile, electronic transfer, or issuing stored value."[19]

Kentucky's Department of Financial Institutions has not publicly taken any position on the application
of its Money Services Act to virtual currency businesses, nor has the Department published any
enforcement actions against virtual currency businesses under the Money Transmitters Act.[20]
However, a company with a business model substantially similar to FTX.US's represented to another
state regulator that the company had received confirmation from Kentucky that it did not need a
license.[21] As previously noted, where a state has not taken an affirmative position on the application
of its money transmission laws to cryptocurrency activity, such states have uniformly not required
MTLs for cryptocurrency activity. FTX.US therefore does not presently require licensure. However, we
further note that FTX.US has submitted an MTL application to account for changes in the regulatory
treatment of the Platform and any future product launches that may require licensure.

---

[18] Kansas Office of the State Bank Commissioner, Guidance Document MT 2014-01: "Regulatory Treatment of
Virtual Currencies Under the Kansas Money Transmitter Act" (Jun. 6, 2014), https://www.osbckansas.org/wp-
content/uploads/mt2014_01_virtual_currency.pdf.

[19] KRS § 286.11-003(17).

[20] Kentucky Department of Financial Institutions, "Other Industry Enforcement Actions,"
https://kfi.ky.gov/new_docs.aspx?cat=87.

[21] Letter from Arkansas Securities Department to CryptoFlip re: CryptoFlip 20-NA-0003 (Mar. 25, 2020),
http://www.securities.arkansas.gov/!userfiles/CryptoFlip%2020-NA-0003.pdf.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-270**

Daniel S. Friedberg
January 10, 2022
Page 13

> **(j)**     Louisiana

Under Louisiana law, a person may not engage in virtual currency business activity unless it is licensed under the state's Virtual Currency Business Act.[22]

The State has issued public guidance on the applicability of the State's Money Transmitter Act to cryptocurrency transactions, stating that a person identified as an "exchanger" under FinCEN's interpretation is the only party who may be subject to licensure as a money transmitter in the State. FinCEN has characterized sellers of decentralized virtual currencies in exchange for another virtual currency or fiat currency, among others, as "exchangers."[23] Given the ambiguity associated with referencing FinCEN guidance, FTX.US operated in Louisiana consistent with industry practice. However, Effective August 1, 2020, Louisiana enacted House Bill 701, "Virtual Currency Businesses Act" which regulates various topics including definitions of virtual currency and relevant terminologies, applicability of the statute, licensure for businesses, and license application requirements. "Virtual currency business activity" is defined to include exchanging virtual currency, and "exchange" is defined as follows:

> "Exchange", when used as a verb, means to assume control of virtual currency from, or on behalf of, a resident, at least momentarily, to sell, trade, or convert either of the following: (a) Virtual currency for legal tender, bank credit, or one or more forms of virtual currency. (b) Legal tender or bank credit for one or more forms of virtual currency.[24]

To account for this regulatory change, FTX.US's historic operations leveraged Partner Financial Institutions that assumed the regulated conduct while concurrently expeditiously compiling a license application for Louisiana. FTX.US has since submitted its license application to ensure compliance with Louisiana law.

---

[22] La. Stat. Ann. § 6:1384.

[23] *See* La. Office of Fin. Inst., Consumer and Investor Advisory on Virtual Currency (2014), *available at* http://www.ofi.state.la.us/SOCGuidanceVirtualCurrency.pdf (last visited 7/16/2019). While FinCEN's treatment of exchange activity is broad, many have questioned the applicability of FinCEN's guidance to pure exchange activity. In particular because FinCEN, as relevant to the Platform described above, FinCEN clarified to a proprietary investment operation that its trading of cryptocurrency against various counterparties would not constitute exchange activities so long as such activity (i) constituted bona fide investment activity for the benefit of the company and (ii) did not involve the transmission of funds or cryptocurrency to a third party on behalf of the company's counterparties. In the Investor Letter, FinCEN noted that: "[] when the Company invests in a convertible virtual currency for its own account, and when it realizes the value of its investment, it is acting as a user of that convertible virtual currency within the meaning of the guidance. As a result, to the extent that the Company limits its activities strictly to investing in virtual currency for its own account, it is not acting as a money transmitter and is not an MSB under FinCEN's regulations. However, any transfers to third parties at the behest of the Company's counterparties, creditors, or owners entitled to direct payments should be closely scrutinized, as they may constitute money transmission." The letter further noted that the expansion of investment services to a trading desk or brokerage service may implicate MSB activities.

[24] La. Stat. Ann. § 6:1382(4).

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-271**

Daniel S. Friedberg
January 10, 2022
Page 14

      **(k)**      Massachusetts

Massachusetts law regulates foreign money transmission, not domestic money transmission. The state has issued an opinion letter[25] advising a foreign company that operates a virtual currency exchange business that it was not required to be licensed. It has since expanded on this rationale in a subsequent opinion stating:

> Massachusetts General Laws chapter 169 requires that all persons who engage or are financially interested in the business of receiving deposits of money for the purpose of transmitting the same or equivalents thereof to foreign countries obtain a foreign transmittal agency license from the Division. . . . [T]he Division has reasoned that where a transmission is effected but the sender has no knowledge of the identity of the recipient or the recipient's location (such as in certain automatic exchange transactions), the transmission of the virtual currency does not meet the statutory requirement.

> [The exchange] as noted, [has] three variations of transactions that occur utilizing the . . . Service. The first two permit users to: (i) receive Fiat currency from the user's external account with another bank (external bank account); (ii) send Fiat currency to the user's external bank account. In both of these scenarios, the sending and receiving party are the same person. A Massachusetts consumer who utilizes her [] account to send Fiat currency from her [] Account to her external bank account is merely moving her own money to a separate bank account. The Division does not view the transfer of money between an individual's bank accounts as money transmission. Accordingly, with respect to the first two variations of [] Service transactions, it is the position of the Division that no license would be required . . . .

> With respect to the [exchange,] transactions are automatic transactions, and are effected when a prospective buyer's desired order for the purchase of Digital Assets can be matched with the desired sale price agreeable to another LV user. P2P Exchange Service transactions may also occur as a trade of digital assets for other digital assets, which is also effected automatically when a match is found meeting the requirements of two LVL users. You have confirmed that LVL users may not select a specific individual with whom they will effect a transaction in a P2P Exchange Service transaction. The Division has previously opined that such exchange services do not constitute money transmission under Massachusetts law because they are not undertaken with the purpose of effecting a transmission to a foreign country where the identity of the recipient cannot be selected or determined by the sender; indeed, once an order is set, the trade is automatically

---

[25] ALM GL ch. 169. See Massachusetts Division of Banks, Opinion 18-003 (Jun. 14, 2018), https://www.mass.gov/decision/opinion-18-003, ("Massachusetts does not presently have a domestic money transmission statute").

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-272**

Daniel S. Friedberg
January 10, 2022
Page 15

> matched and neither party is able to select the other party to the trade. Accordingly, it is the position of the Division that offering the P2P Exchange Service, as described, would not require LVL to obtain a foreign transmittal license with the Division.[26]

 As noted above, there is clear regulatory guidance that exempts the Exchange, as discussed herein, from licensure obligations. Therefore, FTX.US operations do not presently require licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

     **(l)**     Nebraska

Under Nebraska law, "money transmission" means "the business of the sale or issuance of payment instruments or stored value or of receiving money or monetary value for transmission to a location within or outside the United States by any and all means, including wire, facsimile, or electronic transfer. Notwithstanding any other provision of law, money transmission also includes bill payment services not limited to the right to receive payment of any claim for another but does not include bill payment services in which an agent of a payee receives money or monetary value on behalf of such payee."[27] The Nebraska Department of Banking and Finance has not published any guidance relating to the application of its Money Transmitters Act to virtual currency activities. The Nebraska Legislature introduced three bills focusing on blockchain and cryptocurrency in January 2018. One of the bills would amend the state's money-laundering statutes to account for cryptocurrencies, and the remaining bills would prohibit local governments from taxing or otherwise regulating the use of distributive ledger technology.  All three bills have been indefinitely postponed since April 18, 2018.

In an administrative release, the Nebraska Department of Revenue found that the term "currency" does not include Bitcoin or other virtual currency.[28] As previously noted, where a state has not taken an affirmative position on the application of its money transmission laws to cryptocurrency activity, such states have uniformly not required MTLs for cryptocurrency activity. FTX.US therefore does not presently require licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

     **(m)**     Nevada

Nevada law prohibits anyone from "[engaging] in the business of selling or issuing checks or of receiving for transmission or transmitting money or credits unless the person is licensed pursuant to this chapter."[29] A "check" means "any check, draft, money order or other instrument used for the

---

[26] ALM GL ch. 169. See Massachusetts Division of Banks, Opinion 020-003 (May 5, 2020), https://www.mass.gov/opinion/opinion-020-003.

[27] Neb. Rev. St. § 8-2716.

[28] *See* Jennifer Jensen, et al, Sales and Use Taxes in a Digital Economy, The Tax Adviser, (Jun. 1, 2015) http://www.thetaxadviser.com/issues/2015/jun/salt-jun2015.html#fnref_13.

[29] Nev. Rev. Stat. Ann. § 671.040.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-273**

Daniel S. Friedberg
January 10, 2022
Page 16

transmission or payment of money."[30] The terms "money" and "credits" are not defined. The Nevada Financial Institutions Division issued guidance that implied the state's Money Transmitters Act would apply to some virtual currency activities, but the guidance does not specify which activities.[31] As previously noted, where a state has not taken an affirmative position on the application of its money transmission laws to cryptocurrency activity, such states have uniformly not required MTLs for cryptocurrency activity.

We further note that Nevada regulators have historically been very lenient towards the cryptocurrency industry and one of the few states that offers trust company charters for cryptocurrency operators. In reviewing its public statements and consent orders, we did not identify any actions that indicate FTX.US is subject to regulatory risk due to its present or historic operations. FTX.US therefore does not presently require licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

    **(n)**    New Jersey

Under New Jersey law, "money transmitter" means "a person who engages in this State in the business of: (1) the sale or issuance of payment instruments for a fee, commission or other benefit; (2) the receipt of money for transmission or transmitting money within the United States or to locations abroad by any and all means, including but not limited to payment instrument, wire, facsimile, electronic transfer, or otherwise for a fee, commission or other benefit; or (3) the receipt of money for obligors for the purpose of paying obligors' bills, invoices or accounts for a fee, commission or other benefit paid by the obligor."[32]

The statute defines money as "a medium of exchange authorized or adopted by the United States or a foreign government as a part of its currency and that is customarily used and accepted as a medium of exchange in the country of issuance."[33] It furthermore defines "payment instrument" in a manner dependent on the definition of money:

> "Payment instrument" means any check, draft, money order, travelers check or other instrument or written order for the transmission or payment of money, sold or issued to one or more persons, whether or not the instrument is negotiable. The term "payment instrument" does not include any credit card voucher, any letter of credit or any instrument which is redeemable by the issuer in goods or services.[34]

---

[30] Nev. Rev. Stat. Ann. § 671.010

[31] Nevada Financial Institutions Division, Nevada Financial Institutions Division Statement on Regulation of Cryptocurrency in Nevada, https://fid.nv.gov/uploadedFiles/fidnvgov/content/Home/features/FID%20Statement%20on%20Crypotcurrency.pdf.

[32] N.J. Stat. § 17:15C-2.

[33] *Id.*

[34] *Id.*

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000291873
SDNY_02_00416571

# A-274

Daniel S. Friedberg
January 10, 2022
Page 17

Since as far back as 2014, the New Jersey Department of Banking and Insurance has not taken any enforcement action against a virtual currency company for violation of the New Jersey Money Transmitter Act.[35] Therefore, FTX.US operations as described above do not presently require licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

> **(o)**     North Carolina

Under North Carolina law, "money transmission" means:

[T]o engage in the business of any of the following: a. Sale or issuance of payment instruments or stored value primarily for personal, family, or household purposes; or b. Receiving money or monetary value for transmission or holding funds incidental to transmission within the United States or to locations abroad by any and all means, including payment instrument, stored value, wire, facsimile, or electronic transfer, primarily for personal, family, or household purposes. This includes maintaining control of virtual currency on behalf of others.[36]

The North Carolina Commissioner of Banks provided in a publicly available FAQ document:

> A virtual currency exchanger is a person that exchanges virtual currency for fiat currency or other virtual currencies, and vice versa. An exchanger that sells its own stock of virtual currency is generally not considered a virtual currency transmitter under the NC MTA. In contrast, an exchanger that holds customer funds while arranging a satisfactory buy/sell order with a third party, and transmits virtual currency and fiat currency between buyer and seller, will typically be considered a virtual currency transmitter.[37]

FTX.US's historic operations leveraged Partner Financial Institutions that assumed the regulated conduct while concurrently expeditiously compiling a license application for North Carolina. FTX.US has since submitted its North Carolina MTL application to ensure compliance with applicable regulatory requirements.

---

[35] New Jersey Department of Banking and Insurance, Depository and Licensee Enforcement Activity, https://www.state.nj.us/dobi/division_banking/bankdivenforce.html.

[36] N.C. Gen. Stat. § 53-208.42(13).

[37] North Carolina Commissioner of Banks, Money Transmitter Frequently Asked Questions, https://www.nccob.gov/Public/financialinstitutions/mt/mtfaq.aspx. *See also* North Carolina, In re: Worldlink Coin Investment, LLC., Docket No. 20:098:MT (Oct. 7, 2020) ("The MTA requires a person who holds or exchanges virtual currency on behalf of another to obtain a license from NCCOB").

CONFIDENTIAL TREATMENT REQUESTED BY FTX

Daniel S. Friedberg
January 10, 2022
Page 18

**(p)**     North Dakota

Under North Dakota law, "money transmission" means:

> [T]o engage in the business of the sale or issuance of payment instruments, stored value, or of receiving money or monetary value for transmission to a location within or outside the United States by any and all means, including wire, facsimile, or electronic transfer. Notwithstanding any other provision of law, "money transmission" also includes bill payment services not limited to the right to receive payment of any claim for another, but does not include payment processing activities conducted for a merchant under an agency relationship.[38]

The North Dakota Department of Financial Institutions has issued FAQ guidance stating, "Currently, the Department does not consider the control or transmission of virtual currency to fall under the scope of NDCC 13-09. However, any such company that also holds or transmits fiat currency will still need to secure a money transmitter license."[39] The document also provides, "The purchase, sale, or exchange of virtual currency does not in and of itself require a money transmitter license. However, other activities related to these business lines may trigger this requirement, such as the transmission of fiat currency-denominated assets to third parties."[40] Based on the above, FTX.US would not be subject to MTL requirements. Nonetheless, FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

**(q)**     Ohio

Under Ohio law, "transmit money" means:

> [T]o receive, directly or indirectly and by any means, money or its equivalent from a person and to deliver, pay, or make accessible, by any means, method, manner, or device, whether or not a payment instrument is used, the money received or its equivalent to the same or another person, at the same or another time, and at the same or another place, but does not include transactions in which the recipient of the money or its equivalent is the principal or authorized representative of the principal in a transaction for which the money or its equivalent is received, other than the transmission of money or its equivalent. "Transmit money" also includes the sale of checks and other payment instruments.[41]

---

[38] N.D. Cent. Code Ann. § 13-09-02(13).

[39] North Dakota Department of Financial Institutions, Frequently Asked Questions - Non-Depository, https://www.nd.gov/dfi/about-dfi/non-depository/frequently-asked-questions-non-depository.

[40] Id.

[41] Ohio Rev. Code Ann. § 1315.01(G)

CONFIDENTIAL TREATMENT REQUESTED BY FTX

A-276

Daniel S. Friedberg
January 10, 2022
Page 19

Ohio's Department of Commerce has not published guidance on virtual currency regulations, nor has it published any enforcement actions relating to virtual currency transmission.[42] As previously noted, where a state has not taken an affirmative position on the application of its money transmission laws to cryptocurrency activity, such states have uniformly not required MTLs for cryptocurrency activity. FTX.US therefore does not presently require licensure. However, we further note that FTX.US is preparing to submit an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

    **(r)**    Oklahoma

Under Oklahoma law, "money transmitter" means "any person who engages in the business of accepting currency or funds denominated in currency, and transmits the currency or funds or the value of the currency or funds, by any means through a financial agency or institution, a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System or both, or an electronic funds transfer network."[43] The statute defines "currency" or "funds" to mean fiat currency.[44] The Oklahoma State Banking Department has not issued any guidance specifically addressing virtual currency activities.[45] As previously noted, where a state has not taken an affirmative position on the application of its money transmission laws to

---

[42] Ohio Department of Commerce, Financial Institutions Enforcement Actions, https://www.com.ohio.gov/fiin/enforcement.aspx.

[43] 6 Okl. St. § 1512(7).

[44] 6 Okl. St. § 1512(3) ("'Currency' or 'funds' means the coin and paper money of the United States or of any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issuance. Currency includes U.S. silver certificates, U.S. notes, and Federal Reserve notes. Currency also includes official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country").

[45] Cryptocurrency transferees are not afforded the same protections as those afforded to the transferees of money. Okla. Stat. Ann. § 1-9-332. The Oklahoma legislature determined that a seller who accepts cryptocurrency (e.g., bitcoin as referenced in the legislator) does not take the cryptocurrency free of an existing security interest. Okla. Stat. Ann. § 1-9-332. Multiple bills have set to amend or add definitions with respect to digital currencies and blockchain. In April 2019, a Senate Bill was adopted, which amends the definitions for electronic records and signatures to be valid if secured via blockchain technology. S.B. 700, 57th Leg., 1st Reg. Sess. (Okla. 2019). Additionally, "virtual currency" is being proposed to be included within the definition of "contribution" for purposes of campaign finance. S.B. 809 57th Leg., 1st Reg. Sess. (Okla. 2019). Also introduced in February 2019, SB 822 defines "virtual currency" as a medium of exchange, unit of account or store of value and "is not recognized as legal tender by the United States." S.B. 822, 57th Leg., 1st Reg. Sess. (Okla. 2019). The Senate also introduced a bill "clarifying status of open blockchain tokens under certain conditions." The proposal delineates when a person is not considered a broker-dealer and posits ways to comply with exemptions. S.B. 843, 57th Leg., 1st Reg. Sess. (Okla. 2019). The House also proposed a bill to create "the Uniform Regulation of Virtual-Currency Businesses Act and the Uniform Supplemental Commercial Law for the Uniform Regulation of Virtual-Currency Businesses Act." H.B. 1954, 57th Leg., 1st Reg. Sess. (Okla. 2019). The Oklahoma Senate introduced a bill authorizing cryptocurrency to be used, offered, sold, exchanged and accepted as an instrument of monetary value within its governmental agencies, the governmental agencies within the its political subdivisions, and by marketplace sellers; provided such governmental agencies and marketplace sellers have entered into a written contractual agreement with a money services business to use cryptocurrency as payment. The bill is currently in the Business, Commerce and Tourism Senate Committee. S.B. 1667, 57th Leg., 2nd Reg. Sess. (Okla. 2020).

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-277**

Daniel S. Friedberg
January 10, 2022
Page 20

cryptocurrency activity, such states have uniformly not required MTLs for cryptocurrency activity. FTX.US therefore does not presently require licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

    **(s)**    Rhode Island

Under Rhode Island law, "currency transmission" means:

> [E]ngaging in the business of any of the following: (i) Sale or issuance of payment instruments or stored value primarily for personal, family, or household purposes; or (ii) Receiving money or monetary value for transmission or holding funds incidental to transmission within the United States or to locations abroad by any and all means, including payment instrument, stored value, wire, facsimile, or electronic transfer, primarily for personal, family, or household purposes. This includes maintaining control of virtual currency or transactions in virtual currency on behalf of others.[46]

The checklist provided to the Nationwide Multistate Licensing System as well as an FAQ promulgated for new applicants for a license notes, "[A]ny entity that maintains control of virtual currency or facilitates transactions involving virtual currency on behalf of others is required to obtain the Rhode Island Currency Transmitter License."[47] However, Rhode Island's regulatory guidance also notes:

> R.I. Gen. Laws § 19-14-1(4) sets forth the several categories of business activities that fall into the definition of "currency transmission." Specific to "virtual currency," § 19-14-1(4)(ii) provides licensure is required for "maintaining control of virtual currency or transactions in virtual currency" "on behalf of others." If a business is participating as one party in a two-party transaction with its customer to buy and sell VC, it is not considered to be controlling a transaction on behalf of others. RI currency transmission licensure would NOT be required for a business that sells or buys VC in customer transactions in exchange for fiat consideration.

To account for this regulatory interpretation, FTX.US's historic operations leveraged Partner Financial Institutions that assumed the regulated conduct while concurrently expeditiously compiling a license application for Rhode Island. FTX.US has since submitted its license application to ensure compliance with applicable regulatory requirements.

---

[46] 19 R.I. Gen. Laws Ann. § 19-14-1(4).

[47] Nationwide Multistate Licensing System, "RI Currency Transmitter," https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/RI_Curency_Transmitter-Company-New_App-Checklist.pdf.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-278**

Daniel S. Friedberg
January 10, 2022
Page 21

    **(t)**    South Carolina

Under South Carolina Law, "money transmission" means "selling or issuing payment instruments, stored value, or receiving money or monetary value for transmission. The term does not include the provision solely of delivery, online or telecommunications services, or network access."[48]

The Money Services Division of the South Carolina Attorney General's Office has issued guidance stating that the South Carolina Anti-Money Laundering Act "does not explicitly address activity involving virtual currency."[49] The Division further stated:

> [T]he Division finds that virtual currencies lack the characteristics of mediums of exchange. Therefore, it is the view of the Division that virtual currencies alone do not qualify as monetary value. However, to the extent that virtual currency transactions also involve the transfer of fiat currency, they may be subject to money transmission regulations under the Act.[50]

The Division subsequently issued an order determining:

> [T]he exchange of virtual currency for fiat currency through an ATM that acts as a third party exchanger that facilitates contemporaneous exchanges of virtual currency for fiat currency, such as where the operator of the ATM receives the buyer's fiat currency in exchange for a promise to make it available to the seller, is money transmission and requires a license under the Act...When an ATM does not act as a third party, and only facilitates a sale or purchase of virtual currency by the ATM operator directly with the customer, there is no money transmission because at no time is fiat currency received in exchange for a promise to make it available at a later time or different location, and therefore no license is required under the Act.[51]

South Carolina has demonstrated an express interest in acting as a regulatory incubator for fintech and crypto-specific businesses.[52] Nonetheless, given that FTX.US matches customer buy and sell orders on its Platform, it has applied for an MTL to ensure compliance with the current regulatory framework in South Carolina and as consistent with industry practice.

---

[48] S.C. Code Ann. § 35-11-105(12).

[49] Letter from Alan Wilson, Securities Commissioner, Re: Request for Interpretive Opinion Under South Carolina Anti-Money Laundering Act (Dec. 5, 2018), http://2hsvz0l74ah31vgcm16peuy12tz.wpengine.netdna-cdn.com/wp-content/uploads/2019/02/01845729.pdf.

[50] *Id.*

[51] South Carolina Office of the Attorney General, Money Services Division, Virtual Currency and Automated Machines, Order Number MSD-19003 (Sep. 6, 2019), http://2hsvz0l74ah31vgcm16peuy12tz.wpengine.netdna-cdn.com/wp-content/uploads/2019/10/Bitcoin-ATM-Order-02085245xD2C78.pdf.

[52] South Carolina is presently debating enacting the "South Carolina Blockchain Industry Empowerment Act of 2021" intended to develop the use of blockchain technology, which in relevant part provides that a person who develops, sells, or facilitates the exchange of an open blockchain token is not subject to specified securities and money transmission laws.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-279**

Daniel S. Friedberg
January 10, 2022
Page 22

**(u)** Tennessee

Under Tennessee law, "money transmission" means "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States or to locations abroad by any and all means, including, but not limited to, payment instrument, wire, facsimile or electronic transfer."[53]

The Tennessee Department of Financial Institutions issued guidance in 2015 stating:

> The exchange of cryptocurrency for sovereign currency between two parties is not money transmission. This is essentially a sale of goods between two parties. The seller gives units of cryptocurrency to the buyer, who pays the seller directly with sovereign currency. The seller does not receive the sovereign currency in exchange for a promise to make it available at a later time or different location.[54]

Based on the above, FTX.US would not be subject to MTL requirements. Nonetheless, FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

**(v)** Texas

Texas defines money transmission as "the receipt of money or monetary value by any means in exchange for a promise to make the money or monetary value available at a later time or different location."[55] The Texas Department of Banking issued 2019 guidance stating:

> Exchange of cryptocurrency for sovereign currency between two parties is not money transmission. This is essentially a sale of goods between two parties. The seller gives units of cryptocurrency to the buyer, who pays the seller directly with sovereign currency. The seller does not receive the sovereign currency in exchange for a promise to make it available at a later time or different location.[56]

Alternatively, the guidance holds that the exchange of cryptocurrency for sovereign currency through a third-party exchanger is generally money transmission.[57] The critical factor for the Department of Banking is whether the exchanger receives the buyer's sovereign currency in exchange for a promise to make it available to the seller of the cryptocurrency. However, a company with a business model

---

[53] Tenn. Code Ann. § 45-7-103(10).

[54] Tennessee Department of Financial Institutions, Memorandum Re: Regulatory Treatment of Virtual Currencies under the Tennessee Money Transmitter Act (Dec. 16, 2015), https://www.tn.gov/content/dam/tn/financialinstitutions/documents/2015-12-16_TDFI_Memo_on_Virtual_Currency.pdf.

[55] Tex. Fin. Code § 151.301(b)(4).

[56] Texas Department of Banking, Supervisory Memorandum 1037 Re: Regulatory Treatment of Virtual Currencies Under the Texas Money Services Act (April 1, 2019), https://www.dob.texas.gov/public/uploads/files/consumer-information/sm1037.pdf.

[57] *Id.*

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-280**

Daniel S. Friedberg
January 10, 2022
Page 23

substantially similar to FTX.US's represented to another state regulator that the company had received confirmation from Texas that it did not need a license.[58]

In the past year, the Texas Department of Banking has issued consent orders against two virtual currency businesses, and in each case the consent order was based on a finding that the respondent provided wallet services accepting fiat or virtual currency in exchange for a promise to distribute those funds at a later time or different location.[59]

To account for this regulatory interpretation, FTX.US's historic operations leveraged Partner Financial Institutions that assumed the regulated conduct while concurrently expeditiously compiling a license application for Texas. Based on anecdotal information, the use of a Partner Financial Institution is disfavored by Texas, and FTX.US has since compiled information necessary to submit a complete MTL application to Texas.

    **(w)**    Utah

Outside counsel for FTX.US contacted the Utah Department of Financial Institutions prior to beginning operations in the state and informed the agency about FTX.US' planned operations. The agency did not oppose FTX.US opening its business to residents.

In 2019, Utah's legislature passed cryptocurrency-specific amendments to the state's Money Transmitter Act" ("**MTA**"). The MTA regulates financial institutions operating within the state of Utah. The amended language addressed the issue of whether cryptocurrency transactions are money transmissions and therefore under the MTA's statutory jurisdiction. According to the amendments, cryptocurrency transactions are not considered money transmissions. Therefore, virtual currency transactions are probably not subject to the MTA's statutory authority because the statutory definition of cryptocurrency is inconsistent with the statutory definition of "money transmission." As noted above, there is clear regulatory guidance that exempts the Exchange, as discussed herein, from licensure obligations. Therefore, FTX.US operations do not presently require licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

    **(x)**    Vermont

Under Vermont law, "money transmission" means "to engage in the business of selling or issuing payment instruments, selling or issuing prepaid access, or receiving money or monetary value for

---

[58] Letter from Arkansas Securities Department to CryptoFlip re: CryptoFlip 20-NA-0003 (Mar. 25, 2020), http://www.securities.arkansas.gov/!userfiles/CryptoFlip%2020-NA-0003.pdf.

[59] Texas Department of Banking, *In the Matter of Wyre Payments, Inc.*, Order No. 2020-051 (Dec. 2, 2020) ("Respondent provides retail customers services related to virtual currency, such as wallets to store virtual and fiat currency, which can be used to buy and sell virtual currencies from Respondent."); Texas Department of Banking, *In the Matter of Bitstamp LTD.*, Order No. 2020-050 (Nov. 17, 2020) ("Respondent operates an online virtual currency exchange whereby it offers users a stored value service for fiat currency in order to facilitate the purchase and sale of virtual currencies. Respondent provides users with an account whereby the user deposits and stores fiat currency to be used to purchase virtual currency or withdrawn at a later time.").

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-281**

Daniel S. Friedberg
January 10, 2022
Page 24

transmission to a location within or outside the United States."[60] The statute was amended in 2017 to define "prepaid access" to include virtual currency.[61] Several recent enforcement actions indicate Vermont's Department of Financial Regulation broadly construes the application of its money transmissions statute to exchange activity.[62] To account for this regulatory interpretation, FTX.US's historic operations leveraged Partner Financial Institutions that assumed the regulated conduct while concurrently expeditiously compiling a license application for Vermont. FTX.US has since submitted its MTL application to ensure compliance with applicable regulatory requirements.

    **(y)**    Virginia

Under Virginia law, "money transmission" means "receiving money or monetary value for transmission by wire, facsimile, electronic means or other means or selling or issuing stored value."[63] The Virginia Bureau of Financial Institutions issued a public notice stating that the Bureau "does not currently regulate virtual currencies; however, to the extent virtual currency transactions also involve the transfer of fiat currency…they may be regulated under Chapter 19 of Title 6.2 of the Code of Virginia (Money Order Sellers and Money Transmitters)."[64] The Virginia State Corporation Commission has not published any enforcement action involving virtual currency businesses transmitting money without a license.[65] As previously noted, where a state has not taken an affirmative position on the application of its money transmission laws to cryptocurrency activity, such states have uniformly not required MTLs for cryptocurrency activity. FTX.US therefore does not presently require licensure. However, we further note that FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

---

[60] 8 V.S.A. § 2500(9).

[61] 8 V.S.A. § 2500(12); H.B. 182, 2017 Gen. Assemb., Reg. Sess. (Vt. 2017).

[62] Vermont Department of Financial Regulation, *In re: Bitstamp, LTD.*, Docket No. 20-033-B (Nov. 13, 2020) (With limited factual description—the order concludes, "A Vermont money transmitter license is required to provide the virtual currency services Respondent provides to Vermont customers."); *In re: Uphold HQ, Inc.*, Docket No. 19-070-B (Jan. 21, 2020) ("Respondent operates a virtual currency exchange which serves as an online trading and settlement platform for virtual currency transactions. Respondent offers members the ability to store, move or exchange a variety of virtual currencies."); *In re: Poloniex, LLC*, Docket No. 19-006-B (May 22, 2019) ("Respondent operates the Poloniex Exchange, an online trading and settlement platform for virtual currency transactions. Respondent offers registered users of the Poloniex Exchange the option of creating an Exchange Account where Respondent will hold virtual currency for the registered user."); *In re: PYC, Inc.*, Docket No. 15-004-B (Mar. 11, 2015) (In a consent order predating the 2017 statutory amendments relating specifically to virtual currency, the Department held, "The business of 'money transmission' includes selling stored value, which includes selling bitcoin or other virtual currencies.").

[63] Va. Code Ann. § 6.2-1900.

[64] Virginia Bureau of Financial Institutions, Notice to Virginia Residents Regarding Virtual Currency, https://scc.virginia.gov/getattachment/1bb52b42-9a10-45a2-ba48-b352e48b6d2e/virtcur.pdf.

[65] Virginia State Corporation Commission, Docket Search, https://scc.virginia.gov/DocketSearch#.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-282**

Daniel S. Friedberg
January 10, 2022
Page 25

### (z)    Wisconsin

Outside counsel for FTX.US contacted the Wisconsin Department of Financial Institutions prior to beginning operations in the state and informed the agency about FTX.US' planned operations. The agency did not oppose FTX.US opening its business to residents.

Under Wisconsin's Seller of Checks law, "No person shall, as a service or for a fee or other consideration, engage in the business as a seller of checks without first securing a license from the division to do so."[66] A "seller of checks" means "a person who, as a service or for a fee or other consideration, engages in the business of selling and issuing checks or the receiving of money for transmission or the transmitting of money, or the transmitting of money to foreign countries."[67] The Wisconsin Department of Financial Institutions has stated:

> Chapter 217, the "Seller of Checks" law, does not currently give the Department the authority to regulate virtual currency. The division is therefore unable to license or supervise companies whose business activities are limited to those involving virtual currency. However, should the transmission of virtual currency include the involvement of sovereign currency, it may be subject to licensure depending on how the transaction is structured. The division would encourage companies to consult with their legal counsel to determine whether the business activities they plan to conduct meet those defined in Chapter 217 as requiring licensure. Please be advised, this position is given subject to subsequent changes required by any regulations or interpretations by the division under Chapter 217.[68]

Based on the above, FTX.US would not be subject to MTL requirements. Nonetheless, FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

### (aa)    Wyoming

Outside counsel for FTX.US contacted the Wyoming Division of Banking prior to beginning operations in the state and informed the agency about FTX.US' planned operations. The agency did not oppose FTX.US opening its business to residents.

Under Wyoming law, "money transmission" means "to engage in business to sell or issue payment instruments, stored value or receive money or monetary value for transmission to a location within or outside the United States by any and all means, including but not limited to wire, facsimile or electronic transfer."[69] However, the state's Money Transmitters Act provides an exemption for

---

[66] Wis. Stat. § 217.03.

[67] Wis. Stat. § 217.02(9).

[68] Wisconsin Department of Financial Institutions, Sellers of Checks, https://www.wdfi.org/fi/lfs/soc/.

[69] Wyo. Stat. § 40-22-102(xiii).

