# 24-961

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖❖❖

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ZIXIAO GARY WANG, CAROLINE ELLISON, NISHAD SINGH, RYAN SALAME,

*Defendants,*

FTX TRADING LTD., WEST REALM SHIRES INC,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors,*

SAMUEL BANKMAN-FRIED, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX FOR DEFENDANT-APPELLANT
## VOLUME III OF V
## (Pages A-504 to A-794)

ALEXANDRA A.E. SHAPIRO
THEODORE SAMPSELL-JONES
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

PAGE

District Court Docket Entries in *United States v. Bankman-Fried*,
   No. 22-cr-673 (LAK) (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Excerpts of Arraignment Transcript, dated January 3, 2023 . . . . . . . . . . . . . A-86

Memorandum and Order Modifying Release Conditions,
   dated February 1, 2023 (Dkt. 58) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-88

Order Modifying Release Conditions, dated February 14, 2023
   (Dkt. 68) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-95

Excerpts of Transcript of February 16, 2023 Pre-Trial Conference . . . . . . . A-96

Third Superseding Indictment, dated February 23, 2023 (Dkt. 80) . . . . . A-103

Fifth Superseding Indictment, dated March 28, 2023 (Dkt. 115) . . . . . . . A-142

Exhibits to Declaration of Christian R. Everdell in Support of Motion
   for Additional Discovery

   Exhibit 9 – Excerpts of Bankruptcy Hearing Transcript,
   dated February 6, 2023 (Dkt. 137-9) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-185

   Exhibit 10 – Emails dated February 16, 2023,
   and January 13, 2023 (Dkt. 137-10). . . . . . . . . . . . . . . . . . . . . . . . . . . . A-205

   Exhibit 11 – Email dated December 16, 2022 (Dkt. 137-11) . . . . . . . A-211

Exhibit To Bankman-Fried's Motion to Compel Discovery

   Exhibit 1 – Subpoena to Fenwick & West LLP (Dkt. 151-1) . . . . . . . A-213

Excerpts of Transcript of June 15, 2023 Pre-Trial Conference . . . . . . . . . A-361

ii

PAGE

Letter from Government to Hon. Lewis A. Kaplan Re Pretrial Filings,
dated June 29, 2023 (Dkt. 171) .................................. A-374

Excerpts of Transcript of July 26, 2023 Pre-Trial Conference .......... A-377

Excerpts of Transcript of August 11, 2023 Pre-Trial Conference ....... A-379

Sixth Superseding (Operative) Indictment, dated August 14, 2023
(Dkt. 202) ..................................................... A-381

Excerpts of Transcript of August 30, 2023 Pre-Trial Conference ....... A-399

Letter from Government to Hon. Lewis A. Kaplan Re Advice-Of-
Counsel Defense Notice, dated August 18, 2023 (Dkt. 211) ....... A-401

Government's Requests to Charge, dated August 21, 2023 (Dkt. 214) .. A-404

Bankman-Fried's Requests to Charge, dated August 21, 2023
(Dkt. 215) ..................................................... A-504

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Re Advice-Of-
Counsel Defense Notice, dated August 23, 2023 (Dkt. 222) ....... A-554

Letter from Government to Hon. Lewis A. Kaplan Re Advice-Of-
Counsel Defense Notice, dated August 29, 2023 (Dkt. 239) ....... A-557

Letter from Bankman-Fried to Hon. Lewis A. Kaplan In Response To
Dkt. 239, dated August 30, 2023 (Dkt. 240) ..................... A-565

Order On Motions To Exclude Proposed Expert Testimony,
dated September 21, 2023 (Dkt. 287) ........................... A-572

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
Clarification And Reconsideration Of Rulings,
dated October 2, 2023 (Dkt. 306) .............................. A-577

iii

PAGE

Letter from Government to Hon. Lewis A. Kaplan Moving to
  Preclude Evidence Of Current Value Of Investments,
  dated October 8, 2023 (Dkt. 315) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-582

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
  Permission To Cross Examine Gary Wang On Involvement of
  Counsel In Loan Structuring, dated October 9, 2023 (Dkt. 316) . . .  A-585

Letter from Bankman-Fried to Hon. Lewis A. Kaplan In Response To
  Dkt. 315, dated October 10, 2023 (Dkt. 317) . . . . . . . . . . . . . . . . . . . . . .  A-588

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
  Permission To Cross Examine Caroline Ellison On Involvement
  of Counsel In Creating Auto-Deletion Policies,
  dated October 10, 2023 (Dkt. 318) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-590

Letter from Government to Hon. Lewis A. Kaplan Re Additional
  Requests To Charge, dated October 19, 2023 (Dkt. 326) . . . . . . . . . .  A-592

Bankman-Fried's Amended Requests to Charge,
  dated October 19, 2023 (Dkt. 327) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-598

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Re Objections
  to Government's Proposed Jury Instructions,
  dated October 24, 2023 (Dkt. 329) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-658

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Providing
  Notice of Certain Direct Examination Testimony Regarding
  Involvement of Counsel, dated October 25, 2023 (Dkt. 338) . . . . . . .  A-664

Excerpts of Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-670

**Government's Exhibits**

GX-532 FTX Investor Deck, dated March 2021 . . . . . . . . . . . . . . . . .  A-1220

GX-558 FTX Terms Of Service, dated May 13, 2022 . . . . . . . . . . . .  A-1231

GX-866 @SBF_FTX Twitter Post, dated November 7, 2022 . . . . . .  A-1293

iv

PAGE

GX-1005 Alameda Balance on FTX in 2022 Chart . . . . . . . . . . . . . . A-1295

GX-1014 Alameda Borrowing From Third Party Lenders Chart . . A-1296

**Defense Exhibits**

DX-1617 Alameda LOC Principal Chart . . . . . . . . . . . . . . . . . . . . . . . A-1297

DX-1618 FTX User Accounts Balance Chart . . . . . . . . . . . . . . . . . . A-1298

DX-1619 FTX User Accounts All Coins Balance Chart . . . . . . . . . A-1299

DX-964 (excluded) FTX Blogpost, dated October 28, 2020 . . . . . . A-1300

Exhibit to Bankman-Fried's Sentencing Submission

Excerpts of Exhibit E – November 15, 2022 Letter From James
M. McDonald To Prosecutors (Dkt. 407-34) . . . . . . . . . . . . . . . . . . A-1304

Excerpts of Sentencing Transcript, dated March 28, 2024 . . . . . . . . . . . A-1308

Notice of Appeal, filed April 11, 2024 (Dkt. 428) . . . . . . . . . . . . . . . . . . A-1311

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                               :

UNITED STATES OF AMERICA        :

                               :       S6 22 Cr. 673 (LAK)

        v.                     :

                               :

SAMUEL BANKMAN-FRIED,        :

                               :

                  Defendant.       :

-------------------------------------------------------------------- x

 

**DEFENDANT SAMUEL BANKMAN-FRIED'S
<u>PROPOSED REQUESTS TO CHARGE</u>**

Mark S. Cohen
Christian R. Everdell
David Lisner
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
Phone:  (212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
dlisner@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Mr. Bankman-Fried*

A-505

## **TABLE OF CONTENTS**

Introduction ............................................................................................................3

Crimes Defined By Statute Only .............................................................................5

Count One: Wire Fraud on FTX Customers............................................................9

Count Three: Wire Fraud on Lenders of Alameda Research ...................................14

Count Two: Conspiracy to Commit Wire Fraud on FTX Customers .........................16

Count Four: Conspiracy to Commit Wire Fraud on Lenders of Alameda Research ...................20

Count Five: Conspiracy to Commit Securities Fraud on Investors in FTX ................22

Count Six: Conspiracy to Commit Commodities Fraud on FTX Customers............................27

Count Seven: Conspiracy to Commit Money Laundering ..........................................31

Venue  ..................................................................................................................40

Bias of Witnesses...................................................................................................41

Cooperating Witness Testimony................................................................................42

Expert Witnesses [If Applicable] .............................................................................45

Defendant's Testimony [If Applicable] ......................................................................46

Defendant's Right Not To Testify [If Applicable] .....................................................47

Missing Witness Charge [If Applicable]....................................................................48

Defense Theory of the Case.....................................................................................49

Conclusion ............................................................................................................50

**A-506**

### INTRODUCTION

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, Mr. Samuel Bankman-Fried through his undersigned attorneys respectfully requests that the Court include the following in its charge to the jury.

The proposed instructions are principally based on and adapted from those contained in the Modern Federal Jury Instructions and those given in the following cases: *United States v. LaGuardia*, No. 19 Cr. 893 (LAK), ECF No. 93 (S.D.N.Y. Dec. 16, 2020); *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), ECF No. 331 (S.D.N.Y. May 16, 2018); *United States v. Adelekan*, No. 19 CR. 291 (LAP), ECF No. 397 (S.D.N.Y. Oct. 26, 2021). Additional citations for certain specific instructions are provided in the footnotes.

The defense objects to having to provide jury instructions at this time when the Government is still producing discovery and has not yet provided a witness list, an exhibit list, or Jencks Act material to the defense, and motions *in limine* are still pending. Accordingly, the defense respectfully reserves the right to supplement or amend these requests to charge in response to the Government's requests, the materials to be produced to the defense, and the evidence presented at trial.

## DEFENSE REQUEST NO. 1

### General Requests

Mr. Bankman-Fried respectfully requests this Court's standard instructions on:

1. Role of the Court

2. Role of the Jury

3. Duty of Impartiality

4. Presumption of Innocence and Burden of Proof

5. Reasonable Doubt

6. Improper Considerations

7. Sympathy

8. Direct and Circumstantial Evidence

9. Witness Credibility

10. Selection of Foreperson

11. Right to See Exhibits and Hear Testimony and Communications with the Court; and

12. Verdict, Need for Unanimity, and Duty to Consult


Mr. Bankman-Fried also reserves the right to request an instruction on pretrial publicity

to be provided closer to trial.

A-508

**DEFENSE REQUEST NO. 2**

**Crimes Defined By Statute Only[1]**

In our system, we only have crimes that are defined by statute.  The fact that you may think something is morally wrong or unfair, is truly of no interest whatsoever.  It is also not relevant whether you believe certain conduct should have been regulated even though it was not regulated at the time.  Statutes define our crimes, and from time to time I will talk to you about the individual statutes and how they break down into elements so that you can consider the elements that the government must prove.  Some vague feeling that something wrong has been done, or that some law should have prevented it, is insufficient to convict anyone of any charge whatsoever.  Break it down to the elements, see if there is proof beyond a reasonable doubt as to each of those elements, and then, with that determination made, you can render a unanimous verdict.

---

[1] Adapted from the charge of the Honorable J. Paul Oetken in *United States v. Danilovich*, 12-CR-171 (JPO), ECF No. 931 (S.D.N.Y. Nov. 13, 2013), Trial transcript at 4785-4786.

5

**A-509**

### DEFENSE REQUEST NO. 3

### The Indictment[2]

The defendant in this matter, Samuel Bankman-Fried, has been formally charged in what is called an Indictment.  An Indictment is simply an accusation.  It is no more than the means by which a criminal case is started.  It is not evidence.  It is not proof of the defendant's guilt.  It creates no presumption, and it permits no inference that the defendant is guilty.  You are to give no weight to the fact that an Indictment has been returned against the defendant.

Before you begin your deliberations, you will be provided with a copy of the Indictment. I will not read the entire Indictment to you at this time.  Rather, I will first summarize the offenses charged in the Indictment and then explain in detail the elements of the charged offenses.

---

[2] Adapted from *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), ECF No. 331 (S.D.N.Y. May 16, 2018), Trial transcript at 3934-35; *United States v. LaGuardia*, No. 19 Cr. 893 (LAK), ECF No. 63 (S.D.N.Y. Dec. 16, 2020).

A-510

**DEFENSE REQUEST NO. 4**

**Summary of Indictment[3]**

The Indictment contains seven counts or "charges."

Count One of the Indictment charges that, from at least in or about 2019, up to and including in or about November 2022, the defendant committed wire fraud on customers of FTX.

Count Two of the Indictment charges that, from at least in or about 2019 up to and including in or about November 2022, the defendant participated in a conspiracy to commit wire fraud on customers of FTX.

Count Three of the Indictment charges that, from at least in or about June 2022, up to and including in or about November 2022, the defendant committed wire fraud on lenders to Alameda Research.

Count Four of the Indictment charges that, from at least in or about June 2022, up to and including in or about November 2022, the defendant participated in a conspiracy to commit wire fraud on lenders to Alameda Research.

Count Five of the Indictment charges that, from at least in or about 2019, up to and including in or about November 2022, the defendant participated in a conspiracy to commit securities fraud on investors in FTX.

Count Six of the Indictment charges that, from at least in or about 2019, up to and including in or about November 2022, the defendant participated in a conspiracy to commit commodities fraud on customers of FTX in Connection with Purchases and Sales of Cryptocurrency and Swaps.

---

[3] Adapted from *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), ECF No. 331 (S.D.N.Y. May 16, 2018) Trial transcript at 3934-35; *United States v. LaGuardia*, No. 19 Cr. 893 (LAK), ECF No. 93 (S.D.N.Y. Dec. 16, 2020) Trial transcript at 561-562; and *United States v. Adelekan*, No. 19 CR. 291 (LAP), ECF No. 397 (S.D.N.Y. October 26, 2021) Trial transcript at 863-64.

Count Seven of the Indictment charges that, from at least in or about 2020, up to and including in or about November 2022, the defendant participated in a conspiracy to commit money laundering.

That is a brief summary of the counts in the Indictment.  By pleading not guilty to these counts, Mr. Bankman-Fried has denied that he committed the charged offenses.  The government must show beyond a reasonable doubt that Mr. Bankman-Fried is guilty with respect to each count.  You must consider each count separately, and you must return a separate verdict of guilty or not guilty on each count.  Whether you find the defendant guilty or not guilty as to one offense should not affect your verdict as to any other offense charged.

**A-512**

**DEFENSE REQUEST NO. 5**

**Count One: Wire Fraud on FTX Customers[4]**

A. Summary of the Indictment

Count One charges Mr. Bankman-Fried with wire fraud on customers of FTX in violation of Title 18, United States Code, Section 1343 and 2. Specifically, Count One charges that from in or about 2019, up to and including in or about November 2022, Mr. Bankman-Fried engaged in a scheme to defraud customers of FTX by misappropriating those customers' deposits to pay expenses and debts of Alameda, to make investments, and for other purposes.

B. Elements of Wire Fraud

Before Mr. Bankman-Fried can be convicted of wire fraud, the Government must prove each of the following elements beyond a reasonable doubt:

First, that there was a scheme or artifice to defraud or to obtain money or property by means of materially false and fraudulent pretenses, representations, or promises;

Second, that Mr. Bankman-Fried knowingly participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud;

Third, that in executing the scheme, Mr. Bankman-Fried used or caused the use of interstate or international wires.

1. First Element – Scheme or Artifice to Defraud

The first element that the Government must prove beyond a reasonable doubt is the existence of a scheme or artifice to defraud FTX customers of money or property by means of false or fraudulent pretenses, representations, or promises.

---

[4] Adapted from *United States v. LaGuardia*, No. 19 Cr. 893 (LAK), ECF No. 93 (S.D.N.Y. Dec. 16, 2020) Trial transcript at 584-590; *United States v. Adelekan*, No. 19 CR. 291 (LAP), ECF No. 397 (S.D.N.Y. October 26, 2021) Trial transcript at 872-878.

A-513

A "scheme to defraud" is any plan, device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

"Fraud" is a term that includes all possible means by which a person seeks to gain an unfair advantage over a victim by intentional misrepresentation or false pretenses.

A representation is "false" if it was untrue when made and was known to be untrue at the time by the person making it or causing it to be made.  A representation is "fraudulent" if it is made with an intent to deceive.

The false or fraudulent representation must relate to a "material" fact.  A material fact is one that would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision.  That means that if you find a particular representation to have been false or misleading, you must determine whether it was material by asking whether the misrepresentation would actually have mattered in a meaningful way to a rational decisionmaker to whom the statement was addressed.[5]  Materiality of the information is judged as of the time the information was disclosed.

The purpose of the scheme to defraud must be to obtain money or property.  Hence, you must determine what property, if any, the scheme was allegedly designed to obtain from FTX customers.   The term "property" includes traditional property interests.  Property does not include intangible interests such as the right to control the use of one's assets, nor does it include potentially valuable economic information that a person might consider valuable in deciding how to use his or her assets.[6]  If you find that FTX customers, after depositing funds with FTX, received a credit to transact on the FTX exchange and therefore received the right to withdraw an

---

[5] *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019).

[6] *Ciminelli v. United States*, 598 U.S. ---, 143 S. Ct. 1121 (2023).

10

**A-514**

equivalent amount of funds at a later time upon request, that is insufficient to establish that they were deprived of property.

Count One alleges that Mr. Bankman-Fried engaged in a scheme to defraud FTX customers by misappropriating and embezzling FTX customer deposits to use for his own, and Alameda's own, private spending.  Misappropriation involves "the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another."  Mr. Bankman-Fried cannot be guilty of wire fraud under this theory unless his use of the FTX customer funds was knowingly wrongful.  Accordingly, before Mr. Bankman-Fried can be convicted of wire fraud as charged in Count One, the Government must prove beyond a reasonable doubt that Mr. Bankman-Fried was not permitted to use FTX customer deposits for the purposes for which they were used and knowingly and purposefully violated an obligation that prohibited the use of the funds in such a manner.[7]

     2.   <u>Second Element – Intent</u>

The second element that the Government must prove beyond a reasonable doubt is that Mr. Bankman-Fried participated in the scheme to defraud knowingly and willfully, and with specific intent to defraud.

To act "knowingly" means to act voluntarily and deliberately, and not because of ignorance, mistake, accident, or carelessness.

To act "willfully" means to act with knowledge that one's conduct is unlawful, and with the intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.  "Unlawful" simply means contrary to law.  In order to act with an unlawful purpose, the defendant does not have to have known that he was breaking some particular law or

---

[7] *See Carpenter v. United States*, 484 U.S. 19, 27, 108 S. Ct. 316, 321 (1987); *United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980).

**A-515**

a particular rule; he needs to have been aware only of the generally unlawful nature of his actions.

To act with "specific intent to defraud" goes further and means that the defendant acted with the specific intent to deceive FTX customers for the purpose of depriving them of something of value.  While the Government need not prove that FTX customers were actually harmed, it must prove beyond a reasonable doubt that when Mr. Bankman-Fried participated in the alleged wire fraud, he did so for the purpose of causing financial loss to those customers.

Because the Government must prove beyond a reasonable doubt that Mr. Bankman-Fried had the specific intent to defraud FTX customers, it follows that good faith on part of Mr. Bankman-Fried is a complete defense to that charge.  In fact, good faith is a complete defense to <u>all</u> of the counts in the Indictment, so you should consider this instruction about good faith in determining whether the Government has proven each of the other counts of the indictment beyond a reasonable doubt.

Good faith is an honest belief by the defendant that his conduct was not unlawful.  If Mr. Bankman-Fried believed in good faith that he was acting properly at the time of the events alleged in the Indictment, even if he was mistaken in that belief and even if others were injured by his conduct, he cannot be found guilty.  An honest mistake in judgment or an honest error in management or even carelessness does not rise to the level of criminal conduct.  For example, if Mr. Bankman-Fried acted in good faith with respect to the use of FTX customer funds and with the belief that as a business matter, FTX would be able to cover all customer withdrawal requests, he did not act with specific intent to defraud.  The burden is on the Government to prove fraudulent intent and lack of good faith beyond a reasonable doubt.  Mr. Bankman-Fried

has no burden to prove his or her good faith; rather, the Government must prove bad faith and an intent to defraud beyond a reasonable doubt.

In evaluating whether Mr. Bankman-Fried acted in good faith, you may consider whether Mr. Bankman-Fried had any discussions with counsel, or understood that counsel had been consulted, concerning the propriety or legality of conduct that the Government claims was part of the scheme to defraud.[8]

### 3.   Third Element – Use of Interstate or International Wires

The third element that the Government must prove beyond a reasonable doubt is that the defendant used or caused to be used an interstate wire communication in furtherance of the scheme to defraud.  Wire communications include phone calls, emails, and text messages, as well as wire transfers of funds.  The wire communication must pass between two or more states, or it must pass between the United States and a foreign country.  A wire communication need not itself contain a false or fraudulent representation in order to satisfy this element.  It must, however, further or assist in carrying out the scheme to defraud.

With respect to the use of the wires, the Government must establish beyond a reasonable doubt the particular use charged in the Indictment – *i.e.*, phone calls, emails, text messages, or wire transfers – and you must agree that the particular use furthered the scheme to defraud. However, the Government does not have to prove that the wires were used on the exact date charged in the indictment.  It is sufficient if the evidence establishes beyond a reasonable doubt that the wires were used on a date substantially similar to the dates charged in the indictment.

---

[8] *Howard v. Sec. and Exch. Comm'n*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) ("[R]eliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith."); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (in evaluating a defense of good faith, "[defendant's] conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent."); Modern Federal Jury Instructions, Instr. 44-5 ("It may also be appropriate to instruct the jury that consulting counsel could be considered as evidence of good faith.").

**A-517**

**DEFENSE REQUEST NO. 6**

**Count Three: Wire Fraud on Lenders of Alameda Research**

A. Summary of the Indictment

I will skip over Count Two for the moment and discuss Count Three.  Count Three charges Mr. Bankman-Fried with wire fraud on lenders of Alameda Research in violation of Title 18, United States Code, Sections 1343 and 2.  Specifically, Count Three charges that from in or about June 2022, up to and including November 2022, Mr. Bankman-Fried engaged in a scheme to defraud lenders of Alameda Research by providing false and misleading information to those lenders regarding Alameda's financial condition so that the lenders would not recall loans and would extend new loans.

B. Elements of Wire Fraud

Like Count One, Count Three charges wire fraud.  The elements of Count Three are the same as Count One, which I just described to you.  You should consider and apply those same instructions here.

Whereas Count One alleges a scheme to defraud customers of FTX, Count Three alleges a scheme to defraud lenders of Alameda Research.

As I previously instructed you, the false or fraudulent representation must relate to a "material" fact.  A material fact is one that would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision.  Hence, a misrepresentation would be material if the Alameda lenders took action or failed to take action based on it.

Count Three alleges that Alameda's lenders were given false or misleading information so that they would not recall loans and would extend new loans.  As I previously instructed you, property does not include intangible interests such as the right to control the use of one's assets,

14

A-518

nor does it include potentially valuable economic information that a person might consider valuable in deciding how to use his or her assets.  If you find that Alameda's lenders were deprived only of the right to control their assets or access to potentially valuable economic information, that is insufficient to convict on Count Three.[9]

Finally, as I previously instructed you, good faith on part of Mr. Bankman-Fried is a complete defense to this charge.  If Mr. Bankman-Fried believed in good faith that he was acting properly at the time of the events alleged in the Indictment, even if he was mistaken in that belief and even if others were injured by his conduct, he cannot be found guilty.

---

[9] *Ciminelli v. United States*, 598 U.S. ---, 143 S. Ct. 1121 (2023).

**DEFENSE REQUEST NO. 7**

**Count Two: Conspiracy to Commit Wire Fraud on FTX Customers[10]**

A. Summary of the Indictment

Now let me jump back to Count Two.  Count Two charges Mr. Bankman-Fried with conspiracy to commit wire fraud on FTX customers in violation of Title 18, United States Code, Section 1349.  Specifically, Count Two charges that from in or about 2019, up to and including in or about November 2022, Mr. Bankman-Fried willfully and knowingly agreed with others to defraud customers of FTX by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

B. The Elements of Conspiracy to Commit Wire Fraud on FTX Customers

Whereas Count One alleges a substantive wire fraud offense against FTX customers, Count Two alleges a conspiracy to commit wire fraud against FTX customers.  Let me explain what a conspiracy is.

A conspiracy is a combination or agreement of two or more persons to join together to accomplish some unlawful purpose.  The unlawful purpose is sometimes called the "object" of the conspiracy.  The crime of conspiracy to violate a federal law is an independent offense.  It is separate and distinct from the violation of any specific federal laws, which the law refers to as "substantive crimes."

Before Mr. Bankman-Fried can be convicted of conspiracy to commit wire fraud as alleged in Count Two, the Government must prove each of the following elements beyond a reasonable doubt:

---

[10] Adapted from *United States v. LaGuardia*, No. 19 Cr. 893 (LAK), ECF No. 93 (S.D.N.Y. Dec. 16, 2020) Trial transcript at 583-590; *United States v. Adelekan*, No. 19 CR. 291 (LAP), ECF No. 397 (S.D.N.Y. October 26, 2021) Trial transcript at 864-866; and *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), ECF No. 331 (S.D.N.Y. May 16, 2018) Trial transcript at 3983-3984; *see also* Modern Federal Jury Instructions, Instr. 19-6.

**A-520**

First, that a conspiracy existed between two or more people to commit wire fraud on FTX customers; and

Second, that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.

1. First Element – Existence of Conspiracy

Starting with the first element, the Government must prove beyond a reasonable doubt the existence of the charged conspiracy. As I just mentioned, a conspiracy is an agreement, or an understanding, by two or more persons to accomplish an unlawful objective by working together.

It is not necessary for you to find that the agreement was ever expressed orally or in writing, but the Government does have to prove that there was a mutual understanding between at least two people to violate the law.

A meeting of the minds is required for there to be an agreement. The Government must therefore prove that the co-conspirators agreed to the same object, or unlawful purpose, of the conspiracy. In other words, you must find that the defendant and his co-conspirators agreed to commit the same offense. While the co-conspirators need not agree to every detail, they must agree to the "essential nature" of the plan.[11]

The Indictment alleges that the conspiracy in Count Two lasted from in or about 2019 through up to and including in or about November 2022. It is not necessary for the Government to prove that the conspiracy lasted throughout the entire period alleged, but only that it existed for some period within that time frame.

Count Two alleges that the object of the conspiracy was to commit wire fraud on customers of FTX. As I previously instructed you, the crime of wire fraud has three elements:

---

[11] See United States v. Ulbricht, 31 F.Supp.3d 540, 551 (S.D.N.Y. 2014) (citing cases); United States v. Rosenblatt, 554 F.2d 36, 38 (2d Cir. 1977).

First, that there was a scheme or artifice to defraud or to obtain money or property by means of materially false and fraudulent pretenses, representations, or promises;

Second, that Mr. Bankman-Fried knowingly participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud;

Third, that in executing the scheme, Mr. Bankman-Fried used or caused the use of interstate or international wires.

The same instructions I gave you with respect to the law and the elements of wire fraud apply to Count Two as well and you should follow those instructions here.

If the Government proves beyond a reasonable doubt that a conspiracy to commit wire fraud on FTX customers existed, the first element of the conspiracy has been proven.  If, however, the Government has not proven beyond a reasonable doubt that such a conspiracy existed, the defendant may not be convicted on Count Two.

## 2.   Second Element – Intent

Moving to the second element, the Government must prove beyond a reasonable doubt that Mr. Bankman-Fried knowingly and willfully joined and participated in the conspiracy with knowledge of its unlawful purpose and in furtherance of its unlawful objective.  I have already instructed you about what "knowingly" and "willfully" mean.  But to reiterate, to act "knowingly" means to act consciously and voluntarily, rather than by mistake or accident.  To act "willfully" means to act deliberately and with purpose to do something that the law forbids.

In deciding whether Mr. Bankman-Fried was a member of the conspiracy, you should ask: Did he participate in the conspiracy with knowledge of its unlawful fraudulent purpose and with the specific intention of furthering the objective of wire fraud?  You may not conclude that Mr. Bankman-Fried acted willfully to join the conspiracy unless you conclude that he acted with the knowledge and specific intent to defraud, as is required to establish a violation of the wire

fraud law, along with his agreement to the commission of acts by himself or by his coconspirators that would violate the wire fraud law.

It is not necessary that Mr. Bankman-Fried be fully informed of all the details of the conspiracy, or all of its participants.  However, I caution you that mere association between Mr. Bankman-Fried and a conspirator does not make Mr. Bankman-Fried a member of the conspiracy, even if he knows that the conspiracy exists.  In other words, knowledge and association are not enough; Mr. Bankman-Fried must have intentionally participated in the conspiracy with the purpose of helping to achieve its unlawful object.

It is important to note that Mr. Bankman-Fried's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences which may be drawn from them.

As I previously instructed you, good faith is a complete defense to this charge.  The instructions I previously gave you with respect to good faith apply to this count as well.  If you find that Mr. Bankman-Fried acted in good faith, he cannot be convicted on Count Two.

**DEFENSE REQUEST NO. 8**

**Count Four: Conspiracy to Commit Wire Fraud on Lenders of Alameda Research[12]**

A. <u>Summary of the Indictment</u>

Count Four charges Mr. Bankman-Fried with conspiracy to commit wire fraud on Alameda's lenders in violation of Title 18, United States Code, Section 1349.  Specifically, Count Four charges that from in or about June 2022, up to and including in or about November 2022, Mr. Bankman-Fried willfully and knowingly agreed with others to defraud lenders to Alameda by providing false and misleading information to those lenders regarding Alameda's financial condition so that lenders would not recall loans and would extend new loans.

B. <u>Elements of Conspiracy to Commit Wire Fraud on Alameda's Lenders</u>

Before Mr. Bankman-Fried can be convicted of conspiracy to commit wire fraud as charged in Count Four, the Government must prove each of the following elements beyond a reasonable doubt:

<u>First</u>, that a conspiracy existed between two or more people to commit wire fraud on Alameda's lenders; and

<u>Second,</u> that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.

The instructions I just gave you about the law of conspiracy with respect to Count Two apply equally to Count Four.  Similarly, the instructions I gave you about wire fraud with respect to Count One apply equally to Count Four.  In determining whether the government has met its burden with respect to each element of Count Four, you should follow these instructions,

---

[12] Adapted from *United States v. LaGuardia*, No. 19 Cr. 893 (LAK), ECF No. 93 (S.D.N.Y. Dec. 16, 2020) Trial transcript at 583-590; *United States v. Adelekan*, No. 19 CR. 291 (LAP), ECF No. 397 (S.D.N.Y. October 26, 2021) Trial transcript at 864-866; and *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), ECF No. 331 (S.D.N.Y. May 16, 2018) Trial transcript at 3983-3984.

**A-524**

including the instructions on the complete defense of good faith.  If you find that Mr. Bankman-Fried acted in good faith, he cannot be convicted on Count Four.

**A-525**

**DEFENSE REQUEST NO. 9**

**Count Five: Conspiracy to Commit Securities Fraud on Investors in FTX**[13]

A. Summary of the Indictment

Count Five charges Mr. Bankman-Fried with conspiracy to commit securities fraud in violation of Title 18, United States Code, Section 371.  Specifically, Count Five charges that from in or about 2019, up to and including in or about November 2022, Mr. Bankman-Fried willfully and knowingly agreed to engage in a scheme to defraud investors in FTX by providing false and misleading information to those investors regarding FTX's financial condition and the relationship between FTX and Alameda.  Count Five further charges that in furtherance of that conspiracy, Mr. Bankman-Fried communicated with FTX investors in a manner that contained materially false information about FTX's financial condition.

B. Elements of Conspiracy to Commit Securities Fraud

Like Counts Two and Four, which I just discussed, Count Five alleges a conspiracy – in this case, conspiracy to commit securities fraud on investors in FTX.  The elements of this conspiracy are similar the wire fraud conspiracies alleged in Counts Two and Four, except the securities fraud conspiracy alleged in Count Five adds an additional element – an overt act requirement – which I will discuss in a moment.

Accordingly, before Mr. Bankman-Fried can be convicted of conspiracy to commit securities fraud as charged in Count Five, the Government must prove each of the following three elements beyond a reasonable doubt:

---

[13] Adapted from *United States v. LaGuardia*, No. 19 Cr. 893 (LAK), ECF No. 93 (S.D.N.Y. Dec. 16, 2020) Trial transcript at 565-572; *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), ECF No. 331 (S.D.N.Y. May 16, 2018) Trial transcript at 3983-3984.

22

**A-526**

First, that a conspiracy existed between two or more people to commit securities fraud on investors in FTX;

Second, that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence; and

Third, that Mr. Bankman-Fried or one of his co-conspirators committed an overt act in furtherance of the conspiracy.

1. First Element – Existence of Conspiracy

Starting with the first element, the Government must prove beyond a reasonable doubt the existence of the charged conspiracy. As I previously instructed you, a conspiracy is an agreement, or an understanding, by two or more persons to accomplish an unlawful objective by working together.

Count Five alleges that the object of the conspiracy was to commit securities fraud on investors in FTX. The crime of securities fraud has three elements:

First, that in connection with the purchase or sale of a security, a defendant did any one of the following:

(1) employed a device, scheme or artifice to defraud, or

(2) made an untrue or misleading statement of material fact; or

(3) engaged in an act, practice or course of business that operated, or would

operate, as a fraud or deceit upon a purchaser or seller;

Second, that in so doing the defendant acted willfully, knowingly, and with the intent to defraud; and

Third, that the defendant knowingly used, or caused to be used, any means or instruments of interstate transportation or interstate communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct.

**A-527**

We will consider these three elements in turn.

      i.   <u>First Element of Securities Fraud – Fraudulent Act</u>

With respect to the first element of securities fraud, the Government does not have to prove that the co-conspirators agreed to do all three types of unlawful conduct in connection with the purchase or sale of securities. Proof of anyone will suffice. However, you must be unanimous as to which of the three types of unlawful conduct, if any, was proven.

I have already instructed you on what constitutes "a scheme or artifice to defraud" and an "untrue or misleading statement" in my instructions on the wire fraud offense charged in Count One. You should consider and apply those same instructions here as well.

The Government must also prove beyond a reasonable doubt that the defendant's alleged fraudulent conduct was "in connection with the purchase or sale" of a security. This requirement is satisfied if you find that there was some nexus or relationship between the allegedly fraudulent conduct and the sale or purchase of securities. On the other hand, if you find the alleged fraudulent conduct was not in connection with the purchase or sake of a security, you cannot convict the defendant on Count Five.

The Government must also prove beyond a reasonable doubt that the information disclosed to the investors was "material." If the information would be important to a reasonable investor in deciding whether to buy or sell the stock at issue, it is "material" information. Put another way, there must be a substantial likelihood that the fact would have been viewed by the reasonable investor as having significantly altered the total mix of information then available. Materiality of the information is judged as of the time the information was disclosed. For the information to be material, it must have been conveyed to the investors before the investment decisions were being considered.

**A-528**

    ii.  <u>Second Element of Securities Fraud – Intent</u>

The second element of securities fraud that the Government must prove beyond a reasonable doubt is that the defendant acted willfully, knowingly, and with the intent to defraud. I have already instructed you on the meaning of the terms "knowingly" and "intent to defraud" in my instructions on the wire fraud offense charged in Count One.  "Willfully" means knowingly acting in violation of the securities laws.[14]  You should consider and apply those same instructions here as well, including the complete defense of good faith.

    iii.  <u>Third Element of Securities Fraud – Means of Interstate Commerce</u>

There is a third and final element of securities fraud that the Government must prove beyond a reasonable doubt; namely, that the defendant knowingly used or caused to be used the mails or the means or instrumentalities of interstate commerce in furtherance of the scheme to defraud or fraudulent conduct.  If you find that the scope of the scheme to defraud did not include the use of the mails or the means or instrumentalities of interstate commerce, this element has not been satisfied.

The use of the term "mails" is self-explanatory.  It includes the U.S. Mail, Federal Express, and other commercial mail couriers.  The term "instrumentality of interstate commerce" means instruments, devices, and means of conducting trade, commerce, transportation, or communication between any two states or between the United States and another country. Telephone calls made by a caller in one state to somebody in another state, or from the United States to a foreign country, or vice-versa, are examples of using an instrumentality of interstate commerce.  Other examples include, but are not limited to, emails, text messages, and wire transfers.

---

[14] *United States v. Peltz*, 433 F.2d 48, 55 (2d Cir. 1970).

25

**A-529**

That covers the elements of the object of the conspiracy alleged in Count Five; namely securities fraud on investors in FTX.  If the Government proves beyond a reasonable doubt that such a conspiracy existed, the first element of the conspiracy has been proven.

2.  <u>Second Element – Intent</u>

The second element of the securities fraud conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.  I have already instructed you on these elements in my instructions on the wire fraud conspiracy charged in Count Two.  You should consider and apply those same instructions here as well.

3.  <u>Third Element – Overt Act</u>

The third and final element of the securities fraud conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried or some other member of the same conspiracy knowingly committed at least one overt act in furtherance of the conspiracy.  In other words, there must have been something more than an agreement, some overt step or action must have been taken by at least one of the conspirators in furtherance of the conspiracy.  The overt act element, to put it another way, is a requirement that any agreement in relation to Count Five went beyond the mere talking stage, the mere agreement stage.

An overt act is any act intended to help achieve the object of the conspiracy.  While an overt act, itself, need not be a criminal act, it must contribute to the goals of the conspiracy.

**DEFENSE REQUEST NO. 10**

**Count Six: Conspiracy to Commit Commodities Fraud on FTX Customers[15]**

A. <u>Summary of the Indictment</u>

Count Six charges Mr. Bankman-Fried with conspiracy to commit commodities fraud in violation of Title 18, United States Code, Section 371.  Specifically, Count Six charges that from in or about 2019, up to and including in or about November 2022, Mr. Bankman-Fried willfully and knowingly agreed with others to commit commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1, by agreeing with others to defraud customers of FTX trading cryptocurrencies, futures, options, swaps, and derivatives by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes. Count Six further charges that in furtherance of that conspiracy, Mr. Bankman-Fried and others misappropriated FTX customer deposits in order to satisfy loan obligations owed by Alameda.

B. <u>Elements of Conspiracy to Commit Commodities Fraud</u>

Before Mr. Bankman-Fried can be convicted of conspiracy to commit commodities fraud as charged in Count Six, the Government must prove each of the following elements beyond a reasonable doubt:

<u>First</u>, that a conspiracy existed between two or more people to commit commodities fraud on customers of FTX;

<u>Second</u>, that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence; and

---

[15] Adapted from *United States v. Flotron*, No. 17 Cr. 220 (JAM), ECF No. 234 (D. Ct. May 8, 2018), Trial transcript 1309-1312.

A-531

Third, that Mr. Bankman-Fried or one of his co-conspirators committed an overt act in furtherance of the conspiracy.

1.  First Element – Existence of Conspiracy

Starting with the first element, the Government must prove beyond a reasonable doubt the existence of the charged conspiracy.  Count Six charges that there was an agreement or understanding between two or more people to commit commodities fraud on customers of FTX. The crime of commodities fraud has two elements:

First, that in connection with a swap, or a contract of sale of a commodity in interstate commerce, or a contract for future delivery on or subject to the rules of a registered entity, as those concepts are defined in the Commodities Exchange Act,[16] a defendant did any one of the following:

(1) used or employed a manipulative device, scheme or artifice to defraud, or

(2) made an untrue or misleading statement of material fact; or

(3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a person;

Second, that in so doing the defendant acted willfully, knowingly, and with the intent to defraud.

In my instructions on the wire fraud offense charged in Count One, I already instructed you on what constitutes "a scheme or artifice to defraud" and an "untrue or misleading statement" and a "material fact," as well as the meaning of the terms "knowingly," "willfully,"

---

[16] Depending on the Government's proof at trial, the defense reserves the right to request instructions on the legal definition of "swap," "commodity," "registered entity," or any other relevant terms or phrases defined in the Commodities Exchange Act and associated regulations.

and "intent to defraud."  You should consider and apply those same instructions here as well, including the complete defense of good faith.

Let me now discuss the "in connection with" requirement for Count Six.  The phrase "in connection with" is not limitless and does not convert every instance of alleged fraudulent conduct that happens to involve commodities into a violation of the federal commodities fraud laws.  For purposes of Count Six, the Government must prove beyond a reasonable doubt a fraud that is "integral"—and not merely incidental—to a purchase or sale of a commodity, or integral to a swap.  Here, the Indictment alleges that the defendant defrauded FTX customers who were "trading or intending to trade cryptocurrencies, futures, options, swaps, and derivatives" by misappropriating their customer deposits.  I instruct you that the "in connection with" requirement is not satisfied if the alleged misappropriation was complete before any actual or contemplated commodities transaction took place.[17]

That covers the elements of the object of the conspiracy alleged in Count Six; namely commodities fraud on customers of FTX.  If the Government proves beyond a reasonable doubt that such a conspiracy existed, the first element of the conspiracy has been proven.

### 2.  Second Element – Intent

The second element of the commodities fraud conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.  I have already instructed you on these elements in my instructions on the wire fraud conspiracy charged in Count Two.  You should consider and apply those same instructions here as well.

---

[17] *See Sec. and Exch. Comm'n v. Zandford*, 535 U.S. 813, 824-25, 122 S. Ct. 1899, 1905-06 (2002); *United States v. O'Hagan*, 521 U.S. 642, 656-57, 117 S. Ct. 2199, 2209-10 (1997); *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 (2d Cir. 2005) *vacated on other grounds* 547 U.S. 71, 126 S. Ct. 1503 (2006); CFTC Commentary, 17 C.F.R. § 180.1, at 41405-06.

**A-533**

    3.  <u>Third Element – Overt Act</u>

The third and final element of the commodities fraud conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried or some other member of the same conspiracy knowingly committed at least one overt act in furtherance of the conspiracy.  I have already instructed you on the overt act element in my instructions on the securities fraud conspiracy charged in Count Five.  You should consider and apply those same instructions here as well.

**DEFENSE REQUEST NO. 11**

**Count Seven: Conspiracy to Commit Money Laundering[18]**

A. Summary of the Indictment

Count Seven charges Mr. Bankman-Fried with conspiracy to commit money laundering

in violation of Title 18 of the United States Code, Section 1956(h).  Specifically, Count Seven

charges that from in or about 2020, up to and including in or about November 2022, Mr.

Bankman-Fried willfully and knowingly agreed with others to commit money laundering in two

ways:

> First, by conducting financial transactions involving the proceeds of the wire fraud
> offense charged in Count One knowing that the transactions were designed in
> whole or in part to disguise the nature, location, source, ownership, or control of
> the proceeds of the unlawful activity in violation of Title 18, United States Code,
> Section 1956(a)(1)(B)(i).

> Second, by engaging in monetary transactions in an amount greater than $10,000
> representing the proceeds of wire fraud offense charged in Count One, in violation
> of Title 18, United States Code, Section 1957.

B. Elements of Conspiracy to Commit Money Laundering

Before Mr. Bankman-Fried can be convicted of conspiracy to commit money laundering

as charged in Count Seven, the Government must prove each of the following elements beyond a

reasonable doubt:

> First, that a conspiracy existed between two or more people to commit money laundering;

and

> Second, that Mr. Bankman-Fried knowingly and willfully joined and participated in the

alleged conspiracy at some point during its existence.

---

[18] Adapted from *United States v. Adelekan*, No. 19 Cr. 291, ECF No. 397 (S.D.N.Y. 2021) Trial transcript at 878-890; *see also* Modern Federal Jury Instructions, Instr. 50A-10.

**A-535**

1.  <u>First Element – Existence of Conspiracy</u>

Starting with the first element, the Government must prove beyond a reasonable doubt the existence of the charged conspiracy.  As I mentioned before, Count Six charges that there was an agreement or understanding between two or more people to commit money laundering in two different ways, which I will call "concealment money laundering" and "illegal monetary transactions."  These are the two objects of the conspiracy charged in Count Six.

The Government does not need to prove that Mr. Bankman-Fried agreed to accomplish both types of money laundering; an agreement to accomplish either one of the objects is sufficient.  You must, however, be unanimous that the Government has proven beyond a reasonable doubt at least one of the two alleged objectives of the conspiracy.  You must also be unanimous as to which of the two types has been proven.

*Concealment Money Laundering*

The crime of concealment money laundering has four elements:

<u>First</u>, that the defendant conducted, or attempted to conduct, a financial transaction, which must in some way or degree have affected interstate or foreign commerce;

<u>Second</u>, that the financial transaction at issue involved the proceeds of specified unlawful activity, which here is alleged to have been a wire fraud offense charged in Count One;

<u>Third</u>, that the defendant knew that the financial transaction involved the proceeds of some form of unlawful activity; and

<u>Fourth</u>, that the defendant knew that the transaction was designed, in whole or in part, either to disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

We will consider these four elements in turn.

i. <u>First Element of Concealment Money Laundering – Financial Transaction</u>

The first element of concealment money laundering that the Government must prove beyond a reasonable doubt is that the defendant conducted a financial transaction that affected interstate or foreign commerce.

The term "conducts" includes the action of initiating, concluding, or participating in initiating or concluding a transaction.

The term "financial transaction" means (1) a transaction involving a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree, or (2) a transaction which in any way or degree affects interstate or foreign commerce and involves the movement of funds by wire or other means, or involves one or more monetary instruments.

A "transaction involving a financial institution" includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution by whatever means.  The term "funds" includes any currency, money, or other medium of exchange that can be used to pay for goods and services.

Interstate commerce includes any transmission, transfer, or transportation of goods or services, both tangible and intangible, communications, and/or persons, between persons, places, or entities located in one state, including the District of Columbia, regardless of whether done for a business purpose or otherwise.

Foreign commerce means the same thing except it is between a person, place, or entity in the United States, any person, place, or entity in a foreign country.

**A-537**

In determining whether a person or institution is engaged in or whether a transaction affects interstate or foreign commerce, the involvement in interstate or foreign commerce can be minimal.  Any involvement at all will satisfy this element.

      ii.  <u>Second Element of Concealment Money Laundering – Proceeds of Specified Unlawful Activity</u>

The second element of concealment money laundering is that the financial transactions must involve the proceeds of specified unlawful activity.  The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity.

The term "specified unlawful activity" means any one of a variety of offenses described in the statute.  In this case the Government has alleged that the financial transactions at issue involved the proceeds of the wire fraud offense charged in Count One of the Indictment.  I instruct you, as a matter of law, that the charge in Count One, if proven beyond a reasonable doubt, meets the definition of specified unlawful activity.  However, you must determine whether the funds involved in the financial transactions were the proceeds of that unlawful activity.  And if you find that the Government has not proven Count One, then you cannot convict on Count Seven.

Relatedly, I instruct you that funds can only be laundered after the underlying crime is complete; otherwise, the funds cannot be considered the "proceeds" of the specified unlawful activity.  In other words, the money laundering transaction – that is, the transaction designed to conceal the proceeds – must be separate and distinct from the wire fraud scheme that generated the proceeds.

   iii.  <u>Third Element of Concealment Money Laundering – Knowledge that Transactions Involved Unlawful Proceeds</u>

The third element of concealment money laundering is that the defendant knew that the financial transactions at issue involved the proceeds of some form, though not necessarily which form, of unlawful activity.

It is not necessary for the defendant to know that the proceeds came from the wire fraud offense alleged in Count One or that the defendant personally participated in the wire fraud offense.  It is sufficient that the defendant knew that the proceeds came from some form of unlawful activity.

   iv.  <u>Fourth Element of Concealment Money Laundering – Knowledge that Transactions Were Designed to Conceal</u>

The fourth and final element of concealment money laundering concerns the purpose of the transaction.  Specifically, the Government must prove beyond a reasonable doubt that the defendant conducted financial transactions with the knowledge that the transactions were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity – namely, the wire fraud offense alleged in Count One.  The terms I have just used have their everyday ordinary meanings.

If you find that the evidence establishes beyond a reasonable doubt that the defendant knew the purpose of a particular transaction in issue and that he knew at the time of the transaction that the transaction was designed to conceal or disguise the true origin of the proceeds of the wire fraud against FTX customers, then this element is satisfied.

However, if you find that the defendant knew of the transaction at issue, but did not know that it was designed to conceal or disguise the true origin of the proceeds of the wire fraud against FTX customers, and instead thought that the transaction was intended to further a

**A-539**

legitimate transaction, you must find that this element has not been satisfied and find the defendant not guilty.

Relatedly, I instruct you that the money laundering statute prohibits money *laundering*, not money *spending*.  Thus, a design to conceal or disguise the source or nature of the proceeds is necessary.  If there is no evidence that the defendant intended to conceal or disguise the proceeds of an unlawful activity, he may not be convicted for concealment money laundering.

That covers the elements of the first object of the money laundering conspiracy alleged in Count Seven; namely concealment money laundering.  We now turn to the elements of the second object of the money laundering conspiracy – illegal monetary transactions.

### *Illegal Monetary Transactions*

The crime of conducting illegal monetary transactions has five elements:

<u>First</u>, that the defendant engaged in a monetary transaction in or affecting interstate or foreign commerce;

<u>Second</u>, that the monetary transaction involved criminally-derived property of a value greater than $10,000;

<u>Third</u>, that the property was derived from specified unlawful activity;

<u>Fourth</u>, that the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense;

<u>Fifth</u>, that the transaction took place in the United States.

We will consider each of these five elements in turn.

   i.  <u>First Element of Illegal Monetary Transactions – Financial Transaction</u>

The first element that the Government must prove beyond a reasonable doubt is that the defendant conducted a financial transaction that affected interstate or foreign commerce.

I already instructed you on the meaning of the terms "financial transaction" and "interstate or foreign commerce."  You should consider and apply those same instructions here as well.

   ii.  <u>Second Element of Illegal Monetary Transactions – Criminally Derived Property Worth Over $10,000</u>

The second element that the Government must prove beyond a reasonable doubt is that the monetary transactions involved criminally derived property having a value in excess of $10,000.

The term "criminally-derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.  I already instructed you on the meaning of the terms "proceeds" and you should apply those same instructions here.  I instruct you, as a matter of law, that wire fraud is a criminal offense for purposes of this statute.

The Government is not required to prove that all of the property involved in the transaction was criminally-derived property.  However, the government must prove that more than $10,000 of the property involved was criminally-derived property.[19]

---

[19] In light of the Second Circuit's decision in *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017), we will not request an instruction on tracing the criminally-derived property.  *See United States v. Rutgard*, 116 F.3d 1270, 1292-93 (9th Cir. 1997).  However, we disagree with this decision and preserve this issue for appeal.

**A-541**

   iii.   <u>Third Element of Illegal Monetary Transactions – Property Derived from Specified Unlawful Activity</u>

   iv.   <u>Fourth Element of Illegal Monetary Transactions – Knowledge</u>

The third and fourth elements that the Government must prove beyond a reasonable doubt is that the property was derived from specified unlawful activity and that the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense.

I already instructed you on the meaning of the terms "specified unlawful activity" and "knowingly" and you should apply those same instructions here.

I instruct you that the Government is not required to prove that the defendant knew the particular offense from which the criminally-derived property was derived. However, the Government must prove beyond a reasonable doubt that the defendant knew that the transaction involved criminally-derived property which, I remind you, means any property constituting or derived from proceeds obtained from a criminal offense.

   v.   <u>Fifth Element of Illegal Monetary Transactions – Transaction in the United States</u>

The fifth and final element that the Government must prove beyond a reasonable doubt is that the agreed upon transaction took place in the United States

That covers the elements of the second object of the money laundering conspiracy alleged in Count Seven; namely illegal monetary transactions. If the Government proves beyond a reasonable doubt that such a conspiracy existed, the first element of the conspiracy has been proven. If, however, the Government has not proven beyond a reasonable doubt that such a conspiracy existed, the defendant may not be convicted on Count Seven.

**A-542**

2.  <u>Second Element – Intent</u>

The second element of the money laundering conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.  I have already instructed you on these elements in my instructions on the wire fraud conspiracy charged in Count Two.  You should consider and apply those same instructions here as well, including the complete defense of good faith.

A-543

### DEFENSE REQUEST NO. 12

### Venue[20]

With respect to any given count you are considering, the Government, in addition to proving the essential elements of that charge, must also prove that at least one act in furtherance of the charge occurred in the Southern District of New York. This is called establishing venue. The Southern District of New York includes all of Manhattan and the Bronx, as well as Westchester, Rockland, Putnam, Dutchess, Orange and Sullivan Counties.

The Government does not have to prove that a completed crime was committed within the Southern District of New York, or that Mr. Bankman-Fried was ever in the Southern District of New York. It is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred in this District. The act itself may not be a criminal act. It could include, for example, processing or executing a securities trade within this District. And the act need not have been taken by Mr. Bankman-Fried, so long as the act was part of the crime that you find was committed by Mr. Bankman-Fried.

Unlike the elements of the offenses which must be proven beyond a reasonable doubt, the Government is only required to prove venue by a preponderance of the evidence. A preponderance of the evidence means that it is more probable than not that some act in furtherance of the crime you are considering occurred in this District.

---

[20] *United States v. Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. 2016), Trial transcript at 1620-21.

**DEFENSE REQUEST NO. 13**

**Bias of Witnesses[21]**

In deciding whether to believe a witness, you should specifically note any evidence of hostility or affection that the witnesses may have towards one of the parties.  Likewise, you should consider evidence of any other interest or motive that the witness may have in cooperating with a particular party.  You should also take into account any evidence of any benefit that a witness may receive from the outcome of the case.

It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony.  In short, if you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

Of course, the mere fact that a witness is interested in the outcome of the case does not mean he or she has not told the truth.  It is for you to decide from your observations and applying your common sense and experience and all the other considerations mentioned whether the possible interest of any witness has intentionally or otherwise colored or distorted his or her testimony.  You are not required to disbelieve an interested witness; you may accept as much of his or her testimony as you deem reliable and reject as much as you deem unworthy of acceptance.

---

[21] Adapted from the charge of the Honorable J. Paul Oetken in *United States v. Danilovich*, 12-CR-171 (JPO), Trial transcript at 4770-71.

**A-545**

**DEFENSE REQUEST NO. 14**

**Cooperating Witness Testimony[22]**

You have heard testimony from witnesses who have pleaded guilty and entered into cooperation agreements with the Government. These witnesses testified that they hope that, as a result of their cooperation with the Government—including their testimony at this trial—that they will receive a lesser sentence.

You are not to draw any conclusions or inferences of any kind about the guilt of Mr. Bankman-Fried merely from the fact that certain witnesses at this trial entered into cooperation agreements with the Government and pleaded guilty to crimes that may be similar or related to the crimes with which Mr. Bankman-Fried is charged.  The witnesses who decided to plead guilty and cooperate with the Government did so based on their evaluation of what was in their best interest.  Their decision to plead guilty and to cooperate with the Government is not evidence that Mr. Bankman-Fried committed a crime.  A defendant may not be found guilty merely because he associated with individuals who decided to plead guilty and enter into cooperation agreements with the Government.

The testimony of cooperating witnesses must be scrutinized with special care and caution.  The fact that a witness has pleaded guilty to crimes and has entered into a cooperation agreement with the Government may be considered by you as bearing on the witness's credibility.  It does not follow, of course, that simply because a person has admitted to committing crimes, and has entered into a cooperation agreement with the Government, that he is incapable of giving a truthful account of what happened.  Moreover, it is no concern of yours

---

[22] Adapted from the charge of the Honorable Paul G. Gardephe in *United States v. Amanat*, 15-CR-536 (PGG), Trial transcript at 7145.

**A-546**

why the Government made an agreement with a witness.  Your sole concern is whether a witness has given truthful testimony.

The testimony of cooperating witnesses should be given such weight as it deserves in light of all the facts and circumstances before you, taking into account the witness's candor, the strength and accuracy of his recollection, his background, his demeanor, and the extent to which his testimony is or is not corroborated by other evidence in the case.  As with other witnesses, you may consider whether a cooperating witness has an interest in the outcome of this case and, if so, whether that interest has affected his or her testimony.

In this regard, you should bear in mind that a witness who has pleaded guilty and entered into a cooperation agreement with the Government has an interest and motives different from those of other witnesses.  In evaluating the testimony of such a witness, you should ask yourself whether the witness would benefit more by lying, or by telling the truth.  Was the witness's testimony influenced in any way by a belief or hope that he would receive favorable treatment by testifying falsely, or did he believe that his interests would be best served by testifying truthfully?  If you believe that a witness was motivated by hopes of avoiding a term of imprisonment, was that motivation one that would cause him to lie, or was it one that would cause him to tell the truth?

In sum, you should consider all of the evidence in deciding what weight, if any, to give to the testimony of a cooperating witness.  If you find that the testimony of a cooperating witness was false, you should reject it.  However, if—after a cautious and careful examination of the cooperating witness's testimony in light of all the evidence—you conclude that the cooperating witness told the truth, you should accept the testimony as credible and act upon it accordingly.

**A-547**

As with any witness, the issue of credibility need not be decided on an all-or-nothing basis.  Even if you find that a witness testified falsely in one part, you may still accept his or her testimony in other parts, or you may disregard all of that witness's testimony.  That is a determination entirely for you to make.

**A-548**

**DEFENSE REQUEST NO. 15**

**Expert Witnesses [If Applicable][23]**

You have heard testimony from a witness/certain witnesses who was/were proffered as (an) expert(s) in different areas.  An expert is allowed to express his or her opinion on those matters about which he or she has special knowledge and training.  Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing an expert's testimony, you may consider the expert's qualifications, opinions, reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony.  You may give the expert testimony whatever weight, if any, you find it deserves in light of all the evidence in this case.  You should not, however, accept a witness's testimony merely because he or she is an expert.  Nor should you substitute it for your own reason, judgment, and common sense.  The determination of the facts in this case rests solely with you.

---

[23] Modern Federal Jury Instructions, Instr. 7-21.

45

**DEFENSE REQUEST NO. 16**

**Defendant's Testimony [If Applicable][24]**

In a criminal case, the defendant never has a duty to testify or come forward with any evidence.  The reason is that, as I have told you, the defendant is presumed innocent and the government at all times has the burden of proof beyond a reasonable doubt.  But, if he chooses, the defendant also has the right to testify and to take the witness stand on his own behalf. In this case, Mr. Bankman-Fried decided to testify, like any other witness, and he was subject to cross-examination, like any other witness.  You should examine and evaluate the testimony of Mr. Bankman-Fried just as you would the testimony of any witness.

---

[24] *See United States v. Solano*, 966 F.3d 184, 192-94 (2d Cir. 2020); *United States v. Gaines*, 457 F.3d 238, 249 n.9 (2d Cir. 2008).

**DEFENSE REQUEST NO. 17**

**Defendant's Right Not To Testify [If Applicable]**

Mr. Bankman-Fried did not testify in this case.  Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt.  That burden remains with the Government throughout the trial and never shifts to the defendant.  A defendant is never required to prove that he or she is innocent.

You must not attach any significance to the fact that Mr. Bankman-Fried did not testify.  You may not draw any inference against Mr. Bankman-Fried because he did not take the witness stand.  You may not speculate as to why he did not testify, and you may not consider this against him in any way in your deliberations.

A-551

**DEFENSE REQUEST NO. 18**

**Missing Witness Charge [If Applicable]**

[Mr. Bankman-Fried respectfully requests that the jury be given a missing witness charge for any material witnesses not presented at trial, to be supplied following the close of trial, prior to the charging conference.]

**A-552**

## DEFENSE REQUEST NO. 19

### Defense Theory of the Case[25]

[Mr. Bankman-Fried respectfully requests that the jury be charged with the defense

theory of the case, to be supplied following the close of trial, prior to the charging conference.]

---

[25] *United States v. GAF Corp.*, 928 F.2d 1253, 1262 (2d Cir 1991) ("This Court has repeatedly recognized a criminal defendant's right to a jury charge which reflects the defense theory").

**A-553**

**CONCLUSION**

Mr. Bankman-Fried respectfully requests that the Court include the foregoing in its instructions to the jury. Mr. Bankman-Fried also reserves the right to supplement or amend these requests to charge in response to the Government's requests, the materials to be produced to the defense, and the evidence presented at trial.

Dated: August 21, 2023
        New York, New York

Respectfully submitted,

_/s/_ Mark S. Cohen
Mark S. Cohen
Christian R. Everdell
David Lisner
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
Phone:  (212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
dlisner@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*

**A-554**

 **COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

August 23, 2022

**BY ECF**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      **Re:  *United States v. Samuel Bankman-Fried*, 22 Cr. 673 (LAK)**

Dear Judge Kaplan:

      We write in response to the Court's order, dated August 21, 2023, directing the defense to respond to the Government's letter, dated August 18, 2023.  ECF Nos. 212, 211.  In its letter, the Government requested additional disclosures related to the defense's proposed advice-of-counsel defense or, in the alternative, precluding the defense from introducing such evidence at trial. ECF No. 211.

      As a preliminary matter, the defense does not believe the Government is entitled to any further information concerning the specific details and scope of the proposed defense, or the evidence the defense proposes to elicit concerning Mr. Bankman-Fried's reliance on the advice of counsel.  *See United States v. Ray*, No. 20 Cr. 110 (LJL), 2021 WL 5493839, at *5 (S.D.N.Y. Nov. 22, 2021) ("[T]he government is not entitled to either the names of the attorneys whom [the defense] intends to call as witness or upon whose advice he intends to rely, and the government is not entitled at the pretrial stage to be informed of the charges to which [the defendant] intends to assert an advice-of-counsel defense").  This information is also not called for under Rule 12.2. Nevertheless, in the interest of avoiding further collateral litigation on this issue, the defense hereby provides the additional disclosures set forth below.

      As the Government and the Court are aware, the defense moved to compel the Government pursuant to Rule 16 to produce various records from Fenwick & West LLP ("Fenwick"), outside counsel for FTX and Alameda, or in the alternative for a Rule 17(c) subpoena to obtain those same records.  ECF No. 151.  The application was based on billing records from Fenwick that were produced in discovery, which showed that Fenwick had

**A-555**

The Honorable Lewis A. Kaplan
August 23, 2022
Page 2

provided legal advice to FTX and Alameda on numerous topics that are directly related to the conduct alleged in the Indictment, including but not limited to the following:

1. Data retention policies at FTX, including the use of auto-delete policies and ephemeral messaging applications;

2. The formation and incorporation of the North Dimension entities, and the banking relationship between Silvergate Bank and Alameda, North Dimension, and FTX;

3. Loans given to the founders and other executives of FTX and Alameda;

4. FTX customer agreements, including the FTX Terms of Service; and

5. Intercompany agreements between FTX and Alameda, including the Payment Agent Agreement;

*Id*. at 6-10.  The Government opposed this application, and the Court denied the requested relief.  ECF Nos. 156, 166.  As a result, the defense was unable to obtain the documents that would have reflected Fenwick's legal advice.  Indeed, it is galling that the Government is requesting specific documents from the defense when the Government helped ensure that we could not obtain these very documents.  The fact that the Government now asks the Court to preclude evidence on reliance of counsel is yet another attempt by the Government – like its 60-page motions *in limin*e submission – to deprive the defense of a defense.

Nevertheless, the defense intends to elicit evidence that Mr. Bankman-Fried was aware that Fenwick lawyers as well as in-house counsel for FTX, including Dan Friedberg, Can Sun, Ryne Miller, and others, were involved in reviewing and approving decisions related to these matters and others, which gave him assurance that he was acting in good faith.  Evidence of the defendant's reliance on counsel is relevant to the question of intent and is not limited to situations where the defense can establish that the defendant formally sought out the advice of counsel, received legal advice, and followed the advice given.  *See Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) ("[R]eliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter."); *see also id*. ("[T]he reliance defense … is not really a defense at all but simply some evidence tending to support a defense based on due care or good faith.") (citation omitted); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (in evaluating a defense of good faith, "[defendant's] conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent."); Sand *et al*., Modern Federal Jury Instructions, Instr. 44-5 ("It may also be appropriate to instruct the jury that consulting counsel could be considered as evidence of good faith.").

**A-556**

The Honorable Lewis A. Kaplan
August 23, 2022
Page 3

     *Howard* is particularly instructive here.  In that case, the defendant was a senior executive at a registered broker-dealer who was accused of securities laws violations in connection with two private placement offerings.  *Id*. at 1138-39.  The defendant was able to elicit evidence that he aware that outside counsel had approved the first transactions and oversaw the closing in its offices and that in-house and outside counsel had approved the second transaction.  *Id*. at 1147-48.  The Court found that these facts constituted "powerful evidence" of the defendant's good faith.  *Id*. at 1148.

     Accordingly, Mr. Bankman-Fried's awareness that counsel was involved in the matters listed above and others is relevant to rebut the Government's claim that Mr. Bankman-Fried acted with criminal intent to defraud.  The list above is non-exhaustive.  The defense reserves the right to elicit similar evidence related to other matters in which Mr. Bankman-Fried was aware that in-house and outside counsel were involved, including following the receipt of the Government's disclosures of Jencks Act material and its exhibit list, as well as based on the evidence presented at trial.

     We submit that these additional disclosures are more than sufficient to apprise the Government of the nature and scope of the reliance-of-counsel evidence the defense intends to elicit.

                        Sincerely,

                        */s/ Mark S. Cohen*
                        Mark S. Cohen
                        Christian R. Everdell
                        **COHEN & GRESSER LLP**
                        800 Third Avenue, 21st Floor
                        New York, New York 10022
                        (212) 957-7600
                        mcohen@cohengresser.com
                        ceverdell@cohengresser.com

**A-557**





**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 29, 2023

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

  Re:  *United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)

Dear Judge Kaplan:

  The Government writes in response to the defendant's August 23, 2023 letter, and pursuant to the Court's August 26, 2023 order, regarding an advice-of-counsel defense, and in further support of the Government's August 18, 2023 letter motion for disclosures and discovery by the defendant. For the reasons set forth below, the Government respectfully requests that the Court order the defendant, as it did in *United States v. Ash*, No. 19 Cr. 780 (LAK), Dkt. 105, to provide the Government sufficiently in advance of trial with (a) written notice of the contours, including specifics, bases, and scope, of any advice-of-counsel defense or good faith defense based on the involvement of attorneys that he will raise at trial, and (b) all documents (including attorney-client and attorney work product documents) that support or might impeach or undermine any such defense. Alternatively, the Government respectfully requests that the Court preclude irrelevant, confusing, and prejudicial questioning, evidence, and arguments about the involvement of attorneys, as further described below.[1]

**A. Background**

  On July 1, 2023, the Court ordered the defendant to, among other things, "provide notice to the Government … of his intention to present an advice of counsel defense…." (Dkt. 173.) On August 16, 2023, the defendant wrote to the Government, "please take notice of our intent to rely on a defense of advice of counsel at trial," without specifying any additional details about such a defense. On August 17, 2023, the Government informed defense counsel that it believed the defendant's notice was insufficiently detailed, but defense counsel declined to supplement the disclosure. On August 18, 2023, the Government moved to require the defendant to provide

---

  [1] To the extent that further discovery directed by the Court to be provided by the defendant reveals that the defendant seeks to offer improper evidence and argument, the Government may seek further relief, as appropriate.

# A-558

Page 2

additional disclosures about such a defense and to provide discovery to the Government. (Dkt. 211.)

In an August 23, 2023 response to the Government's motion, the defendant described his defense as "reliance on the advice of counsel" and explained that the defense will attempt to elicit evidence that attorneys were "reviewing and approving decisions … which gave [the defendant] assurances that he was acting in good faith" and that "reliance on counsel is relevant to the question of intent." (Dkt. 222 at 2.) The defendant further specified a "non-exhaustive" list of topics he says attorneys were involved in: "(1) Data retention policies at FTX, including the use of auto-delete policies and ephemeral messaging applications; (2) The formation and incorporation of the North Dimension entities, and the banking relationship between Silvergate Bank and Alameda, North Dimension, and FTX; (3) Loans given to the founders and other executives of FTX and Alameda; (4) FTX customer agreements, including the FTX Terms of Service; and (5) Intercompany agreements between FTX and Alameda, including the Payment Agent Agreement." (*Id.* at 2-3.) The defense states that the attorneys involved were "Fenwick lawyers as well as in-house counsel for FTX, including Dan Friedberg, Can Sun, Ryne Miller, and others." (*Id.* at 2.) The defense declined to provide any additional information about the nature of the reliance on counsel, or to produce discovery as the Government had requested.

### B.  Applicable Law

"In a fraud case … the advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but rather "is evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.'" *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). "That said, defendants are entitled to an advice-of-counsel instruction only if there are sufficient facts in the record to support the defense." *Scully*, 877 F.3d at 476 (citing *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997)). Specifically, "[t]here must be evidence such that a reasonable juror could find that the defendant 'honestly and in good faith sought the advice of counsel,' 'fully and honestly laid all the facts before his counsel,' and 'in good faith and honestly followed counsel's advice.'" *Id.* (quoting *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012)).

Where the defendant has not put forward a formal defense of reliance on advice of counsel, courts have limited the admission of evidence about the involvement of attorneys on relevancy grounds and pursuant to Rule 403. The decision in *S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013), illustrates the limited relevance of evidence of attorney involvement absent a showing of each of the elements of advice of counsel. In that case, which was brought by the SEC against a Goldman Sachs employee alleged to have violated securities laws in the offer and sale of a synthetic collateralized debt obligation, the defendant disclaimed any advice-of-counsel defense, but sought to introduce evidence that in-house counsel had reviewed various documents, reviewed disclosure language, was copied on communications, and in some instances assisted in drafting documents. *Id.* at 682-83. The court, however, held that Rules 401 and 403 precluded evidence and references to counsel, explaining:

> a lay jury could easily believe that the fact that a lawyer is present
> at a meeting means that he or she must have implicitly or explicitly
> 'blessed' the legality of all aspects of a transaction. Likewise, the
> fact that lawyers saw and commented on disclosure language could
> be understood as 'blessing' the sufficiency of that disclosure. This
> misunderstanding would give the defendant all of the essential
> benefits of an advice of counsel defense without having to bear the
> burden of proving any of the elements of the defense.

*Id.* at 684. Accordingly, in *Tourre*, the court precluded as irrelevant and prejudicial (1) evidence used solely to show lawyers attended or set up meetings, (2) evidence that lawyers approved of certain documents or disclosures, and (3) the placing by the defendant of undue focus on the fact that a lawyer was present at meetings or reviewed documents or disclosures. *Id.* at 685. Although the defendant was allowed to present evidence of the attendees of meetings and to include professional descriptions for those participants, defense counsel could not mention the presence of lawyers in their opening statements or arguments. The court emphasized that this was not an inclusive list of inadmissible references to counsel and that other references may similarly be inadmissible. *Id.*

Similarly, in *S.E.C. v. Stoker*, another civil securities fraud action in which the defendant did not intend to assert an advice-of-counsel defense, but rather sought to elicit testimony about whether lawyers had reviewed certain transactions, Judge Rakoff took issue with defense counsel's efforts to highlight, through questioning, the fact that attorneys had reviewed certain offering materials. No. 11 Civ. 7388 (S.D.N.Y. July 23, 2012), Trial Tr. at 895-96. The court recognized that "absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, at least from outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] totally irrelevant." *Id.* And, although the defendant proffered an alternative reason for the questioning, the court recognized that counsel's tactic was a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the dangers of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981. Similarly, in *S.E.C. v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019), Judge Cote precluded "references to counsel's communications" because, among other things, they were "not relevant in the absence of an advice-of-counsel defense." The court explained that "any probative value of such references is substantially outweighed" by, among other things, "the risk that such references will sow confusion and mislead the jury by suggesting that counsel … fully informed … approved" a transaction. *Id.* [2]

---

[2] The decision in *Howard* cited by the defendant does not support the blanket admissibility of evidence of communications with attorneys. (Dkt. 222 at 2-3.) That out-of-Circuit case involved an appeal from sanctions imposed by the SEC for the defendant's alleged aiding and abetting of securities law violations committed in the course of two private placement offerings. *Howard*, 376 F.3d at 1139. The discussion about whether a defense of reliance on counsel requires a formal invocation of the defense is merely *dicta*, since the court determined that it was undisputed that the defendant "believed that [an in-house attorney], higher management … and outside counsel had approved actions" that allegedly violated the law, *id.* at 1147, which was "powerful evidence"

**A-560**

Page 4

That said, in the absence of evidence to support an advice-of-counsel instruction, some courts have allowed defendants to offer limited evidence of lawyers' involvement in allegedly inculpatory decisions or conversations to support an argument that the defendant lacked intent to defraud. *See, e.g.*, *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. June 24, 2014), Trial Tr. at 84-85 ("the defendant may argue that attorneys who drafted or reviewed documents related to the charged transactions did not inform him of the illegality … and that the defendant took comfort in the attorney silence"). Importantly, however, even those courts that permit such evidence have required extensive pretrial disclosures and have carefully policed references to counsel in testimony and argument to ensure that the defendant does not unfairly hide behind the attorney-client privilege or attempt to mount a disguised reliance argument, given the concerns of relevance and prejudice. *See id.* (noting that the defendant needed to produce documents to the government, particularly in light of his untimely waiver decision); *United States v. Hild*, No. 19 Cr. 602 (RA) (S.D.N.Y. Apr. 15, 2021), Trial Tr. at 215 (noting risk that presence of counsel arguments in the absence of a waiver risks "misleading the jury" by suggesting that "counsel was there for the entirety of the time looking at the relevant issue, which suggests that they gave their blessing without knowing what information they provided").

Thus, where a defendant seeks to admit evidence of the involvement of attorneys, whether as a formal advice of counsel defense, or to show good faith, he must provide the Government with sufficient notice and disclosures ahead of trial. *See, e.g.*, *United States v. Schulte*, No. 17 Cr. 548 (PAC), 2020 WL 133620, at *6 (S.D.N.Y. Jan. 13, 2020) (requiring advanced advice of counsel disclosure); *United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018) (defendant should have made pertinent disclosures in advance of trial); *United States v. Rubin/Chambers, Dunhill*, 828 F. Supp. 2d 698, 711 (S.D.N.Y. 2011) (requiring notification to the Government of advice-of-counsel defense sufficiently before pre-trial conference to permit litigation over disputes). Such pretrial notice and disclosure are necessary to assess the relevance and admissibility of evidence and the permissibility of argument and to prevent confusing and unfairly prejudicial arguments from being presented to the jury.

---

that the defendant's "actions did not amount to an extreme departure from the standards of ordinary care so obvious that the actor must have been aware of it," as required under the applicable legal standard. *Id.* at 1148. The language is therefore also distinguishable because *Howard* had nothing to do with the admissibility of evidence about the presence of counsel, but rather the SEC's failure to weigh that admissible evidence in determining whether the defendant had acted recklessly. Regardless, the court in *Howard* appears to have misread one of the academic sources it relies upon. *See Dolphin & Bradbury, Inc. v. S.E.C.*, 512 F.3d 634, 642 (D.C. Cir. 2008) (citing Douglas W. Hawes & Thomas J. Sherrard, *Reliance on Advice of Counsel as a Defense in Corporate and Securities Cases*, 62 VA. L. REV. 1, 29 (1976), also cited in *Howard*, as stating that "Reliance on advice of counsel will not be available to the defendant if he failed to disclose all relevant facts to the attorney."). The reasoning of *Howard* has also been implicitly rejected by courts in this District, *see, e.g.*, *Tourre*, 950 F. Supp. 2d at 684-85; *Stoker*, No. 11 Civ. 7388, Trial Tr. at 895-96; *Lek*, 2019 WL 5703944, at *4.

Page 5

## C.  Discussion

The defendant's August 23, 2023, letter does not provide sufficient notice of any contemplated reliance on counsel defense, and the defendant has not produced any discovery relating to such a defense. Specifically, the defendant has not (1) provided an exhaustive list of the topics on which he claims there was attorney involvement, (2) identified the contours of the attorney involvement—the who, what, where, and when—or the bases and scope of the defense, or (3) provided documents in support of, impeaching, or undermining such a defense. [3]

This Court was confronted with a similar issue in *United States v. Ash*, No. 19 Cr. 780 (LAK), and required pretrial notice and disclosure by the defendant. There, the defendant declined to indicate whether she would assert an advice-of-counsel defense and did not explain the contours of such a defense, but suggested she might argue or introduce evidence about the presence of attorneys. *See* Gov't Letter, *United States v. Ash*, No. 19 Cr. 780 (Nov. 12, 2021), Dkt. 104 (recounting procedural history). This Court then ordered the defendant to "provide the government with (a) written notice and the contours (including the bases and scope of, and the count or counts to which it is said to apply) of any advice of counsel defense that she will raise at trial, and, if so, (b) all documents (including attorney-client and attorney work product documents) that support or might impeach or undermine any such defense." *Ash*, No. 19 Cr. 780 (LAK) (Nov. 15, 2021) (Dkt. 105). The Court should do the same here and order the defendant to provide additional information, as well as documents, for several reasons.

First, additional disclosure is necessary to determine whether the evidence the defendant hopes to elicit or offer will be relevant and not confusing or prejudicial. Regardless of whether the defendant intends to argue a "formal" advice of counsel defense, he will need to establish the relevance of evidence relating to attorneys' involvement. *See Tourre*, 950 F. Supp. 2d at 684. The non-exhaustive list of topics proffered by the defendant that involved attorneys highlights the relevance and admissibility problems absent further disclosure. Specifically, the defendant states that attorneys were involved in "data retention policies at FTX, including the use of auto-delete policies and ephemeral messaging applications," but he has not indicated whether he fully disclosed his reasons for the auto-deletion, nor has he proffered evidence as to what the attorneys advised him about auto-deletion, or whether the final policy fully reflects their advice. Without such evidence, the mere fact of attorneys' involvement is not relevant and is likely to confuse the jury. Barring disclosure of such additional facts, the Court should preclude evidence of attorneys' general involvement in creating a retention policy.

The same is true with respect to the involvement of attorneys in the formation of North Dimension entities: absent evidence that the defendant disclosed to attorneys that he and other FTX and Alameda employees were making false disclosures to a bank about the purpose of the account opened in North Dimension's name in order to process customer transactions, the

---

[3] Indeed, the defendant's deficient disclosures are in line with his strategic decision to inform the Government he may have received legal advice from his parents, thus delaying the Government's review of potentially relevant and material documents. For the same reasons as described in the Government's filing yesterday, the Court should require the defendant to disclose the specifics of any advice of counsel, including whether he relied on any advice from his parents.

relevance of attorney involvement is minimal, and the risk of prejudice and confusion outweighs it. Even if attorneys were involved in incorporating North Dimension entities, for instance, this would be irrelevant absent evidence that they knew all the facts about how those entities would be used and how that differed from the representations made to Silvergate Bank, advised the defendant about these issues, and the defendant followed that advice. Because the Government intends to submit evidence about the defendant's lies to Silvergate Bank about the North Dimension entities, not simply the incorporation of those entities, on the current record there is no reason to conclude that attorney involvement in incorporation is relevant to the issues at trial, and would simply confuse or mislead the jury.

Another example is loans to founders or other company agreements. At trial, it is likely that one or more FTX or Alameda Research employees may mention that an attorney was involved in drafting loan agreements. But without an additional disclosure by the defendant, it would be appropriate to curtail additional evidence or argument about attorneys' involvement. Without evidence that the defendant told the attorney that the money being loaned was customer money, focusing the jury on the attorney's involvement to make the loans seem benign would be misleading. The same can be said about the terms of service. If attorneys were involved in drafting the terms of service (a fact that will not be disputed), but they did not know the terms about asset custody were false, their involvement in drafting the terms is of little significance and should not be a focus of argument by the defendant. Thus, as in *Tourre* and the other cases cited above, the relevance and admissibility of evidence about attorney involvement turns in large part on the scope of attorney involvement. And for that reason, without additional notice and disclosures, the Court should preclude or significantly curtail questioning and the introduction of evidence by the defendant on attorneys' involvement.

Second, notice and discovery are necessary because by invoking an advice of counsel and/or good faith defense, the defendant typically impliedly waives the privilege. *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Pretrial notice is therefore necessary to conduct discovery into potentially privileged areas. A defendant's "conversations with counsel regarding the legality of his schemes" are "directly relevant in determining the extent of his knowledge and, as a result, his intent." *Id.* Because conversations with counsel can reveal an absence of good faith or advice of counsel, "the attorney-client privilege cannot at once be used as a shield and a sword." *Id.* In other words, to assess whether a defendant truly acted in good faith, it becomes necessary to understand his communications with his attorney: did he fully and honestly lay out all the facts, did the attorney provide him information that would leave him to believe he was not acting lawfully, did he in good faith and honestly follow counsels' advice? For that reason, once a defendant raises a good faith or advice of counsel defense, "any communications or evidence defendants intend to use to establish the defense are subject to disclosure" as is "otherwise-privileged communications that defendants do not intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense." *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018). Further complicating and necessitating early resolution, where the attorney-client privilege is likely controlled by a corporation, the Court may need to resolve whether the defendant can rely on evidence that is protected by a company's privilege. *See United States v. Milton*, 626 F. Supp. 3d 694, 702-03 (S.D.N.Y. 2022) (denying the defendant's constitutional claim that "privileged communications become discoverable simply because a defendant wishes to use those communications in his defense"). Pretrial resolution of that waiver

# A-563

Page 7

issue is important here because it appears that the issue will implicate not only the defendant's privilege, but also FTX's, and therefore may require collateral litigation as to who may waive the privilege and to what materials the Government is entitled.[4]

Third, pretrial notice and disclosure are in the interest of the efficient administration of the trial and to ensure that there are no delays mid-trial. *See Schulte*, 2020 WL 133620, at \*6; *Scali*, 2018 WL 461441, at \*8; *Rubin/Chambers, Dunhill*, 828 F. Supp. 2d at 711. As the Government noted in its August 18, 2023, letter, the course of the litigation in *United States v. Ray*, No. 20 Cr. 110 (LJL), 2021 WL 5493839 (S.D.N.Y. Nov. 22, 2021)—the sole case the defendant relies on in opposition to early disclosure—is an outlier and proves the need here for early notice. There, notwithstanding the fact that *Ray* involved "lurid charges of extortion and sex trafficking" that did not implicate as complicated issues of privilege and waiver, it was necessary for the court to hold, in the middle of trial, a hearing on the defendant's purported advice of counsel defense. Such a hearing is likely avoidable here if the defendant is ordered to make the same disclosures and discovery that this Court ordered in *Ash*.

Accordingly, for the foregoing reasons, the Government respectfully requests that the Court order the defendant to provide additional notice and produce pretrial discovery, as described above. If the defendant does not provide additional disclosures, the Court should preclude

---

[4] The defendant complains about the Government's request for notice after the defendant's request for a Rule 17(c) subpoena to Fenwick & West was denied. (Dkt. 222 at 2.) But the defendant's prior failure to craft a subpoena to the law firm with the requisite particularity, in contravention of the *Nixon* standard, is of a piece with his failure now to provide sufficient notice. In both instances, the defendant has failed to identify evidence in support of a defense of reliance on advice of counsel. The defendant also resorts to rhetoric that the Government seeks "to deprive the defense of a defense." (Dkt. 222 at 2.) It is enough to observe that the defendant is entitled only to a defense consistent with the law and Rules of Evidence. *See United States v. Scheffer*, 523 U.S. 303, 308-09 (1998) ("[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," such as restrictions for "ensuring that only reliable evidence is introduced at trial, preserving the court members' role in determining credibility, and avoiding litigation that is collateral to the primary purpose of the trial"); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").

**A-564**

Page 8

irrelevant, confusing, and prejudicial questioning, evidence, and arguments about the involvement of attorneys.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/ Nicolas Roos
Nicolas Roos
Danielle R. Sassoon
Samuel Raymond
Thane Rehn
Danielle Kudla
Assistant United States Attorneys
(212) 637-2421

Cc: Counsel of Record (by ECF)

A-565



**COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

August 30, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:  *United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)

Dear Judge Kaplan:

On behalf of our client, Samuel Bankman-Fried, we respectfully submit this letter in response to the Government's three submissions to the Court dated August 29, 2023 (ECF Nos. 237, 238 & 239).

At the present time, the defense is unable to adequately prepare for trial and prepare the defense, which is a violation of Mr. Bankman-Fried's Sixth Amendment rights. The path the Government has chosen to take inevitably leads to inadequate representation which cannot be remedied as long as Mr. Bankman-Fried is incarcerated without internet access. There are millions of pages of documents, many of which have only recently been produced. The defendant is being wrongly deprived of his right to counsel and this violation must be remedied.

To detail just a few of the problems: (1) The Government has failed to provide Mr. Bankman-Fried with regular and reliable access to the discovery despite its promises to do so, (2) the internet access provided to Mr. Bankman-Fried two days a week is woefully inadequate and is actually often not available, and (3) the ability of counsel to consult with and discuss the defense with Mr. Bankman-Fried has proven to be cumbersome, time consuming and not productive.

And this is just the tip of the iceberg.  This is a document-heavy case and Mr. Bankman-Fried is entitled to defend himself.  The Government pretending that his current circumstances are not interfering with his right to counsel is false. We implore the court to allow Mr. Bankman-Fried access to counsel and the material which can be accomplished by allowing him to be released in the custody of his parents subject to severe constraints.  Nothing short of that will suffice.

**A-566**

The Honorable Lewis A. Kaplan
August 30, 2023
Page 2

### I.   Release Under Section 3142(i) Is Necessary for Mr. Bankman-Fried to Prepare His Defense.

The Government's most recent plan to provide discovery access to Mr. Bankman-Fried while he is detained at the Metropolitan Detention Center (MDC) remains entirely inadequate. (ECF No. 238).  As stated in defense counsel's previous letters (ECF Nos. 210 & 228), the volume and complexity of the discovery in this case is unique.  Mr. Bankman-Fried requires consistent access to an internet-enabled computer to review the monumental amount of discovery in his case and participate in his own defense.  The Government acknowledged this reality at the hearing on its motion for detention, even proposing that Mr. Bankman-Fried be held in Putnam County Correctional Facility where Mr. Bankman-Fried could purportedly possess a "laptop that is enabled for internet-based discovery review." Tr. 8/11/2023 Conf. at 6; *see also id.* ("The goal would be to implement features similar to the laptop that the defendant currently is able to use -- namely, one that would only permit access to the defense's Relativity database and to the AWS database.")  But the Government now asks the Court to essentially ignore its previous representations around what Mr. Bankman-Fried would, it conceded, practically need to prepare for trial, and instead accept the half-measures that it proposes.  Because the Government's current discovery proposals are insufficient to allow Mr. Bankman-Fried to realistically prepare for trial, he seeks temporary release from detention pursuant to 18 U.S.C. § 3142(i).

The Government's plans for providing Mr. Bankman-Fried access to discovery have followed a pattern—they have made numerous promises that have never materialized and the partial measures they have taken have not worked in practice.  The Government's current proposal for access to discovery consists of: (1) the provision of an air-gapped laptop to Mr. Bankman-Fried at MDC during visiting hours, so long as an attorney is present; and (2) transport to the 500 Pearl Street cellblock two days per week, where he has been promised access to an internet-enabled laptop.  The Government touts these as significant accommodations to Mr. Bankman-Fried; in truth, they amount to far less than what was promised him at the hearing on remand, even assuming they are adequately implemented.

*First*, the provision of an air-gapped laptop to Mr. Bankman-Fried during MDC visiting hours in no way "moots" Mr. Bankman-Fried's "chief complaint" around access to discovery. (ECF No. 238 at 2).  As defense counsel has noted time and again, the utility of an offline-only laptop is severely limited where, as here, one is dealing with millions upon millions of discovery documents.  The Government itself has conceded it would take "at least weeks" (and in light of recent productions, presumably longer) to load the discovery material onto a hard drive, and that in any case such documents would not be searchable, and may not even be readable, on an air-gapped laptop.  Tr. 8/11/2023 Conf. at 42.  Moreover, Mr. Bankman-Fried is entirely unable to access the AWS database from an air-gapped laptop, putting this key source of information wholly out of reach.

**A-567**

The Honorable Lewis A. Kaplan
August 30, 2023
Page 3

Mr. Bankman-Fried also requires limited internet access in order to look up relevant context for evidence online, draft and edit work product analyzing the documents and data, and quickly share these documents and analyses with his attorneys.  The Government tries to handwave away some of these concerns by saying that Mr. Bankman-Fried and his attorneys can simply collaborate "through the exchange of hard drives."  (ECF No. 238 at 5).  But it is far from clear that such "exchanges" will be remotely practicable.  Defense counsel previously sent Mr. Bankman-Fried two hard drives at MDC with certain key discovery materials that arrived on August 22 and August 24.  It is now a week after the initial hard drive arrived at MDC and he still has yet to receive it or be able to review any of the information on it.  We expect this pattern to repeat with future hard drives.

In any case, it is telling that the Government now portrays the provision of an air-gapped laptop to Mr. Bankman-Fried as a significant accommodation and essentially special treatment, when it is no more than what the Court presumed would be provided, at a minimum, to Mr. Bankman-Fried during his detention at MDC.  *See* Tr. 8/11/2023 Conf. at 40-41 ("I understand that he could have a dedicated laptop at the MDC, which would be retained in the visiting room area, to which he would have access very liberally -- nine, ten, eleven, twelve hours a day.") That this absolute baseline provision of discovery access has yet to be put into place nearly three weeks after Mr. Bankman-Fried was remanded—and with only four and a half more weeks until trial—demonstrates why Mr. Bankman-Fried cannot rely on the Government's representations of discovery access.

*Second*, the Government's proposal to transport Mr. Bankman-Fried to the 500 Pearl Street cellblock two days per week and give him limited access to an internet-enabled laptop for six hours at a time does not compensate for Mr. Bankman-Fried's otherwise severe lack of access to discovery and means to collaborate with his attorneys.  Nor have the cellblock visits been anything like the boon to trial preparation that the Government makes them out to be.  As the defense already noted to the Court (ECF No. 228 at 2), during two visits to the cellblock last week, the internet connection was down for over half of the visit—rendering the purpose of the visit largely moot—and slow for the remainder of the time.  The computer battery also cannot be charged in the cellblock, an issue the Government proposes to address with a new battery that should last "approximately four hours" (ECF No. 238 at 5)—substantially short of the six-hour length of the cellblock visits.  Moreover, when Mr. Bankman-Fried previously handed documents to BOP staff that he intended to review in the cellblock, the documents were never produced to him during his visit.  Given these problems, it is hardly "remarkable" that Mr. Bankman-Fried did not wish to go through this process yet again in the absence of some assurance that such visits could actually be productive.  But even if the Government's promises to address these issues are borne out, the cellblock visits can at best provide only a small fraction of the internet-enabled discovery access that Mr. Bankman-Fried requires to prepare for trial.

Mr. Bankman-Fried is facing a lengthy trial on serious, complex charges which will begin in just under five weeks and has spent the past three weeks pressing the Government to

**A-568**

The Honorable Lewis A. Kaplan
August 30, 2023
Page 4

provide the access to discovery that it had represented he would have.  Time and again the Government's promises around providing him bona fide access to discovery have proven empty, and even if the Government's discovery proposals were fully and effectively put into place, they would not provide the consistent access to cloud-based search that he needs to effectively prepare.  As the Court acknowledged at the hearing on remand, where, as here, the situation with access to discovery in detention cannot be effectively worked out, there is a "remedy of last resort" under 18 U.S.C. § 3142(i). Tr. 8/11/2023 Conf. at 41.  Section 3142(i) provides that:

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

18 U.S.C.A § 3142(i).

The defense submits that the remedy of temporary release of Mr. Bankman-Fried is necessary and appropriate at this juncture to enable him to prepare for trial.  In *United States v. Stephens*, the district court determined that obstacles in arranging legal calls with a defendant during the COVID-19 pandemic were sufficient to support pretrial release of the defendant to prepare his defense.  447 F. Supp. 3d 63, 67 (S.D.N.Y. 2020); *see also United States v. Persico*, No. S 84 CR 809 (JFK), 1986 WL 3793, at *1 (S.D.N.Y. Mar. 27, 1986) (discussing cases granting temporary pretrial release where "effective preparation of a defense might have been impossible in the short time available before the commencement of trial.").  The near-impossibility of preparing for trial renders Mr. Bankman-Fried's release similarly appropriate.

The Government's reliance on *United States v. Dupree* to preemptively counter any release under Section 3142(i) is misplaced.  Unlike Mr. Bankman-Fried, the defendant in *Dupree* "had adequate time—nearly fourteen months—since the original indictment was returned to prepare for trial."  *United States v. Dupree*, 833 F. Supp. 2d 241, 248 (E.D.N.Y. 2011).  The original indictment for Mr. Bankman-Fried was returned less than 10 months ago and the government did not start producing discovery until February.  More critically, the *Dupree* court found that the defendant's release was not "necessary" because the MDC agreed to make extraordinary arrangements for the defendant, beginning four weeks before his trial, to allow him extensive access to his counsel and a computer to prepare for trial—including "access to an attorneys' visiting room with a computer that can read DVDs from 9:00 a.m. to 3:30 p.m., with or without counsel, beginning on November 7, 2011 and until the start of trial on December 5, 2011."

Four weeks before Mr. Bankman-Fried's trial, the Government and the MDC continue to deny Mr. Bankman-Fried necessary access to his discovery materials.  In light of these concerns, Mr. Bankman-Fried's release under Section 3142(i) is appropriate.  Mr. Bankman-Fried is of course willing to work closely with the Government on crafting conditions of temporary release

**A-569**

The Honorable Lewis A. Kaplan
August 30, 2023
Page 5

that would address any reasonable concerns around safety of the community during any such periods of temporary release.

> **II.    Mr. Bankman-Fried's Disclosures Regarding his Reliance on an Advice of Counsel Defense Are Sufficient.**

The Government believes it is entitled to information about our defense well before it has advised us of the scope and extent of their case.  That simply is not the law.  In an attempt to circumvent the ordinary process associated with prosecutions, the Government is seeking to solicit information to which it is not yet entitled.  Once the Government fully produces its discovery to the defendant, we will advise the Government of the nature of its defense in connection with the clear participation by counsel.

As the Government concedes, courts have recognized that evidence of the involvement of attorneys in the allegedly inculpatory events at issue is relevant to whether a defendant acted in good faith and thus did not possess the requisite intent.  *See* ECF No. 239 at 4 (citing *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. June 26, 2014), Trial Tr. at 84-85)[1]; *Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004).  In *Tagliaferri*, Judge Abrams permitted "the defendant to elicit testimony that attorneys were involved in the transactions [and] . . . to argue that this involvement affected [the defendant's] state of mind, thus bearing on whether he acted with fraudulent intent."  *Tagliaferri* 6/26/14 Trial Tr. at 83-84; *see also id.* at 84 ("[T]he defendant may argue that attorneys who drafted or reviewed documents related to the charged transactions did not inform him of the illegality of his receiving fees or that formal disclosure of them was required, and that the defendant took comfort in the attorney silence.").

The defense will, of course, provide whatever detail the Court requires.  However, at this stage, we respectfully submit that the parties should confer following defendant's pre-trial disclosures on September 18, 2023 and submit a proposal to the Court in advance of the final pre-trial conference regarding any outstanding issues at that time.  The cases the Government cites to suggest that more extensive disclosures are required now are inapposite because none ordered the defendant to make such detailed disclosure before the Government disclosed its witness and exhibit lists.  *United States v. Ash*, No. 19 Cr. 780, ECF Nos. 90 & 105 (S.D.N.Y. Nov. 15, 2021) (ordering disclosure eleven days before trial, three days *after* the government's proposed witness and exhibit lists were due); *United States v. Scali* No. 7:16-CR-00466. 2018 WL 461441 at *8 and ECF Nos. 120 and 123 (S.D.N.Y. January 18, 2018) (ordering disclosure of materials related to advice of counsel defense more than a month *after* the government's and defendant's proposed exhibit lists were due);[2] *United States v. Rubin/Chambers, Dunhill Ins.*

---

[1] The Government in its letter cited the trial transcript from *Tagliaferri* for June 24, 2014.  This appears to be a clerical error and we believe the Government intended to cite the June 26, 2014 *Tagliaferri* trial transcript.

[2] The defense can provide copies of the relevant dockets and scheduling orders of the cases cited here upon request.

**A-570**

The Honorable Lewis A. Kaplan
August 30, 2023
Page 6

*Serv's*, 828 F.Supp.2d 698, 711 (S.D.N.Y. 2011) (ordering disclosure in advance of final pretrial conference, which occurred more than a month after the Government's final witness and exhibit lists were due); *see also United States v. Rubin/Chambers, Dunhill Ins. Serv's*, Case No. 09 Cr. 1058, ECF No. 164 & 267 (scheduling orders).  Here, per the Court's scheduling order, the Government's exhibit and witness lists are not due until September 8, and Mr. Bankman-Fried is not required to provide a witness or exhibit list until September 18.  ECF No. 173.  It would therefore be unreasonable and impractical to require him to make detailed disclosures at this stage.

The defense's proposal accords with the approach in *United States v. Rubin*, on which the Government relies.  In *Rubin*, the Court denied the Government's request for detailed notice of materials related to an advice of counsel defense six weeks in advance of trial, and instead required the parties to confer in advance of the final pretrial conference.  *United States v. Rubin/Chambers, Dunhill Ins. Serv's*, 828 F.Supp.2d 698, 711 (S.D.N.Y. 2011).  The Court specifically held that the Government's concerns regarding potential evidentiary disputes were unwarranted, holding that "any outstanding issues or disputes related to . . . advice of counsel defenses can be resolved at the final pre-trial conference." *Id.*  That is what we propose to do here.

### III.    The Court Should Preclude Late-Produced Discovery.

With regard to the defendant's motion *in limine* to exclude late-produced discovery, the Government's position seems to be that as long as it disclosed that it would be producing discovery late, then it is free to do so well beyond its promised deadlines with no consequences, even up to just a few weeks before trial.  That cannot be so.  The Government controlled the timing of when to bring this case, not the defense.  The Government is in this position because it rushed to charge Mr. Bankman-Fried before it had collected, or even requested, the relevant documents and was therefore not prepared to provide discovery in a timely fashion.  The defendant is entitled to timely production of discovery so that he can have a meaningful opportunity to review it before trial.

The Government's lengthy explanations for why it produced documents so late are of no consequence.  ECF No. 237 at 4-5.  The defense does not doubt that the Slack archives from Gary Wang's laptop took a long time to convert into a readable format, and that the delay in producing the documents from Google was due to an error by Google, and that document returns from third-party subpoenas continue to flood in even to this day. *Id.*  But that does not mean that the defendant should bear the consequences of late production.  If the Government cannot provide the discovery until the eve of trial, the Court can and should preclude the Government for introducing this evidence.

The defense takes issue with several of the assertions made by the Government.  First, the Government downplays the production of roughly 4 million pages of Google documents on

**A-571**

The Honorable Lewis A. Kaplan
August 30, 2023
Page 7

August 23 by stating that it consisted of documents from Mr. Bankman-Fried's own Google accounts to which he already had access.  That is inaccurate.  The production included thousands of documents from Mr. Bankman-Fried's Alameda Google account, to which he lost access after the bankruptcy.  Second, the Government gives the impression that the production on August 25 was almost entirely duplicative of the August 23 production.  While the defense acknowledges that the production included a filtered set of the Google documents produced on August 25, it also contained over 1 million pages of additional discovery, most of it from the FTX Debtor entities.  That is still a prohibitively large amount of discovery to review just a few weeks before trial.

Finally, the Government incorrectly places blame on the defense for not objecting at the June 15, 2023 conference about the status of discovery.  ECF No. 237 at 4.  But the defense did object in its letter of June 5, 2023, submitted before the conference.  ECF No. 153.  In that letter, we noted that "late production of such voluminous and important discovery will impact the preparation of the defense" and indicated that we reserved the right to "move the Court to preclude the Government from using evidence produced too close to trial."  *Id.*  At the time of the conference, we did not know that the Government would produce such voluminous discovery so close to the trial.  As such, the remedy we previewed in June is now appropriate.

Respectfully submitted,


  /s/ Mark S. Cohen
Mark S. Cohen
Christian R. Everdell
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com

cc:   All counsel of record (via ECF)

**A-572**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

               -against-

SAMUEL BANKMAN-FRIED,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

S6 22-cr-0673 (LAK)

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-21-2023
```

### ORDER ON MOTIONS TO EXCLUDE
### PROPOSED EXPERT TESTIMONY

LEWIS A. KAPLAN, *District Judge.*

        The following are the Court's rulings on the parties' *in limine* motions to exclude proposed expert testimony and opinions.

*Government's Motions in Limine to Exclude Proposed Expert Testimony*

        1.    Defendant's expert notices for both of Messrs. Thomas E. Bishop and Brian Kim completely fail to satisfy the requirements of Fed. R. Crim. P. 16(b)(l)(C) because neither disclosure contains a "statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" nor does it contain "the bases and reasons for them."[1] Defendant claims that the testimony of Messrs. Bishop and Kim "would principally be in the nature of rebuttal testimony, which would necessarily depend on the evidence the Government presents at trial through its own fact and expert witnesses,"[2] whom the defendant identifies as Mr. Easton and an FBI Special Agent. In these circumstances, the government's motion to preclude these two witnesses (Dkt 236) is GRANTED. This ruling, however, is without prejudice to the defendant seeking to call Mr. Bishop to respond to Mr. Easton and Mr. Kim in response to the FBI Agent, in each case on the assumption that the particular anticipated government witness has testified. Should defendant seek to call either or both of Mr. Bishop or Mr. Kim for that purpose, he may do so only if he has filed a complete Rule 16 disclosure for his proposed witness or witnesses at least three days prior to the date of the relevant defense witness or witnesses. The government shall retain the right to object to the testimony of both of these witnesses.

---

[1]    Fed. R. Crim. P. 16(b)(1)(C)(iii).

[2]    Dkt 275, at 6.

# A-573

2

       2.      The government's motion to exclude testimony from Mr. Bradley A. Smith (Dkt 236) is GRANTED. Mr. Smith's proposed testimony, to the rather limited extent that its substance can be determined from the defendant's disclosure statement, is inadmissible on several bases. First, defendant's expert notice for Mr. Smith, under the heading "Scope and Summary of Opinions," actually contains no opinions. Rather it states that he "may testify to the following topics." All of the proposed topics are introduced with the phrase "General Background on" various subjects. Thus, while it is clear that Mr. Smith proposes to discourse on various topics, the substance of what he proposes to say is not at all clear. Nor has he articulated the bases and reasons for whatever that might be. Second, Mr. Smith's testimony is improper because he seeks to instruct the jury on issues of law.[3] Finally, the majority of Mr. Smith's proposed testimony would be irrelevant to the issues at trial and, to the limited extent it would be relevant, its probative value would be substantially outweighed by the risk of confusing the issues or misleading the jury.

       3.      The government's motion to exclude testimony from Mr. Lawrence Akka (Dkt 236) is GRANTED. Mr. Akka intends to testify regarding the meaning of FTX's terms of service and FTX's obligations thereunder. Such testimony plainly is inadmissible under Rule 702 as it invades the province of the Court to instruct the jury on the law and the province of the jury to apply the facts to that law. Experts may not offer their "legal opinions as to the meaning of the contract terms at issue."[4] "[T]he rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle.'"[5] Moreover, it makes no difference that Mr. Akka is an English barrister and that the FTX Terms of Service that he proposes to construe have an English governing law clause. Fed. R. Crim. P. 26.1, which is substantially the same as Fed. R. Civ. P. 44.1, provides in relevant part that "[i]ssues of foreign law [in federal criminal cases] are questions of law." This makes clear that any questions of foreign law that are relevant and material to a federal criminal case are to be determined by the trial judge. The opinion of an English barrister as to the meaning or legal effect of contractual language, even language in a contract governed by English law, simply is not a proper subject of a jury's attention. Accordingly, Mr. Akka's proposed testimony is excluded in its entirety from the jury's consideration.[6]

---

[3]      *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

[4]      *See Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977).

[5]      *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (citations omitted); *see also AU New Haven, LCC v. YKK Corp.*, No. 15 Civ. 3411 (GHW), 2019 WL 1254763, at *10 (S.D.N.Y. Mar. 19, 2019) (excluding foreign law expert testimony, noting "for the same reasons that [the expert] cannot instruct the jury on domestic patent law, he may also not instruct the jury on foreign patent law, . . . because it would improperly infringe on the Court's role of instructing the jury").

[6]      Defendant requests, "[s]hould the Court [] grant the Government's motion in whole or material part, . . . an opportunity to submit a proposed jury charge to instruct the jury on the legal relationship between FTX and its customers." Dkt 275, at 42. The Court would entertain such a proposed jury charge were it submitted.

**A-574**

3

4.      Defendant's expert notice for Dr. Pimbley fails to satisfy the requirements of Fed. R. Crim. P. 16(b)(1)(C) because it does not set forth sufficiently the "bases and reasons" for his anticipated opinions.[7]  In all events, none of Dr. Pimbley's vague opinions would be relevant to the issues at this trial and, to the extent they would have any relevance, they would be barred under Rule 704 as "semantic camouflage"[8] intended to suggest to the jury that the defendant did not know about the purported "deficiencies in the software infrastructure."[9]  Accordingly, the government's motion to preclude the testimony of this witness (Dkt 236) is GRANTED.  This ruling, however, is without prejudice to the defendant seeking to call Dr. Pimbley to respond to a government witness.  Should defendant seek to call Dr. Pimbley for that purpose, he may do so only if he has filed a complete Rule 16 disclosure for Dr. Pimbley at least three days prior to the date of his proposed testimony.  The government shall retain the right to object to the testimony of this witness.

5.      The government's motion to exclude testimony from Dr. Peter U. Vinella (Dkt 236) is GRANTED.  Sections A-C of Dr. Vinella's proposed testimony consist of background testimony on "innovation in the financial services industry, the development of the cryptocurrency markets, and FTX combining aspects of both traditional and decentralized finance in its services."[10]  Such extensive background testimony would have "limited or no bearing on the issues in this case" and any probative value would be "substantially outweighed by the dangers of confusing or misleading the jury."[11]  For example, whether or not FTX was innovative or combined aspects of traditional and decentralized finance in its services is not at issue in this case.  Furthermore, much of Dr. Vinella's proposed testimony regarding FTX's history and place in the market – to the extent it were relevant at all – more appropriately would be introduced by fact witnesses capable of testifying on that subject matter.[12]

Sections D-H of Dr. Vinella's proposed testimony address "the absence of a clear legal and regulatory framework governing the cryptocurrency industry, especially outside the United States,"

---

[7]      *See* Fed. R. Crim. P. 16(b)(1)(C)(iii).

[8]      *United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993); *see also id.* at 1164 (experts may not state an "inference as to a defendant's actual mental state at the time of a crime" as "expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function").

[9]      Dkt 236, Ex. D, at 2.

[10]     Dkt 275, at 29.

[11]     *See United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023).

[12]     *See United States v. Newkirk*, 684 F. App'x 95, 97 (2d Cir. 2017); *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019).

4

"operational challenges this uncertainty posed to FTX," "the general purview of senior executives at fintech startups who are not software engineers," "commercially reasonable steps taken by FTX," and "FTX's use of widely-accepted practices in the financial services industry."[13] Such testimony is inadmissible under Rules 702, 704, 402, and 403. Most of Dr. Vinella's proposed testimony is irrelevant to the issues at trial and any relevant portion appropriately is excluded under Rule 403, as any probative value would be outweighed substantially by the risk of confusing the jury and waste of time. Additionally, certain of Dr. Vinella's opinions – *e.g.*, that "many of FTX's operational problems were, in fact, predictable" and that "FTX never intended to give such a large credit line to Alameda Research" – are not the product of any scientific, technical, or specialized knowledge and thus are improper expert testimony under Rule 702. Other opinions, such as Mr. Vinella's opinion that "senior executives who are not software engineers typically do not know or direct the inner workings of their company's software," are improper under Rules 702 and 704 as thinly veiled attempts to state an inference regarding the defendant's mental state at the time of the alleged crimes.[14] Accordingly, Dr. Vinella's proposed testimony is excluded in its entirety.[15]

6.    Defendant's expert notice for Mr. Wu says that he would testify primarily to give "background testimony" that is irrelevant to the issues on trial.[16] Much of Mr. Wu's proposed testimony is "mere narration," which "fails to fulfill *Daubert*'s most basic requirements."[17] Furthermore, to the extent that any of Mr. Wu's proposed testimony would be relevant to the issues at trial, it is not proper expert testimony and is excluded under Rule 403, due to the substantial risk of confusing the issues and

---

[13]

Dkt 275, at 32.

[14]

*See DiDomenico*, 985 F.2d at 1164-65.

[15]

The Court harbors serious doubts regarding Dr. Vinella's qualifications as an expert in the subject matter of his proffered testimony. Fed. R. Evid. 702; *see also United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). However, the Court need not, and does not, decide that issue because the Court excludes the entirety of Dr. Vinella's testimony on other bases.

[16]

*See Newkirk*, 684 F. App'x at 97; *see also United States v. Sanders*, No. 12 Cr. 0574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27, 2013) (precluding proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers" and unhelpful to the jury "given the abundant evidence thus far offered by percipient witnesses"); *Mendlowitz*, 2019 WL 6977120, at *5 (precluding expert testimony on the "general industry practices in the payment processing industry" as not relevant to whether the defendant violated the wire fraud statute).

[17]

*United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *21 n.226 (S.D.N.Y. Sept. 8, 2021) (quoting *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013)); *see also id.* ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise, nor is such a narration traceable to a reliable methodology.").

**A-576**

5

misleading the jury. Accordingly, the government's motion to preclude the testimony of this witness (Dkt 236) is GRANTED. This ruling, however, is without prejudice to the defendant seeking to call Mr. Wu to respond to Dr. Van der Merwe, on the assumption that the anticipated government witness has testified. Should defendant seek to call Mr. Wu for that purpose, he may do so only if he has filed a complete Rule 16 disclosure for Mr. Wu at least three days prior to the date of the defense witness's proposed testimony. The government shall retain the right to object to the testimony of this witness.

*Defendant's Motion in Limine to Exclude Proposed Expert Testimony*

      1.    Defendant's motion to exclude testimony from Mr. Peter Easton (Dkt 232) is DENIED. Although defendant's motion seeks the total exclusion of Mr. Easton's testimony, his objections, all of which are meritless or moot, are significantly more narrow. Mr. Easton appropriately may testify about customer fiat deposits as described in his Rule 16 disclosure and the government's papers.[18] Mr. Easton's anticipated testimony is the product of specialized knowledge and reliable methodology and does not constitute improper narration.[19] Finally, Mr. Easton is permitted to "rely on data that [he] did not personally collect."[20] Defendant's motion is denied in its entirety.

*Conclusion*

      Accordingly, the government's motions *in limine* (Dkt 236) are GRANTED to the extent set forth above and otherwise DENIED. The defendant's motion *in limine* to exclude the testimony of Mr. Easton (Dkt 232) is DENIED.

      SO ORDERED.

Dated:      September 21, 2023

                                                Lewis A. Kaplan
                                  United States District Judge

---

[18]   *See* Dkt 272, at 4-6.

[19]   *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 299 (E.D.N.Y. 2022).

[20]   *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000); *see also Wantanabe Realty Corp. v. City of New York*, No. 01 Civ. 10137 (LAK), 2004 WL 188088, at *2 (S.D.N.Y. Feb. 2, 2004) ("Rule 703 allows an expert to rely upon information supplied by another in forming an opinion where the material relied upon is of a type reasonably relied upon by experts in the field.").

A-577

 **COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

October 2, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

**Re:** *United States v. Samuel Bankman-Fried*, S5 22 Cr. 673 (LAK)

Dear Judge Kaplan:

On behalf of our client, Samuel Bankman-Fried, we write to respectfully request clarification and reconsideration regarding certain portions of the Court's ruling on the parties' motions *in limine*, ECF No. 289. In particular, as discussed further below, we seek clarification as to (1) the Court's grant of the Government's request to preclude argument concerning whether FTX was regulated within the United States and FTX.US's compliance with applicable rules, ECF No. 289 at ¶ 15; (2) the Court's grant of the Government's request to preclude Mr. Bankman-Fried from offering evidence concerning recovery of assets in the FTX bankruptcy proceeding, *id.* ¶ 16; (3) the Court's grant of the Government's request to preclude evidence concerning Mr. Bankman-Fried's prior good acts, including charitable giving and philanthropy, to disprove his guilt of the crimes charged, *id.* ¶ 11; and (4) the Court's grant of the Government's request to admit evidence concerning the alleged illegal campaign finance scheme, *id.* ¶ 2.

1.    *Ruling as to Argument Concerning Whether FTX was Regulated in the United States and FTX.US's Compliance with Applicable Rules*

The Court granted the Government's request to preclude Mr. Bankman-Fried from arguing that "he is not guilty because FTX was not regulated in the United States and he followed the rules with respect to FTX US," on the basis that the "Defendant has not opposed this request[.]" ECF No. 289 at ¶ 15. However, we respectfully note that Mr. Bankman-Fried opposed the Government's request in his Memorandum of Law in Opposition to the Government's Motions *in Limine* ("Opposition Brief"), ECF No. 246, at 23-24.

Specifically, Mr. Bankman-Fried argued:

**A-578**

The Honorable Lewis A. Kaplan
October 2, 2023
Page 2

> . . . [T]he Government asks the Court to preclude any argument that Mr. Bankman-Fried "is not guilty because FTX was not regulated within the United States and he followed the rules with respect to FTX US."  ECF No. 204 at 53.  The Government is mistaken.

> The status of regulation of cryptocurrency exchanges in the United States and elsewhere is relevant to both the actus reus and the mens rea underlying the Government's theory of fraud based on the alleged misappropriation of FTX customer funds.  Specifically, the Government must prove that the funds were in fact misappropriated.  The Government has not alleged that there are any laws or regulations prohibiting cryptocurrency exchanges from using funds originating in customer deposits for their own purposes—as is commonly done by financial institutions such as banks and digital payment platforms—or providing any relevant guidance as to what may be done with customer deposits. The apparent absence of relevant law or guidance bears directly on whether the alleged use of customer deposits would constitute misappropriation as opposed to a permissible business practice.

> The Government will also have to prove that Mr. Bankman-Fried acted with criminal intent.  As further argued below, the apparent absence of clearly applicable laws or regulations, as well as evidence that pooling and reallocation of customer funds was common among cryptocurrency exchanges, supports the inference that Mr. Bankman-Fried did not believe that his conduct was unlawful or improper.

> The Government's contention that Mr. Bankman-Fried should be precluded from raising the fact that "he adopted more careful practices for FTX.US" is also wholly unsupported. Mr. Bankman-Fried is entitled to introduce evidence that he intended to comply with all applicable laws as shown by the fact that he ensured compliance with laws and regulations applicable to FTX.US, and that he similarly complied with all applicable laws in the Bahamas and other jurisdictions with regard to the operation of the relevant entities. Such behavior is consistent with and supports the fact that Mr. Bankman-Fried never intended to violate any laws and acted in good faith.

We therefore respectfully request reconsideration, or, in the alternative, clarification of the Court's ruling in light of Mr. Bankman-Fried's opposition to the Government's request.

**A-579**

The Honorable Lewis A. Kaplan
October 2, 2023
Page 3

2.      *Ruling as to Evidence Concerning Assets Recovered through the FTX Bankruptcy*

Likewise, in granting the Government's request to preclude Mr. Bankman-Fried "from offering evidence about the amount of assets that have been recovered through FTX's bankruptcy for purposes of suggesting to the jury that victims will be made whole, that the FTX Debtors' progress in securing and recovering estate assets somehow diminishes the scale of the fraud, or that, with more time, FTX could have satisfied customer withdrawals," the Court stated, "[t]he defense does not object to that request, which is hereby granted."  ECF No. 289 ¶ 16 (citing ECF No. 246 at 28 n.7).  However, we respectfully note that Mr. Bankman-Fried opposed this request, as footnote 7 of the Opposition Brief stated in relevant part:

> To the extent that the Government seeks to preclude evidence about the amount of assets that have been recovered through the bankruptcy proceedings for purposes of suggesting to the jury that victims will be made whole, the defense does not object to this request . . . However, should the Government introduce evidence relating to the bankruptcy, the defense should be permitted to rebut the prejudicial inferences such evidence would occasion, as set forth in Mr. Bankman-Fried's Motions *in Limine*.  *See* [ECF No. 207] at 15-18.[1]

ECF No. 246 at 28 n.7.  We also respectfully note that footnote 7 of the Opposition Brief did not address evidence that, as the Court stated, "with more time, FTX could have satisfied customer withdrawals."  ECF No. 289 ¶ 16; ECF No. 246 at 28 n.7.  We further note that the defense's Opposition Brief argued that evidence that "Mr. Bankman-Fried believed it was his primary legal obligation to ensure that customer withdrawals could be honored, that he believed this obligation could be fulfilled, and that he endeavored to ensure that this was true" would corroborate his good faith belief that his actions were lawful, ECF No. 246 at 28, and that the Court denied without prejudice the Government's motion "to the extent that the defendant seeks to introduce evidence and argument probative of his alleged good-faith belief that FTX and Alameda's handling of customer assets was permitted." ECF No. 289 ¶ 16.

In the portion of the Memorandum of Law in Support of Mr. Bankman-Fried's Motions *in Limine*, ECF No. 207, cited in footnote 7, Mr. Bankman-Fried argued that, it "cannot be said at this time that FTX customers will, in fact, lose money and not be made whole," and that, "should the Government claim that FTX customers will not be made whole, the defense would have to delve into the FTX Debtor Entities' mismanagement of the bankruptcy estate and selling off assets at a fraction of what they are worth, in order to rebut the improper but unavoidable inference that the company's current financial condition is the result of Mr. Bankman-Fried's prior conduct."  ECF No. 207 at 11-14.

---

[1] The pin cite to ECF No. 207 at 15-18 referred to the page numbers in the ECF heading, rather than the numbering at the bottom of the page.  The corresponding page numbers at the bottom of the page are 11-14.

**A-580**

The Honorable Lewis A. Kaplan
October 2, 2023
Page 4

We therefore respectfully request reconsideration, or, in the alternative, clarification of the Court's ruling in light of Mr. Bankman-Fried's opposition to the Government's request.

In addition, we respectfully request clarification in light of the Court's ruling that the Government may "explain to the jury its views of what allegedly happened" in respect of "the bankruptcy of FTX and Alameda and of the defendant's resignation as FTX's chief executive officer." ECF No. 289 at 14 ¶ 1. We assume that the defense will also be permitted to present its view of the same facts, and to rebut any evidence introduced by the Government relevant to these issues, particularly in light of the Court's ruling that these facts "are intertwined inextricably with the crimes alleged in the Indictment[.]" *Id.*

Finally, we seek further clarification in light of the Court's ruling permitting the Government to introduce evidence that "defendant selectively prioritized payments to certain creditors in the aftermath of FTX's collapse." ECF No. 289 at ¶ 5. As suggested in our Opposition Brief, Mr. Bankman-Fried should be permitted to rebut any such showing with evidence and argument of his own. ECF No. 246 at 28.

3.    *Ruling as to Prior Good Acts, Including Charitable Giving and Philanthropy*

We respectfully request clarification as to the scope of the Court's ruling that "the defense is precluded from referring to any alleged prior good acts by the defendant, including any charity or philanthropy, as indicative of his character or his guilt or innocence." ECF No. 289 at ¶ 11.

We note that the S6 Indictment includes an allegation concerning Mr. Bankman-Fried's charitable contributions, as follows:

> Even after SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had misappropriated billions of dollars of FTX customer funds to repay Alameda's lenders, BANKMAN-FRIED continued to cause even greater amounts of FTX customer money to be used for discretionary investments, charitable contributions, and political donations, including by directing that Alameda continue to draw on its line of credit on FTX.

ECF No. 202 at ¶ 11. We further anticipate that the Government will seek to argue or introduce evidence concerning Mr. Bankman-Fried's motivations for founding FTX and related entities.

In light of this, we respectfully note our understanding that the Court's ruling, which refers to "prior good acts," ECF No. 289 at ¶ 11, does not preclude the defense from introducing evidence or argument as to charity or philanthropy to the extent relevant to the events at issue, including Mr. Bankman-Fried's conduct and motivations, so long as it is not offered as improper propensity or character evidence.

**A-581**

The Honorable Lewis A. Kaplan
October 2, 2023
Page 5

    4.    *Ruling as to Allegedly Illegal Campaign Finance Contributions*

       Finally, we respectfully request clarification regarding the Court's ruling that the Government may introduce evidence of "defendant's alleged illegal campaign finance scheme." ECF No. 289 at ¶ 2. In particular, the Court ruled that "[p]roof that defendant routed political contributions through straw donors goes directly to the element of concealment for the charged money laundering count and is probative of defendant's criminal intent and knowledge of the wire fraud scheme." *Id.* However, the Court previously ruled that proposed testimony of Professor Bradley Smith, former chair of the Federal Election Commission, concerning the ban on straw donor contributions and other campaign finance issues, *see* ECF No. 236-5 at 2, "would be irrelevant to the issues at trial." ECF No. 287 at 2.

       In light of these apparently inconsistent rulings, we therefore respectfully request clarification as to the extent to which the Government is permitted to argue and present evidence that the campaign contributions were illegal, as opposed to the fact that contributions were made. *See* ECF No. 246 at 9-12.

       Further, in the event that the Court deems the legality of the campaign contributions to be relevant to the charges, we respectfully ask whether the Court would be willing to entertain a more specific disclosure from Professor Smith under Fed. R. Crim. P. 16.

                         Respectfully submitted,


                         /s/ Mark S. Cohen
                         Mark S. Cohen
                         Christian R. Everdell
                         **COHEN & GRESSER LLP**
                         800 Third Avenue, 21st Floor
                         New York, New York  10022
                         (212) 957-7600
                         mcohen@cohengresser.com
                         ceverdell@cohengresser.com

cc:   All counsel of record (via ECF)

**A-582**

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 8, 2023

**By ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    **Re:**    *United States v. Samuel Bankman-Fried,* **S6 22 Cr. 673 (LAK)**

Dear Judge Kaplan:

    The Government respectfully requests that the Court preclude the defendant from introducing evidence or argument about the current value of certain investments made by the defendant. The Government has recently conferred productively with the defense on a number of issues that may be elicited in direct or cross examination of the Government's upcoming witnesses, and the parties have reached agreement on many of these issues. However, the Government understands that the defense may seek to elicit evidence about the current value of the defendant's investment in Anthropic, a company in which the defendant invested approximately $500 million in 2022 using funds that the Government alleges were stolen from FTX customers. Evidence regarding the current value of the defendant's investments could only be used to support the argument that FTX customers and/or other victims will ultimately be made whole, which the Court has recognized is an impermissible purpose. *See United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773, at *9 (S.D.N.Y. June 27, 2023) (noting that "it is immaterial as a matter of law whether the defendant intended to repay the misappropriated funds" or could have). Such evidence would therefore be wholly irrelevant, and present a substantial danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and waste of time. Indeed, preclusion of this evidence would be consistent with the Court's prior order granting the Government's unopposed motion *in limine* to preclude the defense from making arguments about the amount of assets that have been recovered through FTX's bankruptcy for purposes of suggesting to the jury that victims will be made whole. (Dkt. 289 at 12).

    By way of background, the defendant invested approximately $500 million in Anthropic, a startup artificial intelligence company, in April 2022. The Government expects to introduce evidence that the defendant funded this investment with FTX customer deposits. In the past few weeks, Anthropic has announced that it is attempting to raise additional funds from investors, including Amazon and Google, at a valuation between $20 billion and $30 billion. In the wake of this announcement, there has been some public reporting suggesting that this valuation would increase the value of the defendant's investment in Anthropic and thereby increase the potential recovery for FTX customers and other creditors in the FTX bankruptcy.

# A-583

Page 2

There is no relevant purpose to admit evidence about the current value of the Anthropic investment. The Indictment alleges that the defendant committed wire fraud by misappropriating FTX customer deposits to make investments and other expenditures. It is immaterial whether some of those investments might ultimately have been profitable. When there is an "immediate intent to misapply and defraud," the offense is "complete," and what "might have later happened as to repayment is not material and could not be a defense." *United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980); *see also United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2006) ("The requirement under § 1343 that the defendant devise a scheme or artifice for obtaining money or property is satisfied where a defendant fraudulently obtains the use of another person's money or property for a period of time, using it for his own personal profit, and depriving the owner of the ability to do so."); *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from the defendant's fraudulent conduct").

Nor would it be a defense to the charges in this case if the defendant invested stolen FTX money believing that the investments would ultimately be so lucrative that he could pay back the stolen money. *United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008). Indeed, the Court in this case has held that evidence regarding the defendant's intent to later repay the misappropriated funds is irrelevant. *Bankman-Fried*, 2023 WL 4194773, at *9. The current value of the Anthropic shares could only go to the question of whether customers will ultimately be made whole, which is immaterial to whether the defendant committed the alleged fraud. *Id.*; *see also United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.), Dkt. No. 115 at 7 (in accounting fraud case, granting motion to exclude evidence that outstanding debts were ultimately repaid).

Moreover, even if there were any arguable probative value to this evidence, it would be substantially outweighed by the risk that such evidence would cause unfair prejudice, confuse the issues, mislead the jury, cause undue delay, and waste time. Although Anthropic's valuation in its latest fundraising round has increased relative to its prior fundraising rounds, these fundraising rounds represent venture capital investments where the valuation is based on projections of future revenue growth that are highly speculative. To take one salient example, FTX itself raised similar venture investments at valuations of around $18 billion in 2021 and around $32 billion in 2022 and yet today its shares are worth nothing. Permitting the defendant to introduce evidence of Anthropic's valuation in its venture fundraising rounds would necessitate a mini trial regarding the value of assets available through the bankruptcy and the degree to which they might cover customer and other creditor losses. Given that such inquiry bears no relevance to the issues that the jury will need to decide, the Court should preclude this evidence.

Finally, to the extent that the defendant might suggest, consistent with his prior motion for reconsideration of the Court's *in limine* ruling, that evidence of the value of the Anthropic or any other investment is admissible to rebut "evidence relating to the bankruptcy" (Dkt. 306 at 3), this argument would be wholly without merit. Although the Government has and will introduce evidence of the fact that the defendant's misappropriation of customer deposits resulted in a multi-billion-dollar hole in FTX's balance sheet, ultimately leading to FTX's bankruptcy, the

**A-584**

Page 3

Government has not offered, and does not intend to offer, evidence regarding how much money victims will ultimately lose once any recovery is made through FTX's bankruptcy or otherwise. Accordingly, the only purpose and effect of introducing evidence of the current value of the Anthropic investment would be to encourage a verdict on an improper basis, and the evidence should be precluded.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    /s Thane Rehn
Danielle R. Sassoon
Nicolas Roos
Danielle Kudla
Samuel Raymond
Thane Rehn
Assistant United States Attorneys
(212) 637-2354

Cc: Counsel of Record (via ECF)

**A-585**

 **COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

October 9, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re: ***United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)**

Dear Judge Kaplan:

      On behalf of our client, Samuel Bankman-Fried, we respectfully submit this letter pursuant to the Court's order dated October 1, 2023 (ECF No. 305). In its order, the Court precluded the defense from eliciting evidence concerning the presence or involvement of attorneys absent prior notice to the Court and the Government outside of the presence of the jury. *Id.* at 9-10. We write to seek the Court's permission to elicit on cross-examination of Gary Wang evidence concerning the involvement of counsel in structuring the loans issued to Mr. Wang by Alameda Research.

      On direct examination, the Government questioned Mr. Wang about a series of personal loans worth approximately $200-$300 million that he received from Alameda to fund venture investments by FTX and to fund his purchase of a house in the Bahamas. Tr. at 324:25-326:17. In the course of that examination, the Government and Mr. Wang engaged in the following colloquy:

      Q:    And who presented those loans to you?

      A:    Either Sam or a round of lawyers at the company.

      Q:    What did you do when you were presented with the loans?

      A:    I signed the paperwork.

      Q:    Why did you sign them?

      A:    I was told to.

**A-586**

The Honorable Lewis A. Kaplan
October 9, 2023
Page 2

> Q:    What did you believe the expectation was when you were presented with one of
>       these loans?
>
> A:    That I would sign it.

Tr. 325:17-25.

The Government's direct examination of Mr. Wang has already elicited that FTX attorneys were present and involved in structuring and executing the loans, and that Mr. Bankman-Fried was aware of their involvement. Accordingly, the defense seeks to cross-examine Mr. Wang further about his knowledge of the lawyers' involvement, including on the following topics:

- Which attorneys were involved in the loans?
- What was the nature of their involvement?
- What documents did they prepare?
- What were the terms of the loan and Mr. Wang's obligations under the loan?
- Whether Mr. Wang had any concerns about the loans at the time he signed them.

The defense may also seek to introduce the promissory notes memorializing the loans to Mr. Wang. Further, Mr. Wang previously described his interactions with the lawyers concerning the loans in his proffer sessions with the Government. FBI 302 reports provided to the defense in discovery indicate that Mr. Wang told the Government that he relied on the lawyers and "didn't think the loans were designed to hide the fact that money was coming from Alameda [and] didn't think the lawyers would tell him to sign something that was illegal." 3585-028 at 4.[1]

Mr. Wang's understanding of the lawyers' involvement in the loans is directly relevant to Mr. Bankman-Fried's good faith and lack of criminal intent. The Government has alleged as part of its theory of the money laundering conspiracy charged in Count Seven that Mr. Bankman-Fried "took steps to conceal that [] investments and expenditures were funded by transfers originating with Alameda, and therefore funded with FTX customer funds." S6 Indictment ¶ 8. The Indictment further alleges that Mr. Bankman-Fried accomplished this by borrowing over $1 billion from Alameda and overseeing "similar borrowing by other FTX executives." *Id.*

Mr. Wang's understanding that these were actual loans – structured by lawyers and memorialized in formal promissory notes that imposed real interest payment obligations – is

---

[1] Should the Court require, we can provide a copy of the 302 tomorrow.

**A-587**

The Honorable Lewis A. Kaplan
October 9, 2023
Page 3

relevant to rebut the inference that these were simply sham loans directed by Mr. Bankman-Fried to conceal the source of the funds.

Further, as set forth in the FBI 302, the fact that Mr. Wang had no reason to believe, based on the involvement of the lawyers, that the loans were illegal or were designed to conceal that Alameda was the source of the funds undercuts the Government's money laundering theory and corroborates Mr. Bankman-Fried's own understanding that the loans were not improper.

For these reasons, we respectfully request that the Court allow the defense to elicit the above-referenced evidence in its cross-examination of Mr. Wang.

Respectfully submitted,

_/s/ Christian R. Everdell_

Mark S. Cohen
Christian R. Everdell
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com

cc:   All counsel of record (via ECF)

**A-588**



**COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

October 10, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

**Re:  *United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)**

Dear Judge Kaplan:

Per the Court's directive that a response be filed this evening, we respectfully submit this letter on behalf of our client, Samuel Bankman-Fried, in response to the Government's letter motion seeking to exclude evidence or argument concerning the current value of Mr. Bankman-Fried's investment in Anthropic, a company whose value has appreciated substantially since the investment was made.  ECF No. 315.

Separate and apart from the Government's motion, the defense should be allowed to elicit testimony from Ms. Ellison about the portfolio nature of venture-capital investing, namely that successful venture-capital investing turns on returns from a relatively small number of successful investments offsetting other investments that may not have earned a return or have not done so within a certain timeframe.  Here, the significant appreciation in Anthropic since last year reflects this important context and is relevant to testimony that the Government has elicited from Ms. Ellison concerning expected value analyses.

In its letter motion, the Government, however, seeks to exclude evidence of Anthropic's current value based on the claim that such evidence could *only* be relevant to argument that alleged victims may be made whole through FTX's and Alameda's bankruptcies.  The Government's position miscasts the relevance of the evidence.  Evidence of the current value of the Anthropic investment is squarely relevant to rebutting the Government's opening statement and testimony to date, as well as Mr. Bankman-Fried's good-faith.

The Government has repeatedly raised Alameda's venture investments during the trial, including in its opening statement, where the Government argued that Alameda's and Mr. Bankman-Fried's investments were, among other things, "risky" and "losing money."  *See* 2023-10-04 Trial Tr. 34:19-21 (Gov't Opening).  In response, the defense should be permitted to

**A-589**

The Honorable Lewis A. Kaplan
October 10, 2023
Page 2

introduce evidence of positive investment outcomes (*i.e.* Anthropic) of such venture investments to rebut evidence and argument from the Government that Alameda's venture-capital investment strategy was wasteful or reckless.  Moreover, to the extent that the Government contends that Mr. Bankman-Fried made ill-informed or misguided investment decisions to argue that Mr. Bankman-Fried had a tendency toward reckless decisions, the current value of the Anthropic shares and potentially other investments is relevant to rebutting those claims.

To the extent the Court has concerns that evidence concerning Anthropic's current value may improperly suggest that customers, lenders, and investors would be repaid, the defense has no objection to the Court providing an appropriate limiting instruction.  Accordingly, Mr. Bankman-Fried respectfully asks the Court to deny the Government's motion to preclude evidence of the current value of Mr. Bankman-Fried investment in Anthropic.

Respectfully submitted,

  /s/ David Lisner
Mark S. Cohen
Christian R. Everdell
S. Gale Dick
David F. Lisner
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
dlisner@cohengresser.com

cc:    All counsel of record (via ECF)

**A-590**



**COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

October 10, 2023

<u>**VIA ECF**</u>

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

     Re:  *United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)

Dear Judge Kaplan:

     On behalf of our client, Samuel Bankman-Fried, we submit this letter pursuant to the Court's order dated October 1, 2023.  ECF No. 305.  We respectfully request that the Court rule on this matter on Wednesday in advance of the defense's cross-examination of Caroline Ellison.

     In its October 1 order, the Court precluded the defense from eliciting evidence concerning the presence or involvement of attorneys absent prior notice to the Court and the Government outside of the presence of the jury.  *Id.* at 9-10.  Based on our discussions with the Government and exhibits the Government has proposed using in its direct examination of Ms. Ellison, the defense anticipates that the Government will seek to elicit from Ms. Ellison that she was directed by Mr. Bankman-Fried to set auto-deletion on certain of her Signal and Slack messaging accounts.  We therefore write to seek the Court's permission to elicit on cross-examination of Ms. Ellison evidence concerning the involvement of counsel in creating, reviewing, or approving auto-deletion policies at Alameda.

     In particular, if auto-deletion is raised on direct, the defense will seek to cross-examine Ms. Ellison further about her knowledge of the involvement of Alameda or FTX lawyers in the creation of auto-deletion policies, including on the following topics:

- Which attorneys were involved in considering, reviewing, and approving auto-deletion policies applicable to Alameda?

- What was the nature of these attorneys' involvement?

- What policies or communications regarding auto-deletion did these attorneys prepare?

**A-591**

The Honorable Lewis A. Kaplan
October 10, 2023
Page 2


     The lawyers' involvement in the creation of auto-deletion policies is directly relevant to Mr. Bankman-Fried's good faith and lack of criminal intent.  *See* ECF No. 246 at 26-31.  The Government has alleged that Mr. Bankman-Fried directed individuals at FTX and Alameda to set their messages to auto-delete to conceal wrongdoing, but whether Ms. Ellison understood that auto-deletion policies were instituted under the guidance of lawyers would be relevant to rebut the inference that these policies were instituted for improper purposes.

     For these reasons, and because the Government has elicited and may continue to elicit testimony on the use of auto-deletion policies at Alameda and FTX, we respectfully request that the Court allow the defense to elicit the above-referenced evidence in its cross-examination of Ms. Ellison.


Respectfully submitted,


   /s/ Mark S. Cohen
Mark S. Cohen
Christian R. Everdell
S. Gale Dick
David F. Lisner
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
dlisner@cohengresser.com

cc:   All counsel of record (via ECF)

A-592

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 19, 2023

**By ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States v. Samuel Bankman-Fried,* S6 22 Cr. 673 (LAK)

Dear Judge Kaplan:

The Government respectfully submits this letter regarding potential jury instructions in this case. First, the Government requests an instruction that a defendant's intent to repay misappropriated or fraudulently obtained funds is not a defense. Second, to the extent that the defendant seeks to introduce any evidence or argument regarding his moral or political beliefs, the Government may request an instruction that it is not a defense if a defendant, acting with intent to defraud, was motivated in his conduct by his beliefs. Third, the Government notes that its previously filed request to charge contained a proposed instruction regarding disclaimers in contracts, which is now even more appropriate following the testimony of Can Sun. (Dkt. 214, at 35). The Government respectfully submits that the evidence at trial supports the inclusion of this instruction, which is in accordance with the law in this Circuit.

In addition to the above, the Government respectfully submits that certain instructions in the defendant's request to charge (Dkt. 215) are legally erroneous, likely to confuse the jury, or both. The Government also notes that it may seek additional instructions to address any new issues or arguments raised in the defense case.

**A.  The Government Requests an Instruction That Intent to Repay Is Not a Defense**

Over the course of the trial, the defense has attempted to introduce evidence and argument to suggest that the defendant's misappropriation of FTX customer funds was not criminal because he believed that he would ultimately be able to repay customers, either by growing FTX's business, by making successful investments, or by some other means designed to cover customer withdrawals. (*E.g.*, Tr. 49:9-16 (defense opening arguing that defendant believed that the money would be paid back); Tr. 54:7-10 (arguing that defendant did not intend to do harm because he wanted to "repay customers")). As this Court noted previously, "it is immaterial as a matter of law whether the defendant intended to repay the misappropriated funds because the offense is 'complete' where, as alleged here, there is an 'immediate intent to misapply and defraud.'" *United*

**A-593**

Page 2

*States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773, at *9 (S.D.N.Y. June 27, 2023). Accordingly, there is a factual predicate for a "no ultimate harm" instruction along the lines that the Second Circuit has repeatedly affirmed. *See United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) ("A 'no ultimate harm' instruction given by the district court is proper where (1) there was sufficient factual predicate to necessitate the instruction, (2) the instruction required the jury to find intent to defraud to convict, and (3) there was no evidence that the instruction caused confusion."). The Government's prior request to charge includes a clear and detailed instruction to the jury that it must find intent to defraud to convict. (Dkt. 214 at 12-14). Thus, the Government requests the addition of a "no ultimate harm" instruction, as warranted by the arguments made in the defense opening and the facts that the defense has repeatedly sought to elicit through cross-examination of witnesses.

The Government requests that the Court provide the following instruction, which is adapted from the instructions affirmed in *Lange*, as well as in *United States v. Koh*, 199 F.3d 632, 641 (2d Cir. 1999), and *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999):

> You are instructed that a belief by the defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money or property does not warrant a finding by you that the defendant acted in good faith. No amount of honest belief on the part of the defendant that the scheme would ultimately make a profit for customers or lenders would excuse fraudulent actions or false representations by him to obtain money or property.

**B. The Government Requests an Instruction That It Is Not a Defense if a Defendant Was Motivated by his Moral or Political Beliefs to Break the Law**

The defendant has in certain public statements emphasized his philosophy of so-called "effective altruism" to argue that his business decisions were motivated by a desire to do good in the world. Any such arguments are not a defense to fraud or other criminal charges, as courts have repeatedly recognized. Similarly, any argument that the defendant lacked wrongful intent because he subscribed to an idiosyncratic philosophy about the morality of lying and stealing, and placed a greater premium on his subjective conception of the long-term good, would be irrelevant to the *mens rea* for wire fraud. *See, e.g.*, *United States v. Edwards*, 101 F.3d 17, 19 (2d Cir. 1996) (affirming the following jury instruction given by district court: "There was talk here of motive by the defendant. The motive that defendant had or claimed to have had for committing a crime charged is irrelevant to his guilt or non-guilt. Whether this defendant committed acts in order to further a political goal or for a similar reason, for his personal gain or for the gain of somebody else, doesn't excuse his acts if he committed them and violated the law."); *see also United States v. Gatto*, 986 F.3d 104, 133 (2d Cir. 2021) (Lynch, J., concurring in part) ("Such a 'Robin Hood' defense – that the defendants were essentially robbing the rich to help the poor – is of course also not a legal defense."); *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) ("A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants."). To the extent that the defense case attempts to argue that the defendant was motivated by his moral and political beliefs, or that he did not believe he was engaged in wrongdoing because he was using customer funds for altruistic purposes, or any other similar

# A-594

Page 3

suggestion, the Government will request that the Court provide the jury with the following instruction:

> Proof of bad motive is not required to convict. And good motive alone is not a defense. You have heard evidence that the defendant was motivated by his personal philosophical or moral outlook. If you find that the defendant intended to defraud others in order to achieve those aims, his asserted philosophical or other motive for those actions does not excuse his acts and is not a defense to the crimes charged in the Indictment.

## C. The Government's Requested Instruction Regarding Disclaimers Is Warranted by the Facts

In its request to charge, the Government proposed the following instruction concerning disclaimers:

> In considering whether a statement or omission was material, let me caution you that a clause in an investment contract or a disclaimer cannot render any misrepresentation, including any oral misrepresentation, immaterial as a matter of law.

(Dkt. 214, at 35).

The Government notes that this instruction is particularly warranted in light of certain arguments made by the defense and by the evidence introduced in the case to date. Specifically, in its opening statement, the defense highlighted certain language from the FTX terms of service relating to margin trading and margin loans, in an apparent attempt to suggest that these terms authorized the defendant's actions. (Tr. 44:8-11). The defense then attempted to cross-examine former FTX general counsel Can Sun on this same provision during trial today. While being cross-examined by the defense, Mr. Sun indicated that this provision was "drafted mostly for disclaimer purposes" and that there were more detailed policies and representations regarding margin trading, liquidation, and margin loans that were made by FTX and the defendant elsewhere. (Tr. 1984).

Accordingly, this instruction is fully warranted by the facts and to prevent any confusion by the jury that it should evaluate the defendant's conduct solely in terms of whether it constituted a violation of the FTX terms of service. While the terms of service are certainly part of the overall body of actions, representations, and omissions made by the defendant and his co-conspirators, the jury will not be asked to evaluate whether there was a violation of the terms of service or to interpret the effect of particular provisions of the terms of service. *See United States v. Weaver*, 860 F.3d 90, 96 (2d Cir. 2017) (distinguishing criminal cases under mail and wire fraud statutes from civil fraud actions and noting that "fraudsters may not escape criminal liability for lies told to induce gullible victims to make worthless investments by inducing them to sign a contract containing disclaimers of reliance"). In light of the fact that the discussion of disclaimers came up in the context of FTX's terms of service, the Government would not object to a disclaimer instruction narrowed to "a clause in the terms of service or a disclaimer."

**A-595**

Page 4

**D. The Government Objects to the Following Legally Incorrect Statements of Law in the Defendant's Proposed Jury Instructions**

In the defendant's August 21, 2023, proposed jury instructions (*see* Dkt. 215), he proposed several statements of law that are not legally correct or are otherwise unnecessary, confusing, or particularly in comparison with the instructions proposed by the Government. Accordingly, the Government objects to the following parts of the defendant's proposed instruction:

First, on pages 10 and 14 of the defendant's requests he proposes instructing the jury that "[p]roperty does not include intangible interests such as the right to control the use of one's assets, nor does it include potentially valuable economic information that a person might consider valuable in deciding how to use his or her assets." (Dkt. 215 at 10, 14). It is unnecessary to instruct the jury that property does not include "intangible interests such as the right to control" because as the Court previously held, the fraud charges in this case are not based on a right-to-control theory, *see United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773, at *9 (S.D.N.Y. June 27, 2023), and the Government does not intend to argue that victim customers or lenders were deprived of the right to control the use of their assets. Rather, the Government's allegation, as the trial has made clear, is that the defendant took victims' money and property. The Government's proposed instructions would explicitly focus the jury on the "money or property" object, and do not use a "right to control" theory, and therefore are appropriate based on the facts of the case. *Compare United States v. Barbera*, No. 21 Cr. 154 (JGK), 2023 WL 6066249, at *1 (S.D.N.Y. Sept. 18, 2023) (rejecting the defendant's challenge to wire fraud jury instructions based on *Ciminelli* where the instruction "did not use a right to control theory" and "limited the object of the fraud to the traditional property concept of money or property"), *with United States v. Hild*, No. 19 Cr. 602 (RA), 2023 WL 5928350, at *13 (S.D.N.Y. Sept. 12, 2023) (describing right to control language in jury charge but finding its inclusion harmless). In addition to being unnecessary, such an instruction would undoubtedly confuse the jury, which, not being charged with knowing developments in the law of wire fraud generally, would have no understanding of the irrelevant concept of the right to control.

Second, the next sentence in the defendant's proposed charge is factually and legally baseless. Specifically, the defendant proposes on pages 10 and 11 to instruct the jury that: "If you find that FTX customers, after depositing funds with FTX, received a credit to transact on the FTX exchange and therefore received the right to withdraw an equivalent amount of funds at a later time upon request, that is insufficient to establish that they were deprived of property." (Dkt. 215 at 10-11). As a threshold matter, that proposal is untethered to the facts of the case. There has been no testimony or evidence during the trial that after depositing funds, customers "received a credit to transact" or that their property right was limited to a "right to withdraw an equivalent amount." Where there is no basis in evidence for a theory, the defendant is "not as a matter of law entitled to an instruction specifically apprising the jury of that theory." *United States v. Evangelista*, 122 F.3d 112, 117-18 (2d Cir. 1997). Moreover, that instruction is legally incorrect. The requirement that a defendant devise a scheme to obtain money or property is satisfied "where a defendant fraudulently obtains the *use* of another person's money or property for a period of time, using it for his own personal profit, and depriving the owner of the ability to do so," regardless of "whether temporarily … or permanently." *United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2006) (emphasis in original). Thus, it is incorrect as a matter of law—and common sense—that as long

as a victim receives a credit and a right to withdraw, he or she has not been deprived of money or property.  Indeed, a credit to obtain funds at a later date, if such funds are ultimately available, is clearly not the same, or as valuable, as the money or property itself, as is illustrated by the result when FTX's customers, not knowing that their money had been spent, sought to withdraw their deposits.[1]

Third, parts of the defendant's proposed instructions on wire fraud misstate the applicable *mens rea* requirements. The applicable *mens rea* for wire fraud is "specific intent to harm or defraud the victims of the scheme."  *United States v. Rybicki*, 354 F.3d 124, 150 (2d Cir. 2003). The word "willfully" appears nowhere in the text of the wire fraud statute. *See United States v. Gole*, 21 F. Supp. 2d 161, 167-68 (E.D.N.Y. 1997) ("'Willfully' appears nowhere in the mail fraud statute, and the Second Circuit has expressly held that the only scienter requirement for a violation of § 1341 is that the acts proscribed be carried out 'knowingly.'"); *United States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015) ("The wire-fraud statute requires a specific intent to defraud but not willfulness or any other proxy for knowledge of the law."); *United States v. Dockray*, 943 F.2d 152, 156 (1st Cir. 1991) (holding that "willfulness" is "not synonymous with the intent to defraud requirement in the mail and wire fraud statutes"); *United States v. DiRoberto*, 686 F. App'x 458, 461 (9th Cir. 2017) ("The mail and wire fraud statutes do not require proof of willfulness.").  As a result, several aspects of the proposed defense instruction on page 11 and 12 of their requests are wrong or may confuse the jury, including that the defendant is not guilty unless he "purposefully violated an obligation that prohibited use" or acted "with knowledge that [his] conduct [was] unlawful, and with intent to do something the law forbids." (Dkt. 215 at 11-12). If the Court inclined to instruct the jury on willfulness, the Government requests the willfulness instruction set forth on pages 14 and 15 of its requests to charge. (*See* Dkt. 214 at 14-15).

Fourth, the Government opposes the specific example of good faith cited in the defendant's requests at page 12, that if the defendant "acted in good faith with respect to the use of FTX customer funds and with the belief that as a business matter, FTX would be able to cover all customer withdrawal requests, he did not act with specific intent to defraud." This would be likely to confuse the jury about whether a belief that customers could be repaid after their property is wrongfully taken is a defense (it is not).

Fifth, as set forth in the Government's prior briefing, the Government opposes a generalized presence of counsel instruction such as the one offered by the defendant at page 13 of his requests. The Government respectfully submits that the Court should give the Government's requested charge on this issue. (*See* Dkt. 214 at 71).

Finally, the defendant proposed an instruction on bias of witnesses, including relating to an interest in the outcome of the case. In the event the defendant testifies, the Government submits that the instruction should be given in a way that does not suggest that the defendant has a motive to falsely testify based solely on his interest in the outcome of the case. *United States v. Solano*,

---

[1] A popular movie from the 1990s illustrates the point: a briefcase, once filled with money, is not the same as a briefcase later filled with IOUs.  *See* DUMB & DUMBER (1994), available at https://www.youtube.com/watch?v=7GSXbgfKFWg (rejecting suggestion by actor Jim Carrey's character that "IOUs" are "as good as money").

**A-597**

Page 6

966 F.3d 184, 197 (2d Cir. 2020) (holding that it was error for the district court to instruct that "any" witness with an interest in the outcome of the case, which included the defendant, necessarily has a "motive to testify falsely").

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:     /s  Thane Rehn
        Danielle R. Sassoon
        Nicolas Roos
        Danielle Kudla
        Samuel Raymond
        Thane Rehn
        Assistant United States Attorneys
        (212) 637-2354

Cc: Counsel of Record (via ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :        S6 22 Cr. 673 (LAK)
            v.                                       :
                                                    :
SAMUEL BANKMAN-FRIED,                                :
                                                    :
                                                    :
                      Defendant.                    :
------------------------------------------------------------------x

### DEFENDANT SAMUEL BANKMAN-FRIED'S
### AMENDED PROPOSED REQUESTS TO CHARGE

Mark S. Cohen
Christian R. Everdell
David Lisner
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
Phone:  (212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
dlisner@cohengresser.com
skuehnlenz@cohengresser.com


*Attorneys for Samuel Bankman-Fried*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 4

DEFENSE REQUEST NO. 1 General Requests ................................................ 5

DEFENSE REQUEST NO. 2 Crimes Defined by Statute Only.......................... 6

DEFENSE REQUEST NO. 3 The Indictment.................................................... 7

DEFENSE REQUEST NO. 4 Summary of Indictment ..................................... 8

DEFENSE REQUEST NO. 5 Count One: Wire Fraud on FTX Customers................................. 10

DEFENSE REQUEST NO. 6 Count Three: Wire Fraud on Lenders of Alameda Research ....... 16

DEFENSE REQUEST NO. 7 Count Two: Conspiracy to Commit Wire Fraud on FTX
      Customers ...................................................................................... 19

DEFENSE REQUEST NO. 8 Count Four: Conspiracy to Commit Wire Fraud on Lenders
      of Alameda Research ..................................................................... 23

DEFENSE REQUEST NO. 9 Count Five: Conspiracy to Commit Securities Fraud on
      Investors in FTX ........................................................................... 25

DEFENSE REQUEST NO. 10 Count Six: Conspiracy to Commit Commodities Fraud on
      FTX Customers ............................................................................. 30

DEFENSE REQUEST NO. 11 Count Seven: Conspiracy to Commit Money Laundering ........ 35

DEFENSE REQUEST NO. 12 Venue.................................................................... 44

DEFENSE REQUEST NO. 13 Law Enforcement Witnesses ..................................... 45

DEFENSE REQUEST NO. 14 Non-Prosecution Agreements.................................... 46

DEFENSE REQUEST NO. 15 Cooperating Witness Testimony ................................ 47

DEFENSE REQUEST NO. 16 Immunized Witnesses................................................ 50

DEFENSE REQUEST NO. 17 Other Acts Evidence ................................................ 51

DEFENSE REQUEST NO. 18 Coconspirator Statements ......................................... 52

DEFENSE REQUEST NO. 19 Expert Witness[es]..................................................... 53

DEFENSE REQUEST NO. 20 Use of Charts and Summaries .................................... 54

**A-600**

DEFENSE REQUEST NO. 21 Defendant's Right Not To Testify [If Applicable] ..................... 55

DEFENSE REQUEST NO. 22 Defendant's Testimony [If Applicable]...................................... 56

DEFENSE REQUEST NO. 23 Missing Witness Charge [If Applicable] ................................... 57

DEFENSE REQUEST NO. 24 Involvement of Counsel............................................................... 58

DEFENSE REQUEST NO. 25 Defense Theory of the Case........................................................ 59

CONCLUSION.................................................................................................................................. 60

**A-601**

**INTRODUCTION**

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, Mr. Samuel Bankman-Fried through his undersigned attorneys respectfully requests that the Court include the following in its charge to the jury.

The proposed instructions are principally based on and adapted from those contained in the Modern Federal Jury Instructions and those given in the following cases: *United States v. LaGuardia*, No. 19 Cr. 893 (LAK), ECF No. 93 (S.D.N.Y. Dec. 16, 2020); *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), ECF No. 331 (S.D.N.Y. May 16, 2018); *United States v. Adelekan*, No. 19 CR. 291 (LAP), ECF No. 397 (S.D.N.Y. Oct. 26, 2021).  Additional citations for certain specific instructions are provided in the footnotes.

The defense respectfully reserves the right to supplement or amend these requests to charge in response to the Government's amended requests, any proposed charges by the Court, and further evidence presented at trial.

**A-602**

<u>**DEFENSE REQUEST NO. 1**</u>
**General Requests**

Mr. Bankman-Fried respectfully requests this Court's standard instructions on:

1.  Role of the Court

2.  Role of the Jury

3.  Statements of Court and Counsel are Not Evidence.

4.  Duty of Impartiality

5.  Presumption of Innocence and Burden of Proof

6.  Reasonable Doubt

7.  Improper Considerations

8.  Sympathy

9.  Direct and Circumstantial Evidence

10. Witness Credibility

11. Selection of Foreperson

12. Right to See Exhibits and Hear Testimony and Communications with the Court; and

13. Verdict, Need for Unanimity, and Duty to Consult

**A-603**

**DEFENSE REQUEST NO. 2**
**Crimes Defined by Statute Only[1]**

In our system, we only have crimes that are defined by statute.  The fact that you may think something is morally wrong or unfair, is truly of no interest whatsoever.  It is also not relevant whether you believe certain conduct should have been regulated even though it was not regulated at the time.  Statutes define our crimes, and from time to time I will talk to you about the individual statutes and how they break down into elements so that you can consider the elements that the government must prove.  Some vague feeling or belief that something wrong has been done, or that some law should have prevented it, is insufficient to convict anyone of any charge whatsoever.  A witness's stated feeling or belief as to what the law should or should not have prohibited is not sufficient to convict anyone of any charge.  You are to break it down to the elements, assess whether there is proof beyond a reasonable doubt as to each of those elements, and then, with that determination made, you can render a unanimous verdict.

---

[1] Adapted from the charge of the Honorable J. Paul Oetken in *United States v. Danilovich*, 12-CR-171 (S.D.N.Y. Nov. 13, 2013).

**A-604**

**DEFENSE REQUEST NO. 3**
**The Indictment[2]**

The defendant in this matter, Samuel Bankman-Fried, has been formally charged in what is called an Indictment. An Indictment is simply an accusation. It is no more than the means by which a criminal case is started. It is not evidence. It is not proof of the defendant's guilt. It creates no presumption, and it permits no inference that the defendant is guilty. You are to give no weight to the fact that an Indictment has been returned against the defendant.

Before you begin your deliberations, you will be provided with a copy of the Indictment. I will not read the entire Indictment to you at this time. Rather, I will first summarize the offenses charged in the Indictment and then explain in detail the elements of the charged offenses.

---

[2] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. Blaszczak*, No. 17 Cr. 357 (S.D.N.Y. May 16, 2018); and the charge of the Honorable Lewis A. Kaplan in *United States v. LaGuardia*, No. 19 Cr. 893 (S.D.N.Y. Dec. 16, 2020).

**A-605**

### DEFENSE REQUEST NO. 4
**Summary of Indictment[3]**

The Indictment contains seven counts or "charges."

Count One of the Indictment charges that, from at least in or about 2019, up to and including in or about November 2022, the defendant committed wire fraud on customers of FTX.

Count Two of the Indictment charges that, from at least in or about 2019 up to and including in or about November 2022, the defendant participated in a conspiracy to commit wire fraud on customers of FTX.

Count Three of the Indictment charges that, from at least in or about June 2022, up to and including in or about November 2022, the defendant committed wire fraud on lenders to Alameda Research.

Count Four of the Indictment charges that, from at least in or about June 2022, up to and including in or about November 2022, the defendant participated in a conspiracy to commit wire fraud on lenders to Alameda Research.

Count Five of the Indictment charges that, from at least in or about 2019, up to and including in or about November 2022, the defendant participated in a conspiracy to commit securities fraud on investors in FTX.

Count Six of the Indictment charges that, from at least in or about 2019, up to and including in or about November 2022, the defendant participated in a conspiracy to commit

---

[3] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. Blaszczak*, No. 17 Cr. 357 (S.D.N.Y. May 16, 2018); and the charge of the Honorable Lewis A. Kaplan in *United States v. LaGuardia*, No. 19 Cr. 893 (S.D.N.Y. Dec. 16, 2020); and the charge of the Honorable Loretta A. Preska in *United States v. Adelekan*, No. 19 CR. 291 (S.D.N.Y. Oct. 26, 2021).

**A-606**

commodities fraud on customers of FTX in Connection with Purchases and Sales of Cryptocurrency and Swaps.

Count Seven of the Indictment charges that, from at least in or about 2020, up to and including in or about November 2022, the defendant participated in a conspiracy to commit money laundering.

That is a brief summary of the counts in the Indictment. By pleading not guilty to these counts, Mr. Bankman-Fried has denied that he committed the charged offenses. The government must show beyond a reasonable doubt that Mr. Bankman-Fried is guilty with respect to each count. You must consider each count separately, and you must return a separate verdict of guilty or not guilty on each count. Whether you find the defendant guilty or not guilty as to one offense should not affect your verdict as to any other offense charged.

**A-607**

**DEFENSE REQUEST NO. 5**
**Count One: Wire Fraud on FTX Customers[4]**

A.  Summary of the Indictment

Count One charges Mr. Bankman-Fried with wire fraud on customers of FTX in violation of Title 18, United States Code, Section 1343 and 2.  Specifically, Count One charges that from in or about 2019, up to and including in or about November 2022, Mr. Bankman-Fried engaged in a scheme to defraud customers of FTX by misappropriating those customers' deposits to pay expenses and debts of Alameda, to make investments, and for other purposes.

B.  Elements of Wire Fraud

Before Mr. Bankman-Fried can be convicted of wire fraud, the Government must prove each of the following elements beyond a reasonable doubt:

First, that there was a scheme or artifice to defraud or to obtain money or property by means of materially false and fraudulent pretenses, representations, or promises;

---

[4] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. LaGuardia*, No. 19 Cr. 893 (S.D.N.Y. Dec. 16, 2020); and the charge of the Honorable Loretta A. Preska in *United States v. Adelekan*, No. 19 CR. 291 (S.D.N.Y. October 26, 2021).

Materiality.  *See United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019).

Scheme to Defraud – Property.  *See Ciminelli v. United States*, 598 U.S. ---, 143 S. Ct. 1121 (2023).

Scheme to Defraud – Effect of contract on legal relationship.  *See Carpenter v. United States*, 484 U.S. 19, 27, 108 S. Ct. 316, 321 (1987) (definition of misappropriation); *United States v. Chestman*, 947 F.2d 551, 567 (1991) (misappropriation theory requires a fiduciary or similar relationship of trust and confidence, which cannot be imposed unilaterally by entrusting someone with confidences); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) ("Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'") (citation omitted).

Intent – Good Faith.  *See United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 2014), Trial Tr. at 83-85.

10

**A-608**

<u>Second</u>, that Mr. Bankman-Fried knowingly participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud;

<u>Third</u>, that in executing the scheme, Mr. Bankman-Fried used or caused the use of interstate or international wires.

### 1.  <u>First Element – Scheme or Artifice to Defraud</u>

The first element that the Government must prove beyond a reasonable doubt is the existence of a scheme or artifice to defraud FTX customers of money or property by means of false or fraudulent pretenses, representations, or promises.

A "scheme to defraud" is any plan, device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

"Fraud" is a term that includes all possible means by which a person seeks to gain an unfair advantage over a victim by intentional misrepresentation or false pretenses.

A representation is "false" if it was untrue when made and was known to be untrue at the time by the person making it or causing it to be made.  A representation is "fraudulent" if it is made with an intent to deceive.

The false or fraudulent representation must relate to a "material" fact.  A material fact is one that would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision.  That means that if you find a particular representation to have been false or misleading, you must determine whether it was material by asking whether the misrepresentation would actually have mattered in a meaningful way to a rational decisionmaker to whom the statement was addressed.  Materiality of the information is judged as of the time the information was disclosed.

The purpose of the scheme to defraud must be to obtain money or property.  Hence, you must determine what property, if any, the scheme was allegedly designed to obtain from FTX

**A-609**

customers.   The term "property" includes traditional property interests.  Property does not include intangible interests such as the right to control the use of one's assets, nor does it include potentially valuable economic information that a person might consider valuable in deciding how to use his or her assets.

A "scheme to defraud" also includes a scheme to fraudulently misappropriate or embezzle property belonging to another.  Before you can find a scheme to fraudulently misappropriate or embezzle property you must find that there has been an improper taking of a property interest.  Count One alleges that Mr. Bankman-Fried engaged in a scheme to defraud FTX customers by misappropriating or embezzling FTX customer deposits for Alameda's use in investments and for other purposes  You have heard evidence that customers funded their FTX accounts by making currency, or "fiat," deposits to Alameda banks accounts or by depositing cryptocurrency and similar assets to FTX,  You have also heard evidence about various ways in which these customer deposits were used by Alameda for investments and other purposes.

To obtain a conviction for wire fraud in the form of misappropriation as charged in Count One, the Government must prove beyond a reasonable doubt that the customers of FTX were improperly deprived of a property interest by virtue of the use by Alameda or FTX of the customer deposits.  If you find that the Government has not proven beyond a reasonable doubt that there has been a deprivation of a property interest, you must acquit the Defendant regardless of whether the Defendant or others thought or believed they were depriving the customers of a property interest. If you find that the Government has proven the deprivation of a property interest, in order to convict, you must further find beyond a reasonable doubt that the Government has proven that Mr. Bankman Fried acted knowingly, willfully, and with a specific

**A-610**

intent to deprive the customers of a property interest by causing Alameda to violate its legal obligation not to  use of the funds in such a manner.

That obligation cannot be based solely on the subjective expectations of FTX customers. Rather there must be the objective deprivation of a property interest.  You heard testimony that in order to open an account on FTX, customers were required to accept the Terms of Service by clicking a box on the FTX app or website.  The Terms of Service could provide proof of a property interest if the Government has so proven that the Terms of Service created a property interest and has further proven that the property interest created has been deprived of by the Defendant. In determining whether the Terms of Service have created a property interest and that the property interest has been taken, you should take into account that.  The Terms of Service constituted a contract between FTX and its customers, and you must consider what that contract said and didn't say regarding the legal relationship between FTX and its customers.

The Terms of Service specify that they are to be governed by and construed in accordance with English law and, therefore, the Government must have proven beyond a reasonable doubt that under English law the Terms of Service created a property interest and the property interest was taken by the Defendant.

In all events, Government must prove beyond a reasonable doubt the nature of the property interest created and how it was taken by the Defendant and that the Defendant intended to take such property interest.

   2.   Second Element – Intent

The second element that the Government must prove beyond a reasonable doubt is that Mr. Bankman-Fried participated in the scheme to defraud knowingly and willfully, and with specific intent to defraud.

13

**A-611**

To act "knowingly" means to act voluntarily and deliberately, and not because of ignorance, mistake, accident, or carelessness.

To act "willfully" means to act with knowledge that one's conduct is unlawful, and with the intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

To act with "specific intent to defraud" goes further and means that the defendant acted with the specific intent to deceive FTX customers for the purpose of depriving them of a property interest which is something of value.  While the Government need not prove that FTX customers were actually harmed, it must prove beyond a reasonable doubt that when Mr. Bankman-Fried participated in the alleged wire fraud, he did so for the purpose of causing financial loss to those customers.

Because the Government must prove beyond a reasonable doubt that Mr. Bankman-Fried had the specific intent to defraud FTX customers, it follows that good faith on part of Mr. Bankman-Fried is a complete defense to that charge.  In fact, good faith is a complete defense to all of the counts in the Indictment, so you should consider this instruction about good faith in determining whether the Government has proven each of the other counts of the indictment beyond a reasonable doubt.

Good faith is an honest belief by the defendant that his conduct was not unlawful.  If Mr. Bankman-Fried believed in good faith that he was acting properly, even if he was mistaken in that belief and even if others were ultimately harmed, he cannot be found guilty.  An honest mistake in judgment or an honest error in management or even carelessness or recklessness do not rise to the level of criminal intent.  The burden is on the Government to prove fraudulent

**A-612**

intent and bad faith beyond a reasonable doubt.  Mr. Bankman-Fried has no burden to prove his good faith or lack of fraudulent intent.

In evaluating whether Mr. Bankman-Fried acted in good faith, you may consider whether Mr. Bankman-Fried had any discussions with counsel, or understood that counsel had been consulted, concerning the propriety or legality of conduct that the Government claims was part of the scheme to defraud.

### 3.   Third Element – Use of Interstate or International Wires

The third element that the Government must prove beyond a reasonable doubt is that the defendant used or caused to be used an interstate wire communication in furtherance of the scheme to defraud.  Wire communications include phone calls, emails, and text messages, as well as wire transfers of funds.  The wire communication must pass between two or more states, or it must pass between the United States and a foreign country.  A wire communication need not itself contain a false or fraudulent representation in order to satisfy this element.  It must, however, further or assist in carrying out the scheme to defraud.

With respect to the use of the wires, the Government must establish beyond a reasonable doubt the particular use charged in the Indictment – *i.e.*, phone calls, emails, text messages, or wire transfers – and you must agree that the particular use furthered the scheme to defraud. However, the Government does not have to prove that the wires were used on the exact date charged in the indictment.  It is sufficient if the evidence establishes beyond a reasonable doubt that the wires were used on a date substantially similar to the dates charged in the indictment.

**A-613**

### DEFENSE REQUEST NO. 6
### Count Three: Wire Fraud on Lenders of Alameda Research[5]

A. Summary of the Indictment

I will skip over Count Two for the moment and discuss Count Three.  Count Three charges Mr. Bankman-Fried with wire fraud on lenders of Alameda Research in violation of Title 18, United States Code, Sections 1343 and 2.  Specifically, Count Three charges that from in or about June 2022, up to and including November 2022, Mr. Bankman-Fried engaged in a scheme to defraud lenders of Alameda Research by providing false and misleading information to those lenders regarding Alameda's financial condition so that the lenders would not recall loans and would extend new loans.

B. Elements of Wire Fraud

Like Count One, Count Three charges wire fraud.  The elements of Count Three are the same as Count One, which I just described to you.  You should consider and apply those same instructions here.

Whereas Count One alleges a scheme to defraud customers of FTX, Count Three alleges a scheme to defraud lenders of Alameda Research.

All of the instructions I previously gave you as to the required proof of the existence of a property interest which property interest was improperly taken, applies here as well. If the

---

[5] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. LaGuardia*, No. 19 Cr. 893 (S.D.N.Y. Dec. 16, 2020); and the charge of the Honorable Loretta A. Preska in *United States v. Adelekan*, No. 19 CR. 291 (S.D.N.Y. Oct. 26, 2021).

Materiality.  *See United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019).

Scheme to Defraud – Property.  *See Ciminelli v. United States*, 598 U.S. ---, 143 S. Ct. 1121 (2023).

Intent – Good Faith.  *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011).

**A-614**

Government has not proven beyond a reasonable doubt that there was an improper taking by Mr. Bankman-Fried of a property interest, you must acquit Mr. Bankman-Fried of the claim that he improperly misled lenders as the claim of lender fraud is based on failure to disclose the improper borrowing by Alameda. Further, if Mr. Bankman-Fried believed that the financial statements provided to the lenders was consistent with the balance sheet required by the lenders, then you must acquit the Defendant of this charge. As I previously instructed you, the false or fraudulent representation must relate to a "material" fact. A material fact is one that would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision. Hence, a misrepresentation would be material if the Alameda lenders took action or failed to take action based on it.

Count Three alleges that Alameda's lenders were given false or misleading information so that they would not recall loans and would extend new loans. As I previously instructed you, property does not include intangible interests such as the right to control the use of one's assets, nor does it include potentially valuable economic information that a person might consider valuable in deciding how to use his or her assets. If you find that Alameda's lenders were deprived only of the right to control their assets or access to potentially valuable economic information, that is insufficient to convict on Count Three.

Finally, as I previously instructed you, good faith on the part of Mr. Bankman-Fried is a complete defense to this charge. If the Government has not proven beyond a reasonable doubt that Mr. Bankman-Fried did not believe in good faith that he was acting properly at the time of the events alleged in the Indictment, even if he was mistaken in that belief and even if others were injured by his conduct, he cannot be found guilty.

**A-615**

**A-616**

### DEFENSE REQUEST NO. 7
**Count Two: Conspiracy to Commit Wire Fraud on FTX Customers[6]**

A. <u>Summary of the Indictment</u>

Now let me jump back to Count Two.  Count Two charges Mr. Bankman-Fried with

conspiracy to commit wire fraud on FTX customers in violation of Title 18, United States Code,

Section 1349.  Specifically, Count Two charges that from in or about 2019, up to and including

in or about November 2022, Mr. Bankman-Fried willfully and knowingly agreed with others to

defraud customers of FTX by misappropriating those customers' deposits and using those

deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

B. <u>The Elements of Conspiracy to Commit Wire Fraud on FTX Customers</u>

Whereas Count One alleges a substantive wire fraud offense against FTX customers,

Count Two alleges a conspiracy to commit wire fraud against FTX customers.  Let me explain

what a conspiracy is.

A conspiracy is a combination or agreement of two or more persons to join together to

accomplish some unlawful purpose.  The unlawful purpose is sometimes called the "object" of

the conspiracy.  The crime of conspiracy to violate a federal law is an independent offense.  It is

separate and distinct from the violation of any specific federal laws, which the law refers to as

"substantive crimes."

---

[6] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. LaGuardia*, No.
19 Cr. 893 (S.D.N.Y. Dec. 16, 2020); the charge of the Honorable Loretta A. Preska in *United
States v. Adelekan*, No. 19 CR. 291 (S.D.N.Y. Oct. 26, 2021); and the charge of the Honorable
Lewis A. Kaplan in *United States v. Blaszczak*, No. 17 Cr. 357 (S.D.N.Y. May 16, 2018); *see
also* Sand, Modern Federal Jury Instructions, Instr. 19-6.

<u>Existence of Conspiracy – "Essential Nature"</u>.  *See United States v. Ulbricht*, 31 F.Supp.3d 540,
551 (S.D.N.Y. 2014) (citing cases); *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977)
(same).

**A-617**

Before Mr. Bankman-Fried can be convicted of conspiracy to commit wire fraud as alleged in Count Two, the Government must prove each of the following elements beyond a reasonable doubt:

First, that a conspiracy existed between two or more people to commit wire fraud on FTX customers; and

Second, that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.

1.   First Element – Existence of Conspiracy

Starting with the first element, the Government must prove beyond a reasonable doubt the existence of the charged conspiracy.  As I just mentioned, a conspiracy is an agreement, or an understanding, by two or more persons to accomplish an unlawful objective by working together.

It is not necessary for you to find that the agreement was ever expressed orally or in writing, but the Government does have to prove that there was a mutual understanding between at least two people to violate the law.

A meeting of the minds is required for there to be an agreement.  The Government must therefore prove that the co-conspirators agreed to the same object, or unlawful purpose, of the conspiracy.  In other words, you must find that the defendant and his co-conspirators agreed to commit the same offense.  While the co-conspirators need not agree to every detail, they must agree to the "essential nature" of the plan.

The Indictment alleges that the conspiracy in Count Two lasted from in or about 2019 through up to and including in or about November 2022.  It is not necessary for the Government to prove that the conspiracy lasted throughout the entire period alleged, but only that it existed for some period within that time frame.

**A-618**

Count Two alleges that the object of the conspiracy was to commit wire fraud on customers of FTX.  As I previously instructed you, the crime of wire fraud has three elements:

First, that there was a scheme or artifice to defraud or to obtain money or property by means of materially false and fraudulent pretenses, representations, or promises;

Second, that Mr. Bankman-Fried knowingly participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud;

Third, that in executing the scheme, Mr. Bankman-Fried used or caused the use of interstate or international wires.

The same instructions I gave you with respect to the law and the elements of wire fraud apply to Count Two as well and you should follow those instructions here.

If the Government proves beyond a reasonable doubt that a conspiracy to commit wire fraud on FTX customers existed, the first element of the conspiracy has been proven.  If, however, the Government has not proven beyond a reasonable doubt that such a conspiracy existed, the defendant may not be convicted on Count Two.

### 2.  Second Element – Intent

Moving to the second element, the Government must prove beyond a reasonable doubt that Mr. Bankman-Fried knowingly and willfully joined and participated in the conspiracy with knowledge of its unlawful purpose and in furtherance of its unlawful objective.  I have already instructed you about what "knowingly" and "willfully" mean.  But to reiterate, to act "knowingly" means to act consciously and voluntarily, rather than by mistake or accident.  To act "willfully" means to act deliberately and with purpose to do something that the law forbids.

In deciding whether Mr. Bankman-Fried was a member of the conspiracy, you should ask: Did he participate in the conspiracy with knowledge of its unlawful fraudulent purpose and with the specific intention of furthering the objective of wire fraud?  You may not conclude that

Mr. Bankman-Fried acted willfully to join the conspiracy unless you conclude that he acted with the knowledge and specific intent to defraud, as is required to establish a violation of the wire fraud law, along with his agreement to the commission of acts by himself or by his coconspirators that would violate the wire fraud law.

It is not necessary that Mr. Bankman-Fried be fully informed of all the details of the conspiracy, or all of its participants.  However, I caution you that mere association between Mr. Bankman-Fried and a conspirator does not make Mr. Bankman-Fried a member of the conspiracy, even if he knows that the conspiracy exists.  In other words, knowledge and association are not enough; Mr. Bankman-Fried must have intentionally participated in the conspiracy with the purpose of helping to achieve its unlawful object.

It is important to note that Mr. Bankman-Fried's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences which may be drawn from them.

As I previously instructed you, good faith is a complete defense to this charge.  The instructions I previously gave you with respect to good faith apply to this count as well.  If you find that Mr. Bankman-Fried acted in good faith, he cannot be convicted on Count Two.

**A-620**

**DEFENSE REQUEST NO. 8**
**Count Four: Conspiracy to Commit Wire Fraud on Lenders of Alameda Research[7]**

A.   Summary of the Indictment

Count Four charges Mr. Bankman-Fried with conspiracy to commit wire fraud on

Alameda's lenders in violation of Title 18, United States Code, Section 1349.  Specifically,

Count Four charges that from in or about June 2022, up to and including in or about November

2022, Mr. Bankman-Fried willfully and knowingly agreed with others to defraud lenders to

Alameda by providing false and misleading information to those lenders regarding Alameda's

financial condition so that lenders would not recall loans and would extend new loans.

B.   Elements of Conspiracy to Commit Wire Fraud on Alameda's Lenders

Before Mr. Bankman-Fried can be convicted of conspiracy to commit wire fraud as

charged in Count Four, the Government must prove each of the following elements beyond a

reasonable doubt:

First, that a conspiracy existed between two or more people to commit wire fraud on

Alameda's lenders; and

Second, that Mr. Bankman-Fried knowingly and willfully joined and participated in the

alleged conspiracy at some point during its existence.

The instructions I just gave you about the law of conspiracy with respect to Count Two

apply equally to Count Four.  Similarly, the instructions I gave you about wire fraud with respect

to Count One apply equally to Count Four.  In determining whether the government has met its

burden with respect to each element of Count Four, you should follow these instructions,

---

[7] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. LaGuardia*, No.
19 Cr. 893 (S.D.N.Y. Dec. 16, 2020); the charge of the Honorable Loretta A. Preska in *United
States v. Adelekan*, No. 19 CR. 291 (S.D.N.Y. Oct. 26, 2021); and the charge of the Honorable
Lewis A. Kaplan in *United States v. Blaszczak*, No. 17 Cr. 357 (S.D.N.Y. May 16, 2018).

including the instructions on the complete defense of good faith.  If you find that Mr. Bankman-Fried acted in good faith, he cannot be convicted on Count Four.

**A-622**

**DEFENSE REQUEST NO. 9**

**Count Five: Conspiracy to Commit Securities Fraud on Investors in FTX[8]**

A.  Summary of the Indictment

Count Five charges Mr. Bankman-Fried with conspiracy to commit securities fraud in violation of Title 18, United States Code, Section 371.  Specifically, Count Five charges that from in or about 2019, up to and including in or about November 2022, Mr. Bankman-Fried willfully and knowingly agreed to engage in a scheme to defraud investors in FTX by providing false and misleading information to those investors regarding FTX's financial condition and the relationship between FTX and Alameda.  Count Five further charges that in furtherance of that conspiracy, Mr. Bankman-Fried communicated with FTX investors in a manner that contained materially false information about FTX's financial condition.

B.  Elements of Conspiracy to Commit Securities Fraud

Like Counts Two and Four, which I just discussed, Count Five alleges a conspiracy – in this case, conspiracy to commit securities fraud on investors in FTX.  The elements of this conspiracy are similar the wire fraud conspiracies alleged in Counts Two and Four, except the securities fraud conspiracy alleged in Count Five adds an additional element – an overt act requirement – which I will discuss in a moment.

---

[8] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. LaGuardia*, No. 19 Cr. 893 (S.D.N.Y. Dec. 16, 2020); and the charge of the Honorable Lewis A. Kaplan in *United States v. Blaszczak*, No. 17 Cr. 357 (S.D.N.Y. May 16, 2018).

Materiality.  *See United States v. Litvak*, 889 F.3d 56, 69 (2d Cir. 2018).

Intent – Willfully.  *United States v. Peltz*, 433 F.2d 48, 55 (2d Cir. 1970).

**A-623**

Accordingly, before Mr. Bankman-Fried can be convicted of conspiracy to commit securities fraud as charged in Count Five, the Government must prove each of the following three elements beyond a reasonable doubt:

First, that a conspiracy existed between two or more people to commit securities fraud on investors in FTX;

Second, that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence; and

Third, that Mr. Bankman-Fried or one of his co-conspirators committed an overt act in furtherance of the conspiracy.

    1.   First Element – Existence of Conspiracy

Starting with the first element, the Government must prove beyond a reasonable doubt the existence of the charged conspiracy.  As I previously instructed you, a conspiracy is an agreement, or an understanding, by two or more persons to accomplish an unlawful objective by working together.

Count Five alleges that the object of the conspiracy was to commit securities fraud on investors in FTX.  The crime of securities fraud has three elements:

First, that in connection with the purchase or sale of a security, a defendant did any one of the following:

        (1) employed a device, scheme or artifice to defraud, or

        (2) made an untrue or misleading statement of material fact; or

        (3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

Second, that in so doing the defendant acted willfully, knowingly, and with the intent to defraud; and

**A-624**

Third, that the defendant knowingly used, or caused to be used, any means or instruments of interstate transportation or interstate communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct.

We will consider these three elements in turn.

i.   First Element of Securities Fraud – Fraudulent Act

With respect to the first element of securities fraud, the Government does not have to prove that the co-conspirators agreed to do all three types of unlawful conduct in connection with the purchase or sale of securities.  Proof of any one will suffice.  However, you must be unanimous as to which of the three types of unlawful conduct, if any, was proven.

I have already instructed you on what constitutes "a scheme or artifice to defraud" and an "untrue or misleading statement" in my instructions on the wire fraud offense charged in Count One.  You should consider and apply those same instructions here as well.

The Government must also prove beyond a reasonable doubt that the defendant's alleged fraudulent conduct was "in connection with the purchase or sale" of a security.  This requirement is satisfied if you find that there was some nexus or relationship between the allegedly fraudulent conduct and the sale or purchase of securities.  On the other hand, if you find the alleged fraudulent conduct was not in connection with the purchase or sale of a security, you cannot convict the defendant on Count Five.

The Government must also prove beyond a reasonable doubt that the information disclosed to the investors was "material."  The "materiality" standard is an objective one that centers on the views of a hypothetical, reasonable investor in the marketplace at issue, and not the idiosyncratic views of an individual investor.  If the information would be important to a reasonable investor in deciding whether to buy or sell the stock at issue, it is "material" information.  Put another way, there must be a substantial likelihood that the fact would have

**A-625**

been viewed by the reasonable investor as having significantly altered the total mix of information then available.  Materiality of the information is judged as of the time the information was disclosed.  For the information to be material, it must have been conveyed to the investors before the investment decisions were being considered.

ii.  <u>Second Element of Securities Fraud – Intent</u>

The second element of securities fraud that the Government must prove beyond a reasonable doubt is that the defendant acted willfully, knowingly, and with the intent to defraud. I have already instructed you on the meaning of the terms "knowingly" and "intent to defraud" in my instructions on the wire fraud offense charged in Count One.  "Willfully" means knowingly acting in violation of the securities laws.  You should consider and apply those same instructions here as well, including the complete defense of good faith.

iii.  <u>Third Element of Securities Fraud – Means of Interstate Commerce</u>

There is a third and final element of securities fraud that the Government must prove beyond a reasonable doubt; namely, that the defendant knowingly used or caused to be used the mails or the means or instrumentalities of interstate commerce in furtherance of the scheme to defraud or fraudulent conduct.  If you find that the scope of the scheme to defraud did not include the use of the mails or the means or instrumentalities of interstate commerce, this element has not been satisfied.

The use of the term "mails" is self-explanatory.  It includes the U.S. Mail, Federal Express, and other commercial mail couriers.  The term "instrumentality of interstate commerce" means instruments, devices, and means of conducting trade, commerce, transportation, or communication between any two states or between the United States and another country. Telephone calls made by a caller in one state to somebody in another state, or from the United States to a foreign country, or vice-versa, are examples of using an instrumentality of interstate

commerce.  Other examples include, but are not limited to, emails, text messages, and wire transfers.

That covers the elements of the object of the conspiracy alleged in Count Five; namely securities fraud on investors in FTX.  If the Government proves beyond a reasonable doubt that such a conspiracy existed, the first element of the conspiracy has been proven.

2.   Second Element – Intent

The second element of the securities fraud conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.  I have already instructed you on these elements in my instructions on the wire fraud conspiracy charged in Count Two.  You should consider and apply those same instructions here as well.

3.   Third Element – Overt Act

The third and final element of the securities fraud conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried or some other member of the same conspiracy knowingly committed at least one overt act in furtherance of the conspiracy.  In other words, there must have been something more than an agreement, some overt step or action must have been taken by at least one of the conspirators in furtherance of the conspiracy.  The overt act element, to put it another way, is a requirement that any agreement in relation to Count Five went beyond the mere talking stage, the mere agreement stage.

An overt act is any act intended to help achieve the object of the conspiracy.  While an overt act, itself, need not be a criminal act, it must contribute to the goals of the conspiracy.

**A-627**

**DEFENSE REQUEST NO. 10**

**Count Six: Conspiracy to Commit Commodities Fraud on FTX Customers**[9]

A. Summary of the Indictment

Count Six charges Mr. Bankman-Fried with conspiracy to commit commodities fraud in violation of Title 18, United States Code, Section 371.  Specifically, Count Six charges that from in or about 2019, up to and including in or about November 2022, Mr. Bankman-Fried willfully and knowingly agreed with others to commit commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1, by agreeing with others to defraud customers of FTX trading cryptocurrencies, futures, options, swaps, and derivatives by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.  Count Six further charges that in furtherance of that conspiracy, Mr. Bankman-Fried and others misappropriated FTX customer deposits in order to satisfy loan obligations owed by Alameda.

B. Elements of Conspiracy to Commit Commodities Fraud

---

[9] Adapted from the charge of the Honorable Jeffrey A. Meyer in *United States v. Flotron*, No. 17 Cr. 220 (D. Ct. May 8, 2018).

"In Connection With."  *See Sec. and Exch. Comm'n v. Zandford*, 535 U.S. 813, 824-25, 122 S. Ct. 1899, 1905-06 (2002); *United States v. O'Hagan*, 521 U.S. 642, 656-57, 117 S. Ct. 2199, 2209-10 (1997); *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 (2d Cir. 2005) *vacated on other grounds* 547 U.S. 71, 126 S. Ct. 1503 (2006); CFTC Commentary, 17 C.F.R. § 180.1, at 41405-06.

Extraterritorial Application of the Commodities Exchange Act.  *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107-08 (2d Cir. 2019); *Laydon v. Cooperative Rabobank U.A.*, 55 F.4th 86, 97 (2d Cir. 2022); 7 U.S.C. § 2(i).

Depending on the Government's proof at trial, the defense reserves the right to request instructions on the legal definition of "swap," "commodity," "registered entity," or any other relevant terms or phrases defined in the Commodities Exchange Act and associated regulations.

**A-628**

Before Mr. Bankman-Fried can be convicted of conspiracy to commit commodities fraud as charged in Count Six, the Government must prove each of the following elements beyond a reasonable doubt:

First, that a conspiracy existed between two or more people to commit commodities fraud on customers of FTX;

Second, that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence; and

Third, that Mr. Bankman-Fried or one of his co-conspirators committed an overt act in furtherance of the conspiracy.

    1.   First Element – Existence of Conspiracy

Starting with the first element, the Government must prove beyond a reasonable doubt the existence of the charged conspiracy. Count Six charges that there was an agreement or understanding between two or more people to commit commodities fraud on customers of FTX. The crime of commodities fraud has two elements:

First, that in connection with a swap, or a contract of sale of a commodity in interstate commerce, or a contract for future delivery on or subject to the rules of a registered entity, as those concepts are defined in the Commodities Exchange Act, a defendant did any one of the following:

        (1) used or employed a manipulative device, scheme or artifice to defraud, or

        (2) made an untrue or misleading statement of material fact; or

        (3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a person;

Second, that in so doing the defendant acted willfully, knowingly, and with the intent to defraud.

**A-629**

In my instructions on the wire fraud offense charged in Count One, I already instructed you on what constitutes "a scheme or artifice to defraud" and an "untrue or misleading statement" and a "material fact," as well as the meaning of the terms "knowingly," "willfully," and "intent to defraud."  You should consider and apply those same instructions here as well, including the complete defense of good faith.

Let me now discuss the "in connection with" requirement for Count Six.  The phrase "in connection with" is not limitless and does not convert every instance of alleged fraudulent conduct that happens to involve commodities into a violation of the federal commodities fraud laws.  For purposes of Count Six, the Government must prove beyond a reasonable doubt a fraud that is "integral"—and not merely incidental—to a purchase or sale of a commodity, or integral to a swap.  Here, the Indictment alleges that the defendant defrauded FTX customers who were "trading or intending to trade cryptocurrencies, futures, options, swaps, and derivatives" by misappropriating their customer deposits.  I instruct you that the "in connection with" requirement would not be satisfied if the alleged misappropriation was complete before any actual or contemplated commodities transaction took place.  This requirement also would not be satisfied solely by evidence that a defendant embezzles assets, including commodities, from a client's account, even if that client account is used to trade commodities.  Finally, the "in connection requirement" would not be satisfied by evidence that a defendant misappropriated a customer's funds and used them to trade commodities.

The Government must prove one additional factor beyond a reasonable doubt with respect to the object of the conspiracy charged in Count Six.  As a matter of law, the Commodities Exchange Act does not apply to conduct that is extraterritorial.  There is one exception, which I will come back to in a moment.  Outside of that exception, the Government

**A-630**

must prove that the allegedly deceptive or manipulative conduct in connection with a commodities transaction took place inside the United States. If the Government does not prove this beyond a reasonable doubt, the statute does not apply and Mr. Bankman-Fried cannot be found guilty of a conspiracy to violate it. This must be the result even if you find that some fraudulent or manipulative conduct took pace inside the United States, as long as the conduct relating to this object of the conspiracy was predominantly foreign.

As I said, there is a partial exception to the general rule that the Commodities Exchange Act does not apply to extraterritorial conduct. The exception relates to a type of commodity called a swap. The prohibition in the Commodities Exchange Act on commodities fraud does apply to fraudulent or manipulative activities outside the United States if those activities have a direct and significant connection with activities in, or effect on, commerce of the United States. Accordingly, you may not find Mr. Bankman-Fried guilty under this provision of the Commodities Exchange Act unless the Government proves beyond a shadow of a doubt that an object of the alleged conspiracy was to commit commodities fraud relating to swaps through conduct which took place outside of the United States but which had a direct and significant connection or effect on commerce of the United States.

That covers the elements of the object of the conspiracy alleged in Count Six; namely commodities fraud on customers of FTX. If the Government proves beyond a reasonable doubt that such a conspiracy existed, the first element of the conspiracy has been proven.

2. <u>Second Element – Intent</u>

The second element of the commodities fraud conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence. I have already

**A-631**

instructed you on these elements in my instructions on the wire fraud conspiracy charged in Count Two.  You should consider and apply those same instructions here as well.

      3.  <u>Third Element – Overt Act</u>

The third and final element of the commodities fraud conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried or some other member of the same conspiracy knowingly committed at least one overt act in furtherance of the conspiracy.  I have already instructed you on the overt act element in my instructions on the securities fraud conspiracy charged in Count Five.  You should consider and apply those same instructions here as well.

**A-632**

### DEFENSE REQUEST NO. 11
### Count Seven: Conspiracy to Commit Money Laundering[10]

A. Summary of the Indictment

Count Seven charges Mr. Bankman-Fried with conspiracy to commit money laundering in violation of Title 18 of the United States Code, Section 1956(h).  Specifically, Count Seven charges that from in or about 2020, up to and including in or about November 2022, Mr. Bankman-Fried willfully and knowingly agreed with others to commit money laundering in two ways:

> First, by conducting financial transactions involving the proceeds of the wire fraud offense charged in Count One knowing that the transactions were designed in whole or in part to disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

> Second, by engaging in monetary transactions in an amount greater than $10,000 representing the proceeds of wire fraud offense charged in Count One, in violation of Title 18, United States Code, Section 1957.

B. Elements of Conspiracy to Commit Money Laundering

Before Mr. Bankman-Fried can be convicted of conspiracy to commit money laundering as charged in Count Seven, the Government must prove each of the following elements beyond a reasonable doubt:

> First, that a conspiracy existed between two or more people to commit money laundering; and

> Second, that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.

---

[10] Adapted from the charge of the Honorable Loretta A. Preska in *United States v. Adelekan*, No. 19 CR. 291 (S.D.N.Y. Oct. 26, 2021); *see also* Sand, Modern Federal Jury Instructions, Instr. 50A-10.

**A-633**

1.   First Element – Existence of Conspiracy

Starting with the first element, the Government must prove beyond a reasonable doubt the existence of the charged conspiracy.  As I mentioned before, Count Seven charges that there was an agreement or understanding between two or more people to commit money laundering in two different ways, which I will call "concealment money laundering" and "illegal monetary transactions."  These are the two objects of the conspiracy charged in Count Seven.

The Government does not need to prove that Mr. Bankman-Fried agreed to accomplish both types of money laundering; an agreement to accomplish either one of the objects is sufficient.  You must, however, be unanimous that the Government has proven beyond a reasonable doubt at least one of the two alleged objectives of the conspiracy.  You must also be unanimous as to which of the two types has been proven.

*Concealment Money Laundering*

The crime of concealment money laundering has four elements:

First, that the defendant conducted, or attempted to conduct, a financial transaction, which must in some way or degree have affected interstate or foreign commerce;

Second, that the financial transaction at issue involved the proceeds of specified unlawful activity, which here is alleged to have been a wire fraud offense charged in Count One;

Third, that the defendant knew that the financial transaction involved the proceeds of some form of unlawful activity; and

Fourth, that the defendant knew that the transaction was designed, in whole or in part, either to disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

We will consider these four elements in turn.

    i.   First Element of Concealment Money Laundering – Financial Transaction

The first element of concealment money laundering that the Government must prove beyond a reasonable doubt is that the defendant conducted a financial transaction that affected interstate or foreign commerce.

The term "conducts" includes the action of initiating, concluding, or participating in initiating or concluding a transaction.

The term "financial transaction" means (1) a transaction involving a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree, or (2) a transaction which in any way or degree affects interstate or foreign commerce and involves the movement of funds by wire or other means, or involves one or more monetary instruments.

A "transaction involving a financial institution" includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution by whatever means.  The term "funds" includes any currency, money, or other medium of exchange that can be used to pay for goods and services.

Interstate commerce includes any transmission, transfer, or transportation of goods or services, both tangible and intangible, communications, and/or persons, between persons, places, or entities located in one state, including the District of Columbia, regardless of whether done for a business purpose or otherwise.

Foreign commerce means the same thing except it is between a person, place, or entity in the United States, any person, place, or entity in a foreign country.

**A-635**

In determining whether a person or institution is engaged in or whether a transaction affects interstate or foreign commerce, the involvement in interstate or foreign commerce can be minimal.  Any involvement at all will satisfy this element.

> ii.   <u>Second Element of Concealment Money Laundering – Proceeds of Specified Unlawful Activity</u>

The second element of concealment money laundering is that the financial transactions must involve the proceeds of specified unlawful activity.  The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity.

The term "specified unlawful activity" means any one of a variety of offenses described in the statute.  In this case the Government has alleged that the financial transactions at issue involved the proceeds of the wire fraud offense charged in Count One of the Indictment.  I instruct you, as a matter of law, that the charge in Count One, if proven beyond a reasonable doubt, meets the definition of specified unlawful activity.  However, you must determine whether the funds involved in the financial transactions were the proceeds of that unlawful activity.  And if you find that the Government has not proven Count One, then you cannot convict on Count Seven.

Relatedly, I instruct you that funds can only be laundered after the underlying crime is complete; otherwise, the funds cannot be considered the "proceeds" of the specified unlawful activity.  In other words, the money laundering transaction – that is, the transaction designed to conceal the proceeds – must be separate and distinct from the wire fraud scheme that generated the proceeds.

**A-636**

    iii.  <u>Third Element of Concealment Money Laundering – Knowledge that Transactions Involved Unlawful Proceeds</u>

The third element of concealment money laundering is that the defendant knew that the financial transactions at issue involved the proceeds of some form, though not necessarily which form, of unlawful activity.

It is not necessary for the defendant to know that the proceeds came from the wire fraud offense alleged in Count One or that the defendant personally participated in the wire fraud offense.  It is sufficient that the defendant knew that the proceeds came from some form of unlawful activity.

    iv.  <u>Fourth Element of Concealment Money Laundering – Knowledge that Transactions Were Designed to Conceal</u>

The fourth and final element of concealment money laundering concerns the purpose of the transaction.  Specifically, the Government must prove beyond a reasonable doubt that the defendant conducted financial transactions with the knowledge that the transactions were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity – namely, the wire fraud offense alleged in Count One.  The terms I have just used have their everyday ordinary meanings.

If you find that the evidence establishes beyond a reasonable doubt that the defendant knew the purpose of a particular transaction in issue and that he knew at the time of the transaction that the transaction was designed to conceal or disguise the true origin of the proceeds of the wire fraud against FTX customers, then this element is satisfied.

However, if you find that the defendant knew of the transaction at issue, but did not know that it was designed to conceal or disguise the true origin of the proceeds of the wire fraud against FTX customers, and instead thought that the transaction was intended to further a

legitimate transaction, you must find that this element has not been satisfied and find the defendant not guilty.

Relatedly, I instruct you that the money laundering statute prohibits money *laundering*, not money *spending*. Thus, a design to conceal or disguise the source or nature of the proceeds is necessary. If there is no evidence that the defendant intended to conceal or disguise the proceeds of an unlawful activity, he may not be convicted for concealment money laundering.

That covers the elements of the first object of the money laundering conspiracy alleged in Count Seven; namely concealment money laundering. We now turn to the elements of the second object of the money laundering conspiracy – illegal monetary transactions.

### *Illegal Monetary Transactions*

The crime of conducting illegal monetary transactions has five elements:

First, that the defendant engaged in a monetary transaction in or affecting interstate or foreign commerce;

Second, that the monetary transaction involved criminally-derived property of a value greater than $10,000;

Third, that the property was actually derived from specified unlawful activity;

Fourth, that the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense;

Fifth, that the transaction took place in the United States.

We will consider each of these five elements in turn.

**A-638**

i.  <u>First Element of Illegal Monetary Transactions – Financial Transaction</u>

The first element that the Government must prove beyond a reasonable doubt is that the defendant conducted a financial transaction that affected interstate or foreign commerce.

I already instructed you on the meaning of the terms "financial transaction" and "interstate or foreign commerce."  You should consider and apply those same instructions here as well.

ii.  <u>Second Element of Illegal Monetary Transactions – Criminally Derived Property Worth Over $10,000</u>

The second element that the Government must prove beyond a reasonable doubt is that the monetary transactions involved criminally derived property having a value in excess of $10,000.

The term "criminally-derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.  I already instructed you on the meaning of the terms "proceeds" and you should apply those same instructions here.  I instruct you, as a matter of law, that wire fraud is a criminal offense for purposes of this statute.

The Government is not required to prove that all of the property involved in the transaction was criminally-derived property.  However, the government must prove that more than $10,000 of the property involved was criminally-derived property.[11]

---

[11] In light of the Second Circuit's decision in *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017), we will not request an instruction on tracing the criminally-derived property.  *See United States v. Rutgard*, 116 F.3d 1270, 1292-93 (9th Cir. 1997).  However, we disagree with this decision and preserve this issue for appeal.

**A-639**

iii.   <u>Third Element of Illegal Monetary Transactions – Property Derived from Specified Unlawful Activity</u>

iv.   <u>Fourth Element of Illegal Monetary Transactions – Knowledge</u>

The third and fourth elements that the Government must prove beyond a reasonable doubt is that the property was derived from specified unlawful activity and that the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense.

I already instructed you on the meaning of the terms "specified unlawful activity" and "knowingly" and you should apply those same instructions here.

I instruct you that the Government is not required to prove that the defendant knew the particular offense from which the criminally-derived property was derived.  However, the Government must prove beyond a reasonable doubt that the defendant knew that the transaction involved criminally-derived property which, I remind you, means any property constituting or derived from proceeds obtained from a criminal offense.

v.   <u>Fifth Element of Illegal Monetary Transactions – Transaction in the United States</u>

The fifth and final element that the Government must prove beyond a reasonable doubt is that the agreed upon transaction took place in the United States.

That covers the elements of the second object of the money laundering conspiracy alleged in Count Seven; namely illegal monetary transactions.  If the Government proves beyond a reasonable doubt that such a conspiracy existed, the first element of the conspiracy has been proven.  If, however, the Government has not proven beyond a reasonable doubt that such a conspiracy existed, the defendant may not be convicted on Count Seven.

**A-640**

2.  <u>Second Element – Intent</u>

The second element of the money laundering conspiracy, which the Government must prove beyond a reasonable doubt, is that Mr. Bankman-Fried knowingly and willfully joined and participated in the alleged conspiracy at some point during its existence.  I have already instructed you on these elements in my instructions on the wire fraud conspiracy charged in Count Two.  You should consider and apply those same instructions here as well, including the complete defense of good faith.

**A-641**

## DEFENSE REQUEST NO. 12
### Venue[12]

With respect to any given count you are considering, the Government, in addition to proving the essential elements of that charge, must also prove that at least one act in furtherance of the charge occurred in the Southern District of New York.  This is called establishing venue.  The Southern District of New York includes all of Manhattan and the Bronx, as well as Westchester, Rockland, Putnam, Dutchess, Orange and Sullivan Counties.

The Government does not have to prove that a completed crime was committed within the Southern District of New York, or that Mr. Bankman-Fried was ever in the Southern District of New York.  It is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred in this District.  The act itself may not be a criminal act.  It could include, for example, processing or executing a securities trade within this District.  And the act need not have been taken by Mr. Bankman-Fried, so long as the act was part of the crime you find was committed by Mr. Bankman-Fried.

Unlike the elements of the offenses which must be proven beyond a reasonable doubt, the Government is only required to prove venue by a preponderance of the evidence.  A preponderance of the evidence means that it is more probable than not that some act in furtherance of the crime you are considering occurred in this District.

---

[12] Adapted from the charge of the Honorable Laura Taylor Swain in *United States v. Stewart*, No. 15 Cr. 287 (S.D.N.Y. Aug. 9, 2016).

**A-642**

**DEFENSE REQUEST NO. 13**
**Law Enforcement Witnesses[13]**

You have heard the testimony of law enforcement witnesses and other Government employees. The fact that a witness may be employed by the federal Government as a law enforcement agent or employee does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. As with all other witnesses, it is up to you to decide, after reviewing all the evidence, what weight to give the testimony of law enforcement witnesses.

---

[13] Adapted from the charge of the Honorable Jesse M. Furman in *United States v. Avenatti*, No. 19 Cr. 374 (S.D.N.Y. Feb. 1, 2022); and the Honorable J. Paul Oetken in *United States v. Matthews*, 18 Cr. 124 (S.D.N.Y. Sept. 24, 2018).

A-643

**DEFENSE REQUEST NO. 14**
**Non-Prosecution Agreements[14]**

You have heard testimony from at least one witness who entered into a non-prosecution agreement with the Government arising out of facts that are at issue in this case. You are instructed that you are to draw no conclusions or inferences of any kind about the guilt of the defendant from the fact that a witness entered into such an agreement, even involving similar conduct. The decision of that witness to enter into that agreement and of the Government to enter into that agreement was a personal decision on the part of the Government and an exercise of the Government's lawful discretion in the case of the Government. The testimony of a witness who has entered into a non-prosecution agreement with the Government should be examined with great care. You should scrutinize such testimony closely to determine whether or not it is colored in such a way as to place guilt upon the defendant in order to further the witness's own interests. If you believe the testimony to be true, you may give it any weight you believe it deserves.

---

[14] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. Dumitru*, 18 Cr. 243 (S.D.N.Y. Nov. 6, 2018); and the charge of the Honorable J. Paul Oetken in *United States v. Danilovich*, 12 Cr. 171 (S.D.N.Y. Nov. 13, 2013).

A-644

**DEFENSE REQUEST NO. 15**
**Cooperating Witness Testimony[15]**

You have heard testimony from witnesses who have pleaded guilty and entered into cooperation agreements with the Government. These witnesses testified that they hope that, as a result of their cooperation with the Government—including their testimony at this trial—that they will receive a lesser sentence.

You are not to draw any conclusions or inferences of any kind about the guilt of Mr. Bankman-Fried merely from the fact that certain witnesses at this trial entered into cooperation agreements with the Government and pleaded guilty to crimes that may be similar or related to the crimes with which Mr. Bankman-Fried is charged.  The witnesses who decided to plead guilty and cooperate with the Government did so based on their evaluation of what was in their best interest.  Their decision to plead guilty and to cooperate with the Government is not evidence that Mr. Bankman-Fried committed a crime.  A defendant may not be found guilty merely because he associated with individuals who decided to plead guilty and enter into cooperation agreements with the Government.

The testimony of cooperating witnesses must be scrutinized with special care and caution.  The fact that a witness has pleaded guilty to crimes and has entered into a cooperation agreement with the Government may be considered by you as bearing on the witness's credibility.  It does not follow, of course, that simply because a person has admitted to committing crimes, and has entered into a cooperation agreement with the Government, that he is incapable of giving a truthful account of what happened.  Moreover, it is no concern of yours

---

[15] Adapted from the charge of the Honorable Paul G. Gardephe in *United States v. Amanat*, 15-CR-536 (S.D.N.Y. Dec. 22, 2017).

**A-645**

why the Government made an agreement with a witness.  Your sole concern is whether a witness has given truthful testimony.

The testimony of cooperating witnesses should be given such weight as it deserves in light of all the facts and circumstances before you, taking into account the witness's candor, the strength and accuracy of his recollection, his background, his demeanor, and the extent to which his testimony is or is not corroborated by other evidence in the case.  As with other witnesses, you may consider whether a cooperating witness has an interest in the outcome of this case and, if so, whether that interest has affected his or her testimony.

In this regard, you should bear in mind that a witness who has pleaded guilty and entered into a cooperation agreement with the Government has an interest and motives different from those of other witnesses.  In evaluating the testimony of such a witness, you should ask yourself whether the witness would benefit more by lying, or by telling the truth.  Was the witness's testimony influenced in any way by a belief or hope that he would receive favorable treatment by testifying falsely, or did he believe that his interests would be best served by testifying truthfully?  If you believe that a witness was motivated by hopes of avoiding a term of imprisonment, was that motivation one that would cause him to lie, or was it one that would cause him to tell the truth?

In sum, you should consider all of the evidence in deciding what weight, if any, to give to the testimony of a cooperating witness.  If you find that the testimony of a cooperating witness was false, you should reject it.  However, if—after a cautious and careful examination of the cooperating witness's testimony in light of all the evidence—you conclude that the cooperating witness told the truth, you should accept the testimony as credible and act upon it accordingly.

**A-646**

As with any witness, the issue of credibility need not be decided on an all-or-nothing basis.  Even if you find that a witness testified falsely in one part, you may still accept his or her testimony in other parts, or you may disregard all of that witness's testimony.  That is a determination entirely for you to make.

**A-647**

### DEFENSE REQUEST NO. 16
**Immunized Witnesses**[16]

You have heard the testimony of witnesses who have testified under a grant of immunity from this Court, called formal immunity. The testimony of such a witness may not be used against such witnesses in any criminal case except in a prosecution for perjury, giving a false statement, or otherwise failing to comply with the immunity order of this Court. You are instructed that the Government is entitled to call as a witness a person who has been granted immunity by order of this Court.

However, the testimony of a witness who has been granted immunity by the Court should be examined with great care.  You should scrutinize such testimony closely to determine whether or not it is colored in such a way as to place guilt upon the defendant in order to further the witness's own interests. If you believe the testimony to be true, you may give it any weight you believe it deserves.

---

[16] Adapted from the charge of the Honorable J. Paul Oetken in *United States v. Danilovich*, 12 Cr. 171 (S.D.N.Y. Nov. 13, 2013).

**A-648**

### DEFENSE REQUEST NO. 17
### Other Acts Evidence[17]

You have also heard evidence that the defendant, on earlier occasions, engaged in a variety of crimes or other misconduct that are not charged in this indictment. The defendant is not on trial for committing those other acts.  Accordingly, you may not consider the evidence about other uncharged bad acts or evidence of prior incarceration or crimes as a substitute for proof that the defendant committed the crimes with which he is charged in this case. Nor may you consider this evidence as proof that the defendant has a criminal propensity or bad character. This evidence was admitted for far more limited purposes, and you may consider it for those purposes only. And I've instructed you previously about those purposes.

---

[17] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. Jones*, 17 Cr. 791 (S.D.N.Y. Dec. 16, 2019).

**A-649**

## DEFENSE REQUEST NO. 18
### Coconspirator Statements[18]

Certain evidence was admitted during trial concerning acts and statements of others because such acts were committed and such statements were made by a person who, the Government claims, was also a co-conspirator of the defendant. A conspiracy is often referred to as a partnership in crime. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent of the other conspirators in carrying out the conspiracy. In determining the factual issues before you, you may consider against the defendant any acts or statements made by any of the people that you find, under the standards I have already described, to have been co-conspirators, even though such acts or statements were not made in his presence, or were made without his knowledge.

---

[18] Adapted from the charges of the Honorable Lewis A. Kaplan in *United States v. Gatto*, 17 Cr. 686 (S.D.N.Y. Oct. 22, 2018).

**A-650**

## DEFENSE REQUEST NO. 19
### Expert Witness[es][19]

You have heard testimony from [a witness / certain witnesses] who [was/were] proffered as [an] expert[s] in [different areas] [a particular area].  An expert is allowed to express his or her opinion on those matters about which he or she has special knowledge and training.  Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing an expert's testimony, you may consider the expert's qualifications, opinions, reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony.  You may give the expert testimony whatever weight, if any, you find it deserves in light of all the evidence in this case. You should not, however, accept a witness's testimony merely because he or she is an expert. Nor should you substitute it for your own reason, judgment, and common sense.  The determination of the facts in this case rests solely with you.

---

[19] Adapted from Sand, Modern Federal Jury Instructions, Instr. 7-21, and from the charge of the Honorable J. Paul Oetken in *United Sates v. Middendorf*, No. 18 Cr. 36 (S.D.N.Y. Feb. 1, 2022).

**A-651**

**DEFENSE REQUEST NO. 20**
**Use of Charts and Summaries[20]**

There is evidence before you in the form of charts and summaries. Those exhibits purport to summarize the underlying evidence that was used to prepare them. I admitted these charts and summaries into evidence in place of or in addition to the underlying documents that they represent in order to save time and avoid unnecessary inconvenience. They are no better than the documents upon which they are based. Therefore, you are to give no greater consideration to these charts or summaries than you would give to the evidence upohn which they are based. It is for you to decide whether they correctly present the information contained in the testimony and in the exhibits on which they were based.

---

[20] Adapted from the charges of the Honorable Lewis A. Kaplan in *United States v. Dumitru*, 18 Cr. 243 (S.D.N.Y. Nov. 6, 2018); and the Honorable Jesse M. Furman in *United States v. Avenatti*, No. 19 Cr. 374 (S.D.N.Y. Feb. 1, 2022).

**A-652**

<u>**DEFENSE REQUEST NO. 21**</u>
**Defendant's Right Not To Testify [If Applicable][21]**

Mr. Bankman-Fried did not testify in this case.  Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt.  That burden remains with the Government throughout the trial and never shifts to the defendant.  A defendant is never required to prove that he or she is innocent.

You must not attach any significance to the fact that Mr. Bankman-Fried did not testify. You may not draw any inference against Mr. Bankman-Fried because he did not take the witness stand.  You may not speculate as to why he did not testify, and you may not consider this against him in any way in your deliberations.

---

[21] Adapted from Sand, Modern Federal Jury Instructions, Instr. 5-21.

**A-653**

**DEFENSE REQUEST NO. 22**
**Defendant's Testimony [If Applicable][22]**

In a criminal case, the defendant never has a duty to testify or come forward with any evidence.  The reason is that, as I have told you, the defendant is presumed innocent and the government at all times has the burden of proof beyond a reasonable doubt.  But, if he chooses, the defendant also has the right to testify and to take the witness stand on his own behalf. In this case, Mr. Bankman-Fried decided to testify, like any other witness, and he was subject to cross-examination, like any other witness.  You should examine and evaluate the testimony of Mr. Bankman-Fried just as you would the testimony of any witness.

Finally, bear in mind that Mr. Bankman-Fried has been required to be present throughout the trial.  His presence in the courtroom during the testimony of other witnesses should not affect your examination or evaluation of his testimony in any way.

---

[22] *See United States v. Solano*, 966 F.3d 184, 192-94 (2d Cir. 2020); *United States v. Gaines*, 457 F.3d 238, 249 n.9 (2d Cir. 2008).

**A-654**

### DEFENSE REQUEST NO. 23
**Missing Witness Charge [If Applicable][23]**

You have heard evidence about a witness who has not been called to testify.  The defense has argued that the witness could have given material testimony in this case and that the government was in the best position to produce this witness.

If you find that this uncalled witness could have bene called by the government and would have given important new testimony, and that the  government was in the best position to call him, but failed to do so, you are permitted, but you are not required, to infer that the testimony of the uncalled witness would have been unfavorable to the government.

---

[23] Adapted from Sand, Modern Federal Jury Instructions, Instr. 6-5.

**A-655**

### DEFENSE REQUEST NO. 24
### Involvement of Counsel[24]

You have heard evidence that FTX and Alameda Research had lawyers.  You have also heard evidence that Mr. Bankman-Fried was aware that FTX and Alameda Research's lawyers were involved in certain actions and decisions.  A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case.  The defense has not claimed, and cannot claim, that the defendant's conduct was lawful because he acted in good faith on the advice of a lawyer.

However, in considering whether or not Mr. Bankman-Fried acted in good faith, you may consider whether a lawyer's presence, involvement, or advice known to Mr. Bankman-Fried gave him comfort that he was acting properly.

---

[24] Adapted from the charge of the Honorable Edgardo Ramos in *United States v. Milton*, No. 21 Cr. 478 (S.D.N.Y. Sept. 12, 2022); and the Honorable Analisa Torres in *United States v. Shea*, No. 20 Cr. 412 (S.D.N.Y. May 23, 2022); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 2014), Trial Tr. at 83-85.

**A-656**

### DEFENSE REQUEST NO. 25
**Defense Theory of the Case[25]**

[Mr. Bankman-Fried respectfully requests that the jury be charged with the defense

theory of the case, to be supplied following the close of trial, prior to the charging conference.]

---

[25] *United States v. GAF Corp.*, 928 F.2d 1253, 1262 (2d Cir 1991) ("This Court has repeatedly recognized a criminal defendant's right to a jury charge which reflects the defense theory").

A-657

**CONCLUSION**

Mr. Bankman-Fried respectfully requests that the Court include the foregoing in its instructions to the jury. Mr. Bankman-Fried also reserves the right to supplement or amend these requests to charge in response to the Government's amended requests and the evidence presented at trial.

Dated: October 19, 2023
New York, New York

Respectfully submitted,

*/s/* Mark S. Cohen
Mark S. Cohen
Christian R. Everdell
David Lisner
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
Phone: (212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
dlisner@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*

60

**A-658**



**COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

October 24, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

    **Re:  *United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)**

Dear Judge Kaplan:

    On behalf of our client, Samuel Bankman-Fried, we respectfully write to object to certain of the Government's proposed jury instructions, ECF No. 214, and in to respond to the objections and additional instructions set forth in the Government's letter of October 19, 2023 (the "October 19 Letter").  ECF No. 326.

    *1.    Instructions on "Intent" for Wire Fraud on Customers Charge*

    The Government's October 19 Letter raises several issues relating to the proposed instructions for the intent element of the charge of wire fraud on customers.  In addition, the defense objects to certain aspects of the Government's proposed instructions on this issue.

    <u>"No Ultimate Harm" and Good Faith.</u>  The Government seeks a "no ultimate harm" instruction on the ground that an "intent to repay" customers is not a defense.  ECF No. 326 at 102.  Such an instruction is proper only where the defendant contemplates "some immediate loss to the victim," but not where the defendant believed in good faith that victims would "*never*" be harmed.  *United States v. Rossomando*, 144 F.3d 198, 201 (2d Cir. 1998) (emphasis in original).  It is the defense's contention that Mr. Bankman-Fried believed that customers would not be harmed at all because the use of customer deposits was permissible and consistent with the rights and obligations comprising the FTX-customer relationship.[1]  Thus, instructing the jury that an "intent to repay" would not negate the requisite mens rea would be a non-sequitur, because it presupposes an intent to steal from customers, which Mr. Bankman-Fried did not possess.  Such

---

[1] For the sake of clarity, we note that the Government's original proposed instructions already include essentially the same instruction proposed in their October 19 Letter.  ECF No. 214 at 13-14.

**A-659**

The Honorable Lewis A. Kaplan
October 24, 2023
Page 2

an unwarranted and improper instruction would also effectively thwart a key theory of the defense.

In its ruling on the Government's motion *in limine* to preclude evidence and argument regarding Mr. Bankman-Fried's "intent to repay," ECF No. 204 at 41, the Court ruled to exclude evidence that the defendant "intended to steal funds and give them back," but denied the Government's motion without prejudice as to "evidence and argument probative of [the Defendant's] alleged good-faith belief that FTX and Alameda's handling of customer assets was permitted by law and under the Terms of Service." ECF No. 289 at 11-12. Accordingly, the Government's objection to the defense's proposed instruction regarding Mr. Bankman-Fried's "good faith with respect to the use of customer funds" is misplaced. ECF No. 326 at 5; ECF No. 215 at 12. Mr. Bankman-Fried is entitled to have the jury consider whether he acted in good faith on this core question, and the Government's effort to foreclose that defense through the jury charge is improper.

The Government's original proposed jury instruction on the intent element of the wire fraud counts also included the following: "even if the defendant believed that the victims would ultimately lose money, or that they would ultimately not suffer financial loss, that is no defense if the defendant intended immediate or temporary financial or property loss to another." ECF No. 214 at 12. This instruction would be improper for the same reason as the more fulsome "no ultimate harm" instruction.

At a minimum, if the Court decides to include a "no ultimate harm" charge, the defense respectfully requests that the Court add the following language, which the Second Circuit has approved to ensure the jury clearly understands that they cannot "convict [defendant] unless he intended to cause loss to someone." *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999)

> As a practical matter, then, in order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew that his conduct as a participant in the scheme was calculated to deceive and, nonetheless, he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another.

*Id. See also United States v. Finazzo*, 682 F. App'x 6, 9 (2d Cir. 2017) (holding "no ultimate harm instruction" was proper "where the district court clarified immediately thereafter that the Government was still required to establish that [the defendant] engaged in the alleged fraudulent scheme for the purpose of causing some loss to another").

Further, if the Court decides to include part or all of the Government's proposed instruction for the intent element of wire fraud on customers, the defense objects to including the following phrase in the description of good faith: "[If] the defendant in good faith believed that he was entitled to take the money or property from the victim, even though that belief was mistaken . . ." We respectfully submit that the phrase "entitled to *take*" in this instruction

**A-660**

The Honorable Lewis A. Kaplan
October 24, 2023
Page 3

presupposes that money or property was "taken," and could steer the jury toward a finding of fraudulent intent even if Mr. Bankman-Fried believed in good faith that customer assets and property were not being embezzled or misappropriated.

The defense respectfully submits that its proposed instruction regarding good faith is more consistent with precedent, less likely to confuse or prejudice the jury, and more instructive under the circumstances of this case.

"Willfully." The Government objects to the defense's proposed instruction on the mens rea requirement for the wire fraud charges. ECF No. 326 at 5. Specifically, the Government argues that the term "willfully" does not belong in the charge, at least insofar as it is defined to include terms such as "purposely violated an obligation that prohibited use" or "acted with knowledge that [his] conduct was unlawful, and with intent to do something the law forbids." *Id.* In the context of the wire fraud charges, the defense continues its proposed instruction and particularly objects to an instruction that defines willfulness (which appears throughout the Government's proposed wire fraud instruction, ECF No. 214 at 12-14)) as "to act voluntarily and with a wrongful purpose," but does not specify purpose was to deprive customers of some financial or property right. *See United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007) (a wire fraud conviction requires proof of a "specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim").

2.   *The Government's Proposed Instruction Regarding Mr. Bankman-Fried's "Moral or Political Beliefs"*

Citing "certain public statements" by Mr. Bankman-Fried, the Government asks the Court to instruct the jury that it is not a defense "that the defendant was motivated by his personal philosophical or moral outlook." ECF No. 326 at 2-3. The defense does not intend to offer evidence of Mr. Bankman-Fried's morals or political beliefs as an indication that he acted out of "good motive," so such an instruction is unnecessary.

3.   *The Government's Proposed Instructions Regarding Disclaimers*

In connection with the materiality element in the charge of conspiracy to commit securities fraud, the Government's original proposed charge included an instruction "that a clause in an investment contract or a disclaimer cannot render any misrepresentation . . immaterial as a matter of law." ECF No. 214 at 35. The Government's October 19 Letter argues that this instruction is "particularly warranted" now in light of testimony and statements in the defense's opening regarding language in the Terms of Service governing margin trading and margin loans.

Respectfully, we submit that the Court should reject the proposed instruction and the Government's arguments. The proposed instruction is unnecessary for its stated purpose. The Government asserts that the instruction is "particularly warranted" in light of references in the

**A-661**

The Honorable Lewis A. Kaplan
October 24, 2023
Page 4

defense opening to portions of the Terms of Service relevant to margin trading and margin loans in its opening. *Id.* (citing Trial Tr. 44:8-11). But the opening merely noted that portions of section 16 of the Terms of Service, which address margin trading and margin loans, could impact "whether the customer taking the margin loan had sufficient security or collateral." Trial Tr. 12-14. Nothing in the defense's opening creates a need to clarify for the jury that "disclaimers" in the Terms of Service do not render misrepresentations immaterial.

The Government notes that Can Sun testified on section 16 of the Terms of Service), which he characterized as being drafted "mostly for disclaimer purposes. *Id.* 1984. Although section 16 does include risk disclosures, it also includes substantive terms relating to margin maintenance requirements and the obligation to repay debt incurred to other customers through margin trading. GX 558 at 16-19. These requirements cannot plausibly be characterized as disclaimers, and an instruction that substantive provisions do not "render any misrepresentation . . . immaterial" would serve only to confuse the jury.

The authority cited by the Government, *United States v. Weaver*, 860 F.3d 90, 96 (2d Cir. 2017), is also inapposite. *Weaver* held that contractual "disclaimers of reliance" would not render immaterial prior misrepresentations by the defendant. The reasoning of that decision does not support an instruction to jurors regarding substantive provisions in the Terms of Service.

> 4.    *The Government's Proposed Instruction Regarding the Object Element of the Commodities Fraud Conspiracy Charge*

An essential element of commodities fraud is that the fraud was conducted "in connection with" a commodities transaction. 17 C.F.R. § 180.1(a)l 7 U.S.C. § 9(1). In the Government's proposed charge, the jury could find the requisite connection solely from evidence of a "some nexus or relation between" the allegedly fraudulent conduct and a swap or contract of sale of a commodity, or evidence that the fraudulent conduct "touched upon" a commodities transaction. ECF NO. 214 at 46. The law requires more. The alleged fraud must be "integral to" a commodities transaction, rather than merely "incidental." *Sec. and Exch. Comm'n v. Zandford*, 535 U.S. 813, 820, 122 S.Ct. 1899, 1903 (2002). The Government's proposed instruction – that the requisite connection exists where this is "some nexus or relation" between the fraud and a commodities transaction, or if the conduct merely "touched upon" such a transaction – is clearly insufficient.

Indeed, the Supreme Court has specifically cautioned that the "in connection with" requirement not be "stretched beyond reason" when applied to "the fraudulent use of money," *United States v. O'Hagan*, 521 U.S. 642, 657, 117 S.Ct. 2199, 2210 (1997), and that the requirement would not be satisfied by evidence supporting the Government's theory here, namely, "theft of cash or securities in an investment account," *Zandford*, 535 U.S. at 820, 122 S.Ct. at 1903, or the "embezzle[ment] [of] cash" from a customer. *O'Hagan*, 421 U.S. at 656,

**A-662**

The Honorable Lewis A. Kaplan
October 24, 2023
Page 5

117 S.Ct. at 2209.  *See* Omnibus Reply Brief in Support of Defendant's Pretrial Motions, ECF No. 158 at 28-32.

The defense also objects to the Government's proposed charge because it makes no mention of the Commodities Exchange Act's ("CEA") territoriality requirement.  As a general matter, the CEA does not apply to a fraudulent or manipulative scheme that is "predominantly foreign."  *Prime Int'l Trading v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019).  The statute reaches extraterritorial conduct relating to swaps specifically, but only where the fraud has a "direct and significant connection" with U.S. commerce.  7 U.S.C. § 2(i).

Because the Government's proposed instruction regarding the object elements of the Commodities Fraud charge misstates the "in connection with requirement" and is silent on the territoriality requirement, the defense respectfully suggests that the Court should give Mr. Bankman-Fried's Amended Proposed Instruction on these issues.  ECF No. 327 at 30-34.

     *5.*    *The Government's Additional Arguments*

     a.    <u>Right to Control</u>

The Government's October 19 Letter objects to the defense's proposed instruction that property "does not include intangible interests such as the right to control the use of one's assets … or potentially valuable economic information."  ECF No. 326 at 4.  The Government argues that the instruction is unnecessary because of the Court's ruling declining to dismiss the substantive and conspiracy wire fraud charges.  The Court's pretrial ruling was based on allegations in the S5 Indictment that the objectives of the charged frauds were, among other things, to take "money" deposited by customers and retain "hundreds of millions of dollars in loans."  ECF No. 167 at 26, 27.  Respectfully, the defense submits that the requested instruction is still relevant and necessary to ensure the jury is able to properly assess whether the proof at trial establishes that the alleged fraud on customers and lenders relates to a property interest that is cognizable under the federal fraud statutes.

     b.    <u>Involvement of Counsel</u>

The Government's October 19 Letter opposes a "generalized" involvement of counsel instruction on unspecified grounds.  ECF No. 215 at 13.  Instead, the Government asks the Court to give its own, equally generalized charge.  ECF No. 214 at 71.

The defense retains, for record purposes, its objection to instructing the jury regarding the involvement of counsel on a standalone basis as rather than within the instructions regarding any particular count, but will not address that issue here.  However, the Government's proposed instruction is deficient.  It states only that the involvement of lawyers "does not constitute a defense to any charge in this case."  *Id.*  But the involvement of counsel can be relevant to a defendant's intent even without a formal advice of counsel defense.  ECF No. 246 at 29-31.  The

**A-663**

The Honorable Lewis A. Kaplan
October 24, 2023
Page 6

Court has noted that "lawyer presence, involvement, or advice known to the defendant at the time of his alleged misconduct might have a real bearing on whether he acted with or without fraudulent intent."  ECF No. 303 at 9.

The record includes testimony regarding involvement of lawyers in structuring loans from Alameda to FTX executives, drafting the Terms of Service, and other issues.  *See, e.g.,* Trial Tr. 324:24-325:18, 577:10-15, 1460:1-6, (founder loans); 1908:16-21 (Terms of Service); 1975:3-8 (efforts to obtain licenses because "FTX was unregulated at the time").  Consistent with the Court's order and prior briefing, we respectfully submit that the defense's proposed instruction regarding the involvement of counsel is appropriate.

        c.    <u>Witness Bias</u>

Finally, the Government proposes that, if Mr. Bankman-Fried testifies, the defense's proposed "witness bias" instruction be given "in a way that does not suggest that the defendant has a motive to false testify based solely on hits interest in the outcome of the case."  ECF No. 326 at 5.  The defense removed the standalone witness bias instruction from its Amended Proposed Requests to Charge.  *See* ECF No. 327-1 at 50.  To the extent the Government's concern is implicated by other instructions regarding witnesses, the defense has no objection to its request.

                                         <u>  /s/ Mark S. Cohen     </u>
Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sharon L. Barbour
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
sbarbour@cohengresser.com

cc:    All counsel of record (via ECF)

**A-664**



**COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

October 25, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:  ***United States v. Samuel Bankman-Fried**, S6 22 Cr. 673 (LAK)*

Dear Judge Kaplan:

On behalf of our client, Samuel Bankman-Fried, we respectfully submit this letter to give the Court notice regarding certain testimony we anticipate eliciting from Mr. Bankman-Fried on direct examination.[1]  Specifically: (1) Pursuant to the Court's order of October 1, 2023, ECF No. 305 at 9-10, we respectfully request to elicit testimony regarding Mr. Bankman-Fried's knowledge of the involvement of counsel in certain matters; (2) Pursuant to the Court's order of September 26, 2023, ECF No. 289 at 8-9 ¶ 10, we respectfully request to elicit testimony regarding Mr. Bankman-Fried's knowledge of certain industry practices; and (3) We intend to elicit testimony regarding Mr. Bankman-Fried's intentions and beliefs on November 12, 2022, to rebut the inferences from Gary Wang's testimony that Mr. Bankman-Fried directed the transfer of assets to Bahamian regulators on that date, over the objections of FTX's in-house and outside legal counsel, in an effort to retain control of FTX.  This would include testimony regarding Mr. Bankman-Fried's belief that the Bahamian authorities and not FTX's in-house counsel or U.S. bankruptcy counsel were acting in the best interests of FTX customers.

     *1.    Involvement of Counsel as Relevant to Mr. Bankman-Fried's Good Faith*

The Government previously moved to preclude Mr. Bankman-Fried from offering evidence or argument regarding the involvement of attorneys.  ECF No. 204 at 44.  After initially

---

[1] Mr. Bankman-Fried reserves the right to decide not to testify.

**A-665**

The Honorable Lewis A. Kaplan
October 25, 2023
Page 2

deferring a ruling on this matter, ECF No. 289 at 13 ¶ 19, the Court precluded the defense from
referring in its opening statement to the role of counsel and required the defense to give prior
notice to the Court and the Government, outside the presence of the jury, before offering
evidence on these issues at trial. ECF No. 305 at 9-10. The Court explained that whether the
defense may offer such evidence will depend on the circumstances, and noted the risk of
confusion if such evidence were presented "without any degree of specificity about what
[attorneys] were present for or involved in, what their tasks were, what exactly they knew, and
what the defendant knew about what the lawyers knew and were doing." *Id.* at 9. The Court
further noted that "circumstances in which lawyer presence, involvement, or advice [is] known
to the defendant at the time of his alleged misconduct might have a real bearing on whether he
acted with or without fraudulent intent." *Id.*

On September 15, 2023, the defense provided additional disclosures to the Government
indicating that we would seek to adduce evidence as to the involvement of counsel in, *inter alia*,
the following events at FTX and Alameda, as relevant to Mr. Bankman-Fried's good faith:

- In or about mid-2021, FTX Chief Legal Officer Dan Friedberg and outside counsel
Fenwick & West implemented data retention policies, including auto-deletion policies
for Slack and Signal communications, at FTX and Alameda;

- In or about mid-2021, Mr. Friedberg and Fenwick & West were involved in the
creation of the North Dimension entities and Mr. Friedberg supervised the opening of
North Dimension's bank account with Silvergate Bank;

- In mid-2021, Mr. Friedberg and Fenwick & West were involved in drafting and
approving the Payment Agent Agreement between FTX and Alameda;

- In or about late-2021 to mid-2022, Mr. Friedberg, FTX General Counsel Can Sun,
and FTX US General Counsel Ryne Miller, and Fenwick & West were involved in
approving and structuring loans from Alameda to Mr. Bankman-Fried, Gary Wang,
and Nishad Singh, and attorneys drafted the loan documents;

- Mr. Friedberg, Fenwick & West, and later Mr. Sun were involved in drafting and
approving the FTX Terms of Service, which were updated at various points in time
from 2019 to May 2022; and

As discussed below, Mr. Bankman-Fried's knowledge of the involvement of counsel in
these matters is directly relevant to his state of mind and good faith at the time.

First, the Government has argued and elicited testimony that the use of auto-deletion
policies is evidence of Mr. Bankman-Fried's fraudulent and criminal intent. For example, the
Government asserted in its opening argument that Mr. Bankman-Fried "demanded that [his

**A-666**

The Honorable Lewis A. Kaplan
October 25, 2023
Page 3

employees] set their messages to auto delete after 30 days" because "[h]e didn't want a paper trail for his crimes." Trial Tr. at 36; *see also* Trial Tr. 175:12-177:9, 448:8-20 (eliciting testimony from Adam Yedidia and Gary Wang that Mr. Bankman-Fried issued instructions regarding Signal communications and the auto-delete function). The Government recently represented that it will seek to introduce a summary chart showing numerous Signal message chats and information about the auto-delete function for each chat. Mr. Bankman-Fried's understanding that auto-deletion policies were instituted under the guidance of lawyers would be directly relevant to rebut the inference that these policies were instituted for improper purposes. *See* ECF No. 246 at 26-31.

Second, the Government alleged that Mr. Bankman-Fried "misappropriated and embezzled FTX customer deposits" by directing FTX to "[tell] customers to deposit funds into bank accounts controlled by Alameda" and thereafter using customer funds for impermissible purposes. S6 Indictment ¶¶ 1, 6; *see also* Trial Tr. 151:14-18, 155:8-13, 156:9-158:25, 159:15-160:12 (eliciting testimony from Mr. Yedidia that Alameda was receiving FTX customer deposits through a bank account labeled the "North Dimension" bank account and regarding what he was told by Mr. Bankman-Fried or his alleged co-conspirators regarding the reason for using that account). Mr. Bankman-Fried's understanding as to the involvement of counsel in the formation of the North Dimension entities and opening of its bank account at Silvergate bank, and in the creation of the Payment Agent Agreement between FTX and Alameda, would be directly relevant to his good faith belief that there was nothing improper about using Alameda-controlled entities to accept FTX customer deposits.

Third, the Government has alleged that Mr. Bankman-Fried "took steps to conceal that [] investments and expenditures were funded by transfers originating with Alameda, and therefore funded with FTX customer funds" and that Mr. Bankman-Fried accomplished this by borrowing over $1 billion from Alameda and overseeing "similar borrowing by other FTX executives." S6 Indictment ¶ 8; *see also* Trial Tr. 324:24-325:18, 1460:1-6; 1515:5-12 (testimony from Mr. Wang and Nishad Singh regarding personal loans they received from Alameda and the involvement of counsel in preparing documentation for those loans). Mr. Bankman-Fried's knowledge that lawyers were involved in structuring and documenting the loans would be probative of his good faith belief that there was nothing inappropriate about the loans.

Fourth, the FTX Terms of Service govern the contractual relationship between FTX and its customers and therefore inform the scope of permissible conduct with respect to FTX customer assets. *See* ECF No. 321 at 2-4; ECF No. 329 at 2; *see also* ECF No. 322 at 3 (Government noting that the Terms of Service are one piece of evidence of whether FTX had a fiduciary or similar relationship of trust and confidence with its customers). The Government elicited testimony from customer witnesses regarding their expectations concerning assets deposited on FTX. Trial Tr. at 81, 1289. Can Sun, former FTX General Counsel, also testified that the Terms of Service were updated from time to time, and that the purpose of the Terms of

The Honorable Lewis A. Kaplan
October 25, 2023
Page 4

Service "was to lay out the obligations of FTX and its customers." *E.g.,* Trial Tr. 1979:10-
1980:18. Accordingly, Mr. Bankman-Fried's understanding of the involvement of counsel in
drafting the Terms of Service in light of FTX's practices would be relevant to his good faith
belief that FTX's practices were consistent with the Terms of Service. *See also* ECF No. 289 at
12 ¶ 16 (denying Government's motion *in limine* to preclude evidence of the Terms of Service
"to the extent that the defendant seeks to introduce evidence and argument probative of his
alleged good-faith belief that FTX and Alameda's handling of customer assets was permitted by
law and under the Terms of Service").

We therefore respectfully request to elicit testimony from Mr. Bankman-Fried concerning
the involvement of counsel in the above events. The topics for which we have provided notice
are sufficiently specific and relevant along the lines suggested by the Court's order. Among
other things, we anticipate asking Mr. Bankman-Fried about his understanding as to what the
attorneys were present for, what their tasks were, what information they were provided, and the
impact of his knowledge of their involvement on his belief that his conduct was at all times
proper and lawful. At a minimum, Mr. Bankman-Fried should be permitted testify in his defense
regarding the involvement of counsel on these topics to counter any implication from the
testimony elicited to date that he failed to act in good faith with respect to these matters.

   2.   *Industry Practices as Relevant to Mr. Bankman-Fried's Good Faith*

The Government sought in its pretrial motions *in limine* to preclude Mr. Bankman-Fried
from offering evidence or argument "that other companies or individuals were using customers'
assets or otherwise engaging in misconduct." ECF No. 204 at 38-39. The Court declined to rule
on this portion of the Government's motion, explaining that "any relevance of the actions of
others in any event would seem to depend upon the defendant's knowledge of those actions at
the relevant time or times." ECF No. 289 at 8-9 ¶ 10.

The Government argued in its case-in-chief that FTX's use of omnibus wallets is relevant
to this case. For example, the Government elicited testimony from Mr. Sun that he did not
believe that FTX customer deposits could permissibly be commingled with other funds of the
business, Trial Tr. 1904:9-14, and that FTX utilized an omnibus wallet for all customer digital
assets. Trial Tr. 1900:1-3.

We respectfully submit that Mr. Bankman-Fried's knowledge of industry practices
regarding the use of omnibus wallets is relevant to his good faith belief that his conduct was
permissible. *See* ECF No. 246 at 26 (citing *United States v. Litvak*, 808 F.3d 160, 189-90 (2d
Cir. 2015) (explaining that evidence that the defendant's supervisors "regularly approved of
conduct identical to that with which [the defendant] was charged" would support the defendant's
"attempt to introduce a reasonable doubt as to his intent to defraud, i.e., that he held an honest
belief that his conduct was not improper or unlawful"); *see also United States v. Brandt*, 196

**A-668**

The Honorable Lewis A. Kaplan
October 25, 2023
Page 5

F.2d 653, 657 (2d Cir. 1952) (finding reversible error where trial court excluded evidence that defendants were familiar with generally accepted operational practices in their industry because this evidence, even though "perhaps not entitled to much weight," was probative of defendants' intent).  As in *Litvak* and *Brandt*, Mr. Bankman-Fried's understanding of whether FTX's actions were consistent with the crypto industry practices with regard to use of omnibus wallets is probative of his good faith belief that FTX's (and his own) actions were proper.

Accordingly, should Mr. Bankman-Fried decide to testify in his defense, he should be permitted to testify as to his understanding of industry practices regarding use of omnibus wallets to show his good faith and lack of criminal intent.

    3.    *Mr. Bankman-Fried's State of Mind with respect to Compliance with Bahamian Authorities on November 12, 2022*

We anticipate eliciting testimony from Mr. Bankman-Fried regarding his good faith intentions on November 12, 2022 with respect to compliance with orders by Bahamian authorities to transfer assets from FTX to the Securities Commission of The Bahamas over the objections of FTX's in-house counsel and U.S. bankruptcy counsel.  Such testimony would require Mr. Bankman-Fried to discuss his belief that the Bahamian authorities were acting in the best interests of FTX customers, whereas FTX's in-house counsel and outside bankruptcy counsel in the United States had conflicts of interest.[2]  This testimony is necessary to rebut the inferences from Mr. Wang's testimony concerning the events of November 12, 2022 and his assertions as to Mr. Bankman-Fried's state of mind.

Mr. Wang testified about meetings that Mr. Bankman-Fried had with Bahamian liquidators and the Bahamian Securities Commission on November 12, after which Mr. Wang transferred assets to Bahamian authorities.  Trial Tr. 464:19-466:24.  Mr. Wang testified that he was told to do this by "government officials" and "Sam."  Trial Tr. 465:1-3.  He further testified that Mr. Bankman-Fried told him to do this because the Bahamian liquidators "seemed friendly and seemed willing to let him stay in control of the company," and that the Bahamian Securities Commissioner "believed the things [Mr. Bankman-Fried] told her" and was going to "order us to transfer . . . the remaining assets to the Bahamas."  Trial Tr. 465:15-466:1, 466:17-24.  Mr. Wang also testified that Mr. Bankman-Fried directed him to effectuate the asset transfer over objections by FTX's in-house counsel and U.S. bankruptcy counsel, because the Bahamian authorities "seemed more friendly to him, and they seemed more likely to let him stay in control of the company, compared to the U.S."  Trial Tr. 467:4-19, 470:1-471:3.

---

[2] Consistent with this Court's order, Mr. Bankman-Fried will not "offer[] evidence that the amount of assets that have been recovered through FTX's bankruptcy for purposes of suggesting to the jury that victims will be made whole, that the FTX Debtors' progress in securing and recovering estate assets somehow diminishes the scale of the fraud, or that, with more time, FTX could have satisfied customer withdrawals."  ECF No. 289 at 12 ¶ 16.

**A-669**

The Honorable Lewis A. Kaplan
October 25, 2023
Page 6

The Government argued in its pretrial motions *in limine* that evidence on this subject is "relevant to demonstrate [Mr. Bankman-Fried's] criminal intent and the false nature of his representations" that he wanted to "do right by customers." ECF No. 204 at 16. The Court agreed and granted the Government's pretrial motion *in limine* to admit such evidence. *See* ECF No. 289 at 5 ¶ 5 (ruling that "[e]vidence that defendant selectively prioritized payments to certain creditors in the aftermath of FTX's collapse goes to defendant's consciousness of guilt and criminal intent, and therefore is direct evidence of the charged crimes."). The relevance of testimony on this subject has therefore already been established.

Moreover, a defendant "has the right to prove through witnesses his statements of then-existing states of mind which tend to rebut the government's characterizations of his conduct." *United States v. Shakur*, No. 84 CR. 220 (CSH), 1988 WL 34828, at *11 (S.D.N.Y. Apr. 6, 1988) (rejecting government's argument that "defense witnesses may testify that [defendant] said he was afraid, but they may not testify as to why [defendant] said he was afraid"). "The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "This right is a fundamental element of due process of law." *Id.*

Mr. Bankman-Fried's testimony contradicting the Government's evidence as to his motivations and intent behind these actions is plainly relevant. Mr. Bankman-Fried should therefore be permitted to rebut the inferences from Mr. Wang's testimony by testifying as to why, in good faith, he wanted to comply with the orders of the Bahamian authorities over the objections of FTX's in-house counsel and U.S. bankruptcy counsel.

Respectfully submitted,

    */s/ Mark S. Cohen*
Mark S. Cohen
Christian R. Everdell
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com

cc:    All counsel of record (via ECF)

**A-670**

NA3MBAN1                                                              1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           22 CR 673 (LAK)

5    SAMUEL BANKMAN-FRIED,

6              Defendant.                   Trial
     ------------------------------x

7
                                           New York, N.Y.
8                                          October 3, 2023
                                           9:30 a.m.

9

10   Before:

11
                    HON. LEWIS A. KAPLAN,
12
                                           District Judge
13
                         APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        S. GALE DICK
          SHARON L. BARBOUR
23
     Also Present:
24   Luke Booth, FBI
     Kristin Allain, FBI
25   Arjun Ahuja, USAO Paralegal Specialist
     Grant Bianco, USAO Paralegal Specialist

NA4MBAN2                           Opening – Mr. Rehn

1          MR. REHN:  But while the defendant told his customers

2    that they could deposit their money with FTX and FTX would keep

3    it safe for them, in reality, he was taking those customer

4    deposits and spending them for himself.  He spent the money on

5    lavish houses for himself, his parents, and his friends.  He

6    spent it so he could get introduced to celebrities.  He spent

7    millions more on political donations to gain influence in

8    Washington.  He poured money, other people's money, into his

9    own investments to try to make himself even richer.

10         But about a year ago the truth started to come out.

11   Customers tried to get their money back, the money they had

12   been told FTX was holding for them.  But that money, the

13   customers' money, was gone.  The defendant had taken it.

14         FTX collapsed and its customers were left with

15   billions of dollars in losses.  That's why we are here today.

16   Because when the defendant wanted money he didn't have, he

17   committed fraud.  He took other people's money.  He spent that

18   money in all sorts of ways on himself, and he lied about it.

19   We are here today to hold the defendant accountable for his

20   crimes.

21         This morning I am going to talk about what we expect

22   you will see in this trial.  First, I'll tell you what we

23   expect the evidence will show, and then I'll tell you about the

24   types of evidence that you will see at this trial.

25         First, let me tell you what the evidence will show the

**A-672**

28

NA4MBAN2                    Opening – Mr. Rehn

1  with their money?  Well, the defendant assured customers that

2  FTX was holding the money for them and that they would be able

3  to withdraw the money whenever they wanted.  He went to

4  Washington, D.C., and he told Congress and the whole world that

5  FTX had controls in place to protect customer money.  He also

6  said that FTX would not use customer money for itself.  In

7  other words, the defendant promised customers that the money

8  that he put into FTX was still their money.  It was not FTX's

9  money.  And the defendant set up the FTX website and the app to

10  lie to customers.  If you were a customer, you could open the

11  FTX app and this is what it looked like.  It would tell you how

12  much money you had in your account, tell you that it was there

13  for you and that it was available to you to withdraw at any

14  time.

15        And the defendant put this same promise in FTX's terms

16  of service, which told customers how the company would treat

17  their money.  Those terms of service told customers that their

18  crypto belonged to them and not to FTX, that the customers

19  could withdraw the money whenever they wanted and that FTX

20  would not use the customers' money.

21        In addition to the website, the defendant put

22  commercials on TV and the Internet, like this one, saying that

23  FTX was the most trusted way to buy and sell Bitcoin.  That's

24  right.  FTX's advertising slogan was about how customers could

25  trust it.  And the defendant went on Twitter and claimed that

NA4MBAN2                      Opening - Mr. Rehn

1    he was keeping customer money safe.

2           He said, and this is a quote from just one of his

3    tweets, that FTX had a long history of safeguarding client

4    assets, and that remains true today.  But that wasn't true.

5    You will learn that this tweet and all of the defendant's other

6    statements about keeping customer money safe were lies.  You

7    will learn that the defendant knew these were lies.  He knew

8    his company didn't keep customer money safe.

9           Why?  Because he was the one taking their money.  When

10   customers deposited dollars with FTX, he stole that money.  And

11   when customers deposited crypto with FTX, he stole that too.

12          Now I will explain just how he did that.  The

13   defendant used a second company, a smaller and more secretive

14   company that he owned and controlled.  That company was called

15   Alameda Research.  You can see here that the defendant owned

16   both FTX and Alameda.  They were both his companies.  Before

17   the defendant had started FTX, he had started Alameda.  Alameda

18   was a company that bought and sold crypto.  It made some money,

19   but it also suffered some losses, and he wanted to be more

20   successful and to make even more money, so he started FTX.  He

21   named a trader at Alameda, who was also his on-and-off

22   girlfriend, to be the CEO of Alameda.  But he was using her as

23   a front.  In reality, he was still calling the shots at

24   Alameda, and he came up with a scheme to take money from FTX

25   and give it to Alameda.

**A-674**

NA4MBAN2                          Opening – Mr. Rehn

1          When the defendant created FTX, he set FTX up so that

2     Alameda had secret access to FTX customer money, and with that

3     access came the ability to take customer money.  And once

4     Alameda had the money, then the defendant walked out the door

5     with it and spent it as he pleased.

6          So how did the defendant give himself the secret

7     ability to send FTX customer money straight to his other

8     company, Alameda?  There were two ways.  First, as I mentioned,

9     customers sometimes deposited dollars onto FTX to trade crypto.

10    When customers sent dollars to FTX, the company would tell them

11    that the money was in their accounts at FTX.  You saw the app

12    earlier.  They could go onto the FTX website or go on the app

13    and see how much money supposedly sat in their FTX accounts.

14    This was what the customer saw.  This is what they were told

15    was happening with their money.  But the defendant was keeping

16    his customers in the dark about what is really happening.

17         In fact, the money never actually made it to FTX.

18    Instead, the defendant opened a bank account that was under the

19    control of Alameda, his other company.  He put the information

20    for that Alameda bank account on FTX's website as the place

21    where customers should send their money.  So when customers

22    thought their money was going to the exchange, they were

23    actually sending their money right into the defendant's pocket.

24    You will hear that the defendant even lied to a bank to set up

25    an Alameda bank account that he used for this.  Then the

NA4MBAN2                         Opening - Mr. Rehn

1   defendant told customers that the money was on FTX and in their

2   accounts.

3           But that was all a lie.  The website told them that

4   they had money in their FTX accounts, but the defendant had the

5   money in Alameda bank accounts that he controlled where he

6   could spend it whenever he wanted, and he didn't hold it in

7   those Alameda bank accounts.  He did spend it.  You will learn

8   that the defendant took billions of dollars in FTX customer

9   deposits from those Alameda bank accounts and he spent it, and

10  the customers had no way to know that their money was being

11  used in this way.

12          Now, here is the second way that the defendant sent

13  customer money to Alameda for his own spending.  The second way

14  involved the defendant taking customers' crypto.  When

15  customers transferred crypto, they already had to FTX, it went

16  to an account that FTX controlled.

17          You will learn that accounts that hold crypto are

18  called digital wallets.  And, again, this is what it looked

19  like to customers.  The customers could look into FTX and they

20  were told that the crypto was there in their accounts.  But,

21  again, the defendant was keeping his customers in the dark

22  about what was really happening.

23          The defendant set up FTX with a secret special

24  privilege for Alameda, again, his other company.  He gave

25  Alameda the ability to secretly withdraw as much of the FTX

NA4MBAN2                         Opening - Mr. Rehn

1    customers' crypto as Alameda wanted.  The defendant made sure

2    that Alameda's special access to customer money was written

3    right into FTX's computer code.  It allowed the defendant to

4    use Alameda to make unlimited withdrawals and spend unlimited

5    amounts of money, and that is just what the defendant did.

6           Using Alameda, the defendant withdrew billions of

7    dollars worth of customer crypto out of the FTX digital wallet

8    and into Alameda's digital wallet that he owned and controlled.

9    Again, as you can see here, customers were told that the crypto

10   was there for them in FTX, but that was a lie.  The defendant

11   had taken that crypto out through Alameda and spent it.  And in

12   these two ways the defendant used Alameda to take both dollars

13   and crypto from FTX customers.  All that was left in FTX was

14   what amounted to an IOU from Alameda.

15          Now, you will hear that the defendant didn't steal all

16   the customer money from the beginning.  He started by taking

17   some of the money from the bank accounts and some of the money

18   from the FTX digital wallets, and for a while customers were

19   able to make withdrawals from their accounts because he left

20   some money in FTX and more and more customers were joining FTX,

21   and they had no reason to suspect that the defendant was

22   pulling some of their money out whenever he wanted to.

23          You will also hear that FTX had various programs for

24   its customers.  For example, customers could choose to lend out

25   their crypto to other customers on FTX.  But that's not what

33

NA4MBAN2                          Opening – Mr. Rehn

1    happened when the defendant took money.  You will learn that

2    the defendant took money secretly, that he took money from

3    customers who never agreed to that and who had no way of

4    knowing that he was taking their money.  He took it from

5    customers who were told that FTX would hold their money for

6    them and would not use it.  The billions of dollars that he

7    took for his own investments, for real estate, for his

8    political donations, he took it from people without their

9    consent or approval and after lying to them that he would keep

10   their money safe.

11          And, as time went by, the defendant used Alameda to

12   pull more and more customer money out of FTX, and the money the

13   defendant stole really started to add up.  By the summer of

14   2022, the defendant had used Alameda to take more than $10

15   billion of customer money out of FTX, $10 billion stolen from

16   thousands of customers.

17          That's not all.  The defendant didn't just defraud his

18   customers.  You will also hear that the defendant defrauded

19   other people as well.  He sold millions of dollars worth of

20   stock in FTX to investors by lying to them about how the

21   business worked and the money he was stealing, and he used

22   Alameda to borrow millions of dollars from lenders, and he lied

23   to those lenders by sending them false documents.  Just like

24   the fraud on his customers, the defendant lied to get money

25   from his investors, and he lied to get money from his lenders.

34

NA4MBAN2                        Opening – Mr. Rehn

1    That's how the defendant took money from other people, based on

2    lies and misrepresentations.

3            During this trial you will also hear about how the

4    defendant spent the money that he got through his fraud.  He

5    took a lot of the money and put it into investments through

6    Alameda to try to make himself even richer.  He took millions

7    more and spent it on political donations so he could get

8    influence in Washington to help his businesses.  He bought

9    beachfront property in the Bahamas.  And to boost his public

10   image, he gave stolen customer money to a nonprofit

11   organization that his brother controlled.

12           You will also learn that the defendant tried to hide

13   how he was spending this stolen money.  He sent it through

14   various bank accounts to conceal where it came from.  He gave

15   some money to his friends and had them make political donations

16   in their own names, even though the money came from the

17   defendant.

18           In May and June of 2022, the defendant's schemes

19   started to fall apart.  At his direction, Alameda had made a

20   bunch of risky investments in crypto and a lot of those

21   investments were losing money.  That meant that Alameda didn't

22   have enough money to pay its bills.  But the defendant didn't

23   come clean.  Instead, he doubled down.  The defendant pulled

24   even more customer money out of FTX to pay off Alameda's loans,

25   more than he ever had before, and to cover up his fraud he

NA4MBAN2                          Opening - Mr. Cohen

1    with the basics.  Sam didn't defraud anyone.  Sam didn't intend

2    to defraud anyone.  Sam acted in good faith in trying to build

3    and run FTX and Alameda.

4          You know, in its opening statement the government used

5    the phrase over and over again that Sam committed theft, that

6    he stole funds.  They claim that, under Sam, FTX stole funds

7    from its customers and improperly loaned them to Alameda.  But

8    there was no theft.

9          Rather, you will learn that Sam believed, reasonably

10   believed, that loans that FTX made to Alameda were permitted

11   and backed by reasonable security and collateral.  And far from

12   being secret, they were open and known within both companies.

13   As well, Sam believed that the loan funds were not spirited

14   away but remained in investments, and Sam did not steal from

15   anyone.  He did not intend to steal from anyone.

16          Now, I am not going to address every single point in

17   the government's opening statement or talk about every piece of

18   evidence you will see over these many weeks.  That's not the

19   purpose of this opening statement.  Rather, the purpose is to

20   give you, members of the jury, a context for what really

21   happened at the time and suggest ways for you to think about

22   the evidence as it comes in before you.

23          So what will the evidence show about what really

24   happened?  This case is in many ways about the crypto world

25   from 2017 to 2022.  You will learn that crypto was not for

**A-680**

NA4MBAN2                    Opening - Mr. Cohen

1    associated account.  From the customer viewpoint they were

2    getting what they requested.  They were able to wire dollars

3    from their institutions to Alameda in order to set up their FTX

4    Trading account, and there was no secret that the funds for

5    their FTX account were being wired to an Alameda account.

6            We can look at the next slide, Brian.

7            Here you see just one example, wire instructions from

8    June 24 of 2020.  Customer wants to open an account at FTX, is

9    told if he or she wants to do that they have to wire the funds

10   to Silvergate Bank in the name of Alameda.  Nothing secret

11   about that.

12           Now, what happened?  The funds went into the bank

13   account at Alameda, and they were tracked on a ledger entry at

14   FTX called the fiat@ entry, and we will hear a lot about this

15   fiat@ account.  This was tracked in a way similar to if the

16   customer had paid in his or her dollars using PayPal or a

17   credit card.  The fiat@ account was open and known.  But as we

18   will get to in a moment, due to the lack of a fully built-out

19   risk management function, this fiat@ entry was not tracked and

20   not reconciled as it should have been, which became an issue

21   later on when the storm hit.

22           Now, what can FTX do -- we are not up to that, Brian.

23   Sorry.

24           What could FTX do with the funds that came in, the

25   fiat@, the dollars that came in.  You heard from the government

**A-681**

49

NA4MBAN2                    Opening - Mr. Cohen

1   this morning their view that it would it not have been invalid

2   for Sam to believe that they could be loaned out.  It would not

3   have been invalid for him to believe in good faith that FTX

4   could do so.

5          But what will the evidence show?  Again, the evidence

6   will show that Sam reasonably believed that there were no laws

7   or provisions in the terms of service that prohibited FTX from

8   loaning out these deposits, whether loans went to Alameda or to

9   other customers.  And for Sam, as the CEO, from a business

10  perspective, the issue was whether the borrower had sufficient

11  security or collateral to pay back any loans.

12         As you listen to this evidence, think about this.  If

13  Sam believed in good faith the funds were permitted to be

14  loaned by FTX to Alameda, then there was nothing wrong with

15  Alameda using them, provided there was sufficient assets for

16  them to be paid back.  So given Sam's good-faith belief, how

17  could there be a theft.  There wasn't.  In short, you will

18  learn that each of these business relationships between FTX and

19  Alameda were in keeping with business practice.  They were not

20  set up to create some grand fraudulent scheme.

21         Over time Sam stepped away from the day to day at

22  Alameda because he was running FTX, which was more than a

23  full-time job.  In 2021, he gave up his role as CEO of Alameda

24  and turned it over to Caroline Ellison and another person and

25  ultimately to just Ms. Ellison.

**A-682**

NA4MBAN2                          Opening - Mr. Cohen

1    receive -- the account set up to receive dollars back in 2019,

2    when FTX didn't yet have its own bank accounts.

3          Now, FTX had since gotten its own bank accounts and

4    Sam reasonably believed that Alameda had stopped taking

5    deposits from FTX customers.  And even though this fiat@

6    account had been in place for three years, it hadn't been dealt

7    with.  It should have been from a risk management viewpoint.

8    Again, this was part of the claim that they didn't get built

9    out while they were flying it, but it hadn't.

10         Now this fiat@ account had a large balance in it, 8 to

11   $10 billion.  Alameda had assets, but many of them were not

12   liquid.  They couldn't be quickly turned into funds.  Now,

13   Alameda owed payments on back to FTX, which would be used to

14   pay FTX's customers if they asked to withdraw the funds.

15         Well, how did Sam react?  During this trial we will go

16   through the details with you, but for now we ask you to think

17   about the big picture as you hear the evidence from that

18   period, and it's this.  Sam acted in good faith and took

19   reasonable business measures.  He reviewed financial documents

20   for both Alameda and FTX and believed they had the assets to

21   weather the storm.  Things were tight, much tighter than they

22   had been at the beginning of the year, and tight because

23   earlier in the year Ms. Ellison had not put on the hedges for

24   Alameda, which would have offset some of this.

25         But Sam still believed in good faith that both

NA4MBAN2                    Opening – Mr. Cohen

1   companies remained good, innovative profitable companies that

2   were dealing with a liquidity crisis that they could get

3   through it.  He took reasonable steps in good faith.  Among

4   other things, Sam began speaking to outside investors to line

5   up capital if necessary.  He always kept nearly all of his own

6   assets in the companies, and now he was willing, if necessary,

7   to give up everything he owned personally in order to make

8   things work.

9           That brings us to November 2022, which you also heard

10  about from the government.  In particular, you will hear a lot

11  about the period from November 1 to November 11.  No question,

12  a lot happened in those 11 days.

13          As you hear the evidence about this time, consider the

14  following.  Things were changing moment to moment, minute to

15  minute.  Alameda and FTX came under attack in crypto media.

16  Then the CEO of Binance, the largest crypto exchange and FTX's

17  fierce competitor, put out a tweet attacking Alameda.  Because

18  of Alameda's association with FTX, this triggered a run on the

19  bank at FTX.  Now, many customers sought to withdraw their

20  funds.  Normally, FTX would see around 50 million flowing in

21  and out of the company in a day normally.  But now, on November

22  7, it saw billions of dollars of withdrawals in a single day.

23  At the same time, the market fear caused a crash in Alameda's

24  assets.  Its value fell dramatically over a 12-hour period.

25          What did this all mean?  Well, Alameda had

**A-684**

54

NA4MBAN2                    Opening - Mr. Cohen

1   liabilities, but its assets were investments that weren't

2   liquid, which meant that if it had to pay back all of its loans

3   to FTX immediately, it couldn't.  In a matter of months, weeks,

4   years, sure, but they wanted to process all the withdrawals --

5   if they wanted to process all the withdrawals of U.S. dollars

6   that week, they couldn't.

7        And, again, what did Sam do?  In the face of this

8   liquidity crisis, he didn't run away.  He addressed it in good

9   faith and put measures in place to attempt to stabilize the

10  company and repay customers.  This was a frenetic time.  The

11  plane was going into the very eye of the storm.

12       As you hear the evidence of these days, you must

13  consider what Sam did and said in real time and the context

14  that shows about his state of mind.  You will learn that his

15  approach was the opposite of someone who intended to harm.

16  Well, that's certainly a different narrative than you heard

17  from the government, isn't it.

18       As I mentioned, I am not going to go through

19  everything they said in their opening statements, but let me

20  mack a few points about their case.  As you listen to their

21  evidence, we ask you to consider this.  A lot of their case is

22  what we would call a hindsight case.  The approach goes like

23  this.  FTX was worth billions and ultimately filed for

24  bankruptcy, alameda was worth billions and went out, people

25  lost money, so Sam must have committed fraud.

**A-685**

NA41BAN3                    Julliard – Direct

1    A.   8 of November 2022.

2    Q.   And how much did you request to withdraw?

3    A.   About $20,000.

4    Q.   Was the request that we see highlighted on the screen, was

5    that request processed?

6    A.   It was never processed.

7    Q.   How did it make you feel when it was not processed?

8    A.   Extremely anxious.

9    Q.   And did you make any other subsequent attempts?

10   A.   Yes.  I then went on to try and withdraw Bitcoin, but

11   because I wasn't clear whether it was technical difficulties or

12   indeed missing money, I——I wanted to spread my transactions and

13   not do all at once, so I went on to try and withdraw one

14   Bitcoin on the same day I tried to withdraw the US dollars.

15   Q.   Was that request processed?

16   A.   It was never processed.

17   Q.   Now looking at Government Exhibit 427, what was the

18   approximate amount of Bitcoin valued at at that time?

19   A.   I don't know the exact amounts on that particular day, but

20   Bitcoin was ranging around $20,000.

21   Q.   And in November of 2022, how many Bitcoin did you have in

22   your account?

23   A.   Four.

24   Q.   And how much US dollars did you have in your account?

25   A.   $20,000.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92

NA41BAN3                    Julliard - Cross

1   Q.  So fair to say about a hundred thousand dollars?

2   A.  Yes.

3   Q.  Were any of the withdrawal requests that we see in

4   Government Exhibit 427 processed?

5   A.  Never.

6   Q.  And as we sit here today, have you ever been able to

7   withdraw your FTX customer deposits that we see?

8   A.  Never.

9           MS. KUDLA:  Your Honor, no further questions on

10  direct.

11          THE COURT:  Thank you.

12          Cross-examination?

13  CROSS EXAMINATION

14  BY MR. COHEN:

15  Q.  Good afternoon, Mr. Julliard.

16  A.  Good afternoon.

17  Q.  Now you and I have never met; is that correct?

18  A.  Correct.

19  Q.  And you told us on your direct that you are originally from

20  Paris; is that right?

21  A.  Yes, Paris suburb.

22  Q.  Okay.  And you're a French citizen?

23  A.  I am.

24  Q.  But you now work for a—you've moved to London; is that

25  correct?

NA4MBAN4                          Yedidia - Direct

1          THE COURT:  Members of the jury, the answer here is to

2     be received not for the truth of whatever, if anything, this

3     other person told the witness unless I otherwise instruct you

4     in the course of the trial, but to understand why the witness

5     did what he did, if anything.

6     Q.  At a general level, Mr. Yedidia, can you explain why you

7     stopped talking to the defendant and working at FTX in November

8     of 2022?

9     A.  I learned that Alameda Research had used customer -- FTX

10    customer deposits to pay back its loan to creditors.

11    Q.  After you learned that, what did you do?

12    A.  I resigned.

13    Q.  Do you know what happened to FTX shortly after you

14    resigned?

15    A.  It went bankrupt.

16    Q.  Mr. Yedidia, have you ever testified in court before?

17    A.  No.

18    Q.  Did you receive a subpoena requiring you to be here in

19    court today?

20    A.  No.

21    Q.  Are you aware whether your lawyer was provided a subpoena

22    requiring your testimony?

23    A.  I am not certain.

24    Q.  Are you testifying under an immunity order from the Court?

25    A.  Yes.

**A-688**

106

NA4MBAN4                         Yedidia – Direct

1   Q.  What do you understand an immunity order does?

2   A.  It protects me from being prosecuted on the basis of my

3   testimony.

4   Q.  And in order to be protected by the immunity order, what do

5   you understand you must do in court today?

6   A.  I must tell the truth.

7   Q.  And if you don't tell the truth, can you be prosecuted for

8   lying under oath?

9   A.  Yes.

10  Q.  Do you have any agreements with the government about your

11  testimony here today?

12  A.  No.

13  Q.  Are you willing to testify at trial without receiving an

14  immunity order from the Court?

15  A.  No.

16  Q.  Why did you believe you needed immunity?

17  A.  I was concerned that as a developer at FTX I may have

18  unwittingly written code that contributed to the commission of

19  a crime.

20  Q.  I want to turn to your personal background, Mr. Yedidia.

21          Where did you go to college with the defendant?

22  A.  MIT.

23  Q.  What year did you graduate?

24  A.  I graduated in 2014.

25  Q.  How did you meet the defendant at MIT?

**A-689**

NA5MBAN1                     Yedidia - Direct                     141

1    says BTC/USD Bitcoin?

2    A.  Yes.

3    Q.  What does that entire row refer to?

4    A.  It refers to the market on which customers could buy

5    Bitcoins with dollars or sell Bitcoins for dollars.

6    Q.  Do you see toward the end of this row where it says price?

7    A.  Yes.

8    Q.  Does that reflect the price of one Bitcoin on the

9    particular day of this screenshot?

10   A.  Yes.

11        MS. SASSOON:  Let's go back to Government Exhibit 599.

12   Q.  You see where it says futures?

13   A.  Yes.

14   Q.  Is that another product that was available for trading on

15   the exchange?

16   A.  Yes.

17   Q.  What are futures?

18   A.  Futures are a type of financial instrument or financial

19   derivative which tracked the price of a given asset.  So, for

20   example, a Bitcoin future would not represent a Bitcoin itself.

21   Rather, if it had an expiry date, for example, if it expired in

22   March of 2020, then that means that in March of 2020, whatever

23   the price of one Bitcoin was, that's the amount you would be

24   paid out for owning a future in Bitcoin that expires in March

25   2020.

NA5MBAN1                    Yedidia – Direct                    142

1   Q.  Let me make sure I understand this.  Are those transactions

2   that allowed two parties, a buyer and a seller, to exchange

3   payments based on the change in value of a cryptocurrency?

4           MR. EVERDELL:  Objection.

5           MS. SASSOON:  Your Honor, I am just trying to clarify

6   a confusing subject.

7           THE COURT:  Just a minute.

8           Overruled.

9   Q.  I'll ask it again, Mr. Yedidia.

10          These futures transactions that you described, are

11  those transactions that allowed two parties, a buyer and a

12  seller, to exchange payments based on the change in value of a

13  cryptocurrency?

14  A.  Yes.

15  Q.  And were those futures traded on FTX?

16  A.  Yes.

17  Q.  Are there other types of futures that don't have an

18  expiration date?

19  A.  Yes.

20  Q.  What are those called?

21  A.  Those are called perpetual futures.

22  Q.  Were those traded on FTX?

23  A.  Yes.

24  Q.  What is your understanding of the volume of futures that

25  were traded on FTX relative to the spot market?

**A-691**

NA5MBAN1                          Yedidia – Direct                          143

1   A.  My understanding is that the futures markets had more

2   volume than the spot markets.

3            MS. SASSOON:  Let's take a look at Government Exhibit

4   583.

5   Q.  Do you see where it says futures in blue on the left-hand

6   side?

7   A.  Yes.

8   Q.  And what does this page show?

9   A.  This is a list of futures markets on FTX.

10  Q.  Just taking one example, the first row where it says

11  Bitcoin June 2022 futures, what does that mean?

12  A.  These are futures that expire in June 2022 on the price of

13  Bitcoin.

14  Q.  Is everything listed here or listed on the spot markets

15  page things that customers could buy and sell on the exchange?

16  A.  Yes.

17  Q.  We have talked about some of the things customers could

18  trade on the exchange.

19            What was the FTX business model for making money?

20  A.  Collecting fees on trades.

21  Q.  What does that mean exactly?

22  A.  It means that when two customers trade from each other --

23  let's suppose Alex wanted to buy a Bitcoin from Bob for

24  $10,000.  Alex would lose $10,000 and gain one Bitcoin and Bob

25  would gain slightly less than $10,000 and lose one Bitcoin.

**A-692**

NA51BAN2                          Yedidia - Direct                          164

1          THE WITNESS:  Yes, you're right, your Honor.  The——it
2    would match the total amount of all the customers, but any
3    single customer would have an amount that differed from the
4    amount——
5          THE COURT:  Oh, okay.  Sure.  Thank you.
6          Go ahead.
7    BY MS. SASSOON:
8    Q.  Just to be clear, if you added up all of customer fiat
9    balances across the exchange, it should match the number that's
10   in the fiat@ftx.com account, except that would be a negative
11   number.
12   A.  Yes.
13   Q.  And that's because that's the amount of money that Alameda
14   still owed back to FTX customers.
15   A.  Yes.
16   Q.  And this fiat@ftx.com account, did it have actual money in
17   it or it was just tracking that information?
18   A.  The latter.
19   Q.  So it was tracking information.
20   A.  Yes.
21   Q.  So because this is a bit complicated, I'm just going to
22   make sure we all understand.
23          Every time a customer deposited money into Alameda's
24   bank account, what would happen to the customer's balance on
25   the FTX website?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-693**

NA51BAN2                    Yedidia - Direct                    165

1    A.  It would increase.

2    Q.  And what would happen to Alameda's liability to FTX

3    customers reflected in the fiat@ftx.com account?

4    A.  It would increase by the same amount.

5    Q.  When you say increase, do you mean go further negative?

6    A.  Yes.

7    Q.  And why would it go further negative?

8    A.  The negative value of the fiat@ftx.com account effectively

9    represented the liability Alameda owed to FTX's customers.

10            THE COURT:  Okay.  And a third piece of this would be

11   that the amount of fiat in the Alameda bank account at North

12   Dimension, back when North Dimension was being used, would

13   increase, yes?

14            THE WITNESS:  Yes.

15            THE COURT:  Okay.  So the money is in the North

16   Dimension account, the fiat currency, that grows when the

17   customer deposits money to the North Dimension account, the

18   fiat account you referred to, that would go down because North

19   Dimension was treating that as money it owed to FTX, and then

20   the customer balances in the aggregate on the FTX website that

21   the customers could see would go up, yes?

22            THE WITNESS:  That's correct, your Honor.

23            THE COURT:  Okay.  Let's go.

24   BY MS. SASSOON:

25   Q.  And you referred to Alameda's liability to FTX customers.

**A-694**

NA51BAN2                        Yedidia – Direct                        166

1   What is a liability?

2   A.  A liability is a debt owed.

3   Q.  And so following up on Judge Kaplan's question, is the

4   amount in Alameda's bank account supposed to match the amount

5   in the fiat@ftx.com account, except one's positive, one's

6   negative?

7   A.  Yes.

8   Q.  So if you added up all of customer-deposited balances

9   against Alameda's negative liability in the fiat@ftx.com

10  account, what number should you get?

11  A.  Zero.

12  Q.  Why?

13  A.  For every deposit, there's a corresponding increase in

14  customer balances and a corresponding decrease in

15  fiat@ftx.com's balances, and those two amounts should be the

16  same, so when you add the deposited value into the equal

17  negative value, they should cancel to zero, no matter how many

18  times you do that.

19  Q.  And just to take the opposite process, if a customer

20  withdrew money from their FTX account by wire transfer, how did

21  FTX pay for the customer's withdrawal?

22  A.  Until the bank account was switched, the North

23  Dimension——the North Dimension bank account.

24  Q.  And so when a customer withdrew fiat, what would happen to

25  the money in the North Dimension account?

**A-695**

NA51BAN2                           Yedidia - Direct                           167

1    A.  It would decrease.

2    Q.  And what would happen to Alameda's liability to FTX

3    customers reflected in the fiat@ftx.com account?

4    A.  It should decrease.

5    Q.  Meaning get less negative.

6    A.  Yes.

7    Q.  And what would happen to the total customer balances across

8    the exchange if someone withdrew some money?

9    A.  It would also decrease.

10   Q.  So the number in the fiat@ftx.com account in FTX's database

11   I believe you said documented how much money Alameda owed to

12   FTX customers for their dollar deposits; is that right?

13   A.  That's correct.

14   Q.  And in June of 2022, what did you learn about how much

15   money Alameda owed to FTX customers for their dollar deposits?

16   A.  $8 billion.

17   Q.  That is $8 billion of FTX customer money that had never

18   been withdrawn by FTX customers and that Alameda had not yet

19   repaid; is that right?

20   A.  That's correct.

21   Q.  So is that $8 billion money that Alameda still owed to FTX

22   customers?

23            MR. EVERDELL:  Objection.  Leading.

24            THE COURT:  Overruled.

25   Q.  And so that $8 billion that you saw in June of 2022, is

NA51BAN2                    Yedidia - Direct                    175

1   it.

2   Q.  Did you share this document with the defendant?

3   A.  Yes.

4   Q.  How did you share it with him?

5   A.  By a Signal message.

6   Q.  And what exactly is Signal?

7   A.  Signal is an end-to-end encrypted messaging app.

8   Q.  When you say Signal is an encrypted messaging app, what

9   does encrypted mean?

10  A.  It means that the messages are not easily read while

11  they're in flight or possibly while they're stored.

12  Q.  Why were you using Signal to communicate with the

13  defendant?

14  A.  It was his instructions to use Signal in many cases for

15  communications.

16  Q.  When you say it was the defendant's instruction to use

17  Signal, who did he give that instruction to?

18  A.  To my knowledge, the entire company.

19  Q.  What features, if any, were implemented on the Signal

20  communications between employees of FTX and Alameda?

21  A.  Automatic deletion timers.

22  Q.  What is an automatic deletion timer?

23  A.  It causes messages to be deleted after a certain amount of

24  time.

25  Q.  Who implemented the auto-deletion feature on company Signal

**A-697**

| | NA51BAN2 | Yedidia – Direct | 176 |

1    communications?

2    A.  Would you clarify what you mean by "implemented."

3    Q.  Yes.  So why were your communications set to auto-delete on

4    Signal?

5    A.  Sam instructed people to do that.

6    Q.  When you say "people," do you mean employees of the

7    company?

8    A.  Yes.

9    Q.  Around the time that the defendant directed employees of

10   the company to auto-delete their Signal messages, what, if

11   anything, did he explain to you about this policy?

12   A.  He said that it was all downside for messages to be kept

13   around.

14   Q.  What, if anything, did he explain about why it was all

15   downside to preserve messages among company employees?

16   A.  There wasn't much benefit to keeping messages around, and

17   if regulators found something they didn't like in those

18   messages, that could be bad for the company.

19   Q.  Did the defendant say that?

20   A.  He didn't use exactly those words, but that was what the

21   substance—that's the substance of what he said.

22   Q.  You said that you communicated with the defendant about

23   Alameda's debt to FTX customers by Signal.  Do those Signal

24   messages still exist?

25   A.  The documentation that I created does, but the message that

NA5MBAN3                          Yedidia – Cross                          186

1   November of 2022 about what was happening at FTX?

2   A.  We had a conversation over Signal.

3   Q.  What do you recall about that conversation?

4   A.  I said, I love you, Sam, I am not going anywhere.  Don't

5   worry.

6   Q.  Why did you say, I'm not going anywhere?

7   A.  I had learned that a lot of the other employees had quit,

8   and I wanted to reassure him that I wouldn't do the same.

9   Q.  Yesterday you testified that you resigned from FTX in

10  November of 2022.  So what changed?

11  A.  I learned that Alameda had used FTX customer deposits to

12  repay its loans to creditors.

13  Q.  And why did that change your mind about staying at FTX?

14  A.  What Alameda did seemed like a flagrantly wrong thing to

15  have done.

16          MS. SASSOON:  No further questions.

17          THE COURT:  Thank you.

18          Cross-examination.

19  CROSS-EXAMINATION

20  BY MR. EVERDELL:

21  Q.  Good morning, Mr. Yedidia.

22  A.  Good morning.

23  Q.  Mr. Yedidia, you went to college at MIT, correct?

24  A.  Correct.

25  Q.  You majored in electrical engineering and computer science?

**A-699**

NA5MBAN3                    Yedidia - Cross                    202

1   Q.  Let me ask this question, Mr. Yedidia.  Didn't FTX, the

2   international exchange where you worked, take steps to try to

3   prevent U.S.-based customers from accessing the international

4   exchange?

5   A.  Yes.

6   Q.  So, for example, FTX set up geofencing, didn't it, to block

7   U.S.-based IP addresses?

8   A.  Yes.

9   Q.  And that just means that you would look to see where the

10  customer was connecting to the exchange, right?

11  A.  You would look at the IP address to infer from country they

12  were connecting from.

13  Q.  You would look at IP address and look at what country that

14  suggested.  And if it looked like they were connecting from a

15  U.S.-based IP address you would block their access, correct?

16          MS. SASSOON:  Objection.  Form.

17          THE COURT:  Overruled.

18  A.  Correct.

19  Q.  And FTX had know-your-customer protocols, correct?

20  A.  Yes.

21  Q.  Know-your-customer protocols are sometimes called KYC

22  protocols, is that right?

23  A.  Yes.

24  Q.  And just means you try to find out information about who

25  your customers were, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-700**

NA5MBAN3                         Yedidia – Cross                        203

1   A.  Yes.

2   Q.  And that's in part at least to make sure that they were

3   ones who were permitted to use the exchange, right?

4   A.  Yes.

5   Q.  So FTX had KYC protocols to do just that, didn't it?

6   A.  Yes.

7   Q.  And FTX implemented those KYC protocols to verify their

8   customers.

9   A.  Yes.

10  Q.  For example, you'd have customers provide personal

11  information about themselves, like name, date of birth, right?

12  A.  Yes.

13  Q.  And at one point you implemented a phone verification to

14  make sure the customer was who they said they were, right?

15  A.  By you, do you mean me specifically?

16  Q.  No.  Who the customer says you were.  The company had a

17  protocol whereby that was implemented, is that right?

18  A.  Yes.

19  Q.  And in fact in some cases customers were required to have

20  their faces scanned by a web cam, isn't that right?

21  A.  That was one of the options available, yes.

22  Q.  This is to make sure it was an actual human being and not

23  some bot somewhere, right?

24  A.  Yes.

25  Q.  These were all procedures that the company used to make

**A-701**

NA5MBAN3                    Yedidia – Cross                    204

1   sure that the people using the exchange were actually

2   foreign-based customers, not U.S. customers, right?

3   A.  That was one of the purposes, yes.

4   Q.  And this is an effort that Mr. Bankman-Fried, Sam,

5   endorsed, right?

6   A.  Yes.

7   Q.  This is something he cared about, right?

8            MS. SASSOON:  Objection.

9            THE COURT:  Sustained.

10  Q.  Well, it's true that he wanted to make sure that this

11  problem was being addressed if it was a problem?

12           MS. SASSOON:  Objection.

13           THE COURT:  Sustained.

14  Q.  You had discussions with Sam about non-U.S. customers using

15  the international exchange, didn't you?

16  A.  Yes.

17           MS. SASSOON:  Objection.  Hearsay, to the extent he is

18  going to elicit the conversations.

19           THE COURT:  Let's see what the next question is.

20  Q.  Did he want to make sure that the problem was being

21  addressed?

22           THE COURT:  Sustained.

23  Q.  Was it your understanding --

24           MR. EVERDELL:  Withdrawn, your Honor.

25  Q.  It's true that at the time Mr. Bankman-Fried was engaging

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NA5MBAN3                         Yedidia – Cross                         206

1   A.  Yes.

2   Q.  And it wasn't typical, was it, for an executive of a crypto

3   company to want to engage with law makers at the time?

4           MS. SASSOON:  Objection.

5           THE COURT:  Sustained.

6   Q.  Are you aware of -- you yourself didn't think this was

7   going to be a worthwhile effort, isn't that true?

8           MS. SASSOON:  Objection.  Form.

9           MR. EVERDELL:  I'll rephrase.

10          THE COURT:  Sustained.

11  Q.  Did you have an opinion about engaging with regulators and

12  whether that was worthwhile for the company to do?

13  A.  Which regulators are you talking about?

14  Q.  U.S. regulators.

15          THE COURT:  That's a yes-or-no question, unless there

16  is an objection.

17          Is there an objection, or not?

18          MS. SASSOON:  Relevance, your Honor.

19          THE COURT:  Sustained.

20          MR. EVERDELL:  One moment.

21          I'll move to a different topic.

22  Q.  Mr. Yedidia, at the time you joined FTX in January of 2021,

23  it was growing quickly, wasn't it?

24  A.  Yes.

25  Q.  I think you said that when you got there it had roughly 200

**A-703**

NA5MBAN3                    Yedidia – Cross                    207

1   employees is what you said?

2   A.  I think what I said was maybe a hundred, maybe a little bit

3   more.

4   Q.  It eventually got up to about 350 employees, thereabouts.

5   Is that about right?

6   A.  About right, yeah.  Within 100 or so in either direction.

7   Q.  So that's roughly doubling the time that you are there.

8   A.  Right.

9   Q.  Now, part of the reason why it was the growing quickly is

10  that it offered products and services that other exchanges

11  didn't have, isn't that right?

12  A.  I am not sure that's true.  I don't know.

13  Q.  You did offer services that certain exchanges didn't have,

14  right?  You had a lot of products?

15  A.  Could you give a specific example of a product?

16  Q.  Sure.  Let's take a competitor at least in the U.S.  You're

17  familiar with Coinbase, right?

18  A.  Yes.

19  Q.  Coinbase was one of the largest exchanges at the time,

20  right?

21  A.  Yes.

22  Q.  And Coinbase was a spot exchange, right?

23  A.  To my knowledge, yes.

24  Q.  That allows customers to trade cryptocurrencies one for

25  one, right?

**A-704**

NA5MBAN3                    Yedidia – Cross                    208

1   A.  Right.

2   Q.  In other words, if I had $100 worth of Bitcoin, I could

3   trade it for $100 worth of Ethereum?

4   A.  Right.

5   Q.  FTX was different.  FTX allowed customers to trade on

6   margin, is that right?

7   A.  You're talking about the international exchange?

8   Q.  International exchange, yes.

9   A.  Yes.

10  Q.  And that just means that customers are allowed to borrow

11  funds and trade, as long as they put up collateral to back the

12  borrowing, right?

13  A.  That's my understanding, yes.

14  Q.  So, for example, if I had $100 worth of Bitcoin in my FTX

15  account and I wanted to borrow $500 worth of Ether to trade

16  with, I could do that, right?

17  A.  I am not sure about the details of that, but the broad

18  strokes are correct, to my knowledge.

19  Q.  I would just have to post my $100 as collateral, right?

20        MS. SASSOON:  Objection.  Form, and he said he doesn't

21  know the details.

22        THE COURT:  Let him answer.

23        Please answer.

24  A.  Could you repeat the question, please.

25  Q.  I would just have to post some collateral for that

**A-705**

NA5MBAN3                    Yedidia – Cross                    209

1    borrower.

2    A.  That's my understanding.

3    Q.  That would serve as security for the borrowed funds.

4    A.  Sorry.  I am unfamiliar with that term.  What do you mean

5    by that?

6    Q.  Meaning if you started losing your money, that funds that

7    you posted as collateral could be taken by the exchange to

8    protect against the loss?

9    A.  Right.  My understanding, at a broad level, is that the

10   customer could be liquidated, which means that their collateral

11   would be turned into whatever it needed to be turned into in

12   order to even out their position.

13   Q.  Correct.  So to avoid a loss?

14   A.  Right.

15   Q.  And margin trading was a feature that FTX allowed, right?

16   A.  Yes.

17   Q.  And it allowed other products as well too, the

18   international exchange?

19   A.  Yes.

20   Q.  And it processed in settled trades faster sometimes than

21   other exchanges too, is that right?

22   A.  I'm not certain it was faster than other exchanges.

23   Q.  But there were a lot of products that were sophisticated

24   that other exchanges didn't offer, is that right?

25   A.  I guess if you're comparing specifically to Coinbase, then

**A-706**

NA5MBAN3                    Yedidia - Cross                    210

1     FTX.com, as we discussed, did offer products that Coinbase did

2     not.

3     Q.  We talked a little bit about the rapid growth.  You

4     mentioned the number of employees just now that went up, is

5     that right?

6     A.  Yes.

7     Q.  Also, the average amounts of trades per day went up during

8     that time period, isn't that right?

9              MS. SASSOON:  Objection, form.  What time period?

10             MR. EVERDELL:  I'm referring to the time period of

11    your employment from January 2021 to November of 2022.

12    A.  I am not sure that trading volume went up the entire time,

13    but I think -- there were various points during my employment

14    during which trading volume did go up.

15    Q.  At some point it averaged billions of trades per day.  Does

16    that sound right?

17    A.  I am not certain.

18    Q.  And FTX's revenue also was increasing; isn't that correct?

19    A.  I believe that there were points during my employment

20    during which FTX's revenue was increasing, but I don't have

21    specific knowledge of what it was.

22    Q.  And its number of users was going up too, wasn't it?

23    A.  Yes.

24    Q.  I think by 2020 at some point it had about 6 million

25    registered users.  Does that sound about right?

NA5MBAN3                    Yedidia – Cross                    224

1   Q.  Thank you.

2         MR. EVERDELL:  I'll move on, your Honor.

3   Q.  Mr. Yedidia, you testified before that you are testifying

4   today under a grant of immunity, is that right?

5   A.  Yes.

6   Q.  Now, that means that you asserted your Fifth Amendment

7   right not to testify, is that correct?

8   A.  Yes.

9   Q.  But the prosecutors gave you immunity for your testimony.

10  A.  Right.

11  Q.  Immunity means that the prosecutors can't use any of this

12  testimony or information that you give today or that you gave

13  before against you in a criminal case, right?

14  A.  Right.

15  Q.  But testimony at trial here isn't the only time you were

16  given immunity, is that right?

17  A.  That's right.

18  Q.  You were also given immunity back in December of 2022, when

19  the grand jury was investigating this case?

20  A.  Yes.

21  Q.  And you testified that you don't recall getting a subpoena

22  from the prosecutors at that time, right?

23  A.  I made a mistake during my testimony about the subpoena.  I

24  was uncertain about what had happened there, but I apologize

25  for that mistake.  I don't know if that's what you're referring

**A-708**

NA51BAN6                          Wang – Direct                          305

A.  Those of customers.

Q.  Let's talk about——sorry.  And customers of what?

A.  Customers of FTX.

Q.  All right.  You mentioned Alameda Research.  What was

Alameda Research?

A.  This was a cryptocurrency trading firm.

Q.  What is a cryptocurrency trading firm?  Let me rephrase

that.

        What did Alameda Research as a cryptocurrency trading

firm do?

A.  It had accounts on various cryptocurrency exchanges and on

them it bought and sold cryptocurrency.

Q.  Who owned Alameda Research?

A.  Sam and I.

Q.  Now you said Alameda Research was given special privileges

on FTX.  What were you referring to?

A.  It had the ability to withdraw funds or transfer funds

regardless of what it had in its account, even if that would

cause the account balance to become negative, and it had a very

large line of credit, more than other customers, which allowed

it to have——

        (The reporter interrupted for clarification)

        THE COURT:  Mr. Wang, could you kindly slow down and

speak at a different rate of speed.

        THE WITNESS:  Yes.

**A-709**

NA51BAN6                      Wang – Direct                         306

1   A.  So one, it had the ability to have negative balances by

2   either transferring funds or withdrawing funds from the

3   platform regardless of what was in its account; it had a very

4   large line of credit which allowed it to have open orders and

5   open positions, essentially without any limit; it had the

6   ability to place orders on the platform slightly faster than

7   other market makers on the platform; and it had——and when

8   customers deposited USD to FTX, some of those went into

9   Alameda's bank account instead.

10  Q.  Let me ask you a few follow-up questions about your answer.

11       So first of all, where did those special advantages

12  exist?

13  A.  In the code for FTX.

14  Q.  And what do you mean by the code for FTX?

15  A.  In the computer code which——for the FTX platform, the

16  computer code that instructs what the platform should do.

17  Q.  You then listed a few advantages, and I just want to take

18  them each in turn.

19       You said Alameda could have negative balances and make

20  unlimited withdrawals.  Did I understand you correctly?

21       MR. EVERDELL:  Objection.

22       MR. ROOS:  I'm just trying to, since it was quick——

23       THE COURT:  What is the objection?

24       MR. EVERDELL:  He's restating the witness's answer.

25       THE COURT:  I'm sorry?

NA51BAN6                    Wang - Direct                    307

1           MR. EVERDELL:  He's restating the witness's answer in

2    the question.

3           THE COURT:  Overruled.

4    BY MR. ROOS:

5    Q.  Mr. Wang, I think the first thing you said was Alameda had

6    the ability to have negative balances and make unlimited

7    withdrawals.  Did I understand you correctly?

8    A.  Yes.

9    Q.  What did you mean by that?

10   A.  There——normally, when customers withdraw funds from the

11   platform, they need to have those funds in their account before

12   they can do so, but for Alameda, this was not the case.  For

13   Alameda, they can withdraw funds even if that would cause their

14   account balance to become negative as a result of it, as a

15   result of the withdrawal.

16   Q.  What do you mean by a negative balance?

17   A.  So less than zero.  So if they have $10 in their account,

18   they can still——for normal customers, if a customer had $10 in

19   their account, they can only withdraw $10, but for Alameda,

20   this was not the case.  They could withdraw a thousand dollars

21   and then afterwards their account would have negative $990 in

22   it.

23   Q.  And how much over the course——just generally speaking, how

24   much money over the course of your time at FTX did Alameda

25   withdraw into the negative?

**A-711**

NA51BAN6                          Wang – Direct                          308

1    A.  By the——by the time FTX declared bankruptcy, Alameda had

2    withdrawn $8 billion.

3    Q.  Now the second thing I heard you say related to a line of

4    credit.  What were you saying there as a special advantage?

5    A.  Alameda had a large line of credit to act as collateral for

6    their positions and orders on their account.  So normally when

7    a customer places an order or opens a position on FTX, they

8    need——that position needs to be collateralized by some funds

9    that they've deposited onto their accounts, but for Alameda,

10   they have——this was not the case because they had a very——they

11   had a $65 billion line of credit on their platform.

12   Q.  So what's like a normal line of credit for a customer?

13   A.  For——normally, for large market makers, it's usually in the

14   single- to double-digit millions.

15   Q.  And how much was Alameda's?

16   A.  65 billion, with a B.

17   Q.  You mentioned those two advantages and a few others.  Were

18   those advantages?

19          THE COURT:  Excuse me, Mr. Roos.  I just want to make

20   sure what the witness said.

21          You said normally, for large makers, it's in the

22   single- to double-digit——did you say millions or billions?

23          THE WITNESS:  Millions, with an M.

24          THE COURT:  Okay.  Thank you.  So the reporter will

25   correct the record.

NA51BAN6                          Wang – Direct                          316

1    A.   Caroline.

2    Q.   Caroline Ellison?

3    A.   Yes.

4    Q.   And when, roughly, is this from?

5    A.   Also from 2018.

6         MR. ROOS:  We can take that down.

7    Q.   So who owned Alameda Research?

8    A.   Sam and I.

9    Q.   And what was the ownership breakdown?

10   A.   Sam owned 90 percent, I owned 10 percent.

11        MR. ROOS:  Show just the witness what's been marked

12   for identification as Government Exhibit 67.

13   Q.   Do you recognize this?

14   A.   Yes.

15   Q.   What is it?

16   A.   It's a description of the ownership breakdown for Alameda

17   Research.

18        MR. ROOS:  Government offers Exhibit 67.

19        MR. EVERDELL:  No objection.

20        THE COURT:  Received.

21        (Government's Exhibit 67 received in evidence)

22        MR. ROOS:  May we publish it?

23        THE COURT:  Yes.

24   BY MR. ROOS:

25   Q.   Mr. Wang, now that the jury can see this document, what is

NA51BAN6                          Wang – Direct                          318

A.  No.

Q.  So from this time until November 2022, Samuel Bankman-Fried

continued to own 90 percent of the company.

A.  Yes.

        MR. ROOS:  We can take this down.

Q.  You said Alameda Research would buy and sell

cryptocurrency.  Where did it get the money to do that?

A.  So initially some of the funds came from Sam personally,

and then the——and then the remaining came from various lenders.

Q.  What do you mean by various lenders?

A.  So various investment firms or other people's money would

lend money to Alameda at an interest rate and then Alameda

would use that to do trading.

Q.  Did there come a time when the defendant spoke to you about

starting a new business?

A.  Yes.

Q.  What was the new business?

A.  FTX.

Q.  And where did the name for FTX come from, or what does it

stand for?

A.  Stands for Futures Exchange.

Q.  I'm showing you now Government Exhibit 1567.  Do you

recognize this?

A.  Yes.

Q.  What is it?

NA51BAN6                          Wang – Direct                          319

1    A.  The screenshot of FTX's home page from 2019.

2            MR. ROOS:  Government offers Exhibit 5715——I'm sorry.

3    The government offers Government Exhibit 1567.

4            MR. EVERDELL:  No objection.

5            THE COURT:  Received.

6            (Government's Exhibit 1567 received in evidence)

7            MR. ROOS:  May we publish it?

8            THE COURT:  Yes, sir.

9    BY MR. ROOS:

10   Q.  Mr. Wang, what are we looking at here?

11   A.  The screenshot of the ftx.com home page from 2019.

12   Q.  So let me ask you some questions about the FTX exchange.

13   You said it was a place people could buy and sell

14   cryptocurrency; is that right?

15   A.  Yes.

16   Q.  What types of cryptocurrency?

17   A.  There was a large set of cryptocurrency, but such as

18   Bitcoin, Ethereum, Ripple, and USDC.

19   Q.  In addition to allowing users to buy and sell

20   cryptocurrency, what were some of the other things that users

21   could do on the website?

22   A.  They could buy and sell, they could trade various futures.

23   Q.  What's a future?

24   A.  It's a——it's a contract where you can either be——you can

25   either buy it or if you buy——or you can short or sell it, short

NA51BAN6                          Wang - Direct                          320

1   it, and at some future—at some particular future date,

2   depending upon what future it is, based on what—so for

3   example, for a Bitcoin future, you would have a—it would be a

4   future on Bitcoin and it would settle at some particular date

5   in the future, and at that future time, whoever shorts the

6   future pays whoever is long on the future, whatever the price

7   of Bitcoin is on that date.

8   Q.  I think some people maybe have heard of shorting a stock.

9   How does shorting a stock compare to one of these Bitcoin

10  futures?

11  A.  It's the same concept, where you can either be long or be

12  short on the future, but if you think the price of Bitcoin is

13  going to go up, you can buy or become long on the future, and

14  if you think the price of Bitcoin is going to go down, you can

15  short or sell the future.

16  Q.  Mr. Wang, if I can just ask you to go particularly slow

17  here because it can be a little more complicated, okay?

18  A.  Yup.

19  Q.  All right.  So with the futures, what are the two—what are

20  the parties trading?  The two users on the exchange, what are

21  they trading when they're trading a future?

22  A.  They're trading the contract.

23  Q.  What does that mean?  What are they actually exchanging?

24  A.  So they're essentially exchanging obligation on some future

25  date to transfer the price of one Bitcoin between each other.

NA51BAN6                    Wang - Direct                    321

1    So if one user buys a Bitcoin future from another user, they're

2    essentially agreeing that at some date in the future whoever

3    sells the future would pay whoever bought the future the price

4    of one Bitcoin.

5    Q.  So whether it's trading Bitcoin or trading a future, how

6    did FTX make money?

7    A.  From trading fees.  So there would be a small fraction of

8    every trade that would go to the platform.

9    Q.  What were some of the types of customers that traded on

10   FTX?

11   A.  There were large—there were both large institutions, or

12   large trading firms, and then there were also smaller retail

13   users.

14   Q.  What do you mean by—we'll start with:  What do you mean by

15   larger trading firms?

16   A.  So either trading—either trading firms or investment firms

17   that make money trade—make money either trading or holding

18   assets.

19   Q.  And what do you mean by like a retail customer?

20   A.  So just individuals who would just want to invest in

21   cryptocurrency or bet on the price of cryptocurrency.

22   Q.  Who were the founders of FTX?

23   A.  Sam and I.

24   Q.  And did the defendant ever say to you why he wanted to

25   start a cryptocurrency exchange?

**A-717**

NA51BAN6                          Wang – Direct                          322

1   A.   He was dissatisfied with the existing cryptocurrency

2   exchanges at the time.

3   Q.   Who was in charge at FTX?

4   A.   Sam was.

5   Q.   And you were co-founders.  Did you share responsibilities

6   equally?

7   A.   No.

8   Q.   What were your primary responsibilities?

9   A.   I was responsible for the technology, for the code, for

10  writing the code, for reviewing the code that other people

11  within——or direct——for setting the technical direction of the

12  company.

13  Q.   What role, if any, did Sam Bankman-Fried have with the

14  coding?

15  A.   He directed that certain features be implemented, so he

16  told us what features that he wanted to add to the——add or

17  change to the website.

18  Q.   So let me just be clear about this.  Did he do the coding

19  himself?

20  A.   No.

21  Q.   So what then did he do?

22  A.   He told us what things to implement.

23  Q.   Can you give us an example.

24  A.   So for example, the rules for how much collateral is needed

25  for certain positions or where things should be placed on the

**A-718**

NA61BAN1                    Wang – Direct                         368

1   At a high level, what is liquidating account?

2   A.   So when a——when an account opens a position and as part of

3   that position they need to borrow funds, the——if the market

4   moves against that position, their account must lose value, and

5   at some point their account might lose so much value that it's

6   in danger of having——of going negative, of having——it's in

7   danger of having nothing, of losing so much value that it would

8   have nothing in it, would start having negative balances, and

9   before that happens, FTX liquidates the account so it——it

10  closes the position to prevent the account from becoming

11  negative.

12  Q.   Give me the simplest example you can think of of this.

13  A.   So let's say someone deposits a hundred dollars into their

14  FTX account and then uses it to open a $1,000 Bitcoin position.

15  And let's say they bought——they're going long, so they bought

16  the Bitcoin position.  And then let's say the price of Bitcoin

17  starts falling, and, you know, as the price of Bitcoin falls,

18  their account starts losing——the account starts becoming worth

19  less and less.  So let's say if they have a $1,000 Bitcoin

20  position and Bitcoin goes down 1 percent, then now their

21  account only has $90 in it, and if Bitcoin goes down another

22  percent, then now their account only has $80 in it, and if this

23  keeps happening, at some point their account——at some point the

24  $100 they deposited into their account is all gone and now the

25  account might become negative as a result of the price of

**A-719**

NA61BAN1                          Wang – Direct                          369

1    Bitcoin falling.

2    Q.  Okay.  So just to break that down, first of all, you're

3    talking about someone buying a future?

4    A.  Yes.

5    Q.  So either shorting or going long on Bitcoin.

6    A.  Yes.

7    Q.  And you're describing a scenario where somebody has gone

8    long on Bitcoins, they've made a bet on Bitcoin; is that right?

9    A.  Yes.

10   Q.  And what happens then as the price of Bitcoin starts

11   dropping on that bet, so it goes the opposite way?

12   A.  It means that their account starts losing value.

13   Q.  How does their account start losing value in that

14   situation?

15   A.  Well, because when——because they only——they only deposited

16   a hundred dollars but they're buying a $1,000 Bitcoin position,

17   so——and because the Bitcoin future means that it's only worth

18   how much——however much Bitcoin is worth, and so as the price of

19   Bitcoin falls, their position also loses value.

20   Q.  And so you described a situation where the price of Bitcoin

21   keeps falling so the account keeps losing value.  What then

22   does the liquidation process do?

23   A.  So the liquidation process kicks in before the account

24   loses all of its value, and at that——ideally, before it loses

25   all its value.  And the liquidation process sells off their

NA61BAN1                              Wang – Direct                              370

1   position and the collateral to a market maker; either to a

2   market maker or just sells it on the market.

3   Q.  So basically this is the process of closing the account

4   before it goes negative.

5   A.  Yes.

6   Q.  What was the purpose of liquidation at FTX?

7   A.  So it prevents the account from becoming negative, because

8   if the account went negative, then that would mean that FTX

9   would be on the hook for the money, so it was to protect FTX

10  and the other customers from losing money.

11  Q.  How did FTX know when to liquidate an account?

12  A.  So this——there's code for detecting how large the——how

13  large account's positions are and how much collateral they had,

14  and when that——when the amount that it——of value it has in the

15  account is too small relative to how much the account's

16  positions are, at that point it——it——it decides that the

17  account is too risky and that it needs to liquidate the

18  account.

19  Q.  Let me ask you just a few follow-up questions on that

20  liquidation detection.

21          So are there people who are out there just looking for

22  accounts to liquidate?

23  A.  No.

24  Q.  How did this work?

25  A.  So it's an automated process, so there's computer codes

**A-721**

1   same way it treated one dollar of, say, FTT collateral?

2   A.  No.

3   Q.  How did it treat them differently?

4   A.  The BTC collateral would be treated as worth more because

5   the price of Bitcoin is less volatile than the price of FTT.

6   Q.  Now, what's your recollection of approximately the most

7   amount of money that ever --

8           THE COURT:  Just excuse me a minute, Mr. Roos.

9           Mr. Wang, could you just answer again the question

10  Mr. Roos just asked:  How did it treat differently a dollar of

11  Bitcoin collateral versus a dollar of FTT collateral?

12          THE WITNESS:  So a dollar of Bitcoin collateral it

13  would treat as being worth roughly 90 or 95 cents, whereas the

14  dollar of FTT collateral would only be treated as, say, 85

15  cents or so.  That is because Bitcoin is less volatile than

16  FTT.  If Bitcoin is to be sold, that would usually cause the

17  price of Bitcoin to change by less than how much the price of

18  FTT would be sold if FTT was to be sold.

19          THE COURT:  Is it correct that another way to say what

20  you just said is that a unit of Bitcoin was worth more than a

21  comparable unit than FTT for the purpose of collateralizing a

22  margin loan?

23          THE WITNESS:  Yes.  Even if they were both nominally

24  worth one dollar, the BTC would be worth more when it is being

25  used as collateral.

NA6MBAN2                          Wang – Direct                          388

1          THE COURT:  That's attributable to the larger and more

2     stable market for Bitcoin than for FTT at the time you're

3     speaking of?

4          THE WITNESS:  Yes.

5     Q.  Just to follow up on one of Judge Kaplan's questions, you

6     said more volatile.  What do you mean by that?

7     A.  It means that there is less trading activity or less people

8     willing to buy or sell it.  As a result, the price of it tends

9     to fluctuate more both day to day and fluctuated more as a

10    result of buying or selling a particular quantity of it.

11    Q.  I believe you said FTT was more illiquid.  What do you mean

12    by illiquid?

13    A.  More illiquid, meaning that there is less of it traded on

14    any particular day and fewer people who are willing to

15    market-make, which then causes its price to tend to vary more.

16         THE COURT:  And the word you were using was illiquid,

17    i-l-l-i-q-u-i-d, not liquid, l-i-q-u-i-d.  Is that right?

18         THE WITNESS:  Yes.

19    Q.  One other piggyback on another question Judge Kaplan asked.

20         You talked about the value of one Bitcoin as

21    collateral versus one FTT as collateral.

22    A.  One dollar of Bitcoin versus one dollar of FTT.

23    Q.  My apologies.  That's correct.  What if it was $1 million

24    of Bitcoin versus $1 million of FTT.  Is how they are treated

25    change?

**A-723**

NA6MBAN2                    Wang – Direct                    397

1    spot-margin program, whether it's allowed to borrow from the

2    spot-margin program.

3    Q.  Was Alameda's account even in the spot-margin program?

4    A.  Not this account.

5    Q.  So was this account doing margin borrowing?

6    A.  No.

7    Q.  Just a general approximation.  How much money did Alameda

8    take through its main account?

9    A.  A few billion dollars.  I think around $3 billion.

10   Q.  It was negative, that number?

11   A.  Yes.

12   Q.  Were those margin loans?

13   A.  No.

14   Q.  Why not?

15   A.  Because it's not in the spot-margin program.

16           THE COURT:  So this was a few billion dollars in

17   borrowing against the line of credit of 65 billion?

18           THE WITNESS:  Yes.

19           THE COURT:  Thank you.

20           MR. ROOS:  We can take this page down.  We can take

21   the whole exhibit down.

22   Q.  Was Alameda Research's line of credit always 65 billion?

23   A.  No.

24   Q.  How was it that Alameda Research got a line of credit?

25   A.  This happened a few times that Alameda had issues placing

1    orders on the exchange.  Because Alameda was one of the main

2    market makers on FTX that placed a large amount of orders in a

3    large number of markets and each of those orders needs

4    collateral to be placed.  And a few times over the years

5    Alameda would start running into issues placing orders because

6    it did not have enough collateral.  And when that happened,

7    someone from Alameda would tell Sam and Sam would tell me that

8    Alameda is having issues placing orders because it doesn't have

9    enough collateral, and then Sam asks me to take up Alameda's

10   line of credit.

11   Q.  How many times did that happen?

12   A.  A few times.

13   Q.  Did you initially move Alameda's line of credit to 65

14   billion?

15   A.  No.

16   Q.  Give us the progression.

17   A.  So initially it was just a few million dollars, a few

18   hundred million dollars, and then this kept happening, so then

19   to prevent this from continuing to be an issue, Sam asked us to

20   take it a large number.  I took it up to a billion dollars, and

21   then the issue happened again.  And then he asked me to take it

22   up even farther, and I told him I am taking it up to $65

23   billion.  He said he is fine with that, and then I did that.

24   Q.  Did you discuss the number 65 billion with the defendant?

25   A.  Yes.

**A-725**

NA6MBAN2                            Wang - Direct                            399

1   Q.  What did it mean in practice for -- withdraw the question.

2           Judge Kaplan asked you about the used line of credit

3   versus the total line of credit a few moments ago.

4           Do you remember that?

5   A.  Yes.

6   Q.  What did it mean in practice for Alameda to have a $65

7   billion line of credit?

8   A.  It means that it could potentially put on conditions that

9   would require $65 billion of collateral and, in addition, it

10  could withdraw up to that amount.

11  Q.  It can withdraw up to what amount?

12  A.  $65 billion, even if it did not have the allow-negative

13  feature turned on.

14  Q.  So I just want to be clear about that last part you said.

15  Did allow negative let Alameda make unlimited withdrawals?

16          MR. EVERDELL:  Objection.  Asked and answered.

17          THE COURT:  Overruled.

18  Q.  Did allow negative let Alameda to make unlimited

19  withdrawals?

20  A.  Yes.

21  Q.  Did a $65 billion line of credit separately also allow

22  that?

23  A.  Yes.

24  Q.  What risks, if any, did this introduce to the exchange?

25  A.  If Alameda withdrew all of that money and it was unable to

NA6MBAN2                          Wang – Direct                          402

1   Q.  What's the date on that?

2   A.  July 31, 2019.

3   Q.  How does the defendant respond?

4   A.  That its account is like everyone else's and doesn't

5   have --

6   Q.  You're referring to, Alameda is a liquidity provider on

7   FTX, but their account is just like everyone else's?

8   A.  Yes.

9   Q.  Let me ask you about that.  The date on that tweet response

10  is what?

11  A.  July 31, 2019.

12  Q.  Now, earlier in your testimony did you testify about

13  anything else on July 31, 2019?

14  A.  Yes.

15  Q.  What happened that same day?

16  A.  We created the allow-negative feature on FTX and enabled it

17  for Alameda's account and a few other accounts.

18  Q.  Was it true that Alameda was a liquidity provider in FTX,

19  but their account was just like everyone else's?

20  A.  No.

21          MR. ROOS:  We can take this down.

22  Q.  In addition to the defendant's statement about Alameda not

23  being treated differently, do you remember him making any

24  statements about how customer funds were treated?

25  A.  Yes.

**A-727**

NA6MBAN2                          Wang - Direct                          403

1   Q.  What do you recall him saying?

2   A.  That customer funds are kept safe, that they are held in

3   hot and cold wallets of FTX.

4   Q.  Who do you recall him saying that to?

5   A.  On phone calls and on Twitter and in interviews.

6   Q.  Was that true?

7   A.  No.

8   Q.  Why wasn't it true that customer funds were kept in cold

9   and hot storage wallets?

10  A.  Because some of it was withdrawn from FTX from the

11  platform.

12  Q.  By FTX?

13  A.  It was withdrawn by Alameda from FTX.

14  Q.  You said hot and cold storage wallets.  What are you

15  talking about?

16  A.  The cryptocurrency wallets that FTX had -- that FTX used

17  to -- the cryptocurrency wallets that FTX had that it used to

18  store customer assets.

19  Q.  I just want to take a step back on this for a second.  What

20  is a cryptocurrency wallet?

21  A.  It's an account on the Blockchain that holds

22  cryptocurrencies, so it has -- there are a public address --

23  the wallet has a public address, and then there is a private

24  key that the owner of the account has which allows them to

25  withdraw from the accounts.

**A-728**

NA6MBAN2                          Wang - Direct                          405

1   Q.   What did FTX advertise publicly about that?

2   A.   That it was -- that FTX had an advanced margin system and

3   advanced liquidation -- good liquidation system that ensured

4   that customers' losses won't be borne by other customers, that

5   one customer going bankrupt won't affect other customers on the

6   exchange.

7   Q.   You described for us what liquidation is earlier in your

8   testimony today, but can you walk us through the various

9   processes for liquidating an account or a position.

10  A.   Yes.  First, there is an automated process that detects

11  whether or not an account should be liquidated or not based on

12  its position size and its collateral.  When it falls below that

13  threshold, the first step, the FTX starts selling the account's

14  positions just on the open market, just on the order book.

15          After a while, if that's not enough, if the account

16  keeps losing money and its positions can't be closed this way,

17  then it goes to the backstop liquidity providers, which are a

18  set of market makers that have agreed to backstop liquidations.

19  Q.   Let me take those two parts.  The first part, when you're

20  liquidating positions, is that automatic or does someone need

21  to trade?

22  A.   Both of these are automatic.

23  Q.   And the second part, these backstop liquidity providers,

24  what does that refer to?

25  A.   There are particular market makers, other users on the

**A-729**

NA6MBAN2                          Wang - Direct                          406

1    platform who have agreed to be part of the process for

2    liquidating the other accounts.

3    Q.  When you say these other users who help be part of the

4    process to liquidate, what are you referring to?

5    A.  Once an account falls into the -- falls into the range that

6    it would require sending the account's positions to the

7    backstop liquidity providers, at that point the positions in

8    the account are sold off to the market makers along with the

9    collateral in the accounts.

10   Q.  So the backstop liquidity provider user helps to liquidate

11   the account?

12   A.  Yes.

13   Q.  What happens if the backstop liquidity provider makes some

14   money as part of that liquidation?

15   A.  So part of the profits from the liquidations goes into an

16   insurance fund, and the insurance fund is used so that if the

17   backstop liquidity provider would lose money liquidating the

18   account, they get compensated from this insurance found.

19   Q.  That brings me to my next question.  What happens when the

20   backstop liquidity provider is liquidating an account and they

21   take a loss?

22   A.  They are compensated for the loss from the insurance fund.

23   Q.  When you say backstop liquidity provider, what are we

24   talking -- who are we talking about in practical terms?  Who

25   are these backstop liquidity providers?

NA6MBAN2                          Wang - Direct                          407

1    A.  These are typically hedge funds on trade on FTX.

2    Q.  So you mentioned an insurance fund.  At a high level, what

3    was that?

4    A.  So it's an entry in FTX's database that keeps track of how

5    much funds were taken from profitable liquidations to help --

6    to hold in reserve for unprofitable liquidations.

7    Q.  Was this also called a backstop fund?

8    A.  Yes.

9    Q.  What was the purpose of the insurance fund or the backstop

10   fund?

11   A.  To ensure that if an account does not get liquidated in

12   time, that other customers of FTX and FTX itself won't be

13   affected by the loss of the customer.

14   Q.  What was the purpose of having all these steps:

15   Liquidation, backstop liquidity provider, insurance fund?

16   A.  So they are there to protect FTX and protect its other

17   customers.

18   Q.  What do you mean by protect other customers?  What were you

19   trying to prevent?

20   A.  Prevent that if one customer loses a bunch of money trading

21   that other customers of FTX won't be affected by this one user.

22   Q.  Have you ever heard of the concept of a clawback?

23   A.  Yes.

24   Q.  What's a clawback?

25   A.  When FTX was founded, on certain other cryptocurrency

NA6MBAN2                          Wang – Direct                          409

1   February 14, 2021 tweet, what does this tweet show?

2   A.  It shows the screenshot of the size of the backstop fund.

3   Q.  When you say backstop fund, this is the same insurance fund

4   that's supposed to cover losses?

5   A.  Yes.

6   Q.  And the number here, what is the size of the backstop fund

7   listed?

8   A.  Five and a half million USD and five million FTT.

9   Q.  Now, was this number listed on the tweet accurate?

10  A.  No.

11  Q.  Why not?

12  A.  For one, there is no FTT in the insurance fund.  It's just

13  the USD number.  And, two, the number listed here does not

14  match what was in the database.

15  Q.  What do you mean, it doesn't match?

16  A.  The number in the databases was a different number.

17  Q.  Where did this number come from?

18  A.  This comes from a page on the website that claims to show

19  what was in the insurance fund, but it was actually calculated

20  separately.

21  Q.  What do you mean, claims to show?

22  A.  So it's labeled as a backstop fund.  It shows a number.

23  But that number also calculated in a different process from

24  what the insurance fund was actually using.

25  Q.  Is it a real number?

NA61BAN3                          Wang – Direct                          420

1    accounts to be liquidated.

2    Q.  Okay.  And he said that FTX never had a day where there

3    were blowouts greater than revenue.  Did you hear that?

4    A.  Yes.

5    Q.  Was that true?

6    A.  No.

7    Q.  Why not?

8    A.  There were days where FTX lost more money from customers

9    going——being liquidated than FTX earned in trading fees.

10   Q.  Okay.  And on those days what did FTX do to deal with those

11   expenses or losses?

12   A.  It transferred them to Alameda.

13   Q.  And who, if anyone, said that FTX should do that?

14   A.  Sam did.

15   Q.  All right.  Let's turn to the year 2022.

16          MR. ROOS:  We can put our binders and the recording

17   away.

18   Q.  Turning to 2022, were there any times when you spoke with

19   the defendant about Alameda having a negative balance?

20   A.  Yes.

21   Q.  Did you ever observe the defendant looking at Alameda's

22   negative balance?

23   A.  Yes.

24   Q.  What did you see him doing?

25   A.  So——so Sam had six monitors connected to his computers and

NA61BAN3                    Wang - Direct                    422

1   Okay.  Did there come a time when you worked on a project to

2   calculate Alameda's total balances?

3   A.  Yes.

4   Q.  What gave rise to that project?

5   A.  There was a group chat that Sam started where he asked me

6   to figure out what Alameda's balances on FTX were.

7   Q.  At that time what was taking place in the cryptocurrency

8   market?

9   A.  Prices for a bunch of cryptocurrencies had fallen by a

10  large amount.

11  Q.  And you testified yesterday that Alameda funded itself

12  through loans.  Do you remember that?

13  A.  Yes.

14  Q.  Was that true in 2022 as well?

15  A.  Yes.

16  Q.  Okay.  And what was happening at Alameda with respect to

17  its loans at this time in June 2022?

18  A.  Some lenders were asking for their money back.

19  Q.  As part of the defendant's project to review Alameda's

20  balances on FTX, did you work on a spreadsheet?

21  A.  Yes.

22  Q.  And when you say spreadsheet, just so we're all clear, what

23  type of computer file are you talking about?

24  A.  So a Google Sheets.

25  Q.  And——

**A-734**

NA61BAN3                    Wang - Direct                    433

1   balances?

2   A.  Yes.

3   Q.  Let's look at Tab 2 of Exhibit 50.  What does Tab 2, or

4   Sheet 2, as it's labeled, refer to?

5   A.  It's a—it's a—it's how much Alameda has on FTX as

6   reflected in FTX's database, as opposed to Sheet 1, which was

7   as reflected in Alameda's database.

8   Q.  Okay.  And again, let's just talk about what the columns

9   refer to.  What is column A?

10  A.  Column A is the account ID of the account or subaccount at

11  FTX.

12  Q.  And so earlier we looked at a table that listed account IDs

13  within FTX's database.  Are those the same account IDs that are

14  here?

15  A.  Yes.

16  Q.  And column B, what does that refer to?

17  A.  The name of the account, the subaccount.

18  Q.  And column C, what does that refer to?

19  A.  The value in dollars of the balances of the accounts.

20  Q.  Okay.  Now do you see row 17?

21  A.  Yes.

22  Q.  Which account is that?

23  A.  That's the info@alamedaresearch.com account, the main

24  trading account.

25  Q.  What is the balance in that account as of June 2022?

**A-735**

NA61BAN3                    Wang – Direct                    434

1   A.  Negative $2.7 billion.

2   Q.  I want to be clear about something, since we've been

3   talking about fiat and crypto balances.  This 2.784 billion

4   negative number, is that part of the fiat deposit stuff you

5   were just talking about?

6   A.  No.

7   Q.  So this is separate.

8   A.  Yes.

9   Q.  Is this withdrawals, a negative balance from withdrawals of

10  cryptocurrency or of fiat?

11  A.  A combination.

12  Q.  Okay.  And I'll remove that.

13          And now I want to look at copy of Sheet 2.

14          MR. ROOS:  And if we could just expand column C, and

15  also column J.

16  Q.  And is the copy of Sheet 2 the same as Sheet 2 except it's

17  got this Gary number up there?

18  A.  Yes.

19  Q.  Okay.  All right.  But your descriptions of the

20  columns——ID, Name, Value——are otherwise the same?

21  A.  Yes.

22          MR. ROOS:  Okay.  Now, Mr. Bianco, can we sort the

23  name, sort this column by name, A to Z?  Thank you.

24  Q.  Now you said there was a bug with the fiat; is that right?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NA61BAN3                          Wang – Direct                          438

1    investment, the remaining all came from customers.

2    Q.  Let's scroll back up to where we see "Gary's number."

3           So the point where customer funds were being used, did

4    you think that was wrong?

5    A.  Yes.

6    Q.  Why?

7    A.  Because customers did not agree for us to use these funds.

8    Q.  Did you believe FTX or Alameda was allowed to use or spend

9    these customer funds?

10   A.  No.

11   Q.  Why not?

12   A.  Because we said publicly that we would not use customer

13   funds like this.

14   Q.  When you say "we," who are you talking about?

15   A.  Sam.

16   Q.  And did you think Alameda could just take the fiat deposits

17   and loan them to the——loan them to itself?

18           MR. EVERDELL:  Objection, your Honor.

19           THE COURT:  Sustained.

20   Q.  How, if at all, was Alameda allowed to take the deposits?

21   A.  It either kept it in the bank account or converted it into

22   stablecoin and deposited it back onto FTX.

23   Q.  To what extent was it allowed to loan it to itself?

24   A.  Only during this conversion.

25           THE COURT:  I'm sorry.  Repeat your answer, please.

NA6MBAN4                         Wang - Direct                        461

1   the relationship between banks being closed and stablecoin

2   processing?

3   A.  That stablecoin processing is slow because banks are

4   closed.

5   Q.  Did the defendant's tweet accurately convey the reason for

6   the delay in customer withdrawals?

7   A.  No.

8   Q.  Why not?

9   A.  Because stablecoin withdrawals were slow because FTX had

10  ran out of stablecoins.  Even if banks were open, they would

11  still not be able to be processing these.

12          MR. ROOS:  Let's take this down and put up Government

13  Exhibit 866.  This is in evidence.

14          Can we zoom in on the tweets.  Why don't we start with

15  the first tweet here.  We can zoom out and zoom in on that

16  first one.

17  Q.  Mr. Wang, have you seen these tweets before?

18  A.  Yes.

19  Q.  Did the defendant discuss with you why he posted these

20  tweets?

21  A.  No.

22  Q.  It's his Twitter account, right?

23  A.  Yes.

24  Q.  It says in this first tweet here:  FTX is fine.  Assets are

25  fine.

**A-738**

1   A.  No.

2   Q.  It will not?

3   A.  It will not.

4   Q.  Does your getting a 5K depend on the outcome of this trial?

5   A.  No.

6   Q.  What matters most?

7   A.  Telling the truth.

8           MR. ROOS:  No further questions.

9           THE COURT:  Thank you.

10          Cross-examination.

11          You may proceed.

12  CROSS-EXAMINATION

13  BY MR. EVERDELL:

14  Q.  Good afternoon, Mr. Wang.

15          I would like to discuss with you some of the different

16  business relationships that Alameda had with FTX.

17  A.  OK.

18  Q.  You said that Alameda served as a market maker on the FTX

19  exchange, correct?

20  A.  Yes.

21  Q.  Market makers make offers to buy and sell a particular

22  asset at a certain price, is that right?

23  A.  Yes.

24  Q.  They ensure that there is always an available buyer or

25  seller of a certain asset?

**A-739**

NA6MBAN4                    Wang - Cross                    479

```
 1   A.  Yes.
 2   Q.  They provide liquidity and make the trades on the exchange
 3   flow smoothly?
 4   A.  Yes.
 5   Q.  Exchanges like FTX rely on market makers to provide that
 6   liquidity, right?
 7   A.  Yes.
 8   Q.  Alameda was I think the very first market maker on FTX, is
 9   that right?
10   A.  Yes.
11   Q.  And for a period of time when FTX began operating, in 2019,
12   it was the only market maker, wasn't it?
13   A.  Yes.
14   Q.  That meant that at the beginning Alameda was on one side or
15   the other of almost all trades on FTX, is that right?
16   A.  For a short while, yes.
17   Q.  And Alameda's role as a market maker on FTX was described
18   in documents that FTX put out to the public, right?
19   A.  Yes.
20   Q.  Alameda did not remain the only market maker on FTX,
21   correct?
22   A.  Correct.
23   Q.  In fact, it was always the goal to attract other market
24   makers to FTX so that Alameda wasn't the only one?
25   A.  Yes.
```

**A-740**

NA6MBAN4                          Wang – Cross                          480

1  Q.  And by 2022, there were many market makers besides Alameda,

2  right?

3  A.  Yes.

4  Q.  Now, one thing that Alameda did as a market maker was it

5  facilitated access to stablecoins, is that right?

6  A.  Yes.

7  Q.  You mentioned stablecoin is just a cryptocurrency that's

8  pegged to an asset, right?

9  A.  Yes.

10  Q.  If FTX didn't have enough of a particular stablecoin on

11  hand to satisfy a customer's withdrawal request, Alameda would

12  go out and purchase that stablecoin and satisfy the customer's

13  withdrawal, right?

14  A.  Yes.  Either purchase it or go through the stablecoin

15  issuer by depositing dollars to a stablecoin issuer and getting

16  back the stablecoin.

17  Q.  Another service that Alameda performed is a market maker

18  was providing FTX customers with access to new

19  cryptocurrencies, right?

20  A.  Yes.

21  Q.  New cryptocurrencies are created all the time?

22  A.  Yes.

23  Q.  So FTX customers might want to be able to buy those new

24  coins on the exchange?

25  A.  Yes.

NA6MBAN4                           Wang - Cross                          481

1   Q.  So Alameda would submit offers for those new tokens before

2   they were officially listed?

3   A.  At the same time it's being listed, yes.

4   Q.  Simultaneous with their listing?

5   A.  Yes.

6   Q.  And FTX customers could start trading on those tokens

7   immediately when they were available for sale on FTX?

8   A.  Yes.

9   Q.  I think you mentioned backstop liquidity providers in your

10  testimony, right?

11  A.  Yes.

12  Q.  Alameda also served as a backstop liquidity provider on

13  FTX, is that right?

14  A.  Yes.

15  Q.  Backstop liquidity providers agreed to buy assets that are

16  held by users whose accounts are losing too much money, right?

17  A.  Yes.

18  Q.  And that protects the rest of the FTX customers from

19  incurring losses, right?

20  A.  Yes.  As well as FTX itself.

21  Q.  And FTX itself?

22  A.  Yes.

23  Q.  The liquidity provider will step in to purchase those

24  assets of the failing customer?

25  A.  Yes.

NA6MBAN4                    Wang - Cross                         482

1  Q.  And Alameda was not the only backstop liquidity provider on

2  the FTX exchange?

3  A.  Yes, correct, it was not the only one.

4  Q.  But Alameda did agree to buy the assets even if other

5  backstop liquidity providers could not?

6  A.  Correct.

7  Q.  So the backstop liquidity provider of last resort, correct?

8  A.  Yes.  Not only a last resort, but also last resort, yes.

9  Q.  But they would agree to step in if nobody else could buy

10 the assets?

11 A.  Yes.

12 Q.  Now, let me ask you about some of the things you testified

13 about.

14         You testified about certain, I think you called them

15 special privileges that Alameda had on FTX, is that right?

16 A.  Yes.

17 Q.  And they were coded into the code base?

18 A.  Yes.

19 Q.  And you were one of the people who did that coding, you

20 said?

21 A.  Yes.

22 Q.  And Nishad was another?

23 A.  Yes.

24 Q.  One of them you talked about was the allow-negative

25 function, is that right?

NA6MBAN4                    Wang - Cross                        483

1    A.  Yes.

2    Q.  I think you said that allowed customers to withdraw even

3    beyond their balance, right?

4    A.  Yes.

5    Q.  It even allowed the balance to go negative if need be,

6    right?

7    A.  Yeah, if it's enabled to the new accounts.

8    Q.  And I think you said that that flag was coded into the

9    database sometime in 2019?

10   A.  Yes.

11   Q.  And it was applied to Alameda's accounts also in 2019?

12   A.  Yes.

13   Q.  Now, you, I think, testified that the feature allowed

14   Alameda to withdraw funds, regardless of the amount of funds in

15   its account, right?

16   A.  Yes.

17   Q.  And it allowed Alameda to carry a negative balance?

18   A.  Yes.

19   Q.  Now, isn't it true that the reason this feature was

20   implemented was to facilitate Alameda's market-making

21   functions?

22   A.  It was for paying for its expenses and for doing stablecoin

23   conversions.

24   Q.  As we discussed, those stablecoin conversions were part of

25   Alameda's market-making functions.

**A-744**

NA6MBAN4                          Wang – Cross                          484

 1   A.  The stablecoin conversions wasn't really market making per

 2   se.  It was for facilitating customers' money to do a deposit

 3   and withdrawal, different forms of stablecoins for USD.

 4   Q.  Mr. Wang, do you recall discussing this topic with the

 5   prosecutors, the allow-negative function?

 6   A.  Yes.

 7   Q.  In particular, do you recall speaking to the prosecutors on

 8   November 17?

 9   A.  Yes.

10   Q.  That was one of the first times you spoke to the

11   prosecutors?

12   A.  Yes.

13   Q.  And do you recall at that time being asked about the

14   allow-negative function?

15   A.  Yes.

16   Q.  Isn't it true that at that meeting there were the -- the

17   prosecutors were there, right?

18   A.  Yes.

19   Q.  And the FBI agents were there, correct?

20   A.  Yes.

21   Q.  And you there as well of course?

22   A.  Yes.

23   Q.  And you were proffering to the government at that meeting,

24   right?

25   A.  Yes.

NA6MBAN4                           Wang – Cross                           485

1    Q.  This was your attempt --

2             THE COURT:  Could we get to the point.

3             MR. EVERDELL:  Yes, your Honor.

4    Q.  Isn't it true, Mr. Wang, that at that meeting you told the

5    prosecutors that the allow-negative flag was added to Alameda

6    as part of their role as a market maker?

7    A.  I don't remember exactly what words I said.

8    Q.  Let's see if we can refresh your recollection.

9             MR. EVERDELL:  Let's put up on the screen, if we

10   could, what's been marked for identification as 3585-009.  This

11   is just for the witness.  Go to page 3 and blow up the last

12   paragraph.

13   Q.  If we could read the first sentence, Mr. Wang.

14            THE COURT:  To yourself.

15            MR. EVERDELL:  To yourself.

16   A.  OK.

17   Q.  You've read it?

18   A.  Yes.

19   Q.  Does that refresh your recollection about whether you told

20   the prosecutors at your meeting on November 17 that the

21   allow-negative flag was added to Alameda as part of their role

22   as a market maker?

23   A.  I mean -- I don't remember if I said exactly this or not.

24   Q.  You don't remember whether you said it or not?

25   A.  No.

NA6MBAN4                          Wang - Cross                                486

1    Q.  Is it true that that's what's said there?

2           MR. ROOS:  Objection.

3           THE COURT:  Sustained.

4           And don't do that again, Mr. Everdell.

5           MR. EVERDELL:  Yes, your Honor.

6           We will take that down.

7           THE COURT:  The jury will disregard that question.

8    Q.  You also, I think, spoke to the prosecutors again on August

9    31, isn't that right?

10   A.  Yes.

11   Q.  And were you -- I believe you were again asked about the

12   allow-negative flag at that meeting as well?

13   A.  Yes.

14   Q.  And isn't it true that at that meeting you also told the

15   prosecutors that the allow-negative flag was there because it

16   was necessary from when you converted between stablecoins and

17   that this was a part of Alameda's market-making functions?

18   A.  I don't remember if I used the words market-making

19   functions or not, but I definitely did say the first parts.

20   Q.  You said the first part, but you don't recall saying that

21   it was part of their market-making functions?

22   A.  I may well have, but I don't remember.

23   Q.  Let me see if I can refresh your recollection.

24          MR. EVERDELL:  If we can pull up please what's been

25   marked for identification as 3585-025.

**A-747**

NA6MBAN4                         Wang - Cross                          487

 1              If we could go to page 7 of that document, the bottom,

 2    the second paragraph.

 3    Q.  If you could read that to yourself, Mr. Wang.

 4    A.  Yes.

 5    Q.  Does that refresh your recollection about whether or not

 6    you told the prosecutors, on August 31 of 2023, that in order

 7    to do a stablecoin conversion that it was -- that the

 8    allow-negative flag was necessary for that and that this was

 9    part of Alameda's market-making function?

10              MR. ROOS:  Objection.  Compound.

11              THE COURT:  Sustained.  Form.

12              MR. EVERDELL:  I'll break it up.

13    Q.  Do you recall saying to the government -- does it refresh

14    your recollection that you told the government that the

15    allow-negative flag was necessary for converting between

16    stablecoins?

17    A.  Yes.

18    Q.  And does it refresh your recollection that you also told

19    the government that this was part of Alameda's market-making

20    function?

21    A.  I don't know if I used those exact words or not.  I may

22    have said market making.  I may have also said for the

23    functionality of the exchange.

24              MR. EVERDELL:  Take that down.

25    Q.  Being able to go negative was necessary so that Alameda

**A-748**

NA6MBAN4                    Wang – Cross                         488

1   could satisfy stablecoin requests, isn't that right?

2   A.  Yes.

3   Q.  To provide stablecoins to customers, Alameda sometimes had

4   to withdraw one stablecoin from the exchange and convert it to

5   another and then put the new stablecoin back onto the exchange,

6   right?

7   A.  Yes.

8   Q.  And to do that Alameda sometimes had to go negative in its

9   balance, is that right?

10  A.  Yes.

11  Q.  And Alameda wasn't the only customer that could go negative

12  in a particular coin, isn't that right?

13  A.  I'm sorry.  Can you repeat that question.

14  Q.  FTX is a margin exchange, isn't that right?

15  A.  Yes.

16  Q.  So customers that are engaging in margin trading have to go

17  negative in particular coins when they borrow things that they

18  don't have, correct?

19  A.  If they have spot margin enabled, yes.

20  Q.  If they have spot margin enabled, and they borrow an asset

21  that they don't have, they will go negative with the coins, is

22  that right?

23  A.  Yes.

24  Q.  Now, I'll return to that in a minute, but I want to get to

25  another function that you discussed.

NA6MBAN4                           Wang - Cross                           489

1              One of the other special privileges you discussed was

2      the line of credit, correct?

3      A.  Yes.

4      Q.  You said that at one point Alameda had a $65 billion line

5      of credit?

6      A.  Yes.

7      Q.  And you said that that allowed Alameda to effectively

8      borrow unlimited amounts of -- from the FTX exchange because it

9      had unlimited collateral, right?

10     A.  Yes.

11     Q.  Isn't it also true that the line of credit?

12              THE COURT:  I'm sorry.  Excuse me.

13              Because it had unlimited collateral?

14              THE WITNESS:  It has the $65 billion of collateral so

15     it could -- because it had that and it also had the

16     can-withdraw-below-borrow column set on their accounts.  In

17     addition to being able to withdraw because of allow negative,

18     they could also withdraw a large amount of funds because they

19     had the line for the -- in addition to having the

20     allow-negative flag sets, which would allows them to drop

21     funds, they also had the large line of credit, and they had the

22     can-withdraw-below-borrow flags set under accounts.

23              THE COURT:  When you referred to collateral a minute

24     ago, it was to the line of credit, is that right?

25              THE WITNESS:  Yes.

**A-750**

NA6MBAN4                        Wang – Cross                        490

1           THE COURT:  Go ahead.

2   Q.  The line of credit could function as collateral, right?

3   A.  Yes.

4   Q.  Now, that large line of credit that you discussed was also

5   originally provided for a market-making purpose, is that

6   correct?

7   A.  Yes.

8   Q.  As a primary market maker, Alameda had to act as the buyer

9   in a lot of trades, as we discussed, right?

10  A.  Yes.

11  Q.  That meant it often had to borrow funds on margin to make

12  purchases as its function as a market maker?

13  A.  Well, it wasn't borrowing on margin because it did not have

14  spot margin enabled, so it could not be borrowing spot tokens.

15  Q.  But it did have to make a number of trades on a day-to-day

16  basis as a market maker?

17  A.  Yes.

18  Q.  And if it was making so many trades as the primary market

19  maker, it might exceed the collateral it had posted if it were

20  making so many trades?

21  A.  If they were all going in one direction, yes.

22  Q.  I think you testified about some conversations that you had

23  with Sam about this issue, right, about the size of the line of

24  credit?

25  A.  Yes.

**A-751**

NA6MBAN4                              Wang - Cross                              491

1   Q.  I think you said that originally you -- it needed to be

2   increased, right, as things -- as time went on?

3   A.  Yes.

4   Q.  And at first it started with smaller amounts, right?

5   A.  Yes.

6   Q.  Maybe in the size of a million or so, right?

7   A.  Yes.

8   Q.  And then you'd hit that limit, correct?

9   A.  Yes.

10  Q.  So you have to increase it again?

11  A.  Yes.

12  Q.  And there were a couple of these iterations where it hit

13  the limit, isn't that right?

14  A.  Yes.

15  Q.  And so, ultimately, Sam asked you to increase the limit so

16  that this wouldn't happen again, right?

17  A.  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

**A-752**

NA61BAN5                          Wang – Cross                              492

1    BY MR. EVERDELL:

2    Q.  Okay.  And so you said that the number eventually picked

3    was 65 billion; is that right?

4    A.  Well, the first——the first time, we picked a number so high

5    that it would never be hit, that kind of number was picked was

6    1 billion, and then it was hit again, and then the number

7    picked was 65 billion.

8    Q.  Okay.  But the goal of doing this was simply to get to a

9    point where it wouldn't——it wouldn't impact the trading

10   activity, right?

11   A.  It would not impact Alameda placing orders on the exchange

12   for market making.

13   Q.  In its role as a market maker, right?

14   A.  Yes.

15   Q.  And you don't recall who picked the 65 billion number, do

16   you?

17   A.  It was——I mean, it was one of the two of us.

18   Q.  Okay.  But in fact, the amount of Alameda's actual

19   borrowing on the exchange for itself never reached 65 billion,

20   right?

21   A.  Correct.

22   Q.  Okay.  So that was just sort of a notional number to make

23   sure that this problem of butting up against the ceiling didn't

24   happen again, right?

25   A.  Yes.

NA61BAN5                           Wang – Cross                              496

1   that function, right?

2   A.  Yes.

3   Q.  Okay.  And in fact, they——I don't think they were the only

4   customer that was exempted from auto-liquidation, right?

5          THE COURT:  The question is you don't think that?

6   Rephrase the question.

7          MR. EVERDELL:  Sure.

8   Q.  Alameda wasn't the only customer on FTX to be exempted from

9   auto-liquidation, right?

10  A.  Well, other accounts were manually liquidated.

11  Q.  Okay.  I'll move on.

12         MR. EVERDELL:  One moment, your Honor.

13  Q.  Sorry.  One further question about the line of credit we

14  talked about before.

15  A.  Okay.

16  Q.  That was for Alameda's info@ account, correct?

17  A.  Yes.

18  Q.  That was I think account No. 9 that you talked about

19  before?

20  A.  Yes.

21  Q.  Okay.  And you said that was Alameda's main trading

22  account, right?

23  A.  Yes.

24  Q.  Okay.  All right.  Now you testified also that one of the

25  other features was that Alameda had a bit faster trading; is

**A-754**

NA61BAN5                          Wang – Cross                          498

1   Q.  Well, it didn't——it didn't feel like it needed to have

2   Alameda use Cloudflare.

3          MR. ROOS:  Same objection.

4          THE COURT:  Sustained.

5   Q.  All right.  Well, as of October 2022, there were other

6   customers who could bypass Cloudflare too, right?

7   A.  Yes.

8   Q.  Okay.  So Alameda wasn't the only customer who could do

9   this.

10  A.  "This" being bypass Cloudflare or having slightly faster

11  auto-executions?

12  Q.  Bypass Cloudflare.

13  A.  Yes.

14  Q.  Okay.  I'm going to return to those in a bit, but I'm going

15  to move on to something different, okay?

16  A.  Okay.

17  Q.  All right.  I want to talk briefly about Alameda's role as

18  a customer on FTX, okay?

19  A.  Okay.

20  Q.  All right.  You just said that Alameda had a trading

21  account on FTX?

22  A.  Yes.

23  Q.  And its primary trading account was called the info@

24  account, right?

25  A.  Yes.

**A-755**

NA61BAN5                          Wang – Cross                          499

1  Q.  Okay.  And Alameda engaged in margin trading on FTX?

2  A.  Did not——well, the main account did not engage in spot

3  margin trading.  They traded futures.

4  Q.  But there were——Alameda had dozens or hundreds of

5  subaccounts, didn't it?

6  A.  Yes.

7  Q.  Okay.  And some of those subaccounts had margin trading

8  enabled.

9  A.  Yes.

10  Q.  So those subaccounts engaged in margin trading on FTX.

11  A.  Well, those subaccounts——so there were a few subaccounts

12  involved in this.  One of them had "Allow Negative" sets and

13  another subaccount had small-margin lending enabled, and assets

14  were transferred from the "Allow Negative" subaccount to the

15  spot margin trading subaccount to the users.

16  Q.  I believe my question was simply:  Did Alameda, in one of

17  its subaccounts, engage in margin trading?

18  A.  Well, it didn't——I don't think either of those two accounts

19  borrowed on the spot margin or——one of them was "Allow

20  Negative," the other one engaged in spot margin lending.

21  Q.  All right.  Well, you said that Alameda borrowed money from

22  the exchange, yes?

23  A.  Yes.

24  Q.  And you spoke to Sam early on about Alameda's borrowing

25  from FTX; is that right?

**A-756**

NA61BAN5                        Wang – Cross                        508

1   A.  Yes.

2   Q.  All right.  You were the chief technical officer; is that

3   right?

4   A.  Yes.

5   Q.  That's the CTO, right?

6   A.  Yes.

7         MR. ROOS:  Objection.  This is all cumulative of the

8   direct.

9         THE COURT:  Yes.  Well, this part is anyway.

10        MR. EVERDELL:  All right.  I'll move on.

11  Q.  So your role was focused on the code and the code base,

12  right?

13  A.  Yes.

14  Q.  Okay.

15        MR. ROOS:  Objection.

16        THE COURT:  It's been answered, but let's stop that,

17  please.

18        MR. EVERDELL:  Okay.  Understood, your Honor.

19  Q.  You were not focused on the business side of the business?

20        THE COURT:  What part of "let's stop that" was

21  obscure?

22        MR. EVERDELL:  Okay.  All right.

23  Q.  Let's talk briefly about the growth of FTX, okay?

24  A.  Okay.

25  Q.  Once FTX launched in 2019, fair to say it grew very

**A-757**

NA61BAN5                                                             509

1   quickly?

2   A.  Yes.

3   Q.  Do you know how many employees it had when you started in

4   2019?

5   A.  When we started, it was just Sam and I working directly on

6   FTX, and like——and then a couple other people.

7   Q.  And then by 2022, how many did you have, roughly?

8           THE COURT:  Counsel, we really did cover all of this,

9   and it's uncontroversial, and if we're really going on because

10  you want to get right to the dot of 2, I think we can break

11  seven minutes early and let you start off afresh on Tuesday.

12          MR. EVERDELL:  Sure.  That sounds fine, your Honor.

13          THE COURT:  All right, folks.  Have a wonderful

14  weekend and we'll see you Tuesday at 9:30.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

**A-758**

1   about to be and then asking new questions, and I'm not going to

2   have a problem with that.

3           MR. ROOS:  Thank you, your Honor.

4           And then the last thing is, yesterday evening your

5   Honor asked about the schedule for next week.

6           THE COURT:  Yes.

7           MR. ROOS:  So we'll have the conclusion of the cross

8   of Mr. Wang on Tuesday, and then we intend to start

9   Ms. Ellison, Caroline Ellison.

10          THE COURT:  One other thing I may wish to raise with

11  you.

12          There is something I want to bring to the attention of

13  counsel, and we have plenty of time, but it occurs to me to

14  utter the phrase "buried facts doctrine" and to put in your

15  mind the question of whether it has any relevance here or

16  anything analogous to it, and whether it's going to affect the

17  charge.  So I leave that to you.  But if you Google "buried

18  facts doctrine," you'll find out what I'm talking about, if you

19  don't know it already.

20          MR. ROOS:  Thank you, your Honor.

21          THE COURT:  Okay.  Thank you.

22          MR. COHEN:  Thank you, your Honor.

23          THE DEPUTY CLERK:  All rise.

24          (Adjourned to October 10, 2023, at 9:30 a.m.)

25

**A-759**

NAAMBAN1                          Wang - Cross                          524

1   A.  I wasn't sure exactly what assets Alameda had at the time.

2   Q.  Well, are you familiar with the term net asset value?

3   A.  Yes.

4   Q.  That's sometimes called NAV?

5   A.  Yes.

6   Q.  It just means that your assets minus your liabilities,

7   right, roughly speaking?

8   A.  Yes.

9   Q.  If you have a positive NAV, you have more assets than you

10  have liabilities, right?

11  A.  Yes.

12  Q.  Now, isn't it true that when you figured out the

13  miscalculation caused by the fiat bug, you realized Alameda's

14  overall NAV became positive?

15  A.  Yes.

16  Q.  So the overall NAV included all of Alameda's assets, no

17  matter where they were held, right?

18  A.  Yes.

19  Q.  And in fact you felt relieved when you saw Alameda's NAV

20  was positive after all of that, right?

21  A.  Yes.

22  Q.  Among other things, that meant that the fiat liability was

23  secured by assets?

24  A.  Not necessarily liquid assets and not assets that could be

25  deposited onto FTX or be used to pay customers who are

**A-760**

NAAMBAN1                        Wang - Cross                        525

1    trying --

2    Q.  I am not talking about liquid versus nonliquid.  I'm just

3    talking about assets in general.  There were assets more than

4    liabilities at that point, correct?

5    A.  According to the current -- market values that we were

6    using to compute them, yes.

7    Q.  That was enough to make you feel relieved, as you said?

8    A.  Yes.

9    Q.  And how did Caroline and Nishad appear to you when they

10   learned this?

11   A.  I don't recall.

12   Q.  Isn't it true that you believed that they also felt relief?

13   A.  I am not sure.

14   Q.  Well, once you determined that the NAV was positive for

15   Alameda, at that point Caroline paid back the lenders, isn't

16   that right?

17   A.  Yes.

18   Q.  And isn't it true that Alameda's net asset value remained

19   positive all the way up to November of 2022?

20   A.  It depends a lot on how much value you assign to Alameda's

21   investments in other companies, whether you should mark them

22   down because of the crypto downturn or not, according to a

23   calculation that's made.

24   Q.  According to some calculations, Alameda's NAV was positive

25   all the way through November of 2022?

**A-761**

NAAMBAN1                          Wang - Cross                          526

1    A.  There was some calculation that seemed to feel this, so I

2    am not, but I am not sure how accurate that was.

3    Q.  Thinking back to the numbers that we just looked at in that

4    spreadsheet, you said that the fiat@ liability that we looked

5    at was roughly negative 11 billion, right?

6    A.  Yes.

7    Q.  And Alameda's total liability was roughly negative 11

8    billion on that spreadsheet, right?

9    A.  On FTX.

10   Q.  On FTX?

11   A.  Yes.

12   Q.  So the fiat liability represented almost all of Alameda's

13   debt to FTX in June of 2022, isn't that right?

14   A.  I mean, there is a lot of positive and negative numbers --

15   the other accounts also had a bunch of positive and negative

16   numbers that summed up the deal at current market prices at the

17   time, but that some of that included Serum and --

18   cryptocurrency such as serum and FTT that were -- that were

19   illiquid and, if so, wouldn't be able to get the full value.

20   Q.  I'm simply asking about the numbers on the spreadsheet.

21   The numbers on the spreadsheet reflect about 11 billion

22   liability for fiat and almost a total of 11 billion liability

23   on the exchange, right?

24   A.  Yes.

25   Q.  Those are roughly equivalent.

**A-762**

NAAMBAN1                    Wang – Cross                    528

1   A.  Yes.

2   Q.  We have been focusing on the balance of the fiat@ account

3   just for now.  But just to be clear, the fiat@ account is

4   totally separate from the info@ account, right?

5   A.  I mean eventually the balance of one was transferred to the

6   other, into a subaccount of the other.

7   Q.  Let's step back to then June.

8           MR. EVERDELL:  We can pull up Government's Exhibit 50.

9   A.  In June, it was totally separate.

10  Q.  In June, they were separate.

11          MR. EVERDELL:  Let's look at, if we can go, sheet 2,

12  please.

13  Q.  So we have looked at this page before, right, and we see in

14  C13 and C14, that's the fiat@ liability, is that correct?

15  A.  Yes.

16  Q.  Now, if you look at C17.

17          MR. EVERDELL:  Can you highlight that, please, that

18  number.

19  Q.  That number refers to the account for

20  info@alamedaresearch.com, right?

21  A.  Yes.

22  Q.  So that's what we have been calling the info@ account,

23  right?

24  A.  The main account.

25  Q.  The main trading account?

**A-763**

NAAMBAN1                          Wang - Cross                          529

1   A.  The main account, as opposed to the subaccounts of the main

2   account.

3   Q.  For Alameda?

4   A.  Yes.

5   Q.  This is Alameda's main trading account on the FTX exchange?

6   A.  Yes.

7   Q.  And what I want to say, just to be clear, in at least June,

8   as you are doing the spreadsheet, the fiat@ account is totally

9   separate from the info@ account, right?

10  A.  Yes.

11  Q.  Because the fiat@ account was a ledger that kept track of

12  FTX's customers' cash deposits that were sent to Alameda's bank

13  accounts, right?

14  A.  Yes.

15  Q.  The customers wired those funds directly to Alameda's bank

16  accounts, not to FTX, correct?

17  A.  Yes.

18  Q.  And if customers wanted to take cash withdrawals, the fiat@

19  account would keep track of the withdrawals too, right?

20  A.  Yes.

21  Q.  The info@ account, on the other hand, you said, was the

22  main trading account, right?

23  A.  Yes.

24  Q.  And it had a bunch of different subaccounts?

25  A.  Yes.

**A-764**

NAAMBAN1                          Wang – Cross                              530

1   Q.  Some of those subaccounts had spot margin enable on them,

2   right?

3   A.  One of them did, yes.

4   Q.  So they could engage in spot-margin trading on that

5   account?

6   A.  Yes.

7   Q.  And the main account could engage in futures trading,

8   right?

9   A.  As well as -- as far as I knew, they do all the trading on

10  their main account and not the subaccounts.

11  Q.  They could do all that kind of margin trading on the main

12  account?

13  A.  They did futures trading and they did spot trading on the

14  main account.

15  Q.  Got it.

16          So if Alameda withdrew any funds from the FTX

17  exchange, it would be reflected in the info@ account, right?

18  A.  Yes.

19  Q.  Not the fiat@ account?

20  A.  Yes.

21  Q.  I think you testified on Friday that Alameda had withdrawn,

22  you used the word withdrawn, 8 billion from FTX, right?

23  A.  Well -- yes.  But it depends on whether you count the bank

24  account as part of FTX loan.

25  Q.  These are Alameda's own bank accounts, yes?

**A-765**

NAAMBAN1                        Wang - Cross                        531

1    A.  That held customer funds.

2    Q.  But if you're with withdrawing from the bank accounts,

3    you're withdrawing from Alameda's bank accounts, correct?

4    A.  You're withdrawing customer funds from an account owned by

5    Alameda, yes.

6    Q.  You are not withdrawing them off of the exchange, is my

7    point?

8    A.  Through funds that were deposited by customers onto the

9    exchange which are being housed in Alameda bank accounts which

10   then Alameda withdrew.  It depends whether that counts --

11   depends on what you want to call that.

12   Q.  You recall being asked last week about Alameda's line of

13   credit from FTX?

14   A.  Yes.

15   Q.  You testified that Alameda had a $65 billion line of

16   credit?

17   A.  Yes.

18   Q.  So if Alameda borrowed any funds from FTX under its line of

19   credit, that would be reflected in the info@ account, right?

20   A.  Yes.

21   Q.  Because the line of credit didn't apply to the fiat ledger

22   that tracked the cash deposits?

23   A.  Yes.

24   Q.  So if Alameda withdrew funds from FTX to pay back its

25   lenders in June and the months following, you would expect the

**A-766**

NAAMBAN1                         Wang - Cross                              532

1    info@ account liability to increase?

2    A.  Unless they withdrew it from a different subaccount that

3    had a negative but no line of credits.

4    Q.  But not from the fiat account?

5    A.  Not from the fiat account.

6    Q.  It would come from one of the accounts on the exchange.

7    A.  The money might still have come from the bank account.  I

8    don't know if the payments were made in cryptocurrency or in

9    dollars from bank accounts.

10   Q.  You don't know one way or the other?

11   A.  If it's cryptocurrency, then it would come from info@ or

12   one of its subaccounts.  If it is U.S. dollars, then it would

13   come from the bank account.

14   Q.  If it was cryptocurrency it would come from the info

15   account?

16   A.  Yes.

17           MR. ROOS:  Asked and answered.

18   A.  Or if it's coming from FTX, it also would come from

19   somewhere else.

20   Q.  I'm simply saying that, if there were a withdrawal from the

21   exchange of cryptocurrency to pay back lenders who withdraw

22   from the FTX exchange, that would be reflected in the info@

23   balance?

24   A.  Yes.

25   Q.  Now, the info@ account, we just looked at it, had a balance

**A-767**

NAAMBAN1                          Wang – Cross                          533

1   of negative roughly 2.7 billion in June of 2022, is that right?

2   A.  Yes.

3   Q.  That's what the spreadsheet reflects?

4   A.  Yes.  For the main account, not counting the subaccounts.

5   Q.  I think you testified as well that the main account or the

6   info account had roughly the same balance of about negative 3

7   billion in late 2021.

8   A.  That was counting all of the subaccounts together, I think.

9   Q.  But roughly between 2.7, 3 billion, depending on which

10  subaccounts you're talking about, right?

11  A.  I was looking at the total across all subaccounts, so I am

12  not sure one way or the other, if you only look at the main

13  accounts, whether that would be negative 3 billion or not.

14  Q.  Based on what you had seen in the spreadsheet in June and

15  what you saw in the end of 2021, the info@ liability was

16  roughly between 2.7 and 3 billion?

17  A.  Here you're highlighting the main account.  And in late

18  2021, I was looking at all of the subaccounts added together.

19  Q.  Fine.  But either way, we are talking in the ballpark of

20  2.7 to 3 billion, right?

21  A.  In June, the main account had that number in the ballpark

22  and in late 2021, all of the accounts together had in the

23  ballpark of that number.

24  Q.  Well, focusing on June, where it's 2.7 in the main account,

25  right?

**A-768**

NAAMBAN1                          Wang - Cross                          547

1   FTX API or something.

2   Q.  So you recall one instance where you may have spoken to an

3   investor?

4   A.  Might have been a customer.  I don't remember the details.

5   Q.  You don't remember the details.  Regardless, it was about a

6   technical subject, right?

7   A.  Yes.

8   Q.  Mr. Wang, do you recall being asked questions on direct

9   examination about clawbacks?

10  A.  Yes.

11  Q.  Those are sometimes called socialized losses?

12  A.  Yes.

13  Q.  I think you testified that clawbacks happen when customers

14  are losing money and they are not liquidated fast enough, it

15  can result in losses to other customers on the exchange, right?

16  A.  Yes.  On other -- that was a practice on other non-FTX

17  exchanges.  That's what was happening.

18  Q.  Sorry.  I'll rephrase.

19          Generally speaking, if we are talking about what might

20  happen on another exchange, right?

21  A.  Yes.

22  Q.  Clawbacks can happen if a customer is losing money, doesn't

23  get liquidated fast enough.  Then the other customers have to

24  share the loss.

25  A.  Yes.

**A-769**

NAAMBAN1                    Wang – Cross                      548

1   Q.  Now, FTX tried very hard to prevent clawbacks, isn't that

2   right?

3   A.  What do you mean?

4   Q.  Well, FTX designed a risk engine and liquidity engine that

5   would try to stop customers from losing money to the point

6   where other customers had to share in the loss?

7   A.  Yes.

8   Q.  And I think you testified that Sam said that clawbacks

9   would not happen, right?

10  A.  Yes.

11  Q.  Do you recall who Sam made those statements to?

12  A.  I mean, there was a blog post that Sam wrote where he

13  talked about how there is no clawbacks on FTX.

14  Q.  Well, isn't it true that FTX fully disclosed the risks of

15  clawbacks on its website?

16  A.  I don't think FTX even said that clawbacks is a thing that

17  could possibly happen on FTX.

18  Q.  Let me see if you can take a look at DX-964 for

19  identification.

20          MR. EVERDELL:  We can go to the second page, second to

21  last -- actually, the last two full paragraphs.

22          MR. ROOS:  Sorry.  Is he trying to get him to identify

23  the last two paragraphs, or is something else happening here?

24  Q.  I am going to ask if this refreshes your recollection.

25          MR. ROOS:  Objection to the foundation for refreshing.

**A-770**

NAAMBAN1                          Wang – Cross                          552

1   Q.  Mr. Wang, are you familiar with a document called FTX

2   stats?

3   A.  Yes.

4   Q.  What was FTX stats?

5   A.  It was an Excel spreadsheet that Sam made once in a while.

6   Q.  And that was a document that generally kept track of key

7   metrics and statistics related to the FTX exchange?

8   A.  Yes.

9   Q.  I want to ask you just about a few stats about the FTX

10  exchange, if I could.

11  A.  Sure, yes.

12  Q.  Is it true that, by 2021, FTX had roughly over 15 billion

13  in trades per day?

14  A.  Yes.

15  Q.  Is it also true that during that time FTX generated over 3

16  million in revenues per day, roughly?

17  A.  Roughly, yes.

18  Q.  And isn't it also true that, by 2022, FTX had over 6

19  million registered users?

20  A.  The number I recall is around 1 million users.  6 million

21  subaccounts, but those were only for 1 million users.

22  Q.  So users might have more than one subaccount, right?

23  A.  Yes.

24  Q.  Is the term registered user different?  Does that include

25  subaccounts?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-771**

NAAMBAN1                        Wang - Cross                        553

1    A.  That usually refers to how many actual humans, actual

2    people, actual users, not subaccounts.

3    Q.  Isn't it true then, by 2022, FTX actually had over 6

4    million registered users?

5    A.  I don't think so.

6    Q.  Would the FTX stat sheet help refresh your recollection?

7    A.  I mean, there is a different number on the stat sheet,

8    which is number of people who have visited the website.  That

9    might be the number you're looking at.

10   Q.  If you saw a page that showed total registered users, would

11   that help refresh your recollection?

12   A.  I'm pretty confident in the 1 million -- the spreadsheet

13   might just be incorrect, I don't know.  I recall seeing 6

14   million account -- entries in the accounts table, which makes

15   it subaccounts --

16   Q.  6 million accounts.  We will call it that.

17   A.  Accounts and subaccounts, yes.

18   Q.  Let me now ask you a few questions about the months after

19   you discovered the fiat@ bug.  OK?

20   A.  Yes.

21   Q.  I should say, the months after June 2022, after you fixed

22   the bug.

23   A.  Yes.

24   Q.  After you resolved the bug issue, you and Nishad Singh

25   oversaw a review of the accounting for Alameda's net asset

NAA1BAN2                    Wang – Cross                         565

1    your recollection.

2    A.  I mean, it's possible that—

3    Q.  Just take a look at the document and see if that refreshes

4    your recollection.

5    A.  I mean, not—

6            THE COURT:  Does it refresh your recollection is the

7    question.

8            THE WITNESS:  Not in particular.

9            MR. EVERDELL:  All right.  Take it down.

10   Q.  So you do not recall telling the FBI that from a technical

11   perspective, it would take a lot of work to replace Alameda as

12   a market maker?

13   A.  I mean, definitely said that would take a lot of work on a

14   technical level to replace Alameda on FTX, and I might have

15   said market maker, I might not have said market maker.  Still

16   depends on what the definition of market maker is, like if

17   you—like, last time you said that market making was placing

18   the order—

19   Q.  Mr. Wang, I'm simply asking you whether or not you said

20   that to the FBI.  I think your answer was you don't

21   specifically recall, right?

22   A.  Yes.

23   Q.  Okay.  All right.  Let's move on.

24           All right.  Mr. Wang, you were asked some questions on

25   your direct testimony about the time period in November 2022

**A-773**

NAA1BAN2                    Wang – Cross                         566

1    right before the bankruptcy.  Do you recall that?

2    A.  Yes.

3    Q.  And you testified that on November 6th, Nishad came to your

4    room because he needed you to try to increase the speed of

5    processing customer withdrawals; is that right?

6    A.  Yes.

7    Q.  Because there had been a rapid increase in the volume of

8    customer withdrawals at that point, right?

9    A.  Yes.

10   Q.  And that was because the head of Binance had tweeted that

11   he was going to sell all of his FTT tokens; isn't that right?

12   A.  At the time I didn't know about that tweet.  I mean,

13   that—that morning I did not know about that tweet.  I found

14   out about it that evening.

15   Q.  Okay.  But he had done that, right?

16   A.  Yes.

17   Q.  And Binance was FTX's main competitor, wasn't it?

18   A.  Yes.

19   Q.  And his tweet triggered effectively a run on the bank at

20   FTX, right?

21          MR. ROOS:  Objection to the characterization.

22          THE COURT:  Sustained.

23   Q.  Well, it triggered a much larger volume of customer

24   withdrawals than FTX typically experienced; is that right?

25   A.  I'm not sure if it was the tweet or the leaked balance

**A-774**

NAA1BAN2                          Wang - Cross                          567

1   sheet.

2   Q.  Okay.  Well, either way, that was a much larger volume of

3   withdrawals at that time.

4   A.  Yes.

5   Q.  And do you recall the volume of withdrawals that were

6   coming at around——on November 6th when you were asked to help

7   speed up the withdrawal process?

8   A.  Yes.

9   Q.  What was that?

10  A.  That was the part——the part that was backing up.  The part

11  that was slow was Bitcoin withdrawals.

12  Q.  I'm sorry.  The part that was slow?  Can you repeat?

13  A.  Yeah.  The part——the thing that was backed up, the thing

14  that was slow, was Bitcoin withdrawals.

15  Q.  Okay.  But my question is:  Do you remember roughly how

16  many withdrawals in dollars were happening over the course of,

17  say, November 6th?

18          THE COURT:  I'm sorry.  Were you asking the dollars,

19  the volume in dollars of all assets in respect of which

20  withdrawals were made, or are you asking about

21  dollar-denominated withdrawals?

22          MR. EVERDELL:  Understood, your Honor.  I'm asking

23  about the former.  I'm trying to get a sense of the volume of

24  withdrawals off the exchange of all types of withdrawals; not

25  just dollar withdrawals, but denominated in dollars.

**A-775**

NAA1BAN2                     Wang – Cross                          568

1    A.  Yes.  I think it was around a hundred million dollars an

2    hour.

3    Q.  An hour.  So do you know what sort of typical volume was

4    prior to that date of withdrawal volume per hour?

5    A.  Around 10 million, I think.  Yeah, around a hundred million

6    per day.  Around 5 or 10 million, probably.

7    Q.  So it was multiple above that that you were experiencing on

8    the 6th.

9    A.  Yes.

10   Q.  Okay.  Now at that point Sam asked you to calculate how

11   many additional funds were needed to be deposited on the

12   exchange if all customers withdrew their funds, right?

13   A.  Yes.

14   Q.  Okay.  And you did that calculation, right?

15   A.  Yes.

16   Q.  And I think at first you came up with 0, roughly 0.

17   A.  Yes.

18   Q.  But you knew that was not correct, right?

19   A.  Yes.

20   Q.  Because you knew that Alameda owed roughly $8 billion to

21   FTX for the fiat liability.

22   A.  I wasn't sure exactly how much they owed at the time, but

23   it seemed unlikely to me that the correct answer was 0.

24   Q.  And then Sam asked if you were including that Korean friend

25   account; is that right?

**A-776**

NAA1BAN4                    Ellison – Direct                    651

1    A.   He was still the CEO.

2    Q.   Was Alameda a customer on the FTX exchange?

3    A.   Yes, we were.   Initially we were the largest trader on the

4    FTX exchange.   Our market share decreased gradually over time.

5    Q.   As a customer on the exchange, what types of things did

6    Alameda do on FTX?

7    A.   We did trading; we provided on all of the markets on FTX

8    and did our normal sort of arbitrage-type trading there.

9    Q.   Did Alameda buy Bitcoin on FTX?

10   A.   Yes, we bought Bitcoin.

11   Q.   Did that include purchases of spot Bitcoin?

12   A.   Yes.

13   Q.   And what about Bitcoin futures?

14   A.   Yeah, Bitcoin futures too.

15   Q.   How would you describe the relationship between FTX and

16   Alameda when FTX was created?

17   A.   Initially they were very integrated, they were both run by

18   the same teams; eventually they became more separate over time,

19   though still remained fairly integrated.

20   Q.   If Alameda made money on FTX, who was the beneficiary of

21   those profits?

22   A.   Sam, because he owned Alameda.

23   Q.   When you started working at Alameda, where did the company

24   get its money from to buy cryptocurrency and to trade?

25   A.   Initially we were funded primarily by loans from—from

NAA1BAN4                    Ellison - Direct                    670

1  Q.  And after that, when Alameda needed money for trading or

2  other expenses, what sources of capital did you draw from?

3  A.  We drew from——I mean, we were funded largely with loans at

4  that point, and if we needed money for any particular thing, we

5  would take from exchanges, including FTX.

6  Q.  You mentioned loans.  Besides the line of credit, what was

7  Alameda's primary source of money to invest and do trading in

8  2021?

9  A.  It was loans from third-party crypto lending desks.

10 Q.  And initially, when you started working at Alameda, about

11 how much money was Alameda borrowing from third parties?

12 A.  Maybe around a hundred million dollars.

13 Q.  Did there come a time when the defendant spoke to you about

14 getting more loans?

15 A.  Yeah.  Around the end of 2018 or beginning of 2019, he met

16 people from Genesis, which was a large crypto lending desk, and

17 he told me he was very excited about that and he thought we

18 should try to get loans from them.

19 Q.  Did he mention any other lenders?

20 A.  None at the time that I recall, though we later, you know,

21 over the course of, especially in 2021, found more lenders.

22 Q.  And prior to that had Alameda faced any difficulty in

23 getting loans?

24 A.  Yeah, for a lot of 2018, we had a lot of trouble getting

25 loans.

**A-778**

1          THE COURT:  Yes, I understand that, but you have a

2     burden to carry on that and you wouldn't as to other witnesses.

3          MR. REHN:  We understand that, your Honor.  We're

4     asking if the Court will permit the remote testimony.

5     Obviously we would, you know, evaluate our witness list and

6     consider alternatives if the Court denied the motion.

7          THE COURT:  I think you'd better consider

8     alternatives.  I'm not ruling now, but in order for me to make

9     the findings that I need to make, I think I have to be

10    satisfied that this person is unique, important, and that means

11    noncumulative to me.  Am I wrong about that?

12         MR. REHN:  I think that's certainly a factor for the

13    Court to take into account.  So in light of that, we will

14    resubmit this issue later this week.

15         THE COURT:  Okay.  Mr. Cohen?

16         MR. COHEN:  Your Honor made my point.

17         THE COURT:  Well, these things are bound to happen in

18    a long trial.

19         MR. COHEN:  A stopped clock is right twice a day, your

20    Honor.

21         THE COURT:  Somebody else said that before.  I've

22    heard it before.

23         Okay.  Anything else this afternoon?

24         MR. REHN:  We have one more issue just to put on the

25    Court's radar.  We had also filed a letter over the weekend

NAA1BAN6                                                          744

1    regarding preclusion of the defense eliciting testimony

2    regarding the value of and shares in this Anthropic startup

3    company.

4            THE COURT:  I'm sorry.  Say it again slowly.

5            MR. REHN:  We submitted a letter to the Court over the

6    weekend——

7            THE COURT:  That was the part I got.

8            MR. REHN:  ——requesting that the Court preclude the

9    defense from eliciting any testimony——

10           THE COURT:  Oh, yes, yes, yes.

11           MR. REHN:  ——about the value of defendant's investment

12   in a company called Anthropic.

13           MR. COHEN:  Your Honor, might we respond to that and

14   put in a submission on that?

15           THE COURT:  Yes.

16           MR. COHEN:  When would you like it, your Honor?

17           THE COURT:  When would you like a ruling?

18           MS. SASSOON:  Well, your Honor, this witness who's on

19   the stand made a personal investment in Anthropic and has

20   knowledge of the company's investment in Anthropic, and so in

21   the event that the Court deems this admissible, it might be an

22   issue that we want to raise with her.  We don't think that this

23   is a permissible topic of questioning, but if it is, we may

24   want to ask her questions about it.

25           THE COURT:  And you may want to do it tomorrow.

**A-780**

NAA1BAN6                                                                 745

1          MS. SASSOON:  Yes.

2          MR. COHEN:  So we'll have something tonight, your

3    Honor, before 8:00.

4          THE COURT:  Yes, not at 11:05, as we discussed.

5          MR. COHEN:  I also think the door's been opened in

6    light of the direct, but we'll make that point in our letter.

7          THE COURT:  Well, I'm sure you will.

8          MS. SASSOON:  Your Honor, may I raise one more thing.

9          THE COURT:  Yes.

10         MS. SASSOON:  We may ask——we had a motion *in limine* in

11   our motions *in limine* that we filed before trial about the all

12   hands meeting in November where Caroline Ellison made certain

13   statements to her employees about the prior events and the

14   involvement of the defendant in borrowing FTX customer money.

15         THE COURT:  This is the "Sam I guess" meeting, right?

16         MS. SASSOON:  Yes.  So we had moved that it was an

17   agent statement, a co-conspirator statement.  We think it's

18   admissible for those two reasons based on what's been

19   established so far.  We also think it's admissible as a prior

20   consistent statement at this point given statements in the

21   opening that the witnesses had a motive to provide the

22   government information about Sam in order to get a cooperation

23   agreement, and so the fact that she made these statements prior

24   to any meetings with the government or knowing of the

25   government investigation meets the standard for prior

NAB1BAN1                    Ellison – Direct

1              (Jury present)

2              THE COURT:  Good morning, everybody.  The jurors and

3    the defendant are present, as they have been throughout.

4              Ms. Ellison, you are still under oath.

5              And Ms. Sassoon, you may continue.

6              MS. SASSOON:  Thank you, your Honor.

7     CAROLINE ELLISON, resumed.

8    DIRECT EXAMINATION

9    BY MS. SASSOON:

10   Q.  Good morning, Ms. Ellison.

11   A.  Good morning.

12   Q.  When we left off yesterday, we were talking about May of

13   2022, and I want to pick up there.

14             MS. SASSOON:  Mr. Bianco, if you could pull back up

15   Government Exhibit 49A, which we were looking at yesterday

16   afternoon.  And if you could scroll to the second page back to

17   where it talks about your worries and questions.

18   Q.  Just to be clear, the comment bubble on the side where it

19   says Sam Bankman-Fried, "Yup, and could also get worse," who

20   wrote that?

21   A.  That was written by Sam.

22   Q.  And around this time——we could take that down——in May of

23   2022, what happened around then in the cryptocurrency markets?

24   A.  There was a——an overall downturn in the cryptocurrency

25   markets, sort of precipitated by the crash of the coin Luna,

**A-782**

NAB1BAN1                    Ellison – Direct

1  but spreading to other coins in crypto as well.

2  Q.  And when you say a downturn, what does that mean?

3  A.  That means the prices of all, most——or most of all

4  cryptocurrencies went down a lot.

5  Q.  So how does that affect the value of Alameda's assets?

6  A.  It made the value of our assets go down a lot, as they were

7  mostly in cryptocurrency.

8  Q.  What about Alameda's trading positions; what happened with

9  those around this time?

10  A.  Sorry.  What's the distinction between trading positions

11  and assets?

12  Q.  Apart from coins, the trading that Alameda was doing on

13  various exchanges.

14  A.  The day-to-day trading that we were doing during this time

15  was profitable.

16  Q.  And after the value of many of Alameda's cryptocurrency

17  coins went down, what kinds of conversations, if any, were you

18  having with the defendant about Alameda's assets and balances?

19  A.  He started asking for a lot more frequent updates on

20  Alameda's positions.  I was sharing balance sheets and, yeah,

21  talking about Alameda's assets and liabilities.

22  Q.  How did the downturn in the cryptocurrency market affect

23  the billions of dollars in loans that Alameda had around this

24  time from third-party lenders like Genesis?

25  A.  They started to be recalled a bit after the market

NAB1BAN1                    Ellison – Direct

1    downturn, so mostly starting in the middle of June.

2    Q.  So in the middle of June, when lenders were recalling

3    loans, what does it mean that they were recalling loans?

4    A.  It means that they were asking Alameda to pay the loans

5    back.

6    Q.  And under the terms of the loans, was Alameda obligated to

7    repay those loans?

8    A.  Yes, we were.

9    Q.  Why is that?

10   A.  Because the majority of our loans were open-term loans,

11   meaning that the lenders could ask for them back at any time

12   and Alameda would have to repay.

13   Q.  How did you learn about Alameda's third-party lenders

14   asking for their money back?

15   A.  A variety of sources.  Some was from messages on Slack from

16   other Alameda employees, some was from being in Telegram groups

17   or in calls directly with lenders.

18   Q.  What is Telegram?

19   A.  Telegram is a messaging platform that was widely used by

20   cryptocurrency companies.

21   Q.  Was the defendant also on some of these Telegram

22   communications with Alameda's lenders in mid-June?

23   A.  Yes, he was.

24           MS. SASSOON:  Your Honor, at this time I'd ask

25   permission to approach the witness with a few printed exhibits,

NAB1BAN1                    Ellison – Direct

1   working with us on this.  Unsurprisingly have been getting

2   loans called from everyone across the board but obviously want

3   to help you guys out assuming we can get all our other

4   obligations squared away."

5   Q.  And when you said "have been getting loans called from

6   everyone across the board," what are you referring to?

7   A.  I'm referring to our open-term loans with other lenders.

8   Q.  And what was happening with those?

9   A.  They were getting called in addition to the Genesis loans.

10          MS. SASSOON:  We can take that down.

11  Q.  What was your reaction to third-party lenders all asking

12  for their money back around the same time in mid-June?

13  A.  I was very stressed out, and we were talking about billions

14  of dollars, and I knew that Alameda had lost a lot of money in

15  the cryptocurrency market downturn and we didn't have the

16  liquid assets to pay all of the money back and that we would

17  have to be taking money from FTX.

18  Q.  When you say "we would have to be taking money from FTX,"

19  what do you mean?

20  A.  I mean in order to repay all of our loans, we would have to

21  borrow money using our FTX line of credit.

22  Q.  And whose funds would that be?

23  A.  That would be coming from customer funds.

24  Q.  During this time did you attempt to calculate whether

25  Alameda had the ability to repay its lenders with the money

**A-785**

NAB1BAN1                      Ellison – Direct

1    to be discussing.

2    Q.  What did the defendant tell you to do, if anything, when

3    you showed him Alameda's balances?

4    A.  He continued to direct me to repay loans.

5    Q.  When the defendant directed you to repay loans after

6    looking at your analysis of Alameda's balances, what did you

7    understand the defendant to be telling you to do?

8    A.  I understood that he was telling me to borrow money using

9    our FTX line of credit to repay loans when they were called.

10   Q.  And when you say you understood him to be telling you to

11   use Alameda's line of credit on FTX, can you spell out what you

12   mean.

13   A.  I understood that he was telling me to use FTX customer

14   funds to repay our loans.

15   Q.  And why was that your understanding?

16   A.  Because I had shared Alameda's balance sheet information

17   with him that showed that that was the only source of capital

18   large enough to repay all of our loans.  We also had, you know,

19   had many discussions in the past about using this FTX line of

20   credit for various Alameda purposes, including discussions

21   about using it as a——a backstop if our loans were called, so

22   I——yeah, I considered that to be the most reasonable and really

23   the only option on the table.

24   Q.  So what did you do when the defendant told you to repay its

25   lenders despite Alameda's balances?

NAB1BAN1                    Ellison - Direct

1    A.  I continued to direct the Alameda settlement team to repay

2    lenders.

3    Q.  Using what money?

4    A.  Using FTX customer assets in addition to Alameda's other

5    liquid assets that we had.

6    Q.  Over what time period did you repay Alameda's lenders?

7    A.  A lot of it was in June, and there continued to be loan

8    recalls over the next few months as well.

9    Q.  In the course of the defendant telling you to repay these

10   loans, did you also analyze Alameda's overall balances on FTX?

11   A.  Yeah, we did.

12   Q.  Why did you do that?

13   A.  Sam asked us to put together a spreadsheet showing

14   Alameda's balances on FTX.

15   Q.  You said "Sam asked us."  Who's "us"?

16   A.  Me, Gary, and Nishad.

17           MS. SASSOON:  Mr. Bianco, if you could just pull up

18   Government Exhibit 1803.  And that's already in evidence.  And

19   this can be published.

20   Q.  Who is this?

21   A.  That's Nishad.

22           MS. SASSOON:  You can take that down.

23           And now, Mr. Bianco, can you please pull up Government

24   Exhibit 50, which is already in evidence, and which the parties

25   have stipulated is a document called Alameda Balances by FTX

**A-787**

778

NAB1BAN1                    Ellison - Direct

1   being unable to meet customer withdrawals.  Were those facts

2   and predictions concerning to you?

3   A.  Yeah, they were extremely concerning.  I was——yeah, really

4   worried that FTX customers would try to withdraw a bunch of

5   money at once and that we wouldn't be able to process those

6   withdrawals.

7   Q.  How did the concerns you had in mid-June compare to the

8   concerns you expressed having in May 2022 when you described

9   Alameda's leveraged position in that document to the defendant?

10  A.  I mean, they were much worse at that point.  In May 2022,

11  it was more like I was concerned that if the crypto market went

12  down that we would be in a bad situation, whereas in June 2022,

13  we were in the bad situation and I was mostly concerned that if

14  anyone would find out, everything would come crashing down.

15  Q.  So why, given all that, did you proceed to use customer

16  money to repay Alameda's lenders?

17  A.  Because——I mean, because Sam told me to and because I

18  thought that if Alameda just defaulted on its loans and went

19  bankrupt right away, that would be really bad, and if we used

20  customer money, at least there was some chance that we would be

21  able to fix things somehow, that maybe Sam would be able to

22  raise money to repay our loans.

23  Q.  What was your view at the time about whether what you were

24  doing was wrong?

25  A.  Yeah, I thought it was wrong.

**A-788**

779

NAB1BAN1                    Ellison - Direct

1    Q.  And from mid-June onward what happened to the concerns you

2    were having?

3    A.  They continued.  I mean, not—not much materially really

4    changed over the next few months.  The crypto market didn't go

5    back up and we didn't find any new sources of capital, so I

6    continued to live with the constant worry of—of people finding

7    out or of FTX customers withdrawing too much money at once.

8    Q.  We looked at a chat from June 13, 2022, with Genesis.

9    Through that week of June 13, 2022, about how much money did

10   Alameda repay to its third-party lenders?

11   A.  I think it was a few billion dollars; maybe in the ballpark

12   of 5.

13   Q.  And did that include through the use of FTX customer money?

14   A.  Yeah.

15   Q.  And over the next two months or so, about how much money

16   did Alameda repay its lenders?

17   A.  It was another few billion dollars.

18   Q.  And so was that money Alameda was borrowing on top of the

19   borrows we saw from June 13th?

20        MR. COHEN:  Objection, leading.

21        THE COURT:  Sustained.  Form.

22   Q.  How did the money, the billions of dollars used to repay

23   lenders, compare to the figures we looked at from June 13,

24   2022?

25   A.  We were continuing to repay lenders and borrow more money

**A-789**

784

NAB1BAN1                    Ellison - Direct

1    A.  A balance sheet to send to Genesis.

2    Q.  What was your reaction to getting a request from Genesis on

3    June 18th for a balance sheet at that time?

4    A.  I was very stressed out.  I thought that I——it wouldn't be

5    a good idea to ignore them, and I——I wanted to reassure them

6    about Alameda's financial state, but the facts were that

7    Alameda was in a very bad situation that we were——had very

8    risky positions on and that we had been borrowing increasing

9    amounts of money from FTX customers, and I didn't want Genesis

10   to know any of that.

11   Q.  Did you discuss your concerns with the defendant?

12   A.  Yes, I did.

13   Q.  And at first where did you discuss your concerns with him?

14   A.  In a group meeting with him, Gary, and Nishad.

15   Q.  Where was that meeting?

16   A.  It was——I don't remember if it was in the office or in our

17   apartment.

18   Q.  And where were you living at that time?

19   A.  In the Bahamas.

20   Q.  And did he sometimes have work meetings in your apartment?

21   A.  Yeah.

22   Q.  What was discussed at the meeting?

23   A.  We discussed Alameda's most recent balance sheet, and I

24   asked what I should say to Genesis, and Sam gave some

25   suggestions.

**A-790**

785

NAB1BAN1                    Ellison – Direct

1   Q.  What kinds of suggestions did the defendant give you about

2   Alameda's balance sheet?

3   A.  He suggested that the people in that meeting could give our

4   personal Serum tokens to Alameda to put on the balance sheet

5   and that we could put his holdings of FTX equity in the Paper

6   Bird entity on the balance sheet.

7   Q.  If you followed the defendant's suggestions, what effect

8   would that have on the balance sheet?

9   A.  It would make our assets look larger.

10  Q.  After this meeting what did you do?

11  A.  I went back and prepared a balance sheet.

12  Q.  And did you make changes to the balance sheet?

13  A.  Not initially.  Initially I just prepared a—a—yeah,

14  normal balance sheet.

15  Q.  And what did you do then?

16  A.  I sent it to Sam and said, *This is our balance sheet, I*

17  *think it looks bad, I don't think we can send this to Genesis.*

18  *Do you agree?*  And he said, *Yeah, that sounds right.*

19  Q.  Why did you think the balance sheet looked bad and couldn't

20  send it to Genesis?

21  A.  Overall it showed that Alameda was in a very risky

22  position.  It showed that we were borrowing, you know, around

23  $10 billion from FTX, and that we had about $5 billion of loans

24  to FTX executives and to affiliated entities.

25  Q.  Just to be clear, why did you care what Genesis thought of

**A-791**

NAB1BAN1                    Ellison – Direct

1    right?

2    A.  Yes, that's right.

3    Q.  What about the liquid liabilities?  How did they compare in

4    each of these?

5    A.  The liquid liabilities are much lower in alternative 7.

6    It's only $1.8 billion compared to $12 billion.

7    Q.  So if a lender looked at the alternative 7 balance sheet,

8    what's conveyed here about whether Alameda had liquid assets to

9    cover its liquid liabilities?

10            MR. COHEN:  Objection.

11            THE COURT:  Sustained, form.

12   Q.  In alternative 7, what is conveyed about whether Alameda

13   had the liquid assets to cover its liquid liabilities?

14   A.  Alternative 7 makes it look like we had plenty of liquid

15   assets to cover our open-term loans.

16   Q.  Was that true?

17   A.  No.

18   Q.  Why not?

19   A.  Because as you can see in the more accurate main tab, we

20   had around $12 billion of liquid liabilities and more like 3 to

21   $7 billion of liquid assets.

22   Q.  You testified that you sent this to the defendant over

23   Signal.  What, if anything, did you say when you sent this to

24   the defendant by Signal?

25   A.  I said, *Here are some alternative presentations I came up*

NAB1BAN1                    Ellison - Direct

1   *with for the balance sheet*, and I explained roughly what I did

2   in various tabs.

3   Q.  And in substance, how did you describe what you had done in

4   alternative 7?

5   A.  I said I had netted out the exchange borrows against the

6   related-party loans and then moved the rest to the long-term

7   loans category.

8   Q.  What did the defendant say?

9   A.  He said that alternative 7 looked good and that I should

10  send that one to Genesis.

11  Q.  Once the defendant chose alternative 7, what did you do?

12  A.  I sent it to Genesis.

13  Q.  Why did you send it to Genesis?

14  A.  Because Sam directed me to; because Genesis was asking for

15  a balance sheet, and I needed to send something.

16          MS. SASSOON:  Mr. Bianco, can you publish Government

17  Exhibit 1650.

18  Q.  What's the date of this Telegram message between you and

19  Matt Ballensweig at Genesis?

20  A.  This is on June 20, 2022.

21  Q.  Looking at the first two messages, the second one says,

22  "here you go," and above that there's a link.  What is that

23  link?

24  A.  The link is to the——a Google Doc of the balance sheet that

25  I sent them.

**A-793**

NAB1BAN1                    Ellison – Direct

1   Q.  What did Matt Ballensweig respond?

2   A.  He said, "Thanks so much.  Appreciate it.  Just caught up

3   with Sam, by the way.  Let's keep in tight comms this week."

4          THE COURT:  There are people who don't have any idea

5   what a Google Doc is, and it might be useful for the witness to

6   explain it now.

7          MS. SASSOON:  Thank you, your Honor.

8   Q.  Ms. Ellison, can you explain what a Google Doc is.

9   A.  Yeah.  So a Google Doc is a document or a spreadsheet

10  that's kept on your Google account, so it's accessible online,

11  and it can be shared with people and edited and commented on by

12  other people online.

13  Q.  Let's go to page 2.

14          Can you read the first message on this page from Matt

15  Ballensweig?

16  A.  It says, "hey there – so spoke with Sam and I'm sure he

17  filled you in—-wouldn't be pushing you guys here if it wasn't

18  totally necessary but we want to unwind $500 million in 250

19  clips.  If you guys can show us what that's going to cost, it

20  would be helpful, but we're basically in that position where

21  this is no longer a luxury."

22  Q.  What does it mean to unwind 500 million in 250 clips?

23  A.  That meant he wanted us to repay $500 million of our loans

24  in $250 million at a time.

25  Q.  And what's your understanding, if any, of the role that the

NAB1BAN1                    Ellison – Direct

1    balance sheet played in that request?

2    A.  I'm not aware that it played any specific role.  He told me

3    that it was because of recalls that they were getting on their

4    end.

5    Q.  Can you just explain what you mean by recalls that Genesis

6    was getting on their end.

7    A.  It meant Genesis was——the money that they were lending us,

8    they were borrowing from others, including retail lending

9    platforms, and customers were withdrawing their money from

10   those platforms, so Genesis had to have a way to fulfill those

11   withdrawals, and that's why they needed their money back from

12   us.

13   Q.  This refers to speaking with Sam.  What, if anything, did

14   the defendant tell you about his call with Matt Ballensweig?

15   A.  He told me that he talked to Matt and that Matt said that

16   Genesis really needed the money and implied that they might go

17   under or have to default on some loans if they didn't get it,

18   so he said that we should make that happen but show them a

19   reasonable price for it.

20           MS. SASSOON:  Mr. Bianco, can you show the witness

21   what's been marked as Government Exhibit 17.

22   Q.  Do you recognize this?

23   A.  Yeah.

24   Q.  What is it?

25   A.  This is the balance sheet that I ended up sending to