# 24-961

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ZIXIAO GARY WANG, CAROLINE ELLISON, NISHAD SINGH, RYAN SALAME,

*Defendants,*

FTX TRADING LTD., WEST REALM SHIRES INC,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors,*

SAMUEL BANKMAN-FRIED, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX FOR DEFENDANT-APPELLANT
## VOLUME IV OF V
## (Pages A-795 to A-1085)

ALEXANDRA A.E. SHAPIRO
THEODORE SAMPSELL-JONES
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
   17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

PAGE

District Court Docket Entries in *United States v. Bankman-Fried*,
No. 22-cr-673 (LAK) (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Excerpts of Arraignment Transcript, dated January 3, 2023 . . . . . . . . . . . . . A-86

Memorandum and Order Modifying Release Conditions,
dated February 1, 2023 (Dkt. 58) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-88

Order Modifying Release Conditions, dated February 14, 2023
(Dkt. 68) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-95

Excerpts of Transcript of February 16, 2023 Pre-Trial Conference . . . . . . . A-96

Third Superseding Indictment, dated February 23, 2023 (Dkt. 80) . . . . . A-103

Fifth Superseding Indictment, dated March 28, 2023 (Dkt. 115) . . . . . . . A-142

Exhibits to Declaration of Christian R. Everdell in Support of Motion
for Additional Discovery

Exhibit 9 – Excerpts of Bankruptcy Hearing Transcript,
dated February 6, 2023 (Dkt. 137-9) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-185

Exhibit 10 – Emails dated February 16, 2023,
and January 13, 2023 (Dkt. 137-10). . . . . . . . . . . . . . . . . . . . . . . . . . . . A-205

Exhibit 11 – Email dated December 16, 2022 (Dkt. 137-11) . . . . . . . A-211

Exhibit To Bankman-Fried's Motion to Compel Discovery

Exhibit 1 – Subpoena to Fenwick & West LLP (Dkt. 151-1) . . . . . . . A-213

Excerpts of Transcript of June 15, 2023 Pre-Trial Conference . . . . . . . . . A-361

ii

PAGE

Letter from Government to Hon. Lewis A. Kaplan Re Pretrial Filings, dated June 29, 2023 (Dkt. 171) .................................... A-374

Excerpts of Transcript of July 26, 2023 Pre-Trial Conference .......... A-377

Excerpts of Transcript of August 11, 2023 Pre-Trial Conference ....... A-379

Sixth Superseding (Operative) Indictment, dated August 14, 2023 (Dkt. 202) ..................................................... A-381

Excerpts of Transcript of August 30, 2023 Pre-Trial Conference ....... A-399

Letter from Government to Hon. Lewis A. Kaplan Re Advice-Of-Counsel Defense Notice, dated August 18, 2023 (Dkt. 211) ....... A-401

Government's Requests to Charge, dated August 21, 2023 (Dkt. 214) .. A-404

Bankman-Fried's Requests to Charge, dated August 21, 2023 (Dkt. 215) ..................................................... A-504

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Re Advice-Of-Counsel Defense Notice, dated August 23, 2023 (Dkt. 222) ....... A-554

Letter from Government to Hon. Lewis A. Kaplan Re Advice-Of-Counsel Defense Notice, dated August 29, 2023 (Dkt. 239) ....... A-557

Letter from Bankman-Fried to Hon. Lewis A. Kaplan In Response To Dkt. 239, dated August 30, 2023 (Dkt. 240) ..................... A-565

Order On Motions To Exclude Proposed Expert Testimony, dated September 21, 2023 (Dkt. 287) ........................... A-572

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking Clarification And Reconsideration Of Rulings, dated October 2, 2023 (Dkt. 306) ................................ A-577

iii

PAGE

Letter from Government to Hon. Lewis A. Kaplan Moving to
    Preclude Evidence Of Current Value Of Investments,
    dated October 8, 2023 (Dkt. 315) ................................. A-582

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
    Permission To Cross Examine Gary Wang On Involvement of
    Counsel In Loan Structuring, dated October 9, 2023 (Dkt. 316) ... A-585

Letter from Bankman-Fried to Hon. Lewis A. Kaplan In Response To
    Dkt. 315, dated October 10, 2023 (Dkt. 317) ..................... A-588

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
    Permission To Cross Examine Caroline Ellison On Involvement
    of Counsel In Creating Auto-Deletion Policies,
    dated October 10, 2023 (Dkt. 318)............................... A-590

Letter from Government to Hon. Lewis A. Kaplan Re Additional
    Requests To Charge, dated October 19, 2023 (Dkt. 326) .......... A-592

Bankman-Fried's Amended Requests to Charge,
    dated October 19, 2023 (Dkt. 327)............................... A-598

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Re Objections
    to Government's Proposed Jury Instructions,
    dated October 24, 2023 (Dkt. 329)............................... A-658

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Providing
    Notice of Certain Direct Examination Testimony Regarding
    Involvement of Counsel, dated October 25, 2023 (Dkt. 338)....... A-664

Excerpts of Trial Transcript .......................................... A-670

**Government's Exhibits**

GX-532 FTX Investor Deck, dated March 2021 .................. A-1220

GX-558 FTX Terms Of Service, dated May 13, 2022 ............ A-1231

GX-866 @SBF_FTX Twitter Post, dated November 7, 2022...... A-1293

iv

PAGE

GX-1005 Alameda Balance on FTX in 2022 Chart . . . . . . . . . . . . . . A-1295

GX-1014 Alameda Borrowing From Third Party Lenders Chart . . A-1296

**Defense Exhibits**

DX-1617 Alameda LOC Principal Chart . . . . . . . . . . . . . . . . . . . . . . A-1297

DX-1618 FTX User Accounts Balance Chart . . . . . . . . . . . . . . . . . . A-1298

DX-1619 FTX User Accounts All Coins Balance Chart . . . . . . . . . A-1299

DX-964 (excluded) FTX Blogpost, dated October 28, 2020 . . . . . . A-1300

Exhibit to Bankman-Fried's Sentencing Submission

Excerpts of Exhibit E – November 15, 2022 Letter From James
M. McDonald To Prosecutors (Dkt. 407-34) . . . . . . . . . . . . . . . . . . . A-1304

Excerpts of Sentencing Transcript, dated March 28, 2024 . . . . . . . . . . . . A-1308

Notice of Appeal, filed April 11, 2024 (Dkt. 428) . . . . . . . . . . . . . . . . . . A-1311

**A-795**

NAB1BAN1                    Ellison – Direct

1   Genesis.

2           MS. SASSOON:  The government offers Government

3   Exhibit 17, which the parties have stipulated is a document

4   called Rough Balance Sheet, June 19, 2022, dated June 19, 2022.

5           MR. COHEN:  No objection.

6           THE COURT:  Received.

7           (Government's Exhibit 17 received in evidence)

8           MS. SASSOON:  And Mr. Bianco, can you please publish

9   Government Exhibit 17.

10  BY MS. SASSOON:

11  Q.  Ms. Ellison, what is this balance sheet?

12  A.  This is the balance sheet that I sent to Matt Ballensweig

13  at Genesis.

14  Q.  And this is the document you shared via Google Docs?

15  A.  That's right.

16          MS. SASSOON:  And Mr. Bianco, let's bring this up,

17  Government Exhibit 17, side by side with alternative 7 from

18  Government Exhibit 44.

19  Q.  Just to orient you, on the left-hand side we have

20  Government Exhibit 17, which you said was the balance sheet you

21  sent to Genesis, and on the right-hand side we have alternative

22  7.  How did these two documents compare?

23  A.  They're the same.

24  Q.  Did the balance sheet sent to Genesis identify that Alameda

25  had borrowed billions of dollars from FTX customers?

**A-796**

NAB1BAN1                    Ellison – Direct

1   A.   No.

2   Q.   And how did the total liabilities on this balance sheet

3   compare to the internal version of your balance sheet?

4   A.   The total liabilities on this one are only $10 billion,

5   whereas the internal one had about $15 billion.

6   Q.   Did you consider the financial information that you sent to

7   Genesis to be dishonest?

8   A.   Yes, I did.

9        MR. COHEN:   Objection.

10       THE COURT:   Overruled.

11  A.   Yes, I did consider it to be dishonest.

12  Q.   Why?

13  A.   Because it falsely stated the amounts of our actual assets

14  and liabilities, and it——it hid the fact that we were borrowing

15  $10 billion from FTX customers and made us look much safer than

16  we actually were.

17  Q.   You just testified that you sent what you thought was a

18  dishonest balance sheet to Genesis.  When you did that, did you

19  consider what you were doing was wrong?

20  A.   Yeah, definitely.

21       THE COURT:   Let's take our morning break here.

22       (Recess)

23

24

25

**A-797**

NABMBAN2                     Ellison - Direct

```
 1   A.  Those are all either parts of the related-party loans or
 2   investment in equity securities.
 3   Q.  Just to spell that out, is it your understanding that
 4   related-party loans were spent on these types of investments?
 5   A.  Yes.
 6             MR. COHEN:  Objection.  Leading.
 7             THE COURT:  Sustained.  Rephrase.
 8   Q.  Can you explain how these categories under the long-term
 9   column relate to the related-party loans, if at all?
10   A.  The related-party loans were used on these investments.
11   Q.  How did the total liabilities compare on the internal and
12   external version of the October balance sheet?
13   A.  On the internal version, it's 15.6 billion.  On the
14   external version, it's only 8 billion.
15   Q.  In the fall of 2022, what did you believe about Alameda's
16   ability to repay the $13 billion it had borrowed from FTX
17   customers?
18   A.  I believe that we had no way to repay it currently, and we
19   would either hope for the crypto market to go up or raise a
20   large amount of money by selling FTX equity, or something along
21   those lines.
22   Q.  Why was that your belief?
23   A.  Because from looking at these balance sheets, you can see
24   that the FTX borrows number is $13.7 billion and our liquid
25   assets are much less than that.
```

**A-798**

891

NAB1BAN3                    Ellison - Direct

1   recipient of the loans listed here?

2   A.   Sam was.

3   Q.   And looking at row 48 as an example, it says there was a

4   loan of 20 million on October 1, 2021, that was used for GAP.

5   What is GAP?

6   A.   GAP stands for Guarding Against Pandemics.  That was Sam's

7   political lobbying organization.

8   Q.   And what did you learn about how the money to GAP was

9   spent?

10  A.   I learned that it was spent on donations to congressional

11  candidates and to political action committees.

12  Q.   Overall, in the summer and fall of 2022, what did you

13  understand about where the money was coming from to make

14  additional venture investments?

15  A.   I understood that it was coming from Alameda and that

16  Alameda's money was coming from FTX customer funds.

17  Q.   In your view, by making additional investments in the fall

18  and summer of 2022, what effect did this have on Alameda's

19  ability to repay its debt?

20        MR. COHEN:  Objection.  Asked and answered.

21        THE COURT:  Sustained.

22  Q.   Let's turn to November of 2022.

23        At a high level, what happened in November of 2022?

24  A.   Alameda's balance sheet got leaked to CoinDesk, a crypto

25  news outlet.  This caused a general market concern about

892

NAB1BAN3                    Ellison - Direct

1    Alameda that increased, ultimately FTT went down a lot, and

2    people started withdrawing a lot of money from FTX, and FTX did

3    not have enough assets to meet all of those withdrawals.

4    Q.  And so what happened?

5    A.  So FTX and Alameda went bankrupt.

6              MS. SASSOON:  Let's pull up Government Exhibit 1087,

7    which is in evidence.

8    Q.  Let's start first on November 2nd, which is a Wednesday.

9    Where were you on November 2nd?

10   A.  I was on vacation in Japan.

11   Q.  And what happened on that day?

12   A.  Alameda's balance sheet was leaked to CoinDesk.

13   Q.  And when we're talking about Alameda's balance sheet

14   getting leaked, is this the internal balance sheet or a version

15   of the external balance sheet that was shared with lenders?

16   A.  This was a version of the external balance sheet that was

17   shared with lenders.

18   Q.  And what did you do when you learned that Alameda's

19   external balance sheet was leaked?

20   A.  I—I considered whether to comment for the article and

21   discussed the question in a group with Sam and others but

22   decided not to make any comment.

23   Q.  Why is that?

24   A.  I mean, most of the time by default I wouldn't comment on

25   articles, and there wasn't anything we could think of that

**A-800**

NABMBAN4                    Ellison – Direct

1    would just sell it.  So I wanted to point out that his real aim

2    in that tweet, as I saw it, was not to sell his FTT, but was to

3    hurt FTX and Alameda.

4    Q.  Can you read the defendant's message in this thread.

5    A.  Yeah.  He says:  I think the main point is just to counter

6    the PR/narrative here, and Binance probably won't take us up on

7    it.  I also think, for what it's worth, that the market is more

8    likely to buy more if we tweet it, but I don't know.

9    Q.  You wrote back:  I am about to tweet.  FTT will go up.

10            Did you post a tweet?

11   A.  Yes, I did.

12   Q.  And when you tweeted, were you trying to counter a

13   PR/narrative?

14   A.  Yes, I was.

15   Q.  What narrative?

16   A.  The narrative that FTX and Alameda had serious problems and

17   were potentially insolvent.

18   Q.  In your view, at that time, was Alameda and FTX potentially

19   insolvent?

20   A.  Yeah, absolutely.

21            MS. SASSOON:  Mr. Bianco, can you please show the

22   witness Government Exhibit 876.

23   Q.  Do you recognize this tweet?

24   A.  Yeah.

25   Q.  What is it?

**A-801**

926

NABMBAN4                    Ellison – Direct

1    enough money on the acquisition to backstop all FTX customer

2    assets.

3    Q.  What was your reaction to that?

4    A.  I was extremely relieved.  If the deal went through, it

5    would mean that all of FTX's customers would get their money

6    back, which would be more than I was hoping for at the time.

7    Q.  What happened to the deal with Binance?

8    A.  It fell through when CZ backed out of it.

9    Q.  How soon after the deal had been announced did it fall

10   apart?

11   A.  It was pretty soon.  I think it was within a day.

12   Q.  After that, was FTX able to keep up with customer

13   withdrawals?

14   A.  No, it wasn't.

15   Q.  And was Alameda able to repay its lenders in full?

16   A.  No.

17   Q.  What happened on November 11, 2022?

18   A.  I believe that was the day that FTX and Alameda declared

19   bankruptcy.

20   Q.  And at the time that Alameda and FTX declared bankruptcy,

21   about how much money did Alameda still owe its lenders?

22   A.  Its third-party lenders, do you mean?

23   Q.  Yes.

24   A.  Maybe in the ballpark of a billion dollars.

25   Q.  Did there come a time after Alameda and FTX declared

**A-802**

NAB1BAN5

1          (Jury not present)

2          THE COURT:  Okay, folks.  Be seated.

3          I think we have two open items of business that may

4    affect the cross, right?  We have this controversy about

5    mention of Anthropic and Mr. Cohen's letter of October 10th, to

6    which I think I have an answer for you.

7              The witness is out of the room.

8          Let me address a question to the government.  I

9    understand the point about mention of Anthropic.  Suppose that

10   the defendant had otherwise admissible evidence, fully

11   admissible, not about Anthropic or any other specific

12   investment but about what their letter of the 10th refers to as

13   the portfolio nature of venture capital investing.  What would

14   be the government's position about that?

15         MS. SASSOON:  So I think there are two distinct issues

16   here.  One is pre-collapse and one is post-collapse.  I think

17   anything about the portfolio post-collapse is totally

18   irrelevant.  If we're talking about pre-collapse, there was

19   some testimony that these venture investments were speculative

20   and risky, and I think that's what the defense wants to

21   address.  I think from the government's standpoint, it was

22   appropriate to elicit that information because the defense has

23   claimed a variety of the defendant——

24         THE COURT:  But it's in already, so nobody's saying it

25   wasn't.

NAB1BAN5

1          MS. SASSOON:  So I think that goes to the defendant's

2     knowledge and his intent.  But the core issue here is whether

3     he misappropriated the money, and whether he put it into a

4     government bond or a venture portfolio, it's still fraud.  And

5     so we think there's limited to no relevance to any evidence

6     that they want to bring in about how they could have shot the

7     moon with one of these investments.

8          THE COURT:  So your position is even a general

9     discussion of a portfolio nature or portfolio approach to

10    venture capital investing would be irrelevant.

11         MS. SASSOON:  One moment.

12         Yes, so we think that the safety or riskiness of the

13    investments is ultimately not relevant to the misappropriation.

14    On this question about the portfolio, I don't understand the

15    proffered relevance by the defense, but if they explain it now,

16    I would ask for an opportunity to respond.

17         THE COURT:  Well, that's your cue, Mr. Cohen.

18         MR. COHEN:  Thank you, your Honor.

19         A couple of things.  The government has put on

20    evidence that one of the ways in which the loans from FTX to

21    Alameda were invested was in a series of venture investments,

22    which it has gone out of its way to describe as speculative and

23    risky.  We had extensive testimony, including from today's

24    witness——yesterday and today——about her view of the riskiness

25    around making such investments, and the government is——although

**A-804**

NAB1BAN5

1     they claim it's not part of their case, they're doing it an

2     awful lot, Judge, and they're clearly trying to argue to the

3     jury that the fact that the investments were, in their view,

4     risky is itself proof of the crime.  And the only way to rebut

5     that, your Honor, is for us to be able to proffer evidence,

6     either through cross-examination or otherwise, on a couple of

7     levels.  One is that, as your Honor described it, the

8     portfolio——this venture investing is a portfolio approach.  You

9     buy in ten startups; if two hit, you're doing great.  If one of

10    them was, you know, Facebook, you'd——

11             THE COURT:  It depends how much you put in the bad

12    ones——

13             MR. COHEN:  Correct.

14             THE COURT:  ——and what the return on the good ones

15    were, and how much you put in the good ones.

16             MR. COHEN:  Correct.  And here——

17             THE COURT:  So it could be a disastrous venture, or

18    not.

19             MR. COHEN:  Correct.  But here, just to give your

20    Honor context, the Anthropic investment was a $93 million

21    investment that the trustee in bankruptcy sold for a hundred

22    million and is today worth a billion dollars.

23             THE COURT:  Publicly traded?

24             MS. SASSOON:  No, your Honor.  This is a private

25    valuation, which, if you take this case as just one example,

**A-805**

952

NAB1BAN5

1   it's highly misleading about whether you could actually

2   liquidate for that amount of money.  And this is part of the

3   concern about Anthropic specifically.  It has the potential to

4   create a misleading impression with the jury about the nature

5   of this portfolio, which perhaps in hindsight, you could make

6   these arguments, but has no bearing on the fact that it was a

7   gamble at the time that these investments were being made.

8          MR. COHEN:  So then why are they arguing that these

9   investments were risky and illiquid and so forth and trying to

10  suggest they were improper if it's not related to the crime?

11  Why are we having hours of testimony?

12         THE COURT:  The crime charged is that he took the

13  money.

14         MR. COHEN:  Right.

15         THE COURT:  That's the crime.

16         MR. COHEN:  Right.

17         THE COURT:  And what he did with it afterward doesn't

18  matter.  This is like saying that if I break into the Federal

19  Reserve Bank, make off with a million bucks, spend it all on

20  Powerball tickets and happen to win, it was okay.

21         MR. COHEN:  Your Honor, they're offering evidence

22  exactly on your Honor's hypothetical.  They are offering

23  evidence that you used the money for Powerball as proof of the

24  crime.

25         THE COURT:  No, I don't see it that way.  I mean, the

**A-806**

953

NAB1BAN5

1    crime is the misappropriation.  That's it, it's finished, the

2    minute the misappropriation happens, whether it's used wisely,

3    foolishly, or whatever, and that's my view.  I certainly would

4    never have let in the Anthropic because letting in the

5    Anthropic is kind of like trying to prove that you're a good

6    guy by looking around the room, picking your three best

7    friends, and asking them what kind of a guy you are, and

8    ignoring everybody else.  Right?  That doesn't work.  You don't

9    get to pick your friends and do it that way.  It's just

10   unrepresentative.  It's meaningless.  So—

11            MR. COHEN:  But that takes us back to the more narrow

12   point about whether or not we can elicit the nature of venture

13   investing.

14            THE COURT:  Well, it does take us back to that.  And

15   so far as that is concerned, it might be one thing if you had a

16   qualified witness to talk about that.  I'm not saying that

17   would be admissible.  I have my doubts about that.  But I can't

18   see how eliciting anything from Ms. Ellison on

19   cross-examination on this subject possibly overcomes all the

20   barriers to relevance and admissibility, and maybe you can

21   enlighten me on that.

22            MR. COHEN:  Well, they have elicited this testimony

23   from Ms. Ellison.  They have elicited from her that she viewed

24   the venture investments as risky investments, with the

25   implication that the defendant should not have made them and

**A-807**

954

NAB1BAN5

1     that they were reckless, the defendant was reckless for making

2     them, and one way to rebut that is to show they were part of a

3     portfolio approach to venture investing, which is very common.

4               THE COURT:  Which might or might not have paid off.

5               MR. COHEN:  Right.

6               THE COURT:  And she had her opinion.

7               MR. COHEN:  And if the witness doesn't know about the

8     portfolio theory of venture investing, then we are bound by the

9     answer.

10              MS. SASSOON:  Your Honor, that testimony was admitted

11    for a proper purpose, which is to show the defendant's

12    knowledge of the misappropriation.  One——

13              THE COURT:  And her state of mind at various points.

14              MS. SASSOON:  Her state of mind and the fact that the

15    money was not just sitting in a bank account ready to be

16    provided to customers, it had been misappropriated and spent on

17    other things, and there were discussions with the defendant

18    establishing that he knew that it was being spent on other

19    things and that this put them in a position of having to use

20    customer money for other expenses, which is exactly what

21    happened.  And the fact that in 2021 she's warning the

22    defendant about these investments is inextricably linked to

23    what happened in June when they don't have the money and they

24    have to use customer funds, and it goes to his knowledge about

25    the use of funds to repay the loans because he knows that the

**A-808**

955

NAB1BAN5

1      money is tied up in illiquid venture investments.

2              THE COURT:  Yes.  The government's motion on this

3      point is granted, period.  I'm not ruling now on the question

4      of whether somewhere down the road you want to proffer a

5      witness on this.  I'll cross that bridge if, as, and when I get

6      to it.

7              MR. COHEN:  Understood, your Honor.

8              THE COURT:  Okay.  Now the other issue is the

9      application by the defense with respect to auto-deletion, where

10     the witness said that she had been told, or the employees

11     generally had been told, that the defendant told people

12     generally to set auto-deletion on some of these messaging

13     accounts and had some other comments that she attributed to

14     him.  How about that one, or have we really covered that

15     already?  Mr. Cohen?

16             MR. COHEN:  I'm sorry, your Honor.  I apologize.  I

17     didn't hear you.  I'm sorry.

18             THE COURT:  I said how about that, or have we covered

19     this already?

20             MR. COHEN:  Well, I think it is covered in the letter,

21     and the testimony was elicited today about the involvement of

22     counsel, and we would like to be able to ask it—

23             THE COURT:  And what was said about the involvement of

24     counsel—

25             MR. COHEN:  Well, the—

**A-809**

NACMBAN3                    Ellison – Cross                    1059

1   Q.  Take a moment and look at that for a minute, Ms. Ellison.

2   That way, we won't have to come back to it.

3   A.  Um-hum.

4   Q.  What did you mean by the phrase limited factors in scaling?

5   A.  By limiting factors in scaling, I meant those were things

6   that were preventing Alameda from doing as well and making as

7   much money as we could.

8   Q.  The first one you put down was called management and

9   vision.

10          You see that?

11  A.  Yes.

12  Q.  What do those entries refer to?

13  A.  In that I was saying I thought the biggest factor was that

14  Trabucco and I weren't as good managers or leaders as we could

15  be, and we weren't pushing other -- pushing employees to make

16  new things or do better in the way that I wished we were.

17  Q.  Then the next item was about the pros and cons of being in

18  different locations, is that correct?

19  A.  Yes, that's right.

20  Q.  The last item was your thoughts on the trading team.

21  A.  Yes, that's right.

22          MR. COHEN:  We can take that down.

23  Q.  Now, coming back to the bug we have been discussing from

24  June 2022, how did you first learn about it?

25  A.  I learned about it in a meeting with Sam, Gary, and Nishad.

**A-810**

NACMBAN3                    Ellison – Cross                    1060

1   This was an in-person meeting in the Alameda Bahamas office.

2   We came into this meeting to discuss Alameda's capital

3   situation because at the time I believed Alameda's NAV to be

4   negative or at least close to negative, that we were insolvent,

5   and I wanted to discuss what to do about the situation, whether

6   we would need to declare bankruptcy.  But Gary came into this

7   meeting and said, oh, by the way, there is a bug in Alameda's

8   fiat liability, so your NAV numbers are actually off by several

9   billion dollars.

10  Q.  When did you first become concerned that Alameda might be

11  insolvent?

12  A.  I think this was in around May of 2022, when the crypto

13  market was going down.

14  Q.  Is this what led to meeting with Gary, Sam, and Nishad?

15  A.  Yes, that's right.

16  Q.  Now, during this period in June, did you have other

17  meetings with just Gary and Nishad?

18          MS. SASSOON:  Your Honor, objection to this period in

19  June.

20  Q.  We will just say June.

21  A.  None that come to mind.

22  Q.  Did you have any Signal or other Slack communications with

23  Gary and Nishad about the bug?

24  A.  Yeah.  I think we had some Signal communications in the

25  chat that we shared with Sam.

**A-811**

NACMBAN3                    Ellison - Cross                    1061

1   Q.  I'm asking now, ma'am, a different question, whether you

2   had Signal or Slack communications with Gary and Nishad that

3   Sam was not on.

4   A.  Not that I recall.

5   Q.  You don't recall that.

6   A.  No.

7   Q.  Now, you just told us that Gary took a look at this and

8   concluded that there had been a bug in the system, correct?

9           MS. SASSOON:  Objection, form.

10          THE COURT:  Sustained.

11  Q.  Go over what Gary told you.

12  A.  He said that he had found a bug in the calculation of

13  Alameda's fiat liabilities.  That meant that our current

14  numbers were off by several billion dollars.

15  Q.  And when the account was adjusted for the impact of the

16  bug, did that have an impact on whether or not Alameda was

17  solvent, in your view?

18  A.  It made our NAV significantly positive.

19  Q.  The NAV was significantly positive; it wasn't solvent?

20  A.  I think that depends on market conditions and whether we

21  could realistically sell our assets.

22  Q.  What was your reaction when Gary told you this?

23  A.  At first, I was a bit skeptical and confused about how such

24  a large bug could have happened and no one had noticed or

25  caught it before now.  But once I became convinced that it was

NACMBAN3                     Ellison – Cross                     1062

 1    real, I was quite relieved.

 2    Q.  So you had not known about the bug previous to this

 3    sequence you just told us about?

 4    A.  That's right.

 5    Q.  I think you told us one of your concerns -- withdrawn.  Let

 6    me start again.

 7            After the bug was discovered, what happened in terms

 8    of going forward?

 9    A.  There was a period of time where we were aware of the bug,

10    but it hadn't been fixed yet, so I tried to adjust for it in my

11    balance sheet calculations, and then eventually the bug was

12    fixed.

13    Q.  What about the accounting in relation to the bug, what

14    happened to that?

15    A.  Can you specify what you mean by that?

16    Q.  Sure.  After the bug was discovered, there had to be

17    another reconciliation of the fiat@ account, correct?

18    A.  Yes, that's right.

19    Q.  To your knowledge, did that happen?

20    A.  Yes, it did.

21    Q.  Do you know when that happened?

22    A.  No.

23    Q.  Moving to a period after the bug, did you ever come to a

24    view about whether the accounting for the fiat bug was in a

25    better situation than it had been before?

**A-813**

```
NACMBAN3                    Ellison – Cross                    1063
```

1    A.  Yes.  After the bug had been fixed, I believe that our

2    accounting was in a better situation.

3           MR. COHEN:  Your Honor, I am about to start another

4    topic.  This might be a good time for our lunch break.

5           THE COURT:  OK.  We will come back at 20 minutes to 2,

6    please.

7           (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-814**

NACMBAN5                    Drappi - Direct                    1129

1           (At sidebar)

2           THE COURT:  You both get A plus in evidence law, but

3    this is a colossal waste of time.  There is absolutely no doubt

4    he owned the company.  Ellison, the ostensible co-CEO or CEO,

5    runs all these decisions through him.  He was obviously the

6    boss.  What are we wasting this time for?

7           MS. KUDLA:  Your Honor, the employee is a low-level

8    employee, and even from his level of employment he could see,

9    based on this day-to-day --

10          THE COURT:  So what.  So what.

11          MS. SASSOON:  Your Honor, this is a misrep.  The tweet

12   is him saying --

13          THE COURT:  Of course it is.  It's a misrep, no matter

14   what this guy says.

15          MS. SASSOON:  They don't seem to be conceding that

16   these are misreps.

17          MR. EVERDELL:  I don't concede that this witness has

18   the basis to be able to make this statement.  That's all, your

19   Honor.

20          THE COURT:  If you want to play this out this way,

21   fine.  I will let you run evidence for introducing introductory

22   trial lawyers, but this is a joke.

23          MR. EVERDELL:  I understand, your Honor.  I am not

24   trying to waste time.

25          MS. KUDLA:  Your Honor, we are only making very

**A-815**

NACMBAN5                          Drappi - Direct                          1130

1   limited points here that even in his low-level position, the

2   minimal things that he saw that he observed with Sam

3   Bankman-Fried providing direction.

4          THE COURT:  Why don't you ask him that.

5          MS. KUDLA:  I am getting to that point.  It will only

6   take about ten minutes.

7          THE COURT:  Some people don't have ten minutes left to

8   live.

9          MS. KUDLA:  Fair.

10          MS. SASSOON:  Your Honor, we can't assume that the

11   jury credits everything a cooperating witness says.  It's

12   appropriate to corroborate the cooperator and to establish --

13          THE COURT:  If your case rises and falls on whether

14   this guy believed that Sam Bankman-Fried was running the show,

15   you've got troubles.  Could we move along.  There doubtless are

16   things he saw perhaps.  I say doubtless.  I wasn't there.

17          MS. KUDLA:  That's fine, your Honor.

18          (Continued on next page)

19

20

21

22

23

24

25

**A-816**

NAC1BAN6                    Prince - Direct                    1165

1    was around $650 million worth of value.  A week before that it

2    had been a little higher than that, 800 million, but there had

3    been some payments, you know, in that week leading up to their

4    filing, but $650 million was the amount that Alameda owed us at

5    the time of their filing.

6    Q.  So just to be clear, when they filed their bankruptcy, was

7    that paid, had that been paid back to BlockFi, as a lender?

8    A.  No.  No, that was the—the outstanding balance that to date

9    has still not been paid.

10   Q.  And then just one more question before we break, if that's

11   okay with your Honor.  What happened to BlockFi after that?

12   A.  As a result of FTX and Alameda's bankruptcy, because of our

13   lending to Alameda but also some exposure we had to the FTX

14   platform, BlockFi was forced into—into bankruptcy, and so the

15   clients on our platform have, you know, currently, in any of

16   the interest-earning products, an uncertain outcome in terms

17   of, you know, how much of the funds that they had on our

18   platform they will see back.  Our shareholders—

19            MR. COHEN:  Objection, your Honor.

20            THE COURT:  What's the objection?

21            MR. COHEN:  Speculative and beyond the question.

22            THE WITNESS:  I'm sorry.

23            THE COURT:  The question was:  "What happened to

24   BlockFi after that?"  The answer—

25            MR. ROOS:  I think he was describing—

**A-817**

NAD1BAN1                    Prince - Direct

1          (In open court)

2          THE COURT:  The testimony stands, and Mr. Prince, if

3    you remember where you were, you can complete your answer.  And

4    if not, Mr. Roos will take care of it.

5    A.   I remember where I was.  I was starting to talk about the

6    second important distinction between cryptocurrency lenders and

7    cryptocurrency exchanges, which was in how the market and

8    customers understood what would happen with assets that they

9    placed on those platforms.

10         THE COURT:  Well, let's start with how you understood.

11         THE WITNESS:  Sure.

12   A.   So on crypto lending platforms, generally there was a

13   interest rate that was being earned when you held assets there,

14   and there was an understanding that the reason you were earning

15   that interest rate was because the lending platform was going

16   to take those funds and further lend them on.  And there were

17   generally words that describe this; in BlockFi's terms of

18   service there were words that very clearly described this; in

19   our marketing materials there were words that very clearly

20   described this.  We will lend, relend, pledge, rehypothecate,

21   which is a fancy legal word that means relend assets that

22   you're given.  Contrast that to cryptocurrency exchanges,

23   where—

24         THE COURT:  Let's focus on contrast it to

25   cryptocurrency exchanges with which you dealt.

**A-818**

1200

NAD1BAN1                    Prince – Direct

1  throughout that time period, adhered to all the terms in the

2  lending agreements like, you know, like we would expect a good

3  borrower to do.  They made their interest payments on time; if

4  there were ever margin calls, they met them.

5  Q.  Now moving ahead to May 2022, were there any changes to the

6  strength of the cryptocurrency market during that period?

7  A.  Yeah.  In May and——May and June of 2022, the cryptocurrency

8  market was experiencing downward volatility.  The prices of

9  major cryptocurrencies were declining.  There were, you know, a

10  few notable failures or blowups of cryptocurrency firms.

11  Initially there was a——a firm called——or a cryptocurrency

12  called Luna.  The Terra Luna ecosystem blew up.  Subsequently a

13  hedge fund——

14          THE COURT:  What do you mean by Terra Luna ecosystem,

15  please?

16          THE WITNESS:  Yeah.  So Luna was a——was a

17  cryptocurrency.  And think of like Bitcoin or Ethereum.  Call

18  it a competitor to Bitcoin or Ethereum.  Terra was a——it was

19  like a——what we call a stablecoin in cryptocurrency land.  It's

20  another cryptocurrency trying to mimic the value of a dollar.

21  And each of these had their own kind of blockchain protocols

22  and they were connected to each other.  One of the mechanisms

23  that was used to try and keep the coin that was supposed to

24  mimic a dollar at a value of a dollar was the other

25  cryptocurrency Luna.  And this——that whole concept came

**A-819**

NAD1BAN1                    Prince - Direct

1   crashing down.  The dollar coin became not worth a dollar, the

2   Luna coin, you know, declined in price dramatically as well.

3   BY MR. ROOS:

4   Q.  And what effect, if any, did these changes to the

5   cryptocurrency market in May 2022 have on BlockFi?

6   A.  So Three——Three Arrows Capital was a——a kind of trading

7   firm or hedge fund that was also a borrower at BlockFi.  They

8   defaulted on loans that they had with us in late May or early

9   June of 2022.  So we had a very large collateral liquidation

10  process with them and ultimately, at the end of that process,

11  were sitting on——were sitting on some losses.

12       I'm not sure if I'm supposed to go into June of 2022.

13  Q.  Let me stop you there.  I'll ask another question.

14       So after that, were there any additional changes in

15  the cryptocurrency market that affected BlockFi's lending?

16  A.  Sure.  Well, the——the, you know, bigger than Three Arrows,

17  what had a big impact on us at that time is that two of the

18  other top cryptocurrency lending platforms, Voyager and

19  Celsius, paused their platforms, and ultimately both of them

20  filed for bankruptcy.  But they, you know, they paused the

21  ability of consumers to be able to withdraw money from——from

22  their platform.  So you can imagine what, you know, what effect

23  that had on——on BlockFi if you have a couple of crypto lending

24  platforms shutting——shutting their doors.  You know, we were

25  experiencing the highest level of withdrawals that we had——that

**A-820**

NAD1BAN1                    Prince - Direct

1   we had ever experienced in our——in our history as a company.

2   So consumer confidence in cryptocurrency lending platforms and,

3   you know, the broader cryptocurrency market was not in a great

4   spot at that time.

5   Q.  So in light of those withdrawals on BlockFi, how, if at

6   all, did that affect the lending BlockFi was doing?

7   A.  We——so, you know, if you think about our model, when folks

8   are holding funds on our platform to earn interest, we're then

9   lending that out to borrowers over here.  If the folks that

10  were holding the funds go to withdraw their assets, we have to

11  close out the loans with the——with the firms that were

12  borrowing.  And so, you know, in June of 2022, I believe we

13  called back, you know, essentially every single open-term loan

14  that we had on our——on our platforms.  This was, you know,

15  billions of dollars in withdrawals from consumers and then

16  loans that were called back so that we could meet those

17  withdrawals.

18  Q.  Did that include loans to Alameda?

19  A.  It did.

20  Q.  And when did you start calling back loans from Alameda?

21  A.  I don't know the exact date, but it would have been last

22  week of May or first two weeks of June of 2022.

23  Q.  And how was it that BlockFi was able to call these loans

24  back on such a short basis?

25  A.  Because the structure of the loans was that they were, you

**A-821**

NAD1BAN1                        Prince - Direct

1   know, open-term loans, so we had the right as the lender to

2   terminate the loan with, you know, a few days' notice.

3   Q.  Did Alameda repay the loans?

4   A.  Yes, in full.

5   Q.  Now around this time did BlockFi enter into an agreement to

6   potentially sell itself to FTX?

7   A.  Yes.  In the——in the back half of June——

8        MR. COHEN:  Objection.  Could we have clarity by which

9   FTX entity we're talking about.

10       THE COURT:  Sure.

11       MR. ROOS:  Sure.

12  Q.  Which FTX entity are we talking about?

13  A.  It was the FTX.US entity, which I'm not a hundred percent

14  certain about this, but I think it——I think the FTX.US entity

15  had a corporate name of like WRS.  I could have that wrong.

16  But it was——FTX.US was the, you know, counterparty that we did

17  that transaction with.

18  Q.  I think you were in the middle of giving an answer about

19  this agreement to sell.  So I'll pick back up there.

20       How did it come about that you were potentially going

21  to sell to one of the FTX entities?

22  A.  Sure.  So, you know, we——given the market volatility and

23  the action——the activity that we were seeing on our platform

24  and a, you know, hyperawareness that for a business like ours,

25  consumer sentiment and confidence was——was, you know, really

NADMBAN2                    Prince – Direct

1   Q.  What was the breakdown of, on the FTX exchange versus had

2   been lent to Alameda?

3   A.  About 650 million lent to Alameda, about 350 million on the

4   FTX exchange.

5   Q.  Yesterday, right before we broke, you testified that after

6   FTX and Alameda declared bankruptcy, BlockFi declared

7   bankruptcy.  Can you explain why BlockFi had to declare

8   bankruptcy?

9   A.  Sure.  I mean, once it became clear that repayment of the

10  Alameda loans and being able to access the funds that we had on

11  FTX was impaired, once it became clear that that was not going

12  to be possible, our view of the financial health of BlockFi's

13  business was such that we needed to declare bankruptcy.

14          MR. ROOS:  No further questions.

15          THE COURT:  All right.  We will take 15 minutes.

16          For your information, ladies and gentlemen, we are

17  going to break at 12:30 today.

18          (Recess)

19          THE COURT:  OK, folks.  Let's go.  Get the witness,

20  please.

21          Defendant and the jurors are all present, as has been

22  true throughout.

23          Cross-examination, Mr. Cohen.

24          MR. COHEN:  Thank you, your Honor.

25  CROSS-EXAMINATION

NAGMBAN1                    Morad - Direct                    1292

1    said it was balance sheet information that became public and

2    people were a little bit worried about their ability to access

3    all their funds and that they were experiencing -- that many

4    people were withdrawing funds from the platform.

5    Q.  Were you following Mr. Bankman-Fried's Twitter feed at this

6    point in time?

7    A.  Yes, I was.

8    Q.  And do you recall reading any tweets Mr. Bankman-Fried

9    posted to Twitter around that time?

10   A.  Yes, I do.

11   Q.  Do you recall what they said?

12   A.  One in specific was not to worry, all the funds were there

13   and all withdrawals would be covered by FTX.

14   Q.  What, if anything, did you conclude after reviewing that

15   tweet and others like it by Mr. Bankman-Fried?

16   A.  I was very relieved, happy to hear from the leader of the

17   company to know and reassuring and knowing that the money was

18   there and it was just rumors.

19   Q.  Right after you saw that tweet, did you try and withdraw

20   funds from FTX?

21   A.  No, I did not.

22   Q.  Did there later come a time where you did try to withdraw

23   your funds from FTX?

24   A.  Yes.  The following day.

25   Q.  Were you able to successfully withdraw your funds when you

```
     NAGMBAN1                Morad - Direct                    1293
```

 1    tried?

 2    A.  No.  It did not process or go through.

 3             MR. RAYMOND:  Ms. Cotto, can you show for the witness

 4    what's been marked for identification as Government Exhibit

 5    539.

 6    Q.  Mr. Morad, do you recognize Government Exhibit 539?

 7    A.  Yes, I do.

 8    Q.  What is it?

 9    A.  That is a screenshot I took at one time -- I put the date

10    there myself, November 10, 2022 at 1:19 p.m.  It was when I

11    came across that banner across the top there.  I wanted to make

12    sure that I had evidence or proof that I did have money on the

13    platform in case it wasn't functioning anymore or whichever.

14    It was a screenshot I took.

15             MR. RAYMOND:  Your Honor, the government offers

16    Government Exhibit 539.

17             MR. LISNER:  No objection to the document, except we

18    would request to redact the material that Mr. Morad added to

19    the document, which is the date in red.

20             MR. RAYMOND:  Your Honor, I don't know the basis for

21    that.  The witness has explained the source of it.

22             THE COURT:  The request is denied.  The document is

23    received in evidence.

24             (Government Exhibit 539 received in evidence)

25             MR. RAYMOND:  Ms. Cotto, can you publish.  Thank you.

**A-825**

NAGMBAN1                    Morad - Cross                    1294

1  Q.  Mr. Morad, was this after you had attempted to withdraw

2  your funds?

3  A.  Yes, it is.

4  Q.  And can you describe how much funds in U.S. dollar

5  denominated were in your account as of that day?

6  A.  $257,948.53.

7         MR. RAYMOND:  Ms. Cotto, can you go to the second page

8  of this document.

9  Q.  Mr. Morad, did you have holdings in Bitcoin on FTX at that

10  time?

11  A.  Yes, I did.

12  Q.  Did you have holdings in Ethereum at that time?

13  A.  Yes, I did.

14  Q.  Mr. Morad, since November 10, 2022, have you been able to

15  withdraw the funds from FTX?

16  A.  No, I haven't.

17         MR. RAYMOND:  No further questions, your Honor.

18         THE COURT:  Thank you.

19         Cross-examination.

20  CROSS-EXAMINATION

21  BY MR. LISNER:

22  Q.  Good afternoon, Mr. Morad.

23  A.  Good morning.

24  Q.  Just a few questions and a couple of clarifications.

25         You were located in Canada when you opened your FTX

**A-826**

NAGMBAN3                          Singh - Direct                          1342

1              MR. ROOS:  Now, we can take this down.

2    Q.  Focusing on the period of late 2021 and early 2022, at that

3    time what did you believe the state of Alameda's finances were?

4    A.  I thought it was fantastically wealthy.

5    Q.  Just to be clear, what, if any, direct involvement in

6    Alameda's finances did you have at that point?

7    A.  None.

8    Q.  Did there come a time in 2022 when there was a change to

9    the cryptocurrency market?

10   A.  Yes.

11   Q.  What happened?

12   A.  Are you referring to the crash in May?

13   Q.  Let me ask you about that.  What, if any, crash in

14   cryptocurrency prices happened in May?

15   A.  Luna and UST, an associated stablecoin, had some

16   algorithmic failure and it crashed and, with it, brought down a

17   bunch of other crypto prices.

18   Q.  Around that time what, if any, conversations did you have

19   with the defendant about the availability?

20              THE COURT:  I'm sorry.  Can we just back up.

21              What's an algorithmic failure?

22              THE WITNESS:  It's a failure in this case in the

23   financial design of those two tokens and their interactions.  I

24   suppose the algorithm itself operated as expected.  It was just

25   not robust.

**A-827**

NAG1BAN4                    Singh – Direct                    1384

1                          AFTERNOON SESSION

2                              2:07 p.m.

3          (In open court; jury present)

4          THE COURT:  The jurors and the defendant all are

5    present, as they have been throughout.

6          The witness is reminded he's still under oath.

7          Mr. Roos, you can continue.

8          MR. ROOS:  Thank you, your Honor.

9    BY MR. ROOS:

10   Q.  I want to change topics and talk to you about futures

11   trading and collateral.

12          Did FTX allow customers to trade cryptocurrency

13   futures?

14   A.  Yes.

15   Q.  And what's a cryptocurrency future?

16   A.  It's a product that customers can buy such that if it goes

17   up, they'll make money, or short, that if it goes down, they'll

18   make money.

19   Q.  So for example, what does a Bitcoin future do?

20   A.  It's a product, a financial product, that eventually

21   resolves the price of a Bitcoin and so users can bet on Bitcoin

22   by trading it.

23   Q.  What do you mean by resolves the price of a Bitcoin?

24   A.  At some point the future will expire.  When it does, it

25   will be—every—every future that is purchased will turn into

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-828**

NAG1BAN4                    Singh – Direct                    1385

1    the price of Bitcoin at the time of expiry.

2    Q.  So if I thought the price of Bitcoin was going to go up,

3    what would I do?

4    A.  You would buy the future.

5    Q.  What type of future?

6    A.  The Bitcoin future.

7    Q.  And what if I thought the price of Bitcoin was going to go

8    down?

9    A.  You'd short the future, or sell it.

10   Q.  Now to do futures trading——well, let me ask you, did

11   ftx.com allow futures trading?

12   A.  From day one.

13   Q.  And to do futures trading, what was required of a customer?

14   A.  Customer had to deposit collateral.

15   Q.  What's collateral?

16   A.  Real liquid funds that the customer owned used as safety

17   buffer such that if they lose money, the customer can get

18   liquidated, their positions closed, before they lose the

19   entirety of their collateral.

20   Q.  Okay.  So to break that down, what can be collateral?

21   A.  Liquid funds, things like dollars or Bitcoin or other

22   tokens.

23   Q.  Did FTX treat different types of collateral differently?

24   A.  Yes.

25   Q.  How so?

**A-829**

NAG1BAN4                    Singh – Direct                    1388

1   negative and——and Sam and Gary or others would sort of manually

2   handle it however they saw fit.

3   Q.  Now did Alameda do——I'm sorry.  Did Alameda trade futures

4   on FTX?

5   A.  Yes.

6   Q.  You testified a moment ago that futures trading typically

7   required collateral.  What, if any, conversations did you have

8   with the defendant about the collateral Alameda had to support

9   its trading, its futures trading?

10  A.  I had a discussion in September, early September, about

11  this.

12  Q.  What did you——

13          THE COURT:  What year?

14          THE WITNESS:  2022.

15  Q.  What did you discuss with the defendant in September 2022

16  about this?

17  A.  That historically, according to a project that I'd run,

18  like a batch historical data, there were points when Alameda's

19  main account had not nearly enough collateral if you did not

20  include their enormous line of credit.

21  Q.  Okay.  So let's start with the timing of this conversation.

22  Do you remember approximately what date it occurred on?

23  A.  Yeah.  I believe it was either like August——sometime

24  between August 31st and September 2nd.

25  Q.  You mentioned a calculation you did.  What was the

**A-830**

NAG1BAN4                    Singh – Direct                    1404

1   a meeting immediately.

2   Q.  What was your reaction about hearing Alameda owed

3   $13 billion?

4   A.  I was really afraid.

5   Q.  What do you mean?

6   A.  The June exercise, I thought Alameda had positive balances

7   on FTX, that it was borrowing lots in some places but that

8   overall they had more money than they didn't.  This suggested

9   an entirely different reality.  I was hoping that I didn't

10  really understand what Gary meant by borrowing, but if I did,

11  this was absolutely devastating.

12  Q.  And how, if at all, did Alameda's borrowing $13 billion

13  from FTX affect FTX customer funds?

14  A.  The borrowing had to have been from customer funds in large

15  part because FTX itself didn't have—like, didn't own that much

16  money.

17  Q.  How, if at all, did the defendant react when Caroline

18  Ellison said Alameda has—I'm sorry—when Gary Wang said

19  Alameda was borrowing 13 billion from FTX?

20  A.  I was sitting next to Sam at the time.  We were in the

21  office.  So I got some real sense.  He seemed unsurprised and

22  made up what I understood to be a false excuse for dodging the

23  meeting.

24  Q.  So you mentioned the meeting.  Did you in fact meet?

25  A.  Yes.

**A-831**

NAG1BAN4                    Singh - Direct                    1405

1   Q.  Okay.  And then who did you meet with?

2   A.  Just Gary and Caroline because Sam didn't come.

3   Q.  What was your belief at this point as to whether Alameda

4   could repay the $13 billion it owed?

5   A.  Before the meeting I was really hoping that I misunderstood

6   what had been said and that Alameda could in fact close out and

7   repay what it owned.  After the meeting I was significantly

8   less hopeful.

9   Q.  Now did there come a time when you spoke to the defendant

10  about this topic?

11  A.  That evening.

12  Q.  And where did you speak with the defendant?

13  A.  On the balcony of the Orchid 6 penthouse where we lived.

14  Q.  Why did you meet on the balcony?

15  A.  Sam and I almost never met; very, very rarely.  I knew this

16  needed to be really private.  I figured that if we went to our

17  two most common spaces to talk, which were my room or in the

18  office, that both of those were very frequently used by other

19  people for meetings and that others could stumble in on us, and

20  I knew that there was something really serious going on and I

21  didn't want people stumbling in.

22  Q.  What time of day was this?

23  A.  Evening into night.

24         MR. ROOS:  Could we please publish Government

25  Exhibit 1554, which is in evidence.

**A-832**

NAG1BAN4                    Singh – Direct                    1415

1   A.   You said in September?

2   Q.   September 2022 onwards.

3   A.   In one instance, I saw that spreadsheet we looked at

4   earlier that Jayesh showed me that had outlays——that described

5   outlays of future spend on endorsement deals.  I was really

6   upset about that.  There were way more than I knew about.  Many

7   of the numbers are much bigger than what I'd been told.  And

8   there was like a billion dollars headed out the door.  If FTX

9   was making a billion dollars a year, this puts us like a year

10  of revenue behind with a hole.  And so I approached Sam and

11  said:  *You know, this is crazy.  We need to cut as much of this*

12  *as we can.  I thought you were on this.*

13  Q.   And what, if anything, did he say?

14  A.   He said he didn't think that these were bad spends, and he

15  sort of like challenged me to point to one that was worth

16  cutting.  I did point to a couple.  And for the ones I pointed

17  at, he agreed that they were bad, but he said that those

18  weren't his fault and that everybody proposing cutting them was

19  shortsighted because the cost associated with cutting them was

20  about like 70 percent of the cost of seeing them through and so

21  it wasn't worth it.

22  Q.   Was there any other spending that you had disagreements

23  about in September 2022 to November 2022?

24  A.   There are the others I mentioned, AZA and Embed.

25  Q.   What about any——what, if any, proposed transactions did you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-833**

NAHMBAN2                        Singh - Cross                        1539

1  Q.  New topic, Mr. Singh.

2          I want to go back.  Counsel covered with you some

3  questions about certain of the code base features.

4          Do you recall your testimony about that yesterday?

5  A.  Forgive me.  I don't know what you mean by counsel.

6  Q.  I mean Mr. Roos.  I'm sorry.

7  A.  I recall talking about code changes.

8  Q.  Let me start with allow negative.  My first question is a

9  when question.  When did you first learn about the

10  allow-negative feature?

11 A.  July 2019.

12 Q.  How did you learn about that?

13 A.  I was told to write it.  I did.

14 Q.  So you were the person who put it together?

15 A.  In some sense, I wrote the code, but I was sort of given

16 pretty clear and explicit instructions from others.

17 Q.  When you wrote it in 2019, what was the purpose of the

18 code?

19 A.  It was to facilitate FTX admins moving FTT from designated

20 accounts or making trades in FTT from designated accounts and

21 to modernize an existing set of features that would allow

22 accounting-oriented accounts to go negative.

23 Q.  Was this at all in connection with market-making functions?

24 A.  I am not sure.

25 Q.  Did there come a time that you came to believe that the

**A-834**

```
NAHMBAN2              Singh - Cross              1540
```

1     allow-negative feature was used in connection with

2     market-making functions?

3     A.   Yes.

4     Q.   When was that, sir?

5     A.   I don't know precisely.

6     Q.   Approximately is fine.

7     A.   2020.

8     Q.   How did you learn of that?

9     A.   I remember a conversation I had with Gary Wang in which I

10    was thinking about making some changes to some code related to

11    OTC trades, and I noticed that Alameda was the only provider --

12    Q.   Could I interrupt you for a moment, sir.  Can you tell the

13    jury what OTC trades are.

14    A.   Over the counter.  I don't think that does a great job

15    describing it.  If I may.

16    Q.   Does it mean not on the exchange?

17    A.   No.

18    Q.   Tell us what you are thinking.

19    A.   It means not on an order book.  So a customer could

20    basically request -- just say I want to buy one Bitcoin.  Tell

21    me how many dollars that takes.  They get back an answer.  They

22    have some time before they have to accept -- before they can --

23    before that sort of quote expires.  They can say I accept and

24    it happens.  This is different from submitting an order on an

25    order book.

NAH1BAN3                    Singh — Cross                    1546

1  BY MR. COHEN:

2  Q.  Let me see if I can just break this down.

3        You said that this situation arose when an account was

4  in danger or at risk of being closed out.  Can you explain what

5  you mean by that.

6  A.  Accounts were liquidated, under some circumstances; some

7  liquidations could result in ADL events.

8  Q.  Okay.  And by closed out, is this what we were talking

9  about—well, let me rephrase.

10        This means a customer has a position in an account and

11  a certain amount of collateral and the value of the position

12  starts to fall sufficiently that the—that that—actually, I

13  forgot to ask you one more thing.

14        Have you ever heard the term "risk engine"?

15  A.  Yeah.

16  Q.  Okay.  Did FTX have a risk engine?

17  A.  Yeah.

18  Q.  How did that—what was that?

19  A.  A lot of things that went into it, I suppose.  Do you mind

20  clarifying some more.

21  Q.  Did the risk engine have anything to do with closing out

22  positions?

23  A.  Right.  Liquidations were a part of the risk engine.

24  Q.  Okay.  And so if the risk engine, which was basically

25  computer run, noticed that an account was going below its

**A-836**

NAH1BAN3                       Singh — Cross                        1547

1    collateral limit, it would step in and liquidate that account,

2    correct?

3    A.  That's almost right.  If it noticed that it had

4    insufficient collateral to support its positions.  There was

5    not a collateral limit at play.

6    Q.  So it would go into the customer's account and sell the

7    positions to get it back in balance, correct?

8    A.  That's not exactly how I'd put it.

9    Q.  How would you put it, sir?

10   A.  That the liquidation engine would sell, or buy, close out

11   their positions, because the customer could be long or short.

12   Q.  Okay.  And then you referenced something called a backstop

13   liquidity provider.  What was that?

14   A.  Designated accounts were used as the counterparties for

15   some of the trades that were required to close out these

16   positions.

17   Q.  And was Alameda a backstop liquidity provider?

18   A.  It was.

19   Q.  Were other entities backstop liquidity providers?

20   A.  Over time there were many.

21   Q.  So if the engine was closing out an individual customer's

22   account and there weren't sufficient assets, the backstop

23   liquidity provider would step in, correct?

24   A.  It didn't depend on if there were insufficient assets.  The

25   customer would be getting liquidated because they had

**A-837**

NAH1BAN3                    Singh – Cross                    1548

1    insufficient assets.

2    Q.  And if that were the case, then the backstop liquidity

3    provider would step in.

4    A.  Right, under some further conditions.

5    Q.  Okay.  And what would happen if the backstop liquidity

6    providers didn't themselves have sufficient collateral?

7    A.  If none of them did—this would be one criterion for

8    eligibility of a backstop to match against this liquidation.

9    If there were no such eligible backstop liquidity providers,

10   then the system would perform ADLs, or auto-deleveraging fills.

11   Q.  What did that mean?

12   A.  It meant—this area I'm a little uncertain about because I

13   didn't write the code, but I believe it's that it selected

14   other customers to perform the same role that the backstop

15   liquidity providers would have, and serve as counterparties to

16   the liquidation trade.

17   Q.  Okay.  So if customer A had an account that was going into

18   liquidity—liquidation and that account had insufficient

19   assets, the next stage would be the backstop liquidity

20   providers, correct?

21   A.  Sorry.  Could you repeat that.

22   Q.  Sure.  If the—I want to see if we can make this a little

23   bit more concrete for the jury.

24        So if customer A had an account that was being

25   liquidated and had insufficient assets, I believe you told us

**A-838**

```
NAH1BAN3              Singh - Cross                  1549
```

1    the next step would be to take it the level of the backstop

2    liquidity providers.

3    A.  It's getting liquidated because it has insufficient assets.

4    Q.  Correct.

5    A.  So in getting liquidated, it may go and get——it may enter a

6    mode in which it will be liquidated against backstop liquidity

7    providers.

8    Q.  Correct.  And then I think you told us that if they, the

9    backstop liquidity providers, had insufficient assets, we'd

10   have an auto-deleveraging event?

11   A.  There were multiple conditions that could lead to a

12   backstop being ineligible.  One of them is that they had

13   insufficient assets.  If that——if those conditions are met for

14   all backstop liquidity providers, then the system would enact

15   ADLs.

16   Q.  And that would mean the in——the account would be covered by

17   the assets of other customers on the exchange.

18   A.  Not quite.

19   Q.  Okay.  Tell us quite.

20   A.  There is not an exchange of value.  There's a very small

21   exchange of value in a liquidation trade.  It's not that——it's

22   not that the liquidating account is underwater and therefore

23   needs to get topped up by other customers.  It's that——it's

24   that they have positions on that are risky that need to be

25   handed off to other customers.  Those other customers, be them

**A-839**

```
NAH1BAN3                    Singh - Cross                    1550
```

1     backstop liquidity providers or those selected by ADL, receive

2     the positions at slightly better than market value, being that

3     in that moment they actually make some money.  It's not that

4     they're giving up their collateral for it, but they are taking

5     on risk that they did not themselves put on.

6     Q.  Right.  So using our example now, customer B or customer C

7     or so forth, in your words, are having positions handed off to

8     them.

9     A.  Yes.

10    Q.  And they're going to get them at a favorable price, but

11    they themselves are now at risk, correct?

12    A.  Right.  But it may turn favorable quickly.

13    Q.  Let me call your attention to July of 2020.  Did FTX

14    experience an auto-deleveraging event?

15    A.  I recall it——I recall one around early August, so it's

16    possible that this one was in July.

17    Q.  Okay.  Why don't you tell us what happened.

18           MR. ROOS:  Objection, foundation.

19           THE COURT:  Sustained.

20    Q.  Okay.  What do you recall about the auto-deleveraging event

21    that took place in July or August of 2020?

22    A.  I recall that it happened that there were ADL fills for

23    what I think was the first time in FTX's existence, meaning

24    that the——forgive me, I'm using the abbreviation, or the

25    acronym——the ADL system had kicked in, which meant that there

NAI1BAN2                        Easton – Direct                        1740

1    A.  So again, similar to the analyses before, we have a

2    transfer of customer funds through a series of Alameda Research

3    customer depository accounts, through to an Alameda Research

4    external account——in other words, this is an account that does

5    not hold customer funds——of 500 million, and in turn, the

6    bottom right-hand corner, a payment for the investment in

7    Anthropic.

8    Q.  And how does the amount of the investment in Anthropic

9    relate to the amount we saw on that Slack message on the last

10   exhibit?

11   A.  It is that amount.

12            MR. ROOS:  We can take this down.

13            Could we please publish Government Exhibit 1032.

14   Q.  Professor Easton, starting on page 1 of this exhibit, can

15   you explain what the exhibit shows.

16   A.  Yes.  So this is a summary of a purchase by Alameda

17   Research of Robinhood shares——here, a brokerage account called

18   ED&F Man.  Importantly, this exhibit shows that customer funds

19   primarily were used to fund a transfer of 292 million out of

20   customer funds——of customer funds out of customer depositories

21   to Alameda Research to an account that already had 196 million

22   worth of Robinhood shares.  In turn, Alameda Research purchased

23   another 292 million of Robinhood shares.

24   Q.  And by "Robinhood shares," what are you referring to?

25   A.  These are shares in a trading firm called Robinhood.

**A-841**

NAI1BAN2                      Easton – Direct                      1741

1  Q.  When you say "shares," are they like shares of stock?

2  A.  Yes.

3  Q.  Okay.  Let's look at what happens next.

4        MR. ROOS:  Could we go to page 2 of this exhibit.

5  Q.  And some additional information has been added to the

6  exhibit.  What does it depict?

7  A.  So in the first flow, the flow that we saw before we added

8  this piece, I was trying to summarize essentially what

9  happened.  But in addition, Alameda Research—there was a

10  transfer out of Alameda Research of 491 million to Sam

11  Bankman-Fried and 54.6 million to Gary Wang.  This amount was

12  exactly equal to the amount that was used to purchase Robinhood

13  shares.

14        MR. ROOS:  So let's go to the next page.

15  Q.  And what information is now added to the exhibit?

16  A.  So this 468—400—$546 million—I apologize—is—this

17  $546 million was then transferred to an entity wholly owned by

18  Gary Wang and Sam Bankman-Fried called Emergent Fidelity

19  Technologies.  This is the yellow box, identified yellow

20  because now it's a Bankman-Fried entity.

21        MR. ROOS:  And let's go to the next page.

22  Q.  And what does this new information on the exhibit depict?

23  A.  Recall that the 546.1 million which went to Gary and Sam

24  Bankman-Fried goes to Emergent Technologies but then was

25  transferred back to Alameda Research, so there's a round-trip

NAI1BAN2                      Easton - Direct                      1742

1   transaction, if you like, that makes Alameda Research whole.

2   Q.  And what then happened, if anything, in response to this

3   $546.1 million transfer?  And could we go to the next page.

4   A.  So in turn, Robinhood shares were transferred to this

5   brokerage fund in the name of Bankman-Fried and Wang.

6            MR. ROOS:  And let's go to the last page.

7   Q.  So what does this last page now depict?

8   A.  So the end result of all of those transactions, which I've

9   tried to summarize as clearly as possible——I hope it is

10  clear——is that customer funds ultimately went through Alameda

11  Research and did this big round-trip transaction so that they

12  ended up in an account owned by Wang and Bankman-Fried, which

13  then in turn purchased Robinhood shares.

14  Q.  And so just to be clear, we've looked at straight green

15  lines previously.  What do the sort of dashes indicate here?

16  Was this actually the flow of funds?

17  A.  No.  The dashes are there to indicate all of this——these

18  transactions that occurred in the background.

19            MR. ROOS:  Okay.  We can take this exhibit down.

20            Let's put back up Government Exhibit 1044.  And if we

21  go to page 3.

22  Q.  Professor Easton, we've talked about a bunch of instances

23  of payments or investments in businesses.  Have you done any

24  analysis relating to payments for political contributions?

25  A.  Yes, I have.

**A-843**

NAIMBAN3                        Easton - Direct                        1767

1  Q.  Before we talk about that, let's talk about -- sorry.

2  Whose lenders?

3  A.  Lenders to FTX.

4  Q.  To FTX?

5  A.  To Alameda.  I beg your pardon.

6  Q.  So let's talk about just the borrowing and lending before

7  we talk about the use of funds.

8           MR. ROOS:  Can we please publish Government Exhibit

9  1013.

10  Q.  Focusing on the first page of 1013, what does this exhibit

11  show?

12  A.  So Alameda also borrowed funds from other -- from

13  third-party lenders outside of the firm.

14  Q.  Like the Genesis you showed us in the beginning?

15  A.  For example.

16  Q.  What does this diagram or chart show?

17  A.  This is, again, a daily chart.  The Y axis is, again,

18  billions.  You can see the amount borrowed increased over time

19  through the end of November 2021 to a max of 15.4 billion and

20  then declined over time.

21           MR. ROOS:  Let's go to page 2 to add a marker.

22  Q.  Do you see that this marker that was added on May 12, 2022,

23  it says Terra Luna (Luna collapse)?

24  A.  Yes.

25  Q.  What happened to cryptocurrency prices after that Terra

**A-844**

NAIMBAN3                    Easton - Direct                    1768

1    Luna collapse on May 12?

2    A.   Terra Luna -- the Terra Luna collapse introduced a lot of

3    uncertainty to the market and crypto prices collapsed.

4    Q.   Have you analyzed what happened with loans after this

5    period?

6    A.   Yes, I have.

7             MR. ROOS:  Let's go to the next page.

8    Q.   What additional information has been added to the exhibit?

9    A.   This is simply saying that, in the month of May 2022, there

10   were a total of three payments of $1.3 billion to third-party

11   lenders.

12   Q.   So Alameda repaid $1.3 billion in May.  What about in June?

13            MR. ROOS:  Can we go to the next page.

14   A.   So in June, a further 2.9 billion.

15   Q.   What about July.

16            MR. ROOS:  Can we go to the next page.

17   A.   July, almost three-quarters of a billion repayments.

18   Q.   During this period, have you been able to determine whether

19   any new loans were made to Alameda?

20   A.   Yes, I have.

21            MR. ROOS:  Why don't we go to the next page.

22   A.   New loans were 1.7 billion during this period.

23   Q.   And over what period were those new loans extended?

24   A.   From the beginning of May through the end of FTX, 1111.

25   Q.   We have added one more marker here at the end, and what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-845**

NAJ1BAN1                    Sun - Direct                    1897

1   different type of job?

2   A.  Yes.  In August '21 I left Fenwick & West to join FTX.

3   Q.  I believe you said, but can you just repeat when you joined

4   FTX.

5   A.  End of August 2021.

6   Q.  What was your position when you joined FTX?

7   A.  I was general counsel.

8   Q.  What were your general responsibilities as general counsel

9   at FTX?

10  A.  I headed up legal at FTX International.

11  Q.  And what types of duties did that involve?

12  A.  Included licensing regulatory strategy, internal corporate

13  work, everything from fundraising, cap tables, employment

14  agreements, stuff like that.

15  Q.  As part of your responsibilities as general counsel, were

16  you involved in any work related to how FTX treated and dealt

17  with customer assets?

18  A.  Yes.

19  Q.  At any time as general counsel, did you approve lending FTX

20  customer money to Alameda Research?

21          MR. COHEN:  Objection.

22          THE COURT:  What's the objection?

23          MR. COHEN:  Leading.

24          THE COURT:  Sustained.

25  Q.  At any time as general counsel, Mr. Sun, what, if anything,

NAJ1BAN1                    Sun – Direct                    1898

1    did you approve related to lending FTX customer money to

2    Alameda?

3            MR. COHEN:  Same objection.

4            THE COURT:  Overruled.

5    A.  Never approved anything like that, and I would never have

6    done it either.

7    Q.  And if you could just speak up a little bit, Mr. Sun.  I

8    want to make sure the jury can hear you.

9    A.  No, absolutely not.

10   Q.  While you worked at FTX, did you have conversations with

11   the defendant about how FTX treated its customer assets?

12   A.  Yes.

13   Q.  And what, if anything, did the defendant tell you about how

14   FTX received customer fiat or dollar deposits?

15   A.  That they were received, safeguarded, and segregated from

16   FTX's customer funds—sorry—from FTX's proprietary funds.

17   Q.  And you mentioned that the defendant told you that customer

18   funds were segregated from FTX proprietary funds.  What did you

19   mean by FTX proprietary funds?

20   A.  So FTX's own funds as a company, funds that it uses to pay

21   for bills, to pay for, you know, website services, pay vendors,

22   those were FTX's own funds.  FTX customers' funds were always

23   separated from those.

24   Q.  And you referred to the defendant telling you that FTX

25   customer funds were segregated from proprietary funds.  What

**A-847**

NAJ1BAN1                    Sun – Direct                    1899

1   does "segregated" mean?

2   A.  It means it is held separately, in a separate account from

3   FTX's own proprietary funds.

4   Q.  What did you understand was the purpose of segregating

5   customer funds from FTX proprietary funds?

6   A.  To clearly identify them as customer funds so that they

7   would not be misappropriated.

8   Q.  And when you say "misappropriated," what do you mean by

9   that?

10  A.  Stolen, used for anything else other than what the customer

11  instructs us to do.

12  Q.  Did you at any time observe public statements by the

13  defendant about how FTX treated customer assets?

14  A.  Yes.

15  Q.  In what forums?

16  A.  On Sam's tweets; his public congressional testimonies; his,

17  you know, statements to investors; to regulators; other

18  conversations.

19  Q.  And what kinds of things do you recall observing the

20  defendant say publicly about how FTX treated customer assets?

21  A.  That all customer assets of FTX were safeguarded,

22  segregated, protected.

23  Q.  You talked about customer dollar or fiat deposits.  What,

24  if anything, did the defendant tell you about how

25  cryptocurrency deposits were received at FTX?

**A-848**

NAJ1BAN1                    Sun – Direct                    1900

1    A.  They were received and kept in an omnibus wallet for all

2    customer funds that was separated from FTX's own proprietary

3    funds as well.

4    Q.  And just to be clear, is that what the defendant told you?

5    A.  Yes.

6    Q.  And you mentioned——

7            THE COURT:  I didn't hear that.  I'm sorry.  I didn't

8    hear an answer.

9            THE WITNESS:  Yes.

10           THE COURT:  Thank you.

11   Q.  You mentioned that the defendant described an omnibus

12   wallet for customers.  What do you mean by an omnibus wallet?

13   A.  Right.  So say if two customers each had one Bitcoin and

14   they deposit it into the platform.  We would not have one

15   Bitcoin wallet for each customer; instead, we would keep both

16   of those customers' assets into one combined wallet, so that

17   one wallet would have two Bitcoins, but that is all customer

18   assets and it is separated from all of the remaining FTX

19   proprietary assets.

20   Q.  As general counsel of FTX, were you familiar with something

21   called the key principles of FTX?

22   A.  Yes.

23   Q.  And what were those?

24   A.  I used to be able to recite this, but——

25   Q.  So before you recite them, can you explain what we're

**A-849**

NAJ1BAN1                    Sun – Direct                    1901

1    talking about when we talk about the key principles.

2    A.  Sure.  So Sam was on a movement to create a sensible

3    regulatory framework for regulating the crypto industry, and so

4    as part of that framework, FTX had a list of five

5    investor—sorry—key principles for investor protection, things

6    like market manipulation, things like market integrity,

7    prevention of financial crimes, safeguarding of customer

8    assets, and I can't remember the last one off the top right

9    now.

10   Q.  And these principles, were they documented?

11   A.  Yes.

12   Q.  How were they documented?

13   A.  It was on FTX policies website; it was in Sam's testimony

14   to Congress; and we also described it in various forums with

15   regulators we were working with around the world.

16   Q.  And so based on your work with the defendant, what's your

17   understanding of his role in crafting and disseminating these

18   key principles?

19   A.  He was very, very much involved.

20   Q.  And what do you recall, at a general level, about what

21   these key principles said about the treatment of customer

22   assets?

23   A.  Safeguarded and protected.

24   Q.  As general counsel of FTX, did you get questions from

25   regulators about how FTX handled customer deposits?

NAJ1BAN1                    Sun - Direct                    1902

1   A.  Yes.

2   Q.  And what about from FTX customers?

3   A.  Yes.

4   Q.  And did you respond to those inquiries?

5   A.  Yes.

6   Q.  And how did you get the information to respond to those

7   inquiries?

8   A.  Based on the information that Sam gave me, based on

9   information I got from other management at FTX, from the

10  finance team, and obviously all of the public statements that

11  we had talked about earlier.

12  Q.  And so what types of things were you saying to regulators

13  and customers about how FTX treated customer assets?

14  A.  They were safeguarded, segregated, and protected.

15  Q.  Did you personally verify how customer dollar or crypto

16  deposits were treated by FTX?

17  A.  I did not.

18  Q.  Were you involved in any way in monitoring FTX's bank

19  accounts?

20  A.  No, I was not.

21  Q.  Did you have login access to the bank accounts or the

22  wallets?

23  A.  No, I did not.

24  Q.  You've talked about how assets were received.  What, if

25  anything, did the defendant tell you about how customer

**A-851**

NAJ1BAN1                    Sun — Direct                    1903

1   deposits were treated upon being received into FTX's accounts

2   or wallets?

3   A.  Are you talking about fiat or crypto or both?

4   Q.  Why don't we start with fiat.

5   A.  So fiat, it would be transferred into what we call FBO bank

6   accounts held by FTX at various financial institutions and,

7   again, separated from FTX's own proprietary assets.

8           For crypto assets, they would come in to what we call

9   a sweep wallet and then combined into an omnibus wallet and

10  also separated and segregated from FTX's own proprietary

11  assets.

12  Q.  You mentioned a term called an FBO account.  What does that

13  mean?

14  A.  For the benefit of.  Basically where a bank account is

15  owned in the name of one entity but that entity does not

16  actually have beneficial ownership of the funds in that

17  account, and the funds in that account are actually held for

18  the benefit of others——in this case, FTX's customers.

19  Q.  Yes or no:  In your role as FTX's general counsel, did you

20  have expectations about how customer assets should be treated?

21  A.  Yes.

22  Q.  And if you could just speak up.  I see you're nodding,

23  but——

24  A.  Yes, yes.

25  Q.  And what were the expectations you had about how customer

**A-852**

NAJ1BAN1              Sun – Direct                    1904

1   assets should be treated based on?

2   A.  What is it based on?  So my understanding is FTX protects,

3   safeguards customer assets a hundred percent, and it was based

4   on, you know, my conversations with Sam, conversations with

5   other management, conversations with the finance team, FTX's

6   general standing in the industry, our regulatory requirements,

7   Sam's public statements.  Everything was unequivocally that FTX

8   protects customer assets a hundred percent.

9   Q.  Did you believe that FTX customer deposits could

10  permissibly be commingled with other funds of the business?

11  A.  No.

12  Q.  And why not?

13  A.  Those funds belongs to the customers and does not belong to

14  FTX.

15  Q.  Based on your conversations with the defendant, what was

16  your understanding about how, if at all, FTX could use customer

17  assets?

18  A.  Only at the direction of the customer.

19  Q.  And what does that mean?

20  A.  So if the customer wants to trade it, they can trade it; if

21  they want to withdraw it, they can withdraw it; but nothing

22  else.

23  Q.  And what was your understanding as to whether FTX could

24  borrow customer money without express authorization?

25  A.  None whatsoever.

**A-853**

NAJ1BAN1                    Sun – Direct                    1905

1   Q.  What about whether Alameda could borrow customer money

2   without express authorization?

3   A.  None whatsoever.

4   Q.  When you say "none whatsoever," what do you mean?

5   A.  So there's—there's none.  There's none.  There's, you

6   know, there's a borrow-lending program.  If a user wants to

7   voluntarily, affirmatively choose to lend out their assets on

8   the platform, Alameda or other borrowers could borrow it, but

9   without express authorization from the user that they want to,

10  let's say, lend out their funds, neither FTX, Alameda, or

11  anyone had any rights to those assets because it belongs to the

12  user.

13  Q.  While you worked at FTX, were you aware of an entity called

14  North Dimension?

15  A.  Yes.

16  Q.  What did you know about North Dimension based on your work

17  at FTX?

18  A.  First time I saw it I think was in the spring of '22.  I

19  was putting together an organization chart showing the

20  different FTX and Alameda entities.  I saw that entity, wasn't

21  sure what it did, asked our finance team, and they mentioned

22  that it made some payments on behalf of FTX—of Alameda.

23  Q.  Were you aware whether North Dimension was receiving

24  customer deposits of FTX into its bank account?

25  A.  No, I was not.

**A-854**

NAJ1BAN1                    Sun - Direct                    1906

1   Q.  And were you aware, prior to November 2022, of Alameda

2   receiving FTX customer deposits into its bank accounts?

3   A.  I was not.

4   Q.  As general counsel, would you have approved of Alameda

5   receiving FTX customer deposits?

6            MR. COHEN:  Objection.

7            THE COURT:  Sustained.

8   Q.  If you had been told that Alameda was receiving FTX

9   customer deposits, would that have raised concerns for you as

10  general counsel of FTX?

11           MR. COHEN:  Same objection.

12           THE COURT:  What is it?  What is the objection?

13           MR. COHEN:  Calls for speculation and hypothetical.

14           MS. SASSOON:  Your Honor, he was the general counsel.

15           THE COURT:  Yes, I understand.

16           MR. COHEN:  The phrase begins "If you had been told."

17           THE COURT:  Sustained.

18  BY MS. SASSOON:

19  Q.  While you worked as general counsel at FTX, were you aware

20  of an account within the FTX database called the fiat@ftx.com

21  account?

22  A.  I was not aware.

23  Q.  Did there come a time when you started working on terms of

24  service for FTX?

25  A.  Yes.

**A-855**

NAJ1BAN1                          Sun – Direct                          1914

1                    (In open court)

2                    MS. SASSOON:  Mr. Imperato, if we could publish

3       Government Exhibit 558.

4       BY MS. SASSOON:

5       Q.  Mr. Sun, what is this?  And just make sure the mic is

6       positioned so that we can all hear you.

7       A.  Yes.  This is the FTX terms of service.

8       Q.  And which version of the terms of service?

9       A.  This is the new version that was published May 13, '22.

10      Q.  And are these the terms of service you described the

11      defendant approving?

12      A.  Yes.

13                   MS. SASSOON:  If we could go to page 10, and look at

14      provision 8.2.6.

15      Q.  Mr. Sun, is this a provision that you reviewed in the

16      course of finalizing the terms of service?

17      A.  Yes.

18      Q.  I want to direct your attention to (A), which says, "Title

19      to your Digital Assets shall at all times remain with you and

20      shall not transfer to FTX Trading."

21                   First of all, what is FTX Trading?

22      A.  That is the FTX entity providing services to customers

23      under the terms of service.

24      Q.  And so how does this entity relate to ftx.com, the

25      international exchange?

**A-856**

NAJ1BAN1                    Sun – Direct                    1915

1    A.  It was the entity providing services at ftx.com on the

2    website.

3    Q.  And where it says, "Title to your Digital Assets shall at

4    all times remain with you," what did you understand that to

5    mean?

6    A.  It means when a user deposits their assets onto the

7    exchange, they continue to own those assets.

8    Q.  Directing your attention to provision (B), do you see where

9    it says, "None of the Digital Assets in your Account are the

10   property of, or shall or may be loaned to, FTX Trading"?

11   A.  Yes.

12   Q.  How does the language there correspond to discussions you

13   had with the defendant about the treatment of FTX customer

14   assets?

15   A.  It's fully consistent.

16   Q.  How so?

17   A.  That customer assets, when deposited onto the platform,

18   continued to belong to the customers and FTX has no rights to

19   customers' assets.

20   Q.  No. (C), it says, "You control the Digital Assets held in

21   your Account."  What does it mean to control the digital assets

22   in your account?

23   A.  You can choose to do whatever you want with the assets; you

24   can withdraw it, trade it, lend it, you know, do whatever you

25   want with it.

**A-857**

NAJ1BAN1                    Sun - Direct                    1916

1   Q.  "Digital Assets," what does that mean?

2   A.  Cryptocurrencies.

3   Q.  So this paragraph does not mention fiat currency.  Did you

4   understand fiat currency to be treated differently by the

5   exchange?

6   A.  No.  Exactly the same.

7   Q.  As far as you know, did this provision, 8.2.6, regarding

8   Digital Assets, exist in prior versions of FTX's terms of

9   service?

10  A.  This exact language, not to my recollection.

11  Q.  And in your view as general counsel, did the addition of

12  this exact language represent a change in FTX policy?

13           MR. COHEN:  Objection.

14           THE COURT:  Overruled.

15  A.  No, it did not.  It was the same policy.

16  Q.  And so how do you explain the addition of this provision?

17  A.  Again, it was fully consistent with FTX's policy

18  throughout.  I like to make everything clear so the user knows,

19  you know, that assets deposited on the exchange continued to be

20  owned by them.

21  Q.  So when was this language in the terms of service actually

22  finalized?

23  A.  September '21.

24  Q.  And at that point, in September 2021, did you consider the

25  obligations set out here to be an existing FTX policy?

**A-858**

NAJ1BAN1                          Sun – Direct                          1918

1          As general counsel, did you hear the defendant

2   describe FTX's liquidation protocols?

3   A.  Yes.

4   Q.  And based on what the defendant described, what did you

5   understand to be the procedure for liquidating positions on the

6   FTX exchange?

7   A.  So it is a multistep process.  The first step happens is,

8   if your collateral——if the value of your account on the

9   exchange starts to decrease and it hits 3 percent of your

10  position size, that's when FTX's trading engine starts to

11  liquidate you on the market.  If the market moves further

12  adversely to you, it goes further down.  Let's say your

13  collateral, your value of your account drops to 1.5 percent of

14  your total position, notional size, then what happens is, your

15  positions are now moved to what we call backstop liquidity

16  providers, which are basically large market makers on the

17  exchange who signed up to accept these positions.  Now if it

18  goes even further negative and the backstop liquidity program

19  is not able to actually take on these positions, then there's

20  an insurance fund that kicks in, which is basically money that

21  is set aside specifically for the purpose of covering these

22  losses that cannot be satisfied on the platform.  And if that

23  insurance fund gets depleted, runs out, then there would be,

24  you know, socialized losses.  But it has been FTX's consistent

25  position that they have never depleted the insurance fund, we

**A-859**

NAJ1BAN1                    Sun - Direct                    1919

1   have never clawed back users, and we have no intention of

2   clawing back users as well.  It was one of FTX's main marketing

3   and selling points.

4   Q.  So what you just described, are those things that you heard

5   the defendant talk about?

6   A.  Yes.

7   Q.  And where did you hear the defendant describing FTX's

8   liquidation engine and the selling points of that engine?

9   A.  So it comes up in conversations with regulators, our

10  regulators around the world who asks us about our liquidation

11  and margin programs; it comes up in questions from our users

12  who asks about, you know, how our liquidation waterfall works;

13  it's something that a lot of large traders are very much

14  focused on because many other crypto exchanges do not have a

15  good liquidation program, and FTX won a lot of customers

16  because, you know, we marketed it as having a really good

17  program, you have an insurance fund that's never been depleted,

18  we've never done clawbacks.

19  Q.  I want to break that down a little bit.

20          First of all, you said this was a selling point for

21  the exchange.  Why was this a selling point?

22  A.  So other crypto exchanges have had a lot of these losses in

23  the past basically where you have positions stuck in the system

24  that are in the negative that they have not been able to

25  liquidate, and so what other exchanges do—and there's a whole,

**A-860**

NAJ1BAN1                    Sun – Direct                    1920

1   you know, variety of ways as to how they do them—is they would

2   take people who make money in those markets and give it to the

3   people who lost money, to cover the losses.  That is typically

4   known as a clawback—people who make money had their profits

5   taken away from them.  And you can imagine that this is not

6   something that traders like.  And so FTX prided itself on the

7   lowest rate of liquidations, on having an insurance fund, has

8   never been depleted, and not doing clawbacks.

9   Q.  You talked about an insurance fund.  Based on the

10  defendant's statements, what did you understand was the

11  insurance fund?

12  A.  I understand that it was $250 million sitting on the

13  ftx.com exchange and made readily available to cover losses.

14  Q.  And I think you said earlier that you understood that the

15  insurance fund was money that was set aside.  Why did you

16  understand that that money had been set aside?

17  A.  Sorry.  Why did I understand that money had been set aside?

18  It was a program created specifically for that purpose.

19  Q.  And what, if anything, did the defendant tell you about how

20  the insurance fund had been used over time?

21  A.  It started small, obviously, but it, you know, it grew as

22  FTX grew, and one of the key things I remember is that the

23  maximum drawdown from the insurance fund, meaning payouts to

24  cover losses from the insurance fund, is less than the profits

25  made by FTX on that day.

**A-861**

NAJ1BAN1                    Sun - Direct                    1922

1    may be subject to clawback due to losses suffered by other

2    Users."

3              In your conversations with the defendant, what, if

4    anything, did he say to you about clawbacks?

5    A.  So I've not discussed the specific provision, to my

6    recollection, with Sam, but when I talked to Sam about

7    clawbacks, he's always made it clear that FTX does not claw

8    back money from users.

9    Q.  And what, if anything, are you aware of that the defendant

10   said publicly about clawbacks?

11   A.  That we do not claw back against users as well.

12   Q.  And so you said that you don't recall discussing this

13   provision with the defendant.  Did he ever say anything to you

14   that suggested he was aware of this provision?

15             MR. COHEN:  Objection, leading.

16             THE COURT:  Sustained.

17   Q.  In your discussions with the defendant, what, if anything,

18   did he ever say to you about this provision, specifically?

19   A.  I do not recall any conversations with Sam specifically

20   about this provision.

21   Q.  And how does this last sentence in 16.4 compare to the

22   defendant's public statements about clawbacks?

23             MR. COHEN:  Objection.

24             THE COURT:  Sustained.

25             MS. SASSOON:  Your Honor, he described hearing public

NAJMBAN2                    Sun – Direct                        1954

1   A.  Yes, I did.

2   Q.  And besides that one, did you receive any others?

3   A.  No.  That was the only loan I got.

4   Q.  What was the amount of that loan?

5   A.  2.3 million.

6   Q.  And for what purpose did you receive that loan?

7   A.  As part of a management incentive program to incentivize

8   employees to move to the Bahamas.  A hundred percent of it was

9   used for the purchase of a house in the Bahamas.

10  Q.  When you got that loan, where did you think that money was

11  coming from?

12  A.  Alameda's own money, profits.

13  Q.  Mr. Sun, did you enter any agreements with the government

14  prior to your testimony today?

15  A.  Yes.

16  Q.  What type of agreement?

17  A.  A nonprosecution agreement.

18  Q.  What's your understanding of your obligations under the

19  nonprosecution agreement?

20  A.  That I shall speak the truth.

21  Q.  What, if anything, do you understand the agreement to

22  provide in return?

23  A.  That I will not be prosecuted by the government if I speak

24  the truth.

25  Q.  Did you request a nonprosecution agreement from the

**A-863**

NAJMBAN2                    Sun - Direct                    1955

1    government?

2    A.  Yes.

3    Q.  Why?

4    A.  I had no idea that customer funds were being used.  I

5    didn't do anything wrong.  As general counsel I was involved in

6    transactions that now, in hindsight, may have involved the

7    misappropriation of customer funds, so, out of an abundance of

8    caution, I asked the government for protection.

9            MS. SASSOON:  Your Honor, I have one more section.  I

10   can continue and finish and then we can take a break, or we can

11   take a break now, whatever you prefer.

12           THE COURT:  How long a section is it?

13           MS. SASSOON:  Maybe 15 minutes.

14           THE COURT:  Let's get it done.

15   Q.  I want to talk to you about November of 2022, Mr. Sun.

16           Did there come a time in November 2022 when you

17   assisted in efforts to raise capital for FTX?

18   A.  Yes.

19   Q.  Who did you try to raise capital from?

20   A.  Apollo Capital.

21   Q.  What is Apollo Capital?

22   A.  It's a large investment fund.

23   Q.  What was your role in discussions with Apollo about raising

24   money for FTX?

25   A.  So it was on the afternoon of November 7, at around 1 p.m.,

**A-864**

NAJMBAN2                    Sun – Direct                    1959

1   A.  We shared the spreadsheet with Apollo.

2   Q.  What happened after that?

3   A.  About an hour or two after we sent out the spreadsheet, Sam

4   pulls me aside and he says he heard an update from Apollo.

5   They asked him for a legal justification as to why the funds

6   were missing and were at Alameda, and he asked me to come up

7   with legal justifications.

8   Q.  Once the defendant asked you to come up with legal

9   justifications about the missing funds, what do you understand

10  had happened to the customer funds?

11  A.  I mean, basically confirmed my suspicion that had been

12  rising all day that FTX did not have the funds to satisfy

13  customer withdrawals and that they had been misappropriated by

14  Alameda.

15  Q.  And this conversation with the defendant where he asked you

16  to come up with a legal justification, where did it take place?

17  A.  In the same Albany apartment.

18  Q.  And in that conversation did the defendant identify any

19  legal justifications that he was aware of?

20  A.  No.

21  Q.  And in that moment did either of you provide a legal

22  justification?

23  A.  No.

24  Q.  What, if anything, did the defendant tell you in that

25  conversation had actually happened with the customer money?

**A-865**

NAJMBAN2                        Sun - Direct                        1960

1    A.  He did not say anything about that.

2    Q.  After this conversation where the defendant asked you to

3    come up with a legal justification, did you explore possible

4    legal justifications for the missing customer money?

5    A.  Yes.

6    Q.  And did you come to any conclusions?

7    A.  Yes.  That there were no legal justifications for the money

8    being taken away.

9    Q.  Did you have a subsequent discussion with the defendant

10   about those conclusions?

11   A.  Yes.

12   Q.  Where did that conversation take place?

13   A.  So it was right around 7:00 that evening, November 7.  It

14   was still in the same Albany apartment.  And Sam pulls me aside

15   and says he is talking to Apollo in 10, 15 minutes.  He asked

16   me to go on a walk with him.  I go on a walk with him and

17   basically tell him that there was no legal justification for

18   the funds being missing and taken by Alameda.  I did tell him

19   that there were theoretical arguments, but none of them was

20   supported by the facts.

21   Q.  You just testified that you told the defendant there were

22   some theoretical arguments but none were supported by the

23   facts.  Did you walk through those theoretical arguments with

24   the defendant during this walk?

25   A.  Yes.

**A-866**

NAJMBAN2                    Sun - Direct                    1961

1  Q.  And what was the first one that you spelled out for the

2  defendant?

3  A.  The first argument is section 9 of our terms of service

4  which deals with dormancy, or otherwise known as abandoned

5  property.

6          What happens is, if there is a prolonged period of

7  time where FTX is not able to contact the customer, then in

8  that scenario FTX would be able to charge a dormancy fee for

9  administering the user's funds.

10  Q.  What, if anything, did you tell the defendant about whether

11  this was an adequate legal justification?

12  A.  Yes.  I told Sam that this would not justify the amount

13  that was taken away by Alameda.

14  Q.  Why not?

15  A.  The amount of active users on the exchange was very few,

16  and FTX had only been around since 2019, so the amount of funds

17  that we could even call dormant is very little.

18  Q.  I just want to be clear.  When you said certain users or

19  very few, did you say active or inactive?

20  A.  Sorry.  Inactive users with large account balances.

21  Q.  Were what?

22  A.  Very few.

23  Q.  How did the defendant respond to what you said?

24  A.  He acknowledged it.

25  Q.  How did he acknowledge it?

**A-867**

NAJMBAN2                    Sun - Direct                    1962

1   A.  Yup, yup.

2   Q.  I'm sorry.  When you just went yup, yup, is that what he

3   was saying?

4   A.  Yes.  That is what Sam said.

5   Q.  And did you raise any other potential arguments with the

6   defendant on this walk?

7   A.  Yes.  The second theoretical argument is section 16 of our

8   terms of service, which provides that if a user voluntarily

9   affirmatively chooses to lend out their money to other users on

10  the platform, then if the borrower then defaults and unable to

11  return the money, then the lender's money is gone.

12          Alternatively, also under section 16 of our terms of

13  service, if a user decides to take his assets and use it as

14  collateral to trade on leverage, then he is pledging those

15  collateral -- pledging his assets as collateral to trade on

16  margin, and if he or she is liquidated, then those assets will

17  be taken away as well.

18  Q.  What, if anything, did you explain to the defendant about

19  whether this argument was supported by the facts?

20  A.  I had previewed this argument with Nishad and Ramnik before

21  the walk, and they had pulled some numbers that showed that it

22  was not supported by the facts as well.

23  Q.  Did you relay that to the defendant?

24  A.  Yes.

25  Q.  And how did he respond to that?

**A-868**

NAJMBAN2                    Sun - Direct                    1963

1   A.  He acknowledged as well.

2   Q.  How did he acknowledge it?

3   A.  He said yup, yup.

4   Q.  Were there any other theoretical arguments you described to

5   the defendant?

6   A.  Yes.  There was a third one, which is some crypto exchanges

7   do not make it clear what is the relationship between a user

8   when they deposit funds onto the exchange and the exchange.  I

9   told him that unfortunately that is not even feasible for us

10  because our terms of service make it very clear that when a

11  user deposits assets onto the exchange, those assets continue

12  to belong to the user.

13  Q.  Did the defendant respond to this explanation?

14  A.  Yes.  He acknowledged as well.

15  Q.  Did you offer any other theoretical arguments, or was it

16  primarily those three?

17  A.  It was those three.

18  Q.  Once you walked through those three arguments on this walk,

19  how did the defendant react to what you had told him?

20  A.  I was actually expecting a bigger response, but it was very

21  muted.  Sam basically said something like, got it.  He was not

22  surprised at all.

23  Q.  Did the defendant push back on what you said?

24  A.  No.

25  Q.  I couldn't hear you.

**A-869**

NAJ1BAN3                    Sun — Cross                    1981

1  Q.  And you testified about that this morning on your direct,

2  correct?

3  A.  Yes.

4  Q.  Okay.  And if we could go down to 8.2.6.  Do you see that?

5  A.  Yup.

6  Q.  And you told us that this provision related to digital

7  assets and title to digital assets and all the other things

8  laid out in A, B, and C.  I'm not going to go through it again.

9  Is that correct?

10 A.  Yes.

11 Q.  Now is it fair to say, Mr. Sun, that fiat was addressed in

12 different sections of the terms of service?

13 A.  Yes, it's not covered by the definition of digital assets

14 here.

15 Q.  Okay.  Fiat is something different than digital assets,

16 correct?

17 A.  Under the definitions, yes.

18        MR. COHEN:  Okay.  If we could look to the next page,

19 page 11, bottom of the page.  Call out 8.3.

20 Q.  This is a section called "Fiat currency," correct, sir?

21 A.  Yes.

22 Q.  And it called out whatever the obligations that FTX and the

23 customers had with regard to fiat, correct?

24 A.  Yes.

25        MR. COHEN:  All right.  Continuing in the document, if

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-870**

NAJ1BAN3                    Sun – Cross                    1983

1      MS. SASSOON:  Objection, foundation.

2      THE COURT:  Sustained.

3  Q.  In connection with your work at FTX, did you ever——did you

4  ever look into how many——how many users took advantage of the

5  margin trading program?

6      MS. SASSOON:  Objection.  Also vague as to time frame.

7  Q.  During the time you were the general counsel.

8  A.  I do not recall.

9  Q.  Okay.  Before we——well, let me——before we move on, if you

10  could look at Section 16.4.

11      Do you recall giving testimony about that today, sir?

12  A.  Yes.

13  Q.  And if I might go through it with you.

14      MR. COHEN:  At the top of the first——if you could

15  highlight the first sentence.

16  Q.  It says, "Under certain market conditions, it may become

17  difficult or impossible to liquidate a position."

18      And then you described for us, sir, how, if there was

19  a difficulty liquidating a customer's account, the backstop

20  liquidity providers might have to be brought into it, correct?

21  A.  That's right.

22  Q.  And let's continue on.

23      MR. COHEN:  If you could go, Brian, to the sentence

24  that begins, "In such an event."  Right here.  Highlight that

25  sentence.

**A-871**

NAJ1BAN3                        Sun – Cross                        1984

1   Q.  "In the event that the customers did not have sufficient

2   assets, in such event, our backstop liquidity provider program

3   may come into play, but there is no assurance or guarantee that

4   any such program activities will be sufficient or effective in

5   liquidating your position."  Do you see that, sir?

6   A.  Yes, I see that.

7   Q.  That was the next step you described to us earlier.

8   A.  That's right.

9   Q.  Okay.  And then to complete that, "as a result, you may

10  lose all of your assets or incur a negative balance in your

11  account.  In addition, even if you have not suffered any

12  liquidations or losses, your account balance may be subject to

13  clawback due to losses suffered by other users."

14          So is that—let me not try to—let me just ask you

15  your understanding of those sentences, sir.

16  A.  So as it described, this is—describes our liquidation

17  waterfall.  I would just maybe caveat by saying this is a very

18  shortened version that is drafted mostly for disclaimer

19  purposes.  There is a much more detailed description of our

20  liquidation and risk engine on our help desk web page and also,

21  as I mentioned earlier today, that, you know, this does not

22  actually describe the insurance fund, which is something that

23  we have, and as I mentioned earlier today, my understanding is

24  that our insurance fund has never been depleted.

25  Q.  You said this was describing, at least in part, something

**A-872**

NAJ1BAN3                     Sun - Cross                      1985

1   you called the liquidation waterfall.  What do you mean by

2   that?

3   A.  It basically means the order in which liquidations occur.

4   Q.  Okay.  And so at least according to this provision, there

5   could be a time when, even if a customer had not suffered any

6   losses of their own, their balances could be subject to

7   clawback due to losses suffered by other users; is that

8   correct, sir?

9            MS. SASSOON:  Objection.

10           THE COURT:  Sustained.  It says what it says and we've

11  been over this at least twice.

12           MR. COHEN:  Your Honor, he's the author of the

13  document.

14           MS. SASSOON:  Objection.  No, he's not.

15           THE COURT:  He's not the author of the document.  He's

16  somebody who participated, starting at a point where it was 80

17  to 90 percent finished, and in any case, the words are on the

18  page, and it doesn't help to read them six times.

19           MR. COHEN:  Okay.  I won't go for six, your Honor.

20  BY MR. COHEN:

21  Q.  Mr. Sun, have you ever heard of the term

22  "auto-deleveraging"?

23  A.  Yes.

24  Q.  What's your understanding of that?

25  A.  It means that when there is significant volatility in the

NAJ1BAN3                      Sun - Cross                      1986

1  market that could lead to losses, leveraged positions will be

2  automatically closed out as part of the liquidation mechanism.

3  Q.  And in your understanding, sir, are there times when

4  auto-liquidation occurs when one customer's assets could be

5  used to cover the losses of another customer's assets?

6           MS. SASSOON:  Objection.

7           THE COURT:  What's the objection?

8           MS. SASSOON:  Confusing and foundation.

9           MR. COHEN:  He just said he knew it.

10          THE COURT:  Give me a moment.

11          MS. SASSOON:  Your Honor, the previous question was

12  about auto-deleveraging.

13          THE COURT:  Yes, it was, and this question is about

14  something called auto-liquidation.  Sustained.  Let's try

15  again.

16          MR. COHEN:  I'm sorry.  Let's have the last question

17  read back, please.  Two questions ago.

18          (Record read)

19          MR. COHEN:  Okay.  I take his Honor's point.  I will

20  move on.

21  BY MR. COHEN:

22  Q.  Now you were asked some questions about something called

23  segregation of assets.  Do you recall that, Mr. Sun?

24  A.  Yes.

25  Q.  Can you describe for us what your understanding of

**A-874**

```
NAJ1BAN3                    Sun - Cross                    1992
```

1    A.  I can't remember off the top right now.

2    Q.  Nothing comes to mind.

3          THE COURT:  That's what he said.

4    Q.  Answer the next questions yes or no, please.

5          Did you ever talk with Dan Friedberg about data

6    retention issues?

7    A.  Yes.

8    Q.  Answer this question yes or no, please:  Did you ever talk

9    to anyone at Fenwick & West about data retention issues?

10          MS. SASSOON:  Objection.

11          THE COURT:  What's the objection?

12          MS. SASSOON:  401, 403, raised before trial.

13          THE COURT:  Sustained, on all grounds.

14   Q.  During the time you were the general counsel of FTX, did

15   FTX ever receive subpoenas?

16   A.  Yes.

17   Q.  Did you participate in responding to those subpoenas?

18   A.  Yes.

19   Q.  In connection with responding to those subpoenas, did

20   you——answer this yes or no——did you have to deal with data

21   retention issues?

22   A.  Yes.

23   Q.  Have you ever heard of communications called Signal and

24   Slack?

25   A.  Yes.

**A-875**

NAJ1BAN3                          Sun – Cross                          1996

1   Q.  Did he tell you he wasn't really on the hook for them?

2   A.  That he was not really on the hook for them.  I think his

3   conversation with me was he was worried about his ability to

4   repay those loans and what was going to happen to those loans.

5   Q.  Okay.  Understood.

6         Okay.  Now one more topic, Mr. Sun.

7         You mentioned that you're here today pursuant to a

8   non-prosecution agreement.

9   A.  That's right.

10        MR. COHEN:  Okay.  Can we pull up Government

11  Exhibit 12 in evidence.

12        Oh, I'm sorry.  I'm sorry.  It's 3524-012 in evidence.

13        MS. SASSOON:  This is not in evidence, your Honor.

14        MR. COHEN:  Oh, it's not in?  I'm sorry.  I thought

15  you moved it in.  Well, then let's do this.  Just show it to

16  the witness.

17        THE COURT:  I'm still not clear what it is you're

18  proposing to show to the witness.  What exhibit?

19        MR. COHEN:  3524-012.  It's in the 3500, your Honor.

20        THE COURT:  And is it a government exhibit, is it a

21  defense exhibit, or has nobody bothered to mark it?

22        MR. COHEN:  It's not marked outside of that, your

23  Honor.  We could mark it.

24        THE COURT:  Let's mark it.

25        MR. COHEN:  Okay.  What is the next DX number?

**A-876**

NAJ1BAN3                    Sun – Cross                         1997

1          MS. SASSOON:  Your Honor, I think yesterday we marked

2    it using the same number but adding a DX, so to keep with the

3    convention——

4          THE COURT:  That's fine.  So it will be Defendant's

5    Exhibit 3524-012 for identification.

6    BY MR. COHEN:

7    Q.  Take a look at this document, sir, and my question is

8    whether you recognize it.

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  This is the non-prosecution agreement.

12   Q.  And if you can turn to the second page.

13         Is that your signature?

14   A.  Yes.

15         MR. COHEN:  Your Honor, we offer DX 3524-012.

16         MS. SASSOON:  No objection.

17         THE COURT:  Received.

18         (Defendant's Exhibit 3524-012 received in evidence)

19   Q.  So this is a document you are——you mentioned you're

20   testifying here pursuant to a non-prosecution agreement; is

21   that correct?

22   A.  That's right.

23   Q.  And this is the agreement?

24   A.  That's right.

25   Q.  If we could call your attention to the second full

**A-877**

NAJ1BAN3                        Sun – Cross                        1998

1    paragraph.

2            MR. COHEN:  And call that out.

3    Q.  And look at the first sentence.  It says, "On the

4    understandings specified below, the Office of the United States

5    Attorney for the Southern District of New York will not

6    criminally prosecute Mr. Sun for any crimes (except for

7    criminal tax violations, if any, as to which this Office cannot

8    and does not make any agreement) related to the schemes by

9    [Mr.] Bankman-Fried" and others, and so on.

10            So what is your understanding, Mr. Sun, of how this

11    provision works, or this agreement works?

12   A.  My understanding of the agreement is I am to testify

13   truthfully on the stand.  If I do so, I will not be prosecuted

14   by the government.

15   Q.  And who makes the determination of whether you've been

16   truthful on the stand?

17   A.  You know, I'm supposed to tell the truth here on the stand.

18   And that's—that's—

19   Q.  Isn't it fair to say that's the government who makes the

20   determination?

21   A.  I think I'm required to testify as to the truth on the

22   stand.

23   Q.  If the government determines that you haven't been truthful

24   or you've provided incomplete or misleading testimony, this

25   agreement doesn't apply, correct?

**A-878**

NAJMBAN4                    Boroujerdi – Cross                    2022

1  A.  That is -- yes, it is consistent with the terms of service

2  and agreement as well.

3  Q.  What is the current value of the $60 million investment

4  that Third Point made in FTX?

5  A.  Zero.

6        MR. REHN:  No further questions.

7        THE COURT:  Thank you.

8        Cross-examination.

9  CROSS-EXAMINATION

10  BY MR. LISNER:

11  Q.  Good afternoon.  I know we are on the cusp of lunch, so I

12  will be brief.

13        You testified, Mr. Boroujerdi, that after the initial

14  investment you continued to pay attention to FTX, is that

15  right?

16  A.  Yes.

17  Q.  Do you recall reviewing audited financials for FTX after

18  your investment?

19  A.  We looked at both unaudited and audited financials.

20  Q.  And do you recall if the audited financial -- let me

21  rephrase.

22        Do you recall learning, from your review of FTX's

23  audited financials, that FTX relied on related parties or

24  currency and treasury management activities?

25        MR. REHN:  Objection.

**A-879**

NAQMBAN1                    Troiano - Cross                    2065

1   participants on the chart here for number 29.

2   Q.  Special Agent Troiano, you see the name -- one of the

3   participants is named Ryne Miller?

4            MS. KUDLA:  Objection, your Honor.

5            THE COURT:  Sustained.

6            This is not an exam for new eyeglasses.  I assume he

7   can read it just as well as everybody in the jury box can read

8   it.

9            MR. EVERDELL:  I am simply going to ask if he knows

10  who Ryne Miller is.

11           THE COURT:  Why don't you just ask him that.

12           MS. KUDLA:  Objection, your Honor, to that question.

13  It goes beyond the scope.

14           THE COURT:  You can ask him who Johnny Podres was.

15  Let's move along.  He pitched for the Brooklyn Dodgers.

16           MR. EVERDELL:  Let's look at number 201, if we could.

17  Q.  You see that row, number 201, that group -- the name of

18  that group is KYC/legal discuss, is that correct?

19  A.  Yes.

20  Q.  Do you see that the auto-delete function was enabled for

21  that group?

22  A.  Yes.

23  Q.  What was the duration of the auto-deletion function for

24  that group?

25           MS. KUDLA:  Objection, your Honor, 403, and this goes

**A-880**

NAQMBAN1                                                          2072

1          THE COURT:  Now, how long do you expect the first two

2     witnesses to take?

3          MR. EVERDELL:  Your Honor, I don't think that's going

4     to take very long.  I can't speak for cross-examination, but I

5     believe Ms. Rolle will be 15 minutes, 20 minutes tops.

6     Mr. Pimbley about the same.

7          THE COURT:  Now of course I received the relatively

8     lengthy letter from defense counsel last night raising various

9     issues with respect to the admissibility of certain areas of

10    proposed testimony by the defendant.

11         I have concluded that in order to determine all or

12    most of those issues, probably all, I am going to take the

13    testimony initially out of the presence of the jury because the

14    letter provides insufficient detail for me to rule on it.

15         The question is, do you have sufficient other

16    testimony, without touching those subjects, to put

17    Mr. Bankman-Fried on and go as far as we can go and then break

18    for the hearing out of the presence of the jury, or is there

19    simply no point of starting him without having that hearing

20    take place and resolved?

21         MR. COHEN:  Your Honor, I think we have enough to

22    start.

23         THE COURT:  Give me an idea of how much time, please.

24         MR. COHEN:  As I mentioned on our call yesterday, I

25    think the direct will take about as long as Mr. Wang and

**A-881**

NAQMBAN3                    Pimbley – Direct                    2131

1          Looking at the left-hand side, which is the four

2    coins, how much total were the balance information as of that

3    date in November that you found from doing your data pull?

4    A.   That was like 5.8 billion.

5    Q.   Of that 5.8 billion, roughly, how much of that were in

6    accounts that were enabled for spot margin, spot margin lending

7    and had futures activity?

8    A.   About 4.54 billion was in that category.

9    Q.   And then the rest left over is 1.3 billion in the other

10   category?

11   A.   That's correct.

12   Q.   What are the rough percentages breakdown?

13   A.   78 percent in the category was spot margins, spot margin

14   lending enabled and the futures activity, 22 percent that are

15   not in that category.

16   Q.   Skipping over to the right-hand side where you were

17   considering all currencies, all coins, what are the total

18   number -- what is the total balance number you arrived at as of

19   that date in November?

20   A.   That total was $8.9 billion.

21   Q.   Again, the portion that was with those categories enabled

22   is what?

23   A.   6.91 billion.

24   Q.   The rest is 2.03, right?

25   A.   Yes.

**A-882**

NAQ1BAN4                                                                      2169

1          (Jury not present)

2          THE COURT:  Okay.  Be seated, folks.

3          Now just so that everyone who has taken the trouble to

4    get here today understands what is going on and why, there are

5    a number of areas of potential testimony from Mr. Bankman-Fried

6    that the defense wishes to elicit.  The government asserts that

7    I shouldn't hear any of it, or, to be more precise, that the

8    jury shouldn't hear any of it.  And despite a great deal of

9    effort on the part of everybody concerned, the amount of

10   information that I have to date is, in my judgment, inadequate

11   to resolve the admissibility of this testimony, in significant

12   part because it's not sufficiently detailed or specific.

13          I have the authority under the rules of evidence to

14   conduct a hearing so that the defendant can put in the evidence

15   for my ears alone, following which I'll be in a position to

16   rule one way or another as to whether the evidence is

17   admissible before the jury, in whole or in part, and if in

18   part, to what extent; and once that happens, we will then be

19   able to proceed with Mr. Bankman-Fried's testimony before the

20   jury, whatever the scope of it winds up being.  That's what's

21   happening.

22          And so Mr. Cohen, I take it you're going to call your

23   client to testify in this hearing; is that right?

24          MR. COHEN:  Yes, your Honor.  The defense calls Sam

25   Bankman-Fried.

**A-883**

NAQ1BAN4                     Bankman-Fried - Direct                    2171

1   A.  Slack is a workplace communications software where

2   basically employees can post threads, comment on those threads,

3   post files, react; there are various other channels that you

4   can use for whatever purpose, but we generally use them for

5   different topics.

6            Signal, it's a—it's a secure, encrypted peer-to-peer

7   communication platform that is one of the more used platforms

8   in the cryptocurrency industry, where you can form groups to

9   have conversations.

10  Q.  And why were they used at FTX?

11  A.  Both of them had advantages, especially for internal

12  conversations over email, for instance.  With email, it's easy

13  to have a single message sent to a group of people, but

14  threaded conversations with multiple topics, each of which

15  expand into subtopics with comments on those, files uploaded,

16  are not displayed or sort of maintained nearly as clearly.  So

17  we wanted something that involved more interactivity.  Slack

18  and Signal both had that.

19  Q.  Have you ever heard the term "encryption"?

20  A.  Yes.

21  Q.  How did that relate, if at all, to Slack and Signal?

22  A.  So the—almost all internet access is encrypted at this

23  point.  Signal in particular was encrypted in a stronger way,

24  which is to say that there was no third party that stored

25  unencrypted or raw versions of messages.  Instead, the

**A-884**

NAQ1BAN4                    Bankman-Fried - Direct                    2172

1   participants had access to the raw versions of messages but

2   would only send the——what's called the encrypted version to

3   each other, you know, online or through the platform.

4   Q.  What about Slack?

5   A.  Slack was accessed via encryption in terms of the internet

6   access that people had, but the platform stored the raw text

7   that was sent.

8   Q.  Was encryption important to FTX?

9   A.  It was.

10  Q.  Why?

11  A.  There were a number of reasons, in different occasions.

12  One concern was always security threats from the outside.

13  There were constant hacking attempts on FTX from third parties.

14  And any unencrypted data was potentially vulnerable.  So, you

15  know, one standard example of this, which we had concerns

16  about, was confidential user information.  We didn't want any

17  breaches of our systems.  We certainly didn't want information

18  like Social Security numbers of our customers that we had to

19  collect via the new customer process to be accessible by any

20  security breach, so we had, you know, more stringent

21  securities, including storing only encrypted versions of some

22  pieces of data and storing them in more secure locations.

23        There were also foreign policy concerns, for lack of a

24  better word.  For most of FTX's existence, we were

25  headquartered in Hong Kong.  There were some, you know,

**A-885**

NAQ1BAN4                  Bankman-Fried – Direct              2173

1  political occurrences during our period there, which meant that

2  there was concern with employees about unauthorized access to

3  their devices.

4          And, you know, finally, there were concerns about

5  former employees, you know, having access to data that they

6  could sell to a competitor, for instance.

7  Q.  You mentioned the risk of hacking.

8  A.  Yeah.

9  Q.  Did FTX ever get hacked?

10 A.  Well, there were constant attempts to hack FTX.  There was

11 never a core breach, I would say, of FTX's systems themselves,

12 but a number of the third-party services that it used had

13 breaches or what appeared to us at the time as being breaches,

14 of various sorts.  Sometimes we weren't sure what caused them

15 exactly, but we could see the effect, and they would leak out

16 confidential information associated with FTX to the world.

17 Q.  Have you ever heard the term "document retention policy"?

18 A.  Yes.

19 Q.  What did it mean to you?

20 A.  It's a policy that a company keeps that specifies which

21 sorts of data have, you know—are retained, that is to say

22 stored in a company's files, for what periods of time, which

23 sorts of data are not stored, and sort of other related things.

24 Q.  Did there come a time that FTX had put into place a

25 document retention policy?

**A-886**

NAQ1BAN4                    Bankman-Fried - Direct              2174

1    A.  Yes, it did.

2    Q.  Can you tell his Honor how that came about.

3    A.  Yeah.  In short, in response to a number of things, one of

4    which was just the company growing and becoming relatively more

5    mature, at least, it began time for us to formalize a number of

6    the policies that we had.  There were also constant regulatory

7    inquiries from regulators across the world.  We were

8    interfacing with, you know, regulatory infrastructure in dozens

9    of countries, and those each had associated document retention

10   requirements in various cases, and so the chief——chief

11   regulatory officer, Dan Friedberg, along with Fenwick & West,

12   one of our external law firms, put together a document

13   retention policy which described in what circumstances FTX was

14   to have, you know, various forms or lack thereof of retention

15   or deletion of data and then worked with employees at FTX to

16   implement that.

17   Q.  You described Mr. Friedberg as a chief regulatory officer.

18   Was he also an attorney?

19   A.  Yes, he was.

20   Q.  And he worked with Fenwick & West, which was an outside law

21   firm?

22   A.  Yes, when I first met him, he was a——an attorney and later

23   a partner at Fenwick & West and one of our outside counsel that

24   we used.  Subsequent to that, we hired him internally as a

25   in-house lawyer.

**A-887**

NAQ1BAN4                    Bankman-Fried - Direct            2175

1  Q.  Did Mr. Friedberg and the lawyers from Fenwick communicate

2  with you about what they were going to do with regard to this

3  policy?

4  A.  Yeah.  They came up with drafts, they communicated that to

5  myself, to other members of management, and discussed what the

6  details of an implementation of it might look like.

7  Q.  In big picture, what was your understanding; what was your

8  takeaway?

9  A.  My big-picture takeaway was that there were certain classes

10  of data that we had very clear retention requirements around.

11  Those tended to be regulatory.  So a few subsidiaries had

12  particular regulatory requirements on them, and those had

13  particular document retention policies trying that out.

14        In addition, often when we had specific interactions

15  with the regulator, they would request that we retain a

16  particular class of documents or data, and so there were topics

17  that we had a duty to retain.  Those topics tended to concern

18  compliance-related things, "Know Your Customer" policies being

19  an example of that.  So that was one class of data for which

20  there were effectively mandates that we retain corporate

21  records related to it.

22        Separately, there were classes of data for which we

23  had requirements not to retain, at least not to retain beyond a

24  particular time or without particular sorts of security or

25  encryption.  Those tended to be sensitive pieces of customer

**A-888**

NAQ1BAN4                      Bankman-Fried – Direct                    2176

1    information, customer passwords, customer Social Security

2    numbers, things like that.

3            And then beyond that, there were just broad topics

4    that, you know, I think for various channels on Slack——for

5    instance, we——the document retention policy, even if not

6    specifically mandated to by regulation, you know, said that we

7    would not have auto-delete features on, you know, channels

8    related to compliance to formal accounting records and other

9    things like that.

10   Q.  If a category was not in one of the ones you described as

11   requiring deletion, what was your understanding of what the

12   participants could do?

13   A.  Sorry.  To be clear, if it was not in the required deletion

14   category.

15   Q.  Like regulatory, for example.

16   A.  Right.  So for documents that were in the required

17   retention category, the answer was that any——at least any

18   formal business communications, anything memorialized, any

19   business policy, any decisions made or records thereof, would

20   be——would not be deleted.  They would be, you know, in email or

21   Slack channel without any auto-deletion turned on.

22           For, I would say, informal chatter, obviously a lot of

23   that would happen verbally, a lot of questions would be asked

24   via that manner, and if we weren't in person, Signal was a

25   standard chat app to use for sort of informal questions, but

NAQ1BAN4                    Bankman-Fried – Direct                2177

1    not for company policies or for decisions concerning them or

2    for, you know, formal document releases or anything like that.

3    Q.  Coming back to the policy, did there come a time that

4    Mr. Friedberg and Fenwick completed the policy?

5    A.  Yes.

6    Q.  Okay.  And did you understand they had completed it?

7    A.  Yup.

8    Q.  And what did it mean to you as CEO of FTX?

9         THE COURT:  This would be a lot more helpful to you if

10   I was not getting just vague generalities about what he

11   understood, if you understand where I'm going with that.

12        MR. COHEN:  Sure.  I'm just trying to give your Honor

13   all the context.  Obviously the defense's position that this is

14   presented in sort of snippets, so I'm trying to give your Honor

15   context.

16   BY MR. COHEN:

17   Q.  Mr. Bankman-Fried, did you discuss with Mr. Friedberg the

18   policy?

19   A.  Yes.

20   Q.  Tell us what you discussed with him.

21   A.  He presented to myself and a few other people at the

22   company drafts of this policy.  He talked about it with us in

23   person and sent us documents drafting it.  He had meetings with

24   myself and others to discuss which channels would fall under

25   various categories within this document retention policy.  He

**A-890**

NAQ1BAN4                    Bankman-Fried - Direct                    2178

1    sent us a finalized version of it, and that was then

2    implemented.

3    Q.  Okay.  And after it was implemented did you believe you

4    acted in accordance with the policy?

5    A.  To my knowledge, yes.

6    Q.  Okay.  Now when you communicated with the attorneys and

7    compliance people at FTX——

8    A.  Yup.

9    Q.  ——what form did you communicate over?

10   A.  It depended on what the message was.  To give some

11   examples, if we were——if I had, for instance, an announcement,

12   if there was a company policy, that would generally be in a

13   Slack channel.  It would generally be either in a general Slack

14   channel if it was intended for broad consumption or in a

15   compliance- or regulatory-deemed Slack channel.  Those would

16   not have any auto-deletion set on them.  They would be retained

17   forever.

18          If it was an informal question, like, you know,

19   describe to me what your off-the-cuff impression is of the

20   regulatory environment in some country we're not currently

21   operating in so that we can decide whether to allocate more

22   time into investigating whether to operate there, that could be

23   in person, it could be over Signal, it could be in a Slack

24   channel.

25   Q.  Now the government has introduced——I don't want to give the

NAQ1BAN4                    Bankman-Fried – Direct                 2179

1    count, but——about half a dozen exhibits in which you were the

2    person who put auto-delete onto a message.  Do you recall that,

3    sir?

4    A.  Yes.

5    Q.  When you did that, did you believe you were acting in

6    accordance with the policy?

7    A.  Yes.

8    Q.  Tell us why.

9    A.  So as a general matter, those were not channels where there

10   would be formal business records or, for that matter, even

11   informal business records.  Those were not channels in which

12   decisions would be made or announced, or enacted.  And those

13   were not channels in which documents relevant to regulatory

14   inquiries or potential or otherwise were intended to be

15   discussed.  Those would be for——for chatter, for conversation,

16   the types of, you know, workplace communications that would

17   often just be someone wandering over to my desk and saying:

18   Hey, Sam, you know, do you have any thoughts about the Japanese

19   regulatory environment right now?

20        MR. COHEN:  Okay.  Can we put up——it was introduced

21   this morning——Government Exhibit 1083, please.

22   Q.  Okay.  Mr. Bankman-Fried, if you could look at the first

23   page, and you see the entry for item 1 is hashtag organization?

24   A.  Yup.

25   Q.  Item 5 is direct messages between you and Ms. Ellison, and

```
      NAQ1BAN4              Bankman-Fried - Direct          2180
```

 1    item 6 is messages between you and Gary Wang.

 2    A.  Yes.

 3    Q.  And then the far right-hand corner, it says, "auto-deletion

 4    turned off SBF."

 5    A.  Yes.

 6    Q.  Do you recall doing that, sir?

 7    A.  Yes, I do.

 8    Q.  And can you explain to us what happened.

 9    A.  Yeah.  So these were Signal channels for which there had

10    previously been an auto-deletion policy, generally one week.

11    In November 2022, for a variety of reasons but including

12    because what had been communicated to me, what I understood to

13    be coming from regulators, I took an effort to disable

14    auto-deletion on, you know, any place that I found it, and so I

15    went through Signal's chats generally as they were used as

16    people messaged in them that I was a part of, and if I received

17    a message, saw that auto-delete was set, I would disable that,

18    and I also went through the ones that I could think of and, you

19    know, proactively disabled auto-delete on them.

20         MR. COHEN:  Moving in the document to the next page,

21    if you could go to item—one page after, Brian.  I'm sorry.

22    Item 29.  The heading is Sensitive Chatter, and there's a

23    number of folks on that, description in the middle.

24    Q.  Can you identify for us—it says—Gary Wang, we know.  Who

25    is Can?

**A-893**

NAQ1BAN4                    Bankman-Fried – Direct                    2181

1    A.   That was Can Sun, the general counsel of FTX International.

2    Q.   Who was Ryne Miller?

3    A.   That was the general counsel of FTX.US.

4    Q.   Okay.  And who was Brett Harrison?

5    A.   Brett Harrison was the president of FTX.US at the time.

6    Q.   And dropping down to the next entry, Small Group Chat, can

7    you explain who Rahul Sharma was, at the very bottom.

8    A.   Rahul Sharma was—I actually don't know for sure who he was

9    employed by.

10   Q.   Let me rephrase.

11   A.   Yeah.

12   Q.   Were there folks in this who were either in the legal group

13   or the compliance group?

14   A.   Yes.  Absolutely.

15   Q.   Can you identify them for the Court.

16   A.   Yeah.  Ryne Miller, again, general counsel, FTX.US; Ryan

17   Mendel was—you could classify him as compliance; Kumanan—this

18   is a group that was created in November 2022 during the crisis

19   period.  Kumanan was an employee of a consultant who was

20   brought in by the FTX debtor entity to work, my understanding

21   is, on compliance matters.  And my understanding is that Rahul

22   was also a compliance specialist, I believe with FTX US

23   Derivatives, but I'm not a hundred percent sure on that.

24           MR. COHEN:  Okay.  And if we could continue to entry

25   252 on this exhibit.

**A-894**

NAQ1BAN4                    Bankman-Fried – Direct              2182

1    Q.  Mr. Bankman-Fried, the entry on 252 refers to

2    Privileged/Confidential CFTC.  Do you see that?

3    A.  I do.

4    Q.  Who was on that?

5    A.  Gary Wang, CTO; Nishad Singh, head of engineering; myself;

6    Ryne Miller, the general counsel of FTX.US; and Can Sun, the

7    general counsel of FTX International.

8    Q.  And what was your understanding of what that referred to,

9    that entry?

10   A.  That entry was for privileged communications between

11   management and the heads of the legal departments around our

12   interactions with the CFTC, the Commodities Futures Trading

13   Commission, with respect to regulatory applications and

14   inquiries that we had there.

15   Q.  And for that entry, just to complete your testimony,

16   auto-deletion had been turned off, correct?

17   A.  That's right, in the same November period.

18            THE COURT:  By someone else.

19            THE WITNESS:  That's right, by Gary Wang.

20            THE COURT:  Long after you received the message, yes?

21            THE WITNESS:  I'm not sure what message you're

22   referring to.

23            THE COURT:  The one we're talking about.

24            THE WITNESS:  That's correct.  I was in many Signal

25   channels.  There was no way to turn off auto-delete on all of

**A-895**

NAQ1BAN4                    Bankman-Fried - Direct                    2183

1    them at once, so I did that on any channel for which I received

2    a message or had a recent message that would have been deleted

3    otherwise, or for the channels I thought of.  I'm guessing this

4    channel had not been used for a while prior to that, but I

5    don't recall for certain.

6              THE COURT:  Thank you.

7              MR. COHEN:  Let me move, your Honor——if your Honor is

8    fine with this, I'll move to another topic, or——

9              THE COURT:  You're moving to another topic now?

10             MR. COHEN:  Yes.  Unless you want me to ask any more

11   questions on this.

12             THE COURT:  It's up to you.

13             MR. COHEN:  All right.  Let me——

14             THE COURT:  One thought that readily occurs:  Where is

15   this policy?

16             Let's move on.

17   BY MR. COHEN:

18   Q.  All right.  Let me move to another topic,

19   Mr. Bankman-Fried.

20             Do you recall hearing about a company called North

21   Dimension?

22   A.  Yes.

23   Q.  Okay.  What do you recall about that?

24   A.  North Dimension was a subsidiary of Alameda Research, which

25   was incorporated for payment processing purposes.  I believe it

**A-896**

NAQ1BAN4                    Bankman-Fried – Direct                    2184

1    was around 2020 that this happened.

2    Q.   And how did it get set up?

3    A.   Dan Friedberg, the chief regulatory officer of FTX

4    International, in combination with Fenwick & West, one of our

5    outside law firms, was——were the ones who drafted the

6    incorporation documents, had incorporated and also corresponded

7    with banks about opening up bank accounts for it.  I believe

8    there were a few other employees who were involved as well.

9    Q.   Do you recall whether the banks required North Dimension to

10   fill out any forms?

11   A.   Yes.  They had bank account opening forms.

12   Q.   Okay.  And who filled those out?

13   A.   Dan Friedberg did, or at least he was the one who presented

14   them to me.

15   Q.   And when Mr. Friedberg presented them to you, what did you

16   do?

17   A.   I signed them.

18   Q.   Why did you do that?

19   A.   I had a lot of things that passed my desk each day to sign.

20   I trusted that they were proper forms.  And they were necessary

21   for opening up a bank account.  I also briefly reviewed them

22   and didn't see anything that looked obviously wrong to me.

23   Q.   Did there come a time when the topic of an agreement for

24   Alameda to process FTX customer deposits came up?

25   A.   Yes.

**A-897**

NAQ1BAN4                    Bankman-Fried - Direct              2185

1    Q.  Okay.  What do you recall about that?

2    A.  There is a payment agent agreement between Alameda and FTX

3    related to the payment processing.

4          MR. COHEN:  Can we call up DX 245 for identification,

5    please.

6    Q.  Mr. Bankman-Fried, why don't you go through this document.

7          MR. COHEN:  And Brian, if you could scroll so he can

8    see the whole thing.

9    Q.  Okay.  Let's go to the first page.  What is this document,

10   Mr. Bankman-Fried?

11   A.  This is that payment agent agreement.

12   Q.  And do you recall how it was presented to you?

13   A.  Yeah.  Dan Friedberg presented it to me.

14   Q.  Okay.  And what was your understanding of who had drafted

15   it?

16   A.  My understanding is that it was drafted with Fenwick &

17   West, who was our primary external law firm at the time.

18   Q.  And what was the purpose of the agreement?

19   A.  It was to memorialize the ways in which Alameda Research

20   acted as one of the payment agents or payment processors for

21   FTX, which is to say a avenue via which customers could

22   deposit.

23          MR. COHEN:  Okay.  If you can go to the last page,

24   Brian.

25   Q.  You see the signature page.  There's a signature for

**A-898**

NAQ1BAN4                    Bankman-Fried – Direct                    2186

1    Alameda, and is that your signature underneath?

2    A.  Yes.

3    Q.  And there's also a signature for FTX.  Is that your

4    signature underneath?

5    A.  Even though they look a little bit different, yes, those

6    are both mine.

7    Q.  Mr. Bankman-Fried, why were you signing both sides of that

8    agreement?

9    A.  At the time that it was presented to me, I was the CEO of

10   Alameda Research and I was also the CEO of FTX.

11   Q.  And you see there there's an entry, effective date?

12   A.  Yep.

13   Q.  What was your understanding of that?

14   A.  My understanding is that that was the date that the

15   relationship had started, that this was memorializing that

16   relationship.

17   Q.  Okay.  So when customers wired funds into the Alameda bank

18   accounts or the North Dimension bank accounts, did you believe

19   that it was covered by this agreement?

20   A.  Yup.

21   Q.  And how did it work?

22   A.  How did the——how did that process work?

23   Q.  Yes, exactly.

24   A.  Okay.  So this was over the course of 2020 and 2021.  This

25   was prior to FTX having its own customer bank accounts.  So FTX

**A-899**

NAQ1BAN4                    Bankman-Fried - Direct                    2187

1    had attempted from inception to get bank accounts, what are

2    called FBO bank accounts, "for benefit of other" bank accounts,

3    that customers could deposit funds into.  But it took a couple

4    years to get those bank accounts.  In lieu of that, prior to

5    those, it used a number of different payment processors, but

6    the most used is——was Alameda Research.  We put on the FTX

7    originally OTC page and eventually on the FTX website wire

8    transfer instructions for Alameda Research, where customers

9    could wire fiat currencies, generally dollars——I think maybe

10   exclusively dollars in——and have balances credited on their FTX

11   account to trade on FTX.

12   Q.  Did you believe that this process of transferring or wiring

13   funds into Alameda North Dimension was permitted based upon the

14   payment agent agreement?

15   A.  Yup.

16          MR. COHEN:  We would offer it.  Before the jury, we'd

17   offer the document, your Honor.

18          Let me move to another topic, Mr. Bankman-Fried.

19          You can take that down.

20          Before we do, if we could pull up Defendant's

21   Exhibit 255.

22          Take a moment and go through that, all the pages for

23   him, Brian.

24   BY MR. COHEN:

25   Q.  The first question is whether you recognize it.

**A-900**

NAQ1BAN4                    Bankman-Fried - Direct                    2188

1      MS. SASSOON:  Your Honor, I believe this is in

2  evidence as Government Exhibit 267.

3      MR. COHEN:  Okay.  Then let's use the GX number.

4      THE COURT:  Thank you.

5  A.  I do recognize that.

6  Q.  And what is it, sir?

7  A.  That is the form that was used to apply for a North

8  Dimension bank account with Silvergate Bank.

9  Q.  And the first page, it notes name of compliance contact,

10  and it says Dan Friedberg, General Counsel and Compliance

11  Officer.  Do you see that, sir?

12  A.  Yes.

13  Q.  What was your understanding of that?

14  A.  This had been compiled and presented by Dan Friedberg, who

15  was the general counsel and the compliance officer of North

16  Dimension and of Alameda.

17  Q.  And was this the diligence form that got filled out for

18  Silvergate Bank that you referred to a moment ago?

19  A.  Yes, this was.

20      MR. COHEN:  Okay.  All right.  We can take that down.

21  Q.  Let me move to another topic, Mr. Bankman-Fried.

22      Do you recall that you and others made a number of

23  venture investments?

24  A.  Yes.

25  Q.  Okay.  And where did the funds for those investments come

**A-901**

NAQ1BAN4          Bankman-Fried - Direct          2189

1    from?

2    A.  They came from Alameda Research.

3    Q.  Okay.  And how was the transfer of funds structured?

4    A.  It depended on the investment.  There were various entities

5    that did the investing.  If it was Alameda Research's core

6    trading entities that invested, then I believe funds were wired

7    straight from Alameda, or sent via the blockchain in the case

8    of investments done in the form of cryptocurrency.  If it was

9    done via another entity——for instance, one of the Alameda

10   venture entities——then there would generally be an intercompany

11   loan in which Alameda Research would lend money to the

12   affiliate that was making the investment, and that affiliate

13   would then make the investment.  And in some cases there were

14   affiliated entities that had heavily overlapping ownership with

15   Alameda Research, and there would be loans from Alameda to

16   myself and/or the other owners of that entity that would then

17   infuse the capital into that entity for it to make the

18   investment.

19            (Continued on next page)

20

21

22

23

24

25

**A-902**

NAQMBAN5                    Bankman-Fried - Direct                    2190

1  Q.  Let's start with that example.  So there would be times

2  where the loans would go first to you?

3  A.  Yup.

4  Q.  Or Gary or Nishad?

5  A.  Yup.

6  Q.  Were those loans documented?

7  A.  Yes.

8  Q.  How were they documented?

9  A.  There were promissory notes drawn up between us and Alameda

10  Research.

11  Q.  Who drafted those?

12  A.  The legal department drafted those memos, those promissory

13  notes.

14  Q.  Do you ever recall -- let me rephrase.

15          Did you ever recall the issue coming up of whether to

16  denominate those transfers as loans or dividends?

17  A.  At least in a few cases it did come up, and at the time I

18  remember concerns about risk of double taxation if they were

19  structured improperly.  There were also cases where the

20  entities that we were investing in expressed strong preferences

21  about what entity invested in them.

22  Q.  Who did you discuss these issues with?

23  A.  I discussed them with counsel.  It depended on the

24  particular instance which counsel.  Some of them I discussed

25  with Fenwick & West there and attorneys there.  Some of these I

**A-903**

| | NAQMBAN5 | Bankman-Fried - Direct | 2191 |

1    discussed with Dan Friedberg and Can Sun, and some with Ryne

2    Miller as well.

3    Q.  Based on the conversation with these attorneys, what was

4    your understanding about the loan structure?

5    A.  My understanding --

6          THE COURT:  I'm sorry, Mr. Cohen.  I'll let you get an

7    answer to this, but a better question would be, what did you

8    say to them and what did they say to you on that subject?

9          MR. COHEN:  You are right, your Honor.

10   Q.  Let's go with his Honor's question.

11   A.  In those cases, maybe describing the earlier ones by the

12   later ones, a lot of the context had already been built up, I

13   described to them that ultimately there is an investment that I

14   wanted to make.  I described that -- what the investment was,

15   that ultimately funds would be coming from Alameda Research to

16   do it, and gave the reasons why there had been some preference

17   expressed for it to not be Alameda Research itself, the entity

18   that ultimately made the investment, that that is, that was the

19   ultimate acquiring entity of these shares or assets.  And I

20   then asked about what structures would be appropriate for doing

21   that.  Ultimately, we decided on -- for some of them a personal

22   loan to myself coupled with an investment in the entity that

23   was itself making the ultimate investment.

24   Q.  They shared with you their view that it ought to be

25   structured as a loan?

**A-904**

NAQMBAN5                    Bankman-Fried - Direct              2192

1   A.  That either it ought to or that it was one of the

2   permissible options, yes.

3   Q.  What was your reaction to that?

4   A.  I had no strong reaction to that.  I was thinking about it

5   from a business perspective of trying to find a solution that

6   would check all the boxes.  I was glad that we had found one.

7   Q.  Did you take comfort from the fact that the lawyers had

8   structured the loans?

9   A.  Yes, of course.

10          MR. COHEN:  Pull up, I thought it was in evidence,

11  GX-240, please.  We can just look at the first page.  Maybe you

12  can make that bigger.

13  Q.  What is this, Mr. Bankman-Fried?

14  A.  That is -- can you go to the signature page.

15          OK.

16  Q.  What is that?

17  A.  That is one of the promissory notes in which Alameda gave a

18  loan to myself.

19  Q.  That's an example of one of the documents you were just

20  discussing?

21  A.  That is correct, yes.

22          MR. COHEN:  We can take that down.

23  Q.  Let's go to another topic, Mr. Bankman-Fried.

24          MR. COHEN:  Can we pull up Government Exhibit 558 in

25  evidence.

**A-905**

NAQMBAN5                    Bankman-Fried - Direct              2193

1          Take a moment and go through the pages for him.

2   A.  I think we don't have to go through all the pages of this.

3   That's enough.

4   Q.  What is this, sir?

5   A.  That is the May 2022 updated version of the FTX

6   International terms of service.

7   Q.  Did you ever see this document before?

8   A.  Yes.

9   Q.  About when did you see it?

10  A.  I first was presented with drafts of it in, I believe,

11  early 2022, possibly late 2021, and I was presented with a

12  completed version of it around May of 2022.

13  Q.  If you know, who worked on this document?

14  A.  I know that Can Sun, who is the general counsel of FTX

15  International, was heavily involved in working on it and

16  interfacing with me on it.  I know he worked with outside law

17  firms.  I am not sure which ones.

18  Q.  Did you speak with Mr. Sun about the terms of service?

19  A.  Yes.

20  Q.  Tell us what you discussed.

21  A.  We discussed the fact that, at least in part because of the

22  Bahamian entity, FTX Digital Markets, which is regulated by the

23  Securities Commission of the Bahamas, we wanted to have an

24  updated terms of service and that he was working on drafting

25  and ultimately releasing one.

**A-906**

NAQMBAN5                     Bankman-Fried - Direct                     2194

1    Q.  Did you believe that the terms of service addressed margin

2    trading?

3    A.  Yes.

4         MR. COHEN:  Can we go to section 16, please, Brian.

5    Page 16.  I'm sorry.  If we can call out section 16.

6    Q.  Mr. Bankman-Fried, based on your review of that document

7    and your discussions with Mr. Sun, what was your understanding

8    of what it provided for?

9    A.  My understanding is that this section provided for various

10   terms and disclosures related to customers engaging in margin

11   trading on FTX.

12        MR. COHEN:  If we go to the next page --

13        THE COURT:  Mr. Bankman-Fried, did you read this

14   entire document before it was promulgated?

15        THE WITNESS:  I read parts in depth, parts I skimmed

16   over.

17        THE COURT:  Go ahead.

18   Q.  Turning to 16.4, Mr. Bankman-Fried.

19   A.  Yup.

20        MR. COHEN:  Can we call that out.  Brian, can you call

21   that out, 16.4.

22   Q.  Turning to the last two sentences, no need for me to read

23   them, can you tell us what your understanding was of these

24   provisions?

25   A.  Yeah.  Those provisions referred to a few different

NAQMBAN5                    Bankman-Fried – Direct               2195

1    potential –– features isn't quite the right word –– properties

2    of FTX.

3              The first is referring to liquidations, to the fact

4    that if a user engaged in margin trading and their collateral

5    fell below a certain level, their positions might be forcibly

6    shut down in order to mitigate risk associated with their

7    account.

8              The second was what's called clawbacks or socialized

9    losses, which is that if another margin trading user suffered

10   losses, if the value of their collateral fell or their

11   obligations rose, to the point where the net value of their

12   assets minus liabilities, which is to say their net asset value

13   became negative, that if FTX itself was not able to cover that

14   shortfall, it could be effectively socialized on other users.

15   That was something we always hoped to avoid, but that was

16   always a risk.

17   Q.  Based on this and other parts of the terms of service, did

18   you believe that Alameda borrowing funds from FTX exchange was

19   permitted under the terms of service?

20   A.  Yes, in many circumstances.

21             MR. COHEN:  Now, let's turn to schedule 5 of that

22   document and page 35.

23   Q.  That's a service schedule.  At the top it's entitled

24   futures market.

25             Do you see that, sir?

**A-908**

NAQMBAN5                    Bankman-Fried - Direct                    2196

1   A.  Yes.

2   Q.  We don't have to go through it in detail, but what is your

3   understanding of what this provided?

4   A.  My understanding is that it provided for various terms that

5   only applied to futures trading and not to spot markets on FTX.

6   Q.  And based on the terms of service, did you believe Alameda

7   was permitted to engage in futures trading?

8   A.  Yes.

9        MR. COHEN:  We can take that down.

10  Q.  Any other conversations about the terms of service that I

11  have not covered today?

12  A.  Around --

13       MS. SASSOON:  Objection, your Honor.

14       THE COURT:  Sustained.

15  Q.  Let me ask a better question.  Other than the conversations

16  you relayed with Mr. Sun, did you have any other conversations

17  with him about the terms of service?

18  A.  About these particular terms of service?

19  Q.  Yes.

20  A.  We had conversations in which I authorized him to move

21  forward with the new terms of service so long as the exchange

22  infrastructure was prepared for them.  I know there were

23  requirements in terms of going back through old users and

24  reaffirming some of their know-your-customer status in order to

25  release the new terms of service.

**A-909**

NAQMBAN5                     Bankman-Fried – Direct                2197

1   Q.  The terms of service we were just looking at were issued on

2   May 13, 2022?

3   A.  Yup.

4   Q.  To your knowledge, sir, were there versions of the terms of

5   service before that?

6   A.  Yes.

7   Q.  What is your basis for saying that?

8   A.  I mean, FTX always had a terms of service.  I believe from

9   day one I remember posting a terms of service on the website.

10  Q.  How many versions were there prior to the May 13 version?

11  A.  I know that there were a few main versions and likely a

12  number of edits.  I am not sure exactly how many.

13  Q.  Did you review those?

14  A.  I reviewed the initial terms of service and would

15  occasionally skim through updated ones.  I don't know that I

16  reviewed every single edit to them.

17  Q.  Who prepared those?

18  A.  They were originally prepared by Dan Friedberg and Fenwick

19  & West.

20  Q.  Did you believe that you were managing FTX in accordance

21  with the earlier terms of service?

22  A.  Yes.

23  Q.  Let's move to another topic, sir.

24          THE COURT:  Are you going to put the earlier terms

25  into evidence?

**A-910**

NAQMBAN5                    Bankman-Fried - Direct                    2198

1          MR. COHEN:  We are.  We are just getting them, your

2    Honor.

3          THE COURT:  Go ahead.

4    Q.  Let me move to another topic, Mr. Bankman-Fried.

5          While you were CEO of FTX, did you attempt to

6    safeguard customer assets?

7    A.  Yes.

8    Q.  How did you do that?

9    A.  There were a variety of ways.  The single biggest was the

10   physical security of the assets that FTX custodied.  And in

11   terms of their physical security, one potential threat,

12   obviously, was a hacking attempt on FTX's core servers.  That,

13   in practice, was not the most frequent attack that we faced,

14   however.

15         By far more frequent was fishing attacks on FTX

16   customers.  In short, a fishing attack --

17   Q.  Mr. Bankman-Fried, let me focus this more.  I want to take

18   up the issue that the Court is concerned with.

19   A.  Yes.

20   Q.  I apologize.

21         Did you ever hear the term segregation of assets?

22   A.  Yes.

23   Q.  What did it mean to you?

24   A.  What it meant to me in the context of FTX was segregating

25   FTX's corporate assets, which is to say the roughly $1 billion

**A-911**

NAQMBAN5                    Bankman-Fried - Direct              2199

1   of profit that it had accumulated versus the omnibus wallets

2   that stored net customer assets in them.

3   Q.  How were individual customer assets stored?

4   A.  There was no particular wallet for each individual

5   customer.  We had millions of customers.  And if we tried to

6   keep each customer's Bitcoin in a wallet specifically for that

7   customer, then every time there was a trade we would have

8   needed to do a transfer of that physical Bitcoin.  It would

9   have been millions to tens of millions of dollars per day in

10  fees charged to users to cover those transfers.  It would have

11  been completely impractical from a business perspective.

12          So what we had were what are called omnibus wallets

13  and omnibus bank accounts, which effectively mean one wallet

14  where we put all of the net customer Bitcoins in.

15  Q.  All the customer Bitcoins were in one omnibus account?

16  A.  That's right.

17  Q.  Was that separated from the FTX operational account?

18  A.  Yes.

19  Q.  You got into the crypto industry in 2017?

20  A.  Um-hum.

21  Q.  And you worked in there through 2022?

22  A.  Yeah.

23  Q.  You traded on other exchanges?

24  A.  Yup.

25  Q.  You interacted with other leaders in the industry?

**A-912**

NAQMBAN5                    Bankman-Fried - Direct                    2200

1   A.  Yes.

2   Q.  Based on your exposure to that, did you form a view about

3   whether other exchanges used these omnibus wallets?

4   A.  Yes, I did.  Nearly all of them used omnibus wallets.  In

5   fact, to my knowledge, every centralized exchange did.

6          THE COURT:  Mr. Cohen, I'll let you do whatever you

7   want here, but this degree of persuasiveness to personal

8   knowledge that is not present when somebody says my view based

9   on everything I have heard in my life was X.

10          MR. COHEN:  This last piece was just an industry

11   practice point, your Honor.

12          THE COURT:  Similar point.

13   Q.  Let me break it down to his Honor's question:  How did you

14   get your knowledge that other exchanges used omnibus wallets?

15   A.  A variety of means.  I traded on, more or less, every large

16   exchange in the industry, on dozens of exchanges.  In doing so,

17   I would deposit funds into accounts that I owned or controlled

18   on those exchanges.  I would watch Blockchain explorers to see

19   where those funds originally went and where they ultimately

20   were pooled, and in doing so it became clear that there were

21   wallets generally identified explicitly by Blockchain explorers

22   in which all or at least a large segment of customer Bitcoins

23   would end up being pooled, the same with other

24   cryptocurrencies.

25          For instance, if you're depositing to Huobi, which was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-913**

NAQMBAN5                    Bankman-Fried – Direct                    2201

1   one of the larger cryptocurrency exchanges, and you

2   deposited -- when I deposited Bitcoin into accounts that I

3   operated there, I would originally send it to a Bitcoin address

4   that was specifically associated with my account, hoping it was

5   me that was sending the deposit, but immediately thereafter it

6   would be forwarded on to a wallet that was marked on a

7   Blockchain explorer as Huobi wallet number 3.  I would see many

8   different deposit addresses for many different customers, all

9   being pooled in that omnibus wallet.  And when I requested a

10  withdrawal from my Huobi account, it would be sent from one of

11  these omnibus wallets.

12          Later on, as I became more involved in the industry

13  and the people in the industry, especially after I moved to

14  Hong Kong, I had discussions with the leaders of other

15  exchanges about how we operated our platform, how they operated

16  their platform, and talked about how they managed their wallet

17  infrastructure.  And every one of them that I talked to

18  confirmed that they used omnibus wallets, with the exception of

19  decentralized exchanges and of custodians that might have some

20  exchange-like qualities but were primarily not exchanges.

21  Q.  What did you mean by decentralized exchanges?

22  A.  So there was a variety of platforms, still is, in the

23  crypto industry called a DEX, a decentralized exchange.  That

24  means it is sort of like a traditional exchange where you can

25  buy and sell assets.  But rather than being run by a company

**A-914**

NAQMBAN5                    Bankman–Fried – Direct                    2202

1    and maintained in a cloud-computing service, like Amazon Web

2    Services, in the way that FTX was, it was hosted directly on a

3    Blockchain.  SushiSwap was an Ethereum Blockchain based

4    decentralized exchange, Uniswap was another Ethereum Blockchain

5    based decentralized exchange.

6           On decentralized exchanges, there was no central

7    custody of assets.  Instead, you would interact with them

8    directly from your own wallets.  What this meant was, there is

9    no intermediary.  It also meant, though, that any time you did

10   a trade on one of those decentralized exchanges, there was a

11   fixed cost of whatever the blockchain gas fees were at the

12   time, generally a few dollars per transaction, because they did

13   have to do an actual blockchain transfer for every trade, and

14   chiefly, because of that, decentralized exchanges had a far

15   smaller volume than centralized exchanges.

16          THE COURT:  One other question.  You used the phrase

17   Blockchain explorer.

18          THE WITNESS:  Yes.

19          THE COURT:  What is that?

20          THE WITNESS:  A Blockchain explorer -- the Blockchain

21   itself is a ledger of all transfers that have ever happened, so

22   there is an Ethereum Blockchain, which is a ledger involving

23   Ethereum transfers.  It is formally maintained in a

24   decentralized manner, which is to say, a lot of different

25   validators for the network all agree, come to consensus on what

**A-915**

NAQMBAN5                    Bankman-Fried - Direct                    2203

1    that Blockchain is.

2            However, for almost all purposes you don't want to

3    have to be running a sophisticated computer system to be able

4    to ask the question, did someone send an Ethereum token on this

5    day to this address.  So there are a variety of providers that

6    created websites that listed out in a centralized but

7    easy-to-view fashion all of the transfers on the Blockchains,

8    and there are a variety of these.  For each of the major block

9    chains Etherscan was, by far, the most used for the Ethereum

10   Blockchain.

11           THE COURT:  Etherscan?

12           THE WITNESS:  Yes.

13           THE COURT:  Thank you.

14           Go ahead, Mr. Cohen.

15           MR. COHEN:  Thank you.

16   Q.  The larger exchanges, like FTX, used omnibus wallets,

17   correct?

18   A.  Yes.

19   Q.  Let me just go back to a point his Honor made before.

20           MR. COHEN:  If we can pull up DX-165, please.

21   Q.  Take a look and we can go through it, if you would like.

22           My question, sir, is whether you recognize this.

23   A.  Yes, I do.

24           MR. COHEN:  Let's go to the last page.

25   Q.  What is this, Mr. Bankman-Fried?

**A-916**

NAQMBAN5                    Bankman-Fried – Direct                    2204

1   A.  That is an older version of the FTX terms of service.

2   Q.  DX-179, same question.

3   A.  Same answer.  It's an older version of the FTX terms of

4   service.

5   Q.  And DX-434.  Same question.

6   A.  Same answer, an older version of the FTX terms of service.

7   Q.  Mr. Bankman-Fried, one more topic.

8           I want to move now to November.  Did there come a time

9   that you met with the securities commission of the Bahamas at

10  their offices?

11  A.  A number of times, yes.

12  Q.  How did this come about?

13  A.  This was immediately following the bankruptcy filing of FTX

14  International and just before that the joint provisional

15  liquidators being appointed for FTX Digital Markets, the

16  Bahamian entity.

17  Q.  For these next questions, Mr. Bankman-Fried, I want you to

18  answer yes or no.  OK?

19  A.  OK.

20  Q.  Did you attend the meeting?

21  A.  Yes.

22  Q.  You said there were a number of meetings.  Do you recall

23  when the first one was?

24  A.  I believe that it was November 12, 2022.

25  Q.  Did anyone attend with you?

**A-917**

NAQMBAN5                         Bankman-Fried - Direct                        2205

1   A.  Yes.

2   Q.  Who was that?

3   A.  So in the meeting itself that I was part of, there is

4   myself; Krystal Rolle, Bahamian counsel; my father; then there

5   was Christina Rolle, the head of the securities commission of

6   the Bahamas; Brian Simms, one of the joint provisional

7   liquidators; and staff for both of them.  In addition, Gary

8   Wang, the CTO of FTX, was in the building at the time but not

9   present in the meeting itself.

10  Q.  For these questions I do not want you to reveal any

11  conversations between yourself and Krystal Rolle.  OK?

12  A.  Understood.

13  Q.  How long did that meeting you just described last?

14  A.  It took a few hours.

15  Q.  Were you asked questions?

16  A.  Yes.

17  Q.  After the meeting, where did you go?

18  A.  After the meeting, the group of us, roughly the same group

19  of people as had been at that meeting, but also including Gary

20  Wang and consultants from PricewaterhouseCoopers who had been

21  with Gary in the outer office, all drove to the FTX

22  headquarters in Nassau, Bahamas.

23  Q.  What happened there?

24  A.  At the FTX headquarters, I don't know whether this will

25  have already been covered, but the day prior to that, there was

**A-918**

NAQMBAN5                    Bankman-Fried – Direct                    2206

 1  a hack on FTX's assets.  This was immediately following the

 2  transfer of control and bankruptcy filing.  In response to that

 3  there had been urgings to move FTX's assets.

 4  Q.  Let me move on, Mr. Bankman-Fried.

 5  A.  Yup.

 6  Q.  When you came to the office, this was Christina Rolle, the

 7  SCB commissioner there?

 8  A.  Yes.

 9  Q.  Do you recall if she read anything?

10  A.  She did, yes.

11  Q.  What did she read?

12  A.  She read an order that Gary and I assist her in

13  transferring assets that we had access to through FTX's systems

14  to the custody solution that they had set up.

15  Q.  Did you and Gary comply with that order?

16  A.  Yes, we did.

17  Q.  That same night did the Bahamian Police come to your

18  office?

19  A.  Yes.

20  Q.  What happened then?

21  A.  The officers showed up, they had conversations with

22  Christina Rolle, the head of the SCB; with Krystal Rolle; my

23  counsel; and with myself.

24          We agreed that I would voluntarily attend meetings

25  with them that following week and that in the interim I and

A-919

NAQMBAN5                    Bankman-Fried - Cross                2207

1   Gary would surrender our passports.

2          Sorry.  Just to clarify, we agreed that Gary and I

3   would both voluntarily attend meetings with them that following

4   week.

5   Q.  Did you surrender your passport?

6   A.  Yes.

7   Q.  Did you ultimately go to those meetings?

8   A.  No.  Prior to those meetings, prior to when they were to

9   have been had, I was informed that they were no longer

10  necessary.

11         MR. COHEN:  One moment, your Honor.

12         Nothing further, your Honor.

13         THE COURT:  Thank you.

14         Ms. Sassoon.

15         MS. SASSOON:  May we have a short break, your Honor?

16         THE COURT:  Sure.

17         MS. SASSOON:  Fifteen minutes, your Honor.  Is that

18  reasonable?

19         THE COURT:  Yes.

20         (Recess)

21         THE COURT:  You may proceed.

22         MS. SASSOON:  Thank you, your Honor.

23  CROSS-EXAMINATION

24  BY MS. SASSOON:

25  Q.  Mr. Bankman-Fried, I want to begin by talking to you about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-920**

NAQMBAN5                    Bankman-Fried - Cross                    2208

1   Signal.  I want to drill down a little bit more on your

2   testimony.

3   A.  OK.

4   Q.  Did you discuss your use of Signal with lawyers?

5   A.  Yes.

6   Q.  When did you first discuss your use of Signal with lawyers?

7   A.  More or less as soon as I began using Signal.  I think this

8   was sometime around 2020 or so.  And there were lawyers who

9   were involved in some of the original Signal chats.

10  Q.  Which lawyers?

11  A.  At the beginning, Dan Friedberg, who was the general

12  counsel at the time, and then ultimately with most of the

13  lawyers who joined the company.

14  Q.  Did you discuss with lawyers auto deletion of Signal

15  messages?

16  A.  I discussed with them the fact that there was auto

17  deletion, and it was a topic that had come up in connection

18  with the various data-retention policies.  I don't know if

19  there is something more specific you are asking about.

20  Q.  When did you first discuss with lawyers that you were going

21  to be auto deleting your Signal messages?

22  A.  The earliest memories that I have of it were about

23  particular channels, particular channels that lawyers were

24  added to somewhat early on.  I am not sure if you are referring

25  to -- sorry.  I think the answer was, you know, shortly after I

NAQMBAN5                    Bankman-Fried - Cross              2209

 1   started using Signal, although not originally in the context of

 2   a formal policy.

 3   Q.  Let me ask you this.  When, as a general practice, did you

 4   start setting your Signal messages to auto delete?

 5   A.  I can't recall the exact date.

 6   Q.  Was it around the spring of 2021?

 7   A.  That sounds pretty plausible to me.

 8   Q.  And before you started doing that, as a matter of general

 9   practice, did you discuss doing that with any attorneys at FTX?

10   A.  I mentioned it.  I don't know that we had formal

11   discussions about it.

12   Q.  When you say you mentioned it, what does that mean?

13   A.  It means that I mentioned that I was going to be -- I

14   think -- at least what I remember is at some point changing the

15   default toggle on my Signal app.  I am not sure there is

16   another incident there, but that toggle I think I changed to

17   one week for chats -- for new chats that were created at some

18   point in time.  The spring of 2021 sounds like it may have been

19   the right period for that to me.

20   Q.  Before you changed that setting for your Signal chats to be

21   set to auto delete, did you seek approval of that decision from

22   a lawyer?

23   A.  I don't know that I sought specific approval for that, no.

24   Q.  So you mentioned a document-retention policy?

25   A.  Yes.

**A-922**

NAQMBAN5                  Bankman-Fried – Cross                  2210

1    Q.  Was that a written policy?

2    A.  Yes.

3    Q.  When did that go into effect?

4    A.  I believe that went into effect around late 2021.

5    Q.  Whose idea was it to enact a document-retention policy?

6    A.  Originally, it was Dan Friedberg's idea.

7    Q.  What was the scope of that policy?

8    A.  The scope of that policy was for official workplace

9    communications for FTX.

10   Q.  Did that written policy include any provisions specifically

11   about the use of Signal?

12   A.  I don't remember whether it was mentioned by name.

13   Q.  Did that policy, as far as you recall, have any provisions

14   specifically about auto deletion of Signal messages?

15   A.  It had various policies that would have applied to Signal,

16   but I don't know that it had any that specified -- that singled

17   out Signal as a platform.

18   Q.  What about any policies in this written document that you

19   can recall that pertained to the destruction or deletion of

20   company communications?

21   A.  There were -- I mean, there were a number of parts of it

22   that discussed the time periods at which it was or it wasn't

23   appropriate for some subsets of communications to do so.  There

24   were also conversations -- I am not sure whether or not they

25   are in connection with that -- around mandates that we had from

**A-923**

NAQMBAN5                    Bankman-Fried - Cross                    2211

1    various regulators for specific pieces of data to have no

2    longer than a particular shelf life.

3    Q.  I think you said something like there was some subset of

4    communications to do so.  I didn't understand what that means.

5    Did the policy specifically say anything about the

6    permissibility of deleting or destroying company documents?

7    A.  Yeah.  It said that in various circumstances it was not

8    permissible and in other circumstances it was permissible.

9    Q.  What do you recall the policy saying about when it was

10   permissible to destroy company communications?

11   A.  So I remember -- my memory of the policy is that it laid

12   out various circumstances in which it was not permissible to do

13   so or in which there needed to be a lengthy retention period

14   for company communications, and that outside of those sets of

15   topics or forums, there was permissibility to have effectively

16   whatever data-retention link or setting felt appropriate.

17   Q.  Do you recall that policy --

18            THE COURT:  Excuse me a minute, Ms. Sassoon.  What

19   does it mean that there was permissibility about that?  Does

20   that mean you could do whatever you wanted?

21            THE WITNESS:  Sorry.

22            THE COURT:  Yes.  That was from me.

23   A.  So long as there was no particular reason that you didn't

24   do a particular thing, yes.

25   Q.  Is it your recollection that the policy expressly

**A-924**

NAQMBAN5                    Bankman-Fried – Cross                    2212

1   authorized deleting company communications that did not fall

2   within the regulated categories?

3   A.  That is my memory, yes.

4   Q.  Where is this written policy?

5   A.  I'm not sure if my answer is admissible.

6          THE COURT:  Don't worry about that.  You worry about

7   Blockchain explorers.  I will worry about what's admissible.

8   A.  When I was a member of the company, I remember interacting

9   with the policy and discussing it.  As part of this case I

10  think we have been unable to serve the subpoenas we have

11  requested asking for it.

12  Q.  You said that Signal was not expressly mentioned in the

13  policy.  Did you talk to lawyers about whether Signal was

14  covered by the policy?

15  A.  Yeah.

16  Q.  And what were those conversations?

17  A.  That Signal was treated in many ways like the other

18  communication platforms that we used.  There were a few cases

19  where specific platforms were mentioned.  I think there were

20  provisions specifically referring to email, for instance, in

21  the policy, but, otherwise, that it depends not on the app that

22  was used but on the nature of the communication.

23  Q.  I think you said you mentioned in passing that you set this

24  auto-delete feature on Signal.  Did you ever discuss with a

25  lawyer whether that was covered by this policy?

**A-925**

NAQMBAN5                    Bankman-Fried - Cross                    2213

1    A.  Yeah.

2    Q.  With who?

3    A.  With Dan Friedberg.

4    Q.  When?

5    A.  This was around the time that he was discussing the auto

6    deletion and data-retention policy with us, which my memory was

7    late 2021.

8    Q.  So which is it?  Did you just mention that you were putting

9    on this setting or did you seek approval from Dan Friedberg?

10   A.  I think -- I apologize.  I may have misinterpreted.  I

11   interpreted your early question as what conversations I had

12   contemporaneous with when I originally changed that setting,

13   which my memory it was prior to the discussions around the

14   auto-deletion policy.  So there is no formal policy around it

15   when I had initially changed the default settings on my Signal

16   app to one week, but we did have formal discussions about it in

17   connection with the data-retention policy which happened some

18   number of months later.

19   Q.  Just to make sure I follow your testimony, you implemented

20   this setting and later this policy was put into place?

21   A.  I believe that is correct, yes.

22   Q.  Did you discuss with lawyers the retention period that you

23   were placing on your auto-delete feature?

24   A.  Yeah.

25   Q.  How was the retention period decided upon?

**A-926**

NAQMBAN5                    Bankman-Fried - Cross                    2214

1   A.  The retention period from my particular Signal -- like the

2   default on my particular Signal was just what it had been.

3   That was not meant to represent what the companies for official

4   communications or for memorializing business decisions or for

5   storing business documents would set on channels for which

6   retention was important or mandated.

7   Q.  Did any lawyer authorize you to set auto delete for your

8   communications with Caroline Ellison, Nishad Singh, and Gary

9   Wang?

10  A.  Via -- my memory is that, via the data-retention policy,

11  for communications that were not otherwise protected or

12  required to be retained that we were authorized to use whatever

13  retention period we felt like was appropriate.

14  Q.  So you never sought out specific authorization for that?

15  A.  It was, I think, explicitly authorized, although not

16  singled out by the data-retention policy.  It was also

17  something that the lawyers were aware of.

18  Q.  I think you testified that documents related to formal

19  business decisions, it was your understanding that those had to

20  be preserved based on your conversations with lawyers.  Is that

21  accurate?

22  A.  Documents that memorialized formal business decisions were

23  sort of finalized versions of those that were distributed to

24  the company or externally.  That was my understanding.

25  Q.  Can you explain what you mean by that.

**A-927**

NAQMBAN5                    Bankman-Fried - Cross                    2215

1    A.  So effectively -- I apologize.  I wish I had that policy

2    now.  I am working off my memory of it -- is that the policy

3    considered communications which, as an example, we're sending

4    to the company, here is our policy on a particular topic or

5    that were compliance decisions that were made and communicated

6    to a department of the company, or that were us storing

7    know-your-customer related information or that were formal

8    discussions of accounting documents would be, but that, for

9    instance, there is not, to my knowledge, any requirement that

10   every rough draft of documents and the conversation around

11   those, especially informal conversations, be preserved.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-928**

NAQ1BAN6                    Bankman-Fried - Cross                    2216

1    BY MS. SASSOON:

2    Q.  What about the decision, for example, to repay Alameda's

3    lenders, do you consider that a formal business decision?

4    A.  So I would consider formal business document to be the

5    balance sheets that were sent out to Alameda's lenders.  To the

6    extent that there was a communication to Alameda's employees

7    that there was some policy decision, I would expect that that

8    would be.  Now I——

9    Q.  Let me make this concrete.  Do you recall Caroline Ellison

10   testified that she sent to you Government Exhibit 44, the

11   spreadsheet with seven alternative tabs via Signal?

12   A.  Yeah.

13   Q.  Do you recall that testimony?

14   A.  I do, yes.

15   Q.  And do you consider that document a formal business

16   document?

17          MR. COHEN:  Objection.  Beyond the scope of this

18   hearing.

19          THE COURT:  Overruled.

20   A.  I——to be clear, to the extent that there was a document

21   that was sent out or intended to be directly sent out to

22   lenders, I would have thought of that as the type of document

23   that, had it been an FTX document, I would have, you know,

24   posted in a semiformal way in Slack.  I can't speak for certain

25   about what practices Caroline followed with respect to Alameda.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-929**

NAQ1BAN6                Bankman-Fried - Cross              2217

1    However, a rough draft of that that was still being workshopped

2    I would not have yet considered a formal business document that

3    had to be separately memorialized, nor would I have considered

4    the sending of that to one other person so they could look over

5    it to be a formal business decision.

6    Q.  So just to be clear, I want to make sure I understand that.

7    A.  Yup.

8    Q.  It's your view that receiving that seven-tab spreadsheet

9    over Signal and that message getting deleted was consistent

10   with the company's policy?

11   A.  Yeah.

12   Q.  And what specific conversations do you recall with counsel

13   that informed that understanding?

14   A.  We had conversations that effectively——I had conversations

15   with counsel that conversations that people had internally were

16   not in general required to be recorded; for instance, verbal

17   conversations were not required to be recorded, generally

18   messages between two specific people at the company were not

19   required to be recorded because those would generally not be,

20   you know, formal business decisions that were being

21   communicated to the company more generally as there were only

22   two people involved in that and——

23   Q.  You were CEO of FTX, right?

24   A.  Yes.

25   Q.  And Caroline Ellison for a time was CEO of Alameda?

**A-930**

NAQ1BAN6                    Bankman-Fried – Cross                    2218

1    A.   Yes.

2    Q.   And it was your view that no one-on-one communications with

3    Caroline Ellison had to be preserved.

4    A.   I don't know that I would make a statement quite that

5    strong.  I would say in general that was the case, but I——I,

6    you know——one could probably come up with such a communication

7    that would make sense to preserve.

8    Q.   Well, give me an example.

9    A.   I don't actually have any examples.  I can try and think of

10   one.

11   Q.   Do you think you ever violated this policy by communicating

12   with Caroline Ellison in messages that were later deleted?

13   A.   Not to my knowledge.

14   Q.   So am I correct that all your messages with Caroline from I

15   believe around May 2021 onward until November 2022 over Signal

16   were auto-deleted, right?

17   A.   I think that was for Signal communications, yes, not

18   necessarily communications via other methods.

19   Q.   So it's your testimony that there were no communications

20   over that period that would have violated the policy by being

21   auto-deleted?

22   A.   I can't think of any that I believe would have.  I

23   obviously don't remember every message that was sent and don't

24   have, unfortunately, copies of that policy in front of me right

25   now.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-931**

NAQ1BAN6                Bankman-Fried - Cross                2219

1  Q.  What about conversations over Signal with Gary Wang, Nishad

2  Singh, and Caroline Ellison about shutting down Alameda because

3  of a hole in the FTX balance sheet?

4  A.  I'm not sure that's how I would characterize the

5  conversations that I think you're referring to there.  If

6  you're referring to the——are you referring to the "we came, we

7  saw, we researched" document, or are you referring to something

8  else?  Sorry.  I may be misunderstanding.

9  Q.  Did you have conversations over Signal with Gary, Nishad,

10  and Caroline about an approximately $13 billion hole at FTX?

11  A.  I don't specifically recall such conversations.  I wouldn't

12  be surprised that they had sent a Signal message about it at

13  some point.

14  Q.  And so that type of Signal message, do you think that was

15  covered by the retention policy?

16  A.  I would expect that it would be.  I would, but again, it's

17  a little——I can't be confident with a hypothetical message.

18  Q.  Meaning that you would expect that it should be preserved

19  or that it could be deleted?

20  A.  No, no.  So it depends on the exact nature of the message.

21  It's hard to give a definitive general answer to it, because

22  for instance, they would communicate an official vetted company

23  number that action was to be taken based on, and that was to

24  be——you know, that would be different than a conversation in

25  which people were trying to hash out what a number was based on

**A-932**

NAQ1BAN6                    Bankman-Fried - Cross                    2220

1    various approximations, so it's hard for me to answer in the

2    abstract.

3    Q.  Do you recall, were you here for Adam Yedidia's testimony?

4    A.  Yes, I was.

5    Q.  Do you recall him testifying about a conversation you had

6    with him saying preserving Signal messages would be all

7    downside, or something to that effect?

8    A.  I recall something that is at least to some extent to that

9    effect.  I don't recall the specific things that he said.

10   Q.  Did you have a conversation with him along those lines?

11   A.  I don't specifically recall that, but I very well may have.

12   Q.  And did you have that view?

13   A.  Have what view in particular?

14   Q.  That preserving company messages would be all downside with

15   regulators.

16   A.  I didn't have that view with respect to all company

17   messages.  I had that view with respect to particular types.

18   Maybe to——to clarify that a little bit, I thought it was

19   important to memorialize and to store company decisions,

20   official company documents.  On the other hand, I was very

21   concerned about what would happen if an employee was careless

22   about how they phrased something, made a statement that was not

23   in fact nefarious but which, taken out of context, could look

24   bad and unfortunately they didn't give the appropriate context

25   and that that in turn could be publicized and be effectively

**A-933**

NAQ1BAN6                    Bankman-Fried - Cross                    2221

1   embarrassing for the company.

2   Q.  Did you share that concern with lawyers when crafting your

3   document retention policy?

4   A.  I shared that conversation, that——sorry——that concern in

5   general with lawyers.  I'm not sure whether I specifically

6   shared it in connection with the data retention policy.

7   Q.  So you don't have a recollection of expressing that concern

8   with respect to formulating the data retention policy?

9   A.  Yeah, I'm not sure either way about whether that was one of

10  the contexts in which we had that conversation, though I know

11  that prior to that and after that, I had had that conversation

12  with lawyers.

13  Q.  What about when you mentioned to lawyers that you turned on

14  the auto-delete function, did you explain that one purpose was

15  to destroy things that could be downside with regulators?

16  A.  I certainly would not have used that language or described

17  it that way.  I don't recall such a conversation.

18          THE COURT:  How would you have described it?

19          THE WITNESS:  So what I would have said——to give some

20  context on this, the company I worked at prior to

21  joining——well, to founding Alameda and then FTX was Jane Street

22  Capital, and at Jane Street, there was frequent discussion of

23  something called *The New York Times* test."  Context for this

24  was effectively, anything that you write down might end up on

25  the front page of *The New York Times*.  And so especially if

**A-934**

NAQ1BAN6                    Bankman-Fried - Cross                    2222

1   you're describing something which is sensitive, you should make

2   sure that you are considerate about how you write it down, that

3   you think about how it could be interpreted, and that you make

4   sure that it could not be misinterpreted, and this was combined

5   with various stories that were told about cases where there was

6   a very negative public or regulatory reaction to an inoffensive

7   actual behavior because of careless things that people had used

8   to describe it.  And so that was the type of concern that I

9   chiefly had.

10  BY MS. SASSOON:

11  Q.  And did you direct your employees to discuss legally

12  sensitive topics by Signal?

13  A.  It depends on what sorts of discussions.  For, I would say,

14  employees, like, spitballing questions to——to lawyers, I think

15  that often would happen either verbally or over Signal.  If

16  this was asking what is our policy on a particular thing or

17  describing that policy or communicating it, that I would not

18  have suggested particularly be over Signal.

19  Q.  Did FTX ever get subpoenas that resulted in a hold on

20  destruction of records?

21  A.  Yup.

22  Q.  Did you retain Signal records after you got those holds?

23  A.  So my understanding was that we retained records that were

24  responsive to those holds.  Not all Signal channels had

25  auto-deletion turned on, some of them did not, and many Slack

**A-935**

NAQ1BAN6                 Bankman-Fried – Cross                 2223

1    channels did not, and emails in general did not.

2    Q.  Did you ever turn off your auto-delete function on messages

3    with Gary, Caroline, or Nishad in response to such a hold?

4    A.  Just because——we're talking specifically about a group chat

5    with the three of us or are we talking about broader groups

6    that we may have been in?

7    Q.  Groups that would have included only those individuals.

8    A.  Got it.  So those were some subset of the four of us.

9    Q.  Yes.

10   A.  I'm not actually sure if I was——what the deletion history

11   was with those chats.  I don't recall specifically doing so.

12   Q.  When you got such a hold, did you consult lawyers about

13   which Signal chats you should preserve?

14   A.  Yes.

15   Q.  Who did you discuss that with?

16   A.  I remember discussing that with Ryne Miller and Dan

17   Friedberg.

18   Q.  And what were you told?

19   A.  I was told that we basically immediately had to come up

20   with a set of channels and forums that should be fully

21   retained, and I believe that we did so.

22   Q.  And who decided which channels those would be?

23   A.  I mean, there——I want to make sure I answer this correctly.

24   There were a bunch of us——no, a bunch——probably seven or so

25   people involved in that conversation.  Ultimately it was Dan

**A-936**

NAQ1BAN6                    Bankman-Fried – Cross                    2224

1    and Ryan who made the judgment call on which channels did and

2    didn't fall into that, but with, you know, context given by a

3    few other employees.

4    Q.  Did you tell Ryne Miller or Dan Friedberg that you were

5    discussing company business in Signal chats with, for example,

6    Gary, Nishad, and Caroline?

7    A.  Yeah.

8    Q.  And what guidance, if any, did they give you about

9    preservation of those messages?

10   A.  They did not generally tell me that those had to be

11   preserved so long as they were not, you know, formal business

12   decisions or other similar things.

13   Q.  They used the word "formal business decisions"?

14   A.  I don't actually recall the specific phrase they used.

15   Q.  So what phrase do you recall them using?

16   A.  I don't recall a specific one.

17   Q.  Well, what do you recall about the substance of what they

18   said?

19   A.  I recall that the substance of what they said was that for

20   informal company communications, those were permissible to

21   happen in person or over Signal, but that for things that

22   looked like company records, for instance——

23   Q.  So you're giving that as an example.  I want to

24   understand——

25          MR. COHEN:  Please let him finish his answer.

NAQ1BAN6                    Bankman-Fried - Cross                    2225

1          THE COURT:  Yes.

2   A.  But that for things that were like company records or

3   decisions announced to the company that employees were expected

4   to enact, or logs of customer information, that those would not

5   be happening over Signal.

6   Q.  Did anyone use the words "informal business discussions"?

7   A.  Yup.

8   Q.  Did any lawyer tell you about sharing company spreadsheets

9   or informal business conversations?

10  A.  I had conversations with lawyers in which we shared

11  business-related spreadsheets over Signal.  I don't know if I'd

12  specifically asked them about that, but they were well aware

13  that that would sometimes happen.  I would not use that as a

14  way to distribute a finalized spreadsheet.  That was generally

15  a way that I would sometimes send it to a few people to look

16  over and see if I was messing anything up.

17  Q.  And how did this policy you've described apply to anything,

18  any communications related to Alameda?

19  A.  My understanding is that there was a version of this policy

20  for Alameda as well, although I don't know the details of it.

21  Q.  Were you involved in forming that policy?

22  A.  Not in any depth.

23  Q.  What does that mean?

24  A.  I was aware that it was happening.  It was mentioned

25  sometimes in the same conversations as the ones that I had with

**A-938**

NAQ1BAN6                    Bankman-Fried – Cross                    2226

1    counsel about the FTX policy, but I don't know that I reviewed

2    the Alameda policy and I don't remember learning specifically

3    what channels were——were not going to be preserved at Alameda.

4    Q.  When do you recall that taking place?

5    A.  I think late 2021.  I don't remember the exact time.

6    Q.  And what was your involvement in Alameda at that point?

7    A.  So this was after the CEO role had transitioned to Caroline

8    Ellison and Sam Trabucco.  It was during a period where it was,

9    you know——Trabucco was slowly drifting effectively towards

10   retirement, so it was primarily Caroline.  I was involved in a

11   few areas of Alameda.  I was particularly involved in

12   venture-related investments, and later on I became involved in

13   hedging decisions.  I was not on a day-to-day level involved in

14   other topics that I can recall——there——there may well be one or

15   two I'm forgetting there——although I would get periodic updates

16   from Caroline about it and she would sometimes elicit input

17   from me.

18   Q.  Were you in a Signal group called Vertex?

19   A.  Yes.

20   Q.  Was that with Caroline, Sam Trabucco, and Ben Xie?

21   A.  Yup.

22   Q.  And were Alameda trade decisions discussed in Vertex?

23   A.  I——yeah, occasionally.

24   Q.  And was that chat set to auto-delete?

25   A.  I don't recall.  It may have been.

**A-939**

NAQ1BAN6                    Bankman-Fried - Cross                    2227

1    Q.  Do you recall consulting with anybody about setting that

2    chat to auto-delete?

3    A.  Not specifically for that chat.

4    Q.  You've described some consultations with attorneys.  Do you

5    have any paper records of these consultations?

6    A.  I—no, I don't.  I believe we've requested some of those

7    but have not been given them.

8    Q.  When you say "requested some of those," what did you

9    request?

10   A.  I requested both the data retention policy and all

11   communications surrounding that.

12          MS. SASSOON:  Your Honor, permission to approach the

13   witness with a document.

14          THE COURT:  Yes.

15          MS. SASSOON:  I've provided a copy to defense counsel.

16   I'd like to provide one to the Court, and the witness.  I don't

17   know if that leaves one for me, but—

18   BY MS. SASSOON:

19   Q.  Mr. Bankman-Fried, could you just take a look at that and

20   tell me if you recognize this document.

21          THE COURT:  Let's get it marked.

22          MS. SASSOON:  We can mark that as Government

23   Exhibit 3000.

24          THE COURT:  Thank you.  For identification.

25          MS. SASSOON:  Yes.

NAQ1BAN6                    Bankman-Fried – Cross                    2228

1   A.  I——

2              MS. SASSOON:  4000.  4000.

3              THE COURT:  4000 for identification.

4   A.  To be explicit, I do recognize this but not

5   contemporaneously.  I'm aware of this, but I don't remember

6   becoming aware of this when it was actually enacted.  I am

7   certain that I saw this starting, you know, on or around

8   November 2022.

9   Q.  Is that the document retention policy you've been talking

10  about?

11  A.  No, this is not.

12  Q.  And does it resemble in substance what was in the retention

13  policy you've been talking about?

14  A.  No, it does not.

15  Q.  So the supposed policy you've been testifying about, you

16  have no record of it sitting here today.

17  A.  That's correct.  We have requested it numerous times.

18  Q.  Okay.  One moment.

19              I'm going to turn now——before I move on to another

20  topic, I just want to ask if, in your view, you ever violated

21  the document retention policy.

22  A.  I don't have any knowledge that I did.  Although, again,

23  I'm not now looking at a copy of it so I——I don't recall

24  precisely what it said.

25  Q.  Okay.  I want to talk to you about North Dimension.

**A-941**

NAQ1BAN6                    Bankman-Fried - Cross                    2229

1    A.  Yup.

2    Q.  First of all, whose idea was it to incorporate North

3    Dimension?

4    A.  It was communicated to me by Dan Friedberg.  I know there

5    were others involved.  I'm not sure whose idea originally North

6    Dimension in particular was.

7    Q.  You've described a couple things now where you've said that

8    something was Dan Friedberg's idea.

9    A.  Mm-hmm.

10   Q.  Can you explain generally the relationship between you and

11   Dan Friedberg, and generally, were you giving him direction or

12   was he just popping ideas on your desk?

13   A.  There were some of each.  That relationship, it changed a

14   little bit over different periods of time.  I can just give an

15   overview.  If there's a specific time period you want me to

16   zoom in on, I'm happy to do that as well.

17   Q.  Let's focus first on North Dimension.  Did you give Dan

18   Friedberg any direction about North Dimension?

19   A.  I don't recall giving specific direction to him about it.

20   Yeah, no, I don't recall giving a direction to him about it.

21   Q.  And why the name North Dimension for this entity?

22   A.  I honestly don't know where the name came from.

23   Q.  So is it your testimony you didn't come up with the name?

24   A.  That is correct.

25   Q.  And do you have any knowledge of why this entity didn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-942**

NAQ1BAN6                  Bankman-Fried – Cross                  2230

1  have Alameda in the name?

2  A.  I——I don't know for sure why it did not.

3  Q.  I think you testified that FTX couldn't get bank accounts?

4  A.  Yup.

5  Q.  At first, were FTX customer funds getting wired to a bank

6  account in Alameda's name?

7  A.  Originally customers were wiring deposits to Alameda

8  Research.

9  Q.  Why did that stop?

10  A.  Ultimately it stopped because FTX got its own bank

11  accounts, but I'm guessing you're talking about before then, is

12  that——

13  Q.  Why did FTX transition from using bank accounts in the name

14  of Alameda to a bank account in the name of North Dimension?

15  A.  My understanding from what I was told at the time was that

16  there were cases where various banks had difficulty wiring to

17  an Alameda Research bank account or——and/or various customers

18  did, and that it was smoother to process them using a North

19  Dimension bank account.

20  Q.  Were you told that banks did not want to transfer money to

21  Alameda, a cryptocurrency hedge fund?

22  A.  I don't know if I was told that explicitly, but I——it

23  wouldn't surprise me.

24  Q.  Did you understand that at the time?

25  A.  I knew that there were some banks that did not want to do

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-943**

NAQ1BAN6                    Bankman-Fried - Cross                    2231

1   so.  I didn't know whether that was the impetus for North

2   Dimension.

3   Q.  Just to be clear, when North Dimension was created, you

4   were CEO of Alameda, right?

5   A.  I believe that's correct, yes.

6   Q.  And is it your testimony that as CEO of Alameda, you had no

7   insight into why Alameda stopped receiving customer funds into

8   a bank account in Alameda's name?

9   A.  I—it is correct that I do not know why it incorporated

10  North Dimension.  It wasn't a project that I was driving,

11  although it was one that I was made aware of.  I had contextual

12  clues that I could try to draw on, but in general, I was—even

13  for companies that I was fully running day to day, there were a

14  lot of things that happened that I was either not informed of

15  or after the fact sort of summarily informed of, and at that

16  point with Alameda, I was still CEO, I was still involved

17  sometimes in the day-to-day operations, but I often was not.  I

18  was, you know, about halfway, I would say, through

19  transitioning from running Alameda day to day to running FTX

20  day to day.

21  Q.  So we've looked at, or you looked with Mr. Cohen at a bank

22  account application for North Dimension.

23  A.  Yup.

24  Q.  When you signed that, what was your understanding of what

25  you were doing?

**A-944**

NAQ1BAN6                    Bankman-Fried - Cross                    2232

1    A.  My understanding was that Alameda wanted to open up a bank

2    account for North Dimension and this was a form that I had to

3    fill out to do so.

4    Q.  Who told you that?

5    A.  I knew that Dan Friedberg specifically told me that.  I'm

6    not sure if I had conversations with other people about it as

7    well.

8    Q.  What, if anything, did you discuss with Dan Friedberg about

9    the purpose of this bank account?

10   A.  At the time of the——the form, or later on or——

11   Q.  Before and at the time.

12   A.  I'm not sure I remember having discussions before or at the

13   time about the purpose of the bank account.  I know that there

14   had been——yeah.  Sorry.  I'm not sure that I did.  I'm not sure

15   that I did entirely.  I just don't recall any in particular.

16   Q.  When did you learn that the purpose of the bank account was

17   to receive FTX customer funds?

18   A.  I think I learned that when I saw that it had been——so I

19   think I learned when FTX rolled out North Dimension deposit

20   instructions for customers that at least one of the purposes

21   for it was going to be for customer deposits.

22   Q.  Did that raise any concerns for you at the time?

23   A.  I don't think it raised any particular concerns.

24   Q.  Did you discuss with counsel that the purpose of the bank

25   account was to receive customer funds?

**A-945**

NAQ1BAN6                    Bankman-Fried - Cross                    2233

1   A.  Sorry.  Let me actually amend my previous answer.  There

2   was a related thing that did raise a concern to me at the time,

3   that I did raise as a concern with counsel, which was, I saw

4   that one of the North Dimension entities was a US entity, and I

5   was surprised to see that a US entity was being used for——for

6   what seemed like payment processing.

7   Q.  So as far as you understand it, whose decision was that?

8   A.  Whose decision was it to roll it out for FTX or to open the

9   bank account or——

10  Q.  To use North Dimension to receive FTX customer money.

11  A.  I'm actually not entirely sure whose decision it originally

12  was.  I think Nishad was the one who added it to the code base,

13  but presumably that was after conversations with other people.

14  I'm not sure who sort of made that decision initially.

15  Q.  So it's your testimony you weren't part of that decision.

16  A.  The original decision related to North Dimension, I don't

17  recall being a part of it.  I do know that I became——certainly

18  became aware of it and had conversations with it as it was

19  happening, and I may have been in conversations around

20  difficulties that Alameda was having sometimes receiving wire

21  transfers.  I don't recall being conversations around North

22  Dimension in particular until it was being implemented.

23  Q.  What do you mean you may have been in conversations about

24  the account receiving customer money?

25  A.  Sorry.  Conversations——was this referring to the

**A-946**

NAQ1BAN6                    Bankman-Fried – Cross                    2234

1  conversations around difficulties with——

2  Q.  Yes.  I think you said "I may."  So were you——what's your

3  testimony?

4  A.  So, excuse me.  I was in conversations that——in which it

5  was conveyed to me that sometimes people had difficulty wiring

6  to Alameda.  I'm not sure if those were related.  They may have

7  been.

8  Q.  So what conversations, if any, did you have with lawyers

9  about the permissibility of using North Dimension to receive

10  FTX customer funds?

11  A.  We had conversations around Alameda generally acting as a

12  payment processor, as a payment agent for FTX, which were, you

13  know, memorialized in a payment agent agreement, and I had

14  conversations with that at a high level with lawyers, and I was

15  at least aware of conversations that were happening with the

16  accountants and auditors around that as well.  I know that

17  there were lawyers who were, I mean, involved in and driving

18  the incorporation and usage of North Dimension as part of this

19  payment agent.  I'm not sure if I initiated a specific

20  conversation after seeing it around that, the——it was initiated

21  with me.  But yeah.

22          THE COURT:  So I take it the answer is you don't

23  remember; is that about it?

24          THE WITNESS:  I don't remember that specifically.  I

25  do know that lawyers were involved in that decision.  I don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-947**

NAQ1BAN6                    Bankman-Fried - Cross                    2235

1    know that I specifically—

2            THE COURT:  No.  The question was about conversations

3    you had.

4            THE WITNESS:  That's right.

5            THE COURT:  So the answer is you don't remember; is

6    that right or not?

7            THE WITNESS:  Sorry.  I want to make sure I'm

8    answering the right question.  Conversations that I had with

9    lawyers around—

10           THE COURT:  The permissibility of using North

11   Dimension to receive FTX customer funds.  That was the

12   question.

13           THE WITNESS:  Right.  No, I—not unless you count

14   conversations I had around the permissibility of using Alameda

15   as a payment agent, and North Dimension was a wholly-owned

16   subsidiary of Alameda.  I don't know that I had conversations

17   around the permissibility of North Dimension in particular.

18           THE COURT:  Listen to the question and answer the

19   question directly.

20   BY MS. SASSOON:

21   Q.  When you signed the bank account opening document for the

22   North Dimension bank account, at that time, I believe you

23   testified you did not know the bank account would be used

24   specifically to receive FTX customer funds; that was your

25   testimony?

**A-948**

NAQ1BAN6                    Bankman-Fried - Cross                    2236

1    A.  I believe that's correct.

2    Q.  And so at that time when you signed the account opening

3    document, you had not had any conversations with lawyers about

4    the permissibility of using the North Dimension account to

5    receive customer funds; is that accurate?

6    A.  I don't recall having any, no.

7    Q.  And is it likely you did, given that you are testifying

8    that you didn't know the purpose of the account?

9    A.  I don't think that I did, but I can't be certain about the

10   order in conversations here.  I'm relying on my memory here,

11   and this was not a thing I was focused on at the time.

12        MS. SASSOON:  Well, let's look at Government

13   Exhibit 267.

14        Mr. Bianco, if you could pull that up.

15   Q.  This is the bank account application document you signed,

16   right?

17   A.  Yes.

18        MS. SASSOON:  And if we could just go to the last

19   page.

20   Q.  That's your signature?

21   A.  Yes.

22   Q.  And this is dated December 9, 2020, so you were CEO of

23   Alameda at the time?

24   A.  Yes.

25   Q.  And that's a wet signature, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-949**

NAQ1BAN6                    Bankman-Fried - Cross                    2237

1    A.  I guess it looks like one.

2    Q.  Sometimes you used DocuSign, right?

3    A.  Yes.

4    Q.  In this instance you did not?

5    A.  It doesn't look like I did.  I don't recall.

6    Q.  And did you review this document before you signed it?

7    A.  I reviewed it briefly.

8    Q.  Did you discuss it with a lawyer before you signed it?

9    A.  I——it was presented to me by a lawyer.  I didn't have a

10   lengthy discussion with him about it, though.

11   Q.  Did you have any discussion that you can recall, sitting

12   here today, about this document?

13   A.  Not other than, I mean, him saying that there's a document

14   for you to sign related to a bank account opening for a

15   subsidiary of Alameda's, and I said, all right.  That's all I

16   can recall from the moment of that signing.  I'm not entirely

17   sure there isn't something I'm not remembering.  I don't recall

18   anything other than that.

19   Q.  Let's go to the first page.

20   A.  Mm-hmm.

21   Q.  And do you see here under 1, it says "Description of

22   business.  Select all that apply"?

23   A.  Yup, mm-hmm.

24   Q.  And what's checked is "proprietary trading firm" and

25   "over-the-counter trading firm."

**A-950**

NAQ1BAN6                    Bankman-Fried - Cross                    2238

1   A.  Yup.

2   Q.  As far as you know, was North Dimension either of those

3   things?

4   A.  I viewed it to be one.  It was a wholly-owned subsidiary of

5   Alameda, which was both of those things.

6   Q.  And as far as you understood it, was this bank account used

7   for either of those purposes?

8   A.  I'm actually not entirely sure all the things that it ended

9   up being used for.

10  Q.  Did you discuss this section of the application with Dan

11  Friedberg?

12  A.  I don't recall discussing it with him.

13  Q.  In the course of preparing for this trial did you review

14  reports of meetings the government had with Dan Friedberg?

15  A.  I—I'm not sure.  I—I think at least a little bit.  I

16  don't know if I did.

17  Q.  Did you review the witness notes and materials provided to

18  you by the government?

19  A.  I reviewed some of them.

20  Q.  And did you review some of the reports related to Dan

21  Friedberg?

22  A.  Some, but I believe not all of them.

23  Q.  And did you read in one of those reports that Friedberg

24  says he could not recall who asked for North Dimension to be

25  formed but it would have been either you or Andy Croghan?

**A-951**

NAQ1BAN6                    Bankman-Fried - Cross                    2239

1    A.  I don't specifically recall reading that, no, but it very

2    well may have been in there.

3    Q.  Is it possible that you asked Dan Friedberg to form North

4    Dimension?

5    A.  I don't recall doing so.

6    Q.  Do you recall reading in the report that Friedberg said he

7    was not part of any discussion of FTX customer funds depositing

8    into Alameda Research accounts?

9    A.  I remember hearing that that had been there.  I'm not sure

10   whether I read it myself or discussed it.

11   Q.  And do you dispute that?

12   A.  I can't know for sure what is intended by that.  All I have

13   is discussion of the notes.  That's not how I would have I

14   think described it myself, but I don't want to put words in his

15   mouth, as I don't know exactly what he intended by that.

16   Q.  So I'm not asking you that.  I'm asking whether, according

17   to you, Dan Friedberg was in fact part of discussions of FTX

18   customer funds depositing into Alameda Research accounts.

19   A.  So just to clarify, I do think that Dan Friedberg—I do

20   remember Dan Friedberg being involved in discussions relating

21   to Alameda being—Alameda bank accounts being used as a way to

22   accept deposits from customers of FTX.

23   Q.  And when were those discussions?

24   A.  Those discussions were happening when we were discussing

25   the payment agent agreement.  That was, as I understood it, the

**A-952**

NAQ1BAN6                    Bankman-Fried – Cross                    2240

1  primary purpose of the payment agent agreement was to describe

2  that relationship.

3  Q.  And when did you discuss the payment agent agreement with

4  Dan Friedberg?

5  A.  I don't recall exactly when it was.  I think that it was

6  certainly at some points in 2020 and possibly at other times as

7  well.

8  Q.  When did you sign the payment agent agreement?

9  A.  I don't remember when I signed it.

10  Q.  What's your best recollection of when you signed the

11  agreement?

12  A.  I——in 2020 is my best guess, but I——that could be wrong.

13  Q.  We looked at the effective date on the document, which was

14  2019.

15  A.  Yup.

16  Q.  Did you sign it on the effective date of the document?

17  A.  No, I don't think so.

18  Q.  Did you sign it after the effective date of the document?

19  A.  Yeah.

20  Q.  Possibly a year later?

21  A.  It's possible.

22  Q.  Possibly two years later?

23  A.  Possible.  I would have guessed it wasn't that late, but,

24  yeah, it could have been.

25  Q.  Are there any other lawyers you talked to about North

**A-953**

NAQ1BAN6                    Bankman-Fried – Cross                    2241

1  Dimension being used to receive FTX customer funds?

2  A.  I——that I——I personally did not have many discussions

3  around North Dimension.  I know that——I'm honestly not entirely

4  sure.

5  Q.  Did you have any conversations with lawyers about Alameda

6  spending FTX customer money that was deposited into its bank

7  accounts?

8            MR. COHEN:  Objection, scope.

9            THE COURT:  Overruled.

10  A.  Can you repeat the question.  Sorry.

11  Q.  Did you have any conversations with lawyers about the

12  permissibility of Alameda spending FTX customer deposits that

13  were deposited into Alameda bank accounts?

14  A.  I don't recall any conversations that were contemporaneous

15  and phrased that way.

16  Q.  So what do you recall?

17  A.  So there were certainly conver——I certainly had

18  conversations with lawyers far later about when we were trying

19  to reconcile things in November of 2022, and there were

20  conversations with lawyers around Alameda being used as a

21  payment processor, as a payment agent for FTX.  I frankly don't

22  recall conversations with lawyers or otherwise about the

23  details of the funds or of the usage of the North Dimension

24  bank account or what would happen with assets after that.  I

25  certainly, in retrospect, wish that I had.  I wish I had had

**A-954**

NAQ1BAN6                    Bankman-Fried - Cross                    2242

1    conversations, that I myself had been more informed.  I'm not

2    sure if other people were involved in conversations.

3    Q.  So any conversations about this prior to November of 2022

4    with lawyers that you can recall?

5    A.  Sorry.  Give me one second.  I just want to think about

6    conversations that may be scoped to be within that.

7              I recall having conversations with lawyers around some

8    things related to Alameda as a payment agent, including

9    stablecoin creations and redemptions, and I recall

10   conversations with auditors and accountants around it.  I'm not

11   sure that I recall.  And I was also involved in conversations

12   with lawyers around the general practice of using payment

13   processors and storing funds with payment processors.  I'm not

14   sure there were ones specifically around this topic.

15   Q.  Mr. Bankman-Fried, I want to be clear the answer to the

16   question I'm asking you, which is——

17   A.  Yup.

18   Q.  ——prior to November of 2022, do you recall conversations

19   with lawyers about the topic of Alameda spending FTX customer

20   deposits that came into Alameda bank accounts?

21   A.  I don't recall that specifically, no.

22   Q.  And did you have conversations about that with auditors?

23   A.  There were conversations with auditors around the fact that

24   deposits had gone to Alameda and that it was a liability owed

25   to FTX.  I don't know if there were discussions around exactly

**A-955**

NAQ1BAN6                    Bankman-Fried - Cross                    2243

1   how Alameda used its——its assets.

2   Q.  So I believe you said in your direct testimony that North

3   Dimension was created for payment processing purposes.

4   A.  Yup.

5   Q.  What is that understanding based on?

6   A.  That understanding is based on, after having created it,

7   the ways in which I observed it being used.

8   Q.  And so you saw directly it was being used for this purpose?

9   A.  Yeah.

10  Q.  And the payment agent agreement that we looked at during

11  your direct testimony, does it say anything about Alameda being

12  authorized to spend FTX customer funds?

13  A.  So I believe that it authorizes——that it gives a fair bit

14  of discretion to Alameda about what it——how it acts in general,

15  clarifying that it has an obligation upon demand to FTX of that

16  amount of money, but not specifying that it has to be——what has

17  to——what Alameda has to do with any of it, of its assets.  That

18  is my understanding of it.

19  Q.  So is it your understanding that under the agreement

20  Alameda was permitted to spend FTX customer deposits?

21  A.  I wouldn't phrase it that way.  But I think that the answer

22  to the question I understand you to be trying to ask is yes.

23  Q.  Well, let's look at Defense Exhibit 245.

24  A.  Mm-hmm.

25  Q.  And I'm happy to scroll for you, but maybe you could point

**A-956**

NAQ1BAN6                    Bankman-Fried – Cross                    2244

1    out to us where in this agreement you think Alameda is

2    permitted to spend FTX customer funds.  And if you need us to

3    turn the page, just let me know.

4    A.  So I should preface this by saying I'm not a lawyer.  I'm

5    not giving a legal interpretation of this.  I'm just giving, as

6    best I can, what my memory is.  And the parts of this that jibe

7    with that, I, you know—I'm not trying to give a definitive

8    legal ruling on what this does or doesn't say.  The—I'm not

9    sure that I would quite answer yes to the question as you most

10   recently phrased it.  I'm going to try as best I can to give

11   the answer that I believe, which is that the—as—at least as I

12   remember understanding it at the time, FTX either itself or I

13   think as actually happened, without FTX as an intermediary,

14   customer's fiat funds would be sent to Alameda bank accounts,

15   FTX would retain a—effectively a debt from Alameda for those

16   and a—in the lien section here, a lien on Alameda's assets as

17   security for that ongoing liability, that it would be repayable

18   on direction from FTX in the return section here, and—and in

19   the payment directive section.  And—one second.

20        And that the provider could hold or transfer the funds

21   as laid out in the FTX assets section unless or until directed

22   to return them to FTX.

23        All of that being said, I did not do a careful reading

24   of this document at the time contemporaneously, and I would

25   have treated it as effectively, yeah, as a liability from

**A-957**

NAQ1BAN6                    Bankman-Fried - Cross                    2245

1   Alameda to FTX, that it had a contractual obligation to——to

2   make whole.

3   Q.  Is there any line in this exhibit you can point me to that

4   in your view authorized Alameda to spend the FTX customer

5   funds?

6           MR. COHEN:  Objection.  This has been covered.

7           MS. SASSOON:  He didn't answer my question, your

8   Honor.

9           THE COURT:  I agree.  Overruled.

10  A.  So I——there is the line that the——that FTX may, without

11  notice or demand, without notice to or demand on provider,

12  transfer any crypto or cash asset on hand to the provider, to

13  Alameda, to be held and/or transferred by provider.  I would

14  have interpreted that as saying that Alameda had the right to

15  hold or transfer those assets and that——oh, sorry.

16  Q.  Go ahead.

17  A.  And that the——the——what these represented was, in the

18  return section, a secured liability, and that it was secured,

19  as described in the lien section, by a lien against the

20  provider, in this case Alameda, which would implicitly have

21  access to all of Alameda's assets, which is how I would imagine

22  describing a contractual loan obligation, effectively.

23  Q.  Did any lawyer at FTX tell you that any language in this

24  agreement meant that Alameda could spend FTX customer deposits?

25  A.  I don't know that I had contemporaneous conversations with

**A-958**

NAQ1BAN6                    Bankman-Fried – Cross                    2246

1   lawyers about exactly what this agreement meant.

2   Q.  And any conversations you did have about what it meant were

3   in November of 2022?

4   A.  With lawyers in particular, yes.

5   Q.  As far as you know, was this agreement ever disclosed to

6   the public?

7   A.  I'm not sure if it was.

8   Q.  Are you aware of anywhere or any time that it was disclosed

9   to the public?

10  A.  I'm aware of it being disclosed to auditors.  I'm not sure

11  if that in turn turned out to be disclosed to other parties or

12  not.  I'm not aware of any specific incidents in which it was.

13          MS. SASSOON:  Your Honor, I apologize.  I'm not going

14  to finish at 4:30.  I'm happy to continue past 4:30 if the

15  Court would like.  I'm going to move to the next topic, which

16  is the terms of service.

17          THE COURT:  Keep going.

18          MS. SASSOON:  Okay.

19          THE COURT:  We're going to finish.

20  BY MS. SASSOON:

21  Q.  Let's talk about the terms of service.

22  A.  Yup.

23          MS. SASSOON:  Mr. Bianco, can you pull up 558.

24  Q.  I think you testified that you saw this as early as late

25  2021.  Do I have that right?

**A-959**

NAQ1BAN6                    Bankman-Fried - Cross                    2247

1    A.  I was sent it.  I don't know that I looked through it in

2    detail then.

3    Q.  And I think you said some parts you looked at more closely

4    than others; is that right?

5    A.  Yeah.

6            MS. SASSOON:  Can we go to provision 8.2.6, I think it

7    is.

8            8.2 and 8.2.6.  Yeah, that's right.  If we could zoom

9    in on 8.2.6.

10   Q.  Is this one of the provisions you looked at closely?

11   A.  I don't believe I looked at it closely at the time.

12   Q.  What do you recall about your review of this at the time?

13   A.  I recall at the time that I had interpreted this as

14   referring to purely spot trading on the platform and that this

15   was referencing, you know, omnibus segregated wallet setup for

16   spot assets.

17   Q.  Did you discuss that understanding with any attorney?

18   A.  I don't recall doing so, no.

19           MS. SASSOON:  Let's look at Section 16.  And let's go

20   to 16.4.

21   Q.  Did you discuss 16—I think you talked about your

22   understanding of this provision.  Did you discuss the meaning

23   of this provision at the time with any attorneys?

24   A.  Not at the time, no, I didn't.  I don't actually recall

25   discussing specific provisions, any specific provisions with

**A-960**

NAQ1BAN6                     Bankman-Fried - Cross                2248

1    this at the time with attorneys.

2    Q.  And do you know how this provision ended up in the terms of

3    service?

4    A.  I'm not a hundred percent sure how it did, no.  I don't

5    know who drafted which parts of it.

6    Q.  This provision, as you understand it, does it have anything

7    to do with Alameda's fiat liability to FTX?

8    A.  So as I understand it, this refers to assets of——that users

9    post as collateral for their margin positions, so I think that

10   what it would refer to is on a net basis, that——that set of

11   assets, not purely spot assets.

12   Q.  But you think the fiat liability is encompassed within that

13   for this provision?

14   A.  So when you discuss the fiat liability, at least as I

15   understand it——but I may be misinterpreting your question——I

16   think of that as being a liability from Alameda to FTX of a

17   particular size, rather than referring to the

18   particular——rather than referring to the nature of other

19   customers' accounts on the platform.  So, sorry.  Probably be a

20   little bit clearer.  I think that this could potentially relate

21   to any liability on the platform, depending on the nature and

22   amount of assets that were posted in various methods to the

23   platform.

24   Q.  When you reviewed and authorized the terms of service, I

25   believe you said to Can Sun——is that right?

**A-961**

NAQ1BAN6                     Bankman-Fried - Cross                     2249

1    A.  Yeah.

2    Q.  ——did you discuss with him Alameda's line of credit on FTX?

3    A.  I don't think I discussed it with him then, no.

4    Q.  Did you discuss with him Alameda's "Allow Negative" feature

5    and whether it was consistent with the provisions of the terms

6    of service?

7    A.  I——this was——you're referring to in May 2022, this is?

8    Q.  Yes.

9    A.  I don't know that I had any specific conversations with Can

10   when I authorized him to take action if he felt appropriate on

11   new terms of service.

12   Q.  So did you——and I just want to make sure I'm clear on this.

13   Did you have any discussions with Can Sun related to Alameda

14   being exempt from auto-liquidation in connection with

15   authorizing Section 16 of the terms of service?

16              MR. COHEN:  Objection, form.

17              THE COURT:  Overruled.

18   A.  I——same answer as before.  I don't know that I had any

19   specific conversations about anything with Can when I

20   authorized him as general counsel to do what he felt was

21   appropriate with new terms of service.

22   Q.  And at that point in time, May 2022, had you discussed any

23   of those topics I just outlined outside the context of the

24   terms of service with Can Sun?

25   A.  I——certainly not by me.  I'm not sure I was aware of those

**A-962**

NAQ1BAN6                    Bankman-Fried — Cross                    2250

1   topics by name at that time.

2   Q.  Which topics were you not aware of by name?

3   A.  I——you had asked——I was aware of the existence of some of

4   them and not others.  I was aware of the existence of lines of

5   credit by name.  I'm not sure that I was aware of the other

6   terms used by name.

7   Q.  So "Allow Negative," in May 2022, you were not aware of it

8   by name?

9   A.  I don't recall being aware of it then, no.

10  Q.  What about Alameda's exemption from auto-liquidation?

11  A.  I——I recall being aware that there was some form of delay

12  or something like that, or manual check.  I don't recall being

13  aware of the specifics at that time.

14  Q.  Can you explain what you mean by that.

15  A.  What I——what I mean by that is——by——particularly the part

16  about delayed liquidation or more generally?

17  Q.  You said you knew some things but not specifics.  So I want

18  to understand what you mean by that.

19  A.  I apologize.  I thought I had gone through that.  I can

20  repeat that though.  So I don't believe that I was aware of

21  "Allow Negative" by name.  I don't believe that I was aware at

22  that time——sorry.  I was aware of the existence of lines of

23  credit at that time.  And I——

24  Q.  Sorry.  I'm asking specifically about exemption from

25  auto-liquidation.

**A-963**

NAQ1BAN6                    Bankman-Fried – Cross                    2251

1    A.  Ah, okay.  So at that time I was aware that there were at

2    least some speed bumps in place on Alameda's account.  I'm

3    not—I don't remember being aware of the exact nature of them.

4    Q.  So what did you know about the speed bumps?

5    A.  I knew that some had been put in place in response to

6    events in which Alameda—in which an improper liquidation had

7    been triggered or about to be triggered on Alameda's account,

8    which in turn caused chaos on the platform.

9    Q.  And what was the nature of the speed bump, as you

10   understood it?

11           MR. COHEN:  Objection.  Beyond the scope.

12           THE COURT:  Overruled.

13   A.  I—I don't know that I was aware of any particular nature

14   of it.  I—I wish I could tell you more, but thinking back to

15   contemporaneously, at that point in time, I don't particularly

16   recall knowing more specifically about it.

17   Q.  You used the term "speed bumps," so can you explain to me

18   what you meant when you said you were aware of speed bumps in

19   May 2022.

20   A.  So I—sorry.  I apologize.  This is—because of the order

21   that we're doing this in, this will be a somewhat substantial

22   digression if—for me to provide all of the context for that.

23   I'm happy to do it, though.  Or I'm happy to give a summary of

24   it.

25   Q.  I don't think my question calls for extensive context.  I'm

**A-964**

NAQ1BAN6                    Bankman-Fried - Cross                    2252

1   asking you what you knew in terms of Alameda's exemption from

2   auto-liquidation.  You used the term "speed bumps."  What do

3   you mean by "speed bumps"?

4   A.  I understand there had been prior incidents in which

5   liquidations had been erroneously triggered on accounts in

6   general and in some cases on Alameda's account, or had been

7   almost triggered, and in response to those, I had conversations

8   with Gary, Nishad, and others around putting in place some

9   checks to prevent an erroneous liquidation of Alameda's

10  account, which would cause chaos on the platform, and I

11  understood that they had implemented some features that would

12  do as such.  That is roughly the extent of my specific

13  knowledge of it.

14  Q.  So when you say "do as such," you understood these checks

15  would prevent Alameda from being liquidated like any other

16  account would?

17  A.  That it would attempt to address the risk of improper

18  erroneous liquidations on Alameda's account by doing some

19  combination, I wasn't confident which, of having delays, having

20  annual checks, having alerts.  I wasn't sure if it was a alert

21  that you had to click on to liquidate or not to liquidate.  I

22  apologize.  I wish I could give you a more specific answer.  I

23  obviously now have a more specific set of answers to that

24  question, but at the time, that is my best recreation of the

25  state of my knowledge at that point in time.

**A-965**

NAQ1BAN6                    Bankman-Fried – Cross                    2253

1   Q.  So at the time you understood that there were certain

2   checks or features in place such that Alameda would not be

3   liquidated in the same fashion as other accounts; is that

4   accurate?

5   A.  I thought that there might be other accounts on similar or

6   the same program.

7   Q.  What about with respect to the typical customer account?

8   At that time did you understand that the typical process for a

9   typical customer account did not apply to Alameda?

10              MR. COHEN:  We're far afield of the topic of this

11  hearing, your Honor.

12              THE COURT:  Overruled.

13  A.  So at that point in time, in May 2022, I was well aware

14  that there were various programs that market makers

15  participated in that were gated on volume.

16  Q.  Mr. Bankman-Fried——

17  A.  Yeah.

18  Q.  ——I will allow you to answer the questions I ask, but

19  that's not the question I asked.  The question I asked was

20  about a typical customer, not a market maker.  As you

21  understood it in May 2022, did you understand that Alameda was

22  not subject to the same auto-liquidation as a typical customer

23  account?

24  A.  If by typical customer you mean not a market maker, so a

25  very dissimilar account from Alameda, then yeah, I did.

**A-966**

NAQ1BAN6                    Bankman-Fried – Cross                    2254

1    Q.  Okay.  And you mentioned that at this time you were not

2    aware of "Allow Negative" by name.

3    A.  Yeah.

4    Q.  So I just want to clarify.

5    A.  Yeah.

6    Q.  Were you aware that Alameda could go negative regardless of

7    the name for that feature?

8    A.  I was aware that Alameda and many other accounts on the

9    exchange, in fact most by volume, could go negative in a

10   particular asset.  That was a core property of FTX as an

11   exchange.  I'm not—but I—I'm sorry.  I'm probably not

12   addressing your—your question.

13   Q.  Let me rephrase it.  I'm asking about Alameda and only

14   Alameda.

15   A.  Yeah.

16   Q.  Were you aware at that time in May of 2022 that Alameda

17   could have an overall negative balance on FTX?

18   A.  By an overall negative balance, are you referring to a

19   negative balance, a negative net asset value, or are you

20   talking about a negative balance in a particular asset, or are

21   you—sorry.  I just want to make sure I understand what you

22   mean by overall.

23   Q.  That if you added up all the accounts, they could have a

24   overall negative balance.

25   A.  And adding up all assets, not talking about particular

**A-967**

NAQ1BAN6                    Bankman-Fried – Cross                    2255

1    assets; is that correct?

2    Q.  That's correct.

3    A.  Okay.  My understanding was that we were ensuring that

4    Alameda's——at that time my understanding was that we were

5    ensuring Alameda had a positive overall net asset value on FTX.

6    I was not sure whether that was enforced into a code base or

7    whether that was something that we inspected to confirm it was

8    true.  It was something that I had discussed at various points

9    with Gary and others, and had checked that Alameda's overall

10   net asset value on the platform had remained positive.

11   Q.  So when you said that you were not aware of "Allow

12   Negative" by name but you had some understanding of it, tell me

13   what you meant by that.

14   A.  So I'm not sure that——I apologize.  I might be

15   misunderstanding what the "Allow Negative" feature did.

16   I——I——I think I've given you what my understanding was, but I

17   suspect I might be wrong about what it——what it did.

18   Q.  Well, let's talk about Alameda's main trading account.  Are

19   you aware that that main trading account could go negative?

20   A.  And so to clarify, you're talking about info@, the main

21   account, or the entire user?

22   Q.  The info@ main account.

23   A.  So account No. 9.

24   Q.  Yes.

25   A.  And by "go negative," you're talking about negative in a

**A-968**

NAQ1BAN6                    Bankman-Fried – Cross                    2256

1   particular coin or negative net asset value?

2   Q.  Just have a negative balance, Mr. Bankman-Fried.

3   A.  Sorry.  I——

4   Q.  Let me make this easier for you.

5          MS. SASSOON:  If we could pull up Government

6   Exhibit 50 and go to Tab 2.

7   A.  Okay.  The——

8          MR. COHEN:  Your Honor, I would object to this.  The

9   issue for this hearing is the scope of counsel relationship.

10  This is a deposition now.

11         MS. SASSOON:  May I respond.

12         THE COURT:  Yes.

13         MS. SASSOON:  They're asserting a presence of counsel

14  defense.  It's relevant what he did or did not tell counsel,

15  and to understand that, it's also relevant what he did or did

16  not know at the time that he was not telling counsel certain

17  things.

18         MR. COHEN:  That has no limiting principle, your

19  Honor.  That could be let's do our entire case through

20  deposition and then ask him if he told counsel about it.

21         THE COURT:  Well, look, I'm going to allow this.  I

22  understand your point.

23         I've gotten beyond my tether here.

24         I'm going to allow this.  I am going to acknowledge

25  the point you make, but all things are relative, and there is a

```
     NAQ1BAN6              Bankman-Fried - Cross              2257
```

 1   good deal to what the government says also, and part of the

 2   problem is that the witness has what I'll simply call an

 3   interesting way of responding to questions for the moment.

 4        MR. COHEN:  I would say, your Honor, with respect,

 5   part of the problem is just the nature of this kind of a

 6   hearing, where we're doing things sort of out of order, out of

 7   sequence, because we have to address legal issues.

 8        THE COURT:  Well, Mr. Cohen, there's a simple answer

 9   to that, and the simple answer to that is that if you want to

10   push ahead with the evidence you're seeking to introduce, it's

11   through this hearing, if at all.

12        MR. COHEN:  Understood, your Honor.  But I was just

13   responding to the last point, your Honor.

14        THE COURT:  I understand.  Let's go ahead.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

**A-970**

NAQMBAN7                    Bankman-Fried - Cross                    2258

1          MS. SASSOON:  Mr. Bianco, if you could just highlight

2    row 17.

3    Q.  Mr. Bankman-Fried, in May of 2022, were you aware that

4    account ID 9 @AlamedaResearch.com could have an overall

5    negative value?

6    A.  I am giving you my best guess at answering the question.

7    Q.  I'm not asking for a guess.  I'm asking what you understood

8    at the time.

9    A.  I am going to answer what I think the question you are

10   asking is, but I apologize if I'm answering the wrong question.

11          I don't know exactly what that cell was referring to.

12   As of May 2022, I believe that I did not have any specific

13   knowledge about the extent to which, for instance, one

14   subaccount of Alameda Research's info@ account, as in, i.e.,

15   the account number 9, was treated as part of a collection of or

16   separate from other subaccounts of that user or other users

17   affiliated with Alameda.

18          What I believe I knew at that time was, or at least

19   what I believed at that time was that Alameda overall

20   maintained a positive net asset value on FTX.  I don't think at

21   that time I had specific beliefs about how that did or didn't

22   apply to a particular subaccount of Alameda's.

23          I'm assuming that overall net asset value, rather than

24   value in a particular coin, is what I think that you are going

25   for here, so that's how I was answering that question.  That is

**A-971**

NAQMBAN7                    Bankman-Fried - Cross                    2259

1   my answer as of that time.

2          THE COURT:  Mr. Bankman-Fried, you have been asked

3   that question in one form or another quite a number of times

4   and not once did the question include the phrase net asset

5   value.  Unless I'm mistaken, every single answer you have given

6   responded on the assumption that counsel had asked you about

7   net asset value.

8          Now, that's just an observation.  If I'm mistaken,

9   I'll stand corrected, but it says what it says.

10          THE WITNESS:  I apologize if that's correct.

11  A.  If that's true, I don't know what you mean by negative

12  balance.

13          MS. SASSOON:  I am going to move on, your Honor.

14          THE COURT:  OK.

15  Q.  On your direct examination you testified that, in May 2022,

16  that you thought in certain circumstances Alameda Research

17  borrowing funds from FTX was permitted.

18          Do you recall that testimony?

19  A.  Yeah.

20  Q.  Can you explain under what circumstances you believed

21  Alameda was permitted to borrow funds from FTX.

22  A.  I apologize.  I think you said this, but this was as of May

23  2022?

24  Q.  Yes.

25  A.  Yup.  I believe that it was permissible for there to be

**A-972**

NAQMBAN7                    Bankman-Fried - Cross                    2260

1   borrowing from assets that FTX was holding that were acting as
2   security or collateral for margin or futures positions as of
3   that point in time and that that was what at least I was
4   internally treating as the core metric.
5   Q.  Did that include withdrawing those assets off the exchange?
6   A.  Potentially there would have to be a risk analysis
7   associated with doing so.  But, in general, FTX's margin
8   programs did not differentiate between a position or borrow put
9   on by a trade or one put on by a withdrawal.
10  Q.  Just to be clear and to understand the answer to my
11  question, when you just described the borrowing you thought
12  Alameda was permitted to do, did that include withdrawing those
13  assets off the exchange and using them somewhere else?
14  A.  Potentially, subject to a risk analysis.
15  Q.  Did you believe that Alameda had to post collateral to make
16  those withdrawals off the exchange?
17  A.  I would have believed that it had to post security and that
18  the most straightforward and the version I would have been most
19  comfortable with that would have been collateral physically
20  posted to FTX.  We did have discussions with other market
21  makers as well around assets that FTX couldn't physically
22  custody but could get contractual claims on.  I would view that
23  as a possibility, albeit a less desirable one.
24  Q.  I'm asking about Alameda only.  In your view, in May of
25  2022, that Alameda's collateral could take the form of assets

**A-973**

NAQMBAN7                    Bankman-Fried – Cross                    2261

1   that were not posted to the exchange.

2   A.  I had the view that it potentially could.  I also had the

3   view that I would have been less comfortable on a relative

4   basis with that.

5   Q.  Did you discuss that with an attorney?

6   A.  At the time discuss that.  In particular, are you referring

7   to the off-exchange assets, or are you referring to something

8   else?

9   Q.  Yes, that.

10  A.  As of May 2022, in that context, no.

11  Q.  Did you discuss it with an attorney prior to November of

12  2022?

13  A.  In the general context -- give me one second -- I discussed

14  some specific instances of potentially using off-exchange

15  assets as collateral with attorneys prior to November 2022.  I

16  don't know that I had a general discussion around such a

17  practice.

18  Q.  Which attorneys?

19  A.  I believe that we had discussions involving -- I had

20  discussions with Ramnik, who described discussions with

21  attorneys around the potential of accepting some collateral

22  from Three Arrows Capital.

23  Q.  OK.  I am going to stop you.  Ramnik is not an attorney,

24  correct?

25  A.  That is correct.

**A-974**

NAQMBAN7                    Bankman-Fried – Cross                    2262

1    Q.  I'm asking if you had direct conversations with any

2    attorneys about Alameda specifically using as collateral for

3    borrowing assets that were not on the FTX exchange prior to

4    November 2022.

5    A.  I don't believe that I personally, rather than through an

6    intermediary, had discussions, particularly about Alameda doing

7    it prior to November 2022 that I can recall right now, no.

8    Q.  The answer is no?

9    A.  That is correct.

10   Q.  When you had that you thought that Alameda could borrow

11   assets in this fashion, can you explain through what program?

12   Is this the borrow-lend program, something else?

13           MR. COHEN:  Objection.  Scope.

14           THE COURT:  Overruled.

15           I'm sorry.  Sustained.

16   Q.  Let's talk about loans.  Were all of your loans from

17   Alameda documented?

18   A.  Are you referring to the personal loans?

19   Q.  Yes.

20   A.  I was under the belief at the time that they were all

21   documented.  I am not sure today that the most recent ones had

22   been documented yet.

23   Q.  Sitting here today, are you aware that some were not?

24   A.  Sitting here today, I believe that some of the most recent

25   ones prior to the collapse had not yet been documented, that is

**A-975**

NAQMBAN7                    Bankman-Fried - Cross                    2263

1    correct.

2    Q.  At any point in your discussions with counsel about the

3    structure of these loans, was it discussed that some of the

4    funds were coming from FTX customer money?

5    A.  I would not classify that as particularly what happened,

6    so, no.  That is certainly not how I discussed it with

7    attorneys.

8    Q.  What was the reason that the investments were not made

9    directly from Alameda Research?

10   A.  By the investments, you're referring to things like

11   Robinhood, is that correct?

12   Q.  Let me be a little clearer.  You described certain

13   investments being funded by loans that first went to you from

14   Alameda Research toward the investments.  Why not just straight

15   from Alameda Research?

16   A.  It depended on the particular circumstance.  I will say

17   that the most frequent reason, according to my memory, is that

18   the investment target did not want Alameda Research to be the

19   investing entity for one reason or another, or, alternatively,

20   that -- yeah.  That's the reason I can most frequently

21   remember.  In some cases I honestly don't know what the reason

22   is.

23   Q.  Were there occasions when you did not want Alameda to be

24   the investing entity?

25   A.  Yeah.

**A-976**

NAQMBAN7                    Bankman-Fried – Cross                    2264

1   Q.  For example, with Robinhood, is it right that you did not

2   want Alameda to be the investing entity?

3   A.  Yeah.

4   Q.  Did you disclose that to your attorneys?

5   A.  Yeah.

6   Q.  What was the reason you didn't want Alameda to be the

7   investing entity?

8   A.  I was concerned about the potential for conflicts in

9   interest or at least the appearance of conflicts of interest.

10  In particular, Alameda had at various points engaged in talks

11  with Robinhood about potentially being a liquidity provider for

12  Robinhood's flow of cryptocurrency and I did not want anyone,

13  including Robinhood, to view this investment as related to

14  those discussions.

15  Q.  Did you disclose that to your attorneys?

16  A.  Yeah.

17  Q.  Was the buyout of Binance through loans?

18  A.  It was financed -- are you referring to personal loans or

19  intercompany loans?

20  Q.  Any loans.

21  A.  The buyout of Binance, I believe the bulk of it, the

22  international version, my memory is that it was financed

23  through -- it may have been a loan to Paper Bird.  I believe

24  Paper Bird is the entity that ended up with that equity stake,

25  which is where the bulk of my equity stake in FTX was held.

NAQMBAN7                    Bankman-Fried - Cross                    2265

1   I'm not entirely sure if there is an intercompany loan, but I

2   would suspect there may have been associated with that.  There

3   is separately the FTX US portion of the Binance buyout, which I

4   think was structured through personal loans.

5   Q.  Were lawyers involved in that transaction?

6   A.  Yup.

7   Q.  Did you discuss with lawyers that some of the money was

8   coming from FTX customer funds?

9   A.  That is not what I viewed to be happening, so that is

10  certainly not how I discussed it with attorneys.

11  Q.  Let's talk, finally -- I have two more topics.  They should

12  be shorter.

13         You talked about safeguarding of assets.

14  A.  Um-hum.

15  Q.  I think you mentioned in your testimony the physical

16  security of the assets to protect from hacks.

17  A.  Yup.

18  Q.  Is that the limit of your understanding of what it means to

19  safeguard assets?

20  A.  No.  I apologize.  I think that answer was cut short a

21  small fraction the way it's written.  There are a number of

22  things that I would have considered to be related to that.

23  Q.  Would that include not embezzling customer assets, for

24  example?

25         MR. COHEN:  Objection.

**A-978**

NAQMBAN7                          Bankman-Fried - Cross                          2266

1          THE COURT:  Sustained.

2     A.  Yes, it would include that.

3          MR. COHEN:  You didn't have to answer if it has been

4     sustained.  Haven't you been sitting here for four weeks.

5          THE WITNESS:  I felt the need to answer that one.

6     Q.  You talked about discussions with other industry

7     participants about omnibus wallets?

8     A.  Yup.

9     Q.  When you referred to omnibus wallets, are you referring to

10    omnibus FBO wallets?

11    A.  Sorry.  Are you referring to cryptocurrency wallets or FBO

12    bank accounts?  I have not heard FBO as a term applied to

13    wallet, but I could guess what it would mean.

14    Q.  I don't want you to guess.

15         When you talk about a crypto omnibus wallet, did you

16    understand that to be for the benefit of customers?

17    A.  Yes.

18    Q.  When you spoke to industry participants, did they say

19    anything about a practice of using funds from these customer

20    crypto wallets for their own purposes?

21    A.  Of using them for their own purposes -- it depended on the

22    counterparty that I was talking to and the nature of their

23    business.  I don't know that anyone would have described it

24    that way.  The discussions were obviously different after I was

25    talking to a borrow lending desk, for instance.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-979**

NAQMBAN7                    Bankman-Fried - Cross                    2267

1    Q.  Let's limit it to an exchange.

2    A.  Limited to an exchange, I think the answer is no, but let

3    me just give you precisely what my answer would be, and you can

4    tell me if that is not responsive, which is that it did not

5    include industry participant exchanges saying that they would

6    use funds from omnibus customer wallets for the exchange's

7    corporate expenses.  Does that respond --

8    Q.  What about CEOs of these exchanges using customer funds for

9    any of their own spending?

10             MR. COHEN:  Objection.

11             THE COURT:  Form.

12   Q.  Did you have conversations with CEOs of crypto exchanges

13   about whether it was proper to use customer money out of

14   omnibus crypto wallets for purposes other than customer trading

15   and withdrawals and the like?

16             MR. COHEN:  Objection.  Beyond the scope of the

17   direct.

18             THE COURT:  Overruled.

19   A.  Let me, A, apologize if this isn't responsive, so tell me

20   that.  I will try to be responsive.

21             I certainly did not have conversations with CEOs about

22   them discretionarily taking funds from -- as CEO of the

23   exchange from customer omnibus wallets for their own personal

24   expenses.

25   Q.  What about CEOs discussing using customer funds in omnibus

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NAQMBAN7                    Bankman-Fried - Cross                    2268

1    crypto wallets for the spending of their affiliated companies?

2              MR. COHEN:  Same objection.

3              THE COURT:  Same ruling.

4    A.  So, once again, I will give a specific answer, but if this

5    is not scoped correctly, tell me.

6    Q.  Go ahead and give your answer, and I will ask another

7    question if it's not responsive.

8    A.  Thank you.

9              I certainly did not have conversations with CEOs about

10   them as CEO of an exchange, taking -- using funds from omnibus

11   customer wallets for their own spending of any sort.  However,

12   I'm not entirely sure what the implied relationship there was

13   between the CEO of the exchange and the affiliates, so it's

14   hard for me to answer that.

15   Q.  Let me ask it another way.  Did you have any conversations

16   with industry participants that led you to believe that it was

17   proper for you to spend customer cryptocurrency deposited into

18   omnibus crypto wallets for your affiliates?

19             MR. COHEN:  Objection.  Scope and form.

20             THE COURT:  Overruled.

21   A.  So let me again attempt to answer that.

22             What I did have discussions with industry participants

23   about was on margin wallets for margin exchanges that

24   customers, including in some cases affiliates, might have

25   borrows.  They might have liabilities.  And those would

**A-981**

NAQMBAN7                     Bankman-Fried - Cross                2269

1    necessarily have come out -- been part of the net customer

2    balances.  There were negative numbers in those customer

3    balances that added up to the overall customer balances.  That

4    would be a separate thing from a flow-of-funds perspective than

5    the CEO not as a customer but as just the exchange or the CEO

6    of the exchange using funds from customer wallets for corporate

7    expenses.

8    Q.  I apologize now.  Now I'm apologizing.  I don't know that I

9    understood that answer.

10             The wallets you are referring to are those the omnibus

11   wallets that you have been talking about, or different ones?

12   A.  No.  Same wallets, yeah.

13   Q.  I want to talk to you about Dan Friedberg for a few

14   minutes.

15   A.  Um-hum.

16   Q.  You hired him?

17   A.  Yes.

18   Q.  Before you hired him, you had been reluctant to hire a

19   general counsel, correct?

20   A.  I had been reluctant to hire the wrong general counsel is

21   how I would put it.

22   Q.  The wrong general counsel, in your view, was someone who

23   would inhibit you from taking risks for the company, wasn't it?

24             MR. COHEN:  Objection.

25             THE COURT:  Ms. Sassoon.

**A-982**

NAQMBAN7                  Bankman-Fried - Cross                  2270

1          MS. SASSOON:  Your Honor, they are asserting a

2    presence-of-counsel good-faith defense and it's relevant to

3    this, whether in good faith he hired an attorney who was a

4    respectable attorney.

5          MR. COHEN:  Your Honor, that's a very thin soup.

6    Continued objection.

7          THE COURT:  I think the question is appropriate,

8    without endorsing the use of the word respectable.

9    A.  It depends on what exactly you mean by that.  I did want to

10   find a general counsel who would be comfortable with the

11   business being allowed to take reasonable risks, so long as

12   they were otherwise permissible and consistent with its

13   obligations.  I did not want a general counsel who would

14   permit -- who would restrict the company from taking any risks

15   or any significant risks under any circumstances, but I also

16   didn't want a general counsel that would permit it to take any

17   risks without bound.  The answer, it depends on the specifics.

18   Q.  Didn't you tell Caroline Ellison that Dan Friedberg was

19   unlike most lawyers you knew because he was not going to stop

20   you from taking risks?

21   A.  I don't recall saying that in particular.  Had I said

22   something like that, and I may have, it would have been, I

23   suspect, with further context that would have clarified the

24   sorts of risks that it did and didn't refer to.

25   Q.  Were you aware when you hired Dan Friedberg that he had

**A-983**

NAQMBAN7                    Bankman-Fried - Cross                    2271

1   previously been general counsel at a company that suffered an

2   insider trading scandal?

3   A.  I wasn't aware of the details of it, but I was aware at a

4   high level that there had been scandals with one of the

5   companies that he had been counsel for before, yes.

6   Q.  Did you understand that when you hired him that he had been

7   at a company with a criminal scandal?

8            MR. COHEN:  Objection.

9            THE COURT:  Sustained.

10           MS. SASSOON:  Your Honor, he said at a high level

11  scandal.  It was not responsive to the question.

12           MR. COHEN:  Well beyond the topic of this hearing,

13  your Honor.

14           THE COURT:  The topic of this hearing includes

15  good-faith reliance, and I am going to allow the question.

16  A.  I don't know that I know exactly what you are referring to

17  as a criminal scandal, and I don't know that I knew the details

18  of the incidents at the company or companies he had prior

19  worked at in much more specificity than the -- admittedly than

20  specificity I have supplied so far.

21  Q.  Did you know there had been a criminal investigation at his

22  prior company?

23           THE COURT:  Ms. Sassoon, let's move on.

24  Q.  Were you aware that Dan Friedberg used illegal narcotics

25  with your employees?

**A-984**

NAQMBAN7                      Bankman-Fried – Cross                      2272

1            MR. COHEN:  Objection.

2            THE COURT:  Sustained.

3            Let's wrap it up.

4  Q.  Alameda at one point had a general counsel?  His name was

5  Bailey Korrell.

6  A.  Something like that is correct, yes.  I am not sure I know

7  exactly what his title was.

8  Q.  Were you aware that Dan Friedberg fired Bailey Korrell?

9            MR. COHEN:  Objection.

10            THE COURT:  Sustained.

11            MS. SASSOON:  Your Honor, may I be heard on this?

12            THE COURT:  Yes.

13            MS. SASSOON:  I would like to inquire of the witness

14  about whether he was aware of the reason Dan Friedberg hired

15  Bailey Korrell, which is relevant to the good-faith reliance on

16  counsel here.

17            THE COURT:  That's for another day.

18            MS. SASSOON:  This is my second-to-last question, if

19  not my last question.

20            THE COURT:  Let's get on to the next one.

21            MS. SASSOON:  May I have a moment, your Honor?

22            THE COURT:  Yes.

23            MS. SASSOON:  I'll do you one better.  No further

24  questions, your Honor.

25            THE COURT:  Thank you.

**A-985**

```
NAR1BAN1                                                          2288
```

1          MR. COHEN:  We're fine with that.  We have something

2     to raise with the Court.

3          THE COURT:  Yes.  Go ahead.

4          MR. COHEN:  Your Honor, in connection with yesterday's

5     hearing, a few things for the record.

6          We wish to continue our objection to the parts of the

7     cross-examination that we think went beyond the issue about

8     involvement of attorneys.  We're not even sure that

9     cross-examination was necessary for the Court to make its

10    determination on the evidentiary issues, but putting that to

11    one side, we submit that that went far afield.  The Court

12    should not consider that testimony in connection with whatever

13    ruling it comes to.  And perhaps as importantly, we have an

14    application that that testimony not be used in

15    cross-examination of our client today or whenever we get to it,

16    or be used affirmatively, offered as affirmative proof.  It

17    amounted to a deposition.  Depositions are not typical in

18    criminal cases, and certainly not of the defendant.  So we

19    think that that process was improper, and we want to note that

20    for the record and make that application.

21         MS. SASSOON:  Yes, your Honor.

22         First of all, the defense waived a wholesale objection

23    to cross-examination because this objection was not raised

24    before cross-examination began.

25         THE COURT:  Clearly correct.

**A-986**

NAR1BAN1                                                                    2289

1          MS. SASSOON:  Cross-examination was also necessary in

2     part just to elicit the information about involvement of

3     counsel that was only addressed at the highest level during the

4     direct testimony, and the scope of cross-examination was

5     completely proper because it touched on conversations that the

6     defendant had with attorneys, whether or not he spoke to them

7     about the specific topics at issue, and also what he knew and

8     therefore what he did or did not share with counsel at the

9     relevant times.  That said, the government intends to use the

10    testimony from yesterday only to the extent that the defendant

11    testifies inconsistently with his hearing testimony.

12         THE COURT:  Okay.  First of all, to the extent any

13    objections were made yesterday——and they were quite

14    limited——with respect to the cross, and certainly not

15    categorical, I ruled on them.  The rulings stand.

16         I will not prohibit use of anything that the defendant

17    said yesterday on the grounds articulated by Mr. Cohen.

18         And to back up a little further, we've been having

19    this conversation about what I'll refer to——even acknowledging

20    that it's a misnomer——as the "quasi-advice of counsel defense"

21    that Mr. Cohen seeks to assert for a long time.  There has been

22    extensive briefing; there has been a prior written opinion on

23    the subject.  And the essence of the problem is that on the one

24    hand, there is a risk that the defendant, by introducing

25    alleged communications with counsel in the past on matters that

NAR1BAN1                                                              2290

1    fall short of what traditionally is referred to—again,
2    improperly in my view, but referred to—as an "advice of
3    counsel defense," can have the effect of a suggestion from the
4    defense that because lawyers were involved in some degree or
5    another in pieces of what happened, the defendant was entitled
6    to take comfort from the involvement of the lawyers in assuming
7    or believing that he was acting within the bounds of the law.
8    That's an understanding of the defendant's position.  The
9    problem, of course, is that it can be a very misleading
10   impression, depending on the facts.  It is one thing for a
11   defendant to come in and to say:  I had a proposed course of
12   action, I went to a lawyer, I put all of the relevant facts in
13   front of the lawyer, and the lawyer advised me that it was
14   lawful, and therefore when I engaged in that course of action,
15   I had no criminal intent.  That's not what's happening here.
16   It's an impression that may be created.  In order for me to
17   assess the balance between the potential harm to the public
18   interest in creating a misleading impression and the
19   defendant's right to present a defense, I have to know—I had
20   to know—exactly what happened.

21        Now when the government first moved to preclude any
22   testimony of this sort by the defendant, I declined to rule
23   because what the defendant had put before me was at such a high
24   level of generalization that the relevant facts were just not
25   articulated.  So I didn't grant the government's motion.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-988**

NAR1BAN1                                                              2291

1    denied it subject to consideration once we had the facts.  We

2    had the hearing yesterday for the purpose of my hearing

3    straight from Mr. Bankman-Fried's mouth what it is he proposed

4    to say.  In order to get a full picture, it of course was

5    necessary for the government to question him also.  I have a

6    slightly better sense of what's going on.  All of this has been

7    done to ensure that the defendant had a full opportunity,

8    despite the shortcomings of detail in everything that had been

9    said before yesterday in the defense presentations, to make his

10   case for the proposition that what he was endeavoring to do

11   would not be unfairly prejudicial and would be appropriate.

12   He's had his shot.

13           Now there are a number of specific points on which

14   counsel has sought to elicit testimony about the involvement of

15   lawyers.

16           First, I heard testimony yesterday that Mr. Friedberg

17   and other counsel for FTX implemented data retention policies

18   for the company.  That's no surprise to anybody.  There is no

19   suggestion in this case that having a data retention policy in

20   and of itself is fraudulent, or criminal, or improper.

21   Companies do that.  It's a common business practice.  Everybody

22   knows it.  And they're certainly not drafted by chief executive

23   officers, in my experience.  I don't see sufficient harm to the

24   public interest in allowing the defendant, to the extent he did

25   it yesterday, to adduce evidence that counsel were involved in

**A-989**

NAR1BAN1                                                              2292

1    preparing the data retention policy, whatever it may have been,

2    and for the government to cross-examine about what it was, how

3    the defendant knows what it was, and all sorts of related

4    questions.  So to that extent, I'm granting the defense

5    application.

6           The other four items all involve circumstances in

7    which lawyers drafted plain vanilla legal documents and in

8    which the alleged problem was not the transaction in the

9    document per se, it was what was done and with what intent

10   collateral to the document.  In the event there's a conviction,

11   I will write on this subject, no doubt, more extensively than

12   most people will care to read, but we're not going to allow

13   that here.  That evidence would, in my judgment, be confusing

14   and highly prejudicial by falsely implying, given the testimony

15   yesterday, that the lawyers, with full knowledge of the facts,

16   all of the facts, blessed what the defendant is alleged to have

17   done.  And I didn't hear that at all yesterday.

18          First of all, the relevance of all of that material is

19   exceptionally tenuous, if it has any at all, and my best

20   judgment is it has none at all.  In any case, any probative

21   value of that evidence on the points at issue in this case

22   would be outweighed substantially by the risk of unfair

23   prejudice, confusion, and so forth.

24          Now just to illustrate, the fact that a lawyer was

25   involved in drafting a promissory note for a loan that

NAR1BAN1                    Bankman-Fried – Direct                    2296

1    SAM BANKMAN-FRIED,

2         the Defendant,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. COHEN:

6    Q.  Good morning, Mr. Bankman-Fried.

7    A.  Good morning.

8    Q.  We've heard a lot about FTX over the last several weeks.

9    When did you found it?

10   A.  2019.

11   Q.  Who did you found it with?

12   A.  Gary Wang.

13   Q.  What did FTX stand for?

14   A.  Futures Exchange.  The F and the T both come from the word

15   "futures."

16   Q.  What was your vision for FTX when you founded it?

17   A.  We thought that we might be able to build the best product

18   on the market, an exchange that would combine the elements that

19   we thought were best from traditional financial products with

20   the elements we thought were best from the big crypto

21   ecosystem, that it could move the—move the ecosystem forward.

22   Q.  Did it turn out that way?

23   A.  No, it turned out basically the opposite of that.  A lot of

24   people got hurt—customers, employees—and the company ended up

25   in bankruptcy.

**A-991**

NAR1BAN1                    Bankman-Fried – Direct                    2297

1   Q.  Did you defraud anyone?

2   A.  No, I did not.

3   Q.  Did you take customer funds?

4   A.  No.

5   Q.  We're going to talk in detail about what happened at FTX,

6   but can you tell us big picture.

7   A.  Yeah.  At a high level, there are multiple different types

8   of exchanges.  There are spot exchanges, which is where a

9   customer deposits a hundred dollars to buy a hundred dollars of

10  Bitcoin, or hundred dollars of Ethereum.  And there are margin

11  exchanges.  On margin exchanges, customers might deposit a

12  hundred dollars to buy $500 of Bitcoin or to sell $200 of

13  Bitcoin that they don't have, to borrow; customers might also

14  deposit a hundred dollars to withdraw $50 of Bitcoin that they

15  don't have, going negative in Bitcoin.  FTX was predominantly a

16  margin exchange.  The vast majority of activity happened on

17  margin on FTX.  When you have a margin exchange, you know, you

18  can think of it in some ways like a mortgage.  You know, if you

19  have a hundred-thousand-dollar house, you might take out a

20  $10,000 mortgage against that.  That would be the equivalent

21  of, you know, having a deposit of some number of Bitcoins,

22  withdrawing dollars against that.  And the biggest risk for

23  margin exchanges in general, and for FTX, is what happens if

24  one of those is threatening to go bad; that is to say——

25           MS. SASSOON:  Objection, your Honor.  Narrative.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-992**

NAR1BAN1                    Bankman-Fried – Direct                    2298

1    THE COURT:  Yes.  Ask another question, please.

2  Q.  Mr. Bankman-Fried, did you make any mistakes along the way?

3  A.  Yes, I made a number of small mistakes and a number of

4  larger mistakes.  By far the biggest mistake was we did not

5  have a dedicated risk management team, we didn't have a chief

6  risk officer.  We had a number of people who were involved to

7  some extent in managing risk, but no one dedicated to it, and

8  there were significant oversights.

9  Q.  Let me talk a bit about your background, sir.  Where did

10  you grow up?

11  A.  I grew up in Palo Alto.

12  Q.  And did you go to college?

13  A.  I went to MIT.

14  Q.  Okay.  What did you study there?

15  A.  Physics.

16  Q.  What years did you go to college?

17  A.  2010 to 2014.

18  Q.  Okay.  And where did you live there?

19  A.  I lived at it was called an independent living group called

20  Epsilon Theta.

21  Q.  Who did you live with in that house?

22  A.  There were about 20 of us living there, including Gary Wang

23  and Adam Yedidia, and others who I'd come to work with later.

24  Q.  Had you met Gary Wang before that?

25  A.  I met Gary in high school when we went to the same math

**A-993**

```
NAR1BAN1              Bankman-Fried - Direct              2300
```

1    arbitrage.

2    Q.  What is arbitrage?

3    A.  Briefly, arbitrage is trying to buy low and sell high,

4    ideally at the same time.  So if you could buy a share of Apple

5    for a hundred dollars and simultaneously sell it somewhere else

6    for a hundred dollars and 3 cents, you would make 3 cents of

7    profit on that, with—with very little risk.

8    Q.  Just a bit more of terminology.  You used the phrase

9    "long."  Can you describe for the jury what it means to use

10   "long" and "short" in trading.

11   A.  Sorry.  Yeah.  They effectively mean buy and sell.  So if

12   you went long Bitcoin, that would mean you're buying Bitcoins;

13   if you went short Bitcoin, that meant you were selling, and in

14   fact selling more than you had, so that you ended up owing

15   Bitcoins.

16   Q.  During your—what was your job at Jane Street?  What was

17   your title?

18   A.  I was a trader.

19   Q.  Okay.  And in the course of your duties at Jane Street, did

20   you interact with prime brokers?

21   A.  Yeah, frequently.

22   Q.  What were they?

23   A.  Prime brokers—so a traditional broker, a place like

24   E*Trade or Schwab, is where an individual customer might go to

25   buy or sell stocks.  Prime brokers are sort of souped-up

**A-994**

NAR1BAN1                    Bankman-Fried – Direct                    2301

1  versions of that for institutional trading firms.  So when most

2  trading firms would connect to trade stocks, rather than

3  trading directly on an exchange, they would go through what's

4  called a prime broker.  The prime broker would give them credit

5  in margin and interface between them and the exchanges.

6  Q.  Did you receive training at Jane Street?

7  A.  Yeah.  On compliance and a number of other topics.

8  Q.  Okay.  Did you ever hear the phrase "front running"?

9  A.  Yeah.  It came up a lot.

10  Q.  Tell the jury what "front running" meant to you.

11  A.  "Front running" meant effectively a concern of a market

12  practice where one participant would be about to send an order

13  to buy something; another customer would learn one way or

14  another that that first customer was about to do that trade,

15  and race in to do that trade before them, thus buying up the

16  asset when it was cheaper and then maybe even selling it back

17  to that first customer when their order was finally processed.

18  Q.  What, if anything, did Jane Street train you on with regard

19  to front running?

20  A.  Not to do it.

21  Q.  Okay.  During that period did you ever hear the phrase *"The*

22  *New York Times* test"?

23  A.  Yeah.  It came up a fair bit at Jane Street.

24  Q.  At Jane Street.  Can you describe for the jury what you

25  meant by that.

NAR1BAN1                    Bankman-Fried - Direct                  2304

1   things that they own are trading at and, you know, find ways to

2   buy—buy low and sell high, effectively.

3   Q.  How long did you work at Jane Street for?

4   A.  About three and a half years.

5   Q.  Did you enjoy your time there?

6   A.  Very much.  They were very good to me.  I learned a lot

7   there.  They did a really good combination, I felt, of sort of

8   giving responsibility to people while also giving mentorship.

9   Q.  Did anyone work at Jane Street who later worked beside you,

10  who later worked for Alameda or FTX?

11  A.  Yeah.  Caroline Ellison, who was a trader and then later

12  CEO at Alameda, was a trader at Jane Street; Adam Yedidia, who

13  was a developer at FTX, was an intern at Jane Street when I was

14  there; and a few other people at various points of the

15  company's history had worked at Jane Street at various points.

16  Q.  Mr. Yedidia was one of the people you lived with at MIT?

17  A.  That's correct.

18  Q.  Now after your time at Jane Street did there come a time

19  when you started a company called Alameda Research?

20  A.  Yeah, in the fall of 2017.

21  Q.  Why did you start it?

22  A.  This was—this was when crypto was starting to become

23  really publicly visible for the first time, at least in the

24  circles I was in.  You'd walk down the street in the fall of

25  2017, you'd see two people excitedly talking about something,

**A-996**

NAR1BAN1                    Bankman-Fried – Direct                    2305

1   there was a pretty decent chance that thing was Bitcoin, that

2   they had a friend who had a friend who had tried buying Bitcoin

3   for the first time.  And in terms of pricing, Bitcoin went

4   from, you know, $1,000 to $10,000 in a few-month period, in

5   late 2017.  There was a ton of excitement, a ton of demand, and

6   there was very little infrastructure in the space.  Large

7   trading firms like Jane Street weren't trading cryptocurrencies

8   yet, the banks weren't involved, the brokers weren't involved.

9   It seemed like a place where there very well may have been a

10  pretty big demand for basically an arbitrage provider.

11  Q.  When you first started to get into the crypto world, what

12  did you know about it?

13  A.  Basically nothing.  I knew that a Bitcoin was digital.  I

14  knew there was no physical thing, that it was on computers, and

15  that you could trade it on websites called cryptocurrency

16  exchanges.  I knew that there were other cryptocurrencies, like

17  Ethereum and XRP.  And I had absolutely no idea how they

18  worked, what the technology behind them was, what the

19  difference was between different cryptocurrencies.  I just knew

20  they were things you could trade.

21  Q.  When you established Alameda, what was your goal for the

22  company from a business model?

23  A.  At a high level, doing arbitrage, something similar to what

24  Jane Street did, but in the new market.  In particular, there

25  were a lot of places you could buy and sell cryptocurrencies,

**A-997**

NAR1BAN1                    Bankman-Fried - Direct                    2306

1    called exchanges.  Coinbase, Binance are two well-known

2    examples.  And in late 2017, when I started looking into it, it

3    appeared, from my initial overview of public data, that there

4    might be really, really large arbitrage opportunities

5    available.

6    Q.  Okay.  Maybe if you could explain that for the jury.  What

7    were you seeing?  First of all, what public data were you

8    looking at and then what were you seeing?

9    A.  Yeah.  So I was looking at websites like coinmarketcap.com.

10   That is one of the two premier placing sources for

11   cryptocurrencies, CoinGecko being the other one.  And all it

12   did was basically take data from all the various

13   cryptocurrency, you know, exchanges and tokens and summarize it

14   together.  And what I saw, it looked like there were some

15   places where you could buy a Bitcoin for $10,000, and others

16   where you could sell it for $11,000, at the same time.  That's

17   a 10 percent difference in price.  And for context, at Jane

18   Street, if we could do a trade that was 1 percent good, that

19   was unheard of.  We never found a trade even 1 percent good.

20   1 percent of 1 percent was a typical trade.  So that would be

21   something you could buy for a hundred dollars and 3 cents and

22   sell for $100.04 at the same time, making 1 penny on that

23   trade.  It looked like the arbitrage opportunities in Bitcoin

24   might be a thousand times as large.  It was—it was so large, I

25   wasn't sure I even believed it.

**A-998**

NAR1BAN1                    Bankman-Fried - Direct                    2307

1    Q.  And where did Alameda's original funding come from?

2    A.  The very original funding was the money that I had left

3    over after my work at Jane Street, and after that, we cobbled

4    together what we could, mostly lines of credit borrows from

5    people, originally from friends that we knew.

6    Q.  Did you also borrow from third-party lenders?

7    A.  Yeah.  Over time we—we started to know more and more

8    third-party lenders.  These were generally companies whose

9    businesses were borrowing and lending cryptocurrencies.

10   Genesis, Voyager, Celsius, BlockFi, those are four examples

11   that Alameda had borrowing relationships with.  And that

12   ultimately was where the majority of its capital came from.

13   Q.  And how did borrowing from third parties compare, if at

14   all, to what went on at Jane Street?

15   A.  It was fairly similar.  Jane Street had been around,

16   obviously, a long time.  It was—well, a lot longer than

17   Alameda, at least.  They'd been around for about 20 years.

18   Alameda had been around for about 20 months at the time that

19   we're talking about.  So Jane Street had built up a large

20   amount of internal capital, just profits from its trading, but

21   in addition to that, it had borrows, lines of credit from

22   financial institutions.  It was a similar story to Alameda,

23   although we had had far less time to build up the profit

24   portion of that.

25   Q.  Where was Alameda's first office?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-999**

NAR1BAN1                    Bankman-Fried - Direct                    2315

1    A.  I mean, in total, there were hundreds or thousands, but

2    there were 10 or so that had most of the volume and maybe 50 or

3    so that had any appreciable activity.

4    Q.  So why start another one?

5    A.  We felt like, especially for the margin exchanges, there

6    was a really big hole in the space.  At the time we felt like

7    the design philosophies of most of the crypto derivatives or

8    margin exchanges were clunky and didn't make a lot of sense if

9    you wanted to trade, and when we tried trading on the leading

10   margin exchanges for crypto at the time, there were hundreds of

11   different wallets that you had to manage for a single account.

12   If you wanted to trade Bitcoin against dollars, you would have

13   to first use your dollars to buy physical Bitcoins, move them

14   into your Bitcoin-versus-dollar spot margin trading wallet, use

15   that as collateral.  If you then wanted to go trade Ethereum

16   against dollars, you'd have to move those Bitcoins out, sell

17   them for spot Ethereum, move your Ethereum into

18   Ethereum-versus-dollars trading wallet and then do that trade.

19   It was a many-step process every time you wanted to do a

20   different trade.

21   Q.  And were you trying to address that at FTX?

22   A.  Yeah, that was one of the core things that we were trying

23   to do differently than how most other crypto margin exchanges

24   were built at the time.

25   Q.  Let me ask you about another topic.  Have you ever heard

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1000**

NAR1BAN1                    Bankman-Fried – Direct              2316

1   the phrase "cross-margining"?

2   A.  Yes.

3   Q.  What is that?

4   A.  That is effectively the opposite of what I just described.

5   That's——cross-margining is what we were intending to build and

6   what we did build.  The theory with cross-margining——at least

7   what we meant by it——was that you could deposit any one of a

8   number of assets as collateral and then you could trade any

9   market, or at least any——a number of products.  With that, you

10  could buy, you could sell, you could deposit, you could

11  withdraw, and all the exchange monitored——or at least most of

12  what it monitored was just that on net, your account's value

13  was sufficient.  You could go negative in any particular asset

14  as long as you had any other reasonable asset as security for

15  the borrowing that you did, rather than having what's called

16  isolated margin, where you had a completely separate system for

17  every single trade that you wanted to do.

18  Q.  So if a customer had 20 subaccounts——

19  A.  Yup.

20  Q.  ——and assets in each of them, how would that work for

21  cross-margining?

22  A.  So for cross-margining, if you had different subaccounts,

23  you could isolate those from each other if you wanted to, but

24  if you had 20 different assets in your account, FTX would

25  basically just add up the total value of them, add up the total

**A-1001**

NAR1BAN1                    Bankman-Fried - Direct                    2317

1   value of all of your borrows, of all of your liabilities, and

2   ensure that you had more assets than liabilities.

3   Q.  Did you ever hear of the term "clawbacks"?

4   A.  Yes.

5   Q.  What did that mean to you?

6   A.  So the risk associated with a margin system in general is

7   what happens if an account ends up with a negative overall

8   value, which is to say, what happens if the value of its

9   liabilities become greater than the value of its assets.  In

10  that case, you know, we could try to reach out to that——that

11  user and request that they send us more assets that might or

12  might not work, depending on who the user was.  We couldn't

13  rely on that for most users.  And absent that, there would then

14  be, you know, a net debt that that user had that had to be

15  covered by someone.  The exchange——FTX in our case——would try

16  to cover it, but if we couldn't, the risk was that it would

17  have to be socialized, what's called socialized loss or

18  clawback to many or all of the users on the platform where they

19  would cover the loss.

20  Q.  Can you explain that, the last part, socialized loss.

21  A.  Yeah.  So let's say that there were an account that had a

22  thousand dollars of assets and was borrowing $500 against those

23  assets.  Maybe it had deposited a thousand dollars of Bitcoin

24  and withdrawn 500 US dollars.  If Bitcoin fell in value by

25  50 percent, that would then be $500 worth of Bitcoin left in

**A-1002**

NARMBAN2                    Bankman-Fried - Direct                    2319

1   Q.  Now, during your time at Alameda, before you founded FTX, I

2   think you mentioned you traded on other exchanges, is that

3   correct?

4   A.  Yeah, that's correct.

5   Q.  Did they provide for clawbacks?

6   A.  Yes.

7   Q.  What is futures trading?

8   A.  So futures trading is -- it's another form of market or

9   leverage trading where instead of, for instance, trading an

10  actual Bitcoin, instead of depositing some number, you know, a

11  hundred dollars and buying 500 dollars of Bitcoins, you could

12  buy what's called a futures contract on Bitcoin.  You can think

13  of it as something that will eventually turn into however much

14  a Bitcoin is worth.  So if you bought a December Bitcoin

15  future, then in December that would turn -- and in December a

16  Bitcoin was worth $20,000, that future would be worth $20,000

17  at the end of the day.  And futures trading generally happened

18  with leverage, so you might deposit $100 of collateral and then

19  buy or sell $500 of Bitcoin futures and gain or lose, depending

20  on whether Bitcoin went up or down in price.

21  Q.  Last term.  Have you ever heard the term spot margin?

22  A.  Yes.

23  Q.  What was that?

24  A.  That's what I had been referring to as margin.  It's

25  basically when you have spot assets rather than futures assets,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1003**

NARMBAN2                    Bankman-Fried - Direct                    2320

1    so these are actual Bitcoins.  But where -- rather than being

2    fully collateralized and fully funded, you are borrowing.  So

3    that was what was happening.  If you deposited $100 in order to

4    buy $500 of Bitcoin, that would be spot margin trading.

5    Q.  From time to time during your time as CEO of FTX, would you

6    prepare something called explainers?

7    A.  Yeah.

8    Q.  What were they?

9    A.  These were pages that we posted on our website, generally

10   on Zendesk, which is sort of our customer support portal to

11   explain to customers how parts of the exchange worked.

12            MR. COHEN:  Can we call up Defendant's Exhibit 978 for

13   the defendant only for identification entitled spot-margin

14   trading explainer.

15   Q.  Can you go through this quickly, Mr. Bankman-Fried, and

16   tell us what it is.

17   A.  Yeah.

18            MS. SASSOON:  Objection.  I don't believe this is in

19   evidence.

20            THE COURT:  That's correct.

21            MR. COHEN:  That's right.  I am trying to lay a

22   foundation, your Honor.

23            MS. SASSOON:  Your Honor, he just asked him to explain

24   to the jury what this document is.

25            MR. COHEN:  Let me rephrase.  I didn't mean to say

**A-1004**

NARMBAN2                      Bankman-Fried - Direct                      2322

1    please, Brian.

2    Q.  Look at the top.  It says:  How does borrowing and lending

3    work.  You see that?

4    A.  Yup.

5    Q.  From time to time you would put out explainers about how

6    things in the market in the industry worked?

7    A.  That's correct.

8             MR. COHEN:  We can take that down.

9    Q.  Let's move forward, Mr. Bankman-Fried.

10            Did FTX have something called a risk engine?

11   A.  Yes.

12   Q.  Tell us what that was.

13   A.  The risk engine was basically a setup -- a system that

14   would attempt to monitor customer positions to watch to see if

15   any of them were in danger of becoming overall negative value

16   and, if so, would potentially learn about it and potentially

17   start to close down that position to prevent the risk of

18   losses.

19   Q.  How did the risk engine at FTX compare, if you know, with

20   what went on at other crypto exchanges?

21   A.  Yeah.  FTX's risk engine was, first of all, cross-margined.

22   Most other crypto exchanges at the time, as I understood it,

23   were not cross-margined.  So most others I understood to have a

24   separate risk engine effectively for every trade that you would

25   do, every market that you would do.

NARMBAN2                    Bankman-Fried - Direct              2323

1           FTX has looked at users or accounts as a whole, just

2     looking at assets and liabilities overall, and it also had a

3     number of steps that were at least somewhat unique to FTX.  It

4     was mostly automated.  It would monitor markets 24/7.  And it

5     would close down positions if necessary.  It also had a

6     backstop liquidity provider system, which was something I

7     wasn't aware of other exchanges having at the time.

8     Q.  We will come to that in a moment.

9           I realize I meant to ask you --

10          MR. COHEN:  If we could call up just for the

11    witness --

12    Q.  Before we do that, in addition to explainers, from time to

13    time would you set forth your views about terms in the

14    industry?

15    A.  Yeah.

16    Q.  How would you do that?

17    A.  One of the ways was through blog posts that we would make.

18          MR. COHEN:  Just for the witness, if we could call up

19    DX-964 for identification.

20    Q.  If you could go through this and just tell us if you

21    identify the document, sir.

22    A.  Yes, I do.

23    Q.  What is this?

24    A.  This is a blog post that I had written early on in FTX's

25    history about clawbacks and FTX's approach to them.

**A-1006**

NARMBAN2                    Bankman-Fried - Direct                    2339

1  called Amazon Web Services, AWS.  Basically, it was dozens of

2  computers that we needed to rent out.  We needed backups for

3  it.  We needed to be able to add more at a moment's notice if

4  the exchange grew.  And we couldn't manage all of that

5  hardware, all of that -- we'd need a warehouse to make that

6  work.  And Amazon is one of the companies that has a service

7  where you can rent servers, which are basically just computers

8  from them, on demand.

9  Q.  Moving forward, once FTX was up and running, did it have

10  any business relationships with Alameda?

11  A.  Yes, it did.

12  Q.  I am going to talk about a few of them.

13         Have you heard the term market maker?

14  A.  Yes.

15  Q.  What is that?

16  A.  A market maker is a company that intends to have buying and

17  selling offers out at most points in time for a product.  The

18  purpose that we saw for market makers was, without them, if a

19  customer is signed up for FTX, they deposited dollars they

20  wanted to buy at Bitcoin, and no one on the exchange was

21  currently trying to sell a Bitcoin, no one was offering a

22  Bitcoin for any price, then there would be nothing to buy from

23  and the customer, they would go through all the work of

24  creating the account, funding it, they would realize they

25  couldn't actually buy a Bitcoin, there were no sellers, and

**A-1007**

NARMBAN2                    Bankman-Fried - Direct              2340

1    they would be angry and leave.

2         An important thing for customers was that at any point

3    in time they could open up their account and buy, if they

4    wanted to buy, and sell, if they wanted to sell.  That meant

5    that we needed to have market makers.  We needed to have people

6    who were always willing to buy for some price, sell at another

7    price, probably higher, but not that much higher, reasonable

8    prices.

9         And early on it was difficult to get market makers.

10   Early on we didn't have very much volume or activity on the

11   exchange.  Market makers, they made a penny on every hundred

12   dollar trade that they did.  Those were big companies, so they

13   weren't going to bother going through the process of trading on

14   FTX or market making on FTX if they are only getting to ten

15   trades a day and make ten cents a day, which meant that

16   until -- unless and until we got more customers and more

17   volume, we weren't going to get most of the market makers on

18   the platform.  These were -- some of these were Wall Street

19   trading firms.  Some of these were crypto-specific ones.

20        Alameda was a market maker, so Alameda was the primary

21   market maker on FTX at the beginning.

22   Q.  Over time did that role change?  Was Alameda still the

23   primary market maker?

24   A.  It did change.  Alameda was always a market maker.  Where

25   it was something like half of all volume on the exchange for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1008**

NARMBAN2                     Bankman-Fried - Direct                 2343

1     question and he said yes.

2           MR. COHEN:  Let me rephrase then, to your Honor's

3     point.

4     Q.  Let's focus this one, Mr. Bankman-Fried.  Was there any way

5     that having a line of credit related to acting as a market

6     maker in FTX?

7     A.  Yes, there was.

8     Q.  Can you tell us about that.

9     A.  Yes.  We wanted to have a substantial size of orders out,

10    of offers out in thousands of markets, that by the time FTX had

11    reached its peak in 2022 meant billions of dollars of orders

12    out at all points in time.  By default that required

13    collateral.  You had to have assets deposited on the system in

14    order to send those orders.

15          But in the particular case of market makers, they were

16    a service, the orders were a service to FTX.  So we would often

17    give market makers lines of credit to make it more efficient

18    for them to be able to send those orders.

19    Q.  Next concept.  Have you ever heard the term backstop

20    liquidity provider?

21    A.  Yes.

22    Q.  What was that?

23    A.  That was a term that FTX created to describe one of the

24    steps in our risk waterfall.

25    Q.  Can you explain what you mean by the risk waterfall.

**A-1009**

NARMBAN2                    Bankman-Fried - Direct                    2344

A.   Yeah.  If there was an account which had some level of
assets, some level of liabilities and the assets started
dropping or the liabilities rising, to the point where we
became concerned that it might not be able to repay its debts,
and that we might not be able to sell its assets to repay its
debts, we would start to do that, ideally before it dropped
into overall negative territory.

        The first step of the risk waterfall was to just go
out into the order books and start selling off the assets of
the account.  In the case of an account that had deposited say
$500 of Bitcoin and withdrawn 250 U.S. dollars against that,
we'd start selling off those Bitcoins to recoup the dollars
that it had borrowed.  That was the primary line of defense.

        But sometimes that would look like it might be about
to fail.  In other words, the assets would keep dropping or the
liabilities would keep rising, to the point where we didn't
think that we were going to be able to sell off all of those
assets in the market in time, that the account might end up
creating a hole if we weren't careful.

        As a backup we had what were called backstop liquidity
providers.  Those were generally market makers on FTX who
agreed that, in the event of a customer position that we were
liquidating, that we were closing down because we were
concerned about its risk, if it was too big to close down in
the market or markets were moving too fast, that, instead, we

**A-1010**

NARMBAN2                    Bankman-Fried - Direct                    2345

1    could basically just hand the position to those backstop

2    liquidity providers.

3            In the hypothetical with $500 of Bitcoin borrowing

4    $250, we would hand basically that -- those Bitcoin and the

5    dollar liability over to the backstop liquidity providers, who

6    would then fill the liability out of their assets and, by doing

7    that, effectively take care of the liquidation.

8    Q.  Was Alameda a backstop liquidity provider?

9    A.  Yes, it was.

10   Q.  Was Alameda also a customer on the FTX exchange?

11   A.  Yes, it was.

12   Q.  Did it have an account?

13   A.  Yeah.  It had a few accounts.  It had one primary trading

14   account.

15   Q.  Was it sometimes referred to as the main account?

16   A.  Yes.  So there is the info@ user.  User refers to sort of

17   overall entity or person using the system, which had a number

18   of accounts on it, subaccounts.  One of them, the main account

19   had most of the trading activity.

20   Q.  Was that the info@AlamedaResearch.com account?

21   A.  Yes.  Info@AlamedaResearch.com was the user.  Then the main

22   account of that was the primary trading account.  That's right.

23   Q.  As a customer of the exchange, was Alameda permitted to

24   borrow from the exchange?

25   A.  Yeah.

**A-1011**

NARMBAN2                    Bankman-Fried - Direct                    2346

1   Q.  When it borrowed, where was the money coming from?

2   A.  The money -- my understanding was that it was coming from

3   basically margin traders.  It was coming from collateral or --

4   basically collateral from other margin traders or from assets

5   that were earning interest on the platform, and that those were

6   sent to FTX as security for borrowing other traders were doing

7   and was being lent out to traders, including Alameda, that were

8   borrowing.

9   Q.  What could Alameda do with the funds it borrowed off the

10  exchange?

11  A.  In general, FTX didn't have restrictions on what people

12  could do with funds that they borrowed.  So the answer like for

13  other users was, anything -- so long as we believed that the

14  risk was being managed, which is to say, so long as we believe

15  that its assets were greater than its liabilities, we didn't

16  care if a user withdrew funds and used them to buy muffins, to

17  pay business expenses, to invest, or anything else.

18  Q.  Let's move forward to the next topic, Mr. Bankman-Fried.

19          How did the volume of trading on the FTX exchange

20  change, if at all, over time?

21  A.  It grew substantially.  In the early days it was trading a

22  few million dollars a day.  That grew to tens of millions of

23  dollars a day in 2019.  In 2020, that grew to hundreds of

24  millions of dollars a day.  And by 2022, it was 10 to $15

25  billion per day of trading volume.

**A-1012**

NARMBAN2                    Bankman-Fried - Direct                    2349

1   potential liquidation of Alameda's account which in turn,

2   because there was no backstop liquidity provider, would go to

3   the final phase of the risk engine, which was the phase we

4   always tried to minimize and hope to avoid, which was

5   socializing losses on all of the customers of the platform.

6   Q.  Was there a name for what happened?

7   A.  So the auto deleveraging was a name for liquidations

8   effectively closing it down, and then clawbacks was the name

9   for what was going to happen to most or all of the users on the

10  platform.

11  Q.  And what was your reaction --

12        THE COURT:  Excuse me for just a clarification.

13        You used the term realized probably more than once.

14  This was all an automated process, is that correct?

15        THE WITNESS:  That is correct.

16        THE COURT:  There were no human beings making

17  decisions along the way of what you have described.

18        THE WITNESS:  That is correct.

19        THE COURT:  Go ahead.

20        MR. COHEN:  Thank you, your Honor.

21  Q.  What was your reaction to this auto deleveraging event?

22  A.  Well, it was potentially very bad for the platform.  The

23  whole thing shouldn't have happened in the first place.  It

24  should have been a routine liquidation of, I think, thousands

25  of dollars of an account with no large downstream events, but

**A-1013**

NAR1BAN3                    Bankman-Fried – Direct                    2369

1    My next question is about several categories of assets.  We

2    talked about spot margin trading and margin, and futures

3    accounts.

4    A.  Yep.

5    Q.  Let me ask you this:  How did FTX safeguard customer assets

6    involved in spot margin trading?

7    A.  So there were a few different pieces to that.  One was

8    around physical security of those assets against hacking

9    attempts.  The one that came up more was around the risk

10   management system.

11   Q.  Can you explain that.

12   A.  So a lot of that was the risk engine that we had talked

13   about that would monitor user accounts.  The risk that it was

14   designed to prevent was a user account where the——basically

15   assets could no longer repay the liabilities, and that that

16   would cause a loss to the system, and if FTX couldn't fill it,

17   it would be socialized to other users.  We felt at the time

18   that we had built a better risk management system than other

19   exchanges.  It was something we put a lot of thought and time

20   into, how a risk engine worked, and that as such, we hoped that

21   we would reduce clawbacks and ideally avoid them entirely.  We

22   had not had a clawback ever to that point.  There had been some

23   small losses from accounts.  FTX was able to cover those.  That

24   was the——that was the goal of the risk management system.

25   Q.  And was there a difference between spot margin and the

**A-1014**

NAR1BAN3                    Bankman-Fried - Direct                    2371

1   A.  Yes, I do.

2   Q.  Okay.  What is it?

3   A.  This is the FTX terms of service that were created in May

4   of 2022.

5   Q.  Okay.  Did you ever have occasion to review these?

6   A.  I did.

7   Q.  Okay.  Do you know about when you did that?

8   A.  I skimmed it over a few times.  I went through parts of it

9   in more detail after its release.

10           MR. COHEN:  If we could go to page 17, please.

11           Back one page.  I'm sorry.

12   Q.  Do you see Section 16?

13           MR. COHEN:  If you could call that out, Brian.

14   Q.  That refers to margin trading.  Was this one of the

15   provisions that you reviewed?

16   A.  Yes.

17           MR. COHEN:  Okay.  And now continuing to the next

18   page.  16.4, if you can call out that paragraph.

19   Q.  Without me reading the entire thing to you, sir, can you

20   tell the jury what your understanding of this provision was.

21   A.  Yeah, my understanding was that this was referring to two

22   different features of the platform, not features as a

23   necessarily positive connotation, but the first was the risk of

24   liquidations.  When it talks about, you know, liquidating your

25   position, that's—that's referring to the risk that if your

**A-1015**

NAR1BAN3                 Bankman-Fried – Direct              2372

1    assets fell in value, FTX might sell off your positions to

2    reduce risk in your account.  The second part of this is

3    talking about clawbacks, or socialized losses, when it says

4    that even if you haven't suffered any losses yourself, your

5    balance might be clawed back if other users had losses, in

6    particular losses large enough that they created a hole in the

7    system.

8            MR. COHEN:  Okay.  And can we continue on to page 35.

9    And blow that up.

10   Q.  It says Service Schedule.  Futures Market.  Do you see

11   that, sir?

12   A.  Yup.

13   Q.  And again, without having to read through the whole thing,

14   what was your understanding of what Schedule 5 provided for?

15   A.  Yeah.  My understanding was this provided terms that were

16   specific to futures trading rather than spot trading.

17   Q.  Okay.  And did it have the same provisions relating to

18   clawback you just discussed?

19   A.  Yeah.  My memory is it actually just ref——it referenced the

20   margin trading provisions.

21   Q.  Okay.  Good.

22           MR. COHEN:  All right.  If we could go to the middle

23   of that page, where it says Important.

24   Q.  Okay.  If you can just read the first sentence.

25           MR. COHEN:  Brian, if you could highlight that.

**A-1016**

NARMBAN4                    Bankman-Fried – Direct                    2412

1    A.   Yes, that is correct.

2    Q.   Who was Amy?

3    A.   Amy was a former venture capitalist who we had hired to

4    work on and help lead our investment team as well.

5    Q.   I don't want to go through all the investments.  I just

6    want to talk about one.

7         Do you recall the investment in Solana?

8    A.   Yes.

9    Q.   Can you describe for the jury the due diligence, if any,

10   that was performed.

11   A.   Yes.  Solana is a cryptocurrency.  It's a token, like

12   Bitcoin or Ethereum.  In the spring of 2020, it was a new

13   cryptocurrency, had just been launched.  We were investigating

14   various blockchains at the time to compare them and figure out

15   the pros and cons.  I and others had calls with the leadership

16   of most of the major cryptocurrency teams in the space and

17   asked them questions about their technology, about their future

18   projections, how they were going to get there, what they were

19   prioritizing, and came away with the impression from those

20   calls that Solana was --

21             MS. SASSOON:  Objection.  Hearsay.

22             THE COURT:  Yes.

23             Don't tell us what anyone else said,

24   Mr. Bankman-Fried.

25   Q.   To his honor's point, just tell us what your takeaway is.

**A-1017**

NARMBAN4                    Bankman-Fried - Direct            2413

1   A.  Understood.

2           MS. SASSOON:  Objection.  It is based on hearsay.

3           THE COURT:  Sustained.  That's another way of doing

4   it, but it's still hearsay.

5   Q.  Following his Honor's ruling, say what you did.

6   A.  I ended up believing --

7           MS. SASSOON:  Objection.

8   Q.  Just tell us --

9           MS. SASSOON:  He can describe what he did, not what he

10  believed based on his conversations.

11  Q.  Tell us what you did in connection with the Solana

12  investigation.

13  A.  I ended up making a significant investment in the

14  cryptocurrency Solana at prices starting, I think, around 20

15  cents per token.

16  Q.  Where did you believe the funds for the venture investments

17  came from?

18  A.  I believe that they came from Alameda Research's operating

19  profits and, in some cases, from the loans that it had from

20  third-party borrow lending desks.

21  Q.  What entities would make the investments?

22  A.  It varied.  Sometimes, especially for liquid -- for tokens

23  that were already trading, it would be Alameda Research's core

24  trading entities.  For more early-stage projects, or things

25  that were not in the cryptocurrency sector, it would generally

**A-1018**

NARMBAN4                    Bankman-Fried - Direct                    2424

1    answered.

2          THE COURT:  Overruled.

3    A.  The primary goal was helping to establish a regulatory

4    framework for crypto in general in the United States, and in

5    some cases specifically one that FTX would hopefully be able to

6    participate in.

7    Q.  Now, FTX, the FTX we have been talking about, was an

8    international company, correct?

9    A.  That's correct.

10   Q.  So why were you interested in U.S. regulation?

11   A.  There was a different company that, as you said, we have

12   not been talking about, FTX US.  FTX US was a separate exchange

13   that I had started which was small, quite small, compared to

14   FTX international but which was U.S. based which did take U.S.

15   customers and which was seeking to offer crypto futures

16   products in the United States through regulatory frameworks

17   there.

18   Q.  When did you start FTX US?

19   A.  2020.

20   Q.  Now, did there come a time that you testified in front of

21   Congress?

22   A.  Three times, yes.

23   Q.  Approximately when was the testimony?

24   A.  There was one in late 2021, I don't remember the exact

25   date, there was one in early 2022, and there was one in the

NARMBAN4                    Bankman-Fried – Direct                    2427

Q.  I think you mentioned three times in the testimony.  We

have talked about two.  The third time was in the middle of

2022, is that right?

A.  Yes, that's right.

Q.  Who did you testify before then?

A.  The house agricultural services committee.

Q.  What was the reason for that testimony?

A.  I think I mangled the name a little bit, but the house

agricultural committee.

     FTX US Derivatives had an application before the CFTC

to expand its license, to allow it to actually offer

cryptocurrency futures in the traditional sense in the United

States.

     There was -- I was aware of a fair bit of political

talk about this in Washington, D.C.  The house agricultural

committee ended up hosting a hearing on FTX's application, FTX

US Derivatives application to the CFTC.  So it was a house

committee hearing on the company that I owned, and there were

competitors of ours who I believed to be pushing back against.

     MS. SASSOON:  Objection.  No foundation.

     THE COURT:  Beyond that, it's essentially all

unresponsive.  The question was:  Who did you testify before?

And the answer was:  The house agricultural committee, and then

it went on from there.

     MS. SASSOON:  I believe the question was, what was the

**A-1020**

NARMBAN4                    Bankman-Fried - Direct            2428

1    reason for the testimony?  And this portion of the answer, your

2    Honor, about what he believed competitors were doing, there is

3    a lack of foundation.

4            THE COURT:  Thank you.  Sustained.

5            MR. COHEN:  Let me come back to that.

6    Q.  Mr. Bankman-Fried, did you come to a view as to what

7    competitors were doing with regard to the agricultural

8    committee?

9    A.  Yes.

10           MS. SASSOON:  Objection.

11   Q.  Before you answer --

12           THE COURT:  What's the ground?

13   Q.  What's the basis for it?

14           THE COURT:  Excuse me.

15           MS. SASSOON:  Leading.

16           THE COURT:  Overruled.

17   Q.  Don't tell me what they said.  Just tell me what your basis

18   for it was.

19   A.  My basis for it was conversations with staff both at FTX

20   and with staff of congressmen.

21   Q.  What was your understanding then?

22           MS. SASSOON:  Objection.

23           THE COURT:  What's the relevance of this, counsel?

24           MR. COHEN:  It's to round out why he was appearing on

25   this testimony which the government has played for the jury.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1021**

NARMBAN4                     Bankman-Fried - Direct              2429

1            MS. SASSOON:  Your Honor, not only is this not

2   relevant, but it's clear that the answer is derived from

3   hearsay conversations, not any firsthand observations by the

4   witness.

5            THE COURT:  Sustained.

6            MR. COHEN:  We will move on.

7   Q.  New topic, Mr. Bankman-Fried.

8            Are you familiar with something called EcoSerum?

9   A.  Yes.

10  Q.  What was that?

11  A.  It was an entity that was pushing for adoption of a token

12  called Serum, SRM.

13  Q.  Did you ever hear of the phrase staking?

14  A.  Yes.

15  Q.  What does that mean to you?

16  A.  Staking referred to a practice in the cryptocurrency

17  ecosystem where if you held some cryptocurrency asset, you

18  could do what's called staking it, which meant effectively

19  putting it somewhere, locking it up for some period, often so

20  it couldn't be withdrawn, and then giving an interest payment

21  as a reward for doing so.

22  Q.  Could customers on FTX stake their Serum?

23  A.  Yes.

24  Q.  What would they receive if they did so?

25  A.  They would receive tokens, chiefly Serum tokens, but also

                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

**A-1022**

NAR1BAN5                     Bankman-Fried - Direct              2452

1   Q.  What, if anything, did you observe with regard to Terra and

2   Luna in the May period?

3   A.  In May 2022, Luna crashed close to zero from tens of

4   billions of dollars of value, and then Terra, which was backed

5   by the value of Luna, fell close to zero as well, losing its 1

6   dollar peg.

7   Q.  Were you familiar with a company called Three Arrows

8   Capital?

9   A.  Yes.

10  Q.  What were they?

11  A.  They were a cryptocurrency trading firm, sort of like

12  Alameda.

13  Q.  Did you observe anything happening—what did you observe,

14  if anything, with regard to Three Arrows Capital during this

15  period?

16  A.  Three Arrows Capital ended up going bankrupt in June of

17  2022, and I understood that that had been caused by, among

18  other things, them having—

19          THE COURT:  Sir, sir, you were asked what you

20  observed, not what you understood.

21  Q.  Just what you observed.

22  A.  Understood.  Three Arrows Capital went bankrupt in June of

23  2022.

24  Q.  Okay.  And continuing, I think earlier you mentioned

25  certain crypto lenders—

**A-1023**

NAR1BAN5                    Bankman-Fried - Direct                    2453

1    A.  Yeah.

2    Q.  ——do you recall that?  And again, who were the large

3    lenders in the space?

4    A.  Genesis, Celsius, BlockFi, and Voyager were four of the

5    larger ones.

6    Q.  What, if anything, did you observe about them in the May to

7    June period?

8              MS. SASSOON:  Objection, your Honor.  Vague.

9              THE COURT:  Rephrase, please.

10             MR. COHEN:  Okay.

11   Q.  All right.  I'll take it one by one then.

12             Mr. Bankman-Fried, what, if anything, did you observe

13   in the market with regard to Celsius?

14             MS. SASSOON:  Objection, your Honor.  Same objection.

15             THE COURT:  Sustained.

16   Q.  Were you in communication with any of the lenders during

17   the May to June period?

18   A.  Yes.

19   Q.  Okay.  And did you also observe what was happening to them

20   in the marketplace?

21   A.  Yes.

22   Q.  Okay.  And what——just your personal knowledge, sir.  What

23   did you observe?

24             THE COURT:  Sustained.

25             MS. SASSOON:  Objection, your Honor.

NAR1BAN5                    Bankman-Fried - Direct                    2454

1          THE COURT:  Look, if somebody called in a loan on

2    which his company was on the hook, that's one thing, but that's

3    not what you're doing.  You're asking much broader questions.

4          MR. COHEN:  Okay, your Honor.

5          THE COURT:  And you're calling for all kinds of

6    hearsay.  And opinion.

7          MR. COHEN:  Okay.

8    BY MR. COHEN:

9    Q.  Did the decline in price in Bitcoin have any impact on

10   Alameda?

11   A.  Yes, it did.

12   Q.  What was that?

13   A.  Alameda had been leveraged long the market for the prior

14   year.  That basically means it had a bunch of assets that were

15   correlated with the market, and it had loans, liabilities, many

16   of which were in dollars, and as the market crashed, the value

17   of its assets fell.

18   Q.  Okay.  Let me go back.  You said Alameda had been leveraged

19   long.

20   A.  Yes.

21   Q.  What does that mean?

22   A.  So Alameda had a number of assets.  Some of them—a few

23   billion, to my understanding—were from trading profits from

24   arbitrage.  Substantially more than that, tens of billions, as

25   of late 2021, were from investments that it had made, venture

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1025**

NAR1BAN5                    Bankman-Fried - Direct                    2455

1    investments.  Those investments, it had financed in part

2    through borrowing of——from third-party lenders like Genesis and

3    Celsius and others.  That meant that it had tens of billions, I

4    think, tens of billions——over 40 billion of assets at the peak

5    in late 2021, but it also had substantial liabilities.  And it

6    was leveraged long because the exposure it had to the market

7    was that it made money if the market went up and it lost money

8    if the market went down.  Many of its assets had that property.

9    Most of them did.  And——

10   Q.  If I could interrupt.

11   A.  Yup.

12   Q.  Long meaning you bought the stock?

13   A.  Right.  Long meaning we bought these companies rather than

14   short selling, which would be betting on them to decline.  And

15   it was leveraged because it was more than a hundred percent of

16   its value was in its positions, because it had taken on debt to

17   make those investments.

18   Q.  You also used the phrase "correlated with the market."

19   What does that mean?

20   A.  It means that it had historically tended to be the case

21   that if the cryptocurrency market would increase in value——that

22   is, say, if Bitcoin and other major cryptocurrencies went

23   up——that the assets Alameda held would increase in price, and

24   conversely, that if the market overall were to decline, if

25   there were a market crash, that the assets Alameda held would

**A-1026**

NAR1BAN5                    Bankman-Fried - Direct                    2456

1    decrease in value.

2    Q.  So what happened to Alameda's value around May 2022?

3    A.  Well, there were, you know, large decreases in—in market

4    prices, Bitcoin fell from $65,000 or so at the peak in late

5    2021 to 30,000 in May 2022 and 20,000 in June 2022, and as a

6    result, Alameda's net asset value fell from above $40 billion

7    at the peak in late '21 to around $10 billion ultimately in

8    June of 2022.

9    Q.  One more term.  I'm not sure we defined "net asset value."

10   A.  Ah, yes.  So when a company has assets and also has

11   liabilities, the net asset value is those assets minus those

12   liabilities.  So if you had $10,000 of assets but you took out

13   a $2,000 loan to purchase those, your net asset value would be

14   $8,000.

15   Q.  Are you familiar with the concept of hedging?

16   A.  Yes.

17   Q.  What is your understanding of that concept?

18   A.  Hedging is putting on a trade to protect against the risk

19   of a market move.

20   Q.  Did there come a time that you discussed the topic of

21   hedging with anyone at Alameda?

22   A.  Yes.

23   Q.  Who was that?

24   A.  Chiefly with Caroline Ellison, sometimes with other people

25   as well.

NARMBAN6                    Bankman-Fried – Direct              2471

1   general overhaul of FTX's accounting, given both this and other

2   things that were going on at the same time.

3   Q.  Now, moving forward, did there come a time that the bug was

4   fixed?

5   A.  Yeah.

6   Q.  Who worked on that?

7   A.  I know that Adam Yedidia and Nishad Singh both worked on

8   it.

9   Q.  Do you know if the fix of the bug was recorded anywhere?

10  A.  Yes.  There is a memo they wrote up to memorialize it.

11        MR. COHEN:  Can we call up DX-488 for identification.

12  Q.  Take a moment to go through this, Mr. Bankman-Fried, and

13  let me when you have.  If you need to see multiple pages, let

14  us know.

15  A.  Yup, that looks like it.

16  Q.  What is this document?

17  A.  This is that memo that was written up.

18  Q.  Did you see it at the time?

19  A.  Yes.

20        MR. COHEN:  The defense offers Exhibit 488, not for

21  its truth.

22        MS. SASSOON:  Objection, your Honor.

23        THE COURT:  Ground.

24        MS. SASSOON:  401 and hearsay.

25        THE COURT:  Mr. Cohen.

NARMBAN6                    Bankman-Fried - Direct              2472

1          MR. COHEN:  Your Honor, we are just offering it for

2    the fact that the memorandum was done, not for the content of

3    the memo.

4          THE COURT:  Memorandum being done divorced from the

5    content is not relevant.

6          MR. COHEN:  Not for the -- your Honor, may we come to

7    sidebar?

8          THE COURT:  No.  This is straightforward.

9          Sustained.

10   Q.  You also mentioned that one of the follow-up items was the

11   accounting.  Do you recall what happened after that?

12   A.  Yeah.  There is -- there are two projects related to FTX's

13   accounting.  One of them was to overhaul the entire accounting

14   system and the other was specifically to overhaul the parts of

15   it that were related to bank deposits and withdrawals.

16   Q.  Do you know whether that took place?

17   A.  The second one did take place and was completed.  The first

18   one was begone but not fully completed.

19   Q.  Who handled the project about bank withdrawals?

20         THE COURT:  I think you misspoke.  I think the witness

21   said deposits.

22         MR. COHEN:  I'm sorry, your Honor.

23   A.  Adam Yedidia.

24         MS. SASSOON:  Your Honor, I want to make a foundation

25   objection.  I don't believe it was elicited who was part of the

**A-1029**

NARMBAN6                    Bankman-Fried - Direct                    2474

1   A.   So in June 2022, around this date, I was told that there

2   was the bug, this $8 billion miscalculation of Alameda's

3   net-asset value.  And Gary and Nishad told me in person that

4   day in the conversation that it was stemming from something

5   called fiat@.  That was the -- that it was related to bank

6   account deposits and withdrawals and two of those that had gone

7   through Alameda historically.

8   Q.   Did you know what fiat@ was at the time?

9   A.   No.

10  Q.   Did you later learn?

11  A.   Yes.

12  Q.   How did you learn?

13  A.   I ultimately learned what it was by looking it up in a

14  database that I ultimately got access to, although I had heard

15  bits and pieces about it in the interim.

16  Q.   Did Gary and Nishad in that initial conversation discuss

17  the size of the liability?

18  A.   There were some discussions about liabilities.  There was

19  also a lot of uncertainty that they were still looking into.  I

20  remember hearing that there was.

21         THE COURT:  Excuse me, please.  We will all get done

22  with this more efficiently if you would focus on the question

23  better.

24         The question was:  Did Gary and Nishad in that initial

25  conversation discuss the size of the liability?  They either

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1030**

NARMBAN6                    Bankman-Fried - Direct                    2475

1    they did, they didn't, or you don't recall, presumably.  Would

2    you answer that.

3    A.  I don't recall them specifically discussing that liability,

4    no.

5    Q.  Did there come a time where you had later conversations

6    with Gary and Nishad where you discussed the liability?

7    A.  By the liability, are you referring to the fiat@?

8    Q.  Yes.

9    A.  Ultimately, by October of 2022, yes, there were explicit

10   conversations with them about the fiat@ liability.

11   Q.  Now, you mentioned you also had conversations, I think you

12   said, with Ms. Ellison?

13   A.  Yes.

14   Q.  Do you recall those conversations about the liability?

15   A.  I had conversations with her about Alameda's liabilities

16   and liabilities on FTX.  I am not sure I had conversations with

17   her until later on about the fiat@ liability in particular.

18   Q.  I think you also mentioned Mr. Yedidia.

19   A.  Yes.

20   Q.  Same question.

21        MS. SASSOON:  Your Honor, form.

22   Q.  Do you recall having a discussion with Mr. Yedidia about

23   the liability, fiat@ liability?

24   A.  I don't recall having a discussion at the time with him

25   about the fiat@ liability size in particular.  I don't recall

**A-1031**

NARMBAN6                    Bankman-Fried - Direct                    2476

1    discussing that with him until November 2022, although I did

2    have other discussions with him.

3    Q.  Did there come a time that you learned of the size of the

4    fiat@ liability?

5    A.  Yes.

6    Q.  What was the size?

7    A.  Around 8 billion.

8    Q.  Who did you learn that from?

9    A.  I ultimately learned confidently that the fiat@ liability,

10   in particular its size, was 8 billion from a database.

11   Q.  Can you explain that.

12   A.  Yes.  In around September and October of 2022, FTX's

13   developers had built a second database, a Google-hosted

14   database that was similar to but different -- but not the same

15   as the AWS primary database.  The primary purpose of this was

16   to have a source that nondevelopers could interact with.  They

17   had expressed the concerns to me that if I accidentally

18   requested too much data --

19           MS. SASSOON:  Objection.  Hearsay.

20           MR. COHEN:  Your Honor, I might be able to streamline

21   this, if I might.

22           THE COURT:  We are all on the same team on that.

23           MR. COHEN:  Thank you.

24           THE COURT:  That's not to say that you can elicit

25   hearsay like this.

**A-1032**

NARMBAN6                 Bankman-Fried - Direct              2477

1        MR. COHEN:  I understand.  I think there is a way to

2   shorten this.  We shall see.

3   Q.  This database you referred to, Mr. Bankman-Fried, when did

4   that come into effect?

5   A.  I am not sure when it first came into effect.  I believe I

6   got access in October of 2022.

7   Q.  Was it a database that had been available to you before

8   October?

9   A.  No.

10  Q.  Did you go on the database?

11  A.  Yes.

12  Q.  What did you find?

13  A.  Among other things, I found something called fiat@FTX.com.

14  Q.  What did you conclude after finding that?

15  A.  That there was an account with a negative $8 billion

16  balance that was a subaccount of an Alameda affiliate.

17  Q.  What was your reaction, if any, of finding out that Alameda

18  had a liability of $8 billion?

19  A.  I was very surprised.

20  Q.  Why was that?

21  A.  I had certainly, as of prior to this sequence, been under

22  the belief that Alameda's total liability to FTX was reflected

23  in the info@ account that I had looked at.  That was Alameda's

24  primary trading account on FTX.  I had seen liabilities of

25  roughly $2 billion in that account and far more than that in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1033**

NARMBAN6                    Bankman-Fried – Direct                    2478

1    assets.  Now I had come to realize that the total liability was

2    far more than that.

3    Q.  How did this liability compare to what you had seen on the

4    info@ account?

5    A.  So this liability was larger.  It was about 8 billion

6    instead of about 2 billion, making roughly 10 billion in total,

7    and without substantial collateral posted directly on the FTX

8    account.

9    Q.  Upon seeing this, what was your reaction?

10   A.  I was surprised.  I reached out to developers to confirm

11   what this was, and I started to think through what the

12   implications of it were.

13   Q.  Did you believe that it could be paid back?

14   A.  Yes.

15   Q.  What did you base that on?

16   A.  I had confirmed multiple times, and I did again, that

17   Alameda's net-asset value had already included all liabilities,

18   including this one, in other words, that Alameda had

19   approximately 10 billion more in the value of its assets than

20   in its liabilities, including this liability.  As such, I was

21   of the view that Alameda had plenty in asset value to be able

22   to cover the liability.

23   Q.  Did you consider any other assets?

24   A.  By other assets, can you clarify, other than what?

25   Q.  Of Alameda.

**A-1034**

NARMBAN6                    Bankman-Fried - Direct                    2479

1   A.  Yes.  I looked at obviously the collateral on FTX.  I

2   looked at its off-FTX assets, and I also looked into Paper Bird

3   and a few other things not on Alameda's balance sheet.

4   Q.  Let me break that down.  What was Paper Bird?

5   A.  Paper Bird was a company that held my equity stake in FTX.

6   Q.  Why were you looking at Paper Bird in connection with this

7   liability?

8   A.  In connection with this liability, I wanted to check

9   basically, is Alameda going to be able to be good for it.  Does

10  Alameda have enough in value to cover a total liability of $10

11  billion.  And that meant doing a more comprehensive view of

12  what assets it had access to.

13          Traditionally it had not put my holding in FTX equity

14  through Paper Bird on its balance sheets.  It had treated those

15  as separate, but I was more than happy to pledge everything I

16  had, including that, as security for any of Alameda's

17  liabilities, including this one, and so it could potentially

18  act as backup security for liabilities.

19  Q.  Let me go back for a moment.  I meant to cover this.

20          You recall a conversation in June with Ms. Ellison

21  about repaying Alameda's lenders?

22  A.  Yeah.

23  Q.  Did that repayment take place?

24  A.  Repayments did take place, yes.

25  Q.  How much was repaid?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1035**

NARMBAN6                    Bankman-Fried - Direct                    2480

1   A.  My understanding was, it was initially around a billion, in

2   total about two billion in June.

3   Q.  How, in your experience, did that compare with other loans

4   that Alameda had paid back to lenders?

5   A.  It was a sizeable but not extremely anomalous loan recall

6   amount.

7   Q.  Where did you believe the funds to pay the lenders were

8   coming from?

9   A.  From Alameda's assets.  Alameda had at the time 5 to $10

10  billion of highly liquid assets off of FTX in its wallets, bank

11  accounts, and other exchange accounts.

12  Q.  Now, I think we discussed earlier that from time to time

13  Ms. Ellison would send you balance sheets.

14          Do you recall that?

15  A.  Yup.

16  Q.  How regularly would she do that?

17  A.  Every month or two.

18  Q.  What would the balance sheets show?

19  A.  They would show Alameda's net-asset value and a

20  consolidated summary of its assets and liabilities.

21  Q.  How long would they be?

22  A.  The ultimate balance sheets would usually be one page,

23  maybe two pages.

24  Q.  During the summer of 2022, do you recall speaking with

25  Alameda's lenders yourself?

NARMBAN6                    Bankman-Fried - Direct                    2491

1          THE COURT:  Return to the future.

2          MR. COHEN:  Thank you, your Honor.

3   Q.  Stepping back.

4   A.  Yes.

5   Q.  Did the topic of hedging come up again?

6   A.  Yes.

7   Q.  Who did it come up with?

8   A.  Chiefly with Caroline.

9   Q.  Can you tell us what was discussed with Caroline.

10  A.  Yes.  Subsequent to the June market crash and the fiat@ bug

11  and fix, I became fairly concerned about Alameda's risk.  It

12  had fallen 75 percent in asset value since late the previous

13  year as a result of market crashes.  It had not hedged against

14  those market crashes, despite the many conversations, and I was

15  very concerned that if there was one or two more market crashes

16  subsequent to that, Alameda might go bankrupt.

17  Q.  What would a hedge have done in connection with Alameda's

18  NAV?

19  A.  Had there been a sufficient quantity of hedges late the

20  previous year, its NAV would still have been --

21          MS. SASSOON:  Objection.

22          THE COURT:  What's the objection?

23          MS. SASSOON:  Speculative to say what exact effect a

24  hedge would have.

25          THE COURT:  I think that's for cross-examination.  He

**A-1037**

NARMBAN6                      Bankman-Fried - Direct                     2492

1   has already qualified it by saying, a sufficient amount of

2   hedges.  Who knows what that means.

3          MS. SASSOON:  Yes, your Honor.

4          THE COURT:  Let's go ahead.

5   Q.  Please finish your answer, sir.

6   A.  Its NAV would have fallen not very much from the previous

7   year.  It would still be many times higher than it was that

8   day.  In other words, it would have offset much of the losses

9   that its assets had suffered.

10         MR. COHEN:  Can we call up GX-25B in evidence, please.

11  These are notes by Ms. Ellison.

12         Can we turn to the second page, please.  Pull up the

13  paragraph entitled:  Things Sam is freaking out about.  First

14  entry is hedging.

15  Q.  Do you recall discussing this with Ms. Ellison?

16  A.  Yes.

17  Q.  Were you freaking out?

18  A.  I don't tend to show a lot of freakoutness, but relative to

19  my standard, yes.

20         MR. COHEN:  We can take that down.

21  Q.  Now let's move to September, Mr. Bankman-Fried.

22  A.  Yes.

23  Q.  Did there come a time when you considered shutting down

24  Alameda?

25  A.  Yes.

**A-1038**

NAUMBAN1                    Bankman-Fried - Direct                    2518

1   Q.  Let's take your conversations first with Ms. Ellison

2   between June and September.  About how many times did you speak

3   with her about the topic of hedging?

4   A.  I spoke -- in June and July, I spoke chiefly once, followed

5   up a few times, and then in September we spoke a few times.

6   Q.  Let's go to the June, July conversation.  Where was that

7   conversation?

8   A.  That was in the Orchid 6 apartment in the study.

9   Q.  What did you say to her and what did she say to you?

10  A.  I had organized the conversation.  This was after the

11  market crash in mid June, when Bitcoin fell to $20,000.  This

12  is after the fiat bug had been found and fixed.  So this was

13  when Alameda's net asset value was about $10 billion, down

14  from --

15          MS. SASSOON:  Objection.

16          THE COURT:  Yes.  All of that is stricken.  It's

17  unresponsive.

18  Q.  Just say what you said to Ms. Ellison and what she said to

19  you.

20  A.  Understood.

21          I called the meeting with Caroline, and I told her

22  that I was very concerned about Alameda, about, to some extent,

23  its historical failure to hedge, but much more so about its

24  current market exposure.

25  Q.  Go on.

**A-1039**

NAUMBAN1                    Bankman-Fried - Direct                    2522

1   recall exactly in what context it came.

2   Q.  Do you recall whether it was in person or over a chat?

3   A.  I know that -- I don't recall confidently, no.

4   Q.  Who was it with?

5   A.  Caroline, Gary, and Nishad were all involved.  I believe a

6   few other people were as well, but I am not a hundred percent

7   confident.

8   Q.  What did you say and what did Gary, Caroline, and Nishad

9   say?

10  A.  Just to clarify, with respect to the thread about shutting

11  down Alameda?

12  Q.  The size of the liability.

13  A.  The size of the liability.  I remember looking into it to

14  some extent myself.

15          THE COURT:  Sorry, Mr. Bankman-Fried.  The question

16  was, what did you say and what did they say?

17          THE WITNESS:  I remember numbers a bit north that -- I

18  don't remember specifically which one of them said the

19  number -- a bit north of $10 billion of total liability being

20  discussed then.

21          MR. COHEN:  Can we call DX-5 back up again.  We can go

22  to the second page and call out the first entry, entry number

23  1.

24  Q.  You just told us that was a project to get you and other

25  nondevelopers further access, correct?

**A-1040**

NAUMBAN1                    Bankman-Fried - Direct                2523

1  A.   That's correct.

2  Q.   Did there come a time that you did get such access?

3  A.   Yes.

4  Q.   When was that?

5  A.   In October of 2022.

6  Q.   Did there come a time that you used the new access to

7  review the database?

8  A.   Yup.

9  Q.   What did you determine?

10 A.   I did a number of queries, but most relevantly in one of

11 them I found an account called something like Seoyun, a

12 Seoyun88, which had something with fiat in the name and a

13 roughly $8 billion liability.

14 Q.   What did you do after you found this account?

15 A.   I reached out to a few people to confirm what this account

16 was.

17 Q.   Who did you reach out to?

18 A.   I don't remember the full list.  I believe that it was a

19 few FTX developers.

20 Q.   What did you do after reaching out to them?

21 A.   So after reaching out to them, I learned that this was --

22         THE COURT:  I'm sorry.  The question is, what you did

23 after you spoke to them?

24         THE WITNESS:  Yes.  After I spoke to them, I started

25 to compile a list myself of all accounts on FTX that were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1041**

NAUMBAN1                 Bankman-Fried - Direct              2526

1   for instance.

2   Q.  You also mentioned a concept called solvency.

3   A.  Yes.

4   Q.  Can you explain that and how, if at all, it factored into

5   your analysis.

6   A.  Yes.  So solvency, at least as I was thinking of it,

7   referred to -- effectively to net-asset value, to whether -- to

8   the relationship between assets and liabilities.  If a company

9   had more assets than liabilities, it was solvent.  If it had

10  fewer assets than liabilities, it was insolvent.  If Alameda

11  were insolvent, that, in my mind, would have been a very

12  significant problem.  That would have been similar to the few

13  hours of crisis prior to the fiat@ bug fix in June.

14  Q.  And in September, October, was it your view that Alameda

15  was insolvent?

16  A.  No.  My view was that it had about positive $10 billion of

17  net-asset value, which is to say that whatever its liabilities

18  were, it had all of that and then another $10 billion of

19  assets, and that that also wasn't counting some other assets

20  that were securing the position as well.

21  Q.  Staying in October, did there come a time that you took a

22  trip?

23  A.  Yes.

24  Q.  Where did you go?

25  A.  I took a few trips.  The longest was to the Middle East.

NAUMBAN1                    Bankman-Fried – Direct                    2527

1   Q.  Before we get to the Middle East trip, I should ask you, in

2   your duties as CEO of FTX, how often did you travel?

3   A.  Probably too much in retrospect.  About half the time I was

4   gone, more than a hundred days in 2022.

5   Q.  What was the primary place you went to?

6   A.  I went all over, but the single place I went to the most

7   was Washington, D.C.

8   Q.  Why was that?

9   A.  To meet with senators, with policy makers, with regulators

10  there, both about general crypto regulation of the United

11  States and about FTX US derivatives licensing application.

12  Q.  Let's come back.  You said you took a trip to the Middle

13  East in October, is that correct?

14  A.  Yup.

15  Q.  Did anyone go with you?

16  A.  Yeah.

17  Q.  Who was that?

18  A.  From the company, Ramnik did.

19  Q.  Just to remind everyone, what was Ramnik's role?

20  A.  He was effectively -- he was the head of product base.

21  Also effectively the person in charge of both venture investing

22  and fundraising.

23  Q.  What was the purpose of your trip to the Middle East?

24  A.  There were multiple purposes.  I had been invited to speak

25  at a conference there which was happening that month.  I had

NAUMBAN1                    Bankman-Fried - Direct                    2528

1    earlier that year, or possibly late 2021, I don't remember the

2    exact date, been invited to visit Dubai and meet with the

3    regulators there.  FTX had just secured a license with the

4    Dubai financial regulators, but I had cancelled that trip.  And

5    the Dubai regulators I understood to have been asking that I

6    come visit them at some point, so I owed them a trip as well.

7            On top of that, there were prospective investors in

8    the Middle East who had wanted to meet in person, and there

9    were some government officials who wanted to talk about the

10   growth of the Blockchain industry, and we also had a few

11   employees in the Middle East and an office there that I wanted

12   to check out.

13   Q.  Have you ever heard the term sovereign wealth fund?

14   A.  Yup.

15   Q.  What's that?

16   A.  It's an investment firm or venture capital firm that is

17   funded by a government.

18   Q.  Did that relate at all to your Middle Eastern trip?

19   A.  Yeah.

20   Q.  Can you tell us how?

21   A.  Yeah.  One of our larger investors had been a sovereign

22   wealth fund, Temasek, from Singapore, and in the Middle Eastern

23   trip we were going to meet with a few sovereign wealth funds

24   there.

25   Q.  You just told us that in September you had done an analysis

**A-1044**

NAUMBAN1                    Bankman-Fried - Direct                    2529

1    of this $8 billion liability relating to the fiat@ account.

2            Do you recall that, sir?

3    A.  Yup.

4    Q.  Why did you go on a trip to the Middle East in October?

5    A.  Because I viewed Alameda as solvent and FTX as solvent and

6    as decently liquid.  Had that analysis come up the other way,

7    had it come up the way we briefly thought things were in June

8    of 2022, with Alameda being essentially bankrupt or borderline

9    bankrupt, I would have been in full-on crisis mode.  But in my

10   view at the time that wasn't the case.

11   Q.  Did you speak with any FTX employee before you went on the

12   trip?

13   A.  Yeah.  I spoke with a number, probably the most with Adam

14   Yedidia.

15   Q.  Can you tell us what you said to Mr. Yedidia and what he

16   said to you.

17   A.  Yeah.  I described the trip that I was at that time

18   planning to go on, and he said that he was skeptical that I

19   should go on it, that it wasn't worth the time and wasn't worth

20   some other counterparty complications associated with it.  I

21   laid out the reasons that I found it compelling but said I

22   wasn't confident.  After hearing that, he said, oh, that

23   changed his mind, that particularly the excitement of investors

24   there.  He didn't feel like it was worth the trip.

25   Q.  You used the phrase counterparty complications.

**A-1045**

NAUMBAN1                    Bankman-Fried - Direct                    2530

1   A.  Yeah.

2   Q.  Maybe you could explain that.

3   A.  So FTX's largest competitor was Binance.  Binance was the

4   largest crypto exchange in the world.  It had 40 percent of

5   global roughly.  Binance was headquartered in the Middle East

6   and the relationship between FTX and Binance was frosty at that

7   point and had been for a little while.  So by traveling to the

8   Middle East, there is a risk that I would be upsetting Binance

9   by quote/unquote stepping on their turf.

10  Q.  At the end of your conversation with Mr. Yedidia, what was

11  his view on whether you should go on the Middle Eastern trip?

12  A.  He said he thought it definitely made sense.

13  Q.  Did you take the trip?

14  A.  I did.

15  Q.  How did you regard the trip?

16  A.  I thought it was overall pretty successful.

17  Q.  Did you end up speaking with any investors?

18  A.  I did.

19  Q.  What was the reaction?

20  A.  They were interested.  They were going to do more

21  diligence.

22          MS. SASSOON:  Objection.

23          THE COURT:  Pardon?

24          MS. SASSOON:  For him to speculate whether they were

25  interested.

NAUMBAN1                    Bankman-Fried - Direct                    2531

 1             THE COURT:  The answer is stricken.

 2    A.  They expressed --

 3             THE COURT:  Excuse me.  Stop.  I have ruled.

 4             THE WITNESS:  Understood.

 5    Q.  After you came back from your trip -- let's do it this way.

 6    Let's move ahead now, Mr. Bankman-Fried, to November of 2022.

 7             MR. COHEN:  Can we call up, please, GX-1087.

 8             This is a calendar of November 2022.  I am going to

 9    circle November 11.

10    Q.  What happened on November 11, Mr. Bankman-Fried?

11    A.  That was the day that FTX filed for bankruptcy.

12    Q.  Now I am going to ask you a series of questions that relate

13    to the period from the 1st up through the 11th, OK?

14    A.  Yup.

15    Q.  Let me start with November 2.  Did anything happen on that

16    day?

17    A.  Yes.

18    Q.  Why don't you tell us.

19    A.  A CoinDesk article came out.  CoinDesk is a crypto industry

20    news site which leaked an old copy of an Alameda Research

21    balance sheet.

22    Q.  What, if anything, was your response to this CoinDesk

23    article?

24    A.  I reached out to Caroline to ask if she wanted to comment

25    on it.

**A-1047**

NAUMBAN1                    Bankman-Fried - Direct                    2533

1    what was that?

2    A.  That was a company that held my and my Gary's equity stakes

3    in FTX.

4    Q.  Continuing down to the next --

5            THE COURT:  Who owned Paper Bird?

6            THE WITNESS:  Gary and I did.

7            THE COURT:  Go ahead.

8    Q.  Continuing down to the next entry, it says:  The balance

9    sheet breaks out a few of our biggest long positions.  We

10   obviously have hedges that aren't listed.

11           What was your reaction to that, Mr. Bankman-Fried?

12   A.  That seemed self-evidently true to me.

13   Q.  Why was that?

14   A.  There were no hedges listed on that balance sheet, and

15   Alameda had put on hedges.

16   Q.  And continuing to the last entry:  Given the tightening in

17   the crypto credit space this year, we returned most of our

18   loans by now.

19           What was your reaction to that, sir?

20   A.  That seemed true to me.

21   Q.  Why is that?

22   A.  The loans that Alameda had taken out from third-party desks

23   had fallen by far more than 50 percent over the prior year.

24           MR. COHEN:  We can take this exhibit down.

25   Q.  Now, continuing in that period in November, let's go to

**A-1048**

NAUMBAN1                    Bankman-Fried - Direct                    2534

1    November 6.

2          MR. COHEN:  Let's pull up Government Exhibit 874 in

3    evidence.  Brian, if we can expand that.

4    Q.  Looking at the top of it, it says -- first of all, who is

5    this from?

6    A.  That is CZ, Changpeng Zhao, the CEO of finance.

7    Q.  It says:  As part of Binance's exit from FTX equity last

8    year, Binance received roughly $2.1 billion USD equivalent in

9    cash, BUSD and FTT.  Due to recent revelations that have come

10   to light, we have decided to liquidate any remaining FTT on our

11   books.

12          Do you see that, sir?

13   A.  Yes.

14   Q.  I want to take it in steps.  The first sentence says --

15          MR. COHEN:  If you can highlight it Brian.

16   Q.  -- as part of Binance's exit from FTX equity last year,

17   Binance received roughly $2.1 billion and so on.

18          What does that refer to?

19   A.  So in mid 2021, we had bought out Binance's equity holdings

20   of FTX.  It had been the seed investor in FTX.

21   Q.  Continuing on he says:  Due to recent revelations that have

22   come to light, we have decided to liquidate any remaining FTT

23   on our books.

24          What did that refer to?

25   A.  CZ was declaring that they were going to sell off the FTT

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1049**

NAUMBAN1                          Bankman–Fried – Direct                    2535

1    that they had gotten from this equity buyout, which was around

2    $500 million worth.

3              MR. COHEN:  You can take that down, Brian, and you can

4    take down the slide.

5    Q.  What, if anything, was your response to this tweet from CZ?

6    A.  I discussed, again with Caroline and others, about whether

7    any of us should send a tweet in response to it.

8    Q.  What, if anything, happened with respect to customer

9    withdrawals?

10   A.  They increased massively.

11   Q.  Can you explain to us what happened.

12   A.  Yeah.  Historically, FTX had seen roughly $50 million per

13   day of net deposits or withdrawals.  On Sunday, November 6, it

14   saw about $1 billion of net withdrawals.

15   Q.  What was your reaction, if anything, to the size of those

16   withdrawals?

17   A.  I was concerned.

18   Q.  Why were you concerned?

19   A.  It signaled a potential, what I viewed to be a potential

20   run on the bank and a risk of a liquidity crisis if that

21   increased.

22   Q.  Let me stop you.  You used the phrase, run on the bank.

23   A.  Yeah.

24   Q.  What did that mean to you?

25   A.  So what that meant to me was, if there is a bank and all of

NAUMBAN1                    Bankman-Fried - Direct                    2536

1  its customers --

2          MS. SASSOON:  Objection.

3          THE COURT:  Sustained.

4  Q.  What did it mean to you in connection with FTX?

5  A.  What it meant to me in connection with FTX was that it

6  was -- FTX was a marketing exchange.  That meant that there

7  were borrows, that there was leverage, and that, because of

8  that, if many customers all at once wanted to close down their

9  positions and withdraw everything from the exchange, that would

10 necessitate closing down the other side of those positions and

11 recalling all borrows.

12         In other words, the only way to return all funds, the

13 only way to process all withdrawals for all users was to

14 liquidate every open margin position on the exchange and shut

15 down the business.  Obviously, that would be in a most extreme,

16 100 percent withdrawals scenario.  But $1 billion was already

17 about ten times as much as I had ever seen in a given day.

18 Q.  Did you discuss with anyone responding to CZ's tweet?

19 A.  Yes.

20 Q.  Who did you discuss it with?

21 A.  I don't remember the exact list, but I know that Caroline,

22 Zane, Ramnik, Nishad, and Gary were all at least tangentially

23 involved.

24 Q.  I think we all know the names.  You mentioned Zane.  Who

25 was that?

**A-1051**

NAUMBAN1                    Bankman-Fried - Direct                    2538

1   A.  So our understanding was that CZ was signaling that he was

2   going to sell $500 million of FTT roughly over a three-month

3   period, roughly, and FTT had been trading above $22 per token

4   and had been above that level for a fairly long time.  This

5   represented a level that we had discussed and decided it would

6   make sense and be profitable for Alameda to buy those FTT

7   tokens at and an offer for CZ to do it in one big chunk to

8   Alameda rather than by working it out over the course of months

9   and hopefully saying hassle on both sides.

10  Q.  In your view, did Alameda have the funds to purchase the

11  FTT at $22?

12  A.  Yeah.  I remember checking and seeing that Alameda had $5

13  billion, roughly, of liquid assets at hand.

14         MR. COHEN:  We can take this slide down.

15  Q.  As we move from November 6 into November 7, what, if

16  anything, did you observe with respect to withdrawals?

17  A.  They didn't just continue at the pace of -- they increased

18  further.  On Monday, Monday November 7, FTX saw about $4

19  billion of net withdrawals from the platform.  That was about

20  100 times an average day.

21  Q.  What, if anything, did that mean to you?

22  A.  That meant that we were -- that we might be, in my view at

23  the time, days away from a liquidating crisis if this

24  continued.

25         MR. COHEN:  Let's move now to November 7, to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1052**

NAU1BAN2                    Bankman-Fried - Direct                    2543

1   Alameda still had a net asset value of roughly positive

2   10 billion.  FTX had no holes on its balance sheet.  And there

3   had been no attack on the customer assets.  And so my view at

4   the time was that the exchange was okay and that there, you

5   know, there was no——no hole in terms of assets.

6        MR. COHEN:  Okay.  Now let's call out No. 2, Brian.

7   Q.  You said here, "FTX has enough to cover all client

8   holdings.  We don't invest client assets (even in treasuries).

9   We have been processing all withdrawals and will continue to

10  be.  Some details on withdrawal speed."

11       What does this all refer to, Mr. Bankman-Fried?

12  A.  Yeah.  So the last thing——the prior thing we looked at was

13  the BTC notes and the banking and stuff.  The first pieces of

14  that, FTX itself had effectively no liabilities and just

15  assets.  And FTX did not do any investments with customer

16  assets.  So FTX just kept the customer assets it held in

17  wallets and bank accounts.  We had discussed whether to invest

18  in treasuries.  Hadn't done that.  And as of the time this was

19  sent, Alameda, which was obviously a large customer on FTX,

20  still had far more in assets than in liabilities.

21       MR. COHEN:  Okay.  Okay.  You can take that down.

22  Q.  Going into the evening of November 7th, what, if anything,

23  did you observe with respect to customer withdrawals?

24  A.  Yeah.  They accelerated to about $4 billion over the course

25  of the day.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1053**

NAU1BAN2                    Bankman-Fried - Direct              2544

1   Q.  And what did this mean to you?

2   A.  It meant that we were on the verge of a liquidity crisis.

3   Q.  Okay.  Now we've spoken several times about hedges.  Do you

4   recall that, sir?

5   A.  Yes.

6   Q.  And I think you told us hedges got put on in September.

7   A.  That's right.

8   Q.  What effect, if any, did they have now in November?

9   A.  Well, so far they hadn't been relevant because there hadn't

10  been any market move.  Alameda's assets and liabilities had

11  not, in my understanding at the time, moved that much since

12  mid-June.  That would soon change, though.

13  Q.  All right.  So you said you thought there was a liquidity

14  issue.  What did you mean by that?

15  A.  So effectively, going into this, there had been roughly 5

16  to $10 billion of liquidity on hand, which means ability to

17  immediately process or promptly process liquid customer

18  withdrawals.  That was far more than had been needed before,

19  but in a two-day period, customers had withdrawn about

20  $5 billion of liquid assets.

21  Q.  What happened going into November 8th in terms of

22  withdrawals?

23  A.  They were continuing at that same 3-to-$4 billion-a-day

24  clip.

25  Q.  And did anything else happen that—did anything happen that

**A-1054**

NAU1BAN2                    Bankman-Fried – Direct                    2545

1   changed your view of Alameda at that point?

2   A.  Yes.

3   Q.  What was that?

4   A.  On the evening——so beginning on the evening of November 7th

5   and continuing into the morning of November 8th, there was a

6   market crash.

7   Q.  Can you explain what you mean by that.

8   A.  Yeah.  So assets that I understood to be associated with

9   Alameda declined massively in value.  FTT, over a 12-hour

10  period or so, fell I think roughly 80 percent.  Solana fell

11  roughly 50 percent.  This was——overall, this led to an

12  approximately 50 percent crash in Alameda's assets, and that

13  was the 50 percent crash that drove its net asset value from

14  close to $10 billion to only a little bit above 0.

15  Q.  Okay.  And what, if anything, did that mean to you?

16  A.  That meant that Alameda was still solvent but that there

17  was very little margin for error left, that we were risking a

18  solvency crisis.

19  Q.  And now coming back to the hedges we talked about.

20  A.  Yes.

21  Q.  What, if any, effect did they have?

22  A.  Unfortunately none.

23  Q.  Why was that?

24  A.  The hedges had been in general market instruments, both

25  cryptocurrency and equities, things like Bitcoin.  However,

**A-1055**

NAU1BAN2                 Bankman-Fried – Direct               2546

1   unlike all of the previous market crashes, the 70 percent

2   crashes over the first half of the year that had led to the

3   large decline in Alameda's NAV from 40 billion or so to

4   10 billion or so, this crash was not a broad crash.  Bitcoin

5   had been down 70 percent over the first half of the year, but

6   on November 7th and 8th, 2022, Bitcoin basically didn't move.

7   Even though FTT was down over 50 percent, Solana was down

8   around 50 percent, Bitcoin was down maybe 10 percent, and

9   stocks basically didn't move at all.  The hedges, which would

10  have been helpful against the prior crashes to protect income,

11  had effectively no benefit for what happened here.

12          MR. COHEN:  Let's call up again Government

13  Exhibit 866.  And call out the first entry.

14  Q.  Where you say, "FTX is fine.  Assets are fine."

15  A.  Yup.

16  Q.  Once you learned the information you just related, what, if

17  anything, did you do?

18  A.  I took down this tweet thread.

19          MR. COHEN:  All right.  At this time, your Honor, I'd

20  like to read from Government Exhibit 2001, which is a

21  stipulation agreed upon by the parties, and in evidence.

22          "The exhibits set forth in attachment B below are

23  authentic copies of tweets and retweets posted at the dates and

24  times indicated on the exhibits, but which were later deleted

25  at dates and times listed in attachment B."  And it lists

**A-1056**

NAU1BAN2                    Bankman-Fried - Direct                    2547

1    Government Exhibit 866, deleted November 8, 2022, at 5:37 p.m.

2    BY MR. COHEN:

3    Q.   Okay.  All right.  Now I want to pick up——well, let me just

4    ask you one question, and then we'll come back to it.

5            On November 8th, what, if anything, were you thinking,

6    what, if anything, did you do with respect to FTX and Alameda?

7    A.   A few things.  The first was, effectively began liquidating

8    Alameda.  It had reached that critical threshold where its NAV

9    was barely positive, and started to get all liquidity it could

10   put together, begun closing down positions, and potentially

11   closing down the company entirely.  And at the same time I had

12   calls with potential investors.

13   Q.   Why were you calling potential investors?

14   A.   Because in my view at the time, while Alameda was still

15   solvent, as was FTX, it was potentially going to be a lengthy

16   process to close down the company, to liquidate its holdings,

17   and with the run on the bank, customers——

18           MS. SASSOON:  Objection.  "Run on the bank."

19           THE COURT:  Pardon me?

20           MS. SASSOON:  "With the run on the bank."

21           MR. COHEN:  He defined it in terms of FTX.

22           THE COURT:  I don't think exactly, but I'll let it

23   stand.  I think everybody understands what he's saying.

24   A.   With the run on FTX.  The——customers were requesting

25   billions of dollars immediately of——of withdrawals.  And if we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1057**

NAU1BAN2                    Bankman-Fried – Direct                    2553

1              (At the sidebar)

2              MS. SASSOON:  I'm not entirely sure where this is

3     going, but I asked for a sidebar because there is a

4     conversation described in Michael Lewis's book that is sourced

5     to the defendant that we consider a false exculpatory and

6     inadmissible hearsay, and I don't know if that is where you're

7     going, but I would ask for a preview outside the presence of

8     the jury to lodge any hearsay objections.

9              MR. COHEN:  Sure.

10             THE COURT:  Mr. Cohen.

11             MR. COHEN:  Where this is going is, he had a

12    conversation——he, the defendant, had a conversation with Nishad

13    who said, *What do I tell Zane Tackett,* who was the person

14    dealing with institutional investors, and the defendant said, *I*

15    *don't think we did anything wrong.  I don't think you did*

16    *anything wrong.*  And Nishad said, *That's not good enough.*  And

17    that's what I'm seeking to elicit.

18             MS. SASSOON:  Your Honor, we would object to that as

19    hearsay.  Does not go to his state of mind because it does not

20    meet the contemporaneous requirement of the state of mind rule.

21    It's after the collapse had effectively happened, the

22    defendant's been exposed, he's trying to cover his tracks and

23    he's trying to prevent——

24             MR. COHEN:  That's the government's interpretation of

25    the evidence.  We're entitled to bring it out and argue the

**A-1058**

NAU1BAN2          Bankman-Fried – Direct          2554

1    opposite interpretation, which is that our client was

2    continuing to say that he thought neither he nor Mr. Singh had

3    done anything wrong, then Mr. Singh is acting in an opposite

4    way.  It's really a relevancy objection.

5         THE COURT:  Give me the offer of proof again exactly?

6         MR. COHEN:  Sure.  It's——I don't think it's the

7    passage counsel was thinking of, but anyway, the offer of proof

8    is, it speaks to Mr. —— Nishad says to him, *I need to know what*

9    *to say to Zane Tackett,* who was head of institutional invest——

10        THE COURT:  I know.

11        MR. COHEN:  Okay.  And Mr. Bankman-Fried says, *Well, I*

12   *will say tell him we didn't do anything wrong.  I didn't, you*

13   *didn't.*  And Mr. Singh says, *That's not good enough.*  That's

14   the sum and substance I'm trying to elicit.

15        THE COURT:  And you say that "that's not good enough"

16   is not admissible because?

17        MS. SASSOON:  The whole thing of "we didn't do

18   anything wrong" is not admissible.  It's not a statement of his

19   then-existing state of mind as to future intent or plan.  It's

20   a retrospective statement to try to absolve himself of

21   responsibility and under the cases that interpret Rule 803(3),

22   like *Cardascia,* the state of mind exception focuses on the

23   contemporaneity of the statement and the unlikelihood of

24   deliberate or conscious misrepresentation.  This conversation

25   has every indicia of deliberate or conscious misrepresentation,

**A-1059**

NAU1BAN2                    Bankman-Fried – Direct                    2555

1   and this does not pertain to future intent or plans.  It's

2   after the scheme has been exposed.

3           MR. COHEN:  It's after the bankruptcy filing, your

4   Honor, on November 11th, when, according to the government, the

5   conspiracy is still in effect.  This is the first time I've

6   heard in this trial that the conspiracy ended the first week of

7   November.

8           THE COURT:  I don't think you heard that.  I certainly

9   didn't.

10          MS. SASSOON:  And——

11          MR. COHEN:  Can I finish, please.

12          MS. SASSOON:  I'm sorry.

13          MR. COHEN:  And the fact that the defendant is

14  testifying to his own state of mind, that he believed he had

15  not done anything wrong during that period before the filing,

16  that he didn't think Mr. Singh had done anything wrong before

17  the filing, is certainly relevant to the issues in this case,

18  and certainly goes to his state of mind.

19          MS. SASSOON:  Your Honor, there's no general exception

20  that any statement during a conspiracy is admissible under

21  803(3).  Only the government is permitted to put in

22  co-conspirator statements.  What the defense has to show is

23  that the statement itself pertains to future intent or plan.

24  The bankruptcy happened later, but at this point employees are

25  demanding answers, the defendant is in hot water, he's lying on

**A-1060**

NAU1BAN2                    Bankman-Fried – Direct                    2556

1    Twitter, he's trying to cover——

2              MR. COHEN:  That's their interpretation.

3              THE COURT:  Stop interrupting, please.

4              MR. COHEN:  I'm sorry.  I'm sorry.  I'm sorry.

5              MS. SASSOON:  And if he wants to get on that stand and

6    say, "I didn't think I was doing anything wrong," that's one

7    thing, but to offer a self-serving hearsay statement that he

8    gave to his employee, who he wanted to enlist in not exposing

9    his crimes, does not meet Rule 803(3).

10             MR. COHEN:  We just heard the government's summation

11   on that point.  They're entitled to give it, your Honor, but

12   the defendant is entitled to say, at the time, not after the

13   fact, he didn't think——he did not think he did anything wrong,

14   and that's what he said to Mr. Singh.  And Mr. Singh objected

15   to that.  It goes to the weight of this, and not admissibility.

16             MS. SASSOON:  Are you trying to offer this under

17   803(3) or another rule?

18             MR. COHEN:  His statement comes in as 803(3), the

19   defendant's state of mind.  How could it not?

20             MS. SASSOON:  It requires that it be a statement of

21   the declarant's then-existing state of mind, such as motive,

22   intent, or plan, or emotional, sensory, or physical condition,

23   but not including a statement of memory or belief to prove the

24   fact remembered or believed.  And——

25             THE COURT:  Sustained.

**A-1061**

NAU1BAN2                    Bankman-Fried – Direct              2557

1          (In open court)

2          THE COURT:  Objection sustained.

3   BY MR. COHEN:

4   Q.  Okay.  Mr. Bankman-Fried, you mentioned that during this

5   week, starting around November 8th, you started to contact

6   investors.

7   A.  Yup.

8   Q.  Did you have any contact with Binance?

9   A.  Yes.

10  Q.  What was that contact?

11  A.  Beginning with the market crash, late on the 7th and early

12  on the 8th, I reached out to CZ, the CEO of Binance, about

13  potentially acquiring FTX.

14  Q.  Did anything happen with respect to that potential

15  acquisition?

16  A.  Yeah.  Later that day they signed a letter of intent to

17  acquire FTX.

18  Q.  And what happened with respect to that letter of intent?

19  A.  About a day later they backed out of it.

20  Q.  Okay.  Did you speak with other investors that week?

21  A.  I did, yes.

22  Q.  Okay.  Let me call your attention to the end of that week.

23  Did there come a time when you had a conversation with Can Sun?

24  A.  Yes, I did.

25  Q.  And just to remind everyone, who was he?

NAU1BAN2                    Bankman-Fried - Direct            2566

1    Bahamas?

2    A.   Yeah.

3    Q.   Okay.  And where was the meeting?

4    A.   We had multiple meetings.  They were at the headquarters of

5    the Securities Commission.

6    Q.   Who was there?

7    A.   Christina Rolle, the head of the Securities Commission of

8    the Bahamas; her staff; the joint provisional liquidators;

9    myself; Krystal Rolle, my Bahamian attorney; and my father; and

10   then for the first meeting there were others in the

11   headquarters but not in the meeting itself.

12   Q.   Okay.  And after the meeting what happened next?

13   A.   Just to clarify, because there were multiple meetings, are

14   you——you're referring to the November 12th meeting?

15   Q.   November 12th, yes.  I'll get to the others.

16   A.   Yeah.  So in that meeting in particular, Gary Wang was at

17   the headquarters as well, although not in the interview itself.

18          THE COURT:  Sorry.  Mr. Bankman-Fried, the question

19   was:  What happened next?

20          THE WITNESS:  Yes.  Understood.

21   A.   So after that, most of the people who had been at the SCB

22   headquarters drove down to the FTX office.

23   Q.   And what, if anything, happened at the FTX office?

24   A.   At the FTX office, Gary and I were directed to help

25   transfer the remaining assets under FTX's custody to a custody

**A-1063**

NAUMBAN3                    Bankman-Fried - Cross                    2601

1   platform?

2   A.  I am not sure exactly what you are referring to.  I made a

3   lot of public statements.

4   Q.  Yes or no, do you recall making public statements that FTX

5   was a safe platform?

6   A.  I can't think of a specific one off the top of my head.

7   Q.  Generally, do you recall in substance making statements

8   that FTX was a safe platform?

9           MR. COHEN:  Objection.

10          THE COURT:  Overruled.

11  A.  Some things that were sort of like that, yes.  I am not

12  sure exactly what you are referring to.  But I am not saying --

13          THE COURT:  Mr. Bankman-Fried, the issue is not what

14  she is referring to.

15          Please answer the question.

16  Q.  Putting aside what I'm referring to, I'm asking whether you

17  recall making statements as CEO of FTX that in substance stated

18  that the FTX platform was safe.

19  A.  I remember things around specific parts of the FTX platform

20  that were related to that.  I don't remember a general

21  statement to that effect.  I am not sure there wasn't one.

22  Q.  In media interviews isn't it true that you insisted on that

23  FTX had protections for retail customers?

24  A.  Yup.

25  Q.  You told your customers that users' funds and safety come

**A-1064**

NAU1BAN4                    Bankman-Fried - Cross                    2663

1   Q.  I'm asking you whether you had authorization to search the

2   database.

3   A.  I have no idea whether someone had created an account in my

4   name that in theory was designed for me.  If so, I never used

5   it.

6   Q.  And so it's your testimony that until October 2022, you

7   never looked in the database.

8   A.  That's correct.  And even as of then, I never looked in the

9   AWS database.

10  Q.  After FTX declared bankruptcy, isn't it true that one of

11  the first things you did was try to restore your administrative

12  access to the AWS database?

13  A.  That's not how I would put it.

14  Q.  Isn't it true that in the weeks following the bankruptcy,

15  you asked to have your access to the AWS database restored?

16  A.  Not—I was not specifically looking for my personal access

17  to the AWS database.

18  Q.  Isn't it true you were requesting AWS access?

19  A.  I was requesting it on behalf of the joint provisional

20  liquidators in the Bahamas.

21  Q.  So yes or no:  You made requests to restore access to the

22  AWS database?

23  A.  I'm not sure exactly what you're referring to here.

24          THE COURT:  Look, could you just answer the question

25  instead of trying to ask the questioner what she's referring

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NAU1BAN4                    Bankman-Fried - Cross              2664

1  to?

2          THE WITNESS:  Okay.

3  A.  No.

4  Q.  Isn't it true that you made to-do lists after FTX's

5  collapse that included things like "try to get AWS access"?

6  A.  Probably.

7  Q.  And so isn't it true that you were trying to get AWS access

8  after FTX declared bankruptcy?

9  A.  Yes.

10  Q.  Now putting aside the AWS database, you did know that

11  Alameda had a line of credit with FTX while you were CEO,

12  correct?

13  A.  Yes.

14  Q.  And it's true, isn't it, that most customers of FTX did not

15  have a line of credit, right?

16  A.  That's correct.

17  Q.  Most customers had to post actual assets with FTX in order

18  to borrow money, right?

19  A.  Yes, that's correct.

20  Q.  But you permitted Alameda to borrow without requiring that

21  it post collateral to the exchange, right?

22  A.  To my knowledge, a number of market makers had lines of

23  credit.

24  Q.  That wasn't my question, Mr. Bankman-Fried.  My question

25  was:  You permitted Alameda to borrow from FTX without

**A-1066**

NAU1BAN6                    Bankman-Fried – Cross                    2710

1        THE COURT:  So did you become director by mistake or

2   accident or something else?

3        THE WITNESS:  No.  I'm not saying I didn't approve

4   this transfer.  I absolutely did approve this transfer.

5        MS. SASSOON:  If we could show the witness what's been

6   marked as Government Exhibit 933.

7        And Mr. Bianco, if you can scroll.  And my colleagues

8   can correct me if this is already in evidence.

9        My colleagues have indicated this is in evidence, so

10  we can go ahead and publish it.

11  BY MS. SASSOON:

12  Q.  This is an affidavit that you filed in court, right?

13  A.  I'm not sure.

14  Q.  You don't recognize it?

15  A.  I recognize the topic.  I haven't read through the——I don't

16  know.  Sorry.  I didn't read through this one.

17  Q.  Do you see on this page we're looking at here, it says

18  Affirmation of Samuel Bankman-Fried?

19  A.  Yup.  Yup.  I see that.

20  Q.  And this was submitted to a judicial court, correct?

21  A.  Yes.

22  Q.  And is it your testimony that you submitted an affirmation

23  to a court without reading it?

24  A.  Sorry.  I was saying I had not just now read it.  I hadn't

25  gotten to the point of seeing what this was yet.

**A-1067**

NAU1BAN6                    Bankman-Fried – Cross                    2726

1   Q.  So when you say you didn't know at the time that the odds

2   were significant, you understood that that was a risk, correct?

3   A.  There's always a risk with margin trading that there would

4   be clawbacks.

5   Q.  That's not my question, Mr. Bankman-Fried.  My question is

6   whether, in June of 2022, you knew that there was a risk that

7   Alameda specifically might not be able to repay its debts to

8   FTX.

9   A.  I don't remember thinking of it that way.  If you'd asked

10  me, I wouldn't have said that zero was the right number then or

11  ever for margin trading.  I didn't think of there as being a

12  significant risk at that point in time.  But it was not——I

13  would not have said that there was absolutely no risk.

14  Q.  Mr. Bankman-Fried, I didn't ask you about margin trading.

15  I'm asking about Alameda's debt to FTX and whether you

16  understood, in June of 2022, that there was a risk that Alameda

17  could not repay that debt.

18  A.  Okay.  I did not think of that at the time as being a

19  significant risk, but I would not have said that there was no

20  risk at all.

21  Q.  Just to be clear, Mr. Bankman-Fried, taking money from FTX

22  to pay back lenders, that's not margin trading, is it?

23  A.  I'm not——I don't think that's what happened, and I'm also

24  not saying that's not margin trading.

25          THE COURT:  Would you please answer the question.

**A-1068**

NAU1BAN6               Bankman-Fried – Cross                 2732

1   A.  Or something like that, yeah.

2   Q.  And that's the second tab of this spreadsheet.

3   A.  That's right.

4   Q.  Now by the time you testified, you knew that the government

5   had obtained Google metadata showing that you had viewed this

6   spreadsheet on June 19, 2022; isn't that right?

7           MR. COHEN:  Objection.

8           THE COURT:  Ground?

9           MR. COHEN:  Lacks foundation.

10          THE COURT:  Overruled.

11  A.  I'm not sure how to interpret the metadata.

12  Q.  Yes or no, Mr. Bankman-Fried.

13          THE COURT:  You were not asked how to interpret the

14  metadata.

15          THE WITNESS:  I'm sorry.  Can you repeat the question.

16  I'm sorry.

17  Q.  At the time you testified at this trial, you knew that the

18  government had obtained Google metadata showing that you viewed

19  this spreadsheet, this eight-alternative spreadsheet on

20  June 19, 2022, correct?

21          MR. COHEN:  Objection.

22          THE COURT:  What's the objection?

23          MR. COHEN:  Same objection, your Honor.

24          THE COURT:  Same ruling.

25  A.  I know that——I know that the——there was metadata that

**A-1069**

NAV1BAN1                    Bankman-Fried – Cross

1   less involved in Alameda.

2            MS. SASSOON:  Mr. Bianco, will you show the witness

3   what's been marked as Government Exhibit 2577.

4   Q.  Do you recognize the names on this list as members of the

5   Alameda settlements team?

6   A.  I recognize many of them.

7            MS. SASSOON:  The government offers Government

8   Exhibit 2577.

9            MR. COHEN:  No objection.

10           THE COURT:  Received.

11           (Government's Exhibit 2577 received in evidence)

12           MS. SASSOON:  Mr. Bianco, can you publish that.

13   BY MS. SASSOON:

14   Q.  Let's take Lena Ngoy as an example.  Do you recall that she

15   was a member of the Alameda settlements team?

16   A.  Yup.

17   Q.  She was not a trader, right?

18   A.  She was involved in OTC trades.

19           THE COURT:  Mr. Bankman-Fried, the question was

20   whether she was a trader.

21   A.  Her title was not trader.

22   Q.  And was she making trading decisions for Alameda?

23   A.  I'm not sure.

24   Q.  Are you aware of any trading decisions that Lena Ngoy made

25   for Alameda?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1070**

NAV1BAN1                    Bankman-Fried – Cross

1   got fixed, and Adam was ultimately one of the people chiefly

2   working on it.

3   Q.  You were in the courtroom for Adam Yedidia's testimony at

4   the start of this trial, correct?

5   A.  I was.

6   Q.  Do you recall his testimony that when he fixed the bug, he

7   told you that Alameda still owed $8 billion to FTX customers

8   for their dollar deposits?

9   A.  I recall something to that effect.

10  Q.  And is it your testimony that when Adam Yedidia said that

11  under oath under a grant of immunity in this courtroom, that he

12  had it wrong?

13  A.  I don't think I quite said that.  I don't remember him

14  saying it in that way.

15  Q.  So are you saying that Adam Yedidia had it wrong when he

16  described telling you that Alameda still owed $8 billion to FTX

17  customers?

18          MR. COHEN:  Objection.

19          THE COURT:  Sustained.

20          Look, Mr. Bankman-Fried, did he tell you, in words or

21  in substance, after the bug was fixed, that Alameda still owed

22  $8 billion to FTX customers for their dollar accounts?

23          THE WITNESS:  I don't recall him telling that to me on

24  or around that day in words or in substance.

25          THE COURT:  I didn't ask you about that day.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1071**

| | NAV1BAN1 | Bankman-Fried - Redirect |

1   queries in the AWS database?

2   A.  No.

3   Q.  You were asked a number of questions yesterday and today

4   about whether you had made disclosures to customers of FTX.  Do

5   you recall that, sir?

6   A.  Yup.

7   Q.  Was FTX a public company?

8   A.  No.

9   Q.  It was a private company?

10  A.  Yup.

11  Q.  Did you believe you had a obligation to make daily

12  disclosures?

13          MS. SASSOON:  Objection.

14          THE COURT:  Sustained.

15  Q.  What was your view of when you had to make disclosures to

16  customers?

17          MS. SASSOON:  Objection.

18          THE COURT:  Sustained.

19  Q.  Mr. Bankman-Fried, in connection with your duties as CEO of

20  FTX, did you have occasion to review whether to make

21  disclosures to customers?

22  A.  In some cases, yes.

23  Q.  Okay.  And what factors went into that consideration?

24  A.  So specifically around customer positions on the exchange,

25  our general policy for disclosures was that if a customer

**A-1072**

NAVMBAN3

```
 1    and insert, voluntarily and with wrongful purpose.

 2              That picks up your point, Mr. Rehn?

 3              MR. ROOS:  Yes.  Thank you, your Honor.

 4              THE COURT:  Anything else through 14, line 14?

 5              MR. REHN:  Similarly, on page 12, at lines 23 and 24,

 6    there is a sentence that says:  Good faith is an honest belief

 7    by the defendant that his conduct was not unlawful.  I think

 8    that's the inverse of what we just discussed and imports an

 9    incorrect willfulness standard into the good-faith instruction.

10              THE COURT:  And, therefore.

11              MR. REHN:  Therefore, that sentence should be

12    stricken.

13              THE COURT:  Mr. Dick.

14              MR. DICK:  In our view, the sentence under discussion,

15    which goes from lines 23 to 24, on page 12 should read:  Good

16    faith is an honest belief by the defendant that his conduct was

17    not unlawful or improper.  The invert proposition Mr. Rehn was

18    referring to, we don't think is applicable, an honest belief

19    that one's conduct was not unlawful.

20              THE COURT:  Picking up the language that we just

21    adopted on page 11, would it solve the concerns to say, good

22    faith is an honest belief by the defendant that his conduct was

23    not wrongfully intended?

24              MR. REHN:  That would be fine with the government,

25    your Honor.
```

**A-1073**

NAVMBAN3

1              THE COURT:  Mr. Dick.

2              MR. DICK:  Your Honor, we would ask for the original

3      charge, conduct was not unlawful.  We think that's proper.

4              THE COURT:  Overruled.

5              Anything else from either side to and including page

6      14, line 14?

7              MR. REHN:  Nothing further from the government, your

8      Honor.

9              THE COURT:  Mr. Dick.

10             MR. DICK:  Your Honor, on the top of page 13, there is

11     what's been called the no-ultimate-harm instruction beginning

12     on line 3.  It's the sentence, however.  We made a submission

13     that we don't view that as necessary here.  To the extent that

14     the evidence shows Mr. Bankman-Fried believed customers would

15     never be harmed, including in the short term, which is what we

16     submit the evidence shows, this instruction is not necessary,

17     and that's in our prior submission.

18             MR. REHN:  Your Honor, there has been quite a bit of

19     evidence for them in the defense case about a belief that the

20     companies would be able to repay the customers, so there is a

21     factual predicate for this instruction in the record, and it's

22     an instruction that has been approved repeatedly in exactly

23     these terms by the Second Circuit when a factual predicate

24     exists in the trial record.

25             THE COURT:  Overruled, Mr. Dick.

**A-1074**

2869

NAV1BAN4

1      THE COURT:  All right.  Now give me a couple of

2  seconds to look at these authorities.

3      Mr. Dick, *Peltz* and *Cassese*, if it adopted the

4  standard you said at all, did so for insider trading cases

5  alone; isn't that right?

6      MR. DICK:  I think I disagree, your Honor, and if one

7  looks at the *Kaiser* decision, it seemed to say that for insider

8  trading cases only, the specific intent I mentioned——intent to

9  violate the securities law——was not required, but for a

10 misrepresentation on investors theory, it was required.

11     THE COURT:  Mr. Rehn, what about it?

12     MR. ROOS:  I believe he actually has that backwards.

13 I believe in the insider trading context——I don't have the case

14 in front of me, your Honor, but as I recall, the insider

15 trading cases sometimes do have a stronger willfulness

16 instruction than the more general misrepresentation on

17 investors cases, so on my recollection, that's what the *Kaiser*

18 case says.  It certainly was the case in *Petit* that the Second

19 Circuit recently affirmed an instruction that the defendant

20 acted deliberately and with a bad purpose and said that there

21 was no further instruction required for willfulness.

22     *Petit*, I believe, was not an insider trading case; it

23 was just a general securities fraud case.

24     THE COURT:  The government is right on this, so that

25 it will stand as written.

**A-1075**

NAV1BAN6

 1    I'm going to charge as I initially proposed, save with respect

 2    to moving what is the second very large clause at page 8,

 3    lines 2-5, into a separate sentence at the end of that

 4    paragraph.  That was not controversial.  But the charge is I

 5    think making clear that the government has to prove a false

 6    statement in order to prove misappropriation.  And that's how

 7    it's going to go to the jury.

 8            Now this ought not to be much of a problem for the

 9    government because god knows there's more than sufficient

10    evidence of both, to get to the jury, obviously.  And it's a

11    matter, in significant measure, of ordering the trial in a way

12    that is consistent with what everybody has said with good

13    intentions and avoiding other unintended consequences that

14    might follow from allowing the government to change its

15    position here, whether or not the position they took was

16    exactly what they thought they were taking.  So that's the

17    answer.

18            Now should I have somewhere a letter from the defense

19    on the one point I was going to get a proposal for, as to

20    language?

21            MR. EVERDELL:  We didn't file it on the docket, but we

22    can hand up a copy right now.

23            THE COURT:  Okay.  Hand it up and we'll get this all

24    put to bed.

25            And you've seen this, Mr. Rehn, right?

**A-1076**

NB1MBAN1                    Summation - Mr. Roos                    2911

1          THE COURT:  Good morning, everyone.  Everyone can be

2     seated.  The defendant and the jurors all are present.

3          A word to the jury about schedule.  You are going to

4     hear closing argument today.  We may finish them entirely today

5     or we may not.  That depends on how the day goes.  If we don't,

6     they will be finished tomorrow morning.  In either case, you

7     will get the case tomorrow morning for decision.

8          If anyone would have a problem, should the need arise,

9     in staying beyond 4:30 tomorrow, please let me know in a note

10    this morning and what the nature of the problem is, because it

11    may become appropriate to ask you to stay late tomorrow if

12    there is no verdict.  I am not suggesting there should or

13    shouldn't be.  My operating assumption, which I will confirm

14    before I ask you to stay, if I ask you to stay, is that you

15    would get dinner on the government if you stayed.  I don't

16    vouch for the quality, but you would be entitled to dinner.

17    And I think we might be able to provide car services if you

18    stay to a certain hour.  But I'm holding myself available for

19    Thursday night if that would be helpful.

20         As for Friday, I'll keep you posted as the day goes

21    by, and indeed maybe even tomorrow.

22         We are now going to hear the closing argument on

23    behalf of the government.

24         Mr. Roos.

25         MR. ROOS:  Thank you, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1077**

1    And it wasn't just customers.  The defendant's public

2    statements, FTX's ads, FTX's policy documents and its terms of

3    service all said the same thing.  And advertisements like the

4    ones we saw with Tom Brady or Larry David.  FTX said it was the

5    safest and easiest way to buy cryptocurrency.  And in its terms

6    of service FTX said that assets are the property of its

7    customers and do not belong to FTX.  In its policies FTX said

8    that customer assets, both fiat and cryptocurrency, are

9    segregated, that customer funds do not represent the property

10   of FTX, and that customer assets are held in trust.

11           Employees and investors all testified that they

12   believed the customer deposits belonged to the customers, that

13   they could not be taken or used or borrowed, and you heard

14   about the reaction of employees when they learned that FTX

15   customer deposits were being used.  Adam Yedidia quit within a

16   half hour.  Can Sun resigned.  So did Christian Drappi.  The

17   defendant's partners in crime said the same thing.  Caroline

18   Ellison, Nishad Singh, Gary Wang, their understanding was that

19   customer funds were not allowed to be used by FTX or Alameda or

20   anyone else.  They believed it was wrong and illegal.  It

21   didn't matter if it was a customer, an investor, a lender, an

22   employee, or a coconspirator.  It was a universal view from the

23   witnesses you heard.  Customer funds belong to customers and

24   could not be used.

25           Third, there is no serious dispute that around $10

**A-1078**

1   billion went missing.  The evidence you saw, and we will talk

2   about it again, shows that there was a huge difference between

3   what FTX's system said they were supposed to have for customers

4   and what FTX actually had for customers.  Billions of dollars

5   missing in cryptocurrency, billions of dollars missing from

6   bank accounts, and there is no serious dispute about that.

7          Fourth, there is no serious dispute about where the

8   missing money went.  Professor Easton traced the money.  The

9   missing billions went to pay for investments, stock-share

10  buybacks, real estate purchases, donations, trading expenses,

11  and loan repayments.  The clear uncontradicted evidence shows

12  that the defendant was responsible for these giant investments,

13  for stock repurchases, for real estate purchases, for political

14  donations.

15         Over the last month you have heard evidence about

16  Bitcoins and Blockchains, auto-liquidation and

17  auto-deleveraging, computer code, and so-called Korean

18  accounts, about a lot of other concepts.  Here is the thing.

19  This is not about complicated issues of cryptocurrency.  It's

20  not about hedging.  It's not about technical jargon.  It's

21  about deception, it's about lies, it's about stealing, it's

22  about greed.

23         What is the dispute in this case?  One of the disputes

24  is whether the defendant knew.  That's what they have said.

25  The evidence that the defendant knew that he was spending FTX

**A-1079**

NB1MBAN1                    Summation - Mr. Roos                    2916

1    customer money, though, I submit, is beyond dispute.

2         The core dispute in this case is whether the defendant

3    knew taking the money was wrong.  That's the core question.

4    And the answer is clear.  He took the money.  He knew it was

5    wrong.  He did it anyway.  Because he thought he was smarter

6    and better and he that he could figure his way out of it, he

7    could walk his way out of it and talk his way out of it, and

8    today, with you, that ends.  You have sat through this trial.

9    You have seen the evidence.  And, very simply, when you apply

10   your common sense and look at the evidence, you see the

11   defendant schemed and lied to get money, which he spent, and

12   now it's gone.

13        You see over and over and over again he and his

14   company were telling customers their money would be protected,

15   and they were using it at the same time for whatever the

16   defendant wanted to use it for.  And you see over and over

17   again from his own statements, from his own conduct that he

18   knew what he was doing was wrong.  There is overwhelming guilt,

19   overwhelming evidence of the defendant's guilt.

20        Before we dive into the evidence, let me say something

21   about the fact that the defendant took the stand in this case.

22   He didn't have to testify in this trial.  He has a right not to

23   do that, and he doesn't have a burden to put on any evidence.

24   The burden is on the government, and we embrace that burden.

25        But the defendant did take the stand, and he told a

**A-1080**

NB1MBAN1                    Summation – Mr. Roos                    2929

1    with that, and I did that.

2         As a result of Alameda's ability to go negative and

3    its $65 billion line of credit, it was able to run up this

4    massive negative balance, billions of dollars.  When I'm

5    talking about a negative balance, I'm talking about an account

6    that's in the red.  It has got a negative sign in front of it,

7    which means it's in a deficit, it's in a hole, and Alameda was

8    in a multibillion dollar hole.

9         This presented really a massive, totally undisclosed

10   risk to FTX's customers.  They were told that their assets

11   would be safe.  They were told that if a customer's account

12   would go negative, the way they would be kept safe is by having

13   that customer's account liquidated or shut down.

14        And what they didn't know, what you all know but they

15   didn't know and what the defendant hid from them, is that

16   Alameda had this multibillion dollar negative balance in its

17   account.  And Wang testified that that -- it was these special

18   features that allowed and caused Alameda to have such a large

19   hole at FTX, and Singh said the same thing.

20        Now what the defendant does -- actually, let me put it

21   this way.  What the testimony from these witnesses tells you

22   about the defendant, about the core issue in dispute, is, it

23   tells you the defendant gave special secret privileges to

24   Alameda, knowing it would be allowed to take, to steal customer

25   money.  It shows that he knew it was wrong to take money and

**A-1081**

NB1MBAN1          Summation – Mr. Roos          2930

1   the way -- and this is critical -- the way you know that it

2   shows he knew it was wrong to take customer money is, if he

3   thought this was legit to just have a giant line of credit and

4   this allow negative feature and borrow from other customers,

5   why was it so secret? Why not just say, hey, Alameda, by the

6   way, has a $65 billion line of credit? The reason it is secret

7   is because he knows it's wrong. Now because of these secret

8   features Alameda was not subject to the same rules as other

9   customers. And while there were limits on how other customers

10  could borrow, there were no limits on Alameda's borrowing. Let

11  me talk about one of those limits on other customers.

12          Other customers were not allowed to withdraw funds

13  advanced from a line of credit. Here is a customer contract

14  prohibiting it. That restriction, though, as you heard, did

15  not apply to Alameda's borrowing. So while other customers had

16  to have collateral on the exchange, while other customers could

17  not withdraw their lines of credit, it says it right in this

18  contract, Government Exhibit 69, that rule did not apply to

19  Alameda.

20          As a result of these special features, Alameda ran up

21  a huge negative balance on FTX. This is Government Exhibit

22  1002. This is Alameda's borrowing through its accounts that

23  were allowed to go negative. So this exhibit shows what

24  happened in the major cryptocurrencies in those accounts that

25  had that special allow-negative box checked. The box that we

**A-1082**

NB11BAN2              Summation - Mr. Roos              2938

1   find the defendant guilty of fraud.  He had customers send

2   their bank deposits, their money, fiat deposits, directly into

3   Alameda's bank accounts, and then he spent it.  Here's how

4   Ellison described it.

5          "We received FTX customer funds directly into our bank

6   accounts as part of the FTX fiat deposit system."

7          Ellison explained to you that long before she was

8   Alameda's CEO, the defendant set up a system to receive FTX

9   customer deposits into bank accounts that belonged to Alameda,

10  and a lot of those deposits came through this entity that we've

11  heard some about called North Dimension.  The defendant was

12  involved in opening that account.  He signed the application.

13  That is his name right there, as the principal officer.  This

14  is Government Exhibit 1348.  So he knew.

15         Once FTX customers' deposits landed in Alameda's bank

16  accounts, they were used as a source of free cash.  This is

17  Government Exhibit 1050.  In some ways, the picture here just

18  tells you everything, right?  Professor Easton traced the

19  money.  Rather than holding the customers' money in custody, it

20  was moved all around, commingled, mixed, spent, transferred

21  from one account that received customer money for customers to

22  operating accounts, to FTX accounts, to out the door to all

23  sorts of expenditures, to the defendant's own company called

24  Paper Bird.  And that's because, as Ellison told you, the

25  defendant said they could use the money to fund Alameda.

**A-1083**

NB11BAN2            Summation – Mr. Roos            2945

1   that there was a huge, significant hole, right?

2           Go back an exhibit.

3           If the defendant is regularly reconciling

4   balances——that's the black line——against, as he said, what

5   money they had——the yellow line——he knows that there was a huge

6   gap.  He knows that.  And when he's saying everything is fine,

7   after saying, *we regularly reconcile*, he's lying.  And that

8   tells you that he knows what he's doing is wrong.

9           Now yesterday morning on redirect, the defendant came

10  out and he said that he thought it was okay for Alameda to use

11  customer fiat deposits, and that's a claim that not a single

12  witness besides the defendant has made in this case, right?

13  Universally, they've said this was a bright red line.  You

14  cannot touch that money.  No one thought it was okay.  And the

15  truth was that the defendant, he knew that Alameda was not

16  allowed to use that money, and again, the way you know it is

17  because he said something totally different to Congress.

18  Twice, the defendant told Congress that when an intermediary

19  like Alameda receives customer assets, they must ensure there

20  was "no delay in returning customer funds upon request, and no

21  shortfall where an amount lesser than the value of that

22  customer's assets can be returned."  And he told Congress that

23  to ensure that happens, it's important that there be "a

24  restriction on the custodian"——so that's Alameda——"a

25  restriction on the custodian, including, for example, a

**A-1084**

NB11BAN2              Summation - Mr. Roos              2946

1   restriction on the use of customer assets to finance other

2   business expenses and initiatives."  Think about that last part

3   of his testimony here.  He's saying the third party, the

4   intermediary that receives the money, there must be a

5   restriction on it on using customer assets to finance other

6   business expenses and initiatives.  And if you're thinking,

7   well, that sounds familiar, that's because the defendant did

8   exactly the opposite.  He used customer assets to finance other

9   business expenses and initiatives.  But privately, in secret,

10  you know he knew exactly what was going on and he knew it was

11  wrong.

12          We've talked a lot about all the special advantages

13  and secret privileges that Alameda had.  The defendant knew how

14  wrong and unfair these privileges were to every other customer

15  on the exchange, how these privileges flew in the face of

16  everything he said about trust and safety on the exchange.  So

17  he lied about it, to cover it up.

18          And what was the defendant saying about the

19  relationship between FTX and Alameda?  Throughout his time at

20  FTX, the defendant was saying things publicly like, Alameda is

21  treated just like everyone else.  He tweeted that.  "Alameda is

22  a liquidity provider on FTX but their account is just like

23  everyone else's."  He was quoted in articles as saying that

24  Alameda is a wholly separate entity.  And he told CNBC that he

25  "worked to eliminate conflicts of interest," and that he

**A-1085**

NB11BAN2               Summation – Mr. Roos               2947

1    doesn't run Alameda anymore, and that Alameda is a "neutral

2    piece of market infrastructure."  Those were lies.  Privately,

3    the defendant knew that Alameda had all sorts of special

4    privileges and features on FTX.  It wasn't wholly separate, it

5    wasn't just a piece of neutral market infrastructure, its

6    account was not like everyone else's.  Unlike any other

7    customer, Alameda had the $65 billion line of credit.  It was

8    able to do unlimited amounts of withdrawals, make unlimited

9    amounts of borrowing, have its account go negative, not post

10   any collateral, not be liquidated, not be shut down.  Its

11   borrowing wasn't just through the spot margin program.  Much of

12   it wasn't even on FTX.  If customers knew that the defendant

13   had directed these special privileges for its own affiliated

14   company, they would have run for the exits.  It would have been

15   clear as day that their money wasn't safe, that the defendant

16   was treating their deposits as his personal piggy bank by

17   funneling that money to Alameda.  And so the reason he made

18   these public statements is to conceal what he was doing,

19   because he knew what he was doing was wrong.

20          You know these were deliberate lies.  He told

21   customers that backstopping customer assets was primary within

22   weeks of using customer money to repay his debts.  He told

23   reporters that Alameda was totally separate in September, when

24   he was internally freaking out about the close relationship

25   between FTX and Alameda.  And at the same time, in September

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300