# 24-961

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ZIXIAO GARY WANG, CAROLINE ELLISON, NISHAD SINGH, RYAN SALAME,

*Defendants,*

FTX TRADING LTD., WEST REALM SHIRES INC,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors,*

SAMUEL BANKMAN-FRIED, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT
VOLUME V OF V
(Pages A-1086 to A-1312)**

ALEXANDRA A.E. SHAPIRO
THEODORE SAMPSELL-JONES
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

**TABLE OF CONTENTS**

PAGE

District Court Docket Entries in *United States v. Bankman-Fried*,
  No. 22-cr-673 (LAK) (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Excerpts of Arraignment Transcript, dated January 3, 2023 . . . . . . . . . . . . . A-86

Memorandum and Order Modifying Release Conditions,
  dated February 1, 2023 (Dkt. 58) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-88

Order Modifying Release Conditions, dated February 14, 2023
  (Dkt. 68) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-95

Excerpts of Transcript of February 16, 2023 Pre-Trial Conference . . . . . . . A-96

Third Superseding Indictment, dated February 23, 2023 (Dkt. 80) . . . . . A-103

Fifth Superseding Indictment, dated March 28, 2023 (Dkt. 115) . . . . . . . A-142

Exhibits to Declaration of Christian R. Everdell in Support of Motion
  for Additional Discovery

  Exhibit 9 – Excerpts of Bankruptcy Hearing Transcript,
  dated February 6, 2023 (Dkt. 137-9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-185

  Exhibit 10 – Emails dated February 16, 2023,
  and January 13, 2023 (Dkt. 137-10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-205

  Exhibit 11 – Email dated December 16, 2022 (Dkt. 137-11) . . . . . . . A-211

Exhibit To Bankman-Fried's Motion to Compel Discovery

  Exhibit 1 – Subpoena to Fenwick & West LLP (Dkt. 151-1) . . . . . . . A-213

Excerpts of Transcript of June 15, 2023 Pre-Trial Conference . . . . . . . . . A-361

ii

PAGE

Letter from Government to Hon. Lewis A. Kaplan Re Pretrial Filings,
    dated June 29, 2023 (Dkt. 171) .................................. A-374

Excerpts of Transcript of July 26, 2023 Pre-Trial Conference.......... A-377

Excerpts of Transcript of August 11, 2023 Pre-Trial Conference....... A-379

Sixth Superseding (Operative) Indictment, dated August 14, 2023
    (Dkt. 202)..................................................... A-381

Excerpts of Transcript of August 30, 2023 Pre-Trial Conference....... A-399

Letter from Government to Hon. Lewis A. Kaplan Re Advice-Of-
    Counsel Defense Notice, dated August 18, 2023 (Dkt. 211) ....... A-401

Government's Requests to Charge, dated August 21, 2023 (Dkt. 214) .. A-404

Bankman-Fried's Requests to Charge, dated August 21, 2023
    (Dkt. 215)..................................................... A-504

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Re Advice-Of-
    Counsel Defense Notice, dated August 23, 2023 (Dkt. 222) ....... A-554

Letter from Government to Hon. Lewis A. Kaplan Re Advice-Of-
    Counsel Defense Notice, dated August 29, 2023 (Dkt. 239) ....... A-557

Letter from Bankman-Fried to Hon. Lewis A. Kaplan In Response To
    Dkt. 239, dated August 30, 2023 (Dkt. 240) ..................... A-565

Order On Motions To Exclude Proposed Expert Testimony,
    dated September 21, 2023 (Dkt. 287) ............................ A-572

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
    Clarification And Reconsideration Of Rulings,
    dated October 2, 2023 (Dkt. 306) ................................ A-577

iii

PAGE

Letter from Government to Hon. Lewis A. Kaplan Moving to
Preclude Evidence Of Current Value Of Investments,
dated October 8, 2023 (Dkt. 315) ................................. A-582

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
Permission To Cross Examine Gary Wang On Involvement of
Counsel In Loan Structuring, dated October 9, 2023 (Dkt. 316) ... A-585

Letter from Bankman-Fried to Hon. Lewis A. Kaplan In Response To
Dkt. 315, dated October 10, 2023 (Dkt. 317) ..................... A-588

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Seeking
Permission To Cross Examine Caroline Ellison On Involvement
of Counsel In Creating Auto-Deletion Policies,
dated October 10, 2023 (Dkt. 318) .............................. A-590

Letter from Government to Hon. Lewis A. Kaplan Re Additional
Requests To Charge, dated October 19, 2023 (Dkt. 326) .......... A-592

Bankman-Fried's Amended Requests to Charge,
dated October 19, 2023 (Dkt. 327) .............................. A-598

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Re Objections
to Government's Proposed Jury Instructions,
dated October 24, 2023 (Dkt. 329) .............................. A-658

Letter from Bankman-Fried to Hon. Lewis A. Kaplan Providing
Notice of Certain Direct Examination Testimony Regarding
Involvement of Counsel, dated October 25, 2023 (Dkt. 338)....... A-664

Excerpts of Trial Transcript ......................................... A-670

**Government's Exhibits**

GX-532 FTX Investor Deck, dated March 2021 .................. A-1220

GX-558 FTX Terms Of Service, dated May 13, 2022 ............ A-1231

GX-866 @SBF_FTX Twitter Post, dated November 7, 2022...... A-1293

iv

PAGE

    GX-1005 Alameda Balance on FTX in 2022 Chart . . . . . . . . . . . . . . A-1295

    GX-1014 Alameda Borrowing From Third Party Lenders Chart . . A-1296

**Defense Exhibits**

    DX-1617 Alameda LOC Principal Chart . . . . . . . . . . . . . . . . . . . . . . . A-1297

    DX-1618 FTX User Accounts Balance Chart . . . . . . . . . . . . . . . . . . . A-1298

    DX-1619 FTX User Accounts All Coins Balance Chart . . . . . . . . . . A-1299

    DX-964 (excluded) FTX Blogpost, dated October 28, 2020 . . . . . . A-1300

Exhibit to Bankman-Fried's Sentencing Submission

    Excerpts of Exhibit E – November 15, 2022 Letter From James
    M. McDonald To Prosecutors (Dkt. 407-34) . . . . . . . . . . . . . . . . . . A-1304

Excerpts of Sentencing Transcript, dated March 28, 2024 . . . . . . . . . . . A-1308

Notice of Appeal, filed April 11, 2024 (Dkt. 428) . . . . . . . . . . . . . . . . . . A-1311

**A-1086**

NB11BAN2                    Summation – Mr. Roos                    2950

1                    (Jury present)

2              THE COURT:  Okay.  The defendant and the jurors all

3       are present.

4              You may continue, Mr. Roos.

5              MR. ROOS:  Thank you, your Honor.

6              So the defendant directed that these systems be put in

7       place that allowed him to take FTX customer money, and then

8       once the systems were in place, there were points in time,

9       points along the road, where the defendant was presented with a

10      choice——come clean or double down.  And every time he chose to

11      double down, to take more criminal steps to dig the hole in

12      customer deposits deeper.

13             And so what we're going to do now is I'm going to talk

14      about six moments in time.  And here are the first three.  But

15      six moments in time in 2021 and 2022 where the defendant was

16      presented with a choice about coming clean or doubling down and

17      digging the hole deeper.  And each time, he indisputably knew

18      the financial situation at FTX and Alameda, and he knew that he

19      would be spending customer money, and each of these times, he

20      took the path of doing the wrong thing, he took the criminal

21      path, and so that's what we're going to talk about.

22             And No. 1, the first reason is the defendant's

23      purchase, his buying back of stock from Binance using customer

24      money in 2021.

25             So starting in the middle of 2019, back when FTX was

**A-1087**

NB11BAN2             Summation – Mr. Roos                    2964

1    dug the hole even deeper, is the discussion the defendant had

2    with his co-conspirators——his friends, the people who were his

3    roommates in June 2022——about Alameda having a $10 billion

4    negative balance and then how he told Ellison to repay

5    Alameda's lenders, spending billions of dollars more in the

6    process.  And this was another critical moment in the

7    defendant's scheme.  He knows the financial situation.  He

8    knows they're deeply in the red.  And he decides to use more

9    customer money, knowing what he's doing.  So let's walk through

10   that.

11          To set the scene at this point in time, it's May or

12   June and cryptocurrency prices have dropped, and Caroline

13   Ellison is looking at Alameda's balances and she sees they may

14   be insolvent, out of money, and the defendant is looking at

15   Alameda's balances at this time too.  And you heard from

16   several witnesses that the defendant would sit at his computer

17   and would constantly have it open on six monitors, a page

18   showing Alameda's balances.  And even when the defendant was

19   questioned about this, he ultimately admitted that, yeah, he

20   had a balances page on his computer, but it was just an auto

21   open.  But he also told you that Ellison would routinely send

22   him Alameda's balance sheets and that he was reviewing them.

23   So he knew the financial situation at the time.  He sees

24   Alameda's balances are not good.  And he gets more bad news.

25   Alameda's lenders now want their money back, because the market

**A-1088**

NB11BAN2                    Summation - Mr. Roos                    2966

1    options.  Option one is what you heard some other

2    cryptocurrency companies did.  Zac Prince told you about it.

3    The market got bad and they closed up shop; they couldn't repay

4    their loans.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-1089**

NB1MBAN3          Summation – Mr. Roos          2976

1    him?  He claimed that the people he supervised told him to stop

2    asking questions.  He claimed that even though he had been

3    concerned, he was worried that Alameda was insolvent.  He was

4    asking them to check the balances.  There is this bug in the

5    system.  He claimed that the people who reported to him were

6    like, stop asking questions.

7         And then, even though he had cancelled his trip to

8    D.C. and he was worried that maybe Alameda was insolvent, he

9    just didn't follow up, and he doesn't now remember what ended

10   up happening.  I think his answer was, I can't recall.

11        There were four witnesses in this trial that said they

12   talked to the defendant about Alameda's massive negative fiat@

13   balance in June 2022:  Yedidia, Wang, Ellison, and Singh.  When

14   the defendant testified that he didn't learn and couldn't

15   remember, that was a lie.  And the reason he's lying about that

16   is because this is a moment in time where he clearly knows that

17   Alameda is using FTX customer money, and he lied on the stand

18   because he knows it's wrongful and totally inconsistent with

19   everything he said publicly.

20        Let me make one last point about what happened in June

21   and why it proves the defendant knew what he was doing was

22   wrong.

23        Here is what the defendant does in May and June of

24   2022:

25        May 13.  FTX publishes terms of service that say:

**A-1090**

NB1MBAN3               Summation – Mr. Roos                    2977

1   None of the digital assets in your account are the property of

2   or shall or may be loaned to FTX Trading.  Promise to FTX

3   customers.

4        June 13.  Genesis and other lenders asked the

5   defendant for loan repayments.

6        June 14.  The defendant has the spreadsheet project,

7   and they look at all of it, and they see the negative balances.

8   He sees they are in the hole.  He makes the decision to repay

9   the money anyways.

10        June 16.  Repayment happens to places like BlockFi and

11   Genesis using customer money.

12        Then here is the revealing part.  June 23.  The

13   defendant's congressional testimony that we have already looked

14   at where he says:  Whoever is in control of customer assets

15   cannot be misallocating or misusing those assets.

16        Then June 27 he tweets:  Backstopping customer assets

17   should always be primary.

18        What this sequence tells you is that the defendant

19   went out in public, promised them, we are not using your money,

20   it's safe.  Then in June he needs money, so he's taking his

21   customers' assets.  And then if that wasn't enough, he has the

22   audacity within a week to go before Congress under oath and go

23   on Twitter and tell his customers, his victims, that he's not

24   using their money, that money, protecting their money is his

25   top priority, and when the defendant is doing that, when he is

**A-1091**

NB1MBAN3                    Summation - Mr. Roos                    2978

1    taking their money secretly and then within a week is out there

2    publicly lying about it, that tells you he knows what he's

3    doing is wrong.

4         The next moment in time is June 2022, when the

5    defendant works with Caroline Ellison to send a fake balance

6    sheet to Alameda's lenders.  This is another moment where the

7    defendant made a deliberate decision to double down on this

8    fraud.  So what happened?  We have been talking about June.

9         And after Alameda repays its lenders and spends

10   billions more in customer money, the defendant wants to take

11   out new loans, because he hasn't had enough of spending money

12   already, so he goes to Genesis and BlockFi and others, but

13   there has been changes in the cryptocurrency market and prices

14   have fallen and some of these companies have gone out of

15   business, so as third-party lenders they asked for new balance

16   sheets, and now he is presented with a situation that he has to

17   make a decision in.

18        No lender who actually knew the state of Alameda's

19   balances were ever going to lend them money, right.  It was 10

20   billion plus in the hole, and that was before they repaid their

21   loans, and then he spent a few billion dollars more repaying

22   the loans, so they are deeply in the red, totally under water.

23   This was very clear to the defendant.

24        Caroline comes to him and says:  I think it looks bad.

25   I don't think we can send this to Genesis, talking about their

**A-1092**

NB1MBAN3                    Summation – Mr. Roos                    2979

1    balance sheet.  Do you agree?  And he says:  Yeah, that sounds

2    right.

3           Here is Alameda's real balance sheet in June 2022,

4    Government Exhibit 44, the main tab.  What's the reason they

5    can't send this to Genesis and other lenders?  Ellison told you

6    it showed that Alameda was in a very risky position, borrowing

7    around 10 billion from FTX and with about 5 billion of its

8    loans to FTX's executives.  Where does it show that?  Here.

9    Exchange borrows:  9,900.  That means, according to Ellison,

10   Alameda had borrowed 9.9 billion from FTX customers.

11          Here, related-party loans.  That was 4.5 billion in

12   loans to the defendant, Wang, and Singh.  According to Ellison,

13   it might make it look like Alameda was effectively giving or

14   funneling money to FTX executives.

15          So at this point the defendant knows Alameda is deeply

16   in debt.  He knows they borrowed customer money, he knows that

17   it's in the billions, and he knows they have made billions in

18   loans to FTX executives.

19          So the defendant had to make a choice, and this is

20   another critical point, and he decides to lie yet again.  He

21   told Ellison that she should prepare some alternative ways of

22   presenting this information and setting this thing up, ways to

23   conceal things in their balance sheet.

24          So Ellison creates seven alternative balance sheets,

25   and here is that.  This is Government Exhibit 44.  It's another

**A-1093**

NB1MBAN3                 Summation - Mr. Roos                    2999

1   Orchestrating what?  He doesn't say:  That's not right.  He

2   doesn't say:  Anyone else is to blame.  He says:  I think

3   that's probably correct.

4          Keep in kind this context.  The context is, this is a

5   Signal message, one of the messages that they have been sending

6   all along to auto delete, and this is one of his closest

7   confidants.  It is not a public tweet.  It is not an interview.

8   This is a private space between him and his coconspirator over

9   an encrypted messaging platform with auto delete set so he can

10  tell, Nishad, I think that's probably correct.

11         I told you the questions we were going to answer.

12  They were:  What happened?  Where did the money go?  Who was

13  responsible?  We have now answered those questions together,

14  what happened.  The defendant was motivated by greed and

15  ambition, and he wanted more money for Alameda, so he set up

16  systems to take the money.  We have talked about what he did.

17  We talked about where the money went.  It went to investments,

18  to purchases, to expenses, to donations.  It was siphoned off.

19  And the defendant is responsible.

20         Your Honor, do you want me to keep going?  I'm about

21  to switch sections.

22         THE COURT:  I thought you were.  I think we will break

23  for lunch.  Ten minutes past 2 we will resume.

24         (Jury not present)

25         THE COURT:  Time.

**A-1094**

NB11BAN4                    Summation - Mr. Roos                    3003

1    learn or memorize this now.  But the key is that there was—in

2    connection with the sale of commodities or swaps, the defendant

3    knowingly and wilfully participated in a scheme that involved

4    an artifice of fraud or manipulative device.

5           Now these fraud crimes are what we spent most of the

6    morning talking about, right?  We spent the entire morning

7    talking about the false statements the defendant made.  We

8    talked about the false pretenses he set up by displaying

9    customer balances while simultaneously not actually having that

10   money behind the scenes.  We talked about the relationship of

11   trust he established, how his policy documents indicated he and

12   his company were a trustee of his customers, how they were in a

13   custodial relationship, and how, simultaneously, he was lying

14   about that, how he embezzled and stole that money.

15          And we've talked about how the defendant orchestrated

16   the scheme by convincing customers that they could trust him,

17   about how he made lies, about how he directed people, how he

18   made statements and representations, how he moved the money,

19   how he stole and how he misappropriated.  And we've also talked

20   at length about the overwhelming proof that he knew what he was

21   doing was wrong, that he knew what was happening with customer

22   money, that he had a fraudulent intent, and that he agreed with

23   his co-conspirators.  So we've already gone through all the

24   evidence that establishes that he's guilty of these frauds on

25   customers.

**A-1095**

NB11BAN4                    Summation – Mr. Roos                    3004

1          And on this last element that we talked about, about

2     the wires, you saw the tweets, you saw the financial

3     transactions, so that's met too.

4          Now on the conspiracy charge, conspiracy to commit

5     commodities fraud, for that charge only, there is an additional

6     element, which is that the crypto involved fit the definition

7     of a commodity.  And the defendant even admitted that before

8     Congress in 2021.

9          There it is right there.  He's admitting that Bitcoin

10    and Ethereum are two tokens covered as commodities under the

11    CFTC definition.  You also heard evidence from Adam Yedidia

12    where he explained that the futures that were sold on FTX were

13    the exchange of risk which resembled what Judge Kaplan will

14    describe to you as a swap.

15         And the other requirement is that some of the

16    conduct——and this is, again, just for the commodities

17    conspiracy——either occurred in or affected the United States.

18    And Judge Kaplan will give detailed instructions on that, and

19    follow his instructions.  And what I'll tell you now is that

20    there's plenty of evidence that in connection with the

21    commodities fraud charge, Alameda was in the United States.

22    That's where its bank accounts were; it itself was incorporated

23    there; North Dimension, through which the defendant sold

24    customer fiat deposits, that was set up in the United States

25    and had a bank account in California; the defendant made false

**A-1096**

NB11BAN4                Summation - Mr. Roos                3009

1    they had known that the defendant was lying to them, that he

2    was backdating transactions, that he was coming up with phony

3    documents.

4           There were some other points you heard about the

5    investors.  The defendant fraudulently concealed the fact that

6    they were shifting some of the losses to Alameda.  He concealed

7    the fact that the FTX insurance fund wasn't so big.  You heard

8    testimony early in the case from Gary Wang about how in fact

9    that FTX insurance fund number was a made-up number.  They

10   literally just had this random number generator that they used

11   to come up with a fake number for the insurance fund so they

12   could project that out.  And that was the same information they

13   were giving to their investors, when they're saying this is a

14   safe system.  So the lies to the investors are pervasive, they

15   mattered to them, they invested, and they lost all their money,

16   and it's very straightforward, and the evidence is

17   overwhelming.

18          One last point on this.  You remember he moved FTX

19   investor money from FTX to Alameda.  And we saw one of the

20   things they spent that money on; that was on real estate.  And

21   so this is Government Exhibit 1023, and it shows you all the

22   investors who had their money moved over from FTX, which they

23   thought they were investing in, to the Alameda slush fund.  And

24   so he duped investors by lying about this too.  And that's

25   another reason to find him guilty of investor fraud.

**A-1097**

NB11BAN4               Summation – Mr. Roos                    3011

1   to look at all his tracing, his analysis of the balances,

2   that's the range to ask for, 1001-1051.  They all show that the

3   defendant stole money and moved money, and engaged in money

4   laundering to conceal the source of the funds.

5            There's one last requirement which here is called

6   venue.  And that just means that acts in furtherance of the

7   crimes need to have taken place in the Southern District of New

8   York, which includes Manhattan.  And there was plenty of that

9   in this case.  FTX processed wires through Signature Bank,

10  which was located in Manhattan.  So is ED&F Man, where those

11  Robinhood shares were purchased.  Tareq Morad, who was one of

12  the customers who testified in this case, he told you that the

13  wire to fund the accounts was processed through a Wells Fargo

14  bank in New York.  BlockFi and Genesis, which are both lenders

15  in the case of BlockFi, which is also a customer, are in New

16  York.  Zac Prince, the CEO of BlockFi, said he got those

17  balance sheets while he was in Manhattan.  And customers and

18  investors like Third Point and Sculptor are based in Manhattan.

19  And finally, you know from Richard Busick, who was the FBI

20  Agent who did the cellular tower analysis, he told you that the

21  defendant was all over Manhattan doing meetings with investors,

22  acts in furtherance of his crimes.  And that analysis is

23  Government Exhibit 1080.  So venue has been met.

24           Those are the crimes the defendant is charged with,

25  and the evidence is overwhelming.

**A-1098**

NB11BAN4                    Summation - Mr. Roos                    3012

1            And so in our final minutes together, what I want to

2    talk about are some of the defenses you've heard in this case.

3    And like I said, the defense didn't need to make any arguments.

4    We have the burden, and we embrace that.  But when they do make

5    arguments, you should scrutinize them.  And I want to focus on

6    just three arguments that have come up in this case.

7            Here they are: the argument that the defendant acted

8    in good faith; the argument that he thought it would all work

9    out in the end; and lastly, this argument that this was somehow

10   margin lending.

11           And so starting with the first argument, I expect

12   Judge Kaplan will tell you that good faith is when someone

13   honestly believes in the truth of what they're saying or

14   honestly believes the victims were not being deprived of

15   property.  And that's not what happened here.  We spent this

16   morning talking about all the reasons you know the defendant

17   knew what he was doing was wrong, and those are all reasons why

18   the defendant wasn't acting in good faith.

19           Here's another reason.  We've seen this chart before.

20   This is Government Exhibit 1083.  The defendant used Signal.

21   Now of course there's nothing wrong with texting and nothing

22   wrong with encrypted apps.  But what the defendant insisted on

23   was auto-delete.  He insisted that their Signal chats be

24   deleted.  And I expect Judge Kaplan will tell you that if you

25   find that the defendant deleted communications, you can infer

**A-1099**

NB11BAN4             Summation – Mr. Roos             3013

1    that he believed he was guilty, that he didn't have good faith.

2    And so how do you know that was his purpose here?  Well, Adam

3    Yedidia testified that when the defendant began insisting that

4    people use Signal and delete messages, he said it was "all

5    downside for the messages to be kept around.  And if regulators

6    somehow found out, found something they didn't like in those

7    messages, that could be bad for the company."  And the result

8    was that when FTX collapsed and people were asking questions,

9    there were no Signal messages before November, and that made it

10   a lot easier for the defendant to claim that he had no idea

11   what happened.  And so this is important.  It's in some ways a

12   small point, but in other ways it's very significant.  He knew

13   what he was doing was wrong.  He envisioned a day like today.

14   He knew that some day the regulators would see something they

15   didn't like.  What he means is they would see something that

16   was incriminating.  And so he had in mind a courthouse, a

17   courtroom like today, and he didn't want it to be like that so

18   he demanded that the messages be set to auto-delete.  And of

19   course he couldn't delete everything, but that was the aim

20   here, and that tells you about his intent and that it wasn't

21   good faith.

22           And you also heard about coded language he used.

23   Ellison told you the defendant would get upset when they used

24   explicit words, so she said things like "FTX borrows" or "the

25   thing," instead of saying things like FTX customer funds.

**A-1100**

NB11BAN4               Summation – Mr. Roos                3014

1        And finally, on this topic of good faith, I want to

2   talk about one conversation the defendant had with Can Sun, who

3   was one of FTX's lawyers, as FTX was collapsing.

4        In FTX's final days, after one potential investor

5   asked the defendant for "a legal justification as to why the

6   funds were missing, and were at Alameda," the defendant asked

7   Can Sun to come up with legal justifications.  And this

8   testimony by Can Sun all begins around page 1959 of the

9   transcript.  Now importantly, at this point the defendant

10  didn't point to any legal justifications for taking the money.

11  He had none.  When Sun asked whether the defendant

12  identified——when Sun was asked whether the defendant had

13  identified any justifications that he was aware of, the answer

14  was no.  And that shows you——this is an important point.  The

15  answer "No" is important because it shows you the defendant was

16  not acting in good faith.  He didn't have a justification at

17  the time for why he honestly thought this was okay.  He posed

18  the question to Sun.  He didn't say, I think I'm allowed to use

19  this customer money, can you please confirm this for me; he

20  said quite the opposite.  He didn't provide any justification.

21  And so then what happens next?

22       Can Sun takes a look at the terms of service and does

23  some other research around the company, and then goes on a walk

24  with the defendant, and during that walk, here's what Can Sun

25  tells the defendant.  He says there was no justification for

**A-1101**

NB11BAN4               Summation - Mr. Roos               3015

1   the funds being missing and taken by Alameda.  He says there

2   were theoretical arguments, but none of them were supported by

3   the facts.  And what's important about this conversation is

4   what happened next.  It's the defendant's reaction is what

5   particularly matters here.  And so he tells—Sun tells the

6   defendant that while there are some other crypto exchanges that

7   do not make it clear what is the relationship between a user

8   when they deposit funds on the exchange and the exchange,

9   that's not feasible for us because of our terms of service.

10  They make it very clear that when a user deposits assets onto

11  the exchange, those assets continue to belong to the user.  So

12  in other words, Sun is telling him Alameda cannot use customer

13  money.  And then, like I said, what's important is how the

14  defendant responds, because it tells you everything about his

15  good faith or lack of good faith here today.  The defendant

16  doesn't fight him.  He agrees with Can Sun.  He says—and

17  here's the testimony—"he acknowledged."  He "basically said

18  something like, got it."  He "wasn't surprised at all."  If the

19  defendant actually believed that he was allowed to use customer

20  money, as he claimed when he took the witness stand, why didn't

21  he say that back in 2022?  In this private conversation back in

22  2022, why didn't he say what he said up on that witness stand?

23  He didn't direct Can Sun to some part of the terms of service.

24  He just acknowledged Sun's conclusion and didn't seem

25  surprised.  And that tells you he wasn't acting in an honest

**A-1102**

NB11BAN4                 Summation - Mr. Roos                 3016

1    belief or in a good faith.

2           There's another part of this conversation that matters

3    and tells you something about the defendant not acting in good

4    faith.  And that's that Can Sun told the defendant that he

5    considered, as one of the theoretical justifications, whether,

6    under Section 16 of the terms of service, which concerned

7    margin trading, whether FTX could have theoretically argued

8    that it could take the customer funds.  So that was another

9    theoretical justification that Can Sun raised with the

10   defendant.  And Sun told the defendant that he asked Nishad and

11   Ramnik Arora, another employee, to pull some numbers, and those

12   showed that this theoretical justification was not supported by

13   the facts.  And how did the defendant respond?  Again, this is

14   the key part for knowing about his intent.  He acknowledged.

