# 24-0961-cr

## United States Court of Appeals

*for the*

## Second Circuit

───────────────◆───────────────

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ZIXIAO GARY WANG, CAROLINE ELLISON,
NISHAD SINGH, RYAN SALAME,

*Defendants,*

FTX TRADING LTD., WEST REALM SHIRES INC,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors,*

SAMUEL BANKMAN-FRIED, AKA Sealed Defendant 1,

*Defendant-Appellant.*

─────────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

═══════════════════════════════

### BRIEF OF *AMICI CURIAE* BANKRUPTCY LAW PROFESSORS IN SUPPORT OF NEITHER PARTY

═══════════════════════════════

JOSHUA L. SEIFERT
JOSHUA L. SEIFERT PLLC
18 West 18th Street
New York, New York 10011
(646) 470-2647

*Attorney for Amici Curiae Law Professors*

CP COUNSEL PRESS    (800) 4-APPEAL • (332889)

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES............................................................................. iii

INTEREST OF AMICI CURIAE ....................................................................1

SUMMARY OF ARGUMENT .......................................................................1

I. THE CHAPTER 11 PROCESS ...........................................................3

    A. The Estate and its Fiduciaries.................................................3

    B. The Goal: A Plan of Reorganization ......................................5

II. PARALLEL CHAPTER 11 AND CRIMINAL PROCEEDINGS:
    CONTRASTING *FTX* WITH *ENRON* AND *WORLDCOM* .........................6

    A. Commencing the Bankruptcies ...............................................7

        1. Sullivan & Cromwell and the Commencement of the FTX
            Bankruptcy ....................................................................7

        2. Wresting Control from Bankman-Fried.....................10

    B. The Debtors' Investigations.................................................13

    C. Timing ..................................................................................14

III. PREMATURE CLAIMS ABOUT THE ECONOMIC EFFECTS OF
     BANKMAN-FRIED'S ALLEGED ECONOMIC CRIMES. ......................16

    A. Misleading Evidence of Financial Condition.......................16

    B. The Bankruptcy Temporarily Halted Recoveries.................18

IV. FTX'S CONTRIBUTIONS TO THE BANKMAN-FRIED
     PROSECUTION..................................................................................19

    A. "Breaking the Sound Barrier" with "Tens of Millions of Dollars" in
        "Real-time" Support ...............................................................19

        1. "Whatever the Government Requested"....................20

        2. Evidence of the Enron and WorldCom Estates' Cooperation...22

    B. Maligning the Debtors and Bankman-Fried.........................23

V. THE COSTS AND IMPLICATIONS OF COOPERATION........................25

    A. The Costs...............................................................................26

        1. "Tens of Millions of Dollars" .................................26

i

2.    Coordinating Asset Forfeitures ...................................................27

B.    The Implications ...................................................................28

CONCLUSION ......................................................................................28

## TABLE OF AUTHORITIES

**Cases**

*Bank of America National Trust & Savings Association v. 203 N. LaSalle St. P'ship,*
    526 U.S. 434 (1999)..................................................................4

*In re Advanced Contracting Solutions, LLC,*
    582 B.R. 285 (Bankr. S.D.N.Y. 2018) ...........................................4

*In re FTX Trading Ltd.,*
    91 F.4th 148 (3d Cir. 2024).......................................................14

*In re LATAM Airlines Grp. S.A.,*
    55 F.4th 377 (2d Cir. 2022).......................................................18

*In re Teligent, Inc.,*
    640 F.3d 53 (2d Cir. 2011) .........................................................3

*National Labor Relations Board v. Bildisco & Bildisco,*
    465 U.S. 513 (1984)..................................................................3

*Skilling v. United States,*
    561 U.S. 358 (2010)................................................................15

*TLA Claimholders Grp. v. LATAM Airlines Grp. S.A.,*
    143 S. Ct. 2609 (2023)............................................................18

*Wells Fargo Bank, N.A v. Hertz Corp.* (*In re Hertz Corp.*),
    No. 23-1169, 2024 WL 4132132 (3d Cir. Sept 10, 2024) ..............18

**Statutes**

11 U.S.C. § 1104..............................................................................5

11 U.S.C. § 1104(c).........................................................................13

11 U.S.C. § 1112..............................................................................5

11 U.S.C. § 1125(a)...........................................................................5

11 U.S.C. § 362(a) ...........................................................................4

11 U.S.C. § 502(b)(2)......................................................................18

11 U.S.C. § 541(a)(1) ..................................................................4

11 U.S.C. §§ 1101(1) ..................................................................4

11 U.S.C. §§ 1104 ......................................................................4

11 U.S.C. §§ 1108 ......................................................................4

11 U.S.C. §§ 1122-1129 .............................................................5

11 U.S.C. §§ 363(b)(1) ...............................................................4

11 U.S.C. §§ 503(a) ..................................................................26

11 U.S.C. §§ 507(b) ..................................................................26

H.R.Rep. No. 95-595, p. 220 (1977)..........................................3

**Other Authorities**

Ankush Khardori, *The Indictment of SBF is a Bombshell: Federal Prosecutors Broke New Ground With This Shockingly Fast Arrest*, NEW YORK MAG. (Dec. 13, 2022) ..................................................................20

Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, Coindesk (Nov. 2, 2022) .............................9

Jonathan C. Lipson & Christopher Fiore Marotta, *Examining Success,* 90 AM. BANKR. L.J. 1 (2016) ................................................... 7, 13

Jonathan C. Lipson & David Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11,* 77 STAN. L. REV. ___ (forthcoming 2025)...... passim

Jonathan C. Lipson, *The Secret Life of Priority: Corporate Reorganization After Jevic,* 93 WASH. L. REV. 631 (2018) .............................................5

Justin Wise, *Sullivan & Cromwell Wins in FTX, Silicon Valley Bank Wrecks (1)*, BLOOMBERG LAW (Jan. 19, 2024)....................................................6

Kathleen G. Noonan, Jonathan C. Lipson, William H. Simon, *Reforming Institutions: The Judicial Function in Bankruptcy and Public Law Litigation*, 94 IND. L.J. 545 (2019) ................................................................17

Lawrence J. Trautman & Larry D. Foster II, *The FTX Crypto Debacle: Largest Fraud Since Madoff?,* 54 U. MEM. L. REV. 289 (2023) ................................7

LYNN M. LOPUCKI, COURTING FAILURE: HOW COMPETITION FOR BIG CASES IS CORRUPTING THE BANKRUPTCY COURTS (2005)...........................................25

Martin J. Bienenstock, Sarah L. Trum, Jeffrey Chubak, Tevia Jeffries, *Response to "Routine Illegality in Bankruptcy Court, Big-Case Fee Practices,"* 83 AM. BANKR. L.J. 549 (2009) ................................................................................23

Matt Levine, *FTX Lost Track of Its Money*, Bloomberg (Apr. 10, 2023)................25

## INTEREST OF AMICI CURIAE[1]

Amici curiae, identified in the attached Addendum, are law professors who teach, write, and research in the areas of bankruptcy law and legal ethics and focus on chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). They have a strong interest in the fair and efficient operation of the chapter 11 system.

