# 24-961

*To Be Argued By*:
DANIELLE R. SASSOON

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-961

◄━━━►

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

SAMUEL BANKMAN-FRIED, AKA SEALED DEFENDANT 1,

*Defendant-Appellant*,

(*Caption continued on inside cover*)

─────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DANIELLE KUDLA,
NATHAN REHN,
NICOLAS ROOS,
DANIELLE R. SASSOON,
HAGAN SCOTTEN,
  *Assistant United States Attorneys*,
    *Of Counsel*.

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York*,
*Attorney for the United States
of America*.
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

ZIXIAO GARY WANG, CAROLINE ELLISON, NISHAD SINGH,
RYAN SALAME,

*Defendants*,

FTX TRADING LTD., WEST REALM SHIRES INC,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.   The Government's Case . . . . . . . . . . . . . . . .  2

        1.   Bankman-Fried's Fraud on FTX
            Customers. . . . . . . . . . . . . . . . . . . . . . .  3

            a.   Bankman-Fried Moves FTX
                Customer Deposits to Alameda . . .  4

            b.   Bankman-Fried Secretly Uses FTX
                Customers' Deposits . . . . . . . . . . . .  7

            c.   Bankman-Fried Repays Alameda's
                Lenders Using FTX Customer
                Funds . . . . . . . . . . . . . . . . . . . . . . .  8

            d.   Bankman-Fried Lies During FTX's
                Collapse . . . . . . . . . . . . . . . . . . . . .  10

        2.   Bankman-Fried's Fraud on Alameda's
            Lenders. . . . . . . . . . . . . . . . . . . . . . . .  11

        3.   Bankman-Fried's Fraud on FTX
            Investors. . . . . . . . . . . . . . . . . . . . . . .  12

        4.   Bankman-Fried's Concealment Money
            Laundering. . . . . . . . . . . . . . . . . . . . . .  13

    B.   The Defense Case and the Verdict . . . . . .  14

ii

PAGE

ARGUMENT:

POINT I— The District Court Properly Instructed the
Jury on Intent . . . . . . . . . . . . . . . . . . . . . . . . . .  15

   A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  16

   B.  The District Court Properly Instructed the
       Jury on Intent to Defraud . . . . . . . . . . . . .  17

       1.  Relevant Facts . . . . . . . . . . . . . . . . . . . .  17

       2.  Discussion. . . . . . . . . . . . . . . . . . . . . . . .  20

           a.  The District Court Properly Defined
              Fraudulent Intent . . . . . . . . . . . . .  20

           b.  The District Court Properly
              Delivered a "No-Ultimate-Harm"
              Instruction. . . . . . . . . . . . . . . . . . .  23

   C.  The District Court Properly Instructed the
       Jury on Intent for Counts Five and Six  . .  30

POINT II— The District Court's Evidentiary Rulings
Were Correct . . . . . . . . . . . . . . . . . . . . . . . . . .  34

   A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  34

   B.  The District Court Properly Limited Evidence
       on Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

       1.  Relevant Facts . . . . . . . . . . . . . . . . . . . .  36

       2.  Discussion. . . . . . . . . . . . . . . . . . . . . . . .  38

iii

PAGE

C. The District Court Properly Limited Evidence About the Presence of Counsel After a Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    1. Relevant Facts . . . . . . . . . . . . . . . . . . . 45

    2. Discussion. . . . . . . . . . . . . . . . . . . . . . 50

        a. The District Court Properly Limited Testimony About the Involvement of Lawyers in Collateral Matters. . . 50

        b. The Hearing Was a Proper Exercise of the District Court's Discretion. . . . . . . . . . . . . . . . . . . . 55

POINT III—The District Court Properly Denied Bankman-Fried's Request to Order the Government to Review the Files of the Third-Party Debtors. . . . . . . . . . . . . . . . . . . . . . . . . . 59

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 59

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 61

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

POINT IV—The District Court Properly Ordered Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 70

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

iv

PAGE

1. The District Court Properly Imposed a Forfeiture Money Judgment . . . . . . . . 71

2. The District Court Properly Ordered Forfeiture of Investor and Lender Money . . . . . . . . . . . . . . . . . . . . . . . . . 73

3. The Forfeiture Was Not Grossly Disproportional to Bankman-Fried's Crimes. . . . . . . . . . . . . . . . . . . . . . . . . 76

POINT V—There Is No Basis for Remand to a Different Judge . . . . . . . . . . . . . . . . . . . . . . . . 78

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

## TABLE OF AUTHORITIES

*Cases*:

*Brady v. Maryland,*
    373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . 60

*Bryan v. United States,*
    524 U.S. 184 (1998). . . . . . . . . . . . . . . . . . . . . . 31

*Ciminelli v. United States,*
    598 U.S. 306 (2023) . . . . . . . . . . . . . . . . . . . . . 25

*Dietz v. Bouldin,*
    579 U.S. 40 (2016). . . . . . . . . . . . . . . . . . . . . . . 56

*Garrity v. New Jersey,*
    385 U.S. 493 (1967). . . . . . . . . . . . . . . . . . . . . . 65

v

PAGE

*Honeycutt v. United States,*
    581 U.S. 443 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . 70

*In re Aguinda,*
    241 F.3d 194 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 79

*Kelly v. United States,*
    590 U.S. 391 (2020). . . . . . . . . . . . . . . . . . . . . 21, 22

*Kyles v. Whitley,*
    514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . 62

*Neder v. United States,*
    527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . *passim*

*Old Chief v. United States,*
    519 U.S. 172 (1997). . . . . . . . . . . . . . . . . . . . . . . . 53

*S.E.C. v. Lek Securities Corp.,*
    No. 17 Civ. 1789 (DLC), 2019 WL 5703944
    (S.D.N.Y. Nov. 5, 2019). . . . . . . . . . . . . . . . . . . . . 50

*S.E.C. v. Tourre,*
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) . . . . . . . . . . 50

*United States ex rel. Hart v. McKesson Corp.,*
    96 F.4th 145 (2d Cir. 2024) . . . . . . . . . . . . . . . . . 31

*United States v. Alexander,*
    743 F.2d 472 (7th Cir. 1984) . . . . . . . . . . . . . . . . 24

*United States v. Allen,*
    491 F.3d 178 (4th Cir. 2007) . . . . . . . . . . . . . . . . 23

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . 35

vi

PAGE

*United States v. Avellino,*
    136 F.3d 249 (2d Cir. 1998) . . . . . . . . . . . . . 62, 68

*United States v. Awad,*
    598 F.3d 76 (2d Cir. 2010) . . . . . . . . . . . . . . 71, 72

*United States v. Bailey,*
    327 F.3d 1131 (10th Cir. 2003) . . . . . . . . . . . . . 24

*United States v. Bajakajian,*
    524 U.S. 321 (1998) . . . . . . . . . . . . . . . . . . . . . . 76

*United States v. Bakhtiari,*
    913 F.2d 1053 (2d Cir. 1990) . . . . . . . . . . . . 56, 58

*United States v. Barcelo,*
    628 F. App'x 36 (2d Cir. 2015) . . . . . . . . . . . 62, 63

*United States v. Beech-Nut Nutrition Corp.,*
    871 F.2d 1181 (2d Cir. 1989) . . . . . . . . . . . . . . . 51

*United States v. Berkovich,*
    168 F.3d 64 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 28

*United States v. Blackman,*
    746 F.3d 137 (4th Cir. 2014) . . . . . . . . . . . . . . . 72

*United States v. Blaszczak,*
    308 F. Supp. 3d 736 (S.D.N.Y. 2018) . . . . . . . . . 66

*United States v. Bodnar,*
    37 F.4th 833 (2d Cir. 2022) . . . . . . . . . . . . . . . . 35

*United States v. Bodouva,*
    853 F.3d 76 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 74

*United States v. Bonventre,*
    646 F. App'x 73 (2d Cir. 2016) . . . . . . . . . . . . . . 74

vii

PAGE

*United States v. Botti,*
    711 F.3d 299 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 34

*United States v. Boyer,*
    694 F.2d 58 (3d Cir. 1982) . . . . . . . . . . . . . . . . . 23

*United States v. Bradley,*
    105 F.4th 26 (2d Cir. 2024) . . . . . . . . . . . . . . . . 65

*United States v. Burlingame,*
    172 F. App'x 719 (9th Cir. 2006) . . . . . . . . . . . . 24

*United States v. Byors,*
    586 F.3d 222 (2d Cir. 2009) . . . . . . . . . . . . . . . . 75

*United States v. Calderon,*
    944 F.3d 72 (2d Cir. 2019) . . . . . . . . 24, 28, 29, 42

*United States v. Carr,*
    880 F.2d 1550 (2d Cir. 1989) . . . . . . . . . . . . . . . 16

*United States v. Connolly,*
    No. 16 Cr. 370 (CM), 2019 WL 2120523
    (S.D.N.Y. May 2, 2019) . . . . . . . . . . . . . . . . . . . . 65

*United States v. Contorinis,*
    692 F.3d 136 (2d Cir. 2012) . . . . . . . . . . . . . 73, 74

*United States v. Coonan,*
    938 F.2d 1553 (2d Cir. 1991) . . . . . . . . . . . . . . . 39

*United States v. Crowder,*
    325 F. Supp. 3d 131 (D.D.C. 2018) . . . . . . . . . . . 56

*United States v. Diamond,*
    430 F.2d 688 (5th Cir. 1970) . . . . . . . . . . . . . . . 24

viii

PAGE

*United States v. Elfgeeh*,
    515 F.3d 100 (2d Cir. 2008) . . . . . . . . . . . . . . . . 75

*United States v. Finazzo*,
    682 F. App'x 6 (2d Cir. 2017) . . . . . . . . . . . 27, 28

*United States v. Gabinskaya*,
    829 F.3d 127 (2d Cir. 2016) . . . . . . . . . . . . . . . 16

*United States v. Ganim*,
    510 F.3d 134 (2d Cir. 2007) . . . . . . . . . . . . . . . 23

*United States v. Gansman*,
    657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . 17

*United States v. Garcia*,
    509 F. App'x 40 (2d Cir. 2013) . . . . . . . . . . . 62, 63

*United States v. George*,
    386 F.3d 383 (2d Cir. 2004) . . . . . . . . . . . . . . . 31

*United States v. George*,
    779 F.3d 113 (2d Cir. 2015) . . . . . . . . . . . . 71, 76

*United States v. Giraldo*,
    822 F.2d 205 (2d Cir. 1987) . . . . . . . . . . . . . . . 62

*United States v. Gole*,
    158 F.3d 166 (2d Cir. 1998) . . . . . . . . . . . . . . . 28

*United States v. Graham*,
    484 F.3d 413 (6th Cir. 2007) . . . . . . . . . . . . . . 64

*United States v. Grote*,
    961 F.3d 105 (2d Cir. 2020) . . . . . . . . . 16, 17, 31

*United States v. Hampton*,
    732 F.3d 687 (6th Cir. 2013) . . . . . . . . . . . . . . 72

ix

PAGE

*United States v. Holmes,*
    44 F.3d 1150 (2d Cir. 1995) . . . . . . . . . . . . . . . . 39

*United States v. Hsu,*
    669 F.3d 112 (2d Cir. 2012) . . . . . . . . . . . . . . . . 75

*United States v. Hunt,*
    82 F.4th 129 (2d Cir. 2023) . . . . . . . . . . . . . . . . 21

*United States v. Hunter,*
    32 F.4th 22 (2d Cir. 2022) . . . . . . . . . . . 63, 64, 69

*United States v. Hutcher,*
    622 F.2d 1083 (2d Cir. 1980) . . . . . . . . . . . . . . . 62

*United States v. Ingram,*
    490 F. App'x 363 (2d Cir. 2012) . . . . . . . . . . . . . 23

*United States v. Jaswal,*
    47 F.3d 539 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 58

*United States v. Josleyn,*
    206 F.3d 144 (1st Cir. 2000). . . . . . . . . . . . . . 66, 67

*United States v. Kaiser,*
    609 F.3d 556 (2d Cir. 2010) . . . . . . . . . . 30, 31, 33

*United States v. Kelley,*
    551 F.3d 171 (2d Cir. 2009) . . . . . . . . . . . . . . . . 35

*United States v. Kilroy,*
    523 F. Supp. 206 (E.D. Wis. 1981). . . . . . . . . . . . 65

*United States v. Koh,*
    199 F.3d 632 (2d Cir. 1999) . . . . . . . . . . . . . 27, 28

*United States v. Kosinski,*
    976 F.3d 135 (2d Cir. 2020) . . . . . . . . . . . . . 30, 32

x

PAGE

*United States v. Kukushkin*,
  61 F.4th 327 (2d Cir. 2023) . . . . . . . . . . . . . . . 31, 33

*United States v. Lange*,
  834 F.3d 58 (2d Cir. 2016) . . . . . . . . . . . 23, 26, 27

*United States v. Mahaffy*,
  446 F. Supp. 2d 115 (E.D.N.Y. 2006). . . . . . . . . . 69

*United States v. Males*,
  459 F.3d 154 (2d Cir. 2006) . . . . . . . . . . 24, 26, 40

*United States v. Maniktala*,
  934 F.2d 25 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . 63

*United States v. Marcus*,
  560 U.S. 258 (2010). . . . . . . . . . . . . . . . 17, 22, 34

*United States v. McElroy*,
  910 F.2d 1016 (2d Cir. 1990) . . . . . . . . . . . . . . . . 40

*United States v. McSherry*,
  226 F.3d 153 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 56

*United States v. Miller*,
  116 F.3d 641 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 63

*United States v. Nejad*,
  933 F.3d 1162 (9th Cir. 2019) . . . . . . . . . . . 72, 73

*United States v. Olguin*,
  643 F.3d 384 (5th Cir. 2011) . . . . . . . . . . . . . . . . 72

*United States v. Pasternak*,
  2024 WL 4763986 (2d Cir. Nov. 13, 2024). . . . . . 22

*United States v. Patterson*,
  2022 WL 17825627 (2d Cir. 2022) . . . . . . . . . . . 77

xi

PAGE

*United States v. Peralta*,
    778 F. App'x 45 (2d Cir. 2019) . . . . . . . . . . . . . . . 72

*United States v. Percoco*,
    13 F.4th 158 (2d Cir. 2021) . . . . . . . . . . 23, 27, 28

*United States v. Petit*,
    2022 WL 3581648
    (2d Cir. Aug. 22, 2022) . . . . . . . . . . . . . . 30, 32, 33

*United States v. Pisani*,
    773 F.2d 397 (2d Cir. 1985) . . . . . . . . . . . . . . . . . 79

*United States v. Quinones*,
    511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . 35, 39

*United States v. Risha*,
    445 F.3d 298 (3d Cir. 2006) . . . . . . . . . . . . . . . . . 65

*United States v. Rossomando*,
    144 F.3d 197 (2d Cir. 1998) . . . . . . . . . . . . . . 27, 28

*United States v. Roy*,
    783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 16

*United States v. Rubin/Chambers*,
    828 F. Supp. 2d 698 (S.D.N.Y. 2011) . . . . . . . . . . 57

*United States v. Saint Clair*,
    2024 WL 413422 (2d Cir. Feb. 5, 2024) . . . . . . . . 23

*United States v. Scali*,
    No. 16 Cr. 466 (NSR), 2018 WL 461441
    (S.D.N.Y. Jan. 18, 2018) . . . . . . . . . . . . . . . . 56, 57

*United States v. Sampson*,
    898 F.3d 287 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 34

xii

PAGE

*United States v. Scarpa,*
    913 F.2d 993 (2d Cir. 1990) . . . . . . . . . . . . . . . . 16

*United States v. Schulte,*
    No. 17 Cr. 548 (PAC), 2020 WL 133620
    (S.D.N.Y. Jan. 13, 2020) . . . . . . . . . . . . . . . . . . . . 56

*United States v. Schwartz,*
    535 F.2d 160 (2d Cir. 1976) . . . . . . . . . . . . . . . . 78

*United States v. Scully,*
    877 F.3d 464 (2d Cir. 2017) . . . . . . . . . . 51, 52, 54

*United States v. Shkreli,*
    779 F. App'x 38 (2d Cir. 2019) . . . . . . . . . . . 23, 74

*United States v. Siddiqui,*
    699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . . . 35

*United States v. Simels,*
    654 F.3d 161 (2d Cir. 2011) . . . . . . . . . . . . . . . . 35

*United States v. Sindona,*
    636 F.2d 792 (2d Cir. 1980) . . . . . . . . . . . . . . . . 40

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) . . . . . . . . . . . . . . . . . . . . . . . 79

*United States v. Skelly,*
    442 F.3d 94 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 17

*United States v. Skelos,*
    988 F.3d 645 (2d Cir. 2021) . . . . . . . . . . . . . 35, 54

*United States v. Smith,*
    656 F.3d 821 (8th Cir. 2011) . . . . . . . . . . . . . . . . 72

xiii

PAGE

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . 64, 65

*United States v. Surgent*,
    No. 04 Cr. 364 (JG)(SMG), 2009 WL 2525137
    (E.D.N.Y. Aug. 17, 2009) . . . . . . . . . . . . . . . . . . 72

