# 24-961

*To Be Argued By:*
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ZIXIAO GARY WANG, CAROLINE ELLISON, NISHAD SINGH, RYAN SALAME,

*Defendants,*

FTX TRADING LTD., WEST REALM SHIRES INC,
ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD.,

*Intervenors,*

SAMUEL BANKMAN-FRIED, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

ALEXANDRA A.E. SHAPIRO
THEODORE SAMPSELL-JONES
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................................ 1

I.    THE ASYMMETRICAL EVIDENTIARY RULINGS ON LOSS
DEPRIVED BANKMAN-FRIED OF A FAIR TRIAL ................................ 3

    A.    The Government's Legal Arguments About Loss And Fraud Are
Wrong ............................................................................................ 4

    B.    The Government Presented A Case Of Theft And Permanent Loss .... 6

        1.    Government's Case .................................................................. 6

        2.    Defense's Precluded Response.................................................. 8

        3.    The End Result ...................................................................... 10

    C.    The District Court's Rulings Violated The Law................................. 10

    D.    The Argument Was Preserved ........................................................ 12

    E.    The Error Was Not Harmless .......................................................... 14

II.    THE DISTRICT COURT ILLEGALLY BARRED EVIDENCE
THAT BANKMAN-FRIED RELIED ON COUNSEL ................................ 16

    A.    The District Court Lacked Authority To Require Disclosure
And The Preview Hearing ................................................................ 16

        1.    The Rules Do Not Authorize Compelling Disclosure.............. 16

        2.    The Deposition-Hearing Was Unauthorized ........................... 17

        3.    Bankman-Fried Preserved His Objection ................................. 19

    B.    There Was No Legal Basis To Prevent Bankman-Fried
From Rebutting Key Government Arguments ................................... 20

C.     The Errors Require A New Trial ........................................23

III.    THE SCIENTER INSTRUCTIONS ERRONEOUSLY LOWERED
THE GOVERNMENT'S BURDEN ...........................................25

    A.     The Instructions On Temporary Deprivation Misstated
The Law .................................................................................25

    B.     The "Willfulness" And "Good Faith" Instructions Misstated
The Law .................................................................................28

IV.    THE DISTRICT COURT ERRONEOUSLY REFUSED TO ORDER
DISCOVERY FROM THE FTX DEBTORS AND HOLD
A HEARING ..........................................................................30

V.    THE FORFEITURE MONEY JUDGMENT WAS UNLAWFUL ..............38

    A.     The Statutes Do Not Authorize *In Personam* Money
Judgments .............................................................................38

    B.     Section 981(a)(1)(C) Does Not Authorize Forfeiting All
Investor And Lender Money .................................................40

    C.     The Forfeiture Was Unconstitutional ..................................40

VI.    THE CASE SHOULD BE REASSIGNED ..................................41

CONCLUSION .......................................................................43

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Ciminelli v. United States,*
   598 U.S. 306 (2023) .................................................................... 4, 26

*Degen v. United States,*
   517 U.S. 820 (1996) .......................................................................... 16

*DePetris v. Kuykendall,*
   239 F.3d 1057 (9th Cir. 2001) ........................................................ 15

*Gen. Elec. Co. v. N.Y. Dep't of Labor,*
   936 F.2d 1448 (2d Cir. 1991) .......................................................... 35

*Honeycutt v. United States,*
   581 U.S. 443 (2017) .................................................................... 38, 39

*In re Aguinda,*
   241 F.3d 194 (2d Cir. 2001) ............................................................ 42

*In re United States,*
   945 F.3d 616 (2d Cir. 2019) ............................................................ 21

*Kelly v. United States,*
   590 U.S. 391 (2020) .................................................................... 26, 27

*Kyles v. Whitley,*
   514 U.S. 419 (1995) .......................................................................... 36

*Ligon v. City of New York,*
   736 F.3d 118 (2d Cir. 2013) ............................................................ 41

*McCormick v. United States,*
   500 U.S. 257 (1991) ............................................................................ 5

*NLRB v. SW General Inc.,*
   580 U.S. 288 (2017) .......................................................................... 16

*Northern Securities Co. v. United States,*
   193 U.S. 197 (1904) ............................................................................ 1

*Old Chief v. United States*,
　　519 U.S. 172 (1997) ................................................................7, 12

*Ratzlaf v. United States*,
　　510 U.S. 135 (1994) ......................................................................29

*SEC v. Lek Securities Corp.*,
　　2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019) ................................22

*SEC v. Tourre*,
　　950 F. Supp. 2d 666 (S.D.N.Y. 2013) ..........................................22

*United States ex rel. Hart v. McKesson Corp.*,
　　96 F.4th 145 (2d Cir. 2024) .........................................................30

*United States v. Avellino*,
　　136 F.3d 249 (2d Cir. 1998) .........................................................36

*United States v. Awad*,
　　598 F.3d 76 (2d Cir. 2010) ...........................................................38

*United States v. Bakhtiari*,
　　913 F.2d 1053 (2d Cir. 1990) ..................................................17, 18

*United States v. Binday*,
　　804 F.3d 558 (2d Cir. 2015) ...........................................................4

*United States v. Bonventre*,
　　646 F. App'x 73 (2d Cir. 2016) ....................................................41

*United States v. Bradley*,
　　105 F.4th 26 (2d Cir. 2024) .........................................................36

*United States v. Bryan*,
　　524 U.S. 184 (1998) ......................................................................29

*United States v. Byors*,
　　586 F.3d 222 (2d Cir. 2009) .........................................................40

*United States v. Calderon*,
　　944 F.3d 72 (2d Cir. 2019) .............................................................4

iv

*United States v. Carr*,
    557 F.3d 93 (2d Cir. 2009) .................................................................12

*United States v. Castello*,
    611 F.3d 116 (2d Cir. 2010) ...............................................................41

*United States v. Connolly*,
    2019 WL 2120523 (S.D.N.Y. May 2, 2019) ................................33, 35

*United States v. Contorinis*,
    692 F.3d 136 (2d Cir. 2012) ...............................................................40

*United States v. DeMott*,
    513 F.3d 55 (2d Cir. 2008) .................................................................42

*United States v. Dietrich*,
    865 F.2d 17 (2d Cir. 1988) .................................................................14

*United States v. Dinome*,
    86 F.3d 277 (2d Cir. 1996) .................................................................27

*United States v. Elfgeeh*,
    515 F.3d 100 (2d Cir. 2008) ...............................................................41

*United States v. Finazzo*,
    850 F.3d 94 (2d Cir. 2017) ...................................................................4

*United States v. Ganim*,
    510 F.3d 134 (2d Cir. 2007) ...............................................................27

*United States v. Hassan*,
    578 F.3d 108 (2d Cir. 2008) ...............................................................29

*United States v. Hsu*,
    669 F.3d 112 (2d Cir. 2012) ...............................................................40

*United States v. Hunter*,
    32 F.4th 22 (2d Cir. 2022) .................................................................35

*United States v. Jaswal*,
    47 F.3d 539 (2d Cir. 1995) .................................................................18

*United States v. Josleyn,*
    206 F.3d 144 (1st Cir. 2000) ................................................................37

*United States v. Kosinski,*
    976 F.3d 135 (2d Cir. 2020) ...............................................................30

*United States v. Kukushkin,*
    61 F.4th 327 (2d Cir. 2023) ................................................................30

*United States v. Males,*
    459 F.3d 154 (2d Cir. 2006) ...........................................................4, 26

*United States v. Masotto,*
    73 F.3d 1233 (2d Cir. 1996) ...............................................................28

*United States v. McSherry,*
    226 F.3d 153 (2d Cir. 2000) ...............................................................17

*United States v. Nejad,*
    933 F.3d 1162 (9th Cir. 2019) ............................................................38

*United States v. Patterson,*
    2022 WL 17825627 (2d Cir. Dec. 21, 2022) ......................................41

*United States v. Petit,*
    2022 WL 3581648 (2d Cir. Aug. 22, 2022) .........................................30

