24-961-cr
*U.S. v. Bankman-Fried*

# In the
# United States Court of Appeals
# For the Second Circuit

_____

August Term 2025
Argued: November 4, 2025
Decided: June 12, 2026

No. 24-961-cr

UNITED STATES OF AMERICA,
*Appellee*,
v.
SAMUEL BANKMAN-FRIED,
*Defendant-Appellant*,

ZIXIAO GARY WANG, CAROLINE ELLISON, NISHAD SINGH, RYAN
SALAME,
*Defendants*,
FTX TRADING LTD., WEST REALM SHIRES INC, ALAMEDA RESEARCH
LLC, ALAMEDA RESEARCH LTD.,
*Intervenors*.

_____

Appeal from the United States District Court
for the Southern District of New York
No. 22-cr-00673, Lewis A. Kaplan, *Judge*

_____

Before:        PARKER, LEE, and KAHN, *Circuit Judges*.

Defendant-Appellant Samuel Bankman-Fried appeals from a judgment of
conviction in the United States District Court for the Southern District of New York

(Kaplan, *J.*). The judgment was entered following a trial at which the jury found him guilty of seven counts of fraud and conspiracy related to a cryptocurrency exchange and a cryptocurrency trading firm he operated and controlled.

We **AFFIRM** the judgment of the district court.

_____

FOR APPELLEE: NATHAN REHN, (Danielle Kudla, Nicolas Roos, Danielle R. Sassoon, Hagan Scotten, Assistant United States Attorneys, *on the brief*) Assistant United States Attorney, *for* Jay Clayton, (Damian Williams, *on the brief*) United States Attorney for the Southern District of New York, New York, NY.

FOR APPELLANT: ALEXANDRA A.E. SHAPIRO, (Theodore Sampsell-Jones, Jason A. Driscoll, *on the brief*), Shapiro, Arato, Bach LLP, New York, NY.

BARRINGTON D. PARKER, *Circuit Judge*:

Samuel Bankman-Fried appeals from a judgment of the United States District Court for the Southern District of New York (Kaplan, *J.*) entered following a trial at which a jury convicted him of fraud and conspiracy related to the operation of his cryptocurrency exchange and his cryptocurrency trading firm. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND[1]

This case arises from the collapse of FTX.com ("FTX"), a cryptocurrency exchange, and Alameda Research ("Alameda"), a cryptocurrency hedge fund and trading firm specializing in, among other things, arbitrage trading. Bankman-Fried served as CEO of FTX from its founding in 2019 until just before it entered bankruptcy proceedings in November 2022 and as CEO of Alameda from its founding in 2017 until he stepped down in 2021. The parties do not dispute that Bankman-Fried had substantial ownership stakes in both companies and controlled them. FTX operated as a platform where customers could buy and sell

---

[1] Citations to the record are as follows: "Trial Tr." refers to the trial transcript, "App'x" refers to the appendix that Bankman-Fried submitted, "Special App'x" refers to the special appendix that Bankman-Fried submitted, and "Add." refers to the Addendum the government submitted.

3

cryptocurrencies such as Bitcoin, Ethereum, and Ripple. FTX customers could also trade cryptocurrency derivatives, borrow funds and trade on margin. FTX grew quickly, and by 2022, FTX's customers traded around $10–$15 billion daily.

Alameda was FTX's largest customer and primary market maker. As a market maker, Alameda made offers to buy and sell assets at various prices, provided liquidity for the exchange, and through these and related functions, made FTX a more attractive trading venue. In exchange for Alameda performing this role, FTX extended Alameda a substantial line of credit to serve as collateral for its positions and for orders on its accounts. This arrangement also allowed Alameda to maintain negative balances on FTX's books. This relationship provided substantial benefits to Alameda.

In late summer and early fall of 2022, the Federal Reserve rapidly raised interest rates, draining liquidity from financial markets and causing cryptocurrency markets to crash. As a result, Alameda's net asset value, meaning the value of its assets less its liabilities, fell substantially because Alameda's assets were mostly in cryptocurrency. In total, Alameda's net asset value fell from more than $40 billion in late 2021 to around $10 billion in June 2022. When that

happened, Alameda's lenders recalled some of their loans.

On November 2, 2022, a version of Alameda's balance sheet was published by a cryptocurrency news site, triggering widespread customer withdrawals from FTX. Within days, those customer withdrawals skyrocketed, depleting the value of Alameda's holdings in FTX-affiliated cryptocurrencies. Bankman-Fried was forced to liquidate Alameda. On November 11, 2022, Bankman-Fried was replaced as FTX's CEO, and FTX filed for bankruptcy because, at that time, it was unable to meet withdrawal requests from customers.

Bankman-Fried was indicted in December 2022 on charges stemming from FTX's collapse. A seven-count Superseding Indictment, returned in August 2023, charged him with two counts of wire fraud (Counts One and Three), in violation of 18 U.S.C. §§ 1343 and 2, two counts of wire fraud conspiracy (Counts Two and Four), in violation of 18 U.S.C. § 1349, one count of conspiracy to commit securities fraud (Count Five), in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78j(b) and 78ff, one count of conspiracy to commit commodities fraud (Count Six), in violation of 18 U.S.C. § 371 and 7 U.S.C. §§ 9(1) and 13(a)(5), and one count of conspiracy to commit money laundering (Count Seven), in violation of 18 U.S.C. § 1956(h).

Following a four-week trial, he was convicted on all counts. The district court sentenced him to 25 years' imprisonment, to be followed by three years of supervised release. The district court also imposed a forfeiture of approximately $11 billion. This appeal followed.