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-283**

Daniel S. Friedberg
January 10, 2022
Page 26

"Buying, selling, issuing, or taking custody of payment instruments or stored value in the form of virtual currency or receiving virtual currency for transmission to a location within or outside the United States by any means."[70] Based on the above, FTX.US would not be subject to MTL requirements. Nonetheless, FTX.US has submitted an MTL application to account for changes in the regulatory treatment of the Platform and any future product launches that may require licensure.

---

[70] Wyo. Stat. Ann. § 40-22-104(a)(vi).

**A-284**

# Attachment 6

# A-285



**Fenwick & West LLP**
**801 California Street**
**Mountain View, CA 94041**
**Tel  650.988.8500**
**www.fenwick.com**

West Realm Shires Services Inc.
2000 Center Street
Suite 400
Berkeley,  CA  94704

| | |
|---|---|
| Invoice Date: | August 24, 2021 |
| Client Number: | 38608 |
| Invoice Number: | 869276 |

Attn:    Dan Friedberg

**(Invoice Emailed)**

---

For professional services rendered through July 31, 2021.

| | |
|---|---|
| Fees: | $ 83,700.00 |
| Disbursements: | 6,453.01 |
| | |
| CURRENT AMOUNT DUE | $ 90,153.01 |

Confidential Treatment Requested by Armanino LLP

Armanino-FTX-003899
SDNY_03_00056209

**A-286**

West Realm Shires Services Inc.
Client Number: 38608

Invoice Date:      August 24, 2021
Invoice Number:     869276
Billing Attorney:   Andrew Albertson

Page 11

General Corporate
Matter number 38608-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 07/07/21 | Andrea King-Lock Louie | MTL Project: communicate with client team regarding outstanding application items; correspond with I. Voloshin, K. Kirby, and K. Schuler regarding updates to application status; read and review client submitted materials. | 0.4 | 274.00 |
| 07/07/21 | Igor Voloshin | Miscellaneous corporate and regulatory advice. | 2.8 | 2,408.00 |
| 07/08/21 | Andrew Albertson | Attention to High-Vote Low Vote and financing and loan; confer regarding option plan amendments. | 1.3 | 1,319.50 |
| 07/08/21 | Whitney Anne Bishop | Review and respond to email communication regarding the WRS set up. | 0.2 | 81.00 |
| 07/09/21 | Can Sun | Call with Coachella; prepare pro forma cap tables. | 3.9 | 3,490.50 |
| 07/09/21 | Igor Voloshin | Compliance training for MSB matters. | 1.0 | 860.00 |
| 07/11/21 | Can Sun | Review and revise share transfer agreement; prepare updated cap table. | 1.4 | 1,253.00 |
| 07/12/21 | Whitney Anne Bishop | Correspondence regarding share transfer agreements. | 3.4 | 1,377.00 |
| 07/12/21 | Katherine Schuler | Emails re business plan, dbas and filing agent for MTLs; submit MU1 in NMLS; add user to NMLS. | 0.6 | 141.00 |
| 07/12/21 | Can Sun | Call with client; draft share transfer agreements. | 1.2 | 1,074.00 |
| 07/12/21 | Igor Voloshin | Miscellaneous regulatory advice. | 1.0 | 860.00 |

Armanino-FTX-003910
SDNY_03_00056220

# A-287

West Realm Shires Services Inc.  
Client Number: 38608

Invoice Date:      August 24, 2021  
Invoice Number:      869276  
Billing Attorney:      Andrew Albertson

Page 12

General Corporate  
Matter number 38608-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 07/13/21 | Whitney Anne Bishop | Review and respond to email communication from C. Papadopoulos regarding organizational chart; correspondence to C. Sun regarding WRSS capitalization table. | 0.8 | 324.00 |
| 07/13/21 | Andrea King-Lock Louie | Review and analyze Chartwell prepared materials and application status updates; attend meeting with Chartwell to discuss MTL project updates. | 0.9 | 616.50 |
| 07/13/21 | Sean McElroy | Confer regarding tax reporting issues with D. Friedberg et al.; emails regarding ownership structure. | 0.7 | 570.50 |
| 07/13/21 | Katherine Schuler | Emails re manually signed forms; add users to NMLS; Chartwell weekly call. | 0.9 | 211.50 |
| 07/13/21 | Jacob Wittman | Call re WRS matters. | 0.5 | 375.00 |
| 07/14/21 | Andrea King-Lock Louie | MTL Project: communicate with I. Voloshin regarding status of applications; read and review email from Chartwell; review and analyze information from NMLS; correspond with client regarding application status in WA. | 0.4 | 274.00 |
| 07/14/21 | Sean McElroy | Confer regarding tax reporting issues. | 0.3 | 244.50 |
| 07/14/21 | Igor Voloshin | Money transmission related support. | 1.0 | 860.00 |

Confidential Treatment Requested by Armanino LLP

**A-288**

West Realm Shires Services Inc.  
Client Number: 38608

Invoice Date:      August 24, 2021  
Invoice Number:      869276  
Billing Attorney:      Andrew Albertson

Page 16

General Corporate  
Matter number 38608-00600

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Andrew Albertson | Partner | 2.1 | 1015.00 | 2,131.50 |
| Kevin S. Kirby | Associate | 1.1 | 750.00 | 825.00 |
| Andrea King-Lock Louie | Associate | 7.8 | 685.00 | 5,343.00 |
| Sean McElroy | Associate | 1.4 | 815.00 | 1,141.00 |
| Can Sun | Associate | 22.1 | 895.00 | 19,779.50 |
| Igor Voloshin | Associate | 17.7 | 860.00 | 15,222.00 |
| Jacob Wittman | Associate | 0.5 | 750.00 | 375.00 |
| Whitney Anne Bishop | Paralegal | 5.9 | 405.00 | 2,389.50 |
| Katherine Schuler | Paralegal | 4.8 | 235.00 | 1,128.00 |
| Total | | 63.4 | | $ 48,334.50 |

## Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 07/06/21 | Philadelphia indemnity insurance company. - VENDOR: Woodruff Sawyer | 500.00 |
| 07/20/21 | West Realm shires Inc. amendment to articles. - VENDOR: GKL Register Agents Inc./TIN 81-2236321 | 642.00 |
| 12/17/20 | Philadelphia indemnity insurance company fees - VENDOR: Woodruff Sawyer | 200.00 |
| 04/29/21 | Philadelphia indemnity insurance company fees - VENDOR: Woodruff Sawyer | 1,000.00 |
| 07/06/21 | Philadelphia indemnity insurance company fees. - VENDOR: Woodruff Sawyer | 500.00 |
| 07/06/21 | Philadelphia indemnity insurance company fees. - VENDOR: Woodruff Sawyer | 200.00 |
| 07/31/21 | Voice & Data Communications | 1,450.04 |
| | Total Disbursements | $ 4,492.04 |

Confidential Treatment Requested by Armanino LLP

Armanino-FTX-003915  
SDNY_03_00056225

A-289

# Attachment 7

**To:** Daniel Friedberg

**From:** Igor Voloshin

**Sent:** Fri 2/28/2020 6:16:32 PM (UTC)

**Subject:** Tether Gold Analysis

Hi Dan:

You told us that Bitfinex or affiliate is considering listing its stablecoin ("***Tether Gold***") on FTX Trading Ltd. ("***FTX***"). You asked us to consider whether the transaction would result in Bitfinex engaging in a licensable activity, particularly whether money services business ("***MSB***") registration under the Bank Secrecy Act ("***BSA***") is required. As you know, the Financial Crimes Enforcement Network ("***FinCEN***") has not provided guidance on this exact issue, so our legal analysis follows. Please let me know if you want us to put this into a formal memo format.

There are two key questions to consider: (i) whether the underlying activity/transaction constitutes money transmission within the meaning of FinCEN; and if so (ii) whether the parties are MSBs by engaging in the underlying activity. Both conditions have to be present in the transaction to trigger MSB registration.

## Money Transmission

BSA regulations define "money transmission" as "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." 31 C.F.R. § 1010.100(ff)(5)(i)(A) (emphasis in original). FinCEN has said that "convertible virtual currency" qualifies as "value that substitutes for currency." FIN-2013-G001. FinCEN has defined convertible virtual currency to include digital assets that have "an equivalent value in real currency or act[] as a substitute for real currency." *Id.*

Stablecoins fall under the definition of convertible virtual currency ("***CVC***"), thereby making Tether Gold subject to this regulatory regime. As I understand it, offering Tether Gold likely constitutes money transmission as Bitfinex is transmitting (e.g., converting) CVC for another substitute of value.

## Status as an MSB

According to a 2012 FinCEN guidance, "[t]o qualify as an MSB, a person, wherever located, <u>must do business, wholly or in substantial part within the United States</u>, in one or more of the capacities listed in 31 CFR 1010.100(ff). Relevant factors include whether the foreign-located person, whether or not on a regular basis or as an organized or licensed business concern, <u>is providing services to customers located in the United States</u>." FIN-2012-A001 (emphasis added). As noted above, 31 C.F.R. § 1010.100(ff) includes money transmission.

In reviewing the available precedent and FinCEN guidance on this question, it is unlikely that FinCEN would take the position that this activity triggers MSB registration. FinCEN takes a facts and circumstances approach to the underlying transaction to determine if one or more of the parties to the transaction must register as MSBs.

Here, Bitfinex is incorporated and operated outside the US, and does not allow US based customers to trade on its platform. Likewise, FTX is incorporated and operated outside the US, and does not allow US persons to trade on its platform.

FTX is majority owned by Sam Bankman-Fried who we understand is not a resident of the US, but is a US citizen and US taxpayer. FTX is operated from abroad, and no FTX business activities are conducted within the US. We note that FTX does not accept US customers or offer services to the US. FTX also has no physical presence within the US.

On its face, FTX is not a customer "located" in the United States. Any fair reading of the 2012 FinCEN Guidance indicates that the customer's physical location controls for purposes of determining whether an entity is doing business in the United States. This is buttressed by the fact that the few cases where a foreign entity was subject to proceedings for failing to register as an MSB, that entity had a direct and substantial customer base physically located in the US. *See e.g.*, *United States v. Budovsky*, No. 13CR368 DLC (S.D.N.Y. Sept. 23, 2015) (reviewing the application of the BSA to the Liberty Reserve offshore exchange).

However, we note of course that regulatory agencies have wide discretionary authority and often exceed their apparent regulatory authority, and are therefore unpredictable. We think it is very helpful if no FTX customers are US residents.

## Enforcement Risk

As a practical matter, US agencies typically do not take enforcement action against offshore entities unless the underlying business activity sufficiently touches and concerns the US such that it would rebut the presumption against extraterritorial application of the US authority, would warrant the necessary resource allocation to pursue such an action, and requires such action due to the grave nature of the underlying conduct.

However, this of course is uncertain and most of these matters fall within the realm of regulatory discretion.

Thanks,

Igor

**IGOR VOLOSHIN**

Associate | Fenwick & West LLP |

Admitted to practice only in Washington.

A-291

# Attachment 8

**A-292**



**Fenwick & West LLP**
**801 California Street**
**Mountain View, CA 94041**
**Tel  650.988.8500**
**www.fenwick.com**

Alameda Research LLC                          Invoice Date:              December 11, 2020
2000 Center Street, Suite 400
Berkeley,  CA  94704                          Client Number:                        34394

                                             Invoice Number:                      832742

Attn:    Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through November 30, 2020.


Fees:                               $ 138,857.00

Disbursements:                          32,770.72

                                   _____

CURRENT AMOUNT DUE                  $ 171,627.72

SBF_GOOGLE_SW_00137561

## A-293

Alameda Research LLC
Client Number: 34394

Invoice Date:   December 11, 2020
Invoice Number:   832742
Billing Attorney:   Andrew  Albertson

Page 21

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 11/17/20 | Ryan J. Straus | Attention to public facing materials; review ancillary material in connection with same. | 0.5 | 440.00 |
| 11/17/20 | Igor  Voloshin | Draft Silvergate letter; miscellaneous compliance matters related to FTX.US. | 1.0 | 655.00 |
| 11/17/20 | Jacob  Wittman | Attend to corporate records. | 0.5 | 327.50 |
| 11/18/20 | Mark  Porter | Inquiry to Hawaii Department of Financing about licensure. | 0.1 | 85.00 |
| 11/18/20 | Ryan J. Straus | Attention to regulatory review relating to funds travel rule; ancillary regulatory review of same. | 2.5 | 2,200.00 |
| 11/19/20 | Sean  McElroy | Email client regarding IRS residency forms; review emails. | 0.2 | 148.00 |
| 11/20/20 | Andrew  Albertson | Attention to FTX.US redemption and IP issues. | 1.0 | 960.00 |
| 11/20/20 | David L. Forst | Discussion with D. Friedberg, A. Albertson, and S. McElroy regarding structuring. | 0.9 | 1,305.00 |
| 11/20/20 | Sean  McElroy | Confer with D. Friedberg et al. regarding tax issues; review crypto tax developments and update client. | 1.2 | 888.00 |
| 11/20/20 | Mark  Porter | Attention to Texas application. | 1.3 | 1,105.00 |
| 11/20/20 | Jacob  Wittman | Call with client regarding IP contribution matters. | 0.5 | 327.50 |
| 11/21/20 | Igor  Voloshin | Miscellaneous compliance and regulatory advice. | 1.8 | 1,179.00 |
| 11/22/20 | David L. Forst | Emails to and from D. Friedberg and S. McElroy regarding IP transfer. | 0.2 | 290.00 |

SBF_GOOGLE_SW_00137582

# A-294

| | |
|---|---|
| Alameda Research LLC | Invoice Date:     December 11, 2020 |
| Client Number: 34394 | Invoice Number:     832742 |
| | Billing Attorney:     Andrew  Albertson |

Page 24

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| | | Total Hours and Fees | 114.6 | $ 94,263.50 |

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|-------|------|--------|
| Andrew  Albertson | Partner | 17.6 | 960.00 | 16,896.00 |
| David L. Forst | Partner | 11.8 | 1450.00 | 17,110.00 |
| Mark  Porter | Of Counsel | 6.8 | 850.00 | 5,780.00 |
| Ryan J. Straus | Of Counsel | 22.1 | 880.00 | 19,448.00 |
| Sean  McElroy | Associate | 18.4 | 740.00 | 13,616.00 |
| Can  Sun | Associate | 2.5 | 860.00 | 2,150.00 |
| Igor  Voloshin | Associate | 10.7 | 655.00 | 7,008.50 |
| Jacob  Wittman | Associate | 11.8 | 655.00 | 7,729.00 |
| Whitney Anne Bishop | Paralegal | 6.5 | 370.00 | 2,405.00 |
| Miriam  dela Cruz-Rice | Paralegal | 1.4 | 440.00 | 616.00 |
| Catherine  Howell | Paralegal | 2.0 | 340.00 | 680.00 |
| Francisco  Rodriguez | Paralegal | 1.0 | 395.00 | 395.00 |
| Katherine  Schuler | Paralegal | 2.0 | 215.00 | 430.00 |
| Total | | 114.6 | | $ 94,263.50 |

### Disbursement Summary

| Date | Description | Total |
|------|-------------|-------|
| 11/05/20 | Professional services rendered for October 2020. - VENDOR: Alan C. Shapiro, Inc. | 27,950.00 |
| 11/30/20 | Voice & Data Communications | 2,827.91 |
| | Total Disbursements | $ 30,777.91 |

SBF_GOOGLE_SW_00137585

**A-295**

# Attachment 9

**A-296**

| | Silicon Valley Center |
|---|---|
| **Fenwick** <br> **FENWICK & WEST LLP** | 801 California Street <br> Mountain View, CA 94041 <br> Tel  650.988.8500 <br> Fax  650.938.5200 |

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley, CA  94704

| | |
|---|---|
| Invoice Date: | August 21, 2020 |
| Client Number: | 34394 |
| Invoice Number: | 817195 |

Attn:   Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through July 31, 2020.

Fees:                                    $ 556,852.50

Disbursements:                          27,033.58
                                   _____

CURRENT AMOUNT DUE               $ 583,886.08

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000314076
SDNY_03_00208162

**A-297**

Alameda Research LLC
Client Number: 34394

Invoice Date:         August 21, 2020
Invoice Number:              817195
Billing Attorney:     Andrew Albertson

Page 8

Project B
Matter number 34394-00201

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 07/01/20 | Andrew Albertson | Attention to defensive diligence and open items in term sheet; confer regarding FTT and FTX disclosures. | 1.3 | 1,248.00 |
| 07/01/20 | Bomi Lee | Attention to equity issuance and securities law issues. | 0.6 | 591.00 |
| 07/01/20 | Sean McElroy | Research on Project Benchmark tax issues. | 0.7 | 518.00 |
| 07/01/20 | Jacob Wittman | Attend to defensive diligence matters; review F-4. | 2.4 | 1,572.00 |
| 07/02/20 | Andrew Albertson | Call with Dan F. regarding open term sheet points and offensive and defensive diligence, including holding company and nominees; confer regarding same; attention to open items. | 1.5 | 1,440.00 |
| 07/02/20 | Bomi Lee | Attention to Benchmark term sheet; attention to drafting of definitive agreements. | 0.8 | 788.00 |
| 07/02/20 | Sean McElroy | Research on Project Benchmark tax issues for D. Forst. | 1.2 | 888.00 |
| 07/02/20 | Jacob Wittman | Attend to diligence matters; review MNDA; call with client. | 1.5 | 982.50 |
| 07/03/20 | Ammanuel Gebeyehu | Attend transaction discussion with B.Lee. | 0.9 | 652.50 |
| 07/03/20 | Bomi Lee | Attention to drafting approach; call with deal team and attention to regulatory questions. | 0.8 | 788.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-298**

Alameda Research LLC  
Client Number: 34394

Invoice Date:      August 21, 2020  
Invoice Number:       817195  
Billing Attorney:    Andrew  Albertson

Page 35

---

Project B  
Matter number 34394-00201

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|------:|-----:|-------:|
| Andrew  Albertson | Partner | 59.8 | 960.00 | 57,408.00 |
| David L. Forst | Partner | 26.7 | 1450.00 | 38,715.00 |
| Bomi  Lee | Partner | 55.5 | 985.00 | 54,667.50 |
| David K. Michaels | Partner | 0.4 | 1325.00 | 530.00 |
| Jonathan Millard | Partner | 16.5 | 1045.00 | 17,242.50 |
| Marshall  Mort | Partner | 9.8 | 920.00 | 9,016.00 |
| Tyler G. Newby | Partner | 3.3 | 1015.00 | 3,349.50 |
| Julia  Arruda | Associate | 9.4 | 835.00 | 7,849.00 |
| Ammanuel Gebeyehu | Associate | 86.8 | 725.00 | 62,930.00 |
| Carson A. Jackson | Associate | 24.4 | 590.00 | 14,396.00 |
| Mark A. Jansen | Associate | 0.4 | 860.00 | 344.00 |
| Victoria  Lupu | Associate | 32.4 | 860.00 | 27,864.00 |
| Jason  Malashevich | Associate | 2.5 | 590.00 | 1,475.00 |
| Sean  McElroy | Associate | 29.6 | 740.00 | 21,904.00 |
| Corinne  Nhaissi | Associate | 13.9 | 790.00 | 10,981.00 |
| Shajee T. Rizvi | Associate | 23.9 | 590.00 | 14,101.00 |
| Jonathan  Stephenson | Associate | 8.7 | 485.00 | 4,219.50 |
| Can  Sun | Associate | 18.1 | 860.00 | 15,566.00 |
| Jacob  Wittman | Associate | 81.0 | 655.00 | 53,055.00 |
| Eric D. Bobila | Staff Attorney | 5.4 | 375.00 | 2,025.00 |
| Van  Ly | Paralegal | 3.2 | 215.00 | 688.00 |
| Amber  Wales | Paralegal | 11.8 | 260.00 | 3,068.00 |
| Gerald  Delbarrio | Elec Info Mgmt | 0.5 | 395.00 | 197.50 |
| Jana  Lay | Elec Info Mgmt | 0.6 | 450.00 | 270.00 |
| Bao  Nguyen | Elec Info Mgmt | 0.6 | 450.00 | 270.00 |
| Total | | 525.2 | | $ 422,131.50 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

# A-299

| | |
|---|---|
| Alameda Research LLC | Invoice Date: August 21, 2020 |
| Client Number: 34394 | Invoice Number: 817195 |
| | Billing Attorney: Andrew Albertson |
| Page 37 | |

Response to Regulatory Inquiries
Matter number 34394-00401

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 07/16/20 | Casey O'Neill | Research, pull and evaluate FTX terms of service per D. Friedberg request (.7); consider revisions to same (.4). | 1.1 | 935.00 |
| 07/31/20 | Casey O'Neill | Research and collect FTX terms of service for review per prior conversation with D. Friedberg. | 0.3 | 255.00 |
| | | Total Hours and Fees | 1.4 | $ 1,190.00 |

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Casey O'Neill | Of Counsel | 1.4 | 850.00 | 1,190.00 |
| Total | | 1.4 | | $ 1,190.00 |

### Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 07/31/20 | Voice & Data Communications | 35.70 |
| | Total Disbursements | $ 35.70 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-300**

Alameda Research LLC                          Invoice Date:        August 21, 2020
Client Number: 34394                          Invoice Number:            817195
                                              Billing Attorney:    Andrew Albertson

Page 40

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 07/08/20 | Jacob Wittman | Draft FTX Record Holder purchase agreement. | 1.0 | 655.00 |
| 07/09/20 | Andrew Albertson | Review and prepare comments to and confer regarding FTT Option plans; prepare Registered Holder share transfer agreement and nominee and voting agreement; review existing FTT agreements regarding same. | 3.1 | 2,976.00 |
| 07/09/20 | Kathleen Murray | Review as filed certificate of formation for Alameda Research LLC. | 0.2 | 43.00 |
| 07/09/20 | Jacob Wittman | Draft nominee and voting agreement with respect to FTX Equity Record Holder Ltd. | 1.0 | 655.00 |
| 07/10/20 | Andrew Albertson | Attention to FTT option plans and Reg S compliant equity incentive plans. | 0.6 | 576.00 |
| 07/10/20 | Igor Voloshin | Assist foundation formation for Panama foundation. | 0.3 | 196.50 |
| 07/11/20 | Andrew Albertson | Attention to FTT options and Reg S restrictions and compliance for Reg S plans. | 0.4 | 384.00 |
| 07/13/20 | Andrew Albertson | Attention to cap table, Registered Holder, FTT Options, FTX Option Plan and diligence items. | 1.5 | 1,440.00 |
| 07/13/20 | Andrew Albertson | Attention to Reg S Option plan research and terms for U.S. participants in combined plan. | 1.2 | 1,152.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-301**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | August 21, 2020 |
| Client Number: 34394 | Invoice Number: | 817195 |
| | Billing Attorney: | Andrew Albertson |

Page 45

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 07/30/20 | Andrew Albertson | Attention to ancillary transaction agreements and process for wallets and related; confer regarding open items and open issues in the primary agreements. | 1.7 | 1,632.00 |
| 07/31/20 | Igor Voloshin | Call with Silvergate; draft follow up email. | 1.0 | 655.00 |
| | | Total Hours and Fees | 72.3 | $ 71,142.00 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Andrew Albertson | Partner | 22.6 | 960.00 | 21,696.00 |
| David L. Forst | Partner | 19.6 | 1450.00 | 28,420.00 |
| Sean McElroy | Associate | 14.9 | 740.00 | 11,026.00 |
| Can Sun | Associate | 2.9 | 860.00 | 2,494.00 |
| Igor Voloshin | Associate | 5.1 | 655.00 | 3,340.50 |
| Jacob Wittman | Associate | 6.0 | 655.00 | 3,930.00 |
| Kathleen Murray | Paralegal | 0.7 | 215.00 | 150.50 |
| Kent Suegang | Case Assistant | 0.5 | 170.00 | 85.00 |
| Total | | 72.3 | | $ 71,142.00 |

FTX_000314121
SDNY_03_00208207

A-302

# Attachment 10

**A-303**



**Fenwick & West LLP**
**801 California Street**
**Mountain View, CA 94041**
**Tel  650.988.8500**
**www.fenwick.com**

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley, CA  94704

Invoice Date:            November 18, 2020

Client Number:                    34394

Invoice Number:                  828727

Attn:   Sam Bankman-Fried

**(Invoice Emailed)**

For professional services rendered through October 31, 2020.

| | |
|---|---|
| Fees: | $ 217,925.00 |
| Disbursements: | 48,314.26 |
| CURRENT AMOUNT DUE | $ 266,239.26 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000314223
SDNY_03_00208309

**A-304**

Alameda Research LLC
Client Number: 34394

Invoice Date:           November 18, 2020
Invoice Number:                   828727
Billing Attorney:       Andrew  Albertson

Page 32

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 10/27/20 | David L. Forst | Discussion with s. McElroy regarding various Subpart F / GILTI, mark-to-market, and related issues; review sales contracts and consider tax alternatives. | 2.6 | 3,770.00 |
| 10/27/20 | Catherine  Howell | Attend meeting regarding state registration status. | 0.5 | 170.00 |
| 10/27/20 | Sean  McElroy | Attend meeting with A. Albertson et al. on coordinating Alameda matters; confer with D. Forst regarding crypto tax issues; research on crypto tax issues; review sales agreements. | 1.9 | 1,406.00 |
| 10/27/20 | Katherine  Schuler | FTX-MTL group check-in. | 0.4 | 86.00 |
| 10/27/20 | Jacob E. Simmons | Update purchase agreements and distribution list to reflect corrected token amounts; confer with C. Sun regarding same. | 0.3 | 51.00 |
| 10/27/20 | Ryan J. Straus | Attention to corporate reorganization; attention to ancillary matters relating to the same. | 2.2 | 1,936.00 |
| 10/27/20 | Can  Sun | Call with client regarding genesis tokens. | 0.2 | 172.00 |
| 10/27/20 | Igor  Voloshin | Draft response to Silvergate; miscellaneous corporate reorganization matters. | 1.2 | 786.00 |
| 10/28/20 | Andrew  Albertson | Attention to option grants. | 0.3 | 288.00 |
| 10/28/20 | Catherine  Howell | Attend meeting regarding status checks; revise summary regarding state requirements; confer with K. Schuler regarding same. | 1.1 | 374.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-305**

| | |
|---|---|
| Alameda Research LLC | Invoice Date: November 18, 2020 |
| Client Number: 34394 | Invoice Number: 828727 |
| | Billing Attorney: Andrew Albertson |

Page 33

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 10/28/20 | Mark Porter | Conference with K. Schuler and C. Howell regarding status of matters, logistics and timing; email to I. Voloshin. | 0.5 | 425.00 |
| 10/28/20 | Katherine Schuler | FTX-MTL group check-in; emails regarding deadlines. | 0.8 | 172.00 |
| 10/28/20 | Jacob E. Simmons | Update purchase agreements and distribution list to reflect corrected token amounts; confer with C. Sun regarding same. | 0.4 | 68.00 |
| 10/28/20 | Can Sun | Compile revised genesis token grant documents. | 0.2 | 172.00 |
| 10/28/20 | Igor Voloshin | Draft Silvergate EDD responses; miscellaneous corporate reorganization matters. | 0.7 | 458.50 |
| 10/29/20 | Andrew Albertson | Attention to options and process. | 0.4 | 384.00 |
| 10/29/20 | Catherine Howell | Attend meeting regarding status checks; revise summary regarding state requirements; emails regarding outstanding items. | 1.2 | 408.00 |
| 10/29/20 | Sean McElroy | Prepare for and attend phone meting with C. Eades and M. Southwick regarding tax return issues; research on choice of entity issues. | 0.7 | 518.00 |
| 10/29/20 | Ryan J. Straus | Attention to corporate reorganization and ancillary matters. | 0.5 | 440.00 |
| 10/29/20 | Can Sun | Call with client; update MSRM and genesis distribution tracker. | 0.3 | 258.00 |
| 10/29/20 | Jacob Wittman | Prepare redemption agreement; review tender rules. | 2.0 | 1,310.00 |

FTX_000314256
SDNY_03_00208342

**A-306**

Alameda Research LLC
Client Number: 34394

Invoice Date:     November 18, 2020
Invoice Number:              828727
Billing Attorney:     Andrew  Albertson

Page 35

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| | | Total Hours and Fees | 171.4 | $ 133,919.00 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|-------|------|--------|
| Andrew  Albertson | Partner | 8.4 | 960.00 | 8,064.00 |
| David L. Forst | Partner | 23.2 | 1450.00 | 33,640.00 |
| Mark  Porter | Of Counsel | 14.1 | 850.00 | 11,985.00 |
| Ryan J. Straus | Of Counsel | 34.5 | 880.00 | 30,360.00 |
| Sean  McElroy | Associate | 25.1 | 740.00 | 18,574.00 |
| Can  Sun | Associate | 10.8 | 860.00 | 9,288.00 |
| Igor  Voloshin | Associate | 8.6 | 655.00 | 5,633.00 |
| Jacob  Wittman | Associate | 3.6 | 655.00 | 2,358.00 |
| Whitney Anne Bishop | Paralegal | 1.1 | 370.00 | 407.00 |
| Miriam  dela Cruz-Rice | Paralegal | 0.7 | 440.00 | 308.00 |
| Catherine  Howell | Paralegal | 27.2 | 340.00 | 9,248.00 |
| Liliya  McKenzie | Paralegal | 5.6 | 400.00 | 2,240.00 |
| Katherine  Schuler | Paralegal | 7.7 | 215.00 | 1,655.50 |
| Jacob E. Simmons | Case Assistant | 0.7 | 170.00 | 119.00 |
| Gerald  Delbarrio | Elec Info Mgmt | 0.1 | 395.00 | 39.50 |
| Total | | 171.4 | | $ 133,919.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-307**

# Attachment 11

**A-308**



**Fenwick & West LLP**
**801 California Street**
**Mountain View, CA 94041**
**Tel  650.988.8500**
**www.fenwick.com**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | January 26, 2021 |
| 2000 Center Street, Suite 400 | | |
| Berkeley, CA  94704 | Client Number: | 34394 |
| | Invoice Number: | 836987 |

Attn:   Sam Bankman-Fried

**(Invoice Emailed)**

For professional services rendered through December 31, 2020.

| | |
|---|---|
| Fees: | $ 242,658.00 |
| Disbursements: | 25,297.22 |
| | |
| CURRENT AMOUNT DUE | $ 267,955.22 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000314267
SDNY_03_00208353

**A-309**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | January 26, 2021 |
| Client Number: 34394 | Invoice Number: | 836987 |
| | Billing Attorney: | Andrew  Albertson |

Page 22

Compliance and Risk Mitigation
Matter number 34394-00402

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 12/03/20 | Casey  O'Neill | Review draft document retention policy for FTX US and confer with A. Albertson and D. Friedberg re same (.8); evaluate corporate structure issues in re document retention (.3); research retention issues for ephemeral messaging and confer internally re same (.8). | 1.9 | 1,615.00 |
| 12/04/20 | Casey  O'Neill | Confer with D. Friedberg regarding records retention project (.5); prepare for call with same (.4); confer internally regarding staffing and work on matter and consider same (.4). | 1.3 | 1,105.00 |
| 12/15/20 | Casey  O'Neill | Gather templates for retention policies and confer re same. | 0.3 | 255.00 |
| 12/16/20 | James  Gregoire | Call with C. O'Neill to discuss retention policies; review draft policies; discuss the same with M. Loewenthal. | 0.7 | 574.00 |
| 12/16/20 | Casey  O'Neill | Collaborate on and draft document retention policies. | 2.7 | 2,295.00 |
| 12/17/20 | James  Gregoire | Call with K. Rincon to discuss retention policies; review templates; draft retention policy and schedule. | 3.3 | 2,706.00 |
| 12/17/20 | Casey  O'Neill | Collaborate regarding document retention policies. | 0.4 | 340.00 |
| 12/28/20 | Casey  O'Neill | Evaluate status of retention policy project. | 0.2 | 170.00 |
| | | Total Hours and Fees | 10.8 | $ 9,060.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-310**

| | |
|---|---|
| Alameda Research LLC | Invoice Date: January 26, 2021 |
| Client Number: 34394 | Invoice Number: 836987 |
| | Billing Attorney: Andrew Albertson |
| Page 23 | |

Compliance and Risk Mitigation
Matter number 34394-00402

## Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Casey O'Neill | Of Counsel | 6.8 | 850.00 | 5,780.00 |
| James Gregoire | Privacy and Cybersecurity Director | 4.0 | 820.00 | 3,280.00 |
| Total | | 10.8 | | $ 9,060.00 |

## Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 12/31/20 | Voice & Data Communications | 271.80 |
| | Total Disbursements | $ 271.80 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-311**

# Attachment 12

**A-312**



**Fenwick & West LLP**
**801 California Street**
**Mountain View, CA 94041**
**Tel  650.988.8500**
**www.fenwick.com**

Alameda Research LLC                    Invoice Date:           March 31, 2021
2000 Center Street, Suite 400
Berkeley, CA  94704                      Client Number:                 34394

                                        Invoice Number:               848639

Attn:   Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through February 28, 2021.

Fees:                          $ 303,734.00

Disbursements:                   26,298.33
                               _____

CURRENT AMOUNT DUE             $ 330,032.33

# A-313

Alameda Research LLC
Client Number: 34394

| | |
|---|---|
| Invoice Date: | March 31, 2021 |
| Invoice Number: | 848639 |
| Billing Attorney: | Andrew  Albertson |

Page 14

---

Compliance and Risk Mitigation
Matter number 34394-00402

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 02/04/21 | Chad  Richman | FTX US regulatory matters. | 0.3 | 225.00 |
| 02/07/21 | Casey  O'Neill | Prepare for D. Friedberg call through review of prior draft retention policy and related comments (.5); participate in client call (.6). | 1.1 | 968.00 |
| | | Total Hours and Fees | 1.4 | $ 1,193.00 |

## Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Casey  O'Neill | Of Counsel | 1.1 | 880.00 | 968.00 |
| Chad  Richman | Associate | 0.3 | 750.00 | 225.00 |
| Total | | 1.4 | | $ 1,193.00 |

## Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 02/28/21 | Voice & Data Communications | 35.79 |
| | Total Disbursements | $ 35.79 |

FOIA Confidential Treatment Requested

A-314

# Attachment 13

**A-315**

| | Silicon Valley Center |
|---|---|
| Fenwick FENWICK & WEST LLP | 801 California Street<br>Mountain View, CA 94041<br>Tel  650.988.8500<br>Fax  650.938.5200 |

Alameda Research LLC                              Invoice Date:                March 31, 2020
2000 Center Street, Suite 400
Berkeley,  CA  94704                               Client Number:                        34394

                                                  Invoice Number:                        796256


Attn:    Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through February 29, 2020.