15   "He said, yup, yup.  No pushback."  By the way, do you notice

16   how Can Sun's answer resembled exactly the way the defendant

17   answered?  "He said, yup, yup.  No pushback."  This tells you

18   that the same time the defendant didn't think this was part of

19   the terms, at this time the defendant did not think this part

20   of the terms of service allowed him to use customer money.  And

21   that's important, not just for his good faith or lack thereof,

22   but it's important because of what happens next.

23          After FTX declared bankruptcy, the defendant did

24   interviews.  You heard about that during his testimony.  And

25   one of them was on *Good Morning America* with George

**A-1103**

NB11BAN4                    Summation - Mr. Roos                    3017

1    Stephanopoulos.  And during the interview the defendant is

2    confronted with the exact same terms of service that he spoke

3    to Can Sun about in that private meeting.  And Stephanopoulos

4    presses him.  He says, "If Alameda is borrowing the money that

5    belongs to FTX depositors, that's a bright red line, isn't it?"

6    And Stephanopoulos is gesturing to the terms of service.  It

7    says that "digital assets may not be loaned out to FTX.  They

8    can't be loaned out."  So Stephanopoulos confronts him with

9    this.

10            And the defendant takes a long pause.  And then he

11   gives a false excuse.  He says, "There existed a borrow lending

12   facility on FTX, and I think that's probably covered in the

13   terms of service."  So the defendant gives Stephanopoulos, on

14   television, the very justification he had discussed with Sun as

15   not being a theoretical justification that worked.  And this is

16   a false excuse.  And I expect Judge Kaplan will tell you

17   tomorrow that if a defendant gives a false excuse or a false

18   exculpatory in order to divert——in order to divert suspicion

19   from himself, you may consider that as evidence that he

20   believed he was guilty.  So this is another reason you know

21   that the defendant was not acting in good faith, because he

22   thought he was guilty, and that's why he lied and gave a

23   justification he knew wasn't true on television before he was

24   charged with a crime.

25            There's another defense I want to touch on just very

**A-1104**

NB11BAN4                    Summation - Mr. Roos                    3018

1    briefly, and this is the defense that the defendant has brought

2    up again and again, that he just got unlucky.  When he took the

3    witness stand, he blamed everyone and everything.  He claimed

4    the problem wasn't from—that they didn't hedge right, that

5    they had bad luck, that FTT prices dropped, that the

6    investments happened to be illiquid, and the defendant claimed

7    that with just a little more time, everything could have worked

8    out, and they could have processed some more withdrawals.  And

9    I expect Judge Kaplan is going to tell you that a belief by a

10   defendant, even an honest belief, that ultimately everything

11   would work out fine or that victims wouldn't ultimately lose

12   money, does not mean the defendant acted in good faith.  The

13   crime here was when the defendant took the money, when he made

14   false statements to get that money.  What ended up happening

15   later on doesn't make him not guilty of the crime.

16           The last argument I want to talk about today is this

17   idea that it was all margin lending.  And with every hour the

18   defendant spent on the witness stand, we saw this argument get

19   more and more absurd.  Suddenly, any withdrawal off the

20   exchange, to repay any sort of third-party debt or expense, or

21   to buy muffins, this was a margin trade, according to the

22   defendant.  And according to the defense opening, the theory, I

23   guess, is that Alameda was also doing these margin loans and

24   that somehow, under the terms of service, they could just rip

25   all the customers' money because everyone was doing margin

**A-1105**

NB11BAN4                    Summation - Mr. Cohen                    3023

1    even agreed to this when they joined FTX.

2           Here's my last thought on this margin defense.

3           When the defendant was asked directly yesterday under

4    cross-examination whether he was saying the big hole in

5    customer funds in November was the result of a clawback, he

6    sort of fumbled for a second.  And then he said he wouldn't

7    describe it that way.  He conceded that's not actually what

8    happened.  This is a distraction.  It's something manufactured

9    after the fact.  It's something that he came up with after

10   everything came crashing down.  He came up with it for a day

11   like today, in a courthouse, and you should reject it.

12          You've all paid close, careful attention.  Let me

13   leave you with this thought.  This was a fraud that occurred on

14   a massive scale.  Thousands of people lost billions of dollars.

15   Everyday people lost savings, companies went bankrupt, all

16   because of this defendant's fraud, because he wanted more money

17   to do whatever he wanted with.  So when you go back to the jury

18   room, follow the truth.  Let the evidence prevail over his

19   storytelling.  The defendant, he lied and he stole from his

20   customers; he lied and he stole from his lenders; he lied and

21   he stole from his investors.  He's guilty of wire fraud; he's

22   guilty of securities fraud; he's guilty of commodities fraud;

23   and he's guilty of money laundering.  Do justice.  Reach the

24   only verdict consistent with the evidence, with the law, and

25   with the truth, that the defendant is overwhelmingly, beyond

**A-1106**

1    the jury, so I'll speak last for Sam, for my client.  Consider

2    the evidence in light of your real-world experience.  We submit

3    you will find that Sam acted in good faith throughout, that he

4    made the best business decisions he could at every stage.  He

5    didn't want to hurt anyone, far from it.  He didn't want to

6    defraud anyone and he didn't.  He didn't intend to defraud

7    anyone.

8            So, with respect, the greatest of respect, we ask that

9    when you deliberate, you find him not guilty on all counts.

10           Thank you.

11           THE COURT:  Thank you.

12           Ladies and gentlemen, thank you for staying.  We will

13   tomorrow morning hear any rebuttal argument by the government,

14   and I will charge you and you will get the case.

15           I should add, in full disclosure, I am informed during

16   the day -- and, again, I'm not commenting on how long this

17   should take or how quickly you should be done one way or the

18   other -- if we do stay late enough to get something to eat,

19   it's pizza.  It didn't used to be that way.  I'm sorry, but

20   that's what it is.

21           (Adjourned to November 2, 2023, at 9:30 a.m.)

22

23

24

25

**A-1107**

NB21BAN1              Rebuttal - Ms. Sassoon              3117

 1   begin charging you on the law when that break is over.  I won't

 2   do it all in one fell swoop.  Sadly to say, it's going to take

 3   some time.  So we will break for lunch at some convenient point

 4   in the course of my reading the charge.  You know that your

 5   lunches have been ordered, and it will be a 30-minute lunch

 6   break in order to finish up and get the case to you.  After

 7   lunch, I'll finish charging you.  And I will not keep you later

 8   than 8:15, if you get that far.  I'm not suggesting anything,

 9   of course, about whether you should or shouldn't or will need

10   that much time or more or less.  If you stay as late as 8:15,

11   there will be transportation for those who need it, and we will

12   order that up somewhere along the line.  And as you may have

13   learned from Andy already, Andy, who is a magician around here,

14   has managed to accomplish the feat that if you do wind up

15   having supper here, you have a choice of more than pizza.  And

16   you can thank Andy for that.

17              Okay.  With that, Ms. Sassoon, we'll hear your

18   rebuttal argument.

19              MS. SASSOON:  Thank you, your Honor.

20              Telling your customers to trust you with their money,

21   telling your customers that their assets are safe, segregated,

22   safeguarded, held in custody, and then taking that money and

23   spending it on yourself, on your business, on the same business

24   that you've told your customers is separate, walled off,

25   treated no differently from any other account, that is not a

**A-1108**

NB21BAN1                    Rebuttal - Ms. Sassoon                    3125

1    they admitted to serious federal crimes, and they described how

2    they did it and who they did it with.

3         On the other hand, the defense wants you to believe

4    that none of these cooperators helped the defendant commit

5    crimes and that they all pleaded guilty even though none of

6    them actually thought they were doing anything wrong at the

7    time.  Now think about that.  And let's take Gary Wang as an

8    example.  By this argument, Gary Wang leaves the Bahamas days

9    after FTX declares bankruptcy, less than a week later comes to

10   meet with the government, no one at that point has been charged

11   with any crimes, and he confesses to all sorts of things that

12   he didn't do.  In that very first meeting, he pleads guilty to

13   a host of crimes he didn't commit, he exposes himself to

14   penalties for things he never did, and then he comes up here

15   and he lies to you.  That makes no sense.

16        And you know that this is not a case of crimes in

17   hindsight.  And let's just take Caroline Ellison as one

18   example.  The defense said if she really thought something was

19   wrong, wouldn't she have resigned, cashed out, blown the

20   whistle?  Well, she didn't do those things, and that's why

21   she's guilty of participating in a conspiracy.  And she told

22   you that during the conspiracy, she did think she was doing

23   something wrong and she expressed it to the defendant.  She

24   went to him as far back as 2020 and said, *What about these*

25   *auditors?  Are they going to see that we're taking customer*

**A-1109**

NB21BAN1                    Rebuttal - Ms. Sassoon                    3126

1     *money? That would be bad.*  And he said, *Don't worry. The*

2     *auditors won't see it.*  When he wanted to buy out Binance, she

3     said, *Well, we can't do that without taking customer money.*

4     And he said, *Well, do it anyway.*  And in 2022, when he told her

5     to lie to the lenders, she told you the effect that that had on

6     her.  She spent a year in dread and fear, waiting for her

7     crimes to be exposed.  She cried on that stand and she told you

8     about the worst months of her life, when she knew she was

9     committing crimes and was waiting to get caught, waiting for

10    customers to realize that their money was gone.

11            And let's talk about Nishad.  The defense made a big

12    deal out of the fact that he learned of the conspiracy and

13    joined it a little later.  I expect Judge Kaplan is going to

14    instruct you that different people can play different roles in

15    a conspiracy.  You can play a minor role, you can play a major

16    role, you can join at a different time.  You're still part of

17    the conspiracy.  And so it's no surprise that Nishad, who

18    didn't work at Alameda, didn't have visibility into all the

19    spending and all the use of customer money, but when he did,

20    when it sunk in, he didn't say, oh, nothing wrong going on

21    here.  He confronted the defendant on that balcony.  He was

22    shocked, he was blindsided, and eventually he was suicidal.

23    That is not somebody who didn't think he was doing anything

24    wrong.

25            But you don't need to take the cooperators' words for

A-1110

NB21BAN1                    Rebuttal – Ms. Sassoon                    3130

1   just goes about his business.

2        This story not only makes no sense, it's inconsistent

3   with the testimony of every witness in this case, and you know

4   that it's a made-up story.  You should reject it.

5        The defense threw around these terms, "liquidity,"

6   "solvency," and Mr. Cohen told you that the defendant acted in

7   good faith because "he always thought Alameda had sufficient

8   assets on the exchange and off the exchange to cover its

9   liabilities."  That's not good faith.  First of all, you saw

10  the balance sheets, and these were the same balance sheets that

11  were sent to the defendant in June, in September, in October.

12  There isn't $40 billion of NAV; there isn't even $10 billion of

13  NAV.  And you saw the liquid assets, the same liquid assets the

14  defendant was looking at at the time.  Alameda had about

15  $500 million in its bank account and owed FTX $13 billion.  And

16  the other liquid assets, they were coins like FTT and Serum and

17  Solana.  And the government's not claiming, like Mr. Cohen

18  said, that FTT is a fake coin.  What you learned in this trial

19  is that it was an illiquid coin, which the defendant and

20  everybody else knew meant that you couldn't sell all those

21  coins and recover the full value on the balance sheet.

22       So the defendant saw these balance sheets and he knew

23  that Alameda did not have the assets to cover this giant debt

24  to FTX customers.  But let me be clear about this.  Whether

25  Alameda was liquid, solvent, had $40 billion of coins or gold

**A-1111**

NB21BAN1               Rebuttal – Ms. Sassoon               3131

1   bars, or just a worthless pile of junk, it doesn't matter.

2   It's a distraction.  Because even if the defendant thought that

3   Alameda could sell all its assets and investments that were not

4   on the FTX exchange to repay a $14 billion debt——which it

5   couldn't and it didn't——that wouldn't be good faith.  And I'll

6   tell you why.  Because when the defendant told his customers

7   that their assets were safe, that a customer had to deposit

8   collateral on to FTX to trade or borrow, that negative accounts

9   would be liquidated and that Alameda's account was just like

10  everybody else, he lied.  Unlike every other customer, Alameda

11  did not post collateral, it couldn't be liquidated, and they

12  were not being evaluated by the supposedly automatic computer

13  risk engine.  He lied to gain customers' trust, to get their

14  money, and then he decided the rules didn't apply to him and

15  his business.  Whether or not he made good investment decisions

16  after that or it was a good business judgment to pay

17  $300 million to meet celebrities doesn't matter, because he

18  embezzled that money in the first place after his customers

19  trusted him with it.  The customers did not sign up for that.

20  They told you that.  And they would not have put their money on

21  the exchange if they knew what was going on.  So whether or not

22  the defendant thought he could get away with it by selling

23  assets or raising money from other investors, he thought he

24  could one day put that money back, doesn't matter.  He still

25  took his customers' property based on false misrepresentations,

**A-1112**

NB21BAN1                    Rebuttal - Ms. Sassoon                    3133

1    risk officer.  And the defendant didn't need a chief risk

2    officer to tell him that stealing customer money was wrong.

3    You can't go into a jewelry store, steal a diamond necklace,

4    walk out, and then say, there was no security guard.  The

5    defendant knew what he was doing was wrong, and that's why he

6    never hired a risk officer.

7            Before I conclude, I want to make something else very

8    clear, and leave you with this thought.  Even if you accept

9    everything the defendant said on the stand, which you

10   shouldn't, he is still guilty of fraud.  The defense doesn't

11   dispute that by September or October, the defendant knows about

12   Alameda's massive liability to FTX customers; he knows that

13   they've spent customer fiat funds; he knows they have borrowed

14   billions of dollars from customers, outside the normal rules of

15   the exchange; he knows the state of Alameda's balance sheet,

16   he's been reviewing it; he knows that they have barely any

17   money in bank accounts and a bunch of illiquid tokens and

18   investments that are not on the FTX exchange.  And so you know

19   that he directed this fraud, that he was the hub.  But even if

20   you accept what he is saying, he wasn't a member of the

21   conspiracy before then, he became a member of the conspiracy at

22   that point in time.  The defense wants you to think that the

23   government has to prove that this was a giant fraud from day

24   one and that this was the defendant's plan all along.  We

25   don't.  Now the evidence shows that——the evidence shows that

**A-1113**

NB21BAN1                    Rebuttal — Ms. Sassoon                    3136

1    helped Caroline, for example, write a misleading tweet——that's

2    Government Exhibit 875——saying that Alameda's balance sheet was

3    secure because they had repaid all their loans.  Repaid all

4    their loans?  They owed FTX $10 billion.

5           And then he tweeted himself.  This is not the

6    government's favorite piece of evidence.  I don't know if that

7    joke was meant to distract, but this is a significant piece of

8    evidence, and you should take it seriously, because when the

9    defendant said FTX had enough to cover all client holdings,

10   that was a lie.  And the defendant himself admitted that that

11   statement, he was taking into account Alameda's balance sheet,

12   the company he told the public was walled off and separate, and

13   he was taking into account assets that were illiquid and that

14   were not on the FTX exchange.  FTX did not have enough to cover

15   all client holdings.

16          And just look at Government Exhibit 21, where at the

17   same time in private he's saying, *We have one third of the*

18   *money to cover what client assets should be.*

19          So that tweet alone shows that he joined the

20   conspiracy, he took an act in furtherance of it, to prevent

21   customer withdrawals, and he lied over and over again.

22          The defense said that the fact that he deleted this

23   tweet somehow shows that he had good faith.  Give me a break.

24   On November 7 he thought he could still fool the world.  He

25   thought that if he lied to customers, maybe they wouldn't

**A-1114**

NB21BAN1                    Rebuttal – Ms. Sassoon                    3137

1    withdraw their money.  And when he deletes the tweet, it's

2    because the curtain has been pulled back.  The world at that

3    point knows the money's not there.  He's destroying evidence.

4    He's deleting evidence of his lies.

5            And then the defendant went and made false statements

6    to the press, and that's when he thought he would never be

7    caught, that his messages had been deleted, that his

8    fingerprints were not on the code, and that his deniability was

9    airtight.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-1115**

NB2MBAN2                    Rebuttal – Ms. Sassoon                    3138

1          MS. SASSOON:  He went on Good Morning America for the

2    same reason he sent a confident tweet thread, because he

3    thought he could fool his customers, reporters, the public, and

4    now you.  Don't fall for it.  You know better.

5          When the defendant sent that false tweet, when he lied

6    to the public, he didn't bargain for the metadata or Caroline's

7    journals or the complicated tracing of crypto and dollar money

8    movements that show when and how he took the money and where he

9    spent it.  He didn't bargain for his three loyal deputies

10   taking that stand and telling you the truth, that he was the

11   one with the plan, the motive, and the greed to raid FTX

12   customer deposits, billions and billions of dollars to give

13   himself money, power, influence.  He thought the rules did not

14   apply to him.  He thought that he could get away with it.  But

15   his crimes caught up to him.  His crimes have been exposed.

16         It's time to deliberate without fear, favor, sympathy,

17   or prejudice.  You sat through this trial.  You know what

18   happened.  Find him guilty.

19         THE COURT:  Thank you, counsel.  We will take 15

20   minutes.

21         (Recess)

22         (Pages 3139–3141 SEALED)

23

24

25

**A-1116**

NB2MBAN2                              Charge                              3142

1           THE DEPUTY CLERK:  An announcement to the spectators.

2   The Court is about to charge the jury.  All spectators must

3   either remain seated throughout the duration of the charge or

4   leave at this time.

5           Marshal, please lock the door.

6           (Jury present)

7           THE COURT:  The defendant and the jurors all are

8   present.

9           Members of the jury, you are about to perform your

10  final function as jurors.  My instructions to you are going to

11  be in four parts.  I will start by describing the law to be

12  applied to the facts as you find the facts to have been

13  established by the proof.  I will then instruct you about the

14  trial process, give you instructions concerning your evaluation

15  of the evidence, and, finally, talk to you about the conduct of

16  your deliberations.

17          Now, you are free to take notes, but I want you to

18  understand that the charge will be given to each of you in

19  writing when you retire to deliberate, so that you will have it

20  for reference during your deliberations, and the law simply

21  requires that I deliver it orally as well.

22          The defendant, as you now know, is Samuel

23  Bankman-Fried.  He has been formally charged in a document

24  called an indictment.  The indictment is, as I told you at the

25  beginning of the trial, simply an accusation.  It's not

**A-1117**

NB2MBAN2                              Charge                              3143

1    evidence.  It's not proof of the defendant's guilt.  It doesn't

2    create any presumption or permit any inference that the

3    defendant is guilty of any of the charges.

4         You will have a copy of the relevant parts of the

5    indictment in the jury room for your reference.

6         Each part of the indictment or, to be more precise,

7    each count of the indictment charges a different crime.  You

8    must consider each count separately and return a separate

9    verdict of guilty or not guilty for each of the counts.  Except

10   in one respect that I'll explain to you a little bit later on

11   when I discuss Count Seven, your verdict on one count should

12   not control your decision as to any other count.

13        I am now going to describe the counts in the

14   indictment.

15        Count One charges the defendant with committing wire

16   fraud on customers of FTX by misappropriating customer

17   deposits.

18        Count Two charges the defendant with conspiring to

19   commit wire fraud on customers of FTX by misappropriating

20   customer deposits.

21        Count Three charges the defendant with committing wire

22   fraud on lenders to Alameda Research by providing false and

23   misleading information to those lenders.  For convenience, I am

24   going to refer to Alameda Research from time to time simply as

25   Alameda, but you should understand that when I say Alameda or

**A-1118**

NB2MBAN2                          Charge                          3144

1    Alameda Research, I am talking about the same thing, and they

2    are the entity or entities as to which you heard evidence -- I

3    guess it's one entity, I want to be clear -- that was owned 90

4    percent by the defendant.

5         Count Four charges the defendant with conspiring to

6    commit wire fraud on lenders to Alameda by providing false and

7    misleading information to those lenders.

8         Count Five charges the defendant with conspiring to

9    commit securities fraud by providing false and misleading

10   information to FTX's investors.

11        Count Six charges the defendant with conspiring to

12   commit fraud on customers of FTX in connection with the

13   purchase and sale of cryptocurrency and cryptocurrency swaps by

14   misappropriating those customers' deposits.

15        Count Seven charges the defendant with conspiring to

16   commit money laundering in order to conceal and disguise the

17   nature, location, source, ownership, and control of proceeds of

18   the alleged fraud on FTX's customers.

19        Now, the defendant has pleaded not guilty to all the

20   charges in the indictment.  The burden is on the prosecution to

21   prove guilt beyond a reasonable doubt.  That burden never

22   shifts to the defendant.  He is presumed innocent of the

23   charges against him, and I therefore instruct you that he is

24   presumed innocent throughout your deliberations unless and

25   until such time, if such a time ever occurs, that you as a jury

**A-1119**

1    are satisfied that the government has proved him guilty beyond

2    a reasonable doubt.  If the government fails to sustain its

3    burden of proof on one or more counts, you must find the

4    defendant not guilty on that count or counts.

5         I have said that the government must prove guilt

6    beyond a reasonable doubt.  What's a reasonable doubt?  It's a

7    doubt based on reason and common sense.  It's a doubt that a

8    reasonable person has after carefully weighing all of the

9    evidence or lack of evidence.  It is a doubt that would cause a

10   reasonable person to hesitate to act in a matter of importance

11   in his or her personal life.  Proof beyond a reasonable doubt,

12   therefore, is proof of such a convincing character that a

13   reasonable person would not hesitate to rely and act upon it in

14   the most important of his or her own affairs.

15        If, after a fair and impartial consideration of all of

16   the evidence, you have a reasonable doubt about the defendant's

17   guilt with respect to a charge in the indictment, it is your

18   duty to find him not guilty on that charge.  On the other hand,

19   if after fair and impartial consideration of all the evidence

20   or lack of evidence, you are satisfied of the defendant's guilt

21   on a particular charge beyond a reasonable doubt, you should

22   vote to convict on that charge.

23        Let me talk in a little bit more detail about the

24   indictment.  As I have told you, Counts Two, Four, Five, Six,

25   and Seven each charge the defendant with a different crime of

**A-1120**

NB2MBAN2                    Charge                      3146

1    conspiracy.  The other two counts, Counts One and Three, charge

2    what we call substantive crimes.  I talked about that a little

3    bit before we finished jury selection, but now I'll give you

4    the full and dispositive and binding explanation of the

5    difference.

6           A conspiracy count is different from a substantive

7    count.  A conspiracy charge, generally speaking, alleges that

8    two or more persons agreed together to accomplish an unlawful

9    objective.  The focus of a conspiracy count, therefore, is on

10   whether there was an unlawful agreement.  A substantive count,

11   on the other hand, charges a defendant with the responsibility

12   of the actual commission of a crime or an offense.  A

13   substantive offense therefore may be committed by a single

14   person, and it need not involve an agreement with a second or

15   more other persons.

16          A conspiracy to commit a crime is an entirely separate

17   and different offense from a substantive crime, the commission

18   of which may be an object or a purpose of the conspiracy.  And

19   since the essence of the crime of conspiracy is an agreement or

20   an understanding to commit a crime, it doesn't matter if the

21   crime, the commission of which was an objective or a purpose of

22   the conspiracy, ever in fact was committed.  In other words, if

23   a conspiracy exists and certain other requirements are met, it

24   is punishable as a crime even if its purpose was not

25   accomplished.  Consequently, in a conspiracy charge there is no

**A-1121**

NB2MBAN2                    Charge                         3147

1    need to prove that the crime or crimes that were the objective

2    or the objectives of the conspiracy actually were committed.

3          By contrast, conviction on a substantive count

4    requires proof that the crime charged actually was committed,

5    and it doesn't require proof of an agreement.

6          Now, with respect to the two substantive counts,

7    Counts One and Three, you should be aware also that there are

8    three alternative theories on the basis of which you may find a

9    defendant guilty.  I am going to explain all three theories in

10   more detail, but I want to just outline them briefly before I

11   get into the more detailed explanation.

12         The first theory is that the defendant himself

13   committed a substantive crime charged in one of those two

14   substantive counts.  The second theory is that the defendant,

15   with criminal intent, willfully caused some somebody else to

16   engage in certain actions that result in the commission of a

17   substantive crime charged in the indictment by that other

18   person.  I am going to refer, just for the sake of having a

19   shorthand for those two theories that I just outlined for you,

20   as it involving a claim that a defendant is guilty of a crime

21   as a principal.

22         The third theory is that somebody other than the

23   defendant committed a crime charged in the indictment as a

24   substantive offense, and that the defendant aided and abetted

25   in the commission of that crime.  I am going to refer to that

**A-1122**

NB2MBAN2                          Charge                          3148

1    theory as a claim that the defendant is guilty as an aider and

2    abettor.

3          For the sake of organizing my instructions to you in a

4    convenient way, I am going to instruct you first with respect

5    to Counts One and Three, which are the two counts that charge

6    substantive crimes.  I will then instruct you on the first two

7    theories of liability, namely, that the defendant is guilty as

8    a principal of those crimes charged, either because he

9    committed those crimes himself or because with criminal intent

10   he caused somebody else to commit those crimes.  I then will

11   instruct you on the aiding and abetting theory.  Then I'll turn

12   to the conspiracy counts, which don't involve these three

13   alternative theories.

14         Now, Count One charges that:  From at least in or

15   about 2019, up to and including in or about November 2022, the

16   defendant participated in a scheme to defraud customers of FTX

17   of money and property by making, or causing to be made,

18   material false representations, using interstate or

19   international wires, for the purpose of paying expenses and

20   debts of Alameda or to make investments and for other reasons.

21         When I pause like this, I'm fixing typos.

22         Count Three charges that:  From at least in or about

23   June 2022, up to and including in or about November 2022, the

24   defendant participated in a scheme to defraud lenders to

25   Alameda of money and property by making, or causing to be made,

**A-1123**

NB2MBAN2                    Charge                    3149

1    material misrepresentations regarding Alameda's financial

2    conditions, using interstate or international wires, so that

3    those lenders would not recall existing loans or would extend

4    new loans to Alameda.

5         With any criminal charge there are certain basic facts

6    that the government must prove beyond a reasonable doubt before

7    a defendant may be found guilty.  Those basic, necessary facts

8    are called the essential elements of the charge.