Amici take no position on the verdict rendered in the court below. They submit this brief in support of neither party based on their concern about the government's unusual and problematic use of the chapter 11 reorganization, *In re FTX Trading, Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. 2022), in the prosecution of appellant Samuel Bankman-Fried.

## SUMMARY OF ARGUMENT

The chapter 11 reorganization of FTX Trading Ltd, et al. ("FTX" or the "Debtors"), provided "tens of millions of dollars" in "real time" support for prosecutors which enabled them to charge, try and convict the defendant in under a year—the "prosecutorial equivalent of breaking the sound barrier."

The FTX bankruptcy estate's contributions to the prosecution of Bankman-Fried were extraordinary compared to previous cases—notably *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. 2001) ("*Enron*") and *In re WorldCom, Inc.*, No. 02-

---

[1] No counsel for any party authorized this brief in whole or in part, and no person or entity, other than amici curiae or their counsel, made a monetary contribution to fund the preparation or submission of this brief. The parties consented to the filing of this brief.

13533 (Bankr. S.D.N.Y. 2002) ("*WorldCom*")—in which misconduct of corporate executives led to chapter 11 bankruptcies.

Every dollar spent to support the prosecution—and estate professionals have billed hundreds of millions of dollars in the *FTX* bankruptcy—is a dollar not returned to creditors. This is especially concerning given the Bankruptcy Court's lack of, and the Debtors' resistance to, detailed oversight of such activity. Moreover, the speed of the Bankman-Fried prosecution meant that jurors were told repeatedly—and inaccurately—that customers would recover nothing from FTX, yet the defendant had no opportunity to present rebuttal evidence that the Debtors were never found to be insolvent or that FTX customers are in fact likely to receive almost 150% of their claims.

Congress designed the chapter 11 and criminal justice systems to be separate, and the boundary between them is not usually problematic. Here, however, the FTX chapter 11 bankruptcy estate crossed that line repeatedly, pervasively and persuasively, to the detriment of both the defendant and FTX's stakeholders. It sets a dangerous precedent, encouraging the aggressive use of chapter 11 proceedings to support parallel criminal prosecutions.

Amici file this brief not to advocate for the guilt or innocence of Bankman-Fried, but to bring to this Court's attention the potential for unfairness and

inefficiency when a bankruptcy estate cooperates too closely with criminal prosecutors.

## I.    THE CHAPTER 11 PROCESS

FTX commenced its chapter 11 reorganization in the Bankruptcy Court for the District of Delaware on November 11, 2022 (the "Petition Date").[2] Bankman-Fried was indicted less than one month later, on December 9, 2022,[3] and convicted less than a year after that, on November 2, 2023.[4]

### A.    The Estate and its Fiduciaries

Chapter 11 of the Bankruptcy Code is the principal legal mechanism for reorganizing troubled companies in the United States. Congress enacted it in 1978 "'to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.'" *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) (quoting H.R.Rep. No. 95-595, p. 220 (1977)). Its dual goals are to "'preserv[e] going concerns and maximiz[e] property available to satisfy creditors.'" *In re Teligent, Inc.*, 640 F.3d 53, 61 (2d Cir. 2011) (quoting *Bank of Am. Nat'l Trust*

---

[2] *See* Voluntary Petition for Non-Individuals Filing for Bankruptcy at 12, *In re FTX Trading, Ltd*, No. 22-11068-JTD (Bankr. D. Del. Nov. 11, 2022), ECF No. 1 ("FTX Chapter 11 Voluntary Petition"). Citations in this brief to the docket in the *FTX* Ch. 11 case, No. 22-11068-JTD (Bankr. D. Del. 2022), will be "*FTX* Bankr. No. [#]."

[3] *See* Sealed Indictment, *United States v. Samuel Bankman-Fried*, No.1:22-cr-00673-LAK (S.D.N.Y. Dec. 9, 22), ECF No. 1.

[4] *See* Judgment in a Criminal Case at 3, *United States v. Samuel Bankman-Fried*, No. 1:22-cr-00673-LAK (Mar. 29, 2024) ECF No. 424.

*& Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (other citations omitted)).

Commencing a chapter 11 case has three immediate legal consequences:

*First*, an "estate" is created, comprised of all property of the debtor. 11 U.S.C. § 541(a)(1). In *FTX*, the Debtors' bankruptcy estates included all digital (crypto) and fiat (currency) assets held by the Debtors.

*Second*, a stay of creditor collection actions goes into effect, which precludes all efforts to seize or control assets from the debtor. 11 U.S.C. § 362(a). In *FTX*, the stay prevented customers from withdrawing fiat or digital assets held by the Debtors during the bankruptcy.

*Third*, a fiduciary manages the debtor's estate. Chapter 11 presumes that the debtor's management team will serve this role as the debtor in possession ("DIP"), and may operate the debtor in the ordinary course. 11 U.S.C. §§ 1101(1); 1104; 363(b)(1) & 1108. As fiduciaries, "the debtor-in-possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate . . . and protect and conserve the debtor's property." *In re Advanced Contracting Sols., LLC*, 582 B.R. 285, 304 (Bankr. S.D.N.Y. 2018) (citations omitted).

In *FTX*, the DIP was led by John J. Ray, III, a well-known bankruptcy expert who became chief executive officer of the Debtors in the early morning hours of

November 11, 2022. Defendant Bankman-Fried was, until then, the chief executive officer, a director and a majority shareholder of most of the Debtors.

**B.    The Goal: A Plan of Reorganization**

Chapter 11 presumes that debtors will reorganize through court approval ("confirmation") of a "plan of reorganization." A plan of reorganization is a "cross between a consent decree and a contract,"[5] which must reflect minimal levels of creditor support. *See* 11 U.S.C. §§ 1122-1129. If the debtor cannot be reorganized, then a chapter 11 trustee may be appointed, the case may be converted to a liquidation under chapter 7 of the Bankruptcy Code, or it may be dismissed entirely. 11 U.S.C. §§ 1104 (trustee) & 1112 (conversion or dismissal).