*United States v. Thomas*,
    581 F. App'x 100 (2d Cir. 2014) . . . . . . . . . . . . . 40

*United States v. Tuzman*,
    2024 WL 1173044 (2d Cir. Mar. 19, 2024) . . . . . 25

*United States v. Vargas*,
    961 F.3d 566 (2d Cir. 2020) . . . . . . . . . . . . . . . . 78

*United States v. Varrone*,
    554 F.3d 327 (2d Cir. 2009) . . . . . . . . . . . . . . . . 77

*United States v. Vasquez*,
    267 F.3d 79 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 23

*United States v. Villegas*,
    899 F.2d 1324 (2d Cir. 1990) . . . . . . . . . . . . . . . 39

*United States v. Viloski*,
    814 F.3d 104 (2d Cir. 2016) . . . . . . . . . . . . . . . . 77

*United States v. Vincent*,
    416 F.3d 593 (7th Cir. 2005) . . . . . . . . . . . . . . . 40

*United States v. Waked Hatum*,
    969 F.3d 1156 (11th Cir. 2020) . . . . . . . . . . . . . 75

*United States v. Weintraub*,
    273 F.3d 139 (2d Cir. 2001) . . . . . . . . . . . . . 25, 57

xiv

PAGE

*Victor v. Nebraska*,
   511 U.S. 1 (1994)............................. 16

*Williams v. Florida*,
   399 U.S. 78 (1970).......................... 59

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 981(a)(2) ...................... 73, 75

18 U.S.C. § 982(a)(1) ...................... 70, 75

21 U.S.C. § 853............................... 70

28 U.S.C. § 2461(c)........................ 70, 71

Fed. R. Crim P. 16 ........................... 62

Fed. R. Crim. P. 30......................... 14, 16

Fed. R. Crim. P. 32.2 ........................ 71

Fed. R. Crim. P. 52........................... 17

Fed. R. Evid. 103 ............................ 49

Fed. R. Evid. 104 ............................ 57

Fed. R. Evid. 401 ......................... 34, 53

Fed. R. Evid. 402 ............................ 34

Fed. R. Evid. 403 ......................... 34, 52

Fed. R. Evid. 611 ......................... 57, 79

Jonathan C. Lipson & David Skeel, *FTX'd:
   Conflicting Public and Private Interests in Chapter
   11*, 77 Stan. L. Rev. __ (2025)............... 68

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-961

––––––––––––

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ZIXIAO GARY WANG, CAROLINE ~~ELLISON~~, NISHAD
SINGH, RYAN SALAME,

*Defendants,*

FTX TRADING LTD., WEST REALM SHIRES INC.,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors,*

SAMUEL BANKMAN-FRIED, also known as Sealed
Defendant 1,

*Defendant-Appellant.*

––––––––––––

## BRIEF FOR THE UNITED STATES OF AMERICA

––––––––––––

## Preliminary Statement

Samuel Bankman-Fried appeals from a judgment of conviction entered on March 28, 2024, in the Southern District of New York, following a four-week trial before the Honorable Lewis A. Kaplan, United States District Judge, and a jury.

2

Superseding Indictment S6 22 Cr. 673 (LAK) (the "Indictment") was filed on August 14, 2023, in seven counts. Counts One and Three charged Bankman-Fried with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Counts Two and Four charged Bankman-Fried with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Five charged Bankman-Fried with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78j(b) and 78ff. Count Six charged Bankman-Fried with conspiracy to commit commodities fraud, in violation of 18 U.S.C. § 371 and 7 U.S.C. §§ 9(1) and 13(a)(5). Count Seven charged Bankman-Fried with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

Trial commenced on October 3, 2023, and ended on November 2, 2023, when Bankman-Fried was convicted of all seven counts in the Indictment.

On March 28, 2024, Judge Kaplan sentenced Bankman-Fried to a term of imprisonment of 300 months, to be followed by three years' supervised release, imposed a $700 special assessment, and ordered Bankman-Fried to forfeit $11,020,000,000.

Bankman-Fried is serving his sentence.

## Statement of Facts

### A.  The Government's Case

Bankman-Fried was convicted of orchestrating one of the largest frauds in history, stealing more than $8 billion from the customers of his cryptocurrency exchange, FTX.com. Bankman-Fried represented FTX as a safe and trustworthy exchange where customer

3

money was protected. In reality, Bankman-Fried covertly diverted billions of dollars of FTX customer money to his cryptocurrency trading firm, Alameda Research. He spent the money on Alameda's expenses, speculative investments, and charitable donations, and used it to repay Alameda's lenders, make illegal political campaign contributions, and enrich himself. Bankman-Fried's misappropriation of his customers' deposits was exposed in November 2022, when FTX declared bankruptcy after customers attempted to withdraw more money from FTX than the exchange had on hand, revealing a multi-billion-dollar shortfall in FTX's balance sheet.

The evidence at trial included seventeen witnesses, among them three cooperating witnesses who conspired with Bankman-Fried to commit fraud, other former FTX and Alameda employees, a financial expert who traced Bankman-Fried's misappropriation and spending of FTX customer funds, and customer, investor, and lender victims of Bankman-Fried's scheme. The Government also presented documentary evidence including portions of the FTX codebase, financial records, internal company emails and financial analysis, fraudulent balance sheets, Bankman-Fried's tweets and testimony before Congress, and private messages between Bankman-Fried and his coconspirators.

## 1. Bankman-Fried's Fraud on FTX Customers

In 2019, Bankman-Fried founded FTX, which he controlled until FTX declared bankruptcy in

4

November 2022. (Tr. 464, 650).[1] On FTX, customers from all over the world could buy and sell cryptocurrencies, such as Bitcoin, convert dollars to cryptocurrency and vice versa, and trade in cryptocurrency derivatives. (Tr. 65-66, 109, 141-42, 319-21). At the time he founded FTX, Bankman-Fried was also CEO of Alameda, a cryptocurrency trading firm that he had founded in 2017. (Tr. 107-08, 312). Bankman-Fried held out FTX and Alameda as separate entities, but in fact took money that FTX customers deposited with that exchange, and secretly transferred it to Alameda.

### a. Bankman-Fried Moves FTX Customer Deposits to Alameda

Bankman-Fried directly, and through FTX, represented to customers that their funds would not be used by FTX. (*See, e.g.*, Tr. 81, 658, 1289). These misrepresentations were made in FTX's advertisements (Tr. 111; GX-900, 905), its terms of service (Tr. 1915; GX-558), on its website and in its policy documents (Tr. 80-81, 339-40, 1901; GX-340), and in Bankman-Fried's public statements, such as his tweets and

---

[1]  "Br." refers to Bankman-Fried's brief on appeal; "A-" and "SPA-" refer to the appendix and special appendix filed with that brief; "GX" refers to a government exhibit at trial; "Tr." refers to the trial transcript; "Add." refers to the addendum filed with this brief; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

5

Congressional testimony (Tr. 1899). Bankman-Fried testified before Congress that FTX had a robust risk management system and protected customer deposits by "maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request," ensuring "customer assets are custodied," and protecting "against misuse or misallocation of customer assets." (GX-914A, 916T). Bankman-Fried repeatedly asserted on Twitter, in response to reporters' inquiries, in statements to his investors, and in other fora, that Alameda did not have privileged access to FTX, that customer assets were safe, and that Alameda operated as a wholly separate entity from FTX. (Tr. 279, 400-08, 866-70, 1366-67; *see, e.g.*, GX-817, 850).

Contrary to those representations, Bankman-Fried viewed FTX customer funds as "a good source of capital, and he set up [a] system that allowed Alameda to borrow from FTX" (Tr. 654), intentionally using FTX's infrastructure to misappropriate billions of dollars. At the time FTX declared bankruptcy, Alameda had borrowed approximately $8 billion of customer money from the exchange that could not be repaid. (Tr. 351, 355, 1773).

Bankman-Fried misappropriated funds deposited by FTX customers both in the form of fiat currency (like dollars) and cryptocurrency. (Tr. 644-45). Bankman-Fried accomplished this in two ways:

*First*, at Bankman-Fried's direction, FTX told customers to deposit fiat currency into bank accounts that were in fact controlled by Alameda. (Tr. 156-57, 654-55; GX-568). Alameda regularly spent these funds,

6

resulting in a multi-billion-dollar deficit of FTX customer funds. (Tr. 656; GX-1050).

*Second*, Bankman-Fried secretly introduced special features into FTX's computer code, which permitted Alameda to spend and withdraw unlimited amounts of customer money from FTX. (Tr. 304-09, 358-59, 390-91). Cooperating witness Gary Wang implemented changes to FTX's codebase at Bankman-Fried's direction, as did Nishad Singh, another cooperating witness and high-level FTX executive. (Tr. 322, 358). The specific code changes included an "allow negative" feature, which permitted Alameda to accrue a negative balance when making transfers and withdrawals; a $65 billion line of credit; and an exemption from the automatic liquidation feature on FTX. (Tr. 307-09, 358-59, 373, 1361-64; GX-644). As Bankman-Fried publicly touted, FTX would automatically liquidate a typical client's account once its negative balance exceeded the amount of any posted collateral. But the secret code features Bankman-Fried implemented permitted Alameda to maintain a negative balance, borrow funds from other FTX customers and withdraw funds from the exchange without sufficient collateral using a multi-billion-dollar line of credit, and evade auto-liquidation. (Tr. 349-75, 381-96, 658-59).[2]

---------

[2]    Bankman-Fried claims that although "FTX provided Alameda a large line of credit," that was something "it also did for other market makers." (Br. 9-10). As the trial evidence established, there was no other market maker that had a line of credit near the size of

7

Taking advantage of these hidden capabilities, Bankman-Fried "borrowed" billions of dollars of FTX customer funds, accruing a multi-billion-dollar negative balance in Alameda's account—money that was now owed to FTX customers, unbeknownst to them. (Tr. 355, 664, 1464-65; GX-1004). By spending customer funds, FTX created a significant deficit in its cryptocurrency wallets and in the accounts that were supposed to be holding customer fiat deposits (GX-1051), while customers were kept in the dark, believing that they could withdraw the balance in their account at any time. (Tr. 79-81, 339-40, 1289-93, 1760; GX-425, 539). Customers never agreed for their funds to be transferred this way, and doing so contradicted what Bankman-Fried said publicly about how FTX treated customer funds. (*See, e.g.*, Tr. 438-39, 1225).

### b.   Bankman-Fried Secretly Uses FTX Customers' Deposits

To conceal his control of Alameda, Bankman-Fried named co-conspirator (later, cooperating witness) Caroline Ellison as CEO of Alameda in 2021. (Tr. 683-87). When FTX collapsed, Bankman-Fried falsely claimed he was walled off from Alameda and was unaware of the extent of Alameda's spending of FTX customer funds. (*See, e.g.*, GX-2503, 2508). The trial evidence established, however, that Bankman-Fried directed Alameda's borrowing and spending of FTX customer

–––––––––––

Alameda's, and Alameda was the only customer who could withdraw money from the exchange without posting collateral. (Tr. 390-95, 658-62, 1386-95; GX-5).

8

funds, which resulted in the multi-billion-dollar hole in FTX's balance sheet. In particular, in the Fall of 2021, Bankman-Fried decided that Alameda should spend an additional $3 billion on venture investments. (Tr. 707-10). At the time, Alameda's trading operations were funded primarily through open-term loans by third-party cryptocurrency lenders, who could request repayment on demand. (Tr. 692, 809, 815). Ellison advised Bankman-Fried against making additional investments, presenting him with analysis showing that in the event of a market downturn and the recall of Alameda's loans, the only way to repay third-party loans would be to borrow billions more from FTX customer funds. (Tr. 703-06, 712-19, 693-98; GX-36).

Nonetheless, from late 2021 into 2022, Bankman-Fried directed billions of dollars in spending, using FTX customers' money. That included investing hundreds of millions of dollars each into a crypto-mining company, an online bank, an investment firm Bankman-Fried used to connect with politicians and celebrities, the companies Anthropic and Robinhood, real estate in the Bahamas (including a $30 million penthouse apartment for Bankman-Fried and his friends), and political donations. (Tr. 706-29, 1315-41, 1710-56; GX-1017A-K, 1026-33, 1039, 1045).

### c. Bankman-Fried Repays Alameda's Lenders Using FTX Customer Funds

In June 2022, instability in the cryptocurrency market caused Alameda's lenders to recall nearly all their loans, requiring Alameda to repay over $6 billion.

9

(Tr. 752-61, 779; GX-1018). Ellison was "very stressed out" because "we didn't have the liquid assets to pay all of the money back" and "in order to repay all of our loans, we would have to borrow money using our FTX line of credit," meaning that the money "would be coming from customer funds." (Tr. 761). After reviewing a spreadsheet that showed Alameda had a negative $11 billion balance on FTX and was borrowing $13 billion in FTX customer funds (GX-50; Tr. 424-40, 771-77, 1359), Bankman-Fried "continued to direct [Ellison] to repay loans," meaning to use Alameda's access to FTX customer funds to repay the loans, which she did. (Tr. 764-65, 780, 440-42, 1772; GX-1017A-K). Of the $6.5 billion repaid to Alameda's lenders, almost 70 percent was FTX customer money. (GX-1018). This was far from unexpected—it was precisely why Ellison had advised against additional venture investing. (Tr. 780-82).

As of September 1, 2022, Alameda was borrowing approximately $13.7 billion in customer money from FTX (GX-19; Tr. 449-50, 823, 847, 1403). Alameda's internal balance sheets showed that "in an event that all of FTX's customers wanted to withdraw their money," Alameda's liquid assets were not sufficient to meet customer withdrawals. (Tr. 791-92; *see also* Tr. 443-46, 1403). Singh privately expressed concern to Bankman-Fried about the deficit and urged him to refrain from additional spending. (Tr. 1406-09). But Bankman-Fried continued to spend customer funds. (Tr. 850, 888-91, 1414-19; GX-14B, 141A, 1089).

10

### d.  Bankman-Fried Lies During FTX's Collapse

Following the online publication of a leaked Alameda balance sheet on November 2, 2022, customers began rapidly withdrawing funds from FTX. (Tr. 452, 891-92, 896-97). As FTX customer withdrawals surged, Bankman-Fried made a series of false and misleading statements to deter FTX customers from trying to withdraw their money. (Tr. 1292, 1467, 1847-48). On November 7, 2022, Bankman-Fried tweeted: "A competitor is trying to go after us with false rumors. FTX is fine. Assets are fine." (GX-866). He added, in part, "FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries). We have been processing all withdrawals, and will continue to be." (GX-866). In a third tweet, Bankman-Fried wrote, "We have a long history of safeguarding client assets, and that remains true today." (GX-866).

Those statements were false because, as Bankman-Fried knew, at that time FTX had a multi-billion-dollar shortfall and insufficient assets to cover customer withdrawals. (Tr. 461-63 ("FTX did not in fact have enough assets to cover all client holdings . . . [b]ecause Alameda had withdrawn a lot of it," and "FTX was lending client assets to Alameda"), 919-20, 1464-66). In an internal document that he authored the day before these tweets, Bankman-Fried wrote that FTX only had "enough to process ~1/3 of remaining client assets," and just hours before his tweets, Bankman-Fried acknowledged internally that FTX had an $8.1 billion shortfall. (Tr. 909-11, 917-18; GX-21, 406). He

nonetheless posted what he called a "confident tweet thread" to lull FTX's customers into keeping their funds on FTX. (GX-21). As a result of Bankman-Fried's false statements, many FTX customers did not withdraw their money and left it on the exchange. (Tr. 89, 1292).

As FTX struggled to meet customer demands, Bankman-Fried halted customer withdrawals from the exchange. On November 11, 2022, FTX and Alameda filed for bankruptcy and Bankman-Fried resigned as CEO. (Tr. 450).

## 2. Bankman-Fried's Fraud on Alameda's Lenders

Bankman-Fried also defrauded Alameda's lenders of more than $1 billion. In the Summer of 2022, after Alameda repaid its third-party lenders using FTX customer funds, Alameda sought new loans from these same lenders, who requested that Alameda provide an updated balance sheet. (Tr. 783; *see also* GX-1014). Ellison and Bankman-Fried were reluctant to share Alameda's balance sheet because "it showed that Alameda was in a very risky position" and was "borrowing . . . around $10 billion from FTX," which might create "more widespread concern about Alameda" and "cause people to start withdrawing their money from FTX." (Tr. 785-86; *see also* Tr. 789).

Bankman-Fried therefore told Ellison to "prepare some alternative ways of presenting the information and send them to him." (Tr. 786). Ellison prepared seven alternatives to the real balance sheet (GX-44), which omitted or hid Alameda's borrowing from FTX,

12

so that lenders would not "know the truth" (Tr. 786-87). Bankman-Fried chose one of the alternatives whose "intended effect was to make Alameda look less risky than it really was and to hide the fact that we were borrowing around $10 billion from FTX customers." (Tr. 795-800). Ellison sent the deceptive balance sheet to Alameda's lenders and continued to send them similarly fraudulent balance sheets in the months that followed. (Tr. 800-04, 810-23; GX-17, 419). Alameda's lenders then extended new loans, which they would not otherwise have done. (Tr. 808-09, 1206-07, 1217-24, 1768; GX-1014). When Alameda entered bankruptcy, Alameda's defaults on its loans sent several lenders into financial crisis. (Tr. 1227-28).