*United States v. Quattrone,*
    441 F.3d 153 (2d Cir. 2006) ...............................................................42

*United States v. Schwartz,*
    535 F.2d 160 (2d Cir. 1976) ...............................................................43

*United States v. Scully,*
    877 F.3d 464 (2d Cir. 2017) ..........................................................21, 22

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) ...............................................................36

*United States v. Vasquez,*
    267 F.3d 79 (2d Cir. 2001) .................................................................27

*United States v. Viloski*,
    814 F.3d 104 (2d Cir. 2016) ................................................................40

*United States v. Zheng*,
    113 F.4th 280 (2d Cir. 2024) ..............................................................30

*Yee v. City of Escondido*,
    503 U.S. 519 (1992) ......................................................................27, 28

**Statutes**

18 U.S.C. §981 ......................................................................................40

18 U.S.C. §982 ......................................................................................39

21 U.S.C. §853 ................................................................................38, 39

Fed. R. Crim. P. 32.2 ............................................................................38

Fed. R. Evid. 104 ..................................................................................18

Fed. R. Evid. 401 ..................................................................................11

Fed. R. Evid. 403 ............................................................................20, 21

**Other Authorities**

"Crypto Exchange FTX Is The Rare Financial Blowup That Will Repay
    Victims In Full," *Wall Street Journal* (May 8, 2024) ...........................3

"U.S. Senators Question Independence of FTX Bankruptcy Law Firm,"
    *Wall Street Journal* (Jan. 10, 2023)......................................................31

Jonathan Lipson & David Skeel,
    *FTX'd: Conflicting Public and Private Interests in Chapter 11*,
    77 Stan. L. Rev. __ (forthcoming 2025).........................................31, 32

## **INTRODUCTION**

The government desperately clings to this conviction because this is a high-profile case.  But that is exactly why it is so important for the Court to uphold the law and the right to a fair trial.  As Justice Holmes wrote:  "Great cases, like hard cases, make bad law.  For great cases are called great, not by reason of their real importance…but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment."  *Northern Securities Co. v. United States*, 193 U.S. 197, 364 (1904) (dissenting).

Sam Bankman-Fried's conviction was a foregone conclusion before the jury even began deliberating, because he was deprived of fundamental rights necessary for fair trials—the rights to a defense and to jury fact-finding.  The district court prevented him from showing the jury that the government's story about customers and lenders permanently losing their money was false.  It prevented him from telling the jury lawyers were involved in practices the prosecutors said were fraudulent.  It prevented him from obtaining exculpatory evidence prosecutors deliberately avoided obtaining from the Debtors and their conflicted counsel.

At every turn, the judge put his thumb on the scale. The result was a one-sided trial, where the district court allowed the government to present damning false information, concealed contrary information from the jury, erroneously instructed the jury about the law, and effectively directed a guilty verdict.  These

rulings are legally indefensible, and their cumulative effect was a deeply unfair process rigged from inception. The prejudice was palpable, and severe.

Lacking any convincing response to this extreme unfairness, the government's strategy is to divide-and-conquer, rewrite history, and make unfounded arguments about preservation. Unable to refute the prejudice, the government tries to pick the rulings apart, addresses them out of order, invents new rationales for them, and ignores facts and arguments that don't conform to its revisionist history. But these tactics cannot conceal the truth about the proceedings below, which leaps off the page to any fair-minded reader of the record.

The truth is Bankman-Fried was not allowed to present relevant, admissible evidence to support his defense. The truth is the government's tale about permanent loss was false—as Amici explain, the Debtors' bankruptcy filings "support Bankman-Fried's view that the Debtors may *never* have been insolvent." The truth is Bankman-Fried didn't secretly create the company practices at issue— lawyers were involved and suggested some of them. The truth is the scienter instructions defy controlling precedent and erroneously lowered the government's burden of proof. The truth is the Debtors enmeshed themselves in the investigation and prosecution in ways far beyond "normal" cooperation—shielding prosecutors from *Brady* material they would have been obligated to disclose to Bankman-

Fried.  The truth is the $11 *billion* forfeiture order for assets Bankman-Fried had already turned over was legally unauthorized and unconstitutional.

The conviction should be reversed.

## I.    THE ASYMMETRICAL EVIDENTIARY RULINGS ON LOSS DEPRIVED BANKMAN-FRIED OF A FAIR TRIAL

As the bankruptcy professors note, at trial the prosecution "frequently asserted that [FTX and Alameda] were insolvent" and that "customers would recover nothing."  BAB16-17.  That was false.  The Debtors' projections "show a surplus" of billions, and an "unheard-of" ability to pay interest on unsecured claims.  BAB17-18.  The Debtors announced their plans to pay creditors 118% of funds owed only after trial and sentencing.[1]  And as discussed below, the recovery could have been larger but for decisions the Debtors themselves made.  Yet the district court allowed the government to present a false story that customers and creditors lost everything and prevented the defense from responding.

Unable to defend those unfair, asymmetrical rulings, the government invents an alternate reality, in which it never told the jury FTX customers and creditors lost money, and the defense never objected to anything.  That is not what happened.  The government presented evidence and argued—over and over—that Bankman-Fried stole customer funds and frittered them away on lavish real estate and

---

[1] "Crypto Exchange FTX Is The Rare Financial Blowup That Will Repay Victims In Full," *Wall Street Journal* (May 8, 2024).

3

speculative, failed investments.  Bankman-Fried repeatedly tried to respond, but the judge rebuffed him at every turn.

### A.     The Government's Legal Arguments About Loss And Fraud Are Wrong

The government's defense of the evidentiary rulings rests in part on a flawed premise.  According to the government, "where a defendant fraudulently obtains the *use* of another's money or property for a period of time," no matter how short, the defendant has committed fraud.  GB24.  The government relies principally on *United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2006) and *United States v. Calderon*, 944 F.3d 72, 90 (2d Cir. 2019).

There are three problems with the argument.

*First*, those cases rely on the now-repudiated right-to-control doctrine.  If construed as the government suggests, those holdings do not survive *Ciminelli v. United States*, 598 U.S. 306 (2023).  *Calderon*, for example, relied heavily on this Court's prior right-to-control cases including *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), and *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015).  *See* 944 F.3d at 88-89.  *Ciminelli* squarely overruled those cases.  *See* 598 U.S. at 313.  Temporary deprivation of use is equivalent to deprivation of right to control.

*Second*, even if still good law, *Males* and *Calderon* cannot be applied to this case—where customers put assets into FTX as collateral and *allowed* FTX to use them as collateral.  By its nature, on a margin platform with rehypothecated assets

4

the custodian is permitted to use or lend customer deposits to other users or for investments.  FTX was not like a storage locker, where a customer deposits a boat and can retrieve the same boat at any time.  FTX was like a bank, where customers deposit dollars, and those dollars are then commingled with other customers' funds and loaned out to others on a fractional-reserve basis.  Mere temporary use therefore cannot itself prove the requisite contemplated harm to property—use is inherent in the business model, and customers gave FTX permission to lend out funds when they opted into margin trading.

*Third*, and most importantly, the government's theory was not limited to temporary use.  As explained below, the government told the jury Bankman-Fried stole money and that customers and creditors suffered *permanent loss*.  Even if the government could have proceeded on some different theory, that is not what the government did.  Its theory was outright theft and permanent loss.  And this Court, in reviewing Bankman-Fried's appellate claims, must examine *that* theory and the evidence used to support it.  "Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury." *McCormick v. United States*, 500 U.S. 257, 270-71, n.8 (1991).  With respect to loss, Bankman-Fried's evidentiary claim is simple: Because the government presented evidence of, and argued, theft and permanent loss, he was entitled to respond.

5

**B.     The Government Presented A Case Of Theft And Permanent Loss**

The government claims its case was limited to temporary loss and
misappropriation until "FTX declared bankruptcy" (November 2022) and that its
evidence was therefore "legally relevant."  GB40-41.  By contrast, it says,
Bankman-Fried's proffered evidence "post-date[d] the relevant events, and
therefore lack[ed] relevance."  GB41.