## STANDARD OF REVIEW

Because this appeal arises from a judgment of conviction entered after a jury trial, we "draw the facts from the evidence presented at trial, viewed in the light most favorable to the government." *United States v. Thompson*, 896 F.3d 155, 159 (2d Cir. 2018) (quotations omitted). We review conclusions of law regarding statutory interpretation, jury instructions, and forfeiture *de novo*. *See Moore v. Rubin*, 160 F.4th 271, 289 (2d Cir. 2025); *United States v. Contorinis*, 692 F.3d 136, 141, 145 (2d Cir. 2012). We review the district court's evidentiary and discovery rulings for abuse of discretion. *See Warren v. Pataki*, 823 F.3d 125, 137–38 (2d Cir. 2016).

## DISCUSSION

The government's theory at trial was that Bankman-Fried secured investments in FTX by promising customers that their funds would be secure on the platform and used only for cryptocurrency transactions on FTX. Instead,

6

Bankman-Fried freely transferred investor funds from FTX customer accounts to Alameda and elsewhere where he used those funds for purposes investors had not authorized, including for his own personal benefit.

At trial, the government presented evidence from Bankman-Fried's executive team, business associates, former friends, colleagues, government regulators, and FTX's bankruptcy restructuring team. That testimony, which the jury found sufficient to convict Bankman-Fried, proved that he was the driving force behind a fraud in which he misappropriated billions of dollars from customers and investors.

Bankman-Fried does not meaningfully contest the substantial evidence the government marshalled at trial. On appeal, one of his principal lines of defense is that, despite the many unauthorized transactions, his investments were sound ones such that over time, there was, or would be, sufficient liquidity to ensure that investors were made whole and would not experience any losses. He contends that the district court wrongly precluded him from introducing evidence that FTX and Alameda, while temporarily illiquid, held sufficient assets to ultimately make investors and customers whole. Bankman-Fried argues that events post-dating his

indictment validate his defense: Many of his investments have or would have become profitable—some highly so. Bankman-Fried argues that Judge Kaplan prevented him from telling the "complete" story at trial by disallowing his testimony about this aspect of FTX's finances. Appellant's Reply Br. at 10–12.

But this line of defense has essentially been rejected by a decision that came down after the trial and that clarified what counts as federal fraud: *Kousisis v. United States*, 605 U.S. 114, 118 (2025).[2] There, the Supreme Court held that, under the "fraudulent-inducement theory," "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim *net pecuniary loss*." *Id.*

Bankman-Fried's second line of defense is to challenge the district judge's various other rulings. He argues that a series of evidentiary and procedural rulings prevented him from presenting evidence that would have shown the jury

---

[2] "When [the Supreme Court] applies a rule of federal law . . ., that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review." *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993).

8

he did not intend to cause loss to the victims. He argues that these rulings made his trial "fundamentally unfair." Appellant's Br. at 52 (quotations omitted). Specifically, Bankman-Fried contends that the district court issued one-sided evidentiary rulings on the issue of loss, impermissibly required Bankman-Fried to sit for a "deposition" and preview his advice-of-counsel defense, gave legally erroneous jury instructions, improperly limited his access to potential exculpatory material, and imposed an illegal and unconstitutional forfeiture order. *Id.* at 20–21. We consider each argument in turn.

## I.

Bankman-Fried makes these arguments in the face of a trial at which the government's evidence against him was, conservatively stated, robust. That evidence showed that while Bankman-Fried assured customers, investors, regulators and the public that FTX customer funds were safe, he transferred billions of dollars from FTX customer accounts to Alameda and elsewhere. He then used those funds to make investments unrelated to FTX customer deposits, to cover Alameda's losses, to make political contributions, to acquire personal real estate, and to underwrite a lavish lifestyle, all while falsifying business records in order to conceal these transactions.

Much of the evidence presented by the government at trial came from members of Bankman-Fried's inner circle who testified under cooperation agreements. Caroline Ellison, former CEO of Alameda, testified that Bankman-Fried directed her to use FTX customer funds to repay Alameda's lenders. She also testified that, to secure additional loans from an Alameda lender, Bankman-Fried instructed Ellison to send a false balance sheet to the lender to make it appear as though Alameda had more assets than it did. Ellison further testified that Bankman-Fried funneled FTX customer funds to Alameda, which in turn channeled them to, for example, Bankman-Fried's political lobbying organization where they were spent on donations to congressional candidates and political action committees. Ellison testified that as a result of Bankman-Fried's management of FTX and Alameda, she became "more willing to do things like lie and steal" including by "sending false balance sheets to . . . lenders [and] taking customer money." Trial Tr. at 807:20–808:02. Ellison testified that he "directed [her] to commit these crimes" in reference to the fraud, conspiracy, and money laundering that she "committed with Sam." *Id.* at 643:05–11, 644:02–06.

Gary Wang also testified for the government. Wang was co-owner of

Alameda and co-founder and Chief Technology Officer of FTX. He was also Bankman-Fried's former Massachusetts Institute of Technology roommate and childhood friend of 15 years. He told the jury that he and Bankman-Fried illegally built "special privileges" into FTX's code so that Alameda could withdraw unlimited amounts of funds from FTX. Trial Tr. at 304:12–22. These "special privileges" gave Alameda a $65 billion line of credit that it could draw from FTX. Wang testified that when FTX's customers thought they had deposited money into FTX, some of those funds "went into Alameda's bank account instead." App'x at 709. Wang also testified that Bankman-Fried lied to the public about these transactions in telephone calls, in interviews, and on Twitter,[3] falsely assuring the public that "customer funds [we]re kept safe" and were held by FTX and that FTX did not "invest client assets." App'x at 726–27; Trial Tr. at 462:19–24. Wang also testified that he understood that it was "wrong" for FTX to use customer funds in this way because customers had not agreed to these uses of their funds and that Bankman-Fried had publicly promised that he "would not use customer funds like this." App'x at 736. Wang further testified that in a public tweet, Bankman-Fried

---

[3] The social media platform used by Bankman-Fried, formerly known as "Twitter," is now "X." For consistency, we use Twitter throughout this opinion.