Fees:                                    $ 215,879.50

Disbursements:                               21,254.89

                                    _____

CURRENT AMOUNT DUE              $ 237,134.39

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000313968<br>SDNY_03_00208054

# A-316

Alameda Research LLC  
Client Number: 34394

Invoice Date:      March 31, 2020  
Invoice Number:         796256  
Billing Attorney:   Andrew Albertson

Page 13

---

General Corporate  
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 02/20/20 | Sean McElroy | Confer with C. Richman and J. Wittman regarding intercompany agreements; draft term sheet language for international acquisitions; review internal email memorandum by D. Forst; research on partnership tax issues. | 1.3 | 962.00 |
| 02/20/20 | Kathleen Murray | Attention to correspondence with GKL regarding West Realm Shires Services Inc. entity registration in all 47 states and fictitious name filings; review Bitcoin Manipulation closing volume, distribute same. | 0.5 | 107.50 |
| 02/20/20 | Chad Richman | Call regarding intercompany agreements; draft and revise FTX equity token documents. | 2.9 | 2,102.50 |
| 02/20/20 | Igor Voloshin | Advice to C. Richman on margin lending program. MTL Project: miscellaneous reorganization matters. | 1.0 | 655.00 |
| 02/20/20 | Jacob Wittman | Attend to Binance waivers; review waiver requirements; discuss intercompany agreements. | 3.1 | 2,030.50 |
| 02/21/20 | Andrew Albertson | Review comments to FTX offering documents; confer regarding same; prepare comments to same. | 1.4 | 1,344.00 |
| 02/21/20 | Sean McElroy | Review intercompany agreements. | 0.4 | 296.00 |
| 02/21/20 | Kathleen Murray | Attention to correspondence from registered agent regarding qualification filing. | 0.1 | 21.50 |
| 02/21/20 | Chad Richman | Draft ECP only US margin agreement; revisions to FTX equity documents. | 3.6 | 2,610.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-317**

| Alameda Research LLC | | Invoice Date: | March 31, 2020 |
| Client Number: 34394 | | Invoice Number: | 796256 |
| | | Billing Attorney: | Andrew  Albertson |

Page 14

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 02/21/20 | Igor  Voloshin | MTL Project: Fingerprinting and application overview to Fab. | 0.5 | 327.50 |
| 02/21/20 | Jacob  Wittman | Attend to FTX terms. | 1.0 | 655.00 |
| 02/22/20 | Sean  McElroy | Research on partnership issues; review intercompany agreements. | 0.8 | 592.00 |
| 02/23/20 | Andrew  Albertson | Confer regarding global offering and current Reg D and Reg S compliance. | 0.4 | 384.00 |
| 02/23/20 | Sean  McElroy | Research partnership contribution issues. | 0.9 | 666.00 |
| 02/23/20 | Jacob  Wittman | Review online disclosures regarding equity financing. | 1.0 | 655.00 |
| 02/24/20 | Andrew  Albertson | Review updated FTX sale documents; confer regarding arbitration provisions; confer regarding 506(c) verification representations and process; review and prepare comments to Reg D and Reg S global offering guidance email; confer regarding geo blocking and U.S. blocked pages; confer regarding wallet page and user flows; review SEC Internet Offering Release regarding fund exceptions and public and private offerings. | 2.1 | 2,016.00 |
| 02/24/20 | David L. Forst | Discussion with S. McElroy regarding transfer pricing and employee plan; review email from J. Bankman regarding the same; review 704(c) rules. | 2.3 | 3,335.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-318**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | March 31, 2020 |
| Client Number: 34394 | Invoice Number: | 796256 |
| | Billing Attorney: | Andrew Albertson |

Page 17

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| | | Total Hours and Fees | 200.5 | $ 171,268.00 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|-------|------|--------|
| Andrew Albertson | Partner | 17.5 | 960.00 | 16,800.00 |
| David L. Forst | Partner | 36.7 | 1450.00 | 53,215.00 |
| Sean McElroy | Associate | 43.5 | 740.00 | 32,190.00 |
| Chad Richman | Associate | 42.2 | 725.00 | 30,595.00 |
| Can Sun | Associate | 1.2 | 860.00 | 1,032.00 |
| Igor Voloshin | Associate | 22.3 | 655.00 | 14,606.50 |
| Jacob Wittman | Associate | 32.9 | 655.00 | 21,549.50 |
| Jennifer R. Wu | Associate | 0.7 | 485.00 | 339.50 |
| Kathleen Murray | Paralegal | 2.7 | 215.00 | 580.50 |
| Jana Lay | Elec Info Mgmt | 0.4 | 450.00 | 180.00 |
| Bao Nguyen | Elec Info Mgmt | 0.4 | 450.00 | 180.00 |
| Total | | 200.5 | | $ 171,268.00 |

Disbursement Summary

| Date | Description | Total |
|------|-------------|-------|
| 02/11/20 | 2020 Renewal Fees. - VENDOR: Sterling Trust & Fiduciary Limited | 982.50 |
| 02/13/20 | Professional Services: Change of Company Name; Company Share Transfer. - VENDOR: Sterling Trust & Fiduciary Limited | 900.00 |
| 02/24/20 | Extraction of Certificate of Good Standing, Courier Costs, Legal Fees. - VENDOR: Corporate & Trust Services (Caribbean) | 402.00 |
| 02/24/20 | Incorporation of five (5) companies. - VENDOR: Corporate & Trust Services (Caribbean) | 9,085.00 |
| 02/24/20 | Change of Director, Legal and Government Fees. - VENDOR: Corporate & Trust Services (Caribbean) | 550.00 |
| 02/24/20 | Incorporation of International Business Company, Fees. - VENDOR: Corporate & Trust Services (Caribbean) | 1,852.00 |
| 02/29/20 | Voice & Data Communications | 5,138.04 |
| | Total Disbursements | $ 18,909.54 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

# Attachment 14

**A-320**

| Fenwick | |
|---|---|
| **FENWICK & WEST LLP** | Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041<br>Tel 650.988.8500<br>Fax 650.938.5200 |

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley, CA 94704

| | |
|---|---|
| Invoice Date: | April 15, 2020 |
| Client Number: | 34394 |
| Invoice Number: | 798633 |

Attn:   Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through March 31, 2020.

| | |
|---|---|
| Fees: | $ 101,568.00 |
| Disbursements: | 24,370.47 |
| | ———————— |
| CURRENT AMOUNT DUE | $ 125,938.47 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000314001
SDNY_03_00208087

**A-321**

Alameda Research LLC
Client Number: 34394

Invoice Date:       April 15, 2020
Invoice Number:       798633
Billing Attorney:       Andrew Albertson

Page 13

General Corporate
Matter number 34394-00600

| <u>Date</u> | <u>Timekeeper</u> | <u>Description</u> | <u>Hours</u> | <u>Amount</u> |
|---|---|---|---|---|
| 03/27/20 | Kathleen Murray | Prepare CA statement of information; attention to execution of same. | 0.5 | 107.50 |
| 03/27/20 | Jacob Wittman | Attend to general financing matters; call with client. | 1.0 | 655.00 |
| 03/27/20 | Jennifer R. Wu | Team check in. | 0.2 | 97.00 |
| 03/29/20 | Sean McElroy | Research on foreign acquisition; review notes and loan documents; research Subpart F issues. | 0.9 | 666.00 |
| 03/30/20 | David L. Forst | Review emails regarding MVR; discussion with Mr. McElroy regarding same and outstanding tax issues. | 1.9 | 2,755.00 |
| 03/30/20 | Sean McElroy | Confer with D. Forst regarding tax issues; research on procedural questions for mark-to-market elections; research on structuring issues; review notes and prepare for call with D. Forst. | 3.2 | 2,368.00 |
| 03/30/20 | Chad Richman | Review new CFTC guidance on actual delivery for FTX margin program. | 0.8 | 580.00 |
| 03/31/20 | David L. Forst | Discussion with Mr. McElroy regarding MVR; emails regarding same; review email from Mr. Miyatake. | 0.6 | 870.00 |
| 03/31/20 | Sean McElroy | Review intercompanies; call with D. Forst regarding tax issues; call with R. Williams and J. Wittman regarding tax issues with financing; draft loan agreement. | 1.2 | 888.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

# A-322

Alameda Research LLC
Client Number: 34394

| | |
|---|---|
| Invoice Date: | April 15, 2020 |
| Invoice Number: | 798633 |
| Billing Attorney: | Andrew  Albertson |

Page 14

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 03/31/20 | Chad  Richman | Review new CFTC guidance on actual delivery for FTX margin program. | 0.4 | 290.00 |
| | | Total Hours and Fees | 87.2 | $ 84,831.00 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Andrew  Albertson | Partner | 6.5 | 960.00 | 6,240.00 |
| David L. Forst | Partner | 29.4 | 1450.00 | 42,630.00 |
| Sean  McElroy | Associate | 38.9 | 740.00 | 28,786.00 |
| Chad  Richman | Associate | 1.9 | 725.00 | 1,377.50 |
| Igor  Voloshin | Associate | 5.4 | 655.00 | 3,537.00 |
| Jacob  Wittman | Associate | 2.4 | 655.00 | 1,572.00 |
| Jennifer R. Wu | Associate | 0.4 | 485.00 | 194.00 |
| Kathleen  Murray | Paralegal | 2.3 | 215.00 | 494.50 |
| Total | | 87.2 | | $ 84,831.00 |

Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 03/02/20 | West Realm Shires Services Inc qualifications. - VENDOR: GKL Register Agents Inc. / TIN 81-223632 | 20,824.42 |
| 03/16/20 | Obtain Certificate of Good Standing from Delaware. - VENDOR: GKL Register Agents Inc./TIN 81-2236321 | 112.00 |
| 03/16/20 | Obtain Certificate of Good Standing from Delaware. - Vendor: GKL Register Agents Inc./TIN 81-2236321 | 112.00 |
| 03/31/20 | Voice & Data Communications | 2,544.93 |
| | Total Disbursements | $ 23,593.35 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-323**

# Attachment 15

**A-324**

| | Silicon Valley Center |
|---|---|
| **Fenwick** FENWICK & WEST LLP | 801 California Street |
| | Mountain View, CA 94041 |
| | Tel  650.988.8500 |
| | Fax  650.938.5200 |

Alameda Research LLC  
2000 Center Street, Suite 400  
Berkeley, CA 94704

Invoice Date:    May 31, 2019

Client Number:    34394

Invoice Number:   755670

Attn: Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through April 30, 2019.

Fees:        $ 107,844.50

Disbursements:    3,235.34

CURRENT AMOUNT DUE  $ 111,079.84

FOIA Confidential Treatment Requested

**A-325**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | May 31, 2019 |
| Client Number: 34394 | Invoice Number: | 755670 |
| | Billing Attorney: | Daniel Friedberg |

Page 4

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 04/01/19 | Daniel Friedberg | Conference with Antigua counsel; review issues regarding futures exchange. | 1.4 | 1,001.00 |
| 04/01/19 | Chad Richman | Call with Antigua counsel regarding exchange entity; review exchange and leveraged token models and websites, review FTX deck, plan structuring for exchange and leveraged tokens. | 3.4 | 1,683.00 |
| 04/01/19 | Igor Voloshin | Call with Antigua law firm; discuss workflow with D. Friedberg and C. Richman; confer with C. Richman on user agreement/liquidity provider agreement; identify precedent for leveraged token agreement; and review FX site for compliance flags. Begin drafting AML checklist for stablecoin specific transaction flags. | 2.1 | 1,039.50 |
| 04/02/19 | Isaiah Deporto-Plick | Discussion with C. Richman regarding outstanding corporate matters for Alameda. | 0.3 | 148.50 |
| 04/02/19 | Daniel Friedberg | Review futures exchange issues. | 1.8 | 1,287.00 |
| 04/02/19 | Chad Richman | Develop structure for exchange and leverage tokens; research entity for leverage tokens. | 1.0 | 495.00 |
| 04/02/19 | Igor Voloshin | Discuss leveraged token structure with C. Richman; being drafting privacy policy. | 1.0 | 495.00 |
| 04/03/19 | Andrew Albertson | Confer regarding security token design and approach. | 0.4 | 310.00 |

PM-FTX-D_0026605
SDNY_03_00694426

**A-326**

| | |
|---|---|
| Alameda Research LLC | Invoice Date:    May 31, 2019 |
| Client Number: 34394 | Invoice Number:    755670 |
| | Billing Attorney:    Daniel Friedberg |

Page 6

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 04/08/19 | Chad Richman | Call with Seychelles counsel regarding entity choice for leveraged tokens; call with Allen Overy regarding global regulatory survey; revisions to FTX slide deck; emails with J.Bankman regarding slide deck and revisions for his comments; further drafting of exchange agreements. | 5.3 | 2,623.50 |
| 04/09/19 | David L. Forst | Discussion with Mr. Richman and Mr. Hatch regarding various tax issues; review email regarding same. | 1.1 | 1,457.50 |
| 04/09/19 | Daniel Friedberg | Review financing proposals; attention to corporate issues. | 1.5 | 1,072.50 |
| 04/09/19 | Kristofer Hatch | Review tax issues flagged for call; Call with Mr. Forst and Mr. Richman regarding same. | 1.4 | 756.00 |
| 04/09/19 | Chad Richman | Revise FTX deck; call with D.Forst regarding FTX tax issues, emails with W.Skinner, Bob Lee, J.Bankman regarding FTX tax issues; revisions to exchange documents. | 2.9 | 1,435.50 |
| 04/09/19 | William Skinner | Call with Bob Lee CPA regarding C Corporation election and pros and cons. | 0.4 | 390.00 |
| 04/09/19 | Igor Voloshin | Discuss token raise structure with C. Richman; continue drafting terms of use. | 1.2 | 594.00 |
| 04/10/19 | Isaiah Deporto-Plick | Email communication with C. Richman regarding outstanding matters for Alameda. | 0.1 | 49.50 |

PM-FTX-D_0026607
SDNY_03_00694428

**A-327**

Alameda Research LLC                                      Invoice Date:          May 31, 2019
Client Number: 34394                                     Invoice Number:            755670
                                                         Billing Attorney:    Daniel Friedberg

Page 7

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 04/10/19 | David L. Forst | Emails and review authorities regarding prep of 2018 tax returns; conference call regarding same. | 1.4 | 1,855.00 |
| 04/10/19 | Chad Richman | Call with Bob Lee regarding Alameda tax issues; email with team to coordinate for exchange launch and leveraged token creation; call with M.Porter regarding leveraged tokens, call with S.Zhang regarding leveraged tokens; draft collateral agreement for exchange. | 7.2 | 3,564.00 |
| 04/10/19 | Igor Voloshin | Draft terms of use for FTX Exchange. | 2.1 | 1,039.50 |
| 04/11/19 | Andrew Albertson | Confer regarding security token design and related matters. | 0.6 | 465.00 |
| 04/11/19 | Isaiah Deporto-Plick | Begin drafting workstream checklist; attention to corporate matters. | 0.4 | 198.00 |
| 04/11/19 | Kristofer Hatch | Research tax issues regarding leveraged tokens project. | 0.8 | 432.00 |
| 04/11/19 | Chad Richman | Emails with S. and J. Bankman regarding FTT. Call with S.Bankman regarding FTT STO; review FTT terms; call with A.Albertson regarding FTT structuring considerations, develop structure for FTT token offering. | 6.8 | 3,366.00 |
| 04/11/19 | Igor Voloshin | Edits to terms of use. | 0.5 | 247.50 |
| 04/12/19 | Andrew Albertson | Review and prepare comments to term sheet; confer regarding structuring and related matters. | 2.2 | 1,705.00 |
| 04/12/19 | Kristofer Hatch | Research tax issues regarding leveraged tokens project. | 2.4 | 1,296.00 |

**A-328**

Alameda Research LLC
Client Number: 34394

Invoice Date:    May 31, 2019
Invoice Number:    755670
Billing Attorney:    Daniel Friedberg

Page 8

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 04/12/19 | Chad Richman | Draft FTT token issuance term sheet and allocation request; emails with S.Bankman regarding same; discussions and emails with A.Albertson, I.Voloshin regarding same; draft FTT token issuance documents. | 8.4 | 4,158.00 |
| 04/12/19 | Igor Voloshin | Continue drafting terms of use/service and privacy policy. | 2.2 | 1,089.00 |
| 04/13/19 | Chad Richman | Draft FTT token issuance documents including TSA and Token agreement; call with S.Bankman regarding token terms. | 3.1 | 1,534.50 |
| 04/14/19 | Daniel Friedberg | Analyze offering issues. | 1.0 | 715.00 |
| 04/14/19 | Chad Richman | Draft FTT token issuance documents. | 1.4 | 693.00 |
| 04/15/19 | Andrew Albertson | Review and prepare comments to transaction agreements; confer regarding same. | 2.8 | 2,170.00 |
| 04/15/19 | Isaiah Deporto-Plick | Finalize checklist for Alameda corporate matters and projects. | 0.8 | 396.00 |
| 04/15/19 | David L. Forst | Review and consider business structuring alternatives; discussions with Mr. Bankman and Mr. Hatch regarding same; emails regarding same. | 2.3 | 3,047.50 |
| 04/15/19 | Daniel Friedberg | Attention to token sale; conference. | 1.4 | 1,001.00 |
| 04/15/19 | Kristofer Hatch | Research tax issues regarding royalty token project. | 1.6 | 864.00 |
| 04/15/19 | Chad Richman | Call with S.Bankman regarding Bithumb deal; revisions to TSA and Token Agreement. | 0.9 | 445.50 |

FOIA Confidential Treatment Requested

**A-329**

Alameda Research LLC
Client Number: 34394

Invoice Date:        May 31, 2019
Invoice Number:            755670
Billing Attorney:      Daniel Friedberg

Page 14

General Corporate
Matter number 34394-00600

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|-------|------|--------|
| Andrew  Albertson | Partner | 6.0 | 775.00 | 4,650.00 |
| David L. Forst | Partner | 7.5 | 1325.00 | 9,937.50 |
| William  Skinner | Partner | 0.4 | 975.00 | 390.00 |
| Daniel  Friedberg | Of Counsel | 34.6 | 715.00 | 24,739.00 |
| Casey  O'Neill | Of Counsel | 9.2 | 730.00 | 6,716.00 |
| Isaiah  Deporto-Plick | Associate | 1.6 | 495.00 | 792.00 |
| Kristofer  Hatch | Associate | 13.7 | 540.00 | 7,398.00 |
| Chad  Richman | Associate | 87.0 | 495.00 | 43,065.00 |
| Igor  Voloshin | Associate | 17.0 | 495.00 | 8,415.00 |
| Total | | 177.0 | | $ 106,102.50 |

### Disbursement Summary

| Date | Description | Total |
|------|-------------|-------|
| 04/30/19 | Voice & Data Communications | 3,183.08 |
| | Total Disbursements | $ 3,183.08 |

PM-FTX-D_0026615
SDNY_03_00694436

**A-330**

# Attachment 16

**A-331**

|  |  |
|---|---|
| **FENWICK & WEST LLP** | Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041<br>Tel  650.988.8500<br>Fax  650.938.5200 |

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley,  CA  94704

| Invoice Date: | January 22, 2019 |
|---|---|
| Client Number: | 34394 |
| Invoice Number: | 737203 |

Attn:    Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through December 31, 2018.

| | |
|---|---|
| Fees: | $ 27,604.00 |
| Disbursements: | 828.12 |
| | ———————— |
| CURRENT AMOUNT DUE | $ 28,432.12 |

SBF_GOOGLE_SW_00199432

# A-332

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | January 22, 2019 |
| Client Number: 34394 | Invoice Number: | 737203 |
| | Billing Attorney: | Daniel  Friedberg |

Page 6

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 12/26/18 | Chad  Richman | Draft cryptocurrency exchange master agreement. | 3.5 | 1,627.50 |
| 12/27/18 | Chad  Richman | Draft cryptocurrency exchange master agreement. | 2.8 | 1,302.00 |
| 12/28/18 | Daniel  Friedberg | Draft LOI; attend to corporate matters. | 1.4 | 973.00 |
| 12/28/18 | Chad  Richman | Draft letter of intent for OTC trade; draft OTC trading master agreement. | 3.9 | 1,813.50 |
| | | Total Hours and Fees | 39.5 | $ 25,033.00 |

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| David L. Forst | Partner | 4.7 | 1200.00 | 5,640.00 |
| Daniel  Friedberg | Of Counsel | 13.5 | 695.00 | 9,382.50 |
| Michael  Knobler | Associate | 0.6 | 750.00 | 450.00 |
| Chad  Richman | Associate | 18.6 | 465.00 | 8,649.00 |
| Igor  Voloshin | Associate | 1.9 | 465.00 | 883.50 |
| Kathleen  Murray | Paralegal | 0.2 | 140.00 | 28.00 |
| Total | | 39.5 | | $ 25,033.00 |

### Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 12/31/18 | Voice & Data Communications | 750.99 |
| | Total Disbursements | $ 750.99 |

SBF_GOOGLE_SW_00199438

A-333

# Attachment 17

**A-334**

| | Silicon Valley Center |
|---|---|
| **Fenwick**<br>**FENWICK & WEST LLP** | 801 California Street<br>Mountain View, CA 94041<br>Tel  650.988.8500<br>Fax  650.938.5200 |

Alameda Research LLC                                   Invoice Date:                    June 30, 2019
2000 Center Street, Suite 400
Berkeley,  CA  94704                                    Client Number:                           34394

                                                       Invoice Number:                          759331


Attn:   Sam Bankman-Fried


**(Invoice Emailed)**

---

For professional services rendered through May 31, 2019.


Fees:                                  $ 164,399.50

Disbursements:                              16,155.32

                                       _____

CURRENT AMOUNT DUE                     $ 180,554.82

FOIA Confidential Treatment Requested

PM-FTX-D_0026617
SDNY_03_00694438

**A-335**

Alameda Research LLC            Invoice Date:       June 30, 2019
Client Number: 34394           Invoice Number:      759331
                                    Billing Attorney:     Daniel Friedberg

Page 18

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 05/17/19 | Lise Berichel | Pursue drafting of software license agreement to be entered into between Alameda Research Ltd. and FTX Trading Ltd; forward draft to D. Friedberg for review. | 1.7 | 1,122.00 |
| 05/17/19 | Casey O'Neill | Collaborate internally regarding and supervise ongoing document collection and review work. | 0.5 | 365.00 |
| 05/17/19 | Chad Richman | Discuss open items on FTX formation with D.Friedberg; provide guidance on entity formation for I.Voloshin. | 0.6 | 297.00 |
| 05/17/19 | Igor Voloshin | Seychelles entity formation. | 1.0 | 495.00 |
| 05/19/19 | Igor Voloshin | Seychelles entity formation. | 1.8 | 891.00 |
| 05/20/19 | Daniel Friedberg | Review corporate issues; conferences. | 2.3 | 1,644.50 |
| 05/20/19 | Kristofer Hatch | Research regarding joint venture. | 1.5 | 810.00 |
| 05/20/19 | Casey O'Neill | Review and edit document review protocol memo (1.3); manage team with respect to the same (.2). | 1.5 | 1,095.00 |
| 05/20/19 | Igor Voloshin | Seychelles entity formation. | 0.4 | 198.00 |
| 05/21/19 | Daniel Friedberg | Address corporate issues. | 0.9 | 643.50 |
| 05/22/19 | Daniel Friedberg | Draft prospectus. | 3.0 | 2,145.00 |
| 05/22/19 | Casey O'Neill | Draft, revise and circulate subpoena response tracking sheet (1.6); analyze next steps in subpoena response (.9). | 2.5 | 1,825.00 |
| 05/22/19 | Chad Richman | Review revised bithumb proposal. | 0.3 | 165.00 |
| 05/23/19 | Daniel Friedberg | Revisions to documents. | 2.0 | 1,430.00 |

PM-FTX-D_0026635
SDNY_03_00694456

# A-336

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | June 30, 2019 |
| Client Number: 34394 | Invoice Number: | 759331 |
| | Billing Attorney: | Daniel Friedberg |

Page 19

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 05/23/19 | Casey O'Neill | Supervise ongoing document review and consider strategy for the same (.8); consider and communicate with client and team about further document collections for subpoena response (.9). | 1.7 | 1,241.00 |
| 05/24/19 | Daniel Friedberg | Draft user agreements. | 1.8 | 1,287.00 |
| 05/24/19 | Chad Richman | Review leverage token prospectus. | 0.1 | 55.00 |
| 05/26/19 | Daniel Friedberg | Revisions to documents. | 1.3 | 929.50 |
| 05/28/19 | Daniel Friedberg | Attention to formation issues; contract review. | 2.2 | 1,573.00 |
| 05/28/19 | Casey O'Neill | Review and analyze arguments made in Bitfinex and Tether brief concerning lack of NYAG jurisdiction (1.8); re-review production of onboarding documents already made for alignment with Bitfinex and Tether arguments in briefing and public terms of service (1.2); supervise team document review and assess status of same (.3); consider and collaborate internally regarding strategy for further production or response to NYAG (.6). | 3.9 | 2,847.00 |
| 05/28/19 | Chad Richman | Review and comment on draft of leverage token ppm. | 1.2 | 660.00 |
| 05/28/19 | Igor Voloshin | Review PCC regulatory issues provided by Seychelles counterparty; begin drafting application. | 0.3 | 148.50 |
| 05/29/19 | Chad Richman | Discuss leverage token ppm with D.Friedberg; review PPM. | 0.3 | 165.00 |
| 05/29/19 | Igor Voloshin | Draft Certificate of Incumbency. | 0.3 | 148.50 |

PM-FTX-D_0026636
SDNY_03_00694457

**A-337**

| | | | |
|---|---|---|---|
| Alameda Research LLC | | Invoice Date: | June 30, 2019 |
| Client Number: 34394 | | Invoice Number: | 759331 |
| | | Billing Attorney: | Daniel Friedberg |

Page 20

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 05/30/19 | Daniel Friedberg | Revisions to documents. | 3.0 | 2,145.00 |
| 05/30/19 | Chad Richman | Review and revise Leverage Token PPM. | 0.9 | 495.00 |
| 05/30/19 | Igor Voloshin | Draft Corporate documents. | 0.4 | 198.00 |
| 05/31/19 | David L. Forst | Discussion with Mr. Bankman et al., regarding tax structuring issues; review emails regarding same. | 1.6 | 2,120.00 |
| 05/31/19 | Daniel Friedberg | Draft documents; conference. | 4.0 | 2,860.00 |
| | | Total Hours and Fees | 99.7 | $ 68,071.50 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Andrew Albertson | Partner | 1.2 | 775.00 | 930.00 |
| David L. Forst | Partner | 6.7 | 1325.00 | 8,877.50 |
| Daniel Friedberg | Of Counsel | 36.2 | 715.00 | 25,883.00 |
| Casey O'Neill | Of Counsel | 13.4 | 730.00 | 9,782.00 |
| Lise Berichel | Associate | 4.7 | 660.00 | 3,102.00 |
| Kristofer Hatch | Associate | 18.9 | 540.00 | 10,206.00 |
| Chad Richman | Associate | 11.2 | 508.75 | 5,698.00 |
| Igor Voloshin | Associate | 7.2 | 495.00 | 3,564.00 |
| Kathleen Murray | Paralegal | 0.2 | 145.00 | 29.00 |
| Total | | 99.7 | | $ 68,071.50 |

PM-FTX-D_0026637
SDNY_03_00694458

# Attachment 18

**A-339**

| | Silicon Valley Center |
|---|---|
| **FENWICK & WEST LLP** | 801 California Street<br>Mountain View, CA 94041<br>Tel  650.988.8500<br>Fax  650.938.5200 |

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley,  CA  94704

Invoice Date:          August 28, 2019

Client Number:                    34394

Invoice Number:                 766457

Attn:    Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through July 31, 2019.

Fees:                                      $ 71,225.00

Disbursements:                         2,636.76

                                          _____

CURRENT AMOUNT DUE          $ 73,861.76

SBF_GOOGLE_SW_00180328

# A-340

Alameda Research LLC
Client Number: 34394

| | | |
|---|---|---|
| Invoice Date: | | August 28, 2019 |
| Invoice Number: | | 766457 |
| Billing Attorney: | | Daniel  Friedberg |

Page 8

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 07/26/19 | Chad  Richman | Draft intercompany agreements between FTX/Alameda/Cottonwood; draft revised FTT sale documents. | 4.5 | 2,475.00 |
| 07/28/19 | Daniel  Friedberg | Attention to regulatory issues. | 0.4 | 286.00 |
| 07/29/19 | Daniel  Friedberg | Attend to documents; correspondence with outside counsel; attend to corporate matters. | 4.0 | 2,860.00 |
| 07/29/19 | Chad  Richman | Discuss outstanding items for FTT/FTX with D.Friedberg; investigate securities law issues related to FTT listing and roll out. | 0.9 | 495.00 |
| 07/31/19 | Daniel  Friedberg | Draft FTX customer agreement. | 4.0 | 2,860.00 |
| | | Total Hours and Fees | 90.7 | $ 66,090.50 |

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| David L. Forst | Partner | 10.4 | 1325.00 | 13,780.00 |
| Daniel  Friedberg | Of Counsel | 50.2 | 715.00 | 35,893.00 |
| Chad  Richman | Associate | 27.6 | 550.00 | 15,180.00 |
| Igor  Voloshin | Associate | 2.5 | 495.00 | 1,237.50 |
| Total | | 90.7 | | $ 66,090.50 |

### Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 07/31/19 | Voice & Data Communications | 1,982.72 |
| | Total Disbursements | $ 1,982.72 |

A-341

# Attachment 19

**A-342**



**Fenwick & West LLP**
**801 California Street**
**Mountain View, CA 94041**
**Tel  650.988.8500**
**www.fenwick.com**

West Realm Shires Services Inc.
2000 Center Street
Suite 400
Berkeley,  CA  94704

| | |
|---|---|
| Invoice Date: | January 27, 2022 |
| Client Number: | 38608 |
| Invoice Number: | 893087 |

Attn:   Dan Friedberg

**(Invoice Emailed)**

For professional services rendered through December 31, 2021.

| | |
|---|---|
| Fees: | $ 67,252.00 |
| Disbursements: | 2,648.03 |

| | |
|---|---|
| CURRENT AMOUNT DUE | $ 69,900.03 |

Confidential Treatment Requested by Armanino LLP

# A-343

| | | |
|---|---|---|
| West Realm Shires Services Inc. | Invoice Date: | January 27, 2022 |
| Client Number: 38608 | Invoice Number: | 893087 |
| | Billing Attorney: | Andrew Albertson |
| Page 10 | | |

General Corporate
Matter number 38608-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 12/01/21 | Igor Voloshin | Prepare AML memo/analysis. | 1.5 | 1,290.00 |
| 12/02/21 | Whitney Anne Bishop | Correspondence to M. Mort regarding option exercises. | 3.4 | 1,377.00 |
| 12/03/21 | Igor Voloshin | Prepare email overview of MT reporting; updates to legal analysis on BSA compliance. | 1.0 | 860.00 |
| 12/06/21 | Sean McElroy | Attend virtual meeting with FTX.US regarding tax matters. | 0.5 | 407.50 |
| 12/06/21 | Igor Voloshin | Miscellaneous regulatory advice. | 2.3 | 1,978.00 |
| 12/07/21 | Sean McElroy | Draft intercompany services agreement. | 0.3 | 244.50 |
| 12/08/21 | Whitney Anne Bishop | Review of option records. | 0.9 | 364.50 |
| 12/15/21 | Sean McElroy | Review potential acquisition transaction; attend phone conference with S. Bankman-Fried et al. regarding potential acquisition. | 0.4 | 326.00 |
| 12/15/21 | Igor Voloshin | Confer with regulators on no-names basis on ADTL filings. | 1.0 | 860.00 |
| 12/16/21 | Whitney Anne Bishop | Correspondence with T. Levine regarding WRS Financial Services; update capitalization table. | 2.5 | 1,012.50 |
| 12/17/21 | Whitney Anne Bishop | Continue reconciliation of cap table. | 1.1 | 445.50 |

Armanino-FTX-003930
SDNY_03_00056240

# A-344

| | | |
|---|---|---|
| West Realm Shires Services Inc. | Invoice Date: | January 27, 2022 |
| Client Number: 38608 | Invoice Number: | 893087 |
| | Billing Attorney: | Andrew Albertson |

Page 12

---

General Corporate
Matter number 38608-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 12/28/21 | Igor Voloshin | Confer with Minn. Dept of Commerce; discuss with WRSS. | 2.7 | 2,322.00 |
| 12/29/21 | Hector Velez | Review and revise capitalization table. | 1.0 | 685.00 |
| 12/29/21 | Igor Voloshin | Prepare response to Minn. Dept of Commerce. | 2.0 | 1,720.00 |
| 12/30/21 | Sean McElroy | Attend to tax matters relating to Storybook acquisition. | 0.3 | 244.50 |
| 12/30/21 | Hector Velez | Review and revise capitalization table; provide tables to client. | 0.5 | 342.50 |
| | | Total Hours and Fees | 36.6 | $ 26,573.50 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Sean McElroy | Associate | 8.0 | 815.00 | 6,520.00 |
| Hector Velez | Associate | 2.9 | 685.00 | 1,986.50 |
| Igor Voloshin | Associate | 16.7 | 860.00 | 14,362.00 |
| Whitney Anne Bishop | Paralegal | 8.2 | 405.00 | 3,321.00 |
| Anita Marie Crowther | Paralegal | 0.8 | 480.00 | 384.00 |
| Total | | 36.6 | | $ 26,573.50 |