9         For each of Count One and Count Three, the government

10   must prove the following three elements beyond a reasonable

11   doubt:

12        First, that the defendant employed a scheme, device,

13   or artifice to defraud or obtained money or property by false

14   pretensions, representations or promises.

15        Second, that the defendant knowingly and willfully

16   participated in the scheme, device, or artifice was to defraud

17   with knowledge of its fraudulent nature and with specific

18   intent to defraud; and

19        Third, in the discussion of that device, scheme or

20   artifice to defraud, the defendant used, or caused to be used,

21   interstate or international wires (for example, phone calls,

22   email communications, or electronic trades).

23        The first element that the government has to prove

24   beyond a reasonable doubt, and this is true of both Counts One

25   and Three -- excuse me.  Strike "this is true of Counts One and

**A-1124**

NB2MBAN2                         Charge                         3150

1    Three" and disregard that.

2           The first element that the government must prove

3    beyond a reasonable doubt is the existence of a device, scheme

4    or artifice to defraud the alleged victims of money or property

5    by false or fraudulent pretenses, representations, or promises.

6    In Count One, the victims alleged are the customers of FTX.  In

7    Count Three, the alleged victims are lenders to Alameda.

8    Unless I instruct you otherwise, the instructions on the

9    elements that the government has to prove beyond a reasonable

10   doubt to establish wire fraud are exactly the same on Count One

11   and Count Three.  What's different is the alleged victims.

12   Count One the victims are FTX customers; Count Three, Alameda

13   lenders.

14          Now let me define some of the terms relating to wire

15   fraud that I've already used.

16          Fraud is a general term.  It is a term that includes

17   all the possible means by which a person seeks to gain some

18   unfair advantage over a victim by intentional misrepresentation

19   or false pretenses.

20          A device, scheme, or artifice to defraud is any plan,

21   device, or course of action to deprive another of money or

22   property by means of false or fraudulent pretenses,

23   representations, or promises.  It is, in other words, a plan to

24   deprive another person of money or property by trick, deceit,

25   deception, swindle, or overreaching.

**A-1125**

NB2MBAN2                     Charge                          3151

1        Money or property includes fiat currency, such as U.S.

2   dollars or British pounds or other foreign currency.  It also

3   includes cryptocurrencies.

4        A statement or representation is false if it's untrue

5   when it's made.  A statement may be false also if it is

6   ambiguous or incomplete in a manner that makes what is said or

7   represented misleading or deceptive.  A representation is

8   fraudulent if it was made falsely and with intent to deceive.

9        A false or fraudulent statement, representation,

10  promise, or pretense must relate to a material fact or matter.

11  A material fact is one that would be expected to influence, or

12  that is capable of influencing, the decision of a reasonable

13  person.  The same principle applies to fraudulent

14  misappropriation, which I am going to discuss in just a moment.

15       Now, as is pertinent here with respect to the alleged

16  wire fraud on customers of FTX, a scheme to defraud existed if

17  the government has proved beyond a reasonable doubt that the

18  defendant fraudulently embezzled or misappropriated property

19  belonging to another.  The words embezzle and misappropriate

20  mean the fraudulent misappropriation to one's use of money or

21  property that was entrusted to one's care by someone else and

22  with whom that person stood in a relation, implying and

23  necessitating great confidence and trust.  Money or property is

24  entrusted to the defendant's care when the business that the

25  defendant transacted or the money or property that the

**A-1126**

NB2MBAN2                        Charge                        3152

1    defendant handled was not the defendant's own or for the

2    defendant's own benefit, but for the benefit of another person

3    as to whom the defendant stood in a relation implying and

4    necessitating great confidence and trust.

5         Now, such a relationship cannot be based solely on

6    unilateral, subjective expectations of FTX customers.  Rather,

7    your judgment as to whether the government has proved such a

8    relationship should take into account all of the evidence

9    concerning the relationships between and among the defendant,

10   FTX, and FTX's customers.  That evidence may include public FTX

11   policies, public statements and representations by the company,

12   or by the defendant, tweets and other electronic

13   communications, the FTX terms of service, and any other

14   circumstances pertinent to whether the government has proved

15   such a relationship.

16        As far as the terms of service are concerned, I need

17   to make a number of points about them.

18        If you don't mind, I am going to stand, not because of

19   any special emphasis, but because I need to stand once in a

20   while.  If you feel likewise, feel free.

21        Let me make sure I can be heard.

22        First of all, my recollection is that there is only

23   one version of the FTX terms of service in evidence.  It's

24   Government Exhibit 558.  And the evidence, as I recall it, is

25   that it went into effect in May 2022.  While there was

**A-1127**

NB2MBAN2                              Charge                              3153

1    reference in the testimony to earlier versions of FTX terms of

2    service, none of those was received in evidence.  There is

3    evidence also that a prospective customer had to click a box

4    that said, and I think I quoted accurately, I agree to the FTX

5    terms of service in order to open an account.  Government

6    Exhibit 587 is said to be a screenshot of the web page on which

7    a prospective customer was presented with the check box next to

8    the statement, I agree to the FTX terms of service.  Now,

9    mechanisms like this, in other words, where a customer has to

10   click a box on a website stating something to the effect of, I

11   agree to the terms of service in order to get access to

12   services or goods and does click the box, are often called

13   clickwrap agreements.

14          The second point I need to make about the terms of

15   service is that a clickwrap agreement is a civilly enforceable

16   contract of the terms of service that were reasonably

17   conspicuous to the prospective customer, which is often a

18   function of the design and the content of the relevant computer

19   interface.  If the terms of service were reasonably

20   conspicuous, the prospective customer, as a matter of the civil

21   law of contracts, is bound by those terms of service -- excuse

22   me -- terms and conditions, terms of service, when he or she

23   clicks I agree, regardless of whether he or she ever read the

24   terms of service, as long as a reasonably prudent user would

25   see that next to the box appears text saying I agree in the

**A-1128**

NB2MBAN2                        Charge                        3154

1    check box, and there is highlighted and underlined indications

2    that I suspect everybody is familiar with and that a reasonably

3    prudent user would understand that the page is hyperlinked to

4    another web page where the terms of service would be found.  In

5    considering whether a statement or omission is material, let me

6    caution you that a clause in a contract or a disclaimer cannot

7    render any misrepresentation, including any oral

8    misrepresentation, immaterial as a matter of law.

9            The third point is that, insofar as Count One is

10   concerned, this, of course, is a criminal wire fraud case.  It

11   is not a civil case for breach of contract.  In order to decide

12   whether the defendant misappropriated or embezzled to his own

13   use money or property of FTX customers, you first need to

14   determine whether the relationship between the defendant and

15   those customers was one implying and necessitating great

16   confidence and trust.  In doing so, you should, as I have said,

17   consider all of the evidence concerning the relationships

18   between and among the defendant, FTX, and FTX's customers, not

19   simply the terms of service alone.  And if the government has

20   proved such a relationship of trust and confidence, you must

21   determine whether or not the government has proved beyond a

22   reasonable doubt that FTX customers were materially deceived or

23   misled to entrust their money and property to FTX whenever they

24   did so or to leave it there.  Misappropriation of property is

25   material if the disclosure of the misappropriation would be

**A-1129**

NB2MBAN2                    Charge                    3155

1    expected to influence or is capable of influencing the decision

2    of a reasonable person.

3         Now, you have heard evidence that after customers and

4    lenders transferred money to FTX and Alameda Research, the

5    defendant engaged in conduct, made tweets and other public

6    statements and provided financial information, which the

7    government claims were false or misleading.  It is not

8    necessary for the government to prove that a false or

9    misleading -- excuse me -- false or fraudulent representation

10   or statement was made prior to a customer's or lender's

11   decision to part with money or property.  Rather, if after

12   having obtained money or property, the defendant devised or

13   participated in a fraudulent scheme to deprive the alleged

14   victim of that money or property by keeping the money or

15   property through making a subsequent false or fraudulent

16   misrepresentation as to a material fact, that is sufficient to

17   establish the existence of a scheme to defraud.  It is not

18   necessary for the government to prove that the scheme to

19   defraud actually succeeded, that any particular person actually

20   relied on a statement or representation, or that any victim

21   actually suffered damages as a consequence of any false or

22   fraudulent representations, promises, or pretenses.  Nor do you

23   need to find that the defendant profited from the fraud or

24   realized any gain.  You must concentrate on whether there was

25   such a scheme, not the consequences of the scheme, although

**A-1130**

1    proof concerning accomplishment of the goals of the scheme may

2    be persuasive evidence of the existence of the scheme itself.

3           In determining whether a scheme to defraud existed, it

4    is irrelevant whether a victim might have discovered the fraud

5    if the victim had looked more closely or probed more

6    extensively.  A victim's negligence or gullibility in failing

7    to discover a fraudulent scheme is not a defense to wire fraud.

8    On the other hand, a finding that a victim intentionally turned

9    a blind eye to certain types of representations when making

10   decisions about the victim's money or property may be relevant

11   to the materiality of the representations.

12          Finally, the government, in order to satisfy this

13   first element of substantive wire fraud, must prove beyond a

14   reasonable doubt that the alleged scheme contemplated depriving

15   the victims, that is, the customers of FTX, in the case of

16   Count One, and the lenders to Alameda, in the case of Count

17   Three, of money or property.

18          A scheme to defraud need not be shown by direct

19   evidence.  It may be established by all the circumstances and

20   facts of the case.

21          The second element that the government must prove

22   beyond a reasonable doubt to establish the substantive crime of

23   wire fraud is that the defendant knowingly and willfully

24   participated in the device, scheme, or artifice to defraud,

25   with knowledge of its fraudulent nature and with specific

**A-1131**

NB2MBAN2                          Charge                          3157

1   intent to defraud.

2          To act knowingly means to act intentionally and

3   voluntarily, and not because of ignorance, mistake, accident,

4   or carelessness.

5          To act willfully means to act voluntarily and with

6   wrongful purpose.

7          Unlawfully means simply contrary to law.  In order to

8   know of an unlawful purpose, the defendant does not had to have

9   known that he was breaking any particular law or any particular

10  rule.  He need to have been aware only of the generally

11  unlawful nature of his actions.

12         To prove that the defendant acted with specific intent

13  and defraud, the government must prove that he acted with

14  intent to deceive for the purpose of depriving the relevant

15  victim of money or property.  The government need not prove

16  that the victim actually was harmed, only that the defendant

17  contemplated some actual harm or injury to the victim in

18  question.  In addition, the government doesn't need to prove

19  that the intent to defraud was the only intent of the

20  defendant.  A defendant may have the requisite intent to

21  defraud even if the defendant was motivated by other lawful

22  purposes as well.

23         To participate in a scheme means to engage in it by

24  taking some affirmative step to help it succeed.  Merely

25  associating with people who were participating in a scheme,

NB2MBAN2                         Charge                         3158

1   even if the defendant knew what they were doing, is not

2   participation.

3          It is not necessary for the government to establish

4   that the defendant originated the scheme to defraud.  It is

5   sufficient if you find that there was a scheme to defraud, even

6   if somebody else originated it, and that the defendant, while

7   aware of the existence of the scheme, knowingly and willfully

8   participated in it with the intent to defraud.

9          Nor is it required that the defendant have

10  participated in or have had knowledge of all of the operations

11  of the scheme.  The responsibility of the defendant is not

12  governed by the extent of his participation.  For example, it

13  is not necessary that the defendant have participated in the

14  alleged scheme from the beginning.  A person who comes in at a

15  later point with knowledge of the scheme's general operation,

16  although not necessarily all of its details, and intentionally

17  acts in a way to further the unlawful goals, becomes a

18  participant in the scheme and is legally responsible for all

19  that may have been done in the past in furtherance of the

20  criminal objective and all that is done thereafter.

21         Even if the defendant participated in the scheme to a

22  lesser degree than others, he nevertheless is equally guilty as

23  long as he knowingly and willfully participated in the alleged

24  scheme to defraud with knowledge of its general scope and

25  purpose and with specific intent to defraud.

**A-1133**

NB2MBAN2                                    Charge                                    3159

1          Because an essential element of the crime charged is

2    intent to defraud, it follows that good faith on the part of a

3    defendant is a complete defense to the charge of wire fraud.

4    Good faith is an honest belief by the defendant that his

5    conduct was not wrongfully intended.  An honest belief in the

6    truth of the representations made or caused to be made by a

7    defendant is a complete defense, however inaccurate the

8    statements may turn out to be.  Similarly, it is a complete

9    defense if a defendant held an honest belief that the victims

10   were not being deprived of money or property.  Moreover, a

11   defendant that doesn't have any burden to establish a defense

12   of good faith, it's always the government's burden to prove

13   fraudulent intent and the consequent lack of good faith beyond

14   a reasonable doubt.  However, in considering whether or not a

15   defendant acted in good faith, you are instructed that an

16   honest belief on the part of the defendant, if such a belief

17   existed, that ultimately everything would work out to the

18   benefit of the alleged victims does not necessarily mean that

19   the defendant acted in good faith.  If the defendant knowingly

20   and willfully participated in the scheme with the intent to

21   deceive the victim or victims in question for the purpose of

22   depriving the victim or victims of money or property, even if

23   only for a period of time, then no amount of honest belief on

24   the part of the defendant that the victim ultimately would be

25   benefited will excuse false representations that a defendant

**A-1134**

NB2MBAN2                         Charge                         3160

1    willfully made or caused to be made.

2         As I instructed you previously, it is the government's

3    burden to prove beyond a reasonable doubt that the defendant

4    had a fraudulent intent and that he engaged in a fraudulent

5    scheme for the purpose of causing some loss to another.

6         All of that said, you have heard evidence that FTX and

7    Alameda had lawyers.  A lawyer's involvement with an

8    individual, entity -- an individual or entity or transaction

9    doesn't itself constitute a defense to any charge in this case.

10   The defense has not claimed, and it cannot claim, that the

11   defendant's allegedly unlawful conduct, assuming he committed

12   any unlawful conduct, was lawful because he engaged in such

13   conduct in good-faith reliance on the advice of a lawyer.

14        In the last analysis, whether a person acted

15   knowingly, willfully, and with intent to defraud is a question

16   of fact.  It is for you to determine, like any other fact

17   question.  Direct proof of knowledge and fraudulent intent is

18   never or almost never available, nor is it required.  It would

19   be a very rare case where it could be shown that a person wrote

20   or stated that as of a given time in the past he or she

21   committed an act with fraudulent intent.

22        The ultimate facts of knowledge and criminal intent,

23   though subjective, may be established by circumstantial

24   evidence, based upon a person's outward manifestations, his or

25   her words, his or her conduct, his or her acts, and all the

**A-1135**

NB2MBAN2                          Charge                          3161

1   surrounding circumstances disclosed by the evidence and the

2   rational or logical inferences that may be drawn from that

3   evidence.  You may, but you are not required, to infer that

4   people intend the natural and probable consequences of their

5   actions.  Accordingly, when the necessary result of a scheme is

6   to injure others, fraudulent intent may be inferred from the

7   scheme itself.  As I instructed earlier, circumstantial

8   evidence, if believed, and I'll talk about circumstantial

9   evidence later on, is of no less value than direct evidence.

10          The third and final element that the government must

11  prove beyond a reasonable doubt is that one or more foreign

12  wires, which I have also referred to as international wires,

13  same thing, were used in furtherance of the scheme to defraud.

14  An interstate wire means a wire that passes between two or more

15  states.  A foreign wire means a wire that travels between the

16  United States and another country.  Examples of wires include

17  telephone calls, text messages, communications over the

18  Internet, commercials on television, and financial wires

19  between bank accounts, among other things.

20          A wire communication need not be fraudulent.  It must,

21  however, further or assist in some way in carrying out the

22  scheme to defraud in order to satisfy this third element.  A

23  wire communication can also include a communication made after

24  an alleged victim's funds were obtained if the communication

25  was designed to lull the victim into a false sense of security,

**A-1136**

NB2MBAN2                        Charge                        3162

1    to postpone the victim from complaining to the authorities, or

2    to keep money obtained in the scheme.

3            It is not necessary for the defendant to have been

4    directly or personally involved in a wire communication, as

5    long as the wire was reasonably foreseeable in the execution of

6    the alleged scheme to defraud in which the defendant is accused

7    of participating.  In this regard, it is sufficient to

8    establish this third element of the crime if the evidence

9    justifies a finding that the defendant caused a wire to be used

10   by another.  This does not mean that the defendant must

11   specifically have authorized others to make the communication

12   or communications.  When one does an act with knowledge that

13   the use of the wires will follow in the ordinary course of

14   business or where such use of wires reasonably can be foreseen,

15   even if not specifically or actually intended, then a person

16   causes the wires to be used.

17           Finally, if you find that a wire communication was

18   reasonably foreseeable and that the interstate or foreign wire

19   communication charged in the indictment took place, then this

20   element is satisfied even if it was not foreseeable that the

21   communication would cross state lines or the United States

22   border.

23           That takes care of the first of the three theories on

24   which the government could theoretically convict the defendant

25   on Count One and/or Count Three.

**A-1137**

NB2MBAN2                          Charge                          3163

1          Now, if you unanimously find that the government has

2    proved the defendant guilty of both Counts One and Three under

3    that first theory of liability that I just finished explaining,

4    in other words, if you find that the government has proved that

5    the defendant himself committed the substantive crimes charged

6    in Counts One and Three, then you don't need to consider the

7    government's second and third theories of liability on either

8    one of those counts.

9          I have to tell you about them anyway.

10          If, on the other hand, you do not so find as to either

11    or both of Count One or Count Three, then you will consider the

12    government's second alternative theory of liability, namely,

13    that the defendant is guilty of the relevant conduct or counts

14    because he allegedly possessed the requisite criminal intent

15    and he willfully caused someone else to engage in actions

16    necessary to commit the crime or crimes.  I am now going to

17    take a moment, I promise, to discuss what it means for a

18    defendant to be guilty as a principal through willful causation

19    in the context of this case.

20          Whoever willfully causes an act to be done which, if

21    directly done by the defendant, would be an offense against the

22    United States, it is punishable as a principal.

23          What does the term willfully caused mean?  It doesn't

24    mean that the defendant need physically have committed the

25    crime or supervised or participated in the actual criminal

**A-1138**

NB2MBAN2                        Charge                        3164

1   conduct charged in the indictment.  Rather, anybody who causes

2   the doing of an act, which that person, had he done so directly

3   himself, would render him guilty of an offense against the

4   United States, is guilty as a principal.  Accordingly, one who

5   intentionally causes another person to make a material false

6   statement in connection with depriving a victim of money or

7   property is guilty as a principal if the government proves that

8   the person who causes the making of the false statement acted

9   knowingly, willfully, and with the specific intent to defraud

10  the victim in question and satisfies the other elements of wire

11  fraud that I have described to you.  That is so even if the

12  individual who was caused to make the false statement did so

13  without criminal intent.

14          Now, if you unanimously find that the government has

15  proved the defendant guilty beyond a reasonable doubt of both

16  of Count One and Count Three, under either of the first or the

17  second theory of liability that I have just finished explaining

18  to you, then you don't need to consider the government's third

19  theory of liability, but I need to tell you about it anyway,

20  just in case.  And I don't mean anything by just in case.  It's

21  just a note of humor.  At least I hope so.

22          If you do not convict the defendant of Count One or

23  Count Three or both counts under either of the first two

24  theories of liability, then you must consider whether the

25  government has proved him guilty on the third theory, which is

**A-1139**

NB2MBAN2                         Charge                          3165

1    called aiding and abetting.

2          I will explain that to you in a little more detail.

3          It is unlawful for someone to aid, abet, counsel,

4    command, induce, or procure someone else to commit an offense.

5    A person who does that is just as guilty of the offense as

6    someone who actually commits the offense himself or herself.

7    Accordingly, for either of the two substantive counts in the

8    indictment, you may find the defendant guilty if you find that

9    the government has proved on that count beyond a reasonable

10   doubt that someone else actually committed the crime and that

11   the defendant aided, abetted, counseled, commanded, induced, or

12   procured the commission of that crime.

13         In order to convict the defendant as an aider and

14   abettor, the government must prove beyond a reasonable doubt

15   two elements.

16         First, it must prove that someone other than the

17   defendant (and other than a person that the defendant willfully

18   caused to commit the crime, as I described that to you

19   previously) committed the crime charged.  The reason is

20   obviously this.  No one can be convicted of aiding or abetting

21   the criminal act of some other person if nobody committed the

22   crime in the first place.  Accordingly, if the government has

23   not proved beyond a reasonable doubt that someone other than

24   the defendant committed the substantive crime or crimes in the

25   indictment, then you don't have to consider the second element

**A-1140**

NB2MBAN2                     Charge                      3166

1    of aiding and abetting.  But if you do find that a crime was

2    committed by someone other than the defendant, or someone he

3    willfully caused to take the actions necessary for the

4    commission of the crime, then you must consider whether the

5    defendant aided or abetted the commission of that crime and,

6    therefore, whether the government has proved the second element

7    of aiding and abetting, which requires the government to prove

8    that the defendant willfully and knowingly associated himself

9    in some way with the crime and that he willfully and knowingly

10   engaged in some affirmative conduct or some overt act for the

11   specific purpose of bringing about the crime.  Participation in

12   a crime is willful if it is done voluntarily and intentionally,

13   with the specific intent to do something that the law

14   prohibits.

15          The mere presence of the defendant in a place where a

16   crime is being committed, even with knowledge that a crime is

17   being committed, is not enough to make the defendant an aider

18   and abettor.  Similarly, a defendant's acquiescence in criminal

19   conduct of others, even with guilty knowledge, is not enough to

20   establish aiding and abetting.  An aider or abettor must know

21   that the crime is being committed and act in a way which is

22   intended to bring about the success of the criminal venture.

23          To determine whether a defendant aided and abetted in

24   the commission of a crime, ask yourself these questions:

25          Did the defendant knowingly associate himself with the

**A-1141**

NB2MBAN2                         Charge                          3167

1    criminal venture?  Did he by his actions make the crime or the

2    criminal venture succeed?  And did the defendant participate in

3    the crime charged as something he wished to bring about?  And

4    if he did, then he's an aider and abettor.  If, on the other

5    hand, your answer to any one of those three questions I just

6    posed is no, the defendant is not an aider or abettor.  I

7    certainly understand, depending on your view of the evidence,

8    that there may be a very subtle distinction with respect to

9    whether a defendant is guilty, if he's guilty at all, as a

10   principal or as an aider and abettor.  The question is what is

11   the difference between a defendant willfully causing someone

12   else to take actions necessary for the commission of a crime,

13   as opposed to aiding and abetting someone else in committing

14   the crime.

15            If this question should come up in your deliberations,

16   you should think of it in terms of the difference between

17   causing someone to do something versus facilitating or helping

18   someone to do it.  If you are persuaded beyond a reasonable

19   doubt that the defendant willfully caused someone else to take

20   actions necessary for the commission of either of the

21   substantive counts charged in the indictment, you should

22   convict him as a principal on that count.  If, on the other

23   hand, you are persuaded beyond a reasonable doubt that the

24   defendant, with knowledge and intent, as I have described as

25   necessary, sought by his actions to facilitate and assist that

**A-1142**

NB2MBAN2                         Charge                         3168

1   other person in committing the crime, then he's guilty as an

2   aider and abettor.  One important difference between willfully

3   causing and aiding another person and abetting another person

4   to commit a crime is that with respect to willful causation,

5   the government need not prove that the defendant acted through

6   a guilty person.

7           With respect to aiding and abetting, however, the

8   government must prove beyond a reasonable doubt that someone

9   else actually committed the crime charged with the requisite

10  criminal intent.

11          If you find that the government has proved beyond a

12  reasonable doubt that another person actually committed one or

13  more of the substantive crimes charged in the indictment, just

14  a reminder, Count One or Count Three, and that the defendant

15  aided or betted that person in the commission of the offense,

16  you should find the defendant guilty of that substantive crime

17  on an aiding-and-abetting theory.  If, however, you do not so

18  find, then you may not find the defendant guilty of that

19  substantive crime on an aiding-and-abetting theory.

20          That takes care of Counts One and Three.  I will say

21  no more about them, I believe.

22          (Continued on next page)

23

24

25

**A-1143**

NB21BAN3                         Charge                         3169

1            THE COURT:  So let's go on to the conspiracy counts.

2      And let's see.  I think I've been going for quite awhile.  But

3      I'm going to push on a little further and take up Counts Two

4      and Four, the charge of conspiracy to commit wire fraud.

5            I've already explained to you that a conspiracy to

6      commit a crime is a separate and different offense from the

7      substantive crime that may have been the object of the

8      conspiracy.  Now that I have discussed the substantive counts

9      charged in the indictment, I'm going to discuss the elements of

10     the conspiracy counts.  And I'm starting with Counts Two and

11     Four.

12           Count Two charges that from at least in or about 2019,

13     up to and including in or about November 2022, the defendant

14     conspired with others to commit wire fraud—the crime I have

15     just described to you—against customers of FTX.

16           Count Four charges that from at least June of 2022 up

17     to and including in or about November of '22, the defendant

18     conspired with others to commit wire fraud against lenders to

19     Alameda.

20           In order to sustain its burden of proof with respect

21     to the conspiracy charged in each of Counts Two and Four, the

22     government must prove each of two elements—on each count, of

23     course.

24           First, it must prove the existence of a conspiracy,

25     the conspiracy charged in the count you're considering;

**A-1144**

NB21BAN3                    Charge                      3170

1              Second, it must prove that the defendant knowingly and

2     willfully became a member of, and joined in, that conspiracy.

3              Starting with the first element, a conspiracy, as I've

4     told you, is an agreement or understanding of two or more

5     people to accomplish by concerted action a criminal or unlawful

6     purpose.  In this instance, Counts Two and Four charge that the

7     criminal or unlawful purpose was to commit wire fraud.

8              To establish a conspiracy, the government is not

9     required to show that two or more people sat down at a table

10    and entered into a solemn compact stating that they have formed

11    a conspiracy to violate the law and setting forth details of

12    the plans and the means by which the project, the unlawful

13    project, is to be carried out, or the roles that everyone is

14    going to play.  Since conspiracy by its very nature is

15    characterized by secrecy, it is rare that a conspiracy can be

16    proved by direct evidence of an explicit agreement.  You may

17    infer the existence of a conspiracy from the circumstances of

18    this case and the conduct of the parties involved.