In *FTX*, the Debtors under Mr. Ray proposed a plan on December 16, 2023, which has been amended several times (as so amended, the "Plan").[6]  Contrary to the rescue norm of most chapter 11 cases, however, the Plan proposes to liquidate the Debtors' assets, and to pay customers 129-143% of the Petition Date value of

---

[5] *See* Jonathan C. Lipson, *The Secret Life of Priority: Corporate Reorganization After* Jevic, 93 WASH. L. REV. 631, 634 (2018).

[6] *See* Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. And its Affiliated Debtors and Debtors-in-Possession, *FTX* Bankr. No. 19143 ("*FTX* Disclosure Statement"). A disclosure statement is a document promulgated by the proponent of a plan of reorganization to provide "adequate information" to creditors to enable them to vote for or against the plan. 11 U.S.C. § 1125(a).

their claims (that is, with interest accruing as of November 11, 2022) due largely to appreciation in value of the Debtors' assets since that time.[7]

If confirmed by the Bankruptcy Court, the Plan would leave Ray and S&C in control of winding down the Debtors' businesses.[8] Meanwhile, S&C and other professionals retained by the bankruptcy estate have charged hundreds of millions of dollars to the estate as first-priority expenses of administration, reflecting what may be one of the highest fee "burn rates" in bankruptcy history.[9]

## II. PARALLEL CHAPTER 11 AND CRIMINAL PROCEEDINGS: CONTRASTING *FTX* WITH *ENRON* AND *WORLDCOM*

The vast majority of large chapter 11 reorganizations do not involve allegations of criminal misconduct. Thus, interaction between the systems is rare.

---

[7] *FTX* Disclosure Statement, *supra* note 6, at 14-15.

[8] *FTX* Disclosure Statement, *supra* note 6, at 7 & App. A § 2.1.143.

[9] Justin Wise, *Sullivan & Cromwell Wins in FTX, Silicon Valley Bank Wrecks (1)*, BLOOMBERG LAW (Jan. 19, 2024), https://news.bloomberglaw.com/business-and-practice/sullivan-cromwell-wins-big-in-ftx-silicon-valley-bank-wrecks ("approved fees for the first nine months eclipsed $300 million, making FTX 'one of the highest, if not the highest,' burn rates for any bankruptcy, said Nancy Rapoport, a University of Nevada Las Vegas law professor").

Notable exceptions are *Enron* and *WorldCom*, cases to which *FTX* is often compared.[10]

## A.    Commencing the Bankruptcies

Like *FTX, Enron* and *WorldCom* were large "freefall" bankruptcies, chapter 11 cases commenced with little advance planning.[11] Like *FTX, Enron* and *WorldCom* were precipitated by allegations of serious misconduct. The bankruptcies of Enron and WorldCom began and unfolded differently from FTX, however, and those differences mattered to the related criminal proceedings.

### 1.    Sullivan & Cromwell and the Commencement of the FTX Bankruptcy

Although Enron and WorldCom landed in bankruptcy suddenly, those bankruptcies were preceded by efforts by the boards of directors of those companies

---

[10] Lawrence J. Trautman & Larry D. Foster II, *The FTX Crypto Debacle: Largest Fraud Since Madoff?,* 54 U. MEM. L. REV. 289, 309 (2023) ("In many ways, the FTX implosion, with estimated losses in excess of $7 billion, brings back memories of corporate failures (and estimated losses) of two decades ago such as Enron ($74 billion), WorldCom (over $175 billion)").  Although *FTX* has also been likened to *Madoff, see id., Madoff* was a chapter 7 liquidation, and so irrelevant for present purposes.

[11] *See* Jonathan C. Lipson & Christopher Fiore Marotta*, Examining Success,* 90 AM. BANKR. L.J. 1, 22 (2016).

to ascertain what had gone wrong and to try to fix it.[12] Those boards then hired independent counsel to oversee their companies' chapter 11 reorganizations.

In *FTX,* by contrast, it appears that the law firm of Sullivan & Cromwell ("S&C") played a pivotal and problematic role in inducing the bankruptcy—and then in leading the bankruptcy estate's support for Bankman-Fried's prosecution. Drawing on disclosures in the Bankman-Fried prosecution and the *FTX* bankruptcy, forthcoming scholarship by Jonathan Lipson and David Skeel shows that S&C may have misled and pressured Bankman-Fried into authorizing the commencement of the bankruptcy as and when he did.[13]

Unlike *Enron* and *WorldCom*, where bankruptcy counsel had no prior connection to the debtors, S&C had represented FTX in 20 nonbankruptcy matters, including in sensitive regulatory work in which the firm may have learned of the

---

[12] Disclosure Statement for Fifth Am. Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code at 98-99, *Enron*, No. 01-16034 (AJG) (Bankr. S.D.N.Y. Jan. 9, 2004), ECF No. 15414 ("*Enron* Disclosure Statement"); Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code at 31-32, *WorldCom*, No. 02-13533 (AJG) (Bankr. S.D.N.Y. May 23, 2003), ECF No. 7273 ("*WorldCom* Disclosure Statement").

[13] Jonathan C. Lipson & David Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11,* 77 STAN. L. REV. ___ (forthcoming 2025), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4760736 ("*FTX'd*"). *FTX'd* draws from, among other sources, Samuel Bankman-Fried's Sentencing Memorandum, *United States of America v. Samuel Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Feb. 27, 2024), ECF No. 407-34 ("SBF Sentencing Memorandum").

asset commingling that precipitated the bankruptcy and formed the basis for the prosecution.[14]

In early November 2022, in the depths of the so-called "crypto winter," troubling news emerged about the financial condition of FTX, leading to a "run" on deposits.[15] Shortly thereafter, on November 9, 2022, S&C bankruptcy partner Andrew Dietderich emailed Bankman-Fried recommending that he hire Mr. Ray as "chief restructuring officer" (CRO) to support Bankman-Fried's efforts to find rescue financing and assuring him that S&C was there to help this effort "however we can."[16]

Earlier that same day, however, and without telling Bankman-Fried, it appears that attorneys from S&C's white-collar group—including a former prosecutor—reported unspecified "concerns" about FTX to prosecutors and caused FTX to agree

---

[14] *See FTX'd, supra* note 13*,* at 25 (citing Suppl. Decl. of Andrew G. Dietderich in Supp. of Debtors' Application for an Order Authorizing the Retention & Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession Nunc Pro Tunc to the Petition Date ¶ 54, *FTX* Bankr. No. 510 ("Dietderich 1st. Suppl.")). S&C's connection to FTX dates to early 2021, when Ryne Miller, an S&C partner, left the firm to become general counsel of FTX US. *See id.*

[15] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, Coindesk (Nov. 2, 2022), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/.