### 3. Bankman-Fried's Fraud on FTX Investors

Bankman-Fried also defrauded equity investors who had purchased shares in FTX stock. (GX-26). Bankman-Fried represented to FTX investors that FTX acted as a custodian of its customers' deposits. (Tr. 273-74). Several FTX investors were falsely told by Bankman-Fried and others acting at his direction that Alameda received no special treatment on FTX and that FTX and Alameda were fully independent and separate companies. (Tr. 278-81, 1945, 2011-14). Had FTX's equity investors known about the misuse of customer funds or Alameda's special treatment, they would not have invested in FTX. (Tr. 274, 280-82, 2014-15).

Bankman-Fried engaged in additional deceptive conduct to mislead investors, shifting losses on the

13

FTX platform to Alameda to conceal these losses from
investors (Tr. 414-15, 939-41, 1455-56), publicly dis-
playing a fake overstated value for FTX's insurance
fund (Tr. 408-12; GX-751), and falsely inflating FTX's
2021 revenue with backdated documents provided to
FTX's auditors (Tr. 1445-54; GX-323). Bankman-Fried
also used FTX investor money to finance Alameda's op-
erations and cover expenses, including a house for
Bankman-Fried's parents. (Tr. 937, 1726, 2016-17;
GX-1023, 1050).

### 4. Bankman-Fried's Concealment Money Laundering

At trial, the Government proved Bankman-Fried's
involvement in a conspiracy to make over $100 million
in political donations to federal and state officials, as
well as political action committees, with funds from Al-
ameda (and ultimately FTX customers). Around 2020,
Bankman-Fried began donating large sums to political
candidates, at least in part to improve his personal
standing in Washington, D.C., increase FTX's profile,
and curry favor with candidates that could help pass
legislation favorable to FTX. (GX-477, 505; Tr. 1437).
Bankman-Fried concealed the source of the funds by
passing donations through accounts belonging to Ryan
Salame and Singh, making unlawful straw and corpo-
rate donations. (Tr. 1420-38; GX-28, 475, 1088-90).

14

## B. The Defense Case and the Verdict

In addition to calling a Bahamian attorney and a financial expert (Tr. 2082-2164),[3] Bankman-Fried testified in his own defense. Bankman-Friend denied defrauding anyone and claimed that he learned of Alameda's large debt to FTX in the Fall of 2022, shortly before FTX's collapse. (Tr. 2297, 2522, 2603-04). Despite Bankman-Fried's insistence on appeal that he was "prohibited from introducing evidence that FTX and Alameda (his hedge fund) were solvent and that he believed there were sufficient assets to cover customer withdrawals" (Br. 2), Bankman-Fried testified extensively to that effect. (*See, e.g.*, Tr. 2478 ("Q: Did you believe that it [Alameda's $8 billion liability to FTX] could be paid back? A: Yes.").[4] Bankman-Fried

—————

[3]    Bankman-Fried complains that the District Court "excluded six of seven expert witnesses the defense disclosed and limited the testimony of the seventh." (Br. 17). But Bankman-Fried does not claim on appeal that the District Court abused its discretion by excluding expert testimony that, among other things, "completely fail[ed] to satisfy the requirements" of Federal Rule of Criminal Procedure 16, "actually contain[ed] no opinions," "invade[d] the province of the jury to apply the facts to [the] law," and consisted of "extensive background testimony" with "limited or no bearing on the issues in this case." (Dkt. 287).

[4]    Bankman-Fried also claims that he was "repeatedly prevented . . . from testifying about his state of mind during relevant events and from telling his side of the story" (Br. 17-18), but in support he cites

15

claimed repeatedly that even accounting for Alameda's liability to FTX, "Alameda had approximately 10 billion more in the value of its assets than its liabilities" and he was therefore "of the view that Alameda had plenty in asset value to be able to cover the liability." (Tr. 2478; *see also* Tr. 2465-69, 2480, 2491-92, 2524-26, 2542-43). The defense also advanced this theme through cross-examination of the Government's witnesses and in its opening and closing statements. (*See, e.g.*, Tr. 49-52, 524-25, 571-74, 995-96, 1061, 1803, 3032-33, 3038, 3059, 3073, 3111-12).

On November 2, 2023, the jury returned a verdict of guilty on all counts.

## ARGUMENT

### POINT I

### The District Court Properly Instructed the Jury on Intent

Contrary to Bankman-Fried's claims on appeal (Br. 21), the District Court correctly instructed the jury with respect to the scienter requirement of each count. And because the evidence of Bankman-Fried's

––––––––––

instances when the District Court sustained evidentiary objections to questions that lacked foundation, called for hearsay, or were unduly vague, without identifying reason to believe those rulings were erroneous.

16

criminal intent was overwhelming, any putative error was harmless.

## A. Applicable Law

An appellant challenging a jury instruction faces a heavy burden. He must demonstrate that: (1) he requested a charge that "accurately represented the law in every respect"; and (2) the charge actually delivered, when viewed as a whole, was erroneous and prejudicial. *United States v. Roy,* 783 F.3d 418, 420 (2d Cir. 2015).

In reviewing jury instructions, this Court does not look only to the particular words or phrases challenged by the defendant, but must "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989); *see also United States v. Gabinskaya*, 829 F.3d 127, 132 (2d Cir. 2016). This is so because "[o]ften isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990). As a general matter, no particular wording is required so long as "taken as a whole" the instructions correctly convey the required legal principles. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).

A party who disagrees with the charge given by the district court must "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d); *United States v. Grote*, 961 F.3d 105, 114 (2d Cir. 2020). Where the defendant "failed to raise a specific

17

objection to the omission of the necessary . . . language from the charge," this Court reviews only for plain error. *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006). To establish plain error, the defendant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; [and] (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). Where those elements are met, this Court may exercise its discretion to correct the error if "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* Reversal for plain error should "be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Grote*, 961 F.3d at 116.

Where a defendant has preserved an objection to the jury instructions, reversal will not be warranted if the alleged error was harmless. Fed. R. Crim. P. 52(a); *see United States v. Gansman*, 657 F.3d 85, 91-92 (2d Cir. 2011). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

## B. The District Court Properly Instructed the Jury on Intent to Defraud

### 1. Relevant Facts

In advance of trial, the Government requested that the jury be instructed that: "Where some financial loss

18

is contemplated, even temporarily, by the defendant, the fact that the defendant believes the victim will ultimately suffer no loss is no excuse to the crime." (A-419). Bankman-Fried's proposed instructions stated that "the Government need not prove that FTX customers were actually harmed," but must prove that Bankman-Fried participated in the alleged wire fraud scheme "for the purpose of causing financial loss to those customers." (A-515).[5]

Prior to the charge conference, the District Court circulated proposed jury instructions. Among other things, the proposed instructions explained that the Government must prove "that the defendant acted with specific intent to defraud," meaning that "he acted with intent to deceive for the purpose of depriving the relevant victim of money or property." (Add. 2). The proposed instructions further explained that "[t]he government need not prove that the victim actually was harmed, only that the defendant contemplated some actual harm or injury to the victim in question." (Add. 2). At the charge conference, Bankman-Fried did not object to this proposed language,

—————————

[5] Bankman-Fried initially requested an instruction that "if [Bankman-Fried] believed FTX could cover all obligations, he lacked intent to defraud." (Br. 56 (citing A-515)). But Bankman-Fried later submitted an amended request to charge, which removed this language entirely (*see* Dkt. 327-1 at 16), and he did not renew a request for this language at the charge conference.

19

which the District Court included in its final jury in-
structions. (A-1131).

At the charge conference, Bankman-Fried objected
to the "no-ultimate-harm" instruction, which was in-
cluded in the following proposed good faith instruction:

> [I]t is a complete defense if a defendant
> held an honest belief that the victims
> were not being deprived of money or prop-
> erty. Moreover . . . it remains the govern-
> ment's burden to prove fraudulent intent
> and the consequent lack of good faith be-
> yond a reasonable doubt. *However, in*
> *considering whether or not a defendant*
> *acted in good faith, you are instructed*
> *that an honest belief on the part of the de-*
> *fendant, if such a belief existed, that ulti-*
> *mately everything would work out to the*
> *benefit of the alleged victims does not nec-*
> *essarily mean that the defendant acted in*
> *good faith. If the defendant knowingly*
> *and willfully participated in the scheme*
> *with the intent to deceive the victim in*
> *question for the purpose of depriving the*
> *victim of money or property, even if only*
> *for a period of time, then no amount of*
> *honest belief on the part of the defendant*
> *that the victim ultimately would be bene-*
> *fitted will excuse false representations*
> *that a defendant willfully made or caused*
> *to be made.* As I instructed you earlier, it
> is the government's burden to prove be-
> yond a reasonable doubt that the

20

> defendant had a fraudulent intent and
> that he engaged in the alleged fraudulent
> scheme for the purpose of causing some
> loss to another.

((Add. 3-4) (emphasis added to the "no-ultimate-harm" instruction)). Bankman-Fried did not object that the instruction was legally incorrect; instead he objected that "we don't view that [instruction] as necessary here" because "Mr. Bankman-Fried believed customers would never be harmed, including in the short term." (Tr. 2861). The Government countered that "there has been quite a bit of evidence from them in the defense case about a belief that the companies would be able to repay the customers, so there is a factual predicate for this instruction in the record" and "it's an instruction that has been approved repeatedly in exactly these terms by the Second Circuit when a factual predicate exists in the trial record." (Tr. 2861). The District Court overruled the objection and delivered the instruction in the final jury charge. (Tr. 2861, A-1133-34).

## 2. Discussion

### a. The District Court Properly Defined Fraudulent Intent

Bankman-Fried claims that although he "sought jury instructions on [the] principle" that "fraud requires intended loss," the District Court's jury instructions "eliminated an element of the offense—namely, intent to cause loss." (Br. 55, 56). But Bankman-Fried does not point to any objection to the relevant portion of the District Court's definition of "intent to defraud,"

21

because no such objection was made. Nor did Bankman-Fried's counsel propose any affirmative changes to the proposed instructions, which also stated (consistent with Bankman-Fried's proposal) that "the government need not prove that the victim was actually harmed," and which also specified that the Government must prove "only that the defendant contemplated some actual harm or injury to the victim in question." (Tr. 2837-92 (charge conference); A-1131 (jury charge)). Bankman-Fried must therefore satisfy the plain error standard.

Bankman-Fried comes nowhere near showing that these instructions were plainly erroneous. *See United States v. Hunt*, 82 F.4th 129, 139 (2d Cir. 2023) (error not plain where appellant "cites no binding precedent supporting his proposed jury instruction"). On the contrary, the instructions were manifestly correct under existing law. Bankman-Fried relies principally on *Kelly v. United States*, 590 U.S. 391, 402 (2020), for the proposition that the "government must prove 'loss to the victim' was 'an object of the fraud.'" (Br. 56-57). But that is not what *Kelly* says. Bankman-Fried takes two phrases found in separate sentences of *Kelly*, then reverses their order to invent a proposition not found in the opinion. *See Kelly*, 590 U.S. at 402. The actual sentences in *Kelly* are two statements of the same principle: "that property must play more than some bit part in a scheme: It must be an 'object of the fraud.' Or put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id.* Thus, the Government must "show not only that [the defendant] engaged in deception, but that an object of th[e] fraud was money

22

or property." *Kelly*, 590 U.S. at 391. That is precisely what the District Court instructed the jury here: "the government must prove that [Bankman-Fried] acted with intent to deceive *for the purpose of depriving the relevant victim of money or property*." (A-1131 (emphasis added)). The instructions even stated the exact proposition—that fraud requires not just an intent to take property, but an intent to cause loss to the victim —that Bankman-Fried claims they omitted. (*Compare* Br. 56 ("the jury instructions eliminated an element of the offense—intent to cause loss") *with* A-1134 (requiring the Government "to prove beyond a reasonable doubt that the defendant . . . engaged in a fraudulent scheme for the purpose of causing some loss to another.")).[6]

Any difference between Bankman-Fried's proposed language and that of the District Court was also harmless. *See Marcus*, 560 U.S. at 262. The instructions as a whole eliminated any risk that the jury would convict without finding that Bankman-Fried intended to cause loss. (*See* A-1134). And unlike in *Kelly*, loss to the victim was not "an incidental byproduct of the scheme," *Kelly*, 590 U.S. at 402—obtaining the victims'

---

[6] That instruction arguably went beyond what this Court has required: "The scheme to defraud language in the wire fraud statute demands neither a showing of ultimate financial loss *nor a showing of intent to cause financial loss* . . . ." *United States v. Pasternak*, 2024 WL 4763986, at *3 (2d Cir. Nov. 13, 2024).

23

property was the core object of Bankman-Fried's deception.

### b. The District Court Properly Delivered a "No-Ultimate-Harm" Instruction

Bankman-Fried next challenges the District Court's "no-ultimate-harm" instruction. Although Bankman-Fried objected below that this instruction was "not necessary" (Tr. 2861), he did not claim—as he does now on appeal—that it was an "incorrect statement of the law" (Br. 57), and so plain error applies. *See, e.g.*, *United States v. Vasquez*, 267 F.3d 79, 87 (2d Cir. 2001) (plain error review where defendant's objection below was "ambiguous" and "different" from his objection on appeal); *United States v. Ganim*, 510 F.3d 134, 151 (2d Cir. 2007) (plain error review where defendant raised "different objection" to the same jury instruction below).

This argument should be rejected under any standard of review. No-ultimate-harm instructions are well-established and standard in fraud cases. *See, e.g.*, *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016); *United States v. Percoco*, 13 F.4th 158, 177 (2d Cir. 2021), *vacated on other grounds sub nom. Ciminelli v. United States*, 598 U.S. 306 (2023). This Court has routinely and recently affirmed use of the instruction, *see United States v. Saint Clair*, 2024 WL 413422, at *4 (2d Cir. Feb. 5, 2024); *United States v. Shkreli*, 779 F. App'x 38, 40 (2d Cir. 2019); and *United States v. Ingram*, 490 F. App'x 363, 367 (2d Cir. 2012), and it has been endorsed in other circuits, *see United States v. Boyer*, 694 F.2d 58, 60 (3d Cir. 1982); *United States v.*

24

*Allen*, 491 F.3d 178, 188 (4th Cir. 2007); *United States v. Diamond*, 430 F.2d 688, 691-92 (5th Cir. 1970); *United States v. Alexander*, 743 F.2d 472, 478 (7th Cir. 1984); *United States v. Burlingame*, 172 F. App'x 719, 721 (9th Cir. 2006), and *United States v. Bailey*, 327 F.3d 1131, 1143 (10th Cir. 2003).

Bankman-Fried claims that the instruction incorrectly indicated that a defendant "can be guilty based on a temporary deprivation" of property. (Br. 57). That, however, is the law: "where a defendant fraudulently obtains the *use* of another's money or property for a period of time, using it for his own personal profit, and depriving the owner of the ability to do so," that constitutes a scheme to defraud, and "it makes no difference" whether the defendant obtains the use of the property "temporarily . . . or permanently." *United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2006). Therefore:

> [W]here some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct.

*United States v. Calderon*, 944 F.3d 72, 90 (2d Cir. 2019).

Bankman-Fried tries to conflate this settled principle about a defendant's intent with the now-defunct "right-to-control" theory of property. (Br. 57). But that

25

theory incorrectly defined property to include "potentially valuable economic information necessary to make discretionary economic decisions," *Ciminelli*, 598 U.S. at 309, and had nothing to do with a defendant's intent to deprive victims of property like the currency at issue here. *See, e.g.*, *United States v. Tuzman*, 2024 WL 1173044, at *3 (2d Cir. Mar. 19, 2024) (distinguishing between a scheme "merely affecting investors' rights to information" and one which involved false statements to deprive victims of their property).[7] *Ciminelli* did not, as Bankman-Fried urges, impliedly reject a standard instruction that was not at issue in the case and that has been approved by courts of appeals for decades.

Bankman-Fried speculates that the Supreme Court will "likely" change the law in *Kousisis v. United States*, No. 23-909, *cert. granted*, 144 S. Ct. 2655 (2024). (Br. 57). But this effort to read the tea leaves falls far short of establishing plain error. *See United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001) (no plain error "[w]ithout a prior decision from this court or the Supreme Court mandating the jury instruction that [appellant], for the first time on appeal, says should have been given"). In any event, even if the Supreme Court were to hold—as Bankman-Fried prophesies—that deception does not amount to fraud if "inflicting economic harm on the victim was not an object of the scheme" (Br. 57), that would not cast

---

[7] *See also* Dkt. 167 (holding that the fraud charges in this case are not based on a right-to-control theory of fraud).