That is false on both counts.

*1.  Government's Case*

The government repeatedly presented evidence about ongoing and
permanent losses after November 2022.  It did not merely ask whether customer
witnesses could withdraw their money in November.  It asked: "And *as we sit here
today*, have you *ever* been able to withdraw your FTX customer deposits that we
see?"  A-686 (emphasis added); *accord* A823-25.  The government similarly
elicited testimony from creditors that their loans "still [had] not been paid."  A-
816.  The government presented this evidence because the district court had
specifically ruled—over the defense's pretrial objection—that it could present
evidence of permanent loss to "explain to the jury its views of what allegedly
happened."  SPA-59-60.

Nor were the government's jury arguments limited to events before
November.  The government argued that Bankman-Fried had "walked out the door

6

with [customer money] and spent it as he pleased." A-674. It said the funds were "missing" and "gone" because FTX and Alameda were "deeply in the red" due to Bankman-Fried's stealing or squandering customer money. A-1077-79, A-1091. Customers, creditors, and investors "lost all their money." A-1096. "Thousands of people lost billions of dollars. Everyday people lost savings, companies went bankrupt, all because of this defendant's fraud." A-1105. The government's case was not one of temporary misuse.

The government knew exactly what it was doing. Temporary misappropriation is not very sexy. The government could have argued: "Ladies and gentlemen, although everyone will probably be made whole in the end, they had to wait and that's enough for fraud." But that would not have tugged heartstrings or sparked outrage. As the Supreme Court has emphasized, evidence is relevant "not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment." *Old Chief v. United States*, 519 U.S. 172, 187-88 (1997). The government knew theft and *permanent loss* would make the jury feel the moral weight of the conduct and more likely to sit in judgment. So that is what it presented to the jury.

7

### 2. *Defense's Precluded Response*

Nor was Bankman-Fried's proffered evidence limited to matters "post-dat[ing] the relevant events." GB41. Bankman-Fried sought to show FTX and Alameda were *never* insolvent—before, at the time of, or after the bankruptcy petition. Rather, his theory was that FTX and Alameda faced a temporary liquidity crisis due to adverse market conditions and the resulting bank-run, but they could have liquidated valuable assets to pay customers and creditors back. (That is in fact what eventually happened.) This was relevant to rebut the government's claims about permanent loss and intent to defraud.

Consider Anthropic. Bankman-Fried invested early in Anthropic—purchasing a substantial share for approximately $500 million. The company is now worth $60 billion, earning a return multiples over. His investment was brilliant.

Evidence regarding Anthropic was relevant for many purposes. It was relevant to rebut the government's argument that everyone "lost all their money"—they did not, in part because the Anthropic investment was eventually liquidated, with proceeds returned to customers and creditors. It was relevant to rebut the argument that Bankman-Fried's investments were "risky" and "losing money," A-678—they were not. Nor was Anthropic Bankman-Fried's only home-run investment—for example, Solana, Aptos Labs, and Mysten Labs were all valuable

8

assets eventually sold to repay customers.  And yet all such evidence was precluded, because the district court ruled—but only as to the defense evidence—that it "doesn't matter" what happened to customer funds in the end.  A-805.

The relevance of such evidence was not, as the government claims, limited to events post-dating bankruptcy.  The Anthropic investment is worth more now than it was then, but it was worth *a lot* then—so it was relevant to rebut the government's claim that FTX and Alameda were deeply insolvent *at that time*.  It is true that because Anthropic was a private company, there "may not have been a market" to immediately realize its value.  GB37 n.9.[2]  But that simply proves Bankman-Fried's point: *During the fall of 2022 and the bankruptcy petition*, FTX and Alameda faced a liquidity crisis, not a solvency crisis.

Perhaps most fundamentally, the evidence was relevant to rebut the government's theory that Bankman-Fried "knew" all along Alameda was insolvent and "did not have the assets to cover" funds owed to FTX customers.  A-1110.  In fact, Bankman-Fried not only believed but *knew* Alameda had valuable assets that could, with sufficient time, be liquidated to repay customers and lenders.  The government told the jury Bankman-Fried was lying, but it turns out he was right all along.

---

[2] That doesn't make any valuation "misleading and confusing" to the jury.  GB37 n.9.  People routinely value private companies when considering investment or loan transactions with such companies.

9

### 3. The End Result

The government maintains customers might not truly be "made whole," GB41 n.11, citing nothing other than its own sentencing submission. The Debtors' filings tell a different story. *See*, *e.g.*, BAB16-19.

Moreover, if customers and creditors could have received more money or received it sooner, the fault lies with the Debtors, not Bankman-Fried. The Debtors took control of FTX, Alameda, and all assets once the bankruptcy was filed. It was the Debtors, not Bankman-Fried, who controlled the repayment schedule and form. It was the Debtors, not Bankman-Fried, who decided to shutter the still-profitable exchange. It was the Debtors, not Bankman-Fried, who decided to sell assets at bargain-basement prices—some of which have since appreciated dramatically. And it was the Debtors, not Bankman-Fried, who racked up *hundreds of millions* in legal fees.

But the larger point is all such nuance was missing from trial. Whether anyone was "made whole" may be a debatable definitional question. But the government told the jury, over and over, that everyone lost all their money, period. That wasn't nuanced or complicated—it was just false.

### C. The District Court's Rulings Violated The Law

In another attempt to rewrite history, the government pretends the district court consistently limited this case to events through November 2022 and

10

prevented both parties from presenting evidence of subsequent events. That is not what happened. The district court only excluded *defense* evidence of subsequent events.

When analyzing defense evidence, the court ruled the crime complete at the moment of misappropriation and all subsequent events irrelevant. "That's it," the court said, "it's finished, the minute the misappropriation happens." A-806. "[W]hat he did with [the money] afterward doesn't matter." A-805. But when it came to the government's proof, the district court changed its tune—evidence about subsequent events, including the bankruptcy, was now "intertwined inextricably" with the charged crimes, and permitted to "complete the story." SPA-59-60.

The government makes no serious effort to defend these asymmetrical rulings under the Rules of Evidence. Its sole argument conflates the substantive law with evidentiary relevance. The government argues that because absence of loss is "not a defense," evidence regarding loss is irrelevant. GB40 & n.10. Even if the government's (false) premise were true, the conclusion would not follow. Just as actual loss—had it occurred—would have some "tendency" to make intent to defraud more likely, Fed. R. Evid. 401, absence of loss tends to make lack of intent more likely.

11

Regardless, it is disingenuous for the government to argue now that evidence of loss "doesn't matter," because the government itself presented evidence of loss. If it didn't matter what Bankman-Fried did with the money, why did the government present evidence that he bought expensive real estate in the Bahamas? If customers' ultimate loss was irrelevant, why did the government elicit testimony that customers and lenders never recovered their money?

Facts like these can be relevant because they shed inferential light on a defendant's intent, "complete the story," and demonstrate the moral weight of the alleged conduct, triggering "a juror's obligation to sit in judgment." *Old Chief*, 519 U.S. at 188. The problem in this case was that only one party was allowed to complete its story.

### D.     The Argument Was Preserved

The government's preservation arguments, GB38-39, are based on a few quotes plucked out of context and ignore the district court's prior rulings.

As explained, OB23-26, the issues first arose with Bankman-Fried's motion to dismiss—which the government ignores. In denying that motion, the court ruled loss and intent to repay "immaterial as a matter of law" because the government was proceeding on a temporary misappropriation theory. SPA-28. The defense disagreed, but was obligated to "adhere to" that ruling as law of the case as it proceeded to trial. *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009).

12

Based on that ruling, the government then moved to exclude all defense evidence regarding loss and repayment. Dkt.204 at 49-51. The defense responded by arguing that—under the court's prior order—*neither* party should be allowed to present evidence of later solvency or insolvency, subsequent repayment or lack thereof. Dkt.207 at 8, 11-14.