11

falsely stated that FTX had "a long history of safeguarding client assets and that remains true today." Trial Tr. at 461:19–20, 463:02–12. He testified that, despite Bankman-Fried's tweets to the contrary, "FTX was not fine and assets were not fine because FTX did not have enough assets for customer withdrawals." *Id.* at 461:19, 461:24–462:07.

Nishad Singh, former head of engineering at FTX, testified that Bankman-Fried was "unsurprised" when he learned that Alameda was borrowing $13 billion from FTX. App'x at 830. Singh also testified that he wanted to resign from FTX because he "knew that [he] was becoming party [to] and participating in something heinously criminal . . . [and that] [t]he scale of wrongdoing was enormous." Trial Tr. at 1623:02–13. Singh testified that he would frequently express to Bankman-Fried his concerns about Bankman-Fried spending "large amounts" of company money "on real estate and endorsement deals, . . . like deals with celebrities [and] stadiums." *Id.* at 1313:01–07, 1314:06–08. Singh testified that, by signing "blank checks" in his name, Singh helped conceal that political donations came from FTX customer funds. *Id.* at 1431:19–1434:12. Singh also testified that Bankman-Fried directed him to manually backdate and falsify FTX's

revenue numbers.

Can Sun, FTX's former general counsel, testified that Bankman-Fried asked him "to come up with legal justifications" for misappropriated FTX funds and that Bankman-Fried was "not surprised at all" when Sun told him that the theoretical justifications Sun could come up with were not "supported by the facts." App'x at 864–68.

Christian Drappi, a former software engineer for Alameda, testified that, at a secretly recorded meeting, Ellison told Alameda employees that Bankman-Fried knew that Alameda was using FTX customer deposits to repay its loans. When asked at that meeting who made the decision to repay loans with FTX customer funds, Ellison responded that Sam did. Trial Tr. at 1093:19–1095:02.

Bankman-Fried testified on his own behalf. He told the jury that he believed the money Alameda siphoned from FTX customers could be repaid because Alameda's assets were greater than its liabilities. He testified that he did not "defraud anyone" and did not "take customer funds." App'x at 991. He explained that he "made a number of small mistakes and a number of larger mistakes." *Id.* at 992. According to him, "[b]y far the biggest mistake was [that] [FTX] did not

13

have a dedicated risk management team, [FTX] didn't have a chief risk officer . . . and [as a result] there were significant oversights." *Id.* Bankman-Fried also testified that he was surprised when he first learned of Alameda's $8 billion negative balance on FTX in October 2022. He explained that he believed that FTX customers' money could be repaid because Alameda had $10 billion more in assets than liabilities, even including Alameda's $8 billion in liability to FTX. He testified that he posted a tweet saying "FTX is fine. Assets are fine" because "Alameda still had a net asset value of roughly positive 10 billion" meaning that "there was no . . . hole in terms of assets." Trial Tr. at 2542:22–2543:05. Then, when he learned shortly thereafter that the market had crashed and Alameda's asset value declined "from close to $10 billion to only a little bit above [zero]," he took the tweet down. *Id.* at 2545:11–2546:18.

Bankman-Fried's counsel argued to the jury that what mattered was not the number of people who testified against him, but rather his "state of mind" and the fact that Bankman-Fried "acted in good faith throughout." *Id.* at 3091:17–19, 3112:3. The jury was unpersuaded and found him guilty on all counts.

## II.

On appeal, Bankman-Fried contends that reversal is required because the

14

district court, through a series of evidentiary rulings, unfairly prevented him from presenting his defense and rebutting the government's case. Bankman-Fried's trial lasted a month, and nearly every day of trial sophisticated counsel on both sides lodged objections of one sort or another. As is typical in most trials, the district court issued many evidentiary rulings, at times in favor of the government, and at other times in favor of the defendant. But the Federal Rules of Evidence and Procedure afford trial judges considerable latitude in superintending trial proceedings and in admitting or excluding evidence so the trial can proceed fairly and efficiently. Most of a trial judge's rulings on these matters are reviewed for abuse of discretion, a purposefully high standard. And, of course, all of the evidentiary challenges raised by the defense on appeal must be weighed against the substantial evidence of guilt the prosecutors presented to the jury. With these considerations in mind, we turn to Bankman-Fried's contentions on appeal.

### III.

Bankman-Fried argues that the district court abused its discretion by issuing "profoundly one-sided" evidentiary rulings on loss. Appellant's Br. at 20. Specifically, he argues that the district court's rulings, in reliance on a "misinterpretation of the law of fraud," erroneously permitted the government to

15

argue that the misappropriated funds were permanently lost and prevented Bankman-Fried from rebutting that claim by presenting evidence of his investments' ultimate value. *See id.*

Before trial, the district court ruled that it was "immaterial as a matter of law" whether Bankman-Fried thought his customers and lenders would ultimately suffer no loss. *See* Special App'x at 28. Several evidentiary rulings followed. First, the district court granted the government's motion in limine, preventing Bankman-Fried from arguing that he intended "to return or repay victims' funds." *Id.* at 56–57. In response to Bankman-Fried's request to reconsider, the district court declined to change its mind and explained that it is "immaterial as a matter of law whether the defendant intended to repay." *Id.* at 72–73 (quotations omitted). This ruling was correct. To secure Bankman-Fried's fraud conviction, the government did not need to prove intent to cause economic loss. *See Kousisis*, 605 U.S. at 132 (rejecting "the argument that a fraud conviction depends on economic loss"). As the district court recognized, any contention that Bankman-Fried lacked an intent to defraud because he intended to eventually repay his customers was legally misleading and prejudicial because the wire fraud

16

statute encompasses temporary misappropriation of money or property. As the district court made clear, FTX customers were defrauded as soon as Bankman-Fried transferred their money to Alameda regardless of how strongly he believed he might later return the money.