Disbursement Summary

| Date | Description | Total |
|---|---|---|
| 12/31/21 | Voice & Data Communications | 797.21 |
| | Total Disbursements | $ 797.21 |

Confidential Treatment Requested by Armanino LLP

**A-345**

# Attachment 20

**A-346**

| | Silicon Valley Center |
|---|---|
| Fenwick FENWICK & WEST LLP | 801 California Street |
| | Mountain View, CA 94041 |
| | Tel  650.988.8500 |
| | Fax  650.938.5200 |

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley,  CA  94704

| | |
|---|---|
| Invoice Date: | January 28, 2020 |
| Client Number: | 34394 |
| Invoice Number: | 787532 |

Attn:   Sam Bankman-Fried

**(Invoice Emailed)**

For professional services rendered through December 31, 2019.

| | |
|---|---|
| Fees: | $ 169,080.50 |
| Disbursements: | 19,282.79 |
| CURRENT AMOUNT DUE | $ 188,363.29 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-347**

Alameda Research LLC
Client Number: 34394

Invoice Date:  January 28, 2020
Invoice Number:  787532
Billing Attorney:  Daniel Friedberg

Page 18

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 12/17/19 | David L. Forst | Discussion with Mr. McElroy regarding charitable contribution issue; emails regarding HK residency issue; conference call regarding outstanding tax issues. | 1.6 | 2,120.00 |
| 12/17/19 | Daniel Friedberg | Attention to acquisitions; address corporate issues. | 2.4 | 1,716.00 |
| 12/17/19 | Sean McElroy | Prepare for and attend phone conference with Joe Bankman et al. regarding year-end tax issues; draft internal email regarding tax issues; research on tax deduction issue and confer with D. Forst regarding same. | 2.4 | 1,512.00 |
| 12/17/19 | Kathleen Murray | Review and update corporate records with evidence of Paper Bird Transfer. | 0.1 | 14.50 |
| 12/17/19 | Chad Richman | Discuss vc investment structure with D.Friedberg. | 0.2 | 110.00 |
| 12/17/19 | Igor Voloshin | Misc. corporate reorganization matters. | 0.6 | 297.00 |
| 12/17/19 | Jennifer R. Wu | Review exchange agreement. | 0.5 | 200.00 |
| 12/18/19 | David L. Forst | Discussion with Mr. McElroy regarding follow up regarding tax issues; review email regarding BVI. | 0.7 | 927.50 |
| 12/18/19 | Daniel Friedberg | Attention to corporate issues; conference with acquisition target; conferences. | 3.3 | 2,359.50 |
| 12/18/19 | Sean McElroy | Research on tax deduction issues; confer with D. Forst regarding same; draft internal email regarding same. | 2.2 | 1,386.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-348**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | January 28, 2020 |
| Client Number: 34394 | Invoice Number: | 787532 |
| | Billing Attorney: | Daniel Friedberg |

Page 22

---

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 12/30/19 | Jennifer R. Wu | Review, edit, and discuss data room for FTX. | 1.6 | 640.00 |
| 12/30/19 | Jennifer R. Wu | Update legal workflows. | 0.2 | 80.00 |
| 12/31/19 | David L. Forst | Emails regarding FTX issues. | 0.2 | 265.00 |
| 12/31/19 | Daniel Friedberg | Attend to intercompany agreements; conferences and correspondence. | 3.3 | 2,359.50 |
| 12/31/19 | Sean McElroy | Review outstanding tax issues; draft emails regarding same. | 0.3 | 189.00 |
| 12/31/19 | Can Sun | Attend to client emails. | 0.1 | 71.00 |
| 12/31/19 | Igor Voloshin | Misc. corporate reorganization matters. | 2.8 | 1,386.00 |
| 12/31/19 | Jennifer R. Wu | Update legal workflows. | 0.1 | 40.00 |
| 12/31/19 | Jennifer R. Wu | Edit token exchange documents. | 0.3 | 120.00 |
| | | Total Hours and Fees | 149.1 | $ 101,168.00 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|-------|------|--------|
| David L. Forst | Partner | 16.7 | 1325.00 | 22,127.50 |
| Daniel Friedberg | Partner | 35.4 | 715.00 | 25,311.00 |
| Sean McElroy | Associate | 35.6 | 630.00 | 22,428.00 |
| Chad Richman | Associate | 15.1 | 550.00 | 8,305.00 |
| Joseph Schenck | Associate | 1.6 | 715.00 | 1,144.00 |
| Can Sun | Associate | 4.4 | 710.00 | 3,124.00 |
| Igor Voloshin | Associate | 13.5 | 495.00 | 6,682.50 |
| Jacob Wittman | Associate | 15.3 | 495.00 | 7,573.50 |
| Jennifer R. Wu | Associate | 11.0 | 400.00 | 4,400.00 |
| Kathleen Murray | Paralegal | 0.5 | 145.00 | 72.50 |
| Total | | 149.1 | | $ 101,168.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

A-349

# Attachment 21

**A-350**

| F f | Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041<br>Tel  650.988.8500<br>Fax  650.938.5200 |
|---|---|

Alameda Research LLC
2000 Center Street, Suite 400
Berkeley,  CA  94704

| | |
|---|---|
| Invoice Date: | July 13, 2020 |
| Client Number: | 34394 |
| Invoice Number: | 811396 |

Attn:   Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through June 30, 2020.

| | |
|---|---|
| Fees: | $ 225,752.00 |
| Disbursements: | 19,419.70 |
| | |
| CURRENT AMOUNT DUE | $ 245,171.70 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000314037
SDNY_03_00208123

**A-351**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | July 13, 2020 |
| Client Number: 34394 | Invoice Number: | 811396 |
| | Billing Attorney: | Andrew  Albertson |

Page 12

Response to Regulatory Inquiries
Matter number 34394-00401

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 06/05/20 | Casey  O'Neill | Attend to client email traffic regarding bank request; review screenshot of same. | 0.3 | 255.00 |
| 06/06/20 | Casey  O'Neill | Attend to client email traffic regarding bank dialogue and need for law enforcement response policy. | 0.2 | 170.00 |
| 06/07/20 | Casey  O'Neill | Coordinate client call regarding law enforcement response policy. | 0.2 | 170.00 |
| 06/09/20 | Casey  O'Neill | Prepare for client call regarding law enforcement response policy and consider form for same; review FTX website for terms of service; lead client call regarding law enforcement response policy and review notes from same. | 1.2 | 1,020.00 |
| 06/12/20 | Casey  O'Neill | Consider next steps in law enforcement response development and follow up with D. Friedberg regarding user agreements and privacy policies. | 0.3 | 255.00 |
| | | Total Hours and Fees | 2.2 | $ 1,870.00 |

Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Casey  O'Neill | Of Counsel | 2.2 | 850.00 | 1,870.00 |
| Total | | 2.2 | | $ 1,870.00 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

# Attachment 22

**A-353**



**Fenwick & West LLP**
**801 California Street**
**Mountain View, CA 94041**
**Tel  650.988.8500**
**www.fenwick.com**

West Realm Shires Services Inc.
2000 Center Street
Suite 400
Berkeley,  CA  94704

| | |
|---|---|
| Invoice Date: | October 19, 2021 |
| Client Number: | 38608 |
| Invoice Number: | 877666 |

Attn:   Dan Friedberg

**(Invoice Emailed)**

For professional services rendered through September 30, 2021.

| | |
|---|---|
| Fees: | $ 89,087.00 |
| Disbursements: | 2,672.61 |
| **CURRENT AMOUNT DUE** | $ 91,759.61 |

# A-354

West Realm Shires Services Inc.
Client Number: 38608

Invoice Date: October 19, 2021
Invoice Number: 877666
Billing Attorney: Andrew Albertson

Page 10

General Corporate
Matter number 38608-00600

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 09/03/21 | Hector Velez | Correspond with investors on data room access and questions regarding investments; prepare closing documents; draft summary capitalization slide; send financing documents for signature. | 4.7 | 3,219.50 |
| 09/05/21 | Joseph B. Doll | Edit Series B-1 financing documents, address due diligence questions, and related correspondence. | 1.7 | 1,275.00 |
| 09/05/21 | David L. Forst | Review information statement regarding Project Main. | 0.5 | 762.50 |
| 09/05/21 | Hector Velez | Draft option grant agreements. | 3.5 | 2,397.50 |
| 09/06/21 | Whitney Anne Bishop | Prepare option award agreements for WRS; prepare documents forming subsidiaries. | 1.5 | 607.50 |
| 09/06/21 | Joseph B. Doll | Edit Series B-1 financing documents, address due diligence questions, and related correspondence. | 2.2 | 1,650.00 |
| 09/06/21 | Hector Velez | Revise option grant agreements. | 4.5 | 3,082.50 |
| 09/06/21 | Igor Voloshin | Miscellaneous regulatory items: Chartwell report; updated risk assessment; updates to AML policy; response to FinCEN audit. | 3.1 | 2,666.00 |
| 09/07/21 | Whitney Anne Bishop | Review and respond to email communication regarding WRS records; continue preparation of subsidiary documents. | 2.2 | 891.00 |
| 09/07/21 | Hector Velez | Correspond with investors on data room access and questions regarding investments; update side letters signature tracker; send common stock purchase agreement for signature. | 3.2 | 2,192.00 |

Armanino-FTX-003776
SDNY_03_00056086

**A-355**

West Realm Shires Services Inc.  
Client Number: 38608  

Invoice Date:  October 19, 2021  
Invoice Number:  877666  
Billing Attorney:  Andrew Albertson  

Page 15

---

General Corporate  
Matter number 38608-00600

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|-------|------|--------|
| David L. Forst | Partner | 0.5 | 1525.00 | 762.50 |
| Joseph B. Doll | Associate | 9.8 | 750.00 | 7,350.00 |
| Andrea King-Lock Louie | Associate | 0.5 | 685.00 | 342.50 |
| Sean McElroy | Associate | 1.3 | 815.00 | 1,059.50 |
| Hector Velez | Associate | 64.6 | 685.00 | 44,251.00 |
| Igor Voloshin | Associate | 13.1 | 860.00 | 11,266.00 |
| Jacob Wittman | Associate | 0.4 | 750.00 | 300.00 |
| Whitney Anne Bishop | Paralegal | 9.1 | 405.00 | 3,685.50 |
| Katherine Schuler | Paralegal | 0.5 | 235.00 | 117.50 |
| Katie Wagner | Paralegal | 0.4 | 355.00 | 142.00 |
| Ellen Welichko | Paralegal | 0.3 | 480.00 | 144.00 |
| Total | | 100.5 | | $ 69,420.50 |

### Disbursement Summary

| Date | Description | Total |
|------|-------------|-------|
| 09/30/21 | Voice & Data Communications | 2,082.61 |
| | Total Disbursements | $ 2,082.61 |

Armanino-FTX-003781
SDNY_03_00056091

**A-356**

# Attachment 23

**A-357**

|  | Silicon Valley Center |
| --- | --- |
| **Fenwick**<br>**FENWICK & WEST LLP.** | 801 California Street<br>Mountain View, CA 94041<br>Tel  650.988.8500<br>Fax  650.938.5200 |

| | | |
| --- | --- | --- |
| Alameda Research LLC | Invoice Date: | May 12, 2020 |
| 2000 Center Street, Suite 400 | | |
| Berkeley,  CA  94704 | Client Number: | 34394 |
| | Invoice Number: | 802382 |

Attn:    Sam Bankman-Fried

**(Invoice Emailed)**

---

For professional services rendered through April 30, 2020.

| | |
| --- | --- |
| Fees: | $ 96,355.50 |
| Disbursements: | 2,778.67 |
| | ———————— |
| CURRENT AMOUNT DUE | $ 99,134.17 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_000314022
SDNY_03_00208108

**A-358**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | May 12, 2020 |
| Client Number: 34394 | Invoice Number: | 802382 |
| | Billing Attorney: | Andrew Albertson |
| Page 2 | | |

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 04/01/20 | Sean McElroy | Draft loan agreement; revise intercompany agreements; research on mark to market issue; draft internal email regarding same. | 1.4 | 1,036.00 |
| 04/01/20 | Igor Voloshin | MTL Project; call Washington DFI for update on Phase I; draft regulatory notices to Colorado, Indian, Kentucky, Maryland. | 1.8 | 1,179.00 |
| 04/02/20 | Andrew Albertson | Standing tax/update call and follow-up. | 0.8 | 768.00 |
| 04/02/20 | David L. Forst | Review emails and research from Mr. McElroy regarding investments, tokenization and various other tax issues; discussion with Mr. McElroy regarding same; conference call with Mr. Bankman, Mr. Friedberg, Mr. McElroy et al regarding same; discussion with Ms. Eades and Mr. McElroy regarding CARES issues; review email from Ms. Eades regarding same. | 2.8 | 4,060.00 |
| 04/02/20 | Sean McElroy | Confer with D. Forst regarding tax issues; confer with D. Friedberg et al. regarding tax issues; research partnership tax issues; draft intercompany loan agreement and intercompany tokenization exhibit; confer with D. Forst and C. Eades regarding CARES Act issue; review CARES Act. | 3.8 | 2,812.00 |
| 04/02/20 | Igor Voloshin | MTL Project: call with WRS team on Phase I; NMLS & Fieldprint. Update Phase I docs. | 2.0 | 1,310.00 |

FTX_000314024
SDNY_03_00208110

# A-359

Alameda Research LLC
Client Number: 34394

| | | |
|---|---|---|
| Invoice Date: | May 12, 2020 |
| Invoice Number: | 802382 |
| Billing Attorney: | Andrew Albertson |

Page 3

General Corporate
Matter number 34394-00600

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 04/03/20 | David L. Forst | Follow up review on tokenization. | 0.5 | 725.00 |
| 04/03/20 | Igor Voloshin | Misc. corporate reorganization matters. | 1.4 | 917.00 |
| 04/06/20 | Andrew Albertson | Review omnibus consent, charter and existing governance agreementss; aanalyze stock split in context; confer regarding EIP and open ancillary transaction agreements. | 1.5 | 1,440.00 |
| 04/06/20 | Sean McElroy | Internal email; revise intercompany agreement. | 0.4 | 296.00 |
| 04/06/20 | Can Sun | Research seed round docs. | 0.2 | 172.00 |
| 04/06/20 | Jacob Wittman | Attend to record keeping matters. | 0.5 | 327.50 |
| 04/07/20 | Andrew Albertson | Review omnibus consent and model; call regarding consents and EIP; confer regarding documents and process. | 1.1 | 1,056.00 |
| 04/07/20 | David L. Forst | Review and comment on intercompany agreement; discussion with Mr. McElroy; email from Ms. Eades. | 1.1 | 1,595.00 |
| 04/07/20 | Sean McElroy | Confer with D. Forst regarding intercompany agreements and related tax issues; draft internal emails regarding same; draft email to A. Sarin regarding same; research on partnership tax issue. | 0.8 | 592.00 |
| 04/07/20 | Chad Richman | Emails with D.Friedberg regarding FTT employee grants. | 0.4 | 290.00 |
| 04/07/20 | Jacob Wittman | Call with client; attend to records; draft consents. | 2.7 | 1,768.50 |

**A-360**

| | | |
|---|---|---|
| Alameda Research LLC | Invoice Date: | May 12, 2020 |
| Client Number: 34394 | Invoice Number: | 802382 |
| | Billing Attorney: | Andrew Albertson |
| Page 10 | | |

General Corporate
Matter number 34394-00600

### Timekeeper Summary

| Name | Title | Hours | Rate | Amount |
|------|-------|------:|-----:|-------:|
| Andrew Albertson | Partner | 8.5 | 960.00 | 8,160.00 |
| Michael Dicke | Partner | 0.6 | 1110.00 | 666.00 |
| David L. Forst | Partner | 19.0 | 1450.00 | 27,550.00 |
| Sean McElroy | Associate | 28.4 | 740.00 | 21,016.00 |
| Chad Richman | Associate | 9.0 | 725.00 | 6,525.00 |
| Can Sun | Associate | 1.7 | 860.00 | 1,462.00 |
| Igor Voloshin | Associate | 13.9 | 655.00 | 9,104.50 |
| Jacob Wittman | Associate | 7.1 | 655.00 | 4,650.50 |
| Jennifer R. Wu | Associate | 0.4 | 485.00 | 194.00 |
| Total | | 88.6 | | $ 79,328.00 |

### Disbursement Summary

| Date | Description | Total |
|------|-------------|------:|
| 04/06/20 | Cancellation of: Obtain Certificate of Good Standing from Delaware. - VENDOR: GKL Register Agents Inc./TIN 81-2236321 | -112.00 |
| 04/30/20 | Voice & Data Communications | 2,379.84 |
| | Total Disbursements | $ 2,267.84 |

CONFIDENTIAL TREATMENT REQUESTED BY FTX

**A-361**

1

N6FDBANO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                         22 Cr. 673 (LAK)

5  SAMUEL BANKMAN-FRIED,

6              Defendant.                 Conference
   ------------------------------x

7
                                          New York, N.Y.
8                                         June 15, 2023
                                          10:30 a.m.
9

10  Before:

11                  HON. LEWIS A. KAPLAN,

12                                        District Judge

13
                             APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  NICOLAS ROOS, ESQ.
         DANIELLE R. SASSOON, ESQ.
17       DANIELLE M. KUDLA, ESQ.
         SAMUEL RAYMOND, ESQ.
18       NATHAN M. REHN, ESQ.
         JIL SIMON, ESQ.
19       Assistant United States Attorneys

20  COHEN & GRESSER, LLP
         Attorneys for Defendant
21  BY:  MARK S. COHEN, ESQ.
         CHRISTIAN R. EVERDELL, ESQ.
22       SRI KUEHNLENZ, ESQ.
         STEPHEN G. DICK, ESQ.

23

24

25

**A-362**

N6FDBANO

1          THE COURT:  Yes.  There will be no bill of

2     particulars.  That's denied.

3          So other than the FTX debtors being part of the

4     government team, that takes care of discovery, that and the

5     schedule discussions, yes?

6          Okay.  Everybody's nodding affirmatively.

7          So let's get to that argument.  Is that you,

8     Mr. Cohen?

9          MR. COHEN:  Yes, your Honor.

10         THE COURT:  Let's try and do it in the next 5, 10

11    minutes.

12         MR. COHEN:  Yes.  I'll be brief, your Honor.

13         So there's no dispute that the government is under an

14    order from this Court to produce *Brady* material that is known

15    to the government promptly in realtime.  As your Honor pointed

16    out in *Blaszczak*, that's a variance from the prior practice of

17    how *Brady* was evaluated, which was retrospective.

18         There's no question the government --

19         THE COURT:  I'm not sure I agree with that

20    characterization, but go ahead.

21         MR. COHEN:  Okay.  I may be shorthanding too much in

22    the interest of time, your Honor.

23         But moving on, the question is whether or not the

24    debtors have become part of the prosecution team, and I

25    couldn't really tell in the government's papers whether they're

**A-363**

57

N6FDBANO

1    taking the position that a third-party could never become a

2    part of the prosecution team, or they're position is less than

3    that.  We think it's clear under the *Martha Stewart* case,

4    *Blaszczak* from your Honor, and other cases in this circuit that

5    there is no per se test, that what Courts do is they look at

6    various factors to make a determination whether, in the

7    specific case before it, there is a basis for the finding.

8         And we submit, and as we laid out in our papers, when

9    you look at those factors, they're all present here.  The

10   government has, or the FTX debtors have controlled the

11   documents, they have reviewed documents in what they describe

12   as a circular effort with the government.  They've acted --

13   gone back and forth in terms of gathering facts.  We laid out

14   in our paper a very significant sequence with respect to the

15   charge of unlicensed money transmitter, in which the government

16   sent an email to the debtors and said, this is one of our top

17   priorities; we'd like you to gather everything on this; and

18   their response was, there are 6,000 documents we have to go

19   through them, and we'll make a presentation to you.  That's how

20   you would talk to someone who is on your team.

21        It doesn't matter whether the government leads the

22   team or not.  I think there's something to that effect in the

23   papers which I think misses the point.  It's whether they were

24   a part of the team.  And they then, at the end of this

25   sequence, the debtors waived privilege, and they said, we're

58

N6FDBANO

1    waiving it to assist in the investigation or its investigation.

2    So that's under the *Stewart*, *Blaszczak* factors, another

3    example.

4         The government has interviewed -- excuse me, the

5    debtors have interviewed witnesses, but, more importantly, for

6    purposes of this analysis, they've done readouts of those

7    interviews to the government attorneys.  Now, the government in

8    its papers says, well, they didn't give us any memorandum.

9    They just gave us readouts.  But, you know, they're reading --

10        THE COURT:  Who selected the people they interviewed

11   for whom readouts were given?

12        MR. COHEN:  As I understand it, the government

13   selected who they give the readouts to.

14        THE COURT:  My question is who decided to interview

15   those people.

16        MR. COHEN:  I don't know that, your Honor, but at

17   least the submission of the government said who did that -- who

18   made the decision of who they would interview.  In addition,

19   your Honor, they have -- the record reflects, and, again, we're

20   only getting bits and pieces of this from the bills filed in

21   the bankruptcy proceeding from certain materials that have been

22   produced to us in discovery.  That's why we're making this

23   application.  But it indicates that the government -- the

24   debtors have assisted the government in drawing conclusions

25   about how facts and materials relate to each other, such as the

59

N6FDBANO

1    allegation relating to the $45 million hole in the FTX U.S.

2    account.

3          So when you put all this together, we submit, your

4    Honor, it shows that for these facts, in this case, and we're

5    not advocating this as a uniform rule applicable in all cases,

6    given how involved this debtor was, spending 90 percent of its

7    time in the -- from the beginning of the case working with the

8    government, countless hours of its own and attorneys' time,

9    there's a basis to make the finding.  And the other thing we

10   wanted to stress to your Honor is --

11         THE COURT:  It's in the debtors' interest, is it not,

12   to further the prosecution for its own purposes?

13         MR. COHEN:  Well, the debtor has its own purposes, and

14   that's, in fact, your Honor, part of our argument.  They're a

15   third-party here that doesn't have a *Brady* obligation.  And to

16   the extent they've become involved with and enmeshed within

17   part of the team, that's being kept from the defense.  And I

18   think the best -- not the best, but one of the examples that is

19   most relevant, because there were letters about it today, and

20   your Honor just touched on it, was the codebase history.

21         THE COURT:  The what?

22         MR. COHEN:  The codebase history.  I'm sorry, your

23   Honor.  The codebase history.

24         Let me give the significance, your Honor, and the

25   sequence, and I think this ties right into the motion.  The

N6FDBANO

1   significance is, as I understand it, and I'm learning like your

2   Honor a lot about technology in this case, but the codebase

3   history reflects who worked on the code, what drafts there were

4   of the code, what edits were made to the code, who made them,

5   what comments were made when the edits were made, who had

6   access to and read those comments, and who didn't.

7           And given the allegations about Mr. Bankman-Fried

8   causing or directing an adjustment to the code in a nefarious

9   way, it's obviously highly relevant that this evidence may well

10  show or may tend to show that there are alternative

11  explanations for these edits and adjustments, that others,

12  including the cooperating witnesses, were aware of, and that

13  Mr. Bankman-Fried did not access.  This is all incredibly

14  relevant.

15          So here is the sequence, your Honor.  We asked the

16  government for it in our Rule 16 *Brady* letter.  They said to

17  us, no, you can't have it, because they're not -- FTX is not

18  part of the prosecution team.  We went to FTX, the debtor, and

19  asked them informally for it.  They said, no, you can't have

20  it.  We're here before your Honor, and I'm sure the next step

21  would be -- well, the next step would be if we filed a motion

22  like we did, like I'm sure your Honor's going to deal with on

23  the other issue, there would be an opposition to the motion on

24  Rule 16, Rule 17.  And all we've gotten is a statement in

25  today's letter, well, we'll ask them about it.

N6FDBANO

1          That's far different than an order from your Honor

2     saying, here's a schedule, you have to -- you have to ask them

3     about it, you have to ask them to provide it, you have to

4     provide it by X date, because otherwise, your Honor, we're

5     faced with a situation where they are, quote, asked about it;

6     they consider it for a month; they get back; they say they

7     can't do it, so on and so forth, and the clock has run out on

8     it us.  And this is potentially very important information that

9     would tend to exculpate our client.

10          So in the interest of time --

11          THE COURT:  Or inculpate him.

12          MR. COHEN:  Also possible.  Also possible.

13          And we took that into account in making this request,

14    your Honor, although I have a feeling if the government thought

15    it would inculpate my client, they would have the codebase

16    already.  But so in the interest of time, you know, I think

17    that's the gist of the argument, your Honor.

18          THE COURT:  Okay.  I'll hear from the government.

19          MS. SASSOON:  Just a few points, your Honor.

20          I'll start where Mr. Cohen ended.  The case law is

21    clear that the power to act on behalf of the government to

22    collect documents is not equivalent to a duty to act, and here

23    the government does not have a duty to review the entirety of

24    the materials in the possession of the FTX debtors, because

25    they're not part of the prosecution team.

**A-368**

62

N6FDBANO

1          I want to respond to a few things that Mr.  --

2          THE COURT:  Let me just get clear about one thing.

3     The FTX debtors are a group of a number of different entities,

4     right?

5          MS. SASSOON:  Yes, and they're all represented by

6     Sullivan & Cromwell.

7          THE COURT:  Where are they located?

8          MS. SASSOON:  The debtors?

9          THE COURT:  The debtors.  Are they in the United

10    States?

11         MS. SASSOON:  Some of the entities are in the United

12    States.

13         THE COURT:  Where are the others?  How many -- what's

14    the breakdown, U.S. versus foreign?

15         MS. SASSOON:  I don't have it at my fingertips.  It's

16    dozens of entities, your Honor, including foreign.

17         THE COURT:  Mostly U.S. or mostly foreign?

18         MS. SASSOON:  Mostly foreign.

19         THE COURT:  Go ahead.

20         MS. SASSOON:  So a few additional things.  5(f) in the

21    government's view does not change our constitutional

22    obligations with respect to *Brady* or our obligations under Rule

23    16.  This case does not require the Court to consider whether a

24    third-party can ever be part of the prosecution team, because

25    this is not a case that's far afield of the heartland of cases

**A-369**

N6FDBANO

1  in this district that have found that cooperating third parties

2  are not part of the prosecution team, and their materials are

3  not in the possession of the government.

4       Mr. Cohen said that all the factors that Courts

5  consider in deciding whether a third-party is part of the team

6  or present here, that just can't be squared with the facts

7  here.  Whereas the government has laid out, the debtors did not

8  participate in any of the investigative duties of the

9  government, did not participate in any strategic decision

10  making, had no role in pursuing charges against the people

11  being prosecuted here, had no role in the defendant's arrest,

12  did not attend a single witness interview.

13       In *Blaszczak*, which Mr. Cohen referenced, your Honor

14  found that the SEC was not part of the prosecution team even

15  though the SEC had participated in interviews with the

16  government and more materials had been shared between the

17  parties.  Here, the government has not shared any 6(e) material

18  with the debtors, they have not reviewed documents the

19  government has collected in its case, other than for purposes

20  of assessing privilege, and this case is just not different

21  from the many cases we've cited where a third-party cooperator

22  was not considered part of the prosecution.

23       As your Honor -- in response to your Honor's question

24  about who selected the interviewees for the FTX debtor

25  interviews, that was FTX.  After learning about who the debtors

**A-370**

N6FDBANO

1    interviewed, the government requested readouts related to some

2    of those interviews, which were conducted for the debtors' own

3    purposes.  And as your Honor noted, it is true that the debtor

4    has its own interests here in being cooperative and

5    investigating the fraud, and that is precisely why it would be

6    untenable to deem them part of the prosecution team.

7            In their reply brief, the defendants made light of the

8    scope of their request, which is not limited to the codebase.

9    It's a request that the government review all of the FTX files

10   for discoverable information, which necessarily would involve

11   millions of pages of document, and terabytes of data.  And they

12   claim that this burden on the government, quote, warrants no

13   consideration.  But, thankfully, the Second Circuit and Courts

14   in this district have been less sanguine about this, and

15   they've recognized, including the Second Circuit in *Avelino*,

16   that imposing that type of duty on prosecutors would result in

17   a state of paralysis in prosecutions, and would be untenable.

18   And we think that that's true here.

19           Unless your Honor has questions about the

20   circumstances of the debtors' cooperation that I can address,

21   or any other questions, we'll rest on our submission.

22           THE COURT:  Thank you.

23           Anything else, Mr. Cohen?

24           MR. COHEN:  Just briefly, your Honor.

25           One point I meant to mention in my initial comments on

65

N6FDBANO

1     this is how extraordinary this is, your Honor.  This is far

2     beyond what we typically see in a cooperation situation.

3             We have an entity that is not a target of an

4     investigation; as far as we know, has no other reason to do it;

5     that has been from literally day one involved with the

6     government in making presentations, controlling the documents.

7     Usually the government takes control of the documents.  It's

8     really extraordinary.  Waiving privilege when there is no

9     requirement that it do so.  Turning over the contents of

10    interview memos when there is no requirement to do so.

11            And on these facts, given the level -- the level at

12    which the debtor, by its own admission and public statements

13    that we cited to your Honor, has been enmeshed with the

14    government, what I keep asking myself is if the debtor hadn't

15    done these things, someone on the government team would have

16    done them, would have reviewed the unlicensed money transmitter

17    documents, work through the issues about whether there's a

18    potential charge there or not, work through the issue of the

19    $45 million hole.

20            Now, the government can say, we did that anyway.

21    Okay.  I understand that.  But somebody would have done that,

22    and somebody did do that, and that was the debtor.  So if we

23    look at, as the *Martha Stewart* case says, we look at what

24    people do rather than their status, on these facts, certainly

25    from the sequence from December to now, there's a basis for the

N6FDBANO

1   finding.  There's certainly a basis for the Court to order that

2   specific *Brady* request from the defense be considered, that the

3   government have the debtors respond to and consider specific

4   *Brady* requests from the defendant, like the one I mentioned

5   about the codebase history, and some of the others that are in

6   our papers.

7          THE COURT:  I understood that they have made that

8   request.

9          MR. COHEN:  Well, again, it's a far different thing to

10  make the request without the force of an order from your Honor

11  behind it, and a schedule.

12         THE COURT:  I request the Bureau of Prisons to do

13  things all the time.  There's an old Yiddish expression, *gar*

14  *nicht helfen*, which means "it doesn't help at all."

15         MR. COHEN:  Well, I can think of the comeback, but I'm

16  not going to say it here.

17         THE COURT:  Okay.  My father's long lost knowledge of

18  some Yiddish.

19         MR. COHEN:  Right.  So, and then I won't invoke the

20  *rachmones* doctrine here, your Honor.

21         THE COURT:  Right.

22         MR. COHEN:  But, yes, I think your Honor has the

23  argument.

24         THE COURT:  You're going to very much enjoy the court

25  reporter's transliteration of our discussion.

**A-373**

67

N6FDBANO

1          MR. COHEN:  We'll get ChatGPT to do that, your Honor.

2          THE COURT:  Yes.  Fine.  I will probably -- probably,

3     I don't promise, write something brief about this, but

4     substantially for the reasons that the government has advanced,

5     insofar as the motion is to require the government to review

6     the files of the FTX debtors, it's denied.  The bill of

7     particulars is denied.

8          The part of the motion that seeks immediate production

9     of *Brady* and *Giglio* material is denied without prejudice to

10     renewal in the event that's necessary after the parties work

11     out a schedule that is mutually acceptable to them and to me.

12     The same is true for the part of the motion seeking immediate

13     production of the Jencks Act material, and the witness list,

14     with the same qualification.  The same is also true of the

15     404(b) evidence disclosure part of the motion.

16          I think, then, that takes care of it for this morning,

17     yes?

18          MR. COHEN:  (Nodding)

19          THE COURT:  I really do appreciate counsels'

20     succinctness and responsiveness.  You wrote great papers.  You

21     made good, targeted arguments.  Now it's my turn.

22          Thank you.

23          (Adjourned)

24

25

**A-374**

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 29, 2023

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:    *United States v. Samuel Bankman-Fried*, S5 22 Cr. 673 (LAK)

Dear Judge Kaplan:

    The Government writes regarding a proposed schedule for pretrial filings. At the conference on June 15, 2023, the Government proposed a schedule for filings and disclosure of materials in advance of trial, which it had previously proposed to the defense. The Court indicated at the time that the deadlines for the filing of motions *in limine*, proposed jury instructions, and *Daubert* motions should be shifted earlier. Additionally, since the conference, the Government has conferred with the defense regarding a schedule for the reciprocal disclosure of Government and defense exhibits and witness statements, but the parties have been unable to reach an agreement. Accordingly, the Government proposes the following schedule for filings and disclosures:

| | |
|---|---|
| August 14, 2023: | The Government provides notice to the defendant of evidence it may seek to offer pursuant to Federal Rule of Evidence 404(b). |
| | The parties provide notice to each other, consistent with the requirements of Federal Rule of Criminal Procedure 16, of experts potentially to be called, if any, during the Government's case-in-chief and the defendant's case. |
| | The defendant provides notice to the Government, consistent with the requirements of Federal Rule of Criminal Procedure 12.2 and 16, of his intention to present an advice of counsel defense or a defense based on mental condition or defect. |
| August 21, 2023: | The parties provide notice to each other, consistent with the requirements of Rule 16, of rebuttal experts, if any, to be called during the defendant's case or during the Government's rebuttal case. |
| | The parties file motions *in limine* and proposed jury instructions. |

**A-375**

Page 2

| | |
|---|---|
| August 28, 2023: | The parties file *Daubert* motions, if any. |
| September 1, 2023: | The parties file oppositions to motions *in limine*. |
| September 8, 2023: | The Government provides to the defendant material covered by 18 U.S.C. § 3500, including material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), other witness materials, and a list of witnesses whom the Government reasonably expects to call in its case-in-chief. The Government would continue to provide witness materials as they are generated on a rolling basis. |
| | The Government provides to the defendant a list of exhibits the Government reasonably expects to seek to introduce during its case-in-chief. This exhibit list will be subject to good-faith revision as the Government continues to prepare its case for trial, including in response to the defense's list of proposed exhibits that it anticipates seeking to introduce into evidence during the Government's case-in-chief. |
| September 11, 2023: | The parties file oppositions to any *Daubert* motions. |
| | The parties file proposed questions for the examination of prospective jurors. |
| September 18, 2023: | Defense counsel provides to the Government a list of exhibits that the defendant reasonably expects to introduce during the Government's case-in-chief or the defendant's case. This exhibit list will be subject to good-faith revision as the defense continues to prepare for its case. |
| | The defendant produces material covered by Federal Rule of Criminal Procedure 16. |
| | Defense counsel provides to the Government material covered by Federal Rule of Criminal Procedure 26.2 and a list of witnesses whom the defendant reasonably expects to call in his case. |

At the Court's suggestion, this proposed schedule shifts the deadline for filings motions *in limine* two weeks earlier, such that they will be due six weeks in advance of trial; it shifts the deadline for proposed jury instructions three weeks earlier, such that they will be due six weeks in advance of trial; and it shifts the deadlines for expert disclosures and *Daubert* motions earlier such that *Daubert* motions will be due five weeks in advance of trial.