19             The adage "actions speak louder than words" may apply

20    here.  Usually, the only evidence available with respect to the

21    existence of a conspiracy is that of disconnected acts on the

22    part of the alleged individual co-conspirators.  When taken

23    together and considered as a whole, however, such acts may show

24    a conspiracy or an agreement as conclusively as would direct

25    proof.  In determining whether the conspiracy charged in Counts

**A-1145**

NB21BAN3                        Charge                        3171

1   Two and Four actually existed, you may consider all of the

2   acts, conduct, and statements of the alleged co-conspirators

3   and the reasonable inferences to be drawn therefrom.

4           In order to prove the necessary agreement, it is

5   sufficient if two or more persons came to a common

6   understanding to violate the law.

7           As I told you earlier, since the essence of the crime

8   of conspiracy is an agreement or understanding to commit a

9   crime, it does not matter if the crime, the commission of which

10  was an objective or a goal of the conspiracy, ever was

11  committed.  A conspiracy to commit a crime, I've told you, is

12  an entirely separate and distinct offense from the actual

13  commission of the illegal act that is the object of the

14  conspiracy.  The success or failure of a conspiracy is not

15  material to the question of guilt or innocence of an alleged

16  conspirator.

17          Now each of the conspiracies charged in Counts Two and

18  Four allegedly had one object—in other words, each of the

19  conspiracies in those two counts had a single illegal purpose

20  that the co-conspirators alleged to accomplish—which was to

21  commit wire fraud against customers of FTX in the case of Count

22  Two and against lenders to Alameda in the case of Count Four.

23  I've already explained the elements of wire fraud to you when I

24  instructed you on Counts One and Three.  You will apply those

25  instructions when you consider whether the government has

**A-1146**

NB21BAN3                    Charge                    3172

1    proved beyond a reasonable doubt that the conspiracies charged

2    in Count Two and Count Four existed.  However, because Counts

3    Two and Four each charge a conspiracy, the government does not

4    have to prove that anyone committed the substantive crime of

5    wire fraud.  It need prove beyond a reasonable doubt only that

6    there was an agreement or understanding to try to accomplish

7    that.

8            The indictment charges that the conspiracy alleged in

9    Count Two lasted from at least in or about 2019 through at

10   least in or about 2022; the conspiracy charged in Count Four

11   allegedly lasted from at least in or about June 2022 through at

12   least in or about November of that year.  It is not necessary

13   for the government to prove that the conspiracy in either count

14   lasted through the entire period alleged in the indictment.  It

15   is sufficient if the government proved only that it existed for

16   some period within those time frames.

17           In sum, in order to find that the conspiracies charged

18   in Count Two and in Count Four existed, the government must

19   prove beyond a reasonable doubt that there was a material

20   understanding, either spoken or unspoken, between two or more

21   people to commit the wire fraud alleged in the relevant count,

22   Two or Four.

23           The second element that the government must prove in

24   order to convict on Count Two or on Count Four is that the

25   defendant willfully joined and participated in the conspiracy

**A-1147**

NB21BAN3                         Charge                         3173

1   you are considering, with knowledge of its unlawful purpose,

2   and with an intent to aid in the accomplishment of its illegal

3   objective—-assuming, of course, that the government has proved

4   that there was such a conspiracy in the first place.  In other

5   words, it must prove that the defendant willfully joined and

6   participated in the conspiracy to commit the wire fraud that is

7   the subject of the count that you are considering.

8         The government must prove beyond a reasonable doubt

9   that the defendant unlawfully, willfully, knowingly, and with

10  specific intent to defraud entered into the conspiracy that's

11  relevant on each count.

12        "Knowingly" and "willfully" have the same meanings

13  here that I described earlier with respect to the second

14  element of substantive wire fraud.

15        The defendant's participation in the conspiracy, if

16  there was a conspiracy, must be established by independent

17  evidence of his own acts or statements, as well as those of the

18  other alleged co-conspirators, and the reasonable inferences

19  that may be drawn from them.

20        Now obviously science has not yet devised a manner of

21  looking into a person's mind and knowing what the person is or

22  was thinking.  To make that determination, you may look to the

23  evidence of certain acts that are alleged to have taken place

24  by or with the defendant or in his presence.  As I instructed

25  you earlier with respect to determining a defendant's knowledge

**A-1148**

NB21BAN3                          Charge                          3174

1    and intent, you may consider circumstantial evidence based on

2    the defendant's outward manifestation, his words, his conduct,

3    his acts, and all of the surrounding circumstances of which you

4    have heard evidence, and the rational and logical inferences

5    that may be drawn therefrom.

6         To become a member of the conspiracy, the defendant

7    need not have known the identities of each and every other

8    member, nor need he have known of all of their activities.  In

9    fact, a defendant may know only one other member of a

10   conspiracy and still be a co-conspirator.

11        Moreover, the defendant need not have been fully

12   informed as to all of the details, or the scope, of an alleged

13   conspiracy in order to justify an inference of knowledge on his

14   part.  Proof of a financial interest in the outcome or another

15   motive is not essential, but if you find that the defendant had

16   such an interest or such another motive, that is a factor that

17   you may consider in determining whether the defendant was a

18   member of a conspiracy, alleged conspiracy that you're

19   considering.  The presence or absence of motive, however, is a

20   circumstance that you may consider as bearing on the

21   defendant's intent.

22        The duration and extent of a defendant's participation

23   has no bearing on the issue of a defendant's guilt.  Each

24   member of a conspiracy may perform separate and distinct acts

25   and may perform them at different times.  Some conspirators

**A-1149**

NB21BAN3                         Charge                         3175

1   play major roles, others play only minor parts.  An equal role

2   is not what the law requires.  In fact, even a single act may

3   be sufficient to draw a defendant within the ambit of the

4   conspiracy.  Moreover, a defendant need not have joined the

5   conspiracy at the outset.  He may have joined at any time, and

6   if he joined, he——or she, as may be applicable in other

7   cases——will still be held responsible for the acts done after

8   joining.

9        I do want to caution you, however, that mere

10  association by one person with another does not make that

11  person a member of a conspiracy even when coupled with

12  knowledge that a conspiracy is taking place.  Similarly, mere

13  presence at the scene of a crime, even coupled with knowledge

14  that a crime is taking place, is not sufficient to support a

15  conviction.  A person may know, or be friendly with, a

16  criminal, without being a criminal himself.  Mere similarity of

17  conduct or the fact that people may have assembled together and

18  discussed common aims and interests does not necessarily

19  establish membership in a conspiracy.

20       I further instruct you that mere knowledge or

21  acquiescence without participation in an unlawful plan is also

22  not sufficient.  The fact that the acts of a defendant, without

23  knowledge, merely happen to further the purpose or objective of

24  a conspiracy doesn't make the defendant a member.

25       What is necessary is that the defendant must have

**A-1150**

NB21BAN3                    Charge                    3176

1    participated with knowledge of the unlawful purpose of the

2    conspiracy—in this case, to commit wire fraud.  The

3    instructions that I previously gave you with respect to good

4    faith apply to these counts as well.  If you find that the

5    defendant acted in good faith, he can't be convicted on Counts

6    Two or Four.

7            In sum, the government must prove beyond a reasonable

8    doubt that the defendant, with an understanding of the unlawful

9    nature of the conspiracy you're considering, intentionally

10   engaged, advised, or assisted the conspiracy in order,

11   knowingly and willfully, to promote its unlawful goal.  The

12   defendant thereby becomes a conspirator.

13           A conspiracy, once formed, is presumed to continue

14   until its objectives are accomplished or there is some

15   affirmative act of termination by its members.  So too, once a

16   person is found to be a member of a conspiracy, that person is

17   presumed to continue being a member in the venture until the

18   venture is terminated, unless it is shown by some affirmative

19   proof that the defendant or the person concerned withdrew and

20   disassociated him or herself from it.

21           In sum, if you find the government has met its burden

22   of proof on both elements as to the count you are considering,

23   then you should find the defendant guilty on that count.  If

24   you find that the government has not met that burden with

25   respect to any of the elements as to the count you are

**A-1151**

NB21BAN3                          Charge                            3177

1    considering, then you must find the defendant not guilty on

2    that count.

3            Now let's all take a break and stand up for a minute

4    and catch our breath.

5            (Pause)

6            THE COURT:  In fact, we'll take a ten-minute recess.

7            THE DEPUTY CLERK:  All rise.  Will the jury please

8    come this way.

9            (Recess)

10           (In open court; jury present)

11           THE COURT:  The record will reflect that the defendant

12   and the jurors all are present, as they have been throughout.

13           Okay.  We are up to Count Five.  And just so everybody

14   has an idea of schedule, I'll probably take our lunch break at

15   1, or thereabouts.  I'll get to a good stopping point, we'll

16   take our half hour, and come back and finish.

17           Okay.  Count Five charges the defendant with

18   conspiring to commit securities fraud.  Specifically, it

19   charges that from at least in or about 2019, up to and

20   including in or about November 2022, the defendant conspired

21   with others to commit securities fraud against investors in

22   FTX.

23           Now let me just back up for a minute.  My

24   ever-detail-oriented and brilliant law clerks invited my

25   attention to the fact that as I was winding up the instruction

**A-1152**

NB21BAN3                              Charge                              3178

1   with respect to the last two counts, the conspiracy counts, Two

2   and Four, I left a word out that I should have read.  The

3   sentence I read to you said, they tell me, he may have joined,

4   referring to the defendant, and to the alleged conspiracy, at

5   any time, and if he joined still would be held responsible for

6   acts done before he joined.  I think that's what they tell me I

7   read, but if that's what I read, doesn't matter.  It should

8   have said before or after.  Everybody got it?  Okay.

9            Now back to Count Five.

10           In order to sustain its burden of proof with respect

11   to the conspiracy alleged in Count Five, the government must

12   prove beyond a reasonable doubt each of the three elements:

13           First, that there was an agreement or understanding to

14   accomplish the unlawful objective alleged in Count Five of the

15   indictment—specifically, securities fraud—by providing false

16   information to FTX investors;

17           Second, that the defendant knowingly and willfully

18   became a member of and joined that conspiracy;

19           Third, that at least one person who was a member of

20   that conspiracy committed some overt act in furtherance of the

21   conspiracy.

22           Now the first element, as I said, that the government

23   has to prove was that there was a conspiracy that has as its

24   object the commission of securities fraud.  I have already told

25   you probably more than you ever wanted to hear about the

**A-1153**

1  definition of a conspiracy and what it takes to prove a

2  conspiracy, and you will apply all of those instructions to

3  Count Five.  So what remains is to talk to you about the

4  alleged objective of the conspiracy charged in Count Five,

5  which is securities fraud.  So let me tell you about securities

6  fraud, the alleged object of this alleged conspiracy.

7        Now harkening back to something I said before, the

8  government doesn't have to prove that a securities fraud

9  actually was committed.  It simply has to prove that that was

10 an objective of an alleged conspiracy that you find to have

11 existed.  Securities fraud, in turn, has three elements:

12        The first element is that in connection with the

13 purchase or sale of securities, the defendant did any one or

14 more of the following: (1) employed a scheme, device, or

15 artifice to defraud—you've already heard a lot about that;

16 second, made an untrue statement of a material fact or omitted

17 to state a material fact which made what was said, in the

18 circumstances, misleading; or (3) engaged in an act, practice,

19 or course of business that operated, or would operate, as a

20 fraud or deceit upon a purchaser of the securities.

21        That's the first element of securities fraud.

22        The second element of securities fraud is that the

23 defendant, when the defendant engaged in that scheme, if the

24 defendant did so, acted knowingly, willfully, and with an

25 intent to defraud.

**A-1154**

NB21BAN3                          Charge                          3180

1       The third element of securities fraud is that in

2   furtherance of the fraudulent conduct, there occurred at least

3   one use of any means or instruments of transportation or

4   communication in interstate or foreign commerce, or the use of

5   the mails, or the use of any facility of a national securities

6   exchange.

7       So I'm going to talk about those three elements of

8   securities fraud in order that you can evaluate whether there

9   was an agreement or an understanding to attempt to accomplish

10  securities fraud.

11      The first element of securities fraud which I

12  mentioned is that the defendant did one or more of the three

13  things that I just outlined to you.  In proving a fraudulent

14  act, it is not necessary for the government to prove all three

15  of those types of unlawful conduct that I just read out to you

16  a moment ago were part of the objective of the conspiracy.  Any

17  one would be sufficient to satisfy that element.  You must,

18  however, be unanimous as to which type of unlawful conduct was

19  the alleged object of the conspiracy.

20      Now earlier, in the context of the wire fraud charges,

21  I explained what "fraud" means, and I explained device, scheme,

22  or artifice to defraud, and you will apply those definitions

23  here.

24      Material information, in the context of securities

25  fraud, is information that a reasonable investor would have

**A-1155**

NB21BAN3                          Charge                          3181

1   considered important in making an investment decision in light

2   of the total mix of information publicly available.

3   Materiality of the information is judged as of the time the

4   information was disclosed.

5          The government must prove also beyond a reasonable

6   doubt that the defendant's alleged fraudulent conduct was in

7   connection with the purchase or sale of a security.  That

8   requirement would be satisfied if you find that there was some

9   nexus or relationship between the allegedly fraudulent conduct

10  and the sale or purchase of securities.  On the other hand, if

11  you are not persuaded that any fraudulent conduct that may have

12  occurred was in connection with the purchase or sale of a

13  security, you cannot convict the defendant on Count Five.

14         The second element of securities fraud is that the

15  defendant in question participated in the scheme knowingly,

16  willfully, and with intent to defraud.

17         I have already defined "knowingly" and "willfully,"

18  and you will apply those definitions here.

19         In the context of the securities laws, intent to

20  defraud means to act knowingly and with the intent to deceive.

21  Since an essential element of securities fraud is intent to

22  defraud, good faith, as I have previously defined that term, is

23  a complete defense to a charge of securities fraud.  And you'll

24  apply what I've said already about good faith with respect to

25  Count Five.

**A-1156**

NB21BAN3                        Charge                        3182

1          And the final element of securities fraud is that the

2    defendant knowingly used or caused to be used at least one

3    instrumentality of interstate or foreign commerce, such as an

4    interstate or international telephone call, a use of the mails,

5    or an interstate transaction in furtherance of the scheme to

6    defraud or the fraudulent conduct.

7          The government does not have to prove that a defendant

8    was directly or personally involved in the use of an

9    instrumentality of interstate or foreign commerce.  If the

10   defendant was an active participant in the scheme and took

11   steps or engaged in conduct that he knew or reasonably could

12   have foreseen would naturally and probably result in the use of

13   an instrumentality of interstate or foreign commerce, this

14   element would be satisfied.  Nor is it necessary that the

15   communication did or would contain a fraudulent representation.

16   The use of the mails or instrumentality of interstate or

17   foreign commerce need not be central to the execution of the

18   scheme or even incidental to it.  All that is required is that

19   the use of the mails or instrumentality of interstate or

20   foreign commerce bear some relation to the object of the scheme

21   or fraudulent commerce.

22          Moreover, the actual purchase or sale of a security

23   need not be accomplished by the use of the mails or an

24   instrumentality of interstate or foreign commerce, as long as

25   the mails or instrumentality of interstate or foreign commerce

**A-1157**

NB21BAN3                    Charge                        3183

1   are used in furtherance of the scheme and the defendant is

2   still engaged in actions that are part of the fraudulent scheme

3   when the mails or the instrumentalities of interstate or

4   foreign commerce are used.

5          I've now defined for you the elements of securities

6   fraud, the commission of which allegedly was the purpose, the

7   object, of the conspiracy found in Count Five.  Again, not

8   necessary that it be proven that that purpose was achieved in

9   order to convict on Count Five.

10         The second element of the conspiracy charged in Count

11  Five is that the defendant knowingly and willfully joined and

12  participated in the conspiracy to commit securities

13  fraud—assuming, of course, that there was such a conspiracy.

14  I've already instructed you on the terms "knowingly" and

15  "willfully," and what it means for a defendant to knowingly and

16  willfully become a member of and join a conspiracy.  You will

17  apply all of those instructions here.

18         The third and last element with respect to Count Five

19  that the government must prove beyond a reasonable doubt is

20  that at least one of the conspirators, not necessarily the

21  defendant, committed at least one overt act in furtherance of

22  the conspiracy.  Now this is different from Counts Two and

23  Four.  No overt act requirement there.  Some day we'll all ask

24  congressmen why, but that's the way it is.  In other words, the

25  overt act requirement requires that there have been something

**A-1158**

NB21BAN3                           Charge                           3184

1    more than an agreement—-some overt step or action must have

2    been taken by at least one of the conspirators in furtherance

3    of the conspiracy.  The overt act element, to put it another

4    way, is a requirement that the agreement that's charged in

5    Count Five have gone beyond merely the talking stage.

6           The government may satisfy the overt act element by

7    proving one of the overt acts that you'll find listed in the

8    indictment, but it doesn't have to prove one of the overt acts

9    listed in the indictment.  It is enough if the government

10   proves one overt act committed in the furtherance of the

11   conspiracy whether or not that overt act is listed in the

12   indictment.  As long as you all agree that at least one overt

13   act was committed, that element of an overt act is satisfied.

14   But you must agree on at least one act, all 12 of you.

15          Similarly, it is not necessary for the government to

16   prove that each member of the alleged conspiracy committed or

17   participated in an overt act.  It's enough if you find that at

18   least one overt act was committed and performed by at least one

19   member of the conspiracy, whether the defendant or someone

20   else, and that it have furthered the conspiracy within the time

21   frame of the conspiracy.  Remember, the act of any one of the

22   members of the conspiracy done in furtherance of the

23   conspiracy, effectively, in law, becomes the act of all of

24   them.  To be a member of the conspiracy, it is not necessary

25   for a defendant to have committed an overt act.

**A-1159**

NB21BAN3                          Charge                          3185

1           The overt act, as I have suggested already, must have

2    been done knowingly and it must be in furtherance of one of the

3    objects of the conspiracy charged in the indictment, and in

4    fact I believe this is another count where there's one object

5    of the conspiracy——the commission of securities fraud.

6           You should be aware that an apparently innocent act

7    sheds its harmless character if it is a step in carrying out,

8    promoting, aiding, or assisting an alleged conspiratorial

9    scheme.  The overt act does not have to have been an act which

10   in and of itself was criminal, or that its occurrence have been

11   an objective of the conspiracy.  It's just one overt act that

12   you all agree upon and that it be in furtherance of the

13   conspiracy, regardless of what it is.

14          If you find that the government has met its burden on

15   all three elements of this conspiracy claim, Count Five, you

16   should find the defendant guilty of Count Five.  If the

17   government has not met its burden with respect to any of the

18   three elements of this conspiracy claim, then you must find the

19   defendant not guilty on Count Five.

20          That brings me to Count Six, which should give you

21   confidence that some day this too will end, because there are

22   only seven.  And I once charged a case with 283 counts, many

23   years ago.

24          Count Six charges that the defendant, from at least in

25   or about 2019, up to and including in or about November 2022,

**A-1160**

NB21BAN3                    Charge                    3186

1    conspired with others to commit commodities fraud against

2    customers of FTX.

3              In order to sustain its burden of proof with respect

4    to the conspiracy alleged in Count Six, the government must

5    prove beyond a reasonable doubt each of the three elements:

6              First, that there was an agreement or understanding to

7    accomplish the illegal or unlawful objective alleged in Count

8    Six—namely, commodities fraud;

9              Second, that the defendant knowingly and willfully

10   became a member of and joined that conspiracy; and

11             Thirdly, that at least one person who was a member of

12   the conspiracy committed some overt act in furtherance of that

13   conspiracy.

14             Now the elements of the conspiracy charged in Count

15   Six are exactly the same as those in Count Four, except the

16   object of Count Six is different.  Count Six says the object

17   was commodities fraud, whereas Count Five alleges that the

18   object was securities fraud.

19             Once again, in order to convict on Count Six, the

20   government does not have to prove that commodities fraud was

21   actually committed, only that doing so was the objective of the

22   conspiracy.  So as I did with Count Five, now I'm going to tell

23   you about commodities fraud for a similar purpose, so that you

24   understand what the object is said to have been.

25             Commodities fraud has three elements:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1161**

NB21BAN3                         Charge                         3187

1            First, that the defendant did any one or more of three

2      things: thing (1) employed a manipulative device, scheme, or

3      artifice to defraud; thing (2) made an untrue statement of a

4      material fact or omitted to state a material fact which made

5      what was said, under the circumstances, misleading; and thing

6      (3) engaged in an act, practice, or course of business that

7      operated, or would operate, as a fraud or deceit.  That's the

8      first element.

9            Second element:  The scheme, untrue statement, act,

10     practice, or course of conduct was in connection with a swap,

11     or a contract of sale of any commodity in interstate or foreign

12     commerce.

13            Third, that the defendant acted knowingly, willfully,

14     and with an intent to defraud.

15            Now as respects the first element of commodities

16     fraud, I described that as involving doing one of three things,

17     remember?  Manipulative scheme or artifice to defraud, untrue

18     statement, or omission, act, practice, or course of business

19     that operated or would operate as a fraud.

20            The government doesn't have to prove all three.  Proof

21     of one is enough.  But you must be unanimous as to which one.

22            Now the terms I used with respect to that first

23     element are exactly the same terms I defined with respect to

24     Count Five, and earlier counts in some cases.  You will apply

25     them all here, as you will also apply what I said about good

**A-1162**

NB21BAN3                      Charge                          3188

1    faith on Count Six.

2           The second element of commodities fraud is that the

3    defendant and his co-conspirators, if there were more than one,

4    committed their conduct in connection with a swap, or a

5    contract of sale of a commodity in interstate or foreign

6    commerce.  So let me tell you what those terms are.

7           A commodity is a good, article, service, right, or

8    interest in which contracts for future delivery are dealt.  A

9    "contract for future delivery," which is also called a "futures

10   contract," is an agreement to buy or sell a particular

11   commodity at a specific price in the future.  A virtual

12   currency or cryptocurrency may qualify as a commodity.

13          A swap is an agreement between two parties to exchange

14   payments with each other based on the value of one or more

15   rates, commodities, indices, or other financial or economic

16   interests.  A swap transfers between the two parties, in whole

17   or in part, the risk of changes in value of the things

18   underlying the swap, without actually exchanging those things.

19   In determining whether a financial contract, agreement, or

20   transaction qualifies as a swap, you may consider whether the

21   arrangement is commonly known as or referred to as a swap.

22          The requirement that the fraudulent conduct, if there

23   is any, be in connection with a swap or contract of sale off of

24   a commodity is satisfied so long as there was some nexus or

25   relation between the alleged fraudulent conduct and the swap or

**A-1163**

NB21BAN3                          Charge                          3189

1   contract of sale of a commodity.  Fraudulent conduct may

2   satisfy the "in connection with" requirement if you find that

3   the fraudulent conduct touched upon a swap or contract of sale

4   of a commodity.  Statements directed to the general public

5   which affect the public's interest in these products are made

6   in connection with them.  The fraudulent or deceitful conduct

7   need not relate to the value of the swap or contract of sale of

8   a commodity.  It is also not necessary for you to find the

9   defendant was or would be the actual seller of the swap or

10  commodity.

11        Now the third element of commodities fraud is that the

12  defendant participated in the scheme to defraud, false

13  statement, misleading omission, or deceptive act, practice, or

14  course of conduct knowingly, willfully, and with intent to

15  defraud.

16        I've already instructed you about the meaning of the

17  terms "knowingly" and "willfully," and you will apply those

18  instructions here.  So too with the term "intent to defraud,"

19  which I defined in connection with Count Five, and you will

20  apply those instructions here.

21        Additionally, as to Count Six, the government must

22  prove beyond a reasonable doubt a sufficient relationship

23  between the commodities fraud, which was the object of the

24  conspiracy, and the United States.  And there are two ways the

25  government could do that—that is to say, satisfy that burden.

**A-1164**

NB21BAN3                           Charge                              3190

1          One way the government could prove a sufficient

2     connection to the United States is by showing that some conduct

3     relevant to the offense charged in Count Six occurred in the

4     United States and that the fraudulent conduct that was the

5     object of the alleged conspiracy would not have been

6     predominantly foreign.  It is not necessary that all or most of

7     the conduct relevant to those crimes happened in the United

8     States, although the conduct in the United States must be more

9     than incidental to the scheme.  Nor does the government have to

10    prove that the defendant ever was in the United States, just

11    that conduct relevant to the offenses occurred in this country.

12    In assessing that issue, you may consider also whether conduct

13    in furtherance of the crime charged in Count Six caused

14    trading, money transfers, and communications to occur in the

15    United States, or otherwise affected commerce in this country.

16    In proving the existence of a connection to the United States,

17    it is not necessary to prove both conduct in, and an effect on,

18    the United States.  Either would be enough to satisfy the

19    government's burden.

20          A second way the government may prove a sufficient

21    connection to the United States is by showing that some conduct

22    relating to swaps had a direct and significant effect on, or

23    connection with, commerce in the United States.  Here, there is

24    no need for any conduct to have occurred in the United States.

25    All the government has to prove is that the offense involved

**A-1165**

NB21BAN3                          Charge                          3191

1   conduct that had an effect on or a connection with commerce in

2   the United States and that the effect or connection was direct

3   and significant.

4           If you find that the government has met its burden on

5   all three elements of this conspiracy claim, Count Six—that

6   is, it proved beyond a reasonable doubt that there was an

7   agreement to commit securities fraud, the defendant became a

8   member of that conspiracy, or at least one co-conspirator

9   committed an overt act in furtherance of that conspiracy, and

10  it has proved also beyond a reasonable doubt a sufficient

11  connection to the United States—then you should find the

12  defendant guilty on Count Six.  If you find that the government

13  has not met its burden with respect to any of those three

14  elements of Count Six or that it has not done so with respect

15  to a sufficient connection to the United States, then you must

16  find the defendant not guilty on Count Six.

17          Now, lunchtime?

18          I misspoke, again.

19          The last paragraph should have begun:  If you find

20  that the government has met its burden on all three elements of

21  its conspiracy claim in Count Six—that is, that it has proved

22  beyond a reasonable doubt that there was an agreement to commit

23  commodities fraud, that the defendant became a member of that

24  conspiracy, or at least one co-conspirator committed an overt

25  act, etc.  That's how it should have gone.  You forgive me for

**A-1166**

NB21BAN3                          Charge                              3192

1    my misstatement.

2         But it is now lunchtime.  I will see you back at 1:30.

3    I hope you enjoy the canteen food and that you've left some for

4    others.  And we'll resume with Count Seven at 1:30.

5         THE DEPUTY CLERK:  Will the jury please come this way.

6         (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-1167**

NB2MBAN4                    Charge                    3193

1                         AFTERNOON SESSION

2                             1:40 p.m.