[16] *See* Email from Andrew Dietderich to Bankman-Fried, re Preparation Steps (Nov. 9, 2022, 9:32 PM), reproduced in SBF Sentencing Mem., *supra* note 13*,* Ex. E at 8-9 ("November 9 Email").

to voluntarily disclose confidential information on a "rolling basis" to the government.[17]

### 2. Wresting Control from Bankman-Fried

In *Enron* and *WorldCom,* prebankruptcy counsel played little if any role in the chapter 11 reorganizations. Indeed, Enron's prebankruptcy counsel was the target of investigation by the *Enron* creditors' committee, who recovered significant sums from the firm.[18]

In *FTX,* by contrast, S&C was FTX's pre-bankruptcy counsel, played an instrumental role in FTX's decision when and how to commence the bankruptcy, and subsequently became FTX's bankruptcy counsel. Although Dietderich's November 9 Email implied that a bankruptcy filing would be two weeks away (if needed at all), two days later, in the early morning hours of November 11, 2022, Dietderich sent Bankman-Fried an email marked "URGENT," demanding that he

---

[17] *See* Letter from James McDonald, Sullivan & Cromwell, to U.S. Attorneys Nicolas Roos and Danielle Sassoon, Nov. 15, 2022, reproduced in SBF Sentencing Mem., *supra* note 13, Ex. E at 30-33 (J.A.1305-06). Mr. McDonald was a prosecutor for the Southern District of New York until 2017. *See* Sullivan & Cromwell LLP, James M. McDonald, https://www.sullcrom.com/Lawyers/James-M-McDonald; *see also* Dietderich 1st Suppl., *supra* note 14*, ¶* 16 (reporting).

[18] *See In re: Committee of Unsecured Creditors of Enron Corp.*, 2006 WL 1889497 (June 6, 2006) (indicating Vinson & Elkins settled with Enron for $30 million).

immediately sign an "omnibus corporate authority" (OCA) prepared by S&C, which Bankman-Fried did around 4:30 that morning.[19]

In retrospect, the OCA that Bankman-Fried signed went far beyond what Dietderich had indicated two days earlier.[20] Rather than merely appoint Ray as CRO—which would leave Bankman-Fried as chief executive officer—it caused Bankman-Fried to convey *all* of his corporate powers and status as majority shareholder, director, and CEO to Ray, which Ray then used to commence the FTX bankruptcy and to retain S&C as FTX's bankruptcy counsel.[21] The OCA gave Ray control of FTX, its data, and its billions of dollars in assets, which Ray would use in his discretion, including extensive support for the Bankman-Fried prosecution.

There is no evidence that S&C informed Bankman-Fried or the Paul Weiss law firm (which briefly represented Bankman-Fried personally) that S&C had already gone to prosecutors. Nor does it appear that S&C recommended that the boards of directors of any of the 100-plus entities in the FTX group meet before Bankman-Fried executed the OCA or before Ray filed the bankruptcy petitions. Unlike the boards of most FTX entities—where Bankman-Fried conceded he did not

---

[19] *See* Email from Andrew G. Dietderich to Ken Ziman, *et al.*, Omnibus Corporate Authority - URGENT (Nov. 11, 2022, 12:58 AM) ("November 11 Email"), reproduced in SBF Sentencing Mem., *supra* note 13*,* Ex. E at 14.

[20] The OCA is Annex 1 to the Voluntary Petition.

[21] A chief restructuring officer does not typically run a chapter 11 debtor, but instead supports the CEO, who may be unfamiliar with bankruptcy but continues to manage the company's operations as debtor in possession. *See FTX'd, supra* note 13*,* at 29.

even know the directors' names[22]—the FTX US entities appear to have had a functional board of directors, a fact that should have been known to S&C, since much of its prebankruptcy work was for them.[23]

Although there were objections to S&C's retention in the bankruptcy, critical aspects of S&C's history with FTX were not before the Bankruptcy Court, and so the Court approved S&C's retention as general bankruptcy counsel at the beginning of the bankruptcy.[24]  In that capacity, S&C would control the day-to-day flow of the bankruptcy, and act as an important conduit to government officials—and would

---

[22] *See FTX* Disclosure Statement, *supra* note 6*,* at 1.  The disclosure statement asserts that "there was not time to hold over 100 board meetings for companies with incomplete records," *id.* 36, but it is not clear why the boards of the top-level entities could not have been convened or, if not functional, properly appointed by Bankman-Fried on advice of counsel.

[23] *See* Dietderich 1st Suppl., *supra* note 14*,* at ¶¶ 47-50. It appears, for example, that FTX US Derivatives had an eight-member board, comprised of various commodities and investment professionals (*e.g.*, Keisha Bell, Managing Director, Head of Diverse Talent Management and Advancement, DTCC; Lucas Moskowitz, Vice President and Deputy General Counsel at Robinhood). *See* Press Release, *FTX US Derivatives Announces Board of Directors*, PR Newswire (Jan. 19, 2022), https://www.prnewswire.com/news-releases/ftx-us-derivatives-announces-board-of-directors-301463938.html.

[24] *See* Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-In-Possession *Nunc Pro Tunc* to the Petition Date at 2, *FTX* Bankr. No. 553.

12

charge hundreds of millions of dollars for its services, including to support the prosecution of Bankman-Fried.[25]

## B.     The Debtors' Investigations

The investigations of Enron and WorldCom also proceeded very differently than in *FTX*. In *Enron* and *WorldCom*, bankruptcy examiners were appointed at the beginning of the cases to investigate and report on the causes and consequences of the debtors' collapse.[26]  Bankruptcy Code section 1104(c) requires the appointment of an examiner to conduct such investigations, if requested in a large case.  11 U.S.C. § 1104(c). Although examiners are rarely sought, they have played central roles in cases such as *Enron* and *WorldCom* by providing an independent investigation and report on the debtor's failure.[27]

In *FTX,* the United States Trustee (an arm of the Department of Justice) also sought an examiner.[28] Mr. Ray and S&C opposed the request.[29] The Bankruptcy Judge denied it because, unaware of S&C's problematic history with FTX, he

---

[25] As of March 2024, S&C received over $200 million in fees. *See* Fifteenth Monthly Fee Statement of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession for Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred for the Period from Jan. 1, 2024 through and including Jan. 31, 2024, *FTX* Bankr. No. 8306.