26

doubt on the jury instructions here, which required an intent to deprive the "relevant victim of money or property" (A-1131) and a "purpose of causing some loss to another" (A-1134). Bankman-Fried provides no basis to question the "accurate statement of the applicable law" that the "requirement of contemplated harm or injury does not require that [the defendant] intended to permanently deprive the victim's money or property." *Males*, 459 F.3d at 159.

Bankman-Fried's objection to the *necessity* of the "no-ultimate-harm" instruction fares no better. Such an instruction "is proper where (1) there was a sufficient factual predicate to necessitate the instruction, (2) the instruction required the jury to find intent to defraud to convict, and (3) there was no evidence that the instruction caused confusion." *Lange*, 834 F.3d at 79. All three factors are present here.

*First*, as in *Lange*, "there was a factual predicate for the instruction, because there was evidence that [the defendant] intended to immediately deprive [victims] of their capital through fraud, even if [he] truly believed that in the long-term [the company] would ultimately succeed, deriving profits for the defrauded [victims]." *Lange*, 834 F.3d at 79. Bankman-Fried claims that the District Court excluded any evidence about his intent to ultimately return the funds. (Br. 58). That is belied by the record. Throughout the trial, in jury addresses, cross-examination of Government witnesses, and in the defense case, Bankman-Fried argued that he did not intend to defraud or harm FTX customers because he believed that Alameda's net asset value was positive and the money would be

27

repaid. (*See, e.g.*, Tr. 49-52, 524-25, 571-74, 995-96, 1061, 1803, 2497, 2526, 3032-33, 3038, 3059, 3073, 3111-12). Bankman-Fried's introduction of that evidence and argument provided a sufficient factual predicate for the instruction. *See, e.g.*, *Percoco*, 13 F.4th at 177; *United States v. Koh*, 199 F.3d 632, 641 (2d Cir. 1999) (factual predicate for charge where defendant argued that he "intended to ultimately pay back the money" he took from investors).

*Second*, not only did the jury instructions "require[ ] the jury to find intent to defraud to convict," *Lange*, 834 F.3d at 79, but the District Court also "clarified immediately [ ]after" the no-ultimate-harm instruction "that the Government was still required to establish that the defendant engaged in the alleged fraudulent scheme for the purpose of causing some loss to another" (A-1134). *See United States v. Finazzo*, 682 F. App'x 6, 9 (2d Cir. 2017) (upholding a similar instruction).

*Third*, the instruction here did not have the "grave potential to confuse jurors" (Br. 58). As in *Lange*, "there is nothing in the record to suggest that the instruction caused any confusion," *Lange*, 834 F.3d at 79. That is particularly true in light of the instructions concerning intent to defraud and good faith. (A-1134); *see Percoco*, 13 F.4th at 177 (no evidence of juror confusion where jury instructions "clearly stated that an honest belief in the truth of the representations made by a defendant is a complete defense"). Bankman-Fried thus draws no support from *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998). (*See* Br. 58). That case makes clear that the no-ultimate-harm

28

instruction accurately states the law. *Rossomando*, 144 F.3d at 201. And although *Rossomando* found fault with giving the instruction under the idiosyncratic circumstances of the case, it was almost immediately "limited to the quite peculiar facts that compelled its result." *United States v. Gole*, 158 F.3d 166, 169 (2d Cir. 1998) (Jacobs, J., concurring); *see also Percoco*, 13 F.4th at 176 (same). This Court has consistently rejected arguments challenging this instruction by analogy to *Rossomando* and has upheld "nearly identical clarification[s] of a no-ultimate harm instruction . . . that clearly informed the jury that they could not convict appellant unless he intended to cause loss to someone, which greatly reduced the possibility of jury confusion." *Finazzo*, 682 F. App'x at 9 (citing *United States v. Berkovich*, 168 F.3d 64 (2d Cir. 1999)); *see also Calderon*, 944 F.3d at 90-91; *Koh*, 199 F.3d at 641.

Nor was the instruction "deeply confusing" because Alameda's lenders and FTX's customers permitted the temporary investment of their funds elsewhere. (Br. 58-59). The instruction addressed a central aspect of the fraudulent schemes at issue: Bankman-Fried represented that FTX customers' deposits were "custodied" and that Alameda had no special access to them, but in fact transferred FTX depositors' property to Alameda for his own purposes, perhaps hoping he could return the money if his ventures paid off. (*See supra* at 4-9). The no-ultimate-harm instruction bore directly on that core part of the case, informing the jurors—as in many other cases—that fraudsters cannot secretly misappropriate their victims' property so long as the defendants hope that one day their scheme will

29

pan out for everyone. *See Calderon*, 944 F.3d at 90-91. That had nothing to do with Bankman-Fried's emphasis on FTX as a forum for margin trading (Br. 18, 59) because, among other reasons, Bankman-Fried's victims included customers who did not opt in to margin trading (*see, e.g.*, Tr. 73-74, 2647), the misappropriation of customer fiat deposits had nothing to do with margin trades, and, as Bankman-Fried knew, the hole in FTX's balance sheet did not result from borrowing through the spot margin system (Tr. 1468-69, 1773-75, 1962-66, 3018-21). Nor is at all relevant that Alameda's lenders understood their money would be reinvested. The fraud on Alameda's lenders had nothing to do with how Bankman-Fried used the money; Bankman-Fried fraudulently induced loans to Alameda with false statements about Alameda's financial health. (Tr. 794-800, 1208-11).

Even if Bankman-Fried could demonstrate that the instruction was ill-suited to this case—which he cannot—at worst, it was pointless, rather than confusing or misleading, because the jury instructions were unambiguous that the Government was required to prove intent to defraud. Bankman-Fried claims that he would have "presented much more evidence on solvency," without identifying what that evidence would have been (Br. 62), and giving a superfluous jury instruction would not have prevented Bankman-Fried from offering evidence in any event. Moreover, the fraud was the misappropriation of funds that Bankman-Fried had falsely told his customers would be kept safe—he completed the fraud when he secretly moved funds from FTX to Alameda, regardless

30

whether Alameda was solvent, insolvent, or merely il-liquid. *See infra* Point II.B.

## C. The District Court Properly Instructed the Jury on Intent for Counts Five and Six

With respect to Counts Five and Six, charging se-curities fraud and commodities fraud conspiracy, the District Court instructed the jury that "[t]o act will-fully means to act voluntarily and with a wrongful pur-pose." (A-1131, 1155, 1163). This Court has repeatedly affirmed such an instruction. *See United States v. Kai-ser*, 609 F.3d 556, 569 (2d Cir. 2010) (affirming defini-tion of willfulness requiring defendant's "awareness of the general wrongfulness of his conduct"); *United States v. Petit*, 2022 WL 3581648, at *4 (2d Cir. Aug. 22, 2022) ("[T]he district court correctly instructed the jury that it could find [the defendants] acted willfully if they 'acted deliberately and with a bad purpose, ra-ther than innocently'").

Bankman-Fried argues that the District Court should have instructed the jury that willfulness re-quires "proof that the defendant knew his conduct was unlawful." (Br. 59). Bankman-Fried's claim is review-able for plain error. Although he initially requested a similar charge (A-611), at the charge conference he in-stead urged that "willfully" requires "a specific intent to violate the securities law" (Tr. 2867), a heightened standard that he disavows on appeal, and that was ex-pressly rejected by the cases on which he now re-lies. (Br. 61 ("defendants need not know what *specific* law they are violating")); *see United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020) (a defendant "need not

31

be aware of the specific law or rule that his conduct may be violating"); *see also Grote*, 961 F.3d at 115 (where defendant made request to charge, but did not object to district court's different instruction in accordance with Rule 30(d), plain error review applies).

Bankman-Fried's claim fails under any standard, because it is exactly the argument that this Court rejected in *Kaiser*, which held that securities fraud "do[es] not require a showing that a defendant had an awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of the general wrongfulness of his conduct." 609 F.3d at 569; *see also id.* at 568; *Bryan v. United States*, 524 U.S. 184, 191-92 n.13 (1998) (collecting cases using the "bad purpose" formulation without referring to knowledge-of-unlawfulness).

Bankman-Fried tries to evade the clear holding of *Kaiser* by discussing later cases (Br. 60-61) that could not, and did not purport to, overturn *Kaiser*. Two do not even concern the statutes at issue here. *See United States v. Kukushkin*, 61 F.4th 327, 332 (2d Cir. 2023); *United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 154 (2d Cir. 2024). Nor is their reasoning in tension with *Kaiser*'s: As that decision explains, the types of fraud at issue here require proof that the defendant intentionally deceived investors, meaning that a defendant who believed he was acting innocently cannot possibly be convicted, which obviates the need for a specific finding that the defendant knew he was acting unlawfully. *See* 609 F.3d at 569-70; *see also United States v. George*, 386 F.3d 383, 393-94 (2d Cir. 2004) ("willful" is interpreted "to require only the minimum

32

*mens rea* necessary to separate innocent from wrong-ful conduct").

Nor does Bankman-Fried derive any support from *Kosinski*, 976 F.3d 135. Although *Kosinski* affirmed a jury instruction requiring proof of a defendant's "bad purpose either to disobey or to disregard the law," *id.* at 153, it nowhere called into question the holding or reasoning of *Kaiser*. To the contrary, *Kosinki* relied on *Kaiser* in rejecting the argument that the jury should have been required to find a specific intent to violate the securities laws. *Id.* at 154-55. Thus, well after *Kosinki*, this Court cited *Kaiser* when affirming a jury instruction that defined "willfully" under the securi-ties fraud statute as "act[ing] deliberately and with a bad purpose, rather than innocently." *Petit*, 2022 WL 3581648, at *4.

Bankman-Fried also errs in making the related ar-gument that the jury should have been charged that "[g]ood faith is an honest belief by the defendant that his conduct was not unlawful." (Br. 59 (citing A-1072)). This claim is, unlike the prior one, preserved. (*See* A-1072-74, 1212-13). But it is no more meritorious. It is inconceivable that a defendant could act in good faith while intentionally deceiving his investors—as the jury was required to find in order to convict. (*see* A-1152 (requiring jury to find that Bankman-Fried agreed to "accomplish the unlawful objective" of the conspiracy (securities fraud); 1131, 1155 (requiring that jury to find that Bankman Fried acted with an intent to defraud)). That is the essence of *Kaiser*'s rea-soning: although other criminal acts, such as insider trading, might be committed with an innocent state of

33

mind if the perpetrator did not know his actions had been outlawed, "[t]he same cannot be said of one who deliberately misleads investors about a security." 609 F.3d at 569. And where, as here, a court properly instructs on the applicable willfulness standard, the instructions will also adequately convey "the essence of a 'good faith defense' instruction." *Kukushkin*, 61 F.4th at 334 (collecting cases).

In any event, any error in not giving the exact good faith instruction requested by Bankman-Fried would be harmless. The District Court told the jury that good faith was "a complete defense," explaining that "[g]ood faith is an honest belief by the defendant that his conduct was not wrongfully intended." (A-1133). Bankman-Fried cannot reasonably claim that the jury which convicted him under that instruction would not have done the same under his proposed instruction, which turned on whether he "believed in good faith that he was acting properly." (A-611). Given the overwhelming evidence that Bankman engaged in a sustained course of deceit toward his customers, investors, and lenders (*see supra* at 2-13), he could not have prevailed under either definition of good faith. *Cf. Petit*, 2022 WL 3581648, at *4 ("Conduct such as arranging secret loans or modifying contracts with surreptitious emails is enough to infer willfulness.").[8]

_____

[8]   Bankman-Fried attempts to show that the instructions he has appealed prejudiced him by complaining about other instructions he has not challenged on appeal. (Br. 63-64). But "issues adverted to in a perfunctory manner, unaccompanied by some

34

Finally, Bankman-Fried did not object to the willfulness instruction for Count Six, and he identifies no reason to treat commodities, as opposed to securities, fraud conspiracy differently. His claim therefore fails every prong of plain error review. *See Marcus*, 560 U.S. at 262.

## POINT II

### The District Court's Evidentiary Rulings Were Correct

#### A. Applicable Law

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Under Rule 402, relevant evidence is generally admissible. *See* Fed. R. Evid. 402. But relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

––––––––––

effort at developed argumentation, are deemed waived." *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013). Nor can he rectify this omission in his reply brief. *United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) ("[I]t is well-settled that we will not usually entertain an argument made for the first time in a reply brief.").

35

Because a district court "ha[s] broad discretion to decide evidentiary issues," *United States v. Atilla*, 966 F.3d 118, 131 (2d Cir. 2020), this Court reviews evidentiary rulings "under a deferential abuse of discretion standard," *United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021), and "will find an abuse of discretion only where the trial judge ruled in an arbitrary or irrational fashion." *United States v. Kelley*, 551 F.3d 171, 175 (2d Cir. 2009).

Where a defendant fails to assert an objection in the district court, evidentiary rulings are reviewed for plain error only. *See, e.g.*, *United States v. Simels*, 654 F.3d 161, 168 (2d Cir. 2011). But "[t]he law is well established that if, as a tactical matter, a party raises no objection to a purported error, such inaction constitutes a true waiver which will negate even plain error review." *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007); *see also United States v. Bodnar*, 37 F.4th 833, 844 (2d Cir. 2022) (finding true waiver of evidentiary challenge where record indicated that defense counsel "made a considered decision *not* to object").

Even when a defendant preserves his objection to a district court's evidentiary ruling, and that ruling is "manifestly erroneous," the defendant is not entitled to a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012).

36

## B. The District Court Properly Limited Evidence on Loss

### 1. Relevant Facts

In advance of trial, the Government moved to preclude Bankman-Fried from arguing that because he ultimately intended to repay his victims, he was not guilty of fraud. (Dkt. 204 at 41-44). In response, Bankman-Fried explained that his "defense is not that he intended to steal funds and give them back," but that he should be permitted to offer "evidence of Mr. Bankman-Fried's good-faith belief that FTX and Alameda were not acting improperly with respect to FTX customer assets." (Dkt. 246 at 27-28). The District Court granted the Government's unopposed motion to preclude evidence or argument that Bankman-Fried "intended to return or repay victims' funds and therefore . . . did not act with intent to defraud," but denied the motion without prejudice "to the extent that the defendant seeks to introduce evidence and argument probative of his alleged good-faith belief that FTX and Alameda's handling of customer assets was permitted by law." (Dkt. 289 at 11-12).

Both parties also moved to exclude evidence related to the FTX bankruptcy, including about whether or not victims would be made whole. (Dkts. 204 at 43-44, 207 at 8). Bankman-Fried further moved to "exclude evidence that FTX and Alameda filed for bankruptcy" (Dkt. 207 at 8), which the Government opposed, "as it was FTX's inability to honor customer withdrawals that caused the company to declare bankruptcy." (Dkt. 245 at 1).

37

The District Court granted the unopposed motion to preclude evidence about the value of assets recovered through FTX's bankruptcy "for purposes of suggesting to the jury that the victims will be made whole," that the asset recovery "somehow diminishes the scale of the fraud, or that, with more time, FTX could have satisfied customer withdrawals." (Dkt. 289 at 12). The District Court denied Bankman-Fried's motion to "preclude any evidence whatsoever of the bankruptcy," explaining that this "would go too far" because "[t]hose facts, which are undisputed by the parties, are intertwined inextricably with the crimes alleged in the Indictment" and are "direct evidence of at least one of the criminal conspiracies." (Dkt. 289 at 14-15).

At the outset of trial, the Government moved to preclude "evidence or argument about the current value of certain investments made by the defendant," including an investment in Anthropic, because such evidence "could only be used to support the argument that FTX customers and/or other victims will ultimately be made whole." (Dkt. 315 at 1).[9] Bankman-Fried argued that such evidence would rebut the claim that "Alameda's venture-capital investment strategy was wasteful or reckless," but conceded that such evidence could not be used to "improperly suggest that customers, lenders, and investors would be repaid."

---

[9] Because Anthropic was privately traded, the valuation itself was potentially misleading and confusing to a jury, given that there may not have been a market to liquidate all the shares at the valuation price. (Tr. 951-52).

38

(Dkt. 317 at 2). Judge Kaplan found that the potential
for prejudice outweighed any probative value:

> The crime charged is that he took the
> money. . . . And what he did with it after-
> ward doesn't matter. This is like saying
> that if I break into the Federal Reserve
> Bank, make off with a million bucks,
> spend it all on Powerball tickets and hap-
> pen to win, it was okay. . . . [T]he crime is
> the misappropriation. That's it, it's fin-
> ished, the minute the misappropriation
> happens, whether it's used wisely, [or]
> foolishly[.]

(Tr. 952-53).

Throughout trial, Bankman-Fried argued that he
acted in good faith because he believed "the funds were
permitted to be loaned by FTX to Alameda" and "there
was sufficient assets for them to be paid back." (Tr. 49;
*see also, e.g.*, Tr. 52, 3033).