But the whole thing was a bait-and-switch. After solemnly declaring it was proceeding only on a misappropriation theory, and that loss and repayment were therefore irrelevant, the government reversed course, announcing *it* would present evidence that everyone lost everything, that FTX was fundamentally insolvent, that no one would be repaid, and that Bankman-Fried knew they wouldn't be repaid. Dkt.245 at 1.

In response, Bankman-Fried was clear his "defense is not that he intended to steal funds and give them back." Dkt.246 at 28. He never "expressly disclaimed" any defense about lack of loss or solvency. GB38. The operative word is "steal"—a core pillar of Bankman-Fried's defense was that customer money was never "stolen," because on a margin lending platform, FTX was *allowed* to lend deposits just as a bank lends deposits. Moreover, at that point, the defense merely stated it was not intending to present a repayment defense because *the district court had already ruled it could not.*

13

The defense immediately made clear, however, that "should the Government introduce evidence relating to the bankruptcy, the defense should be permitted to rebut the prejudicial inferences such evidence would occasion." Dkt.246 at 29 n.7. When the district court thereafter issued its asymmetrical rulings, the defense reiterated its objection that the government could not have it both ways. A-579-80, A-588-89. The government ignores these objections as well.

### E.      The Error Was Not Harmless

The prejudice from the district court's unfair asymmetrical rulings is manifest. The government told the jury everyone lost everything. That was false, as the government now tacitly concedes. The jury did not hear the truth, because the defense was prevented from responding. And the tale of permanent loss undoubtedly weighed on the jury's mind.

The government notes that Bankman-Fried was allowed to testify in general that he acted in good faith and believed Alameda had sufficient assets. GB43-44. But jurors always view an accused's testimony with skepticism. His own testimony on the same subject carries little force on its own and does not render the error harmless, because his "credibility may have been much reduced, absent the corroborative effect of the excluded" proof. *United States v. Dietrich*, 865 F.2d 17, 21-22 (2d Cir. 1988) (reversing erroneous exclusion of defense evidence even though defendant testified on same subject). That is especially true where, as here,

14

the prosecution repeatedly criticized the defendant's inability to support his testimony with other evidence. *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001).

Moreover, the district court narrowly limited Bankman-Fried's testimony to his contemporaneous belief—not the ultimate truth of FTX's solvency, or the ultimate outcome. The latter were relevant to rebut the government's repeated arguments that he acted like a crazed gambler with customer funds and that his claims about solvency were obvious lies.

The government claims Bankman-Fried fails to demonstrate "what [his] evidence would have been or how it would have helped." GB44. As to the former, there would have been ample evidence showing FTX and Alameda were not insolvent and customers did not lose everything. It would have included, for example, evidence about value of Anthropic and other investments, as discussed. It also would have included the material in the Debtors' bankruptcy filings showing the valuable assets held by FTX and Alameda.

As to "how it would have helped," the answer is simple: The jury would have learned the truth. The government's theory of guilt was false. Bankman-Fried didn't steal everyone's money, and everyone didn't lose everything. Despite the government's revisionist history and legal sophistry, those are important facts that matter to humans—in the real world, and in the jury room.

15

## II. THE DISTRICT COURT ILLEGALLY BARRED EVIDENCE THAT BANKMAN-FRIED RELIED ON COUNSEL

The government told the jury Bankman-Fried created inherently fraudulent corporate policies and practices at FTX and Alameda. The district court again prevented him from responding with proof counsel had approved those policies. To defend the lawless rulings, the government relies on the dubious concept of "inherent authority," cites inapposite cases, continues to misread *Scully*, and strains to rewrite the district court's spurious reasoning. In reality, the judge excluded the evidence because *he* didn't believe Bankman-Fried. The district court deprived Bankman-Fried of his right to have *the jury* determine his credibility and his guilt.

### A. The District Court Lacked Authority To Require Disclosure And The Preview Hearing

#### 1. The Rules Do Not Authorize Compelling Disclosure

The peculiar proceedings that led to the exclusion started with the district court's unfounded disclosure rulings. As the government acknowledges, no statute, rule, or binding case requires defendants to disclose in advance evidence that they relied on counsel. Rule 12 specifies a few particular defenses that must be disclosed before trial, but includes nothing about reliance on counsel, and *expressio unius* counsels against adding items to such a carefully crafted list. *E.g.*, *NLRB v. SW General Inc.*, 580 U.S. 288, 301-02 (2017). The government relies on "inherent authority," GB56, a dubious and "danger[ous]" concept, *Degen v. United States*, 517 U.S. 820, 823 (1996). The government's lead authority, *United States*

16

*v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990), did not discuss "inherent authority" at all, and its second case, *United States v. McSherry*, 226 F.3d 153, 157 (2d Cir. 2000), only held that courts have inherent authority to supplement existing rules, not create entirely new ones.

While a few district courts have asserted inherent authority in this regard, GB56, many others have held that creating an entirely new provision in Rule 12 is *not* a proper exercise of inherent authority, OB43-44.  This Court should follow those better-reasoned cases.  Creation of new provisions in Rule 12 is best left to the Rules Committee.

## 2.  *The Deposition-Hearing Was Unauthorized*

Even if some pretrial disclosure was authorized, which is dubious, requiring the defendant to be deposed is not—and violates basic constitutional norms about criminal trials.  *See* OB44-46.  The defense's detailed disclosure letter (A-664-67) was more than sufficient to enable the district court to rule on admissibility of the topics, and any specific questions could have been handled as they arose on the stand.  That is what judges do every day.  The pre-testimony deposition was unnecessary, unprecedented and, once again, unauthorized by any rule, statute, or prior precedent.

On this point, the government's authority is thin to nonexistent.  It cites *Bakhtiari* (GB57-58), where the defendant testified prior to trial to lay a foundation

17

for his duress defense. 913 F.2d at 1056. The defendant did not challenge the hearing itself on appeal—indeed, he may have affirmatively sought it, and there is no indication the hearing included cross-examination. *Bakhtiari* is irrelevant. The government does not cite a single case where a defendant was forced to be deposed before being allowed to testify that counsel was involved in making some relevant decision. That's because there are none.

The government pretends there was "nothing unusual" because "Rule 104 permits cross-examination at a hearing." GB58. It cites *United States v. Jaswal*, where a defendant *requested* to testify he was not *Mirandized* before making a statement. 47 F.3d 539, 543-44 (2d Cir. 1995). That has no bearing here. Rule 104(c)(2) requires courts to hold hearings on preliminary questions if the defendant "so requests"—as in *Jaswal*. It is doubtful Rule 104 even applies here, because the court was not attempting to determine any ancillary preliminary question like whether a privilege exists. Regardless, Bankman-Fried never requested this hearing. The judge ordered it sua sponte based on his expansive notions of inherent authority.

This case illustrates the problem with inherent authority: Once unleashed, it is boundless. If a defendant can be forced to sit for a deposition before testifying about counsel's involvement, why not any other topic or any defense? What is the

18

point of specific, narrow rules if courts can just invent new ones the drafters didn't include?

The government provides no answer. This Court should require district courts to adhere to the disclosure requirements in the rules rather than permitting depositions of the accused not contemplated by the Rules Committee or consistent with basic principles of fairness in criminal cases. Courts should "encourage people to take the stand"—not create roadblocks that will deter defendants from testifying, particularly because "it is…useful and helpful in many white collar cases to hear testimony from both sides." *United States v. Stewart*, 15 Cr. 287 (S.D.N.Y.). (Rakoff, J.), ECF 367, at 4.

### 3. *Bankman-Fried Preserved His Objection*

Contrary to the government's argument (GB51, 57), Bankman-Fried made clear from the outset that he would present evidence of counsel's involvement in adopting corporate policies. A-401. He contended such evidence was relevant to good faith and necessary to respond to the government's arguments about those policies. Dkt.246 at 29-31. He repeatedly said no special advance disclosures were required. A-554, 569-70. The court disagreed and required disclosure. SPA-70-71, A-400.