In any event, Bankman-Fried was able to present his version of events to the jury when he testified to his good faith belief that Alameda's assets were greater than its liabilities. His main objection is that he wanted to say more along these lines but was prevented from doing so by the district court. We, however, see no error in the district court's rulings. Judge Kaplan acted within his broad discretion when he concluded that more testimony from Bankman-Fried along these lines would have created a real danger of confusing, if not misleading, the jury. As he correctly charged the jury: "[i]f the defendant knowingly and willfully participated in the scheme with the intent to deceive the . . . victims in question for the purpose of depriving the . . . victims of money or property, even if only for a period of time, then no amount of honest belief on the part of the defendant that the victim ultimately would be benefited will excuse" the defendant's "false representations." App'x at 1133.

17

The district court also denied Bankman-Fried's motion in limine that aimed to block the government from introducing certain evidence related to FTX and Alameda's bankruptcies.  The court reasoned that "undisputed" facts about the bankruptcies were "intertwined inextricably with the crimes alleged in the Indictment," and thus "the government [was] entitled, within reason and without appealing to sympathy, to explain to the jury its view of what allegedly happened here."  Special App'x at 59–60 (citing *Old Chief v. United States*, 519 U.S. 172 (1997); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).  We see no abuse of discretion.  The evidence admitted concerning FTX's and Alameda's bankruptcies was indeed "intertwined inextricably" with the government's theory of fraudulent intent.  The government had to prove that the money customers placed with FTX was not accessible and was not custodied as promised.  To convict Bankman-Fried of wire fraud, the government needed to prove, *inter alia*, that Bankman-Fried possessed fraudulent intent.  *See United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021).  Thus, facts about the events surrounding FTX's and Alameda's bankruptcies showing that the money was not accessible, when juxtaposed with Bankman-Fried's public statements and assurances to the contrary, went directly

to Bankman-Fried's knowledge that he had misappropriated FTX customer funds.

Next, the district court granted the government's motion to exclude evidence about the current value of Bankman-Fried's investments, reasoning that the crime charged was misappropriation and anything that occurred after "the minute the misappropriation happen[ed]" was irrelevant. App'x 802–08; Special App'x at 74. We agree. For the same reasons evidence about Bankman-Fried's intent to repay the misappropriated funds was misleading, so too was evidence about the value of Bankman-Fried's investments following the misappropriation. Whether the assets purchased by Bankman-Fried appreciated in value is irrelevant as to whether he committed fraud.

Finally, Bankman-Fried contends that the district court erred by permitting the government to argue at trial that victims permanently lost their funds. Assuming *arguendo* that Bankman-Fried has shown that the district court erred by permitting the government to exceed the scope of its pretrial rulings, Bankman-Fried has not shown that the error required reversal considering the strength of the prosecution's case. *See United States v. Scott*, 677 F.3d 72, 85 (2d Cir. 2012) (explaining that "the strength of the prosecution's case" is likely "the single most

19

critical factor" in determining whether any evidentiary error is harmless (quotations omitted)). The overwhelming evidence presented at trial proved that Bankman-Fried knowingly and intentionally committed large-scale fraud on FTX's customers. While he was publicly reassuring customers, investors, and regulators that FTX customer funds were safe, he was simultaneously using FTX as his own personal piggy bank, spending customer funds on real estate, political contributions, and investments. Given the overwhelming evidence against him, we are not convinced that the isolated statements Bankman-Fried points to, tainted the jury's verdict. *See United States v. Al–Moayad*, 545 F.3d 139, 164 (2d Cir. 2008).

### IV.

Bankman-Fried also argues that the district court improperly instructed the jury regarding the scienter requirement for all counts and in so doing, improperly lowered the government's burden of proof. This argument is also unpersuasive.

### a.

First, Bankman-Fried objects to the district court's fraudulent intent instruction. Bankman-Fried sought instructions that to prove fraudulent intent, the government needed to show that he engaged in fraud "for the purpose of causing financial loss." App'x at 515. The district court's instructions omitted this

20

requirement and on appeal, Bankman-Fried contends the court erred.

As the Supreme Court explained in *Kousisis* (decided after this appeal was briefed), "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim *net* pecuniary loss." 605 U.S. at 118. The Supreme Court explained that "the wire fraud statute is agnostic about economic loss. The statute does not so much as mention loss, let alone require it. Instead, a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." *Id.* at 124. Therefore, because it is now clear that proof of intent to cause net financial loss is not required, we see no error in omitting Bankman-Fried's requested instruction.

**b.**

Second, Bankman-Fried argues that the court erred in providing a "no ultimate harm" instruction. It instructed the jury that the unauthorized—even temporary—use of a victim's money or property sufficed to establish fraudulent

21

intent even if "no ultimate harm" was intended or occurred. On this issue, the court instructed the jury as follows:

> [I]n considering whether or not a defendant acted in good faith, you are instructed that an honest belief on the part of the defendant, . . . that ultimately everything would work out to the benefit of the alleged victims does not necessarily mean that the defendant acted in good faith. If the defendant knowingly and willfully participated in the scheme with the intent to deceive the . . . victims . . . for the purpose of depriving the . . . victims of money or property, even if only for a period of time, then no amount of honest belief on the part of the defendant that the victim[s] ultimately would be benefited will excuse false representations that a defendant willfully made or caused to be made.