Based on recent discussions with defense counsel, the Government understands that the defense prefers to have the Government's witness materials eight weeks before trial and its exhibits seven weeks before trial.  At the same time, the defense has rejected the Government's proposed deadline for the defendant's witness list, exhibit list, and Rule 26.2 material, suggesting instead that those materials be provided after the close of the Government's case. While the Jencks Act does not require the production of witness materials prior to a witness's testimony, the Government will agree to produce such materials several weeks in advance of trial to ensure the trial moves

# A-376

Page 3

efficiently, provided the defendant acts reciprocally in making an advanced disclosure of 26.2 materials. The proposed reciprocal disclosure schedule, which fixes the defendant's due date two weeks after the Government's, will ensure the efficient administration of trial and fairness for both sides.

With respect to exhibit lists, consistent with Rule 16(b), courts in this District regularly require disclosure of defense exhibits in advance of trial, including over a defendant's objection. *See, e.g.*, *United States v. Shah*, No. 19 Cr. 833 (SHS), Doc. 583, at 7-8 (S.D.N.Y. July 5, 2022) (11 days before trial over objection); *United States v. Melzer*, No. 20 Cr. 314 (GHW), Doc. 131 (S.D.N.Y. Jun. 16, 2022) (11 days before trial over objection); *United States v. Liu*, No. 19 Cr. 804 (VEC), Doc. 177 (S.D.N.Y. Feb. 28, 2022) (12 days before trial over objection); *United States v. Gillier*, No. 11 Cr. 409 (PAE), Doc. 75 (S.D.N.Y. Feb. 1, 2022) (approximately three weeks before trial); *United States v. Avenatti*, No. 19 Cr. 374 (JMF), Doc. 213 (S.D.N.Y. Jan. 7, 2022) (approximately two weeks before trial over objection); *United States v. Shea*, No. 20 Cr. 412 (AT), Doc. 206 (S.D.N.Y. May 4, 2022) (14 days before trial over objection). The term "case in chief" in Rule 16(b) "has been interpreted to encompass 'all non-impeachment exhibits [defendants] intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a defendant.'" *Melzer*, No. 20 Cr. 314 (GHW), Doc. 150, at 13 (quoting *United States v. Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017)). "Nearly every court to consider the issue has concluded the same." *United States v. Crowder*, 325 F. Supp. 3d 131, 136 (D.D.C. 2018) (collecting cases). Therefore, Rule 16 requires that the defendant produce any exhibits he wishes to use in his own case in chief or on cross-examination (except for impeachment) in advance of trial.

For the foregoing reasons, the Government respectfully requests that the Court order the schedule for filings and disclosures set forth above.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:  /s/ Nicolas Roos
Nicolas Roos
Danielle R. Sassoon
Samuel Raymond
Thane Rehn
Danielle Kudla
Assistant United States Attorneys
(212) 637-2421

Cc:    Defense Counsel (by ECF)

# A-377

1

N7QKBANC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    v.                    22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6                                          Conference

            Defendant.
7
    ------------------------------x
8
                                           New York, N.Y.
9                                          July 26, 2023
                                           2:15 p.m.
10

11  Before:

12                      HON. LEWIS A. KAPLAN,

13                                         District Judge

14                          APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    DANIELLE SASSOON
17  NICOLAS ROOS
    SAMUEL RAYMOND
18  THANE REHN
    DANIELLE KUDLA
19       Assistant United States Attorneys

20  COHEN & GRESSER LLP
         Attorneys for Defendant
21  BY:  MARK STEWART COHEN
         CHRISTIAN R. EVERDELL
22
    SULLIVAN & CROMWELL, LLP
23       Attorneys for FTX Debtors
    BY:  NICOLE FRIEDLANDER
24
    ALSO PRESENT:  KRISTIN ALLAIN, FBI Special Agent
25                 JOSH ROTHMAN, Pretrial Services Officer

**A-378**

2

N7QKBANC

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Government, are you ready?

 3              MS. SASSOON:  Yes.

 4              Good afternoon, your Honor.  Danielle Sassoon, for the

 5   United States, and I am joined by my colleagues, Nicolas Roos,

 6   Sam Raymond, Thane Rehn, and Danielle Kudla.  We are also

 7   joined at counsel's table by Kristin Allain, a special agent

 8   with the FBI.

 9              THE COURT:  Good afternoon, all.

10              THE DEPUTY CLERK:  Please be seated.

11              Defendant, are you ready?

12              MR. COHEN:  Yes.

13              Your Honor, good afternoon.  Mark Cohen,

14   Cohen & Gresser, for the defendant.

15              THE COURT:  Mr. Cohen.

16              MR. EVERDELL:  Good afternoon, your Honor.  Christian

17   Everdell, for the defendant.

18              THE COURT:  Mr. Everdell.

19              Okay.  Ms. Sassoon, your dime.

20              MS. SASSOON:  Your Honor, as you know, we submitted a

21   proposed order to govern extrajudicial statements in this case,

22   and today, we are seeking the detention of the defendant.