3          (Jury present)

4          THE COURT:  Defendant and the jurors all are present,

5    as they have been throughout.

6          I hope you enjoyed your lunch, folks.

7          We are up to Count Seven, which is the last count on

8    which I need to instruct you.

9          The defendant is charged in Count Seven with

10   conspiracy to launder the proceeds of the wire fraud charged in

11   Count One.  You will consider Count Seven if and only if you

12   find the defendant guilty on Count One.  If you have found the

13   defendant not guilty on Count One, you must enter a verdict of

14   not guilty on Count Seven.

15         Count Seven charges the defendant with conspiring to

16   commit money laundering from in or about 2020, up to and

17   including in or about November 2022, by agreeing to launder the

18   proceeds of the wire fraud charged in Count One.

19         To sustain its burden with respect to the offense

20   charged in Count Seven; the government must prove beyond a

21   reasonable doubt two elements:

22         First, that two or more persons entered into an

23   unlawful agreement or understanding to seek to accomplish money

24   laundering; and

25         Second, that the defendant knowingly and willfully

**A-1168**

NB2MBAN4                        Charge                        3194

1    entered into the agreement.

2          In other words, the elements of the conspiracy charged

3    in Count Seven are the same elements that the government must

4    prove with respect to the conspiracies alleged in Counts Two

5    and Four, namely, the existence of an agreement or

6    understanding to violate the law and knowing and willful entry

7    of the defendant into the agreement.  The difference between

8    Counts Two and Four and Count Seven is that Counts Two and Four

9    alleged conspiracies to commit wired fraud.  Count Seven is an

10   alleged conspiracy to commit money laundering.

11         Now, Count Seven actually charges that there were two

12   objects of the conspiracy charged in that count.  As I told you

13   before, you don't need to find that the defendant actually or

14   anyone else actually achieved the object or objects of the

15   charged conspiracy, but only that he agreed with others or that

16   the conspirators agreed with others, putting aside the

17   defendant for the moment.  I frankly lost my place, folks.

18         But the short answer is, the short principle is, you

19   don't have to find that the object of the conspiracy was

20   achieved, only that there was an agreement to do so.

21         Now, let's talk about the agreement.

22         The first object of the two objects charged in Count

23   Seven is that the defendant agreed with at least one other

24   person to commit money laundering by engaging in financial

25   transactions that involved the proceeds of the wire fraud in

**A-1169**

NB2MBAN4                          Charge                          3195

1    order to conceal or disguise the nature, location, source,

2    ownership, or control of proceeds of the wire fraud.  Now, the

3    wire fraud we are talking there, remember, is Count One.  I am

4    going to refer to this object, this first object of the

5    conspiracy charged in Count Seven, as concealment money

6    laundering, which is a shorthand way of saying to conceal or

7    disguise the nature, location, source, ownership or control of

8    proceeds of the Count One wire fraud.  That's what it is.

9          The second object of the conspiracy is that the

10   conspirators agreed to engage in money laundering by engaging

11   in monetary transactions greater than $10,000 involving the

12   proceeds of the wire fraud.  I am going to call that object

13   wire fraud proceeds money laundering.

14         So we have concealment money laundering and wire fraud

15   proceeds money laundering.  In each case what we are talking

16   about is concealment of or proceeds of the money laundering

17   charged in Count One and, again, you are going to consider

18   Count Seven if and only if you found him guilty on Count One.

19         Now, John Hammel is going to distribute to you the

20   proposed verdict form which I am going to talk about very

21   briefly now.

22         The part we are interested in for now is Count Seven,

23   so it's on the second page.  Everything that comes before this

24   just asks you, as you normally expect:  Do you find the

25   defendant guilty or not guilty on Counts One, Two, Three, Four,

**A-1170**

NB2MBAN4                          Charge                          3196

1    Five and Six?  But we are going to talk about Seven because

2    it's a little different.

3          You were asked, to be sure, on Count Seven:  Do you

4    find the defendant guilty or not guilty of conspiracy to commit

5    money laundering?  If you find him guilty, there is another

6    line on the verdict form that you will have to fill out and it

7    asks you:  In the event there is a conviction on Count Seven,

8    whether you unanimously have concluded that it was concealment

9    money laundering or wire fraud proceeds money laundering, or

10   both -- that's what's different -- and in order to answer yes

11   to those questions, each question, one, two, or both, you got

12   to be unanimous.  That's the verdict form.

13         Now I am going to explain the two types of money

14   laundering.

15         I am going to start with concealment money laundering,

16   and it has four elements.

17         The first element of concealment money laundering that

18   the government must prove beyond a reasonable doubt is that a

19   person, that is to say, a person who is part of the conspiracy

20   would have conducted a financial transaction that would have

21   affected interstate or foreign commerce.

22         That is to say, if the conspiracy had had its

23   objective achieved, would a person who did that, and so forth.

24         The term conducted includes the action of initiating,

25   concluding, or participating in, initiating, or concluding a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1171**

| NB2MBAN4 | Charge | 3197 |
|---|---|---|

1  transaction.

2       The term financial transaction means (1) a transaction

3  involving a financial institution, including a bank, that is

4  engaged in, or the activities of which affect, interstate or

5  foreign commerce in any way or degree, or (2) a transaction

6  that involves the movement of funds by wire or other means and

7  in any way or degree affects interstate or foreign commerce.

8       A transaction involving a financial institution

9  includes a deposit, a withdrawal, a transfer between or among

10  accounts, an exchange of currency, a loan, extension of credit,

11  purchase or sale of any stock, or any other payment, transfer,

12  or delivery by, through, or to a financial institution by

13  whatever means.

14       The term funds includes any currency, money, or other

15  medium of exchange that can be used to pay for goods and

16  services, including digital or cryptocurrency.

17       Interstate commerce, for purposes of Count Seven,

18  includes any transmission or transfer between persons or

19  entities located in different states, and foreign commerce

20  means the same thing, except that it involves somebody in the

21  United States and somebody in a foreign country.  The

22  involvement of interstate or foreign commerce can be minimal.

23  The government satisfies its burden if it proves any effect or

24  involvement, regardless of whether it was beneficial or

25  harmful.  It is also not necessary for the government to show

**A-1172**

NB2MBAN4                          Charge                          3198

1    that the defendant actually would have intended or anticipated

2    an effect on interstate or foreign commerce by his actions or

3    that commerce actually would have been affected.  All that is

4    necessary is that the natural and probable consequences of the

5    acts the defendant would have agreed to take, assuming he

6    agreed at all, would affect interstate or foreign commerce.

7         The second element of concealment money laundering is

8    that the financial transactions would have involved the

9    proceeds of specified unlawful activity.  As I have said

10   already, the specified unlawful activity here is the wire fraud

11   charged in Count One, and I instruct you, therefore, that if

12   you've convicted on Count One, this element is satisfied here.

13        The term proceeds means any property or any interest

14   in property that someone would have acquired or retained as

15   profits resulting from the commission of the specified unlawful

16   activity, which I have already defined.

17        The third element of concealment money laundering is

18   that the person would have known that the financial

19   transactions at issue involved the proceeds of some form,

20   though not necessarily which form, of unlawful activity.

21        If you find beyond a reasonable doubt that the

22   defendant committed the wire fraud offense I have instructed

23   you on in Count One, and he knew that the proceeds came from

24   that activity, that is sufficient for you to find that the

25   defendant knew that the proceeds came from unlawful activity.

**A-1173**

NB2MBAN4                    Charge                    3199

1  However, keep in mind that it is not necessary for the

2  defendant to know that the proceeds came from the wire fraud

3  offense alleged in Count One or that the defendant personally

4  participated in the wire fraud.  It is sufficient that the

5  defendant knew that the proceeds would come from some unlawful

6  activity.

7          The fourth element of concealment money laundering

8  that the government must prove beyond a reasonable doubt

9  concerns the purpose of the transaction.  Specifically, the

10 government must prove beyond a reasonable doubt an agreement to

11 conduct financial transactions with knowledge that the

12 transactions were designed in whole or in part to conceal or

13 disguise the nature, location, source, ownership, or control of

14 the proceeds of the specified unlawful activity.  The

15 government need not prove that the intent to conceal or

16 disguise would have been the only or even the primary purpose

17 of the person, as long as it was an intent of that individual.

18         I previously instructed you that to act knowingly

19 means to act purposely and voluntarily and not because of

20 mistake, accident, or other innocent reason.  The acts must

21 have been the product of the actor's conscious objective.  To

22 prove that than act is done knowingly for the purpose of this

23 element, the government is not required to prove that the

24 person would have known that his acts were unlawful.  If you

25 find that the evidence establishes beyond a reasonable doubt

**A-1174**

NB2MBAN4                          Charge                          3200

1    that the person would have known of the purpose of the

2    particular transaction in issue and that he would have known

3    that the transaction was either designed to conceal or disguise

4    the true origin or ownership of the property in question, then

5    this element would be satisfied.  However, if you find that the

6    person would have known of the transaction, but that the

7    government failed to prove beyond a reasonable doubt that the

8    person would have known that it was designed either to conceal

9    or disguise the true original of the property in question, but

10   instead throughout that the transaction was intended to further

11   the innocent transaction, you must find that this element has

12   not been satisfied.

13          For the fourth element to be satisfied, the person

14   whose actions you are considering need not have known which

15   specified unlawful activity he or she was agreeing to help

16   conceal.  Such person need have known only that a purpose of

17   the financial transaction would have been concealing the

18   nature, location, source, ownership, or control of the funds.

19   Furthermore, intent to disguise or conceal the true origin of

20   the property need not have been the sole motivating factor for

21   the transaction.

22          That covers the elements of the first object of the

23   money laundering conspiracy alleged in Count Seven.  Now I am

24   going to go on to the second object, wire fraud proceeds money

25   laundering.

**A-1175**

NB2MBAN4                          Charge                          3201

1          The elements of wire fraud proceeds money laundering

2     are these:

3          First, that a person would have engaged in a monetary

4     transaction in or affecting interstate or foreign commerce;

5          Second, that the monetary transaction would have

6     involved criminally-derived property of a value greater than

7     $10,000;

8          Third, that the property would have been derived from

9     specified unlawful activity;

10          Fourth, that the person in question would have acted

11     knowingly, that is, with knowledge that the transaction

12     involved proceeds of a criminal offense; and

13          Fifth, and last, that the transaction would have taken

14     place in the United States.

15          A bit more about the five elements individually.  I

16     remind you again that you will get to Count Seven only if there

17     was a guilty verdict on Count One.

18          If there is such a guilty verdict, however, and you

19     get to Count Seven, it's sufficient to convict on Count Seven

20     if you all agree that the defendant committed either

21     concealment money laundering or financial transaction wire

22     proceeds money laundering.

23          The first element of wire fraud proceeds money

24     laundering is that the person would have conducted a financial

25     transaction that affected interstate or foreign commerce.  You

**A-1176**

NB2MBAN4                              Charge                              3202

1  know what that means already.  I have told you.

2          The second element is that the transactions would have

3  involved criminally derived property having a value in excess

4  of $10,000.

5          Criminally derived property means any property

6  constituting or derived from proceeds obtained from a criminal

7  offense.  I already instructed you about proceeds.  You will

8  apply those instructions here.  Wire fraud, of course, is a

9  criminal offense.

10          The government is not required to prove that all of

11  the property involved in the transaction would have been

12  criminally derived property.  However, the government must

13  prove that more than $10,000 of the property involved would

14  have been criminally-derived property.

15          The third and fourth elements of wire fraud proceeds

16  money laundering are that the property would have been derived

17  from the specified unlawful activity and that the person would

18  have acted knowingly, that is, with knowledge that the

19  transaction involved proceeds of a criminal offense.

20          The term specified unlawful activity has been defined

21  previously.  That definition applies equally to the second

22  object of the conspiracy charged in Count Seven.  I have also

23  defined knowingly, and you will apply that definition here too.

24          I instruct you that the government is not required to

25  prove that the person in question knew the particular offense

**A-1177**

NB2MBAN4                         Charge                         3203

1   which the criminally derived property was derived from.

2   However, the government is required to prove beyond a

3   reasonable doubt that the person in question knew that the

4   transaction involved criminally derived property, which means

5   any property constituting or derived from proceeds obtained

6   from a criminal offense.  This element would be satisfied by

7   proof that the person you are considering knew that the

8   transaction involved such property, property derived from a

9   criminal offense.

10          The final element of wire fraud proceeds money

11  laundering is that the agreed-upon transaction, that is, the

12  transaction that was the object of the conspiracy, would have

13  taken place in the United States if it had been achieved.

14          If you prove that the government has -- excuse me.  If

15  you find that the government has proved beyond a reasonable

16  doubt that there was an agreement or understanding by two or

17  more persons to act together to accomplish one or both of the

18  objects of the money laundering conspiracy, the first element

19  of the money laundering conspiracy charged in Count Seven will

20  have been satisfied.  You then would go on to consider the

21  second element.  If, on the other hand, the government has not

22  proved the existence of such an agreement or understanding, you

23  must find the defendant not guilty on Count Seven.

24          The second element of Count Seven is that the

25  government -- the defendant knowingly and willfully have joined

**A-1178**

NB2MBAN4                        Charge                        3204

1    and participated in the conspiracy to commit money laundering.

2    I already have instructed you on knowingly and willfully and

3    what it means to join a conspiracy.  You will apply those

4    instructions here, including the instruction concerning good

5    faith.

6              If, after conscientious and deliberate consideration

7    of the evidence, you conclude that the defendant has proved

8    each of the two elements of the charge of conspiracy to commit

9    money laundering, that is, it has proved beyond a reasonable

10   doubt that there was a conspiracy to commit money laundering

11   for the purpose of achieving either or both of the two

12   objectives I was just described and that the defendant

13   knowingly and willfully joined in that conspiracy, then you

14   should find the defendant guilty on Count Seven, and mark the

15   appropriate space on the verdict form to indicate whether you

16   found him guilty as to either or both of the concealment or

17   money wire proceeds money laundering bases.  If the government

18   has failed to prove any of the elements of the conspiracy

19   charged in Count Seven with respect to both the concealment and

20   the wire fraud proceeds money laundering bases, then you must

21   find the defendant not guilty on Count Seven.

22             Now, there are three other very small points, and I'm

23   finished instructing you on the law.  These will be brief.

24             First of all, as I explained with respect to every

25   count in this indictment, the government is obliged to prove

**A-1179**

NB2MBAN4                           Charge                           3205

1    that the defendant, usually among other elements, acted

2    knowingly.  In determining whether the defendant had knowledge

3    of a fact, you may consider whether that defendant deliberately

4    closed his eyes to what otherwise would have been obvious.  As

5    you all know, if someone is actually aware of a fact, then he

6    knows it.  He knows the fact.  But the law allows you also to

7    find that a defendant had knowledge of a fact when the evidence

8    shows you that the defendant was aware of a high probability of

9    that fact, but intentionally avoided confirming the fact.  We

10   refer to this concept, this notion of blinding yourself to what

11   is staring you in the face, as conscious avoidance or willful

12   blindness.

13        Although I told you before that acts done knowingly

14   must be a product of a defendant's conscious intention, not

15   simply the product of carelessness or negligence, a person

16   cannot willfully blind himself to what is obvious and disregard

17   what is plainly in front of him.  When one consciously avoids

18   learning a fact, the law treats that person as knowing that

19   fact.  An argument of conscious avoidance or willful blindness,

20   however, isn't a substitute for proof.  It's simply another

21   fact you may consider in deciding what the defendant knew.

22        With respect to the substantive wire fraud charges in

23   Counts One and Three, in determining whether the government has

24   proved beyond a reasonable doubt that the defendant had

25   knowledge or acted knowingly or acted knowing that something

**A-1180**

NB2MBAN4                            Charge                              3206

1   was intended or would occur, you may consider whether the

2   defendant deliberately closed his eyes to what would otherwise

3   have been obvious to him.  One may not willfully and

4   intentionally remain ignorant of a fact important to his

5   conduct in order to escape the consequences of criminal law,

6   and a person cannot look at all sorts of things that make it

7   obvious to any reasonable person what is going on and then

8   claim in court that because he deliberately avoided learning,

9   explicitly what was obvious anyway, he did not actually know

10  the incriminating fact.

11          Accordingly, if you find that the defendant was aware

12  of a high probability of a fact, and that the defendant acted

13  with deliberate disregard of the facts, you may find that the

14  defendant knew that fact.  However, if you find the defendant

15  actually believed that the fact was true, then you may not find

16  that he knew that fact.  You must remember also that guilty

17  knowledge may not be established by demonstrating that a

18  defendant was merely negligent, or reckless or foolish or

19  mistaken.

20          Now, with respect to the conspiracy charges, that is,

21  Counts Two, Four, Five, Six, and Seven, conscious avoidance or

22  willful blindness cannot be used as a basis for finding that a

23  defendant knowingly joined a conspiracy.  If you think about it

24  for a minute, you will see why.  To join a conspiracy a

25  defendant needs to know that there is an agreement among one or

**A-1181**

NB2MBAN4                          Charge                          3207

1    more persons to act together to achieve some unlawful purpose.

2    If the defendant doesn't know of the agreement, he can't join

3    it.  It's logically impossible.  But if you find that the

4    defendant entered into such an agreement, you are entitled to

5    consider conscious avoidance or willful blindness in

6    considering whether he knew the illegal object of the

7    conspiracy.  You may consider, in other words, whether the

8    defendant was aware of a high probability that the facts were

9    so, in other words, that there was an unlawful object and what

10   it was, but took deliberate and conscious action to avoid

11   confirming those facts.  In other words, if you find beyond a

12   reasonable doubt that the defendant deliberately avoided

13   learning or confirming the illegal object of the conspiracy,

14   such as by purposely closing his eyes to it or intentionally

15   failing to investigate it, then you may treat this deliberate

16   avoidance of learning a fact as the equivalent of knowledge.

17   If, however, the defendant actually believed he wasn't a party

18   to an illegal agreement, or if the defendant was merely

19   negligent or careless with regard to what knowledge he had,

20   then he lacked the knowledge necessary to become a member of

21   the conspiracy.

22            Two to go.

23            Now, in addition to all the elements I have described

24   to you, you must separately decide whether an act in

25   furtherance of each alleged crime occurred within the Southern

**A-1182**

NB2MBAN4                           Charge                              3208

 1    District of New York.  The Southern District of New York

 2    includes the Manhattan, Bronx -- I am not insulting anybody who

 3    may live there, but some other counties upstate, none of which

 4    was mentioned in this trial.  This requirement is called venue

 5    and that word refers in this context to the fact that the

 6    government must prove that this case as to these various counts

 7    was brought properly in this court rather than in a different

 8    federal court.  You will determine the satisfaction of the

 9    venue requirement separately for each count.

10            For the wire fraud charges in Counts One and Two, it

11    is sufficient for the government to establish -- I'll talk

12    about the standard of proof in a minute -- venue if the

13    defendant caused any interstate or international wire, such as

14    an email, a phone call, television, Internet broadcast, or

15    financial transaction to be transmitted into or out of this

16    district.

17            What did I forget to read?  Did I say Counts One and

18    Two.  Never mind.  I mean to say Counts One and Three.  Thank

19    you, Aditi.  Where would I be without them.  Let me tell you,

20    it wouldn't be pretty.

21            The wire need not itself have been criminal, as long

22    as it was transmitted or caused to be transmitted as part of

23    the scheme.  The act need not have been taken by the defendant,

24    so long as the act was any part of any crime you otherwise find

25    he has committed.

**A-1183**

NB2MBAN4                          Charge                            3209

1          With respect to all the conspiracy counts, Counts Two,

2     Four, Five, Six, and Seven, it is sufficient for the government

3     to prove that some act in furtherance of the conspiracy

4     occurred within the Southern District of New York.  In that

5     regard, the government does not have to prove that the crime

6     itself was committed in this district or that the defendant

7     himself was even present here.

8          Now, what's the government's burden on venue?  It is

9     not beyond a reasonable doubt.  It is to show that venue was

10    proper count by count.  Of course you don't have to consider

11    venue if you have otherwise concluded the defendant is not

12    guilty on a particular count.  Then it becomes irrelevant.  But

13    if you are considering a guilty verdict on any count, you also

14    have to find venue is satisfied as to that count.  And now as

15    to the government's burden to establish proper venue, it is

16    simply that the government must prove it by a preponderance of

17    the evidence; in other words, that it is more likely that the

18    requirements of venue in this district are satisfied as to that

19    count than not.

20         All of the elements of the offense that I talked about

21    before, everything other than venue, the standard is proof

22    beyond a reasonable doubt, as I told you.  Venue is different.

23         Regardless of what you think about the elements on any

24    given count as to which the government is required to prove

25    guilt beyond a reasonable doubt, if you conclude that the

**A-1184**

NB2MBAN4                          Charge                          3210

1    government hasn't established proper venue by a preponderance

2    of the evidence, you must acquit on that count.

3           Lastly, you have heard various references, and you

4    will see in the indictment that goes into the jury room various

5    references to dates.  It does not matter if the evidence you

6    heard at trial indicates that a particular act occurred on a

7    different date, and the government is not -- it is not

8    essential that the government prove that the charged offenses

9    started on the dates that may be alleged, either in court or in

10   the indictment, or ended on any specific dates.  The law

11   requires only a substantial similarity between the dates in the

12   indictment, to the extent there are any dates in the

13   indictment, and the dates established in the evidence.

14          Now, those, folks, are my substantive legal

15   instructions.  The rest of this is all downhill.  Not that it

16   isn't important, but it is neither as long nor as technical.

17          I'll start out with the trial process.  As I told you

18   all about the time you were selected, you are the sole and

19   exclusive judges of the facts.  Please understand that I do not

20   now, and I never during this trial have meant to indicate any

21   opinion as to what the facts are or what your verdict should

22   be.  The rulings I have made during the trial, the questions I

23   asked, any comments I have made in managing the trial or in

24   attempting to clarify the evidence or get it into evidence more

25   efficiently and quickly are no indication of any views that I

**A-1185**

NB2MBAN4                    Charge                    3211

1    might have as to what your decision ought to be or as to

2    whether or not the government has proved its case.

3         I remind you that it is your duty to accept my

4    instructions on the law and to apply them to the facts as you

5    determine those facts to be, regardless of whether or not you

6    agree with my instructions.  You are to show no prejudice

7    against an attorney or the attorney's client because the

8    attorney made objections to evidence, asked for sidebars, asked

9    me to rule on questions of law.  They were doing their jobs,

10   and I was doing mine, and that's all there is to it.

11        In addition, I want to reemphasize the fact that I may

12   have asked questions of witnesses and may have made comments to

13   counsel or to a witness or witnesses.  It was never intended to

14   suggest that I believed or disbelieved any witness or have any

15   view about how this case should be decided.  You are to

16   disregard entirely the fact that I have asked a few questions,

17   though of course you may consider the answers, and you are to

18   disregard entirely any comments that I may have made during the

19   course of the last several weeks.

20        You should find the facts in this case without

21   prejudice as to any party.  The case is brought, of course,

22   formally in the name of the United States.  That doesn't

23   entitle the government to any greater consideration than the

24   defendant.  By the same token, the government is entitled to no

25   less consideration.  We stand for equal justice before the law.

**A-1186**

NB2MBAN4                          Charge                          3212

1    It applies to both sides in court.

2              Let's talk about the evidence a little bit.

3              The evidence is the sworn testimony of the witnesses,

4    the exhibits received in evidence, and the stipulations between

5    the lawyers.

6              The indictment is not evidence.  The questions,

7    arguments, or objections are not evidence.  You are not to

8    consider any statements that I told you to disregard or said

9    were stricken or struck or whatever formulation I may have

10   used.

11             It is for you alone to decide the weight, if any, to

12   be given all the testimony you have heard and the exhibits you

13   have seen.

14             I have already referred a bit to direct and

15   circumstantial evidence, or at least circumstantial evidence.

16   Direct evidence is really pretty obvious.  It is evidence that

17   you can observe with your own senses and evidence that a

18   witness came in and swore on the witness stand.  The witness

19   personally perceived, the witness heard it, saw it, touched it.

20   You got the idea.

21             And in a case I tried earlier this year, which

22   involved the question of the meaning of the word beer, I would

23   have said taste it, but this isn't that kind of case.

24             Circumstantial evidence.  Believe it or not, my idea

25   of a good time is a trial movie or a Law & Order episode or

**A-1187**

NB2MBAN4                          Charge                          3213

1   whatever.  I have been watching trials my entire life, many of

2   them dramatic performances of Hollywood, and I have heard on

3   television and on streaming and everywhere else more nonsense

4   about circumstantial evidence than one could possibly imagine.

5        Let me tell you the simple answer to this.

6   Circumstantial evidence is simply evidence that tends to prove

7   a fact that is in dispute by proving some other fact and

8   logically reasoning from the one you can prove to the one

9   that's maybe not so certain.  That's what it's all about.  The

10  circumstantial evidence is the direct evidence and it refers to

11  the process of logic.  The law is that circumstantial evidence

12  is of no lesser value than direct evidence.  You are simply

13  required to base your verdict on your conscientious evaluation

14  of all the evidence and come to the conclusion that you think

15  is consistent with the facts.

16       I told you during the trial that whatever the lawyers

17  stipulated to you are bound by.  You must accept whatever they

18  stipulated to as being fact for purposes of this case.  We have

19  heard a fair amount of credibility in the last day and a half.

20  Now it's your job to decide who you believe and how important

21  each witness was, and you're the sole judges of credibility of

22  each witness and of the importance of each witness' testimony.

23  I urge you to use your common sense and apply all of the tests

24  that you would apply in everyday life with respect to important

25  matters in determining the truthfulness and accuracy of what

**A-1188**

NB2MBAN4                          Charge                          3214

1   testimony you have heard.

2          Your decision whether or not to believe a witness may

3   depend on how the witness impressed you.  Was the witness

4   candid and frank and forthright?  Or did the witness seem as if

5   the witness was hiding something, being evasive or suspect in

6   some way?  How did the way the witness testified on direct

7   examination compare with how the witness testified on

8   cross-examination?  Was the witness consistent in the witness'

9   testimony, or did the witness contradict what he had said on

10  another occasion?  Did a witness appear to know what he or she

11  was talking about, and did the witness strike you as someone

12  who was trying to report his or her knowledge accurately?

13         If you find that a witness willfully lied to you about

14  any material matter, you may either disregard everything that

15  witness said or you may accept whatever part of it you think

16  deserves to be believed.  In other words, if you find that a

17  witness lied under oath about a material fact, you may treat it

18  like a slice of toast that has been partially burned.  You can

19  either throw the whole piece in the trash or you can scrape the

20  black parts off and eat the rest.