[26] *See Enron* Disclosure Statement, *supra* note 12*,* at 212; *WorldCom* Disclosure Statement, *supra* note 12*,* at 21

[27] *See* Lipson & Marotta*, Examining Success, supra* note 11*,* at 5.

[28] Mot. of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner at 23, *FTX* Bankr. No. 176.

[29] Debtors' Objection to Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner at 4, *FTX* Bankr. No. 573.

believed that Mr. Ray and S&C were the functional equivalent of an examiner.[30] The Bankruptcy Judge was later reversed by the Third Circuit Court of Appeals, but that reversal came too late in the bankruptcy for the examiner who was appointed to investigate or report fully on the causes of the Debtors' collapse.[31]

Thus, unlike *Enron* and *WorldCom*, where investigations were conducted by independent outsiders, in *FTX,* the investigation—and the use of the information uncovered—was generated and controlled by Mr. Ray and S&C, who characterized Bankman-Fried as a criminal long before he was tried or convicted.

## C.    Timing

A third, and perhaps most critical, difference involved timing: in both *Enron* and *WorldCom*, the prosecution of key insiders did not commence until late in, or after, the bankruptcies.

- The *Enron* bankruptcy was commenced in December 2001.[32]  Jeffrey Skilling, Ken Lay, and most of Enron's other key prebankruptcy insiders were not indicted until July 7, 2004, two-and-a-half years later,

---

[30] Hr'g Tr. 9:8-11 (Feb. 7, 2023), *FTX* Bankr. No. 632 ("Examiner Hr'g Tr.").

[31] *In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024). The examiner who was ultimately appointed released a report after two months' work largely exonerating S&C, but ignoring the critical evidence adduced in *FTX'd, supra* note 13. *See* Report of Robert J. Cleary, Examiner at 35, *FTX* Bankr. No. 15545.

[32] Enron Disclosure Statement, *supra* note 12, at 1.

and about two weeks before the company's plan of reorganization was confirmed.[33]

- WorldCom commenced its chapter 11 case in July 2002.[34] Bernard Ebbers, WorldCom's prebankruptcy chief executive officer, was not indicted until March 24, 2004, nearly two years later and six months after WorldCom's plan was confirmed.[35]

Thus, for all practical purposes, the bankruptcies of Enron and WorldCom had concluded by the time key insiders were prosecuted. In *FTX,* by contrast, the chapter 11 case and prosecution began almost simultaneously. The *FTX* bankruptcy continues as of this writing; a hearing to confirm the Plan is scheduled for October 7, 2024.[36]

This timing means that the economic effects of misconduct were known in *Enron* and *WorldCom*, and those bankruptcy estates could provide little active support for the prosecution of insiders. In *FTX*, by contrast, prosecutors' claims about the economic effects of the alleged misconduct were premature and potentially

---

[33] *Skilling v. United States*, 561 U.S. 358, 368–69 (2010) (observing that "[o]n July 7, 2004, a grand jury indicted Skilling, Lay, and Richard Causey, Enron's former chief accounting officer.").

[34] *WorldCom* Disclosure Statement, *supra* note 12*,* at 26.

[35] *See* Press Release, U.S. Charges Ex-WorldCom CEO Bernard Ebbers (Mar. 24, 2004) https://archives.fbi.gov/archives/news/pressrel/press-releases/u.s.-charges-ex-worldcom-ceo-bernard-ebbers. The *WorldCom* plan was confirmed October 31, 2003. *See* Order Confirming Debtors' Modified 2d Am. Joint Plan of Reorganization under Ch. 11 of the Bankruptcy Code dated October 21, 2003, *WorldCom*, No. 02-13533 (Bankr. S.D.N.Y. Oct. 31, 2003).

[36] *See FTX* Disclosure Statement, *supra* note 6*,* at 29.

misleading, yet prosecutors enjoyed extraordinary levels of real-time support by the Debtors' estates.

## III.   PREMATURE CLAIMS ABOUT THE ECONOMIC EFFECTS OF BANKMAN-FRIED'S ALLEGED ECONOMIC CRIMES.

In his appellate brief, Bankman-Fried asserts that the *FTX* bankruptcy was used as a one-way ratchet in his prosecution. The district court allowed the government to present evidence of loss, but precluded Bankman-Fried from presenting contrary evidence that FTX was potentially solvent and would almost certainly return significant sums to customers and creditors.[37] In any event, it appears that assertions about the economic effects of Bankman-Fried's alleged economic crimes would have been premature at his criminal trial.

### A.   Misleading Evidence of Financial Condition

The prosecution frequently asserted that the Debtors were insolvent.[38]  From this, it appears the prosecution wanted jurors to infer that Bankman-Fried intended to defraud customers and lenders.

But the question of FTX's solvency has never been asked or answered by the Bankruptcy Court. This is not surprising, because the Bankruptcy Code "does not

---

[37] *See* Brief for Appellant at 22-27, *United States v. Samuel Bankman-Fried*, No. 24-961 (2d Cir. Sept. 13, 2024), ECF No. 28.1 ("Def.'s Brief"); *see also* SPA-56-57 (granting the government's motion to preclude evidence "about the amount of assets that have been recovered through FTX's bankruptcy . . . or that, with more time, with more time, FTX could have satisfied customer withdrawals").

[38] *E.g.*, A-1086-7 (Mr. Roos, for the prosecution, arguing, "So starting in the middle of 2019, back when FTX [] dug the hole even deeper . . . [Mr. Bankman-Fried] knows they're deeply in the red");

require a particular level of financial distress to commence a voluntary reorganization under Chapter 11, such as technical insolvency; it is enough that management believes in good faith that the debtor is, or will soon be, unable to pay its debts."[39]

Here, there is little doubt that the Debtors faced a liquidity crisis in November 2022. Thus, even if Bankman-Fried had been duped into giving up control of the companies, chapter 11 may have been a sensible solution. But from this it does not follow that the Debtors were insolvent or that customers would recover nothing, as prosecutors argued.

While there has been no adjudication of the Debtors' solvency, the Debtors' Disclosure Statement provides evidence tending to support Bankman-Fried's view that the Debtors may never have been insolvent—evidence he was apparently precluded from presenting. Although the Debtors claim they (or at least certain of them[40]) are insolvent, their own financial projections show a surplus of $2.8-$4.6 billion, if one puts aside government fines of about $8.9 billion.[41] Given the close

---

A-1091 (Mr. Roos, for the prosecution, arguing, "[Alameda] was 10 billion plus in the hole . . . so they are deeply in the red, totally under water"); *see also* A-800 & A-830-31 (eliciting testimony suggesting FTX was likely insolvent).