## 2. Discussion

Bankman-Fried argues on appeal that "excluding
evidence that Bankman-Fried believed he could repay
customers and lenders gutted his core defense—that
FTX and Alameda faced a liquidity crisis, not a sol-
vency crisis, and he reasonably believed that with
enough time, their assets could easily satisfy their lia-
bilities." (Br. 28). But Bankman-Fried expressly dis-
claimed this defense below, telling the District Court
that his "defense is *not* that he intended to steal funds
and give them back" (Dkt. 246 at 28 (emphasis added)),
that "evidence or argument about whether [FTX] will

39

be able to make [customers] whole is irrelevant, speculative, and unduly prejudicial" (Dkt. 246 at 28-29 n.7), and that evidence about the value of investments made with FTX customers' funds could not be used to "improperly suggest that customers, lenders, and investors would be repaid." (Dkt. 317 at 2). These concessions on thoroughly briefed issues constitute true waiver. *See Quinones*, 511 F.3d at 321; *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

Even if his objection were not waived, Bankman-Fried cannot demonstrate plain error. On the contrary, it was well within Judge Kaplan's broad discretion to exclude evidence that was irrelevant and likely to confuse the jury. *See United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995) ("Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant . . . evidence."). A defendant's constitutional due process rights do not include a right to advance legally irrelevant claims to the jury. *See, e.g.*, *United States v. Villegas*, 899 F.2d 1324, 1343 (2d Cir. 1990) (in context of duress defense, holding that "no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial").

As Bankman-Fried recognized below—but now disputes on appeal—any suggestion that he lacked intent to defraud because he intended to ultimately repay his customers was legally improper and prejudicial, for the same reason the jury instructions on intent to defraud were correct. *See supra* Point I. In short, the harm contemplated by the wire fraud statute encompasses the temporary wrongful deprivation of

40

property. *E.g.*, *Males*, 459 F.3d at 158-59. Thus, as Judge Kaplan explained, Bankman-Fried defrauded FTX customers the instant he transferred their funds to Alameda, regardless how strongly he believed he might later return the property. Where there is an "immediate intent to misapply and defraud," the offense is "complete," and what "might have later happened as to repayment is not material and could not be a defense." *United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980).[10]

Bankman-Fried insists that he was denied a right to present "counterproof" to the Government's evidence of loss, but he is comparing apples to oranges. The Government's evidence had a legally relevant

_____

[10] Bankman-Fried asserts that *Sindona*'s "logic" is "spurious." (Br. 30). But it would remain binding precedent even if that were so. And *Sindona* offers just one example of the oft-repeated principle that "an intent to return money or property is not a defense to the charge of embezzlement." *United States v. Thomas*, 581 F. App'x 100, 102 n.3 (2d Cir. 2014); *see also, e.g.*, *United States v. McElroy*, 910 F.2d 1016, 1025 (2d Cir. 1990) ("evidence of repayment is generally irrelevant" because the "offense occurred and was complete when the misapplication took place"); *United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005) ("Nor is it a defense to [wire fraud] that the accused voluntarily returned the funds."). That is why time and again this Court has approved a no-ultimate-harm jury instruction, which embodies that principle. *See supra* Point I.B.2.b.

41

foundation—the hole in FTX's balance sheet when FTX declared bankruptcy proved that customer money was not being custodied in the manner represented by Bankman-Fried. (*See, e.g.*, Tr. 450, 464, 646 (testimony that there was not enough money for customers in November 2022 "[b]ecause Alameda had taken it to make our own investments and to repay our lenders")). When victims testified—without objection from the defense—about being unable to withdraw their funds held on FTX, this was contrary to the assurances Bankman-Fried had made to them during the scheme, including in his contemporaneous tweets. (*See* Tr. 80-81, 89-92, 131, 339-40, 1289-94).

By contrast, Bankman-Fried makes factual claims that post-date the relevant events, and therefore lack relevance. He claims that "everyone now knows" FTX customers will be made whole. (Br. 22, 35). Even if this were so,[11] it would not be "counterproof" to the Government arguments he decries, because those arguments relied on the state of affairs at the time of the crime to prove his intent. For example, Bankman-Fried excerpts the Government's argument that it was "very clear to the defendant" that FTX was "deeply in

_____

[11] In fact, many if not most FTX customers will never get back either the amount of actual fiat money they deposited with FTX nor the value of the cryptocurrency they were falsely told their deposits had been used to purchase. (Dkt. 410 at 43-45). Even Bankman-Fried acknowledges that FTX victims may never be made whole given the form in which they are being compensated. (Br. 35 n.2).

42

the red." (Br. 27 (citing A-1087, 1091)). But the Government was expressly describing events in 2022, when FTX plainly was "missing" over $10 billion. (*See* A-1087 ("in June 2022") ("at this point in time"), A-1091 ("in June 2022" it "was very clear to the defendant" that FTX "was 10 billion plus in the hole").[12] That contemporaneous understanding bore directly on Bankman-Fried's knowledge, at the time of the charged conduct, that he had taken FTX customer money to use elsewhere, and that he lied when he said that FTX deposits were safe, among other things. By contrast, Bankman-Fried's claim that—more than two years later—Alameda's investments ultimately paid off, provides "no excuse for the real and immediate loss contemplated to result from the defendant's fraudulent conduct." *Calderon*, 944 F.3d at 90.

To the extent Bankman-Fried wanted to introduce evidence about his investments to show that

──────────

[12] Similarly, Bankman-Fried complains that the Government argued that he knew that Alameda "did not have the assets to cover this giant debt to FTX customers." (Br. 34 (quoting A-1110)). But that assertion followed a detailed discussion of the balance sheets Bankman-Fried reviewed in 2022, and how those balance sheets reflected inadequate liquid assets to repay FTX customers at that time. (A-1110). Once again, the point was not that Bankman-Fried made bad long-term investments, but that he misappropriated customer deposits *at the time*, contrary to his representations about what FTX would do with its depositors' property.

43

Alameda's investment strategy was not "reckless" (Dkt. 317 at 2), Judge Kaplan was well within his discretion to conclude that any minimal probative value was far outweighed by the risk of unfair prejudice. As Bankman-Fried conceded, this evidence risked "improperly suggest[ing] that customers, lenders, and investors would be repaid." (Dkt. 317 at 2). And as the District Court recognized, Bankman-Fried's guilt did not turn on whether his investments were reckless, because the money was not his to invest. (Tr. 952-53). On the other hand, Ellison's testimony that she warned Bankman-Fried about the risks of making additional investments was highly probative of Bankman-Fried's intent because—as Bankman-Fried admitted—he made the investments knowing that they carried risk to FTX. (*See, e.g.*, Tr. 704-05, 738-39, 2519, 2704). Moreover, Bankman-Fried's illicit spending was not limited to potentially profitable venture investments, but also included expenditures such as billions of dollars in repayments to third-party lenders and hundreds of millions of dollars on real estate and political contributions. (*See, e.g.*, GX-1018, 1026, 1031, 1039).

Finally, Bankman-Fried cannot show prejudice. For the same reason that the no-ultimate-harm instruction was proper, *see supra* Point I.B.2.b, excluding evidence of the ultimate financial outcome was harmless. Moreover, the District Court's ruling was far from "categorical, barring an entire defense" (Br. 33), and instead gave Bankman-Fried substantial leeway for his good faith defense (Dkt. 289 at 11-12). Bankman-Fried testified repeatedly that although aware of Alameda's multi-billion-dollar liability to FTX, he believed it could be repaid because Alameda's net asset

44

value was $10 billion. (Tr. 2465-69, 2478-80, 2491-92, 2497, 2526, 2542-43). Bankman-Fried used that testimony to make his good faith arguments. (*See, e.g.*, Tr. 49-52 (Bankman-Fried "believed they had the assets to weather the storm"); 3032-33 ("[H]e always thought that Alameda had sufficient assets on the exchange and off the exchange to cover all of its liabilities"), 3038, 3059, 3073, 3111-12).

Bankman-Fried complains that he was prevented from presenting corroborating evidence, without explaining what that evidence would have been or how it would have helped (Br. 18). The Government did not dispute that Alameda's balance sheets showed a positive net asset value, only the import of that value. Alameda's balance sheet included many illiquid assets that could not likely be sold to cover Alameda's liabilities, as Bankman-Fried and his coconspirators understood. (Tr. 679-83, 699-700, 714-15, 791-94, 896-97, 925 (Ellison explaining that she did not consider Alameda to be solvent "[b]ecause we had debts to FTX that were much larger than what we could realistically repay"), 1464 (Singh felt "uncomfortable" characterizing FTX as "solvent or well capitalized" because "neither was true"). Bankman-Fried cross-examined these witnesses about Alameda's net assets, and although none disputed that they existed, each explained why they were cold comfort. (*See, e.g.*, Tr. 524-25, 571-74, 995-96, 1061; *see also* Tr. 1803 (cross-examining the expert witness about the failure to perform a net asset value analysis)).

Thus, neither corroborating the existence of these illiquid assets in 2022, nor showing that they held

45

long-term value in 2024, could have undermined the overwhelming evidence that at least by the Fall of 2022, Bankman-Fried understood that Alameda had used more FTX customer money than it could then expect to repay—in direct contravention of his many public statements about how FTX treated customer money—and yet continued to accept customer deposits and misappropriate customer funds. *See supra* at pages 4-9.

## C. The District Court Properly Limited Evidence About the Presence of Counsel After a Hearing

### 1. Relevant Facts

After an order from the District Court to provide a pretrial advice of counsel disclosure (Dkt. 243 at 1), Bankman-Fried informed the Government that he did "not intend to present a formal advice of counsel defense," but intended to elicit evidence that attorneys "were involved in reviewing and approving decisions related to several matters at issue in this case, which gave [Bankman-Fried] assurance that he was acting in good faith." (Add. 6; *see also* Dkts. 204 at 44, 246 at 29).

In a later pretrial order, the District Court noted that Bankman-Fried was not asserting a "formal advice-of-counsel defense, which would require him to establish" that he made a "complete disclosure" to counsel about the matter at issue and sought advice about its legality, among other things. (Dkt. 303 at 2-3). The District Court emphasized the "risk of confusion and unfair prejudice to the government" if Bankman-Fried were permitted to "focus on the presence or

46

involvement of lawyers . . . without any degree of spec-ificity about what they were present for or involved in, what their tasks were, what exactly they knew, and what the defendant knew about what the lawyers knew and were doing." (Dkt. 303 at 9). At the same time, the District Court recognized that there "may be circumstances in which" the involvement of lawyers "might have a real bearing on" fraudulent intent. (Dkt. 303 at 9). The District Court held that such evidence could not be offered without "prior notice to the Court and the government outside the presence of the jury." (Dkt. 303 at 10).

After the Government rested, Bankman-Fried pro-vided notice of "certain testimony we anticipate elicit-ing from Mr. Bankman-Fried" about his "knowledge of the involvement of counsel in certain matters." (Dkt. 338 at 1). Bankman-Fried argued that certain topics were relevant—such as the involvement of counsel in data retention policies and the formation of Alameda-controlled bank accounts—but did not specify the na-ture of the attorneys' involvement, what the attorneys knew, and the substance of the relevant attorney com-munications. (Dkt. 338 at 1-4).

Judge Kaplan "concluded that in order to deter-mine" the "admissibility of certain areas of proposed testimony . . . I am going to take the testimony initially out of the presence of the jury because the letter pro-vides insufficient detail for me to rule on it." (Tr. 2072). Bankman-Fried did not object to the hearing, but ra-ther told Judge Kaplan: "Whatever your Honor wants. We're ready to start, if you'd like." (Tr. 2167). Bank-man-Fried testified outside the jury's presence about

47

the topics in his letter. (Tr. 2170-2207). Without objection, the Government proceeded to cross examine Bankman-Fried. (Tr. 2207). Bankman-Fried's counsel objected to certain specific questions as outside the scope of the direct examination, many of which Judge Kaplan overruled because the questions probed what Bankman-Fried did or did not share with his attorneys. (*See, e.g.*, Tr. 2241 (Q: "Did you have any conversations with lawyers about Alameda spending FTX customer money that was deposited into its bank accounts?")).

Bankman-Fried's counsel argued that the testimony was admissible, even though "[o]ur position is not that any of these are entitled to a formal advice-of-counsel defense—we have been very clear with the Court from the beginning to that effect." (Tr. 2273). The Government argued that any probative value was outweighed by the risk of unfair prejudice, because Bankman-Fried had admitted that he did not discuss with lawyers the use of customer funds and "whether or not it was proper," and therefore the areas of supposed "lawyer involvement go to collateral issues" unrelated to "whether [Bankman-Fried] believed the use of funds was improper." (Tr. 2277-79).

The following day, Bankman-Fried's counsel asserted that the Government's cross-examination "amounted to a deposition" and that the "process was improper." (Tr. 2288). The Government noted that Bankman-Fried "waived a wholesale objection to cross-examination because this objection was not raised before cross-examination began," to which the District Court responded: "Clearly correct." (Tr. 2288).

48

The District Court held that its rulings stood with respect to the "quite limited" objections made the previous day. (Tr. 2289).

The District Court explained that it had initially "declined to rule" on the admissibility of Bankman-Fried's proposed testimony about the involvement of counsel because the defense notice "was at such a high level of generalization that the relevant facts were just not articulated." (Tr. 2290). The District Court emphasized the risk of prejudice from offering communications with counsel that do not support an advice-of-counsel instruction. Such evidence can result in a "very misleading impression, depending on the facts" that "because lawyers were involved in some degree or another . . . the defendant was entitled to take comfort from the involvement of the lawyers in assuming or believing that he was acting within the bounds of the law," even without evidence that he "put all of the relevant facts in front of the lawyer, and the lawyer advised [him] that it was lawful." (Tr. 2290).

In light of the hearing testimony, the District Court held that Bankman-Fried was permitted to "adduce evidence that counsel were involved in preparing the data retention policy." (Tr. 2291-92). As for the remaining areas of proposed testimony, Judge Kaplan described the relevance as "exceptionally tenuous, if it has any at all, and my best judgment is it has none at all," and found that any probative value "would be outweighed substantially by the risk of unfair prejudice." (Tr. 2292). The District Court explained that the remaining topics "all involve circumstances in which lawyers drafted plain vanilla legal documents and in

49

which the alleged problem was not the transaction in the document per se, it was what was done and with what intent collateral to the document." (Tr. 2292). Therefore, the "evidence would, in my judgment, be confusing and highly prejudicial by falsely implying, given the testimony yesterday, that the lawyers, with full knowledge of the facts, all of the facts, blessed what the defendant is alleged to have done. And I didn't hear that at all yesterday." (Tr. 2292). Judge Kaplan also noted that "[i]n the event there's a conviction, I will write on the subject . . . more extensively." (Tr. 2292).

After Bankman-Fried's conviction, the District Court issued a written opinion. (SPA-75-87). In "view of the generality of the defendant's notice, the Court took an offer of proof in question and answer form from the defendant outside the presence of the jury pursuant to Federal Rules of Evidence 103 and 104." (SPA-79-80). And because Bankman-Fried disclaimed a formal advice-of-counsel defense, the District Court considered the proffered testimony under Rules 401 and 403, consistent with the approach "employed by other courts in this district in similar circumstances." (SPA-81-82 (citing cases)). The District Court explained that it "considered each area of testimony proffered by Mr. Bankman-Fried in detail" (SPA-83), and determined that the lawyers' involvement was irrelevant to Bankman-Fried's "state of mind in using FTX customer funds, conduct of which the lawyers were unaware." (SPA-85). Yet the testimony risked misleading the jury that counsels' involvement assured Bankman-Fried that "his misappropriation of customer funds was permissible." (SPA-86).

50

## 2.  Discussion

### a.  The District Court Properly Limited Testimony About the Involvement of Lawyers in Collateral Matters

The District Court reasonably concluded that allowing Bankman-Fried to offer evidence that attorneys were involved in several collateral matters created far more risk of confusion and unfair prejudice than it would offer in probative value. For example, that attorneys drafted documents by which Bankman-Fried took loans from Alameda had no relevance on its own terms (Tr. 2292-93), yet could suggest that lawyers had approved the larger scheme which allowed Bankman-Fried access to the funds underlying the loans. (SPA-85). There is nothing unusual about district courts excluding evidence that tends to suggest lawyers blessed the charged conduct, absent some evidence that the lawyers actually did so. *E.g.*, *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 683-84 (S.D.N.Y. 2013); *S.E.C. v. Lek Securities Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019). Nor does Bankman-Fried meaningfully engage with Judge Kaplan's careful, fact-specific reasoning in admitting one aspect of his proffered evidence while excluding several others. (Tr. 2291-93; SPA-83-87).