Thus, *to comply with the court's ruling*, Bankman-Fried provided further disclosure. A-644. But the court ruled it insufficient and compelled a hearing. A-

882. Bankman-Fried had no choice—if he did not testify at the hearing, the district court would not consider admitting his proffered evidence. Further objection would have been futile given the district court's repeated rulings against him. Indeed, even when he repeatedly objected that cross-examination was going far beyond the scope of the ostensible purpose of the hearing, those objections were overruled. OB41.

### B. There Was No Legal Basis To Prevent Bankman-Fried From Rebutting Key Government Arguments

1. The district court's stated rationale for excluding Bankman-Fried's testimony rested on three legally indefensible pillars: First, that it could exclude testimony in the "public interest"; second, if Bankman-Fried could not carry the burden necessary to receive an instruction, he could not present his evidence *at all*; and third, the evidence was misleading because jurors can't be trusted to understand what lawyers do.

The court's principal basis for exclusion was its purported concerns about "potential harm to the public interest" from the testimony. A-987-99. This was saying the quiet part out loud—the judge assumed Bankman-Fried was guilty, didn't believe his testimony, and wanted to make sure the jury didn't hear it. The government knows "public interest" isn't a proper basis to exclude a defendant's own testimony, so it calls the phrase "shorthand" for Rule 403's actual considerations. GB53. But the district court's actual words defy that fiction.

20

The Rule 403 factors favoring exclusion involve harms to the parties and the jury's factfinding process, not vague harms to "the public interest." Unfair prejudice, for example, refers to the tendency of evidence to lure the jury into reasoning based on an "improper purpose" such as "nullification." *In re United States*, 945 F.3d 616, 630 (2d Cir. 2019); *see* Fed. R. 403 adv. comm. notes. In this case, however, there was nothing like nullification in play—the judge's apparent concern was that the jury might believe Bankman-Fried.

The government's other attempt to defend this rationale fares no better. It states: "There is nothing unusual about district courts excluding evidence that tends to suggest lawyers blessed the charged conduct, absent some evidence that the lawyers actually did so." GB50. This ignores the obvious: a defendant's own testimony *is* "some evidence." And Bankman-Fried would have testified that lawyers blessed certain business practices at FTX that prosecutors claimed he had nefariously invented on his own.

2. Like the district court, the government conflates the requirements for an advice-of-counsel *instruction* with the requirements for *relevance*. The government suggests counsel's involvement is not relevant unless the defendant "fully and honestly laid all the facts before his counsel." GB50. But as support, it again cites the portion of *Scully* dealing with an advice-of-counsel *instruction*. GB51 (citing *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017)). The

21

whole point of *Scully* is that a defendant is entitled to present *evidence and testimony* of counsel's involvement, 877 F.3d at 473-75, even if he does not make a showing sufficient for an *instruction*, *id*. at 476-77. The court ignored that distinction below, and the government ignores it again now.

Once again, the government's only authority is a few district court orders. For instance, *SEC v. Tourre*, 950 F. Supp. 2d 666, 683-84 (S.D.N.Y. 2013), predates *Scully*, and repeats the district court's conceptual mistake—conflating admissibility with entitlement to an instruction on an affirmative defense. *See* OB47-48. And *SEC v. Lek Securities Corp.*, 2019 WL 5703944, at *4-5 (S.D.N.Y. Nov. 5, 2019), is inapposite. It excluded evidence because the defendant sought to raise an advice-of-counsel defense but refused to waive the attorney-client privilege.

3. The concern that defense evidence was "misleading" is equally baseless. Like the trial judge, the government assumes that because lawyers didn't know all the facts, evidence of their involvement would have somehow confused the jury. GB52-53. But that goes to weight. It involves a matter of common sense—precisely what juries are supposed to resolve. The government could have responded by arguing *to the jury* that those lawyers didn't have all the facts. Jurors understand that professional advisors—lawyers, doctors, accountants—need facts to give advice, and are perfectly capable of appropriately weighing this evidence.

The argument that the evidence "risked wrongly implying that Bankman-Fried's conduct was lawful simply because lawyers were involved," GB52, targets a straw man. Bankman-Fried wasn't claiming he was innocent "simply because lawyers were involved." The point was that the proffered evidence, combined with other defense evidence, shed light on his good faith and rebutted the government's arguments regarding those policies.

### C.     The Errors Require A New Trial

The excluded evidence was critical to the defense. In each instance, it helped rebut the government's argument that Bankman-Fried acted alone and possessed criminal intent.

For example, the government repeatedly argued the North Dimension bank accounts were shady and set up so Bankman-Fried could pilfer customer funds. In summation, it argued that "a lot of those deposits came through this entity that we've heard some about called North Dimension. The defendant was involved in opening that account. He signed the application. That is his name right there, as the principal officer"; and "once FTX customers' deposits landed in" the North Dimension account, "they were used as a source of free cash." A-1082. The government went on to argue that Bankman-Fried's exploitation of funds in the North Dimension account "just tells you everything, right?" *Id.*; *see also* Tr.2939-40; A-1095.

23

To rebut that argument, it was essential for the defense to tell the jury the truth—that FTX's chief legal officer and outside counsel advised creating the North Dimension entity and were involved in setting up the bank account.  A-665. That evidence alone would not have shown "Bankman-Fried's conduct was lawful simply because lawyers were involved."  GB52.  But it was nonetheless *relevant* and *important* to respond to the government's argument that North Dimension was inherently fraudulent—and was solely Bankman-Fried's doing.  The same is true of the other policies.

The government claims none of this matters, because lawyers did not bless "the misappropriation of FTX customer funds."  GB54.  That is question-begging. The government told the jury these corporate policies were inherently fraudulent and proved the handling of customer funds was fraudulent rather than legitimate. The government admitted evidence about these policies in the first instance, and Bankman-Fried was entitled to respond.

Finally, the government maintains the deposition procedure was harmless because it *benefited* the defense by giving Bankman-Fried a chance to practice his testimony.  GB58-59.  If that were true, one would expect criminal defendants around the country to clamor for depositions before taking the stand.  Not surprisingly to anyone who has practiced law, that never happens.  Moreover, as the amicus brief of the neurodiversity experts explains, the prejudice here was

24

particularly pronounced because of Bankman-Fried's diagnosed conditions of autism spectrum disorder and ADHD.  ND23-27.

*　　　*　　　*

The district court illegally forced a deposition and then excluded the defense evidence anyway.  That allowed the government—once again—to offer a one-sided, and false, picture of the facts, and deprived Bankman-Fried of a fair trial.

## III. THE SCIENTER INSTRUCTIONS ERRONEOUSLY LOWERED THE GOVERNMENT'S BURDEN

### A. The Instructions On Temporary Deprivation Misstated The Law

1.     Although jury instructions are reviewed as a whole, GB16, it is the government, not Bankman-Fried, that analyzes "isolated statements taken from the charge," *id*, and then tries to show each isolated statement has been approved in some context, GB20-28.  That ignores the fundamental problem with the loss instructions:  Taken as a whole and read together, they failed to require proof that loss was an object of the alleged fraud.  Instead, the instructions said no loss (actual or intended) was required because mere use of another's money or property suffices.

Although the instructions did require proof that "the defendant contemplated some actual harm or injury to the victim," GB18, they wrongly defined what *types* of "harm or injury" *count* for wire fraud.  The court told the jury merely depriving someone of the right to "use" their money or property was adequate harm.  A-

25

1125-26.  The no-ultimate-harm instruction compounded the error by stating that depriving someone of money "even if only for a period of time" is itself a fully sufficient "harm or injury."  A-1133.  Reading the instructions *as a whole* is precisely what makes the error manifest.

2.      The instructions were wrong under *Kelly* and *Ciminelli*.  To state that a temporary deprivation of the ability to use one's property is sufficient for fraud violates *Ciminelli*—it is just another way of reframing the invalid right-to-control doctrine.  *Males* and the other pre-*Ciminelli* cases the government cites, GB24, no longer accurately state the law.  *See* Point I, *supra*.