App'x at 1133–34.

The court's no-ultimate-harm instruction was not erroneous because it was an accurate statement of the law. A defendant who uses deceit to temporarily deprive another of their property cannot claim that he was acting in good faith and therefore lacked fraudulent intent. As the Supreme Court explained, "a fraud is complete when the defendant has induced the deprivation of money or property under materially false pretenses." *Kousisis*, 605 U.S. at 127 n.5. Therefore, the fact that a defendant believed victims would ultimately benefit is not a defense to a charge of fraud.

Bankman-Fried argues that even if it was not legally erroneous, the

22

instruction was unnecessary because the district court excluded his evidence and arguments about his intent to repay FTX's customers. However, the record is clear that Bankman-Fried testified at trial that he did not intend to harm FTX customers because he believed Alameda's assets were greater than its liabilities and that the money would eventually be repaid. Given this evidence, the instruction was proper.

Bankman-Fried also argues that "the facts here also make the instruction wrong and deeply confusing" because FTX's structure as a margin futures trading platform involves lending whereby customers and lenders by definition "giv[e] up the right to use assets for a time." Appellant's Br. at 58–59; Appellant's Reply Br. at 26. We are unpersuaded. The fact that some FTX customers opted into margin trading, and thus temporary deprivation of their money, is beside the point. Some opted into margin trading, some did not. No one opted into having their money transferred under false pretenses to Alameda. The point was that people were harmed when they were temporarily deprived of their money through deception. Thus, the instruction simply—and properly—clarified that Bankman-Fried could not escape criminal liability for inducing people to part with

their money through misrepresentations based on his belief that, eventually, things would all work out.

**c.**

Third, Bankman-Fried takes issue with the district court's definition of "willfully." Bankman-Fried requested an instruction that the definition of "willfully," for conspiracy to commit securities and conspiracy to commit commodities fraud, requires proof that the defendant knew his conduct was unlawful. App'x at 611, 625, 629. But, instead of giving Bankman-Fried's requested definition for those counts, the court instructed the jury that "willfully" "means to act voluntarily and with wrongful purpose." *Id.* at 1131; *see id.* at 1155, 1163. Bankman-Fried consented to the court's definition of "willfully" for the wire fraud counts but objected to using that definition for the conspiracy-to-commit-securities-fraud and conspiracy-to-commit-commodities-fraud counts. The district court's instruction was a correct statement of the law, and we see no error. *See United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010) (concluding that securities fraud "do[es] not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of

24

the general wrongfulness of his conduct").

**d.**

Finally, Bankman-Fried objects to the district court's definition of "good faith," which is applicable to all counts. Bankman-Fried had requested that the court instruct jurors that "[g]ood faith is an honest belief by the defendant that his conduct was not unlawful or improper." App'x at 1072. The district court properly omitted this language from its good-faith instruction as to all counts. Such an instruction was not necessary because the government was not required to prove that Bankman-Fried was aware of the general *unlawfulness* of his conduct to convict him. Instead, it just had to demonstrate that he had an awareness of the general *wrongfulness* of his conduct. *See United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020); *Kaiser*, 609 F.3d at 569. As the government put it, "[i]t is inconceivable that a defendant could act in good faith while intentionally deceiving his investors—as the jury was required to find in order to convict." Appellee's Br. at 32.

**V.**

On appeal, Bankman-Fried argues that the court erred by requiring him to disclose his advice-of-counsel defense in advance of his testimony.

25

**a.**

Before the trial started, the district court ordered the defense to provide pretrial advice of counsel disclosure.[4] In response, Bankman-Fried's counsel informed the court that he did "not intend to present a formal advice of counsel defense" but intended to present evidence to the jury that attorneys were involved in reviewing and approving decisions related to several matters at issue. Add. at 6. Bankman-Fried's counsel contended that discussions Bankman-Fried had with his attorneys regarding various matters led Bankman-Fried to believe that he was acting in good faith. *Id.*

Later, the district court emphasized that Bankman-Fried was not asserting a "formal advice-of-counsel defense," which would require him to establish that he made, among other things, a "complete disclosure" to counsel about the matter at issue and sought advice about the legality of his conduct. Special App'x at 63. The court reasoned that Bankman-Fried's approach risked unfairly prejudicing the government. *Id.* at 70. The court explained that it would likely confuse the jury if

---

[4] To assert an advice-of-counsel defense, defendants must "show that [they] [(1)] made complete disclosure to counsel, [(2)] sought advice as to the legality of [their] conduct, [(3)] received advice that [their] conduct was legal, and [(4)] relied on that advice in good faith." *Markowski v. SEC*, 34 F.3d 99, 104–05 (2d Cir. 1994).

Bankman-Fried was permitted to focus on the presence or involvement of lawyers without providing "any degree of specificity about what they were present for or involved in, what their tasks were, what exactly they knew, and what the defendant knew about what the lawyers knew and were doing." *Id.* Based on these conclusions, the court held that Bankman-Fried was precluded from offering evidence, argument, or testimony on his advice-of-counsel defense "absent prior notice to the [c]ourt and the government outside of the presence of the jury." *Id.* at 70–71.