23              THE COURT:  Okay.

24              MS. SASSOON:  The record here, going back to the first

25   instance of attempted witness tampering with the FTX U.S.
```

**A-379**

1

N8B8BANA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6                                         Conference
                 Defendant.
7   ------------------------------x

8                                         New York, N.Y.
9                                         August 11, 2023
                                          2:00 p.m.
10

11  Before:

12                  HON. LEWIS A. KAPLAN,

13                                        District Judge

14                      APPEARANCES

15  DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
    DANIELLE SASSOON
17  NICOLAS ROOS
    SAMUEL RAYMOND
18  THANE REHN
    DANIELLE KUDLA
19      Assistant United States Attorneys

20  COHEN & GRESSER LLP
        Attorneys for Defendant
21  BY:  MARK STEWART COHEN
         CHRISTIAN R. EVERDELL
22

23  ALSO PRESENT:  KRISTIN ALLAIN, FBI Special Agent
                    JOHN MOSCATO, Pretrial Services Officer
24

25

**A-380**

39

N8B8BANA

1    significant part of the previous order, would prohibit him, if

2    I were to adopt this long-term, from communicating with any

3    public communications media anything about the case.  In this

4    day and age, I don't know what public communications media are,

5    and I don't think anybody else does either.  Is that anybody

6    who posts on Instagram?  How about people who comment on the

7    Washington Post opinion pieces?  It's arguably anybody who

8    wants to be included.  Moreover, judging by the submissions I

9    have received from the media, even if I were to go along with

10   this despite the problems, I'd rather imagine we would be in

11   for collateral litigation of some moment.  I don't think that

12   it's a workable solution longer term, particularly with someone

13   who has shown a willingness and desire to risk crossing the

14   line in an effort to get right up to it, no matter where the

15   line is.

16            It's certainly true, for example, that his use of the

17   VPN to watch a football game over an account on which he wasn't

18   entitled to watch it from the United States didn't violate any

19   of his bail conditions.  It wasn't even a big deal in and of

20   itself, but there it is.  He subscribed to this service from

21   the Bahamas, then used a VPN to log into it as if he were in

22   the Bahamas, when he was sitting in Palo Alto and could have

23   watched the game on public television.  It says something about

24   the mindset.  The means of sharing the documents with the New

25   York Times says to me something about the mindset.  And I think

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SUPERSEDING INDICTMENT** |
| v. | S6 22 Cr. 673 (LAK) |
| SAMUEL BANKMAN-FRIED, a/k/a "SBF," | |
| Defendant. | |

### Overview

1.  From at least in or about 2019, up to and including in or about November 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, who founded and controlled the cryptocurrency exchange FTX.com ("FTX") and the quantitative cryptocurrency trading firm Alameda Research ("Alameda"), defrauded FTX customers, FTX investors, and lenders to Alameda.  Exploiting the trust of FTX customers, BANKMAN-FRIED misappropriated and embezzled FTX customer deposits, and used billions of dollars in stolen funds for a variety of purposes, including, among other things, to enrich himself; to support the operations of FTX; to fund speculative venture investments; to help fund over a hundred million dollars in campaign contributions to Democrats and Republicans to seek to influence cryptocurrency regulation; and to pay for Alameda's operating costs.  BANKMAN-FRIED also made, and conspired with others to make, false and fraudulent statements and representations to FTX's investors and Alameda's lenders, including by providing false financial information to those investors and lenders.

2.  In or about early November 2022, after SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had embezzled and used billions of dollars in customer deposits, a substantial number of FTX customers began seeking to withdraw their funds from FTX.

BANKMAN-FRIED falsely reassured FTX customers about the safety of their funds in order to slow their withdrawals and retain their money, and conspired to and did make false statements to Alameda's lenders to prevent them from recalling millions of dollars in loans that Alameda owed.

### BANKMAN-FRIED's Fraud on FTX's Customers and Money Laundering

3.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, represented himself as the figurehead of a trustworthy and law-abiding segment of the cryptocurrency industry that was focused not only on profits, but also on investor and client protection.  Likewise, in public statements, including in testimony before the United States Senate, BANKMAN-FRIED represented that FTX had a focus on "consumer protection," that FTX had adopted "principles for ensuring investor protections on digital asset-platforms," including "avoiding or managing conflicts of interest," and that "as a general principle FTX segregates customer assets from its own assets across our platforms."  BANKMAN-FRIED further burnished his image by spending millions of dollars to promote FTX, and its sister company FTX.US, as safe places to invest in cryptocurrency, through celebrity endorsement deals, television advertisements, and other high-profile promotions.

4.     Despite the representations that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, made and caused to be made, FTX was not focused on investor or client protection, nor was it the legitimate business that BANKMAN-FRIED claimed.  Contrary to BANKMAN-FRIED's promises to FTX customers that the exchange would protect their interests and segregate their assets, BANKMAN-FRIED routinely misappropriated, commingled, and embezzled FTX customer deposits to use for his and Alameda's private spending.

5.     As part of this scheme, to promote the interests of FTX and Alameda and to lobby for favorable government regulation, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant,

2

used stolen customer funds in part to make campaign contributions, and made the contributions in the names of straw donors to conceal the source of the funds. As recently as late 2022, BANKMAN-FRIED boasted about FTX's profits and portrayed himself as a savior of the cryptocurrency industry, making venture investments and acquisitions purportedly to assist struggling industry participants, and making lavish federal campaign contributions and lobbying members of Congress and other high-level government officials to promote cryptocurrency regulation that would favor his business and personal interests. In fact, as BANKMAN-FRIED well knew, FTX's finances contained a multi-billion-dollar deficiency caused by his own misappropriation of customer funds from the exchange, and yet he continued through FTX's collapse in November 2022 to use misappropriated customer funds to pay for his investments, acquisitions, and campaign contributions.

6. SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and, at his direction, others working at Alameda, misappropriated FTX customer funds through two primary means. First, at BANKMAN-FRIED's direction, FTX told customers to deposit funds into bank accounts controlled by Alameda. Alameda regularly took customer funds from those bank accounts, transferred the funds to other bank accounts under Alameda's control, and used or spent the funds. As a result of the spending of customers' deposits, FTX and Alameda had a multi-billion-dollar deficit of customer funds. Second, BANKMAN-FRIED and others secretly introduced special features into FTX's computer code, which permitted Alameda to spend and withdraw unlimited amounts of money from FTX. While BANKMAN-FRIED publicly and repeatedly asserted that Alameda did not have privileged access to FTX, BANKMAN-FRIED directed his co-conspirator, Gary Wang, to alter FTX's computer code to allow Alameda to accrue a negative balance on FTX's exchange. That modification to FTX's code, along with others implemented at BANKMAN-

FRIED's direction, made Alameda's account unlike those of other customers, and gave Alameda improper preferential access to the detriment of FTX customers. While FTX typically would have automatically liquidated a client's account once its negative balance exceeded the amount of any posted collateral, net of fees, FTX permitted Alameda to maintain a negative balance, draw on a multi-billion-dollar line of credit, borrow funds from FTX without sufficient collateral, evade auto-liquidation, and withdraw funds from the exchange. Over time, BANKMAN-FRIED directed that Alameda's credit limit be raised so high that, in practice, Alameda was permitted to draw on FTX accounts funded by customer assets on an unlimited basis—in amounts that exceeded FTX revenue and tapped into customer funds.

7.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, used the billions of dollars in misappropriated FTX customer deposits to finance exorbitant spending unrelated to the operation of the FTX platform. Among other things, BANKMAN-FRIED used FTX customer funds to pay for his own personal expenses, real estate in The Bahamas, speculative venture investments, a wide-ranging political influence operation, and to repay Alameda's lenders.

8.     For instance, at the direction of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, FTX used customer funds to help purchase more than $200 million of real estate properties in The Bahamas. BANKMAN-FRIED also used FTX customer funds to make billions of dollars of investments for his own interest and the interests of his businesses. BANKMAN-FRIED took steps to conceal that these investments and expenditures were funded by transfers originating with Alameda, and therefore funded with FTX customer funds. For example, BANKMAN-FRIED directed Caroline Ellison, a longtime associate and co-conspirator in the fraudulent scheme, to change the name of Alameda entities that were funding venture capital investments by FTX so that it would not be apparent that the money was coming from Alameda.

4

Similarly, BANKMAN-FRIED personally borrowed more than $1 billion from Alameda and oversaw similar borrowing by other FTX executives, which was then principally used to make investments in the name of BANKMAN-FRIED and his associates, rather than in the name of Alameda. This conduct served to conceal the close connection to Alameda, as well as the criminal source of some of the funds.

9.      As noted above, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, also used misappropriated customer money to help fund over $100 million in political contributions in advance of the 2022 election. At BANKMAN-FRIED's direction, and to conceal the source of the funds used for the contributions, some of the political contributions were made in the names of FTX executives, including Nishad Singh. To conceal the fact that the Alameda account containing FTX customer deposits was a source of the donations, BANKMAN-FRIED directed that money from the Alameda account be wired to these executives' personal bank accounts, and that these executives then make donations in their own names. By directing donations through Singh and another FTX executive, BANKMAN-FRIED was able to evade restrictions on certain types of political contributions, and thereby maximize FTX's political influence. He leveraged this influence, in turn, to lobby Congress and regulatory agencies to support legislation and regulation he believed would make it easier for FTX to continue to accept customer deposits and grow, which would, in turn, allow the misappropriation scheme to continue. BANKMAN-FRIED also used these connections with politicians and government officials to falsely burnish the public image of FTX as a legitimate exchange.

10.      In or about June 2022, the cryptocurrency markets experienced a downturn. As a result of the market downturn, Alameda faced demands for repayment from multiple third-party cryptocurrency lenders on substantial outstanding loans. Alameda lacked the funds to repay these

5

lenders. Rather than allow Alameda to default on its loans, which would have jeopardized the survival of both Alameda and FTX, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, authorized Alameda to draw down billions of dollars in customer assets from FTX and to use those assets to repay Alameda's lenders. The billions of dollars that BANKMAN-FRIED caused Alameda to draw from FTX was funded with misappropriated customer assets and greatly exceeded FTX's revenue, liquid capital, and available funds under FTX's peer-to-peer lending program. BANKMAN-FRIED was able to divert billions of dollars in FTX customer funds to Alameda without being detected because of the features that he had directed be built into FTX's code and software in order to benefit Alameda. As he authorized the misappropriation of these funds, BANKMAN-FRIED falsely assured the public that FTX was a safe platform that properly maintained customer assets.

11. Even after SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had misappropriated billions of dollars of FTX customer funds to repay Alameda's lenders, BANKMAN-FRIED continued to cause even greater amounts of FTX customer money to be used for discretionary investments, charitable contributions, and political donations, including by directing that Alameda continue to draw on its line of credit on FTX.

### BANKMAN-FRIED's Fraud on FTX's Investors and Alameda's Lenders

12. SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, made materially false and fraudulent statements and representations to FTX's investors, in connection with sales of FTX stock to investors from 2019 through 2022. When raising capital from investors in FTX, BANKMAN-FRIED deceived those investors about the exchange's relationship with Alameda, and about the safety of the exchange more generally. He deliberately concealed the fact that he controlled FTX and Alameda, and that he used each entity to prop the other up, notwithstanding

6

conflicts of interests and outright lies to the contrary.  Additionally, in the course of audits of

FTX's financial statements, BANKMAN-FRIED and those acting at his direction misled auditors

and omitted material information about FTX customers, including Alameda, and about the

commingling of customer assets with Alameda funds, as well as Alameda's enormous line of credit

on the exchange.  As a result of those false statements and omissions to the auditors, FTX received

false and inaccurate audited financials, which were then used to falsely reassure investors that FTX

had proper risk management controls and systems for storing customer assets.

13.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, also conspired with

others to make and made false and fraudulent representations to Alameda's lenders in order to

prevent them from recalling loans and to obtain new loans.  Although BANKMAN-FRIED had

caused Alameda to repay lenders using FTX customer funds in the summer of 2022, Alameda still

had at least hundreds of millions of dollars in outstanding loans, and had to provide financial

information to its creditors to keep those loans.  BANKMAN-FRIED directed Ellison to devise a

way to mislead those creditors about the money Alameda had "borrowed" from FTX, as well as

about the substantial personal loans Alameda had made to FTX executives, and together,

BANKMAN-FRIED and Ellison provided false and misleading financial statements to creditors.

As a result of the false information, Alameda's lenders did not recall loans and issued new loans

to Alameda.

### BANKMAN-FRIED's Lies During FTX's Collapse

14.     In or about November 2022, as a result of negative news on the Internet, FTX

customers began withdrawing their funds from FTX.  In an effort to tamp down the concerns about

FTX and stop or slow withdrawals, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant,

posted a series of false and misleading tweets, including tweets representing that customer assets

7

were secure.  Ultimately, however, FTX ceased allowing customers to make withdrawals, leaving those customers with billions of dollars in losses, and Alameda did not repay hundreds of millions of dollars to its lenders.

15.    On November 11, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, resigned from FTX.  FTX and approximately one hundred affiliated entities, including Alameda, filed for Chapter 11 bankruptcy protection.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Wire Fraud on Customers of FTX)

The Grand Jury charges:

16.    The allegations contained in paragraphs 1 through 15 of this Indictment are repeated and realleged as if fully set forth herein.

17.    From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud customers of FTX by misappropriating those customers' deposits, and using those deposits to pay expenses and debts of Alameda to make investments, and for other purposes.

(Title 18, United States Code, Sections 1343 and 2.)

8

## COUNT TWO
### (Conspiracy to Commit Wire Fraud on Customers of FTX)

The Grand Jury further charges:

18.     The allegations contained in paragraphs 1 through 15 of this Indictment are repeated and realleged as if fully set forth herein.

19.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

20.     It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BANKMAN-FRIED agreed with others to defraud customers of FTX by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

(Title 18, United States Code, Section 1349.)

### COUNT THREE
#### (Wire Fraud on Lenders to Alameda Research)

The Grand Jury further charges:

21.     The allegations contained in paragraphs 1 through 15 of this Indictment are repeated and realleged as if fully set forth herein.

22.     From at least in or about June 2022, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud, including through the use of interstate wires, lenders to Alameda by providing false and misleading information to those lenders regarding Alameda's financial condition so that the lenders would not recall loans and would extend new loans.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT FOUR
#### (Conspiracy to Commit Wire Fraud on Lenders to Alameda Research)

The Grand Jury further charges:

23.     The allegations contained in paragraphs 1 through 15 of this Indictment are repeated and realleged as if fully set forth herein.

24.     From at least in or about June 2022, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a

"SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Sections 1343.

25.    It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BANKMAN-FRIED agreed with others to defraud, including through the use of interstate wires, lenders to Alameda by providing false and misleading information to those lenders regarding Alameda's financial condition so that the lenders would not recall loans and would extend new loans.

(Title 18, United States Code, Section 1349.)

### COUNT FIVE
**(Conspiracy to Commit Securities Fraud on Investors in FTX)**

The Grand Jury further charges:

26.    The allegations contained in paragraphs 1 through 15 of this Indictment are repeated and realleged as if fully set forth herein.

27.    From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and

11

Title 17, Code of Federal Regulations, Section 240.10b-5.

28.     It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, by the use of a means and instrumentality of interstate commerce, and of the mails and of a facility of a national securities exchange, use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, BANKMAN-FRIED agreed with others to engage in a scheme to defraud investors in FTX by providing false and misleading information to those investors regarding FTX's financial condition and the relationship between FTX and Alameda.

Overt Act

29.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, communicated with FTX investors in a manner that contained materially false information about FTX's financial condition.

(Title 18, United States Code, Section 371.)

## COUNT SIX
### (Conspiracy to Commit Commodities Fraud on Customers of FTX in Connection with Purchases and Sales of Cryptocurrency and Swaps)

The Grand Jury further charges:

30.     The allegations contained in paragraphs 1 through 15 of this Indictment are repeated and realleged as if fully set forth herein.

31.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1.

32.     It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, use and employ, and attempt to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (a) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (b) making, and attempting to make, an untrue and misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (c) engaging, and attempting to engage in an act, practice, and course of business, which operated and would operate as a fraud and deceit upon a person, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), to wit, BANKMAN-FRIED agreed with

13

others to defraud customers of FTX trading or intending to trade cryptocurrencies, futures, options, swaps, and derivatives by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

Overt Act

33.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: in or about June 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others misappropriated FTX customer deposits in order to, among other things, satisfy loan obligations owed by Alameda Research.

(Title 18, United States Code, Section 371.)

**COUNT SEVEN**
**(Conspiracy to Commit Money Laundering)**

The Grand Jury further charges:

34.     The allegations contained in paragraphs 1 through 15 of this Indictment are repeated and realleged as if fully set forth herein.

35.     From at least in or about 2020, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957(a).

36.     It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, in an offense in and affecting interstate and foreign commerce, knowing that the property involved in a financial transaction, to wit, one or more monetary transfers, represented the proceeds of some form of unlawful activity,

14

would and did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud alleged in Count One of this Indictment, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

37.     It was a further part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, within the United States, would and did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, the wire fraud alleged in Count One of this Indictment, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

### FORFEITURE ALLEGATION

38.     As a result of committing the offenses alleged in Counts One, Two, Three and Four of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses, and the following specific property:

a.     55,273,469 shares of the stock of Robinhood Markets Inc. from Account Number 499-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

b.     $20,746,713.67 in United States currency formerly on deposit in Account Numbers 499-30500 and 429-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in

**A-396**

the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

        c.     $49,999,500 in United States currency formerly on deposit in Account Number 9000-1924-02685 at Farmington State Bank d/b/a "Moonstone Bank" held in the name of "FTX Digital Markets," seized by the Government on or about January 4, 2023;

        d.     $5,322,385.32 in United States currency formerly held on deposit in Account Number 0000005090042549 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

        e.     $719,359.65 in United States currency formerly on deposit in Account Number 0000005090042556 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

        f.     $1,071.83 in United States currency formerly on deposit in Account Number 0000005090042564 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

        g.     $94,570,490.63 in United States currency formerly on deposit in Account Number 0000005091010037 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 19, 2023;

        h.     Any and all monies, assets, and funds contained in Binance account number 94086678;

        i.     Any and all monies, assets, and funds contained in Binance.us account number 35000066; and

        j.     Any and all monies, assets, and funds contained in Binance.us account number 35155204.

    39.    As a result of committing the offenses alleged in Count Five of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

16

**A-397**

40.     As a result of committing the offense alleged in Count Seven of this Indictment,

SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States,

pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal,

involved in said offense, or any property traceable to such property, including but not limited to a

sum of money in United States currency representing the amount of property involved in said

offense, and the following specific property:

a.     55,273,469 shares of the stock of Robinhood Markets Inc. from Account Number 499-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

b.     $20,746,713.67 in United States currency formerly on deposit in Account Numbers 499-30500 and 429-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

c.     $49,999,500 in United States currency formerly on deposit in Account Number 9000-1924-02685 at Farmington State Bank d/b/a "Moonstone Bank" held in the name of "FTX Digital Markets," seized by the Government on or about January 4, 2023;

d.     $5,322,385.32 in United States currency formerly held on deposit in Account Number 0000005090042549 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

e.     $719,359.65 in United States currency formerly on deposit in Account Number 0000005090042556 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

f.     $1,071.83 in United States currency formerly on deposit in Account Number 0000005090042564 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

g.     $94,570,490.63 in United States currency formerly on deposit in Account Number 0000005091010037 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 19, 2023;

h.     Any and all monies, assets, and funds contained in Binance account number 94086678;

i.     Any and all monies, assets, and funds contained in Binance.us account number 35000066; and

17

j. Any and all monies, assets, and funds contained in Binance.us account number 35155204.

41. If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

8/14/2023

DAMIAN WILLIAMS
United States Attorney

**A-399**

1

N8UQbanO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA
3
                v.                          22 CR 673 (LAK)
4
     SAMUEL BANKMAN-FRIED
5
                     Defendant
6    ------------------------------x

7                                      New York, N.Y.
                                       August 30, 2023
8                                      1:00 p.m.

9
     Before:
10
                           HON. LEWIS A. KAPLAN
11                                          District Judge

12
                           APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorneys for the
          Southern District of New York
15   NATHAN REHN
     DANIELLE KUDLA
16   DANIELLE SASSOON
     SAMUEL RAYMOND
17   NICOLAS ROOS
          Assistant United States Attorney
18
     COHEN & GRESSER LLP
19        Attorneys for Defendant
     CHRISTIAN R. EVERDELL
20   MARK COHEN

21

22

23

24

25

              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

**A-400**

35

N8UQbanO

 1   if anything doesn't work, I want to know about that too, and we

 2   will see.  And, as I say, if there is to be an application for

 3   more time from the defense, it would best be made by the close

 4   of business Friday, but it's not a deadline.  I would consider

 5   one made later but with reluctance.

 6           Okay.  Advice of counsel.  I will start out by saying

 7   that I am going to order some disclosure, but I think the

 8   defendant's suggestion that disclosure on this subject might

 9   make more sense after the government's disclosures on

10   September 8.  I think that makes sense.  And so I am going to

11   require that the defendant's disclosures, whatever they turn

12   out to be, be made on or before September 15.

13           So what I would like to have is a joint proposal by

14   the close of business Friday as to exactly what disclosures the

15   defendant will make.  If the parties can't agree entirely, I

16   would like a joint letter setting out what they agree upon and

17   what they haven't and their respective positions on the areas

18   of disagreement, and then I will resolve the disagreement over

19   the weekend, and that will give the defendant time to make

20   disclosures by the 15th.

21           Now, please understand, I understand I have demanded a

22   lot from you folks in the last week.  You have demanded a lot

23   from me.  That's fine.  I'm very appreciative of the efforts

24   that you have all made on both sides and the zealous and very

25   capable advocacy on both sides.  It's been very helpful, and I

# A-401



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 18, 2023

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:   *United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)

Dear Judge Kaplan:

    After receiving an extension from the Court to provide the Government with notice of an advice-of-counsel defense by August 16, 2023, the defense summarily informed the Government on that date that it intended to assert such a defense, and has refused to provide any additional detail. The Government respectfully moves for an order requiring the defendant to provide immediate notice to the Government of (i) the nature and specifics of his advice of counsel defense, including identification of the attorney(s) who provided such advice and a proffer of facts in support of such a defense, and (ii) all documents that he intends to rely on in support of such a defense, as well as any other documents relating to such a defense. Because the deficient disclosure will prevent motion practice and discovery on the merits of the defense, the defendant should be ordered to respond to this letter motion or supplement his disclosures by August 23, 2023 (a week after his original notice was due). Alternatively, the Government moves to preclude the defendant from introducing a purported advice-of-counsel defense at trial given his failure to provide this necessary information.

    On July 1, 2023, the Court ordered the defendant to "provide notice to the Government, consistent with the requirements of Federal Rules of Criminal Procedure 12.2 and 16, of his intention to present an advice of counsel or a defense based on mental condition or defect." (Dkt. 173.) Such a disclosure order is routine in this District because of the practical and logistical difficulties that can arise when advice of counsel issues are litigated mid-trial. *See, e.g.*, *United States v. Schulte*, No. S2 17 Cr. 548 (PAC), 2020 WL 133620, at *6 (S.D.N.Y. Jan. 13, 2020) (requiring advanced advice of counsel disclosure); *United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018) (defendant should have made pertinent disclosures in advance of trial); *United States v. Rubin/Chambers, Dunhill*, 828 F. Supp. 2d 698, 711 (S.D.N.Y. 2011) (requiring notification to the Government of advice-of-counsel defense sufficiently before pre-trial conference to permit litigation over disputes). Those practical and logistical issues include determining whether there is "evidence such that a reasonable juror could find that the defendant honestly and in good faith sought the advice of counsel, fully and honestly

**A-402**

Page 2

laid all the facts before his counsel, and in good faith and honestly followed counsel's advice." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (citation omitted). Putative advice of counsel defenses also routinely require production of discovery, a hearing, and privilege waivers. Where the attorney-client privilege is likely controlled by a corporation, the Court may need to resolve whether the defendant can rely on evidence that is protected by a company's privilege. *See United States v. Milton*, 626 F. Supp. 3d 694, 702-03 (S.D.N.Y. 2022) (denying the defendant's constitutional claim that "privileged communications become discoverable simply because a defendant wishes to use those communications in his defense"). All of those issues are likely to manifest here. *See* Gov't Motion *in Limine*, Dkt. No. 204 at 58 (arguing that the Court should evaluate documents which the Debtors claim are privileged *in camera*).

On August 16, 2023, the defendant made the following advice of counsel disclosure: "please take notice of our intent to rely on a defense of advice of counsel at trial." The notice did not indicate on what aspects of the case the defendant purportedly received legal advice. The Government is left to guess whether it is the defendant's assertion that he received legal advice relating to his deletion of Slack and Signal messages—a defense he alluded to at the August 11, 2023, conference, *see* Aug. 11, 2023 Tr. at 22, or that his fraudulent misappropriation of billions of dollars was somehow laid fully before legal counsel, who approved of the conduct, or that the defendant received legal advice on any other particular aspect of the conduct at issue, or a combination of these defenses, or something else entirely. Nor has the defendant disclosed which attorney(s) he consulted, whether the advice came from his lawyer or FTX's lawyer (or someone else's lawyer), what he sought advice on, when he sought advice, in what form he sought advice, what information he provided to the attorney(s), what advice they gave, and whether he fully and honestly followed the advice.

On August 17, 2023, the Government informed defense counsel that it believed the defendant's notice was insufficiently detailed, but defense counsel declined to supplement the disclosure.[1]

---

[1] Defense counsel referred the Government to the decision in *United States v. Ray*, No. 20 Cr. 110 (LJL), 2021 WL 5493839 (S.D.N.Y. Nov. 22, 2021), to support its decision to provide nothing beyond its 17-word summary notice. But the facts of that case are far afield from those present here – and even there the defendant named the attorney at issue (something that has not been done here), and Judge Liman required the defendant to produce non-privileged documents related to the advice-of-counsel defense before trial, *Id.* at *5. Indeed, the court's decision not to order early disclosure of privileged materials was based in part on the fact that the case involved "lurid charges of extortion and sex trafficking," there was no "risk that the defense would ask questions of any of the [government] witnesses" about the advice of attorneys, and it was "unlikely in the extreme that the occasional question on cross-examination about attorney advice (were there to be such a question) would prejudice the jury." *Id.* at *7. Those facts that informed the exercise of Judge Liman's discretion are not present in this case, where any advice-of-counsel defense is likely to implicate a substantial number of documents and communications, and result in questions put to several witnesses. And subsequent to the decision requiring the defendant in *Ray* to produce in advance of trial only non-privileged documents, Judge Liman had to hold, in the middle of trial, a hearing on the defendant's purported advice of counsel defense, proving the need in this case for early disclosure and resolution of issues before trial.

A-403

Page 3

Because the defendant has indicated he intends to rely on an advice of counsel, he must provide "all documents concerning their intended advice of counsel defense." *United States v. Hatfield*, No. 06 Cr. 550 (JS), 2010 WL 183522, at *13 (E.D.N.Y. Jan. 8, 2010); *see also Scali*, 2018 WL 461441, at *8 (requiring the defendant to provide "pertinent disclosures during discovery"); *United States v. Sharma*, 18 Cr. 340 (LGS) (July 1, 2019) (Dkt. No. 140) (ordering defendants to "provide discovery relating to any advice of counsel defense they intend to advance at trial" about three months before the scheduled trial date). That necessarily includes "any communications or evidence [the] defendant[] intend[s] to use to establish the defense are subject to disclosure." *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018). Such disclosures "include not only those documents which support the defense, but also all documents (including attorney-client and attorney work product documents) that might impeach or undermine such a defense." *Scali*, 2018 WL 461441, at *8 (citing *Hatfield*, 2010 WL 183522, at *13); *Crowder*, 325 F. Supp. 3d at 138 ("even otherwise-privileged communications that defendants do not intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense, are subject to disclosure in their entirety").

Accordingly, the Government respectfully requests that the Court order the defendant to immediately provide (1) a detailed advice of counsel disclosure setting forth the specifics of the defense including what advice the defendant received and on what topics and on what factual basis, who he received it from, the circumstances of the advice, and when the advice was received; and (2) production of all documents concerning the intended advice of counsel defense, including any documents that might impeach or undermine the defense.

If the defendant fails to make such a disclosure, the Government respectfully requests that the defense be precluded at trial. *See Schulte*, 2020 WL 133620, at *6 ("Failure to provide this discovery will preclude reliance on an advice-of-counsel defense at trial.").

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/ _____
Nicolas Roos
Danielle R. Sassoon
Samuel Raymond
Thane Rehn
Danielle Kudla
Assistant United States Attorneys
(212) 637-2421

Cc: Counsel of Record (by ECF)

**A-404**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                    :

UNITED STATES OF AMERICA          :

                                      :

      - v. -                         :         S6 22 Cr. 673 (LAK)

                                      :

SAMUEL BANKMAN-FRIED,        :

                                      :

            Defendant.         :

                                      :

------------------------------------------------------------X

### THE GOVERNMENT'S REQUESTS TO CHARGE

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Nicolas Roos
Danielle Kudla
Samuel Raymond
Thane Rehn
Danielle R. Sassoon
Assistant United States Attorneys
     -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
UNITED STATES OF AMERICA                                    :
                                                            :
                 - v. -                                     :          S6 22 Cr. 673 (LAK)
                                                            :
SAMUEL BANKMAN-FRIED,                                       :
                                                            :
                 Defendant.                                 :
                                                            :
------------------------------------------------------------X

<u>REQUESTS TO CHARGE</u>

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Government

respectfully requests that the Court include the following in its charge to the jury.

i

**A-406**

## TABLE OF CONTENTS

REQUEST NO. 1:    General Requests ................................................................................................. 1

REQUEST NO. 2:    Summary of the Indictment ................................................................................. 2

REQUEST NO. 3:    Multiple Counts .................................................................................................. 3

REQUEST NO. 4:    Conspiracy and Substantive Crimes Explained .................................................. 4

REQUEST NO. 5:    Counts 1 and 3 – Wire Fraud – General Instruction ........................................... 6

REQUEST NO. 6:    Counts 1 and 3 – Wire Fraud – Elements ........................................................... 7

REQUEST NO. 7:    Counts 1 and 3  – Wire Fraud – First Element – Existence of a Scheme ............ 8

REQUEST NO. 8:    Counts 1 and 3 – Wire Fraud – Second Element – Intent ................................. 12

REQUEST NO. 9:    Counts 1 and 3 – Wire Fraud – Third Element – Interstate Wire .................... 16

REQUEST NO. 10:    Counts 1 and 3 – Wire Fraud – Willful Causation ......................................... 18

REQUEST NO. 11:    Counts 1 and 3 – Wire Fraud – Aiding and Abetting ...................................... 19

REQUEST NO. 12:    Counts 2 and 4 – Conspiracy to Commit Wire Fraud ..................................... 22

REQUEST NO. 13:    Counts 2 and 4 – Conspiracy to Commit Wire Fraud – Elements .................. 23

REQUEST NO. 14:    Counts 2 and 4 – Conspiracy to Commit Wire Fraud – First Element - Agreement ......................... 24

REQUEST NO. 15:    Counts 2 and 4 – Conspiracy to Commit Wire Fraud – Second Element – Membership .................. 27

REQUEST NO. 16:    Count 5 – Conspiracy to Commit Securities Fraud – General Instruction and Elements .................. 30

REQUEST NO. 17:    Count 5 – Conspiracy to Commit Securities Fraud – Existence of Agreement ................................. 31

REQUEST NO. 18:    Count 5 – Conspiracy to Commit Securities Fraud –  Object Elements ........................................... 32

REQUEST NO. 19:    Count 5 – Conspiracy to Commit Securities Fraud –  Object – First Element ................................... 33

REQUEST NO. 20:    Count 5 – Conspiracy to Commit Securities Fraud –  Object – Second Element .............................. 36

REQUEST NO. 21:    Count 5 – Conspiracy to Commit Securities Fraud –  Object – Third Element ................................. 37

REQUEST NO. 22:    Count 5 – Conspiracy to Commit Securities Fraud – Membership .................................................. 38

REQUEST NO. 23:    Count 5 – Conspiracy to Commit Securities Fraud – Overt Act ...................................................... 39

REQUEST NO. 24:    Count 6 – Conspiracy to Commit Commodities Fraud – Elements .................................................. 41

REQUEST NO. 25:    Count 6 – Conspiracy to Commit Commodities Fraud – Existence of Agreement ........................... 42

REQUEST NO. 26:    Count 6 – Conspiracy to Commit Commodities Fraud – Object Elements ...................................... 43

REQUEST NO. 27:    Count 6 – Conspiracy to Commit Commodities Fraud – Object - First Element .............................. 44

REQUEST NO. 28:    Count 6 – Conspiracy to Commit Commodities Fraud – Object – Second Element .......................... 46

REQUEST NO. 29:    Count 6 – Conspiracy to Commit Commodities Fraud – Object – Third Element ............................ 48

REQUEST NO. 30:    Count 6 – Conspiracy to Commit Commodities Fraud – Membership .............................................. 49

REQUEST NO. 31:    Count 6 – Conspiracy to Commit Commodities Fraud – Overt Act .................................................. 50

REQUEST NO. 32:    Count 7 – Conspiracy to Commit Money Laundering – General Instruction .................................... 51

REQUEST NO. 33:    Count 7 – Conspiracy to Commit Money Laundering – Elements .................................................... 52

REQUEST NO. 34:    Count 7 – Conspiracy to Commit Money Laundering – First Element .............................................. 53

REQUEST NO. 35:    Count 7 – Conspiracy to Commit Money Laundering – Concealment Elements .............................. 54

REQUEST NO. 36:    Count 7 – Conspiracy to Commit Money Laundering – Concealment – First Element ..................... 55

REQUEST NO. 37:    Count 7 – Conspiracy to Commit Money Laundering – Concealment – Second Element ................. 57

ii

**A-407**

REQUEST NO. 38: Count 7 – Conspiracy to Commit Money Laundering – Concealment – Third Element .................. 58

REQUEST NO. 39: Count 7 – Conspiracy to Commit Money Laundering – Concealment – Fourth Element ................ 59

REQUEST NO. 40: Count 7 – Conspiracy to Commit Money Laundering – $10,000 Transaction Elements.................... 62

REQUEST NO. 41: Count 7 – Conspiracy to Commit Money Laundering – $10,000 Transaction – First Element .......... 63

REQUEST NO. 42: Count 7 – Conspiracy to Commit Money Laundering – $10,000 Transaction – Second Element....... 64

REQUEST NO. 43: Count 7 – Conspiracy to Commit Money Laundering – $10,000 Transaction – Third Element ........ 65

REQUEST NO. 44: Count 7 – Conspiracy to Commit Money Laundering – Membership .................................................. 66

REQUEST NO. 45: Conscious Avoidance ......................................................................................................................... 67

REQUEST NO. 46: Coconspirator Statements .................................................................................................................. 70

REQUEST NO. 47: Presence of Counsel ........................................................................................................................... 71

REQUEST NO. 48: Venue .................................................................................................................................................. 72

REQUEST NO. 49: False Exculpatory Statements ........................................................................................................... 74

REQUEST NO. 50: Destruction of Evidence .................................................................................................................... 75

REQUEST NO. 51: Other Acts Evidence .......................................................................................................................... 76

REQUEST NO. 52: Variance in Dates ............................................................................................................................... 77

REQUEST NO. 53: Cooperating Witnesses ...................................................................................................................... 78

REQUEST NO. 54: Non-Prosecution Agreement ............................................................................................................. 81

REQUEST NO. 55: Immunized Witnesses ........................................................................................................................ 82

REQUEST NO. 56: Expert Witness ................................................................................................................................... 83

REQUEST NO. 57: Law Enforcement Witnesses ............................................................................................................. 84

REQUEST NO. 58: Preparation of Witnesses ................................................................................................................... 85

REQUEST NO. 59: Uncalled Witnesses – Equally Available To Both Sides .................................................................. 86

REQUEST NO. 60: Other Individuals Not on Trial .......................................................................................................... 87

REQUEST NO. 61: Defendant's Testimony ...................................................................................................................... 88

REQUEST NO. 62: Defendant's Right Not to Testify ...................................................................................................... 89

REQUEST NO. 63: Particular Investigative Techniques Not Required ............................................................................ 90

REQUEST NO. 64: Use of Evidence Obtained Pursuant to Searches .............................................................................. 91

REQUEST NO. 65: Use of Charts and Summaries ........................................................................................................... 92

REQUEST NO. 66: Stipulations ........................................................................................................................................ 93

REQUEST NO. 67: Transcripts .......................................................................................................................................... 94

REQUEST NO. 68: Redactions ......................................................................................................................................... 95

REQUEST NO. 69: Concluding Remarks .......................................................................................................................... 96

**A-408**

<u>REQUEST NO. 1:</u>   <u>General Requests</u>

The Government respectfully requests that the Court give its usual instructions to the jury on the following matters:

a.   Function of Court and Jury.

b.   Indictment Not Evidence.

c.   Statements of Court and Counsel Not Evidence.

d.   Rulings on Evidence and Objections.

e.   Burden of Proof and Presumption of Innocence.

f.   Reasonable Doubt.

g.   Government Treated Like Any Other Party.

h.   Definitions, Explanations, and Example of Direct and Circumstantial Evidence.

i.   Inferences.

j.   Credibility of Witnesses.

k.   Jury's Recollection Controls.

l.   Right to See Exhibits and Have Testimony Read During Deliberations.

m.  Sympathy: Oath of Jurors.

n.   Punishment is Not to Be Considered by the Jury.

o.   Verdict of Guilt or Innocence Must Be Unanimous.

**A-409**

REQUEST NO. 2:   Summary of the Indictment

The defendant, SAMUEL BANKMAN-FRIED, has been charged in what is called an Indictment. An Indictment is simply an accusation. It is not evidence. The Indictment contains seven counts, or charges. In a few moments, I will instruct you on each of these charges in more detail. At the outset, however, let me instruct you that in your deliberations and in reaching your verdict, you must consider each count separately. You must return a separate verdict as to each count.

Count One charges the defendant with committing wire fraud on customers of FTX by misappropriating those customers' deposits. Count Two charges the defendant with conspiring to commit wire fraud on customers of FTX by misappropriating those customers' deposits. Count Three charges the defendant with committing wire fraud on lenders to Alameda Research by providing false and misleading information to those lenders. Count Four charges the defendant with conspiring to commit wire fraud on lenders to Alameda Research by providing false and misleading information to those lenders. Count Five charges the defendant with conspiring to commit securities fraud by providing false and misleading information to FTX's investors. Count Six charges the defendant with conspiring to commit fraud on customers of FTX in connection with the purchase and sale of cryptocurrency and cryptocurrency swaps by misappropriating those customers' deposits. Count Seven charges the defendant with conspiring to commit money laundering in order to conceal and disguise the nature, location, source, ownership, and control of proceeds of the wire fraud on FTX's customers.

2

**A-410**

REQUEST NO. 3:   Multiple Counts

Each count charges a different crime.  You must consider each count of the Indictment separately, and you must return a separate verdict as to each Count.  The case on each count stands or falls upon the proof or lack of proof with respect to that count.  Except in one respect that I will explain to you in a few minutes when I discuss Count Seven, your verdict on one count should not control your decision as to any other count.  I am now going to discuss the counts of the Indictment.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 3-8.

3

REQUEST NO. 4:   Conspiracy and Substantive Crimes Explained

As I have told you, Counts Two, Four, Five, Six, and Seven of the Indictment each charge the defendant with the crime of conspiracy.  The other counts—Counts One and Three—charge what we call substantive crimes.  The crime of conspiracy is different from a substantive crime. A conspiracy charge, generally speaking, alleges that two or more persons agreed together to accomplish some unlawful objective. The focus of a conspiracy count, therefore, is on whether there was an unlawful agreement. A substantive count, on the other hand, charges a defendant with the actual commission or attempted commission, or with causing someone else to engage in certain actions necessary for the actual commission, of an offense. A substantive offense therefore can be committed by a single person. It need not involve any agreement with anyone else.

A conspiracy to commit a crime is an entirely separate and different offense from a substantive crime, the commission of which may be an objective of a conspiracy. And since the essence of the crime of conspiracy is an agreement or an understanding to commit a crime, it does not matter if the crime that was the objective of the conspiracy was ever actually committed. In other words, if a conspiracy exists and certain other requirements are met, the conspiracy is punishable as a crime even if its purpose is not established or accomplished. Consequently, in a conspiracy charge, there is no need to prove that the crime or crimes that were the objective or objectives of the conspiracy actually were committed. By contrast, conviction on a substantive count requires proof that the crime charged actually was committed or attempted, but it does not require proof of an agreement.

With respect to the substantive counts, you should be aware also that there are three alternative theories on the basis of which you may find a defendant guilty. While I am going to explain these three theories in more detail, I want to take a very brief moment to outline them

4

briefly. The first theory is that the defendant committed a substantive crime charged in the Indictment. The second theory is that the defendant, with criminal intent, willfully caused someone else to engage in certain actions that resulted in the commission of a substantive crime charged in the indictment. I am going to refer to both of those two theories that I just outlined for you as involving a claim that a defendant is guilty of a crime as a principal. The third theory is that someone other than the defendant committed a crime charged in the indictment and the defendant aided and abetted the commission of that crime. I will refer to that theory as a claim that the defendant is guilty of a crime as an aider and abettor.

Now, for the sake of convenience, in organizing my instructions to you, I'm going to instruct you first with respect to the two counts that charge substantive crimes, Counts One and Three.  I will instruct you initially on the first two theories of liability, namely, that the defendant is guilty as a principal of the substantive crimes charged in the Indictment either because he committed the substantive crimes or because he, with criminal intent, caused someone else to commit the substantive crimes. I then will instruct you on the third theory of liability—that is, the alternative theory that the defendant is guilty as an aider and abettor. Finally, I will instruct you on the conspiracy counts.