21         Ultimately, the determination of whether and to what

22  extent you accept the testimony of any witness is entirely up

23  to you.

24         In evaluating the credibility of the witnesses, you

25  should take into account any evidence that a witness may

**A-1189**

NB2MBAN4                           Charge                              3215

1   benefit in some way from the outcome of the case.  Keep in

2   mind, though, that it doesn't automatically follow that

3   testimony given by an interested witness is to be disbelieved.

4   It is for you to decide, based on your own perceptions and your

5   common sense, the extent to which a witness' interest has

6   affected whatever the witness testified to, if it affected it

7   at all.

8            Now, you have heard the testimony of at least two, but

9   there may have been another, law enforcement officers.  The

10  fact that a witness may be, or may previously have been,

11  employed by the government in law enforcement does not mean

12  that the witness' testimony is deserving of any more

13  consideration or any less consideration, or in each case

14  weight, of an ordinary witness.  At the same time, in

15  considering the credibility of such a witness, you are entitled

16  to consider whether the testimony may have been colored by a

17  personal or a professional interest in the outcome of the case.

18           It is your decision, after reviewing all of the

19  evidence, whether to accept the testimony of law enforcement

20  witnesses and to give that testimony whatever weight you find

21  it deserves.

22           You have heard testimony from a number of government

23  witnesses that they actually were involved in planning and

24  carrying out some of the crimes charged in the indictment.

25           You should be aware that it is not unusual for the

**A-1190**

NB2MBAN4                          Charge                          3216

1    government to rely on the testimony of witnesses who admit to

2    having participated in criminal activity.  The government has

3    to take its witnesses as it finds them, and frequently the

4    government must use such testimony in criminal prosecutions

5    because it otherwise would be difficult and sometimes

6    impossible to detect and prosecute wrongdoers.  Accordingly,

7    the law allows the use of cooperating witness testimony, and

8    you may consider the testimony of these witnesses in

9    determining whether the government has met its burden of

10   proving guilt beyond a reasonable doubt.

11          However, the testimony of an accomplice witness should

12   be scrutinized with special care and caution because such

13   witnesses may believe that it is in their interest to give

14   testimony favorable to the government.  The fact that a witness

15   is an accomplice can be considered by you as bearing on the

16   witness' credibility.  It doesn't follow, however, that simply

17   because a person has admitted to participating in one or more

18   crimes that he or she is incapable of giving a truthful version

19   of what happened.

20          Like the testimony of any other witness, accomplice

21   witness testimony should be given the weight you think it

22   deserves in light of the facts and circumstances before you,

23   taking into account the witness' demeanor, candor, the strength

24   and accuracy of the witness' recollection, their background,

25   and the extent to which their testimony is or is not

**A-1191**

NB2MBAN4                    Charge                    3217

corroborated by other evidence. You may consider whether an
accomplice witness, like any other witness in this case, has an
interest in the outcome and, if so, whether and to what extent
it may have affected the witness' testimony.

You certainly heard testimony, and probably have in
evidence before you, though I don't offhand remember, certain
agreements between the government and accomplice witnesses. I
must caution you that it is of no concern to you why the
government made agreements with any particular witness. Your
sole concern is whether a witness has given truthful and
accurate testimony here in this courtroom before you.

In evaluating the testimony of accomplice witnesses,
you should ask yourself whether these witnesses would benefit
more by lying or by telling the truth. Was their testimony
made up in any way because they believed or hoped that it would
somehow result in favorable treatment if they testified
falsely, or did they think their interests would best be served
by testifying truthfully and accurately? You believe if that a
witness was motivated by hopes of personal gain, was that the
motivation one that would cause him to lie, or was it one that
would cause the witness to tell the truth? Did the motivation
color the witness' testimony?

If you find that the testimony was false, you should
reject it. If, however, after carefully and cautiously
examining an accomplice witness' testimony and demeanor, and

**A-1192**

NB2MBAN4                          Charge                          3218

1    you are satisfied that the witness told you the truth, you

2    should accept it as credible and act on it accordingly.

3          As with any witness, let me emphasize that this issue

4    of credibility doesn't have to be an all-or-nothing decision on

5    your part.  Even if you find that a witness testified falsely

6    in one part, you still may accept their testimony in other

7    parts, or you may disregard all of it.  That's up to you.  It

8    is not an all-or-nothing decision necessarily.  It may be, but

9    that's your job.

10          You have also heard testimony from, I believe, three

11   government witnesses who have pleaded guilty to charges arising

12   out of the same facts that are at issue in this case.  I

13   instruct you that you are to draw no conclusions or inferences

14   of any kind about the guilt of Mr. Bankman-Fried from the fact

15   that one or more prosecution witnesses pled guilty to similar

16   charges.  The decision of those witnesses to plead guilty were

17   personal decisions that those individuals made about their own

18   guilt, and it may not be used by you in any way as evidence

19   against or unfavorable to the defendant in this case.

20          You also heard testimony from one witness who entered

21   into a nonprosecution agreement with the government arising out

22   of at least some of the same facts that are at issue in this

23   case.  I instruct you that you are to draw no conclusions or

24   inferences of any kind about the guilt of the defendant here in

25   this case from the fact that a prosecution witness entered into

**A-1193**

NB2MBAN4                          Charge                          3219

1   such an agreement.  Again, that was a personal decision and it

2   may not be used by you in any way as evidence against the

3   defendant.

4           The same is true with respect to the testimony of the

5   one witness who testified under a grant of immunity, formal

6   immunity issued by the Court.  The testimony of such a witness

7   cannot be used against the witness in a criminal case except

8   for prosecutions for perjury or giving false statements to the

9   Court while he was immunized.  I instruct you that the

10  government is entitled to call such a witness as a person who

11  has been granted immunity by an order of this Court.  You

12  should examine the testimony of such a witness to determine

13  whether or not it's colored in any way by the witness' own

14  interests.  If you believe the testimony, you may give it

15  whatever weight you think it deserves.

16          You heard a couple of expert witnesses in this case,

17  and I'm using a couple as an approximation.  I don't remember

18  the count.  Why are they here?  Ordinarily, witnesses are

19  restricted to testify about facts, facts that they have

20  personal knowledge of.

21          (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1194**

NB21BAN5                              Charge                              3220

1          THE COURT:  There are occasions when there are people,

2    however, who have technical or specialized knowledge in some

3    area that would assist you, the jurors, in deciding a disputed

4    fact.  And when that occurs, a witness who has those

5    qualifications can be called to testify about some evidence or

6    facts at issue in the form of opinions.

7          In weighing expert testimony, of course you may

8    consider the expert's qualifications, the opinions given, the

9    reasons the witness is here and why they're testifying, and

10   everything else I talked to you about relating to credibility.

11   You can give the expert testimony whatever weight you think it

12   deserves in light of the whole record in this case.  What you

13   should not do is accept a witness's testimony because the

14   witness in some sense is regarded as an expert.  It's not a

15   substitute for your own common sense, judgment, and reason.

16   The determination of the facts is up to you, not expert

17   witnesses.

18         Now you have heard some evidence that the defendant

19   was involved in conduct that is not charged in the indictment

20   in this case, and you probably all remember what that is.

21   You've heard some evidence about an alleged bribe involving one

22   or more Chinese government officials and alleged campaign

23   finance law issues.  Mr. Bankman-Fried is not on trial for any

24   such offenses here.  You can't consider the evidence of those

25   uncharged bad acts as a substitute for proof that he committed

**A-1195**

NB21BAN5                    Charge                    3221

1   the crimes of which he is accused in this case, nor may you

2   consider that evidence as proving that the defendant is a

3   person with a propensity to commit crimes or a man of bad

4   character.  The evidence was admitted for limited purposes, and

5   you may consider it only for those purposes.

6              You may consider the evidence you heard regarding the

7   alleged bribe to someone in China as bearing on the

8   relationship of trust and confidence between the defendant and

9   Ms. Ellison and as to the defendant's motives.  You may

10  consider the evidence you heard regarding the campaign finance

11  matters as relevant to the defendant's criminal intent and

12  knowledge and as to his relationship of mutual trust with

13  Mr. Singh.  You may also consider that evidence as direct

14  evidence of the charged wire fraud scheme on FTX customers, as

15  it pertains to allegations about how the defendant spent

16  alleged misappropriated customer funds, and as direct evidence

17  of the charged money laundering conspiracy, as it pertains to

18  the allegation that the defendant engaged in financial

19  transactions that it is alleged were designed to conceal the

20  nature, location, source, ownership, or control of criminal

21  proceeds.  And I remind you that this is not to be considered

22  as evidence of a criminal propensity and that the defendant is

23  not charged with crimes on the basis of those two categories of

24  evidence.

25             Certain evidence that came in concerned the acts and

**A-1196**

NB21BAN5                    Charge                         3222

1    statements of others because the acts were committed and the

2    statements were made by individuals whom the government claims

3    conspired with the defendant.

4         The reason for allowing that evidence has to do with

5    the nature of the crime of conspiracy.  A conspiracy is often

6    referred to as a partnership in crime.  Thus, as in other types

7    of partnerships, when people enter into a conspiracy to

8    accomplish an unlawful end, each and every member of the

9    conspiracy becomes an agent for the other conspirators in

10   carrying out the conspiracy.

11        In determining the factual issues before you, you may

12   consider against the defendant any acts or statements made by

13   any of the people that you find, under the standards I have

14   already described, to have been his co-conspirators, even

15   though such acts or statements were not made in his presence,

16   or were made without his knowledge.

17        You have heard some evidence during the trial that at

18   least one witness——and possibly more than one, although I don't

19   remember, it's your memory that counts, folks——prior to the

20   trial, made statements that were the same as, or similar to,

21   the testimony the witness gave in court.  As I instructed you

22   then, I believe, and in any case instruct you now, you may

23   consider evidence of such statements——that is, pretrial

24   statements consistent with what was said at trial——in

25   determining the facts of the case.  Evidence like that may help

**A-1197**

NB21BAN5                        Charge                        3223

1    you decide whether you believe the witness's testimony in

2    court.  If the witness made statements before trial, and before

3    the witness was aware of anything that would have given him or

4    her a motive to give a false account, in other words, that were

5    the same as or similar to what the witness said at trial, that

6    may be reason for you to believe his or her trial testimony on

7    the same subject.

8            You have certainly heard evidence during the trial

9    that some witnesses have discussed the facts of the case and

10   their testimony with lawyers before they appeared in court.

11           You're entitled to consider that fact in evaluating

12   credibility, but I do tell you that there is nothing unusual or

13   improper about a witness meeting with lawyers before testifying

14   so that the witness can be aware of the subjects he or she will

15   be questioned about, focus on those subjects, and have the

16   opportunity to review relevant evidence before being questioned

17   about them in court.  Such consultation helps conserve your

18   time and, frankly, the Court's time.  In fact, it would be

19   unusual for a lawyer to call a witness without such

20   consultation.

21           But again, the weight you give to the fact or nature

22   of a witness's preparation for testimony and what conclusions

23   or inferences you draw from preparation like that are

24   completely up to you.

25           Now I'm about to make a vast understatement.

**A-1198**

NB21BAN5                          Charge                          3224

1        There is evidence before you in the form of charts and

2   summaries.  These exhibits purport to summarize some of the

3   underlying evidence that was used to prepare them, and they

4   were shown to you to make the other evidence more meaningful

5   and to aid you in considering the evidence.  They are no better

6   than the documents they're based on, and they're not themselves

7   independent evidence.  You are therefore to give no greater

8   weight to the charts and summaries than you would give to the

9   evidence on which they are based.

10       It is for you to decide whether the charts and

11  summaries correctly present the information contained in the

12  exhibits on which they were based.  You are entitled to

13  consider them if they help you in analyzing and understanding

14  the evidence.

15       I have instructed you previously during the trial

16  about the audio and video recordings and, in those cases where

17  there are transcripts, that it's the recordings that are the

18  ultimate determinative evidence, not the transcripts.  I'm

19  going to spare you repeating it.

20       There are some documents and exhibits received in

21  evidence that are marked redacted and probably a few that

22  simply have big black blotches on them in some of the original

23  content.  You are only to concern yourself with the parts that

24  have not been redacted.  You are not to speculate about what's

25  under the black markings and what was redacted.  There were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1199**

NB21BAN5                          Charge                          3225

1    sufficient reasons for doing all of that, to the extent it was

2    done, and you are not to concern yourself with what those

3    reasons might have been.  You are to decide the case on the

4    basis of what's actually in front of you.

5           Now you have certainly heard a lot of people's names

6    during the course of this trial who were not called as

7    witnesses.  I instruct you that both sides had an equal

8    opportunity or lack of opportunity to call as a witness any of

9    them.  Therefore, you should not draw any inferences or reach

10   any conclusions as to what those people might have testified to

11   had they been called.  Their absence should not affect your

12   judgment at all.

13          But you should remember that the law does not impose

14   on the defendant in a criminal case the burden of calling any

15   witnesses or producing any evidence.  The burden of proof is

16   always with the government.

17          Now you have heard recordings or seen statements by

18   the defendant, which are in evidence, in which he claimed that

19   his conduct was consistent with innocence and not guilt.  The

20   government claims that these statements, or at least some of

21   them, in which he exonerated or exculpated himself are false.

22          If you find that the defendant gave one or more false

23   statements in order to divert suspicion from himself, you may,

24   but you are not required to, infer that he believed he was

25   guilty.  You may not, however, infer on the basis of that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1200**

1    evidence alone that the defendant in fact is guilty of any of

2    the crimes with which he is charged.

3          Whether or not the evidence as to the defendant's

4    statements shows that he believed he was guilty and the

5    significance, if any, to be attached to any such evidence, are

6    matters for you to decide.

7          Now let's talk about auto-deletion for a minute.

8          And we truly are in the home stretch.

9          If you find that the defendant deleted or caused the

10   deletion of communications, you may, but you need not, infer

11   that he believed that he was guilty.  You may not, however,

12   infer on the basis of this alone that the defendant is in fact

13   guilty of any of the crimes with which he is charged.

14         Whether or not the evidence as to a defendant's

15   deletion of evidence, or his having caused evidence to be

16   deleted, shows that the defendant believed he was guilty, and

17   the significance, if any, to be attached to any such deletions,

18   are for you to decide.

19         You have heard some testimony about evidence that was

20   seized pursuant to one or more search warrants signed by a

21   judge, from email accounts, Twitter accounts, electronic

22   devices, and conceivably other things, but I don't remember.

23   Evidence obtained from such searches were properly admitted in

24   this case and are properly considered by you.  Indeed, searches

25   of online accounts and electronic devices are entirely

**A-1201**

NB21BAN5                        Charge                        3227

1    appropriate law enforcement actions.  Whether you approve or

2    disapprove of how that evidence was obtained should not enter

3    into your deliberations because I now instruct you that the

4    government's use of that evidence is entirely lawful.

5         You must give that evidence, regardless of personal

6    opinions, full consideration along with all other evidence in

7    deciding whether the government has proved the defendant's

8    guilt beyond a reasonable doubt.

9         Now in a criminal case, of course, a defendant never

10   has a duty to testify or to come forward with any evidence.

11   The reason, as I've told you, is that he is presumed innocent

12   and the government at all times has the burden of proof beyond

13   a reasonable doubt.  Except of course on venue, where it's by a

14   preponderance of the evidence.  But if the defendant takes the

15   stand and testifies on his own behalf, he has the right to do

16   that.

17        In this case, Mr. Bankman-Fried decided to testify,

18   like any other witness, and he was subject to

19   cross-examination.  You should examine and evaluate the

20   testimony of the defendant just as you would the testimony of

21   any other defendant.

22        Some of the people who may have been involved in the

23   events leading to this trial are not on trial here.  You may

24   draw no inference, favorable or unfavorable, toward the

25   government or the defendant from the fact that any person other

**A-1202**

NB21BAN5                    Charge                         3228

1   than defendant is not on trial here.  Nor may you speculate as

2   to the reasons why that is so.  Those matters are wholly

3   outside your concern, and you may not consider them in reaching

4   your verdict.  Your task is limited to considering the charges

5   in the indictment and the defendant before you.

6          Now John Hammel points out to me that I made a mistake

7   a moment ago.  I mistakenly said you should examine and

8   evaluate the testimony of the defendant just as you would the

9   testimony of any other defendant.  If in fact I said that, it

10  was wrong.  And I will read it to you the way I typed it.  The

11  hour draws late.  You should examine and evaluate the testimony

12  of the defendant just as you would the testimony of any other

13  witness.

14         The question of possible punishment of the defendant

15  is of no concern to the jury, and it should not enter into or

16  influence your deliberations.  The duty of sentencing in the

17  event of a conviction rests entirely with the Court.  Under

18  your oath, you cannot allow consideration of punishment that

19  may be imposed in the event of conviction to influence your

20  judgment.

21         Last words.  Your deliberations.  You're going to

22  retire to decide this case in just a couple of minutes.  You

23  must consult with each other and deliberate with a view to

24  reaching an agreement.  Each of you must decide the case for

25  yourself, but you should do so only after considering the case

**A-1203**

NB21BAN5                    Charge                    3229

1    with your fellow jurors.  You should not hesitate to change an

2    opinion if you're convinced it's erroneous.

3         Your verdict, whether it's guilty or not guilty, must

4    be unanimous, but you are not bound to surrender your honest

5    convictions concerning the weight or the effect of the evidence

6    merely for the purpose of returning a verdict or solely because

7    of the views of other jurors.  Discuss and weigh your

8    respective opinions dispassionately, without regard to

9    sympathy, without regard to prejudice or favor for either

10   party, and come to the conclusion which in your good conscience

11   appears from the evidence to be in accordance with the truth.

12        I need to say a word about your notes.  I remind you

13   that any notes you may have taken are for your personal use

14   only.  Each of you may consult your own notes during

15   deliberations, but any notes you may have taken are not to be

16   regarded during deliberations as a substitute for the

17   collective memory of all of you.  Your notes should be used as

18   memory aids but shouldn't be given precedence over your

19   independent recollection of the evidence.  If you did not take

20   notes, you should rely on your own independent recollection of

21   the evidence, and you should not be influenced by the notes of

22   others.  The notes are entitled to no greater weight than the

23   recollection or impression of each juror as to what the

24   evidence showed.

25        You are all, as I told you right at the beginning,

**A-1204**

NB21BAN5                         Charge                         3230

1   going to get a typewritten copy of my instructions in the jury

2   room.  Two things about that.  The copies you get will have a

3   handful of handwritten interlineations, which are my chicken

4   scratchings making little tiny corrections that I made as I

5   went along.  And the little tiny corrections are part of the

6   instructions.  They are binding on you.

7         You are also going to find scattered among the

8   instructions legal citations.  They are probably going to be

9   incomprehensible because——and here I'm being facetious again,

10  but——they're in lawyer code.  They indicate which books, on

11  what volume and what page things come from.  You are not going

12  to understand them, I think, and even if you do, disregard them

13  entirely.  They are my audit trail and the lawyers' audit trail

14  about what we are relying on in formulating the instructions

15  I've given you.

16        You are not to discuss the case unless all 12 jurors

17  are there.  When there are less than 12 of you, you are not a

18  jury.  You are 10 or 11 or six what I imagine by now are pretty

19  good friends; at least I hope so.

20        When you retire, you will select one of your number as

21  the foreperson.  That person will preside over the

22  deliberations and speak for you here in open court.  The

23  foreperson will send out any notes and, when you've reached a

24  verdict, the foreperson will notify the court officer that you

25  have a verdict, and I'll talk more about how.

**A-1205**

NB21BAN5                          Charge                          3231

1       And now is the best time.  You have the verdict form

2   already.  If you need more, you'll send out a note and ask for

3   more.  But they're all the same.  When you've reached a

4   verdict, the foreperson should record the verdict on a copy of

5   the verdict form, and that's of course when you have a

6   unanimous verdict.  Please don't add any commentary or any

7   suggestions or thoughts to the verdict form.  They're basically

8   yes/no questions.  I can tell you from prior experience, no

9   good will come of it.  Maybe no bad, but no good will come of

10  it, and it will take time.

11      When you have a verdict form filled out, each of you

12  should sign it.  The foreperson will send in a note with the

13  court officer in a sealed envelope that says, "We have a

14  verdict."  Don't give the verdict form to the court officer.

15  Put it in an envelope.  The foreperson will bring it into the

16  courtroom.  Clutch it tightly to your breast.  And I will ask

17  for it at the appropriate moment.  I stress that you each

18  should be in agreement when it's announced in court.  Once it's

19  announced by the foreperson and officially recorded, it

20  ordinarily cannot be revoked.

21      If during your deliberations you want me to discuss

22  any of my instructions further or you have any questions about

23  my instructions, you should formulate a note.  The foreperson

24  should put the note in a sealed envelope, give it to the court

25  officer, tell the court officer there's a note.  Every page and

**A-1206**

NB21BAN5                          Charge                          3232

1   line of these instructions is numbered.  If it's a question

2   about something in the instructions, give the page numbers and

3   lines so that I know for sure what you're talking about.  The

4   procedure we go through when we get a note is I give the note

5   to the lawyers, the lawyers each decide what they think it

6   means and what they think the answer should be.  If everybody's

7   in agreement, I'll bring you into the courtroom and answer the

8   question.  If there's disagreement, I'll decide the answer and

9   bring you back and give you the answer.  And that process is

10  facilitated and speeded up the faster we can understand the

11  note.  So that's the reason for being specific.

12          We will respond to any requests as fast as we can.

13          Now if you need any testimony read back, the procedure

14  is exactly the same.  Send in a note, sealed envelope, and

15  exactly what you want to hear.  With the witnesses, if you can

16  remember whether it's direct or cross, what the subject is,

17  just be as specific as you possibly can.  We go through the

18  same procedure.  We try to understand what you're really asking

19  for, and then we have to search through the transcript, which

20  is now over 3,000 pages—there are some automated ways of

21  searching, but they're not perfect—and get you exactly what

22  you want, and we will do that.  But first of all, be sure you

23  need it, and second of all, be as clear as you can be.

24          I remind you that you took an oath to render judgment

25  impartially and fairly, without prejudice or sympathy and

**A-1207**

NB21BAN5                              Charge                              3233

1    without fear, based solely on the evidence in the case and the

2    applicable law.  It would be improper for you to consider, in

3    reaching your decision as to whether or not the government

4    sustained its burden of proof, any personal feelings you may

5    have about the race, religion, national origin, sex, or age of

6    the defendant.

7            If you let prejudice or sympathy enter into your

8    thinking, it could interfere with clarity of judgment, and

9    there's a risk that you would not arrive at a just verdict.

10           Both parties are entitled to a fair trial.  You must

11   make a fair and impartial decision to come to a just verdict.

12   If you have a reasonable doubt as to the defendant's guilt on

13   one or more counts, you should not hesitate to find him not

14   guilty.  On the other hand, if you find the government has met

15   its burden of proving the defendant's guilt beyond a reasonable

16   doubt on one or more counts, you should not hesitate, because

17   of sympathy or anything else, to find him guilty.

18           Finally, on a related point that I suspect crossed

19   somebody's mind at some point, in the federal system, we have

20   crimes only that are defined by statutes—laws passed by

21   Congress and signed by the president.  I have instructed you as

22   to the law under those statutes, and it's your job to apply

23   those instructions to the facts that you find.  In the event

24   that you conscientiously conclude that the government has not

25   proved every required element necessary to convict, but you

**A-1208**

NB21BAN5                    Charge                    3234

1   necessarily think that something was morally wrong or unfair,

2   you may not allow your feelings to substitute for your

3   conscientious determination as to the facts or following the

4   law that I have given you.  You are obliged to return a verdict

5   consistent with the law and the facts as you find them,

6   regardless of personal feelings.

7           Now a couple of other——oh, yes.  If you need any

8   exhibits, you will tell us.

9           Now you're going to get a laptop, and I think it's

10  going to have either all of one party's exhibits or all of the

11  exhibits.  And use it to your heart's content.  But if there's

12  something in evidence that you need that you don't have in

13  there and that we haven't sent in to you and you want it, send

14  us a note, we'll get it for you.

15          Thank you, Aditi.

16          Now let me come to our stalwart alternates.

17          You are not going to deliberate, at least now.  But I

18  am not discharging you.  You remain alternates in this case,

19  though I'm going to send you off home or wherever you go next.

20  You may not discuss the case or read about the case or any of

21  the other things about the case that I told you at the

22  beginning not to do, and the reason for that is that if, god

23  forbid, something happens to a juror, you may be re-called to

24  serve as a juror in this case, in which case deliberations will

25  begin anew and you will be one of the 12 jurors just as if you

**A-1209**

NB21BAN5                    Charge                         3235

1    were one of the first 12 now.  It is very important that you

2    adhere to that instruction.  Now believe me when I say that

3    everybody appreciates your time here, your close attention

4    here.  It was essential—particularly in this era, when all

5    sorts of things happen, not least of which a pandemic that we

6    hope is nearly all gone—that we have alternates, and we thank

7    you.  So you now will go with the court officer into the

8    jury—sorry.

9          MS. SASSOON:  Your Honor, there are a couple things to

10   raise at sidebar with regards to the instructions before the

11   alternates are discharged.

12         THE COURT:  All right.  Just give us a moment.

13         (At the sidebar)

14         THE COURT:  Quickly.

15         MS. SASSOON:  Page 43.  I'm going in reverse order.

16   We didn't catch this typo before, but on lines 18-19, on

17   page 43, it says, "However, if you find that the defendant

18   actually believed the fact was true, then you may not find he

19   knew the facts," and it should say "believed that the fact was

20   not true."  And I think it's important just to get the context

21   of the instruction correctly.

22         THE COURT:  I'm just showing you that I marked that on

23   here.  Do you agree with that?

24         MR. COHEN:  Yes.

25         THE COURT:  Next.

**A-1210**

NB21BAN5                    Charge                    3236

1      MS. SASSOON:  The other one I have is on page 37, with

2  regard to concealment money laundering.  The second element.

3  So we're at lines 16-21.

4      THE COURT:  Just give me a minute to wrestle with the

5  staples.

6      Go ahead.

7      MS. SASSOON:  So this is not reflected in the

8  language.  I think your Honor went slightly off script and said

9  something along the lines of, "If you find he's guilty of wire

10  fraud, this element is satisfied."  And I believe it's that

11  that meets the definition of "specified unlawful activity," but

12  your Honor I don't think read lines 20-21.