[39] Kathleen G. Noonan, Jonathan C. Lipson, William H. Simon, *Reforming Institutions: The Judicial Function in Bankruptcy and Public Law Litigation*, 94 IND. L.J. 545, 561 (2019).

[40] *See, e.g., FTX* Disclosure Statement, *supra* note 6, at 53 (discussing solvent European Debtors) & 87 (indicating that "Separate Subsidiaries are entities that are expected to be fully solvent and historically maintained corporate separateness.").

[41] *FTX* Disclosure Statement, *supra* note 6, App. C at 8.

relationship between the Debtors and the government here, it is fair to ask whether these fines—which would wipe out the surplus—are appropriate. They reflect not an adjudication, but simply Mr. Ray's agreements with the government.[42]

Moreover, the Plan proposes to pay interest on unsecured claims at a "consensus rate" of 9%.[43] While *solvent* debtors sometimes pay interest on prepetition unsecured claims, the practice is controversial because the Bankruptcy Code halts the accrual of interest on unsecured claims at case commencement. 11 U.S.C. § 502(b)(2). It is practically unheard-of for an *insolvent* debtor to pay interest on unsecured claims, as the Debtors here propose to do.[44]

The most that can be said at this point—as at *every* point during the Bankman-Fried prosecution—is that assertions about the Debtors' solvency, and thus the economic impact of the alleged misconduct, were premature.

### B. The Bankruptcy Temporarily Halted Recoveries

The prosecution also used the simultaneity of the proceedings to elicit testimony that customers had lost all of their deposits with the Debtors. Thus, for

---

[42] *FTX* Disclosure Statement, *supra note 6*, at 84-87.

[43] *FTX* Disclosure Statement, *supra note 6*, at 92.

[44] *See In re LATAM Airlines Grp. S.A.*, 55 F.4th 377, 385 (2d Cir. 2022), *cert. denied sub nom. TLA Claimholders Grp. v. LATAM Airlines Grp. S.A.*, 143 S. Ct. 2609 (2023) ("we reject the argument that post-petition interest must be paid regardless of solvency"); *Wells Fargo Bank, N.A v. Hertz Corp.* (*In re Hertz Corp.*), No. 23-1169, 2024 WL 4132132 (3d Cir. Sept 10, 2024) (discussing payment of interest on unsecured claims by solvent debtors).

example, customers Marc-Antoine Julliard and Tareq Morad testified that they had been unable to withdraw any funds deposited with the Debtors.[45]

These statements were true, but misleadingly incomplete because they failed to recognize that creditors would ultimately recover significant amounts through the bankruptcy. Because the prosecution and bankruptcy proceeded simultaneously, the automatic stay under section 362 of the Bankruptcy Code prohibited customer withdrawals at that time.

Yet, as explained above, the Plan proposes to pay customers nearly 150% of the Petition Date value of their claims. Even in the worst-case scenario—conversion to a liquidation under chapter 7 of the Bankruptcy Code—the Debtors have projected that customer claims would be paid 100%.[46]

## IV. FTX'S CONTRIBUTIONS TO THE BANKMAN-FRIED PROSECUTION

Mr. Ray and S&C have made no secret of their substantial support for prosecutors from the outset of the bankruptcy.

### A. "Breaking the Sound Barrier" with "Tens of Millions of Dollars" in "Real-time" Support

The indictment, prosecution, and trial of Sam Bankman-Fried all took place in less than a year, which one expert described as "the prosecutorial equivalent of

---

[45] *See* Def.'s Brief at 16-27 (citing A-686 & A-825).

[46] *See FTX* Disclosure Statement, *supra* note 6, App. D at 5 (projecting 100% recoveries for FTX Trading and FTX US customer entitlements).

breaking the sound barrier."[47] Mr. Ray and S&C have taken ample credit for this extraordinary outcome.

### 1. "Whatever the Government Requested"

At an early hearing in the bankruptcy, in January 2023, S&C partner James Bromley said that Mr. Ray and S&C were treating the Debtors as a "crime scene," and responding to a "phenomenal number" of requests from criminal authorities "on an expedited basis."[48] "Frankly, Your Honor," he continued, "I think if it were not for that type of prompt and immediate response, we would not have seen the indictments and the plea agreements that we have seen to date."[49]

At a bankruptcy hearing the next month, Mr. Ray testified that "I made it very, very clear from the beginning of my taking control. . . that we would do whatever the Government request[ed] relative to cooperation."[50] Ray would give prosecutors "full access to the information on a real time basis."[51]

FTX was doubtless prudent to cooperate with prosecutors under these conditions. It is, however, hard to see how Mr. Ray could know in "real time" that

---

[47] Ankush Khardori, *The Indictment of SBF is a Bombshell: Federal Prosecutors Broke New Ground With This Shockingly Fast Arrest*, New York Mag. (Dec. 13, 2022), https://nymag.com/intelligencer/2022/12/the-indictment-of-sam-bankman-fried-is-a-bombshell.html.

[48] *See* Hr'g Tr. 28:11-24, *FTX* Bankr. No. 558 ("S&C Retention Transcript").

[49] *Id.*

[50] Examiner Hr'g Tr., *supra* note 30*, 51:23-25, 52:1-10.

[51] *Id.*

"full access" was consistent with the interests of the Debtors' estate unless he was so fully aligned with the government that the difference did not matter to him.

Indeed, in one sworn statement, Mr. Ray conflated the Debtors and prosecutors, stating that "*[t]he Debtors, through* . . . most importantly, the tireless work of *Federal prosecutors* . . .  have made it quite clear exactly what transpired, how it occurred, who was principally involved and the results of their actions" (emphasis added).[52]

After Bankman-Fried's conviction, FTX's Disclosure Statement provided further insight into the "substantial cooperation" given to "various governmental authorities around the world," including Bankman-Fried's prosecutors.[53] "From the filing of these Chapter 11 Cases through the completion of Mr. Bankman-Fried's criminal trial," the Debtors stated, they—

> responded to near-daily requests from domestic and international authorities for documents and data pertaining not only to Mr. Bankman-Fried and other FTX insiders, but also to various users of FTX Exchanges who may be the subject of investigations or been victims of criminal activity. These efforts include: More than 400 requests from the Department of Justice and federal

---

[52] *See* Suppl. Decl. of John J. Ray III in Supp. of Debtors' Application for Orders Authorizing the Retention & Employment of Sullivan & Cromwell LLP, Alix Partners LLP & Quinn Emanuel Urquhart & Sullivan LLP ¶ 9, *FTX* Bankr. No. 511.