Instead, Bankman-Fried offers misdirection. He repeatedly discusses the contours of "an advice-of-counsel defense." (Br. 37-38, 41-46, 51). But that phrase refers to a defendant's claim that before embarking on the conduct with which he is charged, he "fully and honestly laid all the facts before his counsel and in

51

good faith and honestly followed counsel's advice." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). Bankman-Fried was explicit in the District Court that he was *not* offering any such defense. (Dkt. 246 at 29; Tr. 2273-74). He also does not claim now— nor could he reasonably—that during or before committing the charged frauds, he explained to his attorneys all the relevant facts, then relied on their advice that his conduct was lawful. (*See, e.g.*, Tr. 2241). Bankman-Fried has never offered anything resembling what is typically considered "an advice-of-counsel defense." *See, e.g.*, *Scully*, 877 F.3d at 473-76; *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194-95 (2d Cir. 1989).[13]

This defeats Bankman-Fried's claim that "[t]his case is on all fours with *Scully*." (Br. 47-50). In *Scully*, the defendant was charged with operating a fraudulent pharmacological business. The district court barred the defendant from testifying that his attorney

_____

[13] Bankman-Fried refers to a pretrial statement that he "would present an advice-of-counsel defense" (Br. 38), but this was an early preliminary assertion to the Government, devoid of any content as to what advice he relied on, and which he soon abandoned. (*See* A-401-02). Bankman-Fried subsequently, repeatedly (before and during trial), and explicitly disclaimed any formal advice-of-counsel defense and sought only to testify that he consulted with lawyers on several collateral topics. (*E.g.*, Add. 6; Dkt. 246 at 29; Tr. 2273, 2274 ("We have never advanced the formal advice-of-counsel defense, as your Honor knows.")).

52

—a former prosecutor with experience in FDA compliance—"had given his approval and said the business was completely legal." *Scully*, 877 F.3d at 471, 475. That testimony, had it been credited by the jury, would have negated fraudulent intent. *See id.* at 475. Bankman-Fried does not, and cannot, suggest that the excluded testimony here had anything like that central connection to his mental state. Nor does *Scully* stand for the blanket proposition that "a defendant's testimony on his discussions with his counsel are relevant to good faith" (Br. 48) regardless of the topic or what the lawyer said—which is why *Scully* examined the probative value of the specific testimony at issue before finding its exclusion improper.

Bankman-Fried also errs in claiming that this case resembles *Scully* because in both cases testimony was excluded as "misleading." (Br. 49). In *Scully*, the district court believed the defendant's claim to have received legal advice was misleading in the sense that it was false—that the defendant appeared to be lying about whether he had in fact received this advice. 877 F.3d at 474-75. This Court explained that such credibility determinations were for the jury. *Id.* Here, Judge Kaplan did the opposite—his opinion relied on Bankman-Fried's testimony that he did not disclose the relevant facts to counsel. (SPA-86-87). Unlike in *Scully*, Judge Kaplan's concern was that Bankman-Fried's testimony was "misleading" in that even if entirely true, it risked wrongly implying that Bankman-Fried's conduct was lawful simply because lawyers were involved in its peripheral aspects. (SPA-82-83, 86). That sort of misleading evidence is exactly what Rule 403 says district courts should exclude. *See* Fed. R. Evid.

53

403 (relevant evidence may be excluded "if its proba-
tive value is substantially outweighed by a danger of
. . . misleading the jury," among other things).

Nor did the District Court rely on a "novel ra-
tionale" of "harm to the public interest." (Br. 48).
Judge Kaplan used the phrase "public interest" exactly
twice—once in ruling for Bankman-Fried—as short-
hand for those interests to be weighed against the de-
fendant's in the Rule 403 balancing test. (Tr. 2290,
2291). Read as a whole, Judge Kaplan's oral and writ-
ten decisions were firmly rooted in the routine rele-
vance and prejudice analysis of Rules 401 and 403.
(*See* Tr. 2292-93; SPA-81-87).[14] Because Bankman-
Fried has not even attempted to engage with the rea-
soning actually contained in the District Court's rul-
ing, he has shown no error in those rulings, much less
overcome the "deferential abuse of discretion

—————

[14] Bankman-Fried claims it was improper for
Judge Kaplan to issue a written opinion further ex-
plaining his initial oral ruling, citing *Old Chief v.
United States*, 519 U.S. 172, 182 n.6 (1997) (Br. 48-49
& n.4). Unsurprisingly, *Old Chief* does not in fact con-
demn the common practice of district courts making
brief oral rulings to keep trials moving, then later writ-
ing to more fully explain their reasoning. Rather, *Old
Chief* explains that district courts' exercise of discre-
tion must be evaluated based on what they knew at
the time of their decision, and that appellate courts
should "not indulge in review by hindsight." 519 U.S.
at 182 n.6.

54

standard" applicable to rulings under Rule 403. *Skelos*, 988 F.3d at 662.

For similar reasons, the District Court's jury instructions on advice-of-counsel were not erroneous. To start, what Bankman-Fried now characterizes as "false" (Br. 51), was taken straight from Bankman-Fried's own requests to charge: "A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case." (Dkt. 327 at 58). "Such affirmative endorsement of the district court's jury instructions waives the right to appellate review." *Scully*, 877 F.3d at 476. Moreover, although in certain circumstances a "defendant *can* legally claim he is not guilty because he relied on a lawyer and therefore acted in good faith" (Br. 52), "defendants are entitled to an advice-of-counsel instruction only if there are sufficient facts in the record to support the defense," *Scully*, 877 F.3d at 476. Bankman-Fried has never identified any such facts here. *Id.* ("There must be evidence such that a reasonable juror could find that the defendant honestly and in good faith sought the advice of counsel, fully and honestly laid all the facts before his counsel, and in good faith and honestly followed counsel's advice.").

In any event, any error with respect to these evidentiary or instructional issues would be harmless, for the same reason that the evidence was minimally probative. Even had Bankman-Fried introduced evidence that lawyers were involved in certain company decisions, it was undisputed that no lawyer knew about, let alone blessed, the misappropriation of FTX customer funds. Bankman-Fried claims his consultation

55

with lawyers on other topics would have rebutted the suggestion that "numerous FTX business practices were unusual and inherently deceptive." (Br. 53). But Bankman-Fried was permitted to offer evidence about lawyers' involvement in the data retention policy (Tr. 1991-92, 2442-43), and it was undisputed that lawyers were involved in documenting loans (Tr. 1946-50). If anything, further testimony that lawyers participated in certain decisions would have underscored Bankman-Fried's deception because, even by Bankman-Fried's account, the lawyers were not informed or consulted about the use of customer funds. (Tr. 2241-46). Likewise, Bankman-Fried fails to explain how his proffered evidence would have rebutted the testimony of FTX's former general counsel, to which he did not object. (Br. 54). Because the excluded evidence was collateral to the question of criminal intent, and Bankman-Fried has never identified facts that would entitle him to an advice-of-counsel instruction, this Court can conclude beyond a reasonable doubt that the evidence would not have affected the jury's determination that Bankman-Fried acted with the intent to defraud. *See Neder*, 527 U.S. at 15.

### b. The Hearing Was a Proper Exercise of the District Court's Discretion

Bankman-Fried claims that the District Court lacked authority to require him to disclose the evidence he intended to offer concerning his consultations with counsel. (Br. 43). But although certain evidentiary rules list particular defenses that a defendant *must* disclose in advance of trial, district courts have discretion to order defendants to provide pretrial

56

notice beyond the defenses expressly listed in the rules of evidence. *See United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990) (affirming district court's order of pretrial disclosure and hearing on duress defense); *see also United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018), *aff'd* 820 F. App'x 23 (2d Cir. 2020) (order requiring pretrial disclosure of advice of counsel defense); *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018) ("Although the Federal Rules of Criminal Procedure do not specifically require defendants to provide pretrial notice of an advice-of-counsel defense, courts have broad discretion to impose disclosure and notice requirements outside the rules."). *Cf. United States v. McSherry*, 226 F.3d 153, 157 (2d Cir. 2000) (explaining that "[n]othing in Rule 12.2 can be read to supplant the inherent authority exercised here by the trial court"). As the Supreme Court recognized in affirming a district court order that was not expressly authorized by the Federal Rules, district courts have "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin,* 579 U.S. 40, 47 (2016).[15]

—————

[15] Bankman-Fried relies on out-of-Circuit district court cases (Br. 43-44), but such cases do not show error—much less plain error—in the common practice within this Circuit of requiring pretrial disclosures to prevent the logistical difficulties that can arise when advice-of-counsel issues are litigated mid-trial. *See, e.g.*, *United States v. Schulte*, No. 17 Cr. 548 (PAC),

57

The District Court also did not err, much less plainly err, by conducting a hearing before admitting Bankman-Fried's testimony. Rule 104 requires district courts to decide issues of admissibility and allows courts to "conduct any hearing on a preliminary question so that the jury cannot hear it if . . . justice so requires." Fed. R. Evid. 104(c); *see also* Fed. R. Evid. 611(a) (district courts may exercise "reasonable control" over mode and presentation of evidence). Bankman-Fried has not identified any case in which this Court held, or even suggested, that a district court abused its discretion by resolving a question of admissibility in a hearing outside the jury's presence, rather than on a question-by-question basis before the jury. Nor can he seriously claim that he had "no choice but to acquiesce to the hearing." (Br. 45 n.3). His bluster aside, when the District Court provided Bankman-Fried an opportunity to compensate for his deficient notice with a hearing, Bankman-Fried did not object or resist, nor did he assert that cross-examination should be disallowed, but rather confirmed he was ready to begin immediately. (Tr. 2167).

Bankman-Fried claims that this Court has never approved such a hearing. But even if true, the absence of precedent cannot establish plain error. *See Weintraub*, 273 F.3d at 152. And in *Bakhtiari*, this Court affirmed the District Court's preclusion of a duress defense after conducting a pretrial hearing at which the

––––––––

2020 WL 133620, at *6 (S.D.N.Y. Jan. 13, 2020); *Scali*, 2018 WL 461441, at *8; *United States v. Rubin/Chambers*, 828 F. Supp. 2d 698, 711 (S.D.N.Y. 2011).

58

defendant testified. *Bakhtiari*, 913 F.2d at 1056-58. This Court explained that the district court "appropriately held a pre-trial hearing of the type . . . authorized by the Supreme Court," which "enabled . . . [the District Court] to preclude the evidence and thereby avoid unnecessary jury confusion." *Id.* at 1057.

There was also nothing unusual, much less improper, about Bankman-Fried facing cross-examination, and so even if he had objected to this common procedure—which he did not—the objection would have been meritless. Rule 104 permits cross-examination at a hearing, and its use to impeach later trial testimony. *See United States v. Jaswal*, 47 F.3d 539, 543-44 (2d Cir. 1995). Here, the scope of cross-examination was proper because it concerned conversations with counsel, what Bankman-Fried disclosed to counsel, and "also what he knew and therefore what he did or did not share with counsel at the relevant times." (Tr. 2289). With respect to Bankman-Fried's complaint about the length of cross-examination (Br. 40), that resulted from his own long, unresponsive answers. (*See, e.g.*, Tr. 2244 (answer of over 250 words that the District Court deemed unresponsive); 2259 (District Court noting that "you have been asked that question in one form or another quite a number of times" without answering it)).

Bankman-Fried also cannot show prejudice. He insinuates that he was wrongly forced to divulge his defense and preview his testimony. (Br. 45). But the hearing occurred after the Government rested, and the Supreme Court has rejected the notion that defendants have a constitutional right to ambush the

59

prosecution or the trial court with surprise evidence. *See Williams v. Florida*, 399 U.S. 78, 82 (1970) ("The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played."). Bankman-Fried's *ipse dixit* that the hearing gave the Government a "major tactical advantage" (Br. 52) also fails to prove that it actually did so. It is equally plausible that Bankman-Fried benefitted from first testifying outside the presence of the jury—in his trial testimony, he avoided the long-winded answers that had come across as evasive, and abandoned certain assertions that fell apart on the stand. (*See, e.g.*, Tr. 2235, 2244-45). The Government, on the other hand, used Bankman-Fried's hearing testimony for impeachment only once (Tr. 2665-66), and its cross-examination of Bankman-Fried before the jury had minimal overlap with the subject of the hearing.

## POINT III

### The District Court Properly Denied Bankman-Fried's Request to Order the Government to Review the Files of the Third-Party Debtors

#### A. Relevant Facts

During its investigation, the Government served a document request on FTX and Alameda (the "Debtors"). (A-1305). The Government did not use a grand jury subpoena because some records and entities were located outside the United States and not susceptible to subpoena. (Dkt. 149 at 61). The Government served additional record requests to the Debtors before trial,

60

some of which were the result of requests made by Bankman-Fried to the Government for particular materials. (Dkt. 249 at 11).

Between November 2022 and October 2023, the Debtors produced approximately one million documents, as well as copies of FTX's transaction database and its computer code, all of which Bankman-Fried received in discovery. (Dkt. 149 at 61). The Government also produced millions of pages of additional records obtained from third parties or pursuant to search warrants. Among those records were complete copies of Bankman-Fried's email accounts and a copy of the FTX code extracted from Wang's laptop. (Dkts. 149 at 78, 38 at 6-8, 161 at 2-3).

Although the Debtors publicly pledged general "cooperation" with the investigation (A-189-90), they entered no agreement obligating them to produce documents to the Government. (Dkt. 149 at 63). In some instances, the Debtors asked the Government to narrow the scope of its requests, resisted providing data because of security concerns, or declined to produce information based on claims of privilege. (Dkt. 149 at 61). The Debtors also had no involvement in any witness interviews conducted by the Government, or in determining prosecutorial strategy, proposing criminal charges, or presenting the case to the Grand Jury. (Dkt. 149 at 59).

On May 8, 2023, Bankman-Fried moved to require the Government to review all the files in the possession of the Debtors and disclose any materials that were discoverable under Rule 16, *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act. (Dkt. 143). The

61

only documents Bankman-Fried specifically sought were FTX's "codebase history" and "documents reflecting that FTX sought legal advice from counsel about the use of ephemeral messaging apps." (Dkt. 143 at 12). Bankman-Fried then moved for an order compelling the Government to produce documents from Fenwick & West LLP, which had served as FTX's outside counsel, or for a subpoena pursuant to Rule 17(c). (Dkt. 151). The Government opposed the motions (*see* Dkts. 149, 156), and the Debtors intervened and opposed the issuance of a subpoena to Fenwick (*see* Dkt. 159). The District Court denied the motion to compel records from Fenwick because the "requests, on their face, call for documents protected from disclosure by the Debtors' attorney-client privilege." (Dkt. 159 at 1-2).

The District Court also declined to compel the Government to review the Debtors' files, ruling that "[n]either Fenwick nor the Debtors are part of the 'prosecution team'" and therefore "the government has no obligation to produce materials that are not within its possession, custody, or control." (Dkt. 166). With respect to Bankman-Fried's request for the FTX code, the Government had previously produced a copy from Wang's laptop, and as a courtesy "agreed to request it" from the Debtors. (Dkt. 168 at 44-45, 161 at 2-3). The Debtors produced the FTX code and codebase history to Bankman-Fried (Dkt. 249 at 7, 12-13), who used portions of that evidence at trial (Tr. 1555-58).

## B. Applicable Law

Rule 16 of the Federal Rules of Criminal Procedure provides for pretrial discovery of items "within the

62

government's possession, custody, or control." Fed. R. Crim P. 16(a)(1)(E). Likewise, the Government's obligation to produce exculpatory materials under *Brady* extends to those materials in the prosecutors' custody, as well as information in the possession of "others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The notion of "possession" is not "so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about." *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980). "Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." *Id.* An "unlimited duty on prosecutors" to inquire about and obtain evidence not in their possession "would condemn the prosecution of criminal cases to a state of paralysis." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). For that reason, this Court has rejected the argument that the "prosecution team" reaches anyone who provides information to the Government, including cooperating witnesses, by summary order. *See, e.g.*, *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (noting that this Court "has never held that the 'prosecution team' includes cooperating witnesses"); *United States v. Garcia*, 509 F. App'x 40, 43 (2d Cir. 2013) (same).

Trial courts have "wide latitude" in overseeing discovery under Rule 16, and therefore discovery decisions are reviewed for an "abuse of discretion." *United States v. Giraldo*, 822 F.2d 205, 212 (2d Cir. 1987). A "reversal will only be warranted if the nondisclosure results in substantial prejudice to the defendant," meaning that it "adversely affected" the defendant at

63

trial. *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997). "Unlike Rule 16 . . . *Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation and is not violated unless the Government's nondisclosure infringes upon a defendant's right to a fair trial." *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991). To make that showing a defendant must demonstrate "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *United States v. Hunter*, 32 F.4th 22, 31 (2d Cir. 2022).

## C. Discussion

The District Court did not err in refusing to order the Government to search the Debtors' files, which were not within the possession, custody, or control of the Government. In any event, because Bankman-Fried received the specific items he sought from the Debtors, and he has not identified any other material evidence he was denied, Bankman-Fried has failed to show an effect on his right to a fair trial.