The instructions were particularly flawed because this case involved a margin lending platform where customers allowed FTX to lend their deposits to others.  In that context, it makes no sense to say temporarily depriving a customer of her ability to use her assets is a "harm or injury."  The very nature of lending— whether by customers or lenders—involves giving up the right to use assets for a time.

The government's only response is that some customers "did not opt in to margin trading."  GB29.  That sounds like a tacit concession that the instructions were faulty as to 80% of the assets on FTX.  As to lenders, the government claims "fraudulently induc[ing]" the loans is the essence of the offense.  GB29.  But that conflates deception with loss.  *Kelly*, *Ciminelli*, and many of this Court's

26

precedents are clear that deception alone is insufficient. *See Kelly v. United States*, 590 U.S. 391, 393 (2020); OB28-31. Wire fraud requires *both* deception *and* contemplated harm to a property interest cognizable under the statute. A temporary deprivation of the ability to use property is not a cognizable harm.

3.    The government argues these claims were forfeited. GB21-23. But the defense proposed alternate language and repeatedly objected to the no-ultimate-harm instruction, and it was clear—especially given the judge's earlier rulings—further protest would be futile. OB55-56. Where, as here, the district court has rejected legal arguments, further specificity is not required to preserve a claim. *United States v. Dinome*, 86 F.3d 277, 282 (2d Cir. 1996).

The government's cases (GB23) do not hold otherwise. In *United States v. Ganim*, the defendant objected to different instructions at trial and on appeal, and the language he attacked on appeal was *included* in his own proposed instructions. 510 F.3d 134, 151 & n.11 (2d Cir. 2007). Similarly, *United States v. Vasquez*, 267 F.3d 79, 87 (2d Cir. 2001), involved objections to different instructions at trial and on appeal.

Here, by contrast, Bankman-Fried "properly presented" the same general claim as to intended loss below. *Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992). He repeatedly and consistently objected to the no-ultimate-harm instruction. He objected at the charge conference, A-1073; A-658-60, and long

27

before that, he objected to the same legal principle in his motion to dismiss, OB23-24. That was plainly "sufficient to direct the district court to his contention" and preserve his claim. *United States v. Masotto*, 73 F.3d 1233, 1238 (2d Cir. 1996). Bankman-Fried is "not limited to the precise *arguments* [he] made below" in support of his *claim* about what suffices for loss. *Yee*, 503 U.S. at 534. The district court considered and rejected his claim.

4. Nor was the error harmless. Like the related evidentiary error, it went to the heart of the defense: that he lacked the intent to defraud because he believed—reasonably and correctly—that FTX and Alameda had sufficient assets to make everyone whole, given time. The district court gutted that defense, first by excluding evidence supporting his defense, and then by instructing the jury that temporary use of customer deposits was sufficient to convict, effectively directing a guilty verdict.

## B. The "Willfulness" And "Good Faith" Instructions Misstated The Law

The government's claim that securities and commodities fraud require only "a wrongful purpose" rather than knowledge of "unlawfulness," GB30-31, defies precedent.

1. The government's preservation argument (GB30, 34) again fails. Magic words are not required, and "the substance of the claim now being raised on appeal was squarely raised below." *United States v. Hassan*, 578 F.3d 108, 129

28

(2d Cir. 2008). Bankman-Fried requested instructions that "willfully" requires proof the defendant knew his conduct was "unlawful," A-611, A-625, A-629, and the parties "briefed the issue…with respect to each of the[] crimes," Tr.2859; *see also* A-660. At the charge conference, the government argued that *all* the fraud charges were "going to use the same definition of willfully, [and] there is not a requirement that the defendant act with knowledge that one's conduct is unlawful" but only "with [a] wrongful purpose." Tr.2859. Bankman-Fried consented "[w]ith respect to the wire fraud counts" only, but objected to the "wrongful purpose" formulation for the other fraud counts. *Id.*; A-1072-74.

2. *United States v. Bryan* (GB31) held that "to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" 524 U.S. 184, 191-92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). The government misleadingly suggests *Bryan* approved "bad purpose" language (GB31), but the instruction *Bryan* endorsed required "bad purpose *to disobey or to disregard the law*," *id*. at 190 (emphasis added). And the Court approved an instruction stating "willfulness" requires "knowledge that the conduct is unlawful," *id*. at 196—the exact formulation rejected here.

3. The government's spin on this Court's precedent is equally unsound. It erroneously contends *United States v. Kosinski* "relied on *Kaiser* in rejecting the

argument that the jury should have been required to find a specific intent to violate the securities laws."  GB32.  But in rejecting that even stricter standard, *Kosinski* reaffirmed *Bryan*'s "generally applicable" definition of "willfulness," reiterating the requirement of "knowledge that the conduct is unlawful."  976 F.3d 135, 154 & n.14 (2d Cir. 2020).

As for *United States v. Petit*, 2022 WL 3581648 (2d Cir. Aug. 22, 2022), in *precedential* opinions the Court has since *thrice* reiterated that willfulness requires knowledge of unlawfulness.  *See United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir. 2024) ("[T]he defendant must act 'with knowledge that his conduct was unlawful.'") (quoting *United States v. Kukushkin*, 61 F.4th 327, 332 (2d Cir. 2023)); *accord United States v. Zheng*, 113 F.4th 280, 296 n.5 (2d Cir. 2024).

4.     The good faith instructions likewise erroneously omitted that a defendant's good faith belief that he was not violating the law negates scienter. OB59-60.  The instructions did not "adequately convey," GB33, the good faith defense, because they did nothing to countermand the incorrect willfulness instructions.

## IV.   THE DISTRICT COURT ERRONEOUSLY REFUSED TO ORDER DISCOVERY FROM THE FTX DEBTORS AND HOLD A HEARING

The Debtors and S&C took control of FTX, forced it into bankruptcy proceedings, billed the Estate hundreds of millions of dollars, and repeatedly

condemned Bankman-Fried as a "villain." OB65-66. In stark contrast to the independent counsel retained in notable bankruptcies like *Enron* and *Worldcom*, S&C had multiple conflicts of interest immediately flagged by the U.S. Trustee and four U.S. Senators.[3] Most troublingly, S&C had done "significant prebankruptcy work for FTX," and likely knew "FTX was commingling customer assets."[4] But instead of recusing itself, S&C suddenly claimed this commingling was a crime after the November 2022 run on deposits.[5] S&C then affirmatively reached out to prosecutors—without notifying Bankman-Fried, its then-client—to invite this prosecution. OB67; Bankr.Dkt.510 at 5. S&C's many subsequent communications with prosecutors even included a presentation about whether an independent examiner, which would investigate S&C's own role in FTX's collapse, should be appointed.[6]

The government nevertheless charged ahead. It weaponized the Debtors and their conflicted counsel to indict Bankman-Fried and secure a conviction in record time, all while using them to conceal exculpatory information from the defense. If the Court does not find the Debtors an arm of the prosecution in this extraordinary

---

[3] *See* BAB7-14; Jonathan Lipson & David Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11*, 77 Stan. L. Rev. ___, Parts IV.B-C (forthcoming 2025); "U.S. Senators Question Independence of FTX Bankruptcy Law Firm," *Wall Street Journal* (Jan. 10, 2023).

[4] Lipson & Skeel, *supra*, at n.24-26 and accompanying text.

[5] *Id.*

[6] *See, e.g.*, Bankr.Dkt.721 at 273, 419, 420.

31

situation, the government will get a blank check in every white-collar case to evade its *Brady* obligations by delegating investigative responsibilities to private parties.

The government's defense of its conduct and the district court's rulings is disingenuous. The Debtors' bankruptcy filings and S&C's timesheets refute the government's false claims that the Debtors had "no involvement in any significant aspect" of its work, GB65, and that this was "nothing more than the usual cooperation of corporate counsel," GB68. No controlling precedent supports the government's contention that the prosecution team can only include public officials. And the government ignores the serious constitutional problems it created by asking S&C—an entity with pervasive conflicts of interest—to play an active role in the investigation and prosecution of its own former client.