At trial, after the government rested, defense counsel informed the court that Bankman-Fried wanted to testify about the involvement of counsel in data retention policies and the formation of certain bank accounts. However, Judge Kaplan concluded that because he had been given insufficient information to properly rule on the request, he would need to hold a hearing outside the presence of the jury to decide whether to permit Bankman-Fried's testimony about counsel's involvement. According to Bankman-Fried, his counsel did not object to the hearing itself because "[f]urther objection would have been futile given the district court's repeated rulings against [Bankman-Fried]." Appellant's Reply Br.

27

at 19–20.

Bankman-Fried then testified and was cross-examined outside the presence of the jury along the lines drawn by the court. At the start of the hearing, Bankman-Fried told the court he wanted to testify to the FTX attorneys' involvement in four matters: (1) implementing document retention policies and enabling auto-deletion procedures; (2) forming Alameda subsidiary North Dimension and executing a payment processing agreement between FTX and Alameda; (3) structuring and documenting loans from Alameda to Bankman-Fried and other FTX executives; and (4) drafting FTX's Terms of Service. The district court considered each category of involvement in turn.

After considering this proposed testimony, the court concluded that Bankman-Fried could testify to the role of FTX attorneys in implementing document retention policies (category 1), because such testimony "would not pose a substantial risk of confusion or unfair prejudice." Special App'x at 80. However, the court concluded that the probative value of Bankman-Fried's testimony as to the other policies and procedures was significantly outweighed by the risk "of confusing the jury and unfairly prejudicing the government." *Id*. at 87.

**b.**

On appeal, Bankman-Fried principally raises two objections to the district court's handling of his advice-of-counsel defense during trial. First, Bankman-Fried claims that the district court erred in requiring him to sit for a "deposition" in which his anticipated testimony to the jury could be previewed by the government. Appellant's Br. at 43–46. We disagree. Rule 104 authorizes district courts to decide issues of admissibility and allows them to "conduct any hearing on a preliminary question so that the jury cannot hear it if . . . justice so requires." Fed. R. Evid. 104(c). Also, district courts have broad discretion to take the necessary steps to minimize jury confusion and to exclude irrelevant evidence. *See* Fed. R. Evid. 403. Conducting a hearing outside the presence of the jury, Judge Kaplan was obviously concerned that Bankman-Fried wished to advance some sort of hybrid advice-of-counsel defense without meeting the legal requirements for that defense, particularly the requirement of full disclosure to FTX's counsel. To address this concern, Judge Kaplan needed to understand what Bankman-Fried intended to tell the jury.

Second, Bankman-Fried argues that the district court's rulings flowing from

29

the hearing, which permitted testimony regarding only the role of FTX's lawyers in implementing document retention policies, were erroneous. We disagree. Bankman-Fried has not shown that the district court abused its discretion in the compromise it reached. For each category of testimony the district court excluded, it is undisputed that FTX lawyers were not informed of all the relevant facts and did not receive full disclosure of the intended use of the documents in question.[5] The fact that lawyers drafted run-of-the-mill corporate documents provided little to no evidence relevant to Bankman-Fried's good faith in using them but created a substantial risk of jury confusion.[6] As the district court explained, "such

---

[5] As to category 2, the formation of North Dimension and execution of a payment processing agreement between Alameda and FTX, "Bankman-Fried testified that he could not recall discussing with counsel the use or purpose of the North Dimension bank account or the topic of Alameda spending FTX customer deposits that came into Alameda bank accounts." Special App'x at 84 (quotations omitted). He also admitted "that counsel did not tell him that Alameda could spend FTX customer deposits." *Id*. (quotations omitted). Likewise, as to category 3, counsel's involvement in structuring and documenting loans from Alameda to Bankman-Fried, Bankman-Fried conceded that he did not tell counsel that the source of the funds for the loans was FTX customer money. *Id.* at 85. Therefore, "that the defendant took comfort from the fact that the lawyers had structured the loans would have been irrelevant to his state of mind in using FTX customer funds, conduct of which the lawyers were unaware." *Id.* (citation modified). As to category 4, the role of counsel in preparing FTX's Terms of Service, by Bankman-Fried's own admission, he did not recall discussing with counsel any particular provision of the Terms of Service, let alone allowing Alameda to borrow from FTX customer deposits. *Id.* at 86. Therefore, evidence that FTX lawyers drafted the company's Terms of Service was only minimally probative of his good faith in creating a system whereby FTX customer funds were siphoned off to Alameda. *Id.* at 86–87.

[6] Bankman-Fried also argues that because an advice-of-counsel defense can "negate" fraudulent intent, the district court erred in instructing the jury that "'[a] lawyer's involvement with . . . an individual or entity

---

30

evidence risks suggesting to the jury that, because lawyers were involved to some degree with one aspect of events, the defendant was entitled to conclude that he was acting within the law with respect to some other aspect of events." Special App'x at 82. We agree with the district court that the risk of using counsel to create a misplaced air of legality substantially outweighed the probative value of the testimony.

## VI.

Next, Bankman-Fried argues to us that the district court improperly denied his motions to compel discovery from the FTX Debtors and their counsel. He argues that the FTX debtor estate had sole possession of much of the evidence—including exculpatory information—necessary for his defense, and the government's failure to disclose that information undermined the fairness and integrity of his trial.

Bankman-Fried's allegations center around the involvement of law firm

---

or transaction doesn't itself constitute a defense to any charge in this case.'" Appellant's Br. at 51 (quoting App'x at 1134). However, for the same reasons Bankman-Fried was not entitled to present an advice-of-counsel defense, he was not entitled to an advice-of-counsel jury instruction. *See United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (citing *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997)).