Adapted from the charges of the Honorable Lewis A. Kaplan in
United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018)

5

**A-413**

REQUEST NO. 5:   Counts 1 and 3 – Wire Fraud – General Instruction

As I said, Counts One and Three charge SAMUEL BANKMAN-FRIED with committing wire fraud.  Count One charges that from in or about 2019 up to and including in or about November 2022, the defendant devised and participated in a scheme to defraud customers of FTX by misappropriating those customers' deposits.  Count Three charges that from in or about June 2022, up to and including in or about November 2022, the defendant devised and participated in a scheme to defraud lenders to Alameda Research by providing false and misleading information to those lenders about Alameda Research's financial condition.

Adapted from the charges of the Honorable Lewis A. Kaplan in
United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018)

6

**A-414**

<u>REQUEST NO. 6:</u>   <u>Counts 1 and 3 – Wire Fraud – Elements</u>

To sustain its burden of proof with respect to the offense charged in Counts One and Three, the Government must prove beyond a doubt the following three elements:

First, that there was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises.

Second, that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud.

Third, that in execution of that scheme, the defendant used or caused the use of interstate wires.

I will discuss each in turn.

> Adapted from the charges of the Honorable Lewis A. Kaplan in <u>United States</u> v. <u>Gatto</u>, 17 Cr. 686 (Oct. 1, 2018) and <u>United States</u> v. <u>Blaszczak</u>, 17 Cr. 357 (Apr. 27, 2018); <u>See</u> Sand, <u>Modern Federal Jury Instructions</u>, Instr. 44-3.

> Willfulness is not an element of wire fraud, but for the reasons outlined below, the Government does not object to instructing the jury that willfully means to act voluntarily and with a wrongful purpose.

7

**A-415**

REQUEST NO. 7:   Counts 1 and 3  – Wire Fraud – First Element – Existence of a Scheme

The first element the Government must prove beyond a reasonable doubt is that there was a scheme or artifice to defraud the victims of money or property by false or fraudulent pretenses, representations, or promises.

A scheme or artifice to defraud is a plan, device, or course of action to obtain money or property by means of false or fraudulent statements, representations, promises, or pretenses.

A statement or representation is false if it is untrue when made and was then known to be untrue by the person making it or causing it to be made.  A statement may also be false if it contains half-truths, conceals material facts, or is ambiguous or incomplete in a manner that makes what is said, or represented, misleading or deceptive. The deception need not be based upon spoken or written words alone. The arrangement of the words, the circumstances in which they are used, or the defendant's conduct may convey the false and deceptive appearance. If there is deception, the manner in which it is accomplished does not matter.

Statements, representations, promises, or pretenses is fraudulent if it was made falsely and with intent to deceive.

As is pertinent here with respect to the alleged wire fraud on customers of FTX, a "scheme to defraud" also includes a scheme to fraudulently embezzle or fraudulently misappropriate property belonging to another.  The words "embezzle" and "misappropriate" mean the fraudulent appropriation to one's own use of money or property that was entrusted to one's care by someone else. Money or property is entrusted to a defendant's care when the business he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust. Where the scheme to defraud involves fraudulently embezzling or misappropriating money

8

**A-416**

or property, as it is for Count One, the Government is not required to show that the defendant made a misrepresentation or false statement.

A scheme to defraud need not be shown by direct evidence, but may be established by all the circumstances and facts in the case.

The false or fraudulent statement, representation, promise, or pretense must relate to a material fact or matter. A material fact is one that would be expected to influence, or that is capable of influencing, the decision of a reasonable person. The same principle applies to fraudulent misappropriation, meaning that misappropriation of property is material if the disclosure of the misappropriation would be expected to influence, or is capable of influencing, the decision of a reasonable person.

You have heard evidence that after customers and lenders transferred money to FTX and Alameda Research, respectively, the defendant engaged in conduct, made tweets and other public statements, and provided financial information, which the Government claims were false or misleading. It is not necessary for the Government to prove that a false or fraudulent representation or statement was made prior to a customer's or lender's decision to part with money or property. Rather, if after having obtained money or property, the defendant devises or participates in a fraudulent scheme to deprive the alleged victim of that money or property by keeping the money or property through making a subsequent false or fraudulent representation as to a material fact, that is sufficient to establish the existence of a scheme to defraud. It is not necessary for the Government to prove that the scheme to defraud actually succeeded, that any particular person actually relied upon a statement or representation, or that any victim actually suffered damages as a consequence of any false or fraudulent representations, promises, or pretenses. Nor do you need to find that the defendant profited from the fraud or realized any gain. You must concentrate on

9

## A-417

whether there was such a scheme, not the consequences of the scheme, although proof concerning accomplishment of the goals of the scheme may be persuasive evidence of the existence of the scheme itself. In determining whether a scheme to defraud existed, it is irrelevant whether a victim might have discovered the fraud if he, she, or it had looked more closely or probed more extensively. A victim's negligence or gullibility in failing to discover a fraudulent scheme is not a defense to wire fraud.

If you find the Government has sustained its burden of proof that a scheme to defraud, as charged, did exist, you should next consider the second element.

> Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018) and United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018), and the charge of the Honorable Jesse M. Furman in United States v. Avenatti, 19 Cr. 374 (Feb. 1, 2022); see Sand, Modern Federal Jury Instructions, Instr. 44-4.

> While fraud "in most circumstances requires a false representation of a material fact, there is no such requirement under the mail and wire fraud statutes" when the scheme alleges "embezzlement by a fiduciary." Spira v. Nick, 876 F. Supp. 553, 558 (S.D.N.Y. 1995) (Kaplan, J.) (citing United States v. Altman, 48 F.3d 96, 101 (2d Cir. 1995)); see Altman, 48 F.3d at 101 ("By embezzling the estate funds with which he was entrusted as a fiduciary, Altman effectuated a scheme to defraud within the meaning of the mail fraud statute."); Carpenter v. United States, 484 U.S. 19, 27 (1987) ("The concept of 'fraud' includes the act of embezzlement, which is 'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.'" (quoting Grin v. Shine, 187 U.S. 181, 189 (1902))); United States v. Chestman, 947 F.2d 551, 568-69 (2d Cir. 1991) (defining a "fiduciary or similar relationship of trust and confidence").

> "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999) (cleaned up). However, the "common -law requirements of 'justifiable reliance' and 'damages' … plainly have no place in the federal fraud statutes." Id. at 24-25.

10

The proposed instruction about retaining money or property is adapted from the charge of the Honorable Denis R. Hurley in <u>United States</u> v. <u>Schneider,</u> 02 Cr. 128, 2002 WL 34348617 (Oct. 23, 2002). <u>See also United States</u> v. <u>Gole,</u> 158 F.3d 166, 168 (2d Cir. 1998) (scheme to defraud where the defendant "intentionally misrepresented his income in order to retain pension overpayments").

**A-419**

REQUEST NO. 8:   Counts 1 and 3 – Wire Fraud – Second Element – Intent

The second element that the Government must prove beyond a reasonable doubt is that the defendant participated in the scheme to defraud knowingly, willfully and with specific intent to defraud.

To act "knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.

To act "willfully" means to act voluntarily and with a wrongful purpose.

"Intent to defraud" means to act knowingly with the specific intent to deceive, for the purpose of causing some financial or property loss to another.  The Government need not prove that any intended victim was actually harmed, including actually financially harmed.  Thus, even if the defendant believed that the victims would not ultimately lose money, or that they would ultimately not suffer financial loss, that is no defense if the defendant intended immediate or temporary financial or property loss to another.  Where some financial loss is contemplated, even temporarily, by the defendant, the fact that the defendant believes the victim will ultimately suffer no loss is no excuse to the crime.  Additionally, the Government need not prove that the intent to defraud was the only intent or even primary intent of the defendant.  A defendant may have the required intent to defraud even if the defendant was motivated by other lawful purposes as well.

To participate in a scheme means to engage in it by taking some affirmative step to help it succeed. Merely associating with people who are participating in a scheme is not participation.  It is not necessary that the defendant originated the scheme to defraud. It is sufficient if you find that a scheme to defraud existed, even if someone else originated it, and that the defendant, while aware of the scheme's existence, knowingly and willfully participated in it with intent to defraud. Nor is it required that the defendant participated in or had knowledge of all of the operations of the

12

**A-420**

scheme. The responsibility of the defendant is not governed by the extent of his participation.  It is not necessary that the defendant have participated in the alleged scheme from the beginning. A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and who knowingly and willfully acts in a way to further its goals, becomes a participant in the scheme and is legally responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done subsequently.  Even if the defendant participated in the scheme to a degree less than others, he nevertheless is equally guilty as long as the defendant knowingly and willfully participated in the scheme to defraud with knowledge of its general scope and purpose and with specific intent to defraud.

Because an essential element of wire fraud is the intent to defraud, it follows that good faith on the part of a defendant is a complete defense to the charge of wire fraud.  An honest belief in the truth of the representations made or caused to be made by a defendant is a complete defense, however inaccurate the statements may turn out to be. Similarly, if the defendant in good faith believed that he was entitled to take the money or property from the victim, even though that belief was mistaken, then you must find him not guilty even if others were injured by the defendant's conduct.  The defendant has no burden to establish good faith.  The burden is on the government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt. However, in considering whether or not the defendant acted in good faith, you are instructed that an honest belief on the part of the defendant, if such a belief existed, that ultimately everything would work out does not necessarily mean that the defendant acted in good faith. If the defendant knowingly and willfully participated in the scheme with the intent to deceive for the purpose of depriving a victim of money or property, even if only for a period of time, then no amount of

13

**A-421**

honest belief on the part of the defendant that customers or lenders ultimately would be benefited will excuse false representations that a defendant made.

Direct proof of knowledge and fraudulent intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with fraudulent intent. Such direct proof is not required. Instead, the ultimate facts of knowledge and intent, though subjective, may be established by circumstantial evidence, based upon a person's words, his conduct, his acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them. You may also infer, but are not required to infer, that people intend the natural and probable consequences of their actions. Accordingly, when the necessary result of a scheme is to injure others, fraudulent intent may be inferred from the scheme itself. As I instructed you earlier, circumstantial evidence, if believed, is of no less value than direct evidence.

> Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

> The applicable *mens rea* for wire fraud is "specific intent to harm or defraud the victims of the scheme." United States v. Rybicki, 354 F.3d 124, 150 (2d Cir. 2003). The word "willfully" appears nowhere in the text of the wire fraud statute. See United States v. Gole, 21 F. Supp. 2d 161, 167-68 (E.D.N.Y. 1997) ("'Willfully' appears nowhere in the mail fraud statute, and the Second Circuit has expressly held that the only scienter requirement for a violation of § 1341 is that the acts proscribed be carried out 'knowingly.'"); United States v. Blagojevich, 794 F.3d 729, 739 (7th Cir. 2015) ("The wire-fraud statute requires a specific intent to defraud but not willfulness or any other proxy for knowledge of the law."); United States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991) (holding that "willfulness" is "not synonymous with the intent to defraud requirement in the mail and wire fraud statutes"); United States v. DiRoberto, 686 F. App'x 458, 461 (9th Cir. 2017) ("The mail and wire fraud statutes do not require proof of willfulness."). While the Government does not object to the inclusion of the word in the Court's charge, the definition of willfulness given to the jury should

14

**A-422**

be: "To act willfully means to act voluntarily and with a wrongful purpose." See United States v. Avenatti, No. 19 Cr. 374 (JMF) (Jan. 24, 2022) (Tr. at 1738); United States v. Middendorf, No. 18 Cr. 36 (JPO) (Feb. 11, 2019) (Tr. at 3459).  The definition of willfulness used in some cases, which defines the term as "to act with knowledge that one's conduct is unlawful and with intent to do something the law forbids" or "with the bad purpose to disobey or disregard the law" is inappropriate for a fraud prosecution. See United States v. Porcelli, 865 F.2d 1352, 1358 (2d Cir. 1989) (rejecting due process claim that defendant "had no notice that his conduct was illegal" because "[t]he specific intent required under the mail fraud statute is . . . not the intent to violate a statute"); United States v. Weiss, 930 F.2d 185 (2d Cir. 1991) (in mail fraud prosecution, affirming preclusion of defendant's testimony regarding whether he "intended to commit a crime" because it was "not relevant" and "not dispositive of any element of the charges").

See United States v. Technodyne LLC, 753 F.3d 368, 385 (2d Cir. 2013) ("It is commonplace that the law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the actor's sole, or even primary, purpose.").

See United States v. Jabar, 19 F.4th 66, 77 (2d Cir. 2021) ("Proof of actual injury to the victim is not required . . . .").

See United States v. Calderon, 944 F.3d 72, 90 (2d Cir. 2019) ("A 'no ultimate harm' instruction advises the jury that where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will ultimately be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct.").

15

**A-423**

REQUEST NO. 9:   Counts 1 and 3 – Wire Fraud – Third Element – Interstate Wire

The third and final element that the Government must establish beyond a reasonable doubt is that one or more interstate or foreign wires were used in furtherance of the scheme to defraud. An "interstate wire" means a wire that passes between two or more states. A "foreign" wire means a wire that travels internationally. Examples of wires include telephone calls and messages, communications over the internet, commercials on television, and financial wires between bank accounts.

A wire communication need not itself be fraudulent.  Indeed, it may be completely innocent, as long as it was made in furtherance of the fraudulent scheme.  To be in furtherance of the scheme, the wire communication must further or assist in some way in carrying out the scheme to defraud.  A wire communication can also include a communication made after a victim's funds were obtained if the communication was designed to lull the victim into a false sense of security, to postpone his or her complaint to the authorities, or to keep the money obtained from the scheme.

It is not necessary for the defendant to have been directly or personally involved in a wire communication, as long as the wire was reasonably foreseeable in the execution of the alleged scheme to defraud in which the defendant is accused of participating. In this regard, it is sufficient to establish this element of the crime if the evidence justifies a finding that the defendant caused the wires to be used by others. The wire communication requirement can be satisfied even if the wire communication was done by the person being defrauded or some other innocent party. When one does an act with knowledge that the use of the wires will follow in the ordinary course of business or where such use of the wires reasonably can be foreseen, even though not actually intended, then he causes the wires to be used. Thus, there is no requirement that the defendant specifically authorize others to make a communication by wire.

16

**A-424**

Finally, if you find that a wire communication was reasonably foreseeable and that the interstate or foreign wire communication charged in the indictment took place, then this element is satisfied even if it was not foreseeable that the wire communication would cross state lines.

> Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018); see Sand, Modern Federal Jury Instructions, Instr. 44-5.

> The lulling instruction is adapted from the charge of the Honorable Judge John G. Koeltl in United States v. Dunseath, 98 Cr. 493 (Apr. 14, 1999), and from United States v. Jergensen, 797 F. App'x 4, 6 (2d Cir. 2019), which affirmed the use of the lulling instruction given by the district court.

REQUEST NO. 10:  Counts 1 and 3 – Wire Fraud – Willful Causation

Now, as I instructed you earlier, the Government's second theory of liability on the substantive wire fraud counts, Counts One and Three, is that the defendant is guilty of the substantive crimes charged in those counts as a principal because he possessed the requisite criminal intent and willfully caused someone else to engage in actions necessary to commit the crimes. So I am now going to take a minute to discuss what it means for a defendant to be guilty as a principal through willful causation in the context of this case.

It is the law of the United States "that whoever willfully causes an act to be done which, if directly performed by that person, would be an offense against the United States, is punishable as a principal." So what does the term "willfully caused" mean? It does not mean that the defendant must physically have committed the crime or supervised or participated in the actual criminal conduct charged in the Indictment. Rather, anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States is guilty as a principal.  Accordingly, one who intentionally causes someone else to make false or fraudulent statements or representations, or who intentionally causes someone else to fraudulently embezzle or fraudulently misappropriate property belonging to another is guilty as a principal if the Government proves that the person who causes the making of that false or fraudulent representation, or who causes the fraudulent embezzlement or misappropriation, acted knowingly, willfully, and with the specific intent to defraud and satisfies the other elements of wire fraud that I have described to you. This is so even if the individual that was caused to make the false statement, or embezzled or misappropriated property, had no criminal intent.

Adapted from the charges of the Honorable Lewis A. Kaplan in
United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

18

**A-426**

REQUEST NO. 11:  Counts 1 and 3 – Wire Fraud – Aiding and Abetting

I will now explain the third theory of liability on the substantive wire fraud counts, Counts One and Three, the aiding and abetting theory, in greater detail. It is unlawful for a person to aid, abet, counsel, command, induce, or procure someone else to commit an offense. A person who does that is just as guilty of the offense as someone who actually commits it. Accordingly, for any substantive count in the Indictment, you may find the defendant guilty on that count if you find that the Government has proved beyond a reasonable doubt that another person actually committed the crime and that the defendant aided, abetted, counseled, commanded, induced, or procured the commission of that crime.

In order to convict the defendant as an aider and abettor, the Government must prove beyond a reasonable doubt two elements. First, it must prove that a person other than the defendant, and other than a person the defendant willfully caused to take actions necessary for the commission of the crime, as I have described that concept to you previously, committed the crime charged. Obviously, no one can be convicted of aiding or abetting the criminal acts of someone else if no crime was committed by the other person in the first place. Accordingly, if the Government has not proved beyond a reasonable doubt that a person other than the defendant committed the substantive crime charged in the Indictment, then you need not consider the second element under this theory of aiding and abetting. But if you do find that a crime was committed by someone other than the defendant, or someone he willfully caused to take actions necessary for the commission of the crime, then you must consider whether the defendant aided or abetted the commission of that crime.

Second, in order to convict on an aiding and abetting theory, the Government must prove that the defendant willfully and knowingly associated himself in some way with the crime, and

19

**A-427**

that he willfully and knowingly engaged in some affirmative conduct or some overt act for the specific purpose of bringing about that crime. Participation in a crime is willful if done voluntarily and with a wrongful purpose. The mere presence of a defendant in a place where a crime is being committed, even coupled with knowledge that a crime is being committed, is not enough to make the defendant an aider and abettor. Similarly, a defendant's acquiescence in the criminal conduct of others, even with guilty knowledge, is not enough to establish aiding and abetting. An aider and abettor must know that the crime is being committed and act in a way that is intended to bring about the success of the criminal venture. To determine whether the defendant aided and abetted the commission of the crime, ask yourself these questions:

Did the defendant participate in the crime charged as something that the defendant wished to bring about?

Did he knowingly associate himself with the criminal venture?

Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor. If, on the other hand, your answer to any of these questions is no, then the defendant is not an aider and abettor.

There is a subtle difference between a defendant willfully causing someone else to take actions necessary for the commission of a crime as opposed to aiding and abetting someone else to commit a crime. If this question comes up in your deliberations, you should think of it in terms of the difference between causing someone to do something versus facilitating or helping someone to do it. If you are persuaded beyond a reasonable doubt that the defendant willfully caused someone else to take actions necessary for the commission of either of the substantive wire frauds charged in the Indictment, you should convict him as a principal on that count. If, on the other hand, you are persuaded beyond a reasonable doubt that the defendant, with the knowledge and

20

**A-428**

intent that I described, sought by his actions to facilitate or assist that other person in committing the crime, then he is guilty as an aider and abettor. One important difference between willfully causing and aiding and abetting another person to commit a crime, as I instructed you earlier, is that with respect to willful causation, the Government need not prove that the defendant acted through a guilty person. With respect to aiding and abetting, however, the Government must prove beyond a reasonable doubt that someone else committed the crime charged with the requisite intent. If you find beyond a reasonable doubt that the Government has proved that another person actually committed one or more of the substantive crimes charged in Counts One and Three and that the defendant aided or abetted that person in the commission of that offense, you should find that defendant guilty of that substantive crime on an aiding and abetting theory. If, however, you do not so find, you may not convict the defendant of that crime on the basis of an aiding and abetting theory.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

**A-429**

REQUEST NO. 12:  Counts 2 and 4 – Conspiracy to Commit Wire Fraud

I will now turn to the conspiracy charges, and specifically the charge of conspiracy to commit wire fraud, which is the crime charged in Counts Two and Four of the Indictment. As I told you, a conspiracy is a kind of a criminal partnership -- a combination or agreement of two or more persons to join together to accomplish some unlawful objective. Count Two charges that the defendant conspired with others to commit wire fraud against FTX's customers by misappropriating their deposits.  Count Four charges that the defendant conspired with others to commit wire fraud against lenders to Alameda Research by making false and fraudulent statements, representations, and promises to those lenders.

Adapted from the charges of the Honorable Lewis A. Kaplan in
United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

22

**A-430**

<u>REQUEST NO. 13:</u>   <u>Counts 2 and 4 – Conspiracy to Commit Wire Fraud – Elements</u>

In order to sustain its burden of proof with respect to the conspiracy charged in Counts Two and Four, the Government must prove beyond a reasonable doubt each of two elements:

First, it must prove the existence of the conspiracy charged in the count of the Indictment.

Second, it must prove that the defendant knowingly and willfully became a member of, and joined in, the conspiracy.

Adapted from the charges of the Honorable Lewis A. Kaplan in <u>United States</u> v. <u>Gatto</u>, 17 Cr. 686 (Oct. 1, 2018).

23

<u>REQUEST NO. 14:</u>   <u>Counts 2 and 4 – Conspiracy to Commit Wire Fraud – First Element - Agreement</u>

Starting with the first element, a conspiracy is a combination, an agreement or an understanding of two or more people to accomplish by concerted action a criminal or unlawful purpose. Counts Two and Four charge that the criminal or unlawful purpose was to commit wire fraud.

To establish a conspiracy, the Government is not required to show that two or more persons sat down around a table and entered into a solemn pact, orally or in writing, stating that they had formed a conspiracy to violate the law and setting forth the details of the plans and the means by which the unlawful project is to be carried out, or the part to be played by each conspirator. Your common sense will tell you that when people, in fact, undertake to enter into a criminal conspiracy, much usually is left to unexpressed understanding. Conspirators do not usually reduce their agreements to writing or acknowledge them publicly, nor do they broadcast their plans. From its very nature, a conspiracy almost invariably is secret in its origin and in its execution. It is sufficient if two or more persons in some way or manner come to a common understanding to violate the law. Express language or specific words are not required to indicate that someone has joined in a conspiracy.

Because conspiracy by its very nature is characterized by secrecy, it is rare that a conspiracy can be proved by direct evidence of that explicit agreement. You may infer the existence of a conspiracy from the circumstances and the conduct of the persons involved. The adage "actions speak louder than words" may be applicable here. Usually, the only evidence available with respect to the existence of a conspiracy is that of disconnected acts on the part of the alleged individual co-conspirators. When taken together and considered as a whole, however, such acts may show a conspiracy or agreement as conclusively as would direct proof. In determining whether a

24

conspiracy actually existed, you may consider all the evidence of the acts, conduct, and statements of the alleged conspirators and the reasonable inferences to be drawn from those matters.

As I instructed you earlier, the essence of the crime of conspiracy is an agreement or an understanding to commit a crime. So it does not matter if the crime, the commission of which was the objective of the conspiracy, ever was committed. A conspiracy to commit a crime is an entirely separate and distinct offense from the actual commission of the illegal act that is the object of the conspiracy. The success or failure of a conspiracy is not material to the question of guilt or innocence of an alleged conspirator.

Now, each of the conspiracies charged in Counts Two and Four allegedly had one objective - that is, each conspiracy had a single illegal purpose, according to the allegations of the Indictment, that the conspirators are alleged to have hoped to accomplish – that was, respectively, to commit wire fraud against FTX customer and against Alameda Research lenders. I explained the elements of wire fraud to you already in charging you on Counts One and Three. You will apply those instructions when you consider whether the Government has proved beyond a reasonable doubt that the conspiracies charged in Count Two and Four existed. However, because Counts Two and Four charge conspiracies, the Government does not need to prove that anyone committed the substantive crime of wire fraud. It need prove beyond a reasonable doubt only that there was an agreement to do so.

The Indictment charges that the conspiracy charged in Count Two lasted from at least in or about 2019 through at least in or about November 2022, and the conspiracy charged in Count Four lasted from at least in or about June 2022 through at least in or about November 2022. It is not necessary for the Government to prove that the conspiracy lasted throughout the entire period alleged, but only that it existed for some time within that time frame.

**A-433**

In sum, in order to find that the conspiracies charged in Counts Two and Four existed, the Government must prove beyond a reasonable doubt that there was a mutual understanding, either spoken or unspoken, between two or more people to commit wire fraud.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018), and in United States v. Jones, 17 Cr. 791 (Dec. 16, 2019).

26

**A-434**

REQUEST NO. 15:  Counts 2 and 4 – Conspiracy to Commit Wire Fraud – Second Element – Membership

If you conclude that the Government has proved beyond a reasonable doubt that the conspiracy charged in Count Two and/or Count Four existed, you next must determine whether the defendant willfully joined and participated in the conspiracy with knowledge of its wrongful purpose, and with an intent to aid in the accomplishment of its unlawful objective -- that is, the commission of wire fraud. The Government must prove beyond a reasonable doubt that the defendant knowingly, willfully, and with specific intent to defraud entered into the conspiracy. "Knowingly" and "willfully" have the same meanings here as I described earlier with respect to the second element of substantive wire fraud.

A defendant's participation in the conspiracy may be established by independent evidence of his own acts or statements, as well as those of the other alleged conspirators, and the reasonable inferences that may be drawn from it. Now, science has not yet devised a manner of looking into a person's mind and knowing what the person is thinking. To make that determination, you may look to the evidence of certain acts alleged to have taken place by or with the defendant or in his presence. As I instructed you earlier with respect to determining a defendant's knowledge and intent, you may consider circumstantial evidence based upon the defendant's outward manifestations, his words, his conduct, his acts, and all of the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

To become a member of the conspiracy, the defendant need not have known the activities of each and every other member. Moreover, the defendant does not need to be fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part.

27

**A-435**

Nor is it necessary that the defendant receive any monetary benefit from participating in the conspiracy, or that the defendant have a financial stake in the outcome, so long as he, in fact, participated in the manner in which I have described.  Although proof of a financial interest in the outcome or another motive is not essential, if you find that the defendant had such an interest or other motive, that's a factor you may consider in determining whether the defendant was a member of the conspiracy. The presence or absence of motive is, however, a circumstance that you may consider as bearing on the intent of the defendant.

The duration and extent of the defendant's participation has no bearing on the issue of a defendant's guilt. Each member of a conspiracy may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, others play only minor parts in a conspiracy. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of a conspiracy. Moreover, the defendant need not have joined the conspiracy at the outset. He may have joined at any time, and if he joined, still will be held responsible for the acts done before or after he joined.

I want to caution you, however, that the mere association by one person with another does not make that person a member of the conspiracy even when coupled with knowledge that a conspiracy is taking place. Similarly, mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support a conviction.  In other words, knowledge without participation is not enough. What is necessary is that the defendant participated in the conspiracy with knowledge of the unlawful purpose of the conspiracy, in this case, to commit wire fraud, and with an intent to aid in the accomplishment of its unlawful objective.

In sum, the defendant, with an understanding of the unlawful nature of the alleged conspiracy, must intentionally have engaged, advised or assisted in the conspiracy for the purpose

28

**A-436**

of the illegal undertaking. A defendant thereby becomes a knowing and willing participant in the lawful agreement: in other words, a defendant thereby becomes a conspirator.

A conspiracy, once formed, is presumed to continue until either its objectives are accomplished or there is some affirmative act of termination by its members. So, too, once a person is found to be a member of a conspiracy, that person is presumed to continue being a member in the venture until the venture is terminated, unless it is shown by some affirmative proof that the person withdrew and disassociated himself from it. You may find that the conspiracy existed even if there were changes in personnel or activities over time, so long as you find that at least two of the conspirators continued to act for the duration of the conspiracy for the purpose charged in the Indictment, that is, committing wire fraud.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018) and in United States v. Jones, 17 Cr. 791 (Dec. 16, 2019).

29

**A-437**

REQUEST NO. 16:  Count 5 – Conspiracy to Commit Securities Fraud – General Instruction and Elements

Count Five charges SAMUEL BANKMAN-FRIED with conspiring to commit securities fraud.

In order to sustain its burden of proof with respect to the conspiracy allege in Count Five, the Government must prove beyond a reasonable doubt each of the following three elements:

*First*, that there was an agreement or understanding to accomplish the unlawful objective alleged in Count Five of the Indictment, specifically securities fraud;

*Second*, that the defendant knowingly and willfully became a member of and joined the conspiracy;

*Third*, that at least one person who was a member of the conspiracy committed some overt act in furtherance of the conspiracy.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018).

30

**A-438**

<u>REQUEST NO. 17:</u>  <u>Count 5 – Conspiracy to Commit Securities Fraud – Existence of Agreement</u>

The first element that the Government must prove beyond a reasonable doubt is that two or more persons entered into an agreement to commit securities fraud.  I have already instructed you on what it means to enter an agreement to accomplish the unlawful objective of a conspiracy, and those instructions apply to Count Five.

As I explained earlier, the object or objective of a conspiracy is the illegal goal the co-conspirators agree or hope to achieve.  Count Five of the Indictment charges that the object (or illegal goal) of the conspiracy was committing securities fraud.

> Adapted from the charge of the Honorable Lewis A. Kaplan in <u>United States</u> v. <u>Blaszczak,</u> 17 Cr. 357 (Apr. 27, 2018).

31

**A-439**

REQUEST NO. 18:  Count 5 – Conspiracy to Commit Securities Fraud –  Object Elements

I will now instruct you on the elements of the object of the conspiracy charged in Count Five.  As I explained to you previously, with respect to a conspiracy, the Government must prove that the defendant agreed with his co-conspirators to commit the objective of the conspiracy, here securities fraud, but it need not prove that the securities fraud was actually committed or accomplished.

Securities fraud has the following three elements:

*First*, that in connection with the purchase or sale of securities, the defendant did any one or more of the following: (a) employed a device, scheme, or artifice to defraud; or (b) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser of the securities.

*Second*, that the defendant acted knowingly, willfully, and with an intent to defraud; and

*Third*, that in furtherance of the fraudulent conduct, there occurred at least one use of any means or instruments of transportation or communication in interstate commerce, or the use of the mails, or the use of any facility of any national securities exchange.

> Adapted from the charges of the Honorable Edgardo Ramos in United States v. Milton, 21 Cr. 478 (Sept. 12, 2022); the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018); and the Honorable Paul G. Gardephe in United States v. Tuzman, 15 Cr. 536 (Dec. 22, 2017).

32

REQUEST NO. 19:  Count 5 – Conspiracy to Commit Securities Fraud –  Object – First Element

The first element of securities fraud is that, in connection with the purchase or sale of securities, the defendant did any one or more of the following: employed a device, scheme, or artifice to defraud; made an untrue statement of material fact, or omitted to state a material fact which made what was said, under the circumstances, misleading; or engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller of securities.

In proving a fraudulent act, it is not necessary for the Government to prove that all three types of unlawful conduct were part of the conspiracy's object. Any one will be sufficient to satisfy this element of the offense. You must, however, be unanimous as to which type of unlawful conduct was the alleged object of the conspiracy.

I will now explain a number of terms used in this provision.

A "device, scheme, or artifice to defraud" is merely a plan to accomplish a fraudulent objective. A "scheme to defraud" is a pattern or course of conduct concerning a material matter designed to deceive a person.

A statement, representation, claim, or document is false if it is untrue when made and was then known to be untrue by the person making it or causing it to be made. A representation or statement is fraudulent if it was made with the intent to deceive. A statement may also be false if it contains half-truths or if it conceals material facts in a manner that makes what is said or represented deliberately misleading.  This includes statements that may be literally true but nevertheless create a materially misleading impression.

To establish that the conspiracy's objective included the first element of securities fraud, you must find that the defendant agreed to participate in fraudulent conduct that was "in connection

33

with" a purchase or sale of securities. The Government alleges that the agreed-upon fraudulent conduct was in connection with the purchase and sale of stock shares of FTX, which were also referred to at trial as "equity" in FTX, and which are "securities" within the meaning of federal law. The requirement that the fraudulent conduct be "in connection with" a purchase or sale of securities is satisfied so long as there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities. Fraudulent conduct may be "in connection with" the sale or purchase of securities if you find that the fraudulent conduct touched upon a securities transaction.  The fraudulent or deceitful conduct alleged need not relate to the investment value of the securities involved.

You need not find that the defendant actually participated in any specific purchase or sale of a security if you find that the defendant participated, or agreed to participate, in the fraudulent conduct that was "in connection with" a "purchase or sale" of securities. It is not necessary for you to find that the defendant was or would be the actual seller of the securities. It is sufficient if the misrepresentation or omission of material fact involved the purchase or sale of securities.

By the same token, the Government need not prove that the defendant agreed to personally make a misrepresentation or omit a material fact. It is sufficient if the Government establishes that the defendant intended to cause the statement to be made or the fact to be omitted.

With regard to the alleged misrepresentations and omissions, you must determine whether the statements were true or false when made and, in the case of alleged omissions, whether the omissions were misleading.

If you find that the Government has established that the statement the defendant agreed to make was false or a statement was omitted, rendering the statements that were made misleading, you must next determine whether the device, scheme, statement, half-truth, or omission was

material under the circumstances.  Material information in this context is information that a reasonable investor would have considered important in making an investment decision in light of the total mix of information publicly available.

In considering whether a statement or omission was material, let me caution you that a clause in an investment contract or a disclaimer cannot render any misrepresentation, including any oral misrepresentation, immaterial as a matter of law.

In considering whether a statement or omission was material, let me caution you that it is not a defense if the material misrepresentation or omission would not have deceived a person of ordinary intelligence. Once you find that the offense involved the making of material misrepresentations or omissions of material facts, it does not matter whether any of the victims involved were careless, gullible, or even negligent, or that they might have uncovered the scheme on their own had they probed more deeply, because the law protects the gullible and unsophisticated as well as the experienced investor.

Nor does it matter whether the unlawful conduct was or would have been successful, or whether the defendant profited or would have profited as a result of the alleged scheme. Success is not an element of the offense. If, however, you find that the defendant expected to or did profit from the scheme, you may consider that in relation to the element of intent, which I will discuss in a moment.

> Adapted from the charges of the Honorable Edgardo Ramos in United States v. Milton, 21 Cr. 478 (Sept. 12, 2022); and the Honorable Paul G. Gardephe in United States v. Tuzman, 15 Cr. 536 (Dec. 22, 2017).

**A-443**

<u>REQUEST NO. 20:</u>   Count 5 – Conspiracy to Commit Securities Fraud –  Object – Second Element

The second element of securities fraud is that the defendant participated in the scheme to defraud knowingly, willfully, and with the intent to defraud.

I have already instructed you on the meaning of the terms "knowingly" and "willfully" and you should apply those definitions here.

In the context of securities laws, "intent to defraud" means to act knowingly and with the intent to deceive. Since an essential element of securities fraud is intent to defraud, good faith, as I have previously defined that term, is a complete defense to a charge of securities fraud. My prior instructions concerning good faith apply with equal force here.

> Adapted from the charges of the Honorable Edgardo Ramos in <u>United States</u> v. <u>Milton</u>, 21 Cr. 478 (Sept. 12, 2022); and the Honorable Paul G. Gardephe in <u>United States</u> v. <u>Tuzman</u>, 15 Cr. 536 (Dec. 22, 2017).

> <u>See</u> <u>United States</u> v. <u>Litvak</u>, 808 F.3d 160, 178 (2d Cir. 2015) (intent element for securities fraud is "intent to deceive, manipulate or defraud" not "intent to harm"); <u>United States</u> v. <u>Kaiser</u>, 609 F.3d 556, 569 (2d Cir. 2010) (holding that willfulness for purposes of Title 15 securities fraud "do[es] not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of the general wrongfulness of his conduct").

36

**A-444**

<u>REQUEST NO. 21:</u>  <u>Count 5 – Conspiracy to Commit Securities Fraud –  Object – Third Element</u>

The third element of securities fraud is that the defendant knowingly used or caused to be used at least one instrumentality of interstate commerce, such as an interstate telephone call, a use of the mails, or an interstate transaction in furtherance of the scheme to defraud or the fraudulent conduct.

The Government need not prove that a defendant was directly or personally involved in the use of an instrumentality of interstate commerce. If the defendant was an active participant in the scheme and took steps or engaged in conduct that he knew or could reasonably foresee would naturally and probably result in the use of an instrumentality of interstate commerce, this element would be satisfied. Nor is it necessary that the communication did or would contain a fraudulent representation. The use of the mails or instrumentality of interstate commerce need not be central to the execution of the scheme or even be incidental to it. All that is required is that the use of the mails or instrumentality of interstate commerce bear some relation to the object of the scheme or fraudulent conduct.

Moreover, the actual purchase or sale of a security need not be accompanied by the use of the mails or an instrumentality of interstate commerce, so long as the mails or instrumentality of interstate commerce are used in furtherance of the scheme and the defendant is still engaged in actions that are part of a fraudulent scheme when the mails or the instrumentalities of interstate commerce are used.

Adapted from the charge of the Honorable Paul G. Gardephe in
<u>United States</u> v. <u>Tuzman</u>, 15 Cr. 536 (Dec. 22, 2017).

**A-445**

REQUEST NO. 22:  Count 5 – Conspiracy to Commit Securities Fraud – Membership

I have defined for you the elements of securities fraud, which was the object of the conspiracy charged in Count Five.  The second element of Count Five is that the defendant knowingly and willfully joined and participated in the conspiracy to commit securities fraud.  I have already instructed you on the meaning of the terms "knowingly" and "willfully," and what it means for a defendant to knowingly and willfully become a member of and join a conspiracy.  You should apply those instructions here.

Adapted from the charge of the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018).

**A-446**

REQUEST NO. 23:  Count 5 – Conspiracy to Commit Securities Fraud – Overt Act

The third and last element with respect to Count Five is that the Government must prove beyond a reasonable doubt that at least one of the coconspirators, not necessarily the defendant, committed at least one overt act in furtherance of the conspiracy. In other words, there must have been something more than an agreement, some overt step or action must have been taken by at least one of the conspirators in furtherance of the conspiracy. The overt act element, to put it another way, is a requirement that any agreement in relation to Count Five went beyond the mere talking stage, the mere agreement stage.

I will note that this overt act element applies to this Count – Count Five – as well as Count Six, but does not apply to the other conspiracy charges in Counts Two, Four, and Seven.

It is not required or necessary for the Government to prove any particular overt act. It is enough if the Government proves at least one overt act was committed in furtherance of the conspiracy regardless of whether it's alleged in the Indictment. Although you must find unanimously that some overt act in furtherance of the conspiracy has been proved, you do not have to be unanimous as to which act. Similarly, you need not find that the defendant committed the overt act. It is sufficient for the Government to show that one of the alleged conspirators knowingly committed an overt act in furtherance of the conspiracy, since such an act becomes, in the eyes of the law, the act of all the members of the conspiracy.

You should bear in mind that the overt act standing alone may be an innocent lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding or assisting a conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act which in and of itself is criminal or constitutes an objective of the conspiracy.

39

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018) and the Honorable J. Paul Oetken in United States v. Parnas, 19 Cr. 725 (JPO) (Oct. 13, 2021).

**A-448**

REQUEST NO. 24:  Count 6 – Conspiracy to Commit Commodities Fraud – Elements

Count Six charges SAMUEL BANKMAN-FRIED with conspiring to commit commodities fraud.

In order to sustain its burden of proof with respect to the conspiracy allege in Count Six, the Government must prove beyond a reasonable doubt each of the following three elements:

*First*, that there was an agreement or understanding to accomplish the unlawful objective alleged in Count Six of the Indictment, specifically commodities fraud;

*Second*, that the defendant knowingly and willfully became a member of and joined the conspiracy;

*Third*, that at least one person who was a member of the conspiracy committed some overt act in furtherance of the conspiracy.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018).

41

**A-449**

<u>REQUEST NO. 25:</u>  <u>Count 6 – Conspiracy to Commit Commodities Fraud – Existence of Agreement</u>

The first element that the Government must prove beyond a reasonable doubt is that two or more persons entered into an agreement to commit commodities fraud.  I have already instructed you on what it means to enter an agreement to accomplish the unlawful objective of a conspiracy, and those instructions apply to Count Six.

As I explained earlier, the object or objective of a conspiracy is the illegal goal the co-conspirators agree or hope to achieve.  Count Six of the Indictment charges that the object (or illegal goal) of the conspiracy was committing commodities fraud.

> Adapted from the charges of the Honorable Lewis A. Kaplan in <u>United States</u> v. <u>Blaszczak</u>, 17 Cr. 357 (Apr. 27, 2018).

42

**A-450**

REQUEST NO. 26:  Count 6 – Conspiracy to Commit Commodities Fraud – Object Elements

I will now instruct you on the elements of the object of the conspiracy.  As I explained to you previously, with respect to a conspiracy, the Government must prove that the defendant agreed with his co-conspirators to commit the objective of the conspiracy, here commodities fraud, but it need not prove that the commodities fraud was actually committed or accomplished.  Commodities fraud has the following three elements:

*First*, the defendant did any one or more of the following: (a) employed a manipulative device, scheme, or artifice to defraud; or (b) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit.

*Second*, the scheme, untrue statement, act, practice, or course of conduct was in connection with a swap,  or a contract of sale of any commodity in interstate commerce.

*Third*, that the defendant acted knowingly, willfully, and with an intent to defraud.

> Adapted from the charge of the Honorable Edmond E. Chang in United States v. Smith, 19 Cr. 669 (N.D. Ill. July 28, 2022) pursuant to the cognate offense 18 U.S.C. § 1348(1) and from the Honorable Jack B. Weinstein's statement of the elements in Commodity Futures Trading Comm'n v. McDonnell, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018)

43

**A-451**

REQUEST NO. 27:  Count 6 – Conspiracy to Commit Commodities Fraud – Object - First Element

The first element of commodities fraud is that the defendant did any one or more of the following: employed a manipulative device, scheme, or artifice to defraud; made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit.

In proving a fraudulent act, it is not necessary for the Government to prove all three types of unlawful conduct. Any one will be sufficient to satisfy this element of the offense. You must, however, be unanimous as to which type of unlawful conduct was the alleged object of the conspiracy.

The terms used in this provision are the same used in the securities fraud count, Count Five. The definitions I provided you when instructing you on the first element of securities fraud apply here as well.