13      THE COURT:  I think you're right.  So I'll read that

14  whole paragraph to the jury then.  Yes?

15      MR. REHN:  One more.

16      MR. COHEN:  Your Honor?

17      MR. REHN:  Sorry.  We have one more from the

18  government first.

19      On page 63, you did not read the sentence telling them

20  that they should not indicate in a note to the Court how they

21  were divided.

22      THE COURT:  Yes, okay.

23      MR. REHN:  Which is on lines 18-20.

24      MR. COHEN:  And your Honor, on page 35, lines 5-6, the

25  Court read "must prove beyond a reasonable doubt."

**A-1211**

NB21BAN5                          Charge                          3237

1        THE COURT:  Yes, I did.

2        MR. COHEN:  The text——the wording has to be added to

3   the text.

4        THE COURT:  Well, I gave it orally so I'm just going

5   to interlineate.

6        MR. COHEN:  Okay.  And then several times——and I think

7   this can probably be just addressed by one more repetition, but

8   several times, starting with page 19, lines 24-26, the Court

9   read——

10        THE COURT:  You're going too fast for me.  Let me get

11   to page 19.

12        MR. COHEN:  Sorry, your Honor.

13        THE COURT:  Yes.  What lines?

14        MR. COHEN:  24-26.  And the way it came out in the

15   reading was the Court left out the phrase "the government must

16   prove beyond a reasonable doubt."

17        THE COURT:  That entire phrase?

18        MR. COHEN:  Yes, just that.  The rest of it was read

19   except for the clause "the government must prove"——the "beyond

20   a reasonable doubt" part.

21        THE COURT:  So you're telling me that I charged that,

22   and I'm quoting now, charged in Counts Two and Four each of the

23   following elements?

24        MR. COHEN:  Yes, yes.

25        MR. REHN:  I only had it as omitted "beyond a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1212**

NB21BAN5                    Charge                    3238

1    reasonable doubt."

2         MR. COHEN:  That's what I said, yeah.

3         MR. REHN:  I think you read "the government must

4    prove."

5         MR. COHEN:  No.  I had it the same as Mr. Rehn.  And I

6    think that happened again.

7         THE COURT:  Yes.  Look, I understand, and you may well

8    be right that I omitted it, but I think I probably said a

9    hundred times in this that they have to prove every element

10   beyond a reasonable doubt.

11        MR. COHEN:  Right, and where I was getting to was we

12   would ask that you just repeat that one, because it happened a

13   few other times.  Rather than——

14        THE COURT:  It's quite possible.  All right.  So I'll

15   start with that one.

16        MR. COHEN:  Okay.

17        THE COURT:  And then somebody's going to prompt me

18   page by page.  And I'll start with you if there's another page

19   that you made a point about——

20        MR. COHEN:  That's it, your Honor.

21        THE COURT:  ——and then go to the government.

22        MR. COHEN:  Your Honor, before we go back, a couple

23   other things.  Obviously for record purposes, we continue any

24   objections we made at the charge conference and before about

25   the charges, the charges we had asked for.  And also, we would

**A-1213**

NB21BAN5                         Charge                         3239

1   ask that the Court—

2           THE COURT:  I didn't hear your whole statement.

3           MR. COHEN:  I'm sorry.  For record purposes—

4           THE COURT:  Obviously you need not renew objections

5   you made at the charge conference.

6           MR. COHEN:  Okay.  And lastly, your Honor, we would

7   ask that you instruct the jury that while they certainly can

8   stay to 8:15 tonight, they're not required to, and if they feel

9   it would be more productive for them to pick up on Monday, that

10  they may do so.

11          THE COURT:  Yeah, I'll do that.

12          Okay.

13          MR. EVERDELL:  Your Honor, one last thing.  This is

14  the indictment that the government prepared to pass back to the

15  jury.

16          THE COURT:  I'll deal with that when the jury is out.

17          MR. EVERDELL:  Okay.

18          (In open court)

19          THE COURT:  Okay.  During the course of my reading of

20  the typewritten instructions, counsel have brought to my

21  attention that in one place or another, I left out a phrase or

22  a word, and we're going to go through about a half a dozen of

23  these corrections now.

24          First of all, before we even do that, I remind you

25  that as I said many, many times during the course of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1214**

NB21BAN5                         Charge                         3240

```
 1   instructions, it is the government's burden to prove each of

 2   the essential elements of the offense beyond a reasonable

 3   doubt, and if anywhere in the typescript or in my oral

 4   rendition of the typescript I left out any of those words, you

 5   are to understand that they belong there, "beyond a reasonable

 6   doubt."

 7           Okay.  Now——

 8           MS. SASSOON:  Page 37.

 9           THE COURT:  Okay.  See, I have very able prompters.

10           Oh, you're now going in ascending order rather than

11   descending order?

12           MS. SASSOON:  I started with the earliest, but I can——

13           THE COURT:  Listen, I'll go either way.  I'm very

14   versatile on that, backwards and forwards.

15           Okay.  In the course of charging you on the second

16   element of concealment money laundering, I am told that I

17   orally may have gone off script, so I'm going to read you that

18   paragraph again.  But it is accurate in the typescript.  And

19   that paragraph reads:

20           The second element of concealment money laundering is

21   that the financial transactions would have involved the

22   proceeds of specified unlawful activity.  Here, the specified

23   unlawful activity is the wire fraud offense charged in Count

24   One, and I instruct you as a matter of law that the wire fraud

25   charged in Count One of the indictment, if proven beyond a
```

**A-1215**

NB21BAN5                          Charge                          3241

1   reasonable doubt, meets the definition of "specified unlawful

2   activity."  You must determine whether the funds involved in

3   the financial transactions would have been proceeds of that

4   unlawful activity.

5           Next.

6           MS. SASSOON:  Page 43, lines 18-19.  But perhaps some

7   context is necessary.

8           THE COURT:  Don't worry.  I think I can handle it.

9           I'll read you this whole paragraph.  We were talking

10  here about conscious avoidance and willful blindness, and in

11  summing up part of that, I left a "not" out somewhere.  So I'm

12  now going to read it to you accurately, and this will be

13  reflected in an interlineation in my handwriting, which I

14  promise to make arguably readable.

15          Accordingly, if you find that the defendant was aware

16  of a high probability of a fact and that defendant acted with

17  deliberate disregard of the facts, you may find that the

18  defendant knew that fact.  However, if you find that the

19  defendant actually believed that the fact was not true, then

20  you may not find that he knew that fact.

21          Next.

22          MS. SASSOON:  Page 63, lines 18-20.

23          THE COURT:  Yes.  I neglected to tell you that if you

24  communicate with the Court before you reach a verdict, either

25  by a note or in the courtroom, you are not ever to indicate how

**A-1216**

NB21BAN5                          Charge                          3242

1    you are divided on the defendant's guilt or lack of guilt,

2    unless I specifically ask you for it.

3              And?

4              MS. SASSOON:  Nothing further.

5              MR. COHEN:  You've already addressed our point, your

6    Honor.  Thank you.

7              THE COURT:  There was a place on page 28 where I was

8    talking about securities fraud and I mistakenly said

9    "fraudulent commerce" instead of "fraudulent conduct."  But

10   we'll fix that one too.  Thank you, Aditi.

11             Okay.  Now back to the alternates.

12             You folks are temporarily excused, but you are subject

13   to re-call.  I imagine Andy will tell you how to find out when

14   the case is finally over and you're done.  You can always call

15   Andy.  So if the five of you would kindly go with Andy, collect

16   your stuff, leave your notes with Andy, and we'll proceed from

17   there.

18             (Alternates excused)

19             THE COURT:  Please be seated.

20             Now, members of the jury, it is ten after 3.  Let's

21   talk about the rest of the day.

22             First of all, although I'm willing to stay till 8:15

23   if you want to stay till 8:15—car service, cafeteria,

24   dinner—but you're not obliged to.  And it would be extremely

25   helpful if you could send us a note in the next half hour

**A-1217**

NB21BAN5                         Charge                          3243

1    about——I have to be careful how I phrase this to get it exactly

2    right——should we order supper, should we order car service.

3    Two different questions.  You could do one without the other.

4    And it's a question of what you want.  And if you want to order

5    both against the possibility that you'll use it, that's okay

6    too.  The government can afford it.  I don't mean to say the

7    government's money should be wasted.  Obviously not.  But we

8    have to give advance notice to the vendors in order to make

9    sure it's available should you need it, and that's a legitimate

10   purpose.

11        So as soon as Andy gets back, we will send you out to

12   deliberate.

13        First thing he's going to do is swear the officer, of

14   which these two were going to remind me.

15        Oh, yes.  I'm reminded that I committed to the court

16   staff that we would not keep you past 8.  Somebody has a train

17   to catch.

18        Swear the Marshal, please.

19        THE DEPUTY CLERK:  Okay.  Would the Marshal please

20   come forward and raise his right hand.

21        (Marshal sworn)

22        THE DEPUTY CLERK:  Thank you.

23        THE COURT:  Ladies and gentlemen, thank you for your

24   attention.  You will get the charge in writing as soon as we

25   can Xerox enough copies.  And we'll wrestle with the exhibit

**A-1218**

NB2MBAN6                                                                3252

1          THE COURT:  Mr. Bankman-Fried, please rise and face

2     the jury box.

3          THE DEPUTY CLERK:  As to Count One, wire fraud (FTX

4     customers) how do you find the defendant, guilty or not guilty?

5          THE FOREPERSON:  Guilty.

6          THE DEPUTY CLERK:  As to Count Two, conspiracy to

7     commit wire fraud (FTX customers), guilty or not guilty?

8          THE FOREPERSON:  Guilty.

9          THE DEPUTY CLERK:  As to Count Three, wire fraud

10    (Lenders to Alameda Research), guilty or not guilty?

11         THE FOREPERSON:  Guilty.

12         THE DEPUTY CLERK:  As to Count Four, conspiracy to

13    commit wire fraud (Lenders to Alameda Research), guilty or not

14    guilty.

15         THE FOREPERSON:  Guilty.

16         THE DEPUTY CLERK:  As to Count Five, conspiracy to

17    commit securities fraud, guilty or not guilty?

18         THE FOREPERSON:  Guilty.

19         THE DEPUTY CLERK:  As to Count Six, conspiracy to

20    commit commodities fraud, guilty or not guilty?

21         THE FOREPERSON:  Guilty.

22         THE DEPUTY CLERK:  As to Count Seven, conspiracy to

23    commit money laundering, guilty or not guilty?

24         THE FOREPERSON:  Guilty.

25         THE DEPUTY CLERK:  Thank you.  Please be seated.

**A-1219**

NB2MBAN6                                                                 3253

1           THE COURT:  There is another question, Andy.

2           THE DEPUTY CLERK:  My apologies.

3           Is your unanimous verdict based on concealment money

4    laundering, wire fraud proceeds money laundering, or both?

5           THE FOREPERSON:  Both.

6           THE COURT:  Thank you.

7           You may be seated, Mr. Bankman-Fried.

8           Andy you can recapture the original verdict form.

9           MR. COHEN:  Your Honor, we would ask that the jurors

10   be polled.

11          THE COURT:  Of course.

12          The clerk will poll the jury.

13          THE DEPUTY CLERK:  Juror number 1, is that your

14   verdict?

15          JUROR:  Yes.

16          THE DEPUTY CLERK:  Juror number 2, is that your

17   verdict?

18          JUROR:  Yes.

19          THE DEPUTY CLERK:  Juror number 3, is that your

20   verdict?

21          JUROR:  Yes.

22          THE DEPUTY CLERK:  Juror number 4, is that your

23   verdict?

24          JUROR:  Yes.

25          THE DEPUTY CLERK:  Juror number 5, is that your



GOVERNMENT
EXHIBIT
**532**
22 Cr. 673 (LAK)

FTX-POLP-00003533

FOIA Confidential Treatment Requested

A-1221

# Overview

FTX is the leading digital assets exchange, servicing crypto spot, futures, tokenized equity and prediction markets, among other novel digital assets.

We are the largest non-Chinese crypto exchange, fourth largest crypto exchange and the fastest growing crypto exchange in the world by volume.

**2017** ● Core team gets into crypto launching a market maker

Founders leave Jane Street Capital, Google

**2019** ● After years of using other exchanges, team realizes they could build a better exchange. FTX is launched

$50m ADV from handful of users in the first few months

**2020** ● FTX onboards more users and institutions, scales exchange capacity and team. Acquires Blockfolio

Became largest non-Chinese crypto exchange by volume

**2021** ● Focus on onboarding retail investors by integrating trading into Blockfolio. Launch new product lines like options and prediction markets

$400m+ annualized run-rate based on January 2021 revenues

1

**FTX**

FOIA Confidential Treatment Requested

FTX-POLP-00003534

A-1222

# Crypto = Bitcoin = Crypto Exchanges

Crypto exchanges are synonymous with the industry. Compared to our counterparts in traditional finance, crypto exchanges play a more significant and encompassing role. We are the infrastructure layer of crypto providing:

1. Tech infrastructure for order-book management, matching service, API for connectivity
2. The gateway for crypto investor, both retail and institutional
3. Initial Exchange Offerings, which are the crypto equivalent of IPOs and often happen on centralized exchanges
4. Exchange wallets, serving as full-service settlement infrastructure:
   a. Prime broker
   b. Clearing firm
   c. Custodian
   d. Execution service
5. Unique structured products, including ETFs and nuanced products like perpetuals, volatility contracts etc.
6. Access to an OTC desk for the industry with both white-glove and automated solutions

2

FTX

FOIA Confidential Treatment Requested

FTX-POLP-00003535

**A-1223**

## 2020 vs 2019

**$1B ADV**
$150m average daily volume

**7x**
In daily active users

**$150M for Blockfolio**
Zero inorganic growth

**15x***
Exchange capacity

**1,100 Markets**
410 in 2019

**$0****
Almost no paid marketing

**72 employees**
15 in 2019

\* While our competitors have outages stretching for hours during surges of high volatility, we've kept stable and active while our volumes have exceeded $10B.

\*\* Our paid marketing until Q1 2021 has been mostly defensive in order to protect our customers from phishing attacks.

**FTX**

3

FTX-POLP-00003536

FOIA Confidential Treatment Requested

**A-1224**

## Statistics in 2021*

$640M
Annualized Run Rate

$7.9B
Average Daily Volume

$400M
Estimated Profit

Growth has primarily come from our core userbase demographic: high-volume, engaged, active traders and institutions.

More room to grow: top 3 exchanges each have $20B+ of ADV.

* numbers are approximate, based on recent performance. They do not incorporate any additional growth.



4

FTX-POLP-00003537

FOIA Confidential Treatment Requested

FTX-POLP-00003538

FOIA Confidential Treatment Requested



# Growing faster than competitors

24.6x growth in volume between start of 2020 and now

| Exchange | Growth | Starting ADV | Ending ADV |
|---|---|---|---|
| FTX | 24.6x | 239.7M | 5,900.5M |
| Coinbase | 24x | 139.2M | 3,339.4M |
| Binance | 23.7x | 2,051.8M | 48,646.8M |
| Kraken | 17.3x | 92.9M | 1,608.7M |
| Huobi | 8.8x | 3,530.4M | 31,242.9M |
| Deribit | 6.8x | 277.3M | 1,887.3M |
| OKEx | 5.9x | 4,075.2M | 23,965.3M |
| BitMex | 2.2x | 2,253.9M | 4,919.9M |

**A-1226**



# Current product offering

**Futures**

75% of the revenues came from futures on crypto-assets.

**Spot**

We list 81 spot markets, supporting 11 Layer 1's.

**Leveraged Tokens**

Our leveraged tokens are listed on partner exchanges.

**OTC**

Access to an OTC portal and RFQ system that provides liquidity for large orders. OTC volume has been growing steadily.

**Spot Margin trading and P2P Lending**

Launched spot margin in late November. It's growing rapidly with $1.2B lent/borrowed on FTX.

**Tokenized Stocks**

In partnership with CM-Equity, a licensed broker-dealer in Germany, we offer tokenized equity on our platform.

More products, less mess: A single wallet where all assets can be cross-margined

FTX

6

FTX-POLP-00003539

FOIA Confidential Treatment Requested

# 2021: New customers and new products

Rapidly grow retail customer base by integrating trading within the Blockfolio app.

Expand into new product lines including options, sportsbook and prediction markets.

Reviews

★ ★ ★ ★ ★ 122,560

★ ★ ★ ★ ★ 284,534

★ ★ ★ ★ ★ 15,834

★ ★ ★ ★ ★ 322,659

**Daily Active Users**

We listed prediction markets on elections which settle to $1 if Trump wins and $0 if Trump loses.

On election night, we saw a surge in active users, and almost $300M contracts were traded on election night.

Election Night



FTX-POLP-00003540

FOIA Confidential Treatment Requested

A-1228

## Compliance Framework

Work closely with policymakers and regulators to operate in a compliant manner*.

Comprehensive anti-money laundering policies and procedures. KYC and AML conducted by full-time employees. Mandatory AML, Cyber Security training for all employees.

Use multiple third party identity verification services including Jumio, WorldCheck and ChainAnalysis.

Offering tokenized stocks in partnership with CM-Equity, a licensed broker-dealer in Germany.

West Realm, an independent US-regulated entity acts as the back end for US Blockfolio users, has MSB, MTLs and a US broker-dealer license.

Member of the Blockchain Association, Future of Digital Currency Initiative.

* FTX Intl. blocks restricted jurisdictions and does not service US customers.

8

**FTX**

FOIA Confidential Treatment Requested

FTX-POLP-00003541

A-1229

# OUR TEAM



### Sam Bankman-Fried
#### CEO

Before founding Alameda and FTX, Sam was a trader on Jane Street Capital's international ETF desk. He traded a variety of ETFs, futures, currencies, and equities, and designed their automated OTC trading system. He graduated from MIT with a degree in physics.



### Gary Wang
#### CTO

Gary was a software engineer at Google prior to founding Alameda and FTX. There, he built systems to aggregate prices across millions of flights, decreasing latency and memory usage by over 50%. He graduated from MIT with a degree in Mathematics with Computer Science.



### Nishad Singh
#### Head of Engineering

Nishad joined Alameda Research in 2017 and is now the Director of Engineering in FTX. Prior to joining Alameda, Nishad was a software engineer on Facebook's Applied Machine Learning team. He graduated summa cum laude from Berkeley with a degree in Electrical Engineering and Computer Science.



### Dan Friedberg
#### General Counsel

Prior to joining FTX, Dan was a partner at Fenwick & West LLP. There, he was the chair of the Payment Systems group, counseling clients from entrepreneurs and startup companies to publicly traded companies in various industries including manufacturing, consumer products and services, biotechnology, gaming and software. Dan received his J.D. from the University of Wisconsin, cum laude.



### Ramnik Arora
#### Head of Product

Ramnik joined FTX from Facebook where he built ads products. He was also on the Facebook Libra team and was a co-author of the whitepaper. Prior to Facebook, Ramnik was at Investment Management at Goldman Sachs. He is an alum of IIT Kanpur, NYU and Stanford.

**And a team of 75 and growing.**

FTX

9

FOIA Confidential Treatment Requested

FTX-POLP-00003542



FTX-POLP-00003543

FOIA Confidential Treatment Requested

# A-1231

**FTX TERMS OF SERVICE**

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)     the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)     the FTX Application Programming Interface (**"API"**); and

(C)     any other services offered through the FTX website ([ftx.com](ftx.com)) (the **"Site"**) or any Mobile Application,

       (together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)     FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)     Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.       **STRUCTURE OF TERMS**

1.1     The Terms comprise:

       1.1.1    the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which

GOVERNMENT
EXHIBIT
558
22 Cr. 673 (LAK)

1

**A-1232**

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2    the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our <u>Privacy Policy</u>, <u>Security Policy</u> and <u>Fee Schedule</u> (**"FTX Policies"**); and

1.1.3    the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2    To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, <u>Fee Schedule</u>, <u>Privacy Policy</u>, <u>Security Policy</u> and other FTX Policies.

1.3    <u>**IMPORTANT:**</u> You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

## 2.   RISK DISCLOSURES

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1    **No advice and no reliance**

2.1.1    FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2    You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3    FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2    **Digital Asset transfers and volatility**

2.2.1    Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

# A-1233

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2   Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3   You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

## 2.3   Supply and value of Digital Assets

2.3.1   The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2   You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

## 2.4   Margin trading

2.4.1   Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

## 2.5   Complex products

2.5.1   Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2   Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

## A-1234

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3    USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4    FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

### 2.6    Blacklisted addresses and forfeited Assets

2.6.1    FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms (**"Blacklisted Addresses"**). In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2    In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

### 2.7    Software protocols and operational challenges

2.7.1    The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2    You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3    You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4    Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

# A-1235

2.7.5   Digital Assets depend on the availability and reliability of power, connectivity, and hardware. Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

2.8   **Compliance**

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

2.9   **Legislative and regulatory changes**

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

2.10   **No deposit protection**

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

2.11   **Digital Asset Distributions not supported**

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

2.12   **Reliance on third parties**

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

3.   **APPLICABLE LAWS AND REGULATIONS**

3.1   **Compliance with Applicable Laws**

3.1.1   You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2   Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

**A-1236**

3.2    **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3    **Export controls**

3.3.1    The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

(A)    you are in a prohibited jurisdiction as set forth at <u>Location Restrictions</u> (**"Restricted Territories"**);

(B)    you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

(C)    you intend to transact with any Restricted Territories or Restricted Persons;

(D)    you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

(E)    the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2    We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4.    **ELIGIBILITY**

4.1    In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1    If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2    If you are registering to use the Services on behalf of a legal entity, then:

(A)    you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

(B)    the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

(C)    the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

A-1237

> Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3   You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4   You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5   You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6   You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2   If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

5.   **REGISTRATION PROCESS; IDENTITY VERIFICATION**

5.1   When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2   In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3   You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4   Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5   If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6   We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

## A-1238

6.  **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1  You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features (**"User Credentials and Security Passwords"**) made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2  You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3  You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4  FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5  In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7.  **ORDER BOOK AND CONVERT**

7.1  FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2  The Convert function on the Platform also allows you to submit instructions ("**Convert Instructions**") to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

## A-1239

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3 The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4 We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5 You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6 You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7 Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8 Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9 Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10 You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

## 8. ACCOUNT FUNDING

### 8.1 Funding - General

8.1.1 In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

8.1.2 You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

8.1.3 Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

### A-1240

8.2 **Digital Assets**

8.2.1 The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2 You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3 The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4 You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5 FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6 All Digital Assets are held in your Account on the following basis:

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7 FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8 It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

# A-1241

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9    You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10   When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11   You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12   It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

## 8.3    Fiat currency

8.3.1    Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2    Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3    E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4    E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5    You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

A-1242

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility entirely to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

9.    **UNCLAIMED OR ABANDONED PROPERTY**

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

# A-1243

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

10. **DEBIT ACCOUNT BALANCE**

10.1 If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2 If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3 If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

   10.3.1   you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

   10.3.2   you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

   10.3.3   you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

11. **THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT**

If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

12. **ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION**

12.1 FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

   12.1.1   refuse to let you open an Account, suspend your Account, or terminate your Account;

   12.1.2   decline to process any instruction or Order submitted by you; and/or

   12.1.3   limit, suspend or terminate your use of one or more, or part of, the Services.

12.2 Such actions will not relieve you from your obligations pursuant to the Terms.

12.3 Such actions may be taken as a result of a number of factors, including without limitation:

13

## A-1244

12.3.1    as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2    as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3    where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4    If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5    Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6    Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7    You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8    We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1    your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2    to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3    you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9    Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10    Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

13.    **RESTRICTED ACTIVITIES**

In connection with your use of the Services, you agree that you will not:

13.1.1    violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2    provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3    infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4    engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

## A-1245

13.1.5 distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6 use a web crawler or similar technique to access our Services or to extract data;

13.1.7 reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8 perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9 take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10 transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11 otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12 transfer any rights granted to you under the Terms;

13.1.13 engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14 engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15 assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

## 14.    ELECTRONIC TRADING TERMS

14.1 FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2 A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3 In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4 We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

# A-1246

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5   FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6   Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7   The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

15.   **STAKING**

15.1   When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2   The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

16.   **MARGIN TRADING**

16.1   This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2   Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

# A-1247

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3    When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4    Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5    The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and take no responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

## 17.    FORKS AND DISTRIBUTIONS

17.1    As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2    FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3    If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4    The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

**A-1248**

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5 In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18. ATTACKS ON BLOCKCHAIN NETWORKS

18.1 FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2 Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19. SITE; THIRD PARTY CONTENT

19.1 FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2 The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3 We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20. AVAILABILITY

20.1 We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

A-1249

20.2    You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3    FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

21.     **RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES**

21.1    We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2    If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

22.     **UPDATES TO THE TERMS**

22.1    We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2    If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

23.     **FEES**

23.1    In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2    On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3    You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

A-1250

24.   **TAXES**

24.1   You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2   FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25.   **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1   **License**

25.1.1   FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2   Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3   "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2   **API use**

25.2.1   Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2   FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3   FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3   **Third Party Applications**

25.3.1   We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

## A-1251

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2  If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3  You acknowledge and agree that you will not hold us responsible for, and will indemnify us from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4  In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

## 26.   PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

## 27.   CONFIDENTIALITY

27.1  You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2  You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3  The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1  in the public domain through no breach of the Terms;

27.3.2  known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3  required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4  If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5  Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6  Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

# A-1252

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7    The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8    The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9    The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

## 28.    COOKIES

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

## 29.    INDEMNIFICATION; RELEASE

29.1    You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2    You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3    You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

## 30.    LIMITATION OF LIABILITY; NO WARRANTY

30.1    NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

# A-1253

30.1.1   FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2   FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3   TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2   SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1   INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2   INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3   YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4   YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1   THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2   THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3   THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

## A-1254

30.5   SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31. **COUNTRY-SPECIFIC ADDENDA**

If you are a resident of Australia, Japan, or South Africa, additional terms and conditions will apply to your use of the Services as set forth in the Schedules attached hereto.

32. **COMMUNICATIONS IN ENGLISH**

The Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

33. **FEEDBACK**

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide to us or one of our social media accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, in and to such Feedback, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgement or compensation to you.

34. **QUESTIONS AND CONTACT INFORMATION**

34.1   We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise You to check those channels before contacting support.

Telegram: https://t.me/FTX_Official

Twitter: https://twitter.com/FTX_Official

WeChat: ftexchange

Blog: https://blog.ftx.com/

34.2   To contact us, please visit one of the links or channels above. For support with your Account, you may submit a support ticket at https://ftx.com/support. For legal and media inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide all relevant information, including your Account username and transaction IDs of any related deposits. Although we make no representations or provide no warranties as to the speed of response, we will endeavour to get back to you as soon as possible.