[53] *FTX* Disclosure Statement, *supra* note 6*,* at 63

law enforcement agencies, including the Federal Bureau of Investigation Department of Homeland Security, IRS and Drug Enforcement.[54]

"All told," Ray and S&C reported, "the Debtors and their advisors have provided law enforcement and regulatory authorities with more than 4.3 terabytes of data, including more than 1.4 million documents."[55]

### 2. Evidence of the Enron and WorldCom Estates' Cooperation

The disclosure statements from the *Enron* and *WorldCom* bankruptcies tell a different tale about the support those bankruptcy estates gave government authorities. While they did cooperate, there is no evidence that they gave prosecutors "full access" to "terabytes" of "real-time" information or did "whatever the Government requested." To the contrary, the government could not have relied on the bankruptcy estates of Enron and WorldCom for support, because those bankruptcies had largely concluded by the time key insiders were prosecuted.

In *Enron,* it appears that the Federal Bureau of Investigation had to conduct its own five-year investigation, which "was administered at the highest levels of the FBI and the Department of Justice, as well as the Securities and Exchange Commission."[56] "Agents expert at teasing forensic evidence from computers"—not

---

[54] *Id*. at 64.

[55] *Id*.

[56] Federal Bureau of Investigation, *Crime in the Suites A Look Back at the Enron Case* (Dec. 13, 2006), https://archives.fbi.gov/archives/news/stories/2006/december/enron_121306.

the debtors' bankruptcy estate—"collected over four terabytes (imagine 4,000 copies of an encyclopedia) of data."[57]

Moreover, prosecutors could not rely on information provided by the bankruptcy estate of Enron because its management had little to do with the investigation of the debtors; information about Enron came instead from independent sources, such as the examiners appointed during bankruptcy.[58] Without any such check in *FTX,* Ray and S&C were largely free to say what they wished about the Debtors and Bankman-Fried.

## B.     Maligning the Debtors and Bankman-Fried

Mr. Ray and S&C had a great deal to say about Bankman-Fried and the Debtors—most of it bad.

On November 17, 2022—after six days on the job—Mr. Ray issued the following statement under oath:

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of

---

[57] *Id*.

[58] *See* Martin J. Bienenstock, Sarah L. Trum, Jeffrey Chubak, Tevia Jeffries, *Response to "Routine Illegality in Bankruptcy Court, Big-Case Fee Practices,"* 83 AM. BANKR. L.J. 549, 553 (2009) (creditors' counsel noting management played little role in investigation of debtors).

inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.[59]

The statement gained widespread attention.[60]  Less than a month later, on December 13, 2022—a few days after Bankman-Fried was taken into custody—Mr. Ray testified to Congress that FTX had "virtually no internal controls and no separateness whatsoever."[61]  The company was, he famously said, a "dumpster fire."[62]

To industry observers, these statements were remarkable. While it is understandable that a new management team in bankruptcy would want to distinguish itself from prebankruptcy management, "it is hard to think of a CEO in recent memory who has been more focused on trashing the previous management"

---

[59] *See* Decl. of John J. Ray III in Supp. of Ch. 11 Petitions & First Day Pleadings ¶ 5, *FTX* Bankr. No. 14.

[60] At a hearing early in the bankruptcy, S&C partner James Bromley stated, "Mr. Ray's first day declaration included language which was quoted in the *New York Times'* top 25 quotes of 2022." *See* S&C Retention Transcript, *supra* note 48*,* at 26:18-23.

[61] Suppl. Decl. of John J. Ray III in Supp. of Retention Applications ¶ 9, *FTX* Bankr. No. 511.

[62] The "dumpster fire" image derives from testimony by FTX's turnaround CEO John Ray to Congress. *Id.* at 2.

than Ray was in disparaging Bankman-Fried and other insiders, columnist Matt Levine wrote.[63]

There is no comparable evidence that management of the debtors in possession in *Enron* or *WorldCom* made similar statements about the insiders there. To the contrary, Stephen Cooper, who led Enron's bankruptcy, was criticized for "flatly refus[ing] to take action against" former insider Kenneth Lay.[64]

## V.     THE COSTS AND IMPLICATIONS OF COOPERATION

Congress did not enact chapter 11 of the Bankruptcy Code to make life easier for prosecutors.  Yet, that is how Mr. Ray and S&C appear to have viewed their role

---

[63]     Matt Levine, *FTX Lost Track of Its Money*, Bloomberg (Apr. 10, 2023), https://www.bloomberg.com/opinion/articles/2023-04-10/ftx-lost-track-of-its-money?leadSource=uverify%20wall&embedded-checkout=true.

[64] LYNN M. LOPUCKI, COURTING FAILURE: HOW COMPETITION FOR BIG CASES IS CORRUPTING THE BANKRUPTCY COURTS 256 (2005).

at the Debtors. This perversion of their roles would be costly, and it would set a troubling precedent.

## A. The Costs

The costs of FTX's unusual support for the Bankman-Fried prosecution took two forms.

### 1. "Tens of Millions of Dollars"

First, this support was expensive, costing "tens of millions of dollars," in the words of S&C's Bromley. [65] These costs would be borne directly by creditors, because expenses of administering the bankruptcy estate enjoy first priority.[66]

S&C's billing records reveal ample evidence of coordination among S&C and prosecutors. A preliminary review of S&C's first fee application in *FTX*, for example, shows twenty-two S&C attorney time entries involving communications with prosecutors Danielle Sassoon and Nicholas Roos in the first 18 days of the case (from November 12 to November 30, 2022).[67] In many cases, the communications

---

[65] Examiner Hr'g Tr., *supra* note 30*, 113:11-23.

[66] 11 U.S.C. §§ 503(a) & 507(b).

[67] On November 28, 2022, for example, S&C white collar defense partner Steve Peikin billed 1.2 hours for a call with U.S. attorneys Nicholas Roos and Danielle Sassoon "re: Delaware issues." *See* 1st Monthly Fee Statement of S&C as Counsel to the Debtors & Debtors-in-Possession for Compensation for Professional Services Rendered & Reimbursement of Expenses Incurred for the Period from Nov. 12, 2022 through and including Nov. 30, 2022 at 207, *FTX* Bankr. No. 648.