Bankman-Fried contends that the Debtors—private corporations with no obligation to take orders from the Government—were part of the prosecution team, and thus Rule 16 and *Brady* extend to evidence in their possession. (Br. 65-78). But he has offered no case standing for that novel proposition, and this Court has declined to find that even witnesses who entered binding cooperation agreements with the Government became part of the Government for discovery purposes. *See Barcelo*, 628 F. App'x at 38 (cooperating witness not member of the prosecution team); *Garcia*,

64

509 F. App'x at 43 (same); *see also United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (same).[16]

Bankman-Fried relies on *Hunter* (Br. 73, 77), but that case concerned whether another *government* agency was part of the prosecution team. This Court suggested that if a law enforcement agency—there, part of the DEA—became aware that it possessed exculpatory information in a federal case, it could not withhold that information on the ground that it was not part of the prosecution team. 32 F.4th at 37-38. Nothing in *Hunter* suggests that a similar concern extends to private entities like the Debtors. To the contrary, this Court observed that "prosecution team" limitations "prudently prevent[] a prosecutor" from shouldering discovery obligations that are "unworkable." *Id.* at 37.

---

[16] To be sure, this Court has explained that in determining whether a particular person is a member of the prosecution team, "the relevant inquiry is what the person *did,* not who the person *is.*" *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). But its point was that particular government employees may or may not have their knowledge imputed to the prosecutors depending on how closely they worked with the prosecution, and not simply because they work for the Government. *Id.* This Court has not, so far as the Government is aware, ever suggested that a private corporation could be deemed a member of the prosecution team.

65

Bankman-Fried's other citations similarly do not help him. This Court concluded that an expert witness, who was a government employee, could *not* be considered a member of the prosecution team in *Stewart*, 433 F.3d at 298-99, and that private parties who provided evidence to the Government were *not* its agent under Rule 16 in *United States v. Bradley*, 105 F.4th 26, 28, 35 (2d Cir. 2024). The Third Circuit examined whether state law enforcement officers working with federal prosecutors should be considered part of the prosecution team—and questioned whether that was so—in *United States v. Risha*, 445 F.3d 298 (3d Cir. 2006). A district court found that the Government had effectively used corporate investigators to compel an employee to submit to an interview under *Garrity v. New Jersey*, 385 U.S. 493 (1967), in *United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019), but that case not only concerned very different facts, but said nothing about discovery obligations. And in *United States v. Kilroy*, a district court ordered the Government to use "best efforts" to obtain certain records from a cooperating corporation, but made clear that the corporation had no obligation to agree, and that the order was merely a more expeditious alternative to a defense subpoena. 523 F. Supp. 206, 215 (E.D. Wis. 1981).

There are no extraordinary circumstances here that would justify expanding the prosecution team to include non-governmental third parties. The Debtors had no involvement in any significant aspect of the Government's investigation or prosecution; they were not involved in the Government's witness interviews, had no access to records obtained by the Government

66

by subpoena or search warrant, no role in strategy, and no involvement in grand jury proceedings. (Dkt. 149 at 59). Thus, even if the Debtors had been law enforcement agents, it is unclear that they would qualify as members of the prosecution team. *See, e.g.*, *United States v. Blaszczak*, 308 F. Supp. 3d 736, 742-43 (S.D.N.Y. 2018) (listing factors district courts often use in analyzing this question). More generally, that corporations involved in a massive fraud would assiduously cooperate with law enforcement—and publicly tout doing so (Br. 70-71)—is common and appropriate, but does not mean they have become part of the Government. *See United States v. Josleyn*, 206 F.3d 144, 152 (1st Cir. 2000) ("[W]e are loath to extend the analogy from police investigators to cooperating private parties who have their own set of interests."). The amount of time the Debtors' lawyers spent on the Government's requests (Br. 68-70), is thus irrelevant to whether they are an arm of the prosecution—and in fact the Debtors explained to the Bankruptcy Court that they were "not sharing for sharing sake," but rather were conducting their own investigation in order to "recover on avoidance actions" and "file actions related to . . . misfeasance." (Dkt. 137-9 at 64-66).

Nor can this Court take Bankman-Fried's factual claims at face value. Contrary to his assertions, none of the interviews conducted by the Debtors were requested or attended by the Government and the Government did not direct that any questions be asked. (Dkt. 149 at 63). Bankman-Fried also claims that the Debtors "recommended new areas of inquiry" and "vetted prosecution theories." (Br. 69). Again, those claims are false. The email about a "$45 million 'hole' in the

67

FTX.us balance sheet" (Br. 69), was a response to a question from the Government about that hole. (Dkt. 149 at 64). Despite Bankman-Fried's speculation (Br. 69-70), the Debtors never gave a presentation about operating an unlicensed money transmission business—the Grand Jury charged Bankman-Fried with conspiring to commit that offense based on other substantial evidence the Government had assembled. (Dkt. 149 at 64-65). More generally, counsel presentations do not convert a third party into part of the prosecution team. *See Josleyn*, 206 F.3d at 152-53 (presentations by corporate counsel were not a basis to find that a corporation was part of the prosecution team). The Debtors also did not "dictate[] government strategy regarding bail conditions" (Br. 70), an absurd claim based on non-record materials Bankman-Fried never put before the District Court.[17]

─────────

[17] Bankman-Fried's claims about what the Debtors did for the Government rely in significant part on their attorneys' time sheets filed in a bankruptcy proceeding. (*See* Br. 23 n.1, 69-71). And Bankman-Fried's speculation about their meaning is nothing short of wild. For example, entries on which he relies bill for "Review and analyze SDNY motion re: bail order," "Call with SDNY re: Bankman-Fried motion and debtors," and "correspondence" with other lawyers at her firm on those subjects. *In re: FTX Trading Ltd.*, 22-11068 Dkt. 2271-2 at 244, 246 (Bankr. D. Del.). From this Bankman-Fried hypothesizes that the attorney "dictated government strategy" (Br. 70), when any lawyer would understand this as the attorney having

68

Bankman-Fried was also not entitled to a hearing to prove that his assertions were anything other than outlandish. (*See* Br. 76). The concrete allegations he made showed nothing more than the usual cooperation of corporate counsel with an investigation, meaning that even if proven true they would not have entitled him to relief. And his speculation that routine communications between the Debtors and the Government reflect a nefarious plot did not demand a hearing to reject. *See Avellino*, 136 F.3d at 260-61 (where motion lacked "any nonspeculative basis," district court did not abuse discretion in denying request for hearing on alleged *Brady* violation). Thus, that one district court viewing a different record held a hearing on a similar issue (Br. 76) does not suggest that Judge Kaplan

—————

read the "SDNY motion," sent an email about it to her colleagues, talked to the Government about something in the "Bankman-Fried motion"—which may or may not be the same as the "SDNY motion"—concerning her client ("debtors"), then sent a couple more emails to her co-workers. Similarly, the purported facts set forth in the Brief of *Amici Curiae* Bankruptcy Law Professors also lend no support to Bankman-Fried's claims—they are largely drawn from a forthcoming law review article by two of the professors, which discloses that the source materials for the article were pleadings and court documents, along with interviews by "Bankman-Fried and his parents." *See* Jonathan C. Lipson & David Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11*, 77 Stan. L. Rev. __ (2025).

69

abused his discretion in denying a hearing here. *See, e.g.*, *United States v. Mahaffy*, 446 F. Supp. 2d 115, 127 (E.D.N.Y. 2006) (the defendant's "conclusory assertions" that "the S.E.C. operated as a surrogate for the USAO, without more, do not warrant an evidentiary hearing").

Finally, even if Judge Kaplan erred in denying Bankman-Fried's motion—which he did not—Bankman-Fried cannot show the required prejudice. Bankman-Fried never specifies what evidence the Debtors had in their "sole possession" (Br. 65) that established his innocence, or that would have altered the trial verdict. Bankman-Fried cites his request for the FTX codebase history (Br. 71), but he received two copies of it—one from Wang's laptop and another from the Debtors at the Government's request—and then used portions of it at trial. (Dkts. 161 at 2-3, 168 at 44-45, 249 at 7, 12-13; Tr. 1555-58). Bankman-Fried notes that his motion for "*Brady* material disclosed to the government orally" was denied (Br. 72-73), but fails to mention that it was denied only as premature (SPA-60-61), and the Government produced notes of oral communications with the Debtors on schedule (Dkt. 245 at 9). Bankman-Fried claims he was entitled to legal documents about FTX's document retention policy (Br. 72), but does not dispute that they were privileged, and thus unavailable to the parties, or that he was able to offer other evidence on that tangential point in any event. (Tr. 1991-92, 2442-43). Because, Bankman-Fried has not identified any exculpatory evidence that he was denied, much less established its materiality, his motion would fail even if his novel prosecution team theory were correct. *See Hunter*, 32

70

F.4th at 35, 38 (no *Brady* violation where evidence was not material, regardless of prosecution team analysis).

## POINT IV

### The District Court Properly Ordered Forfeiture

### A. Applicable Law

The forfeiture statutes provide that the "proceeds" of certain offenses, including wire fraud and securities fraud, and the "property. . . involved" in certain other offenses, including money laundering, are forfeitable to the United States. *See* 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1). When entering judgment, the district court "shall order the forfeiture of the property as part of the sentence," and the procedures set forth in 21 U.S.C. § 853 "apply to all stages of a criminal forfeiture proceeding." 28 U.S.C. § 2461(c).

Section 853(p) states that if, as a result of any act or omission of the defendant, the tainted property subject to forfeiture "cannot be located upon the exercise of due diligence" then "the court shall order the forfeiture of any other property of the defendant, up to the value of" the unavailable tainted property. 21 U.S.C. 853(p)(1) and (2). "Section 853(p)(1) demonstrates that Congress contemplated situations where the tainted property itself would fall outside the Government's reach" and "authorized the Government to confiscate [other] assets . . . from the defendant who initially acquired the property and who bears responsibility for its dissipation." *Honeycutt v. United States*, 581 U.S. 443, 452 (2017).

71

Federal Rule of Criminal Procedure 32.2 likewise recognizes the Government's ability to seek a "forfeiture money judgment." Fed. R. Crim. P. 32.2(a)(1); *see also* Fed. R. Crim. P. 32.2(c)(1). After Congress allowed Rule 32.2 to go into effect, it enacted 28 U.S.C. § 2461(c), which authorizes courts to enter criminal forfeitures "pursuant to the Federal Rules of Criminal Procedure," including Rule 32.2's authorization of money judgments. 28 U.S.C. 2461(c).

Interpreting these statutes, this Court has held that district courts may impose "forfeiture money judgments" and that the propriety of such orders "does not depend on a defendant's assets at the time of sentencing." *United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010). This Court reviews "a district court's legal determinations regarding forfeiture *de novo* and its underlying factual findings for clear error." *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015).

## B. Discussion

The District Court correctly ordered approximately $11 billion in forfeiture, an amount that reflected funds Bankman-Fried fraudulently obtained and was not disproportional to the gravity Bankman-Fried's offenses.

### 1. The District Court Properly Imposed a Forfeiture Money Judgment

Bankman-Fried's argument that the forfeiture statutes do not authorize entry of a money judgment is foreclosed by circuit precedent. *Awad* expressly approved of money judgments and rejected the case cited

72

by Bankman-Fried. *See* 598 F.3d at 79 & n.5 (rejecting reasoning of *United States v. Surgent*, No. 04 Cr. 364 (JG)(SMG), 2009 WL 2525137 (E.D.N.Y. Aug. 17, 2009)). As *Awad* explained, the procedures set forth in the forfeiture statutes plainly contemplate that district courts may enter money judgments where the tainted property is unavailable at the time of sentencing. This Court has reaffirmed *Awad*'s holding in subsequent cases, rejecting the same argument advanced by Bankman-Fried in this appeal. *See, e.g.*, *United States v. Peralta*, 778 F. App'x 45, 46 (2d Cir. 2019).[18] Every other federal court of appeals with criminal jurisdiction has reached the same conclusion. *See, e.g.*, *United States v. Olguin*, 643 F.3d 384, 397 (5th Cir. 2011) (collecting cases); *United States v. Blackman*, 746 F.3d 137, 145 (4th Cir. 2014); *United States v. Hampton*, 732 F.3d 687, 691-692 (6th Cir. 2013); *United States v. Smith*, 656 F.3d 821, 827 (8th Cir. 2011).[19]

––––––––––

[18] Bankman-Fried argues that the forfeiture order is "duplicative" because it supposedly "fail[s] to account" for the specific property the Government seized, such as the Robinhood shares he purchased with misappropriated customer funds. (Br. 79-80). That misreads the forfeiture order, which provides that "[a]ll specific property forfeited to the United States . . . shall be applied towards the satisfaction of the Money Judgment." (SPA-94).

[19] Bankman-Fried suggests that *United States v. Nejad*, 933 F.3d 1162 (9th Cir. 2019), supports his argument, but quotes language that was merely

73

### 2. The District Court Properly Ordered Forfeiture of Investor and Lender Money

The District Court also correctly included the full amount fraudulently obtained from investors and lenders in the forfeiture judgment. Bankman-Fried argues that Judge Kaplan should have applied 18 U.S.C. § 981(a)(2)(B), and deducted from the forfeiture amount "the direct costs incurred in providing the goods or services," which—according to Bankman-Fried—would have required an analysis of "what the value of FTX stock would have been" absent the fraud. (Br. 81). That argument fails for four independent reasons:

*First*, the applicable section is Section 981(a)(2)(A), which requires the forfeiture of gross proceeds without deducting costs. Bankman-Fried relies on *United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012), an insider-trading case, but insider-trading cases involve the purchase and sale of publicly traded securities, a type of "good" under Section 981(a)(2)(B), in which the counterparties to the defendant's trading have received value, and the illegality lies in the manner in which the defendant induced the trade to occur. Under those circumstances, reducing the forfeiture by the costs incurred in purchasing the securities is

―――――――――

summarizing the defendant's argument (Br. 80), which the Ninth Circuit rejected in reaffirming that "a court may order forfeiture in the form of a personal money judgment against the defendant." *Nejad*, 933 F.3d at 1165.

74

warranted. *See Contorinis*, 692 F.3d at 145 n.3. By contrast, Bankman-Fried obtained investor funds based on misrepresentations, then misappropriated those funds for his own purposes, as occurs in fraud schemes for which forfeiture of gross receipts under Section 981(a)(2)(A) is mandated, such as Ponzi and embezzlement schemes. *See, e.g.*, *United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017) (embezzlement scheme); *United States v. Bonventre*, 646 F. App'x 73, 90 (2d Cir. 2016) (Ponzi scheme).

*Second*, even if Section 981(a)(2)(B) applied, the money that Bankman-Fried identifies as "costs" is not deductible. His suggestion that Judge Kaplan should have identified the purported "value" that the defrauded investors received misunderstands forfeiture law. As this Court recently explained in a similar case, "forfeiture is gain based, *not* based on the losses (or gains) to victims." *Shkreli*, 779 F. App'x at 42. When a defendant has "misappropriated large sums of the money invested in his funds for his own use," it is reasonable for a district court to conclude that "*at the very least*, the gains to [the defendant] include the money he caused his investors to invest via fraud." *Id.* Thus, for forfeiture purposes the relevant question is the amount of money Bankman-Fried reaped from his fraud, not whether that money represented ultimate losses to investors and lenders.

*Third*, even if it were appropriate to consider the value received by investors and lenders, that is accounted for in the forfeiture order. As for lenders, the Government sought forfeiture only for fraudulently induced loans that were not repaid and were

75

"outstanding at the time of bankruptcy." (PSR at 50). As for investors, the FTX stock they purchased had no value, as evidenced by the fact that the company declared bankruptcy immediately when the fraud was discovered. As this Court has recognized, "when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested[.]" *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012); *see also United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009). Here, where investors received nothing for their $1.7 billion investment, that full amount was appropriately included in the forfeiture judgment under any subsection of 18 U.S.C. § 981(a)(2).

*Fourth*, Bankman-Fried's argument only goes to the first basis of forfeiture, the proceeds of his fraudulent schemes. The forfeiture was independently warranted as a measure of the property involved in the money laundering offense under 18 U.S.C. § 982(a)(1). *See United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008) (for money transmitting offense, which similarly applies Section 982(a)(1) for forfeiture, affirming judgment for total amount transmitted even though there were no victims); *United States v. Waked Hatum*, 969 F.3d 1156, 1164 (11th Cir. 2020) (affirming forfeiture judgment of total sum of laundered money, because "the government's interest in the [laundered property] vests the moment such property is laundered").

### 3. The Forfeiture Was Not Grossly Disproportional to Bankman-Fried's Crimes

Finally, Bankman-Fried asserts that the forfeiture was unconstitutionally excessive. (Br. 82). A criminal forfeiture is excessive if "it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian,* 524 U.S. 321, 334 (1998). In evaluating whether a forfeiture is grossly disproportional, this Court considers four factors: "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct." *George*, 779 F.3d at 122.