1.     The government disparages Bankman-Fried's arguments as "absurd" and "wild," GB67 & n.17, but the government's assertions are flatly contradicted by the words in the Debtors' own bankruptcy filings. Consider first the extraordinary volume and timing of the Debtors' efforts to spur the prosecution, which are so unlike the more methodical approach taken in *Enron* and *Worldcom*. BAB13-16. For instance, in just the 2½ weeks following the petition, there were 22 time entries reflecting S&C communications with SDNY prosecutors.[7]

---

[7] *See* Lipson & Skeel, at n.350 and accompanying text.

32

Likewise, the government denies directing S&C to ask any questions in its witness interviews, GB66, but the timesheets refute its denial. They show S&C posed "questions for former FTX personnel" spoon-fed to it by "SDNY," Bankr.Dkt.818-2 at 521, and later provided SDNY "interview readouts," *id.* at 529. It is one thing for a company to share findings of an internal investigation with prosecutors. It is quite another for the company to conduct that investigation at the behest of prosecutors, who, instead of conducting their own interviews, direct the company's interviews and decisions about what evidence to collect. *See United States v. Connolly*, 2019 WL 2120523, at *11 (S.D.N.Y. May 2, 2019) (investigation "fairly attributable" to government in part because "interview…was conducted at [government's] behest").

The government also denies the Debtors "recommended new areas of inquiry" or "vetted prosecution theories," GB66, but the evidence shows the opposite. While contemplating a superseder, the government asked S&C to give "[a] presentation…with respect to whether [the Debtor entities] were acting as an unlicensed money transmission business." A-210. S&C agreed and provided "a zip file containing documents relating" to the request. A-207. And the government's claim that S&C's email about a "$45 million 'hole'" responded to its own question, GB66-67, is refuted by the email itself. The email indicates S&C

reached out on its own initiative and documents S&C's own prior overtures to prosecutors on this issue.  OB69; A-212.

The government's denial of the Debtors' involvement in its bail strategy is also refuted by clear evidence showing S&C strategized with prosecutors on bail from the instant the Magistrate Judge set release conditions.  The *very next day*, S&C billed time to "consider potential bail restrictions for S. Bankman-Fried," Bankr. Dkt.721-2 at 63, including a "strategy for amendment to [the] bail package" and a "call with [AUSA] Roos…re: amendment to [the] bail package," *id*. at 510. S&C later had another "call with SDNY…re: bail conditions," when other S&C lawyers billed time regarding "conversations with SDNY re: bail conditions" and "potential bail revocation."  *Id.* at 521.  Similar interactions led to the government's request to remand Bankman-Fried.  OB70.  The government says the entries don't mean what they say, but *its* tortured interpretation (GB67-68 n.17), not Bankman-Fried's, reflects nonsensical "speculation."

If S&C really had "no role in strategy," GB66, or "involvement in any significant aspect of the [case]," GB65, why did S&C lawyers bill time to strategize with prosecutors about issues as important as Bankman-Fried's pretrial detention?  If this type of conduct is the "routine" way the government deals with corporate cooperators represented by former colleagues—as it claims, GB68—then it is time for the Court to adopt a clearer standard sufficient "to protect

[d]efendants' rights." *United States v. Hunter*, 32 F.4th 22, 38 & n.70 (2d Cir. 2022).[8]

The government dismisses the concerns this Court expressed in *Hunter*, but those concerns are particularly acute here, because the government relied on S&C, which it knew had multiple conflicts of interest and "played a pivotal and problematic role in inducing [FTX's] bankruptcy." BAB8. The government simply ignores these pervasive conflicts, and worse, suggests it will continue its questionable tactics in future cases. The Court should not endorse such problematic "outsourc[ing]," which enables the government to insulate itself from *Brady* material by hiding behind private parties like the Debtors. *Connolly*, 2019 WL 2120523, *12; *cf. Gen. Elec. Co. v. N.Y. Dep't of Labor*, 936 F.2d 1448, 1454-55 (2d Cir. 1991) (discussing unconstitutional delegations to private parties).

2.    The government also misreads the caselaw, and its proposed rule would invite the government to do exactly what it did here—deliberately avoid obtaining exculpatory material to hamper the defense.

Contrary to the government's suggestion (GB63-65), this Court has never held that cooperators can never be deemed members of the prosecution team. The

---

[8] S&C's interactions with prosecutors also implicated what position another U.S. agency—the Trustee—would take on an Examiner, and how appointment of an Examiner might impact the criminal case. This only underscores the extraordinary nature of the Debtors' involvement in the prosecution, and how far beyond "normal" cooperation it went.

35

only binding decision the government cites, *United States v. Bradley*, 105 F.4th 26, 35 (2d Cir. 2024), involved routine cooperation from witnesses who were merely subpoenaed and interviewed.  The extensive collaboration between the Debtors and the government here was materially different.  It proceeded on the assumption that the Debtors were willing to do—and did—"whatever the Government request[ed]," including providing "full access to the information."  A-189-90.

The dispositive question is not whether the government knows about or possesses the information at issue.  The government "'has a duty to learn of any favorable evidence known to…others acting on the government's behalf.'"  *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).  Here, it deliberately avoided learning the information, even though the Debtors collected and "review[ed] documents," "interview[ed] witnesses," and "gather[ed] facts" at the government's request to distill the evidence and "develop prosecutorial strategy."  *United States v. Stewart*, 433 F.3d 273, 299 (2d Cir. 2006).  The extent of the collaboration was extreme, and "prosecutors enjoyed extraordinary levels of real-time support by the Debtors' estate."  BAB6-10, 13-16.

3.    And in *United States v. Josleyn* (cited GB66-67) the First Circuit indicated the outcome would have been different had the government "engineered"

36

that result or remained "willfully blind to exculpatory evidence."  206 F.3d 144,

153 & n.8 (1st Cir. 2000).  That is exactly what happened here.

The government opposed Bankman-Fried's discovery motions, intervened to

quash his subpoenas, and refused to subpoena the information itself.  It hides

behind privilege assertions, GB60-61, but knew the Debtors had "agreed to waive

privilege" before and pressed for such waivers when it found them helpful to its

case, A-207.  By contrast, prosecutors chose not to seek privilege waivers where

the information might have assisted Bankman-Fried.

4.      Finally, the conduct was not harmless.  The Debtors did not

"produce[] the FTX…codebase history," GB61, 69, for example.  The government

stated it had "been told by the FTX debtors that they did provide access to

the…code base history," Dkt.249 at 13, but the defense never "received the code

base history," *id.* at 9.  The codebase history used at trial was limited to 21 pages

of screenshots of code base history from Wang's laptop, not the full codebase

history, which was necessary to rebut the government's false allegation that

Bankman-Fried "secretly introduced special features into FTX's computer code" to

grant Alameda privileges.  GB6.

This is just one example.  Without a hearing, there is no way to know the

full extent of potentially exculpatory information the government avoided

obtaining that might have assisted Bankman-Fried's defense.

## V.    THE FORFEITURE MONEY JUDGMENT WAS UNLAWFUL

Prior to his indictment Bankman-Fried turned over control of FTX and all its assets to the FTX Debtors, who are now making all creditors whole.  The government nevertheless sought an unlawful, duplicative $11 billion money judgment against Bankman-Fried, who has no remaining assets to forfeit.  The forfeiture order is indefensible.

### A.    The Statutes Do Not Authorize *In Personam* Money Judgments

The government identifies no textual basis in the statutes for the unlawful money judgment imposed here.

*United States v. Awad*, 598 F.3d 76 (2d Cir. 2010), involved a different statute, 21 U.S.C. §853(a)(1), which should be interpreted "liberally," *id.* §853(o). *Awad* also preceded *Honeycutt v. United States*, which held "[t]he plain text and structure" of Congress's chosen forfeiture scheme leaves no room to "read…into the statute" "an end run" not specifically prescribed.  581 U.S. 443, 452-53 (2017).