Sullivan & Cromwell LLP ("S&C")[7] with FTX around the time of its collapse in November 2022. According to Bankman-Fried, S&C represented not only FTX but also represented him personally in the run-up to FTX's collapse. Bankman-Fried alleges that S&C, without notifying him, contacted federal prosecutors on November 9, 2022, which led to the beginning of a federal criminal investigation. Bankman-Fried alleges that shortly thereafter, he resigned as CEO of FTX, and S&C arranged for John Ray to replace him. Then, Bankman-Fried contends, at Ray's behest, FTX filed for bankruptcy and Ray had S&C appointed as counsel to the estate.

Bankman-Fried alleges that S&C worked closely with federal prosecutors in preparing the case against him. He points to the more than 150 requests S&C fielded from prosecutors who they spoke with "on a daily basis." App'x at 191–92, 201–02. S&C also collected tens of millions of documents and provided analyses of hundreds of thousands of documents to the prosecution. Bankman-Fried contends that S&C also provided prosecutors with read-outs of its notes from interviews with current and former FTX employees and sometimes asked

---

[7] S&C represents the FTX Debtors.

questions on behalf of prosecutors.  S&C also, he contends, agreed to review thousands of documents so that it could "make a presentation on . . . topic[s]" the prosecution requested.  *See* Appellant's Br. at 70; App'x at 210; *see also* Appellant's Reply Br. at 33.  For this work, Bankman-Fried alleges, S&C billed the estate hundreds of millions of dollars.  Appellant's Br. at 65.

While S&C provided the government with extensive disclosure, meaningful disclosure was also made to Bankman-Fried.  He received a large volume of discovery from S&C and from the FTX Debtors and third parties.  The FTX Debtors produced approximately one million documents to Bankman-Fried over the course of about a year.  The government also produced millions of pages of additional records to Bankman-Fried that it obtained from third parties or pursuant to search warrants.  According to the government, Bankman-Fried received the specific items he sought from the FTX Debtors and, during the proceedings below, failed to identify any material evidence he requested but was denied access to.

Before trial, Bankman-Fried moved to compel discovery pursuant to Federal Rule of Criminal Procedure 16, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v.*

*United States*, 405 U.S. 150 (1972), and the Jencks Act (18 U.S.C. § 3500) based on his theory that the FTX Debtors and S&C were members of the prosecution team. Alternatively, the motion sought an evidentiary hearing to determine whether the FTX Debtors and S&C were, in fact, members of the prosecution team. Bankman-Fried also filed a motion requesting a subpoena addressed to FTX's outside counsel, Fenwick & West, seeking documents that reflected counsel's legal advice on various topics said to be material to the defense. Bankman-Fried then filed a third motion for disclosure of any oral *Brady* information disclosed to the government. The government opposed these motions. It insisted that it had no obligation to search the Debtors' files controlled by S&C because it was not an arm of the prosecution and, in any event, the documents were not in the government's possession or control.

The obligation to disclose evidence favorable to the defense applies to unilateral evidence "that is *known to the prosecutor*," and the prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf. *See United States v. Hunter*, 32 F.4th 22, 35 (2d Cir. 2022) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)). To determine who acts on the

34

government's behalf, we examine "what the [actor] *did*, not who the [actor] *is*." *Id.* at 36 (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)).

In determining whether an actor is an arm of the prosecution team, the first line of inquiry is whether the actor and the government conducted a joint investigation. In answering this question, we look to whether the actor (l) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings, and other factors may be pertinent as well. *See Stewart*, 433 F.3d at 298–99.

The district court agreed with the government and concluded that the FTX Debtors and S&C were not arms of the prosecution. Judge Kaplan reasoned that the FTX Debtors and S&C did not have a role in the presentation of the case to the grand jury, did not directly participate in witness interviews, did not play a meaningful role in the development of prosecutors' strategy, and did not have access to documents the government obtained via subpoena or search warrant. These conclusions were sound and grounded in the record. Consequently, the

35

district court did not err or abuse its discretion in denying Bankman-Fried's motions.

## VII.

We now turn to forfeiture. At sentencing, the district court ordered Bankman-Fried to forfeit $11,020,000,000 pursuant to 18 U.S.C. §§ 981(a)(1)(c) and 982(a)(1), and 28 U.S.C. § 2461(c). Bankman-Fried challenges the forfeiture order on three grounds. First, he argues that the district court erred by relying on statutes that do not expressly authorize money judgments. Next, he argues that the court erred by miscalculating the forfeiture amount under § 981(a)(1)(c). Third, he argues that the amount of the forfeiture was excessive and therefore unconstitutional.

### a.

Although 18 U.S.C. §§ 981(a)(1)(c) and 982(a)(1), and 28 U.S.C. § 2461(c), do not expressly authorize forfeiture money judgments, courts may impose them on defendants who lack assets that can be forfeited at the time of sentencing. *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010). In *Awad*, we held that "§ 853 permits imposition of a money judgment on a defendant who possesses no assets at the

36

time of sentencing," and that such judgment "is effectively an *in personam* judgment in the amount of the forfeiture order." *Id.* (quotations omitted). Section 853 governs here because 18 U.S.C. § 982(b)(1), the criminal forfeiture statute at issue, provides that "[t]he forfeiture of property under this section . . . shall be governed by" 21 U.S.C. § 853. 18 U.S.C. § 982(b)(1). We subsequently extended *Awad* to forfeiture orders entered pursuant to 28 U.S.C. § 2461(c), holding that "28 U.S.C. § 2461(c) . . . incorporates the procedures laid out in [S]ection 853" including the authorization of *in personam* money judgments. *See United States v. Kalish*, 626 F.3d 165, 169 (2d Cir. 2010). Those procedures include the forfeiture of substitute assets procedures enumerated in 21 U.S.C. § 853(p). *See United States v. Stevenson*, 834 F.3d 80, 85 n.2 (2d Cir. 2016). Section 2461(c) also integrates the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(c), into criminal proceedings by "authoriz[ing] criminal forfeiture as a punishment for any act for which civil forfeiture is authorized." *United States v. Elias*, 154 F.4th 56, 64 (2d Cir. 2025) (quotations omitted). For these reasons, we hold that the district court correctly concluded

37

that it had authority to impose an *in personam* money judgment.

**b.**

Bankman-Fried also argues that the forfeiture amount was miscalculated under § 981(a)(1)(c) because that provision does not permit all of the money received from investors and lenders to be forfeited. According to him, the district court incorrectly ordered gross-proceeds forfeiture under 18 U.S.C. § 981(a)(2)(A) instead of net-proceeds forfeiture under 18 U.S.C. § 981(a)(2)(B). Therefore, he claims, the forfeiture order was "grossly inflated." Appellant's Br. at 81. We are not persuaded.

Under 18 U.S.C. § 981(a)(1)(C), the "proceeds" of certain crimes—including the crimes at issue here—are subject to forfeiture. Section 981 defines "proceeds" differently in different cases, depending on whether defendants transacted in "illegal" goods or services or "lawful" goods or services. *See* 18 U.S.C. § 981(a)(2)(A)–(B). Section 981(a)(2)(A) mandates the forfeiture of all property obtained through the sale of illegal goods. *See id.* § 981(a)(2)(A). Section 981(a)(2)(B), in contrast, permits the direct costs "incurred in providing the goods or services" to be deducted from the forfeiture calculation. *See id.* § 981(a)(2)(B).

38

Bankman-Fried contends that § 981(a)(2)(B)'s definition of "proceeds" should have applied, in which case only the difference between the FTX stock's inflated value, and what it would have sold for absent the fraud, is subject to forfeiture.

But even assuming that § 981(a)(2)(B)'s net-proceeds definition applies, under that provision, the defendant bears the burden of establishing direct costs, and where a defendant fails to present evidence or provides "no more than cursory argument as to this issue, we hold that he has failed to meet his burden." *United States v. Mandell*, 752 F.3d 544, 553–54 (2d Cir. 2014). And here, Bankman-Fried has not satisfied this burden. He has not, for example, established the value of the FTX stock absent the fraud. Where a defendant fails to establish any residual value in the company's shares, despite their own call for the application of § 981(a)(2)(B), the defendant fails to establish the relevant direct costs for forfeiture calculation purposes. For these reasons, we conclude that Bankman-Fried has not demonstrated that Judge Kaplan erred in ordering the forfeiture of all investor and lender funds under § 981(a)(1)(C).

**c.**

Next, Bankman-Fried argues that the size of the $11,020,000,000 forfeiture

39

violates the Excessive Fines Clause of the Eighth Amendment. He argues that he will be unable to come close to satisfying that judgment and, after his 25 years of incarceration, the financial burden of the judgment will destroy his ability to ever earn a living. He argues that the forfeiture order is also unconstitutional because it is not precisely calibrated to the harm caused and does not reflect the actual losses to the victims, who largely will be repaid. We recognize that $11 billion is a very large amount, especially in the context of an illegal scheme in which many victims may be made whole. But Congress has fashioned a scheme under which the size of the forfeiture depends on the amount of a defendant's gains as opposed to some other matrix such as moral culpability. And we are constrained by the laws Congress enacted.

In *United States v. Bajakajian*, the Supreme Court established a two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment. 524 U.S. 321 (1998). First, we determine whether the Excessive Fines Clause applies. *See id.* at 334. If it does, we proceed to the second step and determine whether the forfeiture is unconstitutionally excessive. *Id.*

Whether a forfeiture constitutes a fine for Eighth Amendment purposes

40

turns on whether the forfeiture may be appropriately characterized as punitive, meaning a forfeiture for which a defendant is personally liable. *United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016). The forfeiture here is punitive, not remedial. *See id.* And it is not restitutive. *See United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011).

Thus, we proceed to step two of our Eighth Amendment analysis, where we determine whether the forfeiture is unconstitutionally excessive. A criminal forfeiture violates the Excessive Fines Clause if it is "grossly disproportional to the gravity of the defendant's offense." *Bajakajian*, 524 U.S. at 337. To make this determination, we consider:

> (a) the essence of the [defendant's] crime . . . and its relation to other criminal activity, (b) whether the [defendant] fit into the class of persons for whom the statute was principally designed, (c) the maximum sentence and fine that could have been imposed, and (d) the nature of the harm caused by the [defendant's] conduct.

*United States v. Collado*, 348 F.3d 323, 328 (2d Cir. 2003) (per curiam) (quotations omitted). In addition to these considerations, we have also recognized that whether the forfeiture would deprive the defendant of his future ability to earn a living is a factor courts *may* consider. *Viloski*, 814 F.3d at 111.

41

Bankman-Fried does not meaningfully contest the district court's application of the four *Bajakajian* factors. He was, the government contends, the main driver of one of the largest frauds on record. Instead, he argues that the court gave inadequate consideration to the discretionary factor of whether the forfeiture would destroy his ability to make a livelihood (after 25 years of incarceration). But assuming the court did fail to weigh Bankman-Fried's ability to earn a livelihood, that failure does not render his forfeiture unconstitutional. The fact that Bankman-Fried will "never be able to come close to satisfying the $11 billion judgment[,]" Appellant's Br. at 82, alone, does not render a forfeiture that satisfies the *Bajakajian* factors grossly disproportionate and thus does not establish a constitutional violation.

## CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.