As I previously told you, a scheme to defraud, false statement, misleading omission, or deceptive act, practice, or course of conduct must be material under the circumstances. In this context, materiality means the scheme, statement, omission, act, practice, or course of conduct must have the natural tendency to influence or be capable of influencing the actions of a person who was a target of the scheme, statement, omission, act, practice, or course of conduct. In the context of a commodities fraud, it is not necessary that the victim was actually deceived or lost money or property as a result of the deceptive conduct so long as there is proof that the scheme was at least capable of affecting the victim's conduct or decision in the market in a manner that could lead either to some gain for the wrongdoer or some harm to the victim.

44

Adapted from the charge of the Honorable Jeffrey Meyer in United States v. Flotron, 17 Cr. 220 (D. Conn. Apr. 24, 2018) pursuant to the cognate offense 18 U.S.C. § 1348(1).  See also Loginovskaya v. Batratchenko, 764 F.3d 266, 272 (2d Cir. 2014) ("courts have looked to the securities laws when called upon to interpret similar provisions of the Commodity Exchange Act.").

A-453

REQUEST NO. 28:  Count 6 – Conspiracy to Commit Commodities Fraud – Object – Second Element

The second element of commodities fraud is that the defendant and his co-conspirators committed their conduct in connection with a "swap," or contract of sale of a "commodity" in interstate commerce.

Let me define those terms for you.

A "commodity" is a good, article, service, right, or interest in which contracts for future delivery are dealt.  A "contract for future delivery," which is also called a "futures contract," is an agreement to buy or sell a particular commodity at a specific price in the future. A virtual currency or cryptocurrency may qualify as a "commodity."

A "swap" is an agreement between two parties to exchange payments with each other based on the value of one or more rates, commodities, indices, or other financial or economic interests. A "swap" transfers between the two parties, in whole or in part, the risk of changes in value of the things underlying the swap, without actually exchanging those things. In determining whether a financial contract, agreement, or transaction qualifies as a "swap," you may consider whether the arrangement is commonly known as or referred to as a "swap."

The requirement that the fraudulent conduct be "in connection with" a "swap," or contract of sale of a "commodity" is satisfied so long as there was some nexus or relation between the allegedly fraudulent conduct and the swap or contract of sale of a commodity. Fraudulent conduct may be "in connection with" if you find that the fraudulent conduct touched upon a swap or contract of sale of a commodity.  Statements directed to the general public which affect the public's interest in these products are made in connection with them.  The fraudulent or deceitful conduct need not relate to the value of the swap or contract of sale of a commodity.  It is also not necessary for you to find that the defendant was or would be the actual seller of the swap or commodity.

46

**A-454**

Adapted from the definitions of "commodities" and "swaps" as defined in 7 U.S.C. § 1a(9).  Courts have repeatedly held that virtual currencies qualify as "commodities."  See, e.g., United States v. Reed, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *4 (S.D.N.Y. Feb. 28, 2022) ("under the plain language of the CEA, cryptocurrencies fall within the definition of commodities"); Commodity Futures Trading Comm'n v. Gelfman Blueprint, Inc., No. 17-7181 (PKC), 2018 WL 6320656, at *8 (S.D.N.Y. Oct. 16, 2018) ("Virtual currencies such as Bitcoin are encompassed in the definition of 'commodity' under Section 1a(9) of the Act").  Therefore, it is appropriate to instruct the jury that a virtual currency may be a "commodity."

**A-455**

REQUEST NO. 29:  Count 6 – Conspiracy to Commit Commodities Fraud – Object – Third Element

The third element of commodities fraud is that the defendant participated in the scheme to defraud, false statement, misleading omission, or deceptive act, practice, or course of conduct knowingly, willfully, and with the intent to defraud.

I have already instructed you on the meaning of the terms "knowingly" and "willfully" and you should apply those definitions here.  With respect to the term "intent to defraud," I previously defined that term in connection with my instructions for Count Five, and you should apply those instructions here.

> See Loginovskaya v. Batratchenko, 764 F.3d 266, 272 (2d Cir. 2014) ("courts have looked to the securities laws when called upon to interpret similar provisions of the Commodity Exchange Act"); Commodity Futures Trading Comm'n v. Oystacher, 203 F. Supp. 3d 934, 950 (N.D. Ill. 2016) (applying the *scienter* standard for securities fraud to Rule 180.1).

48

**A-456**

REQUEST NO. 30:  Count 6 – Conspiracy to Commit Commodities Fraud – Membership

I defined for you the elements of commodities fraud, which was the object of the conspiracy charged in Count Six. The second element of Count Six is that the defendant knowingly and willfully joined and participated in the conspiracy to commit commodities fraud.  I have already instructed you on the meaning of the terms "knowingly" and "willfully," and what it means for a defendant to knowingly and willfully become a member of and join a conspiracy.  You should apply those instructions here.

Adapted from the charge of the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018).

**A-457**

REQUEST NO. 31:  Count 6 – Conspiracy to Commit Commodities Fraud – Overt Act

The third and last element with respect to Count Six is that the Government must prove beyond a reasonable doubt that at least one of the coconspirators, not necessarily the defendant, committed at least one overt act in furtherance of the conspiracy. I instructed you on the requirements of the "overt act" element when I instructed you on Count Five, and you should apply those instructions here.

> Adapted from the charge of the Honorable Lewis A. Kaplan in
> United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018).

50

**A-458**

REQUEST NO. 32:  Count 7 – Conspiracy to Commit Money Laundering – General Instruction

Count Seven charges SAMUEL BANKMAN-FRIED with conspiring to commit money laundering. Specifically, Count Seven charges the defendant with conspiring to commit money laundering from in or about 2020 through in or about November 2022, by agreeing to launder the proceeds of the wire fraud charged in Count One.

**A-459**

REQUEST NO. 33:  Count 7 – Conspiracy to Commit Money Laundering – Elements

To sustain its burden of proof with respect to the offense charged in Count Seven, the Government must prove beyond a doubt the following four elements:

*First*, that two or more persons entered into an unlawful agreement to participate in money laundering; and

*Second*, that the defendant knowingly and willfully entered into the agreement.

In other words, the elements of the conspiracy charged in Count Seven are the same elements the Government is required to prove with respect to the conspiracies alleged in Count Two and Count Four—namely, the existence of an agreement to violate the law and knowing and willful entry of the considered defendant into that agreement. The difference is that the object or objective of those counts was committing wire fraud, while the object or objective here is committing money laundering.

> Adapted from the jury charges of the Honorable Loretta A. Preska in United States v. Adelekan, 19 Cr. 291 (LAP) (Oct. 26, 2021).

52

**A-460**

REQUEST NO. 34:  Count 7 – Conspiracy to Commit Money Laundering – First Element

The first element that the Government must prove beyond a reasonable doubt is that two or more persons entered into an agreement to commit money laundering.  I have already instructed you on the elements of a conspiracy charge generally and those instructions apply to Count Seven.

As I explained earlier, the object or objective of a conspiracy is the illegal goal the co-conspirators agree or hope to achieve.  Count Seven of the Indictment charges that there were two objects (or illegal goals) of the conspiracy.  As I told you before, you do not need to find that the defendant actually committed the objects of a charged conspiracy, but only that he agreed with others to commit at least one of the objects.  The first object of the conspiracy alleges that the defendant agreed to commit money laundering by engaging in financial transactions that involve the proceeds of the wire fraud, in order to conceal or disguise the nature, location, source, ownership, or control of proceeds of the wire fraud.  I will refer to this object as "concealment" money laundering.  The second object of the conspiracy alleges that the defendant agreed to commit money laundering by engaging in monetary transactions greater than $10,000 involving the proceeds of the wire fraud.

There are two lines for Count Seven for you to fill in on the verdict form.  The first line asks whether the defendant is guilty of the first object of the conspiracy and the second line asks whether the defendant is guilty of the second object of the conspiracy.  In order to find the defendant guilty of either object, there must be unanimous agreement on that object.  With that in mind, I will now proceed to discuss the elements of each form of money laundering.

Adapted from the jury charges of the Honorable Loretta A. Preska
in United States v. Adelekan, 19 Cr. 291 (LAP) (Oct. 26, 2021).

53

**A-461**

<u>REQUEST NO. 35</u>:  <u>Count 7 – Conspiracy to Commit Money Laundering – Concealment Elements</u>

I will instruct you on the elements of the first object of the conspiracy, which is concealment money laundering.  As I explained to you previously, the Government must prove that the defendant agreed with his co-conspirators to commit the objective of the conspiracy, but it need not prove that money laundering was actually committed or accomplished.

Concealment money laundering has the following elements:

*First*, that the defendant conducted (or attempted to conduct) a "financial transaction," which must in some way or degree have affected interstate or foreign commerce;

*Second*, that the financial transaction at issue involved the proceeds of specified unlawful activity, which here was a wire fraud scheme;

*Third*, that the defendant knew that the financial transaction involved the proceeds of some form of unlawful activity; and

*Fourth*, that the defendant knew that the transaction was designed in whole or in part either to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity.

If you find beyond a reasonable doubt that the defendant agreed with at least one other person to commit concealment money laundering, then the concealment money laundering object of Count Seven would be proved.  However, if you find that the Government has not met its burden to prove that the defendant agreed with at least one other person to commit concealment money laundering, then the object would not be proved.

Adapted from the jury charges of the Honorable Loretta A. Preska
in <u>United States</u> v. <u>Adelekan</u>, 19 Cr. 291 (LAP) (Oct. 26, 2021); and
from Sand et al., <u>Modern Federal Jury Instructions</u>, Instr. 50A-8.

54

<u>REQUEST NO. 36:</u>  <u>Count 7 – Conspiracy to Commit Money Laundering – Concealment – First Element</u>

The first element of concealment money laundering is that the defendant conducted a financial transaction.

The term "conducts" includes the action of initiating, concluding, or participating in initiating or concluding a transaction.

The term "financial transaction" means (1) a transaction involving a financial institution – including a bank – which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree, or (2) a transaction which involves the movement of funds by wire or other means and in any way or degree affects interstate or foreign commerce.

A "transaction involving a financial institution" includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, or any other payment, transfer, or delivery by, through or to a financial institution by whatever means.

The term "funds" includes any currency, money, or other medium of exchange that can be used to pay for goods and services, including digital or cryptocurrency.

Interstate commerce includes any transmission or transfer between persons or entities located in different states, and foreign commerce means the same thing, except it is between a person or entity in the United States and a person or entity in a foreign country.  The involvement in interstate or foreign commerce can be minimal, and the Government satisfies its burden if it proves any effect or involvement, regardless of whether it was beneficial or harmful.  It is also not necessary for the Government to show that the defendant actually intended or anticipated an effect on interstate or foreign commerce by his actions or that commerce was actually affected.  All that

55

**A-463**

is necessary is that the natural and probable consequences of the acts the defendant agreed to take

would affect interstate or foreign commerce.

> Adapted from the jury charges of the Honorable Jesse M. Furman in United States v. Chastain, 22 Cr. 305 (JMF) (Apr. 25, 2023), the Honorable Loretta A. Preska in United States v. Adelekan, 19 Cr. 291 (LAP) (Oct. 26, 2021); and from Sand et al., Modern Federal Jury Instructions, Instr. 50A-8.

> See United States v. Ulbricht, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) (digital currency constituted "funds" within the meaning of the money laundering statute); United States v. Budovsky, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *13 (S.D.N.Y. Sept. 23, 2015) (same).

**A-464**

<u>REQUEST NO. 37:</u>  <u>Count 7 – Conspiracy to Commit Money Laundering – Concealment – Second Element</u>

The second element of concealment money laundering is that the financial transactions must involve the proceeds of "specified" unlawful activity.  Here, the "specified" unlawful activity is the wire fraud scheme charged in Count One, and I instruct you, as a matter of law, that the term "specified unlawful activity" includes wire fraud.

The term "proceeds" means any property, or any interest in property, that someone acquires or retains as profits resulting from the commission of the specified unlawful activity.

> Adapted from the jury charges of the Honorable Jesse M. Furman in <u>United States</u> v. <u>Chastain</u>, 22 Cr. 305 (JMF) (Apr. 25, 2023), and the Honorable Loretta A. Preska in <u>United States</u> v. <u>Adelekan</u>, 19 Cr. 291 (LAP) (Oct. 26, 2021); and from Sand et al., <u>Modern Federal Jury Instructions</u>, Instr. 50A-8.

57

**A-465**

<u>REQUEST NO. 38:</u>  <u>Count 7 – Conspiracy to Commit Money Laundering – Concealment – Third Element</u>

The third element of concealment money laundering is that the defendant knew that the financial transactions at issue involved the proceeds of some form, though not necessarily which form, of unlawful activity. If you find beyond a reasonable doubt that the defendant committed the wire fraud offense I have instructed you on in Count One, and he knew that the proceeds came from that activity, that is sufficient for you to find that the defendant believed that the proceeds came from unlawful activity. Keep in mind, however, that it is not necessary for the defendant to believe that the proceeds would come from wire fraud specifically. It is sufficient that the defendant believed that the proceeds would come from some unlawful activity.

> Adapted from the jury charges of the Honorable Jesse M. Furman in <u>United States</u> v. <u>Chastain</u>, 22 Cr. 305 (JMF) (Apr. 25, 2023), and the Honorable Ronnie Abrams in <u>United States</u> v. <u>Rahmankulov</u>, 20 Cr. 652 (Aug. 22, 2022); and from Sand et al., <u>Modern Federal Jury Instructions</u>, Instr. 50A-9.

> <u>See</u> <u>United States</u> v. <u>Diggles</u>, 928 F.3d 380 (5th Cir. 2019) (holding knowledge funds came from unlawful activity satisfied when defendant was perpetrator of underlying crime); <u>United States</u> v. <u>Chon</u>, 713 F.3d 812, 820 (5th Cir. 2013) (same); <u>United States</u> v. <u>Bohn</u>, 281 F. App'x 430, 441 (6th Cir. 2008) ("Because we have already determined that the circumstantial evidence was sufficient to show that [the defendant] knew about the mail fraud scheme, it follows that the evidence was also sufficient to show that [he] knew that the money was from some form of unlawful activity); <u>United States</u> v. <u>Martinelli</u>, 454 F.3d 1300, 1311 (11th Cir. 2006) (holding that the defendant simply had to know the funds were derived from the specified unlawful activity of mail fraud).

**A-466**

<u>REQUEST NO. 39:</u>  <u>Count 7 – Conspiracy to Commit Money Laundering – Concealment – Fourth Element</u>

The fourth element that the Government must establish beyond a reasonable doubt for purposes of the concealment object of Count Seven concerns the purpose of the transaction. Specifically, the Government must prove beyond a reasonable doubt that the defendant agreed to conduct financial transactions with knowledge that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity. The Government need not prove that the intent to conceal or disguise was the only or even primary purpose of the defendant, as long as it was an intent of the defendant.

As I have previously instructed, to act knowingly means to act purposely and voluntarily and not because of a mistake, accident, or other innocent reason. That is, the acts must be the product of the defendant's conscious objective. To prove that an act is done knowingly for the purposes of this element, the Government is not required to prove that the defendant knew that his acts were unlawful. If you find that the evidence establishes beyond a reasonable doubt that the defendant knew of the purpose of the particular transaction in issue and that he knew that the transaction was either designed to conceal or disguise the true origin or ownership of the property in question, then this element is satisfied. However, if you find that the defendant knew of the transaction, but did not know that it was either designed to conceal or disguise the true origin of the property in question, but, instead, thought that the transaction was intended to further the innocent transaction, you must find that this element has not been satisfied and find the defendant not guilty.

For the fourth element to be satisfied, the defendant or the coconspirator need not know which specified unlawful activity he or she was agreeing to help conceal. Such person need only

59

**A-467**

know that a purpose of the financial transaction was concealing the nature, location, source, ownership, or control of the funds.

Conduct that is sufficient to establish an intent to conceal includes, but is not limited to, engaging in convoluted financial transactions, inter-company transfers with no clear purpose, transactions consummated with unusual secrecy, depositing ill-gotten funds into another's bank accounts, using interest-free loans, and using third parties' names to conceal the real owner of the relevant funds. Intent to disguise or conceal the true origin of the property need not be the sole motivating factor for the transactions, and the Government need not prove with regard to any single transaction that the defendant removed all trace of his involvement with the money or property.

> Adapted from the jury charges of the Honorable Jesse M. Furman in United States v. Chastain, 22 Cr. 305 (JMF) (Apr. 25, 2023); and from Sand *et al.*, Modern Federal Jury Instructions, Instr. 50A-10.

> See United States v. Willey, 57 F.3d 1374, 1386 (5th Cir. 1995) ("in order to establish the design element of money laundering, it is not necessary to prove with regard to any single transaction that the defendant removed all trace of his involvement with the money…").

> See United States v. Technodyne LLC, 753 F.3d 368, 385 (2d Cir. 2013) ("It is commonplace that the law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the actor's sole, or even primary, purpose.").

> See United States v. Bikundi, 926 F.3d 761, 784 (D.C. Cir. 2019) ("hallmarks of an intent to conceal" include engaging in "convoluted financial transactions and inter-company transfers with no clear purpose"); United States v. Turner, 400 F.3d 491, 497 (7th Cir. 2005) ("certain types of transactions may be indicative of a design to conceal" such as "transactions surrounded in unusual secrecy, structured transactions, depositing ill-gotten funds into another's bank accounts, using third parties to conceal the real owner, or engaging in unusual financial moves which culminate in a transaction" or "convoluted, seller-financed and interest-free loan").

> See United States v. Knapp, 120 F.3d 928, 931 (9th Cir. 1997) ("As to money laundering, the government is not required to prove that the defendant knew that his acts or omissions were unlawful.");

60

A-468

<u>United States</u> v. <u>Lonich</u>, 23 F.4th 881, 898 (9th Cir. 2022) ("To prove that an act is done knowingly, the government is not required to prove that the defendant knew that his or her acts were unlawful.").

**A-469**

REQUEST NO. 40:   Count 7 – Conspiracy to Commit Money Laundering – $10,000 Transaction Elements

The second object of Count Seven is engaging in monetary transactions over $10,000 in property derived from specified unlawful activity.  The elements of this object are as follows:

*First*, the defendant was a United States person or in the United States and engaged in a monetary transaction with a value greater than $10,000.

*Second*, the defendant knew the property involved in the transaction was criminally derived property.

*Third*, the property involved in the transaction was actually derived from specified unlawful activity.

If you find beyond a reasonable doubt that the defendant agreed with at least one other person to engage in monetary transactions over $10,000 in property derived from specified unlawful activity, then the second object of Count Seven would be proved.  However, if you find that the Government has not met its burden to prove that the defendant agreed with at least one other person to engage in monetary transactions over $10,000 in property derived from specified unlawful activity, then the object would not be proved.

> Adapted from United States v. Carucci, 364 F.3d 339, 343 (1st Cir. 2004) ("To establish a violation of 18 U.S.C. § 1957, the government must prove that (1) the defendant engaged or attempted to engage in a monetary transaction with a value of more than $10,000; (2) the defendant knew that the property involved in the transaction had been derived from some form of criminal activity; and (3) the property involved in the transaction was actually derived from specified unlawful activity."). See also United States v. Moparty, 11 F.4th 280, 298 (5th Cir. 2021) (adopting an alternative three-element formulation). The Modern Federal Jury Instructions use a five-element formulation for this offense. See Sand et al., Modern Federal Jury Instructions, Instr. 50A-26. While substantively the same, the three-element formulation is shorter and easier to understand.

<u>REQUEST NO. 41:</u>   <u>Count 7 – Conspiracy to Commit Money Laundering – $10,000 Transaction – First Element</u>

The first element of this object is that the defendant was a United States person or in the United States and agreed to engage in a monetary transaction with a value greater than $10,000.

A "United States person" is a citizen or national of the United States.

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "interstate or foreign commerce" means commerce between any combination of states, territories or possessions of the United States, or between the United States and a foreign country.

You must find that, had the object of the conspiracy been completed, the transaction would have affected interstate commerce in some way, however minimal.  As I explained earlier, the effect on interstate commerce can be established in several ways, including, but not limited to that the source of the funds used in the transaction affected interstate commerce, or that the transaction itself involved an interstate transfer of funds.

The amount or value of the "financial transaction" must be greater than $10,000.

> Adapted from the jury charges of the Honorable Loretta A. Preska in <u>United States</u> v. <u>Adelekan</u>, 19 Cr. 291 (LAP) (Oct. 26, 2021); and from Sand et al., <u>Modern Federal Jury Instructions,</u> Instr. 50A-27.
>
> There is no need to treat an effect on interstate commerce as a separate element because proof of an effect on interstate commerce is required by the definition of the term "monetary transaction." <u>See</u> Sand et al., <u>Modern Federal Jury Instructions,</u> Instr. 50A-27, Cmt.

**A-471**

<u>REQUEST NO. 42:</u>   <u>Count 7 – Conspiracy to Commit Money Laundering – $10,000 Transaction – Second Element</u>

The second element of this object is that the defendant knew the property involved in the transaction was criminally derived property.

"Criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense. The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

The Government must prove that the defendant knew the transaction involved criminally derived property.  However, the Government is not required to prove that the defendant knew the particular offense from which the criminally derived property was derived.

Adapted from Sand et al., <u>Modern Federal Jury Instructions</u>, Instr. 50A-28, 50A-30.

64

**A-472**

REQUEST NO. 43:   Count 7 – Conspiracy to Commit Money Laundering – $10,000 Transaction – Third Element

The third element of this object is that the property involved in the transaction was actually derived from specified unlawful activity. The term "specified unlawful activity" was defined previously, and that definition applies equally to this second object of the conspiracy charged in Count Seven.  Here too the "specified" unlawful activity is the wire fraud scheme charged in Count One, and I instruct you again, as a matter of law, that the term "specified unlawful activity" includes wire fraud.

Adapted from Sand et al., Modern Federal Jury Instructions, Instr. 50A-29.

65

REQUEST NO. 44:  Count 7 – Conspiracy to Commit Money Laundering – Membership

If you find that the Government has proved one or both objects of the money laundering conspiracy beyond a reasonable doubt, you should consider the second element.  The second element of Count Seven is that the defendant knowingly and willfully joined and participated in the conspiracy to commit money laundering.  I have already instructed you on the meaning of the terms "knowingly" and "willfully," and what it means for a defendant to knowingly and willfully become a member of and join a conspiracy.  You should apply those instructions here.

**A-474**

<u>REQUEST NO. 45:</u>  <u>Conscious Avoidance</u>
(If Applicable)

As I explained with respect to each count charged in the indictment, the Government is required to prove that the defendant acted knowingly. In determining whether a defendant has knowledge of a fact, you may consider whether that defendant deliberately closed his eyes to what otherwise would have been obvious.  As you all know, if a person is actually aware of a fact, then he knows that fact.  But the law also allows you to find that a defendant had knowledge of a fact when the evidence shows that he was aware of a high probability of that fact, but intentionally avoided confirming that fact. We refer to this concept, this notion of blinding yourself to what is staring you in the face as "conscious avoidance" or "willful blindness."

With respect to the substantive wire fraud crimes charged in Counts One and Three of the Indictment, in determining whether the Government has proven beyond a reasonable doubt that the defendant had knowledge or acted "knowing" that a certain thing was intended or would occur, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  One may not willfully and intentionally remain ignorant of a fact important to his conduct in order to escape the consequences of criminal law.  And a person cannot look at all sorts of things that make it obvious to any reasonable person what is going on and then claim in court that because he deliberately avoided learning explicitly what was obvious anyway, he did not actually know the incriminating fact.

Accordingly, if you find that the defendant was aware of a high probability of a fact, and that defendant acted with deliberate disregard of the facts, you may find that the defendant knew that fact.  However, if you find that the defendant actually believed that the fact was true, then you

67

**A-475**

may not find that he knew that fact. You must also remember that guilty knowledge may not be established by demonstrating that a defendant was merely negligent, reckless, foolish, or mistaken.

With respect to the conspiracy charges in Counts Two, Four, Five, Six, and Seven, "conscious avoidance," as I have described it, cannot be used as a basis for finding that the defendant knowingly joined the conspiracy. It is logically impossible for the defendant to agree to join the conspiracy unless he knows that the conspiracy exists. However, if you find that the defendant entered into such an agreement, in considering whether he knew the illegal object of the conspiracy, you may consider whether the defendant was aware of a high probability that facts were so, but took deliberate and conscious action to avoid confirming those facts. In other words, if you find beyond a reasonable doubt that the defendant deliberately avoided learning or confirming that the illegal object of the conspiracy, such as by purposely closing his eyes to it or intentionally failing to investigate it, then you may treat this deliberate avoidance of learning a fact as the equivalent of knowledge. If, however, the defendant actually believed that he was not a party to an illegal agreement, or if the defendant was merely negligent or careless with regard to what knowledge he had, he lacked the knowledge necessary to become a co-conspirator.

> Adapted from the charges of the Honorable Paul A. Crotty in United States v. Campo Flores, No. 15 Cr. 765 (Nov. 18, 2016) (conscious avoidance instruction affirmed at United States v. Campo Flores, 945 F.3d 687, 715 (2d Cir. 2019)), the Honorable Lewis A. Kaplan in United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018), and from Sand, Modern Federal Jury Instructions, Instr. 3A and United States v. Goffer, 721 F.3d 113 (2d Cir. 2013).

> The Government "need not choose between an 'actual knowledge' and a 'conscious avoidance' theory." United States v. Ferguson, 676 F.3d 260, 278 (2d Cir. 2011). "A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."

**A-476**

United States v. Hopkins, 53 F.3d 533, 542 (2d Cir. 1995). A conscious avoidance instruction is appropriate in a conspiracy case to prove that the defendant had knowledge of the illegal object of the conspiracy. United States v. Reyes, 302 F.3d 48, 55 (2d Cir. 2002) (discussing conscious avoidance in conspiracy cases and noting that "the jury may use the conscious avoidance doctrine to establish the defendant's knowledge of the aims of the conspiracy but, as just noted, may not use it to establish the defendant's intent to participate in the conspiracy").

A conscious avoidance instruction should include the "high probability" and actual belief language. See United States v. Feroz, 848 F.2d 359, 360 (2d Cir. 1988) (per curiam).

69

**A-477**

REQUEST NO. 46:  Coconspirator Statements

Certain evidence was admitted during trial concerning acts and statements of others because such acts were committed and such statements were made by a person who, the Government claims, was also a co-conspirator of the defendant. The reason for allowing this evidence to be received against the defendant has to do with the nature of the crime of conspiracy. A conspiracy is often referred to as a partnership in crime. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent of the other conspirators in carrying out the conspiracy. In determining the factual issues before you, you may consider against the defendant any acts or statements made by any of the people that you find, under the standards I have already described, to have been co-conspirators, even though such acts or statements were not made in his presence, or were made without his knowledge.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

**A-478**

REQUEST NO. 47:  Presence of Counsel
(If Applicable)

You have heard evidence that FTX and Alameda Research had lawyers. A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case. The defense has not claimed, and cannot claim, that the defendant's conduct was lawful because he acted in good faith on the advice of a lawyer.

> Adapted from the charges of the Honorable Edgardo Ramos in United States v. Milton, No. 21 Cr. 478 (Sept. 12, 2022), and the Honorable Analisa Torres in United States v. Shea, No. 20 Cr. 412 (May 23, 2022).

**A-479**

REQUEST NO. 48:  Venue

In addition to all of the elements that I have described for you, you must separately decide whether an act in furtherance of each alleged crime occurred within the Southern District of New York.  The Southern District of New York includes Manhattan, the Bronx, and Westchester.  This requirement is called "venue."  Venue refers to the fact that the Government must prove that a charge was properly brought in this court as opposed to a different federal court.  You'll determine the satisfaction of the venue requirement separately for each count.

For the wire fraud charges in Counts One and Three, it is sufficient to establish venue if the defendant caused any interstate wire such as an e-mail, phone call, television or Internet broadcast, or financial transaction to be transmitted into or out of the district. The wire need not itself be criminal as long as it was transmitted or caused to be transmitted as part of the scheme. The act need not have been taken by the defendant so long as the act was part of the crime that you find he committed.

With respect to all of the other counts, which charge conspiracies – Counts Two, Four, Five, Six and Seven – it is sufficient for the Government to prove that some act in furtherance of the conspiracy occurred within the Southern District of New York.  In this regard, the Government does not have to prove that the crime itself was committed in this district or that the defendant himself was even present here.

As to the venue requirement alone, the Government's burden is to show that venue is proper by a preponderance of the evidence.  That is, the Government must show simply that it is more likely than not that venue is proper here.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Dumitru, 18 Cr. 243 (Nov. 6, 2018), and of the Honorable Edgardo Ramos in United States v. Milton, 21 Cr. 478

72

(Sept. 12, 2022).  <u>See</u> <u>also</u> <u>United States</u> v. <u>Lange</u>, 834 F.3d 58, 72 (2d Cir. 2016) (venue proper where fraudulent communications were received).

**A-481**

<u>REQUEST NO. 49:</u>  <u>False Exculpatory Statements</u>
(If Applicable)

You have heard recordings or seen statements by the defendant, which are in evidence, in which he claimed that his conduct was consistent with innocence and not guilt. The Government claims that those statements in which he exonerated or exculpated himself were false.  If you find that the defendant gave a false statement in order to divert suspicion from himself, you may infer that the defendant believed that he was guilty. You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged. Whether or not the evidence as to a defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to any such evidence, are matters for you the jury to decide.

Adapted from the charges of the Honorable Lewis A. Kaplan in <u>United States</u> v. <u>Blaszczak</u>, 17 Cr. 357 (Apr. 27, 2018) and the Honorable Richard J. Sullivan in <u>United States</u> v. <u>Brennerman</u>, 17 Cr. 337 (Dec. 6, 2017).

74

**A-482**

<u>REQUEST NO. 50:</u>  <u>Destruction of Evidence</u>
(If Applicable)

You have heard evidence that the defendant deleted, or caused to be deleted, certain communications sent and received over the messaging applications Signal and Slack. If you find that the defendant deleted communications, you may, but need not, infer that he believed that he was guilty. You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged. Whether or not the evidence as to a defendant's deletion of evidence shows that the defendant believed that he was guilty, and the significance, if any, to be attached to any such deletions, are matters for you the jury to decide.

Adapted from the charge of the Honorable Paul G. Gardephe in <u>United States</u> v. <u>Tuzman</u>, 15 Cr. 536 (Dec. 22, 2017), as well as those charges approved of in <u>United States</u> v. <u>Scheibel</u>, 870 F.2d 818, 822 (2d Cir. 1989), <u>United States</u> v. <u>Howard</u>, 729 Fed. Appx. 181, 187 (3d Cir. 2018), and <u>United States</u> v. <u>Singleton</u>, 904 F.2d 37 (6th Cir. 1990).

**A-483**

REQUEST NO. 51:  Other Acts Evidence
(If Applicable)

Now, you also heard evidence that the defendant engaged in misconduct that is not charged in this Indictment including _____. He is not on trial for committing those acts. Accordingly, you may not consider the evidence of other uncharged bad acts as a substitute for proof that he committed the crimes with which he is charged here. Nor may you consider that evidence as proof that he has a criminal personality or bad character. The evidence was admitted for limited purposes, and you may consider it for those purposes alone.

More specifically, you may consider the evidence you have heard regarding _____ as relevant to _____.

Adapted from the charge of the Honorable Lewis A. Kaplan in United States v. Dumitru, 18 Cr. 243 (Nov. 6, 2018).

76

**A-484**

REQUEST NO. 52:  Variance in Dates

As I have described the Indictment, you may have noticed that it refers to various dates or times.  It does not matter if the evidence you heard at trial indicates that a particular act occurred on a different date, and it is not essential that the Government prove that the charged offenses started and ended on any specific dates.  The law requires only a substantial similarity between the dates alleged in the indictment and the dates established by the evidence.

> Adapted from Sand, et al., Modern Federal Jury Instructions, Instr. 3-12 and the charges of the Honorable Lewis A. Kaplan in United United States v. Jones, 17 Cr. 791 (Dec. 16, 2019).

**A-485**

REQUEST NO. 53:  Cooperating Witnesses

You have heard testimony from several government witnesses who testified that they, in fact, were involved in planning and carrying out some of the crimes charged in the indictment. There has been a whole lot said about these cooperating or accomplice witnesses in the summations of the attorneys and whether or not you should believe them. So let me talk to you about that.

Experience will tell you that the Government frequently must rely on the testimony of witnesses who participated in the criminal activity about which they testify at trials. For those very reasons, the law allows the use of this testimony. In fact, in federal court, the law is that the testimony of a cooperating witness, another phrase being "accomplice witness," in itself may be enough for a conviction if the jury believes it proves guilt beyond a reasonable doubt. So, the testimony of the accomplice or cooperating witnesses is properly before you. The Government argues, as it's entitled to do, that if such testimony could not be used, there would be many cases in which there was real guilt, and convictions could not be obtained. However, the testimony of cooperating or accomplice witnesses should be scrutinized with special care and caution because such witnesses may believe that it's in their interest to give testimony favorable to the Government. The fact that a witness is an accomplice can be considered by you in bearing on his or her credibility. It does not follow, however, that simply because a person has admitted to participating in one or more crimes, that he or she is incapable of giving you a truthful version of what happened. Like the testimony of any other witness, accomplice testimony should be given the weight that it deserves in light of the facts and circumstances before you, considering the witness's demeanor, candor, the strength, and accuracy of a witness's recollection, their background, and the extent to which the testimony they gave is corroborated or not corroborated by other evidence in the case.

**A-486**

You may consider whether an accomplice witness has an interest in the outcome, and, if so, whether that's affected his or her testimony.

You heard testimony about various agreements between the Government and the accomplice witnesses. I must caution you that it is no concern of yours why the Government made an agreement with a particular witness. Your sole concern is whether the witness has given truthful and accurate testimony here in this courtroom.

In evaluating the testimony of these witnesses, you should ask yourselves whether these witnesses would benefit more by lying or more by telling you the truth. Was their testimony made up in some way because they believed or hoped that they would somehow receive favorable treatment by testifying falsely? Or did they believe that their interests would be best served telling you the truth? If you believe that a witness was motivated by hopes of personal gain, was the motivation one that would cause them to lie or one that would cause him to tell you the truth? Did the motivation color the witnesses' testimony? If you find that testimony by such a witness is false, you should reject it. If, however, after giving cautious and careful consideration to that testimony, and to the witness's demeanor, and the other things that I mentioned, and you're satisfied that the witness told you the truth, you should accept it as credible and act accordingly.

As with any witness, let me emphasize that the issue of credibility does not have to be decided on an all-or-nothing basis. Even if you find that a witness testified falsely in part, you still may accept any part of the testimony you find to have been credible.

Let me say a word about the guilty pleas: You have heard testimony from three witnesses who have pled guilty to charges that arise out of some of the facts that are at issue in this case. You are to draw no conclusions or inference of any kind about the guilt of the defendant on trial here from the fact that these witnesses pled guilty to similar or the same charges, including conspiracy

charges involving the defendant. The decisions of those witnesses to plead guilty were personal decisions that they made about their own guilt. It cannot be used by you in any way as evidence against or unfavorable to the defendant on trial here.

Adapted from the charge of the Honorable Lewis A. Kaplan in
United States v. Blaszczak, 17 Cr. 357 (Apr. 27, 2018).

80

**A-488**

REQUEST NO. 54:  Non-Prosecution Agreement
(If Applicable)

You have heard testimony from at least one witness who entered into a non-prosecution agreement with the Government arising out of facts that are at issue in this case. You are instructed that you are to draw no conclusions or inferences of any kind about the guilt of the defendant from the fact that a witness entered into such an agreement, even involving similar conduct. The decision of that witness to enter into that agreement and of the Government to enter into that agreement was a personal decision on the part of the Government and an exercise of the Government's lawful discretion in the case of the Government. It may not be used by you in any way for or against the defendant.

Adapted from the charge of the Honorable Lewis A. Kaplan in United States v. Dumitru, 18 Cr. 243 (Nov. 6, 2018).

81

**A-489**

REQUEST NO. 55:  Immunized Witnesses
(If Applicable)

You have heard the testimony of witnesses who have testified under a grant of immunity

from this Court, called formal immunity.  The testimony of such a witness may not be used against

such witnesses in any criminal case except in a prosecution for perjury, giving a false statement,

or otherwise failing to comply with the immunity order of this Court. You are instructed that the

Government is entitled to call as a witness a person who has been granted immunity by order of

this Court.  You should examine the testimony of such a witness to determine whether or not it is

colored in any way to further the witness's own interests.  If you believe the testimony to be true,

you may give it any weight you believe it deserves.

Adapted from the charge of the Honorable J. Paul Oetken in United
States v. Gabinskaya, 12 Cr. 171 (Oct. 3, 2014).

**A-490**

REQUEST NO. 56:  Expert Witness

You heard the testimony of certain witnesses who I certified as experts. An expert is a witness who, by education or experience, has acquired knowledge in a specialized area.  Such witnesses are allowed to give their opinions as to relevant matters in which they profess to be an expert, and to give the reasons for their opinions.  Expert testimony is presented to you on the theory that someone who is experienced and knowledgeable in a field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing expert testimony, you may consider the expert's qualifications, the opinion given, the witness's reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether or not to believe a witness. You may give expert testimony whatever weight, if any, you find it deserves in light of all the evidence before you. You should not, however, accept a witness's testimony merely because he or she is an expert in a field. Nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you, the jury.

> Adapted from the charge of the Honorable Richard J. Sullivan in United States v. Brennerman, No. 17 Cr. 337 (Dec. 6, 2017), and from the Honorable J. Paul Oetken in United States v. Middendorf, No. 18 Cr. 36 (Feb. 1, 2022).

**A-491**

REQUEST NO. 57:  Law Enforcement Witnesses

You have heard the testimony of law enforcement witnesses and other Government employees.  The fact that a witness may be employed by the federal Government as a law enforcement agent or employee does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.  As with all other witnesses, it is up to you to decide, after reviewing all the evidence, what weight to give the testimony of law enforcement witnesses.

> Adapted from the charges of the Honorable Jesse M. Furman in United States v. Avenatti, No. 19 Cr. 374 (Feb. 1, 2022), and from the charge of the Honorable J. Paul Oetken in United States v. Matthews, 18 Cr. 124 (Sept. 24, 2018).

84

**A-492**

REQUEST NO. 58:  Preparation of Witnesses
(If Applicable)

You have heard evidence during the trial that some witnesses have discussed the facts of the case and their testimony with lawyers before the witnesses appeared in court. Although you may consider that fact when you evaluate a witness's credibility, I should tell you that there is nothing unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time. In fact, it would be unusual for a lawyer to call a witness without such consultation. Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

Adapted from the charges of the Honorable Lewis A. Kaplan in
United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

**A-493**

REQUEST NO. 59:  Uncalled Witnesses – Equally Available To Both Sides

There are people whose names you have heard during the course of trial, but who did not appear here to testify.  I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses.  Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called.  Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.  The burden of proof remains at all times with the Government.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

**A-494**

REQUEST NO. 60:  Other Individuals Not on Trial

You may not draw any inference, favorable or unfavorable, toward the Government or the defendant from the fact that any person was not named as a defendant in this case, and you may not speculate as to the reasons why other people are not on trial before you now.  Those matters are wholly outside your concern and have no bearing on your function as jurors in deciding the case before you.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

**A-495**

REQUEST NO. 61:   Defendant's Testimony
(If Applicable)

As you saw, the defendant took the witness stand and testified.  I have already instructed

you on how you should evaluate the credibility of the witnesses you have heard in this case.  You

should evaluate the defendant's testimony the same way that you judge the testimony of the other

witnesses in this case.

> See United States v. Gaines, 457 F.3d 238, 240 (2d Cir. 2006) ("[I]f
> the defendant has testified, the trial court should tell the jury to
> evaluate the defendant's testimony in the same way it judges the
> testimony of other witnesses."); but see United States v. Solano, 966
> F.3d 184, 197 (2d Cir. 2020) (holding that it was error for the district
> court to instruct that "any" witness with an interest in the outcome
> of the case, which included the defendant, necessarily has a "motive
> to testify falsely").

88

**A-496**

REQUEST NO. 62:  Defendant's Right Not to Testify
(If Requested by the Defense)

The defendant did not testify.  Under our Constitution, a defendant never is required to testify or to present any evidence because it is always the Government's burden to prove a defendant guilty beyond a reason doubt. A defendant never is required to prove that he is innocent. You may not attach any significance to the fact that the defendant did not testify. You may not draw any adverse inference against the defendant because the defendant did not take the witness stand. You may not consider this in any way in your deliberations.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

**A-497**

REQUEST NO. 63:  Particular Investigative Techniques Not Required
(If Applicable)

You have heard reference to certain investigative techniques that were used or not used by the Government in this case.  There is no legal requirement that the Government prove its case through any particular means.  While you are to carefully consider the evidence adduced by the Government, you are not to speculate as to why the Government used the techniques it did or why it did not use other techniques.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

**A-498**

REQUEST NO. 64:  Use of Evidence Obtained Pursuant to Searches
(If Applicable)

You have heard testimony about evidence seized, pursuant to search warrants signed by a judge, from email accounts, Twitter accounts, and electronic devices.  Evidence obtained from these searches was properly admitted in this case and may properly be considered by you.   Indeed, searches of online accounts and electronic devices are entirely appropriate law enforcement actions. Whether you approve or disapprove of how it was obtained should not enter into your deliberations because I now instruct you that the Government's use of this evidence is entirely lawful.

Adapted from the charges of the Honorable Lewis A. Kaplan in
United States v. Gatto, 17 Cr. 686 (Oct. 1, 2018).

91

**A-499**

REQUEST NO. 65:  Use of Charts and Summaries

There is evidence before you in the form of charts and summaries.  Those exhibits purport to summarize the underlying evidence that was used to prepare them. I admitted these charts and summaries into evidence in place of or in addition to the underlying documents that they represent in order to save time and avoid unnecessary inconvenience.  They are no better than the documents upon which they are based.  Therefore, you are to give no greater consideration to these charts or summaries than you would give to the evidence upon which they are based.  It is for you to decide whether they correctly present the information contained in the testimony and in the exhibits on which they were based.

Adapted from the charges of the Honorable Lewis A. Kaplan in United States v. Dumitru, 18 Cr. 243 (Nov. 6, 2018), and the Honorable Jesse M. Furman in United States v. Avenatti, No. 19 Cr. 374 (Feb. 1, 2022).

92

**A-500**

REQUEST NO. 66:  Stipulations
(If Applicable)

You have heard some stipulations in this case. Generically speaking, there are two kinds.

A stipulation of fact is an agreement between the parties that a certain fact is true. You must regard such agreed-upon facts as true, but it is still for you to determine the weight to be given to that evidence, to that fact.

A stipulation of testimony is an agreement between the parties that, if called as a witness, the person would have given certain testimony. You must accept as true the fact that the witness would have given that testimony. However, it is for you to determine the weight to be given to that testimony.

Adopted from the charge of the Honorable Richard J. Sullivan in United States v. Brennerman, 17 Cr. 337 (Dec. 6, 2017).

93

**A-501**

<u>REQUEST NO. 67:</u>  <u>Transcripts</u>

Audio and video recordings have been admitted into evidence and transcripts of those recordings were provided to use as aids. I instructed you then, and I remind you now, that the transcripts are not evidence.  The transcripts were provided only as an aid to you in listening to the recordings.  It is for you to decide whether the transcripts correctly present the conversations recorded on the recordings that you heard.

Adopted from the charge of the Honorable Richard J. Sullivan in
<u>United States</u> v. <u>Brennerman</u>, 17 Cr. 337 (Dec. 6, 2017).

94

**A-502**

REQUEST NO. 68:  Redactions
(If Applicable)

There are, among the exhibits received in evidence, some documents that are redacted.

"Redacted" means that part of the document or recording was taken out.  You are to concern yourself only with the part of the item that has been admitted into evidence.  You should not consider any possible reason why the other part of it has been deleted.

Adapted from the charges of the Honorable Jesse M. Furman in United States v. Avenatti, No. 19 Cr. 374 (Feb. 1, 2022), and from the charge of the Honorable Lewis A. Kaplan in United States v. Sterling, S4 16 Cr. 488 (Apr. 3, 2017).

95

**A-503**

<u>REQUEST NO. 69:</u>  <u>Concluding Remarks</u>

The Government respectfully requests that the Court close by instructing the jurors regarding the selection of a foreperson, communications with the Court during deliberations, provision of copies of the Indictment and jury charge, and the procedures regarding requests for particular exhibits or testimony.

Dated: New York, New York
       August 21, 2023

                             Respectfully submitted,

                             DAMIAN WILLIAMS
                             United States Attorney
                             Southern District of New York

By:   /s/ Nicolas Roos
                             Nicolas Roos
                             Danielle Kudla
                             Samuel Raymond
                             Thane Rehn
                             Danielle R. Sassoon
                             Assistant United States Attorneys
                             Southern District of New York