35. **PROMOTIONS**

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere. You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to the Platform.

# A-1255

36. **FORCE MAJEURE AND RELIEF EVENTS**

36.1 FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

36.1.1 any Force Majeure Event; or

36.1.2 any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37. **ASSIGNMENT AND SUBCONTRACTING**

37.1 You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2 FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38. **GENERAL**

38.1 **Entire agreement**

38.1.1 You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

38.1.2 You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

38.1.3 You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2 **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3 **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4 **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

# A-1256

assigns.

**38.5    Variation and waiver**

38.5.1    Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2    No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

**38.6    No partnership or agency**

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

**38.7    Set off**

38.7.1    Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2    FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

**38.8    Equitable remedies**

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

**38.9    Third party rights**

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1    the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2    no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

**38.10    Electronic signature**

The Terms may be entered into by electronic means.

# A-1257

38.11    **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12    **Arbitration**

38.12.1    Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2    This arbitration agreement shall be governed by English law.

38.12.3    The seat of the arbitration shall be Singapore.

38.12.4    The language of the arbitration shall be English.

38.12.5    The number of arbitrators shall be one.

38.12.6    Each party agrees that:

(A)    any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B)    combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7    This agreement to arbitrate shall:

(A)    be binding upon the parties, their successors and assigns;

(B)    survive the termination of these Terms.

38.12.8    Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13    **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

A-1258

SCHEDULE 1

DEFINITIONS AND INTERPRETATION

1.    **DEFINITIONS**

1.1    As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)    acts of God, flood, drought, earthquake or other natural disaster;

(ii)   epidemic or pandemic;

(iii)  terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)   nuclear, chemical or biological contamination or sonic boom;

(v)    any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)   collapse of buildings, fire, explosion or accident; and

(vii)  any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

# A-1259

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2. **INTERPRETATION**

2.1 **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1 a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2 a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3 the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4 a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5 a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2 **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

**A-1260**

2.3    **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1    a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2    a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3    a reference to an individual includes that individual's estate and personal representatives.

2.4    **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5    **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6    **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1    the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2    general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7    **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8    **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

A-1261

**SCHEDULE 2**

**SERVICE SCHEDULE**

| | |
|---|---|
| **Specified Service** | **Spot Market** |
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

**A-1262**

SCHEDULE 3

SERVICE SCHEDULE

| Specified Service | Spot Margin Trading |
|---|---|
| Specified Service description | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform. <br><br> You may also lend your Digital Assets to other Users who need them to spot trade. <br><br> Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) | **IMPORTANT**: Section 16 of the General Terms applies to this service. <br><br> You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement. <br><br> The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk. <br><br> The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins. <br><br> The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion. <br><br> Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations. <br><br> The Service Provider reserves the right to final interpretation of this Specified Service. |

**A-1263**

| Risk disclosures | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms. |
| --- | --- |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |

**A-1264**

SCHEDULE 4

SERVICE SCHEDULE

| Specified Service | OTC / Off-exchange Portal (OEP Portal) |
|---|---|
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal. The Service Provider reserves the right to final interpretation of this Specified Service. |

## A-1265

SCHEDULE 5

SERVICE SCHEDULE

| | |
|---|---|
| **Specified Service** | **Futures Market** |
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by <u>**FTX Digital Markets Ltd**</u>, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after. |
| | Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24. |
| | You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins. |
| | **IMPORTANT:** Section 16 of the General Terms applies to this service. |
| | Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors. |
| | In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

**A-1266**

| | |
|---|---|
| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES. |
| | By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

A-1267

**SCHEDULE 6**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (Options Contacts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date.<br><br>If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies.<br><br>You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin.<br><br>Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins.<br><br>**IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date.<br><br>The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money".<br><br>The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration.<br><br>Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value.<br><br>If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

**A-1268**

|  | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
| --- | --- |
| **Risk disclosures** | See Section 2 of the General Terms. |

**A-1269**

SCHEDULE 7

SERVICE SCHEDULE

| Specified Service | Volatility Market (MOVE Volatility Contracts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. |

MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC.

1. Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC.

2. Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November.

3. Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020.

You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin.

**IMPORTANT**: Section 16 of the General Terms applies to this service.

MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value.

A-1270

| | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING.

The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

**A-1271**

SCHEDULE 8

SERVICE SCHEDULE

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| **Specified Service description** | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

A-1272

|  | ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.<br><br>By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account.<br><br>If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specific Service. |
|---|---|
| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors.<br><br>• **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying.<br><br>• **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.<br><br>• **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets. |

SCHEDULE 9

SERVICE SCHEDULE

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
|---|---|
| Specified Service description | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.

In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of:

- Tomorrow's MOVE Volatility contract
- Next weeks' MOVE contract, and the two weeks after that
- Next Quarter's MOVE contract, and the quarter after that

and

- -1x BTC-PERP (Short)

IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long).

BVOL targets +1x leverage, and IBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk.

YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION |

A-1274

| | |
|---|---|
| | REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.<br><br>BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors.<br><br>By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account.<br><br>If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors.<br><br>• **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens.<br><br>• **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could |

**A-1275**

| | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |
|---|---|

A-1276

SCHEDULE 10

SERVICE SCHEDULE

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| Specified Service description | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| Service Provider | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) and risk disclosures | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider.<br><br>Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index.<br><br>Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.<br><br>You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins.<br><br>You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform.<br><br>You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins.<br><br>Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable).<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

## A-1277

**SCHEDULE 11**

**SERVICE SCHEDULE**

| | |
|---|---|
| **Specified Service** | **NFT Market** |
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion. |
| | Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens. |
| | NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all. |
| | NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it. |
| | While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion. |
| | You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so. |
| | There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value. |
| | NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

A-1278

| | PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT. |
| --- | --- |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING. |

**A-1279**

SCHEDULE 12

SERVICE SCHEDULE

| Specified Service | NFT Listing |
|---|---|
| Specified Service description | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) and risk disclosures | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms. |
| | If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail. |
| | Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise. |
| | **Intellectual property** |
| | You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content. |
| | By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates. |
| | You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork. |
| | **Prohibited activities** |
| | You will not: |

A-1280

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

## A-1281

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"NFT Losses"** or **"NFT Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

## A-1282

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

**A-1283**

**SCHEDULE 13**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO AUSTRALIAN USERS ONLY**

**(Updated September 18, 2022)**

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

---

**1. FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES**

If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

a) your deposit of fiat currency to Digital Assets; and

b) your withdrawal of Digital Assets to fiat currency,

will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

---

**2. FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA**

Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

Neither FTX Trading or the DCE provider will, or may, provide you with financial services or  financial products.

---

**A-1284**

**3. STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions ("**FTX Australia Terms**") to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

**4. YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the _Corporations Act 2001_ (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

**5. DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the _Privacy Act 1988_ (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

54

A-1285

**SCHEDULE 14**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY**

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

**A-1286**

**SCHEDULE 15**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO JAPAN USERS ONLY**

**(Updated September 19, 2022)**

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

A-1287

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are ***non-recourse*** with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

A-1288

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

---

**A-1289**

別紙 **15**

サービスに関する別紙

日本のユーザーにのみ適用される規約

以下の規約は、本約款等の一部を構成し、**FTX Earn** を利用しているか又は **FTX** トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

---

**FTX** トレーディングは、**P2P** 貸借暗号資産の貸出人及び借受人のマッチングのための **P2P** 貸借暗号資産取引プラットフォームを **FTX Japan** 株式会社（暗号資産交換事業者（登録番号関東財務局長第 **00002** 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。**P2P** 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの **FTX Earn** プログラムを通じて利用可能です。

（当社ウェブサイト又は **FTX Earn** プログラムのいずれかを通じて）**P2P** 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、**P2P** 貸借暗号資産取引に係るサービスは全て **FTX** トレーディングが単独で提供しています。

- お客様は、ご利用規約及び **FTX** のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を **FTX** トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、**1** 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、**FTX** トレーディングが当社に対して本貸出人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり **P2P** 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ **P2P** 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、**P2P** 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが **P2P** 貸借暗号資産の借受人又は貸出人となることはありません。

当社のユーザーのみが、借受人又は貸出人のいずれかとして **P2P** 貸借暗号資産取引に参加する資格を有します。

59

A-1290

## 貸出し

お客様が P2P 貸借暗号資産取引の貸出人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことができるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸料料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て**責任財産限定型**消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

## 借受け

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

# A-1291

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、**責任財産は**本借受人の口座において本借受人が保有する資産**に限定されます**。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身がリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出を含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限するよう当社に指図する可能性があることに同意します。

*FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。*

---

A-1292

### SCHEDULE 16
### SERVICE SCHEDULE
### TERMS APPLICABLE TO UK USERS ONLY
**(Updated September 29, 2022)**

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

A-1293



A-1294



**A-1295**



A-1296





ALAMEDA LOC Principal

$ Billion

DEFENDANT'S
EXHIBIT
1617
S6 22 Cr. 673 (LAK)

**A-1298**





USD, ETH, BTC, USDT
Final Balance for User Accounts (Excluding Alameda & FTX) ($ Billions)

$4.54 (78%)

$1.30 (22%)

■ Spot Margin Enabled OR Spot Margin Lending OR Futures trading  ■ Not (Spot Margin Enabled OR Spot Margin Lending OR Futures trading)

**A-1299**



All COINS Final Balance for User Accounts (Excluding Alameda & FTX) ($ Billions)



$6.91 (77%)

$2.03 (23%)



■ Spot Margin Enabled OR Spot Margin Lending OR Futures trading

■ Not (Spot Margin Enabled OR Spot Margin Lending OR Futures trading)

A-1300

The Wayback Machine - https://web.archive.org/web/20201028121600/https://blog.ftx.com/blog/our-liquidation-engine/

> $ cd /ftx-research ◐

Blog

Change Log

Market Recap

Monthly Digest

Videos

Also available in ◉ ◉

# Our Liquidation Engine — how we significantly reduced the likelihood of clawbacks from ever occurring



Note: since this article was published, OKEx has significantly revamped their liquidation engine, bringing it more in line with industry norms. As of May 2020, FTX has in fact never had a clawback.

It's first worth making explicit: the thing that causes socialized losses, and clawbacks, and auto-delevering, is when an account goes beyond bankrupt. If a user has a leveraged futures position on and markets move against their account enough that their net asset value is negative, then someone has to pay for that loss; and in crypto you can't reposses assets from the bankrupt account's owner from outside the system, so you're stuck with other users — the users who aren't getting liquidated — footing the bill.

Like most liquidation engines, the one FTX uses starts by detecting when a user has dropped below maintenance margin. Unlike many other platforms it chooses intelligent, efficient values for these — some other platforms, like OKEx, are fucked by the time a liquidation starts because their maintenance margin was too low and there is no way for them to liquidate such a large position so quickly.

We send reasonable, volume-limited liquidation orders to close down positions that drop below maintenance margin (which starts at 4.5% and increases with position size). We don't sell so quickly that the liquidation orders themselves will crash the market; that would be dooming the entire process. We also don't

DEFENDANT'S
EXHIBIT
964
S6 22 Cr. 673 (LAK)

**A-1301**

give up if the price looks 'bad' — it might only get worse from there and you have to do the best you can liquidating an account rather than hoping things magically reverse (as OKEx does).

Usually this is enough. But if there's a large liquidation — say a long position (position B) that needs to get sold off — and markets are moving down too quickly, it might become clear that the normal liquidation orders in FTX's orderbooks are unlikely to successfully close down position B before the account goes bankrupt.

In that case, the backstop liquidity provider system kicks in. In this situation, liquidity providers who have opted in to the system will internalize position B, taking over the whole obligation and collateral. They'll do this before the account actually goes bankrupt so they have a chance to successfully manage the position. They will then go hedge their books on other venues. This effectively allows the backstop liquidity providers to instantly inject liquidity from other exchanges into FTX in an emergency, removing the dangerous account's position from FTX's books and preventing a likely bankrupcy.

It's worth noting here the difference between the role that an insurance fund plays from the role that a liquidity provider plays. If someone has a long *$200m BTC position that's bankrupt you can try to pay for it's net losses out of an insurance fund. But if that's all yo* $200m position — and so if markets keep moving the insurance fund will just keep losing more and more and more. The way to actually end a liquidation is for someone to take that position of the client's hands — that is someone to actually take on the long $200m of BTC exposure. In this way the backstop liquidity provider program solves a problem that no insurance fund can solve, no matter how large.

Hopefully, the backstop liquidity provider program will be enough to prevent any clawbacks from occurring. In our testing, even market moves of 40% in a 20 minute period were not enough to cause clawbacks; the combination of on-exchange liquidity and backstop liquidity providers were able to provide to all of the nearly bankrupt accounts before they went under. In fact the insurance fund actually gained about $1m in most of these scenarios.

But there needs to be a worst case scenario. And if all else fails, FTX will do what other exchanges do — it will auto-delever an account's position against accounts that have the opposite position on, and attempt to cover any losses out of the insurance fund; and if the insurance fund runs dry then there will be clawbacks.

But FTX really does see clawbacks as a worst case scenario that we hope never happens. We designed a system that we think will withstand huge market moves and huge volume without leading to any clawbacks. And if there's ever a clawback on FTX, we fucked up. We will apologize, write a detailed post explaining the mistakes we made to get the market to the point that clawbacks were necessary, and issue IOUs against future insurance fund increases for any shortfall.

Because that's what should happen if an exchange loses customers' money, even if it's far from the norm right now.

A-1302

Anyway — that's the FTX manifesto on liquidations. How are our competitors doing?

We'd like to start by explicitly saying that all things considered BitMEX has done a good job at preventing clawbacks. There are occasional auto-deleveragings and socialized losses on the illiquid altcoin contracts but they're rare and the BTC perpetual swaps — the one really liquid product on BitMEX — virtually never sees them.

But OKEx is in a pretty bad state. There was a well-publicized $9m clawback on July 31st 2018. Quoting from OKEx's official blog post on the incident:

1. OKEx saw this as business as usual: "OKEx has adopted the societal loss risk management mechanism since launched and it has been working orderly as intended.
2. OKEx's attempt to address the situation: "Our risk management team immediately contacted the client, requesting the client several times to partially close the positions to reduce the overall market risks. However, the client refused to cooperate…"
3. If OKEx was not going to be able to handle the order why did they let the client place it? OKEx's risk systems are woefully inadequate.
4. "Shortly after this preemptive action, unfortunately, the BTC price tumbled, causing the liquidation of the account."
5. OKEx seems not to be fully aware of why the BTC price tumbled. "Unfortunate" is one way of putting it; "in response to OKEx manually placing a $400m liquidation offer and hoping against hope someone would trade against it — but instead seeing the market update on the expected impact of the order" is another. OKEx caused the move that caused the clawback.
6. "We will implement a series of risk management enhancements, which are in line with our futures roadmap released on July 17, 2018, to prevent any similar cases from occurring again." So how has this new framework done?
7. On 2018–11–23 OKEx clawed back 50% of profit from ETC futures, or over $1m.
8. On 2018–09–07, OKEx clawed back 18% of profit from EOS futures, or over $3m.
9. OKEx's BSV futures went through a 6 week stretch from 2018–12–28 to 2019–02–01 where the average clawback was 42%.
10. The now-delisted OKEx BTG futures went through periods of having over 80% clawbacks each week — meaning that nearly the entire trading in the futures was someone going bankrupt!
11. And, infamously, a few days before the BCH fork OKEx emergency settled their futures early — without notice — to a marked to market price in a downlimit future trading against the wrong index, leading to roughly $20m of losses.
12. Huobi's product, HBDM, has not yet had clawbacks — to their credit. But their product is only a month old; and given that the product was copy-pasted from OKEx's, it should not be expected to withstand the test of time.

You can see the specs on FTX. You can also see a flowchart of the liquidation process in our previous article.

Note: since this article was published, OKEx has significantly revamped their liquidation engine, bringing it more in line with

A-1303

industry norms by borrowing elements seen in lots of other platforms, including FTX. As of May 2020, FTX has in fact never had a clawback.

---

*Sam Bankman-Fried*

**A-1304**

# EXHIBIT E

## A-1305

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

**FOIA CONFIDENTIAL TREATMENT REQUESTED**
**BY FTX**

November 15, 2022

Via Email and Secure File Transfer

Nicolas Roos,
Danielle Sassoon,
Assistant United States Attorney,
United States Attorney's Office,
Southern District of New York,
One Saint Andrew's Plaza,
New York, NY 10007.

Re:    November 9, 2022 Voluntary Document Request

Dear Counsel:

On behalf of the FTX Debtors in *In re FTX Trading Ltd., et al.*, Case No. 22-11068 (JTD),[1] I write in response to your November 9, 2022 Voluntary Document Request (the "Requests").[2]

In partial response to the Requests, I am sending, via a secure file transfer, a production file containing non-privileged documents (bearing production numbers FTX_000000001 – FTX_000001226)[3] as described in further detail below. For reference, we have included below the text of the Requests to which we are responding. Unless specified otherwise, the enclosed documents and information set forth in this letter were obtained from FTX's internal records. FTX continues to gather information

---

[1]    Sullivan & Cromwell LLP is proposed counsel to the FTX Debtors.

[2]    FTX is procuring and producing the information in this letter and the enclosed materials voluntarily, and by making available documents, data and information maintained outside the United States, FTX does not waive and expressly reserves all arguments and/or legal defenses as to itself and its data, including with respect to jurisdiction.

[3]    The documents referred to in this letter include the documents sent with this letter and the documents that were sent to you yesterday.

*FOIA Confidential Treatment Requested By FTX*

**A-1306**

and documents responsive to the Requests and will produce such information and documents on a rolling basis.

**Request No. 1:  All of FTX's and Alameda's balance sheets, profit and loss statements, general ledgers, and bank account statements.**

      In partial response to Request No. 1, I enclose responsive, non-privileged documents (bearing production numbers FTX_000000001 – FTX_000001157) containing financial statements, general ledgers and bank account statements for certain FTX and Alameda entities.

**Request No. 12:  Standard FTX customer agreements, terms of service, and other forms and agreements provided to customers.**

      In partial response to Request No. 12, I enclose a responsive, non-privileged document (bearing production numbers FTX_000001158 – FTX_000001219), which reflects the FTX Terms of Service for FTX Trading Ltd.

**Request No. 18:  A list of all current and former employees of FTX and Alameda to include known phone numbers, email addresses, and application usernames or handles.**

      In partial response to Request No. 18, I enclose responsive, non-privileged spreadsheets (bearing production numbers FTX_000001220 – FTX_000001224) containing employee contact information for certain FTX entities, West Realm Shires Services Inc. and Alameda Research LLC.

**Request No. 19:  Organizational charts for FTX and Alameda.**

      In partial response to Request No. 19, I enclose responsive, non-privileged documents (bearing production numbers FTX_000001225 – FTX_000001226) containing organizational charts for FTX US and LedgerX LLC.[4]

     \*     \*     \*

---

[4]     LedgerX LLC does business as FTX US Derivatives.

-2-

*FOIA Confidential Treatment Requested By FTX*

**A-1307**

The information set forth in this letter and the enclosed materials contains confidential and proprietary commercial information concerning FTX and its affiliates that FTX actually and customarily treats as private.  Further, any disclosure of this letter or its enclosures may not only violate proprietary rights of FTX and its affiliates, but also may grant competitors an unfair competitive advantage or compromise competitive advantages possessed by FTX and its affiliates.  FTX thus respectfully requests, for reasons of business confidentiality and personal privacy, that this letter and the enclosed materials be afforded confidential treatment pursuant to Department regulations promulgated at 28 C.F.R. Part 16, and that this letter and the enclosed materials not be disclosed in response to any request under the Freedom of Information Act, 5 U.S.C. § 552.  FTX is providing this information on the understanding that the Department, as provided in 28 C.F.R. §§ 16.7(c)–(g), will hold it in confidence to the maximum extent permitted by law, subject to any express waivers by FTX.

If this letter or any of the enclosed materials become the subject of a Freedom of Information Act request, in accordance with the notice and disclosure requirements of the Justice Manual § 1-7.000 and 28 C.F.R. § 16.7, please contact me at (212) 558-4636, and we will provide further information in support of FTX's request for confidential treatment.

*       *       *

Please call me at (212) 558-4636 if you have any questions.

Sincerely,

*/s/ James M. McDonald*
James M. McDonald

(Enclosure)

cc:    Steven R. Peikin (Sullivan & Cromwell)
       Stephanie G. Wheeler (Sullivan & Cromwell)
       Jacob M. Croke (Sullivan & Cromwell)

-3-

*FOIA Confidential Treatment Requested By FTX*

# A-1308

O3SCban1 CORRECTED                                                      1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                        22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6            Defendant.                Sentence
    ------------------------------x

7
                                       New York, N.Y.
8                                      March 28, 2024
                                       9:30 a.m.
9

10  Before:

11
                          HON. LEWIS A. KAPLAN,
12
                                       District Judge
13
                              APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DANIELLE R. SASSOON
         NICOLAS ROOS
17       DANIELLE KUDLA
         SAMUEL RAYMOND
18       THANE REHN
         Assistant United States Attorneys
19
    MUKASEY YOUNG LLP
20       Attorneys for Defendant
    BY:  MARC L. MUKASEY
21       TORREY K. YOUNG
         THOMAS E. THORNHILL
22
    Also Present:
23  Luke Booth, FBI
    Kristin Allain, FBI
24

25

**A-1309**

O3SCban3                                                                55

1    had him, even after his arrest, pitching his story to a huge

2    number of media people — and he had every right to do that, we

3    had a big discussion of that in the bail context — demonstrates

4    that he knows how to do it and the will is there.  The mistakes

5    were made, other people are to blame, the bankruptcy people

6    screwed up, this lawyer had a conflict of interest, that lawyer

7    the other thing.  It doesn't take much of an imagination to see

8    the outlines of the campaign.  I certainly am not prescient, I

9    make no such claim.  But there is a risk that this man will be

10   in a position to do something very bad in the future, and it's

11   not negligible risk, not a negligible risk at all.  So, in

12   part, my sentence will be for the purpose of disabling him, to

13   the extent that can appropriately be done, for a significant

14   period of time.

15          We had some talk about general deterrence.

16   Mr. Mukasey is a very fine defense lawyer.  I think it is fair

17   to say I've seen him on both sides of the bar for his entire

18   career, and I've heard these arguments about general deterrence

19   probably deployed by him against and in favor of defendants,

20   but I can't swear to that.  I've certainly heard a lot of good

21   lawyers deploy those arguments both ways.  But the argument

22   just isn't all that persuasive.  I appreciate that part of the

23   premise of substantial punishment for the purpose of general

24   deterrence makes assumptions about the mental processes by

25   which people decide to commit crimes that are, for many crimes

**A-1310**

O3SCban3                                                                 59

1          You thereafter shall serve a term of three years on

2   supervised release, and you shall pay the mandatory assessment

3   of $700.

4          The term of supervised release shall be subject to the

5   mandatory, the standard, and the special conditions set forth

6   at pages 56 to 58 of the presentence report, which you

7   indicated you have read.

8          Does any counsel want me to read the conditions

9   verbatim?

10          Mr. Mukasey.

11          MR. MUKASEY:  No need, Judge.

12          MR. ROOS:  No, your Honor.

13          THE COURT:  It is further adjudged, Mr. Bankman-Fried,

14   that you forfeit to the United States the sum of

15   $11,020,000,000, including the specific property identified in

16   the preliminary order of forfeiture that I will be signing

17   today, all on the terms and conditions there set forth.  I

18   decline to order restitution due to the complexity of the case

19   and the number of victims.  I instead grant the government's

20   motion to authorize the United States to compensate victims

21   with finally forfeited assets through a recognition process as

22   restitution would be impractical in this case.

23          I strongly recommend to the Bureau of Prisons that

24   defendant be designated initially to a medium security facility

25   or any lower security institution the BOP considers

A-1311

Criminal Notice of Appeal - Form A

## NOTICE OF APPEAL

### United States District Court

__Southern__ District of __New York__

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _4/11/2024_

Caption:

__United States__

v.

__Samuel Bankman-Fried__

Docket No. __1:22-cr-00673-LAK__

__Lewis A. Kaplan__

(District Court Judge)

Notice is hereby given that __Samuel Bankman-Fried__ appeals to the United States Court of

Appeals for the Second Circuit from the judgment [ ✔ ], other [ ] _____

entered in this action on __April 1, 2024__

(date)

(specify)

This appeal concerns: Conviction only [ ___ ]     Sentence only [ ___ ]     Conviction & Sentence [ ✔ ]     Other [ ___ ]

Defendant found guilty by plea [ ]     | trial [ ✔ ]     N/A [ ]     .

Offense occurred after November 1, 1987?   Yes [ ✔ ]   No [ ]     N/A [

Date of sentence: __March 28, 2024__     N/A [ ___ ]

Bail/Jail Disposition: Committed [ ✔ ]     Not committed [     |     N/A ]

Appellant is represented by counsel?   Yes [ ✔ ] No [     |   If yes, provide the following information:

Defendant's Counsel: __Alexandra A.E. Shapiro__

Counsel's Address: __Shapiro Arato Bach LLP__

__1140 Avenue of the Americas, 17th Floor, New York, NY 10036__

Counsel's Phone: __(212) 257-4881__

Assistant U.S. Attorney: __Nicolas Roos__

AUSA's Address: __United States Attorney's Office, SDNY__

__One Saint Andrew's Plaza, New York, New York 10007__

AUSA's Phone: __(212) 637-2421__

_____

Signature

**A-1312**

Generated: Apr 11, 2024 1:41PM                                                                                    Page 1/1

# U.S. District Court

## New York Southern - Manhattan

Receipt Date: Apr 11, 2024 1:41PM

ALEXANDRA A.E. SHAPIRO

Rcpt. No: 28286                              Trans. Date: Apr 11, 2024 1:41PM                    Cashier ID: #SS

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|----|---------|----------------------|-----|-------|-----|
| 203 | Notice of Appeal/Docketing Fee | | 1 | 605.00 | 605.00 |

| CD | Tender | Amt |
|----|--------|-----|
| CC | Credit Card | $605.00 |
| | Total Due Prior to Payment: | $605.00 |
| | Total Tendered: | $605.00 |
| | Total Cash Received: | $0.00 |
| | Cash Change Amount: | $0.00 |

**Comments:** 22CR00673 LAK

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.