26

were a two-way street: it appears that prosecutors discussed *FTX* bankruptcy issues with S&C.[68]

## 2. Coordinating Asset Forfeitures

The Debtors' cooperation may have been especially costly to creditors and investors due to their efforts to "coordinate" the government's seizure of assets. Between November of 2022 and June of 2023, S&C billed for about 187.5 hours of asset-forfeiture related work.[69] The *FTX* Disclosure Statement asserts that FTX undertook this coordination "in order to maximize recoveries for creditors and victims."[70]

If, however, S&C enabled the government to seize assets, it was preferring the government over FTX's customers and other stakeholders—and deviating from the Bankruptcy Code's priority scheme, which generally subordinates claims for fines, penalties and forfeitures. 11 U.S.C. § 726(a)(4).

The disclosure statements in *Enron* and *WorldCom*, by contrast, reveal no similar evidence that the debtors in those cases coordinated asset forfeitures.[71] To

---

[68] *Id*. The "Delaware issues" discussed by S&C and prosecutors appear to have involved the *FTX* bankruptcy, pending in the Delaware Bankruptcy Court. *Id.*

[69] The Fourth through Seventh Applications for Compensation of Sullivan & Cromwell, Nov. 12, 2022 to June 30, 2023, appear as *FTX* Bankr. Nos. 648, 721, 818, 1221, 1388, 1556, 1822, & 2101.

[70] *See FTX* Disclosure Statement, *supra* note 6*,* at 64.

[71] *See Enron* Disclosure Statement, *supra* note 12*,* at 245, 312-15.

the contrary, the debtors there sought to subordinate government claims "in accordance with the priority scheme under the Bankruptcy Code."[72]

## B.   The Implications

The *FTX* bankruptcy sets a dangerous practical precedent.  Future prosecutors would understandably want to mimic the use of bankruptcy here, to exaggerate victims' losses in a parallel criminal proceeding while enjoying tens of millions of dollars in creditor-subsidized, back-office support.  Those tasked with conducting the bankruptcy—in particular, estate fiduciaries—may happily bill for this work if, like S&C, they recruited management of the DIP and have large white-collar practices.[73]  This dynamic would threaten Congress' goals in creating chapter 11 to reorganize viable businesses and may also undermine the fairness of related criminal proceedings.

## CONCLUSION

The undersigned express no opinion on whether Mr. Bankman-Fried should have been charged, tried, or convicted. They offer the foregoing solely out of their

---

[72] *Enron* Disclosure Statement, *supra* note 12, at 572 (subordinating government claims); *WorldCom* Disclosure Statement, *supra* note 12, at 55 (same).

[73] Unfortunately, as explained in *FTX'd,* other system checks that might have limited the support Mr. Ray and S&C gave prosecutors—in a particular, the creditors' committee and U.S. Trustee program—suffered from their own conflicting interests. *See FTX'd, supra* note 13, at 49-51 & 62-63.

concern that the FTX bankruptcy was used in ways that blur the healthy boundary between the chapter 11 and criminal justice systems.

Respectfully submitted,


Dated: September 20, 2024        By:   /s/ Joshua L. Seifert
                                 Joshua L. Seifert, Esq.
                                 Joshua L. Seifert PLLC
                                 18 West 18th Street, 6th Floor
                                 New York, NY 10011
                                 (646) 470-2647
                                 jseifert@seifertpllc.com

                                 *Attorney for Amici Curiae Bankruptcy Law Professors*

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 2d Cir. L.R. 29.1(c) because this brief contains 6,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: September 20, 2024      By: *_/s/ Joshua L. Seifert_*
         Joshua L. Seifert, Esq.
         Joshua L. Seifert PLLC
         18 West 18th Street, 6th Floor
         New York, NY 10011
         (646) 470-2647
         jseifert@seifertpllc.com

         *Attorney for Amici Curiae Bankruptcy Law Professors*

## ADDENDUM

List of Amici Curiae Law Professors
(affiliations provided for identification purposes only)

**Laura N. Coordes** is Professor of Law at Arizona State University's Sandra Day O'Connor College of Law. She has published numerous articles in the areas of bankruptcy and commercial law and is author of THE LAW OF BANKRUPTCY (forthcoming), with Charles Tabb and Kara Bruce. She is a contributing editor for *Bankruptcy Law Letter* and a Fellow of the American Bar Foundation. Professor Coordes was honored as a member of the American Bankruptcy Institute's "40 Under 40" in 2020.

**Jonathan C. Lipson** is a Professor of Law and holds the Harold E. Kohn Chair at the Temple University-Beasley School of Law. He is an elected member of the American Law Institute, the Assistant Reporter of the Model Business Corporation Act and was counsel of record to amici law professors in support of (successful) petitioners in *In re FTX* (3d Cir. 2024), *Harrington v. Purdue Pharma* (Sup. Ct. 2024) and *Cyzewski v. Jevic Holding Corp*. (Sup. Ct. 2017). He is the author (with David Skeel) of *FTX'd: Conflicting Public and Private Interests in Chapter 11*, STAN L. REV., forthcoming 2025.

**Bruce A. Markell** is the Professor of Bankruptcy Law and Practice, and Edward Avery Harriman Lecturer in Law at the Northwestern Pritzker School of Law in Chicago, Illinois. He is a retired United States Bankruptcy Judge and a former member of the Ninth Circuit Bankruptcy Appellate Panel. He is also a member of the COLLIER ON BANKRUPTCY Board of Editors, a lifetime member of the American Law Institute, a fellow and former scholar in residence at the American College of Bankruptcy, a conferee of the National Bankruptcy Conference and a founding member of the International Insolvency Institute.

**Nancy B. Rapoport** is a UNLV Distinguished Professor, the Garman Turner Gordon Professor of Law at the William S. Boyd School of Law, University of Nevada, Las Vegas, and an Affiliate Professor of Business Law and Ethics in the Lee Business School at UNLV. After receiving her B.A., *summa cum laude,* from Rice University in 1982 and her J.D. from Stanford Law School in 1985, she clerked for the Honorable Joseph T. Sneed III on the United States Court of Appeals for the Ninth Circuit and then practiced law (primarily bankruptcy law) with Morrison & Foerster in San Francisco from 1986-1991. She a leading expert on legal ethics in

bankruptcy, and has served as Dean of several law schools, including the University of Nebraska,

**David Skeel** is S. Samuel Arsht Professor of Corporate Law at the University of Pennsylvania Carey Law School. He has authored many articles and book chapters on bankruptcy and the monograph DEBT'S DOMINION: A HISTORY OF BANKRUPTCY LAW IN AMERICA (Princeton, 2001). He is the author (with Jonathan Lipson) of *FTX'd: Conflicting Public and Private Interests in Chapter 11*, STAN L. REV., forthcoming 2025.