Bankman-Fried does not even attempt to argue that these factors support a finding that the forfeiture is grossly disproportional to his crimes. Nor could he. With respect to the first factor, Bankman-Fried was the mastermind of massive financial frauds that, as Judge Kaplan recognized, were also tied to a variety of other criminal conduct, including one of the largest "political financial crime[s] in history." (Dkt. 426 at 50). With respect to the second factor, Bankman-Fried "fits squarely within the class of persons for whom the federal mail- and wire-fraud and money-laundering statutes were designed—namely, those who use facilities of interstate or foreign commerce to engage in fraudulent schemes and financial transactions and then seek to conceal or disguise the nature of the

77

proceeds of the fraud." *United States v. Viloski*, 814 F.3d 104, 114 (2d Cir. 2016). As for the third factor, Bankman-Fried could have been fined up to twice the loss to his victims from the offenses, which would have been higher than the forfeiture judgment. *See United States v. Varrone*, 554 F.3d 327, 332 (2d Cir. 2009) ("If the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional."). And as for the fourth factor, the forfeiture order was precisely calibrated to the harm caused by Bankman-Fried's crimes, as it simply reflected the actual losses to victims from those crimes. Thus, although the forfeiture is large, it is not grossly disproportional to the gravity of Bankman-Fried's crimes.

Bankman-Fried argues that the forfeiture will destroy his "future livelihood." (Br. 82). That is a factor which courts may, but need not, consider, and "a forfeiture that deprives a defendant of his livelihood might nonetheless be constitutional, depending on his culpability or other circumstances." *Viloski*, 814 F.3d at 112. Given that the four factors weigh so strongly in favor of the forfeiture judgment here, the Constitution does not immunize Bankman-Fried from an otherwise appropriate forfeiture order solely because he misappropriated far more than he can likely repay. *See, e.g.*, *United States v. Patterson*, 2022 WL 17825627, at *6 (2d Cir. 2022) (reviewing, with approval, large forfeitures in financial crimes cases).

78

## POINT V

### There Is No Basis for Remand to a Different Judge

Because Bankman-Fried has not shown any reversible error, this Court need not consider his request for remand to a different district court judge (Br. 83-86). But even if the case were remanded, it should not be reassigned. "Adverse rulings, standing alone, do not establish judicial bias or prejudice, nor create a reasonable question of judicial impartiality." *United States v. Schwartz*, 535 F.2d 160, 165 (2d Cir. 1976). Bankman-Fried's arguments about partiality, which largely impugn appropriate measures to oversee an efficient trial, fall well short of the standard for reassignment. *See United States v. Vargas*, 961 F.3d 566, 584 (2d Cir. 2020) ("Remanding a case to a different judge is a serious request rarely made and rarely granted.").

Bankman-Fried cherry-picks examples within the trial transcript of over 3,000 pages where the District Court criticized his attorneys. But the District Court admonished the Government too—on many occasions, and often for the same reason as with Bankman-Fried's counsel: to move the trial along. (*See, e.g.*, Tr. 821-22 (the Government: "This is the last spreadsheet." The District Court: "Microsoft's stock must be plunging."), 1125, 1127 ("[T]his is a colossal waste of time."), 1823-24, 2163). In support of his claim that Judge Kaplan expressed a belief in Bankman-Fried's guilt, derided a defense argument as a "joke," and unfairly said a tweet was a misrepresentation, Bankman-Fried cites an instance when the District Court

79

*sustained* a defense objection at sidebar that evidence was cumulative, meaning repetitive of an undisputed point. (Br. 86; Tr. 1127-30 (telling the Government: "What are we wasting this time for? . . . Some people don't have ten minutes left to live.")). The District Court's efforts to oversee an efficient trial, *see* Fed. R. Evid. 611, do not cast doubt on Judge Kaplan's statement that: "I'm dealing with honorable and honest counsel all around in this case." (Tr. 875). Nor does it matter that certain media sources played up the drama of these exchanges (Br. 83-84): this Court has already rejected the argument that high-profile litigants like Bankman-Fried can use press coverage to show partiality. *See In re Aguinda*, 241 F.3d 194, 202 (2d Cir. 2001) ("The test, as we have stated, is one of reasonableness, and the appearance of partiality portrayed in the media may be, at times, unreasonable.").

Similarly, there was nothing improper about the judge's inquiries of counsel or witnesses (Br. 85), which occurred during examinations by both parties. (*See, e.g.*, Tr. 637-41, 1033-34, 1037-38). A District Court is permitted to ask questions to "clarify[] ambiguities, correct[] misstatements, or obtain[] information needed to make rulings." *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir. 1985). Nor does Judge Kaplan's noting an "obscure legal doctrine" (Br. 85) bear any resemblance to the Ninth Circuit *sua sponte* finding a statute unconstitutional despite neither party contending that was so, in *United States v. Sineneng-Smith*, 590 U.S. 371 (2020). And Judge Kaplan did not improperly interfere with the jury's deliberations. When providing the jury the option to deliberate in the evening, Judge Kaplan made clear: "I'm

80

not commenting on how long this should take or how quickly you should be done one way or the other." (Tr. 3112). There is no reason to doubt that the swiftness of the jury's verdict and the length of the District Court's sentence (which is not challenged on appeal) were the product of the overwhelming evidence of Bankman-Fried's guilt of very serious crimes.

## CONCLUSION

**The judgment of conviction and forfeiture order should be affirmed.**

Dated:    New York, New York
          December 13, 2024

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                         *of America.*

DANIELLE KUDLA,
NATHAN REHN,
NICOLAS ROOS,
DANIELLE R. SASSOON,
HAGAN SCOTTEN,
    *Assistant United States Attorneys,*
              *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

On November 26, 2024, the Court granted the Government leave to file an oversize brief of no more than 19,000 words in response to appellant's brief. Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation set by the Court in its November 26, 2024 order. As measured by the word processing system used to prepare this brief, there are 18,997 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: HAGAN SCOTTEN,
*Assistant United States Attorney*

**Addendum**

**Add. 1**

| | |
|---|---|
| UNITED STATES DISTRICT COURT | CIRCULATION DRAFT |
| SOUTHERN DISTRICT OF NEW YORK | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

        -against-                         S6 22-cr-0673 (LAK)

SAMUEL BANKMAN-FRIED,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**JURY INSTRUCTIONS**

**Add. 2**

11

*Weaver*, 860 F.3d 90, 94 (2d Cir. 2017); *United States v. Males*, 459 F.3d 154, 157 (2d Cir. 2006) (conjunctive reading); *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (negligence of victim no defense); *United States v. Chestman*, 947 F.2d 551, 567-69 (2d Cir. 1991) (relationship of great confidence and trust); *United States v. Greenberg*, 835 F.3d 295, 305-06 (2d Cir. 2016) (actual injury unnecessary); *United States v. Binday*, 804 F.3d 558, 581-82 (2d Cir. 2015); *United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 12154927, at *2 (S.D.N.Y. Sept. 16, 2013).]

        2.    **Second Element: Intent**

The second element that the government must prove beyond a reasonable doubt to establish substantive wire fraud is that the defendant knowingly and willfully participated in the device, scheme, or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud.

To act "knowingly" means to act intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness.

To act "willfully" means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say, with the bad purpose to disobey or disregard the law.

"Unlawful" simply means contrary to law. In order to know of an unlawful purpose, the defendant need not have known that he was breaking any particular law or any particular rule. He needs to have been aware only of the generally unlawful nature of his actions.

To prove that the defendant acted with specific intent to defraud, the government must prove that he acted with intent to deceive for the purpose of depriving the relevant victim of money or property. The government need not prove that the victim actually was harmed, only that the defendant contemplated some actual harm or injury to the victim in question. In addition, the government need not prove that the intent to defraud was the only intent of the defendant. A defendant may have the requisite intent to defraud even if the defendant was motivated by other lawful purposes as well.

[*See United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (contemplated actual harm or injury); *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (same). Adapted from the charge given in *United States v. Skelos*, 15 Cr. 317

**Add. 3**

12

1    (KMW) (other lawful purposes); *see also United States v. Coyne*, 4 F.3d 100, 113
2    (2d Cir. 1993) (same).]

3         To participate in a scheme means to engage in it by taking some affirmative step to

4    help it succeed. Merely associating with people who were participating in a scheme – even if the

5    defendant knew what they were doing – is not participation.

6         It is not necessary for the government to establish that the defendant originated the

7    scheme to defraud. It is sufficient if you find that a scheme to defraud existed, even if originated

8    by another, and that the defendant, while aware of the scheme's existence, knowingly and willfully

9    participated in it with intent to defraud.

10         Nor is it required that the defendant have participated in or have had knowledge of

11   all of the operations of the scheme. The responsibility of the defendant is not governed by the extent

12   of his participation. For example, it is not necessary that the defendant have participated in the

13   alleged scheme from the beginning. A person who comes in at a later point with knowledge of the

14   scheme's general operation, although not necessarily all of its details, and intentionally acts in a way

15   to further the unlawful goals, becomes a participant in the scheme and is legally responsible for all

16   that may have been done in the past in furtherance of the criminal objective, and all that is done

17   thereafter.

18         Even if the defendant participated in the scheme to a lesser degree than others, he

19   nevertheless is equally guilty as long as he knowingly and willfully participated in the alleged

20   scheme to defraud with knowledge of its general scope and purpose and with specific intent to

21   defraud.

22         Because an essential element of the crime charged is intent to defraud, it follows that

23   good faith on the part of a defendant is a complete defense to the charge of wire fraud. Good faith

24   is an honest belief by the defendant that his conduct was not unlawful. An honest belief in the truth

25   of the representations made or caused to be made by a defendant is a complete defense, however

26   inaccurate the statements may turn out to be. Similarly, it is a complete defense if a defendant held

27   an honest belief that the victims were not being deprived of money or property. Moreover, a

**Add. 4**

13

1    defendant has no burden to establish a defense of good faith; it remains the government's burden

2    to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt.

3    However, in considering whether or not a defendant acted in good faith, you are instructed that an

4    honest belief on the part of the defendant, if such a belief existed, that ultimately everything would

5    work out to the benefit of the alleged victims does not necessarily mean that the defendant acted in

6    good faith. If the defendant knowingly and willfully participated in the scheme with the intent to

7    deceive the victim in question for the purpose of depriving the victim of money or property, even

8    if only for a period of time, then no amount of honest belief on the part of the defendant that the

9    victim ultimately would be benefitted will excuse false representations that a defendant willfully

10   made or caused to be made. As I instructed you earlier, it is the government's burden to prove

11   beyond a reasonable doubt that the defendant had a fraudulent intent and that he engaged in the

12   alleged fraudulent scheme for the purpose of causing some loss to another.

13   [*See United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016); *United States v.*
14   *Finazzo*, 682 F. App'x 6, 9 (2d Cir. 2017).]

15   All of that said, you have heard evidence that FTX and Alameda Research had

16   lawyers. A lawyer's involvement with an individual or entity or transaction does not itself constitute

17   a defense to any charge in this case. The defense has not claimed, and cannot claim, that the

18   defendant's allegedly unlawful conduct, assuming he committed any such conduct, was lawful

19   because he engaged in any such conduct in good faith on the advice of a lawyer.

20   [Adapted from the charges of the Hon. Edgardo Ramos in *United States v. Milton*,
21   21 Cr. 478 (ER), and the Hon. Analisa Torres in *United States v. Shea*, 20 Cr. 412
22   (AT).]

23   In the last analysis, whether a person acted knowingly, willfully, and with intent to

24   defraud is a question of fact for you to determine, like any other fact question. Direct proof of

25   knowledge and fraudulent intent almost never is available. Nor is it required. It would be a rare

26   case where it could be shown that a person wrote or stated that as of a given time in the past he or

27   she committed an act with fraudulent intent. The ultimate facts of knowledge and criminal intent,

**Add. 5**

14

1    though subjective, may be established by circumstantial evidence, based upon a person's outward

2    manifestations, his or her words, his or her conduct, his or her acts, and all the surrounding

3    circumstances disclosed by the evidence and the rational or logical inferences that may be drawn

4    therefrom. You may – but you are not required to – infer that people intend the natural and probable

5    consequences of their actions. Accordingly, when the necessary result of a scheme is to injure

6    others, fraudulent intent may be inferred from the scheme itself. As I instructed you earlier,

7    circumstantial evidence, if believed, is of no less value than direct evidence.

8              [Adapted from Sand, Instr. 44-4, 44-5, and the charge given in *United States v.*
9              *Males*, S1 03 Cr. 754 (LAK); *United States v. Blaszczak*, 17 Cr. 357 (LAK); *United*
10             *States v. Skelos*, S1 15 Cr. 317 (KMW). *See also United States v. D'Amato*, 39 F.3d
11             1249, 1257-60 (2d Cir. 1994) (citing "apparent authority" definition in Restatement
12             of Agency); *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (ultimate
13             benefit no defense); *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011)
14             (same).]

15        **3.**     **Third Element: Use of Interstate or Foreign Wires**

16             The third and final element that the government must prove beyond a reasonable

17   doubt is that one or more interstate or foreign wires were used in furtherance of the scheme to

18   defraud. An "interstate wire" means a wire that passes between two or more states. A "foreign"

19   wire means a wire that travels between the United States and another country. Examples of wires

20   include telephone calls and messages, communications over the internet, commercials on television,

21   and financial wires between bank accounts.

22             A wire communication need not itself be fraudulent. It must, however, further or

23   assist in some way in carrying out of the scheme to defraud. A wire communication can also include

24   a communication made after an alleged victim's funds were obtained if the communication was

25   designed to lull the victim into a false sense of security, to postpone his or her complaint to the

26   authorities, or to keep the money obtained from the scheme.

27             It is not necessary for the defendant to have been directly or personally involved in

28   a wire communication, as long as the wire was reasonably foreseeable in the execution of the alleged

29   scheme to defraud in which the defendant is accused of participating. In this regard, it is sufficient

**Add. 6**

 **COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

September 15, 2023

<u>**BY EMAIL**</u>

Danielle Sassoon, Esq.
Nicolas Roos, Esq.
Danielle Kudla, Esq.
Samuel Raymond, Esq.
Nathan Rehn, Esq.
United States Attorney's Office
Southern District of New York
1 St. Andrew's Plaza
New York, New York 10007

　　　　Re:　*United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)

Dear Counsel:

　　　　We write pursuant to the parties' joint letter to the Court, dated September 1, 2023, to provide additional disclosures related to the defendant's intent to elicit evidence concerning the involvement of counsel.  (ECF. No. 243).

　　　　Mr. Bankman-Fried does not intend to present a formal advice of counsel defense. Rather, the defense intends to elicit evidence that Mr. Bankman-Fried was aware that in-house and outside counsel for FTX were involved in reviewing and approving decisions related to several matters at issue in this case, which gave him assurance that he was acting in good faith. Below is a list of topics and a brief description of the contours of the evidence the defense intends to elicit:[1]

　　　　1.　Data retention policies at FTX, including the use of auto-delete policies and ephemeral messaging applications.

　　　　　　Mr. Bankman-Fried was aware that, in or about mid-2021, Dan Friedberg initiated a plan to implement formal data retention policies at FTX and

---

[1] The defense reserves the right to supplement this list as the trial progresses depending on the Government's proof.

**Add. 7**

The Honorable Lewis A. Kaplan
September 15, 2023
Page 2

Alameda, which he worked on with the involvement of Fenwick & West. This plan included auto-deletion policies for Slack and Signal, which were implemented across the companies.

2. The formation and incorporation of the North Dimension entities, and the banking relationship between Silvergate Bank and Alameda, North Dimension, and FTX.

Mr. Bankman-Fried was aware that, in or about mid-2021, Dan Friedberg was involved in the creation of the North Dimension entities, with the assistance of Fenwick & West, and the creation of the North Dimension bank accounts. Mr. Bankman-Fried was aware that the forms to open the North Dimension bank account had been filled out by Mr. Friedberg.

3. Loans given to the founders and other executives of FTX and Alameda.

Mr. Bankman-Fried was aware that, in or about late-2021 to mid-2022, Dan Friedberg, Can Sun, Ryne Miller, and Fenwick & West were involved in approving and structuring loans from Alameda to Mr. Bankman-Fried, Gary Wang, and Nishad Singh, and that attorneys drafted the loan documents.

4. FTX customer agreements, including the FTX Terms of Service.

Mr. Bankman-Fried was aware that Dan Friedberg and Fenwick & West, and later Can Sun, were involved in drafting and approving the FTX Terms of Service, which were updated at various points in time from 2019 to May 2022.

5. Intercompany agreements between FTX and Alameda, including the Payment Agent Agreement.

Mr. Bankman-Fried was aware that in mid-2021, Dan Friedberg and Fenwick & West were involved in drafting and approving the Payment Agent Agreement between FTX and Alameda.

6. CFTC Licensing Response.

Mr. Bankman-Fried was aware that in mid-2022, FTX US Derivatives was being asked to respond to questions from the CFTC related to its licensing application. Some of these questions sought information concerning the relationship between FTX and Alameda. Mr. Bankman-Fried was aware that Brian Mulherin, Ryne

**Add. 8**

The Honorable Lewis A. Kaplan
September 15, 2023
Page 3

        Miller, and lawyers from Sullivan & Cromwell were involved in reviewing and approving the responses that were sent to the CFTC.

        These topics relate to all counts in the indictment and relate more generally to Mr. Bankman-Fried's good faith, which is a defense to all counts.  At this time, the defense does not have any documents to produce related to these topics apart from what has already been produced in discovery.

        Sincerely,


    _/s/ Mark S. Cohen_
Mark S. Cohen
Christian R. Everdell
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com