Rule 32.2's "money judgment" language (GB71) is irrelevant.  The Rules Committee was merely prescribing procedure—not a new government remedy—and "t[ook] no position on the correctness of…rulings" that "ha[d] approved use of money judgment forfeitures."  Fed. R. Crim. P. 32.2, adv. comm. notes 2000.  And *United States v. Nejad* acknowledged there was no "textual basis for imposing" a money judgment. 933 F.3d 1162, 1164-65 (9th Cir. 2019).

38

Indeed, "Congress provided just one way for the Government to recoup substitute property when [it claims] the tainted property itself is unavailable—the procedures outlined in § 853(p)." *Honeycutt*, 581 U.S. at 453. Those procedures require proof the property is unavailable "as a result of any act or omission of the defendant." 21 U.S.C. §853(p)(1). That isn't what happened here. The FTX bankruptcy proceedings will ultimately render the money judgment entirely duplicative. Creditors will be made whole through the bankruptcy for the same reason Bankman-Fried cannot personally return the assets: they are available but remain in FTX's custody.

If the government—and district court—had followed §853(p)(1)'s mandated procedures, the forfeiture order would have been markedly different, and orders of magnitude lower. As one obvious example, the government credits itself for seeking "forfeiture only for fraudulently induced loans that were not repaid and were 'outstanding at the time of bankruptcy,'" GB74-75 (quoting PSR at 50), but billions of assets remained at FTX and *all lenders will be paid back in full*.[9]

---

[9] The money judgment was not "independently warranted as a measure of the property involved in the money laundering offense." GB75. Section 853(p)'s substitute asset procedures apply to such forfeiture as well. *See* 18 U.S.C. §982(b)(2) (referencing 21 U.S.C. §853(p)).

39

**B.  Section 981(a)(1)(C) Does Not Authorize Forfeiting All Investor And Lender Money**

Contrary to the government's argument, GB73-74, *United States v. Contorinis* did not limit its holding that §981(a)(2)(B) defines "'proceeds' in cases involving fraud in the purchase or sale of securities," 692 F.3d 136, 145 n.3 (2d Cir. 2012), to insider trading.  The dispositive question is whether the crime involves inherently "illegal goods," or legal goods sold in an illegal "manner"—like the FTX securities.

If §981(a)(2)(B)'s definition of "proceeds" is correctly applied, then only the "difference between the stock's inflated value, and what it would have sold for absent the fraud" is subject to forfeiture.  OB81.  The government ignores Bankman-Fried's caselaw and cites no precedent to the contrary.[10]

The government also ignores that lenders will be made whole.  Section 981(a)(2)(C) provides "the court shall allow…a deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied," and §981(a)(1)(C) thus does not authorize the forfeiture for the lender counts.

**C.  The Forfeiture Was Unconstitutional**

"Whether a forfeiture would destroy a defendant's livelihood is a component of the proportionality analysis."  *United States v. Viloski*, 814 F.3d 104, 111-12 (2d

---

[10] *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012), and *United States v. Byors*, 586 F.3d 222 (2d Cir. 2009), *see* GB75, did not involve forfeiture.

Cir. 2016).  The government denies the order is unconstitutionally excessive,

arguing "the Constitution does not immunize Bankman-Fried…solely because he

misappropriated far more than he can likely repay."  GB77.  But it's not a question

of what is likely.  There is *zero* chance Bankman-Fried—who already turned over

all his assets—could ever repay $11,020,000,000, or anything close.

Nor can the government seriously contend "the forfeiture order was

precisely calibrated to the harm caused," or "simply reflected the actual losses to

victims."  GB77.  As explained, the Debtors will repay 118% of customer assets.

The government's cases, including those cited in *United States v. Patterson*,

2022 WL 17825627 (2d Cir. Dec. 21, 2022), GB77, are not remotely comparable.

They involve the low *millions*, not *billions*.  *See United States v. Bonventre*, 646 F.

App'x 73, 91-92 (2d Cir. 2016) ($19 million); *United States v. Elfgeeh*, 515 F.3d

100, 139 (2d Cir. 2008) ($22 million); *United States v. Castello*, 611 F.3d 116,

121-24 (2d Cir. 2010) ($12 million).  The forfeiture here is several orders of

magnitude larger, and the government cites no precedent even remotely close.

## VI.    THE CASE SHOULD BE REASSIGNED

A fair retrial requires a new judge.  Remanding without reassignment would

invite the same one-sided proceedings that tainted the first trial.

Contrary to the government's claim, GB78, "[r]eassigning a case…is not

unusual in this Circuit," *Ligon v. City of New York*, 736 F.3d 118, 128-29 & n.29

41

(2d Cir. 2013) (collecting cases).  Reassignment "simply…ensure[s] that cases are decided by judges without even an *appearance* of partiality," *id.*, and is warranted even where the record reveals no actual impropriety or bias.  In *United States v. Quattrone*, for example, the Court ordered reassignment because "certain comments could be viewed as rising beyond mere impatience or annoyance," despite no "evidence that the trial judge made any inappropriate statements leading [the Court] to seriously doubt his impartiality."  441 F.3d 153, 192-93 (2d Cir. 2006); *see also United States v. DeMott*, 513 F.3d 55, 59 (2d Cir. 2008) ("We cannot find on this record that Judge Platt is personally biased against Day; but an objective observer might nonetheless question his impartiality.").  That standard is satisfied here.

The government's precedent is inapposite.  *In re Aguinda*, *see* GB79, concerned a mandamus petition challenging the denial of a recusal motion.  241 F.3d 194, 200 (2d Cir. 2001).  The court expressly distinguished "petitions seeking disqualification," which "must satisfy an 'exacting standard,'" from "ordinary appeals based on allegations of a judge's partiality," like this one.  *Id.* at 202. *United States v. Schwartz*, 535 F.2d 160 (2d Cir. 1976), *see* GB78, similarly did not concern reassignment.

Moreover, even if media portrayals of "partiality…may be, at times, unreasonable," *In re Aguinda*, 241 F.3d at 202, the media portrayals of Judge

42

Kaplan's partiality were accurate, as the extensive quotations from the record in the opening brief demonstrate. OB84-87. The record clearly demonstrates more than mere "[a]dverse rulings, standing alone," *Schwartz*, 535 F.2d at 165.

The government of course can cherry pick times when Judge Kaplan curtailed its trial presentation, but his comments were overwhelmingly one-sided against Bankman-Fried. The government's examples pale in comparison to the numerous times the judge impugned the defense in front of the jury. When Judge Kaplan sought to hasten government questioning, for example, he remarked "[t]his is getting to be time to wrap it up." Tr.2163 (cited GB78). His comments to defense counsel were far more disparaging. *See, e.g.*, OB84 ("Could we get to the point."); OB17. The government's other examples involved statements outside the jury's presence. *See* Tr.1127-29, 1823-24. And the government has no response to the other instances of partiality the court expressed during Bankman-Fried's bail hearing, the charging conference, and sentencing. OB85-87.

## **CONCLUSION**

For the foregoing reasons, the judgment should be vacated and the case remanded to another judge for a new trial, or at minimum, an evidentiary hearing.

43

Dated:   New York, New York       /s/Alexandra A.E. Shapiro
         January 31, 2025           Alexandra A.E. Shapiro

Theodore Sampsell-Jones

Jason A. Driscoll

SHAPIRO ARATO BACH LLP

1140 Ave of the Americas, 17th Floor

New York, New York 10036

(212) 257-4880

*Attorneys for Defendant-Appellant*
*Samuel Bankman-Fried*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. The undersigned counsel of record for Defendant-Appellant Samuel Bankman-Fried certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 9,464 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word 2025, and is therefore in compliance with this Court's Order dated December 16, 2024, permitting Bankman-Fried to file a reply brief of up to 9,500 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2025 in 14-point font of Times New Roman.

Dated: January 31, 2025

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro